**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| M & G USA CORPORATION, *et al.*,[1] | : | Case No. 17- 12307 (BLS) |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |

**DECLARATION OF DENNIS STOGSDILL**
**IN SUPPORT OF FIRST DAY PLEADINGS**

I, Dennis Stogsdill, declare and state as follows:

1.      I am the Chief Restructuring Officer ("CRO") of M&G Chemicals S.A. ("M&G Chemicals") and certain of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), which, with one exception, filed voluntary petitions (the "Petitions") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on the date hereof (the "Petition Date").[2]  The Debtors are subsidiaries of Mossi & Ghisolfi S.p.A., an entity organized under the laws of Italy and the ultimate parent company of the Debtors and their non-Debtor affiliates.  The Debtors, together with the direct and indirect subsidiaries of Mossi & Ghisolfi S.p.A. are referred to herein collectively as  the "M&G Group."

2.      To minimize the adverse effects of filing the Petitions while at the same time preserving value for the benefit of stakeholders, the Debtors have filed a number of motions

---

[1]      The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M&G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2]      Debtor M&G Polymers USA, LLC ("M&G Polymers") commenced a chapter 11 case before this Court prior to the Petition Date, on October 24, 2017 (the "Polymers Petition Date").

requesting various forms of "first day" relief (collectively, the "First Day Pleadings").[3]  I submit this Declaration in support of the Petitions and the First Day Pleadings.  The relief requested in the First Day Pleadings is necessary to maximize the value of the Debtors' estates and allow them to sustain their current operations in chapter 11 while they pursue a sale of certain of their U.S. assets.

3.      I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such pleadings) and, to the best of my knowledge, after reasonable inquiry, believe that the relief sought in each First Day Pleading: (a) will enable the Debtors to sustain their current level of operations while in chapter 11; (b) is critical to the Debtors' ability to maximize the value of their chapter 11 estates and (c) best serves the interests of the Debtors' estates and creditors.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above.

4.      In addition to serving as CRO of certain of the Debtors, I am a Managing Director at Alvarez & Marsal North America LLC ("A&M").  From December 2016 through February 2017, my colleagues at Alvarez & Marsal Italia S.r.l. were retained by M&G Chemicals to conduct an analysis of the financial performance of M&G Chemicals and its direct and indirect subsidiaries (collectively, the "M&G Chemicals Group" or the "Company"), including an assessment of short and medium term cash flow forecasts.  On August 23, 2017, the engagement was modified and, effective as of September 7, 2017, A&M began providing the Debtors with my services as CRO and a team to support me in carrying out my duties (the "A&M Team").  In this capacity, I have become familiar with the Debtors' businesses, operations and financial affairs.  As part of my duties as CRO, I oversee the Debtors in their day-to-day operations,

---

[3]      Unless otherwise defined herein, capitalized terms in this Declaration shall have the meanings ascribed to them in the relevant First Day Pleading.

development of restructuring strategies, budgets, cash flows and financial analysis, and I lead the A&M Team in, among other things, assisting the Debtors with forecasting their liquidity position, identifying and implementing cost-saving strategies, negotiating with key constituents, analyzing potential claims and preparing the filing of the Debtors' chapter 11 cases (these "Cases"). Accordingly, I have knowledge of the Debtors' cash flow needs and projections.  I also am familiar with the Debtors' assets and liabilities and the status of the Debtors' relationships with their various vendors, suppliers, service providers and customers.

5.        I have over twenty years of financial restructuring and management consulting experience.  My industry experience includes all aspects of the reorganization process, including the development and negotiation of complex capital structure solutions, valuation, developing and evaluating strategic business plans and recapitalization strategies, implementing liquidity conservation, and advising on mergers and acquisitions and in-court and out-of-court restructurings.  I am recognized as an Accredited Valuation Analyst by the National Association of Certified Valuation Analysts.  Additionally, I have a certification in Distressed Business Valuation issued by the Association of Insolvency & Restructuring Advisors. I earned my B.S. in accounting from Rutgers University.

6.        Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management, the A&M Team or the Debtors' other professionals that I believe in good faith to be reliable; (c) my review of relevant documents and/or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  The Debtors have authorized me to submit this Declaration.

7.      This Declaration is divided into five parts.  Part I sets forth an executive

summary.  Part II provides an overview of the Company and the Debtors' businesses, corporate

structure and prepetition indebtedness.  Part III discusses the Debtors' recent financial

performance, the circumstances surrounding the commencement of these Cases and what the

Debtors view as the path forward.  Part IV provides an overview of the proposed DIP Financing.

Finally, Part V discusses the other First Day Pleadings.

## I.      EXECUTIVE SUMMARY

8.      The M&G Group is the largest privately owned chemical company in Italy and is

controlled through the holding company M&G Finanziaria S.p.A. ("M&G Finanziaria").  The

M&G Group—specifically, its chemicals division, which includes the Debtors—is one of the

largest producers of polyethylene terephthalate ("PET") resin for packaging applications in the

world.  PET is a plastic polymer produced principally from purified terephthalic acid ("PTA")

and monoethylene glycol, and is used to manufacture plastic bottles and other packaging for the

beverage, food and personal care industries.

9.      In April 2013, the Company began construction on a vertically integrated

PTA/PET plant in Corpus Christi, Texas (the "Corpus Christi Plant").  When completed, the

Corpus Christi Plant will be the largest vertically integrated single line PTA/PET production

facility in the world and the largest PTA plant in the Americas.  The facility's PET line will have

a nominal production capacity of 1.1 million tons per year, while the integrated PTA line will

have a nominal production capacity of 1.3 million tons per year.

10.     Construction of the Corpus Christi Plant initially was expected to be completed in

December 2015.  However, as a result of (a) construction costs far in excess of what was initially

projected, (b) disputes with their prior engineering, procurement and construction firm resulting

in the filing of purported mechanics' liens against the property in excess of $196 million and (c)

most recently, construction and supply disruptions caused by Hurricane Harvey, completion of the Corpus Christi Plant has been significantly delayed and the facility remains less than 85% complete.

11.     Delays and rising costs at the Corpus Christi Plant forced the Company to incur significant additional debt in an attempt to complete the project.  At the same time, the plant's inoperability made it impossible for the Debtors and their affiliates to meet their obligations to future customers of the Corpus Christi Plant and service their existing debt, which depended, at least in part, on the revenue that was expected to be generated by the Corpus Christi Plant's operations.  As a result, the Company has been operating under severe liquidity constraints over the past several months, forcing the Debtors to significantly scale back construction and development at the Corpus Christi Plant and cease operations at certain of their other facilities prior to the Polymers Petition Date.

12.     After  exhaustively searching for funding from many potential sources, it became apparent that additional financing would not be available to the Debtors outside of a chapter 11 proceeding.  Accordingly, the Debtors commenced these Cases to access the $100 million debtor in possession financing (the "DIP Financing") described below.  The DIP Financing will, among other things, fund the working capital needs of the Debtors' remaining operations and a sale process for the Corpus Christi Plant and certain of the Debtors' other U.S. assets.

## II.     OVERVIEW OF THE DEBTORS' BUSINESSES

13.     The M&G Group, founded in 1953, has been engaged in the plastic processing industry for over 60 years.  In addition to operating business lines related to the production of biofuels and polyester fiber, through the Debtors and other members of the M&G Chemicals

Group,[4] the M&G Group is engaged in the production of PET resin and engineering relating to PET plants.

14.    Prior to the Polymers Petition Date, the M&G Chemicals Group employed over 950 people in 14 locations in six countries around the world.  The Company is headquartered in Luxembourg and has manufacturing locations in Brazil, Mexico and the United States.  Its plants in Suape, Brazil and Altamira, Mexico are the two largest single line and most efficient PET producing plants (measured in terms of operating costs per metric ton) in the world.

15.    In 2016, the M&G Chemicals Group's revenues reached $1.6 billion.  Its customers are major plastic packaging companies, including Amcor Limited, Coca-Cola Cross Enterprise Procurement Group, Graham Packaging Company LP and the Pepsi-Cola Company. Historically, the M&G Chemicals Group has been successful in competing in the PET industry by being able to position its cost curve substantially below the industry average by leveraging proprietary engineering and technology, which has enabled the Company to build much larger and more efficient plants.

16.    Additionally, the Company operates an engineering, procurement and construction business that specializes in the provision of services and solutions to the petrochemical, polymer, fiber, energy, biofuels and environmental technology sectors, through Debtor Chemtex International Inc. ("Chemtex") and its Debtor and non-Debtor subsidiaries (collectively, the "Chemtex Group").  The Chemtex Group has operations in the United States, China and India and provides engineering services and solutions to independent customers as

---

[4]    Debtor M&G Capital S.à r.l. ("M&G Capital"), is not a subsidiary of M&G Chemicals; rather, it is an 18.25% equity holder of M&G Chemicals.  Historically, it has not been considered part of the M&G Chemicals Group but, because M&G Capital has no employees or operations and its significant creditors are also creditors of certain of the other Debtors, M&G Capital is considered part of the Chemicals Division for purposes of this Declaration.

well as internal projects undertaken by members of the M&G Group.  In 2013, Sinopec

Engineering (Group) Co., Ltd., the general contractor for the Corpus Christi Plant, subcontracted

all activities related to project management and procurement for the project to Chemtex.

### A.    The Debtors' Corporate Organizational Structure

17.    M&G Chemicals, the direct or indirect parent of ten of the eleven other Debtors,[5]

is organized under the laws of Luxembourg, as are Debtors M&G Capital and Mossi & Ghisolfi

International S.à r.l. ("M&G International").[6]  Debtor M&G Waters USA LLC ("M&G Waters")

is organized under the laws of Nevada.  Each of the remaining Debtors are organized under the

laws of Delaware.  A corporate organization chart depicting the ownership structure of the

Debtors and certain non-Debtor affiliates is attached as Exhibit A.

18.    The overall management of the Debtors is conducted by senior executives located

in Luxembourg, Italy and Houston, Texas.[7]  However, prior to the Polymers Petition Date, the

Debtors' day-to-day operations were conducted primarily through (a) M&G Polymers, which

owns a PET manufacturing plant in Apple Grove, West Virginia (the "Apple Grove Plant") and

maintains offices in Houston, Texas and Sharon Center, Ohio, (b) M&G Resins USA, LLC

("M&G Resins"), the owner of the Corpus Christi Plant, (c) M&G International, a trade company

whose primary focus was historically on PTA trading and buying PTA on behalf of its

subsidiaries and (d) Chemtex, which maintains offices in Wilmington, North Carolina.

### B.    The Debtors' Prepetition Indebtedness

---

[5]    As noted above, M&G Capital is not a subsidiary of M&G Chemicals; rather, M&G Capital owns a 18.25% equity stake in that entity.

[6]    Each Debtor in these Cases has assets, property, or other interests located in the United States by among other things: (a) owning equity interests in entities organized under the laws of U.S. jurisdictions; (b) owning a bank account with a positive cash balance at a U.S.-based financial institution; (c) maintaining certain residual interests, including in retainer amounts paid to United States-based professionals; (d) being party to contracts governed by law in the United States and (e) owning certain other assets, property, or interests located in the United States.

[7]    The Company's corporate headquarters is located in Luxembourg, but several members of its senior management team and many corporate personnel are located in Italy.

19.　　As of the Petition Date, the Debtors had outstanding debt in the aggregate principal amount of nearly $1.7 billion under eleven financing arrangements, each of which are described below.  A summary of these debt obligations is as follows:

|  | Lender | Borrower | Guarantor | Amount Outstanding (USD millions) |
|---|---|---|---|---|
| 1. | Sculptor Investments IV S.à r.l. | M&G Capital S.à r.l. | M&G Finanziaria S.p.A. | $37.5 |
| 2. | Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa | M&G International S.à r.l. | M&G Chemicals S.A. M&G Polimeros Brasil S.A. M&G Polimeros Mexico S.A., de C.V. | $120 |
| 3. | Sculptor Investments IV S.à r.l. | M&G International S.à r.l. | M&G Polymers USA, LLC M&G Finanziaria S.p.A. M&G Mexico Holding S.A. de C.V. M&G Polimeros Mexico S.A. de C.V. | $72.5 |
| 4. | Delta Lloyd Levensverzekering N.V. and Delta Lloyd Life N.V. | M&G International S.à r.l. | M&G Chemicals S.A. | $83.3 |
| 5. | Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa | M&G Resins USA, LLC | M&G Polymers USA, LLC | $436 |
| 6. | Industrial and Commercial Bank of China Limited | M&G Resins USA, LLC | M&G Chemicals S.A. | $350 |
| 7. | Banco do Brasil S.A., New York Branch | M&G Resins USA, LLC | M&G Chemicals S.A. | $35 |
| 8. | Macquarie Investments US Inc. | M&G Waters USA, LLC | M&G Finanziaria S.p.A. | $55.5 |
| 9. | DAK Americas, LLC | M&G USA Corporation M&G Resins USA, LLC | M&G Chemicals S.A. | $435 |
| 10. | Comerica Bank | M&G Polymers USA, LLC | M&G Chemicals S.A. M&G International S.à  r.l. | $50 |
| 11. | Banca Monte dei Paschi di Siena S.p.A, New York Branch | M&G Polymers USA, LLC | M&G International S.à  r.l. | $10 |
|  |  |  | Total | $1,684.8 |

1.　　Inbursa Credit Facilities

20.　　In 2013, Debtor M&G Resins borrowed $250 million from Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa ("Inbursa") to partially fund the construction and development of the Corpus Christi Plant (as amended, the "U.S. Inbursa

<u>Facility</u>").  However, as construction costs at the Corpus Christi Plant rose, the Company was forced to seek further funding.  Subsequent borrowings and amendments to the U.S. Inbursa Facility have increased the outstanding principal amount to approximately $436 million, exclusive of interest, fees and other expenses due and owing under that facility.  M&G Resins' obligations under the U.S. Inbursa Facility are guaranteed by M&G Polymers and secured by a first priority lien on the Corpus Christi Plant and the Apple Grove Plant.

21.     Debtor M&G International is party to a second loan agreement with Inbursa, pursuant to which M&G International borrowed $120 million to fund its working capital needs (as amended, the "<u>Lux Inbursa Loan</u>").  This loan was guaranteed by M&G Chemicals and non-Debtor affiliates M&G Polimeros Brasil S.A. ("<u>Polimeros Brazil</u>") and M&G Polimeros Mexico S.A. de C.V. (the "<u>Polimeros Mexico</u>"). The Lux Inbursa Loan is secured by liens on the Company's manufacturing facility in Suape, Brazil and certain equipment of  Polimeros Brazil.

2.     <u>DAK Capacity Reservation Agreement</u>

22.     Another primary source of funding for the construction of the Corpus Christi Plant was the Corpus Christi Capacity Reservation Agreement (as amended, the "<u>Capacity Reservation Agreement</u>"), dated May 20, 2015, by and among, M&G USA Corporation ("<u>M&G USA</u>"), M&G Resins and DAK Americas, LLC, ("<u>DAK</u>") pursuant to which DAK purchased future production capacity at the Corpus Christi Plant at a cost of $435 million.[8]  If the Corpus Christi Plant does not become operational and the Debtors are unable to fulfill their obligations under the DAK Capacity Reservation Agreement, the Company must reimburse DAK for the upfront amounts it has provided, among other payment obligations.  These obligations are guaranteed by M&G Chemicals and secured by liens on the Corpus Christi Plant and M&G

---

[8]     The initial amount of future capacity that was purchased by DAK was $350 million, but subsequent purchases and amendments to the DAK Capacity Reservation Agreement increased these amounts to $435 million.

USA's 100% equity interest in M&G Resins.  DAK's security interests in the Corpus Christi

Plant are subordinate to Inbursa's liens on the property and subject to a subordination agreement

among the parties.

> 3.    Macquarie Credit Facility

23.    M&G Waters is the borrower under a $55.5 million secured credit facility by and

among Macquarie Investments US Inc., as administrative and collateral agent and the lenders

from time to time party thereto (the "Macquarie Loan").  M&G Waters was formed to undertake

the construction and operation of desalination equipment and boilers situated at the Corpus

Christi Plant.  The proceeds of the Macquarie Loan were used to partially finance the

construction, installation and operation of such desalination equipment, a process that is largely

complete.  M&G Waters' obligations under the Macquarie Loan are guaranteed by non-Debtor

M&G Finanziaria and secured by a lien on substantially all of M&G Waters' assets and M&G

USA's 100% equity interest in M&G Waters.

> 4.    Delta Lloyd Facility

24.    M&G International is the borrower under a €70 million credit facility by and

among Delta Lloyd Levensverzekering N.V. and  Delta Lloyd Life N.V. as lenders.  As of the

Petition Date, $82.4 million[9] remains outstanding under the Delta Lloyd Facility.  These

obligations are guaranteed by M&G Chemicals and secured by a pledge of M&G International's

equity interests in M&G USA and M&G USA Holding LLC.

> 5.    M&G Polymers' Revolving Credit Facilities

25.    M&G Polymers is the primary obligor under a $10 million unsecured revolving

loan with Banca Monte dei Paschi di Siena S.p.A., New York Branch (the "Monte dei Paschi

---

[9]    Based on a 1.1767:1 Euro to U.S. dollar conversion rate as of October 25, 2017.

Loan").  The Monte dei Paschi Loan is guaranteed by M&G International.   As of the Polymers

Petition Date, the Monte dei Paschi Loan was fully drawn.

26.     M&G Polymers is also the borrower under a $50 million revolving credit facility

(the "Comerica Loan") with Comerica Bank ("Comerica") that is guaranteed by Debtors M&G

Chemicals and M&G International.  The Comerica Loan is secured by certain accounts

receivable of M&G Polymers, among other collateral.

27.     On October 20, 2017, Comerica filed a complaint in the United States District

Court for the Eastern District of Michigan seeking the appointment of a receiver to take control

of the collateral securing the Comerica Loan as well as certain of the Debtors' books and records

(the "Complaint").   Comerica also sought injunctive relief to limit M&G Polymers' ability to

access and use Comerica's collateral.  Following the filing of the Complaint, the Debtors and

Comerica engaged in negotiations in an effort to reach a consensual resolution that would allow

the Debtors' continued access to certain cash for limited purposes.  Ultimately, however, the

parties were not able to reach a resolution and M&G Polymers commenced its chapter 11 case on

the Polymers Petition Date in order to preserve estate assets in the days leading up to the filing of

these Cases.

6.     Sculptor Bonds

28.     On March 23, 2016, the Company entered into two transactions with Sculptor

Investments IV S.à r.l. ("Sculptor"), an affiliate of the Och-Ziff Capital Management Group.

First, Debtor M&G International issued $72.5 million of floating rate bonds due 2019 (the "2019

Bonds") to  Sculptor.  M&G Polymers and non-Debtor affiliates, M&G Finanziaria, M&G

Mexico Holding S.A. de C.V. ("Mexico Holding") and Polimeros Mexico guaranteed the

obligations outstanding thereunder.  In addition, Mossi & Ghisolfi S.p.A. pledged its equity in

M&G Finanziaria, its direct subsidiary, as collateral for the obligations under the 2019 Bonds.[10]

29.     Second, Debtor M&G Capital issued $37.5 million of floating rate bonds due

2023 (the "2023 Bonds," and together with the 2019 Bonds, the "Bonds") to Sculptor.  The 2023

Bonds are guaranteed by M&G Finanziaria and secured by equity pledges by Mossi & Ghisolfi

S.p.A and certain of its non-Debtor direct and indirect subsidiaries.

30.     On October 6, 2017, the Law Debenture Trust Corporation, the trustee for the

Bonds, issued Notices of Acceleration, notifying M&G International, M&G Capital and the other

bond obligors that Sculptor had declared Events of Default under the 2019 Bonds and 2023

Bonds and that, therefore, the Bonds and related guarantees had been accelerated and were

immediately due and payable.  These amounts remain outstanding as of the Polymers Petition

Date.

### 7.     Banco do Brasil Loan

31.     In July of this year, the Company obtained an additional $35 million to be used

for general corporate purposes pursuant to a senior secured term loan agreement by and among

M&G Resins, as borrower, M&G Chemicals, as guarantor, and Banco do Brasil S.A., New York

Branch as lender, and administrative and collateral agent.   M&G Resins pledged certain of its

unencumbered property, including certain receivables and proceeds from specified sales

contracts to secure the loan.

### 8.     ICBC Loan

32.     M&G Resins is the borrower under a $350 million unsecured credit facility with

Industrial and Commercial Bank of China Limited (the "ICBC Loan"), the proceeds of which

---

[10]    M&G Capital Investments 2 S.à r.l., a direct subsidiary of M&G Finanziaria also pledged its equity in its direct subsidiary M&G Capital 2 S.à r.l. to secure the outstanding 2019 Bonds obligations.

were used to finance the initial construction of the Corpus Christi Plant.  M&G Resins'

obligations under the ICBC Loan are guaranteed by M&G Chemicals.  As of the Petition Date,

the full $350 million remains outstanding under the ICBC Loan.

9. Guarantee Obligations

33. In addition to the foregoing primary obligations of the Debtors, certain of the

Debtors are guarantors of debt obligations incurred by their non-Debtor affiliates.  Specifically,

M&G Polymers and M&G International have guaranteed obligations owing by Polimeros

Mexico under an $80 million revolving loan provided by Banco Mercantil del Norte, S.A.  M&G

International has also guaranteed Polimeros Brazil's obligations to (a) under a R$7.3 million loan

provided by Banco Inbursa de Investimentos S.A. and (b) a series of loans provided by Banco do

Brasil S.A. up to the amount of $55 million.  Finally, M&G International, M&G Polymers and

M&G Resins have guaranteed floating rate notes issued by non-Debtor M&G Finance

Luxembourg S.A. in the outstanding principal amount of €66.9 million.

10. Additional Unsecured Debt

34. In addition to the funded debt obligations described above, due to the severe

liquidity constraints the Debtors were experiencing prior to the filing of these Cases, the Debtors

owe significant amounts to their raw materials suppliers.  As of the Petition Date, the Debtors

estimate that they owe approximately $250 million in past due amounts to their suppliers.

11. Intercompany Obligations

35. The Company historically has operated as a globally integrated business and, in

the ordinary course of business, the Debtors and their affiliates generate intercompany payables

and receivables.  As of the Petition Date, the Debtors estimate that they owe $1.27 billion in

intercompany payables in the aggregate and hold $556 million in intercompany receivables in

the aggregate.   Additionally, several of the Debtors are borrowers and/or lenders to a series of

intercompany loans.   A chart listing these obligations is attached hereto as <u>Exhibit B</u>.

### C.   Non-Debtor Affiliate Indebtedness

36.     As noted above, non-Debtor affiliates in Mexico and Brazil have entered into

credit facilities and other financing arrangements, which, in some instances, are guaranteed by

certain of the Debtors.  In Mexico, non-Debtor Polimeros Mexico, the entity that owns and

operates the Company's plant in Altamira, is the primary obligor under six credit facilities and

factoring arrangements that were used to fund working capital needs and general corporate

purposes, including a $100 million credit facility that was initially provided by Inbursa.[11]

Additionally, Mexico Holding (together with Polimeros Mexico, the "<u>Mexican Affiliates</u>")  is the

borrower under a $120 million secured credit facility with Banco Nacional de Comercio

Exterior, S.N.C.  In total, the aggregate outstanding principal amount of funded debt and

factoring arrangement obligations of the Mexican Affiliates is approximately $489.1 million.[12]

37.     In Brazil, non-Debtor Polimeros Brazil, the operator of the Company's PET plant

in Suape, is the obligor under nine financing agreements and several factoring arrangements.

The aggregate outstanding principal amount of these obligations is approximately $148.8

million.[13]

38.     Finally, in addition to the guarantee obligations detailed above, the Debtors'

operating parent company, M&G Finanziaria, is the obligor under approximately €28 million in

unsecured funded debt obligations.  On October 16, 2017, M&G Finanziaria and certain of its

subsidiaries that are not Debtors in these Cases commenced a *concordato preventivo in bianco*,

---

[11]    Prior to the Petition Date, Inbursa sold its position in this facility to DAK.
[12]    As of September 30, 2017.
[13]    As of September 30, 2017.

an in-court restructuring proceeding, in Alessandria, Italy to restructure these and certain other outstanding debt obligations.  As of the date hereof, those proceedings remain pending.

### III.   EVENTS LEADING TO THE FILING OF THESE CASES AND THE PATH FORWARD

39.     The delays and cost overruns at the Corpus Christ Plant are the primary cause of the Company's liquidity crisis that led to the filing of these Cases.   Mechanical completion of the Corpus Christi Plant was originally projected to occur in December 2015 at a cost of $1.1 billion.  As construction progressed, however, the Company was repeatedly required to adjust the planned schedule and budget to account for (a) changes in the overall approach to construction of the plant due to design and technical problems, (b) delays due to the weather, (c) subcontractors failing to meet deadlines and cost projections, (d) engineering audits and (e) delays in equipment delivery.  To date, the Company has spent $1.86 billion on construction of the Corpus Christi Plant and it is estimated that a further $505 million is required to complete construction and render the facility fully operational.   As noted above, liquidity constraints forced the Company to scale back construction and further development of the Corpus Christi Plant site prior to the filing of these Cases.

40.     By far the most significant factor contributing to the cost overruns and delays at the Corpus Christi Plant is higher than expected construction costs.  Although equipment costs remained within budget for the project, labor costs far exceeded expectations.  Specifically, labor costs for construction of the Corpus Christi Plan have averaged about $104 per hour, compared with the $55-60 per hour that was budgeted, due to market forces and low productivity.  Delays and costs related to labor further increased last December, when one of the Debtors' major

subcontractors declared it was stopping work and walked off the job without proper justification.[14]

41.     These escalating cost overruns forced the Company to incur greater debt in the months leading up to the filing of these Cases in an effort to complete the Corpus Christi Plant and commence operations at that facility.  Specifically, as noted above, the Debtors engaged in additional borrowings under the U.S. Inbursa Facility, sold additional incremental future capacity to DAK under the Capacity Reservation Agreement and issued the 2019 Bonds and 2023 Bonds with the expectation that the funds generated would be sufficient to fund working capital expenditures and completion of construction of the Corpus Christi Plant.

42.     The Debtors also sought to raise capital by other means, including by, among other things, engaging in pre-buy contracts with their customers, whereby customers agreed to pay upfront for PET to be delivered in the future.  Ultimately, however, these measures were insufficient.  Rising construction costs not only increased the cost to complete the Corpus Christi Plant, but the attendant delays in completion of the facility meant that the Debtors were unable to generate revenue from the sale of PET resin that they expected to be able to produce in 2016 and 2017.

43.     These circumstances, when coupled with other market forces—including (a) higher raw material costs due to supply shortages, (b) a recent wave of competing low-priced imports that flooded the U.S. market[15] and (c) discounts the Company was forced to offer to

---

[14]    This dispute is the subject of pending arbitration proceedings that are now stayed by the filing of these Cases.

[15]    On September 26, 2017, M&G Polymers and three other U.S. PET manufacturers filed petitions with the U.S. Department of Commerce and the U.S. International Trade Commission asking that the U.S. government investigate certain imports of PET resin from Brazil, Indonesia, South Korea, Pakistan and Taiwan that are being sold at below-market value in the U.S. and to impose anti-dumping duties on those imports.

certain customers in response to a competitor slashing prices as it exited the marketplace—placed the Company in a precarious liquidity position.

44.     Recognizing these liquidity constraints and the need to finish construction of the Corpus Christi Plant as quickly as possible, the Company, with the assistance of its investment banker, Rothschild, Inc. ("Rothschild"), pursued a variety of potential capital-raising efforts throughout this past summer and, in fact, the Debtors anticipated closing on a new source of capital that would have largely alleviated their liquidity concerns in July of 2017.  As August progressed, however, it became clear that this new capital source was not going to close in the near term.

45.     Further, during the course of the summer, the Company had been forced to delay payments to its raw materials suppliers due to its liquidity constraints and, as the weeks and months progressed and past due balances grew, those suppliers became increasingly less willing to accept delayed payment terms from the Debtors.  Many of the suppliers threatened to withhold or delay raw material shipments to the Company, and those vendors that remained willing to ship goods demanded cash on delivery.

46.     With the need for liquidity becoming critical, on August 21, 2017, the Debtors engaged Jones Day as restructuring counsel.  Shortly thereafter, in the first week of September, the Company engaged with its key stakeholders in order to seek access to additional liquidity.  These discussions eventually led to an agreement by Inbursa, DAK and one of M&G Chemicals' equity holders, Magnate S.á r.l. ("Magnate"), to provide the Company with emergency financing to pay necessary expenses and prepare for a potential chapter 11 filing.  Accordingly, on September 12, 2017, M&G Resins and Inbursa entered into an amendment to the U.S. Inbursa Facility pursuant to which Inbursa agreed to advance a total of $6 million in additional funds to

the Company (the "September Advance"), with DAK and Magnate each participating in the amount of $2 million.

47.    While its discussions with its key stakeholders remained ongoing, the Company endeavored to find other ways to maintain its supply chain, including by continuing to negotiate further extended payment terms with its key suppliers.  Ultimately, however, these efforts were unsuccessful and, on September 5, 2017, the Company was forced to shut down operations at its PET manufacturing facility in Altamira, Mexico because it lacked the necessary raw materials to continue production.  This shut down negatively affected the remainder of the M&G Chemicals Group, including, in particular, Debtor M&G Polymers' operations at the Apple Grove Plant, which derived nearly 50% of its sales from PET resin produced by the Altamira plant.  While the Debtors were able to maintain manufacturing operations at the Apple Grove Plant for several weeks following the shut down at the Altamira plant, a lack of liquidity to purchase necessary raw materials eventually forced the Debtors to cease production at the Apple Grove Plant on October 22, 2017.

48.    Despite the Debtors' best efforts, the September Advance and the Company's discussions with its key stakeholders did not lead to the provision of sufficient liquidity to avoid a chapter 11 filing; however, with the cooperation of DAK and Magnate, an affiliate of Inbursa did offer the DIP Financing, which will allow the Debtors funding necessary to pursue an organized and orderly sale of the Corpus Christi Plant and certain other assets.

### IV.    THE PROPOSED DIP FINANCING

49.    As noted above, the Debtors have filed these Cases, in part, to access financing that will allow them to maintain a minimum level of operations and fulfill obligations to certain of their key creditor constituencies while they conduct a sale of certain of their U.S. assets.   The Debtors have secured a $100 million senior secured term loan debtor-in-possession credit facility

(the "<u>DIP Credit Facility</u>") from Control Empresarial de Capitales, S.A. De C.V. (the "<u>DIP Lender</u>"), an affiliate of Inbursa.  The Debtors' obligations under the DIP Credit Facility will be secured by liens on the majority of the Debtors' assets that are senior to all existing liens on the Debtors' property except: (a) any liens existing as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code that are senior to any portion of the liens securing the U.S. Inbursa Facility (the "<u>Senior Prior Liens</u>") and (b) any liens securing the portion of the U.S. Inbursa Facility that is senior to the Senior Prior Liens.

50.     I believe that the DIP Credit Facility represents the best terms for financing that the Debtors are able to arrange following arm's-length negotiations and a marketing process to third party financiers undertaken by Rothschild.  As noted above, in the months leading up to the filing of these Cases, the Debtors engaged in an exhaustive search for financing, but ultimately determined that no financing would be available outside of chapter 11.  Since that time, the Debtors have engaged in extensive negotiations with a number of their key stakeholders in an effort to obtain postpetition financing and the DIP Credit Facility is the result of those negotiations.

51.     The DIP Credit Facility will permit the Debtors to run a controlled and orderly sale process and fulfill their obligations to certain key creditor constituencies.  Without the DIP Financing, the Debtors will experience an immediate liquidity shortfall and will be unable to conduct a sale process in a way that preserves value for its creditors.  Specifically, the DIP Credit Facility will ensure that the Debtors are able to maintain the level of operations at the Corpus Christi Plant necessary to secure the safety and preservation of the facility and avoid the incurrence of additional liabilities that could result from an immediate and uncontrolled cessation of operations.

52.     The principal terms of the DIP Credit Facility, which are described in more detail

in the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain*

*Postpetition Senior Secured Superpriority Financing Pursuant to Section 361, 362, 363(c),*

*363(e), 364(c), 364(d)(l), 364(e) and 507 of the Bankruptcy Code, (II) Granting Priming Liens*

*and Superpriority Claims to the DIP Secured Parties, (III) Granting Adequate Protection to*

*Prepetition Secured Parties, (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules*

*4001(b) and (c) of the Bankruptcy Rules and (V) Granting Related Relief* (the "DIP Motion") and

the declaration of Neil Augustine in support of the DIP Motion, are as follows:[16]

- Debtor M&G Resins is the borrower under the DIP Credit Facility and the other Debtors, other than M&G Polymers M&G Chemicals, M&G International and M&G Capital, are guarantors.

- Trimont Real Estate Advisors, LLC has been designated to serve as administrative and collateral agent.

- The maturity of the DIP Credit Facility is the earlier of: (a) 6 months after the Petition Date; (b) 183 days after the closing of the DIP Credit Facility, (c) the date of a sale of all or substantially all of the assets pledged as collateral for the DIP Credit Facility or (d) upon acceleration of the obligations following an event of default under the DIP Credit Facility.

- The interest rate payable by the Debtors under the DIP Credit Facility is LIBOR + 9.5% and is payable monthly in arrears.

- The DIP Lender shall be authorized to fund a loan under the DIP Credit Facility in an amount sufficient to repay the September Advance and M&G Resins shall be authorized to draw and shall be deemed to have drawn on the DIP Credit Facility in order to effectuate this roll-up.

53.     Additionally, the DIP Credit Facility sets forth a series of milestones that the

Debtors must adhere to in order to avoid an event of default.  These milestones include:

---

[16]     The following is only a summary of the relevant terms and the terms of the DIP Credit Facility and any related documents shall definitively govern the relationship between the parties thereto.

- Entry of an order approving the Debtors' entry into the DIP Credit Facility on an interim basis within three days of the date hereof;

- Entry of an order approving the Debtors' entry into the DIP Credit Facility on a final basis within 30 days of the date hereof;

- The Debtors' delivery of a business plan to the DIP Lender, including a comprehensive cost-to-complete assessment for the Corpus Christi Plant within 60 days of the date hereof;

- The Debtors' filing of a motion seeking approval of bidding procedures and authority to sell substantially all of Debtors' assets (the "Sale Motion"), including the Corpus Christi Plant, within 15 days of the date hereof;

- Entry of  an order approving the bidding procedures set forth in the Sale Motion (the "Bidding Procedures Order") no later than 25 days after the filing of the Sale Motion;

- A deadline for bids for the purchase of the Debtors' assets (the "Bid Deadline") of no later than 75 days after entry of the Bidding Procedures Order;

- An auction for the sale of the Debtors' assets no later than three business days after the Bid Deadline;

- Entry of a order approving a sale of the Debtors' assets no later than 10 business days after the Bid Deadline; and

- The closing of any sale and distribution of sale proceeds within the later of (a) 25 days after the Bid Deadline or (b) five days following the receipt of necessary regulatory approvals.

54.    I believe these milestones are reasonable, capable of satisfaction and consistent with the Debtors' desire to maximize the value of their estates and minimize the costs of administering these Cases.  Further, these milestones, in addition to the other terms of the DIP Credit Facility, are the result of lengthy, hard-fought and—at times, contentious—negotiations and represent the best terms for funding available to the Debtors.

55.    The funding provided by the DIP Facility is essential to allow the Debtors to preserve the value of their assets during a sale process while honoring their obligations during the case.  I, therefore, believe that the Debtors' entry into the DIP Credit Facility is a reasonable exercise of their business judgment and in the best interests of their estates.

## V.    FIRST DAY MOTIONS

56.    In addition to the DIP Motion, concurrently with the filing of these Cases, the Debtors filed  the First Day Pleadings seeking relief related to the administration of these Cases, the Debtors' vendors and employees, their operations, and their cash and financing needs.  A list of the First Day Pleadings is set forth below.

Administrative and Operational First Day Motions

- *Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases*

- *Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and File a Consolidated Creditor Matrix, (II) Authorizing the Filing of a Consolidated List of Top 30 Unsecured Creditors, (III) Approving the Master Service List and (IV) Approving the Form and Manner of Notice of the Commencement of the Debtors' Chapter 11 Cases*

- *Motion for Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes*

- *Motion for an Order Authorizing the Debtors to Continue Their Insurance Programs and Pay Related Obligations*

- *Motion for Interim and Final Orders Establishing Adequate Assurance Procedures with Respect to Debtors' Utility Providers*

- *Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date*

- *Motion for an Order Authorizing the Debtors to Pay Prepetition Employee Wages, Benefits, and Related Items*

- *Motion for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors*

- *Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Certain Shippers and Warehousemen and Related Obligations*

Financing and Cash Management Motions

- *Motion for Interim and Final Orders (I) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts and Business Forms, (II) Approving, on an Interim Basis, the Debtors' Deposit Guidelines and Extending Time to Comply with Section 345(b) of the Bankruptcy Code, (III) Approving Continuation of Ordinary Course Inter-Debtor Transactions and (IV) Granting Related Relief*

•   The DIP Motion

57.     The Debtors have narrowly tailored the First Day Pleadings to meet their goals of: (a) continuing their current operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of their key vendor, customer and employee constituencies; and (c) establishing procedures for the efficient administration of these Cases.

58.     I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

59.     It is my belief that the relief sought in each of the First Day Pleadings is  necessary to the successful implementation of the Debtors' efforts to maximize the recovery of  its creditors. It is my further belief that, with respect to those First Day  Pleadings requesting the authority to pay specific prepetition claims or continue selected  prepetition programs—those First Day Pleadings seeking relief related to the Debtors' obligations to their employees, taxing authorities and insurers—the relief requested is essential to the maintenance of the Debtors' remaining operations and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

60.     The success of these Cases depends upon the Debtors' ability to preserve the value of their assets while they pursue a sale process. The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

61.     Accordingly, I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted.

## **CONCLUSION**

62.    For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 30, 2017
      New York, New York

                        Dennis Stogsdill
                        Chief Restructuring Officer