# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 17-12307 (BLS) |
| M & G USA CORPORATION, *et al.*,[1] | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Bidding Procedures Hearing Date:** |
| | : | December 11, 2017 at 1:00 p.m. (prevailing Eastern Time) |
| | : | **Bidding Procedures Objection Deadline:** |
| | | November 30, 2017 at 4:00 p.m. (prevailing Eastern Time) |

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS
(I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN OF THE
DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO ONE OR
MORE STALKING HORSE PURCHASE AGREEMENTS AND TO PROVIDE BID
PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION
AND ASSIGNMENT PROCEDURES AND (E) SCHEDULING A SALE HEARING AND
APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
(II)(A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE
AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND
(B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

move the Court pursuant to sections 105(a), 363 and 365 of title 11 of the U.S. Code

(the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1 and 9006-1 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M&G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

District of Delaware (the "Local Rules"), for entry of an order substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"):

(i)     approving the proposed procedures attached as Exhibit 1 to the Bidding Procedures Order (the "Bidding Procedures") to be used in connection with the sale (the "Sale") of certain of the Debtors' assets (the "Assets");

(ii)    authorizing the Debtors to enter into one or more asset purchase agreements (each, an "Asset Purchase Agreement") with one or more potential bidders, including one or more Asset Purchase Agreements with one or more "stalking horse" bidders (each, a "Stalking Horse Agreement," each such bidder, a "Stalking Horse Bidder" and each such bid, a "Stalking Horse Bid"), and to provide certain bid protections (the "Bid Protections") to any Stalking Horse Bidder in connection therewith;

(iii)   scheduling an auction of the Assets (the "Auction") and a final hearing for approval of the sale(s) of the Assets (the "Sale Hearing");

(iv)    approving the form and manner of notice of the Bidding Procedures, the Auction and the Sale Hearing;

(v)     authorizing certain procedures related to the Debtors' assumption and assignment of executory contracts and unexpired leases (the "Assumption and Assignment Procedures") in connection with any Sale; and

(vi)    granting related relief.

The Debtors also move the Court, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006 and Local Rule 6004-1, for entry of one or more orders in substantially the form attached hereto as Exhibit B (the "Sale Order"):

(i)     authorizing the sale of the Assets to one or more Successful Bidders (as defined below) at the Auction free and clear of all liens, claims, interests and encumbrances (each such sale, a "Sale Transaction");

(ii)    authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

(iii)   granting related relief.

In support of this Motion, the Debtors submit the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* (the "First Day Declaration") [Docket No. 3] and the Declaration of Neil

Augustine attached hereto as <u>Exhibit C</u> (the "<u>Augustine Declaration</u>") and respectfully represent as follows:

<u>**JURISDICTION AND VENUE**</u>

1.  The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>**BACKGROUND**</u>

**A.  General Background**

2.  On October 24, 2017 (the "<u>Polymers Petition Date</u>"), Debtor M&G Polymers USA, LLC ("<u>M&G Polymers</u>") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, thereafter, on October 30, 2017 (the "<u>Petition Date</u>"), each of the other Debtors commenced chapter 11 cases before this Court (together with the chapter 11 case of M&G Polymers, the "<u>Cases</u>").  The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On November 13, 2017, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "<u>Committee</u>") in these Cases.  Additional information regarding the Debtors and these Cases, including the Debtors' businesses, corporate structure and financial condition, is set forth in the First Day Declaration, incorporated herein by reference.

**B.  The Debtors' Marketing Efforts**

3.  As described in further detail in the First Day Declaration and the DIP Motion,[2] in the period leading up to the Petition Date, the Debtors were primarily focused on addressing

---

[2] *Motion for Entry of Interim and Final Orders to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority*

severe liquidity constraints resulting from the construction of a vertically integrated PTA/PET[3] plant in Corpus Christi, Texas (the "Corpus Christi Plant"), as well as their related efforts to obtain a $100 million in debtor in possession financing ("DIP Financing") in order to commence these Cases and ultimately consummate a Sale of the Assets under the protections of the Bankruptcy Code.  The DIP Financing was provided on an interim basis to certain of the Debtors, each of which is an Obligor (as defined in the DIP Motion).

4.    Prior to the Petition Date, the Debtors, together with their investment banker Rothschild Inc. ("Rothschild"), engaged in discussions with certain interested parties regarding the purchase of some or all of the Assets.  In addition, the Debtors began taking steps necessary to enable such parties to conduct due diligence and to prepare for a more comprehensive post-petition marketing process.  *See* Augustine Decl. ¶ 10.  Rothschild has established a virtual data room to facilitate interested parties' due diligence, has developed a "teaser" to gauge potential purchaser interest and is preparing a confidential information memorandum for interested parties. *Id.*  Following the Petition Date, Rothschild has continued to contact potential purchasers and seek to have those potential purchasers that express interest in the Debtors' Assets enter into confidentiality agreements with the Debtors and begin conducting due diligence.  *Id.*  During the pendency of this Motion, the Debtors will continue with their marketing efforts, in compliance

---

*Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2; and (6) Grant Related Relief,* [Docket No. 14] (the "DIP Motion").

[3]    As set forth in the First Day Declaration, the Debtors, together with the non-Debtor direct and indirect subsidiaries of M&G Chemicals S.A., are one of the largest producers of polyethylene terephthalate ("PET") resin for packaging applications in the world.  PET is a plastic polymer produced principally from purified terephthalic acid ("PTA") and monoethylene glycol, and is used to manufacture plastic bottles and other packaging for the beverage, food and personal care industries.

with the terms of the DIP Financing, to ensure that the Sale process can be completed expeditiously and yield a value-maximizing result for the Debtors' stakeholders. *Id.*

5.      The Bidding Procedures reflect a two-step marketing process. In the first round, interested parties will have the opportunity to submit preliminary indications of interest by the Proposal Deadline (as defined below). After affording prospective interested parties additional time to conduct due diligence, the second round of the Sale process will culminate with the Final Bid Deadline (as defined below), by which date interested parties must submit a final, binding bid in order to qualify, subject to the Bidding Procedures, for participation in the Auction.

**C.      The Need for a Timely Process**

6.      The Debtors propose to conduct the Sale process and Auction on the following timeline:[4]

| | |
|---|---|
| **December 11, 2017 at 1:00 p.m. (prevailing Eastern Time)** | Hearing to consider entry of the Bidding Procedures Order |
| **No later than five business days after entry of the Bidding Procedures Order** | Deadline for Debtors to file Assumption and Assignment Notice |
| **5:00 p.m. (prevailing Eastern Time) on the date that is 14 days after filing of the Assumption and Assignment Notice** | Deadline to file Cure Objections |
| **January 16, 2018, at 5:00 p.m. (prevailing Eastern Time)** | Proposal Deadline |
| **February 23, 2018, at 11:59 p.m. (prevailing Eastern Time)[5]** | Final Bid Deadline |
| **February 26, 2018, at 5:00 p.m. (prevailing Eastern Time)** | Deadline for objections to the applicable Sale Transaction(s) other than Cure Objections and Adequate Assurance Objections |

---

[4] Capitalized terms used in this table but not previously defined have the meaning given to such terms later in this Motion.

[5] Subject to Debtors' limited extension right set forth in Section V of the Bidding Procedures.

| | |
|---|---|
| **February 28, 2018, at a time to be determined** | Auction, to be held at the offices of Jones Day, 250 Vesey Street, New York, New York 10281 |
| **March 2, 2018, at noon (prevailing Eastern Time)** | Deadline to file Adequate Assurance Objections |
| **March 5, 2018, at 5:00 p.m. (prevailing Eastern Time)** | Deadline to file the replies in connection with the applicable Sale Transaction(s) |
| **March 6, 2018, as determined by, and subject to the availability of, the Court** | Proposed hearing to approve proposed Sale Transaction(s) |

7. The Debtors believe that conducting the Sale process within the time periods set forth above and in accordance with the Bidding Procedures is reasonable and will provide parties with sufficient time and information necessary to formulate and submit bids to purchase the Assets. In formulating the procedures and time periods, the Debtors balanced the need to provide an adequate period for potential purchasers to conduct due diligence and submit bids on the Assets on a fully informed basis with the Debtors' need to quickly and efficiently sell their Assets while they have sufficient funding to do so. *See* Augustine Decl. ¶ 13. Furthermore, the proposed timeline will provide potential bidders with ample time (more than three months) to review the comprehensive materials made available by the Debtors and their advisors. *See Id.* ¶ 15.

8. Completion of the Sale process in a timely manner will also maximize the value of the Assets. The terms of the Obligors' DIP Financing require the Obligors to adhere to certain milestones related to the Sale process. The proposed dates governing the Sale process are within the milestones required under the DIP Financing. The Obligors' failure to adhere to these milestones is an event of default under the DIP Financing, which could cause the DIP Lender (as defined in the DIP Motion) to exercise its rights and remedies thereunder and/or the Obligors to

run out of the funding they need to preserve the Corpus Christi Plant and their other Assets. *Id.* at ¶ 13.

9. In addition to the DIP milestones, the Debtors have significant business and financial imperatives to move quickly to protect and preserve value. Even with the DIP Financing, the Debtors are not currently operating their plants or otherwise generating revenue, and they continue to incur expenses every day. Therefore, it is in the Debtors' best interests and the interests of their stakeholders to pursue an expeditious Sale process. In formulating the proposed Sale timeline, the Debtors have considered their liquidity needs and their ability to maintain their facilities and corporate functions and pay employees during the Sale process. The Debtors' proposed Sale timeline is designed to maximize value, while at the same time limit needless expenditures and the incurrence of administrative expenses, which may risk a liquidity shortfall that could frustrate their restructuring efforts. The Debtors have determined, in their business judgment, that a reasonable marketing period, as reflected in the proposed timeline, will allow the Debtors to devote funds to maintain their facilities and corporate functions, as well as to continue to pay their remaining employees, and offers the estates the best chance of maintaining value and maximizing returns to creditors. *See* Augustine Decl. ¶ 14. Accordingly, the Debtors have determined that pursuing the Sale process and Auction in the manner and with the procedures proposed is in the best interest of the Debtors' estates and their creditors.

**D. The Proposed Form Sale Order**

10. The Debtors have prepared the proposed form Sale Order, which is attached hereto as <u>Exhibit B</u> and will be provided to all prospective bidders in connection with the Sale of the Assets. As set forth in further detail below and in the Bidding Procedures, potential bidders will be required to submit to the Debtors a modified proposed Sale order, revised to reflect the

terms of their respective bids. In accordance with Rule 6004-1(b)(iv) of the Local Rules, the

material terms of the proposed Sale Order are set forth in the following table:[6]

| | |
|---|---|
| **Use of Proceeds**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(H)* | All sale proceeds from the DIP Collateral and the Pre-Petition Collateral shall be distributed in accordance with the terms of the Final DIP Order and the DIP Loan Documents, including without limitation (a) distributions to be made at Closing to the DIP Lender, the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party, in accordance with the terms of the DIP Loan Documents, the Final DIP Order, including paragraphs B(vii), B(viii) and 13 of the Final DIP Order, and (b) the transfer to be made at Closing by the CC Selling Parties into an escrow account not subject to the control of the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party or any party that purports to have a validly, perfected security interest in any of the Debtors' deposit accounts or cash (the "<u>Carve-Out Account</u>") of the sale proceeds from the Pre-Petition Collateral in an amount equal to the Sale Professional Fees Amounts, Sale Excess Fees Hold-Back Amounts (to the extent applicable and in accordance with the order of priorities set forth in the Final DIP Order) and Sale Excess Fee Amounts (to the extent applicable and in accordance with the order of priorities set forth in the Final DIP Order), in each case in this clause (b), as authorized pursuant to paragraph 13 of the Final DIP Order; <u>provided</u> that any excess amounts remaining in the Carve-Out Account shall be governed by and distributed in accordance with the Final DIP Order and the DIP Loan Documents. Sale Order ¶¶ 7, 26.[7] |
| **Record Retention**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(J)* | The Debtors shall retain originals or copies of all hard documents and data and information that constitute Assets and any other document, data or information stored on or in servers, backup devices, mobile devices, electronic storage devices, or miscellaneous IT equipment, in each case, that constitutes Assets, currently in the Debtors' possession, custody, or control pertaining to pending or threatened litigation or necessary to administer these Cases. Sale Order ¶ 40. |
| **Successor Liability**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(L)* | The Purchaser shall incur no successor liability with respect to the purchased Assets. Sale Order ¶¶ CC, 7, 11-12, 14-18, 29. |
| **Relief from Bankruptcy Rule 6004(h) Stay**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(O)* | The Debtors seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) with respect to the effectiveness of the Sale Order. Sale Order ¶¶ M, 39. |
| **Credit Bidding**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(N)* | Pursuant to the Bidding Procedures, and as set forth in more detail below, a person or entity holding a perfected security interest in the Debtors' assets may seek to credit bid some or all of their claims that are not subject to a |

---

[6] This summary is qualified, in its entirety by the provisions of the proposed Sale Order. Capitalized terms used in this table but not previously defined have the meaning given to such terms later in this Motion or in the Sale Order, as applicable.

[7] This summary and all related Sale Order provisions are qualified in their entirety to the terms of the DIP Orders and the DIP Loan Documents.

| | |
|---|---|
| | *bona fide* dispute for their respective collateral. Bidding Procedures § VI.A.5. |
| **Good Faith Deposit** *Del. Bankr. L.R. 6004-1(b)(iv)(F)* | Any Good Faith Deposit that is not returned to the Successful Bidder or Backup Bidder, as applicable shall become DIP Collateral; <u>provided</u> that in the event that (a) the Successful Bidder does not close the Sale Transaction and there is no Backup Bidder or (b) each of the Successful Bidder and the Backup Bidder does not close the Sale Transaction, the Debtors shall be authorized to transfer cash comprising the necessary portion of such Good Faith Deposit into the Carve-Out Account and to pay, upon approval by the Court of the allowance of such professional fees, the Sale Professional Fees Amounts that are determined to be owing to those professionals retained by the Obligors (as defined in the DIP Loan Agreement) whose retention is approved by the Court pursuant to any one or more of sections 327, 363 and 1103 of the Bankruptcy Code. Any amounts deposited to fund the Carve-Out Account shall reduce any obligation under the DIP Loan and/or the Final DIP Order to fund the Carve-Out Account and/or to pay the Sale Professional Fees Amounts on an equal dollar basis, and shall not constitute DIP Collateral, except that the DIP Lender shall retain security interests in any residual interests in the Carve-Out Account available following satisfaction in full of all obligations benefitting from the Carve Out, and shall receive distributions on account of such residual interests. Sale Order ¶¶ 6, 27. |
| | Pursuant to the Bidding Procedures, and as set forth in more detail below, each Qualified Bid must be accompanied by a Good Faith Deposit in the form of cash in the amount set forth in the Bidding Procedures, plus, to the extent applicable, the Incremental Deposit Amount. Bidding Procedures §§ VI.A.7. |

## <u>RELIEF REQUESTED</u>

11.     By this Motion, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules, the Debtors request that the Court:

    (a)     enter the Bidding Procedures Order:

        (i)     approving the Bidding Procedures substantially in the form attached as <u>Exhibit 1</u> to the Bidding Procedures Order;

        (ii)     scheduling the Auction for **February 28, 2018, at a time to be determined**;

        (iii)     scheduling the Sale Hearing for **March 6, 2018**, as determined by, and subject to the availability of, the Court;

        (iv)     authorizing and approving the (A) notice to each non-Debtor counterparty (each, a "<u>Counterparty</u>") to an executory contract or unexpired lease (collectively, the "<u>Contracts</u>") of the Debtors'

proposed cure amounts (the "Cure Costs"), substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Assumption and Assignment Notice"), (B) procedures and deadlines for asserting Cure Objections and Adequate Assurance Objections (as such terms are defined below) and (C) Assumption and Assignment Procedures;

(v) authorizing and approving the notice of the Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Sale Notice"); and

(vi) authorizing the Debtors to publish an abridged form of the Sale Notice in the *Wall Street Journal*, *Plastics News* and/or *Corpus Christi Caller-Times* (the "Publication Notice"); and

(b) enter one or more Sale Orders:

(i) authorizing the sale of the Assets (or a portion thereof) free and clear of all liens, claims, interests, and encumbrances, with liens to attach to the proceeds of such Sale Transaction(s);

(ii) authorizing the assumption and assignment of the Proposed Assumed Contracts (as defined below); and

(iii) granting related relief.

## BIDDING PROCEDURES

A. **Overview**[8]

12.    The Bidding Procedures are intended to provide for a fair, timely and competitive sale process consistent with the timeline of these Cases. Because the Bidding Procedures are attached to the proposed Bidding Procedures Order as Exhibit 1, they are not stated herein in their entirety. However, pursuant to Local Rule 6004-1, certain key terms of the Bidding Procedures are highlighted below:

---

[8]    This summary is qualified, in its entirety by the provisions of the Bidding Procedures and the Bidding Procedures Order. Unless otherwise set forth in this summary, capitalized terms used within this summary have the meanings given to such terms in the Bidding Procedures.

| | |
|---|---|
| **Assets** | The Assets subject to the Bidding Procedures include:<br><br>• the Debtors' entire right, title and interest in and to their Corpus Christi Plant and related assets (together, the "<u>Corpus Christi Assets</u>");<br><br>• the Debtors' entire right, title and interest in and to their desalination equipment and boilers situated at or in the vicinity of the Corpus Christi Plant (the "<u>Desalination Assets</u>");<br><br>• the Debtors' entire right, title and interest in and to their intellectual property other than the intellectual property of M & G Polymers USA, LLC's (the "<u>IP Assets</u>");<br><br>• M & G Polymers USA, LLC's entire right, title and interest in and to their intellectual property (the "<u>Polymers IP Assets</u>");<br><br>• M & G Polymers USA, LLC's entire right, title and interest in and to their research and development facility located in Sharon Center, Ohio (the "<u>Sharon R&D Assets</u>"); and<br><br>• M & G Polymers USA, LLC's entire right, title and interest in and to their manufacturing facility located in Apple Grove, West Virginia and related assets (the "<u>Apple Grove Plant</u>").<br><br>The Assets owned by M & G Polymers USA, LLC will remain available for sale pursuant to these procedures so long as the Debtors have sufficient funding to maintain such assets through the closing of any sale of such assets. Consistent with Section IX of the Bidding Procedures, the Debtors may seek expedited approval of a Stalking Horse Agreement, Sale Transaction or otherwise proceed on an alternative sale timeline or with alternate sales procedures (including dispensing with an Auction) than those set forth in the Bidding Procedures, in each case, with respect to any of the Assets owned by M & G Polymers USA, LLC.<br><br>A Prospective Bidder may bid on all or any combination of the Corpus Christi Assets, the Desalination Assets, the IP Assets, the Polymers IP Assets, the Sharon R&D Assets, and the Apple Grove Plant, subject to the conditions set forth herein. |
| **Proposal Deadline** | Prospective interested parties will be requested to submit written preliminary indications of interest (each, a "<u>Proposal</u>") to the Bid Notice Parties at any time but by no later than **January 16, 2018 at 5:00 p.m. (prevailing Eastern Time)** (the "<u>Proposal Deadline</u>") and otherwise in compliance with the Bidding Procedures. The receipt of Proposals by the Proposal Deadline will assist the Debtors in promptly identifying potential Stalking Horse Bidder(s). The DIP Lender and Pre-Petition First Lien Lender are not required to submit a Proposal in order to be a Qualified Bidder. |
| **Proposal Requirements** | Proposals must contain the following information:<br><br>• <u>Identity of Purchaser and its Affiliates</u>: A Proposal must specify the identity of the purchaser, including the legal entity that would acquire all or part of the Assets, the ultimate holding company, the identity of all key shareholders and any relevant history and/or experience in the industry. A Proposal must confirm that the prospective interested party is acting as a principal and not as an agent or broker for any other party. A Proposal must also disclose whether the prospective interested party or any of its representatives has, or within the last 24 months has had, any commercial relationship or dealings with the Debtors or any of their affiliated or associated entities and their respective directors and officers or any of the Debtors' prepetition secured lenders, and, if so, disclose in reasonable detail information about such relationship and/or dealings. |

- Proposed Sale Transaction: A Proposal must include the terms of the proposed Sale Transaction, including, but not limited to:
  - the Assets included in the Proposed Sale Transaction;
  - total purchase price and form of consideration for the proposed Sale Transaction and, if bidding on more than one Asset, an allocation of the total purchase price among those Assets; provided, however, that no such allocation shall be required for Assets subject to a Credit Bid except to the extent that the underlying Proposal that includes such Credit Bid proposes the purchase of Assets that are subject to another lender's valid, perfected senior lien securing funded debt obligations, in which case the Proposal must identify the means of satisfying or otherwise resolving or assuming such obligations;
  - a description of any significant assumptions on which the Proposal has been based;
  - structure, terms and conditions of the proposed Sale Transaction;
  - evidence of financial wherewithal to close the proposed Sale Transaction, including the prospective interested party's cash balances as of the most recent month end, availability under existing credit facilities or guarantee and/or equity commitment letter from a credit worthy affiliate entity; and
  - other economic matters to the extent material to the proposed Sale Transaction.
- Due Diligence: A Proposal must include a description of the due diligence the prospective interested party needs to conduct, including a list of any due diligence items the prospective interested party needs to review or confirm in order for it to enter into a definitive agreement.
- Material Conditions: A Proposal must list any other material conditions to which the consummation of the proposed Sale Transaction would be subject.
- Sources of Financing: A Proposal must include an indication (with as much specificity as possible) of expected sources of funds (including the amounts of debt and equity financing necessary to fund the Sale Transaction together with the indications from any third party sources of their commitment to provide such funds) and the steps required (and anticipated timing) to obtain definitive funding commitments. If the purchaser will be a newly formed entity, the Proposal must identify the entity or entities that will provide backstops in the form of a guarantee and/or equity commitment letter and describe the nature of such arrangement(s).
- Required Approvals & Timing: A Proposal must include a description of the level of review, authorization and approval within the prospective interested party's organization that the potential Sale Transaction has received to date and an indication of any anticipated need (and associated timing) for further corporate, shareholder, or regulatory authorization, approvals and waivers and any other material conditions or time constraints related to closing. In addition, a Proposal must provide an estimate of the aggregate timing required to secure any necessary financing, complete due diligence and obtain any necessary approvals to close a Sale Transaction. Finally, a Proposal must provide information on the prospective interested party's existing involvement and/or extent of production capacity it owns or operates in the North American and global markets for PTA or PET.
- Pre-Closing Funding: A Proposal must (i) state the prospective interested party's ability and willingness to fund the Debtors' Cases from March 31, 2018 through the closing of a Sale Transaction and (ii) disclose in reasonable detail the proposed structure and material terms of such financing (such as a proposed

| | refinancing of the DIP Financing, providing incremental financing on a junior basis, etc., in each case subject to obtaining the necessary approvals and consents). |
|---|---|
| | • <u>Prior Investments or Acquisitions</u>: A Proposal must include a description of material investments or acquisitions that the prospective interested party has completed over the last five years as further evidence of its capability to close the Sale Transaction in a timely fashion. |
| | • <u>Advisors</u>: A Proposal must include a list of all financial, legal and other advisors that a prospective interested party has retained or plans to retain in connection with the Sale Transaction. |
| | • <u>Contacts</u>: A Proposal must provide a list of contacts (including mailing and e-mail addresses and phone numbers) who would be involved in further due diligence and with whom the Bid Notice Parties may discuss the Proposal, including individuals employed by any prospective interested party and any of its financial and legal advisors. |
| | The Debtors will in their reasonable discretion, and in consultation with the Consultation Parties, determine compliance with the foregoing. |
| **Final Bid Deadline** | Any person or entity that desires to participate in the Auction (each, a "<u>Prospective Bidder</u>") must submit its final, binding bid on applicable Assets (a "<u>Final Bid</u>") on or before **February 23, 2018 at 11:59 p.m. (prevailing Eastern Time)** (the "<u>Final Bid Deadline</u>") in writing to the Bid Notice Parties and otherwise in compliance with the Bidding Procedures; <u>provided</u> that the Debtors shall have the discretion to the extend in writing the Final Bid Deadline for any Prospective Bidder so long as such extended deadline does not exceed the applicable milestone for such deadline under the DIP Loan Agreement (as defined in the DIP Orders). Any bid received after the Final Bid Deadline will not constitute a Qualified Bid. |
| **Diligence** | To be eligible to participate in the bidding process, a Prospective Bidder must first deliver (i) an executed confidentiality agreement, in form and substance satisfactory to the Debtors, (ii) • a statement and other factual support demonstrating to the Debtors' reasonable satisfaction in the exercise of their reasonable business judgment that the Prospective Bidder has a bona fide interest in purchasing the Assets, and (iii) preliminary proof by the Prospective Bidder of its financial capacity to close a proposed Sale Transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Prospective Bidder (or, if the Prospective Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which the Debtors and its advisors will determine; <u>provided</u> that such proof shall not be required to the extent that the Prospective Bidder's financial capacity is reasonably known to the Debtors' investment banker Upon execution of a valid confidentiality agreement, any Prospective Bidder identified by the Debtors as reasonably likely to be a Qualified Bidder (as defined below) that wishes to conduct due diligence on the Assets may be granted access to information regarding the Assets; <u>provided</u> that, if any Prospective Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required to disclose to such Prospective Bidder any trade secrets or proprietary information, as determined by the Debtors' in their sole discretion, unless the confidentiality agreement executed by such Prospective Bidder is satisfactory to the Debtors to ensure that such trade secrets or proprietary information will not be used for an improper purpose or to gain an unfair competitive advantage. If the Debtors determine at any time that a Prospective Bidder is not reasonably likely to qualify as a Qualified Bidder or fails to become a Qualified Bidder, then such Prospective Bidder shall not be entitled to receive further due diligence access or non-public information and all information provided by the Debtors prior to such time will be returned to the Debtors or destroyed in accordance with the terms of the applicable confidentiality agreement. |

| | |
|---|---|
| | The Debtors shall be entitled to revoke due diligence access to any Prospective Bidder that fails to become a Qualified Bidder. |
| **Authority to Enter into Stalking Horse Agreements** | The Debtors may, as they deem necessary and appropriate in the prudent exercise of their business judgment, accept one or more Stalking Horse Bids and execute one or more Stalking Horse Agreements with such Stalking Horse Bidder(s), which may be comprised of a Credit Bid (including by the DIP Agent, DIP Lender and/or the Pre-Petition First Lien Lender), in connection with the proposed sale of the Assets and file a motion (each, a "Stalking Horse Motion") seeking approval of such Stalking Horse Agreement, including any Bid Protections provided therein. Subject to the Court's determination, but no earlier than ten days after filing a Stalking Horse Motion, and no later than the Sale Hearing, the Debtors will seek approval from the Court on an expedited basis of such Stalking Horse Agreement(s) and any Bid Protections contained therein, in accordance with Rule 6004-1 of the Local Rules. The applicable Debtors' entry into a Stalking Horse Agreement and/or provision of Bid Protections to a Stalking Horse Bidder shall be in compliance with the DIP Orders, the DIP Loan Documents (as defined in the DIP Orders) and the Debtors' obligations thereunder. |
| **Qualified Bid Requirements** | In order for a Final Bid to qualify as a "Qualified Bid," the Final Bid must be in writing and the Debtors must determine that the Final Bid satisfies the following requirements (and any Prospective Bidder that submits a Qualified Bid satisfying the following requirements shall be a "Qualified Bidder"): <ul><li>Purchased Assets: A Qualified Bid must identify the following: (i) the Assets to be purchased, including any Contracts of the Debtors that would be assumed and assigned in connection with the relevant Sale Transaction (all such Contracts, the "Proposed Assumed Contracts"); (ii) the liabilities, if any, to be assumed, including any debt to be assumed; (iii) the cash purchase price of, and any other consideration offered in connection with, the Final Bid (the "Purchase Price"); provided that, if the Final Bid is for more than one Asset, such bid must also allocate the Purchase Price across the individual Assets; provided, however, that no such allocation shall be required for Assets subject to a Credit Bid except to the extent that the underlying Final Bid that includes such Credit Bid proposes the purchase of Assets that are subject to another lender's valid, perfected senior lien securing funded debt obligations, in which case the Final Bid must identify the means of satisfying or otherwise resolving or assuming such obligations; provided further that, if the Final Bid is for Assets subject to a Stalking Horse Agreement, such Purchase Price must exceed the Stalking Horse Overbid (as defined below); (iv) the proposed form of adequate assurance of future performance of the Qualified Bidder with respect to any Proposed Assumed Contracts, including the legal name of any proposed assignee of a Proposed Assumed Contract, the proposed use of any leased premises and, with respect to the Corpus Christi Assets, the proposed plans and any financing therein, if any, to complete construction of the Corpus Christi Plant; (v) whether the Prospective Bidder intends to operate all or a portion of the Debtors' business as a going concern (as applicable) or to liquidate the applicable Assets; and (vi) whether the Prospective Bidder intends to offer future employment to any of the Debtors' employees.</li><li>Identification of Bidder: A Qualified Bid must fully disclose the legal identity of each person or entity bidding for the applicable Assets and otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), participating in (including through license or similar arrangement with respect to the assets to be acquired in connection with such bid) such bid or the Auction in connection with such bid, and the complete terms of any such participation, and must also disclose any past or present connections or agreements with the Debtors, any Stalking Horse Bidder(s), any other known Prospective Bidder or Qualified Bidder, any prepetition secured</li></ul> |

lender and/or any officer or director of the foregoing (including any current or former officer or director of the Debtors).

- <u>Asset Purchase Agreement</u>:  A Qualified Bid for some or all of the Assets must include (i) a duly authorized and executed Asset Purchase Agreement based on the form asset purchase agreement that the Debtors provided to Prospective Bidders and (ii) a proposed sale order based on the proposed Sale Order attached to the Motion as <u>Exhibit D</u>, both modified to reflect such Qualified Bidder's proposed Sale Transaction (including all exhibits and schedules thereto), together with copies marked to show any amendments and modifications to (i) the form asset purchase agreement and (ii) the proposed Sale Order.

- <u>Asset Purchase Agreement for Stalking Horse Assets Only</u>:  To the extent the Debtors enter into a Stalking Horse Agreement for any of their Assets, a Qualified Bid solely for such Assets must include (i) a duly authorized and executed copy of the Stalking Horse Agreement and (ii) a proposed sale order based on the proposed Sale Order attached to the Motion as <u>Exhibit D</u>, both modified to reflect such Qualified Bidder's proposed Sale Transaction (including all exhibits and schedules thereto), together with copies marked to show any amendments and modifications to (i) the Stalking Horse Agreement and (ii) the proposed Sale Order.

- <u>Credit Bidding</u>:[9]  Subject to the satisfaction of the requirements set forth above and in these Bidding Procedures, a bid that includes a credit bid as a portion of the purchase price (each such bid, a "<u>Credit Bid</u>") shall be considered to be a Qualified Bid only if a court of competent jurisdiction has, as of the date of the submission of such bid to the Bid Notice Parties, entered a final, non-appealable order determining the validity, priority, and extent of the claims and liens that form the underlying basis of the Credit Bid, <u>provided</u>, <u>however</u>, that any Credit Bid by any Specified Lender on any Assets on which such Lender has a valid, perfected lien,[10] shall not require the entry of a final, non-appealable order determining the validity, priority, and extent of the claims and liens that form the underlying basis of the Credit Bid.  All Credit Bids shall be subject to the Credit Bid Requirements (as defined below).  A Credit Bid may be applied only to reduce the cash consideration with respect to the Assets in which the party submitting the Credit Bid holds a security interest.

A Qualified Bidder whose Final Bid includes a Credit Bid or who would like to preserve its right to submit a Credit Bid at the Auction, in each case, on any applicable Assets shall deliver to the Debtors at the time of the submission of its Final Bid or, if such Qualified Bidder does not submit a Final Bid, one business

---

[9] Capitalized terms used in this section but not otherwise defined have the meanings given to them in the DIP Motion or the *Interim Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2; and (6) Grant Related Relief*, [Docket No. 62] (the "<u>Interim DIP Order</u>") and the final order approving the relief sought in the DIP Motion (the "<u>Final DIP Order</u>" and, together with the Interim DIP Order, the  "<u>DIP Orders</u>"), as applicable.

[10] "<u>Specified Lender</u>" includes:  (a) any of the DIP Secured Parties (as defined in the DIP Motion); (b) Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financier, solely in its capacity as Pre-Petition First Lender ("<u>Pre-Petition First Lien Lender</u>"); (c) DAK Americas, LLC, solely in its capacity as the Pre-Petition Second Lien Lender  ("<u>DAK</u>"); and (d) Macquarie Investments US Inc., solely in its capacity as collateral agent under that certain $55.5 million secured credit facility to which M&G Waters USA, LLC is a party.

day before the Auction as a condition precedent to its participation in the Auction (i) a Good Faith Deposit pursuant to Section VI.A.7 of the Bidding Procedures, and (ii)(x) a written commitment to fund into an escrow account established by the Debtors upon the closing of the Sale Transaction (as further described in Section VI.A.6 of the Bidding Procedures) an amount of cash (the "Cash Amount") sufficient to satisfy (1) the estimated Sale Professional Fees, (2) to the extent the Sale Excess Fees are senior to the obligations subject to such Credit Bid, the estimated Sale Excess Fees, and (3) any obligations secured by liens on such CC Assets that are senior to the obligations that are the subject of such Credit Bid (the "Senior Secured Obligations"), as the terms "Sale Professional Fees" and "Sale Excess Fees" would apply under the Final DIP Order either before or after the Carve-Out Trigger Date, as appropriate, and (y) documentary evidence of its financial wherewithal (as of the date of such commitment) to fund the Cash Amount upon the closing of the Sale Transaction (the foregoing requirements set forth in this paragraph, the "Credit Bid Requirements") provided that, to the extent a Sale Transaction is for less than all of the Corpus Christi Assets, the Debtors may permit the commitment described in the immediately preceding clause (ii) to be in an amount in cash that is less than the Cash Amount.

For the avoidance of doubt, any Credit Bid by the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender shall not require payment of any Pre-Petition Second Lien Obligations. Moreover, in the event that the DIP Agent, the DIP Lender or Pre-Petition First Lien Lender submits a Credit Bid comprised of any of their DIP Obligations or Pre-Petition First Lien Obligations, respectively, on any Assets securing such respective obligations, and without limiting any other requirements for approval of any other bid as a higher or better offer or a Successful Bid (including without limitation the satisfaction of the Senior Secured Obligations), any further bid for the purchase of some or all of the Assets and any Sale of such Assets to a Successful Bidder (other than the DIP Lender or Pre-Prepetition First Lien Lender) that is approved by the Court must provide for, at the closing of such Sale Transaction, indefeasible cash payments of the DIP Obligations and the Pre-Petition First Lien Obligations to the DIP Lender and the Pre-Petition First Lien Lender, respectively, in at least the dollar amount equivalent of the Credit Bid submitted by the DIP Lender and the Pre-Petition First Lien Lender (as applicable), plus the Sale Professional Fees Amounts and the Sale Excess Fee Amounts (each, as defined in the Final DIP Order) in order for the Successful Bid of such Successful Bidder to be considered as a potentially higher or better bid and/or to be approved by the Court as a Successful Bid, unless otherwise agreed to by the DIP Agent, the DIP Lender and/or the Pre-Petition First Lien Lender (as applicable) (the foregoing requirements set forth in this paragraph, the "Credit Bid Overbid Requirements"). In addition, and without limiting any other requirements for approval of such bid as a higher or better bid or a Successful Bid (including without limitation the satisfaction of the Senior Secured Obligations) any bid by the Pre-Petition Second Lien Secured Party for the Corpus Christi Assets, by Credit Bid or otherwise, shall provide at the closing of the Sale Transaction (a) that the DIP Obligations and the Pre-Petition First Lien Obligations are indefeasibly paid in full in cash to the DIP Lender and the Pre-Petition First Lien Lender, respectively (unless otherwise agreed to by the DIP Agent, the DIP Lender and/or the Pre-Petition First Lien Lender (as applicable)) and (b) cash in an amount equal to the Sale Professional Fees Amounts and Sale Excess Fee Amounts, as authorized pursuant to the Final DIP Order, is transferred into an escrow account pursuant to the Final DIP Order.

- Financial Information: A Qualified Bid must include the following: (i) a statement that the Prospective Bidder is financially capable of consummating

the Sale Transaction(s) contemplated by the applicable Asset Purchase Agreement, together with the Prospective Bidder's audited financial statements for the prior two years and pro forma capital structure; (ii) if the bid of a Qualified Bidder includes a Credit Bid pursuant to section 363(k) of the Bankruptcy Code, at the time of the submission of such Qualified Bidder's Final Bid or, if such Qualified Bidder does not submit a Final Bid, one business day before the Auction as a condition precedent to its participation in the Auction, such Qualified Bidder must deliver to the Debtors (a) a written commitment to fund into an escrow account established by the Debtors upon the closing of the Sale Transaction an amount of cash equal to the Cash Amount and (b) documentary evidence of its financial wherewithal as of the date of such commitment to fund upon the closing of the Sale Transaction the Cash Amount plus any remaining balance of the bid after reducing the applicable Purchase Price of the Assets by the amount of the proposed Credit Bid; and (iii)(a) a written commitment by the Prospective Bidder to provide the Debtors with financing to fund the Debtors' Cases from March 31, 2018 through the closing of the Sale Transaction and (b) a writing setting forth in reasonable detail the proposed structure and material terms of such financing (such as a proposed refinancing of the DIP Financing, providing incremental financing on a junior basis, etc., in each case subject to obtaining the necessary approvals and consents).

- <u>Good Faith Deposit</u>.  Each Qualified Bid (including a Qualified Bid that includes a Credit Bid) must be accompanied by a good faith deposit (the "<u>Good Faith Deposit</u>") in the form of cash (or other form acceptable to the Debtors in their sole and absolute discretion) in an amount equal to the greater of (a) $10 million or (b) 10% of the Purchase Price (inclusive of any amount thereof comprising Credit Bid consideration) offered to purchase the applicable Assets (or portion thereof); <u>provided</u> that, with respect to a bid (other than a bid on Assets owned by M & G Polymers USA, LLC) that includes a Credit Bid by the DIP Lender or the Pre-Petition First Lien Lender, the Good Faith Deposit shall equal $20 million.  All Good Faith Deposits shall be held in escrow in a non-interest bearing account identified by the Debtors until no later than five business days after the conclusion of the Auction unless such bidder is selected as the Successful Bidder or as a Backup Bidder (as hereinafter defined) and thereafter returned to the respective Qualified Bidders in accordance with the Bidding Procedures or, in the case of a Stalking Horse Bidder, if any, return of its Good Faith Deposit shall be governed by the Stalking Horse Agreement. The Backup Bidder's Good Faith Deposit shall be returned by the Debtors upon the earlier of (a) three business days after the closing of the Sale Transaction and (b) 75 days from the date of the Sale Hearing.  The Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) (other than any Stalking Horse Bidder's Good Faith Deposit or the DIP Lender or Pre-Petition First Lien Lender's Good Faith Deposit) in their sole and reasonable discretion.

- <u>Adequate Assurance</u>.  A Qualified Bid must include evidence of the Prospective Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Prospective Bidder's ability to perform future obligations arising under the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the Prospective Bidder, in a form that will permit the immediate dissemination of such evidence to the Counterparties to such contracts and leases.

- <u>Representations and Warranties</u>:  A Qualified Bid must include the following representations and warranties: (i) expressly state that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its bid; and

(ii) a statement that the Prospective Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the applicable Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in a Stalking Horse Agreement or the form asset purchase agreement (as applicable) signed by the Prospective Bidder and ultimately accepted and executed by the Debtors.

- Authorization: A Qualified Bid must include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution and delivery of a Final Bid, participation in the Auction and closing of the proposed Sale Transaction(s) in accordance with the terms of the Final Bid and these Bidding Procedures; provided that, if the Prospective Bidder is an entity specially formed for the purpose of effecting the Sale Transaction, a Qualified Bid must provide written evidence acceptable to the Debtors of the approval by the equity holder(s) of such Prospective Bidder.

- Other Requirements: A Qualified Bid shall: (i) state that the bid is binding, not subject to or conditioned on any further due diligence and irrevocable until the selection of the Successful Bid (as defined below) in accordance with these Bidding Procedures; provided that if such Prospective Bidder is selected as the Successful Bidder or Backup Bidder, its bid must remain irrevocable until the earlier of (a) Debtors' consummation of a Sale Transaction with the Successful Bidder and (b) 75 days from the date of the Sale Hearing; (ii) if the bid is for Assets subject to a Stalking Horse Agreement, state that (a) the bid is not subject to conditions more burdensome than those in such Stalking Horse Agreement and (b) the bid is on terms that are determined to be better than the terms of such Stalking Horse Agreement; (iii) expressly state that the Prospective Bidder is committed to closing the proposed Sale Transaction(s) contemplated by the bid as soon as practicable; (iv) except for Bid Protections (as defined in the Bidding Procedures Order) for a potential Stalking Horse Bidder approved by an order of the Court, expressly state and acknowledge that no Prospective Bidder shall be entitled to a break-up fee, termination fee, expense reimbursement, or similar type of "bid protection" in connection with the submission of a bid; (v) expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for the applicable Assets and/or participating in the Auction; (vi) not contain any financing contingencies of any kind; (vii) not contain any condition to closing of the proposed Sale Transaction(s) on the receipt of any third party approvals (excluding Court approval and any applicable required governmental and/or regulatory approval); (viii) provide information on the Prospective Bidder's existing involvement and/or extent of production capacity it owns or operates in the North American and global markets for PTA or PET, set forth each regulatory and third-party approval required for the Prospective Bidder to consummate the Sale Transaction and the time period within which the Bidder expects to receive such regulatory or third-party approvals, and state that all necessary filings under applicable regulatory, antitrust and other laws will be made and that payment of the fees associated therewith shall be made by the Prospective Bidder (all such information, "Regulatory Disclosures")); (ix) expressly state that the Prospective Bidder agrees to serve as a backup bidder (a "Backup Bidder") if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable Assets; (x) include contact

| | |
|---|---|
| | information for the specific person(s) the Debtors should contact in the event they have any questions about the Prospective Bidder's Final Bid; (xi) be received by the Bid Notice Parties set forth in Section X.A of the Bidding Procedures by the Final Bid Deadline; and (x) certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture or other entity in which more than one bidder (or any of its affiliates) has a direct or indirect interest, unless consented to in writing by the Debtors, and that its bid represents a binding, good faith and bona fide offer to purchase the Assets identified if selected as the Successful Bid or Backup Bid at the Auction. |
| **Disqualification of Final Bids:** | The Debtors, in their business judgment and in consultation with the Consultation Parties, reserve the right to reject any Final Bid (other than any Stalking Horse Bid), including without limitation, if such Final Bid: (i) is on terms that are more burdensome or conditional than the terms of any Stalking Horse Agreement; (ii) requires any indemnification of the Prospective Bidder; (iii) is not received by the Final Bid Deadline; (iv) is subject to any contingencies (including representations, warranties, covenants, financing, due diligence and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the applicable Assets; or (v) does not, in the Debtors' determination, include a fair and adequate price or the acceptance of which would not be in the best interests of the Debtors estates or the Auction. Any Final Bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid. In the event that any Final Bid is so rejected, the Debtors shall cause the Good Faith Deposit of such Prospective Bidder to be refunded to it within five business days after the Final Bid Deadline. |
| **Selecting Qualified Bidders** | The Debtors, in consultation with the Consultation Parties,[11] will make a determination regarding which Final Bids qualify as Qualified Bids and as Baseline Bids (as defined below) and shall notify bidders whether they have been selected as Qualified Bidders prior to the Auction. |
| **Bid Protections** | Other than the Bid Protections provided to a Stalking Horse Bidder (if any), subject to approval by the Court pursuant to a Stalking Horse Motion, no party submitting a Final Bid, whether or not such Final Bid is determined by the Debtors to qualify as a Qualified Bid, shall be entitled to a break-up fee or expense reimbursement, or any other bid protection, unless such break-up fee, expense reimbursement or other bid protection is approved by the Court. <br><br> The Debtors are authorized, but not required, to provide customary bid protections to Stalking Horse Bidders, if any, subject to further approval of the Court. |

---

[11]     The "Consultation Parties" are (a) the DIP Lender and Inbursa and their counsel Cleary Gottlieb Steen & Hamilton LLP and Young Conaway Stargatt & Taylor, LLP; (b) DAK and its counsel Weil, Gotshal & Manges LLP and Morris, Nichols, Arsht & Tunnell LLP; and (c) the Committee and its counsel, Milbank, Tweed, Hadley & McCoy LLP and Cole Schotz P.C.

| | |
|---|---|
| **Auction** | <u>Time and Place</u>:  If the Debtors receive more than one Qualified Bid for any of the Assets, the Debtors shall conduct the Auction.  The Auction, if required, will be conducted at the offices of Jones Day, 250 Vesey Street, New York, New York 10281 on **February 28, 2018**, at a time to be determined, or on such other date or at such other location as designated by the Debtors; <u>provided</u> that the Auction shall not be rescheduled for a date that is beyond the outside date or milestone for the Auction set forth in the DIP Loan Documents (as defined in the DIP Orders).  If the Debtors receive no more than one Qualified Bid (including any Stalking Horse Bid(s) or Credit Bid by the DIP Agent, the DIP Lender and/or Pre-Petition First Lien Lender) with respect to any of the Assets, the Debtors may determine, in their reasonable discretion, not to hold the Auction for such Assets and instead declare such Qualified Bid as the Successful Bid on such Assets and request at the Sale Hearing (defined below) that the Court approve the applicable Asset Purchase Agreement with the applicable Successful Bidder (including any Stalking Horse Agreement(s) with the applicable Stalking Horse Bidder(s)). <br><br> <u>Transcription</u>.  The bidding at the Auction shall be transcribed or videotaped and the Debtors shall maintain a transcript or video of all bids made and announced at the Auction. <br><br> <u>Participants and Attendees</u>:  Only Qualified Bidders that have submitted Qualified Bids (including any Stalking Horse Bids) by the Final Bid Deadline are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in consultation with the Consultation Parties in accordance with these Bidding Procedures.  Qualified Bidders participating in the Auction must appear in person at the Auction or through a duly authorized representative.  Subject to the Auction procedures set forth in Section VII.B of the Bidding Procedures, the Auction will be conducted openly and all Qualified Bidders, Specified Lenders and the Consultation Parties are permitted to attend; <u>provided</u> that the Debtors may, in their sole and exclusive discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder at the Auction. <br><br> Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the submission of any bid or the Auction and (ii)  each Qualified Bid it submits at the Auction is a binding, good faith and bona fide offer to purchase the Assets identified in such bid. |
| **Baseline Bids** | Prior to the commencement of the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids that the Debtors determine in their reasonable business judgment, after consultation with the Consultation Parties, to be the highest and/or best Qualified Bid (the "<u>Baseline Bid</u>") to all other Qualified Bidders who have submitted a Qualified Bid prior to the Final Bid Deadline.  Bidding at the Auction shall commence at the amount of the Baseline Bid. |
| **Minimum Overbid** | At each round of bidding, Qualified Bidders may submit successive bids higher than the Leading Bid from the prior round (or the Baseline Bid for the first round), based on and increased in an amount of at least 1,000,000 or such other amount as the Debtors may determine from the Leading Bid (or Baseline Bid for the first round) for the applicable Assets (each such bid, a "<u>Minimum Overbid</u>"); <u>provided</u>, <u>however</u>, that to the extent that the Baseline Bid includes a Qualified Bid for Assets that are subject to a Stalking Horse Agreement, if any, the bidding for such Assets at the first round of bidding will start at an amount equal to the sum of:  (i) the value of the Baseline Bid, (ii) the amount of the Bid Protections, and (iii) the Minimum Overbid amount (each such bid, a  "<u>Stalking Horse Overbid</u>").  The Debtors may, in their reasonable discretion, announce increases or reductions to Minimum Overbids or Stalking Horse Overbids at any time during the Auction. <br><br> Additionally, with the exception of the DIP Lender and the Pre-Petition First Lien Lender, upon a Qualified Bidder's declaration of its bid, it must commit on the record to |

| | pay following the Auction, if such bid were to be the Successful Bid or the Backup Bid, the incremental amount of its Good Faith Deposit calculated based on the increased Purchase Price of such bid (such Good Faith Deposit so increased, the "Incremental Deposit Amount").

Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any bid subsequent to a Baseline Bid, the Debtors will at each round of bidding, give effect to the Bid Protections payable to any Stalking Horse Bidder, if any, under the applicable Stalking Horse Agreement, as well as any additional liabilities to be assumed by a Qualified Bidder and whether they are secured or unsecured and any additional costs that may be imposed on the Debtors. To the extent that a Leading Bid has been accepted entirely or in part because of the addition, deletion or modification of a provision or provisions in the applicable Asset Purchase Agreement, the Debtors will identify such added, deleted or modified provision or provisions and the value thereof. |
|---|---|
| **Leading Bid** | After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce, in consultation with the Consultation Parties, the bid that they believe to be the highest or otherwise best offer for the applicable Assets (the "Leading Bid") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

The Auction may include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to be present for all rounds of bidding and to submit additional bids and make modifications to their proposed Asset Purchase Agreement at the Auction to improve their bids; provided that such bidders comply with Section VII.B.4 of the Bidding Procedures. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.

The Debtors shall have the right to determine, in their reasonable discretion, and in consultation with the Consultation Parties, which bid is the highest or otherwise best bid with respect to the applicable Asset(s) and reject at any time, without liability, any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, Bankruptcy Rules or the Local Rules, these Bidding Procedures (including the Credit Bid Overbid Requirements), any order of the Court or the best interests of the Debtors and their estates.

Any Leading Bid made from time to time by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a higher or otherwise better bid submitted by another Qualified Bidder during the Auction as a Leading Bid and (ii) such Leading Bid is not selected as the Backup Bid.

To the extent not previously provided (which will be determined by the Debtors), a Qualified Bidder submitting a subsequent bid must submit at the Debtors' request, as part of its subsequent bid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction at the Purchase Price contemplated by such subsequent bid. |
| **No Round-Skipping** | To remain eligible to participate in the Auction for a particular Asset, in each round of bidding, (i) each Qualified Bidder must submit a bid in such round of bidding that is of a higher value or is a better offer than the immediately preceding bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid such round of bidding or to submit a bid in such round of bidding that is of a higher value or is a better offer than the immediately preceding bid submitted by a Qualified Bidder in such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Asset; provided that the Debtors |

| | |
|---|---|
| | may opt to utilize Auction procedures other than the foregoing procedure for any round of bidding. |
| | To the extent to the Debtors conduct multiple auctions for different subgroupings of the Assets (each, a "Sub-Auction") and a Qualified Bidder declines to participate in any specific Sub-Auction or Sub-Auctions, or any round of bidding for such specific Sub-Auctions, such Qualified Bidder shall still be permitted to offer a bid in subsequent Sub-Auctions, including bids that include assets subject to a prior Sub-Auction. This includes the right to bid on groupings of Assets that may include specific Assets which were the subject of an earlier Sub-Auction. |
| **Successful Bids** | Immediately prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, shall (i) determine, consistent with the Bidding Procedures, which bid constitutes the highest or otherwise best bid(s) for the applicable Asset(s) (each such bid, a "Successful Bid") and (ii) notify all Qualified Bidders at the Auction for the applicable Asset(s) of the identity of the bidder that submitted the Successful Bid (each such bidder, the "Successful Bidder") for such Asset(s) and the amount of the Purchase Price and other material terms of the Successful Bid. As a condition to remaining the Successful Bidder, the Successful Bidder (other than the DIP Lender or the Pre-Petition First Lien Lender) shall wire to the Debtors in immediately available funds the Incremental Deposit Amount, calculated based on the Purchase Price of the Successful Bid, no later than one business day following the date on which the Auction Results Notification is made. |
| **Backup Bids** | Immediately prior to the conclusion of the Auction, the Debtors shall (i) determine, in consultation with the Consultation Parties and consistent with these Bidding Procedures, which Qualified Bid is the next highest or otherwise best Qualified Bid for the applicable Assets after the Successful Bid (each such Qualified Bid, a "Backup Bid") and (ii) notify all Qualified Bidders at the Auction for the applicable Asset of the identity of the Backup Bidder and the amount of the Purchase Price and other material terms of the Backup Bid (such notification, together with the notification described in Section VII.C.1 of the Bidding Procedures, the "Auction Results Notification"). As a condition to remaining the Backup Bidder, the Backup Bidder (other than the DIP Lender or the Pre-Petition First Lien Lender) shall wire to the Debtors in immediately available funds the Increased Deposit Amount, calculated based on the Purchase Price of the Backup Bid, no later than one business day following the date on which the Auction Results Notification is made. |
| | The Backup Bid remains binding on the Backup Bidder until the earlier of (i) the closing of a Sale Transaction for the applicable Assets pursuant to the Successful Bid and (ii) 75 days after the date of the Sale Hearing. If the Successful Bidder for the applicable Assets fails to consummate a Sale Transaction, the Backup Bidder shall be deemed the new Successful Bidder for the applicable Assets, and the Debtors will be authorized, but not required, to consummate a Sale Transaction for the applicable Assets with the Backup Bidder. |
| **Auction Results** | On or before one business day after the Auction, the Debtors shall file with the Court, serve on the Sale Notice Parties and cause to be published on the website maintained by the Debtors' claim and noticing agent, Prime Clerk, LLC located at http://cases.primeclerk.com/rngusa (the "Prime Clerk Website"), the results of the Auction, which shall include (i) a copy of the Successful Bid(s) and Backup Bid(s); and (ii) the identities of the Successful Bidder(s) and Backup Bidder(s). |
| **Modification of Procedures** | The Debtors may, in any manner consistent with the Debtors' fiduciary duties and applicable law, modify the rules, procedures and deadlines set forth herein (including, without limitation, extending the Final Bid Deadline, modifying the Qualified Bid Requirements, modifying the procedures for conducting the Auction, rescheduling the Auction or adjourning the Sale Hearing) or adopt new rules, procedures and deadlines or otherwise modify these Bidding Procedures in order to, in their sole and reasonable |

discretion, better promote the goals of such procedures, namely, to maximize value for the estates; <u>provided</u> that all modifications and additional rules, procedures and deadlines may in no event permit the submission of bids after the close of the Auction; and <u>provided, further,</u> that the Debtors may not amend these Bidding Procedures or the bidding process to (a) reduce or otherwise modify their obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court, (b) reduce or otherwise modify their obligations to obtain consent from the DIP Lender or Pre-Petition First Lien Lender pursuant to these Bidding Procedures, the DIP Orders or the DIP Loan Documents (as defined in the DIP Orders), as applicable or (c) provide for any extensions of deadlines, other modifications of the Bidding Procedures or acceptance of any bid which limit the rights set out in or the protections provided to the DIP Agent, the DIP Lender and the Pre-Petition First Lien Lender as set forth in the DIP Orders, the DIP Loan Documents or the Pre-Petition First Lien Documents (each as defined in the DIP Orders), or are inconsistent with the Debtors' agreements and obligations thereunder, in each case, without the prior written consent of the Pre-Petition First Lien Lender or the DIP Agent or DIP Lender, as applicable. All such modifications and additional rules will be communicated to each of the Consultation Parties, the Sale Notice Parties, Prospective Bidders and Qualified Bidders; <u>provided</u> that, to the extent such modifications occur at the Auction, disclosure of such modifications is limited to those in attendance at the Auction.

## B.    Notice Procedures

13.    The Debtors request approval of the Sale Notice substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u>. Within two days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by first class mail or email on: (a) the Consultation Parties, as applicable, (b) any counsel to a Stalking Horse Bidder, (c) DAK Americas, LLC, (d) Macquarie Investments US Inc., (e) all persons and entities known by the Debtors to have expressed an interest to the Debtors in a Sale Transaction involving any of the Assets during the past 12 months, including any person or entity that has submitted a bid for any of the Assets, as applicable, (f) all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors), (g) all non-Debtor parties to any Contracts that are proposed to be assumed or rejected in connection with a Sale Transaction, (h) any governmental authority known to have a claim against the Debtors in these Cases, (i) the United States Attorney General, (j) the Antitrust Division of the United States Department of Justice, (k) the United States Attorney for the District of Delaware, (l) the Office of the Attorney General in

each state in which the Debtors operate, (m) the Federal Trade Commission, (n) the office of the United States Trustee for the District of Delaware, (o) counsel for the Committee, (p) the Internal Revenue Service, (q) the United States Securities and Exchange Commission, (r) all of the Debtors' known creditors (for whom identifying information and addresses are known to the Debtors), (s) all parties who have filed a notice of appearance and request for service of papers in these Cases pursuant to Bankruptcy Rule 2002 and (t) all other persons and entities as directed by the Court.

14. In addition, the Debtors will also post the Sale Notice and the Bidding Procedures Order on the Prime Clerk Website and no later than five days after entry of the Bidding Procedures Order, the Debtors will cause the Publication Notice to be published once in the *Wall Street Journal*, *Plastics News* and/or *Corpus Christi Caller-Times*.

15. The Debtors submit that the procedures described above (the "Notice Procedures"), coupled with the Assumption and Assignment Procedures further described below, constitute adequate and reasonable notice of the key dates and deadlines for the Sale, including, among other things, the deadline to object to the Sale of the Assets, assumption and assignment of the Contracts and Cure Costs, the Auction, the Final Bid Deadline and the Sale Hearing.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

16. In connection with any Sale Transaction, the Debtors propose to assume and assign to the Successful Bidder(s) the Proposed Assumed Contracts. The Assumption and Assignment Procedures will, among other things, notify the Counterparties of the potential assumption and assignment of their Contracts and the Debtors' calculation of Cure Costs with respect thereto. Specifically, the Assumption and Assignment Procedures provide that:

      (a)    Assumption and Assignment Notice: Within five business days after the entry of the Bidding Procedures Order, the Debtors shall file with the Court, serve on the Sale Notice Parties, including each Counterparty to a

Contract that may be assumed in connection with any Sale Transaction, and cause to be published on the Prime Clerk Website, the Assumption and Assignment Notice, which shall (i) identify the Contracts; (ii) list the Debtors' good faith calculation of Cure Costs with respect to each Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval; and (iv) prominently display the deadline to file objections to the assumption, assignment or sale of the Debtors' Proposed Assumed Contracts. In the event that the Debtors identify Counterparties that were not served with the Assumption and Assignment Notice, the Debtors may subsequently serve such Counterparty with an Assumption and Assignment Notice, and the following procedures will nevertheless apply to such Counterparty; provided, however, that the deadline to file a Cure Objection and/or Adequate Assurance Objection with respect to such Counterparty shall be **5:00 p.m. (prevailing Eastern Time) on the date that is 14 days following service of the Assumption and Assignment Notice.**

(b)     Proposed Assumed Contracts Notice: As soon as reasonably practicable after the conclusion of the Auction, but no later than **March 1, 2018**, the Debtors shall file with the Court, serve on the Sale Notice Parties (as defined in the Bidding Procedures), including each applicable Counterparty and cause to be published on the Prime Clerk Website a list of the Proposed Assumed Contracts that the Debtors will seek to assume and assign pursuant to a Stalking Horse Agreement, if any, or one or more Asset Purchase Agreements submitted by a Successful Bidder (as defined in the Bidding Procedures) (such notice, a "Proposed Assumed Contracts Notice").

(c)     Objection Recipients: Any Counterparty that wishes to object to the assumption or assumption and assignment of a Contract to a Successful Bidder must file with the Court and serve its objection on the Objection Recipients (as defined in the Bidding Procedures).

(d)     Cure Costs Objections.

(i)     Deadline: Any Counterparty to a Proposed Assumed Contract that wishes to object to the proposed assumption and assignment of the Proposed Assumed Contract, the subject of which objection is the Debtors' proposed Cure Costs to cure any outstanding monetary defaults then existing under such contract (each, a "Cure Objection"), shall file with the Court and serve on the Objection Recipients its Cure Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than **5:00 p.m. (prevailing Eastern Time) on the date that is 14 days after filing of the Assumption and Assignment Notice**.

(ii) <u>Resolution</u>:  The Debtors, in consultation with the Consultation Parties, and a Counterparty that has filed a Cure Objection shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention.  If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objections at a hearing scheduled pursuant to the following paragraph.  If a Cure Objection is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolved Cure Objection occurs prior to or after the closing of the applicable Sale Transaction, the Debtors may determine that any Proposed Assumed Contract subject to such resolved Cure Objection will no longer be assumed and assigned pursuant to the applicable Sale Transaction (subject to the terms of the applicable Sale Transaction).  All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to, and under a Contract, if it is ultimately designated a Proposed Assumed Contract, will be heard at the Sale Hearing.

(iii) <u>Adjournment</u>:  If a timely filed Cure Objection cannot otherwise be resolved by the parties, such objection may be heard by the Court at the Sale Hearing or subsequent to the Sale Hearing (an "<u>Adjourned Cure Objection</u>"); <u>provided</u> that the determination of whether a Cure Objection may be heard at the Sale Hearing is in the Debtors' and the Court's discretion.  An Adjourned Cure Objection may be resolved after the closing date of the applicable Sale Transaction(s); <u>provided</u> that the Sale Transaction provides for the establishment of a cash reserve equal to the cure amount the objecting Counterparty reasonably believes is required to cure the asserted monetary default under the applicable Proposed Assumed Contract (or as otherwise may be provided under the applicable Asset Purchase Agreement or as so ordered by the Court).  Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the applicable Proposed Assumed Contract that was the subject of such Adjourned Cure Objection shall be deemed assumed and assigned to the applicable Successful Bidder, as of the closing date of the applicable Sale Transaction(s).

(iv) <u>Failure to Timely Object</u>:  If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Cure Objection, the Counterparty shall be deemed to have consented to the assumption and assignment of the Proposed Assumed Contract and the adequate assurance of future performance in connection therewith (unless such Counterparty has timely filed an Adequate Assurance Objection (as defined below) with respect to the Proposed Assumed Contract) to the applicable Successful Bidder

and forever shall be barred from asserting any objection with regard to such assumption and assignment or the adequate assurance of future performance in connection therewith. The Cure Costs set forth in the Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Proposed Assumed Contract under section 365(b) of the Bankruptcy Code, notwithstanding anything to the contrary in any Proposed Assumed Contract, or any other document, and the Counterparty to the Proposed Assumed Contract shall be deemed to have consented to the Cure Costs and forever shall be barred from asserting any other claims related to such Proposed Assumed Contract against the Debtors or any Successful Bidder(s) or their respective property.

(e)  Adequate Assurance Objections.

(i)  Deadline:  Any Counterparty to a Proposed Assumed Contract that wishes to object to the proposed assumption and assignment of the Proposed Assumed Contract, the subject of which objection is a Successful Bidder's proposed form of adequate assurance of future performance with respect to such contract (each, an "Adequate Assurance Objection"), shall file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than **March 2, 2018 at noon (prevailing Eastern Time)**.

(ii)  Resolution of Objections:  The Debtors and a Counterparty that has filed an Adequate Assurance Objection shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention.  If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, such objection and all issues of adequate assurance of future performance of the applicable Successful Bidder shall be determined by the Court at the Sale Hearing.

(iii)  Failure to Timely Object:  If a Counterparty fails to timely file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, the Counterparty shall be deemed to have consented to the assumption and assignment of the Proposed Assumed Contract (unless the Counterparty has filed a timely Cure Objection with respect to the Proposed Assumed Contract) and adequate assurance of future performance in connection therewith to the applicable Successful Bidder and forever shall be barred from asserting any objection with regard to such assumption and assignment or adequate assurance of future performance in

connection therewith. The applicable Successful Bidder shall be deemed to have provided adequate assurance of future performance with respect to the applicable Proposed Assumed Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code, notwithstanding anything to the contrary in the Proposed Assumed Contract, or any other document, and the Counterparty to the Proposed Assumed Contract shall be deemed to have consented to the Cure Costs and forever shall be barred from asserting any other claims related to such Proposed Assumed Contract against the Debtors or any Successful Bidder(s) or their respective property.

## APPLICATION OF SALE TRANSACTION PROCEEDS[12]

17.     As further reflected in the proposed Sale Order, all proceeds shall be distributed in accordance with the terms of the Final DIP Order and the DIP Loan Documents as further set forth in paragraph 26 of the proposed Sale Order. Among other things, the Debtors' DIP Financing includes provisions that reflect the DIP Secured Parties, the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party and the Obligors' agreement regarding a mechanism to apply the proceeds of any Pre-Petition Collateral sold in a Sale Transaction that constitutes a CC Sale. This agreement governs the application of proceeds of any Pre-Petition Collateral in a CC Sale, including to effect the repayment of the DIP Obligations under the DIP Financing, without which the Debtors would not be able to undertake a sales process with respect to the Assets. This mechanism respects the seniority of the Senior Prior Liens, if any, under applicable non-bankruptcy law and provides a means by which professionals of the Obligors' estates will be able to obtain funding for the "carve-out" proposed in connection with the DIP Financing. The foregoing mechanism and terms are set forth in detail under the DIP Loan Documents and the DIP Orders.

---

[12]     This section is qualified, in its entirety by the provisions of the DIP Loan Documents and the DIP Orders. Unless otherwise set forth in this section, capitalized terms used but not otherwise defined have the meanings given to them in the Final DIP Order.

**BASIS FOR RELIEF**

A.     **The Bidding Procedures Are Appropriate and Are in the Best Interests of the Debtors and their Estates**

18.     Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." The paramount goal of any proposed sale of property of the debtor's estate is to maximize the value of the sale proceeds received by the estate. *See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (the debtor has the "fiduciary duty to maximize the value of the bankruptcy estate."); *Burtch et al. v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564- 65 (8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (citing *Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors."). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for fair and efficient resolution of bankrupt estates.").

19.    The proposed Bidding Procedures are designed to facilitate a Sale process in compliance with the Bankruptcy Rules and relevant case law by providing a method by which the Debtors will be able to maximize the value of the Assets.  The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to attract competitive and active bidding from those parties with the financial capability to do so.  The Bidding Procedures will allow the Debtors to conduct the Auction in a fair, controlled and transparent manner that will encourage participation by financially capable bidders that demonstrate the financial wherewithal to close a transaction.  To the extent the Debtors have identified and obtained Court approval of any Stalking Horse Bidders by the Final Bid Deadline, such Stalking Horse Bidders will enable the Debtors to set a floor for the value of the Assets subject to the respective Stalking Horse Bid, while also increasing the likelihood that the Debtors will receive the greatest possible consideration for the applicable Assets at the Auction.  The Debtors submit that courts in this District and other districts routinely approve procedures substantially similar to the proposed Bidding Procedures.  *See*, *e.g.*, *In re Golfsmith, Inc.*, Case No. 16-12033 (CSS) [Docket No. 196] (Bankr. D. Del. Oct. 6, 2016) (approving bidding procedures absent an existing stalking horse bidder and permitting the debtors to appoint and provide bid protections to, subject to court approval, one or more stalking horse bidders prior to the auction); *In re Sports Authority, Inc.*, No. 16-10257 (MFW) [Docket No. 1186] (Bankr. D. Del. Apr. 14, 2016) (approving bidding procedures absent an existing stalking horse bidder and permitting the debtors to select a stalking horse bidder following the staking horse bid deadline and offer bid protections, subject to court approval, to such bidder(s)); *In re Haggen Holdings, LLC*, No. 15-11874 (KG) [Docket No. 911] (Bankr. D. Del. Dec. 4, 2015) (approving bidding procedures absent an existing stalking horse bidder and permitting the debtors to select a stalking horse bidder 14 days prior to the bid

deadline and to offer bid protections, subject to court approval, to such bidder(s)); *In re Quicksilver Resources Inc.*, Case No. 15-10585 (LSS) [Docket No. 681] (Bankr. D. Del. Oct. 6, 2015) (approving bidding procedures absent an existing stalking horse bidder and permitting the debtors to select a stalking horse bidder up until one day after the bid deadline and to offer bid protections, subject to court approval, to such bidder(s)); *In re Aeropostale, Inc.*, Case No. 16-11275 (SHL) [Docket No. 527] (Bankr. S.D.N.Y. July 29, 2016) (approving bidding procedures absent an existing stalking horse bidder and permitting the debtors to select, prior to the bid deadline, any potential bidder to serve as a stalking horse); *see also In re AFA Investment Inc.*, Case No. 12-11127 (MFW) [Docket No. 242] (Bankr. D. Del. May 8, 2012) (approving bidding procedures absent an existing stalking horse bidder and permitting the debtors to appoint stalking horse bidders up until 24 hours prior to the auction and to offer pre-approved bid protections to such bidders). Accordingly, the Bidding Procedures should be approved as reasonable, appropriate, and in the best interests of the Debtors, their estates and all parties in interest.

### B. Bid Protections Requested for any Stalking Horse Bidders will be Reasonable and Justified

20. To the extent the Debtors enter into a Stalking Horse Agreement, it is appropriate to offer and ultimately provide, subject to Court approval, the Stalking Horse Bidder with Bid Protections. While the Debtors will file a separate motion to the extent they may seek to grant Bid Protections to any Stalking Horse Bidder, in general Bid Protections are appropriate in these cases because the Debtors will enter into a Stalking Horse Agreement with a Stalking Horse Bidder only if the Debtors, in consultation with the Consultation Parties, believe such agreement will maximize the ultimate sale price for the applicable Assets, and the Bid Protections remain subject to approval by the Court. Under Third Circuit precedent, break-up fees, termination fees, topping fees, expense reimbursement and similar types of "bid protection" constitute

administrative expenses,[13] and therefore, the payment of such fees must provide a postpetition benefit to the bankruptcy estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999). In *O'Brien*, the Third Circuit provided two examples of a potential benefit accruing from the payment of a termination fee. *Id.* First, a benefit to the estate may arise if, "assurance of a breakup fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, bid protections encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

21. Courts have recognized that termination and similar fees may be used to protect bidders in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code and that such fees can be "important tools to encourage bidding and to maximize the value of the Debtors' assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Such protections enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity of obtaining even greater benefits for the estate through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (stating that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted) (internal quotation marks omitted).

---

[13] The applicable Debtors' entry into a Stalking Horse Agreement and/or provision of Bid Protections to a Stalking Horse Bidder shall be in compliance with the DIP Orders, the DIP Loan Documents (as defined in the DIP Orders) and the Debtors' obligations thereunder.

22.     The Debtors intend to negotiate any Stalking Horse Agreement at arms'-length and in good faith and will enter into a Stalking Horse Agreement with a Stalking Horse Bidder only if the Debtors, in consultation with the Consultation Parties, believe it will maximize the return for the sale of the applicable Assets and will not chill bidding.  Further, the ability to offer the Bid Protections, subject to Court approval pursuant to a Stalking Horse Motion to be heard on no less than ten days' notice as determined by the Court subject to its availability, and no later than the Final Bid Deadline, may be necessary to encourage potential purchasers to finalize their bids and serve as Stalking Horse Bidders to promote a competitive sales process.  A Stalking Horse Bid could secure an adequate price floor for the applicable Assets that are subject to the bid, and ensure that competing bids will be materially higher or better than that contained in the respective Stalking Horse Agreement.  Accordingly, the Debtors' ability to offer the Bid Protections enables them to ensure the sale of some or all of the Assets to a contractually committed bidder at a price they believe to be fair, while, at the same time, providing them with the potential for even greater benefit to their estates.  Thus, the authorization for the Debtors to offer the Bid Protections, subject to later Court approval on an expedited basis, is justified.  *See*, *e.g.*, *In re Golfsmith, Inc.*, Case No. 16-12033 (CSS) [Docket No. 196] (Bankr. D. Del. Oct. 6, 2016); *In re Sports Authority, Inc.*, No. 16-10257 (MFW) [Docket No. 1186] (Bankr. D. Del. Apr. 14, 2016).

**C.     Approval of the Sale is Warranted Under Section 363 of the Bankruptcy Code**

23.     Section 363 of the Bankruptcy Code provides that the debtor may, "after a notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363.  In turn, section 105(a) of the Bankruptcy Code provides that the court

"may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

24.     While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts uniformly agree that the business judgment standard applies.  *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).  Courts typically apply four factors in determining whether a section 363 sale is appropriate under the business judgment standard—namely, whether:  (a) a sound business justification exists for the sale; (b) adequate and reasonable notice of the sale was provided to interested parties; (c) the sale will produce a fair and reasonable price for the property; and (d) the parties have acted in good faith.  *Id.* at 1070 (setting forth the "sound business" purpose standard for the sale of the debtor's assets under section 363 of the Bankruptcy Code); *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (citing *Guilford Transportation Industries, Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)).  As such, it follows that when a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc.*

*(In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

> **1.    The Debtors Have Demonstrated a Sound Business Justification for the Sale of the Assets**

25.    A sound business justification exists where a sale of the debtor's assets are necessary to preserve the value of the Debtors' estates.  *See, e.g.*, *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . ."); *In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale).

26.    As set forth above, in the First Day Declaration and in the Augustine Declaration, the Debtors have demonstrated a sound business justification for the potential entry into one or more Stalking Horse Agreements and any Sale Transaction that may result from the Auction. The Debtors, as currently constituted, are no longer able to operate their businesses or continue construction at the Corpus Christi Plant without significant infusions of cash.  A sale is necessary to preserve the Assets in order to maximize the likelihood of going-concern bids and, therefore, the value of the Assets, consistent with the Debtors' fiduciary duties to their economic stakeholders.

27.    Further, to the extent any Stalking Horse Agreements are proposed for approval of the Court, there is a sound business purpose for potentially entering into one or more Stalking Horse Agreements, because any such agreements will provide a "floor" price for the Assets that are subject to such agreements, thereby increasing the likelihood that the ultimate price obtained for the applicable Assets will reflect a value-maximizing bid for such Assets.

28.     Accordingly, sound business justifications exist for the Sale of the Assets pursuant to the Bidding Procedures set forth in this Motion.

### 2.     The Notice Procedures Are Appropriate and Comply with Bankruptcy Rule 2002

29.     Bankruptcy Rule 2002(a) and (c) require the Debtors to notify creditors of the Sale, including a disclosure of the time and place of any auction, the terms and conditions of the sale and the deadline for filing any objections.

30.     The Debtors submit that the Notice Procedures comply with Bankruptcy Rule 2002 and are reasonably calculated to provide all creditors and known parties in interest with adequate and timely notice of a Sale Transaction, the Bidding Procedures, the Auction and the Sale Hearing.  Moreover, the Debtors are publishing the Publication Notice in the *Wall Street Journal*, *Plastics News* and/or *Corpus Christi Caller-Times*.  Accordingly, the Debtors request that the Court approve the Notice Procedures as set forth herein, including the form and manner of the Sale Notice and that no other further notice of the Bidding Procedures, the Auction and the Sale Hearing is necessary or required.

### 3.     The Proposed Sale Will Yield a Fair and Reasonable Purchase Price

31.     As set forth above, the Debtors believe that the proposed Sale will yield a fair and reasonable price for the Assets.  The Bidding Procedures were carefully designed to ensure that the Auction, if necessary, will yield the maximum value for the Debtors' stakeholders.  The Debtors have constructed the Bidding Procedures to encourage competitive bidding, while giving the Debtors the opportunity to review and analyze all competitive bids only from Qualified Bidders, who will have been vetted prior to the Auction.  These carefully constructed measures will prevent any bid that does not constitute a fair and adequate purchase price for the Assets or any combination thereof.

4. **The Bidding Procedures Ensure a Good Faith Process and the Ultimate Purchaser of the Applicable Assets Is Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

32.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good faith purchaser.  Specifically, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . .were stayed pending appeal.

11 U.S.C. § 363(m).

33.     While the Bankruptcy Code does not define good faith, the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn., Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983) (other citations omitted); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) (noting that the type of "misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders.").

34.     The Bidding Procedures were designed with the goal of producing a fair and transparent bidding process to allow the Debtors to attract the best offers for the Assets.  The Successful Bidder(s) and the Debtors will have negotiated at arm's-length and in good faith for the purchase of the Assets, pursuant to a process providing for an Auction in certain

circumstances.  As such, the Debtors request that the ultimate purchaser of the applicable Assets

be entitled to the protections of section 363(m) of the Bankruptcy Code.

> **D.      The Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code**

35.      Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and

clear of all liens, claims, interests and encumbrances provided that one of the following

conditions are met:

> a.      applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> b.      such entity consents;
>
> c.      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> d.      such interest is in bona fide dispute; or
>
> e.      such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5).

36.      As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when

proceeding pursuant to section 363(b), it is only necessary for a debtor to meet one of the five

conditions of section 363(f).  *See id.*; *Mich. Employment Sec. Comm'n v. Wolverine Radio Co.*

*(In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy

Code section 363(f) written in disjunctive; holding that court may approve sale "free and clear"

provided at least one of the subsections of Bankruptcy Code 363(f) is met); *In re Zeigler*, 320

B.R. 362, 381 (Bankr. N.D.Ill. 2005); *In re Dundee Equity Corp.*, No. 89-B-10233 1992 Bankr.

LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such

that the sale free of the interest concerned may occur if any one of the conditions of §363(f) have

been met"); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

37.    The Debtors anticipate that, whichever Sale Transaction they pursue, whether that be with a Stalking Horse Bidder or Successful Bidder selected after the Auction, or any combination thereof, such Sale Transaction(s) will satisfy one of the five requirements set forth under section 363(f) of the Bankruptcy Code, either because there are proceeds sufficient to cover such liens or interests, the affected parties consent to the Sale of the applicable Assets or some other bases exist under section 363(f) of the Bankruptcy Code to warrant the sale of the applicable Assets free and clear of such liens or interests. Accordingly, the Debtors anticipate that one or more prongs of section 363(f) of the Bankruptcy Code will be satisfied with respect to parties that assert liens on or interests in the Assets.

**E.    Assumption and Assignment of Executory Contracts  and Unexpired Leases**

38.    Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease . . ."  11 U.S.C. § 365(a).

39.    Courts employ a business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *See*, *e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the Court. . .").  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

40.     The proposed Sale Transaction(s) will provide Successful Bidders the opportunity

to designate certain Contracts for assumption and assignment in connection with the Sale

Transaction.  Assumption of the Proposed Assumed Contracts is a sound exercise of the Debtors'

business judgment.  Assuming and assigning the Proposed Assumed Contracts will permit the

Debtors to attract the highest or otherwise best offer for the Assets, by enabling the Debtors to

offer parties in interest with a combination of Contracts that are integral to the ownership or

operation of the Assets that the Debtors seek to sell.

41.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any

executory contract provide "adequate assurance of future performance . . . whether or not there

has been a default in such contract."  11 U.S.C. § 365(f)(2).  Section 365(b), which codifies the

requirements for assuming an executory contract, provides, in pertinent part that the debtor may

only assume an executory contract if it:

> (A) cures, or provides adequate assurance that the [debtor] will
> promptly cure[s] [any defaults existing under the executory
> contract];
>
> (B) compensates, or provides adequate assurance that the [debtor]
> will promptly compensate, a party other than the debtor to such
> contract . . . for any actual pecuniary loss to such party resulting
> from such default; and
>
> (C) provides adequate assurance of future performance under such
> contract or lease.

11 U.S.C. § 365(b).

42.     While undefined by the Bankruptcy Code, adequate assurance is guided by "a

practical, pragmatic construction based upon the facts and circumstances of each case." *Carlisle

Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988)

(quoting *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill.

1995)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that

the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations.").  While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance."  *In re Carlisle Homes, Inc.*, 103 B.R. at 538.  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

43.     The Bidding Procedures specifically require any Qualified Bidders to provide financial and other information that would provide the Counterparties with adequate assurance of future performance of the applicable obligations under any Proposed Assumed Contracts included as part of a Qualified Bid.  Moreover, the Debtors will provide adequate assurance information to all Counterparties to the Proposed Assumed Contracts.  Finally, Counterparties unsatisfied with the proposed adequate assurance of future performance provided to them will be able to lodge objections with respect thereto.

44.     Accordingly, the Debtors have satisfied the requirements of section 365 of the Bankruptcy Code with respect to the assumption and assignment of the Proposed Assumed Contracts.

45.     In order to facilitate the assumption and assignment of the Proposed Assumed Contracts, the Debtors respectfully request that the Court find that all anti-assignment provisions included in the Proposed Assumed Contracts, including those Proposed Assumed Contracts that

have the effect of restricting or limiting assignment, to be unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[14]

### F.    Application of the Sale Proceeds is Appropriate

46.    The application of Sale proceeds in the manner described above (and as contemplated in the DIP Loan Documents and the DIP Orders) is appropriate under the circumstances and necessary to permit the Debtors to repay the DIP Obligations (which are subordinate to certain of the debt of the Pre-Petition First Lien Lender and obligations secured by the Senior Prior Liens, if any), as well as to ensure the payment of the Obligors' professionals retained in these Cases, without whom the Sale process likely would not be possible.  The repayment of obligations under a post-petition financing facility, such as the DIP Financing, is not an uncommon provision in a sale order and often approved by Courts in this and other districts.  *See, e.g.*, *In re Haggen Holdings, LLC*, No. 15-11874 (KG) [Docket No. 1700] at ¶ R (Bankr. D. Del. Mar. 29, 2016) (authorizing repayment in full of obligations under existing debtor-in-possession financing and authorizing debtors to offset a portion of the purchase price through a dollar-for-dollar reduction of obligations owing under a replacement debtor-in-possession financing); *In re Flying J, Inc.*, No. 08-13384 (MFW), 2009 Bankr. LEXIS 5718, at *81-83 (Bankr. D. Del. July 27, 2009) (in addition to allocating a portion of sale proceeds to repay certain secured lenders, authorizing the repayment of obligations under the debtors' debtor-in-possession financing); *In re Aeropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y.

---

[14]    Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease. . ." 11 U.S.C. § 365(f)(1).  Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

Sept. 13, 2016) [Docket No. 809] at ¶ 45 (authorizing repayment from sale proceeds of obligations under debtor-in-possession financing). Moreover, not only does the application of proceeds from a CC Sale of Pre-Petition Collateral described in paragraph 17 above represent a consensual agreement among the Obligors' secured funded-debt creditors, it also preserves the priority of any mechanics' liens in the applicable Obligor's capital structure and with respect to any recovery from the Sale proceeds to which such claims are entitled. *See, e.g.*, *In re Flying J, Inc.*, No. 08-13384 (MFW), 2009 Bankr. LEXIS 5718, at *81-83 (Bankr. D. Del. July 27, 2009) (authorizing the application of sale proceeds to repay certain secured lenders); *In re TH Props., L.P.*, No. 09-13201 (SR), 2010 Bankr. LEXIS 5696, at *17-19 (Bankr. E.D. Pa. July 28, 2010) (order approving the DIP authorized application of sale proceeds to, among other things, the repayment of mechanics' liens). Finally, the payment of the Obligors' professionals, whose efforts are critical to achieving a value-maximizing Sale, ensures that they will be reasonably and appropriately compensated in connection with the transaction.

## REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY

47.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Sale Order(s). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court order otherwise."

48.     As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders.

Accordingly, the Debtors submit that ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that each Rule applies.

## NOTICE

49.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates; (c) the Internal Revenue Service, the Securities and Exchange Commission and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or order of the Court; (d) Magnate S.à r.l. and its counsel, Kirkland & Ellis LLP and Klehr Harrison Harvey Branzburg LLP; (e) DAK Americas LLC and its counsel, Weil, Gotshal & Manges LLP and Morris, Nichols, Arsht & Tunnell LLP; (f) Trimont Real Estate Advisors, LLC and its counsel, Thompson & Knight LLP, (g) Control Empresarial de Capitales, S.A. De C.V., and Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financiero Inbursa and its counsel, Cleary Gottlieb Steen & Hamilton LLP and Young Conaway Stargatt & Taylor, LLP; (h) Macquarie Investments US Inc. and its counsel, Sidley Austin LLP and Ashby & Geddes, P.A., (i) the Committee and its counsel Milbank, Tweed, Hadley & McCoy LLP and Cole Schotz P.C.; and (j) all persons and entities that have filed a request for service of filings in these Cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

50.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order substantially in the form attached hereto as <u>Exhibit A</u>, (ii) enter the Sale Order (or Sale Orders), substantially in the form attached hereto as <u>Exhibit B</u>, authorizing the Sale of the Assets to the Successful Bidder(s)**,** and (iii) grant such other and further relief to the Debtors as the Court may be appropriate.

Dated:  November 16, 2017

PACHULSKI STANG ZIEHL & JONES LLP

/s/  *James E. O'Neill*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:            ljones@pszjlaw.com
                      joneill@pszjlaw.com
                      jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:      (212) 326-3939
Facsimile:      (212) 755-7306
Email:            sgreenberg@jonesday.com
                      scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:      (216) 586-7035
Facsimile:      (216) 579-0212
Email:            ceblack@jonesday.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*