IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) ) ) Chapter 11 |
| M & G USA CORPORATION, *et al.*, | ) Case No. 17-12307 (BLS) |
| Debtors. | ) ) (Jointly Administered) ) ) Re: Docket Nos. 5, 69 ) ) Obj. Deadline: 11/22/17, 4:00 p.m. ) Hearing Date: 12/1/17, 10:00 a.m. ) |

## OBJECTION OF APPALACHIAN POWER COMPANY d/b/a AMERICAN ELECTRIC POWER TO THE MOTION FOR INTERIM AND FINAL ORDER ESTABLISHING ADEQUATE ASSURANCE PROCEDURES WITH RESPECT TO DEBTORS' UTILITY PROVIDERS

Appalachian Power Company d/b/a American Electric Power ("AEP"), by counsel, hereby objects to the *Motion for Interim and Final Orders Establishing Adequate Assurance Procedures With Respect to Debtors' Utility Providers* (the "Utility Motion"), and sets forth the following:

### Introduction

Pursuant to a contract dated April 22, 2015 (the "2015 Contract") and applicable state-law tariffs, AEP provided electricity to Debtor M & G Polymers USA, LLC (the "Debtor") at the Debtor's manufacturing facility located in Apple Grove, West Virginia (the "Apple Grove Plant"). On October 22, 2017, all but essential operations at the Apple Grove Plant ceased.

Utility Motion at ¶ 13.  Prior to the halt of production at the Apple Grove Plant, the Debtor's average monthly utility bills with AEP were $493,724 (In Exhibit "C" to the Utility Motion, the Debtor estimated that their average monthly bills were $503,000).  After becoming aware of the plant shut down, AEP and the Debtor have been engaged in discussions to enter into a new post-petition contract reflecting the reduced electricity usage at the Apple Grove Plant.  As a result of the foregoing discussions, AEP believes that a contract capacity of 5,000 kW would be appropriate.  AEP estimates that the average monthly bill at the 5,000 kW capacity would be approximately $181,000. Based on the foregoing communications, AEP prepared a contract to reflect that reduced usage amount (the "Reduced Usage Contract").  On November 14, 2017, AEP's counsel provided Debtors' counsel with a copy of the most recent version of the proposed Reduced Usage Contract.

The Debtors have filed a motion seeking post-petition DIP Financing for certain Debtors [Docket No. 14] (the "DIP Financing Motion"), but it does not include financing for the Debtor.  Due to the Debtor's need for funding to maintain the Apple Grove Plant, the Debtor filed the *Motion of M&G Polymers USA, LLC For Approval of Agreed Interim Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay and (IV) Scheduling a Final*

2

*Hearing* (the "Cash Collateral Motion")(Docket No. 53) to use cash collateral until the earlier of (a) December 29, 2017 or (b) the day following written notice of a termination event. Exhibit A to the Cash Collateral Motion is a budget that only budgets $187,500 for electric utility expenses for the period November 3, 2017 to December 29, 2017 (As the Debtor filed for bankruptcy on October 24, 2017, it is not clear why the budget starts on November 3, 2017). The foregoing amount is woefully short of the $181,000 per month needed for AEP's estimated monthly utility charges for the period of October 24, 2017 to December 29, 2017 and the adequate assurance of payment necessary under Section 366(c). Furthermore, the foregoing access to financing ceases at the end of December 2017 even though it is unlikely that the Debtors need for utility service from AEP will cease at that time.

Despite all of the foregoing, the Debtors filed the Utility Motion improperly seeking to shift the Debtors' obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested by AEP under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Specifically, the Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account

containing $140,000 (the "Bank Account") for all of the Debtors' Utilities.

Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account. Moreover, even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment for the Utilities, the Court should reject it as an insufficient form of adequate assurance of payment for the reasons set forth in Section A.1. of this Objection.

AEP is seeking a two-month cash deposit of $362,000 from the Debtor, which is an amount that AEP is authorized to obtain pursuant to applicable state law. Based on all the foregoing, this Court should deny the Utility Motion as to AEP because the amount of AEP's post-petition deposit request is reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1. On October 24, 2017 (the "Polymers Petition Date"), the Debtor commenced its case under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that is now pending with this Court. On October 30, 2017 (the "Petition Date"), the other Debtors commenced their cases under Chapter 11 of the Bankruptcy Code that are now pending with this Court.

4

The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.    The Debtors' chapter 11 bankruptcy cases are being jointly administered.

### The Utility Motion

3.    On October 31, 2017, the Debtors filed the Utility Motion.

4.    Proper notice of the Utility Motion was not provided to AEP prior to the Court entering the *Interim Order Establishing Adequate Assurance Procedures With Respect to the Debtors' Utility Providers* (the "Interim Utility Order") on November 1, 2017.

5.    Because AEP was not properly or timely served with the Utility Motion and the Debtors never attempted to contact AEP regarding its adequate assurance request prior to the filing of the Utility Motion, AEP had no opportunity to respond to the Utility Motion or otherwise be heard at the *ex parte* hearing on the Utility Motion that took place on November 1, 2017, despite the fact that Section 366(c)(3) (presuming this was the statutory basis for the relief sought by the Debtors) requires that there be "notice" (to AEP) "and a hearing."

6.    The Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court

5

approval for their own form of adequate assurance of payment, which is the Bank Account containing $140,000 (the "Bank Account"). Utility Motion at ¶ 13.

7. The Debtors estimate that their monthly utility charges are approximately $900,000, but they expect that their monthly average utility bills will be significantly reduced going forward.

8. The Interim Utility Order provides that any amounts borrowed under the DIP Financing will not be used to pay for any expenses of the Debtor. Interim Utility Order at ¶ 18. As such, it is unclear if the Bank Account would even contain any monies on behalf of AEP because only the Debtor receives utility goods/services from AEP and any adequate assurance of payment for AEP would have to be provided by the Debtor.

9. Even if AEP had access to the proposed Bank Account, it is not acceptable to AEP and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by AEP under Section 366(c)(2).

10. The Utility Motion does not address why the Bank Account would be undercapitalized at approximately two-weeks of

supposed reduced usage average utility charges when the Debtors know that AEP is required by applicable state laws, regulations, tariffs or contract to bill the Debtor monthly. Moreover, AEP presumes that the Debtors want AEP to continue to bill the Debtor monthly in arrears pursuant to its billing cycle established by applicable state law or contract. Accordingly, if the Bank Account is relevant, which AEP disputes, the Debtors need to explain: (A) why they are only proposing to deposit supposed two-week amounts into the Bank Account; (B) whether they propose to deposit any money into the Bank Account on behalf of AEP; and (C) how such an insufficient amount could even begin to constitute adequate assurance of payment for AEP's monthly bills.

11.    Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amount of AEP's adequate assurance request pursuant to Section 366(c)(2). Rather, without providing any specifics, the Utility Motion merely states that the Bank Account, "together with the Debtors' ability to pay for future utility services in the ordinary course of business," constitutes sufficient adequate assurance to the Debtors' utility providers.  Utility Motion at ¶ 13.

<u>Facts Regarding the Debtors</u>

12.    The Debtors, together with the direct and indirect

11/16/2017 SL1 1495419v1 018560.00227

subsidiaries of Mossi & Ghisolfi S.p.A (collectively, the "M & G Group") are engaged in the plastic processing industry. *Declaration of Dennis Stogsdill In Support of First Day Pleadings* ("First Day Declaration") at ¶ 23.

13.    As of the Petition Date, the Debtors had outstanding debt in the aggregate principal amount of nearly $1.7 billion, with approximately $60 million of outstanding debt borrowed by the Debtor.  First Day Declaration at ¶ 19.

14.    A lack of liquidity to purchase necessary raw materials eventually forced the Debtors to cease production at the Apple Grove Plant on October 22, 2017. First Day Declaration at ¶ 47.

15.    The DIP Credit Facility (which, as discussed herein, does not provide DIP funding for the Debtor), sets forth a series of milestones that the Debtors must adhere to in order to avoid an event of default, including:

> a.    The Debtors' delivery of a business plan to the DIP Lender, including a comprehensive cost-to-complete assessment for the Corpus Christi Plant within 60 days of "the date hereof"; **[December 30, 2017]**
>
> b.    The Debtors' filing of a motion seeking approval of bidding procedures and authority to sell substantially all of Debtors' assets (the "Sale Motion"), including the Corpus Christi Plant, within 15 days of "the date hereof"; **[November 15, 2017]**
>
> c.    Entry of an order approving the bidding procedures set forth in the Sale Motion (the "Bidding Procedures Order") no later than 25 days after the filing of the Sale Motion; **[December 10, 2017]**

d.   A deadline for bids for the purchase of the Debtors'
assets (the "Bid Deadline") of no later than 75 days
after entry of the Bidding Procedures Order; **[February
23, 2018]**

e.   An auction for the sale of the Debtors' assets no
later than three business days after the Bid Deadline;
**[February 28, 2018]**

f.   Entry of an order approving a sale of the Debtors'
assets no later than 10 business days after the Bid
Deadline; and **[March 14, 2018]**

g.   The closing of any sale and distribution of sale
proceeds within the later of (a) 25 days after the Bid
Deadline or (b) five days following the receipt of
necessary regulatory approvals.**[April 9, 2018]**

First Day Declaration at ¶ 52.

### The Debtor's Use of Cash Collateral

16.   On November 1, 2017, the Debtor filed the Cash

Collateral Motion.

17.   Although the proposed DIP Financing provides for

necessary post-petition financing of certain Debtors, it does

not provide any funding for the Debtor.   Cash Collateral Motion

at ¶ 17.

18.   The Debtor contends that without the generation of

any new revenue, and given its inability to access the proposed

DIP Financing, it has an immediate and critical need for the

use of cash collateral to (a) safeguard the public, (b)

continue to provide employment and benefits to certain of its

employees and (c) avoid irreparable harm to its estate and

9

creditors.  Cash Collateral Motion at ¶ 18.

19.   The Debtor seeks authority to use cash collateral
until the earlier of (a) December 29, 2017 or (b) the day
following written notice of a termination event.  Cash
Collateral Motion at ¶ 21.

20.   On November 2, 2017, the Court entered the *Interim
Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 and 507 (1)
Authorizing Use of Cash Collateral (2) Granting Adequate
Protection, (3) Modifying the Automatic Stay, and (4)
Scheduling a Final Hearing* (the "Interim Cash Collateral
Order").

21.   The Interim Cash Collateral Order authorized the
Debtor to use cash collateral on an interim basis in a maximum
amount of $6 million.  The Interim Cash Collateral Order also
authorized the use of cash collateral until the earlier of (a)
December 29, 2017 and (b) the day following written notice of
the occurrence of a Termination Event.  Cash Collateral Order
at page 12.

22.   Attached as Exhibit "A" to the Interim Cash
Collateral Order is a nine-week budget through December 29,
2017 (the "Budget").  The Budget reflects that the Debtor only
budgeted $37,500, $75,000 and $75,000 for electric utility
expenses over the next two months.

23.   The Interim Cash Collateral Order also approved a

10

carve-out for the payment of all accrued and unpaid fee claims for services provided by professional that are directly attributable to the Debtor after the date of entry of the Interim Cash Collateral Order and prior to a Termination Date up to the difference between $850,000 and the amount paid to such professional during that period (the "Carve-Out"). Cash Collateral Motion at page 26.

### Facts Concerning AEP

24. Pursuant to the 2015 Contract and applicable state-law tariffs, AEP provided electricity to the Debtor at the Debtor's manufacturing facility located in Apple Grove, West Virginia (the "Apple Grove Plant"). Prior to the halt of production at the Apple Grove Plant, the Debtor operated under a contract with: (a) a contract capacity of 14,000 kW; and (b) average monthly utility charges of $493,724 (Exhibit "C" to the Utility Motion reflects average monthly bills of $503,000 from AEP).

25. AEP and the Debtor estimate that the Debtor will require a contract capacity of 5,000 kW at the Apple Grove Plant for the post-petition period. AEP estimates that the average monthly utility charges at the 5,000 kW contract capacity will be approximately $181,000.

26. AEP and the Debtor have been engaged in discussions to enter into the proposed Reduced Usage Contract reflecting a

11

reduced contract capacity of 5,000 kW.  On November 14, 2017,
AEP's counsel provided Debtors' counsel with the proposed
Reduced Usage Contract.

27.  AEP provided the Debtor with prepetition utility
goods/services and has continued to do so for that Debtor post-
petition.

28.  Under AEP's billing cycle, the Debtor receives
approximately one month of utility service before AEP issues a
bill for such service.  If the Debtor fails to pay the bill
within approximately 20 days after the bill is issued, a past
due notice is issued and a late fee is subsequently imposed on
the account.  If the Debtor fails to pay the bill after the
issuance of the past due notice, AEP issues a notice that
informs the Debtor that it must cure the arrearage within a
certain period of time or its service will be disconnected.
Accordingly, under AEP's billing cycle, the Debtor could
receive at least two-months of unpaid service before its
service could be terminated for a post-petition payment
default.

29.  In order to avoid the need to bring witnesses and
have lengthy testimony regarding AEP's regulated billing cycle,
AEP requests that this Court, pursuant to Rule 201 of the
Federal Rules of Evidence, take judicial notice of the AEP
billing cycle.  Pursuant to the foregoing request and based on

the voluminous size of the applicable documents, the AEP web site link to the tariffs and/or state laws, regulations and/or ordinances obtained at:

West Virginia –
https://www.appalachianpower.com/account/bills/rates/APCORatesTariffsWV.aspx

30. Subject to a reservation of AEP's right to supplement its post-petition deposit request if additional accounts belonging to the Debtors are subsequently identified, AEP's estimated prepetition debt and post-petition two-month deposit request is as follows:

| No. of Accts. | Est. Prepet. Debt | Deposit Request |
|---|---|---|
| 3 | $798,910.15 | $362,000 (2-month) |

The foregoing request presumes that the Debtor and AEP will be entering into the Reduced Usage Contract. If the Debtor elects not to enter into the Reduced Usage Contract, AEP's deposit request would increase.

## Discussion

### A. THE UTILITY MOTION SHOULD BE DENIED AS TO AEP.

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

(2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate

11/16/2017 SL1 1495419v1 018560.00227

assurance of payment for utility service that is satisfactory to the utility;

(3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. *In re* Lucre, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005). If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to

14

improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to AEP.

> **1. The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide AEP With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

> 1. Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by AEP. Accordingly, AEP has no control over how long the Bank Account will remain in place.
>
> 2. It is unknown whether any monies would be deposited into the Bank Account on behalf of AEP.

15

3. If AEP would have access to the Bank Account, in order to access the Bank Account, AEP would have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a disbursement request.

4. It is underfunded from the outset because AEP issues monthly bills and by the time a default notice is issued, the Debtor will have received approximately 60 days of commodity or service.

5. The Debtors are not required to replenish the Bank Account following pay-outs.

6. All funds contained in the Bank Account may remain subject to prepetition liens in favor of the Debtors' secured lenders (this is in complete contrast to the $850,000 Carve-Out received by Debtors' professionals in the cash collateral pleadings, which remains in place even if there is an event of default).

7. The Debtors may close the Bank Account before all post-petition utility charges are paid in full.

8. The Debtors fail to state whether draws from the Bank Account would be limited to two-week amounts.

Accordingly, the Court should not approve the Bank Account as adequate assurance as to AEP because the Bank Account is: (a) not the **form** of adequate assurance requested by AEP; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

## 2. The Utility Motion Should Be Denied As To AEP Because the Debtors Have Not Set Forth Any Basis For Modifying AEP's Requested Deposit.

In the Utility Motion, the Debtors fail to address why this Court should modify the amount of AEP's request for

16

adequate assurance of payment. Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amount of AEP's adequate assurance of payment request should be modified. *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof). However, the Debtors do not provide the Court with any evidence or factually supported documentation to explain why the amount of AEP's adequate assurance request should be modified. Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to AEP.

   **B.  THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY AEP PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases. Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or

17

(vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

AEP issues bills to the Debtor on a monthly basis for the charges incurred by that Debtor in the prior month. AEP then provides the Debtor with approximately 20 days to pay a bill before a late fee may be charged, and also provides written notice before utility service can be terminated for non-payment pursuant to applicable state laws, tariffs, regulations and/or contracts. Based on the foregoing state-mandated billing cycle, the minimum period of time that the Debtor could receive service from AEP before termination of service for non-payment

18

of post-petition bills is approximately two (2) months.

Moreover, even if the Debtor timely pays its post-petition

utility bills, AEP still has potential exposure of

approximately 60 days based on its billing cycle.  Furthermore,

the amount of AEP's deposit request is the amount that the

applicable public service commission, which is a neutral third-

party entity, permits AEP to request from its customers.  AEP

is not taking the position that the deposit that it is entitled

to obtain under applicable state law is binding on this Court,

but, instead is introducing that amount as evidence of the

amount that its regulatory entity or contract permit AEP to

request from its customers.

Moreover, as the Debtor is not entitled to any of the

funds sought by the other Debtors in the DIP Financing Motion,

the Debtor is limited to the funds sought in the Cash

Collateral Motion to pay AEP's post-petition charges and

adequate assurance of payment deposit.  As set forth above, the

Debtor has only budgeted $187,500 in electric utility expenses

in the Cash Collateral Motion for the November 3, 2017 to

December 29, 2017 period.  AEP estimates that average monthly

charges under the Reduced Usage Contract will be $181,000, or

$407,250 for the October 24, 2017 to December 29, 2017 period.

Furthermore, the Debtor's access to the cash collateral ceases

on December 29, 2017.  Debtors' counsel has informed counsel

19

for AEP that the Debtor's assets will not be included in the sale motion seeking to sell substantially all of the Debtors' other assets and that the Debtor is still continuing to explore options for the Apple Grove Plant. Accordingly, unless the Debtor intends to abandon the Apple Grove Plant or no longer require electric service for the water treatment plant and fire suppression system after December 29, 2017, the Debtor needs to obtain funding to pay for AEP's charges for electric service provided after December 29, 2017. Therefore, it is clear that the Debtor has neither sought nor obtained access to sufficient funding to pay AEP's post-petition bills or any meaningful adequate assurance of payment deposit. Based on the foregoing, the Court should deny the Utility Motion and grant AEP the adequate assurance of payment requested in this Objection.

WHEREFORE, AEP respectfully requests that this Court enter an order:

1. Denying the Utility Motion as to AEP;

2. Requiring the Debtor to pay AEP's post-petition bills by the applicable due dates on the invoices and awarding AEP the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to AEP, which is the form and amount requested herein; and

11/16/2017 SL1 1495419v1 018560.00227

3.  Providing such other and further relief as the Court
    deems just and appropriate.

Dated:  November 17, 2017        STEVENS & LEE, P.C.

                                 /s/ John D. Demmy_____
                                 John D. Demmy (Bar No. 2802)
                                 919 North Market Street, Suite 13007
                                 Wilmington, Delaware 19801
                                 Telephone:  (302) 425-3308
                                 E-mail:   jdd@stevenslee.com

                                 and

                                 Russell R. Johnson III
                                 John M. Craig
                                 Law Firm of Russell R. Johnson III, PLC
                                 2258 Wheatlands Drive
                                 Manakin-Sabot, Virginia  23103
                                 Telephone: (804) 749-8861
                                 E-mail:
                                 russell@russelljohnsonlawfirm.com
                                 john@russelljohnsonlawfirm.com


                                 *Counsel for Appalachian Power
                                 Company d/b/a American Electric
                                 Power*

21