# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| M & G USA CORPORATION, *et al.*,[1] | Case No. 17- 12307 (BLS) |
| Debtors. | (Jointly Administered) |
| | Ref: Docket No. 246 |

## DEBTORS' OBJECTION TO MOTION OF THE CONSTRUCTION LIENHOLDER GROUP FOR APPOINTMENT OF AN OFFICIAL COMMITTEE OF CONSTRUCTION LIENHOLDERS

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby object (this "Objection") to (i) the *Motion of the Construction Lienholder Group for Appointment of an Official Committee of Construction Lienholders* (Docket No. 246) (the "Motion"),[2] (ii) *Joinder of AC Plastiques USA, LLC in Motion of the Construction Lienholder Group for Appointment of an Official Committee of Construction Lienholders* (Docket No. 264) (the "AC Plastiques Joinder"), (iii) Arc Energy Services, Inc.'s *Joinder in Motion of the Construction Lienholder Group for Appointment of an Official Committee of Construction Lienholders* (Docket No. 284) (the "Arc Joinder") and (iv) Service Steel Warehouse Co LP's *Joinder in Motion of the Construction Lienholder Group for Appointment of an Official Committee of Construction Lienholders* (Docket No. 315) (together with the AC

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Plastiques Joinder and the Arc Joinder, the "Joinders"). In support of this Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1. The appointment of an official committee of construction lienholders (an "Official Lienholder Committee") will achieve nothing but significantly increased administrative expenses and the depletion of scarce estate resources. The Construction Lienholder Group's refusal to acknowledge the circumstances of these Cases and the relief that the Debtors have sought from the Court to-date renders the Construction Lienholder Group's motives transparent—the Motion is simply an attempt to improperly shift individual creditors' legal costs on to the Debtors' estates.[3]

2. The Construction Lienholder Group already attempted to pursue this agenda via the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") when, by letters dated November 7 and 16, 2017, it asked the U.S. Trustee to appoint an Official Lienholder Committee. After due deliberation, taking into account "all of the facts and circumstances of these cases," by letter dated November 29, 2017 (the "Denial Letter"), the U.S. Trustee denied the Construction Lienholder Group's request, finding that the appointment of a Lienholder Committee was "not warranted at this time."[4] Denial Letter, at 1. The U.S. Trustee reaffirmed his position in the *Response to Motion to Appoint an Official Committee of Construction Lienholders* (Docket No. 321), filed on December 1, 2017 (the "UST Response"), in which the U.S. Trustee notes that the holders of mechanics' and materialmen's liens

---

[3] *See .e.g.*, AC Plastiques Joinder, ¶ 3 ("Plastiques will have the unenviable choice of either standing by and allowing the debtors' train to roll down the tracks unimpeded, or spending significant funds on attorneys' fees to protect its rights in this consolidated case – fees that it will not be able to recover.").

[4] Attached hereto as Exhibit A is a copy of the Denial Letter.

(collectively, the "Construction Lienholders")[5] are already adequately represented and that "the record established by the movants before the Court thus far fails to demonstrate grounds for [the appointment of the Official Lienholder Committee]." Response, at Intro. The Debtors respectfully submit that this Court should reach the same conclusion.

3. As described in more detail below, the appointment of a second official committee of creditors (in addition to an official committee of unsecured creditors) is an extraordinary remedy warranted only when necessary to ensure the adequate protection of otherwise unrepresented creditors. The Construction Lienholder Group has fallen woefully short in demonstrating that extraordinary circumstances exist warranting the relief requested in the Motion. Unlike unsecured creditors or equity holders, as secured creditors,[6] lienholders' interests are preserved by their collateral and, to the extent such claims are not secured, any such purported lienholder is adequately represented by the Official Committee of Unsecured Creditors (the "Committee").

4. Despite the Construction Lienholder Group's assertions to the contrary, the relief the Debtors are seeking in the Financing Motions[7] and the Sale Motion[8] is not prejudicial to the

---

[5] Reference to the Construction Lienholders is intended to encompass all mechanic's, contractors' or materialmen's liens arising under and pursuant to Texas property law.

[6] Nothing in this Objection should be construed as an admission or concession that any lienholder holds a secured claim, and the Debtors reserve all rights to dispute the same.

[7] *Motion for Entry of Interim and Final Orders to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superiority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2; and (6) Grant Related Relief* (Docket No. 14) (the "DIP Motion") and *Motion of M&G Polymers USA, LLC for Approval of Agreed Interim Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing* (Docket No. 53) (the "Cash Collateral Motion" and together with the DIP Motion, the "Financing Motions").

[8] *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchasing Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and*

Construction Lienholders. The Debtors' postpetition financing facility (the "DIP Facility") does not prime valid and perfected liens of nonconsenting parties, including the Construction Lienholders. Further, the waterfall for the distribution of proceeds generated by any sale of the Corpus Christi Plant contemplates that holders of valid and perfected liens will receive payment in order of priority on account of their claims prior to any recovery by the Control Empressarial de Capitales, S.A. De C.V. (the "DIP Lender") or the holder of any junior liens.

5. The Construction Lienholder Group's participation in these Cases further demonstrates that the interests of the Construction Lienholders are already adequately represented.[9] The Construction Lienholder Group points to the Debtors' Lien Identification Motion[10] and the relief requested therein as evidence of the need for an Official Lienholder Committee because "there is no other party in these cases who can or will negotiate more reasonable relief on the construction lienholders' behalf . . ." Motion, ¶24. However, that is exactly what the Construction Lienholder Group is doing. The Construction Lienholder Group, which purports to represent claimants holding more than $162 million of the approximately $200 million in lien claims asserted against the Corpus Christi Plant, has failed to demonstrate why it cannot advance the interests of the Construction Lienholders generally in a manner sufficient to protect their interests on issues—such as the approval of lienholder procedures described in the Lien Identification Motion—in which all Construction Lienholders' interests are aligned. As

---

*Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (Docket No. 173) (the "Bidding Procedures Motion").

[9] *See*, *e.g.*, UST Response, at ¶ 12 (noting that the Construction Lienholders are "adequately represented" and that although "the Construction Lienholder Group is acting only in the interests of its members, any benefit it secures . . . will benefit the lienholders as a group.").

[10] *Debtors' Motion for Entry of an Order (I) Establishing Lien Identification Procedures and (II) Granting Related Relief* (Docket No. 214) (the "Lien Identification Motion").

evidenced by its Extensions Motion Objection,[11] the Construction Lienholder Group has already been an active participant in these Cases and is both capable of, and—due to the size of their holdings—incentivized to, seek relief that, if granted, would be applicable to all Construction Lienholders.

6. Finally, the Construction Lienholder Group's assertions regarding the purported benefits that the appointment of an Official Lienholder Committee will bring to the Debtors' estates are disingenuous at best. Unlike *Semcrude*, a case readily distinguishable from the facts here (yet heavily relied on by the Construction Lienholder Group), there are no potential cost savings that will inure to the benefit of the Debtors' estates by appointing a committee to act as the single point of contact for the Debtors to interact with regarding issues affecting Construction Lienholders generally. Rather, the only benefit to be gained by the appointment of an Official Lienholder Committee is the benefit members of the Construction Lienholder Group will obtain by shifting the cost of their legal bills to the estate. For these reasons, the Debtors request that the Court deny the relief sought in the Motion and the Joinders.

## OBJECTION

### A. The Construction Lienholder Group Has Failed to Satisfy Applicable Standards

7. The party seeking appointment of an additional committee bears a heavy burden of establishing its necessity. *In re Budd Co.*, 512 B.R. 910, 912 (Bankr. N.D. Ill. 2014) (citing *In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002)). Courts have observed that the appointment of additional committees of creditors or equity holders "is considered 'extraordinary relief' and should be 'the rare exception'" to the general rule that such committees are usually

---

[11] *See Limited Objection of the Construction Lienholder Group to the Debtors' Motion for Entry of an Order Extending the Time to File (I) Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Rule 2015.3 Report* (Docket No. 257) (the "Extensions Motion Objection").

unnecessary and superfluous.  *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (quoting *Exide Tech. v. State of Wisconsin Inv. Bd.*, No. 02-11125-KJC, 2002 WL 32332000, *1 (D. Del. Dec. 23, 2002)); *In re Pub. Serv. Co. of N.H.*, 89 B.R. 1014, 1020 (Bankr. D. N.H. 1988) ("Bankruptcy Courts generally have been reluctant to appoint separate committees of unsecured creditors notwithstanding the diverse and sometimes conflicting interests of such creditors in the context of a chapter 11 proceeding.") (citations omitted); *In re Sharon Steel Corp.*, 100 B.R. 767, 778 (Bankr. W.D. Pa. 1989) ("[A] single committee for unsecured creditors is the norm and the creation of additional committees is an extraordinary remedy.").  While the appointment of a second committee is considered extraordinary, the appointment of official committees of secured creditors is even more unusual because "it is rare indeed, if not non-existent, that the interest[s] of secured creditors are identical."  *Matter of Wekiva Dev. Corp.*, 22 B.R. 301, 302 (Bankr. M.D. Fla. 1982).

8. The appointment of additional official committees is appropriate only when "necessary to assure adequate representation of creditors or of equity security holders." 11 U.S.C. § 1102(a)(2).  Courts considering whether to appoint a second committee generally apply a two part test: "first, whether the appointment of an additional committee is necessary to assure that the movants are adequately represented; and second, whether the court should exercise its discretion and order the appointment."  *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC), 2013 Bankr. Lexis 4021, at *9 (Bankr. D. Del. Sept. 26, 2013) (citing *In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002)).  The Construction Lienholder Group has failed to satisfy this test.

### 1. The Construction Lienholders' Interests are Already Adequately Represented

9. To the extent that Construction Lienholders' claims are secured, their interests are preserved by their collateral and, as described below, the relief that the Debtors are seeking in these Cases does not seek to disturb valid and perfected Construction Lienholders' claims to their collateral. Further, as evidenced by the formation of the Construction Lienholder Group and its participation in these Cases so far, to the extent the Construction Lienholders' interests align, they are capable of organizing informally and do not require the appointment of the Official Lienholder Committee to assure their adequate representation. Indeed, the Construction Lienholder Group has already begun to assert positions and take actions that are designed to benefit all Construction Lienholders, regardless of their membership in the Construction Lienholder Group.

10. For example, the Construction Lienholder Group has noted that it will be filing an objection with respect to the Debtors' Lien Identification Motion that, if granted, will presumably be generally applicable to all Construction Lienholders. *See* Extension Motion Objection, fn. 4. Simply put, the Construction Lienholders do not require the appointment of an official committee financed by the Debtors' estates to promote their interests. *See Enron*, 279 B.R. at 692-93 ("[t]he Court does not believe the estate should fund a distinct group of creditors to litigate an issue that would appear to be in their interest alone and provide no benefit to the estate.").

11. Finally, the Debtors note that to the extent that lienholders hold unsecured claims, their interests are adequately protected by the Committee. "[A] strong indicator of whether a committee is able to adequately represent its constituents is its ability to function." *Enron*, 279 B.R. at 686. The Construction Lienholder Group has failed to present a single instance where

-7-

the Committee has been unable to function in these Cases, a factor weighing against appointing an additional committee. *See In re Sharon Steel Corp.*, 100 B.R. 767, 778 (Bankr. W.D. Penn. 1989) (finding in favor of objectors where "the [m]ovants [failed to] cite a single instance where the ability of the [c]reditors' [c]ommittee to function ha[d] been impaired.").

### 2. The Facts and Circumstances of these Cases Weigh Against the Court's Exercise of Discretion to Appoint an Official Lienholder Committee

12. Not only is the appointment of an Official Lienholder Committee unnecessary, but the facts and circumstances of these Cases demonstrate that the appointment of such a committee would be detrimental to the Debtors' estates. In determining whether to exercise discretion and order the appointment of a second committee, courts consider "(1) the ability of the committee to function; (2) the nature of the case; and (3) the standing and desires of the various constituencies." *Enron*, 279 B.R. at 685. Other relevant considerations include "(1) the cost associated with the appointment; (2) the time of the application; (3) the potential for added complexity; and (4) the presence of other avenues for creditor participation." *Id.* (citations omitted); *see also in re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600 (Bankr. D. Del. 1996) (considering similar factors in connection with the appointment of an equity committee).

13. The Debtors question the ability of an Official Lienholder Committee to function effectively as the Construction Lienholders' interests may be in tension with each other, particularly to the extent their claims may (a) arise from different contracts and services, (b) relate to the same or different collateral, (c) arise at different times or under different legal theories or (d) be subject to different potential objections and defenses. For example, the interests of a contractor and its lower-tiered subcontractors will likely diverge to the extent that the Debtors contend that there are back-charges and/or over-progressed work (a situation that the Debtors were often faced with prepetition) in connection with construction of the Corpus Christi

-8-

Plant. Further, the Debtors agreed to certain prepetition settlements with a number of contractors that performed, and/or contracted with subcontractors to perform, work at the Corpus Christi Plant. Many of these settlements remain pending or were otherwise not finalized as of the Petition Date. The claims and interests of these general contractors may vary from those of their subcontractors not party to such settlements with the Debtors.

14. The Debtors do not believe that any global settlement of Construction Lienholders' claims is possible and any settlements of Construction Lienholder claims will be on case-by-case basis, rendering an Official Lienholder Committee prohibitive and ineffective in this respect. As such, adding an additional official committee to these Cases that would be unable to fully represent all of its constituents due to their divergent individual interests would only succeed in adding an additional layer of complexity and cost. *See In re Winn-Dixie Stores Inc.*, 326 B.R. 853, 857-58 (Bankr. M.D. Fla. 2005) (noting that appointment of an additional committee "would not facilitate a more harmonious resolution of the cases but would instead engender discord, litigation and delay.").

15. To the extent that the Construction Lienholder Group suggests that the complexity of these Cases and the mere "potential for disputes" among the Construction Lienholders and the Debtors' prepetition lenders regarding the nature and relative priority of their interests is reason to burden the Debtors' estates with an additional official committee, the Construction Lienholder Group's arguments are misguided. *See Enron*, 279 B.R. at 688 (noting that the size and complexity of the case alone is not determinative and that "adding additional committees would likely intensify conflict and lead to further complication"). The Construction Lienholder Group's assertions regarding the size of their claims demonstrate that they have more than enough at stake to justify the expense of defending their own interests, whether acting independently or in

concert. Additionally, it is not clear that there is any greater risk of dispute between the Construction Lienholders and other secured creditors than among the Construction Lienholders themselves. As described above, several of the liens that were filed against the Corpus Christi Plant are duplicative of each other and were filed by contractors and subcontractors whose interest may diverge. Thus, there are parties asserting different claims and liens for the same and/or overlapping work.

16. In short, there are no efficiencies to be gained by appointing an Official Lienholder Committee in these Cases and, despite the Construction Lienholder Group's assertions to the contrary, such appointment would create an undue burden on these estates. With or without an Official Lienholder Committee, the Debtors must analyze and potentially negotiate, compromise or litigate each lien filed against the Corpus Christi Plant. Adding an Official Lienholder Committee into this process would only serve to double the time and expense necessary to complete that process.

### 3. The Construction Lienholder Group's reliance on this Court's *Semcrude* Ruling is Misplaced

17. As support for their contention that the appointment of an Official Lienholder Committee is appropriate, the Construction Lienholder Group relies heavily upon this Court's decision to appoint an official committee of certain holders of interests in oil and gas wells in *In re Semcrude, LP*. *See In re Semcrude, LP*, Tr. of Hr'g Oct. 3, 2008, No. 08-11525 (BLS) (Docket No. 1897) (Bankr. D. Del. Oct. 3, 2008) (hereinafter the "Semcrude Transcript"). Their reliance on *Semcrude* is overstated and misplaced.

18. As an initial matter, the Debtors note that this Court appointed a second official committee in *Semcrude* only after finding that the case was one of the "very, very rare cases that would support [the appointment of a secured creditor's committee]" and only upon finding "that

DOCS_DE:216675.1 54032/001

the facts necessary for such appointment are essentially extraordinary and . . . that [the *Semcrude* case] present[ed] those circumstances." Semcrude Transcript, at 141:19 – 22 (Hon. Shannon, J.). These extraordinary circumstances are not present here.

19. As the Court is well aware, in *Semcrude* there were over two million potential individual oil and gas interest holders—many of whom had claims as small as $50—and each of whom had the right under state law and applicable law to assert liens, secured and/or administrative claims based on their interests in certain oil and gas wells from which the *Semcrude* debtors were purchasers (the "<u>Oil and Gas Claimants</u>"). *See* Semcrude Transcript, at 108:20 – 109: 1 – 3 (counsel to an Oil and Gas Claimant noting that there were anywhere from 870,000 to 2,000,000 potential Oil and Gas Claimant interests at stake in the *Semcrude* case) (Bugg, S.); *id.* at 113:1 – 2 (counsel to an Oil and Gas Claimant noting that there were potentially "hundreds of thousands of interest owners who might have [had] interest [in the Semcrude cases] as low as $50, $100 . . .") (McNutt, P.). By the Construction Lienholder Group's own admission, however, there will be approximately 300 individual Construction Lienholders (*see* Motion, fn. 5) in these Cases, a number that pales in comparison to the number of potential Oil and Gas Claimants in *Semcrude*. Nor is there a concern that there will be a large number of Construction Lienholders with de minimis claims.

20. Finally, unlike in *Semcrude*, there is no benefit, conceived or actual, emanating from the appointment of an official committee to act as a "single voice" for all Construction Lienholders. *See* Semcrude Transcript, at 143:1 – 8 (finding that there was "benefit from having a single voice within whom to negotiate on at least some important issues."). Where the Construction Lienholders' interests are aligned—such as in the negotiation of procedural issues in respect of the Lienholder Procedures Motion—the arguments that the Construction Lienholder

DOCS_DE:216675.1 54032/001

Group advances will sufficiently protect the Construction Lienholders' interests generally. Absent these limited administrative matters, the Construction Lienholders' interests diverge, rendering the presence of a "single voice" ineffective, unworkable and inefficient.

> **B.     The Relief Sought by the Debtors in these Cases Does Not Necessitate the Appointment of an Official Lienholder Committee**

21.     In support of its Motion, the Construction Lienholder Group argues that an Official Lienholder Committee is necessary to protect the Construction Lienholders against the relief sought by the Debtors in the Financing Motions, the Bidding Procedures Motion and the Lien Identification Motion. *See* Motion, ¶¶ 21-22. However, the Construction Lienholder Group fails to identify the aspects of the Financing Motions and the Bidding Procedures Motion which "substantively affect" their rights (*id.* at ¶ 21), and with respect to the Lien Identification Motion, the Construction Lienholder Group advances no argument as to why it cannot adequately negotiate the proposed identification procedures with the Debtors on behalf of all Construction Lienholders.

22.     *First*, the DIP Facility does not prime valid and perfected mechanics' or materialmen's liens and the perfected liens of other nonconsenting parties. *See* Interim DIP Order,[12] at ¶ 3(b) (providing that the liens granted under the DIP Facility have priority over all other liens except, among other things, Senior Prior Liens, which includes valid mechanics' and

---

[12] *Interim Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superiority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2; and (6) Grant Related Relief* (Docket No. 62) (the "Interim DIP Order").

materialmen's liens);[13] Tr. of Nov. 1, 2017 Hr'g at 60:21-61:5 (statements of counsel to the Debtors and the DIP Lender that the DIP Facility involves no non-consensual priming).

23. Indeed, the Pre-Petition First Lien Lender (as defined in the Interim DIP Order) made significant concessions, memorialized in the Interim DIP Order, for the specific purpose of maximizing the value of the Debtors' estates through a controlled sale while preserving the interests of the valid and perfected Construction Lienholders in all respects. The waterfall describing the application of certain sale proceeds provided for under the DIP Facility was negotiated by the Debtors to leave the claims of the Construction Lienholders, to the extent valid and perfected, unaffected. Accordingly, the Construction Lienholders have retained, and will continue to retain following final approval of the DIP Facility, whatever priority with respect to their collateral that they were entitled to in these Cases based on applicable non-bankruptcy law.

24. *Second*, to the extent that the Construction Lienholder Group is arguing that the Construction Lienholders require protection from the relief being sought in the Cash Collateral Motion, their arguments are unfounded and without merit. The relief sought in the Cash Collateral Motion pertains only to Debtor M & G Polymers USA, LLC's consensual use of Comerica Bank's cash collateral and has no bearing on the Corpus Christi Plant, the only collateral in which the Construction Lienholders have an interest. *See* Motion, ¶ 8 (noting that the Construction Lienholders have a security interest in the Corpus Christi Plan); ¶ 16 ("The members of the Construction Lienholder Group collectively hold more than $162 million on construction liens against the Corpus Christi Plant . . .").

---

[13] The Interim DIP Order defines "Senior Prior Liens" as (a) "valid, enforceable, non-avoidable, and perfected liens in existence on the Petition Date . . . senior in priority to all or any portion of the Pre-Petition First Lien Security Interests (solely to the extent of such portion)" and (b) similar liens "perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code." Interim Order, at ¶ 3(b).

25.     *Third*, with respect to the Lien Identification Motion, the Construction Lienholder Group asserts that "there is no party in these cases who can or will negotiate more reasonable relief on the construction lienholders' behalf. . ." Motion, ¶ 22. Yet, by their own admission, the Construction Lienholder Group anticipates filing an objection to the Lien Identification Motion,[14] and the Construction Lienholder Group provides no justification as to why it cannot adequately negotiate the lien identification procedures that the Debtors seek to establish. Indeed, the Construction Lienholder Group asserts that all Construction Lienholders will receive "a pro rata distribution [from the Debtors' estates] without distinction based upon the timing of filing" of any lien. *See* Motion, ¶ 24.[15] On that basis (and the Debtors make no concession on this point), it is unclear why any concessions that the Construction Lienholder Group would be able to negotiate (if any) in respect of the lien identification procedures would not otherwise benefit the Construction Lienholders generally.

26.     *Finally*, it is unclear how the Bidding Procedures Motion "will substantively affect the rights of the construction liens." Motion, ¶ 21. Nothing in the Bidding Procedures Motion is prejudicial to the Construction Lienholders and the proposed bidding procedures respect the existing priorities among holders of valid, perfected secured liens against the Corpus Christi Plant. To the extent that there is some procedural or administrative element of the bidding procedures that will negatively impact the Construction Lienholders, there is no reason

---

[14] *See* Extension Motion Objection, at fn. 4 ("The Construction Lienholder Group anticipates filing a separate objection to the Lienholder Bar Date Motion.").

[15] While not the subject of this Objection, the Debtors submit that that the lien identification procedures merely require the Construction Lienholders to provide information to the Debtors that any such lienholder already has or would have to prepare in connection with the filing of its lien. Moreover, the Debtors have proposed to serve the entire universe of known lienholders and a meaningful subset of their creditor matrix, as well as to publish the procedures to indemnify all potential Construction Lienholders that will be affected by the Lien Identification Motion. As such, the Debtors seriously question how the Official Lienholder Committee would be better equipped to "ensur[e] adequate notice for construction lienholders and protect[] their due process rights." Motion, ¶ 22.

why any concession that the Construction Lienholder Group is able negotiate will not also benefit Construction Lienholders generally.

## **CONCLUSION**

27. Whether (a) as secured creditors whose interests are preserved by their collateral, (b) as unsecured creditors protected by the Committee or (c) by banding together and forming an informal committee such as the Construction Lienholder Group, the Construction Lienholders' interests are being adequately advanced and represented in these Cases, and the Construction Lienholder Group has provided no evidence to the contrary. Instead, the Construction Lienholder Group appears to be motivated by their desire to fund the advancement of their interests with estate assets. Because the Construction Lienholder Group has failed to meet its heavy burden of demonstrating the need for adequate representation, the relief requested in the Motion and the Joinders must be denied and overruled in their entirety.

WHEREFORE, the Debtors respectfully request that the Court enter an order denying the relief requested in the Motion and Joinders and grant such other and further relief as may be appropriate.

| | |
|---|---|
| Dated: December 4, 2017 | PACHULSKI STANG ZIEHL & JONES LLP |
| | */s/ Laura Davis Jones* |
| | Laura Davis Jones (DE Bar No. 2436) |
| | James E. O'Neill (DE Bar No. 4042) |
| | Joseph M. Mulvihill (DE Bar No. 6061) |
| | 919 N. Market Street, 17th Floor |
| | P.O. Box 8705 |
| | Wilmington, DE 19899-8705 (Courier 19801) |
| | Telephone: (302) 652-4100 |
| | Facsimile: (302) 652-4400 |
| | Email: ljones@pszjlaw.com |
| | joneill@pszjlaw.com |
| | jmulvihill@pszjlaw.com |
| | |
| | and |
| | |
| | JONES DAY |
| | Scott J. Greenberg |
| | Stacey L. Corr-Irvine |
| | 250 Vesey Street |
| | New York, NY 10281 |
| | Telephone: (212) 326-3939 |
| | Facsimile: (212) 755-7306 |
| | Email: sgreenberg@jonesday.com |
| | scorrirvine@jonesday.com |
| | |
| | and |
| | |
| | Carl E. Black |
| | 901 Lakeside Avenue |
| | Cleveland, Ohio 44114 |
| | Telephone: (216) 586-7035 |
| | Facsimile: (216) 579-0212 |
| | Email: ceblack@jonesday.com |
| | |
| | Co-Counsel for the Debtors and Debtors in Possession |