IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) <br> ) <br> M & G USA CORPORATION, *et al.*,[1] ) <br> ) <br> Debtors. ) <br> ) | Chapter 11 <br><br> Case No. 17-12307 (BLS) <br> (Jointly Administered) <br> **Related to ECF Nos. 14, 62** |

## OBJECTION OF CONSTRUCTION LIENHOLDER GROUP TO THE DEBTORS' MOTION TO APPROVE DEBTOR IN POSSESSION FINANCING

Certain construction lien claimants (the "Construction Lienholder Group"),[2] by and through their undersigned counsel hereby object to the motion of the above-referenced debtors (the "Debtors") to approve postpetition financing [Docket No. 14] (the "DIP Motion"),[3] and in support of its objection, the Construction Lienholder Group states as follows:

### Introduction

The Debtors' bankruptcy cases are, and have been from their inception, about the liquidation of the Debtors' assets. Most notably, these cases are about the sale of the Corpus Christi Plant, which is one of the CC Assets, as defined in the pending sale motion. To enable the Debtors to finance this process, the Debtors seek approval of postpetition financing under a term loan agreement by which the Debtors will be able to borrow up to $100 million, less the significant

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à.r.l. (1270), M&G Chemicals, S.A. (1022), M&G Capital S.à.r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062), and Indo American Investments Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2] The members of the Construction Lienholder Group are (i) Apache Industrial, Inc., (ii) Axis Industrial Services, LLC, (iii) Bay Ltd., (iv) Dawkins On-Site Concrete, LLC d/b/a Dawkins On-Site Concrete, LLC, (v) Fagioli, Inc., (vi) Garrett Mechanical, Inc., (vii) Lexicon, Inc., (viii) MEITEC, Inc., (ix) Mirage Industrial Group, LLC, (x) MMR Constructors, Inc., (xi) Repcon, Inc., (xii) Simplex Grinnell, (xiii) TCI Business Capital as assignee of Integrity Mechanical Specialists LLC, (xiv) TNT Crane & Rigging, Inc., (xv) WFS Construction Company, LLC, and (xvi) Wholesale Electric Supply of Houston, Inc.

[3] Capitalized terms that not defined herein have the meanings in the DIP Financing Motion.

9877175/1

fees and expenses to be provided to the DIP Lender, Pre-Petition First Lien Lender, and Pre-Petition Second Lien Secured Party.

Prior to the Petition Date, the Corpus Christi Plant was encumbered with more than $1.086 billion of secured claims, all of which remain subject to challenge to validity, perfection, priority, extent or enforceability of any amount due. As a matter of applicable nonbankruptcy law, the senior priority liens on the Corpus Christi Plant are for "removables" provided by construction lien claimants. After that, in some order and in some amount, are the remaining liens of construction lienholders and the liens of the Pre-Petition First Lien Lender. Last are the prepetition liens of the Pre-Petition Second Lien Secured Party.

By and through the proposed financing, the security interests in the Corpus Christi Plant will swell to more than $1,108,000,000. Notably, by and through the proposed financing, the Debtors (and their DIP Lender) are not seeking to prime the construction liens, however there are significant and substantive issues with the proposed financing and the proposed treatment of construction lienholders thereunder, that should either be revised or not be approved. Those include the following:

- construction lienholders should be entitled to adequate protection;
- the definition of "Prior Senior Claims" should be revised or clarified;
- the proposed distribution of proceeds from the sale of the Corpus Christi Plant does not preserve construction lienholders' rights in accordance with Texas law;
- the proposed distribution of proceeds from the sale of the Corpus Christi Plant by a credit bid by the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender does not preserve construction lienholders' rights;
- construction lienholders should not need standing to bring an action with respect to the priority of their claims, relative to the security interests of the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; and
- the waiver of the doctrine of marshaling should not apply to the construction lienholders.

## Background

1. According to the Debtors, in April 2013, the Debtors began construction on a plant in Corpus Christi, Texas (the "Corpus Christi Plant")[4] owned by M & G Resins USA, LLC, one of the above-captioned debtors. Upon information and belief, construction of the Corpus Christi Plant initially was expected to be completed in December 2015, however the construction ceased prior to October 24, 2017 at only 85% complete. The claims and liens of all of the members of the Construction Lienholder Group arose from the construction of the Corpus Christi Plant.

**Prepetition Security Interests in the Corpus Christi Plant**

2. Prior to October 24, 2017, there were more than $1.086 billion of claims secured by the Corpus Christi Plant.

3. On March 21, 2013, Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financier ("Inbursa") entered into a loan agreement in the amount of $250 million with M&G Resins (the "Inbursa Loan Agreement"), and Deed of Trust, Assignment of Rents, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing was recorded on March 22, 2013 (the "Inbursa Deed of Trust"). Pursuant to the Inbursa Loan Agreement, Inbursa began providing funds to M&G Resins for the Corpus Christi Plant. The Debtors allege that, in April 2013, the company began construction on the Corpus Christi Plant. See Stogsdill Declaration, ¶ 9. On or about September 2, 2016, pursuant to the Second Amendment to the Inbursa Loan Agreement, Inbursa was authorized to lend an additional $140 million. On or about May 4, 2017, Inbursa was authorized to lend an additional $40 million.

---

[4] As part of the DIP Motion and the Sale Motion, the Debtors use the terms "CC Property" and "CC Assets." The use of the term "Corpus Christi Plant" is intended to include all of the Corpus Christi Plant upon which the construction lienholders have a security interest.

4.      On May 20, 2015, the Debtors and DAK Americas LLC ("DAK") entered into a capacity reservation agreement (the "Capacity Reserve Agreement"). By and through the Capacity Reserve Agreement, DAK agreed to provide funding to the Debtors in the form of upfront money for the purpose of purchasing future product. Nineteen months later, on December 27, 2016, DAK recorded a Subordinated Deed of Trust, Assignment of Rents, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing, which purported to secure the Debtors' obligations arising under the Capacity Reserve Agreement with the Corpus Christi Plant.

5.      On September 12, 2017, the Debtors and DAK entered into a first amendment to the Amended and Restated Subordination Agreement in favor of Inbursa, and on September 13, 2017, Inbursa made an additional $6 million advance to the Debtors related to these bankruptcy filings. Accordingly, the Debtors asserted that, on the Petition Date, DAK was owed $435 million and Inbursa was owed $436 million.

6.      Prior to October 24, 2017, a significant number of contractors, materialmen, and mechanics had filed construction liens[5] on the Corpus Christi Plant, including security interests in "removables" under Texas law. The Debtors have estimated that the contractors' liens total in excess of $196 million. See Declaration of Dennis Stogsdill in Support of First Day Pleadings, ¶ 10 [Docket No. 3] (the "Stogsdill Declaration"). The 16 members of the Construction Lienholder Group, by themselves, hold more than $162 million of construction liens against the Corpus Christi Plant. In addition to the claims of the members of the Construction Lienholder Group, a Notice of Perfection of Mechanics Lien was filed by Sinopec Engineering Group America, LLC alleging an additional construction lien on the Corpus Christi Plant, of approximately $52 million.

---

[5]     The term "construction lien" is intended to encompass all mechanics', contractors', or materialmen's liens arising under and pursuant to Texas property law.

Accordingly, the known claims for construction liens on the Corpus Christi Plant already exceed $215 million. This does not include legal fees, expenses and interest allowed under applicable non-bankruptcy law; nor do they include the claims of other contractors, materialmen, and mechanics who have asserted construction liens on the Corpus Christi Plant, some of which have been filed notices of perfection of liens in the Bankruptcy Cases.

7. Taken together, the total amount of construction liens on the Corpus Christi Plant may ultimately exceed $250 million.

**The Debtors' Bankruptcy Filings**

8. On October 24, 2017, M&G Polymers, one of the above-captioned debtors, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On October 30, 2017 (the "Petition Date"), each of the other Debtors commenced chapter 11 cases before this Court (together with the chapter 11 case of M&G Polymers, the "Cases").

9. On November 13, 2017, the United States Trustee appointed the Unsecured Creditors Committee. No construction lienholders serve – or were invited to serve – as members of the Unsecured Creditors Committee. A motion by Construction Lienholder Group requesting the appointment of an official committee of construction lienholders is scheduled to be heard contemporaneously with the filing of this Motion.

**The Debtors' DIP Motion[6]**

10. On the Petition Date, the Debtors filed the DIP Motion. By and through the DIP Motion, the Debtors seek approval of a Super-Priority Senior Secured Debtor-In-Possession Term Loan Agreement between the Debtors, Control Empresarial De Capitales, S.A. DE C.V., Trimont

---

[6] M&G Polymers USA LLC ("M&G Polymers"), one of the Debtors, has filed a motion to approve the use of the cash collateral of Comerica Bank [Docket No. 53] (the "Cash Collateral Motion"). The Construction lienholder Group is not objecting to the Cash Collateral Motion.

Real Estate Advisors, LLC, as administrative agent and collateral agent Banco Inbursa, S.A., Institución De Bancamúltiple, Grupo Financiero Inbursa, and DAK Americas LLC (the "DIP Agreement").

11. Pursuant to the DIP Motion and the DIP Agreement, seek authority to, among other things, borrow and use in the aggregate of $100 million for a term of up to six months, subject to a number of conditions and defaults. Under the DIP Agreement, DIP Lenders are entitled to interest at LIBOR + 9.5%, and a laundry list of fees and expenses, including but not limited to unusued line premiums, up front premiums, exit premiums, and DIP agent premiums. As is customary, the DIP Lender will receive significant protections, in the form of security.

12. The DIP Motion further provide for adequate protection for the Pre-Petition First Lien Lender through, among other things, the roll up of $6 million of prepetition obligations owed on account of an advance made in September 2017, additional collateral, and payment of legal fees and expenses. The DIP Motion, also provides for adequate protection to the Pre-Petition Second Lien Secured Party, including legal fees of up to $1.5 million.

13. Notwithstanding that the Debtors continue to use the construction lienholder's collateral, which remains subject to depreciation or other diminution in value from, among other things, exposure to both the elements and potential other sources of damage, and that the automatic stay prevents the construction lienholders from exercising their rights with respect to their collateral, the DIP Motion does not seek to provide any adequate protection to the construction lienholders, including not even paying any of their legal fees and expenses of the construction lienholders.

14. Most notable are the milestones required by the DIP Agreement. See DIP Motion, p. 33-34 and DIP Agreement, Section 5.19 (the "Milestones"). The Milestones require that the

9877175/1

Debtors, among other things,[7] file a motion seeking entry of an order, in form and substance satisfactory to the Lenders, for approval of a sale under section 363 of the Bankruptcy Code of all of the Collateral. Further, the Debtors were required to seek approval of a sale process that will provide that bids are due within 75 calendar days after entry of a sale procedure order. The Debtors were also required within 25 calendar days after the Sale Motion Filing Date, to seek approval of a sales procedure that will result in bids being be due within 75 calendar days after entry of the Sale Procedures Order and scheduling the date for an auction and a hearing to consider approval of the Sale. The sale procedures were also required to provide the following:

> upon the later of 25 calendar days after the Bid Deadline and five calendar days after all necessary regulatory approvals are completed, the Debtors shall consummate the Sale to the winning bidder or bidders and, other than in the event of a credit bid, the proceeds of the consummated Sale shall be disbursed on such date to pay, among other things and, with respect to the CC Assets, in accordance with Section 10.8, any (i) Sale Professional Fees or Sale Professional Trigger Date Fees, as the case may be, (ii) Senior Pre-Petition First Lien Obligations, (iii) obligations secured by Senior Prior Liens, (iv) Obligations with respect to the DIP Facility, (v) Sale Excess Fees or Sale Excess Trigger Date Fees Hold-Back Amounts, as the case may be, (vi) any remaining outstanding Pre-Petition First Lien Obligations, and (vii) any outstanding Pre-Petition Second Lien Obligations; provided, that no disbursement shall be required to be made to the Pre-Petition Second Lien Secured Party in the event that the Pre-Petition Second Lien CRA is assumed and assigned pursuant to section 365 of the Bankruptcy Code to the winning bidder in any Sale. . . .

DIP Agreement, Section 5.19(i). See also DIP Motion, pp. 33-34. Section 10.8 of the DIP Agreement is the basis for the waterfall for payments from the proceeds of the sale of the Corpus Christi Plant which serve as the collateral for the DIP Lender.

---

[7] The required Milestones also provide that the Debtors must prepare and file a motion requiring that the lienholders have no more than 45 days from entry of the order and in no case later than February 1, 2017 to file statements, and if they fail to file those statements, their liens will be subordinated to liens under the Loan Documents pursuant to 11 U.S.C. § 510(c).

15. On November 1, 2017, the Bankruptcy Court entered an Interim Order approving the DIP Motion [Docket No. 62], and a hearing is scheduled for December 11, 2017 to consider entry of a final order approving the DIP Motion (the "DIP Order").

### The Debtors' Sale Motion

16. Consistent with the requirements under the DIP Agreement, on November 16, 2017, the Debtors filed a Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [Docket No. 173] (the "Sale Motion").

17. By and through the Sale Motion, the Debtors seek, among other things, approval of bid procedures for the sale of certain assets, including the Corpus Christi Plant. The Sale Motion also seeks the approval of distribution from the Corpus Christi Plant pursuant to a waterfall consistent with those required by the Milestones in the DIP Motion and DIP Agreement.

### BASIS FOR OBJECTION TO THE PROPOSED FINANCING

18. The Construction Lienholders Group appreciates that the proposed financing motion purports not to prime Senior Prior Claims (which, as defined in the DIP Motion, include the construction liens), however there are significant and substantive issues with the proposed

8

9877175/1

financing, the Milestones, and the proposed treatment of construction lienholders thereunder, that should be revised or not be approved.

### A. The Construction Lienholders are Entitled to Adequate Protection.

19. Under the DIP Motion and DIP Agreement, the Pre-Petition Second Lien Secured Party is to receive adequate protection on account of the use, sale, lease or depreciation or other diminution in value of the Pre-Petition Second Lien Secured Party's interests in the Pre-Petition Second Lien Collateral; the subordination of the Pre-Petition Second Lien Security Interests to the Carve-Out, the DIP Liens and the Pre-Petition First Lien Lender Adequate Protection Liens; and the imposition of the automatic stay under section 362(a) of the Bankruptcy Code or otherwise pursuant to sections 361(a), 363(c), 364(c) and 364(d)(1) of the Bankruptcy Code. Specifically, under the DIP Agreement, the Pre-Petition Second Lien Secured Party is to receive payment of all reasonable and documented outstanding fees and expenses, incurred in accordance with the Pre-Petition Second Lien Documents, including, but not limited to, expenses relating to monitoring and enforcing the Pre-Petition Second Lien Secured Party rights in the Obligors' Chapter 11 Cases, and the reasonable and documented fees and expenses, incurred by the Pre-Petition Second Lien Secured Party in connection with the DIP Credit Documents, which, together, shall not exceed $1,500,000. See Proposed Order, ¶ 8.

20. Although the Debtors are not seeking to subordinate the claims of construction lienholders to the Carve-Out, the DIP Liens and the Pre-Petition First Lien Lender Adequate Protection Liens, the rights of the construction are still being adversely impaired. The Debtors continue to use the construction lienholders' collateral, which remains subject to depreciation or other diminution in value. Specifically, the Corpus Christi Plant remains exposed to both the elements, and potential other sources of damage. Further, the automatic stay prevents the

9

construction lienholders from exercising their rights with respect to their collateral. As a matter of applicable non-bankruptcy law, holders of construction liens are entitled to interest (which is currently set at 5% for those parties who do not have interest in their contracts),[8] plus legal fees and expenses.

21. The Construction Lienholder Group objects to the proposed financing, absent the Debtors agreement to provide adequate protection to the construction lienholders.

### B. The Definition of "Prior Senior Claims" Should Be Revised or Clarified.

22. In the DIP Motion, the proposed Order approving the DIP, and the DIP Agreement, "Senior Prior Claims" are defined as follows:

> (i) valid, enforceable, non-avoidable, and perfected liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement, are senior in priority to all or any portion of the Pre-Petition First Lien Security Interests (solely to the extent of such portion) [and] (ii) valid, enforceable and non-avoidable liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement are senior in priority to all or any portion of Pre-Petition First Lien Security Interest (solely to the extent of such portion).

See DIP Motion, p. 30, DIP Agreement, 2.18, Term Sheet pp 3-8, and Proposed Final DIP Order, ¶ 3(b)(1). This definition of Senior Prior Claims and other related definitions premised upon Senior Prior Claims are used throughout the DIP Motion and Sale Motion and documents in connection with, among other things, the priority for distributions from the proceeds from the sale of the Corpus Christi Plant.

23. The definition of Senior Prior Claims includes only "valid, enforceable, non-avoidable, and perfected liens in existence on the Petition Date" and "valid, enforceable and non-

---

[8] For those contractors, mechanics, and materialmen whose contracts include a provision for interest, the applicable interest rate could be as high as 18%.

avoidable liens in existence on the Petition Date that are perfected subsequent to the Petition Date." The Construction Lienholder Group understands from the Debtors' pleadings that this was intended to include all valid construction claims to the extent that they are timely perfected, either prior to or after the Petition Date, and there was no intent to create ambiguity by which a party could subsequently assert that a construction lien does not qualify because it was neither valid nor enforceable on the Petition Date because it was not yet perfected. Because the current definition leaves the possibility of an ambiguity, the Construction Lienholder Group respectfully submits that the definition should be revised to reflect that the Senior Prior Claims include all valid and enforceable claims which were perfected, either prior to or the Petition Date or after the Petition Date, as permitted by section 546(b) of the Bankruptcy Code or self-executing construction liens arising under Article 16 of the Texas Constitution.

24. Additionally, the Construction Lienholder Group is unaware of any intercreditor or subordination agreement that may affect or impair the rights of construction lienholders. The Construction Lienholder Group requests that the definition be amended to remove any reference to intercreditor or subordination agreements solely with respect to Senior Prior Claims, or that the Debtors provide evidence of all prepetition agreements that they assert might affect, modify or impair the rights that construction lienholders had prior to the Petition Date.

    C.    **The Proposed Distribution of Proceeds from the Sale of the Corpus Christi Plant Does Not Preserve Construction Lienholders' Rights.**

25. Consistent with Section 10.8 of the DIP Agreement, Paragraph B(vii)(2) of the proposed Final DIP Order, titled "363 Sale Payment Provisions" provides, in relevant part, as follows:

> The Court acknowledges the following stipulations by and among the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party and the Debtors, and that each of these parties agrees to each of the

11

following. Subject to the provisions for the payment of Sales Professional Fees and Sale Excess Fees (as such terms are defined in paragraph 13) under the heading "Additional Carve Out Provisions Applicable to Certain Asset Sales" in paragraph 13, the procedures of any sale in the Chapter 11 Cases by an Obligor (a "CC Selling Party") of the assets of M & G Resins and all the assets of the Guarantors (as defined in the DIP Loan Documents) that have been or may be useful to the current or future construction, business operations or uses of M & G Resins' assets (collectively, the "CC Assets") pursuant to section 363 of the Bankruptcy Code (a "CC Sale") shall provide that:

> 1. With respect to any CC Sale not involving a credit bid, on the Sale Final Closing Date, the CC Selling Parties shall apply the sale proceeds with respect to any Pre-Petition Collateral (as defined in the DIP Loan Agreement) that would otherwise be distributed to the DIP Secured Parties, the Pre-Petition First Lien Lender, the Second Lien Secured Party and holders of Senior Prior Liens Obligations in the following order of priority:
>
>> (a) first, to pay all outstanding Senior Pre-Petition First Lien Obligations other than **Residual Senior Pre-Petition First Lien Obligations** (as defined in paragraph 13), until indefeasibly paid in full;
>> (b) second, to pay all outstanding Pre-Petition Second Lien Obligations senior in priority to any Senior Prior Liens Obligations (the "Senior Pre-Petition Second Lien Obligations"), if any, until indefeasibly paid in full, provided that any such proceeds shall be held in trust for the DIP Lien Lender and Pre-Petition First Lien Lender, as applicable, and promptly delivered to the DIP Lien Lender and Pre-Petition First Lien Lender, as applicable, for application to outstanding DIP Obligations and Pre-Petition First Lien Obligations, in order of their relative priority, until such obligations are indefeasibly paid in full;
>> (c) third, to deposit sufficient cash proceeds to pay the estimated amount of obligations secured by Senior Prior Liens (the "Senior Prior Liens Obligations") in escrow (the "Senior Prior Liens Amounts") for the sole purpose of satisfying such obligations; provided that, any Senior Prior Liens Amounts in excess of the Senior Prior Liens Obligations allowed by the Bankruptcy Court pursuant to a final order shall be released from escrow and applied to the next outstanding senior obligation secured by a Lien on the CC Assets, or if no such obligation is outstanding, the next outstanding unsecured obligation owed by the CC Selling Parties; .
>> . .

26. This provision raises a number of issues. First, by the Order, in the event that the Corpus Christi Plant is sold through a sale that is <u>not</u> a credit bid, the Debtors are seeking to

establish a priority for distributions that anticipates that the Prior Senior Liens are behind the Senior Pre-Petition First Lien Obligations. That may be true, that may be false, or there may be some portion of the Senior Pre-Petition First Lien Obligations that is senior to the Prior Senior Liens and some portion that is junior to the Prior Senior Liens. To date, there has been no determination as to the priority of the Senior Pre-Petition First Lien Obligations, Pre-Petition Second Lien Obligations or the Prior Senior Lien Obligations with respect to the Corpus Christi Plant.

27. This provision also ignores the construction lienholders security interests in removables that are, as a matter of Texas law, senior to the Senior Pre-Petition First Liens. See Texas Prop. Code § 53.123.

28. Also, while the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party and the Debtors, may have agreed to pay the Sales Professional Fees and Sale Excess Fees (as such terms are defined in paragraph 13 of the Proposed Order), the construction lienholders have not agreed to any such treatment. Any payments to sales professionals are administrative expenses that are junior to construction lienholders' security interests in the proceeds of their collateral, and none of the Construction Lienholder Group have given their consent for use of their collateral for the payment of administrative expenses.

**D. The Proposed Distribution of Proceeds from the Sale of the Corpus Christi Plant by a Credit Bid by the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender Does Not Preserve Construction Lienholders' Rights.**

29. Paragraph B(vii)(2) of the proposed Order approving the DIP Motion addresses the sale of the Corpus Christi Plant involving a credit bid. It provides, in relevant part, as follows:

> (a) at the Sale Final Closing Date, the purchaser shall contribute cash sufficient to pay (i) the estimated Sale Professional Fees Amounts (as defined in paragraph 13), (ii) to the extent such obligations are senior to the

obligations subject to such credit bid, the estimated Sale Excess Fees Amounts (as defined in paragraph 13), and (iii) any obligations secured by liens on the CC Assets, to the extent such liens are senior to the obligations subject to such credit bid (the "Senior Secured Obligations" and such amounts, the "Senior Secured Obligations Amounts") (for the avoidance of doubt, any credit bid by the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender shall not require payment of any Pre-Petition Second Lien Obligation); and

\* \* \* \* \* \* \* \* \* \*

(c) in the event that the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender credit bids any of their DIP Obligations or Pre-Petition First Lien Obligations, respectively, any Sale or alternative bid or proposal for the purchase of the CC Assets that is approved by the Court must provide for indefeasible cash payments at closing to the DIP Agent, the DIP Lender and/or the Pre-Petition First Lien Lender, as applicable, of at least the dollar amount of the credit bid submitted by the DIP Agent, the DIP Lender and/or the Pre-Petition First Lien Lender, as applicable, plus the Sale Professional Fees Amounts and the Sale Excess Fees Amounts (as defined in paragraph 13) in order to be considered as a potentially higher and better bid, unless otherwise agreed to by the DIP Agent, the DIP Lender and/or the Pre-Petition First Lien Lender (as applicable). For the avoidance of doubt, any Credit Bid by the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender shall not require payment of any Pre-Petition Second Lien Obligations. In addition, and without limiting any other requirements for approval of such bid as a higher or better bid any bid by the Pre-Petition Second Lien Secured Party for the CC Assets, by credit bid or otherwise, shall provide that the DIP Obligations and the Pre-Petition First Lien Obligations are indefeasibly paid in full in cash provided to the DIP Lender and the Pre-Petition First Lien Lender, respectively, at the closing of the Sale Transaction unless otherwise agreed to by the DIP Agent, the DIP Lender and/or the Pre-Petition First Lien Lender (as applicable), and any such bid must also agree to fund in escrow amounts to pay the Sale Professional Fees Amounts and the Sale Excess Fees Amounts (as defined in paragraph 13). Any allocation of sale proceeds to specific CC Assets shall be done in good faith and shall not violate the priorities or protections provided to the DIP Facility or the Pre-Petition First Lien Obligations under the DIP Loan Documents, the Interim Order, this Final Order or the Pre-Petition First Lien Loan Documents as the case may be.

30. While Section (a) provides for the payment of "any obligations secured by liens on the CC Assets, to the extent such liens are senior to the obligations subject to such credit bid," Section (c) does not include a similar provision in the event that the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender is the credit bidder. Both should provide that any credit bid is

14

required to provide for the indefeasible cash payments of the Senior Secured Obligations at closing.

31. Relatedly, Paragraph B(viii)(1)(h) of the proposed order provides that "any bid by the Pre-Petition Second Lien Secured Party for the CC Assets, by credit bid or otherwise, shall provide that the DIP Obligations and the Pre-Petition First Lien Obligations are indefeasibly paid in full in cash." If the Pre-Petition Second Lien Secured Party submits a credit bid, it must also provide for the escrowing of the indubitable equivalent of all construction liens, including interest, legal fees, and expenses.

### D. There Should Be No Deadline for Construction Lienholders to Bring an Action to Determine the Relative Priority of Liens of Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party.

32. Typically, Bankruptcy Courts set deadlines for creditors' committees and other parties to commence adversary proceedings to challenge the amounts of claims and the validity of liens for prepetition creditors. These cases are different. Here, it is anticipated that there may be conflicts as to the priorities under the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party, and Construction Lienholders as to the relative priority of their liens, either in whole or in part. Such claims (if brought) would not constitute actions brought on behalf of the estates requiring derivative standing in accordance with Hartford Underwriters Insurance Company v. Union Planters Bank, 530 U.S. 1 (2000) and Cybergenics v. Chinery, 330 F.3d 548 (3d Cir. 2003). Rather, these would be direct actions brought by individual lienholders and there is no basis to set a deadline for the construction lienholders to bring claims on their own behalf.

33. Moreover, as this Court is aware, the Debtors are in the process of attempting to sell the Corpus Christi Plant, the results of which are likely to determine whether some or all of the secured claims upon the Corpus Christi Plant will be satisfied. Accordingly, it would be a

9877175/1

waste of estate assets[9] (and judicial resources) to require that the parties litigate the issue of the priority of their liens prior to the results of the sale. It is only after the sale that the parties will know whether the issue of priority is moot.

34. Additionally, The Construction Lienholder Group understands that there are significant "removables" at the Corpus Christi Plant. Removables are materials that can be removed without material injury to the land or other improvements at the project site. See e.g., First Nat'l Bank in Dallas v. Whirlpool Corp., 517 S.W.2d 262, 269 (Tex. 1974). Statutory liens upon removables are superior even to prior recorded deeds of trust. Id. (citations omitted). There are issues as to the amount of those receivables. If this Court were to require that actions be brought to contest the priority of the liens on removables, relative to the liens of the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party, there would need to be substantial discovery at the Corpus Christi Plant with respect to what is, and what is not, a removable.

35. Finally, as a matter of due process, the Court should not set a deadline for all construction lienholders to commence litigation against the Pre-Petition First Lien Lender, Pre-Petition Second Lien Secured Party related to the relative priority of their claims. In in their Motion for Entry of an Order (I) Establishing Lien Identification Procedures and (II) Granting Related Relief [Docket No. 214] (the "Lienholder Bar Date Motion"), the Debtors stated that they "may not be aware of all potential Lien claims because of the applicable state law requirements." Lienholder Bar Date Motion, ¶ 5. The Debtors have identified 118 parties that they believe are known lienholders (See Exhibit B to Lienholder Bar Date Motion), however, the Construction Lienholder Group is aware of at least five construction lienholders (including two members of the

---

[9] In the event that the proceeds from the sale of the Corpus Christi Plant are sufficient to pay all of the claims of the construction lienholders, the Pre-Petition First Lien Lender, and Pre-Petition Second Lien Secured Party, the estates would be responsible for payment of all of their legal fees pursuant to Section 506(b) of the Bankruptcy Code.

16

9877175/1

Construction Lienholder Group) who were not served with notice of the final hearing to consider the DIP Motion. To establish a deadline without providing them notice, including notice by publication, would deny each fundamental due process.

### E. Construction Lienholders Should Not Need Standing to Bring an Action with Respect to their Claims, Relative to the Security Interests of the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party.

36. Relatedly, the Construction Lienholder Group does not believe that there is any need for any party, including construction lienholders to seek standing to bring a claim against the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party with respect to the validity or priority of their liens. The Debtors have already stated that they have agreed to the validity or priority of the liens, as set forth in the proposed order. Accordingly, it is clear that the Debtors are not going to bring any such action. Requiring the parties file motions to seek standing is simply a waste of the time and efforts of the parties and this Court.

### F. The Waiver of the Doctrine of Marshaling should not apply to the Construction Lienholders.

37. Pursuant to the terms of the proposed order, the Debtors would waive doctrine of marshaling in these Cases. The construction lienholders have not agreed to any such waiver.

38. The Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party each have a security interest in the Corpus Christi Plant, and the Debtors and their non-debtor affiliates have numerous and (presumably) valuable assets, some or all of which may be subject to cross-collateralization by the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party. While this Bankruptcy Court frequently enters orders waiving the rights of the Debtors and their estates with respect to the doctrine of marshalling, there is simply no basis to preclude other secured creditors, like construction lienholders who have security interest in only

one asset, from seeking to require that the other secured lenders enforce their claims against other assets. The Court should not do so here.

## RESERVATION OF RIGHTS

39. The Construction Lienholder Group expressly reserves its right to supplement this objection at any time at or prior to the hearing to consider the proposed bid procedures and to introduce evidence at the hearing in support of its objection to the DIP Motion.

WHEREFORE, based on the foregoing, the Construction Lienholder Group respectfully requests that the Court enter an Order: (i) granting the Debtors' Financing Motions, as amended to reflect the objections of the Construction Lienholder Group as set forth herein; and (ii) granting to the Construction Lienholder Group such other and further relief as is just and proper.

December 6, 2017  **MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*

Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Brenna A. Dolphin (DE Bar No. 5604)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: emonzo@morrisjames.com
E-mail: bdolphin@morrisjames.com

Counsel to the Construction Lienholder Group

9877175/1