# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>M & G USA CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12307 (BLS)<br><br>Jointly Administered<br><br>**Related to Docket Nos. 14 and 173** |

## SINOPEC'S OMNIBUS
## RESPONSE AND RESERVATION OF RIGHTS
## WITH RESPECT TO DEBTORS' MOTION TO
## APPROVE POST-PETITION FINANCING [D.I. 14] AND
## DEBTORS' MOTION TO APPROVE SALE PROCEDURES [D.I. 173]

Sinopec Engineering Group America, LLC ("**SEGA**") and Sinopec Engineering (Group) Co., Ltd. ("**SEG**" and together with SEGA, "**Sinopec**"), by and through their undersigned counsel, hereby file this response and reservation of rights with respect to the motion of the above-referenced debtors (the "**Debtors**") to approve post-petition financing [D.I. 14] (the "**DIP Motion**") and the Debtors' motion to, among other things, approve certain bidding procedures for the sale of certain assets [D.I. 173] (the "**Sale Procedures Motion**").

## PRELIMINARY STATEMENT

The primary right Sinopec presently is focused on is the preservation of its rights as a mechanic's lienholder under Texas law.[2] The DIP Motion and the Sale Procedures Motion,

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à.r.l. (1270), M&G Chemicals S.A. (1022), M&G Capital S.à.r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2] Sinopec is also counterparty to contracts with the Debtors and reserves all its rights with respect to those contracts under 11 U.S.C. §§ 363 or 365 or other applicable law.

when taken together, could provide for payment in full to Sinopec of its over $52 million secured claim and Sinopec in no way intends to diminish the Debtors' efforts in setting forth a path to that potential outcome. The final order requested in the DIP Motion (the "**Final DIP Order**"), together with the proposed credit agreement, total over 250 pages, contain numerous defined terms and cross-references to other documents and matters in these cases, such as the Sale Procedures Motion and the *Debtors' Motion for Entry of an Order (I) Establishing Lien Identification Procedures and (II) Granting Related Relief* [D.I. 214] ("**Lien Procedures Motion**"), and thus, it is foreseeable that there are terms and provisions that will be used in the future, perhaps even by some party not presently at the table, like a liquidating trustee, to suggest that somehow Sinopec consented to the subordination or priming of its lien to other pre-petition creditors (when it doesn't) or that its collateral can be used without its consent to pay junior creditors. Sinopec thus is compelled to file this response and statement in order to obtain clarification of certain provisions to ensure its lien rights are not violated.

In short, Sinopec's concern is that through a series of interrelated orders lienholders or other creditors or holders of administrative expenses junior to Sinopec in these cases could be paid in full, while the Debtors (or the DIP Agent)[3] litigate or seek to bar Sinopec's claim through a lien claim process, and that when that claim ultimately is allowed in full its collateral is gone (subject to a free and clear sale order) or there are insufficient funds reserved to pay Sinopec in full.

Sinopec thus files this omnibus response (the "**Omnibus Response**") to the DIP Motion and the Sale Procedures Motion to ensure that (i) it is provided with adequate protection (on which the Debtors bear the burden of proof) to the extent its collateral is sold and any proceeds

---

[3] Paragraph 3(e) of the proposed Final DIP Order grants the DIP Agent the right to challenge the amount, validity and perfection of liens senior to the DIP Loan or the Pre-Petition First Lien Security Interest.

of its collateral are used for distribution to other creditors, (ii) it is either paid in full from the sale proceeds or an adequate reserve is established that ensures it will be paid in full (including any fees, expenses, interest, and time value of money should any party seek to litigate over Sinopec's claims),[4] and (iii) that if a reserve is established but insufficient that there is an appropriate mechanism for the Debtors to provide payment to Sinopec from another source. Any contrary outcome would be contradict the distribution provisions of the Bankruptcy Code and to the extent accomplished through a series of orders on December 11 prior to the submission of a Plan under section 1129 of the Bankruptcy Code, would also not be permissible. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 983-87 (2017) (stating a dismissal order cannot provide priority-skipping distributions and discussing case law with approval that holds the same with respect to various bankruptcy situations like plans and asset sales).

Sinopec also files this statement to communicate that it presently does not consent to the use, sale, or lease of any property in which Sinopec has an interest if the proposed use, sale, or lease is free and clear of Sinopec's interest in that property without Sinopec being paid in full on account of the lien it has obtained under Texas law and provided notice of in these cases.

Sinopec and its counsel, however, are willing to confer with the Debtors and their counsel (and other parties in interest) to ensure that Sinopec's lien rights are preserved and that the Debtors' estates can move forward with a sale to ensure payment in full of Sinopec's claims. It is likely that the Debtors will simply point to paragraph 3 of the Proposed Final Order and say that if Sinopec has a valid lien that existed on the Petition Date and is thus a Senior Prior Lien, that its mechanic's lien is not being primed. But presently, there is uncertainty regarding the various lien priorities in the Debtors' pleadings, and later proceedings could result in a

---

[4] Sinopec reserves all rights it may have under 11 U.S.C. § 506, Texas law, or any other law, regulation, or provision with respect to its secured claim.

mechanic's lienholder not being the holder of a Senior Prior Lien but still would have lien rights senior to others, which rights would be primed, entitling it to adequate protection. Additionally, there are conflicting and confusing provisions of the DIP Credit Agreement and the Bidding Procedures.

Sinopec's position is driven by unique aspects of Texas law that provide circumstances in which mechanics' liens arising either under Texas statute or the Texas Constitution can retroactively have a first priority right in collateral, like the Corpus Christ Plant, even in the face of a prior-filed, valid mortgage. For purposes of a Texas mechanic's lienholder's statutory right, the "inception of the mechanics' lien" turns on the date of the "commencement of construction."

In these cases, the Debtors have stated that the original amount due under the Pre-Petition First Lien Loan Agreement, dated as of March 21, 2013, was $250 million and that this sum was then increased under a Second Amendment to the Pre-Petition Loan Agreement dated as of July 29, 2016 to $390 million and further increased to a total of $590 million under a Fourth Amendment to the Pre-Petition First Lien Loan Agreement dated as of May 4, 2017.[5] Thus, if the "commencement of construction" in Corpus Christi was prior to March 21, 2013,[6] Sinopec's lien could be senior to all others; however, if the "commencement of construction" is after March 21, 2013,[7] but before July 29, 2016, then Sinopec's mechanic's lien would likely be senior to all but the $250 million of the Pre-Petition First Lien Loan. If this is the case, the query must then

---

[5]  *See* DIP Motion, ¶ 19 & n.4.

[6]  There is nothing presently in the record regarding the "commencement of construction" as is relevant to Texas law determination. The Stogsdill Declaration's statement that "[i]n April 2013, the Company began construction . . ." speaks only to the company's conduct and does not address when the first materials were delivered or when ground was initially broken. Moreover, as is apparent from the Declaration itself, Mr. Stogsdill began rendering his services to the Debtors in September 2017 and as such his statements regarding facts prior to that would not be based on his personal knowledge and are likely hearsay and thus inadmissible.

[7]  This statement assumes the Pre-Petition First Lien Deed of Trust filed on that same date was properly filed, a point which Sinopec assumes solely for illustrative and argument purposes here, but on which it reserves all rights and does not concede to such validity at this time.

be, is Sinopec's lien still a "Senior Prior Lien"? The answer likely seems to be "yes" based on the fact that the definition of "Senior Prior Lien" contains a qualifier that it is senior in priority to all "or any portion" of the Pre-Petition First Lien Security Interest. And, if the collateral securing that lien is sold, then that lien should be paid; however, the Credit Bid provisions in the Bidding Procedures Motion do not seem to honor that payment right. And, the Final DIP Order proposes adequate protection to the certain of the Debtors' prepetition lenders but not to Sinopec, whose liens are senior.

Sinopec thus raises the issues below to ensure that its lien priority status is not modified by the Final DIP Order or the Bidding Procedures and to ensure that the Court does not approve distribution procedures in those orders that are contrary to the rights Sinopec would receive if distribution was proposed under the terms of a plan and the provisions of section 1129 of the Bankruptcy Code. Sinopec remains open to language changes, including those proposed below, that resolve the concerns set forth below.

## BACKGROUND

1. Sinopec is party to several integrated agreements, including that certain Agreement for Supply of Engineering, Procurement, and Construction for Facilities for the Manufacture of Terephthalic Acid and Polyethylene Terephthalic Acid and Polytheylene Terephthalate Bottle Grade Chip by and between M&G Resins USA, LLC and Sinopec, dated January 11, 2013, as may be amended from time (the "**Main Supply Agreement**"), as well as a related Umbrella Agreement by and between M&G Finanziaria S.R.L. ("**MGF**") and Sinopec, dated January 11, 2013, as amended and restated from time to time (the "**Umbrella Agreement**"). Sinopec is also party to at least the following agreements (which together with the Main Supply Agreement and the Umbrella Agreement are referred to herein as the "**Sinopec**

**Agreements**"): (1) Onshore Supply Agreement by and between SEGA and Chemtex International, Inc., dated June 17, 2013, as amended, (2) Offshore Supply by and between SEGA and MGF, dated June 17, 2013, as amended, and (3) Supplementary Onshore Services Agreement by and between SEGA and Mossi & Ghisolfi Logistics & Engineering Co., dated June 17, 2013, as amended.

2. On a general descriptive basis, without prejudice to Sinopec's right to argue that as a substantive matter the Sinopec Agreements constitute a single integrated agreement (which right Sinopec reserves), under the Sinopec Agreements, SEG provided offshore procurement, mainly providing goods from the People's Republic of China, and subcontracted offshore procurement, onshore construction, transportation, and design work, and overall project management services at the Corpus Christi Plant to certain Debtors and affiliated parties. The Umbrella Agreement provided that MGF is responsible for (a) all engineering, procurement, and construction risk and (b) all prime contract risk under the Main Supply Agreement, including all subcontracts with MGF's affiliates, including certain of the Debtors. In essence, Sinopec was a material provider, including specially fabricated material specific to the plant in Corpus Christi, Texas (the "**Corpus Christi Plant**") owned by debtor M & G Resins USA, LLC.

3. The Sinopec Main Supply Agreement and Umbrella Agreement (and thus all the integrated agreements) predate the Pre-Petition First Lien Deed of Trust, with respect to the Corpus Christ Plant.

4. On the Petition Date, the Debtors filed the DIP Motion and on November 16, 2017, the Debtors filed the Sale Procedures Motion. The relief requested in the DIP Motion and the Sale Procedures Motion is scheduled to be heard for approval by this Court on December 11, 2017 at 1:00 p.m.

5. Under Texas law, mechanic's liens arise under both the Texas Constitution and under Texas statutory law. The Texas Constitution provides as follows:

> LIENS OF MECHANICS, ARTISANS, AND MATERIAL MEN. Mechanics, artisans and material men, of every class, shall have a lien upon the buildings and articles made or repaired by them for the value of their labor done thereon, or material furnished therefor; and the Legislature shall provide by law for the speedy and efficient enforcement of said liens.

TEX. CONST., Art. XVI, § 37. The Debtors have acknowledged that these Texas Constitutional liens exist without any action by the beneficiary of such liens. *See* Lien Procedures Motion at 3 n.2.

6. By statute in Texas, a person has a lien if it specially fabricates material or provides labor or materials for construction or repairs in the State of Texas to a building or improvement. *See* TEX. PROP. CODE ANN. § 53.021(a)(1). A lien for specially fabricated material gives rise to a lien even if the material is not delivered. *Id*. § 53.021(b). Similarly, an architect, engineer, or surveyor who prepares a plan or plat under a written contract with the owner of property in connection with the actual or proposed design, construction, or repair of improvements on real property is considered a person entitled to assert a lien for unpaid work. *Id*. § 53.021(c). These mechanic's liens extend to, among other property, the building, fixtures, or improvements and secure payment for the labor done, material furnished, and fabricated material (even if not delivered). *Id*., §§ 53.022 & 53.023. In commercial settings, the various perfected mechanic's liens are on equal footing without reference to the date of the filing the affidavit claiming the lien, *id*., § 53.122, and a mechanic's lien attaches in preference to any prior lien, encumbrance or mortgage on the land on which it is located but does not affect any lien, encumbrance or mortgage on the land or improvement "at the time of the inception of the mechanic's lien[,]" *id*., § 53.123, which inception is defined as "the commencement of

construction of improvements or delivery of materials to the land on which the improvements are to be located and on which the materials are to be used." *Id*., § 53.124. The facts and circumstances related to the commencement of construction can thus be highly relevant to whether mechanic's liens prime a mortgage or construction loan.

7.  On the Petition Date, the Debtors filed the Declaration of Dennis Stogsdill in Support of First Day Pleadings [D.I. 3] (the "**Stogsdill Declaration**"). The Stogsdill Declaration represents that there are at least $196 million of construction liens against the Corpus Christi Plant.[8] Stogsdill Declaration, ¶ 10. Sinopec holds more than $52 million of construction liens against the Corpus Christi Plant.[9] The claims and liens of Sinopec arise from its performance of its obligations under the Sinopec Contracts and in connection with the construction of the Corpus Christi Plant.[10] As of the date of this Omnibus Response, there has not been a determination regarding the inception of Sinopec's mechanic's lien or the date on which construction commenced at the Corpus Christi Plant.

## RESPONSE AND RESERVATION OF RIGHTS

A.  **Statement Regarding DIP Motion**[11]

8.  Based on Sinopec's review of the DIP Motion, the Debtors contend that they are not intent on priming Sinopec's lien to the extent that Sinopec's lien is senior to the Debtors' Pre-Petition First Lien Obligations and Pre-Petition Second Lien Obligations or otherwise alter

---

[8] The term "construction lien" is understood to encompass all mechanic's, contractors', or materialman's liens arising under Texas law.

[9] *See Notice of Perfection of Mechanic's Liens Under 11 U.S.C. § 546(b)(2) of Sinopec Engineering Group America, LLC* [D.I. 192].

[10] Sinopec reserves all rights to raise any arguments against the Debtors and any other lienholders with respect to the date of inception and priority of its lien, including, but not limited to the "relation back" of its mechanic's lien to the date of commencement of construction.

[11] Capitalized terms used but not defined in this Section A shall have the means given them in the Final DIP Order.

the priority of Sinopec's lien and claim. Indeed, Sinopec does not consent to the priming of its liens. *See generally The Newhall Land and Farming Co. v. American Heritage Landscape, LP (In re Landsource Comms. Dev. LLC)*, 476 B.R. 454 (Bankr. D. Del. 2012) (addressing arguments that a mechanic's lienholder waived its lien rights by failing to object to a debtor's DIP loan motion). However, to protect its rights, Sinopec asserts that several clarifications to the Final DIP Order are required as certain provisions appear to result in priming of, or negative treatment of, Sinopec's lien rights.

> i. *Clarification Regarding Priming*

9. The Proposed DIP Order and DIP Credit Agreement state that the DIP Liens shall exclude and be junior to:

> valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement, are senior in priority to all or any portion of the Pre-Petition First Lien Security Interests, solely to the extent of such portion, (collectively, with the liens described in clause (1), the "Senior Prior Liens;"

DIP Credit Agreement § 2.18 (emphasis added); Proposed DIP Order at ¶ 3(b) (emphasis added).

10. Sinopec is of the impression that the emphasized language above was drafted with the intention to carve-out senior construction liens existing as of the Petition Date. However, the language is unclear. Accordingly, the Final DIP Order should contain the following clarifications:

- First, the language "valid, enforceable and non-avoidable" should be removed because it is vague. If a construction lienholder's lien is invalid, unenforceable, or avoidable, then it cannot be "senior in priority" to other liens. Accordingly, the vague language should be deleted.

- **Second**, the emphasized language should be clarified to state that to the extent a construction lienholder's lien was not required to be perfected prior to the Petition Date under the Texas Constitution or was not required to be perfected prior to the commencement of the Debtors' cases under the Texas Property Code and the construction lienholder, like Sinopec, timely filed a notice in accordance with section 546(b) of the Bankruptcy Code, it still falls within the definition of "Senior Prior Liens."

- **Third**, the definition of "Lien" in the DIP Credit Agreement should be clarified to specifically include construction liens, whether arising under the Texas Constitution or otherwise.

ii. *Clarification Regarding Section 506(c) Waiver*

11. The Proposed DIP Order provides that the Pre-Petition First Lien Lender and Pre-Petition Second Lien Secured Party may not have their collateral charged under section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of such DIP Secured Party, Pre-Petition First Lien Lender, or Pre-Petition Second Lien Secured Party, as the case may be. Proposed DIP Order at ¶ 11.

12. Sinopec objects to any other 506(c) waiver contained in the Finial DIP Order unless (a) Sinopec receives an identical waiver or (b) the Final DIP Order provides that any claims secured by liens that are junior to the Senior Prior Liens will not be paid until claims secured by the Senior Prior Liens are paid in full.

13. The reason for this is that as drafted, the Debtors, or a successor, could seek to surcharge all of the Senior Prior Liens yet pay the DIP Secured Party, the Pre-Petition First Lien Lender, and the Pre-Petition Second Lien Secured Party in full (and under the orders proposed by

the Debtors, such payment appears mandatory in connection with a sale), which effectively would prime the Senior Prior Liens to the extent of any surcharge imposed. This all appears to occur without providing adequate protection as required by Bankruptcy Code section 364(d) to Sinopec. Thus, as constructed, all potential surchargeable costs could be placed onto the mechanic's lienholders, like Sinopec. This is unjust and should be corrected, especially where the proposed budget provides for payment of those amounts and the gravamen of the Proposed DIP Order is that no cash can be used unless and until the DIP Loan is paid in full.

      *iii.*     *Carveouts and Waterfall*

14. Similarly, paragraphs 12 and 13 of the Proposed DIP Order contains carve-outs for professional fees, including in the event of a sale. The standard Carve-Out does not appear to affect Senior Prior Liens and the Carve-Out in the event of a sale appears to be an escrow funded by lienholders that are senior to the Senior Prior Liens (if any); however, as Senior Prior Lien holders, no other claims can be paid under the Bankruptcy Code unless and until the claims secured by Senior Prior Liens are paid in full. If junior creditors want to agree to permit their collateral proceeds to be subject to the Carve-Out post-payment in full of Sinopec, Sinopec has no opposition to that, but Sinopec does not consent to any surcharge or Carve-Out reducing its collateral value without it being provided adequate protection. Again, as drafted, the Carve-Out provisions could result in creditors and administrative claimants junior to Sinopec being paid with the proceeds of Sinopec's collateral at a time when Sinopec has not been paid in full. This could be remedied by including Sinopec's claim as one that benefits from the adequate protection liens afforded other secured parties in the Proposed DIP Order or providing that any payments to any creditors or holders of administrative expense claims that are junior to Sinopec will be made on an interim basis or subject to a holdback and not be made final until Sinopec is paid in full.

15. The Proposed DIP Order also effectively includes a waterfall of payments in the event of a sale. While on its face, paragraph B(viii) of the Final DIP Order appears to be a stipulation between the Debtors, the DIP Lender, and certain of the Debtors' prepetition lenders regarding such priority of payments, paragraph 22 of the Proposed DIP Order states that these provisions are binding on third parties such as Sinopec and not subject to Challenge and Section 10.8(c) of the proposed credit agreement provides for a distribution waterfall that will govern this case. Providing for a mechanism for distribution of proceeds in advance of unknown events that might violate the Bankruptcy Code is not permissible, especially if it is done in such a way that does not ensure Sinopec is paid in full or describes what happens if any reserve established to pay Sinopec in full is deficient. The law requires a mechanism to ensure that Sinopec is paid in full or that its lien survives any sale. *See Jevic*, *supra*.

16. To the extent the relevant Carve-Out and waterfall provisions do not impact Sinopec's rights or priority, Sinopec is not opposed to it, but as presently written and when considered in combination with the Lien Procedures Motion, it appears that the Debtors are proposing to permit a credit bid by a junior lienholder or a cash sale in which junior lienholders are paid in full, while the Debtors (or DIP Agent) seek to discharge valid liens without commencing adversary proceedings and in violation of Texas law. Thus, if the Debtors do seek to alter the priority of Sinopec's claim or lien under the Bankruptcy Code, Sinopec objects to such provisions, including because they may constitute a *sub rosa* plan. *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets"); *see also In re Decora Industries*, Case No. 00-4459-JJF, 2002 WL 32332749 at *8 (D. Del. May 20, 2002)

("the focus of '*sub rosa*' plan analysis is oriented toward those situations in which a debtor proposes to sell 'all' or 'substantially all' of its assets without the benefit of a confirmed plan or a court-approved disclosure statement.").

17. Sinopec proposes that the Debtors add the following language to the DIP Order to resolve this concern:

> Notwithstanding anything to the contrary herein, nothing in this Order shall (1) affect the priority of the claims or liens of Sinopec Engineering Group America, LLC or Sinopec Engineering (Group) Co., Ltd. as provided for by the Bankruptcy Code and other applicable law, including, but not limited to, Texas law, and any payment to any creditor junior to Sinopec Engineering Group America, LLC or Sinopec Engineering (Group) Co., Ltd. shall be made on an interim basis until such time as Sinopec Engineering Group America, LLC or Sinopec Engineering (Group) Co., Ltd. is paid in full on account of its allowed claims, and (3) affect any right that Sinopec Engineering Group America, LLC or Sinopec Engineering (Group) Co., Ltd. has to object to the use, sale, or lease of any of the Debtors' assets free and clear of Sinopec Engineering Group America, LLC's or Sinopec Engineering (Group) Co., Ltd.'s liens.

**B.     Statement Regarding Sale Procedures Motion**

18. Sinopec understands that by the Debtors' Sale Procedures Motion, the Debtors seek approval of procedures (the "**Bidding Procedures Order**") in connection with the proposed sale of their assets and that if a sale occurs, there will be a later sale order ("**Sale Order**"). As part of the Bidding Procedures Order, the Debtors have proposed Assumption and Assignment Procedures. Sinopec reserves all rights to object to the assumption and assignment of any of its contracts with the Debtors at the appropriate time. Additionally, Sinopec reserves its rights to raise any objection to the Sale Order at the appropriate time.

19. With respect to the Bidding Procedures Order, the primary flaw is they contain a series of paragraphs that approve offers that will contain priority skipping distributions. Paragraphs 8, 9, and 10 of the proposed Bidding Procedures Order permit the DIP Lender, the DIP Agent, the Pre-Petition First Lien Lender to Credit Bid and does not require them to pay any

of the Pre-Petition Second Lien Obligations. Any further bid must provide for an indefeasible cash payment of the DIP Obligations and the Pre-Petition First Lien Obligations to the DIP Lender and the Pre-Petition First Lien Lender in an amount at least equal to the Credit Bid plus the Sale Professional Fees Amounts and Sale Excess Fee Amounts. Paragraph 11 of the proposed Bidding Procedures Order provides that the Pre-Petition Second Lien Secured Party may also Credit Bid for the Corpus Christi Plant and that if it does, it shall pay the DIP Obligations and the Pre-Petition First Lien Obligations indefeasibly in full and in cash plus pay a cash amount in an escrow not subject to any lien to fund the Sale Professional Fees and the Sale Excess Fee. The Bidding Procedures attached to the Bidding Procedures Order contain similar provisions. *See* Bidding Procedures Order at Ex. 1, pp.10-11 at section VI.A.5.

20. What's missing from all of this is any mention of the Sinopec lien, which may be senior or equal to some or all of the other pre-petition liens. Thus, through the guise of a Bidding Procedures Order, the Debtors seek entry of an order that will provide for distributions over and around Sinopec's secured claim in violation of Texas law and the Bankruptcy Code.

21. Confusingly, the Bidding Procedures attached the Bidding Procedures Order also provide that "a Credit Bid that proposes the purchase of Assets subject to another lender's valid, perfected senior lien securing funded debt obligations, in which case the Proposed Bidder must identify the means of satisfying or otherwise resolving or assuming such obligations." *See id.*, p. 6, section III.B.2.c. The Bidding Procedures contain a similar provision for a Qualified Bid. *See* id. at pp. 8-9, section VI.A.1.c. Thus, not only do the Bidding Procedures permit a Credit Bid that pays creditors and administrative expenses junior to Sinopec, but it expressly states that claims for "funded debt" must be provided for but contain no provisions for payment of a lender's valid, perfected senior liens under state law for provision of materials or labor or for

providing improvements or construction. There is no explanation for these discriminatory bidding procedures that would permit a sale of collateral securing a valid mechanics' lien free and clear of those liens without payment on account of the claims secured by such liens.

22. The Bidding Procedures Order thus contains impermissible provisions and it must be remedied. The Court should require the Debtors to add Sinopec to the list of parties for whom a credit bid must pay in full and the Court should strike those provisions of paragraphs 10 and 11 of the proposed Bidding Procedures Order that govern the future distribution of sale proceeds in a manner that violates Sinopec's secured lien rights. The Court should also require modification of subparagraph c of Section III.B.2, subparagraph c of Section VI.A.1, and paragraph 5 of Section VI.A.1 of the Bidding Procedures to include that any bid, Credit Bid or otherwise, must also identify the means of satisfying or otherwise resolving or assuming Sinopec's obligations.

23. It should be noted that this outcome is required by the DIP Credit Agreement that provides in Section 10.8(c) that the Bidding Procedures provide a deposit in Cash "sufficient to pay the estimated amount of obligations secured by Senior Prior Liens in escrow for the sole purpose of satisfying such obligations." DIP Credit Agreement at 127. This provision goes on to provide what happens if the funds so deposited ***exceed*** the amount of Senior Prior Liens, but fails to say what happens if these funds are ***insufficient***, electing instead to dictate payment down the priority chain (which means as noted above, the Final DIP Order must be modified to provided that notwithstanding this Section 10.8 of the DIP Credit Agreement, no creditor junior to the senior Sinopec lien can be paid on a final basis until Sinopec is paid in full the amounts it is owed on account of its statutory and constitutional liens under Texas law).

## C. Joinder in Certain Other Objections

24. In addition to the issues raised herein, Sinopec reserves its right to join in any other objections to the DIP Motion and the Sale Procedures Motion that may be made by any other party in interest. Sinopec also reserves the right to supplement this response and to join in any other filings, and to present supplemental and further arguments at any hearing on the DIP Motion and the Sale Procedures Motion.

Dated: December 6, 2017

Respectfully submitted,

By: */s/ R. Craig Martin*
R. Craig Martin (DE 5032)
DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: craig.martin@dlapiper.com

*Attorneys for Sinopec Engineering Group America, LLC, and Sinopec Engineering (Group) Co., Ltd.*