## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| M & G USA CORPORATION, *et al.*, | ) Case No. 17-12307 (BLS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Related to ECF No. 173** |
| | ) **Hearing: December 11, 2017 at 1:00 p.m.** |
| | ) **Objection Deadline: December 4, 2017 at 4:00** |
| | ) **p.m.** (Extended for the Committee to December |
| | ) 6, 2017 at 4:00 p.m.) |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO MOTION OF THE DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS'
ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO ONE OR MORE
STALKING HORSE PURCHASE AGREEMENTS AND TO PROVIDE BID
PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION
AND ASSIGNMENT PROCEDURES AND (E) SCHEDULING A SALE HEARING
AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
(II)(A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE
AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND
(B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors of M & G USA Corporation, *et al.* (the "Committee") hereby objects to the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired*

*Leases; and (III) Granting Related Relief* [ECF No. 173] (the "<u>Sale Motion</u>").[1]  In support of its

objection (the "<u>Objection</u>"), the Committee submits simultaneously herewith (i) the *Declaration*

*of Leon Szlezinger in Support of Objection of Official Committee of Unsecured Creditors to the*

*Debtors' Sale Motion* (the "<u>Szlezinger Decl.</u>"); and (ii) the *Declaration of James Burke in*

*Support of Objection of Official Committee of Unsecured Creditors to the Debtors' Sale Motion*

(the "<u>Burke Decl.</u>"), and respectfully states as follows.

## PRELIMINARY STATEMENT

1.  While all parties acknowledge that a sale is likely the best path to

maximize value in these Chapter 11 Cases, the sale process that the Debtors are conducting here

(the "<u>Sale Process</u>") is a ***sham***, the sole purpose of which is to allow their prepetition first lien

lender, Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa

("<u>Inbursa</u>"), to either obtain a quick and immediate payoff of its secured debt or foreclose on the

Debtors' crown jewel (the unfinished Jumbo Plant, in Corpus Christi, Texas).[2]  Inbursa is

seeking to liquidate its collateral and run—crippling the Debtors and leaving these estates

without the wherewithal to run an effective process, no ability to maximize value for their other

creditors, and likely administratively insolvent.[3]

---

[1]  Capitalized terms that are not defined herein have the meanings given to them in the Sale Motion or, if not defined therein, in the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* [ECF No. 3] (the "<u>First Day Decl.</u>"). This Objection relates solely to the Bidding Procedures (as defined below) and the proposed order approving such Bidding Procedures (the "<u>Bidding Procedures Order</u>").  The Committee reserves its right to object to any proposed sale, including any sale to a Stalking Horse Bidder (as defined below) or any Stalking Horse Motion (as defined below), including any proposed Bid Protections.

[2]  Burke Decl. Ex. B ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

[3]  ████████████████████████████████████████████████████
████████████████████████████████████████████████

2.	When viewed in connection with the Debtors' proposed DIP Financing, it is clear that the Bidding Procedures are just the next step in the implementation of Inbursa's[4] overall strategy.  In fact, as the Court noted during the telephonic hearing on November 21, 2017, the proposed DIP Financing and the Bidding Procedures are inextricably intertwined.[5]  As more fully detailed in the *Objection of the Official Committee of Unsecured Creditors to (I) DIP Financing Motion and (II) Cash Collateral Motion* (the "Committee DIP Objection"), filed contemporaneously herewith, Inbursa has designed a DIP Financing package to be used solely as a "tool" to pursue its expedited sale, including imposing an unreasonably restrictive budget, impossible to meet case milestones, extraordinary termination rights, disguised roll-up and anti-cramdown provisions, provisions for the immediate distribution of sale proceeds, and leaving virtually no funds for the Committee to exercise its fiduciary duties.[6]

3.	Having provided only the bare minimum of financing necessary to run an auction process on an extremely truncated timeline, and having granted to themselves and certain other prepetition lenders the automatic right to credit bid despite the fact that their allegedly

---

[4]	The party providing the DIP Financing is Control Empresarial de Capitales, S.A. De C.V. (the "DIP Lender"), an affiliate of Inbursa.  First Day Decl. ¶ 49.

[5]	In re M & G USA Corp., Case No. 17-12307 (BLS) (Bankr. D. Del. Nov. 21, 2017) (Hr'g Tr. 12:10-12) ("[A] number of the issues that are raised in the DIP financing carryover or travel together with the bid procedures.")

[6]	■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

secured debt has not yet been allowed as such, Inbursa has effectively designed Bidding Procedures that are guaranteed to repel any third-party cash bids at a high enough level to provide a recovery to any constituency other than the prepetition secured lender. Indeed, both the Debtors' investment banker and the Committee's investment banker acknowledge that a longer runway would be better. █████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████

4.      Among the numerous problems with the proposed Bidding Procedures and proposed Bidding Procedures Order are the following:[7]

- **Proposed Sale Timeline**: (Bidding Procedures I.)  As noted above, the proposed Sale Timeline is simply too tight.  Prospective bidders will only have 35 days from entry of the proposed Bidding Procedures Order to submit initial proposals and just 74 days to submit their Final Bid.  The amount of work that any third-party bidder would need to complete in order to submit an Initial Proposal (let alone a Final Bid) for these assets is simply insurmountable during this time frame (***unless they are already intimately involved in the process***).  In just 35 days, a potential bidder is expected to have formulated a view and provide detailed information on (i) purchase price, (2) allocation of purchase price, (3) sources of financing for the purchase price; (4) regulatory approvals (including antitrust), hurdles, timeline and plan to obtain such approvals; and (5) bridge financing from the Sale Hearing to Closing.  Bidding Procedures III.B.  All this is in the absence of adequate information, including a delayed Confidential Information Memorandum ("CIM"); a Cost of Completion report, which is not due until the end of December; and a general dearth of information as conceded by the Debtors' investment banker.  See, e.g., ███████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[7]      Additional comments to the proposed Bidding Procedures have been included in the Committee's mark-up of the proposed Bidding Procedures and proposed Bidding Procedures Order, annexed hereto respectively as Exhibit A and Exhibit B.  The proposed Sale Order annexed to the Sale Motion is not before the Court.  It currently, as drafted, contains provisions that have been inserted by, or for the benefit of Inbursa, as one of the "Specified Lenders."  Any Sale Order that will be used as form for any potential bidder should be in form and substance acceptable to the Committee.

[BLACK REDACTION BAR] The Debtors need to provide potential bidders a *minimum* of 180 days for the overall Sale Process, from today to the end of the Sale Process. Szlezinger Decl. ¶ 26.

- **Specified Lender Automatic Right to Credit Bid**. (Bidding Procedures VII.A.5.) The Specified Lenders (*i.e.*, Inbursa and DAK) should not be permitted the immediate right to credit bid until their allegedly secured claims have been allowed as such.[8] Although the Bidding Procedures, as a general matter, only permit Credit Bids if a final, non-appealable order has been entered determining the validity, priority and extent of the claims and liens that underlie the Credit Bid, *this requirement does not apply to the Specified Lenders*. Preferred treatment of this kind is simply not appropriate and the Court need not make any such determination at this time. A single process must be put in place for determining a secured creditors' entitlement to credit bid in advance of the Auction.

- **Distribution of Sale Proceeds**. (Bidding Procedures XIII; VII.A.5,8; Sale Order ¶ 26.) Neither any Credit Bid, nor the immediate distribution of the cash sale proceeds as proposed by the Debtors, should leave the Debtors' estates administratively insolvent. The Bidding Procedures should require that all Credit Bids provide for a cash component sufficient to fund a "wind-down" budget and, with respect to any Qualified Bid by a third-party cash bidder, that such "wind-down" budget come off the top of any cash proceeds before any distribution is made to any DIP or prepetition secured lenders. *Any sale must be guaranteed to at least permit the Debtors to avoid immediate administrative insolvency*.

- **Payment of Committees Fees**. (Bidding Procedures VII.A.5; Final DIP Order ¶ 13.) The proposed payment of professional fees off the top of the Sale proceeds (as set forth in the proposed Final DIP Order and Sale Order) must include payment of *all* of the Committee's allowed professional fees and expenses, not just the limited amounts permitted by the budget [BLACK REDACTION BAR] While these issues must be addressed in the proposed Final DIP Order first and foremost, it is essential that any Credit Bid and any Qualified Bid by a third-party

---

[8] Notably, the Bidding Procedures do not even limit such automatic right to credit bid to the rights of the Committee to investigate their claims and liens as permitted by the proposed Final DIP Order. Bidding Procedures VII.A.5. Nevertheless, as discussed in the Committee DIP Objection, 60 days from formation (the first 30 of which the Committee has had to focus its efforts on righting the egregious terms of the proposed DIP Financing and Bidding Procedures) is simply inadequate to conduct a meaningful investigation here, and the proposed investigation budget of $20,000, which would likely not even cover the costs of lien searches.

cash bidder include a cash amount sufficient to cover all of these costs, and that such amounts be set aside from any other Successful Bid.

- **Inbursa's Consultation Rights.** (Bidding Procedures XII.) If Inbursa or DAK (or any of the Consultation Parties) submits a Bid (credit bid or otherwise) they cannot also serve as a Consultation Party with respect to other Bids, such a right would pose an impossible to overcome conflict. Inbursa should be compelled to relinquish all such rights to extent that it seeks for bid for any of the assets.[9]

- **Stalking Horse Bidder**. (Bidding Procedures V.) The Company has conceded that Inbursa is considering and is likely to submit a Stalking Horse Bid. ███████ ████████████████████████████████████████████████████████ ████████████ However, the Debtors have requested to be able to seek Court approval of such Stalking Horse Bid at any time prior to the Sale Hearing. The benefit of a Stalking Horse Bidder is encouraging competition for the asset. As such any proposed Stalking Horse Bid must be approved prior to the Final Bid Deadline. In addition, neither Inbursa nor DAK should be entitled to bid protections associated with a Stalking Horse Bid.

- **Good Faith Deposit**. (Bidding Procedures VII.A.7.) As currently drafted, a Credit Bid by Inbursa is held to an entirely different standard than all other Qualified Bids (including other Credit Bids). Instead of requiring Inbursa to put forth a Good Faith Deposit equal to the greater of $10 million and 10% of the Purchase Price, the Bidding Procedures only require Inbursa to deposit a Good Faith Deposit equal to $20 million (even if such amount is significantly less than 10% of the Purchase Price). Inbursa should not be granted special treatment.

- **Committee Consultation/Consent Rights.** (Bidding Procedures § XII.) The Committee should be granted additional notice/consultation/consent rights with respect to critical Sale Process matters (e.g., selection of Stalking Horse Bids, extension of Bid Deadline, granting of Bid Protections, decision to not proceed with Auction, and modification of Minimum Overbid, determination of Qualified Bids, Leading Bids, Successful Bids and Back-Up Bids).

- **Minimum Overbid.** (Bidding Procedures VII.B.2.) The Minimum Overbid amount should be reduced from $1,000,000, to $500,000. The lower overbid amount will likely assure that the highest price is obtained.

- **Modification of Bidding Procedures**. (Bidding Procedures IX.) The Debtors are currently authorized to modify the Bidding Procedures subject to certain limitations. One limitation that should be added is that the Debtors obtain the Committee's consent for any such modification. In addition, the Debtors should

---

[9]    Notably, the proposed DIP Financing effectively gives them an absolute consent right as to the selection of the Successful Bidder and should similarly be modified. DIP Financing §§ 5.19(h), 8.1(p) (failure by DIP Lender to consent to selection of Successful Bidder is event of default).

be expressly prohibited from modifying the "reasonableness" qualifier to each exercise of their discretion. Moreover, the *proviso* prohibiting the Debtors from reducing or otherwise modifying their obligations to obtain consent from the DIP Lender/Pre-Petition First Lien Lender should be struck.

5.     Only if all of the above problems with the Bidding Procedures are addressed, can the Sale Process be allowed to proceed. Putting aside what Inbursa **wants**, what the Debtors, their advisors, and their estates **need** are sufficient time and a playing field level enough to elicit third-party cash bids at a high enough level to allow for a recovery by the Debtors' unsecured creditors. The Court should not approve the Bidding Procedures in their current form.

## BACKGROUND

6.     On November 13, 2017, pursuant to section 1102(a)(1) of the Bankruptcy Code, the United States Trustee appointed the Committee in these cases. *Notice of Appointment of Committee of Unsecured Creditors* [ECF No. 146].

### A.     DIP Motion

7.     On the Petition Date, the Debtors filed the DIP Motion, seeking approval of a $100 million superpriority, secured debtor-in-possession financing. The following day, on November 1, 2017, the Court entered an order granting the DIP Motion on an interim basis [ECF No. 62] (the "Interim DIP Order").

8.     The Debtors' obligations under the DIP Financing are putatively secured by liens on the majority of their assets that are senior to the existing liens thereon except: (a) the liens that are senior to any portion of the liens securing the U.S. Inbursa Facility (the "Senior Prior Liens") and (b) any liens securing the portion of the U.S. Inbursa Facility that is senior to the Senior Prior Liens. Interim DIP Order ¶ 3.

9.     The Debtors' access to the DIP Financing proceeds is subject to a number of case milestones, which, among other things, require that the sale of all or substantially all of the Debtors' assets be approved on or before March 12, 2018.  DIP Financing § 5.19.  The Debtors' failure to adhere to these milestone is an event of default, which would allow the DIP Lender to exercise its rights and remedies thereunder.[10]  DIP Financing §§ 8.1, 8.2.

10.     The Interim DIP Order also provides that any challenges to the liens and claims (each, a "Challenge") of Inbursa and DAK will be forfeited if the Committee does not conclude an investigation as to such matters (the "Committee Investigation") and commence an adversary proceeding asserting any resulting Challenge within sixty (60) days of the Committee's appointment (the "Committee Investigation Period").  Interim DIP Order § 23(b).  The Interim DIP Order limits the amount of DIP Proceeds that may be used in connection with the Committee Investigation to just $20,000 and prohibits the use of any DIP Proceeds to commence any related action.  Interim DIP Order § 13.

11.     The Interim DIP Order also provides that the Debtors will not challenge the rights of the DIP Agent, the DIP Lender and the Pre-Petition First Lien Lender to credit bid for the Debtors' assets, and that, in the event that any one of them credit bids any of their debt, any Sale Order to be entered by the Court must provide for "indefeasible cash payment" at

---

[10]     On the same day that the Court entered the Interim DIP Order, the Debtor that owns and operates the West Virginia facility ("M&G Polymer") filed a motion seeking authority to use cash deposited in an account with Comerica that serves as collateral for its prepetition indebtedness to Comerica.  By virtue of a prepetition guaranty, Inbursa also is a secured creditor of M&G Polymers, with liens on certain of M&G Polymers' assets, including the now-inoperative Apple Grove Plant and certain equipment.   First Day Decl. ¶ 20.  On November 2, 2017, this Court entered an interim order [ECF No. 91] (the "Interim Cash Collateral Order") granting the Cash Collateral Motion and authorizing M&G Polymers to use up to $6 million of Comerica's cash collateral, subject to the terms of the Interim Cash Collateral Order and the Cash Collateral Budget, through the date of entry of a final order on the Cash Collateral Motion.  Interim Cash Collateral Order ¶ 1.

closing to either or both the DIP Lender and the Pre-Petition First Lien Lender of at least the dollar equivalent of the credit bid submitted by either or both them.  Interim DIP Order ¶ 28.

12.     Most notably for the purposes of this Objection, the Interim DIP Order includes provisions governing the distribution of asset sale proceeds, which permit the Specified Lenders' secured claims to be satisfied out of the Sale Transaction proceeds without awaiting distributions under a confirmed chapter 11 plan.  Interim DIP Order ¶ 28.  While the Interim DIP Order provides that sufficient cash proceeds must be reserved to satisfy certain of the Debtors' and the Committees' professional fess (*e.g.* Sale Professional Fees and Sale Excess Fees) before other claims, those fees are limited to fees and expenses incurred prior to that date and allowed by a final order subject to the Committee professional fee budget █████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ ; Interim DIP Order ¶12. Anything in excess of the specified fees will only be paid if proceeds remain after distributions to all of the Debtors prepetition secured lenders.

**B.      Sale Motion**

13.     On November 16, 2017, the Debtors filed the Sale Motion.  The Sale Motion seeks, among other things, an order  (1) approving certain proposed procedures (the "Bidding Procedures") to be used in connection with the sale (the "Sale") of certain of the Debtors' assets (the "Assets"); (2) authorizing the Debtors to enter into one or more asset purchase agreements (each, an "Asset Purchase Agreement") with one or more potential bidders, including with one or more "stalking horse" bidders (each, a "Stalking Horse Bidder"), and to provide certain bid protections (the "Bid Protections") to any Stalking Horse Bidder; and (3)

scheduling an auction for the Assets (the "Auction") for February 28, 2018, and a final hearing for approval of the Sale(s) (the "Sale Hearing") for March 6, 2018, subject to the availability of the Court.  Sale Motion ¶ 11.

14.  The Sale Motion also seeks, subsequent to the conclusion of the Auction, entry of one or more orders (collectively, the "Sale Order"):  (a) authorizing the sale of the Assets to one or more Successful Bidders (as defined below) free and clear of all liens, claims, interests and encumbrances; and (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidders or their designees.  Id.

15.  Most significantly, the Sale Motion, like the Interim DIP Order, dictates an extremely expedited timeline for the Sale Process, pursuant to which (i) initial proposals (each, an "Initial Proposal") are due on or before January 16, 2018; (ii) final bids (each, a "Final Bid") are due on or before February 23, 2018; (iii) the Auction is to be conducted on February 28, 2018; and (iv) the Sale Hearing is to be held on March 6, 2018.  Bidding Procedures I.  The Bidding Procedures also permit, as discussed further below, Inbursa, the proposed DIP Lender (Inbursa's affiliate), and DAK to credit bid for the Assets without regard to whether they have valid and/or perfected liens.  Id. VII.A.5.

### *1.* *Marketing Efforts*

16.  In support of the Sale Motion, the Debtors submitted the *Declaration of Neil Augustine* (the "Augustine Decl."), a Senior Managing Director at Rothschild.  According to the Augustine Declaration, prior to the Petition Date, the Debtors and Rothschild engaged in discussions with certain parties regarding the purchase of some or all of the Assets.  Augustine Decl. ¶ 10.  In addition, the Debtors began taking steps necessary to enable such parties to

conduct due diligence and to prepare for a more comprehensive post-petition marketing process. Id.

17. Rothschild established a virtual data room to facilitate interested parties' due diligence, developed a "teaser" to gauge potential interest, and is preparing a confidential information memorandum for interested parties. Id.

18. Nevertheless, the Debtors' marketing efforts to date have been limited and have met with even more limited success. Szlezinger Decl. ¶ 16. Most significant is the fact that the Debtors have not yet enlisted a Stalking Horse Bidder.[11] Id. Nor have they yet been able to make available to prospective purchasers (i) a promised confidential information memorandum; (ii) a form of asset purchase agreement; and (iii) a promised "cost of completion" analysis with respect to the Corpus Christi Plant, which will not be available until the end of December (at the earliest) and will not have been vetted by any third-party. Id. ¶ 19. See, e.g., ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

### 2. Bidding Procedures

19. The Sale Motion seeks authorization to conduct a two-step marketing process: (i) the Debtors are seeking an Initial Proposal deadline for January 16, 2018; and (ii) a Final Bid deadline for February 23, 2018, with the Auction to follow on February 28, 2018, and

---

[11] The Debtors seek authorization, subject to further Court approval, to designate one or more Stalking Horse Bids and execute one or more Stalking Horse Agreements. Bidding Procedures IV. The Stalking Horse Bids (i) could be Credit Bids (as defined below); and (ii) would require the Debtors to file a motion (each, a "Stalking Horse Motion") seeking approval of the proposed Stalking Horse Agreement on an expedited basis. Id.

the Sale Hearing to be held on March 6, 2018.  Sale Motion ¶ 6.  The Debtors wrongly contend that the proposed timeline will provide potential bidders with ample time (approximately 74 days from approval of the Bidding Procedures through Final Bid Deadline) to: (i) review the materials made available and to be made available by the Debtors and their advisors; (ii) evaluate various regulatory issues; (iii) address other issues that potential foreign purchasers may have; and (iv) formulate and submit bids to purchase the Assets.  Augustine Decl. ¶ 15; Szlezinger Decl. ¶ 20.

20.    The Debtors falsely assert that the Bidding Procedures are designed to maximize value, while at the same time, limiting needless incurrence of administrative expenses, which may risk a liquidity shortfall that could frustrate their restructuring efforts.  Sale Motion ¶¶ 8-9; ███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

### 3.    *Credit Bids*

21.    The Bidding Procedures permit secured creditors to participate in the Auction by "credit bidding" their valid secured claims in lieu of cash to fund some or all of the purchase price for the relevant Assets (each such bid, a "Credit Bid").  Bidding Procedures VII.A.5.

22.    In the case of most secured creditors, a Credit Bid will be considered to be a Qualified Bid only if a court of competent jurisdiction has, as of the date of the submission of such bid, entered a final, non-appealable order determining the validity, priority, and extent of

the claims and liens that form the underlying basis of the Credit Bid. Bidding Procedures VII.A.5. This is fair, reasonable, and gives parties the time and ability to investigate such secured creditor's liens. This requirement, however, does not apply to the Specified Lenders, who are permitted to submit a Credit Bid even if their claims or liens have not been determined to be valid.[12] Id.

23. The Bidding Procedures currently also require, among other things, that all Credit Bids include "a written commitment to fund into an escrow account established by the Debtors upon the closing of the Sale Transaction an amount of cash (the "Cash Amount") sufficient to satisfy (i) the estimated Sale Professional Fees,[13] (ii) to the extent the Sale Excess Fees[14] are senior to the obligations subject to such Credit Bid, the estimated Sale Excess Fees, and (iii) any obligations secured by liens on such Assets that are senior to the obligations that are the subject of such Credit Bid" (collectively, the "Credit Bid Requirements"). Bidding

---

[12]     Bidding Procedures VII.A.5 ("Subject to the satisfaction of the requirements set forth above and in these Bidding Procedures, a bid that includes a credit bid as a portion of the Purchase Price . . . shall be considered to be a Qualified Bid only if a court of competent jurisdiction has, as of the date of the submission of such bid to the Bid Notice Parties, entered a final, non-appealable order determining the validity, priority, and extent of the claims and liens that form the underlying basis of the Credit Bid, provided, however, that any Credit Bid by any Specified Lender on any Assets on which such Lender has a valid, perfected lien, shall not require the entry of a final, non-appealable order determining the validity, priority, and extent of the claims and liens that form the underlying basis of the Credit Bid.); see also Bidding Procedures Order ¶ 8 ("The Pre-Petition First Lien Lender, the DIP Agent and the DIP Lender are entitled to Credit Bid any and/or all amounts owed to them in their capacity as Pre-Petition First Lien Lender, DIP Lender or DIP Agent, respectively on any Assets to which the Pre-Petition First Lien Lender, the DIP Agent and/or the DIP Lender, as applicable have a lien.").

[13]     

[14]     The Sale Excess Fees include sufficient cash proceeds to pay the estimated amount of claims for unpaid fees, costs and expenses incurred by persons or firms retained by the Obligors in excess of the Carve-Out Expenses but not to exceed an amount equal to 10% of Carve-Out Expenses with respect to such persons or firms retained by the Obligors. Final DIP Order ¶¶ 12-13.

Procedures §VI.A.5.  Conspicuously omitted from the cash component of any Credit Bid is any provision for the funding of the administration of the Chapter 11 Cases post-Sale.

### 4.  Auction Procedures

24.  The Bidding Procedures address in detail the conduct of the Auction, many aspects of which require that the Debtors only take action after "consultation" with the "Consultation Parties."[15]  Bidding Procedures § VII.A.11 ("The Debtors . . . in consultation with the Consultation Parties, reserve the right to reject any Final Bid") and § VII.B ("A Final Bid . . . is determined by the Debtors in their reasonable judgment, in consultation with the Consultation Parties, to meet the requirements set forth in Section VII.A will be considered a "<u>Qualified Bid</u>" and any bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>.").  The Bidding Procedures, as currently proposed, grant numerous "consultation" rights to the DIP Agent, the DIP Lender and the Pre-Petition First Lien Lender.

### 5.  Application of Sale Transaction Proceeds

25.  The Sale Order currently contemplates that, following the Closing of a Sale (and before the confirmation of a plan of liquidation), "[a]ll sale proceeds from the DIP Collateral and Pre-Petition Collateral shall be distributed in accordance with the terms of the Final DIP Order and the DIP Loan Documents . . ."  Sale Order ¶ 26.  According to the provision for the distribution of the proceeds of any Pre-Petition Collateral following a Sale Transaction in the Interim DIP Order, none of the Sale proceeds are currently allocated to provide the funding for the administration of the Chapter 11 Cases post-Sale, confirmation of a liquidating plan, or the Debtors' efforts to obtain a recovery for their unsecured creditors.  Interim DIP Order ¶ 28.

---

[15]     The Consultation Parties are defined as: "(a) the DIP Agent and its counsel Thompson & Knight LLP; (b) the DIP Lender and the Pre-Petition First Lien Lender and their counsel Cleary Gottlieb Steen & Hamilton LLP and Young Conaway Stargatt & Taylor, LLP; and (c) the Committee and their counsel Milbank, Tweed, Hadley & McCoy LLP and Cole Schotz P.C."  Bidding Procedures XII.

## **OBJECTION**

26.     The Court should not approve the proposed Bidding Procedures. The "paramount goal" of any sale of property under section 363 of the Bankruptcy Code is to maximize the value of proceeds received by a debtor's estate. In re Dura Auto. Sys., Inc., 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007). The Third Circuit has consistently held that a debtor in possession has a fiduciary duty to accomplish this goal. See Official Comm. of Unsecured Creditors of Cybergenics, Corp., 330 F.3d 548, 573 (3d Cir. 2003); In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004).

27.     In addition, "[c]reditor and Court oversight of the debtors' actions outside the ordinary course of business, including asset marketing and sales, is not only appropriate, but is required by the law." In re Energy Future Holdings Corp., Case No. 14-10979 (Bankr. D. Del. Nov. 4, 2014) Hr'g Tr. 21:15-18 [Docket No. 2699] (denying approval of bidding procedures because, among other things, creditors' committee was not included in sale process).

28.     The bankruptcy court has wide discretion in assuring that value is maximized in the sale context. See In re Wintz Co., 219 F.3d 807, 812 (8th Cir. 2000) (stating that court has "ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets") (citation omitted); In re Kjeld, Case No. 04-04303, 2005 Bankr. LEXIS 2068 at *5 (Bankr. N.D. Iowa Oct. 26, 2005) (denying trustee's sale motion and stating that in structuring sales of estate assets, bankruptcy courts have "wide discretion" to ensure robust sale process). Even in a case, unlike this one, where the debtor's business judgment is above reproach, the court must make an independent determination of what is "fair and reasonable." In re Am. Safety Razor Co., LLC, Case No. 10-12351 (Bankr. D. Del), Sept. 30, 2011 Hr'g Tr. at 132:23-133:5 [ECF No. 318].

29. This paramount goal requires "an open and fair public sale designed to maximize value for the estate." In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998). Bid procedures also must be designed to encourage, not hinder, bidding. See In re Energy Future Holdings Corp., [Bid. Proc. Hr'g Tr. at ECF No. 2699] (denying approval of bidding procedures because, among other things, procedures were not transparent and timelines were too truncated); Gey Assocs. Gen. P'ship v. 310 Assocs., L.P., 2002 WL 31426344, at *2 (S.D.N.Y. Oct. 29, 2002), aff'd nom In re 310 Assocs. L.P., 346 F.3d 31 (2d Cir. 2003).

30. The Sale Process and the Bidding Procedures do not meet these standards because, as currently proposed, the Sale Process and the Bidding Procedures are guaranteed to deliver the entire value of the Debtors' estates into the hands of Inbursa.

31. If the Bidding Procedures are approved, either a sale to Inbursa or DAK pursuant to a Credit Bid, or a piecemeal fire sale to one or more low-ball cash bidders is all but guaranteed, and unsecured creditors will see no recovery in these cases. Granting judicial blessing to this scheme by Inbursa to enrich itself at the expense of the unsecured creditors and to control the outcome of these cases for its sole benefit will have a lasting and devastating impact on these cases and all the Debtors' stakeholders.

## I. BIDDING PROCEDURES IMPOSE UNDULY TRUNCATED TIMELINE ON SALE PROCESS

32. The Bidding Procedures establish an unreasonably aggressive timeline for the Sale Process that is insufficient to ensure that the value of the Assets is maximized. The Sale Motion contemplates that Initial Proposals will be due January 16, 2018, and Final Bids will be due February 23, 2018. Bidding Procedures § I. This timeline allots just 74 days from the hearing to approve these Bidding Procedures until Final Bids are due. Without thorough marketing efforts, which both allow sufficient time to reach all potential purchasers and afford those parties the

opportunity to complete the requisite due diligence, the Debtors' chances of obtaining the highest or otherwise best offer for their Assets will be severely limited. Here, only extremely limited marketing activities were conducted by the Debtors and their advisors prior to the Petition Date. Szlezinger Decl. ¶ 16.

33. In addition, at this time, there is a complete and utter lack of information available to potential purchasers regarding the "costs of completion" of the Corpus Christi Plant. Such information will undoubtedly be a key component of any potential bid. However, it will not be ready until the end of December and will not have been vetted by any third-party—leaving potential bidders barely two-weeks to formulate their initial proposal based on this information. However, Rothschild acknowledged that an independent engineering stated that, "[i]n order to prepare a precise finding of construction progress, thousands of activities would have to be examined, quantified and measured. Such an effort could take several months with a sizable workforce and even then would not be exact as construction efforts are ongoing and fluid." Burke Decl. Ex. S (Augustine Dep. Tr. 51:11-18).

34. The delays and difficulties encountered with the preparation of the Cost to Complete Analysis are understandable, given that, according the Debtors, the completion costs have ballooned over time and continue to do so. Construction of the Corpus Christi Plan was originally budgeted to cost $1.1 billion; to date, the Debtors have spent $1.86 billion on its construction, and it is estimated by the Debtors that in excess of a further $500 million will be required to complete construction and render the facility fully operational. First Day Decl. ¶ 39. Potential purchasers will want the best possible information on such costs. Locking in a Sale timeline without assurances that such a report will be timely available to potential bidders is not likely to yield a Sale process that will maximize value for the estates. Szlezinger Decl. ¶ 18.

Potential bidders, both domestic and foreign, must be provided adequate time to conduct due diligence and make financing arrangements in order to facilitate a robust, value-maximizing auction.

35.     In addition, given the existing saturation of the market in which the Debtors are in, it is expected that any strategic buyer would be required to undergo significant regulatory review, which would not only require extensive diligence and analysis, but could extend the timeline for Closing by several months.[16] Id. ¶ 22. Similarly, potential buyers will likely include foreign entities who will require additional time and effort to prepare and present competitive bids. Id. ¶ 21. Moreover, in light of the Debtors' checkered history with respect to cost overruns and delays, even U.S. entities may require a longer runway to complete the appropriate level of diligence.  Id.

36.     Accordingly, more time is needed to allow the Debtors' investment bankers to properly market the Assets.  See, e.g., Siddiqui v. Gardner (In re Williamson), 327 B.R. 578, 581 (Bankr. E.D. Va. 2005) ("The objective is to obtain the best price so as to assure the maximum distribution to creditors.  This is accomplished, in part, by assuring that the marketing is full, fair and complete and that all prospective purchasers have a fair opportunity to participate in the process.")

37.     It is unknown when all of the necessary information with respect to the Assets will be available, or how much of the 35-day marketing period (between entry of the Bidding Procedures Order and the January 16, 2018 Initial Proposal deadline) contemplated by the Bidding Procedures will have elapsed before such information will become available to potential

16 ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

bidders.  Szlezinger Decl. ¶¶ 19-20.  What is clear, however, is that, given the Debtors' expansive and complex corporate structure and the scope and current condition of the Assets, requiring the submission of Initial Proposals in just 35 days and Final Bids in 73 days is unrealistic.  <u>See, e.g.</u>, Transcript of Hearing at 20:16-20, <u>In re Energy Future Holdings Corp.</u>, [Bid. Proc. Hr'g Tr. at ECF No. 2699] (holding that "the proposed timelines must be stretched . . . to allow for sufficient time for any interested party to develop an alternative transaction").  Even for a debtor with a simple business and corporate structure, such a timeline would be ambitious and would likely render impossible such debtor's efforts to meaningfully market their assets.  Szlezinger Decl. ¶¶ 12-26.

38.     The only parties in interest certain to benefit from the expedited nature of the Sale Process are Inbursa and DAK.  Only they know the Debtors' assets like the back of their hand.  Both have been long-standing creditors, have been in confidential discussions with the Debtors since last summer, and, pursuant to the Interim DIP Order, they are now being paid millions of dollars in interest and fees to become the smartest bidder in the room.  First Day Decl. ¶¶ 20-21, 44-48; Interim DIP Order ¶¶ 7(c), 7(e), 8(c).  Indeed, Inbursa has been considering whether to "put in an accelerated stalking horse bid to move the process along—they won't have the anti-trust issues and would be helpful in a number of ways."[17] Burke Decl. Ex. O.

39.     ████████████████████████████████████████████████

████████████████████████████████████████████████

---

[17]     Worthy of note is the fact that Rothschild will obtain a $5 million fee for "securing" an Inbursa and/or AK credit bid.  <u>See</u> *Debtors' Application for Entry of an Order (I) Authorizing Them to Employ and Retain Rothschild Inc. and Rothschild S.p.A. as Financial Advisors and Investment Bankers to the Debtors Effective Nunc Pro Tunc to the Petition Date, (II) Approving the Terms of the Engagement Letter, (III) Waiving Certain Time-Keeping Requirements and (IV) Granting Related Relief* [ECF No. 184] ¶ 13(c).

[18]     ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████  *See* First Day Decl. ¶ 36 n. 1; Burke Decl. Ex. R (Press Release,

Alpek, Alpek Reports 3Q17 EBITDA of U.S. $3 Million, Iincluding a U.S. -$113 Million

Provision Covering Full Amount of M&G Accounts Receivable (Oct. 16, 2017)).  ████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████  Interim DIP Order ¶ 29.  Achieving a level playing field against

this backdrop is a difficult mission, which will only be exacerbated if the Bidding Procedures are

approved.  The Debtors' estates should not be thus further disadvantaged.  Other bidders should

be afforded the time they need to compete with the privileged prepetition lenders.

      40.     In circumstances such as these, courts have rejected similarly aggressive

timelines, particularly where parties that are effectively insiders stand to benefit.  See In re Exaeris

Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008) (rejecting "emergency" sale to DIP lender in view

of fact that purchaser was insider, proceeds were not likely to benefit unsecured creditors in any

event, three weeks' notice was insufficient, and concern about creditors' committee's investigation

"which was not described to the Court and was conducted without discovery, with access to a very

small universe of documents, and in the very short and insufficient time dictated by" insider); cf.

Transcript of Hearing at 55:12-14, In re Digital Domain Media Grp., No. 12-12568 (Bankr. D. Del. Sept. 24, 2012) (Hr'g Tr. 55:12-14) [ECF No. 248] (approving sale of assets on expedited basis, but only where sale proceeds were placed into segregated account, there was no credit bid, the transaction was not with insider, and with "great weight and emphasis on the position and input" of creditors' committee); see also In re Crutcher Res. Corp., 72 B.R. 628, 632 (Bankr. N.D. Tex. 1987) ("blatant attempt to place pressure on the Court only serves to raise additional suspicions concerning the 'cozy' relationship between the parent and the Lenders and to suggest that this case is being orchestrated not for the benefit of unsecured creditors . . . but rather for the benefit of the Lenders and the principals of the parent corporation;" no evidence on value of assets being sold other than the self-serving statements of the purchasers (who were insiders); approval of sale denied); In re Beker Indus. Corp., 64 B.R. 900, 906 (Bankr. S.D.N.Y. 1986) ("Primary among the considerations applicable here is the notion that this case is at a crucial stage where the path the Debtor will take is to be determined;" court found at early stage of the case the type of compelling circumstances permitting such a sale were not presented), rev'd on other grounds, 89 B.R. 336 (S.D.N.Y. 1988); In re Au Nat. Rest., Inc., 63 B.R. 575 (Bankr. S.D.N.Y. 1986) (claimed need for expedition contradicted by record, proposed transaction not clear; installment sale would restrict payments to creditors; transaction disapproved).

41.     The highly expedited Sale Process proposed by the Debtors is not justified under the circumstances of these cases and is not calculated to maximize the value of the Debtors' estates for the benefit of their unsecured creditors.

## II.     SPECIFIED LENDERS SHOULD NOT BE GRANTED AN UNQUALIFIED RIGHT TO CREDIT BID

42.     The Bidding Procedures, as a general matter, only permit Credit Bids if a final, non-appealable order has been entered determining the validity, priority and extent of the

claims and liens that underlie the Credit Bid. Bidding Procedures §VII.A.5. This requirement, however, does not apply to the Specified Lenders. Id. Preferred treatment of this kind would not be acceptable in any event, but here it is all the more egregious because evidence already suggests, as described in more detail below, that there may be potential claims and causes of action against the Specified Lenders.

        **A.**      **The Specified Lenders Should Not Be Granted**
                      **Right to Credit Bid Before a Determination As to**
                      **Validity, Perfection, and Unavoidability of Liens**

        43.      There is "no doubt that the holder of a lien the validity of which has not been determined . . . may not bid its lien." In re Fisker Auto. Holdings Inc., 510 B.R. 55, 61 (Bank. D. Del. 2014); Nat'l Bank of Commerce of El Dorado v. McMullan (In re McMullan), 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) ("At any such sale, NBC shall not be entitled to offset bid any of its claimed liens or security interest under [§ 363(k)] because the validity of its liens and security interests are unresolved."); In re Akard Street Fuels, L.P., 2001 WL 1568332 (Bankr. N.D. Tex. Dec. 4, 2001) (a "*bona fide* dispute" regarding a creditor's liens satisfied § 363(k)'s requirement of "cause" to deny a secured creditor the right to credit bid); In re L.L. Murphrey, 2013 WL 2451368 (Bankr. E.D.N.C. June 6, 2013) (limiting right to credit bid because of dispute over validity of liens); In re Daufuskie Island Props, LLC, 441 B.R. 60, 64 (Bankr. D. S.C. 2010) ("the Court finds that the Dixon mortgage and claim are disputed, and thus Dixon is not eligible to credit bid . . ."); see also In re Diebart Bancroft, 1993 WL 21423, at *5 (E.D. La. Jan. 26, 1993) (requiring secured creditor to post approximately $270,000 of its $497,000 credit bid in cash due to lien dispute); In re Octagon Roofing, 124 B.R. 522, 526 (Bankr. N.D. Ill. 1991) (requiring secured creditor to post irrevocable letter of credit in amount of $416,000 out of its $2.22 million credit bid because the Trustee and another creditor had brought adversary proceedings to avoid

the secured creditor's liens as either a preference or fraudulent transfer); In re St. Croix Hotel Corp., 44 B.R. 277 (Bankr. D.V.I. 1984) (requiring secured lender to post entire $1 million amount of credit bid of its secured claim in cash pending result of an adversary proceeding that debtor brought to challenge secured creditor's claim).

44.     The Specified Lenders should be treated no differently than any other secured lender in these Chapter 11 Cases.  Absent a final order determining the validity, priority and enforceability of their claims and liens, they should not be permitted to credit bid.

**B.     Cause May Exist to Limit or Deny Credit Bid Rights
of Specified Lenders Under Section 363(k)**

45.     A secured claim holder's ability to credit bid is not an absolute, unfettered right.  Courts have, and this Court may, for cause, restrict or condition the secured claim holder's ability to credit bid.  11 U.S.C. § 363(k); see Fisker, 510 B.R. at 60-61 (finding cause existed to restrict credit bid to amount paid for secured claim rather than face amount).

46.     "Cause" to deny or condition credit bid rights under 363(k) is not a defined term in the Bankruptcy Code.  Instead, courts decide on a case-by-case basis if such "cause" exists. See In re N.J. Affordable Homes Corp. (Bankr. D.N.J. June 29, 2006); In re RML Dev. Inc., 528 B.R. 150 (Bankr. W.D. Tenn. 2014) (same).  Indeed, a court may "deny a lender the right to credit bid in the interest of *any policy* advanced by the Code."  In re Phila. Newspapers, LLC, 599 F. 3d 298, 316 n.14 (3d Cir. 2010.

47.     The Committee Investigation has only just begun, and the period of time and budget allotted to investigate both the Specified Lenders' claims and liens and whether cause exists to limit their credit bid rights for cause, are woefully inadequate.  Nevertheless, the Committee should have an adequate amount of time and funds to investigate whether "cause" exists:

- Inbursa is controlling the Sale Process for its own benefit and, thus, is in a position to shield its liens and claims from appropriate scrutiny. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- Inbursa has no incentive to assure that any third-party buyer comes to the table. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- Inbursa extracted agreements out of DAK as part of the Interim DIP Order to agree that its CRA will not be assumed or assumed and assigned nor replicated in any sale or plan of reorganization, unless Inbursa is paid off in full in cash. Interim DIP Order ¶ 29.

- Inbursa has restricted the Debtors' DIP Budget such that a credit bid by it or DAK, if made, would be a *fait accompli*. Interim DIP Order ¶ 13; ████████████████████████████████████████

- It is unclear whether and to what extent the Debtors undertook any investigation prior to the Petition Date to determine the extent, validity, priority and enforceability of the Specified Lenders' claims and liens.

- Questions exist as to the timing of the incurrence of DAKS' claims and the granting of their liens. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- Question also exist as to DAK's motives ████████████████████████████████████████████████████████████████████

- DAK's several hats and positions all over the Debtors' capital structure (as secured lender, competitor, supplier, and customer) pose questions about DAK's involvement in the commencement of these Chapter 11 Cases. First Day Decl. ¶¶ 22, 41, 46; ███████████████████████████████████████████████████████████████████

■

- DAK purchased Inbursa's loan at Polimeros Mexico—a non-Debtor affiliate at face value in the days leading up to the Chapter 11 Cases. *See* First Day Decl. 36, n. 11; Burke Decl. Ex. R (Press Release, <u>Alpek, Alpek Reports 3Q17 EBITDA of U.S. $3 Million, Including a U.S. -$113 Million Provision Covering Full Amount of M&G Accounts Receivable</u> (Oct. 16, 2017)).

48.     Thus, the roles played by Inbursa and DAK and the status and validity of their respective claims and liens are areas that have already raised concerns and will require additional investigation.  The Committee must be given adequate time to investigate all of the foregoing.  <u>See</u> <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 395 (3d Cir. 1996) (emphasizing role of "review by the creditors," equipped with "full information," in any prospective section 363 sale and noting that the "creditor body could suffer" if the review process were not fully informed); <u>In re Standard Register Co.</u>, Case No. 15-10541 (CSS) (Bankr. D. Del.  April 13, 2015) (Hr'g. Tr. 82:15-84:22)) (observing in context of contested bidding procedures granting credit bid right to secured creditors that "good policy require[s] that [the Committee] be afforded the opportunity to do [its investigation].")

49.     The Committee Investigation Period—which the Committee anticipates will be extended beyond the 60 days currently granted by the Interim DIP Order (Interim DIP Order ¶ 23(b))—is still ongoing (and in reality, only just beginning).  In light of the foregoing precedent, there is no basis on which to grant the blank check credit bid right to the Specified Lenders unless and until the Committee Investigation has concluded.  <u>See</u> <u>In re RadioShack Corp.</u>, Case No. 15-10197 (Feb. 25, 2015 Hr'g Tr. 205:1-17) (declining to permit secured creditor to credit bid for Debtors' assets before the Committee's challenge period had expired); <u>In re AFA Inv., Inc.</u>, Case No. 12-11127 (Bank. D. Del. April 29, 2012; Docket No. 194,) Hr'g. Tr. 30:9-17

(declining to grant second lien lenders right to credit bid because Committee had not yet conducted its lien investigation).

50.     If the Specified Lenders were allowed to credit bid prior to conclusion of the Committee Investigation Period, the lien and claim challenge process contemplated by the Interim DIP Order would be completely nullified.  For example, any basis to seek disallowance or subordination of the Specified Lenders' claims would, in effect, be released if the Specified Lenders were allowed to collect on such claims through a credit bid.  The Specified Lenders would exchange their claims for the Debtors' Assets and walk away with those Assets free and clear of any claims that the Debtors' estates may have had against the Specified Lenders.  Sale Order ¶ 7. Such free and clear status would also be protected from challenge by the "good faith" finding that the Specified Lenders would insist upon in the Sale Order if they were the Successful Bidder(s). Sale Order ¶ 13; see 11 U.S.C. 363(m) ("The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . .")

51.     The Court need not, however, make any decision with respect to the Specified Lenders' liens and claims or right to Credit Bid today.  Rather, like the provision for other secured lenders seeking to credit bid in the proposed Bidding Procedures, procedures should be put in place, as set forth below, to allow the Court to determine in advance of the Auction whether such creditor has a valid, existing, perfected secured claim.

52.     To that end, any party submitting a Proposal that contemplates a Credit Bid should, within five (5) business days of the Proposal Deadline, be required to file with the Court a motion (the "Credit Bid Approval Motion") seeking entry of an Order determining (i) the validity,

priority, and extent of the claims and liens that form the underlying basis of the proposed Credit Bid; (ii) whether there are any terms, conditions, or limitations that should be imposed on such party's exercise of its credit bid rights under these Bidding Procedures and/or section 363(k) of the Bankruptcy Code; and (iii) whether circumstances exist that would warrant the denial of the right credit bid to such party for "cause" within the meaning of section 363(k) of the Bankruptcy Code (the "Credit Bid Approval Order").  The Credit Bid Approval Motion should (i) be filed on thirty-five (35) calendar days' notice; (ii) be subject to hearing only after a period of document and deposition discovery; (iii) contemplate that objections be filed seven (7) calendar days and replies three (3) calendar days prior to the hearing thereon (the "Credit Bid Approval Hearing"); and (iv) be subject to disposition at the Credit Bid Approval Hearing, which shall be, if deemed appropriate by the Court, an evidentiary hearing.  The foregoing procedures, which are set forth in the Committee's markup of the Bidding Procedures and the Bidding Procedures Order, provide a clear path for all potential bidders.

III.   **NEITHER ANY CREDIT BID, NOR DEBTORS' PROPOSED ALLOCATION OF SALE PROCEEDS, SHOULD LEAVE DEBTORS' ESTATES ADMINISTRATIVELY INSOLVENT**

53.   Neither any Credit Bid, nor the immediate payout of sale proceeds proposed in the Sale Order, should leave the Debtors' estates administratively insolvent.  Sale Order ¶ 26; Interim DIP Order, Annex B (DIP Budget) (projections showing that there will be zero dollars to administer the Debtors' estates after consummation of the Sale in March 2018). The Bidding Procedures should be amended to require that all Credit Bids provide for a cash component to fund a proposed "wind-down" budget that will permit the Debtors to avoid administrative insolvency. In addition, such "wind-down" budget should be funded from first-dollars of any cash purchase price before any distributions are made to any creditor.  Sale Order ¶ 26.

### A. Credit Bid Requirements Must Be Amended To Provide for Wind-Down Budget

54. The Bidding Procedures currently require all Credit Bids to include "a written commitment to fund into an escrow account established by the Debtors upon the closing of the Sale Transaction an amount of cash (the "<u>Cash Amount</u>") sufficient to, among other things, satisfy certain professional fees and expenses (although the Committee's professionals are treated demonstrably worse that all other professionals). Bidding Procedures § VII.A.5. The definition of the Cash Amount must be amended to include additional cash in an amount sufficient to permit the Debtors to avoid administrative insolvency and pay all allowed advisory fees.

55. Absent such additional cash contribution, the Debtors will likely not be able to confirm a liquidating plan, and even if they succeed in doing so, the liquidating trustee appointed thereunder will be left without adequate resources to liquidate the Debtors' remaining assets or pursue causes of action on the Debtors' behalf. As the estates will be left with significant liabilities, the trustee will require adequate funds to pay ongoing expenses and to hire professionals to properly administer the Debtors' estates. Additional funds will be needed to reconcile and pay allowed administrative claims, even if there is no distribution to unsecured creditors. Further, there will need to be provision for any unanticipated administrative expenses, which inevitably arise in complex chapter 11 cases such these.

56. This Court, along with courts in other jurisdictions, has repeatedly stated that secured creditors permitted to foreclose upon their collateral through the chapter 11 process must pay for this privilege. <u>See</u> <u>In re NEC Holdings Corp.</u>, Case No. 10-10890-PJW (Bankr. D. Del. July 13, 2010) Hr'g Tr. 100:17-20 (price for running bankruptcy sales process is that the secured creditor must "pay the freight, and the freight is . . . not necessarily a tip to the unsecureds, but the freight is certainly an administratively solvent estate.")**;** <u>In re Golden Cnty. Foods, Inc.</u>,

Case No. 15-11062 (KG) (Bankr. D. Del. June 22, 2015) [ECF No. 175] (DIP order required sale proceeds in excess of postpetition financing obligations be available to pay administrative expense claims prior to the payment of certain prepetition debt); In re Family Christian, LLC, Case No. 15-00643 (JTG) (Bankr. W.D. Mich. Apr. 14, 2015) Hr'g Tr. at 11:22-24 ("I think we'll have a problem at the sale hearing if the administrative expenses are not to be paid in connection with the sale"); see, e.g., In re Chieftain Sand & Proppant, LLC, No. 17-10064 (Bankr. D. Del. Mar. 27, 2017) [ECF No. 178] (sale order providing for "wind-down budget"); In re MIG, LLC & ITC Cellular, LLC, No. 14-11605 (Bankr. D. Del. July 20, 2017) [ECF No. 853] (same); In re Vertellus Specialties Inc., No. 16-11290 (ECF No. 392) (same) (Bankr. D. Del. Sept. 8, 2016); see generally Lawrence V. Gelber and James T. Bentley, *Asset Sales: ABI Commission's Recommendation Could Make Value Realization by Secured Creditors a Waiting Game of Diminishing Returns*, Bankruptcy Law Reporter, at 2-3 (March 12, 2015) (discussing "common, but undocumented feature of many credit bid sales, *i.e.,* the 'tax' and 'tip' that secured creditors often pay to ensure a consensual sale order."). The Court must ensure that Specified Lenders pay the piper.

**B.  Allocation of Sale Proceeds Mandated By Sale Order Should Also Provide Cash to Address Administrative Solvency and Liquidation Issues**

57.     The allocation of the proceeds realized from any Successful Bid payable in cash should also ensure that there is sufficient cash left in the Debtors' estates to address administrative solvency issues and funding for confirming a liquidating plan.

58.     The Sale Order currently contemplates that "[a]ll proceeds from the DIP Collateral and Pre-Petition Collateral shall be distributed in accordance with the terms of the Final DIP Order and the DIP Loan Documents . . .." Sale Order ¶ 26. Among other things, the DIP Financing includes provisions that reflect the agreement among the Debtors, the DIP Secured

Parties, the Pre-Petition First Lien Lender, and the Pre-Petition Second Lien Secured Party regarding a mechanism for applying the proceeds of Pre-Petition Collateral in a number of sale scenarios, in all cases requiring the repayment of both the Prepetition First Lien Obligations and the DIP Obligations. Interim DIP Order ¶ 28; Sale Order ¶ 26.

59. However, the Sale Order, like the Credit Bid Requirements, does not currently require the use of the cash proceeds realized from any Sale to address administrative solvency and liquidation issues. The Sale Order must be amended to require such a cash contribution out of the Sale proceeds and thereby prevent the Specified Lenders draining the Debtors' estates and leaving them administratively insolvent.

60. If provision for such a cash contribution is not made, the Specified Lenders would effectively be granted the right to "take the money and run,"[19] which, for their purposes, would amount to a *sub rosa* plan permitting distributions of estate assets without the Debtors having to take all the creditor-protective steps required to confirm a chapter 11 plan. See In re Braniff Airways, Inc., 700 F.2d 935 (5th Cir. 1983); In re Conroe Forge & Manuf. Corp., 82 B.R. 781, 784 (Bankr. W.D. Pa. 1988) (rejecting a secured creditor's request for immediate distribution of all proceeds from sale of its collateral as it would leave little incentive for completing requirements for a disclosure statement and plan); see generally Reginald W. Jackson *Sub Rosa Plans, Successor Liability, Gifting To Avoid Statutory Priorities And Other Section 363 Sale Issues*, ABI L. J. (Dec. 17, 2015) ("Even the most thoroughly prepared and objectively supported § 363(b) sale cannot be approved if the transaction attempts to structure the rights and claims of interested parties, the so-called "creeping plan.") The Specified Lenders should not be the only

beneficiaries of these Chapter 11 Cases.  Like all secured creditors whose collateral is sold under the supervision of a bankruptcy court, they must pay the price for this privilege.

## IV.    CONSULTATION RIGHTS GRANTED TO SPECFIED LENDERS SHOULD BE CURTAILED

61.    The control over these cases that Inbursa has seized is even more clearly evidenced by its unqualified ability to both participate in the Sale Process as a bidder and serve as a "Consultation Party" with respect to other bidders.  Bidding Procedures § XI.  Inbursa's consultation rights should be curtailed to preserve the integrity of the Sale Process and restore the level playing field required to ensure a robust auction.

62.    The Bidding Procedures grant numerous "consultation" rights to the DIP Agent, the DIP Lender and the Pre-Petition First Lien Lender as so-called "Consultation Parties." Bidding Procedures § XII.  For example, the Consultation Parties are entitled to consult on the "determination regarding which Final Bids qualify as Qualified Bids and as Baseline Bids" and which bid is the Successful Bid and the Backup Bid.  Bidding Procedures §§ VII.B, VII.C.  If the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender never submit a Bid (Credit Bid or otherwise), exercise of such consultation rights will not be problematic.  If, however, any one of them elect to submit a Bid, and thus participate in the Sale Process as a bidder, exercise of consultation rights would give rise to an insuperable conflict of interest, and they should, consequently, be compelled to relinquish such consultation rights under these circumstances. Indeed, it is an event of default under the proposed DIP Financing if the DIP Lender does not consent to the Sale to the Successful Bidder.  DIP Financing §§ 5.19(h), 8.1(p).

63.    Such relief has often been granted where secured lenders wear multiple hats in a section 363 sale process.  See In re Tridimension Energy, L.P., 2010 Bankr. LEXIS 4763, at *78 n.5 (Bankr. N.D. Tex. Oct. 28, 2010) ("Any of the Lenders' rights of consultation set forth in

the[] Bid Procedures will not apply in the event the Lenders assert or submit any credit bid pursuant to Bankruptcy Code Section 363(k)."); In re Computer Sys. Co., 2010 Bankr. LEXIS 4263, *4 (Bankr. N.D. Ohio Aug. 23, 2010) ("The United States Trustee's Objection has been resolved . . . by the inclusion in the Order of a provision excluding Huntington, in the event of a credit bid, from the consultation process for rejection and selection of bidders."); see, e.g., In re Phx. Brands LLC, No. 16-11242 (Bidding Procedures, ECF No. 136) (Bankr. D. Del. June 6, 2016) (approving bidding procedures that provided that if secured lender "submits a credit bid, then [the secured lender] (which is a Qualified Bidder for all purposes hereunder and the Bidding Process) will thereafter not be a Consultation Party"); In re Vertellus Specialties Inc., No. 16-11290 (Bank. D. Del. June 28, 2016 (Order Approving Bidding Procedures, ECF No. 169) (approving bidding procedures that permit secured creditor that was also stalking horse bidder to be "consultation party" as to auction-dispositive matters only to extent that "the Stalking Horse Bidder has withdrawn from bidding at the Auction").

64. If similar relief is not granted in this case, the significant, insider-like advantage that the Specified Lenders already have will be materially enhanced. Not only will they have more control over the Sale Process than any other participant, they will be in position to frustrate the efforts of any competing bidder seeking to level the playing field. The Specified Lenders cannot be on both sides of Auction decision process, and the Bidders Procedures must be amended to ensure that the Specified Lenders are not permitted to be thus privileged.

## V. COMMITTEE SHOULD BE GRANTED GREATER CONSULTATION AND CONSENT RIGHTS

65.     These cases offer the perfect example of why official committees should be granted broad oversight and participation rights with respect to a sale of a debtor's assets outside the ordinary course.  As the Debtors have readily acknowledged, this Sale and the Chapter 11 Cases themselves are being run for the benefit of Inbursa. ███████████████████████ ███████████████████████████████████████████ The restrictions put in place by Inbursa make it virtually impossible for the Debtors run a meaningful auction process that could elicit real cash-paying bidders.

66.     While the Bidding Procedures do currently grant "consultation" rights to the Committee as to certain Sale-related matters, as reflected in the amended version of the Bidding Procedures submitted simultaneously herewith, there are a number of issues as to which no consultation rights are granted to the Committee (e.g., selection of Stalking Horse Bidders, extension of Bid Deadline, granting of Bid Protections, decision to not proceed with Auction, and modification of Minimum Overbid) and there are other key issues as to which the Committee should be granted a "consent" and not merely a "consultation" right, as reflected in the annexed Committee markup of the Bidding Procedures.

67.     Such relief has been granted in many other cases and would be consistent with the "eyes and ears" role official committees are generally expected to assume with respect to section 363 sales, especially where insiders and entrenched secured lenders are in the mix.  See In re Martin, 91 F.3d at 395 (emphasizing role of "review by the creditors," equipped with "full information," in any prospective section 363 sale and noting that the "creditor body could suffer" if the review process were not fully informed); In re Energy Future Holdings, Case No. 14-10979 Hr'g Tr. 21:15-18 ("[c]reditor and Court oversight of the debtors' action outside the ordinary

course of business, including asset marketing and sales, is not only appropriate, but is required by the law."); see, e.g., In re Midwood Gardens, LLC, No. 15-44797 (CEC) [ECF No. 70] (Bankr. E.D.N.Y. Mar. 11, 2016) (committee consent required to, *inter alia*, adjourn sale closing); In re Tropical Sportswear Int'l Corp., No. 04-24134 [ECF No. 137] (Bankr. M.D. Fla. Jan. 19, 2005) (committee consent required to determine whether any person is a qualified overbidder and negotiate any such offer); see also Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 514 (S.D.N.Y. 1994) ("An official committee of creditors plays a pivotal role in the bankruptcy process. The function of an official creditors committee is to aid, assist and monitor the debtor to ensure that the unsecured creditors' views are heard and their interests are protected.") (internal citations omitted); In re Johns-Manville Corp., 26 B.R. 919, 925 (Bankr. S.D.N.Y. 1983) ("Fiduciary duties of [committees] are crucial because of the importance of committees . . . [The] wide and important array of authority [provided to committees] indicat[es] the intent to create a significant and central role for committees in carrying out a reorganization.") (internal citations omitted).

68.     If the Committee's consultation/consent rights are not expanded as requested, the Debtors' march to value destruction with either a Specified Lender's Credit Bid or a low-ball cash bid will be further enabled. The Debtors will plow ahead without seeking the Committee's input or consent as to a number of key issues, allowing them to continue to completely disregard the interests of their unsecured creditors.

## **RESERVATION OF RIGHTS**

69.     The Committee notes that discovery is in process, with documents still being produced and depositions scheduled up until the eve of the hearing on the Sale Motion. The arguments set forth herein reflect the Committee's response to the issues based on its current understanding of the relevant circumstances; however, discovery or other additional developments

may give rise to new issues as to which a response will be required.  Accordingly, the Committee reserves the right to supplement this objection prior to or at the hearing.

## CONCLUSION

In light of all the foregoing, the Committee respectfully requests that the Court (i) deny entry of the Bidding Procedures Order; (ii) in the alternative, grant it only to the extent the Bidding Procedures and the Bidding Procedures Order are amended as requested herein (as set forth in the revised forms thereof submitted simultaneously herewith); and (iii) grant the Committee such other relief as the Court deems appropriate.

Dated: December 6, 2017
      Wilmington, DE

**COLE SCHOTZ P.C.**

By:     J. Kate Stickles    
J. Kate Stickles (No. 2917)
David R. Hurst (No. 3743)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
kstickles@coleschotz.com
dhurst@coleschotz.com

- and -

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Dennis F. Dunne
Abhilash M. Raval
Lauren C. Doyle
Alan J. Stone
Alexander Lees
28 Liberty Street
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
ddunne@milbank.com
araval@milbank.com
ldoyle@milbank.com

*Proposed Counsel to Official Committee of*
*Unsecured Creditors of M & G USA*
*Corporation, et al.*