**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br><br>M & G USA CORPORATION, *et al.*,<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 17-12307 (BLS)<br>)<br>) Jointly Administered<br>)<br>) |

### DECLARATION OF LEON SZLEZINGER IN SUPPORT OF OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' SALE MOTION

I, Leon Szlezinger, being duly sworn, hereby depose and say as follows:

1. I am over the age of 18 and competent to testify.

2. I am a Managing Director and Global Joint Head of Restructuring & Recapitalization at Jefferies LLC ("Jefferies"), an investment banking and financial advisory firm with principal offices located at 520 Madison Avenue, New York, New York 10022, as well offices at other locations worldwide. Jefferies is the proposed investment banker to the Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (the "Debtors").

3. Jefferies provides a broad range of corporate advisory services to its clients including, without limitation, services relating to the following: (a) general financial advice; (b) mergers, acquisitions, and divestitures; (c) special committee assignments; (d) capital raising; and (e) corporate restructurings. Jefferies and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies. Jefferies has advised debtors, creditor and equity constituencies, and purchasers in numerous reorganizations in the United States and worldwide. Since 2007, Jefferies has been involved in over 100 restructurings representing over $200 billion in restructured liabilities.

4. I personally have over 20 years of experience serving as an investment banker and/or financial advisor in connection with corporate restructurings, both in chapter 11 cases and out-of-court transactions. At Jefferies, I have advised on numerous complex restructurings, including serving as investment banker and/or financial advisor for the official committees of unsecured creditors in the chapter 11 cases of Avaya, Peabody Energy, Caesars Entertainment Operating Company, Alpha Natural Resources, Arch Coal, Patriot Coal and Eastman Kodak. Other restructurings in which I have acted as investment banker and/or financial advisor for interested parties include Westinghouse, Standard Register, MPM Silicones (Momentive), AMR (American Airlines), K-V Discovery Solutions, MSR Golf Resort, Innkeepers USA Trust, Spheris, RathGibson, Medical Staffing Network, Delphi Automotive, Parmalat, and Enron.

5. Before joining Jefferies, I was a Senior Managing Director at Mesirow Financial Consulting, specializing in Restructuring Advisory Services. Prior to that, I was a partner at KPMG LLP and PricewaterhouseCoopers LLP specializing in Financial Advisory Services. I received a bachelor's degree in economics from the University of Manchester in 1987.

6. I submit this declaration on behalf of the Committee in support of the Committee's objection (the "<u>Objection</u>")[1] to the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of*

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Objection or the Sale Motion.

*Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 173] (the "Sale Motion").[2]

7. Through my role as proposed investment banker to the Committee, I am familiar with the Sale Motion, including the Bidding Procedures annexed thereto (the "Bidding Procedures"). In connection with the Sale Motion, I have, among other things, reviewed materials posted to the Debtors' data room, participated in meetings and teleconferences with the Debtors' Chief Restructuring Officer, their financial advisor, Alvarez & Marsal North America LLC ("A&M") and investment banker, Rothschild Inc. ("Rothschild"), and reviewed documents produced by the Debtors in response to the Committee's discovery requests. I have attended the Debtors' partially complete plant in Corpus Christi (the "Corpus Christi Plant") and had discussions with certain potentially interested purchasers of their assets. Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein.[3]

## I. THE DEBTORS' PROPOSED BIDDING PROCEDURES DO NOT PROMOTE COMPETITIVE BIDDING FOR THE ASSETS

8. In the Sale Motion, the Debtors seek entry of an order approving Bidding Procedures to govern the proposed sale of certain Assets, including: (i) the Corpus Christi Assets; (ii) the Desalination Assets; (iii) the IP Assets; (iv) the Polymers IP Assets; (v) the Sharon R&D Assets; and (vi) the Apple Grove Plant. I have experience evaluating and preparing

---

[2] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Sale Motion.

[3] Certain disclosures herein relate to matters within the personal knowledge of other professionals at Jefferies and are based on information provided by them.

sale procedures of this nature. Since I joined Jefferies, I have served as investment banker and/or financial adviser in approximately 20 sale transactions, for debtors or their creditor stakeholders or on the buy-side. In my experience, parties are more willing to participate in a sale process when the governing procedures will provide them with a fair opportunity to bid for the relevant assets.

9. It is my opinion that the Debtors' Bidding Procedures are not properly designed to maximize the value of the Assets. In short, encouraging other potentially interested parties to submit cash bids will likely prove extremely challenging given that, under the Bidding Procedures: (i) the DIP Lender, the Pre-Petition First Lien Lender and DAK (a competitor of the Debtor) may seek to credit bid more than $1 billion (in the aggregate) of secured debt for the Assets; and (ii) in such scenario, any competing bid would be required to provide for payment in full in cash of the DIP Obligations and the Pre-Petition First Lien Obligations in at least the dollar amount equivalent of the Credit Bid submitted by the DIP Lender and the Pre-Petition First Lien Lender, *plus* the Sale Professional Fees Amounts, *plus* the Sale Excess Fees Amounts. (Bidding Procedures § VI.A.5.) As a result, it is especially important to ensure that the Bidding Procedures ensure a level playing field to maximize interest among other bidders.

10. Unfortunately, the unduly truncated timeline imposed by the proposed Sale Milestones only exacerbate the challenges facing potential bidders. In particular, given: (i) the limited prepetition marketing activities conducted by the Debtors and their advisors; (ii) the highly competitive nature of the industry; (iii) the geographic location (in Asia and other foreign locales) of many of the strategic players in the industry; (iv) the absence of a Stalking Horse Bidder; (v) the significant uncertainty surrounding the completion of the Corpus Christi Plant (both from a cost and timing perspective); (vi) the lack of any investigation into the

4

massive cost overruns already incurred in connection with the Construction of the Corpus Christi Plant; (vii) the significant competition law hurdles to consummation of any sale of the Corpus Christi Plant on an expedited basis; and (viii) the upcoming holiday season, among other factors, it will be extremely difficult for competing bidders to conduct the necessary diligence, obtain financing, and formulate Qualifying Bids under the Debtors' proposed Sale timeline.

11. For these reasons and those that follow, it is my opinion that, the Debtors' Bidding Procedures are not likely to attract the full universe of potentially interested parties to submit bids for the Assets.

### A. *The Sale Timeline Is Too Compressed to Engender Value Maximizing Bids*

12. Without a careful and thorough marketing process that allows sufficient time to reach all potential purchasers (both strategic and financial), it is my opinion that the Debtors will severely limit their chances of obtaining the highest and best offer for the Assets that the market can produce.

13. Further, in my professional experience, before interested parties that receive marketing materials will be in a position to submit a bid for the Assets, they will require a reasonable amount of time to, among other things, meet with management, conduct physical inspections, diligence material contracts including the arrangements with DAK (as a supplier and customer of the Debtors), understand the projected more than $1.3 billion in cost overruns that have been experienced at Corpus Christi, understand the costs-to-complete the Corpus Christi Plant, evaluate appropriate engineering and construction managers that can facilitate an efficient completion of the Corpus Christi Plant and the costs and risks involved, understand the potential timeline to project completion, evaluate potential working capital requirements which are likely to be several hundred million dollars, understand the extent of mechanic's lien filed with respect

to the Corpus Christi Plant and how they impact the costs to complete, evaluate environmental issues, make arrangements to obtain necessary financing, ██████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████ and procure the requisite cash deposit.

   *1. Debtor Sale Milestones*

14. In the Sale Motion, the Debtors ask the Court to impose the following timeline and milestones (the "Debtor Sale Milestones"):

|  | **Proposed Milestone** |
| --- | --- |
| **January 16, 2018** | Deadline for prospective interested parties to submit Proposals (the "Proposal Deadline") |
| **February 23, 2018** | Final Bid Deadline |
| **February 26, 2018** | Deadline for objections to the applicable Sale Transaction(s) other than Cure Objections and Adequate Assurance Objections |
| **February 28, 2018** | Auction |
| **March 5, 2018** | Deadline to file replies in connection with the applicable Sale Transaction(s) |
| **March 6, 2018 (subject to Court availability)** | Sale Hearing |

15. The Debtors seek to characterize this expedited sale timetable (allotting approximately 85 days, including the holiday period, from start to finish of the Sale Process) as "reasonable" and contend that "[c]ompletion of the Sale process in a timely manner will also maximize the value of the Assets." (Sale Motion ¶¶ 7, 8.) Given the complexity of the assets in question and the risks and uncertainties involved, I do not believe this to be the case.

### 2. *Absence of Marketing Efforts*

16. Here, as the Debtors have conceded, the process has far to go due, in large part, to the fact that there had only been the extremely limited marketing activities conducted by the Debtors and their advisors prior to the Petition Date. In fact, the pre-petition marketing process, I am advised by the Debtors' advisors, only focused on the marketing of non-debtor assets (*i.e.*, the Brazil plant). Marketing efforts with respect to the Corpus Christi Plant, the Debtors' most valuable asset, consequently did not begin until after the Petition Date and remains in its early stages.

### 3. *Dearth of Diligence Information*

17. Further obstructing the path to an auction that yields the highest possible value for the Debtors' stakeholders is the current dearth of information essential to the diligence and bid formulation process. Information in the data room and otherwise available to potential bidders remains extremely sparse and limited, especially for a highly technical asset of this scale and value, and items critical to the marketing process remain unavailable.

18. For example, a detailed "cost to completion" report with respect to the Corpus Christi Plant (the "Cost to Completion Analysis") is likely key to any adequate sale process, but A&M and Rothschild have indicated that such report will only be available at the end of December and will not have been vetted by any third-party engineering or construction expert. The delays and difficulties encountered with the preparation of the Cost to Complete Analysis are understandable, given that, by the Debtors' own admissions, the completion costs have ballooned over time and continue to do so. Construction of the Corpus Christi Plan was originally budgeted to cost $1.1 billion; to date, the Debtors have spent $1.86 billion on its construction; and it is estimated by the Debtors that in excess of a further $500 million will be

required to complete construction and render the facility fully operational.  First Day Decl. ¶ 39.  Potential purchasers will want the best possible information on such costs.

19. In addition, a long-promised process letter and confidential information memorandum have not yet been completed.  Nor has a form of asset purchase agreement been made available.  The Debtors and their advisors have also acknowledged that they have yet to "tick and tie" the amount of the mechanic's liens that have been asserted with the amounts the Debtors' believe they owe to those contractors and subcontractors that provided goods and services to the Debtors' construction efforts at the Corpus Christi Plant prepetition.  While the Debtors have requested to set a "Bar Date" for such lien holders to assert their claims, if approved, such deadline will be only one day before the Proposal Deadline.  Locking in a Sale timeline without assurances that these critical diligence items will be available to potential bidders is not likely to yield a successful Sale process.

20. For this and all of the other reasons articulated above, the Debtors incorrectly assert that bidders will have more than three months to review the comprehensive materials prepared by the Debtors—given status of the confidential information memorandum, the Cost-to Completion Analysis and other critical diligence information, the timeline is much shorter than three months.

### *4. Nature of Assets*

21. This information vacuum would be problematic in the context of any section 363 sale, but it has been rendered even more so here due to the complex nature of the Debtors' assets and their protracted financial distress.  Potential buyers will likely include foreign entities (from Asia and elsewhere) who may require additional time and effort to prepare and present competitive bids.  Moreover, in light of the Debtors' checkered recent history, even

U.S. entities may require a longer runway to obtain the requisite approvals and financing. Potential bidders, both domestic and foreign, must be provided adequate time to conduct due diligence and make financing arrangements in order to facilitate a robust, value-maximizing auction.

     *5.*    *Competition Law Issues*

22. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

     *6.*    *Need for More Time*

23. All of the foregoing considerations underscore the fact that the Debtors need more time to allow their investment bankers to properly market the Debtors' assets so as to effectively maximize value. Under the Debtor Sale Milestones, any potential bidder would have little more than a month (35 days) after entry of the Bidding Procedures Order to execute a confidentiality agreement, evaluate the Assets and the structure of the potential transactions, and submit a preliminary indication of interest (a "Proposal").[4]

24. When the fact that the Cost-to-Completion Analysis, which will be critical to the formulation of any Proposal, will not be available until December 29, 2017 (assuming it is made available to bidders immediately) is taken into account, the time available to potential

---

[4] It is my understanding that certain confidentiality agreements are still in the negotiation process and have not yet been executed.

bidders decreases to just twenty (20) days. A binding Final Bid would be due just thirty-eight (38) days later, with the Auction and Sale Hearing to follow within ten (10) days thereafter. The Debtors' assets are exceedingly complex, potentially located at multiple Debtors and difficult to value in their incomplete or dormant states, and parties will need to have great clarity on remaining costs before deciding to put forth a binding offer. In my opinion, such an abbreviated schedule is insufficient and will not maximize value, for all of the reasons noted above.

### 7. *Proposed Committee Sale Milestones*

25. Far more likely to maximize value are the alternative Sale Milestones proposed by the Committee (the "Committee Sale Milestones") in the revised version of the Bidding Procedures that the Committee has submitted simultaneously herewith:

| | **Proposed Milestone** |
|---|---|
| **April 11, 2018** | Proposal Deadline |
| **May 25, 2018** | Final Bid Deadline |
| **May 28, 2018** | Deadline for objections to the applicable Sale Transaction(s) other than objections relating to the Auction, the identity of the Successful Bidder and/or Back-Up Bidder, the terms of the final APA, Cure Objections and Adequate |
| **May 30, 2018** | Auction |
| **June 4, 2018** | Deadline to file objections relating to the Auction, the identity of the Successful Bidder and/or Back-Up Bidder, the terms of the final APA, and Adequate Assurance Objections. |
| **June 7, 2018** | Deadline to file replies in connection with the applicable Sale Transaction(s) |
| **June 8, 2018 (subject to Court availability)** | Sale Hearing |

26. Based upon my experience with other chapter 11 asset sales, it is my opinion that the timeline outlined above—which allots 179 (instead of the 85 days proposed by

10

the Debtors) to complete the Sale Process—is far more "reasonable" and better calculated to "maximize the value of the Assets." Sale Motion ¶¶ 7, 8. Extending the Sale Milestones in this modest fashion—and thus adding approximately 90 days to the Sale Process—will much better enable (i) the Debtors to make contact with all potential purchasers and negotiate acceptable confidentiality agreements; and (ii) interested parties (many of whom are foreign entities who may be unfamiliar with asset sales under the Bankruptcy Code) to adequately evaluate the Assets, assess (among other things) their potential anti-trust exposure, and complete their diligence efforts.

### B. Features of the Debtors' Proposed Bidding Procedures Risk Chilling Bidding

27. In addition to the truncated timeline proposed in the Sale Motion, it is my opinion that certain features of the Bidding Procedures create a less than level playing field in favor of the Specified Lenders (especially the DIP Lender, the DIP Agent, and the Pre-Petition First Lien Lender) that will further discourage other interested parties from submitting competing bids for the Assets.

28. *First*, although the Bidding Procedures, as a general matter, only permit Credit Bids if a final, non-appealable order has been entered determining the validity, priority and extent of the claims and liens that underlie the Credit Bid, this requirement does not apply to the Specified Lenders. Such a provision would inappropriately require potential purchasers to compete during the Auction with a Credit Bid that could ultimately prove invalid and void.

29. *Second,* the Bidding Procedures grant the DIP Agent, the DIP Lender, and the Pre-Petition First Lien Lender rights to consult with the Debtors on which Final Bids qualify as Qualified Bids and as Baseline Bids, and which bid is the Successful Bid and the Backup Bid. If the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender remain as lenders and

11

never submit a bid (Credit Bid or otherwise), exercise of such consultation rights will not be problematic.

30. If, however, the DIP Agent, the DIP Lender or the Pre-Petition First Lien Lender elect to submit a Credit Bid, and thus participate in the Sale process as bidder, exercise of such rights would give rise to an insuperable conflict for them and they should, consequently, be compelled to relinquish all such consultation rights under such circumstances. If the DIP Agent, the DIP Lender and the Pre-Petition First Lien Lender are not stripped of their consultation rights in the event they submit a bid, the significant, "insider-like" advantage that they already have under the Bidding Procedures will be materially enhanced and will further discourage other interested parties from submitting competing bids for the Assets.

31. *Third*, any party submitting a Credit Bid must be required to place sufficient cash or other consideration into a segregated escrow account, as a Good Faith Deposit, to protect the Debtors' estates in the event it is selected as the Successful Bidder but never closes. (Bidding Procedures § VI.A.6.) As currently drafted, the Bidding Procedures require that each Qualified Bid be accompanied by a Good Faith Deposit in an amount equal to the greater of (a) $10 million or (b) 10% of the Purchase Price. (*Id.*) However, with respect to a Credit Bid by the DIP Lender or the Pre-Petition First Lien Lender, the Bidding Procedures only require a Good Faith Deposit equal to $20 million (even if such amount is significantly less than 10% of the Purchase Price). (*Id.*) The DIP Lender/Pre-Petition First Lien Lender should not be granted such preferential treatment.

32. *Finally,* the Minimum Overbid amount should be reduced from $1,000,000, to $500,000. The lower overbid amount will likely enhance bidding at or near the end of the Auction and, thereby, assure that the highest and best price is obtained.

33. *Collectively*, these features of the Bidding Procedures, among others, will likely sow uncertainty among potential purchasers, and tilt the playing field in favor of the Specified Lenders. The Bidding Procedures should be designed to encourage potential bidders to compete for the Debtors' Assets, not to discourage from ever entering the ring.

## II. COMMITTEE'S REVISED BIDDING PROCEDURES ARE MORE LIKELY TO MAXIMIZE VALUE FOR THE DEBTORS' ESTATES

34. With its Objection, the Committee has included a markup of proposed revisions to the Debtors' Bidding Procedures. It is my opinion that employing the Committee's revised bidding procedures will better enable the Debtors to undertake a robust and competitive sale process, which will benefit all parties in interest in these chapter 11 cases, including both secured and unsecured creditors. Indeed, it is my opinion that if a recovery for unsecured creditors is to be achieved it will be facilitated by the longer runway permitted by adoption of the Committee Sale Milestones and the other Sale Process changes contemplated by the Committee's version of the Bidding Procedures.

\*　　\*　　\*　　\*　　\*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 6, 2017　　　　　　　　　　　　　　/s/ Leon Szlezinger
　　　　　　　　　　　　　　　　　　　　　　　　　　Leon Szlezinger