# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| M & G USA CORPORATION, *et al.*, | ) Case No. 17-12307 (BLS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Related to ECF Nos. 14, 53** |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) DIP FINANCING MOTION AND (II) CASH COLLATERAL MOTION

The Official Committee of Unsecured Creditors of M&G USA Corporation, et al.

(the "<u>Committee</u>") respectfully submits this objection to the Debtors' motion for final authority

to obtain postpetition financing and related relief [ECF No. 14] (the "<u>DIP Financing Motion</u>")

and proposed final order on the DIP Financing Motion [ECF No. 198-1] (the "<u>Proposed DIP</u>

<u>Order</u>"); and the motion of Debtor M & G Polymers USA, LLC ("<u>Polymers</u>") for final authority

to use cash collateral of Comerica Bank ("<u>Comerica</u>") and related relief [ECF No. 53] (the "<u>Cash</u>

<u>Collateral Motion</u>," and together with the DIP Financing Motion, the "<u>Financing Motions</u>").[1]

## PRELIMINARY STATEMENT

1.      <u>DIP Financing Motion</u>.  At the first day hearing on November 1, 2017,

the Debtors received interim authorization to obtain postpetition financing from an affiliate of

Inbursa, the Pre-Petition First Lien Lender.[2]  While the Debtors characterized the proposed DIP

Financing at that hearing as representing "well over a month of hard work and hard-fought

negotiations with the DIP Lender,"[3] the Debtors failed to tell the Court that they were standing

---

[1]     Except as otherwise indicated herein, capitalized terms that are not defined herein have the meanings given to them in the Proposed DIP Order or, if not defined therein, in the Financing Motions.

[2]     The proposed DIP Lender is Control Empresarial de Capitales, S.A. De C.V..  Declaration of Dennis Stogsdill In Support of First Day Pleadings ("<u>First Day Decl.</u>") ¶ 49.

[3]     11/1/17 Hr'g Tr. at 34:3-4.

there with a proverbial "gun against their head," by their DIP Lender and Pre-Petition First Lien Lender, who used that month to drag its feet, ████████ [4] and plot out its path to foreclosure.

2.     The DIP Financing and its related budget, as Inbursa's counsel has ████████, is merely ████ for obtaining a quick pay-off of its prepetition obligations or for otherwise stripping these estates of all their value, leaving behind their liabilities, and reaping the profit on the flip-side.[5] ████████████████████████████████████

████████████████████████████████ [6] Making matters worse, Inbursa has made absolutely zero provision to keep the Debtors from being forced to convert to chapter 7 or to dismiss these cases following the foreclosure sale of their most valuable asset. Inbursa plans to just take its collateral and run, crippling these estates, and eradicating any possibility for unsecured creditors to see a recovery from an asset that, once completed, will make its new owners very wealthy.

3.     Inbursa's motives, however, are only the beginning of the problems with the proposed DIP Financing. Perhaps the most offensive part is the failure (as described below) to comply with Bankruptcy Rule 4001 and Local Rule 4001-2 and by failing to disclose to this Court and parties in interest the egregious terms (including a disguised roll-up of the full amount of its prepetition debt) buried in the 82-page proposed order and 94-page term sheet that

---

[4]     Declaration of James W. Burke ("Burke Decl.") Ex. F.

[5]     According to Inbursa's counsel, the proposed DIP Facility is ████████████████████ ████████, and a "means to bridge to a completed sale" that "ha[s] the protections [of the Bankruptcy Code] in there," 11/1/17 Hr'g Tr. at 69:7-9.

[6]     ████████████████████████████████████████████████
████████

they asked the Court to approve on less than 48 hours' notice at the outset of these cases, before the Committee could be appointed.[7]

4.      Notwithstanding the Debtors' need for working capital, final approval of the Proposed DIP Order will harm, rather than benefit, the Debtors' estates and creditors, and instead benefit only a chosen handful of parties, led by Inbursa.[8]  While the Debtors' putative secured creditors strip the Debtors of substantially all of their assets on the cheap, they also have secured for themselves, among other value grabs:  provisions purporting to limit the power of this Court (or any other) to grant any relief in the future that would not be to Inbursa's liking; improper and overbroad releases; inappropriate, over-market fees and expenses; unsubstantiated adequate protection payments; a disguised roll up of Inbursa's prepetition obligations (dictating that any sale of the Debtors' assets or alternative financing not only repay the DIP Obligations in full in cash, but also Inbursa's prepetition debt); liens on the proceeds of avoidance actions (and possibly the avoidance actions themselves); and waivers of the Debtors' right to surcharge their collateral for expenses incurred maintaining the collateral and selling it solely for their benefit. The only purpose this proposed DIP Financing serves is to make the proposed DIP Lender a little richer, and Inbursa a whole lot better off.

5.      The burdens on the Debtors' estates outweigh any illusory benefits of the DIP Loans.  The unfortunate reality is that entry of the Proposed DIP Order has a good chance of ensuring that the Debtors' end up with administratively insolvent estates—and their unsecured

---

[7]    The United States Trustee appointed the Committee on November 13, 2017, 12 days after the Court entered the interim order on the DIP Financing Motion [ECF No. 62] (the "Interim DIP Order") and 11 days after the Court entered the interim order on the Cash Collateral Motion.  See Notice of Appointment of Committee of Unsecured Creditors [ECF No. 146].

[8]    Inbursa has obtained the support of DAK Americas, LLC (together with its related affiliates "DAK"), a competitor, licensor, and prospective customer of the Debtors and a potential bidder for their assets, which the Debtors allege acquired a junior lien on the Corpus Christi Plant less than a year before the Petition Date.  In addition, (upon information and belief) in the weeks leading up to the Petition Date, DAK purchased a $100 million loan at non-Debtor affiliate Polimeros Mexico from Inbursa at face value.  Burke Decl. Ex. R.

creditors end up in a far worse position than if no financing were approved at all. Over half of the $100 million DIP Facility is slated to go directly back to Inbursa and its affiliates, including over $40 million as "adequate protection" payments, ██████████████████████████████ ████████████████████████████████████████████████████████████ ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████.[9] According to the proposed DIP Budget, the less than $50 million that the Debtors' estates can actually deploy as working capital will be fully exhausted by the end of March 2018, which is not enough time for the Debtors to conduct and consummate a robust Sale process that would maximize the value of their assets for the benefit of all stakeholders.[10] Nor, given the likely need for regulatory approvals (antitrust and anti-competition), is it sufficient time to allow for a closing of any sale; the Debtors will need to find financing to get to a closing and a wind-down budget from their ultimate buyer. Moreover, the DIP Budget allocates a mere pittance for compensation of the Committees' professionals (██████████████████ ████████████████████████████████████████████████ and minimal funding ($20,000) and time (60 days) to investigate claims and causes of action against Inbursa and DAK—ensuring that the Committee is completely constrained from exercising its fiduciary duties.

---

[9]  Declaration of Leon Szlezinger in Support of Objection of Official Committee of Unsecured Creditors to the Debtors' DIP Financing Motion ("Jefferies DIP Decl.") Ex. A.

[10]  See Declaration of Leon Szlezinger in Support of Objection of the Committee to the Debtors' Bidding Procedures ("Jefferies BP Decl."). Concurrently with this filing, the Committee also is filing an objection to the Debtors' proposed "Bidding Procedures," as defined in the Debtors' sale motion [ECF No. 173] (the "Sale Motion").

6.     Moreover, the proposed Final DIP Order is structured to all but guarantee the Debtors' administrative insolvency by March 30, 2018.[11]  As noted above, per the DIP Budget, the Debtors run out of cash upon March 30, 2018, but they may lose their access to cash even sooner, if one of the many foot faults in the proposed DIP Facility is triggered before then. See DIP Loan Agreement § 8.1.  Indeed, unless the Debtors hit a home-run sale (a tall order in light of the doomed-to-fail sale process proposed in the Bidding Procedures), at the end of the sale process, Inbursa intends to take its assets (through a credit bid or otherwise) and go home-- leaving the Debtors administratively insolvent.[12]  While the Debtors have attempted to negotiate a carve-out to cover their own professional fees, such provision, as described below, is woefully inadequate as it applies to the Committee.  Indeed, that is by design.[13]

7.     The DIP Financing Motion should be denied unless the Proposed DIP Order is modified to remove the overreaching provisions Inbursa extracted from the Debtors.[14] Chapter 11 is intended to provide estate fiduciaries with a process to maximize the value of a debtor's assets for the benefit of all stakeholders; not to provide secured creditors with a more advantageous forum than the state courthouse to liquidate their collateral for their own exclusive benefit while they immunize themselves from any prospect of liability at the lowest possible cost.  If Inbursa wants to liquidate its collateral through these cases and obtain the benefits of chapter 11, it must pay to do so.

---

[11]     Burke Decl. Ex. Q (███████████████████████████████████ ██████████████ .

[12]     Burke Decl. Ex. Q.

[13]     See Burke Decl. Ex. N (███████████████████████████████ ██████████ ).

[14]     The Committee has attached hereto as Exhibit 1 a redline markup of the Committee's requested revisions to the Proposed DIP Order.  To the extent any provisions of the Proposed DIP Order that are the subject of the objections set forth herein also appear in the Interim DIP Order, the Committee objects to the Interim DIP Order as well and, to the extent necessary, hereby requests reconsideration pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure.

8.     The proposed DIP Financing must provide sufficient funds and liquidity and an extension of the sale milestones (as more fully described in the Committee's objection to the proposed Bidding Procedures)[15] and maturity date  (a) for the Debtors to conduct a truly value-maximizing Sale process, (b) for the Committee to perform all of its statutory fiduciary duties, including investigating the Debtors' "acts, conduct, assets, liabilities, and financial condition," investigating claims and causes of action against the Debtors' secured creditors and other parties in interest and pursue alternative sources of recovery, (c) to ensure administrative solvency and (d) for the Debtors to bring these cases to an orderly conclusion after the Sale process is completed.  Inbursa cannot be permitted to reap myriad benefits of the chapter 11 process for itself and at the same time avoid "paying the freight" of chapter 11.

9.     <u>Cash Collateral Motion</u>.  The Cash Collateral Motion is more of the same. Despite that Inbursa allegedly has prepetition first-priority liens on the Apple Grove Plant owned by Polymers, Inbursa refused to provide postpetition financing to Polymers, leaving Polymers to fund its minimal operations and the costs of its chapter 11 case from existing cash, which cash allegedly is collateral for prepetition debt Polymers owes to Comerica.

10.     Much like the DIP Facility, the Comerica cash collateral arrangement confers no benefit on Polymers' chapter 11 estate.  Copying Inbursa's playbook, Comerica agreed to fund Polymers' chapter 11 case just long enough to liquidate its collateral (accounts receivables) and run.  While the use of its Cash Collateral over the last several weeks has helped

---

[15]   <u>See</u> Objection of Official Committee of Unsecured Creditors to Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief (the "<u>Committee's Bidding Procedures Objection</u>").

to maintain the Debtors' asset and preserve value, it is unclear what value the Debtors will achieve no value by allowing Comerica to liquidate its assets and run. Polymers would have no liquidity left (including no carve-out) to even fund a chapter 7 case, all but preordaining the abandonment the Apple Grove Plant (with significant environmental liabilities), let alone resources for the Committee to investigate Comerica's and Inbursa's liens. If conversion of the Polymers case to chapter 7 is only a few weeks away, the Polymers unsecured creditors will fact be better served by allowing a chapter 7 trustee to enter the case now before the cash is gone, so that any chapter 7 trustee has funds to operate an orderly liquidation and search for alternate sources of recovery.

11. In exchange for the opportunity to work in economic servitude to Comerica, liquidating collateral for it, Polymers' estate would be subjected to many of the same egregious terms that are in the Proposed DIP Order, including, without limitation: restrictions on Committee investigations; barriers to Polymers seeking various forms of relief without Comerica's consent; waivers of estate rights; and liens on avoidance actions and proceeds.[16] None of these provisions belong in an order that is set up as a two-week bridge to nowhere. The final order on the Cash Collateral Motion should be denied unless these egregious terms are excised and Comerica agree to a budget to fund Polymer's estate through an expedited chapter 11 sale process and wind-down—something it has steadfastly refused to do.

12. The Proposed DIP Order, the proposed DIP Financing, the proposed order on the Cash Collateral Motion (the "CC Order"), and their related documents cannot be approved

---

[16] The Committee objects not only to the forthcoming proposed final order on the Cash Collateral Motion (to the extent it includes the provisions discussed herein) but also to the Interim CC Order as well and, to the extent necessary, hereby requests reconsideration pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure.

in their current form because to do so would leave these estates worse off than immediate

conversion of these cases to chapter 7. Below is a list of the key issues that must be addressed.[17]

- **<u>Adequate Protection Payments/Roll-Up of Prepetition Interest.</u>** (Proposed DIP Order ¶¶ G; 3(a); 4(b); 7(a)-(b); 8(a)-(b)). As set forth more fully below, there is zero justification for any adequate protection cash payments in this case. ███████████████████████

  ████████████████ *As such, any payments already made on account of prepetition and postpetition interest should be disgorged, as should any payment of professional fees to DAK. The Roll-Up of the September 2017 Advance should not be granted.*

  In addition, ██████████████████████████████████
  ██████ the parties have failed to provide any support for the roll-up of that loan. *The approval of the $6 million Roll Up should be denied.*

- **<u>Sale Related Milestones/DIP Maturity</u>**.[18] (DIP Loan Agreement § 5.19). The Proposed DIP Financing must provide sufficient runway to run a meaningful and robust sale process that will maximize value. *The Proposed DIP Financing should provide additional time, funds and liquidity to extend the DIP Maturity and the Sale Related Milestones through to a Sale Hearing date consistent with the dates set forth in the Committee's Bidding Procedures Objection.*

- **<u>DIP Budget</u>**.[19] (Annex B to Interim DIP Order). The DIP Budget must be revised to *eliminate the "cap" on the Committee's Fees*—effectively a "cap" on the Committee's exercise of its fiduciary duties by increasing the line items for the Committee's professionals and treating **all** professionals (including the Debtors' and the Committee's) on a single aggregated basis.

- **<u>Carve-Out</u>**.[20] (Proposed DIP Order ¶¶ 12). The DIP Carve-Out must be revised to *provide a true "carve-out" that comes ahead of all other obligations including those that may be senior to the Proposed DIP Financing whether in the context of a sale or an event of default and*

---

[17] Additional issues and proposed revisions have been included in the attached mark-up of the Proposed DIP Order, attached hereto as Exhibit 1. Similar issues carry through the proposed DIP Loan Documents and will need to be modified or stricken as applicable.

[18] Similarly, with respect to the CC Order, the consent to use Cash Collateral should be extended to facilitate an expedited sale of Apple Grove.

[19] The CC Order should be modified to eliminate any cap on Committee professional fees associated with the Cash Collateral Budget.

[20] The Interim CC Order contains only an $850,000 Carve-Out for professional fee payments and no wind-down budget. Interim CC Order ¶ 15(c)(iv). The CC Order should provide adequate funding to permit Polymers to pursue an expedited sale through chapter 11 or convert its case (if necessary) in an orderly fashion.

*provides a budget for operational expenses (if one is not provided by a purchaser of the assets) and that allows payment of professional fee according to an agreed upon budget*. In addition, the Carve-Out for the Committee's professionals must be *increased from $50,000 and the Committee's professionals together with the Debtors' professionals should be subject to a single Carve-Out of $5 million on an aggregate basis.* A revised Carve-Out would remove Inbursa's ability to control the case by controlling payment of professional expenses.

- **Investigation Budget; Effect of Stipulations; Challenge Deadline**.[21] (Proposed DIP Order ¶¶ 15; 22). The Committee must be provided a meaningful opportunity to investigate the liens and claims and potential causes of action against the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Lender. As such, *the budget must be increased from the completely off-market $20,000 proposed by the Debtors to no less than $1 million. In addition, the period for investigating such claims and causes of action should be no less than 120 days from the formation date.*

- **Disguised Roll-Ups/Anti-Cram Up Provisions**. (Proposed DIP Order ¶¶ B(v);16 (a)-(c); 18(a); 20; 24). *The Proposed DIP Order must be revised to strike*:

  - Any stipulation that the Pre-Petition First Lien Obligations are "fully secured."

  - Any stipulation that the Pre-Petition Second Lien Obligations are "partly secured."

  - Any waiver of the Debtors' right to assert that the value of the Pre-Petition First Lien Collateral is less than the amount of the Pre-Petition First Lien Obligations.

  - Any provision that conditions any future financing or confirmation of any plan of reorganization on payment *in full in cash* of Inbursa's Pre-Petition First Lien Obligations.

  - Any provision that permits *Inbursa upon an event of default on the DIP to foreclose on its collateral in respect of the Pre-Petition First Lien Obligations*.

  - *Any provision preventing DAK from consenting to the Debtors' assumption of their Pre-Petition Second Lien CRA or even offering to provide a similar arrangement in a sale or a plan*

---

[21] The Interim CC Order contains no Investigation Budget. The CC Order should be revised to provide a $250,000 investigation budget and 120 days to investigate the liens and claims of Comerica and Inbursa.

> *unless the Pre-Petition First Lien Lender is paid in full in cash*.
> Id. ¶ B(viii)(1)(b), (c).  Such treatment essentially cripples the
> Debtors from taking any action until the Pre-Petition First Lien
> Lender's claims are fully satisfied ████████████████████
> ████████

- **363 Sale Provisions**.[22] (Proposed DIP Order ¶ B(vii)).  ***The 363 Sale provisions which purport to determine the distribution of the sale proceeds following consummation of a cash sale or credit bid must be eliminated***.  Any distribution of the sale proceeds outside a plan of reorganization constitutes a *sub rosa* plan and the Supreme Court's ruling in Czyzewski v. Jevic Holding Corp, 137 S. Ct. 973, 978 (2017).  In addition, ***any right to Credit Bid must be subject to the procedures set forth in the Committee's Bidding Procedures Objection***.

- **Collateral Diminution Definition.** (Proposed DIP Order ¶¶ H(i)-(ii); 7, 8).  Proposed definitions of Pre-Petition First Lien Lender Collateral Diminution and Pre-Petition Second Lien Collateral Diminution are vastly broader than what is required under the Bankruptcy Code.  The diminution for which prepetition secured parties are required to be compensated should not include matters that are unrelated to the grant of priming liens, the use, sale, or lease of the collateral, or imposition of the automatic stay. ***This definition must be appropriately narrowed and all parties' rights with respect to any amount of diminution that is asserted or any entitlements to compensation relating thereto (including with respect to the valuation of such collateral) must be preserved.***

- **DIP Liens and Adequate Protection Liens on Avoidance Actions, Claims and Proceeds**.[23]  (Proposed DIP Order ¶¶ G; 3(a); 4(b); 7(a)-(b); 8(a)-(b)).  ***The Proposed DIP Order and the Proposed DIP Financing should not grant any Liens on Avoidance Claims and Avoidance Proceeds*** (which may constitute valuable recoveries for unsecured creditors, including based on claims that may exist against the Pre-Petition First Lien Lenders and the Pre-Petition Second Lien Secured Parties).

- **Release and Waiver of Claims (e.g., 506(c), 510(c), 552, Marshaling)**.[24] (Proposed DIP Order ¶¶ 7(b); 8(b); 11; 16(f); 25(b)-(c)).  The rights to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code, the rights to pursue challenges to liens based on the "equities of the case"

---

[22]  The CC Order should eliminate any right to receive a distribution of the proceeds of its collateral outside of a plan of reorganization or liquidation.  Cf. Interim CC Order ¶ 15(a), (b).

[23]  The CC Order should eliminate the grant of any liens on the avoidance claims and avoidance proceeds.  Cf. Interim CC Order ¶ 4(b)(i). The CC Order also should be revised to eliminate any grant of adequate protection to Inbursa who does not have a lien on the Cash Collateral being used, and whose collateral is directly benefitting from the use of such Cash Collateral.  Cf. id. ¶ 4(b)(ii).

[24]  The CC Order should be modified to strike similar provisions.  Cf. Interim CC Order ¶¶ 20, 21, 22.

exception to section 552 of the Bankruptcy Code, the equitable right to require the secured lenders to marshal against their collateral, and the right to seek equitable subordination of Inbursa and DAK all ***must be preserved***.  Also, overbroad releases that purport to be granted by non-Obligors must be significantly narrowed.

- **Events of Default**.[25]  (DIP Loan Agreement § 8.1).  Several Events of Default contained in the Proposed DIP Financing must be stricken or significantly modified, including the unilateral right to call an Event of Default if the business plan is not acceptable to the DIP Lender; if the bidding procedures order is not satisfactory to the DIP Lender; if the bid deadline is more than 75 days from the entry of the bidding procedures order; if the auction is commenced more than 3 business days after the bid deadline; if any party is permitted to solicit votes on a plan that is not acceptable to the DIP Lender in its sole discretion; if a sale or bidding procedure order is entered that does not provide for the indefeasible payment in full of Inbursa's prepetition obligations (irrespective of whether a Challenge may be pending against Inbursa at such time).[26]

## BACKGROUND

A.    **General Background**

13.    Polymers filed its case under chapter 11 of the Bankruptcy Code in this Court on October 24, 2017.  The other Debtors filed their chapter 11 cases on October 31, 2017 (the "Petition Date").  The Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.    As of the Petition Date, the Debtors had approximately $1.7 billion of funded indebtedness, at least $350 million of which is unsecured.  First Day Decl. ¶¶ 19-32. The Debtors also owed approximately $250 million of unsecured debt to suppliers.  Id. ¶ 34.

15.    The Debtors' businesses currently have suspended regular operations. Declaration of Neil A. Augustine In Support of DIP Financing Motion ("Augustine Decl.") ¶ 17.

---

[25]    The CC Order should be modified to eliminate similar termination events.  Cf. Interim CC Order ¶ 14.

[26]    Additionally, there are a number of terms in the DIP Loan Agreement (including Events of Default) that are not market. For example, the ERISA Event of Default should be limited to ERISA Events that could result in a Material Adverse Effect, a higher materiality threshold should be included for Judgments and Attachments, and customary indebtedness and lien carve outs should be added.  See, e.g., DIP Loan Agreement §§ 8.1(f), 8.1(e), 6.1, 6.2.

According to the Debtors, their day-to-day operations before the Petition Date were conducted primarily through (1) Polymers, the owner of the Apple Grove Plant, (2) M&G Resins USA, LLC ("Resins"), the owner of the Corpus Christ Plant, (3) Mossi & Ghisolfi International S.a.r.l. ("M&G International"), a trading company, and (4) Chemtex International Inc., which is the project management and procurement subcontractor for the Corpus Christi Plant and, with its subsidiaries, also provides engineering services and solutions to independent customers. See First Day Decl. ¶¶ 16, 18. At this time, however, the Debtors have ceased production at the Apple Grove Plant (as of October 22, 2017), which the Debtors' counsel has described as "effectively mothballed" (11/1/17 Hr'g Tr. at 14:5-6), and there are no operations at the Corpus Christi Plant, the construction of which has been scaled back. First Day Decl. ¶¶ 39, 47.

16.     The Debtors' stated strategic goal for these cases is to use the protections of chapter 11 to conduct an expedited sale of substantially all of their assets. Id. ¶¶ 12, 48; see also 11/1/17 Hr'g Tr. at 26:7-10; DIP Motion ¶¶ 5, 16. On November 16, 2017, the Debtors filed their Sale Motion seeking authority to sell pursuant to section 363 of the Bankruptcy Code, assets including:

- The Debtors' intellectual property.

- The Corpus Christi Plant (owned by Resins), and related assets.

- Desalination equipment and boilers situated at or in the vicinity of the Corpus Christi Plant, which is owned by M&G Waters USA, LLC ("Waters").

- The Apple Grove Plant (owned by Polymers).

- A research and development facility located in Sharon Center, Ohio, which is owned by Polymers (the "Sharon R&D Assets") and, according to the Debtors' counsel, employs two employees (11/1/17 Hr'g Tr. 14:9-10).

See Sale Motion at 11; see also First Day Decl. ¶¶ 18, 23.

## B. Background Relevant to the DIP Motion

### 1. Inbursa's and DAK's Claims as of the Petition Date

17. As of the Petition Date, Inbursa had claims against only two of the Debtors—Resins and Polymers—and had liens on only two assets: the Corpus Christi Plant and the Apple Grove Plant. According to the Debtors, Resins owes Inbursa prepetition debt in the principal amount of $436 million, which was guaranteed by Polymers. First Day Decl. ¶¶ 19, 20.

18. The Debtors' filings indicate that Resins incurred its debt to Inbursa through multiple borrowings under a Pre-Petition First Lien Loan Agreement. Resins borrowed an initial $250 million in principal amount in March 2013, before construction of the Corpus Christi Plant commenced (which was in April 2013). See Interim DIP Order ¶ B(i); First Day Decl. ¶¶ 9, 20. Resins borrowed the remaining $186 million in principal amount that it owes to Inbursa pursuant to amendments to the Pre-Petition First Lien Loan Agreement dated as of July 29, 2016, May 4, 2017, and September 12, 2017. Interim DIP Order ¶ B(i). The Debtors refer to the final $6 million funded under the Pre-Petition First Lien Loan Agreement as the "September 2017 Advance."

19. The Debtors allege that approximately $196 million of mechanics' liens have been filed against the Corpus Christi Plant and related property. First Day Decl. ¶ 10. The Debtors have taken the position that these mechanics' liens would be senior in priority to the approximately $186 million of debt Resins borrowed from Inbursa after construction on the Corpus Christi Plant began. See 11/1/17 Hr'g Tr. at 38:11-16. The Debtors refer to any such liens as "Senior Prior Liens," and to the initial $250 million that Resins borrowed from Inbursa before construction began on the Corpus Christi Plant, which the Debtors contend is senior in priority to the Senior Prior Liens, as the "Senior Pre-Petition First Lien Obligations." Id.

20.     In addition to Inbursa's lien and the mechanics' liens, the Corpus Christi Plant is also encumbered by a prepetition lien in favor of DAK that the Debtors allege relates to $435 million in principal amount that Resins and co-Debtor M&G USA Corporation ("M&G USA") owe to DAK under a Pre-Petition Second Lien CRA, dated May 20, 2015 (after construction of the Corpus Christi Plan commenced), but that ████████████████ ███████████████████████████████████████████████████████████████ ████.  First Day Decl. ¶¶ 19, 22; Transcript of 12/5/17 Deposition of John Singh at 33:15-34:4.[27] The Debtors allege that DAK's lien on the Corpus Christi Plant is subordinate to Inbursa's lien. Id. ¶ 22.  The Debtors thus refer to Inbursa as the "Pre-Petition First Lien Lender" and to DAK as the "Pre-Petition Second Lien Secured Party" (and the debt owed to DAK as the "Pre-Petition Second Lien Obligations").[28]  Notably, the obligations under DAK's agreements with Resins (i) include over $200 million in payments that DAK had made to M&G USA **before** Resins and DAK had executed any agreements, and (ii) were not secured until more than three years after the original agreement between DAK and Resins was executed and after at least 80% of the obligations owing to DAK had been incurred on what had been an **unsecured** basis.  Although the Committee's investigations are ongoing, there is a real possibility that DAK should be treated as an unsecured creditor.

## 2.     The Obligors' Unencumbered Assets as of the Petition Date

21.     The Proposed DIP Order contemplates that the obligors for the DIP Facility would include Resins and seven Debtors that were not prepetition obligors of Inbursa (collectively with Resins, the "DIP Obligors"):  (1) M&G USA; (2) M&G Finance Corporation;

---

[27]  According to the Debtors, Resins also owes approximately $35 million in principal amount to Banco do Brasil S.A., New York Branch, which debt is secured by assets of Resins including certain receivables and proceeds of sales contracts, but excluding the Corpus Christi Plant.  First Day Decl. ¶ 19.

[28]  DAK also participated in the September 2017 Advance in the amount of $2 million.  Augustine Decl. ¶ 15.

(3) Waters; (4) M&G USA Holding, LLC; (5) Chemtex International Inc. ("Chemtex");

(6) Chemtex Far East Ltd., a Chemtex subsidiary; and (7) Indo American Investments, Inc., also

a Chemtex subsidiary.[29]

22.     According to the First Day Affidavit, five of the DIP Obligors do not have

any prepetition secured debt and therefore potentially all of their assets could have been

Unencumbered Property as of the Petition Date:  M&G Finance Corporation; M&G USA

Holding, LLC; Chemtex International Inc.; Chemtex Far East Ltd.; and Indo American

Investments, Inc.  The other three DIP Obligors may also have had at least some Unencumbered

Property on that date.[30]

23.     Although none of the DIP Motion, the First Day Affidavit, and the

Augustine Declaration addresses the value of the DIP Obligors' Unencumbered Property, and the

Debtors have not yet filed their schedules of assets and statements of financial affairs, the

Debtors have indicated that the Unencumbered Property could have significant value.  ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████; see also Voluntary Petition of Chemtex International Inc., Case No. 17-

12312, ECF No. 1, at 3 (reporting that Chemtex has assets with an aggregate value between $100

million and $500 million).  M&G USA Holding, LLC also reported that it has assets with an

aggregate value between $10 million and $50 million (presumably on a book value basis).

Voluntary Petition of M&G USA Holding, LLC, Case No. 17-12308, ECF No. 1, at 3.

---

[29]    The remaining four Debtors that are not proposed DIP Obligors are:  Polymers; Mossi & Ghisolfi International S.a r.l.; M&G Chemicals S.A.; and M&G Capital S.a r.l.

[30]    According to the Debtors, Macquarie Investments US Inc. has a lien on or security interest in substantially all of Waters' assets and M&G USA's 100% equity interest in Waters (one of M&G USA's two direct subsidiaries) related to a prepetition debt in the principal amount of $55.5 million; and DAK has a security interest in M&G USA's 100% equity interest in Resins (M&G USA's other direct subsidiary), related to the debt owed under the Pre-Petition Second Lien CRA.  First Day Decl. ¶ 19.

### 3.	The Proposed DIP Facility

24.	In the Interim Order, the Court authorized the Debtors to borrow up to $34 million (plus interest, fees and charges) under the DIP Facility. Through the Proposed DIP Order, the Debtors now seek authority to borrow an additional $66 million, increasing their aggregate borrowings under the DIP Facility to $100 million (plus interest, fees and charges).

25.	The Debtors and Inbursa have both acknowledged that the purpose of the DIP Facility is to fund the Sale process and Resins's working capital needs pending consummation of the Sale. See Augustine Decl. ¶ 17; see also 11/1/17 Hr'g Tr. at 29:2-5, 35:20-22, 69:7-9. The DIP Budget thus contemplates that the Final Funding Amount would be fully exhausted by March 30, 2018—the maturity date under the DIP Loan Agreement and the proposed deadline for consummation of the Sale (discussed below). DIP Budget, Annex B to Interim DIP Order; DIP Loan Agreement at 21.

26.	In exchange for funding the DIP Facility, the proposed DIP Lender would receive interest and premiums exceeding $9.15 million over the six month loan term, including:

- An upfront premium of 2.5% of the DIP Facility (DIP Loan Agreement § 2.8(a)). According to the proposed DIP Budget, the DIP Lender already received 2.5% of the funding amount authorized by the Interim DIP Order. Upon entry of the Proposed DIP Order, the DIP Lender would receive 2.5% of the incremental funding amount authorized by that order, including on the amounts used for the Roll-Up and for the other payments to Inbursa, making the total fee $2.5 million.

- Interest at a non-default rate of LIBOR (1% floor) plus 9.5% per annum (Id. §). The proposed DIP Budget projects that approximately $3.149 million of interest would accrue on the DIP Facility before the maturity date. DIP Budget, Annex B to Interim DIP Order.

- An unused line premium of 1% per annum on all undrawn amounts (Id. § 2.8(c)). The unused line premium would be payable monthly in arrears and would be equal to 1% per annum multiplied by the daily average of the differential between the total amount of the DIP Facility and the total amount of loans drawn thereon.

- An exit premium of 3.5% of the DIP Facility (Id. § 2.8(b)). The DIP Loan Agreement provides that the $3.5 million exit premium was fully earned upon

entry of the Interim DIP Order but is not payable until the maturity date of the DIP Facility.

27.     The proposed DIP Budget allocates just ██████████ for reimbursement of fees and expenses of **all** of the Committee's professionals for the five month period between November 2017 and March 2017 (██████████████████████).  Burke Decl. Ex. M.  In contrast, the DIP Budget provides ██████████ for the Debtors' professionals (which is more than 20 times the amount allocated to the Committee's professionals) and ██████████ for Inbursa's professionals (████████████████████████████████████████ ██████████).  Id.  Moreover, the proposed DIP Budget could be amended downward without the consent of the Committee.  Proposed DIP Order ¶ 1(e).  And following an event of default, the Committee's fees and expenses could be capped at fees and expenses incurred and allowed as of the event of default and just $50,000 for any additional fees and expenses.  Proposed DIP Order ¶ 12(a).

28.     Except for these limited amounts, the Committee's administrative expense claims for reimbursement of fees and expenses would be subordinated to the claims of the proposed DIP Lender.  Proposed DIP Order ¶¶ 10, 12.  *It would be an Event of Default under the DIP Loan Agreement if the Committee's fees and expenses varied from the proposed DIP Budget by more than 10% in any budget period*.  DIP Loan Agreement § 8.1(n).

29.     There is no amount allocated in the DIP Budget for either the Committee or the Debtors to continue performing their fiduciary duties after March 2018, when the Sale is supposed to be consummated (by Inbursa's timeline), nor is any amount allocated in the DIP Budget to fund a chapter 11 liquidating plan or chapter 7 case after the Sale.  Cf.  DIP Budget, Annex B to Interim DIP Order.  Moreover, there is a very real possibility that a Sale Closing cannot occur before March 31, 2018, due to antitrust and anti-competition issues and other

regulatory approvals. [31]  Unless the Sale yields proceeds in excess of the DIP Obligors' more than $1 billion of pre- and postpetition secured debt, the only funds available for such purposes would be a Carve-Out from the Sale proceeds limited to $50,000 for the fees and expenses of a chapter 7 trustee and amounts sufficient to pay fees due to the clerk of this Court and the Office of the U.S. trustee.  Proposed DIP Order ¶ 12.[32]  ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

### 4. The Proposed DIP Order

#### a. Superpriority Claims and DIP Liens

30.     The Proposed DIP Order provides, among other things, that the DIP Lender would have joint and several Superpriority Claims against each of the Obligors for the DIP Obligations and DIP Liens on the DIP Collateral.  See Proposed DIP Order ¶¶ G, 3, 4.  The DIP Liens would be junior to (1) liens securing the Senior Pre-Petition First Lien Obligations, and (2) Senior Prior Liens (with respect to assets encumbered by such liens).  Id. ¶ 3(b).  The Debtors thus refer to the DIP Facility as a "third-o[u]t DIP."  11/1/2017 at 38:11-16.

31.     Substantially all of each Obligor's property would be DIP Collateral, including any previously Unencumbered Property.  Proposed DIP Order ¶¶ G, 3(a).[34]  Thus,

---

[31] ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

[32] The Court noted the proposed amount of Carve-Out at the first day hearing and commented:  "I regard that as a plug number.  And I view it as an acknowledgment that the lender and a committee, once appointed, will likely have a discussion."  11/1/17 Hr'g Tr. at 62:4-8.

[33] Burke Decl. Ex. C.

[34] The definition of "DIP Collateral" excludes (1) intellectual property that would be invalidated if it was encumbered by the DIP Liens, and (2) equity interests in "non-US domiciled subsidiaries" of any DIP Obligor,

Inbursa's affiliate would have claims against, and liens on, virtually all, if not all, of the property included in the Sale, except for the intellectual property of the four non-DIP Obligor Debtors, and the Sharon R&D Assets owned by Polymers (a non-DIP Obligor).[35] And, as if that were not enough, Avoidance Proceeds recovered by the Debtors' estates also would be DIP Collateral, *even if the Avoidance Claim was against Inbursa*, the proposed DIP Lender's affiliate. Id. ¶¶ G, 4(b).

### b. Adequate Protection Packages

32. Purportedly to protect Inbursa against diminution in the value of its interest in its collateral, the Proposed DIP Order would provide Inbursa at least four distinct forms of "adequate protection":

- Pre-Petition First Lien Lender Adequate Protection Claims. Inbursa would be entitled to superpriority administrative expense claims in "an amount equal to the aggregate diminution in the value of [Inbursa's] interest in [its collateral] from and after the Petition Date for any reason." Proposed DIP Order ¶ 7; see also id. ¶ H(i). These claims would be secured by adequate protection liens on all of DIP Collateral (i.e., all of the Obligors' assets) that are junior only to the Carve-Out, the DIP Liens, and any liens senior to the DIP Liens. Id. ¶ 7(a), (b). Notably, Inbursa's adequate protection liens would attach even to the Avoidance Proceeds of actions brought by the Committee against Inbursa. Id. ¶ G.

- Pre-Petition Interest Payment. ***Although this fact was not highlighted for the Court as required under the Local Bankruptcy Rules***, shortly after entry of the Interim DIP Order, Inbursa received payment of approximately $13.5 million of interest that had accrued prepetition. DIP Budget, Annex B to Interim DIP Order.

- Pre-Petition First Lien lender Adequate Protection Interest Payments. The Proposed DIP Order now provides for Inbursa to also receive current cash payments of all interest that would accrue under the Pre-Petition First Lien Loan Documents at the non-default rate after the Petition Date, which the proposed DIP

---

which, according to the Debtors, includes all of the DIP Obligor's subsidiaries that are not DIP Obligors themselves. Id. ¶ G; see also First Day Decl. Ex. A (Organizational Chart). The equity interests in such subsidiaries can become DIP Collateral, however, if the DIP Lender makes such a request within 10 days of closing on the DIP Facility. Proposed DIP Order ¶ G.

[35] By virtue of the DIP Liens on Resins' 100% equity interest in Polymers, Inbursa's affiliate would have claims against any residual value that remains from the sale of Polymers assets' after satisfaction of Polymers debts.

Budget contemplates would total approximately ***another*** $13 million. Proposed DIP Order ¶ 7(c); DIP Budget, Annex B to Interim DIP Order.

- <u>Roll-up of the September 2017 Advance</u>. Inbursa would receive immediate payment of $6 million of the principal amount due under the Pre-Petition First Lien Loan Documents plus accrued and unpaid interest and fees, which the proposed DIP Budget calculates as approximately $6.3 million in the aggregate. Proposed DIP Order ¶ 7(d); DIP Budget, Annex B to Interim DIP Order.

- <u>Pre-Petition Fee Payments</u>. Inbursa would be entitled to receive current cash payments to reimburse it for all fees and expenses payable under the Pre-Petition First Lien Loan Documents. Proposed DIP Order ¶ 7(e). The proposed DIP Budget projects that these payments would total approximately $9.15 million. DIP Budget, Annex B to Interim DIP Order. Burke Decl. Ex. M.

    33. Under the proposed DIP Budget, approximately $42 million of the $100 million DIP Facility would be paid to Inbursa as adequate protection:

| Category of Payment | Amount (\$MM) |
|---|---|
| Inbursa – Roll-Up | 6.271 |
| Inbursa – Pre-Petition Interest | 13.450 |
| Inbursa – Post-Petition Interest | 13.062 |
| Inbursa – Professional Fees | ███ |
| Total | ███ |

DIP Budget, Annex B to Interim DIP Order; Burke Decl. Ex. M.[36] When summed with the more than $9 million of fees and premiums payable to the proposed DIP Lender, Inbursa and its affiliate stand to receive approximately $50 million from the $100 million DIP Facility.

    34. In addition to the payments to Inbursa, the DIP Budget also provides for payment of up to $1.5 million to DAK. DAK's proposed "adequate protection" package consists of the following:

- <u>Pre-Petition Second Lien Secured Party Adequate Protection Claims</u>. As with Inbursa, DAK would be entitled to superpriority administrative expense claims in "an amount equal to the aggregate diminution in the value of [DAK's] interest, if any, in [its collateral] from and after the Petition Date for any reason." Proposed

---

[36] According to the proposed DIP Budget, more than $14 million of this amount has already been paid to Inbursa and Inbursa's affiliate from the Initial Funding Amount. DIP Budget, Annex B to Interim DIP Order.

DIP Order ¶ 8; see also id. ¶ H(ii). These claims would be secured by adequate protection liens on all of DIP Collateral (i.e., all of the Obligors' assets) that are junior only to the Carve-Out, the DIP Liens, any liens senior to the DIP Liens, and Inbursa's prepetition and adequate protection liens. Id. ¶ 8(a), (b). As with Inbursa, DAK's adequate protection liens would attach even to the Avoidance Proceeds of actions brought by the Committee against DAK. Id. ¶ G.

- **Pre-Petition Second Lien Secured Party Adequate Protection Payments.** Also like Inbursa, DAK would be entitled to receive current cash payments to reimburse it for fees and expenses payable under the Pre-Petition Second Lien Documents, up to a maximum of $1.5 million. Proposed DIP Order ¶ 8(c).

### c. De Facto Roll-Up of All Prepetition First-Lien Obligations

35. Not only does the Proposed DIP Order provide for roughly $43.5 million of DIP Proceeds that otherwise could be used by the Debtors as working capital to be remitted to Inbursa and DAK instead, but it also bars the Debtors from entertaining any strategy for these chapter 11 cases that does not involve a cash payoff of **all** of Inbursa's prepetition debt.

36. Without having highlighted *the inclusion of this provision in the Debtors' motion or in front of the Court on the first day of these cases, in violation of the Bankruptcy Rules and the Local Rules*, the Proposed DIP Order dictates that any plan the Debtors propose or support must pay the over $436 million in Pre-Petition First Lien Obligations asserted by Inbursa *in full, in cash* (regardless of whether Inbursa is entitled to such treatment). Proposed DIP Order ¶ 23.[37] It also forecloses the Debtors from obtaining any future postpetition financing, even if the DIP Facility would be repaid in full thereby, unless the full amount of Inbursa's Pre-Petition First Lien Obligations is also repaid in full, in cash. Id. ¶ 16(a).[38]

---

[37]   See also DIP Loan Agreement §§ 8.1(h)(vi), 8.1(p).

[38]   See also id. ¶¶ 3(d), 16(a), 21(b), 23; DIP Loan Agreement §§ 6.1, 6.2, 6.16, 8.1(c), 8.1(h)(vi). Although similar provisions were included in the Interim DIP Order, the Court advised at the first day hearing: "I'm reluctant to say that the debtor has waived the right to look for alternatives to financing in a format that would unduly limit its ability, frankly, to manage the case as circumstances arise." 11/1/2017 Hr'g Tr. at 68:21-25. The Court thus stated: "I'll leave it for purposes of the interim and if the committee or other stakeholder wishes to be heard then that issue could get addressed in the final." Id. at 70:4-8.

37. The coup de grace is that if the Proposed DIP Order were approved, these terms and "any actions taken pursuant [t]hereto" survive, and would not be discharged by, any future order entered by this Court or any other court to the contrary. Proposed DIP Order ¶ 16(c), (d). Nothing in the twenty three paragraphs of the DIP Financing Motion entitled "Requirements Under Local Rule 4001-2," discloses this de facto roll-up of staggering proportions. Cf. DIP Financing Motion ¶¶ 68-70 (describing the $6 million Roll-Up).

### d. Sale Milestones and Sale Related Events of Default

38. With the Proposed DIP Order effectively foreclosing any alternative, the DIP Loan Agreement then expressly mandates that the Debtors proceed with an expedited Sale of their assets, making it an Event of Default if near-term deadlines for certain key milestones related to the Sale process are not satisfied.[39] These milestones include the following:

- Final bid deadline: within 75 days after December 11, 2017 (February 23, 2018 per the Bidding Procedures).

- Auction: within three business days after the bid deadline (February 28, 2018 per the Bidding Procedures).

- Sale hearing: within 10 business days after the bid deadline (March 6, 2018 per the Bidding Procedures).

- Consummation of the Sale: the later of (i) 25 days after the bid deadline or (ii) five days after all regulatory approvals are completed.

See DIP Loan Agreement §§ 5.19, 8.1(c); see also Sale Motion ¶ 6.[40] Under this timeline, the Sale process would be completed by approximately March 31, 2018—roughly three and half months after the December 11, 2017 hearing on the Bidding Procedures—barring any delay for regulatory approvals. It is unclear how the Debtors would finance their limited operations if any

---

[39] It also would be an Event of Default if the Obligors pursued a sale pursuant to section 363 of the Bankruptcy Code on terms that are not approved by the proposed DIP Lender. DIP Loan Agreement §§ 6.7, 8.1(c), 8.1(p).

[40] These same milestones were proposed in connection with the Interim DIP Order. At the first day hearing, the Court noted: "I've seen milestones in interim DIP orders that I've expressed at a final hearing that I'm not going to abide by." 11/1/17 Hr'g Tr. at 54:6-9.

regulatory approvals cannot be obtained by March 31, 2018; the DIP Budget does not allocate any DIP Proceeds for the period thereafter.  Cf. DIP Budget, Annex B to Interim DIP Order.

39.     Should an Event of Default occur (as it is almost guaranteed to do), the Proposed DIP Order provides that both the proposed DIP Lender and Inbursa would be entitled to exercise rights to collect the debts owed to them from the assets of the DIP Obligors, including through foreclosure, upon five business days' notice (*whether DIP or prepetition*), without seeking further relief from the automatic stay.  Proposed DIP Order ¶ 18(a).  The Proposed DIP Order still continues to confine the issues the Committee can raise in any emergency hearing to whether an Event of Default has, in fact, occurred or is continuing, id., but this Court already advised the proposed DIP Lender during the first day hearing that:  "You can identify what you want as a default, but the court reserves the right to essentially conduct a full hearing and find out what's going on."  11/1/17 Hr'g Tr. at 66:3-6.  The Court further advised:  "And I don't want any expectation on the part of the lender or otherwise that that hearing will be cabined or limited to whether or not paragraph 22(j)(ix) has tripped or not."  Id. at 65:20-24.  Moreover, following an Event of Default, the Committee only would be permitted to incur $50,000 of Carve-Out Expenses; any additional expenses that the Committee incurred would be subordinated to the claims of the DIP Lender and effectively all secured lenders if their cases are left administratively insolvent.  Proposed DIP Order ¶ 12.

### e.     The Committee's Challenge Rights

40.     In addition to dictating that the Sale of the Debtors' assets be completed on an expedited timeline, the Proposed DIP Order also would limit Challenges to Inbursa's and DAK's prepetition claims and lock in the treatment of those claims as secured, irrespective of whether the value of their collateral supports that treatment.

41.     _Challenge Deadline_.  Although the Proposed DIP Order purports to preserve an opportunity for the Committee to investigate Inbursa's and DAK's prepetition liens and any claims or defenses against Inbursa and DAK, the Committee would be foreclosed from pursuing a Challenge unless it files a motion for standing by January 2, 2017 (50 days after the Committee was appointed).  Proposed DIP Order ¶ 22.

42.     _Waivers, Releases, Stipulations_.  Except to the extent that the Committee files a Challenge by the deadline, it would become bound by:

- _A waiver of any defenses to Inbursa's and DAK's claims_.  The Proposed DIP Order provides for a waiver of "any defense, right of counterclaim, right of set-off, or deduction with respect to the payment of the Pre-Petition First Lien Obligations, the DIP Obligations, and the Pre-Petition Second Lien Obligations . . . arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the Court entering th[e] [Proposed DIP] Order." Proposed DIP Order ¶ 25(c); see also id. ¶ 22(c).

- _A broad release in favor of Inbursa and DAK (among others) of all affirmative Claims_.  The Proposed DIP Order includes a release of all Claims related to "any aspect of the dealings or relationships between or among" the Debtors or their subsidiaries and Inbursa or DAK in connection with "any DIP Loan Document, the Interim Order, th[e] [Proposed DIP] Order or any Pre-Petition First Lien Loan Document or Pre-Petition Second Lien Loan Document." Proposed DIP Order ¶ 25(c); see also id. ¶ 22(c).

- _Stipulations that Inbursa's and DAK's claims are "secured_." The Proposed DIP Order includes (1) a stipulation that Inbursa's prepetition claims, which total $436 million in principal amount, $186 million of which the Debtors have asserted is junior in priority to the Senior Prior Liens, are "fully secured," and a waiver of the right to assert that the collateral securing those claims is worth less than the claims, Proposed DIP Order ¶¶ B(v), 23; see also id. ¶ 22(b); and (2) a stipulation that DAK's prepetition claims for $435 million, which are junior in priority to Inbursa's claims, are "secured," id. ¶¶ B(vi).

43.     _Credit Bidding_.  If the stipulations and waivers related to Inbursa's claims become binding, Inbursa and its affiliate, the proposed DIP Lender, would have secured claims

totaling approximately $520 million at the time of the Sale,[41] and DAK would have secured

claims for another $435 million.  The Proposed DIP Order bars each Debtor from objecting to

any credit bid by Inbursa (or the proposed DIP Lender).  Proposed DIP Order ¶ 16(e).  Although

the Proposed DIP Order states that this provision is "[w]ithout prejudice" to other parties' rights

to assert Challenges (as discussed above) (id.),[42] the Committee remains concerned that the

Challenge provision of the Proposed DIP Order does not expressly refer to challenges to credit

bids for "cause" pursuant to section 363(k) of the Bankruptcy Code as among the Challenges that

are preserved.  Cf. id. ¶ 22.  Absent clarification, therefore, the Proposed DIP Order could be

misinterpreted as foreclosing such for-cause challenges.[43]

      44.      <u>Investigation Budget</u>.  The Proposed DIP Order caps at just ***$20,000*** the

amount of fees and expenses related to investigating Challenges that can be reimbursed to the

Committee from the DIP Loan Proceeds or the Obligors' assets.   Proposed DIP Order ¶ 15.[44]

      45.      <u>363 Sale Payment Provisions</u>.  Should the Committee nonetheless

commence certain Challenges, the Committee would be required to complete such Challenges

before the consummation of the Sale.  The Proposed DIP Order and DIP Loan Agreement

include stipulations that require all Sale proceeds be distributed according to "363 Sale Payment

Provisions" that prescribe two alternative mechanisms for distributing Sale proceeds, the first of

which applies if the Sale does not involve a credit bid, and the second of which applies if it does.

---

[41] Under the proposed DIP Budget, an aggregate amount of approximately $83 million would be drawn under the DIP Facility as of February 23, 2018—the proposed final bid deadline for the Sale.  DIP Budget, Annex B to Interim DIP Order.  The balance due under the DIP Facility would increase to approximately $89 million before March 6, 2018—the proposed date of the final Sale hearing.  Id.

[42] At the first day hearing, the Court described this provision as follows:  "I view that as an arrangement or a stipulation between the debtor and secured lenders and the financing arrangement.  It, obviously, doesn't impair anybody else's ability to complain or be heard about credit bidding."  11/1/17 Hr'g Tr. at 63:3-7.

[43] The Bidding Procedures also do not expressly refer to a deadline for asserting challenges to credit bids and appear to expressly curtail the Committee's challenge rights upon its entry.  Cf. Sale Motion ¶ 6.

[44] At the first day hearing, the Court noted the proposed cap on reimbursement of the Committee's fees and expenses, stating:  "I expect that will be the subject of a separate discussion."  11/1/17 Hr'g Tr. at 62:20-23.

<u>See</u> Proposed DIP Order ¶ B(vii).  If the Sale does not involve a credit bid, the Proposed DIP

Order would require that all Sale proceeds be distributed according to the following waterfall:[45]

| | |
|---|---|
| **First** | Senior Pre-Petition First Lien Obligations<br>Less Reallocated Sale Professional Fees<br>(Inbursa – First $250 MM) |
| **Second** | Pre-Petition Second Lien Obligations<br>Senior to Senior Prior Lien Obligations, If Any<br>(DAK) |
| **Third** | Senior Prior Lien Obligations<br>(E.g., Mechanics Liens) |
| **Fourth** | DIP Obligations<br>(Proposed DIP Lender) |
| **Fifth** | Residual Senior Pre-Petition First Lien Obligations<br>(Reallocated Sale Professional Fees)<br>(Inbursa – First $250MM) |
| **Sixth** | Pre-Petition First Lien Obligations<br>(Inbursa – Subsequent $186 MM) |
| **Seventh** | Pre-Petition Second Lien Obligations<br>(DAK) |
| **Eighth** | All Other Obligations |

Proposed DIP Order ¶ B(vii).  If the Sale does involve a credit bid, the credit bidder would be

required to contribute sufficient cash to pay any senior obligations, plus certain fees, which cash

would be deposited in escrow "for the sole purpose of satisfying such respective fees and

obligations."  <u>Id.</u> ¶ B(vii)2(b).  Under the Proposed DIP Order, payments made pursuant to the

---

[45]  In a Sale that does not involve a credit bid, Senior Pre-Petition First Lien Obligations would be paid "first,"
Proposed DIP Order ¶ B(vii)1(a), and thus "Sale Professional Fees" would be paid "first" also.  The Proposed
DIP Order provides that all "Sale Professional Fees" would be "paid from such portion of the cash proceeds
with respect to any Pre-Petition Collateral . . . that would otherwise be allocated to any Senior Pre-Petition First
Lien Obligations."  <u>Id.</u> ¶ 13(a).

"363 Sale Payment Provisions" cannot be "*stayed, restrained, voidable, avoidable, or recoverable" under either the Bankruptcy Code or state law – even if there was a pending Challenge against the recipien*t.  Id. ¶ 2; see also id. ¶ 9.

46.     At the first day hearing, the Court made clear that it was "not comfortable" approving a substantially identical provision in the Interim DIP Order, which the Court twice observed is "frankly, pretty close to a plan."  11/1/17 Hr'g Tr. at 55:15-55:2.  The Court also advised the Debtors and Inbursa:  "I wouldn't necessarily assume if you're the debtor or the senior stakeholders or the DIP lender that you have the wind at your back with respect to every element of how a sale process will play out."  Id. at 53:23-54:1.

47.     Apparently in response to the Court's comments, the "363 Sale Payment Provisions" have been repackaged as an acknowledged stipulation between the Debtors, Inbursa, and DAK, rather than a directive from the Court, but this is a distinction without a difference. The same provision appears in the DIP Loan Agreement, and the Proposed DIP Order incorporates by reference, and approves, the terms of the DIP Loan Agreement.  See DIP Loan Agreement § 10.8(c); Proposed DIP Order ¶¶ B, 2.  Also, (i) for a Sale that does not involve a credit bid, the distribution of proceeds in accordance with the "363 Sale Payment Provisions" is included in one of the Sale milestones established in the DIP Loan Agreement, and failure to comply with that milestone would result in an "Event of Default," as discussed above (see DIP Loan Agreement §§ 5.19(i), 8.1(c)); and (ii) for a Sale that does involve a credit bid, compliance with the "363 Sale Payment Provisions" is mandated in paragraph 16(e) of the Proposed DIP Order.  Moreover, the Debtors' stipulation agreeing to the "363 Sale Payment Provisions" could not be "subject to any Challenge" and therefore would necessarily become binding on the Committee upon the expiration of the Challenge deadline.  See Proposed DIP Order ¶ 22.

48.     In determining the priority in which Sale proceeds are distributed, the 363 Sale Payment Provisions also dictate the mechanism for payment of professional fee claims in a Sale context.  However, once again, Inbursa is looking to finance the costs of these cases born on the backs of the Committee's professionals.

49.     Whether through a credit bid or cash bid, the Debtors have carved out of any recovery on account of the Senior Pre-Petition First Lien Obligations the "Sale Professional Fees," which consist of:  either (1)(a) any "Carve-Out Expenses" or (1)(b) any "Carve-Out Trigger Date Expenses," plus (2) "any Completion Fees to the extent earned and payable in respect of such CC Sale."  Id. ¶ 13(a).

50.     The "Carve-Out Expenses" in a non-default scenario would be comprised of allowed claims of the DIP Obligors' or the Committee's professionals "for amounts that are in accordance with, and solely up to the total respective amounts set forth in, the DIP Budget" for any period (with only amounts for Debtor professionals "rolling" over from period to period). Id. ¶ 12(b).  For the Committee, the DIP Budget caps these Carve-Out Expenses at ██████████ (plus a 10% permitted variance each period) over the total five month period addressed in the budget as compared to the Debtors' whopping ██████████.  Burke Decl. Ex. M.

51.     In a default scenario, in contrast, the "Carve-Out Trigger Date Expenses" that could be included as Sale Professional Fees consist of (1) "any Carve-Out Expenses incurred prior to the Final Closing Date of the CC Sale," plus (2) "any Carve-Out Expenses capped at the Carve-Out Amount incurred after the Carve-Out Trigger Date and prior to the Sale Final Closing Date."  Id. ¶ 13(a).  For the Committee, the "Carve-Out Amount" that caps the expenses the Committee incurred after the Carve-Out Trigger Date would be "$50,000

in aggregate." <u>Id.</u> ¶ 12(b).  The Proposed DIP Order refers to this amount as the "Professional

Expense Cap."  In contrast, the Debtors' Carve-Out Amount is $2 million.  <u>Id.</u>

52. The Completion Fees that may be included as Sale Professional Fees

are expressly limited to the fees of the Obligor's professionals, Alvarez & Marsal North

America, LLC and Rothschild, S.p.A. in respect of the completion of the Sale, an amount no less

than $7.5 million.  <u>Id.</u> ¶ A.  There is no provision in the Proposed DIP Order for payment of any

similar completion fees of the Committee's advisor.

53. Professional fee claims that do not qualify as Carve-Out Expenses, Carve-

Out Trigger Expenses, or Completion Fees, including the Committee's claims for fees in excess

of the DIP Budget or the Professional Fee Cap, are outside the definition of "Sale Professional

Fees."  In the context of a Sale that does not involve a credit bid, such claims would not be paid

"first" but rather would be grouped with the "other obligations" that are paid "eighth."  <u>Id.</u> ¶

B(vii)1(h).  And in the context of a Sale that does involve a credit bid, the Proposed DIP Order

appears to make no provision for payment of claims by the Committee that are outside of the

definition of "Sale Professional Fees," notwithstanding that it does expressly provide for the

escrow of additional "Sale Excess Fees Amounts" for fees and expenses of the Obligors'

professionals (but not the Committee's).  <u>Id.</u> ¶ 13(b)(ii); <u>see also</u> ¶¶ 10, 12(b),

### f. Other Provisions Benefiting Inbursa and DAK

54. In addition to severely limiting the Committee's ability to pursue

Challenges on behalf of the Debtors' estates, the Proposed DIP Order would restrict or eliminate

several key statutory and common law rights of the Debtors' estates, including the following:

- <u>Preservation of avoided liens</u>.  Contrary to section 551 of the Bankruptcy Code,
  the Proposed DIP Order provides that if the Committee avoids liens senior to the
  adequate protection liens granted to Inbursa and DAK, the avoided liens, would
  not maintain their priority when preserved for the benefit of the Debtors' estates.
  Proposed DIP Order ¶¶ 3(d), 7(a), 8(a), 16(f).

- <u>Surcharges of collateral</u>.  No surcharges for costs or expenses of administration could be imposed on Inbursa and DAK pursuant to section 506(c) of the Bankruptcy Code without their consent.  <u>Id.</u> ¶ 11; <u>see also id.</u> ¶¶ 9, 15.

- <u>Limitations on liens on postpetition proceeds</u>.  No DIP Proceeds could be used to pursue challenges to Inbursa's or DAK's liens pursuant to the "equities of the case" exception in section 552 of the Bankruptcy Code.  <u>Id.</u> ¶ 15.  Moreover, all payments or proceeds made to Inbursa or DAK pursuant to the Proposed DIP Order would be remitted "free and clear" of such claims.  <u>Id.</u> ¶ 9.

- <u>Marshaling</u>.  Inbursa and DAK would not be subject to the equitable doctrine of marshaling or any similar doctrine with respect to their collateral.  <u>Id.</u> ¶ 16(f).  Although the Interim DIP Order included a similar provision, the Court stated at the first day hearing:  "We can circle back to that."  11/1/17 at 73:19-22.

## C. Facts Relevant to Cash Collateral Motion

### 1. Polymers's Guaranty Debt to Inbursa

55.     Even on the onerous terms set forth in the Proposed Final DIP Order, Inbursa was not willing to provide postpetition financing to Polymers.  The proposed DIP Loan Agreement thus provides that DIP Proceeds may not be used to support Polymers, which is not a DIP Obligor, other than to allow Polymers to pay intercompany debts for services performed by its parent companies.  DIP Loan Agreement § 2.3(b)(i); <u>see also</u> Declaration of Dennis Stogsdill In Support of Cash Collateral Motion ("<u>CC Declaration</u>") [ECF No. 53-2] ¶ 9.

56.     As of the Petition Date, Polymers was indebted to Inbursa as guarantor of the full approximately $436 million in principal amount that Resins borrowed from Inbursa.  First Day Decl. ¶¶ 19, 20.  Polymers's guaranty debt to Inbursa is secured by a first priority lien on the Apple Grove Plant.  <u>Id.</u> ¶ 20.

### 2. Comerica's Claim and Cash Collateral

57. Polymers also borrowed approximately $50 million in principal amount from Comerica before the Petition Date,[46] which debt is secured by certain accounts receivable, deposit accounts, and the cash proceeds thereof. First Day Decl. ¶¶ 19, 26; CC Declaration ¶ 7; Cash Collateral Motion ¶ 13.

58. Like Inbursa, Comerica was not willing to extend additional financing to Polymers and, in fact, Comerica filed an action before the Petition Date seeking injunctive relief or the appointment of a receiver to prevent Polymers from using Comerica's cash collateral. First Day Decl. ¶ 27; CC Declaration ¶ 8.

### 3. The Interim Cash Collateral Order and Budget

59. According to the Debtors, even though Polymers has ceased all production, it still "has ongoing obligations under state and federal law to conduct environmental monitoring at the Apple Grove Plant—including the ongoing monitoring and maintenance of a wastewater treatment facility." CC Declaration ¶ 9. Polymers thus filed the Cash Collateral Motion seeking access to funds to "safeguard the public" and "prepare the Apple Grove Plant for a potentially extended idling, including by taking affirmative steps to remain in compliance with applicable environmental laws and regulations." Id. ¶ 9, 11.

60. Comerica apparently had different designs for Polymers. Comerica only agreed to allow Polymers to use cash collateral for a period of nine weeks (beginning with the entry of the interim order on the Cash Collateral Motion (the "Interim CC Order"), over which time the proposed budget forecasts that Polymers would collect approximately $31.5 million of cash from liquidating its accounts receivable, resulting in a net increase in Comerica's cash

---

[46] Polymers' debt to Comerica is guaranteed by M&G Chemicals S.A. and M&G International S.a.r.l. First Day Decl. ¶¶ 19, 26.

collateral of approximately $22 million and an ending cash balance of approximately $42.5 million.  Interim CC Order Ex. A.  The proposed budget does not include any amounts for the period after December 31, 2017, at which time Comerica would be entitled to apply its cash collateral to its claims against Polymers without further Court order and to leave Polymers with no liquidity whatsoever.  Interim CC Order ¶ 7(a).

61.     Much like the Proposed DIP Order, the Interim CC Order would prohibit Polymers from seeking certain relief that is not acceptable to Comerica, including authority to use cash collateral without Comerica's consent.  Id. ¶ 23.  It also provides that it would be a Termination Event if this Court entered any order on postpetition financing, cash collateral, relief from stay (except where the collateral is worth less than $10,000), or confirmation order that does not provide for full payment of Comerica's claims.  Id. ¶ 14(f), (m).  And upon the occurrence of such a Termination Event, Comerica could exercise remedies, including foreclosure, on five business days' notice, without further relief from the automatic stay, and the Committee would be limited to contesting whether a Termination Event occurred.  Id. 15.

62.     Also like the Proposed DIP Order, the Interim CC Order would restrict the Committee's ability to perform its fiduciary duties on behalf of Polymers's unsecured creditors. The proposed budget allocates $0 for reimbursement of fees and expenses of the Committee's professionals for any reason, and the Interim CC Order prohibits any use of the cash collateral for investigating and pursuing Challenges against either Comerica or Inbursa.  Id. ¶ 16. Moreover, the Interim CC Order allows the Committee only 60 days to pursue any Challenges against Comerica or Inbursa, and provides that the commencement of a Challenge would be a Termination Event.  Id. ¶¶ 14(s), 17.

63.    The terms of the Interim CC Order mirror the Proposed DIP Order in other

respects as well, including:

- Superpriority claims on avoidance actions and proceeds.  Comerica would receive
  superpriority administrative expense claims that are "payable and have recourse to
  the proceeds of any claims or causes of action to avoid a transfer of property (or
  an interest in property or an obligation incurred by the Debtor pursuant to any
  applicable section of the Bankruptcy Code."   Interim CC Order ¶ 5(b).

- Waivers of statutory and common law rights of Polymer's estate.  Polymers's
  estate would be precluded from asserting claims pursuant to section 506(c) or
  552.  Id. ¶¶ 20, 22.  Notably, any allowance of a surcharge on Comerica's
  collateral would constitute a Termination Event.  Id. ¶ 14(j).  In addition,
  Comerica would no longer be subject to the doctrine of marshaling.  Id. ¶ 21.

## **OBJECTION**

## I.    **FINAL APPROVAL OF THE PROPOSED DIP FACILITY IS NOT IN THE BEST INTERESTS OF THE DEBTORS' ESTATES**

64.    It is the Debtors' burden to demonstrate that the proposed DIP Facility is

in the best interests of their estates, including unsecured creditors.  See, e.g., In re Crouse Grp.,

Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (denying motion to obtain DIP financing because

the Debtors failed to carry their burden).  The Debtors assert that they have satisfied their burden

because they could not have obtained alternative financing over Inbursa's objection.  In other

words, Inbursa's proposal was the only game in town.[47]  Even if true, however, that would not

excuse the Debtors' "giving away the farm" to Inbursa by agreeing to terms that benefit only

Inbursa and are likely to prove detrimental to their estates.  See In re FCX, Inc., 54 B.R. 833, 838

(Bankr. E.D.N.C. 1985) (recognizing that a "court should not ignore the basic injustice of an

agreement in which the debtor, acting out of desperation, has compromised the rights of

unsecured creditors"); In re Tenney Vill. Co., 104 B.R. 562, 568 (Bankr. D.N.H. 1989)

(recognizing that postpetition financing arrangements must not "pervert the reorganizational

[47] ████████████████████████████████████████████████████████████████████

process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the [secured creditor ]").[48]

65. Irrespective of whether any financing alternatives were available, the Debtors were not without bargaining power. Inbursa expects to benefit greatly from the chapter 11 process, as evidenced by the fact that it declined to exercise remedies outside bankruptcy and instead funded the September 2017 Advance to bridge the Debtors through their chapter 11 filings. By way of example only, had Inbursa attempted to liquidate its prepetition collateral outside of chapter 11, Inbursa would not have had any opportunity to package its prepetition collateral with the other assets that are the subject of the Debtors' Sale Motion. Outside of chapter 11, moreover, Inbursa could not itself purchase, or represent to other potential buyers that they could purchase, Inbursa's collateral free and clear of other liens or successor liability claims.

66. To carry their burden on the DIP Financing Motion, the Debtors must show that they properly utilized their bargaining power vis-à-vis Inbursa to reach terms that will confer a net benefit on their estates. This they cannot do. The proposed DIP Facility is a complete capitulation to Inbursa, the burdens of which outweigh any benefit to the estates.

---

[48] See, e.g., RTC v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.), 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (emphasizing that "bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender"); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (explaining that "credit should not be approved when it is sought for the primary benefit of a party other than the debtor"); In re Ames Dep't Stores, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) (noting that "a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate").

### A. The Benefits of the DIP Facility Are Illusory: The Net Proceeds Are Insufficient to Conduct a Value Maximizing Sale

#### 1. The Adequate Protection Packages for Inbursa and DAK that Siphon Approximately 40% of the DIP Proceeds Are Legally Unsupportable

67.     If the full $100 million DIP Facility were available to the Debtors for use as working capital, the Sale process could be extended and would be more likely to maximize the value of the Debtors' assets. The Proposed DIP Order, however, would divert approximately $40 million of the DIP Proceeds for payment to Inbursa and DAK as "adequate protection." While the Committee does not object to Inbursa receiving adequate protection claims and liens with respect to the Senior Pre-Petition First Lien Obligations (i.e., the first $250 million Inbursa loaned to Resins), all other forms of adequate protection should be stricken from the Proposed DIP Order. Amounts previously paid by the Debtors should be disgorged. See In re Kingston Turf Farms, 176 B.R. 308, 310 (Bankr. D.R.I. 1995) (ordering claimant to disgorge funds previously paid to it by order of the bankruptcy court, concluding that "any payment . . . during the pendency of the case[ ] is a payment 'on account,' and is always subject to review"); Myles v. Wells Fargo Bank, N.A. (In re Myles), 395 B.R. 599, 609 (Bankr. M.D. La. 2008) ("A bankruptcy court does indeed have the authority under 11 U.S.C. §105 to order creditors to disgorge moneys improperly obtained from debtors.").

#### a. Inbursa Is Not Entitled to Current Payment of Postpetition Interest, the Roll Up, or Current Reimbursement of Fees

68.     Sections 362, 363, and 364 of the Bankruptcy Code provide for "adequate protection" of a party's "interest" in the debtor's property. 11 U.S.C. §§ 362(d)(1), 363(e), 364(d)(1)(B). The focus of the adequate protection analysis is thus on the party's "interest," and not the property itself. See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365 (1988). The relevant "interest" here is Inbursa's liens on the Corpus Christi Plant.

69. ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████

70.     Here, Inbursa is not entitled to adequate protection for its $250 million of claims on account of the Senior Pre-Petition First Lien Obligations for at least two reasons. First, Inbursa's first priority liens are not being primed by the third-out DIP Facility.  When the Debtors' financial advisor first learned that Inbursa was "paying themselves adequate protection on the portion of their debt that isn't being primed," it found Inbursa's demand "Unbelievable."

████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

71.

72.

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████,
Inbursa is not entitled to any adequate protection payments on its senior claims.  Any payments

the Debtors have already made on account thereof should be disgorged.

73.  █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**b.** ████████████████████████████████████

74. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

      **c.**      **The Definition of Diminution in the Proposed DIP Order Must Be Conformed to the Bankruptcy Code**

75. While the Committee does not object to Inbursa receiving adequate protection claims and liens with respect to the Senior Pre-Petition First Lien Obligations as its exclusive form of adequate protection, it does object to the Proposed DIP Order improperly providing that the amount of Inbursa's adequate protection claim would be equal to the amount of any diminution in the value of Inbursa's interest in its collateral "for any reason." Proposed DIP Order ¶ 7. Under the Bankruptcy Code, Inbursa is only entitled to receive adequate protection to the extent of any diminution in the value of its interest that results from limited, statutorily specified reasons: as a result of the automatic stay, as a result of the debtor using, selling, or leasing Inbursa's collateral, or as a result of Resins's incurring priming debt. See 11 U.S.C. § 361. The Proposed DIP Order must be conformed to the Bankruptcy Code.

      **2.**      **The Sale Milestones and Related Provisions of the Proposed DIP Order Inhibit the Debtors from Maximizing the Value of their Assets**

76. While the Committee is still in the early stages of examining the Debtors' dealings, assets, and capital structure, and the Debtors have yet to file their schedules of assets

and liabilities, it appears that the assets at issue in the Sale Motion could be the most significant sources of recovery for unsecured creditors (aside from Avoidance Claims, discussed below). Yet, for the reasons set forth in the Committee's objection to the Bidding Procedures and the supporting declaration from the Committee's financial advisor, Jefferies, the timeline for the Sale mandated in the Sale milestones in the DIP Loan Agreement (and the proposed Bidding Procedures) is too truncated for, among other things, interested bidders to complete the requisite due diligence and to obtain requisite regulatory approvals, and the increased uncertainty and risk that bidders would confront as a result is likely to depress their bids.  See Declaration of Leon Szlezinger in Support of Objection of the Committee to the Debtors' Bidding Procedures.

77.     To allow for a truly value maximizing Sale process, the Sale milestones and related Events of Default should be modified to provide for DIP financing through entry of a final non-appealable order approving the Sale in accordance with the timing laid out in the Committee's Objection to the Bidding Procedures.  Various other provisions included in the Proposed DIP Order and DIP Loan Agreement that prevent the Debtors from considering any alternatives to the Sale process should all be eliminated.

**B.      The Burdens Are High:  The Proposed DIP Order Unduly Restricts or Eliminates Valuable Rights of the Debtors' Estates and the Committee**

**1.      The Proposed DIP Order Must Allow the Committee Sufficient Time and Resources to Fulfill Its Investigatory and Other Fiduciary Duties**

78.     In addition to undercutting the benefits the Debtors' estates could hope to realize from the DIP Facility, the Proposed DIP Order would impose tremendous burdens on the Debtors' estates and the Committee, the most obvious of which is the DIP Budget.  In its zeal to minimize the costs of liquidating its collateral,[50] Inbursa has allocated just █████ to

---

[50]    See Burke Decl. Ex. N.

reimbursement of the Committee's fees and expenses through March 2018 ███████████

████████████████████████████████████████)—approximately ████ of the overall

budget for professional fees and expenses.  Burke Decl. Ex. M.  Any administrative expenses

claims the Committee might have on account of additional fees and expenses would be

subordinated to the DIP Loans and in the event of a sale, only would be payable if the sale did

not involve a credit bid and only if there are Sale proceeds in excess of secured debt.  See supra

paragraphs 49-53.

        79.     Moreover, upon an Event of Default, the Carve-Out amount for estate

professionals is equally slanted in favor of the Debtors' professionals who will continue to have

access to an additional $2 million, which the Committee's professionals will be limited to mere

$50,000.  In a typical case where DIP Financing is being provided by the existing first lien

lender, it is customary that a carve-out be provided that is senior in all respects to both the DIP

and prepetition liens and claims.  This provides assurances that there will be sufficient assets in

the estate to compensate professionals and pay the statutory fees owed by the estates in the face

of such parties having (or taking) liens on all available assets and providing themselves advanced

relief from the automatic stay to execute upon those assets.  Additionally, the baseline

assumption is that all retained professionals will be entitled to share in any carve-out on a *pari

passu* basis.  In fact, Local Rule 4001-2(a)(i)(F) specifically requires that any DIP financing that

seeks to discriminate between debtor professionals and committee professionals must highlight

the provision and justify its inclusion in the DIP order (which the DIP Motion does in a most

disingenuous way).

        80.     Here, rather than utilize the typical carve-out structure that has been used

time and again, Inbursa and the Debtors instead once again attempt to reinvent the wheel in a

manner that favors the Pre-Petition Lenders and the Debtors' professionals at the expense of the estates and its other fiduciaries.  Specifically, the Carve-Out is slotted *junior* to Inbursa's Senior Pre-Petition First Lien Obligations.  However, if (and only if) there is a sale subsequent to the Carve Out Trigger Notice, Inbursa would fund the Carve-Out and the completion fees for the Debtors' Professionals from recoveries that otherwise would fund its Senior Pre-Petition First Lien Obligations and would recover the same amount just senior to its remaining Pre-Petition First Lien Obligations.

81.     Adding insult to injury, under the Proposed DIP Order, the Committee is only permitted to spend $20,000 on investigating Inbursa and DAK, and would be left with no resources and only 60 days to pursue any Challenges against Inbursa and DAK that it identifies.

82.     Given the complexity of the Debtors' prepetition capital and corporate structures and the intensive, expedited nature of these proceedings, the amounts budgeted for the Committee are woefully inadequate for the Committee to perform its fiduciary.  And, particularly given the extension the Debtors have sought of the deadlines to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, it is unreasonable to expect that the Committee's investigation could be completed by the January 2, 2018 deadline proposed by Inbursa—slightly more than two weeks after the December 11, 2017 hearing on the Financing Motions, inclusive of year-end holidays.

83.     The Committee submits that any budget for professional fees should be tested in the aggregate and should be substantially increased to account for a realistic estimate of the Committee's professional fees, including an investigation budget of at least $1 million,[51] and

---

[51]    See, e.g., In re Energy Future Holdings Corp., Case No. 14-10979, ECF No. 856 (Bankr. D. Del. June 6, 2014) (approving investigation budget of $500,000 for the creditors' committee).

a 120-day challenge period and would be more appropriate in the circumstances of these cases.[52]

Additionally, the Committee should be granted automatic standing to pursue all Challenges it

identifies in any complaint filed before the expiration of the Challenge deadline. Requiring the

Committee to conduct motion practice to obtain standing would be a waste of the Debtors'

estates' limited resources. Orders conferring standing to creditor committees are routine where,

as here, the debtor has waived the right to pursue the relevant challenges itself.[53]

### 2. The Proposed DIP Order Should Also Clarify the Committee's Right to Challenge a Credit Bid by Inbursa or DAK for "Cause"

84. While the Committee believes that paragraph 16(e) of the Proposed DIP

Order is properly interpreted as allowing the Committee the opportunity to challenge credit bids

for "cause" under section 363(k) of the Bankruptcy Code in advance of the Challenge deadline,

the language of the Proposed DIP Order should be further clarified to remove any possible doubt.

Challenging credit bids based on "cause" is a statutory right of the Committee and it should not

be unduly restricted. See In re Fisker Auto. Holdings, Inc., 510 B.R. 55, 60 (Bankr. D. Del.

2014) (holding that "[a] court may deny a lender the right to credit bid in the interest of any

---

[52] See, e.g., In re NewPage Corp., Case No. 11-12804, ECF No. 310 (Bankr. D. Del. Oct. 5, 2011) (challenge period expired 120 days after appointment of creditors' committee); In re AbitibiBowater Inc., Case No. 09-11296, ECF No. 407 (Bankr. D. Del. June 4, 2009) (same); In re Muzak Holdings LLC, Case No. 09-10422, ECF No. 133 (Bankr. D. Del. Mar. 12, 2009) (creditors' committee required to file a standing motion within 105 days after its appointment and challenge period expired 10 days after entry of standing order); In re Fedders N. Am., Inc., Case No. 07-11176, ECF No. 272 (Bankr. D. Del. Oct. 5, 2007) (challenge period expired 118 days after entry of the final DIP order); see also In re Metro Affiliates, Inc., Case No.13-13591, ECF No. 190 (Bankr. S.D.N.Y. Dec. 4, 2013) (challenge period ended 120 days after entry of final order); In re Eastman Kodak Co., Case No. 12-10202, ECF No. 375 (Bankr. S.D.N.Y. Feb. 16, 2012) (challenge period ended 180 days after entry of final order).

[53] See, e.g., In re Old Razor Company, LLC (f/k/a American Safety Razor, LLC), Case No. 10-12351, ECF No. 174 (Bankr. D. Del. Aug. 27, 2010); In re PCAA Parent, LLC, Case No. 10-10250, ECF No. 179 (Bankr. D. Del. Mar. 2, 2010); In re Pliant Corp., Case No. 09-10443, ECF No. 337 (Bankr. D. Del. Mar. 20, 2009); In re Quebecor World (USA) Inc., Case No 08-10152, ECF No. 470 (Bankr. S.D.N.Y. Apr. 1, 2008); In re Dana Corp., Case No. 06-10354, ECF No. 721 (Bankr. S.D.N.Y. Mar. 29, 2006); In re DPH Holdings Corp., Case No. 05-44481, ECF No. 797 (Bankr. S.D.N.Y. Oct. 28, 2005).

policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment").

### 3. The 363 Sale Payment Provisions Would Effectuate a Sub Rosa Plan that Threatens to Violate the Absolute Priority Rule

85. Merely allowing the Committee to investigate and prosecute Challenges to Inbursa and DAK is not enough. For the Committee's Challenge rights to be meaningful, the Committee must also be allowed to complete any litigation that it may commence and enforce any relief that this Court may grant. The Section 363 Sale Payment Provisions, however, threaten to pull the rug out from under the Committee with respect to any Challenges that are not completed by date on which the Sale is consummated. At that point, the assets at issue in the Sale would be irrevocably transferred to the buyer (including any credit bidder) and any cash proceeds would be distributed to Inbursa and/or DAK (without any further request to lift the automatic stay with respect to sale proceeds), ***irrespective of any open Challenges***, and Inbursa and DAK would be shielded from any disgorgement claims.

86. Not only do the Section 363 Sale Payment Provisions undermine the Committee's Challenge rights but, as noted by the Court, they also constitute a *sub rosa* plan. See In re Braniff Airways, Inc., 700 F.2d 935 (5th Cir. 1983); see generally Reginald W. Jackson, *Sub Rosa Plans, Successor Liability, Gifting To Avoid Statutory Priorities And Other Section 363 Sale Issues*, ABI L. J. (Dec. 17, 2015) ("Even the most thoroughly prepared and objectively supported § 363(b) sale cannot be approved if the transaction attempts to structure the rights and claims of interested parties, the so-called "creeping plan."). Moreover, the Supreme Court recently affirmed, in the context of structured dismissals, the time worn principle that parties cannot "deviate from the basic priority rules that apply under the primary mechanisms the Code establishes for final distributions of estate value in business bankruptcies."

<u>Czyzewski v. Jevic Holding Corp</u>, 137 S. Ct. 973, 978 (2017).  That principle is equally

applicable here, in the context of a chapter 11 sale outside of a plan.  To honor sections 1129 and

1123 of the Bankruptcy Code, distributions to Inbursa and DAK must be deferred until

consummation of a plan of reorganization or liquidation.[54]

### 4. Other Rights Granted to the Debtors' Estates Must Be Preserved

#### a. Neither Avoidance Actions or Avoidance Proceeds Can Be Subjected to Postpetition Liens

87.     In addition to ensuring that the Committee has meaningful Challenge

rights, the Court should reject Inbursa's attempts in the Proposed DIP Order to deprive the

Debtors' estates of rights afforded to them by the Bankruptcy Code, including the estates'

statutory avoidance powers.  If the proposed Sale fails to yield proceeds in excess of the secured

debt, Avoidance Proceeds may be the only source of recovery for unsecured creditors.  It is

therefore critical that Avoidance Proceeds are preserved for the benefit of the Debtors' estates.

88.     The Proposed DIP Order provisions imposing DIP Liens and adequate

protection liens to Inbursa and DAK on Avoidance Proceeds are improper as a matter of law, and

especially offensive with respect to the proceeds of Avoidance Claims against Inbursa which

have not been carved out.[55]  The Bankruptcy Code confers statutory avoidance powers on a

chapter 11 debtor in possession (as trustee for the debtor's estate) to allow the debtor to recover

---

[54]   The 363 Sale Payment Procedures are problematic for a second, related reason.  While the procedures include the administrative expense claims of the Debtors' financial advisor for payment of its completion fees among the "Sale Professional Fees" that would be entitled to first priority payment from Sale distributions, the Committee's administrative expense claims for reimbursement of professional fees and expenses are capped and fees incurred and allowed up to that date, but not to exceed the budgeted ████████, plus $50,000.  Any fess in excess thereof, including the Committee's financial advisors' completion fees, would be subordinate to all secured debt.  This is another attempt by the Debtors to alter the priority scheme dictated by the Bankruptcy Code.  In chapter 11, a debtor must pay all administrative expenses of estate professionals, without distinction, as a condition of confirming a plan.  11 U.S.C. § 1129(a)(9)(A).  And in chapter 7, all administrative expenses are entitled to ratable distributions from liquidation proceeds, again without distinction.  11 U.S.C. § 726(b).

[55]   Should the Court grant DAK any adequate protection, the same argument would apply with respect to the Proposed DIP Order's grant of adequate protection liens on Avoidance Proceeds to DAK.

certain payments *for the benefit of unsecured creditors*.  See, e.g., Buncher Co. v. Official

Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000)

("[w]hen recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for

the benefit of all unsecured creditors").  The Avoidance Claims and proceeds thereof thus belong

to the Debtors' creditors and are not assets of the Debtors on which postpetition liens may be

granted.  See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp., ex rel.

Cybergenics v. Chinery (In re Cybergenics Corp.), 226 F.3d 237, 243-47 (3d Cir. 2000) (holding

that a fraudulent transfer claim belongs to creditors and not a chapter 11 debtor-in-possession);

Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC), 716 F.3d 736,

761 n.26 (3d Cir. 2013) ("courts have limited a debtor's exercise of avoidance powers to

circumstances in which such actions would in fact benefit the creditors, not the debtors

themselves.") (citing Cybergenics, 226 F.3d at 244); Bethlehem Steel Corp. v. Moran Towing

Corp. (In re Bethlehem Steel Corp.), 390 B.R. 784, 786-87 (Bankr. S.D.N.Y. 2008) ("Avoidance

actions . . . never belonged to the Debtor, but rather were creditor claims that could only be

brought by a trustee or debtor-in-possession . . . .").  Significantly, neither the Pre-Petition First

Lien Lender not the Pre-Petition Second Lien lender should be entitled to any recovery from any

damages awarded on account of claims and cause of action brought against them.

### b. Liens Avoided By the Committee Under Section 551 Cannot Be Subordinated to Junior Adequate Protection Liens

89.    The language in paragraph 3(b) of the Proposed DIP Order purporting to

grant priority to DIP Liens over any liens avoided by the Debtors' estates pursuant to section 551

of the Bankruptcy Code is also unlawful.  Section 551 provides that any lien avoided pursuant to

a debtor's estate's avoiding powers "is preserved for the benefit of the estate."  The "bankruptcy

estate, in some sense steps into the shoes of the former lienholder, with the same rights in the

collateralized property that the original lienholder enjoyed." Morris v. St. John Nat'l Bank (In re Haberman), 516 F.3d 1207, 1210 (10th Cir. 2008). Section 551 thus "prevents 'junior lienors from improving their position at the expense of the estate when a senior lien is avoided'" H.R. Rep. No. 95-595, at 376 (1977), reprinted in 1978 U.S.C.C.A.N. 5963; S. Rep. No. 95-989, at 91 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5877.

90. To the extent that the Committee avoids any liens that are senior to the DIP Liens—i.e., liens securing the Senior Pre-Petition First Lien Obligations or the Senior Prior Liens—the Debtors' estates are entitled to receive the benefit of those liens under section 551 of the Bankruptcy Code. By redirecting the benefits of avoidance to the DIP Lender, a junior lienholder, paragraph 13 of the Proposed DIP Order directly conflicts with section 551.[56]

   c.   **The Court Should Not Approve the Section 506(c) Surcharge Waiver or the Restriction on Claims Under Section 552(b) As to Any Prepetition or Adequate Protection Claims or Liens**

91. The Debtors' estates' rights under sections 506(c) and 552 of the Bankruptcy Code also could be of particular significance in the circumstances of these cases, the primary purpose of which is to maintain and liquidate prepetition secured creditors' collateral.

92. Section 506(c) provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to holders of such claim, including the payment of ad valorem property taxes with respect to such property." 11 U.S.C. § 506(c). This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unencumbered assets. See, e.g., Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re

---

[56] To the extent that the Court grants adequate protection liens to (i) Inbursa with respect to the portion of its claims that are not on account of Senior Pre-Petition First Lien Obligations, or to (ii) DAK, the same argument would apply with respect to the provisions of the Proposed DIP Order that purport to subordinate avoided liens to such adequate protection liens.

Visual Indus., Inc.), 57 F.3d 321, 325 (3d Cir. 1995) ("§ 506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant. The rule understandably shifts to the secured party, who has benefitted from the claimant's expenditure, the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate, providing that such unencumbered assets exist.") (citations omitted).

93.     Section 552(b), in turn, provides that "if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case . . . except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b). The purpose of section 552(b) is "to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value." In re Muma Servs., 322 B.R. 541, 558-59 (Bankr. D. Del. 2008).

94.     It is entirely inappropriate for the Proposed DIP Order to foreclose these potentially valuable sources of recovery for unsecured creditors. If unencumbered assets are used to maintain or increase the value of that collateral, unsecured creditors should be able to argue that such value inures to them, and not to the prepetition secured creditors. See, e.g., In re Metaldyne Corp., 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make.

If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lenders' rights, the Court will consider it.").

### 5. The Waiver of Marshaling Is Inappropriate and Should Be Denied

95.     Although the common law doctrine of "marshaling" is generally an equitable remedy to be invoked by junior secured or lien creditors, sections 544(a) and 1107 of the Bankruptcy Code confer upon the Debtors' estates the power to invoke marshaling to require a secured creditor to first satisfy its claims from previously encumbered assets, thus preserving encumbered assets for the benefit of all creditors.  See Kittay v. Atl. Bank of N.Y. (In re Global Serv. Grp. LLC), 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004) ("The trustee has standing to invoke marshaling because he has the status of a hypothetical lien creditor."); see also Berman v. Green (In re Jack Green's Fashions for Men Big & Tall), 597 F.2d 130, 133 (8th Cir. 1979) ("Federal courts of bankruptcy are courts of equity and may apply the doctrine of marshaling in proper cases.  In this case it would be in the highest degree inequitable to allow the [secured lender] to exhaust the business assets of the corporate bankrupt without first looking to the real estate mortgaged to it.  To permit such a course would leave the general creditors of the business with nothing.") (citation omitted).[57]  Given that certain of the Obligors' assets appear to have been unencumbered as of the Petition Date, the doctrine of marshaling also could be of significant benefit to unsecured creditors in the circumstances of cases and should not be waived.

---

[57]     If a debtor refuses to bring a colorable claim of marshaling, then an unsecured creditor may be granted derivative standing to do so.  See, e.g., Official Comm. of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Ctr., Inc.), 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1988) ("[S]tanding in the shoes of the debtor in possession, the Committee can assert [marshaling] claim."); In re Newcorn Enters. 287 B.R. 744, 750 (Bankr. E.D. Mo. 2002) (granting unsecured creditors' committee derivative standing to bring marshaling claim against secured lender, and thereby increase pay-out to unsecured creditors, where debtor refused to do so).

## II. THE CASH COLLATERAL ORDER SUFFERS MANY OF THE SAME INFIRMITIES AS THE PROPOSED DIP ORDER AND MUST ALSO BE MODIFIED

96.     Should the CC Order track the terms of the Interim CC Order, it will be no

less problematic than the Proposed DIP Order.  For substantially the same reasons as set forth

supra with respect to the Proposed DIP Order, the CC Order should be revised as set forth herein.

### CONCLUSION

Based on all of the foregoing, the Committee respectfully requests that the Court

(i) sustain this objection; (ii) deny final approval of the Financing Motions unless they are

modified in accordance herewith, and (iii) grant the Committee such other and further relief as

the Court deems appropriate.

Dated: December 6, 2017
        Wilmington, DE

**COLE SCHOTZ P.C.**

By: /s/ Kate Stickles
J. Kate Stickles (No. 2917)
David R. Hurst (No. 3743)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
kstickles@coleschotz.com
dhurst@coleschotz.com

- and -

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Dennis F. Dunne
Abhilash M. Raval
Alan J. Stone (No. 2677)
Lauren C. Doyle
Alexander B. Lees
28 Liberty Street
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
ddunne@milbank.com
araval@milbank.com

astone@milbank.com
ldoyle@milbank.com
alees@milbank.com

*Proposed Counsel to Official Committee of Unsecured Creditors of M & G USA Corporation, et al.*