**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| M & G USA CORPORATION, *et al.*,[1] | ) Case No. 17-12307 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Hearing Date:** |
| | ) **December 11, 2017 at 1:00 p.m.** |
| | ) |
| | ) **Re: Docket Nos. 14, 62, & 198** |

**UNITED STATES TRUSTEE'S OBJECTION TO FINAL APPROVAL**
**DEBTORS' MOTION FOR POST-PETITION FINANCING**
**(DOCKET NOS. 14, 62, & 198)**

Andrew R. Vara, Acting United States Trustee for Region 3 (the "U.S. Trustee"), hereby objects

to the Debtors' motion for post-petition financing as follows:

## I.    Introduction

The M & G Debtors' proposed post-petition financing motion violates the Bankruptcy

Code and sets these cases up for failure. The proposed final order:  includes sale distribution

procedures that violate the distribution scheme of the Bankruptcy Code (placing them not only in

the body of the order itself but also in the stipulations so that they may become final if no party

files a challenge), liens up both unencumbered assets and avoidance actions, allows credit

bidding while liens are still subject to challenge, permits payment of sale professionals without

fee applications, and sets up complicated and unnecessary challenge procedures. The proposed

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:
numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M &
G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195),
Mossi & Ghisolfi International S.a.r.l. (1270), M&G Chemicals, S.A. (1022), M&G Capital S.a.r.l.
(7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd.
(2062), and Indo American Investments Inc. (9208). The Debtors' noticing address in these chapter 11
cases is 450 Gears Road, Suite 240, Houston, Texas,77067.

final order provides for distributions to creditors outside of the plan process, may skip higher priority creditors, constitutes a *sub rosa* plan, appears to render the estates insolvent and the M & G Debtors with no viable exit from chapter 11, and violates creditors' rights. Debtors may obtain post-petition financing on reasonable terms that benefit the estates. The M & G Debtors' post-petition financing, as proposed, is neither reasonable nor beneficial. Thus, unless the M & G Debtors remove objectionable provisions, the Court should not approve post-petition financing on a final basis.

## II.     Factual Background

1.      On October 24, 2017, M & G Polymers USA, LLC ("M & G Polymers") filed a voluntary chapter 11 bankruptcy case, docketed as case number 17-12268. On October 30, an additional 11 affiliates of M & G Polymers filed voluntary chapter 11 petitions. The debtors' cases are being jointly administered under one of the later-filed cases, that of M & G USA Corporation (collectively with M & G Polymers USA and the additional 11 debtors the "M & G Debtors").

2.      The M & G Debtors are ultimately owned by an Italian corporation, with intermediate Luxembourg holding companies providing executive and back office services for the M & G Debtors as well as non-debtor affiliates and subsidiaries. The M & G Debtors manufacture PET for packaging. In 2013, the M & G Debtors, believing that they could achieve economies of scale, embarked on the construction of a vertically integrated PET plant in Corpus Christie, Texas through the M & G Resins entity. The Corpus Christie plant is approximately 85% complete, and the M & G Debtors estimate that it will cost another $500 million to complete (it is already almost a billion dollars over budget).

3.      On November 13, 2017, the U.S. Trustee appointed an official committee of unsecured creditors.

4.      An ad hoc group of construction lienholders (the "Construction Lienholder Group") has filed a motion requesting that the Court also order the appointment of an official committee of construction lienholders. The Construction Lienholder Group itself asserts approximately $161 million in total lien claims against the Corpus Christie plant, and estimates that there are at least 122 lien claimants who may hold as much as $400 million in total lien claims against the Corpus Christie plant. They assert that these claims may be automatically perfected under Texas law, and may prime the M & G Debtors' first lien lender.

5.      On October 31, 2017, the M & G Debtors filed a motion requesting authority to borrow up to $100 million in post-petition financing from an affiliate of their pre-petition first lien lender (the "DIP Motion"). On November 1, 2017, the M & G Debtors filed a motion to use the cash collateral of Comerica Bank (the "Cash Collateral Motion"). On November 1, after a hearing, the Court entered interim orders granting the relief requested in the DIP Motion and the Cash Collateral Motion. Both the interim DIP financing order and the interim cash collateral order give any official committee 60 days from formation, and any other party in interest 75 days from the bankruptcy filing, to investigate the M & G Debtors' secured lenders, their secured claims, and their actions with respect to their loans.  Thus, the secured lenders' claims will not be fully valid until January 13, 2018 (75 days from the date the Debtors filed bankruptcy) and any credit bid they make could also be challenged until then. If, in the interim, a party files a challenge, the M & G Debtors' bidding procedures and proposed post-petition financing order still permits a credit bid of the challenged debt.

6.     The proposed final DIP order contains extensive sale procedures and a sale distribution waterfall (paragraphs B(vii), 13(b)).

7.     None of the M & G Debtors have filed schedules, and have an extension until January 22, 2018 to do so.

8.     The Construction Lienholder Group, the Committee, and other parties all filed extensive objections to the M & G Debtors' proposed bidding procedures, the DIP Motion, and the Cash Collateral Motion.

9.     Based on the problematic provisions in the proposed final DIP order, the U.S. Trustee brings this objection.

III.    **Law and Argument**

    A.    **Under the reasoning of the Supreme Court's *Jevic* decision, the priority-skipping distribution proposed in the final DIP order is impermissible.**

10.     Paragraph 13(b) of the proposed final DIP order contains a detailed distribution scheme for sale proceeds. The proposed distribution appears to violate the Bankruptcy Codes' priority distribution scheme and the Supreme Court's holding in *Jevic*.[2] In *Jevic*, the Supreme Court rejected a non-plan priority-skipping distribution of estate assets in a chapter 11 case that the three lower courts had approved.  Although *Jevic* presented the Supreme Court with an end-of-case, "structured dismissal" scenario, the Supreme Court's reasoning is not limited to either structured dismissals or case-ending distributions.  Rather, the *Jevic* reasoning applies whenever a bankruptcy court is presented with distributions of estate assets in a chapter 11 case "that would be flatly impermissible" even if they were proposed in a plan "because they violate priority without the impaired creditors' consent."[3]

11.     "The Code's priority system constitutes a basic underpinning of business

---

[2]  *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017).
[3] *Id*. at 985.

4

bankruptcy law," which is "fundamental to the Bankruptcy Code's operation."[4] *Jevic*, 137 S. Ct. at 983, 984. Section 507 establishes the Bankruptcy Code's priority scheme, made applicable to chapter 11 cases by § 103(a). Thus, when analyzing a request to make non-plan priority-skipping distributions in a chapter 11 case, this Court must examine the Bankruptcy Code for "some affirmative indication of intent [that] Congress actually meant to make [the proposed disbursement] a backdoor means to" circumvent the statutory priority system established by section 507. [5] "The importance of the priority system leads us to expect more than simple statutory silence if, and when, Congress were to intend a major departure."[6] Although *Jevic* acknowledged that some courts had approved interim distributions outside of the usual priority scheme (wage orders, critical vendor orders, "roll-ups"), "these courts have usually found that the distributions at issue would enable a successful reorganization and make even the disfavored creditors better off"[7] or that the payments would have "a[ ] significant offsetting bankruptcy-related justification."[8] *Jevic* did contain an exception for "rare cases" containing "sufficient reasons" for the departure, but cautioned against allowing "the exception to swallow the rule" because of the "potentially serious" consequences including: "departure from the protections Congress granted particular classes of creditors, changes in bargaining power of different classes of creditors even in bankruptcies that do not end in structured dismissals, and risks of collusion, i.e., senior secured creditors and general unsecured creditors teaming up to squeeze out priority unsecured creditors."[9] *Id.*

       12.     Here, there is no Bankruptcy Code provision that allows the priority-skipping

---

[4] *Id.* at 984.
[5] *Id.*
[6] *Id.*
[7] *Id.* at 985.
[8] *Id*. at 986.
[9] *Id.*

distribution proposed in the final DIP order. No reorganization will be possible once the M & G

Debtors' assets have been sold and disbursed. The DIP Motion contains no information as to

how any creditor would be "better off" once they have been skipped and all proceeds distributed.

The M & G Debtors have also not provided any evidence that there is a significant offsetting

bankruptcy-related justification for shoehorning a non-Code-compliant distribution scheme into

the DIP order. The proposed final DIP order departs from the Code's creditor protections,

changes the power of creditors left with nothing even if these cases do not end in a structured

dismissal, and is an attempt by secured creditors holding leverage to circumvent the Bankruptcy

Code's priority distribution system and procedural safeguards. The Code's priority scheme and

procedural safeguards protect creditors; the proposed DIP order does the opposite. If the final

DIP order contains sale distribution procedures, it should not be approved.

B. **The proposed final DIP order proposes, in effect, an improper and unconfirmable *sub rosa* plan.**

13. A sale process cannot "short circuit the requirements of Chapter 11 . . . by

establishing the terms of the plan *sub rosa* in connection with the sale of assets."[10] Sale

transactions that dictate the terms of future reorganizations, disenfranchise creditors from their

right to vote on a reorganization plan or release claims against the debtor are impermissible.[11]

Transactions involving DIP lenders may also constitute *sub rosa* plans that cannot be approved.[12]

The sale waterfall provisions in the proposed final DIP order provide secured creditors with what

is likely to be a final recovery outside of a properly court-approved and solicited chapter 11 plan.

These are exactly the types of payments that should be included in a chapter 11 plan, and the

chapter 11 plan process provides confirmation safeguards and protects creditors' rights. Not so

---

[10] *In re Energy Future Holdings Corp.*, 648 F. App'x 277, 284-85 (3d Cir. 2016), *cert. denied*, 137 S. Ct. 447 (2016) (quoting *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) (internal citation omitted).
[11] *Braniff*, 700 F.2d at 940.
[12] *See*, *e.g.*, *In re Belk Properties, LLC*, 421 B.R. 221 (Bankr. N.D. Miss. 2009).

here. The proposed final DIP order, with its out-of-plan distribution scheme, should not be approved.

### C. The cases must be administratively solvent.

14. Chapter 11 of the Bankruptcy Code is designed to allow a debtor-in-possession to retain management and control of the debtor's business operations.[13] As such, a debtor-in-possession owes fiduciary duties to the bankruptcy estate and must, among other things, "protect and . . . conserve property in [its] possession for the benefit of creditors" and "refrain[] from acting in a manner which could damage the estate, or hinder a successful reorganization of the business."[14] M & G's bankruptcy cases appear to benefit only the secured creditors.  To obtain the benefits of a chapter 11 case, including a Section 363 sale, the M & G Debtors must be administratively solvent.[15]  Administrative claimants may not be forced to fund a chapter 11 case for the benefit of secured lenders, with the substantial risk of administrative insolvency and conversion to chapter 7 after the secured lenders have reaped the benefits of a Section 363 sale. This is especially true in a case like this one, where at least some of the M & G Debtors maintain a self-funded health insurance plan.  Employees must be assured of payment of all administrative claims under such plan.  Absent a sufficient wind-down budget, agreed to as part of the DIP and Cash Collateral Motions, this case appears to be administratively insolvent from the start, and the Motions should be denied and the case converted. For the same reason, without an agreement by the secured creditors to fund all administrative cases of the estates, any waiver of marshalling, § 506 (c), or § 105(a) is improper. If the secured creditors want to maximize the value of their collateral by using the chapter 11 process, they should pay for it.

---

[13] *See In re Eurospark Indus.*, 424 B.R 621, 627 (Bankr. E.D.N.Y. 2010).
[14] *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (internal quotations and citation omitted).
[15] *In re Townsends, Inc., et al.,* Case No. 10-14092 (Bankr. D. Del. January 21, 2011) Tr. at 23:25-24:22."

**D.** **Liens on unencumbered property and avoidance actions are not appropriate.**

15. Avoidance actions are uniquely for the benefit of general creditors of the estate, not secured creditors, and are rarely encumbered in favor of secured lenders. Preserving these claims for the estate allows the debtor in possession to gain recoveries for the benefit of all unsecured creditors. [16] Allowing the M & G Debtors to encumber all estate assets (including previously unencumbered assets) and to effectively assign the benefits of certain causes of action and related estate claims to the prepetition lenders is improper. These assets and claims may be the only means of recovery for unsecured creditors.

**D.** **The final DIP order also contains other problematic provisions.**

16. The proposed final DIP order contains a number of other problematic provisions, as follows:

a. Unfettered credit bidding by the prepetition first lien and second lien lenders without any provision for the challenge period.

b. Limits on what this Court can consider at a disputed hearing.

c. Terms that require the Debtors to pay the DIP lenders' counsels' invoices even though they remain subject to a review period. If challenged, parties must request clawback of payments.

d. Challenge provisions that are too complicated and contain too many hidden exceptions.

e. References to the terms of various other agreements (like the DIP credit agreement) implies that the sale procedures they contain have been approved, when they have not. It also forces parties to search through other, often very lengthy documents, to find relevant definitions.

---

[16] *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P 'ship. IV*, 229 F.3d 245, 250 (3d Cir. 2000).

17.     Without substantial change, clarification, and revision, the proposed final DIP order will harm, rather than help, the M & G Debtors' estates and creditors. It should not be approved as proposed.

## IV.     Conclusion

The DIP Motion requests that this Court approve a problematic final DIP order containing priority-skipping distribution procedures without a protective plan process, liens on all unencumbered assets, and challenge provisions full of exceptions and pitfalls, all of which will lead to administrative insolvency. This is unreasonable. It should not be approved. The DIP Motion and final DIP order as proposed should be denied.

**Andrew R. Vara,**
**Acting United States Trustee, Region Three**

Dated: December 7, 2017          **BY:**     /s/ Hannah Mufson McCollum
Hannah Mufson McCollum, Esq.
Trial Attorney
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)