IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>M & G USA CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12307 (BLS)<br><br>(Jointly Administered) |

## CREDITOR UNIVERSAL RESIN COMPANY LIMITED'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO EFFECT A RECOUPMENT, OR ALTERNATIVELY SETOFF

Dated: December 21, 2017

Louis T. DeLucia
SCHIFF HARDIN LLP
666 Fifth Avenue
New York, New York 10103

Matthew F. Prewitt
Michael K. Molzberger
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606

David W. Carickhoff (DE No. 3715)
ARCHER & GREINER P.C.
300 Delaware Avenue; Suite 1100
Wilmington, Delaware 19801

**ATTORNEYS FOR UNIVERSAL RESIN COMPANY LIMITED**

# TABLE OF CONTENTS

Page

SUMMARY OF REQUESTED RELIEF ........................................................................... 1

JURISDICTION AND VENUE ....................................................................................... 2

BACKGROUND ............................................................................................................... 2

    A.    The Parties' Supply Agreement and Subsequent Assignment ......................... 2

    B.    M&G Resins' Breaches, Repudiation, and Failure to Provide Adequate Assurances of Performance, and URC's Subsequent Cancellation of the Supply Agreement ........................................................... 4

    C.    URC's Cover Costs ........................................................................................... 6

    D.    URC's Account Payable Owed to M&G Resins ............................................. 8

    A.    URC is Entitled to Recoup Its Cover Costs Against the Accounts Payable Otherwise Owing to M&G Resins Under the Supply Agreement ........................................................................................................ 8

    B.    Alternatively, URC is Entitled to Setoff Its Cover Costs Against the Accounts Payable Otherwise Owing to M&G Resins Under the Supply Agreement ...................................................................................... 10

        1.    URC is Entitled to Setoff its Cover Costs ............................................. 11

        2.    The Automatic Stay Should be Modified to Permit Setoff ................... 13

CONCLUSION ................................................................................................................ 16

Creditor / Movant Universal Resin Company Limited ("URC"), by and through its undersigned counsel, hereby files this motion for entry of an order pursuant to sections 105(a), 362(d), and 553(a) of Title 11 of the United States Code, Rule 4001 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-1 of the Local Rules of Bankruptcy Procedure, granting it, to the extent necessary, relief from the automatic stay to permit URC to exercise its right of recoupment, or alternatively setoff, against URC's accounts payable otherwise owing to debtor M&G Resins USA, LLC ("M&G Resins").

## SUMMARY OF REQUESTED RELIEF

Creditor / Movant URC and Debtor M&G Resins formerly were parties to a long-term supply agreement. Under the supply agreement, M&G Resins supplied raw material (PET resin) to URC. Prepetition, M&G Resins repudiated the supply agreement by repeated material breaches and failure to provide assurances of continued performance. As a result of M&G Resins' repudiation, URC was forced to purchase raw materials from alternative suppliers at an increased cost compared to the price under the supply agreement.

Under the parties' supply agreement, M&G Resins is liable for URC's increased product acquisition costs, which are readily calculable and are at a minimum $3.45 million over the term of the supply agreement. URC currently has an account payable owing to M&G Resins for approximately $2.47 million under the supply agreement. The accounts payable is composed of invoices for product URC purchased from M&G Resins under the supply agreement. URC's cover costs and the accounts payable arise from the same integrated transaction. URC may therefore recoup its damages against the accounts payable as permitted by the Bankruptcy Code and the parties' agreements and provided for by equity and applicable Delaware law.

Because M&G Resins' liability to URC substantially exceeds the amount that URC owes to M&G Resins, the effect of the recoupment is that M&G Resins' claim for payment otherwise

owing to URC is extinguished.[1] To the extent the Court finds that recoupment does not apply, URC alternatively requests that the Court modify the automatic stay to permit setoff of URC's damages against the accounts payable.

## JURISDICTION AND VENUE

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

## BACKGROUND

### A. The Parties' Supply Agreement and Subsequent Assignment

URC and Debtor M&G Polymers USA, LLC ("M&G Polymers") entered into a "Supply Agreement" effective April 1, 2017, which supplanted the parties' prior supply agreement. (The Supply Agreement is attached as Exhibit A.) Under the Supply Agreement, M&G Polymers supplied URC with a particular type of PET resin, CLEARTUF 8006C (the "Product"), which URC's affiliates used to manufacture rigid plastic packaging. (Supply Agreement, Ex. A, § 6.)

On June 28, 2017, M&G Polymers assigned its rights and obligations under the Supply Agreement to M&G Resins, and URC agreed to this change per the "Assignment and Acceptance Agreement." (The Assignment and Acceptance Agreement is attached as Exhibit B.) On July 19, 2017, M&G Resins assigned its right, title, and interest (but not its obligations)

---

[1] URC does not herein seek affirmative relief against M&G Resins beyond extinguishment of M&G Resins' claim to the $2.47 million accounts payable. Even after the recoupment or setoff of the $2.47 million requested herein, URC will still have a general unsecured claim against M&G Resins for its damages in excess of the amount of the recoupment or setoff. The approximately $2.47 million subject to recoupment is not part of the debtor M&G Resins' estate, *see In Megafoods Stores, Inc. v. Flagstaff Realty Assoc.*, 60 F.3d 1031, 1035 (3d Cir. 1995), and if treated as setoff, is a secured claim, *see* 11 U.S.C.S. § 506(a). URC expressly reserves and does not waive its right to seek such additional relief against M&G Resins as set forth in URC's Proof of Claim.

2

in the Supply Agreement to Banco do Brasil. (The Assignment and Acknowledgment of Rights Under the Designated Sales Contract, the "BDB Assignment Notice," is attached as Exhibit C.)

In general terms, the Supply Agreement provided that M&G Resins would make available for purchase by URC a minimum of ■■■■ pounds of Product per year. (Supply Agreement, Ex. A, § 7.1.) URC was required to purchase a minimum of ■■■■ pounds of Product per year. (*Id.*) The Supply Agreement specified that the price of the Product would be determined by formula, ■■■■■■■■■■■■■■■■■■■■■■■■■■. (*Id.* §10.) ■■■■■■■■■■■■■■■■■■■. (*Id.*) The term of the Supply Agreement was from April 1, 2017 through ■■■■. (*Id.* § 5.)

There are two other pertinent provisions. First, the parties' agreements expressly permit URC to setoff any amounts due to it from claims arising under or in connection with the Supply Agreement against its accounts payable otherwise owing to M&G Resins. The Supply Agreement as initially executed restricted URC's ability to setoff claims against M&G Resins' invoices absent M&G Resins' prior written agreement. (Ex. A, Supply Agreement, § 11.1.) As part of the consideration for executing the BDB Assignment Notice, the parties expressly granted by written agreement URC the right to setoff against M&G Resins' invoices. Specifically, M&G Resins and URC agreed that "all payments by you [URC] under the [Supply Agreement] shall be made without setoff of, deduction of, or counterclaim, *except* for any amounts due or claims arising under or in connection with the [Supply Agreement.]" (Ex. C, BDB Assignment Notice, at 2) (emphasis supplied). URC specifically requested this provision as a condition of signing the BDB Assignment Notice. (*See* Exhibit G, at ¶ 6, Declaration of Conceicao Menezes, URC's Director.) The Supply Agreement did not limit URC's recoupment rights.

Second, under the Supply Agreement, when M&G Resins is unable to deliver product, it is expressly liable for the costs of cover, i.e., URC's increased product acquisition costs:

> In the event Seller is unable to supply Product in the quantity, quality, time, or price as required by this Agreement, then notwithstanding anything to the contrary contained in this Agreement, Buyer may cover by purchasing PET from one or more other suppliers, and Seller, as its sole liability in connection therewith, shall be liable to Buyer for the difference in price paid by Buyer for PET supplied from such third parties.

(Ex. A, Supply Agreement, § 7.2.) The Supply Agreement contains a limitation of liability provision, but the provision does not limit cover damages or direct damages. (*Id.* § 12.6.)

### B. M&G Resins' Breaches, Repudiation, and Failure to Provide Adequate Assurances of Performance, and URC's Subsequent Cancellation of the Supply Agreement

During the fall of 2017, URC became increasingly concerned that M&G Resins would be unable to fulfill its contractual obligations moving forward. Indeed, during September 2017, M&G Resins' Global Marketing & Sales Director, Fred Fournier, informed URC on multiple occasions that M&G Resins had no firm plans to manufacture and supply the Product moving forward. (*See* Ex. G, Declr. C. Menezes, ¶ 7.) Later during September 2017, M&G Resins informed URC that it did not have plans to manufacture and supply Product after current inventory was exhausted. (*Id.*) Additionally, URC learned through various trade publications and news articles that M&G was experiencing significant issues with its suppliers, contractors, and production facilities. (*Id.*)

As a result, on September 29, 2017, counsel for URC sent a letter to M&G Resins regarding these and other issues and requested that M&G Resins provide adequate assurances of performance under the Uniform Commercial Code, § 2-609. (*See* Exhibit D-1, September 29, 2017 Letter.) Although M&G Resins had anticipatorily repudiated the Supply Agreement by stating it lacked plans to manufacture the Product moving forward, URC wanted to make sure

that there had been no misunderstanding and to offer M&G Resins the opportunity to explain. (*See id*; Ex. G, Declr. C. Menezes, ¶7.)

URC received no response at all to its request for concrete assurances that M&G Resins would resume production of the Product. Instead, M&G Resins' communications regarding current shipments referred to ceasing production with no indication of any plans to resume production. On October 5, 2017, URC sent another letter to M&G Resins informing it that it had no choice but to enter into negotiations with other suppliers to meet URC's long-term supply needs. (*See* Exhibit D-2, October 5, 2017 Letter.)

On October 6, 2017, M&G Resins responded to URC's letters dated September 29, 2017 and October 5, 2017. (*See* Exhibit D-3, October 6, 2017 Letter.) Counsel for URC responded on October 9, 2017, noting that M&G Resins still had not indicated that it had any concrete plans to resume manufacturing the Product moving forward in sufficient quantities to fulfill its obligations under the Supply Agreement. (*See* Exhibit D-4, October 9, 2017 E-mail.)

On October 11, 2017, URC cancelled the Supply Agreement. (*See* Exhibit D-5, October 11, 2017 Letter.) URC cancelled the Supply Agreement because M&G Resins had failed to provide any assurances of an ability to perform in the future despite multiple requests by URC and had repudiated the Supply Agreement by informing URC that it had ceased manufacturing Product and could not state when or whether it would ever resume production of the Product. (*See* Ex. G, Declr. C. Menezes, ¶ 11.)

On October 12, 2017, M&G's Chief Restructuring Officer, Dennis Stogsdill of Alvarez & Marsal, led a conference call regarding the business outlook for M&G. Dennis Stogsdill's statements during that call confirmed that M&G Resins could not assure that it would be producing any Product moving forward. (*See* Exhibit D-6, October 13, 2017 Letter.) M&G's

First Day Declaration confirmed that all of its North American plants that had been used to manufacture the Product had ceased production. (Dkt. No. 3, ¶ 47.)

C. **URC's Cover Costs**

URC has experienced increased product acquisition costs on both a short-term and long-term basis as a result of M&G Resins' repudiation, failure to provide adequate assurances of performance, and breaches of contract, and the subsequent cancellation.[2]

In the short-term, between September 2017 and December 2017, URC has been forced to purchase ▮▮▮▮▮ pounds of substitute product on the spot market at an increased cost relative to the Supply Agreement of $▮▮▮▮▮. (*See* Ex. G, Declr. C. Menezes, ¶¶ 9-14, 17.)

As a result of M&G Resins' anticipatory repudiation and failure to provide adequate assurances as set forth above, URC was forced to cancel the Supply Agreement and contract elsewhere for Product. In order to avoid the potentially volatile spot market and ensure that it had adequate supply lined up moving forward, and because suppliers have a preference for long-

---

[2] As noted above, the parties' Supply Agreement expressly recognizes that M&G Resins is liable for URC's increased product acquisition costs. (Ex. A, Supply Agreement, § 7.2.) Similarly, the Uniform Commercial Code recognizes cover costs or the difference in market price as a buyer's direct damages stemming from a seller's anticipatory repudiation, failure to deliver product, and cancellation following a failure to provide adequate assurances of performance. *See* Uniform Commercial Code, § 2-610, § 2-711(1)(a), § 2-712, and § 2-713. *See also Hess Energy, Inc. v. Lightning Oil Co.*, 338 F.3d 357, 362 (4th Cir. 2003) (explaining code provisions and finding that after seller anticipatorily repudiated supply agreement the seller was liable to buyer for damages for nondelivery for the remainder of the contract term); *In re ADI Liquidation, Inc.*, 555 B.R. 423, 439 (Bankr. D. Del. 2016) (discussing the foregoing UCC provisions and noting that costs of cover are generally considered direct damages); *Singapore Recycle Ctr. Pte Ltd. v. Kad Int'l Mktg., Inc.*, No. 06-CV-4997 RRM RER, 2009 WL 2424333, at *15 (E.D.N.Y. Aug. 6, 2009), *report and recommendation adopted*, No. 06-CV-4997(RRM)(RER), 2009 WL 2778003 (E.D.N.Y. Sept. 1, 2009); *In re Cajun Forge Co., Inc.*, No. 03-51828, 2008 WL 5144536, at *10 (Bankr. W.D. La. Sept. 18, 2008) (analyzing Delaware's codification of the foregoing UCC provisions and finding that the buyer was entitled to both cancel the supply agreement and recover damages for the remaining term); *Rockland Industries, Inc. v. E+E (US) Inc.*, 991 F. Supp. 468, 35 U.C.C. Rep. Serv. 2d 1188 (D. Md. 1998), on reconsideration in part, 1 F. Supp. 2d 528 (D. Md. 1998).

term supply agreements in this industry, URC has entered into a long-term supply agreement with an alternative supplier, ███. Obtaining a long-term, reliable source of supply was essential because two of URC's affiliates have long-term customer agreements with a specific customer that depended on M&G Resins' Product to fulfill. (*See* Ex. G, Declr. C. Menezes, ¶¶ 4, 15.) Absent entering into such an agreement, URC's damages would have been substantially higher than the costs of cover.

The supply arrangement with ███ contains a pricing formula linked to ███ ███. The pricing formula is identical to the pricing formula under the M&G Supply Agreement, except ███ ███. The formula under the Supply Agreement with M&G Resins is, for most years, ███ ███. The formula under the supply agreement with ███. (*See* Ex. G, Declr. C. Menezes, ¶ 16.)

Because of these pricing formulas, URC's long-term cover costs are readily calculable. URC requires ███ million pounds of product annually to satisfy its obligations under two long-term agreements with a single customer that depended on M&G Resins' Product. URC's annual cover damages are the difference between the ███ under the M&G Resins Supply Agreement compared to the ███ multiplied by the ███ pounds. URC's long-term cover damages from January 1, 2018 through the remaining term of the Supply Agreement, ███, are therefore at least $███. If the damages are instead measured against the maximum annual quantity that M&G Resins was required to supply, ███ pounds, URC's maximum long-term cover damages through the term of the Supply Agreement are $███. (*See* Ex. G, Declr. C. Menezes, ¶ 17.)

7

In the aggregate, URC's short-term and long-term damages resulting from M&G Resins' repudiation and the resultant cancellation are therefore between $3,458,086 and $5,828,461 depending upon the amount of product that URC is forced to purchase from ▮ at an increased rate relative to the price from M&G Resins under the Supply Agreement. (*See* Ex. G, Declr. C. Menezes, ¶¶ 17-18.) No matter how computed, URC's damages substantially exceed the amount of the account payable against which recoupment or setoff is sought. Determining the precise amount of the damages in excess of the account payable can await determination of URC's Proof of Claim for its remaining general unsecured claim for damages.

### D. URC's Account Payable Owed to M&G Resins

URC has an account payable owing to M&G Resins for $2,474,210. True and correct copies of the M&G Resins invoices constituting this accounts payable are attached as group Exhibit E. The variation between the actual accounts payable owed to M&G Resins ($2,473,545) and the aggregate stated value of the invoices ($2,397,373) is due to price adjustments for both September and October 2017, a $200 underpayment, and M&G Resins' issuing invoices at the incorrect price. (*See* Ex. G, Declr. C. Menezes, ¶ 8.) For purposes of this Motion, however, the precise amount of the accounts payable is immaterial because regardless of minor variation, the accounts payable is less than URC's cover costs.

### DISCUSSION

### A. URC is Entitled to Recoup Its Cover Costs Against the Accounts Payable Otherwise Owing to M&G Resins Under the Supply Agreement

Recoupment is an equitable remedy defined as the "setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *In re University Medical Center*, 973 F.2d 1065, 1079 (3d Cir. 1992) (quoting 4 Collier on Bankruptcy § 553.03, at 553-15-17 (15th ed. 1992)); *In re*

8

*Communication Dynamics, Inc.*, 300 B.R. 220, 225-26 (Bankr. D. Del. 2003). State law governs a party's right to recoupment. Delaware law governs the relationship between M&G Resins and URC. (Ex. A, Supply Agreement, §17.1.) Delaware law "preserves the right of a defendant to plead either setoff or recoupment." *Schwalm v. Zachrais Const.*, No. CIV.A. 00-06-090, 2002 WL 596808, *11 (Del. Ct. Com. Pl. Feb. 07, 2002). *See also Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC*, 151 A.3d 450 (Del. 2016) (recognizing availability of recoupment under Delaware law).

Recoupment applies when the parties' claims arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations with respect thereto. *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984). "The Third Circuit's standard, articulated in *University Medical Center*, does not contemplate an analysis regarding whether or not the [claims] arise from discrete and independent units. Instead, the test focuses on the contractual relationship between the parties and whether the debts on both sides arise from an integrated transaction." *In re WL Homes LLC*, 563 B.R. 512, 517 (Bankr. D. Del. 2017) (citing *In re University Medical Center*, 973 F.2d at 1081)).

When the claims and obligations of the parties arise under the same contract, recoupment's "same transaction" requirement is generally satisfied. *See In re B&L Oil Co.*, 782 F.2d 155, 157 (10th Cir. 1986) ("claims arising from a single contract generally qualify for recoupment"); *Schweiker*, 739 F.2d at 875 (in bankruptcy, "recoupment has most often been applied when the creditor's claim against the debtor and the debtor's claim against the creditor arise from the same contract."); *In re Trans World Airlines, Inc.*, 275 B.R. 712, 720-21 (Bankr. D. Del. 2002); *In re Telephone Warehouse, Inc.*, 259 B.R. 64, 67-68 (Bankr. D. Del. 2001). *See also In re WL Homes LLC*, 563 B.R. at 518; *In re Sivec SRL*, 476 B.R. 310, 327–28 (Bankr. E.D.

9

Okla. 2012); *In re Bill Heard Enterprises, Inc.*, 400 B.R. 813, 823 (Bankr. N.D. Ala. 2009); *Matter of McDonald*, 224 B.R. 862 (Bankr. S.D. Ga. 1998).

Here, both M&G Resins' claim against URC for accounts payable and URC's claim against M&G Resins for cover costs arise from a single integrated transaction under the Supply Agreement. As noted, Section 7.2 of the Supply Agreement expressly recognizes that M&G Resins is liable for URC's cover costs, as does the Uniform Commercial Code. The events forming the basis for the accounts payable were the purchase and delivery of Product, which were conducted pursuant to the Supply Agreement. It would be inequitable for URC to be required to make full payment to M&G Resins for accounts payable when under the terms of the parties' agreements, URC is expressly permitted to offset claims for damages and URC has experienced significant cover costs as a result of M&G Resins' inability to perform and resultant cancellation. Because there is a "single integrated transaction," URC may recoup its cover costs against the accounts payable otherwise owing to M&G Resins.

Exercising a right of recoupment does not require relief from the automatic stay. *University Medical Center*, 973 F.2d at 1079 ("[R]ecoupment is an equitable exception to the automatic stay."). In an abundance of caution, however, URC requests that this Court enter an order granting relief from the automatic stay, to the extent required, in order to allow it to recoup its cover costs against the accounts payable otherwise owing to M&G Resins.

**B.**   **Alternatively, URC is Entitled to Setoff Its Cover Costs Against the Accounts Payable Otherwise Owing to M&G Resins Under the Supply Agreement**

In the alternative, URC requests that the Court grant it relief from the automatic stay in order to allow URC to setoff its cover costs against its accounts payable otherwise owing to M&G Resins.

1. <u>URC is Entitled to Setoff its Cover Costs</u>

Section 553(a) of the Bankruptcy Code preserves the right to setoff. 11 U.S.C. § 553(a). Section 553(a), however, is not an independent source of setoff rights; rather, it preserves the common-law right of setoff arising out of non-bankruptcy law. *U.S. v. Norton*, 717 F.2d 767, 772 (3d Cir. 1983). Delaware law retains the right of setoff, and as noted, the parties expressly recognized URC's setoff rights in the BDB Assignment Notice. *Schwalm v. Zachrais Const.*, No. CIV.A. 00-06-090, 2002 WL 596808, *11 (Del. Ct. Com. Pl. Feb. 07, 2002). *See also* 10 Del. C. § 9536 (establishing statute of limitation to exercise right of setoff).

Setoff is an equitable right that "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)). The elements necessary to exercise a right of setoff under § 553(a) are as follows: (a) A debt exists from the creditor to the debtor that arose before the commencement of the bankruptcy case; (b) the creditor has a claim against the debtor that arose before the commencement of the bankruptcy case; and (c) the debt and the claim are mutual obligations. *Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 262-63 (3d Cir. 2000). *See also In re Communication Dynamics, Inc.*, 382 B.R. at 232 ("Congress has defined 'debt' and 'claim' broadly in section 101 of the Code to include unmatured, contingent, disputed, and unliquidated claims").

Here, URC satisfies each of these three elements. First, a "debt" exists from the creditor to the debtor that arose from a prepetition contract. The accounts payable consists of charges for Product sold and delivered on or before October 20, 2017. The Petition Date was October 31, 2017. Therefore the alleged amount owing to M&G Resins arose before commencement of the bankruptcy case.

11

Second, URC's claim against M&G Resins arose before the commencement of the bankruptcy case because the events giving rise to the claim occurred prepetition. *See In re WL Homes LLC*, 471 B.R. 349, 352 (Bankr. D. Del. 2012) (for setoff purposes, a debt or claim arises when all acts or transactions necessary for liability have occurred), citing *Jeld–Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 121 (3d Cir. 2010). *See also United States v. Gerth*, 991 F.2d 1428, 1433 (8th Cir. 1993) ("a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the petition was filed" and finding that creditor's debt did arise prepetition, making it eligible for setoff); *In re Sivec SRL*, 476 B.R. 310, 327 (Bankr. E.D. Okla. 2012) ("Pursuant to § 101(5), a claim is any right to payment or remedy for breach of performance, regardless of whether it has been reduced to judgment, or is liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."). M&G Resins' material breaches, failure to provide adequate assurances in response to URC's request, and anticipatory repudiation, and URC's resultant cancellation of the Supply Agreement, each occurred prepetition. Because all of the events giving rise to URC's claim arose before M&G Resins filed for bankruptcy, URC's claim for damages arose prepetition.

Third, the mutuality requirement under § 553(a) requires that the claims sought to be setoff be between the same parties in the same capacity. *See In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010). Here, the claims at issue are among and between M&G Resins and URC in their capacity as former parties to the cancelled Supply Agreement.

URC therefore holds a valid and enforceable right of setoff against M&G Resins under § 553(a).

## 2. The Automatic Stay Should be Modified to Permit Setoff

Because there is a valid and enforceable right of setoff against M&G Resins, this Court should find that "cause" exists to modify the automatic stay under § 362(d)(1) of the Bankruptcy Code to allow URC to exercise its setoff rights. Furthermore, the automatic stay should be modified under § 362(d)(2) of the Bankruptcy Code to permit setoff because M&G Resins does not have an equity interest in the property and the property is not necessary for an effective reorganization.

### a. *"Cause" Exists Under § 362(d)(1) of the Bankruptcy Code*

Section 362(d) of the Bankruptcy Code provides ". . . the court shall grant relief from the stay . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . ." 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define "cause." Courts therefore determine whether "cause" is present "based on the totality of the circumstances in each particular case." *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997). "Courts generally recognize that, by establishing a right of setoff, the creditor has established a prima facie showing of 'cause' for relief from the automatic stay under § 362(d)(1)." *In re WL Homes LLC*, 471 B.R. 349, 352 (Bankr. D. Del. 2012). *See also In re Gould*, 401 B.R. 415, 426 (B.A.P. 9th Cir. 2009); *In re Red Rock Services Co., LLC*, 480 B.R. 576 (Bankr. E.D. Pa. 2012); *In re Cullen*, 329 B.R. 52, 57 (Bankr. N.D. Iowa 2005); *In re Nuclear Imaging Sys., Inc.*, 260 B.R. 724, 730 (Bankr. E.D. Pa. 2000). Here, URC has established an entitlement to setoff under both Delaware law and Section 553, and has therefore established a *prima facie* showing for modifying or lifting the automatic stay to permit the requested setoff.

Additionally, "cause" also exists under the totality of the circumstances test. Courts in this jurisdiction have adopted a flexible three-factor test to determine whether under the totality of the circumstances "cause" exists to modify or lift the automatic stay: (1) whether any great

13

prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits. *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010). *See also In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).

Here, these factors favor granting stay relief to permit setoff. First, there is little prejudice to the bankrupt estate or the debtor resulting from stay relief. M&G Resins is liable for URC's cover costs under the terms of the parties' Supply Agreement and expressly agreed that URC would have the right to setoff its damages against any unpaid invoices.

Second, if stay relief is not granted, URC will be severely prejudiced because it could potentially be forced to pay $2.47 million to M&G Resins while only likely recovering from M&G Resins pennies on the dollar for its own claims under precisely the same Supply Agreement. All this at the same time when URC is being forced to pay substantially more for Product than it had contracted and budgeted to pay. The parties negotiated an integrated agreement with overlapping and mutual rights, obligations, duties, and responsibilities. Disallowing setoff would deprive URC of the benefit of its bargain and likely cause it to ultimately recover only pennies on the dollar while paying M&G Resins the full amount of the invoices. These concerns weigh in favor of granting stay relief. *See, e.g., In re Davicter E'prises., Inc.*, 248 B.R. 794, 797 n.5 (Bankr. S.D. Ill. 2000) (setoff in bankruptcy seeks to avoid the injustice of requiring a creditor to pay its obligation to debtors in full while receiving only a partial payment from debtor).

Third and finally, URC has a substantial probability of prevailing on the merits. As set forth above, URC has a straightforward claim for cover damages, valid setoff rights under

Delaware law, and has satisfied the requirements of Section 553 of the Bankruptcy Code to effectuate its setoff.

          b.    *The Requirements of § 362(d)(2) of the Bankruptcy Code Are Also Satisfied*

For similar reasons, stay relief is warranted under Section 362(d)(2) of the Bankruptcy Code, which provides for stay relief when the debtor does not have an equity interest in the property and such property is not necessary for an effective reorganization. 11 U.S.C. § 362(d)(2). Because URC's setoff right is for the entire amount of URC's debt to M&G Resins, M&G Resins has no remaining equity interest in the funds. In other words, M&G Resins' claim to the accounts payable will be wholly extinguished and URC has a complete defense to any turnover action. To the extent that M&G Resins' accounts receivable under the Supply Agreement represent an asset of the bankruptcy estate, such asset is worthless (because uncollectable in a turnover action) and therefore unnecessary for an effective reorganization.[3]

---

[3] As set forth above, URC has an accounts payable owing to M&G Resins for approximately $2.47 million. URC has received conflicting instructions to pay a portion of the accounts payable to both Banco do Brasil and also to Comerica Bank. (*See* Exhibit F, letter from counsel for URC to Comerica Bank; Ex. G, ¶19.) In the event that the Court denies URC's recoupment and setoff requests, URC respectfully requests clarification to whom payment, if any, should be made pending the resolution of URC's Proof of Claim.

## CONCLUSION

Universal Resin Company Limited therefore requests that the Court enter an order substantially in the form as the attached proposed order, extinguishing by recoupment, or alternatively setoff, M&G Resins' claim to URC's $2.47 million accounts payable otherwise owing to M&G Resins.

Dated: December 21, 2017

BY: /s/ *David W. Carickhoff*

ARCHER & GREINER P.C.
David W. Carickhoff (DE No. 3715)
300 Delaware Avenue; Suite 1100
Wilmington, Delaware 19801
Telephone: (302) 356-6621
Facsimile: (302) 777-4352
Email: dcarickhoff@archerlaw.com

Louis T. DeLucia
SCHIFF HARDIN LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 753-5000
Facsimile: (212) 753-5044
Email: ldelucia@schiffhardin.com

Matthew F. Prewitt
Michael K. Molzberger
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
Email: mprewitt@schiffhardin.com
mmolzberger@schiffhardin.com

**ATTORNEYS FOR UNIVERSAL RESIN COMPANY LIMITED**