# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | : |
|  | :    Chapter 11 |
| M & G USA CORPORATION, *et al.*,[1] | :    Case No. 17-12307 (BLS) |
|  | :    (Jointly Administered) |
| Debtors. | :    Ref: Docket No. 549 |
|  | : |

## DEBTORS' OBJECTION TO MOTION OF WFS CONSTRUCTION SERVICES, LLC FOR MODIFICATION OF THE AUTOMATIC STAY TO PERMIT A PENDING ARBITRATION PROCEEDING TO CONTINUE TO DETERMINE THE VALIDITY AND AMOUNT OF FILED MECHANICS' LIENS

The debtors and debtors in possession (collectively, the "Debtors") in the

above-captioned chapter 11 cases (these "Cases") hereby object (this "Objection") to the *Motion*

*for Modification of the Automatic Stay to Permit a Pending Arbitration Proceeding to Continue*

*to Determine the Validity and Amount of Filed Mechanics' Liens* (Docket No. 549)

(the "Motion"),[2] filed by WFS Construction Services, LLC ("WFS").  In support of this

Objection, the Debtors respectfully represent as follows:

---

[1]    The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

**Preliminary Statement**

1. WFS requests relief from the automatic stay to continue a pending arbitration against two of the Debtors in which WFS has asserted various claims for contract damages related to work performed at the Corpus Christi Plant, and seeks a ruling on the validity and extent of its mechanics' liens. While WFS asserts that "cause" exists to lift the automatic stay, the Motion does not—and, under present facts, WFS cannot—show that the "balance of harms" favors lifting the stay to allow the arbitration to proceed at this time.

2. The Debtors commenced these Cases to undertake an efficient and orderly sale process for the benefit of their estates and stakeholders, a process that could not succeed but for the protections afforded by the automatic stay. With final bid deadlines for the Debtors' Apple Grove and Corpus Christi assets approaching on January 22 and March 6, respectively, now is a critical time for the Debtors and the sale process.

3. Recognizing that many mechanics' and materialmen's claims in these Cases are not yet allowed by agreement or otherwise, the Debtors have determined that focusing on consensually resolving lienholder claims in the near term will benefit the Debtors' estates and stakeholders. To that end, the Debtors recently proposed procedures designed to facilitate the efficient and cost-effective settlement of lienholder claims. If approved, these procedures will streamline the lienholder settlement approval process and allow the Debtors and their professionals to focus scarce time and resources on providing clarity with respect to these claim amounts, which will facilitate a more effective and successful sale process.

4. In contrast, WFS effectively seeks to compel the Debtors into a dispute and thereby undertake a more protracted, adversarial and costly process (i.e., arbitration) to resolve WFS' claims and determine the validity and extent of its liens. The pending arbitration

proceeding was in its preliminary stages when these Cases were commenced. Discovery in the arbitration remains far from complete, as no documents have been exchanged and no witnesses have been deposed. An evidentiary hearing was initially scheduled for May 2018, but given the stay of proceedings since the Petition Date, even if the automatic stay were lifted immediately, the hearing likely would not be held until the fall of 2018 at the earliest.

5.    To be clear, if there were no recourse to resolve WFS's claim other than through an adversarial dispute, the Debtors recognize that arbitration likely would be appropriate. The Debtors did, in fact, consent to arbitrating this matter prior to the Petition Date and acknowledge the federal policy favoring arbitration in general.[3] Under the current circumstances of these Cases, however, lifting the automatic stay to force the Debtors to arbitrate with WFS *now* would rob the Debtors of the opportunity to settle lienholder claims such as WFS' in the near term via an efficient and cost-effective process, and also open the proverbial floodgates for a multitude of similar requests. Such an outcome would unduly strain the Debtors' already tight budget and time constraints and, ultimately, doom the Debtors' objective of obtaining clarity with regard to these types of claims in complete disregard of the fundamental bankruptcy objectives of providing debtors a "breathing spell" to focus on resolving disputes and maximizing stakeholder value and favoring settlements.

6.    The proposed lienholder settlement procedures are designed to bring lienholders, including WFS, to the negotiating table in the near term, avoid piecemeal litigation and foster settlements. Forcing the Debtors to resume a costly, adversarial arbitration process with WFS at

---

[3]    Although the Debtors are not seeking an alternative proceeding for resolving WFS' claims at this time, the Debtors reserve their rights to make such a request under appropriate circumstances.

this time would undermine these efforts before they are even given a chance to succeed and needlessly exhaust precious estate resources to the detriment of all stakeholders. As such, the Motion should be denied.

## I. BACKGROUND

### A. Relevant Proceedings in These Cases

7. On October 24, 2017, Debtor M&G Polymers USA, LLC ("M&G Polymers") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, thereafter, on October 30, 2017 (the "Petition Date"), each of the other Debtors commenced chapter 11 cases before this Court. The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. An Official Committee of Unsecured Creditors was appointed in these Cases on November 13, 2017 (Docket No. 146). Additional information regarding the Debtors and these Cases, including the Debtors' businesses, corporate structure and financial condition, is set forth in the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* (Docket No. 3) filed on October 31, 2017 and incorporated herein by reference.

9. On December 14, 2017, the Court entered the *Order (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* (Docket No. 490) (the "Bidding Procedures Order"). Among other things, the Bidding Procedures Order

established a timeline for the sale of M&G Resins' partially-completed polyethylene terephthalate resin plant in Corpus Christi, Texas (the "Corpus Christi Plant") and related assets, with a final bid deadline of March 6, 2018 and an auction scheduled for March 8, 2018.

10.     On December 28, 2017, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Lienholder Claim Settlement Procedures* (Docket No. 568) (the "Lienholder Settlement Procedures Motion").  By the Lienholder Settlement Procedures Motion, the Debtors seek to establish efficient and cost-effective procedures for resolving claims held by holders of mechanics' and materialmen's liens asserted against the Corpus Christi Plant, to (a) streamline the settlement approval process in these Cases, (b) minimize costs incurred by the Debtors' estates in connection with obtaining approval of beneficial settlement agreements and (c) reduce the Court's administrative burden (the "Lienholder Settlement Procedures").  As set forth in the Lienholder Settlement Procedures Motion, the Debtors believe that the proposed Lienholder Settlement Procedures appropriately preserve the rights of the Debtors' key creditor constituencies and the Office of the United States Trustee to participate in the settlement process. A hearing on the Lienholder Settlement Procedures Motion is scheduled for January 18, 2018.

### B.     The Motion and the Arbitration

11.     By the Motion, WFS requests relief from the automatic stay imposed by operation of section 362(a) of the Bankruptcy Code to continue prosecution of a pending arbitration proceeding in Houston, Texas against Debtors M&G Resins USA, LLC ("M&G Resins") and Chemtex International Inc. ("Chemtex" and, together with M&G Resins, the "Debtor Defendants"), initiated on April 13, 2017 with the American Arbitration Association, captioned as *WFS Construction Company, LLC v. M&G Resins USA, LLC and Chemtex International Inc.* (Case No. 01-17-0002-1795) (the "Arbitration").  In the Arbitration, wherein three arbitrators

have been appointed, WFS asserts various claims against the Debtor Defendants in connection with certain "civil and structural steel installation work" WFS contracted to perform at the Corpus Christi Plant.  See Demand for Arbitration, attached as Exhibit G to the Motion (the "Demand for Arbitration"), at ¶¶ 6, 10-11.  Informal negotiations and mediation failed to resolve the parties' dispute, and by an agreed motion to abate in favor of arbitration filed jointly by WFS and the Debtor Defendants in Nueces County, Texas state court on February 22, 2017, the Debtor Defendants and WFS agreed to proceed via arbitration, in accordance with Section 39.4 of the Contracts (as defined below).  See Motion, at 4, Ex. A at § 39.4, Ex. B at § 39.4.

12.      WFS' claims in the Arbitration arise under two contracts to which Chemtex is a party:  (a) that certain Construction Contract on a Turnkey Basis, dated as of July 27, 2015, by and between Chemtex and WFS (defined as the "Civil Contract" in the Demand for Arbitration); and (b) that certain Construction Contract on a Turnkey Basis, dated as of November 23, 2015, by and between Chemtex and WFS (defined as the "Structural Contract" in the Demand for Arbitration) (together, the "Contracts").  In the Arbitration, WFS seeks payment of (a) $5,112,840.10 in contract and retainage claims related to its work at the Corpus Christi Plant and (b) additional damages totaling $19,289,852.99 for certain alleged "delay and interruption/inefficiency claims and wrongfully disputed change order work."  Demand for Arbitration, at ¶¶ 11-12.

13.      As set forth in the *Declaration of Melinda M. Riseden in Support of Debtors' Objection to Motion of WFS Construction Services, LLC for Modification of the Automatic Stay to Permit a Pending Arbitration Proceeding to Continue to Determine the Validity and Amount of Filed Mechanics' Liens*, attached hereto as Exhibit A (the "Riseden Declaration"),

notwithstanding that the Contracts were fixed lump sum contracts, in the Arbitration, WFS seeks approximately $19 million in "extra" costs related to work it performed at the Corpus Christi Plant.  <u>See</u> Riseden Decl., at ¶ 9.  The Debtors have disputed WFS' process in asserting this "extra damages" claim, as well as the substance of the claim.  <u>See</u> <u>id.</u>  The Contracts contain detailed change order procedures, intended to identify issues generating possible price adjustments as they occur.  <u>See</u> <u>id.</u>  Only approximately 5% of the WFS "extra damages" claim involves rejected change orders.  <u>See</u> <u>id.</u>  Meanwhile, for approximately 95% of WFS' $19 million "extra damages" claim, there do not appear to be any contemporaneous requests for price adjustment.  <u>See</u> <u>id.</u>  The Debtors believe this creates a contractual hurdle to WFS' recovery in the Arbitration.  <u>See</u> <u>id.</u>  Moreover, the absence of contemporaneous documentation by WFS means that the discovery process is likely to be much more detailed and time-consuming than it would have been had WFS properly documented its claims.  <u>See</u> <u>id.</u>

14.     Contrary to WFS' assertions in the Motion, the Arbitration has not advanced significantly beyond its initial stages.  <u>See</u> Motion, at 12.  No discovery has been produced by either party, no depositions have been taken and no substantive proceedings have been held in the Arbitration.  <u>See</u> Riseden Decl., at ¶ 12.  At a minimum, the Debtor Defendants' defense of the Arbitration will require:  (a) further investigation of WFS' claims (and, in particular, WFS' claims for delay- and change order-related damages); (b) various depositions of fact and expert witnesses, many of whom have yet to be identified; (c) the promulgation of written discovery requests, such as admissions and interrogatories; and (d) document discovery.  <u>See</u> <u>id.</u> at ¶ 13.

15.     Although a preliminary hearing in the Arbitration was held on July 5, 2017, during which an evidentiary hearing was scheduled to begin on May 15, 2018, the Debtors believe that given the imposition of the automatic stay and the pace of discovery prior to the

Petition Date, even if the automatic stay were lifted immediately, the evidentiary hearing in the Arbitration could not go forward as currently scheduled, and likely would not commence until late fall of 2018 at the earliest.  See id. at ¶ 14.

## II.     ARGUMENT

### A.     WFS Has Failed to Make a *Prima Facie* Showing of Entitlement to Relief from the Automatic Stay

16.     The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws."  In re Aleris Int'l, Inc., 456 B.R. 35, 46 (Bankr. D. Del. 2011) (quoting Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot., 474 U.S. 494, 503 (1986)).  It "was intended to give the debtor 'a breathing spell from [the debtor's] creditors.  It stops all collection efforts, all harassment, and all foreclosure actions.  It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove [the debtor] into bankruptcy.'"  Borman v. Raymark Indus., Inc., 946 F.2d 1031, 1033 (3d Cir. 1991) (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6296-97).  Further, the automatic stay was designed "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor."  Aleris, 456 B.R. at 46 (quoting Borman, 946 F.2d at 1036).

17.     Section 362(d)(1) of the Bankruptcy Code provides that a court may grant relief from the automatic stay for "cause."  See 11 U.S.C. § 362(d)(1).  The statute does not define what constitutes sufficient "cause."  However, "'courts generally consider the policies underlying the automatic stay in addition to the competing interests of the debtor and the movant' when determining whether there is sufficient cause to grant relief from the automatic stay."

In re W.R. Grace & Co., No. 01-01139, 2007 WL 1129170, at *2 (Bankr. D. Del. Apr. 13, 2007) (quoting Am. Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 152 B.R. 420, 424 (D. Del. 1993)).

> **1.** **Courts in This Jurisdiction Apply the "Balance of Harms" Test in Determining Whether Cause Exists to Lift the Automatic Stay to Allow Nonbankruptcy Proceedings to Commence or Continue**

18.     In determining whether "cause" to lift the stay exists, courts in the Third Circuit consider "the totality of the circumstances in each particular case." Aleris, 456 B.R. 35, 47 (quoting Baldino v. Wilson (In re Wilson), 116 F.3d 87, 90 (3d Cir. 1997)). "[T]o establish cause, the party seeking relief from the stay must show that [the] balance of hardships from not obtaining relief tips significantly in [its] favor." Id. (citation and quotation marks omitted).

19.     To determine the balance of the hardships, courts in this jurisdiction look to three factors (sometimes referred to as the "Rexene factors"):  (a) "whether any great prejudice to either the bankrupt estate or the debtor will result from lifting the stay;" (b) "whether the hardship to the non-bankrupt party by the maintenance of the stay *considerably outweighs* the hardship to the debtor if the stay is lifted;" and (c) "whether it is probable that the creditor will prevail on the merits of its case against the debtor." Aleris, 456 B.R. at 47-48 (emphasis added) (citing, *inter alia*, Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.), 141 B.R. 574, 576 (Bankr. D. Del. 1992)); see also In re Nortel Networks Corp., 445 B.R. 370, 375 (Bankr. D. Del. 2011) (in case where movant sought stay relief to resolve a dispute with the debtor in arbitration, stating that "[f]actors courts consider in determining if cause exists are (a) prejudice to the debtor's estate, (b) hardship to the moving party and (c) probability of success on the merits") (citation omitted); In re Samson Res. Corp., 559 B.R. 360, 370 (Bankr. D. Del. 2016) (applying Rexene factors); In re Scarborough-St. James Corp., 535 B.R. 60, 67-68 (Bankr. D. Del. 2015)

(same); <u>In re ABC Learning Ctrs. Ltd.</u>, 445 B.R. 318, 337 (Bankr. D. Del. 2010) (same); <u>Tribune Media Servs., Inc. v. Beatty (In re Tribune Co.)</u>, 418 B.R. 116, 126 (Bankr. D. Del. 2009) (same).

20.     Contrary to the weight of authority in this jurisdiction, WFS asserts in the Motion that the Court should apply a different test in determining whether cause exists to lift the automatic stay—namely, the 12-factor test articulated by the Second Circuit in <u>Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)</u>, 907 F.2d 1280 (2d Cir. 1990).[4]  Although some courts in this District have referenced the <u>Sonnax</u> factors to aid in deciding whether stay relief was appropriate in certain cases, those courts generally have used such factors to supplement the <u>Rexene</u> "balance of hardships" analysis—not as a substitute for it. <u>See</u>, <u>e.g.</u>, <u>In re SCO Grp., Inc.</u>, 395 B.R. 852, 856-60 (Bankr. D. Del. 2007) (stating that "[t]his Court has developed a three-prong balancing test [<u>i.e.</u>, the <u>Rexene</u> factors] to determine if cause exists to lift the stay to allow pending litigation to proceed or continue in another forum;" supplementing <u>Rexene</u> analysis with reference to <u>Sonnax</u> factors, describing them as "general policies").  Accordingly, WFS' reliance on the Second Circuit's <u>Sonnax</u> factors to the exclusion of this jurisdiction's "balance of hardships" test is misplaced.

---

[4]     <u>See</u> Motion, at 8.  The <u>Sonnax</u> factors are:  "(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms."  <u>Sonnax</u>, 907 F.2d at 1286.

### 2. As the Moving Party, WFS Has the Burden of Demonstrating That Cause Exists to Lift the Automatic Stay

21. The moving party bears the initial burden of demonstrating that sufficient cause exists to justify lifting the automatic stay. Section 362(g)(2) provides that "the party opposing such relief [i.e., relief from the automatic stay] has the burden of proof" on all issues other than the debtor's equity in property. See 11 U.S.C. § 362(g)(2). Nevertheless, as stated by this Court, "[i]nitially, the Court must determine whether [the movant] has made a prima facie showing that it is entitled to the requested relief.… 'If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.'" Aleris, 456 B.R. at 46-47 (quoting Sonnax, 907 F.2d at 1285); see also Scarborough-St. James, 535 B.R. at 68 ("The movant has the initial burden of proof to put forth a prima facie case for cause before the debtor must then rebut the case.") (citing Rexene, 141 B.R. at 577); In re DBSI, Inc., 432 B.R. 126, 132 (Bankr. D. Del. 2010) ("Prior to undertaking a hardship balancing analysis, the Court must determine whether the [movant] has made a prima facie showing that it is entitled to the relief it seeks.") (citations omitted); Tribune, 418 B.R. at 127 ("Generally, … section 362(g) is interpreted as placing an initial burden on the moving party to establish its prima facie case which must then be rebutted by the party opposing such relief. To apply section 362(g)(2) otherwise … would force the debtor to prove a negative, that no cause exists.") (quoting Rexene, 141 B.R. at 577).

### 3. WFS Has Not Met Its Burden of Demonstrating That Cause Exists to Lift the Automatic Stay

#### (a) Lifting the Automatic Stay at This Time Will Greatly Prejudice the Debtors

22. The Debtors commenced these Cases to enable them to conduct an orderly, efficient and cost-effective sale process consistent with the purposes of the Bankruptcy Code, for

the benefit of all stakeholders.  To that end, the Debtors proposed, and the Court entered, the Bidding Procedures Order, which establishes deadlines of March 6 and March 8, 2018 for, respectively, final bids on the Corpus Christi Plant assets and the auction of such assets. To further facilitate the sale process and ultimate resolution of these Cases, the Debtors also have proposed the Lienholder Settlement Procedures, which are designed to foster near-term settlement discussions with lienholders and enable the Debtors to expediently and cost-effectively resolve lienholder claims without the need for costly and protracted piecemeal litigation.  The Debtors are motivated to resolve lienholder claims under the proposed Lienholder Settlement Procedures, not only due to exigencies of the sale timeline, but also because settling such claims will give bidders clarity with respect to the component of the Cash Amount (as defined in the Bidding Procedures) allocated to these claims.  See Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order, at § VI.A.5.

23.    Lifting the automatic stay to allow the Arbitration to continue now would greatly prejudice the Debtors, because resuming the Arbitration now (as opposed to enabling WFS and the Debtor Defendants to resolve their dispute via the proposed Lienholder Settlement Procedures) would significantly delay the resolution of WFS' breach of contract claims and a determination regarding the validity and amount of WFS' liens.  As set forth in the Riseden Declaration, the Arbitration remains in its preliminary stages, no discovery has been exchanged and no witnesses have been deposed.  Riseden Decl., at ¶ 12.  As currently scheduled, the evidentiary hearing in the Arbitration will not commence until May 2018, and the Debtors believe that, given the challenges of conducting discovery in this matter and the delay caused by the commencement of these Cases, the evidentiary hearing cannot realistically begin until the fall of 2018 at the earliest.  Id. at ¶ 14.  Contrary to WFS' assertions in the Motion (see Motion, at 9),

forestalling any adjudication of WFS' lienholder claims until at least five months—and possibly

up to a year—from now and forcing the Debtors to focus their funds and energies toward

litigating that dispute threatens to undermine the Debtors' efforts to resolve lienholder claims in

an efficient and cost-effective manner pursuant to the proposed Lienholder Settlement

Procedures.[5]

24.     In addition, lifting the automatic stay as to the Arbitration promises significant

interference with the administration of these Cases and, in particular, with the process for

determining the validity and amount of the various mechanics' and materialmen's liens.  Given

the number of lienholders involved in these Cases, a finding of "cause" with respect to

the Arbitration could result in an avalanche of similar requests for relief (whether involving

arbitration or other nonbankruptcy proceedings).  As many courts have recognized, the Debtors

should not have to divert their limited resources to respond to a multitude of "lift stay" requests

as they are endeavoring to conserve dwindling resources and resolve their chapter 11 cases.

See, e.g., In re Residential Capital, LLC, No. 12-12020, 2012 WL 3555584, at *3

(Bankr. S.D.N.Y. Aug. 16, 2012) (denying a motion for relief from the automatic stay where

"[l]ifting the stay … could open the floodgates for other movants who also seek stay relief[.]");

Truebro, Inc. v. Plumberex Specialty Prods., Inc. (In re Plumberex Specialty Prods., Inc.),

311 B.R. 551, 556 (Bankr. C.D. Cal. 2004) ("the automatic stay serves the two-fold purpose of

prevent[ing] the diminution or dissipation of the bankruptcy estate and enabl[ing] the debtor to

---

[5]     Moreover, even if the Arbitration were to continue, because WFS seeks only a determination of
the validity and amount of its liens in the Arbitration (see Motion, at 1), the Arbitration would not determine the
priority of WFS' liens *vis-à-vis* other non-mechanics' lien secured claims, which issue this Court likely would still
need to determine.

avoid the multiplicity of claims arising against the estate in different forums") (citation and quotation marks omitted).  The Court also should reject WFS' contention that "Debtors will be no more distracted by an arbitration than they would by an adversary proceeding in this Court" (see Motion, at 10), because it presumes that only two paths forward exist when, in fact, the Debtors seek to resolve the lienholder claims, including the claims asserted by WFS in the Arbitration, pursuant to the proposed Lienholder Settlement Procedures, without the need to resume the Arbitration or commence an adversary proceeding.[6]

25.    In light of the foregoing, lifting the automatic stay to permit the Arbitration to proceed at this time would greatly prejudice the Debtors at a critical time in their efforts to effect a successful sale process and resolve these Cases.  Moreover, because the Debtors have proposed procedures designed to promote cost-effective, near-term settlements of lienholder claims, including those asserted by WFS in the Arbitration, the additional time and expense the Arbitration would require may, in fact, prove unnecessary and wasteful.[7]

    **(b)**     **The Hardship to WFS by the Maintenance of the Automatic Stay Does Not Outweigh the Hardship to the Debtors if the Stay is Lifted**

26.    WFS has not met its burden of showing that "the hardship to [WFS] by the maintenance of the stay *considerably outweighs* the hardship to the [D]ebtor[s] if the stay is lifted."  See Aleris, 456 B.R. at 47 (emphasis added).  In fact, the Motion does not directly

---

[6]    The Debtors, however, reserve all of their rights to challenge WFS' liens and any bankruptcy or litigation claims asserted by WFS, including in the context of an adversary proceeding.

[7]    Shortly before WFS filed the Motion, the Debtors reached out to WFS concerning settlement discussions in conjunction with the proposed Lienholder Settlement Procedures.  The Debtors fully expect and plan to continue such settlement discussions with WFS.

address this factor at all. WFS may perceive that it will enjoy a "home court advantage" in the Arbitration, but the lack of any such perceived advantage in this Court does not constitute a "hardship" sufficient to demonstrate a prima facie showing of cause to lift the automatic stay (and WFS does not so argue). In the Motion, WFS states that because the Arbitration "has progressed into the discovery phase[,] [i]t would be unjust to now undo the time and effort spent in arbitration, including the time spent selecting an experienced construction panel, and planning for the arbitration hearing." Motion, at 12-13. This assertion also fails to demonstrate any imbalance of hardships, because the Arbitration remains in its preliminary stages and, in any event, the costs of discovery and of preparing for an eventual hearing are borne equally by WFS and the Debtor Defendants. Because the Motion contains no discernable argument that the burden on WFS by the automatic stay considerably outweighs the burdens on the Debtors if the automatic stay is lifted (discussed above), WFS has not made the required prima facie showing of "cause."

### (c)  WFS Has Not Shown a Likelihood of Succeeding on the Merits

27. Finally, WFS has not met its burden of showing that it is likely to succeed on the merits, and the Motion does not directly address this factor. According to the Motion (and not any declaration from a WFS witness competent to testify to such facts), approximately $19,289,850 of WFS' total claim amount of approximately $24,402,690 consists of claims for damages allegedly arising from "delay and interruption/inefficiency claims and wrongfully disputed change order work" (collectively, the "Excess Damages Claims"). Motion, at 4. Although the Demand for Arbitration contains numerous factual allegations, the Motion lacks any factual support or written testimony via declaration supporting WFS' claims (and, in particular, the Excess Damages Claims), and fails to evaluate the relative strength of any

potential counterarguments or otherwise address WFS' likelihood of success on the merits.

Moreover, as discussed in paragraph 13 above, based on discovery conducted to date,

the Debtors believe that the Excess Damages Claims may be both procedurally and substantively

infirm.

28.     The Debtor Defendants intend to vigorously oppose WFS' claims should the

Arbitration proceed, including by challenging many of the factual assertions set forth in the

Demand for Arbitration.  Because the Debtor Defendants have not yet filed any substantive

papers in the Arbitration, and have neither received any document discovery nor conducted any

depositions, the Debtors are not prepared (nor, given potential issues of privilege and

confidentiality, should they be required) to outline potential defense strategies in this Objection.

It is WFS' sole burden, however, to demonstrate a likelihood of success on the merits.  Because

WFS has not made such a <u>prima</u> <u>facie</u> showing, the Motion must fail.

### 4.     The Relevant *Sonnax* Factors, on Balance, Weigh in Favor of Enforcing the Automatic Stay

29.     To the extent that the Court determines it is appropriate to analyze the <u>Sonnax</u>

factors in conjunction with applying the "balance of harms" test, each of the relevant <u>Sonnax</u>

factors either weigh in favor of enforcing the automatic stay as to the Arbitration at this time, or

are neutral, for the following reasons:

- <u>The interests of judicial economy and the expeditious and economical resolution of litigation</u>.  This factor weighs heavily in favor of enforcing the automatic stay. As set forth above, the Debtors have proposed the Lienholder Settlement Procedures for the express purpose of resolving lienholder claims, including those of WFS, in an efficient and cost-effective manner.  While the proposed Lienholder Settlement Procedures are designed to resolve lienholder claims in the near term while minimizing burdens on the parties and the Court, the Arbitration would saddle the Debtor Defendants with months of discovery-related expenses with no prospect of a final determination on the immediate horizon.  Lifting the automatic stay to allow the Arbitration to continue also risks "opening the floodgates" to numerous other lift-stay motions that would consume the Debtors'

scarce resources and distract their professionals from administering the sale process and successfully resolving these Cases for the benefit of all stakeholders.

- <u>Whether the parties are ready for trial in the other proceeding</u>. This factor weighs in favor of enforcing the automatic stay. As discussed above, the parties are not close to being ready for trial in the Arbitration. <u>See</u> Riseden Decl., at ¶¶ 12-14. Discovery remains in its early stages, no documents have been exchanged and no depositions have been taken, much less scheduled. <u>See id.</u> at ¶ 12. Pursuant to the existing schedule in the Arbitration, the evidentiary hearing will not commence until May 2018 at the earliest. The Debtors further believe that given the commencement of these Cases and other factors, the hearing cannot realistically be held until the fall of 2018 at the earliest. <u>See id.</u> at ¶ 14.

- <u>Lack of any connection with or interference with the bankruptcy case</u>. This factor militates in favor of enforcing the automatic stay for the reasons discussed in Section II.A.3.a above.

- <u>Impact of the stay on the parties and the balance of harms</u>. This factor weighs in favor of enforcing the automatic stay for the reasons discussed in Section II.A.3 above.

- <u>Whether litigation in another forum would prejudice the interests of other creditors</u>. This factor weighs in favor of enforcing the automatic stay. Although no creditors have objected to WFS' asserted liens on property of the estate to date, adjudicating WFS' claims as part of the chapter 11 proceedings likely would afford creditors greater rights to participate and object than they would have in the Arbitration.

- <u>Whether a specialized tribunal with the necessary expertise has been established to hear the cause of action</u>. This factor is neutral. Although the arbitration panel may be considered "specialized," this Court also has the "necessary expertise" to determine the validity and priority of liens arising under state law, <u>see</u> <u>Quality Props., LLC v. Pine Apple Conveyor Serv., Inc. (In re Quality Props., LLC)</u>, No. 10-40132, 2011 WL 6161010, at *3 (Bankr. N.D. Ala. Nov. 29, 2011) ("Admittedly, the adjudication of the validity, extent and priorities of mechanics' liens … is, to a large extent, based on state law. However, … determining the validity (including perfection) of liens arising under state law and determining their priorities are tasks frequently performed by bankruptcy courts in the course of the claims-allowance process, restructuring the debtor-creditor relationship, liquidation of estate assets, and administration of the estate."), and has presided over cases involving similar and even more complex types of claims. <u>See</u>, <u>e.g.</u>, <u>In re Essar Steel Minnesota LLC</u>, No. 16-11626 (BLS) (Bankr. D. Del.) (Docket No. 441, 448) (mechanics' and miners' liens under Minnesota law); <u>In re Longview Power, LLC</u>, Adv. Proc. No. 14-50744 (BLS) (Bankr. D. Del.) (mechanics' lien claims under West Virginia law) (Docket No. 1, 49); <u>In re Semcrude, L.P.</u>, No. 08-11525 (BLS) (Bankr. D. Del.) (Docket No. 600,

1557 (more than 1,000 purchaser claims involving lien and reclamation rights under the laws of numerous states).

- Whether relief would result in a partial or complete resolution of the issues. This factor is neutral, because either this Court or the arbitration panel may fully adjudicate WFS' claims.[8]

For all of these reasons, the relevant Sonnax factors, on balance, favor enforcing the automatic stay and do not support a finding of cause to lift the stay under the circumstances of these Cases.

### B. The Court Has Discretion to Decide Whether to Enforce the Automatic Stay

30. The Court should reject WFS' broad contention that "Federal courts widely accept that the bankruptcy court has no discretion and must stay its own proceedings to allow arbitration to continue in non-core matters …." Motion, at 6. WFS appears to have reached this conclusion based upon two cases (cited elsewhere in the Motion) decided by the same Delaware District Court Judge in which the District Court applied the core/non-core distinction in the context of lift-stay motions involving arbitration. See Hylland v. Northwestern Corp. (In re Northwestern Corp.), 319 B.R. 68, 74-76 (D. Del. 2005); Atl. Marine, Inc. v. Am. Classic Voyages Co. (In re Am. Classic Voyages Co.), 298 B.R. 222, 225-26 (D. Del. 2003). It is debatable, however, whether the District Court was correct to apply the core/non-core distinction in the context of lift-stay motions in those cases, because the Third Circuit case on which both decisions principally relied was decided in the context of a motion to compel arbitration, and had nothing to do with relief from the automatic stay. See Am. Classic Voyages, 298 B.R. at 225-26 (citing

---

[8]     The Debtors concur with WFS that the remaining Sonnax factors are not relevant here. See Motion, at 10-12.

Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, 885 F.2d 1149, 1155-1157 (3d Cir. 1989)); Northwestern, 319 B.R. at 74-75 (citing Hays, 885 F.2d at 1161).[9]

31.    At least one court has expressly addressed the distinction between a motion to compel arbitration, on the one hand, and a lift-stay motion to allow arbitration to continue, on the other hand, for purposes of bankruptcy court discretion.  See Kittay v. Landegger (In re Hagerstown Fiber L.P.), 277 B.R. 181, 204 (Bankr. S.D.N.Y. 2002) ("SBCCS never moved to compel arbitration …, and I did not treat its motion as anything other than one for relief from the stay [to allow arbitration to continue].  Stay relief motions give a bankruptcy court considerable discretion, and I exercised that discretion based upon application of the [lift-stay balancing] factors."); see also In re Woods, 517 B.R. 106, 117 (Bankr. N.D. Ill. 2014) (denying plaintiff's motion for relief from the automatic stay to allow prepetition arbitration to proceed, and rejecting argument that the court lacked discretion to deny relief from stay; stating that "[i]n short, even though this court has the authority to hear the [plaintiff's nonbankruptcy] Claim, whether or not this court has such authority, this court may in fact decline to grant relief from stay, and this argument fails to establish an independent factor for granting relief from the stay").

---

[9]    As this Court recognized in Cote v. Fresh & Easy, LLC (In re Fresh & Easy, LLC), No. 15-51906 (BLS), 2016 Bankr. LEXIS 2883, at **11-12 (Bankr. D. Del. June 2, 2016), even as to motions to compel arbitration, bankruptcy court discretion does not turn on whether the underlying claims are core or non-core.  See id. (citing Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze), 434 F.3d 222, 229 (3d Cir. 2006), which held, in the context of a motion to compel arbitration, that "[t]he core/non-core distinction does not, however, affect whether a bankruptcy court has the discretion to deny enforcement of an arbitration agreement.…  It merely determines whether the bankruptcy court has the jurisdiction to make a full adjudication.").  Unlike the instant matter, Fresh & Easy involved a motion to compel arbitration filed by the debtor after the plaintiff commenced an adversary proceeding— and thus did not implicate the automatic stay.  See Fresh & Easy, 2016 Bankr. LEXIS 2883, at **3-4.

32.     In the lift-stay context, finding that the Court has discretion, and requiring movants to establish a prima facie showing of cause under this jurisdiction's "balance of hardships" test, gives proper weight to the importance of the automatic stay to the Debtors' reorganization efforts and its essential nature as a core protection provided to all debtors under the Bankruptcy Code—a concern that does not arise in most "motion to compel arbitration" cases, where both parties seek an immediate adjudication and the dispute simply relates to which forum is more appropriate.

33.     Importantly, the Debtors are aware of no decisions of the Third Circuit Court of Appeals holding that bankruptcy courts lack discretion to determine whether to lift the automatic stay to allow arbitration proceedings to continue, and WFS cites none.  Moreover, recent decisions of this Court addressing lift-stay motions in the arbitration context make no mention of the core/non-core distinction, but rather simply apply this jurisdiction's "balance of harms" test applicable in lift-stay actions.  See In re Nortel Networks Corp., 445 B.R. 370, 373-75 (Bankr. D. Del. 2011); In re Abeinsa Holding, Inc., No. 16-10790, 2016 WL 5867039, at **2-5 (Bankr. D. Del. Oct. 6, 2016).

34.     In sum, the Debtors acknowledge that cases involving requests to allow pending arbitrations to continue require consideration of the federal policy favoring arbitration and its intersection with bankruptcy law.  It does not follow, however—and WFS has not established— that the Court's discretion to apply the "balance of harms" test in deciding the Motion is limited.

**C.      The Court Should Disregard WFS' Premature Argument for Abstention**

35.     Section III of the Motion, dealing with abstention, does not relate to any live controversy before the Court and, consequently, should be disregarded for purposes of deciding the Motion.  See Motion, at 13-17.  As a mere preview of arguments WFS intends to make if and

when the Debtors contest WFS' liens or commence an adversary proceeding against WFS (neither of which has occurred), this section is premature and phrased in the conditional. Indeed, WFS repeatedly admits in the Motion that the issue of abstention relates only to a potential controversy that may arise in the future between WFS and the Debtors, not any live dispute before the Court. See, e.g., id. at 13 ("No objection to any of the WFS Liens has been filed. That being said, if such an objection is filed, or if the Debtors would seek to have the amount or validity of the WFS Liens decided in an adversary proceeding, and if this Court does not find 'cause' to exist to lift the stay … the Court should … abstain …."); id. at 14 ("Debtors have not filed any objection to any of WFS's Liens nor have they filed any adversary proceeding pertaining to WFS's Liens, but assuming that Debtors intend to file such objections or proceeding … WFS is proactively filing this Motion to expedite resolution of its claims."). As a premature argument relating to a hypothetical controversy that may or may not actually come before this Court, WFS' abstention arguments should be disregarded for purposes of deciding the Motion. The Debtors, however, reserve all of their rights to respond to WFS' arguments regarding abstention as and when appropriate.

## Conclusion

36.     For all of the reasons set forth herein, the Debtors respectfully request that (a) the Motion be denied in its entirety and (b) the Court grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  January 10, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Joseph M. Mulvihill*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:        ljones@pszjlaw.com
                joneill@pszjlaw.com
                jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:      (212) 326-3939
Facsimile:      (212) 755-7306
Email:          sgreenberg@jonesday.com
                scorririvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:      (216) 586-7035
Facsimile:      (216) 579-0212
Email:          ceblack@jonesday.com

Co-Counsel for the Debtors and Debtors in
Possession