# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| M & G USA CORPORATION, *et al.*,[1] | Case No. 17-12307 (BLS) <br> (Jointly Administered) |
| Debtors. | D.I. 568 |

## OBJECTION OF
## THE CONSTRUCTION LIENHOLDER GROUP TO THE DEBTORS' MOTION
## TO ESTABLISH LIENHOLDER CLAIM SETTLEMENT PROCEDURES

Certain construction lien[2] claimants (collectively, the "Construction Lienholder Group"),[3] by and through their undersigned counsel, file this objection to the motion of the above-captioned debtors (the "Debtors") for entry of an order establishing lienholder claim settlement procedures [Docket No. 568] (the "Settlement Procedures Motion"), and in support of its objection, the Construction Lienholder Group states as follows:

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à.r.l. (1270), M&G Chemicals, S.A. (1022), M&G Capital S.à.r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062), and Indo American Investments Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2] The term "construction lien" is intended to encompass all mechanic's, contractors' or materialman's liens arising under and pursuant to Texas property law.

[3] The members of the Construction Lienholder Group are (i) Apache Industrial, Services, Inc., (ii) Arc Energy Services, Inc., (iii) Axis Industrial Services, LLC, (iv) Bay Ltd, (v) CCC group, Inc., (vi) Dawkins On-Site Concrete, LLC, (vii) Fagioli, Inc., (viii) Garrett Mechanical, Inc. (ix) TCI Business Capital as assignee of Integrity Mechanical Specialists, (x) Lexicon, Inc., (xi) Lion Point Capital, (xii) MEITEC, Inc., (xiii) Mirage Industrial Group, LLC, (xiv) MMR Constructors, Inc., (xv) Montcalm USA, Inc. (xvi) N&A Project Management USA, Inc., (xvii) Repcon, Inc., (xviii) SimplexGrinnell, LP, (xix) Sunbelt Rentals, Inc., (xx) TNT Crane & Rigging Inc., (xxi) WFS Construction Company LLC, and (xxii) Wholesale Electric Supply of Houston, Inc.

9937499/3

## Introduction

As this Court is aware, the Debtors' cases are the result of the Debtors' efforts to build a vertically integrated PTA/PET plant in Corpus Christi, Texas (the "Corpus Christi Plant"),[4] for which construction was alleged to have begun in April 2013. As of the Petition Date, the Corpus Christi Plant was still not completed, and a number of the mechanics and materialmen have significant construction liens claims to which they are entitled as a matter of applicable Texas law, which claims include interest, legal fees and expenses. To date, more than $250 million of construction liens have been asserted in connection with the Corpus Christi Plant.

There are, as this Court is aware, a number of significant and substantive issues with respect to the amount of each of the construction liens, and the priority of the security interests, including which portions are "removeable" and therefore entitled to the highest priority under Texas law. During the hearings on December 11 and 12, 2017, to consider the Debtors' motions to approve sale procedures and postpetition financing, the Debtors, the Creditors Committee, the Construction Lienholder Group, and the Court all agreed that there was an need for a process to address the construction liens in the context of establishing a reserve from the sale sufficient to pay all of the claims of construction lienholders from the proceeds from the sale of the Corpus Christi Plant.

Based upon the importance of the issue of the underlying claims of construction lienholders, the Construction Lienholder Group is pleased that the Debtors sought a process that advances the issue of settling construction lienholders' claims. Unfortunately, if the Settlement Procedures Motion was intended to create a process that would either result in the resolution of construction lienholders' claims through settlement, or this Court being able to establish a

---

[4] As part of the DIP Motion and the Sale Motion, the Debtors use the terms "CC Property" and "CC Assets." The use of the term "Corpus Christi Plant" is intended to include all of the Corpus Christi Plant upon which the construction lienholders have a security interest.

2

narrowly-tailored reserve from the proceeds of the sale of the Corpus Christi Plant, then the Settlement Procedures Motion is an abject failure.

The Construction Lienholder Group respectfully requests that the Settlement Procedures Motion be denied unless modified to provide each of the following:

- Remove any requirement that settling lienholders need to file anything with the Nueces County office until after they receive payment on account of their claim;
- Require that the Debtors shall provide notice of any proposed settlement, including the terms of the proposed settlement, to all parties who have entered their appearance in the case, or at any bare minimum, provide notice of settlements, including the terms of the settlement, to any construction lienholder whose claim is alleged to be duplicative of the claim that is being settled;
- Remove the requirement for mediation of objections to settlement and the requirement that settlements must include a waiver of claims against multiple Debtors;
- To the extent that both parties agree, permit the Debtors and any construction lienholder to mediate the claims and counterclaims without need for any further Court order;
- Require any claims and counterclaims of any construction lienholder and any of the Debtors that are subject to an arbitration provision be promptly liquidated through arbitration without need for any motion for stay relief;
- Require that the Debtors promptly allow access to the Corpus Christi Plant to any construction lienholders asserting a claim for removeables for determination as to what is removeable and the value of such removeables; and
- Establish a reasonable deadline after the approval of the sale by which the Debtors will either file an objection or commence an adversary proceeding with respect to all disputed claims or liens of construction lienholders.

Absent such changes, the Settlement Procedures Motion should be denied.

## **Background**

1. According to the Debtors, in April 2013, the Debtors began construction the Corpus Christi Plant owned by M & G Resins USA, LLC, one of the Debtors. Upon information and belief, the general contractor for the Corpus Christi Plant was Chemtex International, Inc., another of the Debtors. Upon information and belief, construction of the Corpus Christi Plant initially was

3

expected to be completed in December 2015, however the construction ceased prior to October 24, 2017 at only 85% complete.

### Prepetition Security Interests in the Corpus Christi Plant

2. To date, more than $250 million of construction liens have been asserted against the Corpus Christi Plant, of which more than $191 million are claims asserted by members of the Construction Lienholder Group.

3. On March 21, 2013, Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financier ("Inbursa") entered into a loan agreement in the amount of $250 million with M&G Resins (the "Inbursa Loan Agreement"), and Deed of Trust, Assignment of Rents, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing was recorded on March 22, 2013 (the "Inbursa Deed of Trust"). Pursuant to the Inbursa Loan Agreement, Inbursa provided an advance of $250 million to M&G Resins for the construction of the Corpus Christi Plant. The Debtor alleges that, in April 2013, the Company began construction on the Corpus Christi Plant. See Stogsdill Declaration, ¶ 9. On or about September 2, 2016, pursuant to the Second Amendment to the Inbursa Loan Agreement, Inbursa arranged to make a second advance totaling $140 million. On or about May 4, 2017, Inbursa arranged to make a third advance to the Debtors totaling $40 million.

4. On May 20, 2015, the Debtors and DAK Americas LLC ("DAK") entered into a capacity reservation agreement (the "Capacity Reserve Agreement"). By and through the Capacity Reserve Agreement, DAK agreed to provide unsecured funding to the Debtors in the form of upfront money for the purpose of purchasing future product. Nineteen months later, on December 27, 2016, DAK recorded a Subordinated Deed of Trust, Assignment of Rents, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing, which purported to

9937499/3

secure the Debtors' obligations arising under the Capacity Reserve Agreement with the Corpus Christi Plant.

5.  There has been no judicial determination as to the relative priority of the secured claims of Inbursa, DAK, and the construction lienholders.

**The Debtors' Bankruptcy Filings**

6.  On October 24, 2017, M & G Polymers USA, LLC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On October 30, 2017 (the "Petition Date"), the other Debtors commenced these chapter 11 cases (together with the chapter 11 case of M & G Polymers, the "Cases").

7.  On November 13, 2017, the United States Trustee appointed the official committee of unsecured creditors (the "Unsecured Creditors Committee"). No construction lienholders serve – or were invited to serve – as members of the Unsecured Creditors Committee.

**The Debtors' Financing and Bid Procedures Motions**

8.  On October 31, 2017, the Debtors filed a Motion to Approve Postpetition Financing [Docket No. 14] (the "DIP Motion"). By and through the DIP Motion, the Debtors sought, among other things, authority to borrow and use in excess of $100 million. On December 6, 2017, the Construction Lienholder Group filed an objection to the DIP Motion [Docket No. 380].

9.  On November 16, 2017, the Debtors filed a motion for entry of orders (i)(a) approving bidding procedures for the sale of certain of the debtors' assets, (b) authorizing the debtors to enter into one or more stalking horse purchase agreements and to provide bid protections thereunder, (c) scheduling an auction and approving the form and manner of notice thereof, (d) approving assumption and assignment procedures and (e) scheduling a sale hearing and approving the form and manner of notice thereof; (ii)(a) approving the sale of certain of the debtors' assets

free and clear of liens, claims, interests and encumbrances and (b) approving the assumption and assignment of executory contracts and unexpired leases; and (iii) granting related relief [Docket No. 173] (the "Bid Procedures Motion"). On December 6, 2017, the Construction Lienholder Group filed an objection to the Bid Procedures Motion [Docket No. 381].

10. On November 20, 2017, the Debtors filed motion for entry of an order (i) establishing lien identification procedures and (ii) granting related relief [Docket No. 241] (the "Construction Bar Date Motion"). In support of their Motion, the Debtors stated that they were seeking "to conduct a fair and reasonable process by which the Debtors can obtain information regarding the existence and basis of all claimed Liens on the Corpus Christi Plant." Further, the Debtors stated that their proposed lien identification procedures would "(a) provide the Debtors with time to evaluate the number, amount and priority of Liens being asserted against the Corpus Christi Plant, which will assist in the evaluation of qualifying bids and (b) assist potential bidders — including any credit bidding parties — in formulating a qualifying preliminary indication of interest ahead of the Proposal Deadline, and ultimately, a qualifying bid ahead of the Final Bid Deadline. Because the Debtors believed that the Corpus Christi Plant is their most valuable asset, these procedures are necessary to the sale process and thus, to maximizing the value of the estates." Construction Bar Date Motion, pp. 4-5. Based upon the importance of determining the amount of construction liens on their most valuable asset, the Debtors sought to establish a deadline of January 15, 2018 for all parties asserting a construction lien would be required to file a form containing certain factual and legal information. Notably, the deadline sought was (i) before the Debtors' deadline to file their schedules and statements of financial affairs (which was extended through January 22, 2018), and (ii) before the February 15, 2018 deadline for construction lienholders to perfect their liens under applicable Texas law. On December 4, 2017, the

9937499/3

Construction Lienholder Group filed an objection to the Debtors' Construction Bar Date Motion [Docket No. 341].

**The Hearing on December 11 and 12, 2017**

11. Prior to the hearings to consider the motions on December 11 and 12, 2017 (the "December Hearing"), the Debtors and Construction Lienholder Group were able to resolve a significant number of issues raised by the Construction Lienholder Group in connection with the DIP Motion, Bid Procedures Motion, and Debtors' Construction Bar Date Motion. With respect to the remaining issues at the conclusion of the December Hearing, the Court considered the DIP Motion and the Bid Procedures Motion and the remaining objections thereto, and granted the motions, overruling the objections in part and sustaining them in part.

12. Significantly, at the December Hearing, the Debtors, the Construction Lienholder Group, multiple construction lienholders, and this Court all addressed the need for a process for the establishment of an adequate reserve from the proceeds of the sale of the Debtors' assets, pending a determination as to the rights of the construction lienholders' and other parties' rights, including the amounts and relative priority of their secured claims. As stated by the Debtors: "[a] process . . . will need to be put in place to reserve for appropriate amounts for the Senior Prior Liens in whatever priority they're ultimately determined to be." Transcript, Dec. 12, 2017, p. 45.

13. Further, as stated by this Court:

> I am acutely aware that there is not consensus about the relative lien priority and positions of the parties. I am also aware that, in the event that there is a process that results in proceeds coming into the estate, at some point, we will need to figure out who gets what, and that's a pretty basic bankruptcy proposition. It's not clear, and I don't think we're going to answer today, what that process will look like. But the primary and, frankly, legitimate concern, particularly expressed by the lien -- mechanics' lien claimants, is they just want to make sure that they don't wind up with a pig in a poke, and I think I get that. And we'll have to come up with a process, and we can talk about that a little bit. But I don't think that the process is a today issue, so long as there is confidence that there will, in fact, be a process that will play itself out prior to disbursal of funds."

7

Transcript, Dec. 12, 2017, pp. 45-56.

14. On December 29, 2917, the Debtors filed the Settlement Procedure Motion with no input from the Construction Lienholders Group.

## BASIS FOR DENIAL OF MOTION

15. The Construction Lienholder Group appreciates that the Debtors have proposed a process, such as it is. Respectfully, the Construction Lienholder Group believes that process would have been far better had it been proposed with the input of the parties with whom the Debtors seek to reach a consensual resolution, rather than the half-a-loaf process for which the Debtors now seek approval.

16. Ultimately, the problem is that the proposed procedures are not directed toward achieving settlement. In fact, some provisions sought directly undermine the likelihood of settlement. Further, in so doing, the Debtors seek to encroach upon all creditors' due process rights, particularly those claimants who may have a pecuniary interest in the settlement. Accordingly, as currently constituted, the proposed procedures should be denied.

**A. The requirement that settling lienholders need to file anything with the Nueces County office until they receive payment on account of their claim should be removed.**

17. The Debtors seek the following under the proposed procedures:

Settlement Agreements shall require the applicable Lienholder party thereto to file in the land records of Nueces County, Texas (i) upon the effective date of such Settlement Agreement, a lien release or similar document limiting such Lienholder's lien against the Debtors' assets to the Lienholder Claim amount agreed to under such Settlement Agreement (the "Settled Lienholder Claim Amount") and (ii) upon the distribution by the Debtors (or such other mechanism agreed upon or authorized by order of the Court) of the applicable net proceeds from the sale of the Corpus Christi Plant to such Lienholder of the Settled Lienholder Claim Amount that is payable from such distribution, a final lien release providing that the Lienholder's Lienholder Claim has been fully and finally satisfied and that no lien remains in respect thereof on the Debtors' property. . . .

8

Settlement Procedures Motion, p. 9.

18. It is hard to envision that any party would agree to file a release or otherwise limit its lien or the underlying claim prior to receiving payment, any more than a bank would agree to file a notice of satisfaction of its mortgage prior to receiving payment. The issue here is even more acute given the reservation of the rights of the DIP Lender and the Pre-Petition First Lien Lender with respect to any Settlement Agreement for which their prior written consent was not obtained. Were that not enough, construction lienholders are entitled to interest, legal fees and expenses. So if it ultimately takes two years to litigate the relative priorities of the parties claiming a security interest in the Corpus Christi Plant, the Construction Lienholders will entitled to two years of interest and legal fees and expenses to the extent incurred in connection with any such litigation, and it is not reasonable to expect that that any construction lienholder will agree to waive its right to interest prior to actually receiving payment on account of its claim. Accordingly, this provision should be stricken.

    **B.    All notices of proposed settlements should include the amounts of the underlying claims and the terms of the proposed settlement, and should be sent to all parties who have entered their appearance in the cases.**

19. Federal Bankruptcy Rules 2002(a)(3) and 9019, provides that creditors are entitled to notices of all settlements. The Local Bankruptcy Rules permit the Court to further limit notice requirements for certain matter in Chapter 11 cases. See Delaware Local Bankruptcy Rule 2002-1(b) ("In chapter 11 and chapter 15 cases, all motions (except matters specified in Fed. R. Bankr. P. 2002(a)(1), (4), (5), (7), 2002(b), 2002(f) and 2002(q) and Local Rules 4001-1 and 9013-1) shall be served only upon counsel for the debtor, counsel for the foreign representative, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices under Fed. R. Bankr. P. 2002(i) and all parties whose rights are affected by the motion, as

applicable"). Nothing in the Federal or Local Bankruptcy Rules permits the court to abrogate or otherwise impair the due process rights of any party whose rights may be directly and adversely affected to reasonable and meaningful notice and an opportunity for hearing.

20. Requiring notices of settlement permits parties the opportunity to review and evaluate any proposed settlement and object to any settlement that they believe is not the product of the debtor's sound business judgment. With respect to the Tier I and Tier II Lienholder Settlements, the Debtors are seeking to avoid providing meaningful notice of settlements to construction lienholders and other parties that have filed requested for service of notices under Fed. R. Bankr. P. 2002(i). Without any factual basis for the settlements, including the underlying claims and the amount of the settlements, no party in interest can reasonably evaluate the proposed settlement.

21. More insidiously yet, the Debtors are intentionally seeking to avoid providing notice of settlement to parties whose rights will be directly and adversely affected by the proposed settlement. Specifically, the Debtors have repeatedly stated (without any factual basis, but solely upon their belief) that "many of the construction lienholders' claims are duplicative, with multiple contractors and subcontractors asserting claims on account of the same." See Settlement Procedure Motion, ¶ 6. See also Lienholder Bar Date Motion, p. 3. n.3. Still, the Debtors seek to limit notice of Tier I and Tier II settlements.

22. The Debtors also propose to redact the settlement amount from each notice provided to any party, thereby completely negating the very purpose of the notice. Bankruptcy Code section 107, in conjunction with the Bankruptcy and Local Rules, clearly sets forth the types of information that may remain confidential, including information which contains a trade secret or confidential research, development, or commercial information. See 11 U.S.C. § 107(b)(1).

The Debtors are able to seek relief from this Court pursuant to Bankruptcy Code section 107 as applicable. However, there is no reason why the Debtors should seek blanket authority to not state the amount of the claims and the amount of the proposed settlement on any notice. The settlements are not trade secrets, and each of the claims and potential counterclaims, to the extent that there are any, are sui generis. Requiring that the Debtors provide information to creditors who have an interest – particularly those who have a direct pecinuary interest[5] – will not disadvantage the Debtors or any other party. Rather it will simply require that the Debtors satisfy their obligations under the Bankruptcy Code and Bankruptcy Rules.

C. **The requirement for mediation of settlement disputes should be stricken.**

23. By the Settlement Procedures Motion, the Debtors seek to require mediation where a party objects to a proposed settlement. Specifically, the Debtors seek the following:

> In the event that (A) all or a portion of such Lienholder Claim is disputed and no consensual resolution is reached between the Debtors and the Lienholder or (B) a Settlement Notice is filed by the Debtors, but a Settlement Objection is filed and remains unresolved, then after a motion is filed for the Court to resolve the dispute, but before a hearing on the motion takes place, the Debtors, the Lienholder and, to the extent applicable, the party or parties asserting the Settlement Objection, shall participate in Court-ordered mediation pursuant to Local Rule 9019-5.

Settlement Procedures Motion, p. 7.

24. There is simply no legal basis to require mediation of a party who objects to a settlement where that party does not want to mediate. More importantly, such procedures are a waste of the estates' and parties' time and money. Beyond that, requiring mediation would be unfair to the party who entered into a settlement in good faith, and would likely require that the settling party wait to receive payment on account of their settled claim until the notice of settlement

---

[5] At a bare minimum, the Debtors should be required to provide notice of all proposed settlements, including the proposed terms of such settlement, to any construction lienholder where the proposed settlement involves any purported duplication of claims. Absent such a requirement, it is foreseeable that the Debtors would seek to settle the claims of multiple lienholders based upon alleged duplication.

11

9937499/3

is filed, for mediation to be held, and then a subsequent hearing to determine the merits of the objection. All the mediation requirement will do is cause delay and expense while chilling – rather than increasing – the likelihood that construction lienholders will consider negotiating with the Debtors, rather than simply litigating their claims.

25. Accordingly, the provision requiring mediation of settlement disputes should be stricken.

### D. The requirement that all settlements permit claims against only one Debtor should be stricken.

26. Lienholder Claim Settlement Procedure (c) provides, among other things, as follows

> (c) Any Settlement Agreement shall grant the applicable Lienholder an allowed claim against only one Debtor, unless the Court orders otherwise or are consented to by the Committee, the Pre-Petition First Lien Lender and the DIP Lender. Regardless of the dollar amount of the settlement, no Settlement Agreement will fix or determine the relative priorities of liens securing a Lienholder Claim and the liens securing the Pre-Petition Obligations or the DIP Obligations (each as defined in the DIP Orders) unless the Debtors and the applicable Lienholder have obtained the prior written consent of the Pre-Petition First Lien Lender and the DIP Lender, respectively.

Settlement Procedures Motion, p. 8.

27. There is no basis to require that any claimant be limited to asserting a claim against only one Debtor. These cases are jointly administered, not substantively consolidated,[6] and there is no basis in law for requiring that any party agree to waive any claim. As this Court is well aware, parties can (and frequently do) agree to waive certain claims as part of a settlement, but

---

[6] The proposal of requiring a construction lienholder to waive its claims against one (or more) Debtor in favor of asserting its claim against only one Debtor creates an unwaivable conflict among the estates. It is unclear how the Debtors (whose CRO works for all but one of the Debtors, and their counsel who work for all of the Debtors) or the Creditors' Committee (who is supposed to represent the interests of all unsecured creditors for all of the estates) can favor one (or more) estates over other estates without violating their respective fiduciary duties.

12

9937499/3

including that as a requirement may undermine the estates' ability to negotiate a settlement with a construction lienholder has a claim for which multiple debtors are jointly and severally liable.

      **E.**     **To the extent that both parties agree, the procedures should permit the Debtors and any construction lienholder to mediate the claims and counterclaims without need for any further Court order.**

28. Prior to the Petition Date, there was distrust among the Debtors and the construction lienholders. Historically, the Debtors have contested the entirety of a significant number of claims of construction lienholders. In fact, many of the construction lienholders have already had conversations with the Debtors and it appears unlikely that the Debtors are going to settle with construction lienholders absent some mechanism. This distrust has continued since the bankruptcy filing. For example, on December 21, 2017, the Debtors filed a list of contracts which may be assumed and assigned as part of their sale process [Docket No. 537]. Notably, of the fifteen executory contracts with construction lienholders, ten were listed as having cure amounts of $0.[7] As evidenced by the number of objections filed in response to the cure amounts, the construction lienholders disagree with the Debtors' assessment.

29. With that background, and despite this Court highlighting the possibility of judicial mediation,[8] it is surprising that the Settlement Procedures Motion does not provide for mediation

---

[7]     In their Omnibus Reply to Objections and Joinders to the Debtors Motion to for Entry of an Order (i) Establishing Lien Identification Procedures, and (ii) granting Related Relief [Docket No. 385] the Debtors stated "the Debtors will be filing Schedule D for Debtors M & G Resins USA, LLC and M&G Waters USA, LLC . . . prior to the December 11 hearing on the Lien Identification Motion." The Debtors did not file Schedule D prior to the December 11 hearing. In fact, more than a month later, the Debtors still have not filed Schedule D (or any other schedules and statements of financial affairs). The deadline for the Debtors to file their schedules and statements of financial affairs is January 22, 2017. The Construction Lienholder Group looks forward to reviewing the Debtors schedules.

[8]     See Transcript, Dec. 12, 2017, pp 49-50. ("There does need to be a process of some sort. . . . .I will leave it to you folks. If, as it relates to the process, you believe that it might be helpful to have a mediator, again, I'm not going to make a -- I'm not going suggesting it or recommending it because I'm not in the room with you folks. And you've all done these sorts of things before, but there are a lot of moving parts. And you've got a whole lot of secured creditors, you've got a whole lot of mechanics' lien creditors. We've got overlay of bankruptcy and the state law issues. And again, not necessarily even to resolve the issues on the merits, but to say this is how we're going to get it done because one of the concerns I have is that you will reach consensus on the process in the fourth week of January,

9937499/3

of the construction lienholder claims. It is particularly puzzling since the Debtors (certainly after getting approval from Inbursa) seek mediation for something so unusual as an objection to a motion to approve settlement of a claim objection.

30. As currently drafted, the Debtors' Proposed Settlement Procedures Order, would specifically not even require the Debtors to *negotiate* with the construction lienholders. If the Debtors are serious about settling the disputed construction lien claims and the liquidating claims to enable the Court to establish a narrowly-tailored reserve, the Debtors should act like it. Specifically, where any construction lienholder agrees to mediation, the parties should mediate the underlying construction lien claim. The Construction Lienholder Group respectfully submits that the product of mediation has far greater promise for settlement discussions solely between the Debtors and the construction lienholders.

**F.  Any claims and counterclaims of any construction lienholder and any of the Debtors that are subject to an arbitration provision shall be promptly liquidated through arbitration without need for any motion for relief.**

31. Similarly, the Construction Lienholder Group understands that a number of the construction lienholders may be parties to contracts with one of more of the Debtors that include arbitration provisions.

32. Solely by way of example, one member of the Construction Lienholder Group, WFS Construction Company, LLC ("WFS"),[9] has asserted a total claim of $24,402,693.00 arising from two contracts to perform work at the Corpus Christi Plant. Prior to the Petition Date, WFS

---

requiring five weeks of trial by me by the end of January. And I only say that because it's happened. So I'm -- again, I'm just asking the parties to be flexible. . . . ")

[9] On December 27, 2017, WFS filed a motion for modification of the automatic stay to permit a pending arbitration proceeding to continue to determine the validity and amount of filed mechanics' liens [Docket No. 549]. The Debtors have subsequently objected to WFS' Motion [Docket No. 645].

14

9937499/3

perfected its liens by filing affidavits with the county clerk of Nueces County in accordance with Section 53.052 of Texas Property Code. WFS and "Chemtex International Inc.," one of the Debtors, met for a "formal negotiation" meeting between executives in Houston, Texas on November 11, 2016 pursuant to the parties' agreements. Prior to that formal negotiation, the parties exchanged contention letters pertaining to WFS's claims (including statements regarding the bases of WFS's claim, and Chemtex's claimed defenses to WFS's claim). The formal negotiation meeting was not successful, and WFS filed a lawsuit to enforce its mechanic's liens in Nueces County on January 3, 2017. WFS' lawsuit was stayed because of the arbitration provision in the parties' agreements. Prior to and during mediation on March 29, 2017 in Houston, WFS provided the Debtors with significant and substantive information regarding its claims. Ultimately, the mediation was unsuccessful, and the Debtors and WFS were scheduled to go to arbitration on May 15, 2018. In anticipation of arbitration, the parties were reviewing even more internal documents pertaining to the dispute between Debtors and WFS, preparing those documents for production. The parties were scheduled to formally exchange documents no later than November 4, 2017, however the arbitration was stayed by the filing of these bankruptcy cases. Even without the information to be exchanged through discovery, based solely upon the public filings, the formal negotiation and mediation process, and the arbitration process, the Debtors have more information than they reasonably need in order to be able to determine the amount of WFS' claim.

33. It is already clear that, for examples such as WFS, there is not going to be a settlement by discussions or even through mediation (particularly in the case of WFS who has already unsuccessfully mediated). Further, based upon the Federal Arbitration Act, this Court can't adjudicate the underlying claim absent an agreement of the parties. See, e.g., Mintze v. Am.

Gen. Fin. Serv.'s (In re Mintze), 434 F.3d 222 (3d Cir. 2006), In re Fleming Companies, Inc., 325 B.R. 687, 694 (Bankr. D. Del. 2005) (enforcing prepetition arbitration provisions). See also Cote v. Fresh & Easy, LLC (In re Fresh & Easy, LLC), Adv. No. 15-51906(BLS), Memorandum Order (Bankr. D. Del. June 2, 2016) (enforcing arbitration provision over the plaintiff's objection).

34. Ultimately, the goal should be to quickly and efficiently liquidate the claims of the construction lienholders' claims. Refusing to arbitrate claims that are premised upon contracts that include arbitration provisions, will only delay the inevitable process and require that the Debtors establish a reserve large enough to include the entirety of the claims being asserted.

G. **Require that the Debtors allow access to the Corpus Christi Plant so that any construction lienholders asserting a claim for removeables can evaluate what is removeable and the value of such removeables.**

35. Under applicable nonbankruptcy (i.e., Texas) law, construction lienholders' claims for removeables are, as a matter of Texas law, senior to the Senior Pre-Petition First Liens. See Texas Prop. Code § 53.123. Because removeables have the highest priority, no proceeds from the sale of the Corpus Christi Plant can be distributed unless and until the issue of the amount of the removeables is resolved.

36. The Construction Lienholder Group on behalf of some, but not all, of its members has repeatedly requested that the Debtors provide construction lienholders asserting a claim for removeables access to the Corpus Christi Plant so that their expert(s) can evaluate what is (and is not) removeable, and the value of such removeables. To date, the Debtors have refused to provide the Construction Lienholder Group with any response to the request for access.

37. At some point prior to the sale of the Corpus Christi Plant, the Debtors are going to have to provide access to the construction lienholders, and the Debtors steadfast refusal will only

16
9937499/3

end up causing the Construction Lienholder Group or the individual construction lienholders (or both) to file motions for access (for which they will seek legal fees and expenses).

38. Ultimately, the issue of removables will have to be determined by this Court. If it is to be done, then it would be best if done quickly.

**H. Establish a reasonable deadline after the approval of the sale by which they will file an objection or commence an adversary proceeding with respect to all claims or liens of construction lienholders.**

39. Finally, in connection with their request to set a bar date for construction lienholders, the Debtors stated their need for an expedited process for the Debtors to obtain information to evaluate the number, amount and priority of liens. In so doing, the Debtors sought to require that construction lienholders - and only construction lienholders - file documents in support of their liens before any general bar date and even ahead of the deadline by which they would otherwise be entitled to perfect their liens in accordance with applicable nonbankruptcy law. Presumably, the Debtors wanted this additional time as an opportunity to evaluate the construction lienholders' claims, rather than contriving a bar date solely for the purpose of denying and expunging otherwise valid claims. Now that the Debtors have (or shortly will have) all of the underlying claim information, there is no reason why the process of determining the validity of the claims should be endless.

40. The Construction Lienholders Group recognizes and appreciates that debtors are generally left to their own time to address claims issue, and the Construction Lienholders Group is not seeking to require that the Debtors immediately turn to resolving every claim filed by a construction lienholder. The Construction Lienholders Group realizes that the most important and immediate matter is selling the Corpus Christi Plant and other assets. After that, the next priority should be distributing the proceeds of the sale.

17

9937499/3

41. In that vein, the Debtors should be required to establish deadline after the approval of the sale of the Corpus Christi Plant by which they (or any other party) either file an objection or commence an adversary proceeding with respect to all claims or liens of construction lienholder, and any claims which are not resolved or the subject of an objection or adversary proceeding will be allowed.

42. To be clear, the Construction Lienholders Group is not seeking a draconian deadline, but a reasonable deadline is appropriate, particularly since, pursuant to 11 U.S.C. § 506 and applicable Texas law, construction lienholders are entitled to interest, legal fees and expenses, which will continue to accrue.

## RESERVATION OF RIGHTS

43. The Construction Lienholder Group expressly reserves its right to supplement this objection at any time at or prior to the hearing to consider the Settlement Procedures Motion.

**WHEREFORE**, for foregoing reasons, the Construction Lienholder Group respectfully requests that the Court (i) approve the proposed settlement procedures, subject to the following (a) removing the requirement that any construction lienholder entering into a settlement be required to file a lien release or similar document limiting such Lienholder's lien against the Debtors' assets to the Lienholder Claim amount agreed to under such Settlement Agreement prior to payment of the claim in full, (b) removing the required waiver of claims against multiple debtors as part of any settlement, (c) allowing all arbitrations between the Debtors and construction lienholders to proceed immediately without need for relief from stay, (d) requiring that the Debtors provide meaningful notice of any proposed settlements, including the terms of the settlement, to all parties and removing the requirement of mediation of any unresolved objection to a proposed settlement, (e) requiring that the Debtors provide reasonable access to the construction lienholders, including

any professionals retained on their behalf, to evaluate the removables at the Corpus Christi Plant, and (f) establishing a reasonable deadline after the approval of the sale by which they will file an objection or commence an adversary proceeding with respect to all claims or liens of construction lienholders; and (ii) granting to the Construction Lienholder Group such other and further relief as is just and proper.

Dated: January 11, 2018

MORRIS JAMES LLP

Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Brenna A. Dolphin (DE Bar No. 5604)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899-2306
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: emonzo@morrisjames.com
E-mail: bdolphin@morrisjames.com

*Counsel to the Construction Lienholder Group*