# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| M & G USA CORPORATION, *et al.*,[1] | : | Case No. 17-12307 (BLS) |
|  | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : |  |

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS (I) AUTHORIZING THE DEBTORS TO ENTER INTO A STALKING HORSE PURCHASE AGREEMENT AND PROVIDE EXPENSE REIMBURSEMENT THEREUNDER; (II)(A) APPROVING THE SALE OF CERTAIN ASSETS OF M & G POLYMERS USA, LLC FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (III)(A) AUTHORIZING POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364; (B) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS TO STALKING HORSE PURSUANT TO 11 U.S.C. §§ 364 AND 507; (C) PROVIDING ADEQUATE PROTECTION; (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND LOCAL RULE 4001-2; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

move the Court pursuant to sections 105, 363 and 365 of title 11 of the United States Code

(the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1 and 9006-1 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), for entry of an order, substantially in the form attached

hereto as Exhibit A (the "Stalking Horse Order"):

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M&G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

(i)     approving and authorizing the Debtors to enter into the stalking-horse asset purchase agreement substantially in the form attached hereto as <u>Exhibit F</u> (the "<u>Stalking Horse APA</u>") by and between M & G Polymers USA, LLC ("<u>M&G Polymers</u>"), as seller, M & G USA Corporation ("<u>M&G USA</u>"), solely for the purposes set forth therein, and Indorama Ventures Holdings LP U.S., as purchaser (together with its permitted designees, successors and assigns in accordance with the Stalking Horse APA, "<u>Indorama Ventures</u>" or the "<u>Stalking Horse</u>"), subject to higher and better offers submitted in accordance with the Bidding Procedures (as defined below), in connection with the sale (the "<u>Sale</u>" or the "<u>Apple Grove Sale</u>") of M&G Polymers' entire right, title and interest in and to its (a) manufacturing facility located in Apple Grove, West Virginia (the "<u>Apple Grove Plant</u>"), (b) the research and development center located in Sharon Center, Ohio ("<u>Sharon Center</u>") and (c) certain other property related thereto, including, among other things, related real property, equipment, fixtures, permits, contracts and records (such property, with the Apple Grove Plant and Sharon Center, the "<u>Purchased Assets</u>");[2]

(ii)    authorizing the Debtors to pay the expense reimbursement (the "<u>Expense Reimbursement</u>") set forth in and pursuant to the terms of the Stalking Horse APA;

(iii)   granting the Lender or the Stalking Horse (following assignment by Lender to the Stalking Horse of Lender's rights under the Polymers DIP Facility to Credit Bid the outstanding Obligations owed under the Polymers DIP Facility) the right to Credit Bid towards the Purchase Price for the Purchased Assets the outstanding Obligations (as defined in the DIP Loan Agreement) owed to Lender under the Polymers DIP Facility, provided that the amount of such Credit Bid shall be limited to $3 million until the indefeasible payment in full in cash of the Prepetition Obligations (as defined in the Polymers Final Cash Collateral Order), subject to such amount increasing in an amount equal to the amount of any increase in the cash portion of the Purchase Price, whether through an amendment of the Stalking Horse APA or subsequent bidding at the Auction for the Purchased Assets;[3] and

(iv)   granting related relief.

---

[2]    The Stalking Horse APA does not cover all of the Apple Grove Assets (as defined in the Bidding Procedures). More specifically, the Stalking Horse APA only applies to the Purchased Assets, and does not include the Barrier IP Assets (as defined in the Bidding Procedures) – *i.e.*, the Debtors' entire right, title and interest in and to their MGC PoliProtect barrier technology (including all associated patents) pertaining to the production of MGC PoliProtect barrier resin.

[3]    For the avoidance of doubt, during the period when the foregoing limitation is in effect, in the event the cash portion of the Purchase Price allocable to the Comerica Adequate Protection Lien (as defined in the Polymers CC Order) is equal to or greater than $7 million, the Lender shall be entitled to credit bid an amount of DIP Obligations up to $5 million.

The Debtors also move the Court, pursuant to sections 105, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001 and Local Rule 4001-2, for entry of an interim order in substantially the form attached hereto as <u>Exhibit B</u> (the "<u>Interim Polymers DIP Order</u>") and a final order (the "<u>Final Polymers DIP Order</u>"):

(i)      authorizing Debtor M&G Polymers to obtain postpetition superpriority debtor-in-possession financing (the "<u>Polymers DIP Facility</u>") from Indorama Netherlands B.V. ("<u>Indorama BV</u>" or the "<u>Lender</u>") pursuant to the terms set forth in (1) that certain *Debtor-in-Possession Credit and Security Agreement*, by and between M&G Polymers and the Lender in the form annexed as <u>Exhibit 1</u> to the Interim Polymers DIP Order and (2) all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, modified or supplemented from time to time, the "<u>DIP Loan Agreement</u>"),

(ii)      authorizing Debtor M&G Polymers to enter into the DIP Loan Agreement;

(iii)      authorizing the use of the proceeds of the Polymers DIP Facility on an interim basis in a manner consistent with the terms and conditions of the DIP Loan Agreement, including for the Lender to fund to M&G Polymers Advances (as defined in the DIP Loan Agreement), provided that M&G Polymers shall use the proceeds of the Advances only for the purpose of funding M&G Polymers' post-petition operations, professional fees and expenses and other items, all strictly in accordance with the allowed disbursements line item(s) set forth in the Budget (as defined in the DIP Loan Agreement), a copy of which is annexed to the Interim Polymers DIP Order as <u>Exhibit 2</u>;

(iv)      granting liens and superpriority administrative claims in connection with the Polymers DIP Facility;

(v)      granting adequate protection to Inbursa;

(vi)      authorizing and directing M&G Polymers to pay, without further order of the Court, the principal, interest and other obligations payable to the Lender under the DIP Loan Agreement as they become due, all as and to the extent provided in the DIP Loan Agreement, on an interim basis;

(vii)      vacating and modifying the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the Polymers DIP Facility;

(viii)      scheduling a final hearing for February 1, 2018 at 10:00 a.m. (prevailing Eastern Time) (the "<u>Final Hearing</u>") on this Motion for the Court to consider entry of the Final Polymers DIP Order, authorizing the borrowings under the Polymers DIP Facility on a final basis; and

(ix)     granting related relief.

Finally, the Debtors move the Court, pursuant to sections 105, 362, 365 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local Rule 6004-1, for entry of one or more orders in substantially the form attached hereto as <u>Exhibit C</u> (the "<u>Apple Grove Sale Order</u>"):

(i)     authorizing the sale of the Purchased Assets to one or more successful bidders at the auction, if any, for the Purchased Assets (the "<u>Apple Grove Auction</u>") free and clear of all liens, claims, interests and encumbrances (each such sale, an "<u>Apple Grove Sale Transaction</u>");

(ii)    authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith; and

(iii)   granting related relief.

In support of this Motion, the Debtors submit the Declaration of Dennis Stogsdill in Support of First Day Pleadings (the "<u>First Day Declaration</u>") [Docket No. 3], the Declaration of Neil A. Augustine in support of the DIP Motion (the "<u>DIP Declaration</u>"),[4] the Declaration of Suneel Mandava dated January 12, 2018 attached hereto as <u>Exhibit D</u> (the "<u>Mandava Declaration</u>") and the Declaration of Neil Augustine dated January 12, 2018 attached hereto as <u>Exhibit E</u> (the "<u>Augustine Declaration</u>" and, together with the First Day Declaration, the DIP Declaration and the Mandava Declaration, the "<u>Declarations</u>") and respectfully represent as follows:

---

[4] *Declaration of Neil A. Augustine in Support of Motion for Entry of Interim and Final Orders to (1) Authorize Certain Debtors in Possession to Obtain Post Petition Financing Pursuant To 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to Dip Lender Pursuant to 11 U.S.C. §§ 364 And 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and The Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2; and (6) Grant Related Relief* [Docket No. 51].

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.      General Background

2.      On October 24, 2017 (the "Polymers Petition Date"), Debtor M&G Polymers filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, thereafter, on October 30, 2017 (the "Petition Date"), each of the other Debtors commenced chapter 11 cases before this Court (together with the chapter 11 case of M&G Polymers, the "Cases").  The Debtors continue in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On November 13, 2017, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee") in these Cases.  Additional information regarding the Debtors and these Cases, including the Debtors' businesses, corporate structure and financial condition, is set forth in the First Day Declaration and is incorporated herein by reference.

### B.      The Apple Grove Assets

3.      The Apple Grove Assets are comprised of (a) the Apple Grove Plant, (b) Sharon Center and (c) the Barrier IP Assets.

Apple Grove Plant

4.      The Apple Grove Plant is a PET manufacturing plant located in Apple Grove, West Virginia and is owned by M&G Polymers.  The Apple Grove Plant has a PET production capacity of 360,000 metric tons per year.  Production at the Apple Grove Plant was adversely affected by the shutdown of operations in September 2017 at the PET manufacturing facility

operated by a non-Debtor affiliate in Altamira, Mexico (the "Altamira Plant"). The Apple Grove Plant derived almost half of its sales from PET resin produced by the Altamira Plant. After the Altamira Plant was closed, the Debtors, due to liquidity constraints, were unable to purchase the necessary raw materials to continue production at the Apple Grove Plant. The Apple Grove Plant consequently ceased production on October 22, 2017. *See* First Day Decl. ¶ 47.

5. Under the U.S. Inbursa Facility (as defined in the First Day Declaration), Inbursa has a first-priority lien on the Apple Grove Plant securing M&G Polymers' guaranty of certain obligations of Debtor M&G Resins USA, LLC under the U.S. Inbursa Facility. *Id.* ¶ 20. Under the Comerica Loan (as defined in the First Day Declaration), Comerica Bank ("Comerica") has a security interest in certain accounts receivable of M&G Polymers. *Id.* ¶ 26. After the Petition Date, the following adequate protection liens were granted on the Apple Grove Plant: (a) a senior adequate protection lien on the proceeds of a sale of the Apple Grove Plant in favor of Comerica, capped at $9.6 million and (b) a junior adequate protection lien on the proceeds of a sale of the Apple Grove Plant in favor of Inbursa. *See* Polymers Final Cash Collateral Order ¶ 5(b).

Sharon Center

6. Sharon Center is a research and development facility located in Sharon Center, Ohio owned by M&G Polymers. The Debtors have historically used the Sharon Center facility to undertake new product and new process development research. Sharon Center also conducts quality testing for its customers. After the Petition Date, the following adequate protection liens were granted on Sharon Center: (a) a senior adequate protection lien on Sharon Center in favor of Comerica, subject to any properly perfected, non-avoidable, first priority liens existing in such property as of the Petition Date and (b) a junior adequate protection lien on Sharon Center in favor of Inbursa. *See* Polymers Final Cash Collateral Order ¶ 5(b).

<u>The Barrier IP Assets</u>

7.        The Barrier IP Assets include the intellectual property (including all associated patents) exclusively pertaining to the production of MGC PoliProtect barrier resin with or without MGC Bico technology, which relates to the delivery system for PET pellets and is currently used in the Debtors' barrier resin products.  The Barrier IP Assets are owned by Debtor M & G USA Corporation.  The Barrier IP Assets secure the obligations under the DIP Financing (as defined below).  The Stalking Horse APA does not contemplate sale of Barrier IP Assets to the Stalking Horse and the Debtors are not providing the Barrier IP Assets as collateral for the Polymers DIP Facility.  Nevertheless, the Debtors understand that the Stalking Horse may separately bid for the Barrier IP Assets.

**C.        The Bidding Procedures**

8.        On November 16, 2017, the Debtors filed a motion seeking, among other things, approval of bidding procedures and ultimately the sale of the Debtors' assets, including the Apple Grove Assets.[5]  On December 14, 2017, the Court entered an order approving such bidding procedures (the "<u>Bidding Procedures</u>"),[6] pursuant to which, the Court established the following timeline for the sale of the Apple Grove Assets:[7]

---

[5]        *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 173].

[6]        *Order (I) (A) Approving Bidding Procedures For The Sale Of Certain Of The Debtors' Assets, (B) Authorizing The Debtors To Enter Into One Or More Stalking Horse Purchase Agreements And to Provide Bid Protections Thereunder, (C) Scheduling An Auction And Approving The Form And Manner Of Notice Thereof, (D) Approving Assumption And Assignment Procedures And (E) Scheduling A Sale Hearing And Approving The Form And Manner Of Notice Thereof And (II) Granting Related Relief* [Docket No. 490] (the "<u>Bidding Procedures Order</u>").

[7]        Capitalized terms used but not defined in the below chart have the meaning given to such terms in the Bidding Procedures.

| | |
|---|---|
| **December 11, 2017 at 1:00 p.m. (prevailing Eastern Time)** | Hearing to consider entry of the Bidding Procedures Order |
| **December 21, 2017 (prevailing Eastern Time)** | Deadline for Debtors to file Assumption and Assignment Notice |
| **January 3, 2018, at 5:00 p.m. (prevailing Eastern Time)** | Deadline to file Cure Objections with respect to Contracts held by M&G Polymers |
| **January 22, 2018, at 5:00 p.m. (prevailing Eastern Time)[8]** | Bid Deadline for Apple Grove Assets |
| **January 24, 2018, at 5:00 p.m. (prevailing Eastern Time)** | Deadline for objections to the applicable Sale Transaction(s) for the Apple Grove Assets other than Cure Objections and Adequate Assurance Objections |
| **January 29, 2018, 10:00 a.m. (prevailing Eastern Time).** | Auction for Apple Grove Assets, to be held at the offices of Jones Day, 250 Vesey Street, New York, New York 10281 |
| **January 31, 2018, at noon (prevailing Eastern Time)** | Deadline to file Adequate Assurance Objections with respect to Contracts held by M&G Polymers |
| **January 31, 2018, at 5:00 p.m. (prevailing Eastern Time)** | Deadline to file the replies in connection with the applicable Sale Transaction(s) for the Apple Grove Assets |
| **February 1, 2018, at 10:00 a.m. (prevailing Eastern Time)** | Proposed hearing to approve proposed Sale Transaction(s) for the Apple Grove Assets |

9.      The Bidding Procedures provide that the Debtors may seek "expedited Court approval of a Stalking Horse Agreement or Sale Transaction . . . with respect to some or all of the Apple Grove Assets."  Bidding Procedures at 3.  The Bidding Procedures also notified creditors that the Apple Grove Assets "will remain available for sale pursuant to these procedures so long as the Debtors have sufficient funding to maintain such assets through the closing of any sale of such assets."  *Id.*

---

[8]     Subject to Debtors' limited extension right set forth in Section V of the Bidding Procedures.

**D.** **The Debtors' Marketing Efforts and
the Negotiation of the Stalking Horse APA**

10.      As described in further detail in the First Day Declaration and the DIP Motion,[9]

leading up to the Petition Date, the Debtors' primary focus was on addressing severe liquidity

constraints due to the construction of a vertically integrated PTA/PET[10] plant in Corpus Christi,

Texas (the "Corpus Christi Plant"), as well as their related efforts to obtain $100 million in

debtor in possession financing (the "DIP Financing") in order to commence these Cases.

Although the Debtors' DIP Financing has provided certain Debtors with funding to maintain their

operations during these Cases, the DIP Financing does not provide funding to M&G Polymers.

Instead, M&G Polymers obtained postpetition liquidity through a cash collateral arrangement

with Comerica, which strictly limits M&G Polymers' use of cash.  This cash collateral

arrangement does not provide financing through a sale of the Purchased Assets and will expire

on January 31, 2018.  *See* Polymers Final Cash Collateral Order ¶ 3(b).

11.      M&G Polymers does not currently have access to any alternative liquidity to fund

its chapter 11 case past the expiration of the Comerica cash collateral arrangement.  Based on

M&G Polymers' constrained liquidity, part of the marketing process for the Apple Grove Assets

involved eliciting interest from potential stalking horse bidders to also provide liquidity to fund

---

9        *Motion for Entry of Interim and Final Orders to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2; and (6) Grant Related Relief,* [Docket No. 14] (the "DIP Motion").

10        As set forth in the First Day Declaration, the Debtors, together with the non-Debtor direct and indirect subsidiaries of M&G Chemicals S.A., are one of the largest producers of polyethylene terephthalate ("PET") resin for packaging applications in the world.  PET is a plastic polymer produced principally from purified terephthalic acid ("PTA") and monoethylene glycol, and is used to manufacture plastic bottles and other packaging for the beverage, food and personal care industries.

M&G Polymers through the closing of a sale of the Purchased Assets.  *See* Mandava Decl. ¶¶ 9-10.

12.     Subsequent to the Petition Date, the Debtors, with the assistance of Rothschild, engaged in discussions with certain interested parties regarding the purchase of some or all of the Apple Grove Assets, which are comprised of (a) the Purchased Assets (*i.e.*, among other things, the Apple Grove Plant and Sharon Center) and (b) the Barrier IP Assets.  M&G Polymers' funding constraints, however, required the Debtors to move quickly in connection with any potential going-concern sale of the Purchased Assets.  Rothschild and the Debtors thus expedited discussions with Indorama Ventures Public Company Limited ("IVL"), a party that expressed preliminary interest in the Apple Grove Assets.  *See* Augustine Decl. ¶ 9.

13.     IVL, through its affiliates including Indorama Ventures and Indorama BV, is one of the largest integrated polyester chain producers worldwide; its common stock is publicly listed on the Stock Exchange of Thailand (symbol: IVL).  It is headquartered in Bangkok, Thailand and operates 70 production sites in 24 countries.  IVL had revenue of approximately $7.2 billion in 2016.  Its core product is PET resin and it is the world's largest producer of PET.

14.     On September 17, 2017, IVL submitted a highly preliminary letter of intent (the "Initial LOI") indicating interest in purchasing certain of the Debtors' assets.  In connection with receiving the Initial LOI, the Debtors granted IVL access to due diligence and management.  Given IVL's diligence on certain of the Debtors' other assets, the Debtors believed that IVL could potentially be convinced to bid for the Purchased Assets.  *See* Augustine Decl. ¶ 10.

15.     In early November, following the expiration of the Initial LOI and the advancement of discussions among IVL and the Debtors and their advisors, IVL submitted an indication of interest relating to the Apple Grove Assets (the "November IOI").  Under the

November IOI, IVL expressed interest in paying M&G Polymers a monthly fee for several months in exchange for, among other things, an expansion of IVL's rights to use certain intellectual property. *See* Augustine Decl. ¶ 11.

16. Although the Debtors welcomed the November IOI as a starting point, the Debtors continued negotiating with IVL to improve the terms of the potential transaction. These continued negotiations involved the exchange of multiple offers and counteroffers throughout November. Among other things, the Debtors sought to change the transaction's structure away from a fee construct and towards a sale under section 363 of the Bankruptcy Code. These continued negotiations ultimately culminated in IVL's submission of an indication of interest, dated December 1, 2017 (the "December IOI"), which the Debtors accepted, subject to definitive documentation. Pursuant to the December IOI, IVL expressed interest in (a) purchasing the Apple Grove Assets, (b) acting as a stalking horse bidder in exchange for bid protections including a break-up fee and expense reimbursement and (c) offering up to $5 million of financing to fund a sales process in exchange for liens on certain of the Apple Grove Assets. The December IOI was premised on IVL's restarting the Apple Grove Plant following closing of the sale and the employment of individuals necessary to operate the plant. Subsequently, in January 2018, IVL modified its proposal to (a) shift its stalking horse bid from the Apple Grove Assets to only the Purchased Assets and (b) shift its requested bid protections from both a breakup fee and an expense reimbursement to only the Expense Reimbursement. These revised stalking horse bid terms were incorporated into the Stalking Horse APA. *See* Augustine Decl. ¶ 12.

17. The Stalking Horse APA has been extensively negotiated between the parties at arm's length and in good faith. As a result of the negotiations from September 2017 to January

2018, the Debtors received improved terms from IVL, ultimately culminating in the Stalking Horse APA. These included a higher purchase price, assumption of certain liabilities, the Polymers DIP Facility, the agreement to act as a stalking horse and an offer to purchase the Purchased Assets rather than merely financing the "mothballing" of the Apple Grove Plant in exchange for certain rights with respect to the other assets. *See* Augustine Decl. ¶ 13.

18.     The Debtors have marketed the Purchased Assets since the Petition Date through reaching agreement on the terms of the Stalking Horse APA. The Debtors will continue with their marketing efforts following the Stalking Horse APA's effectiveness, in compliance with the Bidding Procedures, the terms of the Polymers DIP Facility and the Stalking Horse APA, to ensure that the Apple Grove Sale process can be completed in a manner that will yield a value-maximizing result for the Debtors' stakeholders within the existing time and funding constraints applicable to M&G Polymers. *See* Augustine Decl. ¶ 14.

**E.     The Stalking Horse APA and Proposed Sale Order**

19.     The Stalking Horse APA confers substantial benefits on the Debtors' estates. As a general matter, the Stalking Horse APA provides a clear path to maximizing the value of the Purchased Assets. Before the Stalking Horse APA, certain parties had speculated that, in the near future, M&G Polymers may need to convert to a chapter 7 liquidation. One significant issue is that M&G Polymers' current funding source strictly limits M&G Polymers' use of cash, and does not contemplate financing M&G Polymers' operations through the closing of a sale. Moreover, pursuant to the existing cash collateral order for M&G Polymers, this limited funding will expire on January 31, 2018. *See* Mandava Decl. ¶ 5.

20.     Critically, the Stalking Horse APA is integrated with the Polymers DIP Facility, discussed in further detail below. With the Polymers DIP Facility, M&G Polymers will be able to continue to maintain its assets in a safe and responsible manner through of sale of the

Purchased Assets, thus providing M&G Polymers with the time needed to close a value-maximizing transaction. *See* Mandava Decl. ¶ 6.

21.     Moreover, the Stalking Horse APA sets a floor price for the Purchased Assets.  If the Purchased Assets are ultimately sold to the Stalking Horse, M&G Polymers would receive millions of dollars in proceeds, as well as divest itself of significant liabilities and ongoing material obligations, including those related to environmental compliance.  Finally, given that that Stalking Horse APA is premised upon the Stalking Horse's restart of the Apple Grove Plant, the Stalking Horse APA will preserve a significant number of jobs of employees needed to operate the plant.  *See* Mandava Decl. ¶ 7.

22.     In accordance with Local Rule 6004-1, the material terms of the Stalking Horse APA and proposed Sale Order are set forth in the following table:[11]

| Seller | M & G Polymers USA, LLC |
|---|---|
| Purchaser | Indorama Ventures Holdings LP U.S. (the "Purchaser") |
| Purchased Assets | Substantially all of Seller's rights in (a) the PET manufacturing site located in Apple Grove, West Virginia, (b) the research and development center located in Sharon Center, Ohio and (c) certain other property related thereto, including, among other things, related real property, equipment, fixtures, permits, contracts and records.  Stalking Horse APA § 2.1. |
| Purchase Price | $10 million.  Stalking Horse APA § 3.1(a). |
| Termination Fee and Expense Reimbursement | Break-Up Fee:  None.<br><br>Expense Reimbursement:  Up to a maximum of $350,000 for all reasonable and documented out-of-pocket costs (including reasonable attorneys' fees and expenses) incurred by Purchaser in connection with the transactions contemplated by the Stalking Horse APA and payable upon consummation of an Alternative Transaction.  Stalking Horse APA § 4.6. |
| Sale to Insider<br>*Del. Bankr. L.R. 6004-1(b)(iv)(A)* | The Purchaser is not an insider of the Debtors. |

---

[11]     The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse APA.  In the event of any inconsistencies between the provisions of the Stalking Horse APA and the terms set forth herein, the terms of the Stalking Horse APA will govern.  Capitalized terms used in this summary and not otherwise defined herein have the meanings given to them in the Stalking Horse APA.

| | |
|---|---|
| **Agreements with Management**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(B)* | There are no agreements between the Purchaser and management. |
| **Releases**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(C)* | The Stalking Horse APA does not contain any affirmative releases by either Purchaser or Seller. |
| **Private Sale/No Competitive Bidding**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(D)* | As set forth in the Bidding Procedures, the Apple Grove Auction will be conducted if sufficient Qualified Bids are received.  Bidding Procedures § VII.<br><br>The Seller is permitted to solicit competing offers for purchase of the Purchased Assets from third parties.  Stalking Horse APA § 7.4. |
| **Termination and Milestones**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(E)* | The Stalking Horse APA may be terminated as follows:<br><br>(a) by mutual written consent of Seller and Purchaser;<br><br>(b) by written notice of either Purchaser or Seller to such other party, if:<br><br>    (i) the Closing shall not have been consummated prior to or on February 26, 2018 (subject to extension),<br><br>    (ii) the Bankruptcy Court enters an order approving an Alternative Transaction entered into by Seller; or<br><br>    (iii) there is in effect a final and non-appealable Order prohibiting the consummation of the sale pursuant to the Stalking Horse APA;<br><br>    (iv) a legal proceeding has been instituted by the FTC seeking to restrain or prohibit the consummation of the transactions contemplated by the Stalking Horse APA.<br><br>(c) so long as Purchaser is not in breach of its obligations under the Stalking Horse APA, by Purchaser by written notice to Seller if:<br><br>    (i) Seller or M&G Corp. seeks to have (1) its bankruptcy case converted to a chapter 7 liquidation, (2) the appointment of a trustee or (3) the appointment of an examiner with enlarged power under section 1106(b) of the Bankruptcy Code;<br><br>    (ii) Seller's M&G Corp.'s bankruptcy case is dismissed or converted to a chapter 7 liquidation, or a trustee or examiner is appointed (subject to a cure period);<br><br>    (iii) the Stalking Horse Approval Order and Interim Polymers DIP Order shall not have been entered by the Bankruptcy Court by January 19, 2018;<br><br>    (iv) following entry of the Stalking Horse Approval Order and the Interim Polymers DIP Order, such orders shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any material respect without the prior written consent of Purchaser and Lender;<br><br>    (v) the Apple Grove Auction, if necessary, has not commenced by January 29, 2018;<br><br>    (vi) Purchaser is not determined by Seller to be the Successful Bidder or Backup Bidder with respect to the Purchased Assets after the Apple Grove Auction; |

| | |
|---|---|
| | (vii) the Final Polymers DIP Order shall not have been entered by the Bankruptcy Court by February 2, 2018; |
| | (viii) the Sale Order shall not have been entered by the Bankruptcy Court by February 2, 2018; |
| | (ix) the Sale Order has not become a Final Order by February 20, 2018; |
| | (x) an Event of Default (as defined in the Polymers DIP Loan Agreement) has occurred; |
| | (xi) any condition to the obligations of Purchaser set forth in Section 9.1 and Section 9.3 of the Stalking Horse APA has become incapable of fulfillment, and such condition is not waived by Purchaser; |
| | (xii) Seller or M&G Corp. breaches any representation or warranty or any covenant or agreement contained in the Stalking Horse APA, and such breach would result in a failure of a condition set forth in Section 9.1 or Section 9.3 of the Stalking Horse APA (subject to a cure period); |
| | (xiii) a Material Adverse Effect has occurred; or |
| | (xiv) Seller publicly takes material steps in furtherance of a chapter 11 plan that fails to provide for the Closing pursuant to the Stalking Horse APA; |
| | (d) so long as Seller is not in breach of its obligations under the Stalking Horse APA, by Seller by written notice to Purchaser if: |
| | (i) Purchaser breaches any representation or warranty or any covenant or agreement contained in the Stalking Horse APA, and such breach would result in a failure of a condition set forth in Section 9.2 or Section 9.3 (subject to a cure period); or |
| | (ii) the Bankruptcy Court approves an Alternative Transaction and such Alternative Transaction complies with the Bidding Procedures. |
| | (iii) Lender fails to fund the DIP Obligations (as defined in the Polymers DIP Order) as and when required by the Polymers DIP Loan Agreement. |
| | Stalking Horse APA § 4.4. |
| **Conditions to Closing**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(E)* | In addition to customary closing conditions, the following conditions apply: |
| | (a) fulfillment of the representations and warranties made under the Stalking Horse APA; |
| | (b) material performance and compliance with all obligations under the Stalking Horse APA; |
| | (c) delivery of certain transaction documents; |
| | (d) the absence of a Material Adverse Effect; |
| | (e) entry of the Sale Order; |
| | (f) entry of the Polymers DIP Orders; |
| | (g) Purchaser shall have entered into a new collective bargaining agreement or an amendment to the Collective Bargaining Agreement |

on terms and conditions acceptable to Purchaser and USW and that have been ratified by all parties to the Collective Bargaining Agreement (other than the Company), or (ii) the Bankruptcy Court shall have granted a motion acceptable to Purchaser filed by Seller pursuant to Section 1113(c) of the Bankruptcy Code authorizing Seller to reject the Collective Bargaining Agreement;

(h) the authorized representative of union-represented retirees shall have entered into an agreement acceptable to Purchaser and the authorized representative of union-represented retirees regarding Purchaser's obligations to pay Retiree Benefits after the Closing Date, or (ii) the Bankruptcy Court shall have granted a motion acceptable to Purchaser filed by Seller pursuant to Section 1114 of the Bankruptcy Code authorizing the modification or termination of Retiree Benefits on terms acceptable to Purchaser; and

(i) Purchaser's due diligence investigations relating to matters required to be disclosed on Schedule 5.6 or Schedule 5.10 shall not have resulted in discovery by Purchaser on or before January 17, 2018 of any event, state of facts or occurrence that would reasonably be expected to have a material adverse effect on the Business and Purchaser, taken as a whole, but only to the extent such event, state of fact or occurrence was not actually known to Purchaser after reasonable inquiry on or before January 11, 2018; provided, that Purchaser will provide written certification to Purchaser on January 17, 2018 as to whether this condition has been satisfied.

(j) absence of an order prohibiting the consummation of the transactions contemplated by the Stalking Horse APA;

(h) entry of the Sale Order and the Sale Order becoming a Final Order;

(i) all applicable requirements for compliance under the HSR Act, if any, shall have been satisfied; and

(j) there shall not be any ongoing antitrust investigation involving Purchaser's proposed acquisition of the Purchased Assets by the FTC; provided, however, that if any Legal Proceeding by the FTC seeking to restrain or prohibit the consummation of the transactions contemplated by the Stalking Horse APA (an "FTC Enforcement Action") has not been instituted, or threatened in writing to be instituted, by March 31, 2018 (the "FTC Deadline"), Section 9.3(d) of the Stalking Horse APA will no longer be a condition to either party's obligation to consummate the Closing; provided further, however, that if an antitrust investigation remains ongoing but an FTC Enforcement Action has not been instituted, or threatened in writing to be instituted, Purchaser and Seller may mutually agree in good faith to extend the FTC Deadline.

Stalking Horse APA §§ 9.1, 9.2, 9.3.

| | |
|---|---|
| **Good Faith Deposits**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(F)* | The Stalking Horse APA does not require the Stalking Horse Bidder to make a good faith deposit.  The Stalking Horse Bidder is required, however, to provide M&G Polymers with the Polymers DIP Facility.  Stalking Horse APA § 3.2. |
| **Interim Arrangements**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(G)* | The Stalking Horse Bidder is required to provide M&G Polymers with the Polymers DIP Facility.  Stalking Horse APA § 3.2. |

| | |
|---|---|
| **Use of Proceeds**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(H)* | The Stalking Horse APA contemplates that, upon consummation of an Alternative Transaction, the Debtors will pay the Expense Reimbursement. Stalking Horse APA § 4.6. |
| **Tax Exemption**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(I)* | The Stalking Horse APA does not contemplate that the Apple Grove Sale will be exempt from taxation under section 1146 of the Bankruptcy Code. |
| **Record Retention**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(J)* | Upon consummation of the sale approved by the Sale Order, and to the extent applicable, the Debtors or the Seller shall retain originals or copies of, and preserve in accordance with their discovery obligations, all hard copy documents and data and information that constitute Purchased Assets and any other document, data or information stored on or in servers, backup devices, mobile devices, electronic storage devices, or miscellaneous IT equipment, in each case, that constitutes Purchased Assets, currently in the Debtors' or the Seller's possession, custody, or control pertaining to pending or threatened litigation or necessary to administer these Cases. Sale Order ¶ 34. |
| **Sale of Avoidance Actions**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(K)* | No avoidance actions will be sold under the Stalking Horse APA. Stalking Horse APA § 2.2(f). |
| **Successor Liability**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(L)* | The Purchaser shall incur no successor liability with respect to the Purchased Assets. Sale Order ¶ K. |
| **Sales Free and Clear of Unexpired Leases**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(M)* | Except as may otherwise be provided in the Stalking Horse APA, the Purchaser shall acquire the Stalking Horse Assets free and clear of all liens and other interests pursuant to section 363(f) of the Bankruptcy Code. Sale Order ¶ 10. |

| | |
|---|---|
| **Credit Bidding**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(N)* | Pursuant to the Bidding Procedures, a person or entity holding a perfected security interest in the Debtors' assets may seek to credit bid some or all of their claims for their respective collateral if:<br><br>(i) a court has, as of the date of submission of such credit bid, entered a final, non-appealable order determining the validity, priority, and extent of the claims and liens that form the underlying basis of such credit bid; or<br><br>(ii) such person or entity is a Specified Lender.<br><br>The Lender or the Stalking Horse (following assignment by Lender to the Stalking Horse of Lender's rights under the Polymers DIP Facility to Credit Bid the outstanding Obligations owed under the Polymers DIP Facility) may Credit Bid towards the Purchase Price for the Purchased Assets the outstanding Obligations (as defined in the DIP Loan Agreement) owed to Lender under the Polymers DIP Facility, provided that the amount of such Credit Bid shall be limited to $3 million until the indefeasible payment in full in cash of the Prepetition Obligations (as defined in the Polymers Final Cash Collateral Order), subject to such amount increasing in an amount equal to the amount of any increase in the cash portion of the Purchase Price, whether through an amendment of the Stalking Horse APA or subsequent bidding at the Auction for the Purchased Assets. For the avoidance of doubt, during the period when the foregoing limitation is in effect, in the event the cash portion of the Purchase Price allocable to the Comerica Adequate Protection Lien (as defined in the Polymers CC Order) is equal to or greater than $7 million, the Lender shall be entitled to credit bid an amount of DIP Obligations up to $5 million. Stalking Horse Order ¶ 4(c); Bidding Procedures § VI.A.5. |
| **Relief from Stay**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(O)* | The automatic stay pursuant to section 362 of the Bankruptcy Code shall be modified with respect to the Debtors and the Seller to the extent necessary, without further order of the Court, to allow the Purchaser to deliver any notice provided for in the Stalking Horse APA and allow the Purchaser to take any and all actions permitted or required under the Stalking Horse APA in accordance with the terms and conditions thereof. The Purchaser shall not be required to seek or obtain any further relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other sale-related document. Sale Order ¶ 33. |
| **Relief from Bankruptcy Rule 6004(h) Stay**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(O)* | The Debtors seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) with respect to the effectiveness of the Sale Order. Sale Order ¶ 40. |

## F. The Polymers DIP Facility

23. As noted above, the Stalking Horse APA contemplates the Lender providing

M&G Polymers with the Polymers DIP Facility—*i.e.*, up to $5 million in funding that M&G

Polymers will use to finance its operations through the closing of the Apple Grove Sale.

24.     The Debtors do not believe that financing is available to M&G Polymers on terms more favorable than the Polymers DIP Facility.  As set forth in greater detail in the DIP Declaration, the Debtors conducted an extensive process to obtain funding prior to the Petition Date.  DIP Decl. ¶¶ 10-15.  Of the proposals received by the Debtors, none of them offered financing on an unsecured basis.  *Id.* ¶ 20.  This experience led the Debtors to conclude that a wider market search for unsecured financing would be futile.  This conclusion applies with even greater force to M&G Polymers, given that the Debtors were unable to obtain postpetition financing for M&G Polymers, apart from limited consensual use of cash collateral, which will expire on January 31, 2018.  This consensual cash collateral arrangement will expire before the consummation of any sale of the Purchased Assets pursuant to the Stalking Horse Bid or any higher or better bid.  Indeed, Comerica is not willing to further extend the use of cash collateral or loan any additional funds to M&G Polymers and the Debtors' other existing lenders and the DIP Lender were unwilling to provide funding to M&G Polymers.  As such, the Debtors, with the assistance of their advisors, determined that the Polymers DIP Facility provides M&G Polymers with the best available terms for financing through a sale of the Purchased Assets.  *See* Augustine Decl. ¶¶ 19-20.

25.     Further, the Polymers DIP Facility provides significant benefits to the Debtors.  The Polymers DIP Facility will ensure that M&G Polymers can remain funded in chapter 11 through a sale of the Purchased Assets and avoid the likely outcome of conversion of M&G Polymers' Case to a chapter 7 liquidation absent such financing.  Without the Polymers DIP Facility, M&G Polymers' ability to complete a sale of the Purchased Assets is unlikely, given M&G Polymers' liquidity needs, including preserving the Purchased Assets and paying employees, and the fact that M&G Polymers is not operating but is continuing to incur expenses

every day. As the Debtors otherwise have limited and diminishing funding to support the sale of

the Purchased Assets, the Polymers DIP Facility is necessary to ensure that a Sale is

consummated in accordance with the milestones set forth in the Stalking Horse APA.

*See* Augustine Decl. ¶ 22.

26.     In accordance with Bankruptcy Rule 4001(c) and Local Rule 4001-2 the principal

terms of the Polymers DIP Facility are as follows:[12]

| REQUIRED DISCLOSURE | SUMMARY OF MATERIAL TERMS |
|---|---|
| **Parties**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B) | Borrower:     M & G Polymers USA, LLC<br><br>DIP Lender:    Indorama Netherlands B.V. |
| **Commitment**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B) | Senior secured credit facility in the aggregate principal amount of up to $5 million. |
| **Maturity/Termination Date**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br>*DIP Loan Agreement, Definitions* | The earliest of (a) the Maturity Date, (b) the occurrence of the Closing Date (as defined in the Sale Transaction Agreement), (c) the date of the closing of any Alternative Transaction, (d) the date the Lender accelerates the Obligations pursuant to Section 7.2 following an Event of Default, (e) the date of the filing of any Reorganization Plan by Borrower which does not meet the requirements of an Acceptable Plan, or (f) the date on which the Lender is granted relief from the automatic stay. |
| **Interest Rate and Premiums**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br>*DIP Loan Agreement § 2.4* | Interest Rate:    7% per annum.<br><br>Default Rate:    2% per annum in excess of the Interest Rate. |
| **Expenses**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br><br>*Interim Polymers DIP Order ¶ 19; DIP Loan Agreement § 8.5* | The Lender shall be entitled to all reasonable costs and expenses incurred in connection with the collection and enforcement of the DIP Obligations in connection with and following the occurrence of an Event of Default and the foreclosure or enforcement of the New DIP Liens or the Lenders' security interests, provided that counsel of record for the Borrower, counsel of record for the Official Committee of Unsecured Creditors and the U.S. Trustee shall have the ability to challenge the reasonableness of any portion of invoiced costs and expenses (the "Costs and Expenses" and any such challenged amounts the "Disputed Costs and Expense") for a period often (10) business days (the "Review Period") after receipt of invoices therefor (which invoices may be redacted or summarized for protection of an applicable privilege or the work product doctrine) by, prior to the end of such Review Period, notifying the Lender of the objection in writing (to be followed by the filing with the Court of a motion or other pleading requesting a determination of allowance or disallowance of the Disputed Costs and Expenses) setting forth the specific basis for each objection to the Disputed Costs and Expenses. The Borrower's obligations under |

---

[12]     This summary is qualified in its entirety by the provisions of the DIP Loan Agreement.

| REQUIRED DISCLOSURE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | the DIP Loan Agreement shall survive the termination of the DIP Loan Agreement and the Interim Polymers DIP Order and the discharge of the Borrower's other obligations thereunder. |
| **Use of Funds** Fed. R. Bankr. P. 4001(c)(1)(B) *Interim Polymers DIP Order ¶ 5; DIP Loan Agreement § 2.6* | The Borrower shall (a) use the proceeds of Advances only for the purpose of funding Borrower's post-petition operations, professional fees and expenses, and other items all strictly in accordance with the allowed disbursements line item(s) set forth in the Budget and (b) not use any proceeds of Advances for (i) any purpose adverse to or otherwise against the rights, remedies or interests of Inbursa or Control Empresarial de Capitales, S.A. de C.V. or (ii) any investigation or prosecution of any claim or challenge against Inbursa or Control Empresarial de Capitales, S.A. de C.V. |
| **Funding Conditions** Fed. R. Bankr. P. 4001(c)(1)(B) *DIP Loan Agreement §§ 4.1, 4.2* | Conditions Precedent to Each Advance. The Lender's obligation to make each Advance shall be subject to the condition precedent that the Lender shall have received all of the following, each properly executed by the appropriate party and in form and substance reasonably satisfactory to the Lender in its sole discretion, unless otherwise waived by the Lender: |

Conditions Precedent to Each Advance. The Lender's obligation to make each Advance shall be subject to the condition precedent that the Lender shall have received all of the following, each properly executed by the appropriate party and in form and substance reasonably satisfactory to the Lender in its sole discretion, unless otherwise waived by the Lender:

a)   The DIP Loan Agreement;

b)   the Note;

c)   customary lien searches of appropriate filing offices showing that no Liens have been filed and remain in effect against the Borrower except the Permitted Liens (which Liens shall be senior to the New DIP Liens);

d)   a certificate of the chief restructuring officer of the Borrower confirming as of the DIP Closing Date (i) the representations and warranties set forth in Article V are true and correct in all material respects, (ii) no Default or Event of Default has occurred and is continuing; (iii) the prior Advances (if any) funded by the Lender hereunder have been disbursed only in accordance with the Budget; and (iv) the Advances requested do not exceed, on a weekly basis, the Advances permitted pursuant to the Budget;

e)   certificates of the insurance required hereunder, with all hazard insurance containing a lender's loss payable endorsement in the Lender's favor and with all liability insurance naming the Lender as an additional insured; and

f)   such other documents as the Lender may require in its reasonable discretion.

Additional Conditions Precedent to the Advances. In addition to the items described in Section 4.1, the Lender's obligation to make the Advances to the Borrower shall be subject to the satisfaction of the following conditions precedent in a manner and pursuant to documentation reasonably acceptable to the Lender in its sole discretion:

a)   the Interim Borrowing Order and the Stalking Horse Approval Order shall have been entered by the Bankruptcy Court by January 19, 2018, and such orders and the Bidding Procedures Order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the Lender and the Borrower;

b)   the Borrower shall have entered into the Sale Transaction Agreement, and either the Sale Transaction Agreement shall be in full force and effect or the Borrower shall have declared one or more parties other than Indorama Ventures the Successful Bidder(s) (as defined in the Bidding Procedures) with respect to the Purchased Assets (as defined in the Sale Transaction Agreement) or entered into a definitive agreement with respect to an Alternative Transaction;

| REQUIRED DISCLOSURE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | c) no Event of Default shall have occurred; and |
| | d) there shall not be pending any motion, application or other filing in the Bankruptcy Case or other Court of competent jurisdiction which, if granted by the Bankruptcy Court or other Court of competent jurisdiction, would result in an Event of Default. |
| **Security and Priority**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)(i, vii)<br><br>*DIP Loan Agreement,*<br>*Recitals; § 3.3; Interim*<br>*Polymers DIP Order*<br>*¶¶* vi, 7, 9 | To secure the Obligations, Borrower grants Lender liens and security interests in the New DIP Collateral pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code as follows:<br><br>a) perfected security interests and liens on (collectively, the "New DIP Liens") all of Borrower's property that comprises (i) the Purchased Assets (as defined in the Sale Transaction Agreement) (including the APG Facility, the R&D Center, and related assets), (ii) immediately upon the indefeasible payment in full in cash to Comerica Bank of all Prepetition Obligations and the concurrent release and termination of the Liens thereon, all of Borrower's cash, inventory and receivables (collectively, the "Delayed Attachment Assets"), and (iii) upon entry of the Final Borrowing Order, proceeds of claims and causes of action (the "Avoidance Action Proceeds") brought pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code (the Purchased Assets, together with the Delayed Attachment Assets and the Avoidance Action Proceeds are, collectively, the "New DIP Collateral"; provided that, New DIP Collateral shall not include any Intellectual Property or any licenses or other rights thereto; provided further that, for the avoidance of doubt, the liens granted in the Delayed Attachment Assets shall only attach and become enforceable when the Prepetition Obligations (as defined in the Polymers CC Order) are indefeasibly paid in full in cash to Comerica Bank and the Prepetition Liens thereon are concurrently released and terminated, which security interests and liens shall be:<br><br>i) Priming and senior to the Inbursa Guaranty Liens (as defined in the Polymers CC Order) and Inbursa Adequate Protection Lien (as defined in Polymers CC Order); and<br><br>ii) subject and junior to (i) with respect to the APG Facility, the up to $9.6 million of the Comerica Adequate Protection Lien (as defined in the Polymers CC Order), (ii) with respect to (x) the Avoidance Action Proceeds and (y) all other Purchased Assets other than the APG Facility, in each case of the foregoing clauses (x) and (y), the Comerica Adequate Protection Lien (as defined in the Polymers CC Order), and (iii) any properly perfected, non-avoidable, first-priority, security interests or other liens on such New DIP Collateral existing on the M&G Polymers Petition Date (other than the Inbursa Guaranty Liens (as defined in the Polymers CC Order) and the Inbursa Adequate Protection Lien (as defined in the Polymers CC Order)) (the liens described in each of the foregoing clauses (i) through (iii), collectively, the "Permitted Liens").<br><br>The DIP Obligations shall constitute, and the Lender shall have, in accordance with Section 364(c)(1) of the Bankruptcy Code, an administrative expense claim (the "DIP Administrative Claim") that is (i) senior to any and all administrative expenses, other than the Adequate Protection Superpriority Claim granted to Comerica Bank in the Polymers CC Order, of and unsecured claims against Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code |

| Required Disclosure | Summary of Material Terms |
|---|---|
| | and (ii) junior to the Adequate Protection Superiority Claim granted to Comerica Bank in the Polymers CC Order. The DIP Administrative Claim shall be secured by liens on the New DIP Collateral pursuant to section 364 of the Bankruptcy Code as provided in the Interim Polymers DIP Order. |
| **Adequate Protection / Lien Priming** Fed. R. Bankr. P. 4001(c)(1)(B)(ii) Del. Bankr. L.R. 4001-2(a)(i)(G) *DIP Loan Agreement, Recitals; Interim Polymers DIP Order ¶ 13* | The New DIP Liens only prime the Inbursa Guaranty Liens and the Inbursa Adequate Protection Liens. Inbursa has consented to such priming, and is receiving adequate protection as follows: |

a) As adequate protection for the diminution, if any, in the value of Inbursa's interests in the Inbursa Guaranty Liens or the Inbursa Adequate Protection Lien, resulting from the relief granted in Interim Polymers DIP Order, including without limitation based on (a) the incurrence of the priming DIP Obligations; (b) the granting of the New DIP Liens and the DIP Superpriority Claim; and (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "<u>Diminution</u>"), Inbursa shall be granted (effective and perfected upon the applicable dates as set forth in the Interim Polymers DIP Order and without the necessity of execution by the Borrower of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments):

    i) perfected security interests (collectively, the "<u>Supplemental Inbursa Adequate Protection Liens</u>") on (i) all the New DIP Collateral as follows: (1) upon the entry of the Interim Polymers DIP Order, the Purchased Assets (as defined in the Sale Transaction Agreement) (including the APG Facility, the R&D Center, and related assets), (2) immediately upon the indefeasible payment in full in cash to Comerica Bank of all Prepetition Obligations and the concurrent release and termination of the Liens thereon, the Delayed Attachment Assets, and (3) upon entry of the Final Order, the Avoidance Action Proceeds; provided that, for the avoidance of doubt, the Supplemental Inbursa Adequate Protection Liens granted in the Delayed Attachment Assets shall only attach and become enforceable when the Prepetition Obligations (as defined in the Polymers CC Order) are indefeasibly paid in full in cash to Comerica Bank and the Prepetition Liens thereon are concurrently released and terminated, which security interests and liens shall be junior only to the New DIP Liens (and any other liens senior to the New DIP Liens) and (ii) the postpetition collateral identified in paragraph 5(b)(i) of the Polymers CC Order; and

    ii) subject and subordinate only to the Adequate Protection Superiority Claim granted to Comerica Bank in the Polymers CC Order and the DIP Administrative Claim (and any administrative claims senior to the DIP Administrative Claim), an administrative expense claim (the "<u>Supplemental Inbursa Adequate Protection Claim</u>"), for the Diminution that is, except as set forth in the Interim Polymers DIP Order, senior to all administrative expense claims and unsecured claims against the Borrower or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code. Nothing in the Interim Polymers DIP Order shall, or shall be deemed to, limit, abridge or otherwise affect the rights of Inbursa to request at any time that the Court provide additional or further adequate protection if the protections afforded by the Interim

| REQUIRED DISCLOSURE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | Polymers DIP Order appear to be inadequate. For the avoidance of doubt, such adequate protection provided by the Interim Polymers DIP Order shall be in addition to any adequate protection granted to Inbursa pursuant to the Polymers CC Order. |
| **Acknowledgements / Validity of Prepetition Liens**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii)<br>Del. Bankr. L.R. 4001-2(a)(i)(B)<br><br>*DIP Loan Agreement Recitals; Interim Polymers DIP Order ¶ G* | The Borrower and the Lender each stipulates and acknowledges that, subject to any applicable challenge rights set forth in the Polymers CC Order, the following prior liens and security interests (collectively, the "Prior Liens") with respect to certain of the New DIP Collateral exist or, in respect of clauses (e) and (f), may exist as of today's date: (a) the Inbursa Guaranty Liens (as defined in the Polymers CC Order), (b) Inbursa Adequate Protection Lien (as defined in Polymers CC Order), (c) Prepetition Liens (as defined in Polymers CC Order), (d) Comerica Adequate Protection Lien (as defined in Polymers CC Order), (e) the Prepetition Permitted Liens (as defined in Polymers CC Order), and (f) liens set forth on Schedule 6.2 to the DIP Loan Agreement and any other liens in existence on any assets of M&G Polymers. These prior liens and the secured obligations related to such liens (collectively, the "Prior Obligations") were incurred and/or granted in connection with, *inter alia* (a) entry into the Inbursa Guaranty (as defined in Polymers CC Order), Inbursa Guaranty Documents (as defined in Polymers CC Order), the Prepetition Credit Agreement (as defined in Polymers CC Order), and the Pre-Petition First Lien Guaranty Mortgage (as defined in Polymers CC Order); (b) entry of the Polymers CC Order and/or (c) other transactions that occurred prior to the filing of the Borrower's Chapter 11 Case. The Prior Obligations relating to (a) the Inbursa Guaranty Liens (as defined in the Polymers CC Order), (b) Inbursa Adequate Protection Lien (as defined in Polymers CC Order), (c) Prepetition Liens (as defined in Polymers CC Order), (d) Comerica Adequate Protection Lien (as defined in Polymers CC Order) and (e) the Prepetition Permitted Liens (as defined in Polymers CC Order) constitute valid obligations of the Borrower and are secured by valid, properly perfected and unavoidable liens and security interests as described in the Polymers CC Order (the "Prior Pledged Collateral"). Inbursa and Comerica Bank do not object to the relief requested in the Motion, or the entry of the Interim Polymers DIP Order, and Inbursa further does not object and consents to the priming of the Inbursa Guaranty Liens and Inbursa Adequate Protection Lien in connection with the granting of the New DIP Liens in the Interim Polymers DIP Order and to the extent provided in the Interim Polymers DIP Order. |
| **Automatic Stay**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv)<br><br>*Interim Polymers DIP Order ¶ 22* | The automatic stay imposed by section 362(a) of the Bankruptcy Code shall be modified to permit (a) the Borrower to grant the New DIP Liens and the DIP Administrative Claim, and to perform such acts as the Lender may reasonably request to assure the perfection and priority of the New DIP Liens; and (b) the implementation of the terms of the Interim Polymers DIP Order and the DIP Loan Agreement. |
| **Milestones**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(v, vi)<br><br>*DIP Loan Agreement §§ 4.2, 7.1* | The DIP Loan Agreement sets forth the following milestones:<br><br>a) the Interim Borrowing Order and the Stalking Horse Approval Order shall have been entered by the Bankruptcy Court by January 19, 2018;<br><br>b) the auction as contemplated by the Sale Transaction Bidding Procedures Order, if necessary, shall be held by January 29, 2018; and<br><br>c) the Final Borrowing Order shall be entered by the Bankruptcy Court by February 2, 2018 |
| **Release**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The DIP Loan Agreement does not contain any material affirmative releases by either Borrower or Lender. |

| REQUIRED DISCLOSURE | SUMMARY OF MATERIAL TERMS |
|---|---|
| **Indemnity**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The DIP Loan Agreement does not contain any indemnity by either Borrower or Lender. |
| **506(c) Waiver**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(x)<br>Del. Bankr. L.R. 4001-2(a)(i)(C)<br><br>*DIP Loan Agreement § 2.10; Interim Polymers DIP Order ¶ H* | As a further condition of the DIP Loan Agreement and any obligation of the Lender to make credit extensions pursuant to the DIP Loan Agreement, upon entry of the Interim Polymers DIP Order, the Borrower and its estate shall be deemed to have waived any claim to surcharge the New DIP Collateral under section 506(c) of the Bankruptcy Code. |
| **Liens on Avoidance Actions**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(x)<br>Del. Bankr. L.R. 4001-2(a)(i)(D)<br><br>*DIP Loan Agreement, Recitals; Interim Polymers DIP Order ¶ vi, 7* | Upon entry of the Final Order, the New DIP Collateral shall include the Avoidance Action Proceeds. |
| **Fees Carve Out**<br>Del. Bankr. L.R. 4001-2(a)(i)(F)<br><br>*Polymers Final Cash Collateral Order ¶ 11* | Carve-Out and Reserves.<br><br>a) *Carve-Out.* Notwithstanding anything to the contrary in the Interim Polymers DIP Order, in the DIP Loan Agreement or any other order of the Court to the contrary, the rights and claims of the Lender, including the New DIP Liens (and all liens junior or senior to the New DIP Liens), shall be subject and subordinate in all respects to the payment of the Carve-Out from the Carve-Out Reserves (each as defined below). Following the occurrence of an Event of Default or default under the Interim Polymers DIP Order (each, a "Carve-Out Trigger Event"), and delivery of notice thereof (the "Carve-Out Trigger Notice") (which may be by email) to the Borrower, the Creditors' Committee and the US Trustee (the date of a delivery of such notice, the "Carve-Out Trigger Date"), the Borrower shall be entitled to use remaining availability (if any) under the DIP Facility (but, for the avoidance of doubt, capped under all circumstances at the $5,000,000.00 Maximum Line Amount) for the following purposes only and without duplication (the sum of (i) through (v) below, the "Carve-Out"): (i) amounts for accrued and unpaid wages, benefits and vacation time for the retained employees of the Borrower employed as of the Carve-Out Trigger Date plus wages, benefits and vacation time for such retained employees for a period of 10 days after the Carve-Out Trigger Date to the extent necessary to secure the Apple Grove Facility, each of which such amounts shall be in accordance with the Budget; (ii) amounts owing on account of benefits incurred by, or owing to, retirees of the Borrower as of the Carve-Out Trigger Date, which amounts shall be in accordance with the Budget, (iii) amounts owing on account of benefits incurred by, or owing to, union employees of the Debtor as of the Carve-Out Trigger Date, which amounts shall be in accordance with the Budget; (iv) (a) the amount of accrued and unpaid professional fee claims of the Borrower's estate for services rendered by Borrower's estate professionals for the period beginning on date of Interim Polymers DIP Order through the Carve-Out |

| Required Disclosure | Summary of Material Terms |
|---|---|
| | Trigger Date, but only to the extent such services are directly attributable to the Borrower, subsequently allowed by Court order, and in accordance with the Budget (plus amounts for permitted variances therefrom in respect thereof) (the "Professional Compensation") and (b) Professional Compensation attributable to this Debtor for the period beginning from and after the Carve-Out Trigger Date in an amount not to exceed $300,000; and (v) all statutory fees required to be paid by Borrower to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a). For the avoidance of doubt, in no event shall the Carve-Out Reserve exceed the aggregate amounts set forth in the Budget for the items listed in (i) – (iv)(a) of this paragraph plus $300,000, and for the further avoidance of doubt, the Lender shall not be required to fund any amounts into the Carve-Out Reserve that, when added together with all prior Advances funded prior to the Carve-Out Trigger Date, would cause the Maximum Line Amount to be exceeded.<br><br>b) *Creation and Funding of Carve-Out Reserves.* The Debtor shall be authorized to establish a separate deposit account for the amounts set forth in clauses (i) through (v) in paragraph 11(a) of the Interim Polymers DIP Order (collectively, the "Carve Out Reserve"). Upon the occurrence of the Carve-Out Trigger Date, the Debtor shall be authorized to transfer cash from the Polymers DIP Account and/or to borrow under the DIP Facility (subject to the Maximum Line Amount) in an aggregate amount equal to the amount sufficient to fully fund the Carve-Out Reserve into a segregated deposit account not in the control of the Lender or Comerica. Once funded in accordance with paragraph 11(b) of the Interim Polymers DIP Order, (x) the Carve Out Reserve may be used to pay those obligations for which the Carve-Out Reserve was established, and (y) the Carve Out Reserve shall be in full and complete satisfaction of any obligation Lender may have under and paragraph 11(a) and 11(b) of the Interim Polymers DIP Order.<br><br>c) *Post-Termination Payments from the Carve-Out Reserve.* The Carve-Out Reserve and the proceeds on deposit in respect thereof shall be available only to satisfy obligations benefitting from the Carve-Out and shall not constitute New DIP Collateral, except that the Lender shall retain liens and security interests in any remaining amounts left in the Carve-Out Reserve (the "Unused Carve-Out Amounts") following satisfaction in full of all obligations benefitting from the Carve-Out, and shall receive distributions on account of any unpaid Obligations from such Unused Carve-Out Amounts. |
| **Cross-Collateralization** Del. Bankr. L.R. 4001-2(a)(i)(A) | None. |
| **Roll-Up Provisions** Del. Bankr. L.R. 4001-2(a)(i)(E) | None. |
| **552(b)(1) Waiver** Del. Bankr. L.R. 4001-2(a)(i)(H)<br><br>*DIP Loan Agreement § 7.4; Interim Polymers DIP Order ¶ 29* | Recourse to the New DIP Collateral or other security for the DIP Obligations will not at any time be required, and the Borrower shall waive any right of marshaling the Borrower may have; provided, however, that Lender shall first exhaust recoveries from New DIP Collateral other than Avoidance Action Proceeds. |

## RELIEF REQUESTED

27.     By this Motion, pursuant to sections 105, 107, 362, 363, 364, 365 and 507 of the

Bankruptcy Code, Rules 2002, 4001, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules

and Rules 2002-1, 4001-2, 6004-1 and 9006-1 of the Local Rules, the Debtors request that the

Court:

     (a)     enter the Stalking Horse Order:

          (i)     authorizing the Debtors to enter into the Stalking Horse APA and provide Expense Reimbursement to the Stalking Horse thereunder,

          (ii)     authorizing the Lender or the Stalking Horse (following assignment by Lender to the Stalking Horse of Lender's rights under the Polymers DIP Facility to Credit Bid the outstanding Obligations owed under the Polymers DIP Facility) to Credit Bid towards the Purchase Price for the Purchased Assets the outstanding Obligations (as defined in the DIP Loan Agreement) owed to Lender under the Polymers DIP Facility, provided that the amount of such Credit Bid shall be limited to $3 million until the indefeasible payment in full in cash of the Prepetition Obligations (as defined in the Polymers Final Cash Collateral Order), with such amount being subject to increase in certain circumstances, and

          (iii)     granting related relief;

     (b)     enter the Interim Polymers DIP Order:

          (i)     approving the Polymers DIP Facility on an interim basis;

          (ii)     authorizing Debtor M&G Polymers to enter into the DIP Loan Agreement,

          (iii)     authorizing the use of the proceeds of the Polymers DIP Facility on an interim basis in a manner consistent with the terms and conditions of the DIP Loan Agreement,

          (iv)     granting liens and superpriority administrative claims in connection with the Polymers DIP Facility,

          (v)     granting adequate protection to Inbursa;

          (vi)     authorizing and directing M&G Polymers to pay, without further order of the Court, the obligations payable to the Lender under the DIP Loan Agreement,

(vii)    vacating and modifying the automatic stay as necessary to effectuate the terms of the Polymers DIP Facility.

(viii)    scheduling the Final Hearing, and

(ix)    granting related relief; and

(c)    enter one or more Sale Orders:

(i)    authorizing the sale of the Purchased Assets free and clear of all liens, claims, interests, and encumbrances, with liens to attach to the proceeds of such Sale Transaction(s),

(ii)    authorizing the assumption and assignment of the Proposed Assumed Contracts (as defined below), and

(iii)    granting related relief.

## BASIS FOR RELIEF

**A.**    **Approval of the Sale Pursuant to the Stalking Horse APA is Warranted Under Section 363 of the Bankruptcy Code**

28.    Section 363 of the Bankruptcy Code provides that the debtor may, "after a notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363. In turn, section 105(a) of the Bankruptcy Code provides that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

29.    While the Bankruptcy Code does not state the standard for approving sales of property under section 363, courts uniformly agree that the business judgment standard applies. *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). Courts generally consider four factors to determine whether a section 363 sale is appropriate under the business judgment standard: whether (a) a sound business justification exists for the

sale; (b) adequate and reasonable notice of the sale was provided to interested parties; (c) the sale will produce a fair and reasonable price for the property; and (d) the parties have acted in good faith. *Id.* at 1070 (setting forth the "sound business" purpose standard for the sale of the debtor's assets under section 363 of the Bankruptcy Code); *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (citing *Guilford Transportation Industries, Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)). When a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

### 1. The Debtors Have Demonstrated a Sound Business Justification for the Sale of the Assets Pursuant to the Stalking Horse APA

30.     A sound business justification exists when a sale of the debtor's assets is necessary to preserve the value of the Debtors' estates. *See*, *e.g.*, *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . ."); *In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale).

31.     As set forth above, in the Mandava Declaration and in the Augustine Declaration, the Debtors have demonstrated a sound business justification for the entry into the Stalking Horse APA and any Sale Transaction that may result from the Apple Grove Auction. M&G

Polymers is no longer able to operate in chapter 11 without significant near-term increases in liquidity. A sale of the Purchased Assets on the timeline set forth in the Bidding Procedures is necessary to maximize the likelihood of going-concern bids and, therefore, the ultimate price received by the Debtors for the Purchased Assets, consistent with the Debtors' fiduciary duties to their economic stakeholders.

32.     Further, there is a sound business purpose for entering into the Stalking Horse APA because that agreement sets a "floor" price for the Purchased Assets, thereby increasing the likelihood that the ultimate price obtained for the Purchased Assets will reflect a value-maximizing bid for such assets. Moreover, given that the Stalking Horse APA is premised upon the Stalking Horse's restart of the Apple Grove Plant, the Stalking Horse APA will preserve a significant number of jobs of employees needed to operate the plant.

33.     Finally, as M&G Polymers is not an obligor under the DIP Financing, securing the liquidity necessary to fund the sales process and to maintain the value of the Purchased Assets provides a substantial benefit to the M&G Polymers estate. Therefore, sound business justifications exist for the sale of the Purchased Assets pursuant to the Stalking Horse APA and Bidding Procedures.

> **2.      The Proposed Sale Will Yield a Fair and Reasonable Purchase Price**

34.     As set forth above, the Debtors believe that the proposed sale for the Purchased Assets will yield a fair and reasonable price for these assets. The Bidding Procedures are designed to encourage competitive bidding for the Purchased Assets and these carefully constructed measures, which have already been approved by the Court, will help to ensure a fair and adequate purchase price for the Purchased Assets.

35.    The Bidding Procedures shall continue to apply to the sale of the Purchased Assets.  For the avoidance of doubt, however, certain significant provisions in the Bidding Procedures shall apply to the Apple Grove Sale as follows:[13]

- Consistent with Section IV of the Bidding Procedures, Indorama Ventures shall be the Stalking Horse Bidder for the Purchased Assets.

- Consistent with Section VI.A.4 of the Bidding Procedures, a Qualified Bid for the Purchased Assets for other bidders (aside from Indorama Ventures, who shall be automatically deemed a Qualified Bidder, and the offer to purchase the Purchased Assets pursuant to the Stalking Horse APA shall be deemed a Qualified Bid) must include (i) a duly authorized and executed asset purchase agreement using the form of the Stalking Horse APA and (ii) a proposed sale order based on the proposed Sale Order attached hereto as Exhibit E, both modified to reflect such Qualified Bidder's proposed Sale Transaction (including all exhibits and schedules thereto), together with copies marked to show any amendments and modifications to (1) the Stalking Horse APA and (2) the proposed Sale Order.

- Consistent with Section VI.A.5 of the Bidding Procedures, the Lender or Indorama Ventures (following assignment by Lender to Indorama Ventures of Lender's rights under the Polymers DIP Facility to Credit Bid the outstanding Obligations owed under the Polymers DIP Facility) shall be authorized to Credit Bid towards the Purchase Price for the Purchased Assets the outstanding Obligations (as defined in the DIP Loan Agreement) owed to Lender under the Polymers DIP Facility, provided that the amount of such Credit Bid shall be limited to $3 million until the indefeasible payment in full in cash of the Prepetition Obligations (as defined in the Polymers Final Cash Collateral Order), subject to such amount increasing in an amount equal to the amount of any increase in the cash portion of the Purchase Price, whether through an amendment of the Stalking Horse APA or subsequent bidding at the Auction for the Purchased Assets.  For the avoidance of doubt, during the period when the foregoing limitation is in effect, in the event the cash portion of the Purchase Price allocable to the Comerica Adequate Protection Lien (as defined in the Polymers CC Order) is equal to or greater than $7 million, the Lender shall be entitled to credit bid an amount of DIP Obligations up to $5 million.

- Notwithstanding anything to the contrary in the Bidding Procedures, including Sections VI.A.7 and VII.D thereof, (i) in light of the Indorama BV's agreement to enter into the Polymers DIP Facility, Indorama Ventures shall not be required to provide M&G Polymers with a Good Faith Deposit with respect to its bid for the Purchased Assets, and (ii) the Stalking Horse APA shall govern damages to be

---

[13]    Unless otherwise set forth in this list, capitalized terms used within this list have the meanings given to such terms in the Stalking Horse Order and the Bidding Procedures, as applicable.

provided to M&G Polymers in the event that the Stalking Horse breaches the Stalking Horse APA.

- Consistent with Section VI.B of the Bidding Procedures, Indorama Ventures shall be automatically deemed a Qualified Bidder with respect to the Purchased Assets, and Indorama Ventures' offer to purchase the Purchased Assets pursuant to the Stalking Horse APA shall be deemed a Qualified Bid.

- Consistent with Section VI.C of the Bidding Procedures, the Expense Reimbursement provided to Indorama Ventures pursuant to the Stalking Horse APA consisting of reasonable out-of-pocket and documented fees and expenses in an amount not to exceed $350,000 shall be approved.

- Consistent with Section VII.B of the Bidding Procedures, if Indorama Ventures' Stalking Horse Bid, as reflected in the Stalking Horse APA (which bid is a Qualified Bid), is selected by M&G Polymers as the Baseline Bid, the first round of bidding at the Auction (if any) will start at an amount equal to the sum of: (i) the value of the Baseline Bid, plus (ii) the amount of the Expense Reimbursement, plus (iii) the amount of the loan commitment provided pursuant to the Polymers DIP Facility, plus (iv) the Minimum Overbid amount (each such bid, a "Stalking Horse Overbid").

36.     Finally, the Stalking Horse APA provides the Debtors with the comfort that a party stands ready, willing and able to purchase the Purchased Assets at a price that was the product of extensive arm's-length negotiations conducted in good faith. Consummation of the sale process, either through the Stalking Horse APA or by a value-maximizing bid will in turn allow the Debtors to maximize value of their estates while also limiting the incurrence of unnecessary administrative expenses related to these Cases and the Case of M&G Polymers in particular.

### 3.     The Bidding Procedures Ensure a Good Faith Process and the Ultimate Purchaser of the Purchased Assets Is Entitled to the Protections of Section 363(m) of the Bankruptcy Code

37.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good faith purchaser. Specifically, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such

> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale . . . were stayed
> pending appeal.

11 U.S.C. § 363(m).

38.     The Bankruptcy Code does not define good faith, but the Third Circuit has held

that evidence of bad faith typically includes "fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

*Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn.,*

*Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter*

*Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983) (other citations omitted); *see also Kabro Assoc. of West*

*Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997)

(noting that the type of "misconduct that would destroy a [purchaser]'s good faith status at a

judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee or

an attempt to take grossly unfair advantage of other bidders").

39.     The Bidding Procedures, which were previously approved by the Court, were

designed with the goal of producing a fair and transparent bidding process to allow the Debtors

to attract the best possible offers for the Purchased Assets.  The Stalking Horse (or any other

successful bidder(s)), and the Debtors will have negotiated at arm's-length and in good faith for

the purchase of the Purchased Assets, pursuant to a process providing for an Apple Grove

Auction in certain circumstances.  As such, the Debtors request that the ultimate purchaser of the

Purchased Assets be entitled to the protections of section 363(m) of the Bankruptcy Code.

**B.      The Expense Reimbursement Requested Is Reasonable and Justified**

40.     If the Stalking Horse is not the successful bidder, the Debtors propose to provide

the Stalking Horse with an Expense Reimbursement of reasonable out-of-pocket and

documented fees and expenses not to exceed $350,000. Additionally, the Bidding Procedures provide that the Debtors may take into account the value of the Expense Reimbursement when considering potential overbids at the Apple Grove Auction. The Expense Reimbursement was negotiated by the Stalking Horse and the Debtors and their respective advisors at arm's-length and in good faith. The Debtors believe the Expense Reimbursement is fair and reasonable, will not chill bidding and will enable M&G Polymers to remain in chapter 11 and maximize the value of the Purchased Assets through a sales process. *See* Augustine Decl. ¶ 15.

41.    The Expense Reimbursement was a material inducement for the Stalking Horse to enter into the Stalking Horse APA, and the Stalking Horse has the ability to terminate the Stalking Horse APA if the proposed order approving the Stalking Horse APA, which as proposed seeks authorization to provide the Expense Reimbursement, is not entered. *See* Augustine Decl. ¶ 16.

42.    The Debtors have determined that conducting a sale process and auction with a stalking horse bid for the Purchased Assets is critical to preserving the value of these assets and submit that providing the Expense Reimbursement to the Stalking Horse is an actual, necessary cost of moving forward with this sale process. Therefore, the Debtors respectfully request that the Court approve the Expense Reimbursement.

43.    Under Third Circuit precedent, bid protections such as break-up fees, termination fees, topping fees and expense reimbursement constitute administrative expenses,[14] and therefore, the payment of such fees must provide a postpetition benefit to the bankruptcy estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d

---

[14]    The applicable Debtors' entry into a Stalking Horse Agreement and/or provision of Bid Protections to a Stalking Horse Bidder shall be in compliance with the DIP Orders (all as defined in the Bidding Procedures), the DIP Loan Documents (as defined in the DIP Orders) and the Debtors' obligations thereunder.

527, 533 (3d Cir. 1999) (holding that whether break-up fees may be allowed "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate").  In *O'Brien*, the Third Circuit described two examples of potential postpetition benefits accruing from the payment of a termination fee.  *Id.*  First, a benefit to the estate may arise if providing a break-up fee "promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id.* at 537.  Second, if bid protections encouraged potential bidders to evaluate an asset's value, thereby "increasing the likelihood that the price at which the [asset] is sold will reflect its true worth."  *Id.*

44.     The Expense Reimbursement should be approved and given administrative expense priority status under Bankruptcy Code sections 503(b)(1)(A) and 507.  The Expense Reimbursement provides a benefit to the Debtors' estates.  Moreover, the Stalking Horse has expressly conditioned its entry into the Stalking Horse APA upon the Debtors' agreement to, and this Court's approval of, the Expense Reimbursement.  The Expense Reimbursement, and the Polymers DIP Facility that is dependent upon their approval, will enable the Debtors to (a) conduct a sales process of the Purchased Assets, (b) maintain the Purchased Assets in their current condition, including the retention of necessary employees and (c) allow the Debtors to set an appropriate floor for the Purchased Assets, thus ensuring that competing bids will provide higher or better value than that envisioned by the Stalking Horse APA.  Indeed, the Expense Reimbursement is all the more appropriate here, as the Stalking Horse Bid includes financing that will allow M&G Polymers to continue operating in chapter 11 and afford the Debtors an opportunity to market the Purchased Assets.  Accordingly, the Debtors' ability to offer the Expense Reimbursement will enable them to ensure that a sale of the Purchased Assets will be to

either a contractually committed buyer at a fair price, or to a bidder that proposes a higher or better bid than the bid reflected in the Stalking Horse APA.

45.     The Debtors submit that the Expense Reimbursement is reasonable in light of its amount and the extensive efforts and material expenditures by the Stalking Horse in its due diligence review and negotiation of the terms of the Stalking Horse APA.  Payment of the Expense Reimbursement will not diminish the Debtors' estates.  The Debtors do not intend to terminate the Stalking Horse APA if to do so would incur an obligation to pay the Expense Reimbursement, unless they are accepting an alternative bid, which bid must exceed the consideration offered by the Stalking Horse by an amount sufficient to pay the Expense Reimbursement.  Further, unlike most other sale transactions, given that the Stalking Horse's bid protections are limited to the Expense Reimbursement, and does not include a break-up fee, the Debtors believe that the Expense Reimbursement will not chill bidding for the Purchased Assets. In short, the Debtors believe that the Expense Reimbursement is the result of good faith, arm's-length negotiations and convey benefits to both the Debtors and the Stalking Horse, and should be approved.  *See* Augustine Decl. ¶ 17.

46.     Courts have recognized that termination fees and expense reimbursements may be used to protect bidders in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code and that such fees can be "important tools to encourage bidding and to maximize the value of the Debtors' assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  Such protections enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity of obtaining even greater benefits for the estate

through a competitive bidding and auction process.  *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (stating that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted) (internal quotation marks omitted).

47.     Courts in this district regularly approve protections similar to the Expense Reimbursement as reasonable and consistent with the type and range of bidding protection typically approved.  *See, e.g., In re TerraVia Holdings, Inc.*, No. 17-11655 (CSS) (Docket No. 143) (Bankr. D. Del. Aug. 22, 2017) (approving bidding protections including expense reimbursement); *In re Short Bark Indus., Inc.*, No. 17-11502 (KG) (Docket No. 176) (Bankr. D. Del. Aug. 24, 2017) (approving bidding protections including expense reimbursement); *IMX Acquisition Corp.*, No. 16-12238 (BLS) (Docket No. 124) (Bankr. D. Del. Oct. 31, 2016) (approving bidding procedures permitting the stalking horse to credit bid bid protections and bid protections included expense reimbursement); *In re Delivery Agent, Inc.*, No. 16-12051 (LSS) (Docket No. 202) (Bankr. D. Del. Oct. 14, 2016) (approving bidding procedures permitting credit bid by stalking horse and expense reimbursement); *In re Vertellus Specialties Inc*, No. 16-11290 (CSS) (Docket No. 169) (Bankr. D. Del. Jun. 28, 2016) (approving expense reimbursement in connection with $453 million asset sale); *In re Old FOH Inc. (f/k/a Frederick's of Hollywood, Inc.)*, No. 15-10836 (KG) (Docket No. 120) (Bankr. D. Del. May 6, 2015) (approving expense reimbursement of $300,000 in connection with $22.5 million sale of assets); *In re Hipcricket, Inc.*, No. 15-10104 (LSS) (Docket No. 120) (Bankr. D. Del. Feb. 11, 2015) (approving expense reimbursement in connection with approximately $5 million sale of assets).

48.     Accordingly, the Expense Reimbursement provides an actual and necessary benefit to the Debtors' estates, is reasonable and appropriate in light of the range of such protections typically approved and is in the best interests of the Debtors, their estates and all parties in interest.

### C.     The Sale of the Purchased Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code

49.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances provided that one of the following conditions are met:

a.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.     such entity consents;

c.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5).

50.     Section 363(f) of the Bankruptcy Code is stated in the disjunctive.  As such, when proceeding pursuant to section 363(b), a debtor only needs to satisfy one of the five conditions of section 363(f).  *See id.*; *Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) written in disjunctive; holding that court may approve sale "free and clear" provided at least one of the subsections of Bankruptcy Code 363(f) is met); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D.Ill. 2005); *In re Dundee Equity Corp.*, No. 89-B-10233 1992 Bankr.

LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986).

51.     The Debtors anticipate that, whichever Sale Transaction for the Purchased Assets they ultimately pursue, whether that be with the Stalking Horse or a different successful bidder selected after the Apple Grove Auction, or any combination thereof, such Sale Transaction(s) will satisfy one of the five requirements set forth under section 363(f) of the Bankruptcy Code, either because the affected parties consent to the Sale of the applicable Purchased Assets or some other bases exist under section 363(f) of the Bankruptcy Code to warrant the sale of the Purchased Assets free and clear of such liens or interests.  Specifically, the Debtors consulted with Comerica and Inbursa regarding the terms of the Stalking Horse APA, and such lenders have either consented or not objected to such terms.  Accordingly, the Debtors anticipate that one or more prongs of section 363(f) of the Bankruptcy Code will be satisfied with respect to parties that assert liens on or interests in the Purchased Assets.

### D.     Assumption and Assignment of Executory Contracts and Unexpired Leases

52.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease . . . ." 11 U.S.C. § 365(a).

53.     Courts employ a business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (holding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (holding that assumption or rejection of lease "will be a matter of business judgment by the Court").  The business judgment test "requires only

that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

54.     The Bidding Procedures Order provides successful bidders the opportunity to designate certain contracts for assumption and assignment in connection with the sale of the Purchased Assets.  *See* Bidding Procedures Order ¶ F; Bidding Procedures § VI.A.1. Assumption of designated contracts is a sound exercise of the Debtors' business judgment. Assuming and assigning the designated contracts will permit the Debtors to attract the highest or otherwise best offer for the Purchased Assets, by enabling the Debtors to offer parties in interest with a combination of contracts that are integral to the ownership or operation of the assets that the Debtors seek to sell.

55.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract."  11 U.S.C. § 365(f)(2).  Section 365(b), which codifies the requirements for assuming an executory contract, provides, in relevant part that a debtor may assume an executory contract only if the debtor:

> (A) cures, or provides adequate assurance that the [debtor] will promptly cure[s] [any defaults existing under the executory contract];
>
> (B) compensates, or provides adequate assurance that the [debtor] will promptly compensate, a party other than the debtor to such contract . . . for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).

56.     Adequate assurance is not defined in the Bankruptcy Code.  Courts determining whether adequate assurance has been provided are guided by "a practical, pragmatic construction based upon the facts and circumstances of each case."  *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1995)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations.").  While no single standard governs every case, adequate assurance "fall[s] considerably short of an absolute guarantee of performance."  *In re Carlisle Homes, Inc.*, 103 B.R. at 538.  Adequate assurance may be provided by a demonstration that the assignee has the appropriate financial resources and managerial experience regarding the type of enterprise or property assigned.  *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

57.     The Bidding Procedures require qualified bidders to provide financial and other information that would provide applicable counterparties with adequate assurance of future performance of the applicable obligations under any proposed assumed and assigned contracts included as part of a qualified bid.  Moreover, the Debtors will provide adequate assurance information to all counterparties to the designated contracts.  Finally, counterparties unsatisfied with the proposed adequate assurance of future performance provided to them will be able to lodge objections with respect thereto.

58.     Accordingly, the Debtors have satisfied the requirements of section 365 of the Bankruptcy Code with respect to the assumption and assignment of the proposed assumed contracts.

59.     In order to facilitate the assumption and assignment of the proposed assumed contracts, the Debtors respectfully request that the Court find that all anti-assignment provisions included in the proposed assumed contracts, including those proposed assumed contracts that have the effect of restricting or limiting assignment, to be unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[15]

**E.      Entry into the Polymers DIP Facility is an Appropriate Exercise of the Debtors' Business Judgment**

60.     As described above and in more detail in the Mandava Declaration and the Augustine Declaration, the Debtors' management, after consultation with their advisors, has determined that the Polymers DIP Facility provides the best option for ensuring a value-maximizing sale of the Purchased Assets to the benefit of the Debtors' stakeholders.  Unless a decision to borrow money is arbitrary or capricious, bankruptcy courts will generally defer to a debtor's business judgment.  *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994).  Indeed, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with

---

[15]     Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease. . ." 11 U.S.C. § 365(f)(1).  Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

61. The Polymers DIP Facility provides tangible and immediate benefits to the Debtors' estates. It was a key condition to the consummation of the Stalking Horse APA, as the Debtors' management needed to ensure that sufficient liquidity existed to fund a value-maximizing sale process for the Purchased Assets. Obtaining the Polymers DIP Facility is essential to preserving the value of the Purchased Assets, ensuring that critical employees are retained, maintaining benefits to retirees and union members and securing the liquidity necessary to conduct the sales process. Without the cash provided by the Polymers DIP Facility, the value of the Purchased Assets would decline as the Purchased Assets would no longer be maintained in the manner in which they are at present, employees would leave and the sales process for the Purchased Asset would effectively cease. Such a situation would materially increase the risk that M&G Polymers would need to convert its chapter 11 case to a chapter 7 case and, in the best-case scenario in such context, result in the Purchased Assets being sold by a chapter 7 trustee at "fire-sale" prices on a liquidation basis and for a value materially less than the purchase price contemplated by the Stalking Horse APA. Mandava Decl. ¶ 12.

62. M&G Polymers is not an obligor under the DIP Financing[16] and is not currently operating and generating revenue to sustain its liquidity needs. Consequently, the Polymers DIP Facility is necessary to ensure the consummation of a value-maximizing sale of the Purchased Assets.

---

[16] Final DIP Order n.3.

### F.    M&G Polymers Should be Authorized to Obtain Postpetition Financing under Section 364(c) of the Bankruptcy Code

63.    Section 364(b) of the Bankruptcy Code provides that if a debtor in possession cannot obtain unsecured postpetition credit, a bankruptcy court may authorize the debtor to incur debt entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, secured by a junior lien on encumbered property, or a combination of the three.  11 U.S.C. § 364(c).

64.    If after notice and a hearing, the bankruptcy court finds that a debtor is "unable to obtain unsecured credit allowable under [section 503(b)(1) of the Bankruptcy Code] as an administrative expense," then a debtor may obtain postpetition credit under section 364(c) of the Bankruptcy Code.  11 U.S.C. § 364(c).  Key to this is a showing that the debtor "has made a reasonable effort to seek other sources of credit available under sections 364(a) and (b) [of the Bankruptcy Code]."  *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

65.    To determine whether a debtor may obtain postpetition financing under section 364(c) of the Bankruptcy Code, courts have articulated the following three-part test:

(a)    the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying factors); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (same); *Ames Dep't Stores*, 115 B.R. at 39.  The Sale Polymers DIP Facility satisfies each factor.

### 1. M&G Polymers is Unable to Obtain Unsecured Credit Under Section 364(b) of the Bankruptcy Code

66.    M&G Polymers was unable to obtain unsecured postpetition financing.  To demonstrate that unsecured credit was not available, a debtor only needs to show "by a good faith effort that credit was not available" without the protections provided by section 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  A debtor is not required to conduct an exhaustive search for credit, as "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*  Where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the] Debtor to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

67.    As detailed in the DIP Declaration, the Debtors conducted an extensive process to obtain funding prior to the Petition Date, but did not receive any proposals contemplating unsecured financing.  DIP Decl. ¶¶ 10-15, 20.  This experience led the Debtors to conclude that a wider market search for unsecured financing would be futile.  This conclusion applies with even greater force to M&G Polymers, given that the Debtors were unable to obtain postpetition financing for M&G Polymers, apart from limited consensual use of cash collateral, which will expire on January 31, 2018.  This consensual cash collateral arrangement will expire before the consummation of any sale of the Purchased Assets pursuant to the Stalking Horse Bid or any higher or better bid.  Indeed, Comerica is not willing to further extend the use of cash collateral or loan additional funds to M&G Polymers and the Debtors' other existing lenders and the DIP Lender were unwilling to provide funding to M&G Polymers.  As such, the Debtors, with the

assistance of their advisors, determined that financing for M&G Polymers could only be obtained through a financing package that offered potential lenders, pursuant to section 364(c) of the Bankruptcy Code, debt entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, secured by a junior lien on encumbered property, or a combination of the three. *See* Augustine Decl. ¶ 20.

### 2. The Polymers DIP Facility is Necessary to Preserving and Maximizing the Value of the Debtors' Estates

68.     The Polymers DIP Facility is an essential element of the overall sale process for the Purchased Assets. Without the immediate liquidity provided by the Polymers DIP Facility, the Debtors would be unable to maintain the Purchased Assets, retain key employees or fund a sales process that would enable M&G Polymers to remain in chapter 11 through closing of the sale. In addition, the Polymers DIP Facility is a critical part of the Stalking Horse APA, which sets a floor price for the Purchased Assets, thus encouraging a competitive bidding process. Without the Polymers DIP Facility, the likely alternative is that M&G Polymers would be forced to completely cease operations, convert to chapter 7 and liquidate its assets under the direction of a chapter 7 trustee, which would clearly harm the Debtors' stakeholders and would be contrary to the Debtors' duty to maximize the value of their estates. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (debtors-in-possession have a duty to maximize their estates' assets).

### 3. The Terms of the Polymers DIP Facility are Fair, Reasonable and Adequate Under the Circumstances

69.     To determine whether the terms of postpetition financing are fair, reasonable and adequate, courts generally analyze the terms in light of the bargaining power and relative circumstances of the potential lender and the debtor. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 885-86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v.*

*First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

70.     The Polymers DIP Facility is fair, reasonable and adequate under the circumstances.  The Debtors negotiated the terms of the Stalking Horse APA and the Polymers DIP Facility with the Stalking Horse and the Lender in good faith and at arm's-length.  In particular, the terms of the Polymers DIP Facility are reasonable because the Lender is providing the Polymers DIP Facility as part of a value-maximizing, going-concern bid for the Purchased Assets, which would not be possible absent the Polymers DIP Facility.  Indeed, the liens granted pursuant to the Polymers DIP Facility are appropriate as they relate primarily to the Purchased Assets (and certain other New DIP Collateral).  Because the Lender or the Stalking Horse (as applicable) will be authorized to offset the outstanding Obligations (as defined in the DIP Loan Agreement) against the purchase price for the Purchased Assets in certain circumstances, if such assets are sold to the Stalking Horse, M&G Polymers may have no obligation to repay borrowings under the Polymers DIP Facility.  Further, if another party is the successful bidder, M&G Polymers will have sufficient cash to repay the Polymers DIP Facility as such party's bid must include cash sufficient to repay the Polymers DIP Facility obligations.  Based on the foregoing, the Debtors believe the terms of the Polymers DIP Facility are fair, reasonable and adequate under the circumstances of these Cases.  Augustine Decl. ¶ 23.

### G.     M&G Polymers Should Be Authorized to Obtain Priming Liens Under Section 364(d) of the Bankruptcy Code

71.     A debtor may incur debt "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the court finds, after notice and hearing, that (a) the debtor is "unable to obtain such credit otherwise" and (b) "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed

to be granted." 11 U.S.C. § 364(d)(1); *see Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 863 (Bankr. W.D. Pa. 2003) (debtor met section 364(d) after making efforts by "contact[ing] numerous lenders" and was unable to obtain credit without a priming lien); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (holding that debtor must make an effort to obtain credit without the requirement of a priming lien but is not required to seek credit from every possible lender); *In re Dunes Casino Hotel*, 69 B.R. 784, 791 (Bankr. D.N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien).

72.     Pursuant to Local Rule 400l-2(a)(i)(G), a movant must describe "[p]rovisions that prime any secured lien without the consent of that lienor."  Del. Bankr. L.R. 4001-2(a)(i)(G).

73.     The Polymers DIP Facility does not implicate Local Rule 4001-2(a)(i)(G) because all priming thereunder is consensual.  Here, the Polymers DIP Facility only primes the liens of Inbursa (the "Primed Party") with regards to the Purchased Assets, the proceeds of M&G Polymers' avoidance actions (the "Avoidance Action Proceeds") and certain other assets (collectively, with the Purchased Assets and the Avoidance Action Proceeds, the "New DIP Collateral").[17]  The Primed Party has consented to this treatment.

74.     As detailed above and in the Augustine Declaration, the Polymers DIP Facility was only obtained after the Debtors engaged other parties regarding postpetition financing.  The Debtors agreed to the Polymers DIP Facility only after reasonably concluding that postpetition

---

[17]     Notably, the Polymers DIP Facility does not prime either (a) Comerica's liens on the New DIP Collateral or (b) any properly perfected, non-avoidable, first-priority, security interests or other liens on the New DIP Collateral existing on the Polymers Petition Date (other than the Inbursa Guaranty Liens (as defined in the Polymers Final Cash Collateral Order) and the Inbursa Adequate Protection Lien (as defined in the Polymers Final Cash Collateral Order)).  *See* DIP Loan Agreement, Recitals.

credit would only be available on a priming basis. Indeed, the Lender required priming liens on the New DIP Collateral as a condition to providing the Polymers DIP Facility. This confirmed the expectation of the Debtors that the only way of securing the necessary liquidity to fund the sale process would be through a financing package that primed certain existing liens. Accordingly, it was reasonable for the Debtors to conclude that postpetition financing would only be available if such financing primed existing liens. *See* Augustine Decl. ¶ 21.

### H. The Interests of the Primed Party Are Adequately Protected

75. The Polymers DIP Facility provides adequate protection to the Primed Party. Section 364(d)(1)(B) of the Bankruptcy Code requires a debtor to establish that "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B). Whether the offered protection is "adequate" is determined on a case-by-case basis and "depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the post-petition loan." *Resolution Trust Corp. v. Swedeland Dev. Grp, Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (internal citations and quotations omitted); *495 Cent. Park*, 136 B.R. at 631 (explaining that "[t]he goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest") (citations omitted).

76. Although section 361 of the Bankruptcy Code sets forth three non-exclusive forms of adequate protection (*i.e.*, periodic cash payments, granting replacement liens or for the creditor's realization of the indubitable equivalent of its claim), the concept of adequate protection is designed to give the "parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its [interest] in the property involved." *495 Cent Park*, 136 B.R. at 631 (quoting H. R. .Rep. No. 95-595, 95th Cong., 1st Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6296 (1978)).

77.     Here, the Polymers DIP Facility provides the Primed Party with adequate protection.  The Primed Party will receive adequate protection in the form of (a) supplemental liens on the New DIP Collateral, junior to the New DIP Liens, (b) additional liens on the postpetition collateral identified in paragraph 5(b)(i) of the Polymers Final Cash Collateral Order and (c) an additional administrative expense claim, junior to the DIP Administrative Claim.  As a result, the Primed Party is protected from any diminution in value of its collateral resulting from the Polymers DIP Facility, and such adequate protection is sufficient under the circumstances.

**I.      The Stalking Horse Should be Allowed to Credit Bid the Obligations**

78.     The Stalking Horse APA provides that the Stalking Horse will provide the Polymers DIP Facility of up to $5 million to be used by the Debtors to, among other things, fund M&G Polymers' post-petition operations, professional fees and expenses, and other items in accordance with the Budget (as defined in the DIP Loan Agreement).  As detailed above, the Polymers DIP Facility is secured by first liens on the New DIP Collateral (the "<u>Liens</u>"), subordinate only to the Permitted Liens (as defined in the DIP Loan Agreement).  The Stalking Horse APA and the DIP Loan Agreement provide that the Lender or the Stalking Horse (following assignment by Lender to the Stalking Horse of Lender's rights under the Polymers DIP Facility to Credit Bid the outstanding Obligations owed under the Polymers DIP Facility) to Credit Bid towards the Purchase Price for the Purchased Assets the outstanding Obligations (as defined in the DIP Loan Agreement) owed to Lender under the Polymers DIP Facility, provided that the amount of such Credit Bid shall be limited to $3 million until the indefeasible payment in full in cash of the Prepetition Obligations (as defined in the Polymers Final Cash Collateral Order), with such amount being subject to increase in certain circumstances.

79.     Section 363(k) of the Bankruptcy Code provides that a holder of an allowed claim secured by a lien on property subject to a sale "may bid at such sale, and, if the holder of such

claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). "It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)." *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459 (3d Cir. 2006) (collecting cases); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n.2, (2012) ("The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price."). The Polymers DIP Facility will enable the Debtors to conduct the Sale process in a manner that will allow it to maximize the value of the Purchased Assets. Accordingly, the Lender and the Stalking Horse (as applicable) should be permitted to credit bid the Obligations (as defined in the DIP Loan Agreement), as set forth in the DIP Loan Agreement and Stalking Horse APA, pursuant to section 363(k) of the Bankruptcy Code.

## REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY

80.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Apple Grove Sale Order(s). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court order otherwise."

81.     As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders. Accordingly, the Debtors submit that ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that each Rule applies.

## NOTICE

82.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates; (c) the Internal Revenue Service, the Securities and Exchange Commission and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or order of the Court; (d) Magnate S.à r.l. and its counsel, Kirkland & Ellis LLP and Klehr Harrison Harvey Branzburg LLP; (e) DAK Americas LLC and its counsel, Weil, Gotshal & Manges LLP and Morris, Nichols, Arsht & Tunnell LLP; (f) Trimont Real Estate Advisors, LLC and its counsel, Thompson & Knight LLP, (g) Control Empresarial de Capitales, S.A. De C.V., and Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financiero Inbursa and its counsel, Cleary Gottlieb Steen & Hamilton LLP and Young Conaway Stargatt & Taylor, LLP; (h) Macquarie Investments US Inc. and its counsel, Sidley Austin LLP and Ashby & Geddes, P.A., (i) the Committee and its counsel Milbank, Tweed, Hadley & McCoy LLP and Cole Schotz P.C.; (j) the United Steelworkers and its counsel Cohen, Weiss and Simon LLP and The Law Office of Susan E. Kaufman, LLC; (k) Comerica Bank and its counsel Miller Canfield; (l) all parties that the Debtors are aware of that have an interest in the New DIP Collateral; (m) all parties that have expressed an interest in acquiring Apple Grove Assets; (n) the Debtors' non-Debtor affiliates; and (o) all persons and entities that have filed a request for service of filings in these Cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice need be provided.

## **NO PRIOR REQUEST**

83.     No prior request for the relief sought herein has been made to this Court or any other court, with the exception of the relief requested in the Bidding Procedures and Sale Motion regarding the Apple Grove Assets.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Stalking Horse Order substantially in the form attached hereto as <u>Exhibit A</u>; (ii) enter the Interim Polymers DIP Order substantially in the form attached hereto as <u>Exhibit B</u>, approving the Polymers DIP Facility on an interim basis and scheduling the Final Hearing; (iii) enter the Apple Grove Sale Order(s), substantially in the form attached hereto as <u>Exhibit C</u>, authorizing the Sale of the Purchased Assets to the Successful Bidder(s); and (iv) grant such other and further relief to the Debtors as the Court may be appropriate.

Dated:  January 12, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:           ljones@pszjlaw.com
                     joneill@pszjlaw.com
                     jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:     (212) 326-3939
Facsimile:      (212) 755-7306
Email:           sgreenberg@jonesday.com
                     scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:     (216) 586-7035
Facsimile:      (216) 579-0212
Email:           ceblack@jonesday.com

*Co-Counsel for the Debtors and Debtors in Possession*