REDACTED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) Chapter 11 |
|  | ) |
| M&G USA CORPORATION, *et al.*, | ) Case No. 17-12307 (BLS) |
|  | ) |
| Debtors. | ) Jointly Administered |
|  | ) |
|  | ) **Response Deadline: Feb. 19, 2018** |
|  | ) |
|  | ) **Hearing Date: Mar. 1, 2018, at 10:30 A.M.** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO RECHARACTERIZE, EQUITABLY SUBORDINATE, AND AVOID THE LIENS SECURING THE CLAIMS OF DAK AMERICAS LLC

## PLEADING FILED UNDER SEAL PURSUANT TO
## *ORDER APPROVING STIPULATION AND PROTECTIVE ORDER*
## [ENTERED DECEMBER 5, 2017] [ECF NO. 350]

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*,
    473 B.R. 525 (Bankr. D. Del. 2012) ............................................................................ passim

*Bijou-Pensacola Corp. v. United States*,
    172 F. Supp. 309 (N.D. Fla. 1959)...................................................................................38

*Callaway Cmty. Hosp. Ass'n v. First N. Bank & Tr. (In re Chama, Inc.)*,
    265 B.R. 662 (Bankr. D. Del. 2000) .................................................................................53

*Citicorp Real Estate v. PWA, Inc. (In re Georgetown Bldg. Assocs. Ltd. P'ship)*,
    240 B.R. 124 (Bankr. D.D.C. 1999) .................................................................................29

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    *(In re Papercraft Corp.)*,
    323 F.3d 228 (3d Cir. 2003)..............................................................................................43

*Citicorp Venture Capital v. Comm. Of Creditors Holding Unsecured Claims (In
    re Papercraft Corp.)*,
    160 F.3d 982 (3d. Cir. 1998).............................................................................................49

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*,
    432 F.3d 448 (3d. Cir. 2006)............................................................................ 29, 30, 31, 37

*Ellsworth v. Lyons*,
    181 F. 55 (6th Cir. 1910) ..................................................................................................42

*Estes v. N & D Props., Inc. (In re N & D Props, Inc.)*,
    799 F.2d 726 (11th Cir. 1986) ..........................................................................................43

*Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re
    Dornier Aviation (N. Am.), Inc.)*,
    453 F.3d 225 (4th Cir. 2006) .......................................................................................34, 35

*Fin Hay Realty Co. v. United States*,
    398 F.2d 694 (3d Cir. 1968)..............................................................................................30

*In re Allegheny Int'l, Inc.*,
    118 B.R. 282 (Bankr. W.D. Penn. 1990) ...........................................................................45

*In re Aloha Airlines*,
    Case No. 08-00337, 2009 Bankr. LEXIS 4588 (Bankr. D. Haw. May 14,
    2009) ................................................................................................................................52

i

*In re Antaeus Tech. Servs.*,
   345 B.R. 556 (Bankr. W.D. Va. 2005) ...................................................................52

*In re Autostyle Plastics, Inc.*,
   269 F.3d 726 (6th Cir. 2001) ........................................................... passim

*In re Broadstripe, LLC*,
   444 B.R. 51(Bankr. D. Del. 2010) ...............................................................36, 44

*In re Cold Harbor Assocs.*,
   204 B.R. 904 (Bankr. E.D. Va. 1997)................................................29, 36, 40, 41

*In re Fabricators, Inc.*,
   926 F.2d 1458 (5th Cir. 1991) .....................................................................43

*In re Fisker Automative Holdings, Inc.*,
   510 B.R. 55 (Bankr. D. Del. 2014) ……………………………………….......................52

*In re Friedman's Inc.*,
   452 B.R. 512 (Bankr. D. Del. 2011) ..............................................................34

*In re Hillsborough Holdings Corp.*,
   176 B.R. 223 (M.D. Fla. 1994)......................................................................37

*In re KDI Holdings, Inc.*,
   277 B.R. 493 (Bankr. S.D.N.Y. 1999)............................................................44

*In re Mount Olive Hosp., LLC, Case No. 12-32781/JHW*,
   2014 Bankr. LEXIS 2206 (Bankr. D.N.J. May 16, 2014) .....................................33

*In re Philadelphia Newspapers, LLC, et al.*,
   599 F.3d 298 (3d Cir. 2010)……………………………………………….......................52

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*,
   511 B.R. 253 (Bankr. S.D.N.Y. 2014)............................................................50

*Miller v. Dow (In re Lexington Oil & Gas Ltd.)*,
   423 B.R. 353 (Bankr. E.D. Okla. 2010)..........................................................34

*Official Comm. of Unsecured Creditors v. Fairchild Dornier GmbH (In re Dornier Aviation (N. Am.) Inc.)*,
   Case No. 02-82003, 2005 Bankr. LEXIS 561 (E.D. Va. Feb. 8, 2005)..........................34, 39

*Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*,
   444 B.R. 51 (Bankr. D. Del. 2010) .............................................................36, 44

*Patel v. Shubh Hotels, LLC (In re Shubh Hotels Pittsburgh, LLC)*,
   476 B.R. 181 (Bankr. W.D. Pa. 2012) ........................................................................29, 30, 34

*Roth Steel Tube Co. v. Comm'r*,
   800 F.2d 625 (6th Cir. 1986) ........................................................................................ 33, 34

*Sensenig v. Comm'r*,
   No. 16254-11, 2017 Tax Ct. Memo LEXIS 1 (T.C. Jan. 3, 2017) .........................................30

*Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns)*,
   554 F.3d 382 (3d Cir. 2009).........................................................................................43, 44, 45

*Spencer v. Smith*,
   201 F. 647 (8th Cir. 1912) ...................................................................................................42

*Warren v. King*,
   108 U.S. 389 (1883).............................................................................................................42

## STATUTES

11 U.S.C. § 544(a)(1)...............................................................................................................53

11 U.S.C. § 574(b) ..................................................................................................................51

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 8

I.   THE DEBTORS AND THEIR ATTEMPTS TO FINANCE THE CORPUS CHRISTI PLANT ............................................................................................... 8

II.  DAK AND ITS INVESTMENT IN THE CORPUS CHRISTI PLANT ......................... 10

     A.   ███████████████ ............................................................ 11

     B.   ███████████████████ ..................................................... 13

     C.   ██████████████████████ ............................................... 16

     D.   █████████████████████████████ ..................................... 17

III. M&G'S LIQUIDITY CRISIS AND ALPEK'S OPPORTUNISTIC ACTIONS TO ████████████████ ............................................................................ 21

IV.  THE CHAPTER 11 CASES ............................................................................ 28

ARGUMENT ...................................................................................................... 29

I.   DAK'S ALLEGED "CLAIMS" SHOULD BE RECHARACTERIZED AS AN EQUITY INTEREST ........................................................................................ 29

     A.   Name of the Instrument ........................................................................ 31

     B.   No Fixed Maturity Date, Schedule of Payments, or Interest Rate ......... 32

     C.   Source of Repayment ........................................................................... 33

     D.   Inadequate Capital .............................................................................. 37

     E.   Inability to Obtain Financing from Lending Institutions on Similar Terms ....... 38

     F.   Use of Funds to Acquire Capital Assets ............................................... 41

II.  DAK'S CLAIMS SHOULD BE EQUITABLY SUBORDINATED. ............................. 42

     A.   DAK Should Be Treated as an Insider of the Debtors. ......................... 43

          i.    DAK and M&G Were De Facto Partners or Joint Venturers. .......... 44

          ii.   DAK Used Coercive Tactics to Exert Influence on M&G. ............... 44

     B.   Alpek's Shutoff of Supply and Press Release Constituted Inequitable Misconduct that Harmed the Debtors and Conferred Unfair Advantages on DAK. ........ 46

III. M&G RESINS' GRANT OF A LIEN TO DAK WAS AN AVOIDABLE PREFERENTIAL TRANSFER. ............................................................................ 49

REDACTED

IV.    DAK'S RIGHT TO CREDIT BID SHOULD BE DENIED FOR "CAUSE." ................. 51

V.    DAK'S ALLEGED SECURITY INTEREST IN THE EQUITY OF M&G
       RESINS, HELD BY M&G USA, WAS NEVER PERFECTED AND SHOULD
       BE AVOIDED UNDER SECTION 544 OF THE BANKRUPTCY CODE .................... 52

CONCLUSION ......................................................................................................................... 53

The Official Committee of Unsecured Creditors (the "Committee") of M&G USA Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors," and together with the other direct and indirect subsidiaries of Mossi & Ghisolfi S.p.A, "M&G"),[1] in accordance with paragraph 23 of the Final DIP Order,[2] hereby objects to allowance of the claims asserted by DAK Americas LLC ("DAK")[3] and moves to (i) recharacterize DAK's "claims" as equity interests under section 105 of the Bankruptcy Code; (ii) equitably subordinate DAK's claims to all unsecured claims against the Debtors under section 510(c) of the Bankruptcy Code; (iii) avoid DAK's asserted liens under sections 547(b) and 544(a) of the Bankruptcy Code; and (iv) deny, for cause, DAK's right to credit bid under section 363(k) of the Bankruptcy Code.  In support thereof, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.       On February 13, 2013, after years of failed efforts to raise capital for the construction of a vertically integrated PTA/PET plant in Corpus Christi, Texas (the "Corpus Christi Plant"), Marco Ghisolfi, CEO and Executive Director of M&G Chemicals, proudly

---

[1]   Capitalized terms that are not defined herein have the meanings given to them in the *Final Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession To Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 632, 363, 364 and 507; and (5) Granting Related Relief* [ECF No. 479] (the "Final DIP Order").

[2]   Under the Final DIP Order, the Committee has automatic standing to bring challenges to DAK's alleged secured claim, and authority to proceed by motion rather than adversary proceeding.  Final DIP Order ¶ 23.

[3]   The Committee objects to the full amount of DAK's claims against M&G Resins USA LLC ("M&G Resins") and M&G USA Corporation ("M&G USA"), which is scheduled in the amount of $462,767,500 and which DAK may assert should be even higher.  *See* Amended Schedules of M&G Resins [ECF No. 782]; Schedules of M&G USA [ECF No. 753].  The Committee also objects to the unsecured claim in the same amount against Debtor M&G Chemicals S.A. ("M&G Chemicals") as a guarantor under the "Second Lien Term Loan," which appears to be a reference to a guarantee agreement among M&G Chemicals, DAK and Grupo Petrotemex, S.A. de C.V., dated May 20, 2015.  Schedules of M&G Chemicals [ECF No. 745]; *see also* Declaration of Alexander B. Lees ("Lees Decl.") Ex. AAA.  To the extent DAK asserts that it is entitled to a higher claim amount by virtue of liquidated damages allegedly accruing after the petition date, the Committee reserves the right to challenge such amounts on any ground, including under section 502(b)(2).

announced M&G's success in raising $950 million in funding for the project. ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████

2.      This strategic investment by DAK – which was an outgrowth of a broader plan,

begun years earlier, to expand DAK's role in the North American resins market – was reflected

in a constellation of agreements with M&G, whereby DAK and its affiliates (collectively, the

"DAK Group") effectively formed a joint venture with M&G: ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ it

was, as a matter of economic reality, a partnership or joint venture between DAK and M&G in

all material respects.

3.      ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████ In effect, what had started as a

symbiotic relationship became parasitic.  Now, five years later, with the original agreements and

construction plans in the rearview mirror, DAK belatedly proclaims itself a secured creditor with

an allegedly perfected second-priority lien over the still-incomplete Corpus Christi Plant, and has

expressed its intent to credit bid in an auction for the sale of the facility.  DAK's asserted claims

of at least $462 million should be disallowed for numerous reasons:

4.      ***DAK's alleged "claim" should be recharacterized***.  It was clear to the parties from the outset that M&G's relationship with DAK was in the nature of a partnership or joint venture, and not a debt financing. ████████████████████████████

██████████████████████████████████████████████████

███████████████████ At the same time, the provisions that *are* found in the agreements are indicative of an equity contribution.  For example, the agreements provide that:



- ██████████████████████████████████████
- ██████████████████████████████████████
- ██████████████████████████████████████
- ██████████████████████████████████████

5.      Apart from the terms of the agreements themselves, M&G and the DAK Group evidenced their intent to establish an equity investment by their words and actions.  For instance:

- ██████████████████████████████████████
- ██████████████████████████████████████



6.     Other circumstances surrounding the transaction provide further support for the characterization of DAK as an equity investor:



7.     Based on these and other factors discussed more fully below, the Court should exercise its equitable authority under section 105 of the Bankruptcy Code to recharacterize DAK's alleged secured "claim" as an equity interest, and disregard the purported lien granted in respect thereof.

8.     ***DAK's claims should be equitably subordinated.***  Alternatively, the DAK Group's actions before the commencement of these chapter 11 cases warrant equitable subordination of DAK's claims under section 510(c) of the Bankruptcy Code.

9.      DAK's dealings with the Debtors over the past five years evince a close relationship that was not conducted at arm's length.  The record shows that DAK exploited its multifaceted role as partner, supplier, and competitor of M&G to coerce the Debtors to act contrary to their own financial interests.  ███████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████ These abuses justify treating DAK as a "non-statutory insider" of the Debtors under established Third Circuit law, exposing DAK's behavior to a level of heightened scrutiny that it cannot withstand.

10.     When the prospects for completion of the Corpus Christi Plant began to look bleak, the DAK Group used its role as a de facto insider to injure the Debtors' businesses, devalue their assets, and position the DAK Group to purchase the Debtors' assets at bargain-basement prices.  The DAK Group first cut off supply to M&G's plant in Altamira, Mexico, which would have ripple effects extending to M&G's U.S. operations ████████████████ ████████████████████████████████████████████████ ██████████████████ The DAK Group then broadcast harmful and confidential information (to which it had access by virtue of the close relationship and financial entanglement with M&G) by issuing a condemning press release in September 2017 concerning the progress of the Corpus

Christi construction project.  In doing so, the DAK Group sparked widespread industry distrust,

and exacerbated the extreme liquidity problems that the

Debtors were already experiencing and that ultimately landed them in chapter 11.

11.  DAK's claims should be subordinated so that the

DAK Group cannot profit from its wrongdoing by credit bidding for the Debtors' assets at

depressed prices.

12. ***DAK's alleged security interests are avoidable.***  To the extent that DAK's

investment in M&G Resins is classified as a debt claim and not subordinated, that claim is

nonetheless not entitled to secured status: the grant of a lien on the Corpus Christi Plant to DAK

constituted an avoidable preferential transfer.  DAK's asserted second-priority lien was granted

and recorded in December 2016 – years after the execution of the agreements giving rise to

DAK's alleged claim, less than one year before M&G Resins commenced its bankruptcy case,

and .  For all the reasons that DAK should be

considered a non-statutory insider for purposes of equitable subordination, so too must it be

considered an insider for purposes of section 547, and its lien should be avoided under sections

547(b) and 550 of the Bankruptcy Code.

REDACTED

13.    DAK should be denied secured status as to M&G USA, too.  While DAK was purportedly granted a security interest in the equity of M&G Resins owned by M&G USA (a grant that was of questionable legal efficacy, for reasons discussed below), DAK failed to perfect that security interest before M&G USA's petition date.  Under section 544(a) of the Bankruptcy Code, that unperfected security interest should be avoided.

14.    ***DAK's right to credit bid should be denied for cause***.  Finally, even if DAK is determined to have a secured claim, the inequitable and harmful actions taken by the DAK Group, to exploit M&G's financial difficulties for its own gain – at a minimum – constitute "cause" to deny DAK the right to credit bid for the Debtors' assets under section 363 of the Bankruptcy Code.

*        *        *

15.    A successful challenge to DAK's alleged secured claims will have significant implications for these estates and for the Debtors' unsecured creditors.  If DAK's claims are either recharacterized or equitably subordinated, or its liens are avoided, value of approximately $463 million will be potentially freed up for unsecured creditors – including potentially to fund further investigations of valuable causes of action in these cases.

16.    In addition, if DAK is allowed to credit bid for the Debtors' assets in the upcoming auction, it is likely to chill other bidders, who are required to make cash bids.  If, by contrast, the Court grants the relief sought by this Motion, DAK will not be permitted to credit

bid and the potential for the estates to enjoy a robust and competitive auction process, and to receive substantial cash bids, will be greatly enhanced.[4]

## BACKGROUND

### I. THE DEBTORS AND THEIR ATTEMPTS TO FINANCE THE CORPUS CHRISTI PLANT

17.    The Debtors are subsidiaries of Mossi & Ghisolfi S.p.A, an Italian company controlled through its intermediate subsidiary M&G Finanziaria S.p.A.  They are engaged in the plastics processing business as well as in the production of PET resin and engineering relating to PET plants.  Declaration of Dennis Stogsdill in Support of First Day Pleadings [ECF No. 3] ("Stogsdill Decl.") ¶ 13.  M&G's non-Debtor subsidiaries own plants in Suape, Brazil and Altamira, Mexico.  *Id.* ¶ 14.

18.    In April 2013, M&G Resins began construction of a vertically integrated PET and PTA plant located in Corpus Christi, Texas, which was anticipated to be the largest facility of its kind in the world.  Stogsdill Decl. ¶ 9.  ███████████████████████████████

████████████████████████████████████████████████████████

██████████████████

19.    ████████████████████████████████████████████

████████████████████████████████████████████

---

[4]    The challenges to DAK's alleged claims herein are based on publicly available information and the discovery materials the Committee has received to date from the Debtors, DAK, and Inbursa under Bankruptcy Rule 2004.  The Committee's investigation into DAK's claims and conduct, however, is ongoing.  Among other things, document productions have continued to be rolled out to the Committee throughout January, limiting the Committee's ability to conduct a complete review in advance of the February 1 challenge deadline established by the Final DIP Order.  The Committee intends to supplement existing discovery with depositions and offer expert testimony in further support of its objections to DAK's claims.  As such, following the filing of this motion, the Committee intends to contact DAK's counsel and negotiate a scheduling order that will address the timing of future discovery and litigation tasks.  The Committee hereby reserves the right to supplement its challenges to DAK's claims, including based on new information and evidence that may be uncovered in future discovery.



20.

## II.    DAK AND ITS INVESTMENT IN THE CORPUS CHRISTI PLANT

21.    DAK, founded in 2001, is a self-described "fast growing company"[5] and one of the largest producers and suppliers of PET resins in the world.  DAK is a direct, and the largest, competitor of the Debtors.  It is a subsidiary of Grupo Petrotemex, S.A. de C.V. ("GPT"), which is, in turn, a subsidiary of Alpek S.A.B. de C.V. ("Alpek"), a business group of Alfa S.A.B. de C.V. of Monterrey, Mexico ("Alfa"), one of Mexico's largest global industrial companies.[6]

22.    Beginning in 2011, Alpek implemented a strategy to expand its position in the North American plastic resins market, including two significant acquisitions that year.  First, it acquired three U.S.-based PTA and PET facilities from Eastman Chemical Company on January 31, 2011, as well as intellectual property rights to PTA and PET production technologies known as IntegRex®.  Lees Decl. Ex. E, at 5.  On August 31, 2011, DAK also acquired the PET business of Wellman Holdings, Inc., a resin producer with a plant in Mississippi, referred to as the Pearl River facility.  Alpek described the plant as "strategically located on the coast of the Gulf of Mexico, close to the main sources of raw materials for the production of PET."  *Id.*

23.    The DAK Group's relationship with M&G, including its investment in the Corpus Christi construction project, was a natural outgrowth of the expansion strategy that had begun years earlier. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████    ████████████████

████████████████████████████████████████████████

---

[5]    https://www.dakamericas.com/us-en/about/.

[6]    DAK is also a wholly owned subsidiary of Alfa.

**A.** ████████████████

24. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████

25. ████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

26. ████████████████████████████

████████████████████████████████████████



27.

28.



29.

B.

30.

31.

32.





33. 

34.

35.

     a.

     b.





38. ███████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████
██████████

**D.    The Parties' Recognition of the DAK Group as an Equity Investor**

39.    The parties intended from the outset for the DAK Group to be an equity investor in the Corpus Christi project. ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████

40.    M&G made similar representations to third parties. ███████████████
████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████

[8] ████████████████████████████████████████████████



41.

42.



43.

44.     The DAK Group also referenced the arrangement with M&G in terms more consistent with a partnership or joint venture than a debt financing.

██████████████████████████████████████████████████████████

███████████████

45.    Other communications confirm that the DAK Group viewed the relationship with

M&G as a partnership with *strategic* importance for the DAK Group's enhancement of its

market position in North America.  ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

46.    The parties' accounting treatment for the transaction similarly confirms their view

of DAK as an equity owner.  ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

REDACTED



47.    Industry analysts shared the view that the DAK Group was an equity owner.

### III.    M&G'S LIQUIDITY CRISIS AND ALPEK'S OPPORTUNISTIC ACTIONS TO

48.    While construction of the Corpus Christi Plant was initially anticipated to be completed in December 2015 at a cost of approximately $1.1 billion, the facility was still under construction and had already cost $1.86 billion as of M&G Resins petition date, October 30, 2017. Stogsdill Decl. ¶¶ 10, 39. As a result of increased construction costs caused primarily by delays and cost overruns, and the inability to generate the projected revenue from the sale of PET in 2016 and 2017, M&G found itself in a precarious liquidity position. *Id.* ¶ 43.

49.



███████████████████████████████████████████████████

█████████████████████████████

50.     Though the DAK Group's provision of this loan suggested its interest in alleviating M&G's cash problems so that the Corpus Christi Plant would successfully come online, its real intent was much less magnanimous. ██████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ In doing so, DAK was able to gain preferential treatment that it had not previously enjoyed with respect to M&G Resins' assets.

51.     ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████

52.     ███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

████████  ██████████████████████████████████████



53.    In any event, DAK never perfected its security interest in M&G USA's equity interest in M&G Resins, as it failed to file a UCC-1 financing statement in Delaware.

Yet DAK *did nothing at that time* to exercise its rights.

54.



55.     Ultimately, the DAK Group demanded only a second-priority lien.

56.     But even this was not enough for the DAK Group.

57.



58.     On September 12, 2017, M&G's liquidity issues were further strained when Alpek issued a press release announcing that M&G was past due on payments for the supply of PTA at its plants in Mexico and Brazil (the "Press Release").  Lees Decl. Ex. CC.  Alpek stated that it was halting supply of PTA to these plants, and that it had "engaged other creditors to assess the situation and determine the appropriate individual or joint course of action."  *Id.* Alpek also informed the public that it "anticipate[d] difficulties for M&G to conclude the [Corpus Christi] project" and would continue to "monitor[] the project's status and act accordingly."  *Id.*

59.





60.

61.    On information and belief, Alpek's cutoff of raw materials at the Altamira plant also curtailed M&G's ability to supply its U.S. customers,



62.    The DAK Group's prepetition attempts to exacerbate M&G's liquidity issues were deliberately calculated to take advantage of its competitor's worsening financial situation.



63.    ███████████████████████████████████████ is further supported by the fact that, before the commencement of these cases, Alpek purchased Inbursa's position in a $100 million loan to M&G's Mexican subsidiary, M&G Polímeros México ("Polímeros México").  Stogsdill Decl. ¶ 36 n.11; Lees Decl. Ex. UU.  ██████

███████████████████████████████████████

███████████████████████████████████████

██████████████    On January 11, 2018, Alpek also announced that it signed an agreement to provide financing to Polímeros México, secured by a lien on M&G's Altamira plant.  *See* Lees Decl. Ex. KK.  On information and belief, Polímeros México expects to sell its assets, including the Altamira plant, which will likely occur in a Mexican insolvency proceeding, and DAK may seek to credit bid for such assets.  The Corpus Christi Plant would be an appealing acquisition target, as it is located next to one of DAK's own facilities.

---



REDACTED

## IV.    THE CHAPTER 11 CASES

64.    Despite their attempts to remedy their liquidity crisis, the Debtors were unsuccessful and filed for protection under chapter 11 of the Bankruptcy Code: M&G Polymers commenced its chapter 11 case on October 24, 2017; the remaining Debtors, including M&G Resins, filed their petitions on October 31, 2017.

65.    On December 14, 2017, the Court entered the Final DIP Order, approving debtor-in-possession financing to fund these cases on a final basis.  Notwithstanding the facts described above – including the Debtors' previous admissions that the Upfront Amount was an equity contribution by DAK – the Debtors stipulated in the Final DIP Order that they were "indebted and liable" under the CRA for the total Upfront Amount and any fees, expenses, or other amounts due thereunder.  Final DIP Order ¶ (B)(vi).  The Debtors stipulated that "the liens and claims, which claims are secured, arising in connection with the Pre-Petition Second Lien Obligations are due and owing to [DAK], without any defense, offset, recoupment or counterclaim of any kind" and that the Debtors' prepetition obligations to DAK "constitute the legal, valid, perfected, binding, and enforceable obligations," which are not subject to "avoidance, subordination, recharacterization, . . . or other claim of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law."  *Id.* ¶ (B)(vi).

66.    The Debtors have thus forfeited the right to object to DAK's alleged claims on any ground.  Under paragraph 23(b) of the Final DIP Order, the Committee is authorized to bring any challenge to DAK's claims "by motion on standard 21 day notice and the [Committee] shall be deemed to have standing for any such Challenge so brought."  *Id.* ¶ 23(b).  As such, the Committee was granted automatic standing to seek the relief requested herein, and to proceed by contested matter rather than adversary proceeding.

28

## ARGUMENT

### I.    DAK'S ALLEGED "CLAIMS" SHOULD BE RECHARACTERIZED AS AN EQUITY INTEREST.

67.    Under section 105(a) of the Bankruptcy Code and established case law, under appropriate circumstances, the Court is authorized to characterize an alleged "claim" as an equity interest.  When presented with a recharacterization request, a court is tasked with determining the "true character" of an outlay of funds, *Citicorp Real Estate v. PWA, Inc. (In re Georgetown Bldg. Assocs. Ltd. P'ship)*, 240 B.R. 124, 138 (Bankr. D.D.C. 1999), by examining whether the relevant transaction "created a debt or equity relationship from the outset." *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997).  The Court must determine "what is the proper characterization in the first instance of an investment."  *Cohen v. KB Mezzanine Fund II, LP, (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 (3d. Cir. 2006).  The Court's overarching inquiry is "whether the parties to the transaction in question intended the loan to be a disguised equity contribution."  *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 572 (Bankr. D. Del. 2012) (citation omitted); *see also Patel v. Shubh Hotels, LLC (In re Shubh Hotels Pittsburgh, LLC)*, 476 B.R. 181, 188 (Bankr. W.D. Pa. 2012) (finding the economic realities of the surrounding circumstances of the alleged loan evidenced an equity contribution and not bona fide debt).

68.    As the Third Circuit has held, a court may infer the parties' intent "from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances."  *In re SubMicron Sys.*, 432 F.3d at 456; *see also Sensenig v. Comm'r*, No. 16254-11, 2017 Tax Ct. Memo LEXIS 1, at *21 (T.C. Jan. 3, 2017) (citing *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968) (finding the true nature of an investment to be that of equity and not debt based on "(1) the intent of the parties;

(2) the form of the instrument; and (3) the objective economic reality of the transaction"). When determining how to characterize a transaction, a court should reach a "commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)." *In re SubMicron Sys.*, 432 F.3d at 456.

69.    Courts have identified numerous factors to assist in the evaluation of the parties' intent. These factors, derived primarily from the Sixth Circuit's leading decision in *Autostyle Plastics*, include, among others: (i) the name of the instrument; (ii) the presence or absence of a fixed maturity date or interest rate; (iii) the source of repayments; (iv) the adequacy or inadequacy of capitalization; (v) the corporation's ability to obtain financing from outside lending institutions on similar terms; (vi) the extent to which the proceeds were used to acquire capital assets; and (vii) the presence or absence of a sinking fund. *In re Autostyle Plastics, Inc.*, 269 F.3d 726, 749-750 (6th Cir. 2001); *accord, e.g.*, *In re Shubh Hotels Pittsburgh, LLC*, 476 B.R. at 188 (finding numerous *AutoStyle* factors weighed in favor of recharacterizing as equity). When evaluating these factors, courts in the Third Circuit do not take a mechanistic approach, and instead focus on the totality of the circumstances to determine the intent of the parties. *See, e.g., In re SubMicron Sys.*, 432 F.3d at 456.

70.    Overwhelming evidence in these cases, including the presence of numerous *Autostyle* factors, supports the conclusion that DAK's outlay of funds in connection with the Corpus Christi Plant was, from the start, intended by the parties to be an equity investment, and not a loan.

### A.    Name of the Instrument

71.    One of the factors considered by courts in determining whether to characterize an investment as debt or equity is the name given to the instruments, if any, evidencing the alleged indebtedness.  *See, e.g.*, *In re SubMicron Sys.*, 432 F.3d at 457.; *In re Autostyle Plastics, Inc.*, 269 F.3d at 749-50; *In re Autobacs Strauss, Inc.*, 473 B.R. at 573.

72.    

73.

*Compare In re Autobacs Strauss, Inc.*, 473 B.R. at 573 (instruments named the "'loan agreements' between 'borrower' and 'lender,'" indicate a debt transaction).

Courts have held that this is a "strong indication" that a transaction was an equity contribution. *E.g.*, *In re Autobacs Strauss, Inc.*, 473 B.R. at 573.

74.    There is perhaps no more probative evidence of the parties' intent than the terms and phrases they used contemporaneously to describe their relationship, including in discussions with third parties.



75.    Third-party industry analysts reached similar conclusions as the parties.  Instead of referring to the transaction as a "loan" or other debt instrument, multiple analysts referred to the agreement as a "strategic partnership" and "joint venture." Lees Decl. Ex. V, at 299; Ex. TT, at 254; Ex. X, at 77-79, 90; Ex. Y, at 383-84.

**B.    No Fixed Maturity Date, Schedule of Payments, or Interest Rate**

76.    The absence of a fixed maturity date or schedule of periodic payments is a strong indication that a transaction is properly characterized as an equity investment.  *In re Autobacs Strauss, Inc.*, 473 B.R. at 573 (finding "[t]he absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans") (internal quotation marks omitted); *accord, e.g.*, *In re AutoStyle*, 269 F.3d at 750; *Roth Steel*

[17]

*Tube Co. v. Comm'r*, 800 F.2d 625, 631 (6th Cir. 1986).  So, too, is the absence of an interest

rate: this indicates that an investor "is more interested in seeing the value of its investment grow

rather than receiving periodic payments."  *In re Mount Olive Hosp., LLC*, Case No. 12-

32781/JHW, 2014 Bankr. LEXIS 2206, at *34 (Bankr. D.N.J. May 16, 2014) (citation omitted).

77.         Thus, as the Debtors made clear in their

prospectus issued in connection with the November 2013 Global Offering, "the DAK

contribution [was] not interest-bearing" and non-redeemable.  Lees Decl. Ex. C, at 252.

### C.       Source of Repayment

78.       Where "the expectation of repayment depends solely on the success of the

borrower's business, the transaction has the appearance of a capital contribution."  *Roth Steel*

*Tube Co.*, 800 F.2d at 631; *see also In re Friedman's Inc.*, 452 B.R. 512, 521-22 (Bankr. D. Del.

2011); *Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353 (Bankr. E.D. Okla. 2010)

(where defendants would receive return on investment through profits, this evidences an equity

investment).  Even where repayment is not entirely dependent on a borrower's earnings or success, courts will still look to "the underlying economic reality and the general tie between the loan's repayment and the success of the business" in determining how to characterize an investment.  *In re Autobacs Strauss, Inc.*, 473 B.R. at 575.

79.     Where no repayment is required until after a company's operations become profitable, this weighs in favor of recharacterization because "the hope of payment out of future profits is exactly what characterizes an equity investor."  *Official Comm. of Unsecured Creditors v. Fairchild Dornier GmbH (In re Dornier Aviation (N. Am.) Inc.)*, Case No. 02-82003, 2005 Bankr. LEXIS 561, at *55 (E.D. Va. Feb. 8, 2005) *aff'd by Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 230-35 (4th Cir. 2006); *see also In re Shubh Hotels*, 476 B.R. at 186-87 (where "expectation of repayment from the Debtor" available "only [w]henever it had the cash flow available is the very essence of an investment transaction or equity infusion") (internal citations and quotations omitted).  Applying this factor in *Dornier Aviation*, the Fourth Circuit affirmed a bankruptcy court's recharacterization of a claim where the creditor viewed its infusion of funds as "'a market investment' designed to expand its access to the North American market," *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d at 230, and did not expect repayment "until the whole operation turned positive."  *Id.* (internal quotation marks omitted).

80.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

REDACTED



These are not the terms on which a typical banker would lend money.

81.

82.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████ Neither entity would have the ability to pay if the plants were not

complete, or if they had defaulted on their indebtedness. *See Official Unsecured Creditors'*

*Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R.

96-97 (Bankr. D. Del. 2010) (evidence indicating borrower is "unable to repay . . . out of

operating cash flows" weighs in favor of recharacterizing as equity").

83.    ████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

gives "the appearance of equity as it is assumed that a non-shareholder bargaining at arm's

length would demand specifics and formalities to protect their investment." *See In re Cold*

*Harbor Assocs.*, 204 B.R. at 917-18 (finding that the method of repayment was "vague" and that

"[a]n advance made . . . with so little regard for the method of repayment . . . does not bear the

earmarks of a loan.").

84.    ████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

The possibility of pricing fluctuations meant that DAK not only faced upside both downside and potentially unlimited upside.

### D.    Inadequate Capital

85.    Because true lenders typically do not make loans to companies without the benefit of an equity cushion, "when a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital." *In re SubMicron Sys.*, 432 F.3d at 457 (quoting *AutoStyle*, 269 F.3d at 746-47).  Thus, courts have held that "[t]hin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans." *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 576 (Bankr. D. Del. 2012) (internal citations and quotation marks omitted).  This factor is especially relevant in the case of investments made in a startup – i.e., where a company is "started by the shareholders with a minimal amount of capital" and an alleged loan is made at or near the time of the company's formation. *Id.; see also Bijou-Pensacola Corp. v. United States*, 172 F. Supp. 309, 312-13 (N.D. Fla. 1959) (finding funds advanced to construct and commence the project were equity-like contribution); *In re Hillsborough Holdings Corp.*, 176 B.R. 223, 249 (M.D. Fla. 1994) ("[A]n advance provided to it is more likely to be characterized as a capital contribution [. . .] when a large portion of the funds advanced were used to meet expenses needed to commence operations.").

86.    Here, this factor also weighs in favor of treating DAK as an equity owner rather than a lender. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████

REDACTED



### E.    Inability to Obtain Financing from Lending Institutions on Similar Terms

87.    In conducting a recharacterization analysis, courts consider whether a reasonable creditor would have been willing to make a loan to the debtor on similar terms; if not, this fact weighs in favor of characterizing an investment as an equity contribution.  *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 579 (Bankr. D. Del. 2012) (quoting *AutoStyle*, 269 F.3d at 752).



88.  Typical lenders do not provide "first in" money, but instead rely on a preexisting equity cushion.

89.  This is a quintessential characteristic of equity; institutional lenders providing debt financing do not agree to uncertain or fluctuating returns.

---

[18]

90. 

*See In re*

*Dornier Aviation (N. Am.) Inc.*, Case No. 02-82003-SSM, 2005 Bankr. LEXIS 561, *56-59

(Bankr. E.D. Va. Feb. 8, 2005) (recharacterizing claim that was strategic "market investment"

with no fixed maturity date and expect source of payments from profits).

91.

These terms, too, are not typical of provisions to which a true lender

would agree.  *See In re Cold Harbor Assocs.*, 204 B.R. at 914 (recharacterizing claims that

"display[ed] the earmarks of an equity exchange between a partner and partnership rather than a

debt exchange between a creditor and debtor").

92.



This is not the type and level of exposure that a lender would ever accept. Rather, these rights and obligations of DAK are those that would be expected of an owner.

93.

94.

This is not conduct one would expect from a party truly acting as a secured lender.

95.



This conduct, again, is inconsistent with that of a lender.

96.

Inasmuch as the recharacterization analysis focuses on the intent of the parties at the outset of the investment, a lien granted years after the fact is probative of little, if anything. *See In re Cold Harbor Assocs.*, 204 B.R. at 916-17.

###    F.    Use of Funds to Acquire Capital Assets

97.    In determining whether to recharacterize a debt claim as an equity interest, courts consider the extent to which the funds provided were used to acquire capital assets (which is indicative of an equity infusion), rather than to fund the daily operating needs of the company (which is more typical of debt financing). *See In re Autobacs Strauss, Inc.*, 473 B.R. at 580. This factor, too, weighs in favor of characterizing DAK as an equity investor:

*    *    *

98.    For all of these reasons, DAK's alleged "claims" under the CRA and related contracts are, in reality, an equity interest. It follows, therefore, that DAK cannot assert any security interest in the Debtors' property as a basis for priority treatment in these cases. As the

Supreme Court has held, attempts to secure an equity interest are a nullity, as an equity holder "cannot be both creditor and debtor, by virtue of his ownership of stock." *Warren v. King*, 108 U.S. 389, 399 (1883). This principle is rooted in the proposition that any attempt to give an equity owner an interest above that of creditors is void. *Spencer v. Smith*, 201 F. 647, 655 (8th Cir. 1912); *Ellsworth v. Lyons*, 181 F. 55, 58 (6th Cir. 1910). DAK's asserted secured claim against M&G Resins (as well as any claim premised on a guarantee by M&G Chemicals) should be recharacterized in its entirety, and its alleged security interests disregarded.

## II.    DAK'S CLAIMS SHOULD BE EQUITABLY SUBORDINATED.

99.    If the Court concludes that DAK's claims should not be recharacterized, any such claims should nonetheless be equitably subordinated to the claims of all other creditors.

100.    Under section 510(c) of the Bankruptcy Code, the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c). The Court may exercise its power of equitable subordination where (i) the claimant engaged in some type of misconduct, (ii) that misconduct "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant," and (iii) such subordination is otherwise consistent with the provisions of the Bankruptcy Code. *Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns)*, 554 F.3d 382, 411 (3d Cir. 2009). The purpose of equitable subordination is "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233-34 (3d Cir. 2003) (citation omitted). Equitable

subordination may be warranted even by misconduct "unrelated to the acquisition or assertion of the particular claim whose status [is] at issue." *Winstar*, 554 F.3d at 412 (citation omitted).

101.    Where the claimant is an insider of the debtors, the threshold for granting equitable subordination is much lower and a court may equitably subordinate a claim upon "presenting material evidence of [the claimant's] unfair conduct." *Winstar*, 554 F.3d at 412 (quoting *Estes v. N & D Props., Inc. (In re N & D Props, Inc.)*, 799 F.2d 726, 731 (11th Cir. 1986)).  That is because any dealings between an insider and debtor must be "rigorously scrutinized" by a court.  *Winstar*, 554 F.3d at 412 (citing *In re Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991)); *see also* S.Rep. No. 95-989, at 25 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5810 ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at [arm's] length with the debtor.").

## A.    DAK Should Be Treated as an Insider of the Debtors.

102.    As the Third Circuit recognized in *Winstar*, a person need not be an actual equity owner to be considered an "insider" of the debtor for purposes of equitable subordination. *Winstar*, 554 F.3d at 396.  Instead, a creditor will be considered a "non-statutory" insider where there is a close relationship between it and the debtor and other circumstances "to suggest that any transactions were not conducted at arm's length."  *Id.* at 396-97; *see also* 5-547 Collier on Bankruptcy ¶547.03[6] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. rev.2014) ("The consideration of insider status focuses on two factors: (1) the closeness of the relationship between the parties; and (2) whether the transaction was negotiated at arm's length.").

i.        *DAK and M&G Were De Facto Partners or Joint Venturers.*

103.    In determining whether a creditor is a non-statutory insider, courts have evaluated

whether, among other things, the creditor "generally acted as a joint venture or prospective

partner" with the debtors.  *See In re Broadstripe, LLC*, 444 B.R. 51, 80 (citing *In re KDI*

*Holdings*, 277 B.R. 493, 512 (Bankr. S.D.N.Y. 1999)).  If so, this creates the inference that

transactions between the creditor and the debtor were not conducted at arm's length.  *Id.*

104.    As described in detail above, the DAK Group and M&G were engaged in a de

facto partnership or joint venture with respect to the Corpus Christi Plant.  The relationship

between DAK and M&G far exceeded the bounds of a typical relationship between creditor and

debtor: the parties recognized this close relationship, █████████████████████████

███████████████████████████████████████████████████████████

ii.        *DAK Used Coercive Tactics to Exert Influence on M&G.*

105.    Where a creditor engages in domineering conduct towards a debtor, which goes

beyond the contractual rights incidental to a creditor-debtor relationship, such behavior is

sufficient to render the creditor a non-statutory insider.  *See Winstar*, 554 F.3d at 399 (finding

creditor was insider where it was one of the debtor's major suppliers and "had the ability to

coerce [the debtor] into a series of transactions that were not in [its] best interests").

106.    For example, in *Winstar*, the Third Circuit held that a creditor, who was one of the

debtor's major suppliers and coerced the debtor through economic pressure to engage in

transactions against the debtor's self-interest, was a non-statutory insider of the debtor for

purposes of equitable subordination and avoidance of a preferential transfer to an insider.

*Winstar*, 554 F.3d at 399.  In doing so, the Third Circuit found that the combination of the

defendant's status as creditor and improper behavior went beyond that of a typical creditor-debtor relationship and instead involved "one-sided transactions [that] refute any suggestion of arm's length dealings." *Id.*

107.    So too here was the DAK Group in a unique position to take advantage of its close relationship with M&G and exert undue pressure and control. ███████████████

███████████████████████████████████████████████████████████

███████████████████    *See In re Allegheny Int'l, Inc.*, 118 B.R. 282, 298 (Bankr. W.D. Penn. 1990) (creditor deemed insider where it "received a great volume of information that was not available to other creditors, shareholders, and the general public" and was the "type of information [] available only to insiders"). ███████████████████████

███████████████████████████████████

108.    ███████████████████████████████████





109.

110.    These facts demonstrate that DAK was in a position to take advantage of confidential information about the Debtors, and make them succumb to pressure and enter into agreements on non-arm's-length terms.  Under these circumstances, DAK should be considered a non-statutory insider of the Debtors.

**B.    Alpek's Shutoff of Supply and Press Release Constituted Inequitable Misconduct that Harmed the Debtors and Conferred Unfair Advantages on DAK.**

111.    As a non-statutory insider of the Debtors, the DAK Group's conduct is subject to heightened scrutiny for purposes of the equitable subordination analysis.  Application of that scrutiny should result in subordination of DAK's claims.

112.    As described above, the DAK Group abused its position of control by forcing the

Debtors to ████████████████████████████████████████████████████

████████    But the DAK Group's misconduct extended well beyond this.

113.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████

114.    The DAK Group then proceeded to execute on its plan.  *First*, Alpek cut off a

critical source of raw material supply to M&G's facilities in Mexico and Brazil, ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

115.    Next, the DAK Group moved to deal a death blow to M&G by issuing the Press

Release.  Alpek broadcast to the public that it had suspended supply of PTA to M&G and

"anticipate[d] difficulties for M&G to conclude the [Corpus Christi] project."  Lees Decl. Ex.

CC.  Alpek also stated that it had engaged other creditors about individual or joint action against

M&G.  *Id.*

116.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ Within days of its release,

news of M&G's alleged financial troubles was making headlines,[20] ████████████

█████████████████████████████████████████████████████

█████████████████████

117.    The Press Release thus harmed the Debtors and their creditors.  It also conferred

an unfair advantage on the DAK Group – a direct competitor of M&G – by weakening the

Debtors' already struggling business.  ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ ██████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████

118.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

---

[20]    Lees Decl. Ex. GG ("In an amazingly public battle between supplier and customer, Mexican conglomerate Alpek SAB de CV announced that it is stopping shipments of a PET feedstock to two plants operated by M&G Chemicals SA because of unpaid debts.").

[21]    ████████████████████████████████████████████████████
████████████████████████████████████████████████████

REDACTED

███████████████████████████████ This is not conduct typical of a creditor looking to make a return on a loan.  Rather, this conduct suggests a strategy by DAK to position itself to take control of M&G's Mexican operations – including through a potential credit bid in any insolvency proceeding in Mexico.  *See, e.g., Citicorp Venture Capital v. Comm. Of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 160 F.3d 982, 990-91 (3d. Cir. 1998) (affirming equitable subordination holding where creditor purchased claims against debtors in attempt to control debtor's assets and profit to the detriment of other creditors); *LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 352-53 (Bankr. S.D.N.Y. 2014) (equitably subordinating creditor's claim where creditor acted as acquirer "to preserve a strategic option for the [creditor's] benefit").

119.    This conduct justifies equitable subordination of DAK's claims.  The DAK Group should not be allowed to follow through on its scheme and profit from its inequitable behavior by credit bidding for the Corpus Christi Plant and acquiring control of the project at a depressed price.

## III.    M&G RESINS' GRANT OF A LIEN TO DAK WAS AN AVOIDABLE PREFERENTIAL TRANSFER.

120.    Even to the extent DAK's claims are neither recharacterized nor equitably subordinated, they are still not entitled to secured status.  The lien purportedly securing DAK's claims ████████████████████████████████████████████████████ ████████ When the lien was granted, DAK unjustifiably catapulted ahead of other unsecured creditors.  Therefore, this lien should be avoided as a preferential transfer.

121.    Under Section 547(b), the trustee or other estate representative may avoid any transfer of an interest of the debtor in property:

> (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 574(b).

122.    Each of these elements is satisfied here. *First*, if DAK's claims are determined to be valid, the lien was granted "to a creditor." *Second*, because the lien was granted in December 2016





*Third*, the evidence at the hearing, including expert testimony, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Fourth*, for the reasons described in Part II, DAK is a non-statutory insider of M&G Resins, and thus the lien was granted during the applicable one year reach-back period. *Fifth*, and finally, before the grant of the lien, DAK held no security interest in the assets of M&G Resins; rather, it held – at best – an unperfected security interest in the equity of M&G Resins. By virtue of obtaining the lien, therefore, DAK vaulted over M&G Resins' unsecured creditors, attaining priority that it would not otherwise have held.

123.    For these reasons, the grant of the lien purportedly securing DAK's claims should be avoided under section 547(b) of the Bankruptcy Code and its value recovered under section 550 for the benefit of the M&G Resins estate.

## IV.    DAK'S RIGHT TO CREDIT BID SHOULD BE DENIED FOR "CAUSE."

124.    The essential predicate to the right to credit bid – the existence a secured claim –

is absent for all of the reasons articulated herein.  If, however, the Court determines that DAK's

claims are, in fact, allowed secured claims, "cause" exists to deny DAK the right to credit bid for

M&G Resins' assets under section 363(k) of the Bankruptcy Code.  *See* 11 U.S.C. § 363(k).

125.    Courts may disallow a secured creditor's credit bid rights where the creditor

engaged in inequitable conduct with respect to the sale of the debtor's assets.  *See, e.g., In re*

*Phila. Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010) ("A court may deny a lender the

right to credit bid in the interest of any policy advanced by the [Bankruptcy] Code, such as to

ensure the success of the reorganization or to foster a competitive bidding environment."); *In re*

*Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 61 (Bankr. D. Del. 2014) (limiting secured creditor

right to credit bid where it "insisted on an unfair process, i.e. a hurried process");  *In re Antaeus*

*Tech. Servs.*, 345 B.R. 556 (Bankr. W.D. Va. 2005) (credit bid disallowed where secured

creditor's conduct viewed as not merely protecting the value of its collateral, but enhancing its

position);  *In re Aloha Airlines*, Case No. 08-00337, 2009 Bankr. LEXIS 4588 (Bankr. D. Haw.

May 14, 2009) (denying a secured creditor the right to credit bid due to misconduct, such as

creating side deals with competitor involving confidential information).

126.    Based on the conduct described in Part II above, DAK has acted inequitably,

injuring the Debtors and depressing the value of their assets.  DAK should not be allowed to

profit from its wrongdoing by being allowed to credit bid for M&G Resins' assets and achieving

REDACTED

**V. DAK'S ALLEGED SECURITY INTEREST IN THE EQUITY OF M&G RESINS, HELD BY M&G USA, WAS NEVER PERFECTED AND SHOULD BE AVOIDED UNDER SECTION 544 OF THE BANKRUPTCY CODE.**

127.

128.    This alone justifies disallowance of DAK's alleged secured claim against M&G USA.  Nevertheless, to whatever extent the equity pledge was not released, DAK's security interest was never perfected and should be avoided under section 544(a) of the Bankruptcy Code.

129.    Section 544(a) provides that the trustee "may avoid any transfer of property . . . by the debtor that is voidable by . . . a creditor . . . that obtains . . . a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists."  11 U.S.C. § 544(a)(1).  Where a creditor fails to perfect its security interest under applicable state law – here, Delaware law – before a debtor's petition date, the security interest will be avoided under section 544(a) of the Bankruptcy Code.  *Callaway Cmty. Hosp. Ass'n v. First N. Bank & Tr. (In Re Chama, Inc.)*, 265 B.R. 662, 668 (Bankr. D. Del. 2000) (finding security interest was unperfected under state law and avoidable under section 544(a)).

---

[22]    To the extent that the auction for the Corpus Christi Plant precedes the final determination of this Motion, DAK's right to credit bid should be conditioned on DAK providing adequate credit support (in the form of a letter of credit, bond, or cash escrow) of the entirety of its credit bid.

130.    Under Delaware law, unless an LLC agreement "expressly provide[s] that it is a security" governed by Article 8 of the UCC, the LLC membership interests will be categorized as a general intangible.[23]  Del. C. 8-103(c) ("An interest in a . . . limited liability company is not a security unless . . . its terms expressly provide that it is a security governed by this Article . . . .").  To perfect a security interest in a general intangible, a creditor must file a valid UCC-1 financing statement.  Del. C. 9-310.

131.    M&G Resins is a Delaware limited liability company, whose LLC agreement does not explicitly provide that it is a security.  Lees Decl. Ex. PP.  DAK was therefore required to file a UCC-1 financing statement to perfect its security interest, but never did so.  Lees Decl. Ex. QQ.  As such, any asserted security interest in the membership interests in M&G Resins should be avoided under section 544(a) of the Bankruptcy Code.

## CONCLUSION

For the reasons described herein, and as the Committee will demonstrate further at the hearing, DAK is not entitled to be treated as a secured creditor in these cases or to credit bid for the Debtors' assets.  The Committee therefore respectfully requests entry of an order:

A.    Recharacterizing DAK's secured claims as an equity interest in M&G Resins, and disregarding any purported liens granted in respect of such equity interest;

B.    To the extent any of DAK's claims are not recharacterized, (1) equitably subordinating such claims to those of all unsecured creditors and (2) avoiding any lien and

---

[23]    Pursuant to section 8-103(c), an interest in an LLC may constitute a security where it is "dealt in or traded on securities exchanges or in securities markets," or "it is an investment company security."  M&G Resins is a wholly-owned subsidiary of M&G USA.  It is not traded on securities exchanges or markets and does not qualify as an investment company security.

security interests DAK purports to have on any assets of (and membership interests in) M&G

Resins; and

      C.      Denying DAK's right to credit bid for the Debtors' assets.

The Committee further requests any further relief as is just and proper.


Dated: February 1, 2018
      Wilmington, DE

**COLE SCHOTZ P.C.**

By: /s/ J. Kate Stickles
J. Kate Stickles (No. 2917)
David R. Hurst (No. 3743)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
kstickles@coleschotz.com
dhurst@coleschotz.com

- and -

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Dennis F. Dunne
Abhilash M. Raval
Alan J. Stone (No. 2677)
Lauren C. Doyle
Alexander B. Lees
28 Liberty Street
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
ddunne@milbank.com
araval@milbank.com
astone@milbank.com
ldoyle@milbank.com
alees@milbank.com

*Counsel to Official Committee of Unsecured
Creditors of M & G USA Corporation, et al.*