# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>M & G USA CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12307 (BLS)<br><br>Jointly Administered<br><br>**Related to D.I. 824**<br><br>Hearing Date: February 16, 2018 at 9:30 a.m.<br>Objections Due: February 9, 2018 at 4:00 p.m. |

**OPPOSITION OF BANCOMEXT TO MOTION OF THE CONSTRUCTION LIENHOLDER GROUP FOR RELIEF FROM THE AUTOMATIC STAY, TO THE EXTENT NECESSARY, TO COMMENCE ACTIONS IN TEXAS TO DETERMINE THE RELATIVE PRIORITY OF CONSTRUCTION LIENS BETWEEN THE CONSTRUCTION LIENHOLDERS AND NONDEBTORS, BANCO INBURSA, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINACIERO INBURSA AND DAK AMERICAS LLC**

Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Desarrollo ("**Bancomext**") hereby files this opposition (the "**Opposition**") to the *Motion of the Construction Lienholder Group for Relief from the Automatic Stay, to the Extent Necessary, to Commence Actions in Texas to Determine the Relative Priority of Construction Liens Between the Construction Lienholders and Nondebtors, Banco Inbursa, S.A., Institución de Banca Múltiple Grupo Financiero Inbursa and DAK Amercias LLC* [D.I. 824] (the "**Motion**") filed by a group of twenty-three purported construction lienholders (the "**Construction Lienholder Group**" or, the "**Group**").

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parenthesis): M & G USA Corporation (3449), M & G Resins USA, LLC (3236) ("**M&G Resins**"), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M & G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à.r.l. (1270), M&G Chemicals S.A. (1022), M&G Capital S.à.r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

## PRELIMINARY STATEMENT

The Motion is a request that the Court authorize a piecemeal adjudication in Texas state court of matters that Congress determined should be resolved in this Court. The Motion must be denied.

The efficacy of the bankruptcy process rests on the existence of a centralized forum for resolution of all claims against the debtor and its property. A centralized forum serves the twin objectives of efficient administration and equitable distribution of the debtor's estate. The Construction Lienholder Group asks the Court to ignore these objectives in favor of allowing the Group to proceed in a "tribunal that . . . has a vested interest in determining the underlying issues"—code for what the Group perceives as a more favorable forum. To do so would be to delegate so many determinations of matters central to this Court's authority as to make the fair and efficient administration of the Debtors' estates impossible.

Clearly aware of the potential havoc they could wreak on this process, the Group tries to characterize its request as narrow: permission to sue non-debtors to determine the relative priority of liens in the Debtors' Corpus Christi Plant. This is not narrow relief. Before reaching the question of lien priority, a court would have to determine both what constitutes property of the Debtors and the validity of the asserted liens and corresponding claims. Such determinations with respect to the Corpus Christi Plant would have wide-ranging effects in these cases. The sale of the Corpus Christi Plant and allocation of proceeds is a central issue of tremendous interest to all economic stakeholders—not just Inbursa, DAK and the construction lienholders. As a result, they should be resolved here.

Bancomext believes that it may be the beneficiary of a constructive trust on some or all of the Corpus Christi Plant, which could well make its interests senior to those of Inbursa, DAK and

2

the construction lienholders. Among other things, it is now clear that M&G Polimeros Mexico and its parent, two non-debtors that borrowed approximately $190 million from Bancomext, upstreamed tens of millions of dollars of loan proceeds to the Debtors in violation of loan agreements with Bancomext and that some of those proceeds were wrongfully used to build the Corpus Christi Plant. It is also clear that some of the Debtors (including the owner of the Corpus Christi Plant) and M&G Polimeros Mexico used a common "pooling account" that wrongfully diverted funds from M&G Polimeros Mexico and its parent to some of the Debtors, including funds that may have been used to build the Corpus Christi Plant. Resolving Bancomext's interests in the Corpus Christi Plant goes to the heart of these cases, and this Court is the only appropriate venue to resolve these issues, especially in light of the Debtors' attempts to sell the Corpus Christi Plant in a sale under section 363 of the Bankruptcy Code.

In addition to the foregoing, the Official Committee of Unsecured Creditors has filed a motion seeking to subordinate and avoid the same liens that the construction lienholders hope to attack in Texas. If the Committee is successful, such liens will be transferred to the estates for the benefit of unsecured creditors, making any determination of the relative priority of DAK's liens and those of construction lienholders critical to all parties in this case, including unsecured creditors. The Court should not "outsource" such an important matter to a Texas court.

Congress has expressly designated proceedings to determine the validity, extent and priority of liens as "core proceedings." It has done so because having a central forum to resolve disputes concerning property of the estate is critical to an efficient and equitable bankruptcy proceeding. This Court can and should deny the motion for relief from stay so that the primary disputes involved in this case can be resolved in front of a single forum, as intended by Congress.

**BACKGROUND FACTS**

A. **General Background Facts**

1. On October 24, 2017, M&G Polymers USA, LLC ("**M&G Polymers**") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). On October 31, 2017 (the "**Petition Date**"), the following affiliated entities filed voluntary petitions for relief in the Court: (1) M&G USA Corp. ("**M&G USA**"); (2) M&G Resins USA, LLC ("**M&G Resins**"); (3) M&G Finance Corporation; (4) M&G Waters USA, LLC; (5) Mossi & Ghisolfi International S.à.r.l. ("**M&G International**"); (6) M&G Chemicals S.A.; (7) M&G Capital S.à r.l.; (8) M&G USA Holding, LLC; (9) Chemtex International Inc.; (10) Chemtex Far East, Ltd.; and (11) Indo American Investments, Inc. (collectively with M&G Polymers, the "**Debtors**"). The Debtors' chapter 11 cases (the "**Chapter 11 Cases**") are being jointly administered before this Court as Case No. 17-12307 (BLS).

2. On November 16, 2017, the Debtors filed a motion [D.I. 173] (the "**Sale Motion**") seeking court approval of certain bidding procedures with respect to the sale of substantially all of their assets (the "**Sale**"), including their project in Corpus Christi, Texas (the "**Corpus Christi Plant**"). As part of the Sale Motion, the Debtors requested that the proceeds from such sale be distributed in accordance with the Final DIP Order and DIP Loan Documents (as such terms are defined in the Sale Motion). Sale Mot. at 28. Those documents, in turn, provide a waterfall by which the proceeds of Pre-Petition Collateral (as such term is defined in the Sale Motion) are distributed to holders of Senior Prior Liens, Banco Inbursa, S.A., Institución De Banca Mútiple, Grupo Finaciero Inbursa ("**Inbursa**"), DAK Americas LLC ("**DAK**"), and then the Debtors' other creditors. *See* [D.I. 479] (the "**Final DIP Order**") at 13-18.

Importantly, the requested waterfall only applies to "any assets of M&G Resins or any assets of the Guarantors (as defined in the DIP Loan Documents) that have been or may have been useful to the current or future construction, business operations or uses or M&G Resins' assets. . . ." Final DIP Order at 14. It does not apply to assets that are not property of the Debtors' estates— which would include all assets upon which Bancomext holds a constructive trust.

**B.     Bancomext's Prepetition Loans to the Debtors' Mexican Affiliates**

3.     M&G México Holding, S.A. de C.V. ("**M&G Holding**") and M&G Polímeros México, S.A. de C.V. ("**M&G Polimeros**" and together with M&G Holding, the "**Mexican Entities**") are Mexican affiliates of Debtors. M&G Polimeros, a wholly-owned subsidiary of M&G Holding, is the owner and operator of a PET manufacturing facility in Altamira, Mexico (the "**Altamira Facility**"). Neither of the Mexican Entities is a Debtor in the Chapter 11 Cases.

4.     On March 31, 2010, Bancomext, as lender, and M&G Holding, as borrower, entered into that certain revolving credit agreement titled "Contrato de Apertura de Credito en Cuenta Corriente" (as amended, modified, or supplemented, the "**M&G Holding Revolving Credit Agreement**"). The M&G Holding Revolving Credit Agreement expressly provides that the proceeds of the loans made thereunder may *only* be used to fund exports and for no other purpose. The M&G Holding Revolving Credit Agreement also prohibits the payment of dividends to any affiliates. The obligations created pursuant to the M&G Holding Revolving Credit Agreement are secured by an assignment of certain receivables from M&G International (which is a debtor in the Chapter 11 Cases) and guaranteed by M&G Polimeros. As of the date of this Motion, approximately USD$120 plus all accrued interest and fees is outstanding with respect to the M&G Holding Revolving Credit Agreement.

5

5. On August 3, 2015, Bancomext, as lender, and M&G Polimeros, as borrower, entered into that certain revolving credit agreement titled "Contrato de Apertura de Credito en Cuenta Corriente" (as amended, modified, or supplemented, the "**M&G Polimeros Revolving Credit Agreement**" and together with the M&G Holding Revolving Credit Agreement, the "**Revolving Credit Agreements**"). The M&G Polimeros Revolving Credit Agreement provides that the proceeds of the loans made thereunder may *only* be used to fund the working capital needs of M&G Polimeros and its subsidiaries, none of which are Debtors. The obligations created pursuant to the M&G Polimeros Revolving Credit Agreement are secured by a pledge of M&G Polimeros' inventory and an assignment of certain collection rights with respect to that certain Product Supply Agreement, dated February 1, 2004, by and between M&G Polymers and M&G Polimeros. As of the date of this Motion, approximately USD$70 million plus all accrued interest and fees is outstanding with respect to the M&G Polimeros Revolving Credit Agreement.

6. The Debtors' disclosures in these Chapter 11 Cases have raised serious concerns regarding the use of the proceeds of the Revolving Credit Agreements and potential misappropriation of funds with respect thereto. Most notably, in his first day declaration, the Debtors' CRO disclosed that the Mexican Entities had loaned nearly $550 million to M&G USA in the two years prior to the Petition Date. *See Notice of Revised Exhibit to First Day Declaration* [D.I. 143], at Ex. B. Bancomext believes that some or all of the proceeds of the loans made under the Revolving Credit Agreements were inappropriately and wrongfully used to make intercompany loans to M&G USA.

7. The Debtors also disclosed that the Mexican Entities' funds (including the loan proceeds from Bancomext) were comingled in a "pooling account" maintained for the benefit of all of the "NAFTA Debtors," including M&G USA and M&G Resins. *See* [D.I. 7] at ¶ 11.

Bancomext believes that all of the proceeds of its loans were placed into the pooling account and likely wrongfully used to fund the Debtors' activities, including the construction of the Corpus Christi Plant.

8. Despite maintaining a profitable business, the Altamira Facility was shut down in early September of 2017. Stogsdill Decl. ¶ 47.[2] Immediately thereafter, the Mexican Entities made a $354 million loan to M&G USA. *See* [D.I. 143], at Ex. B. It is unclear why this loan was made immediately after the Altamira Facility was shuttered. It is clear to Bancomext that the Altamira Facility could have remained open had the Debtors not wrongfully diverted close to $550 million from the Mexican Entities, a substantial portion of which Bancomext believes were the proceeds of its loans.

9. In order to further investigate Bancomext's constructive trust claims against the Debtors, on January 25, 2018, Bancomext filed its *Motion for Examination of M&G México Holding, S.A. de. C.V. and M&G Polimeros México, S.A. de D.V. Pursuant to Bankruptcy Rule 2004* [D.I. 770] (the "**2004 Motion**"). By the 2004 Motion, Bancomext sought to compel the production of documents from the Mexican Entities responsive to targeted document requests with respect to the Revolving Credit Agreements. The 2004 Motion is scheduled to be heard at the same time as the Motion that is the subject of this Opposition.

C. **The Construction Lienholder Group's Stay Relief Motion**

10. On January 29, 2018, the Construction Lienholder Group filed the Motion. By the Motion, the Group seeks relief from stay so that its constituents may file lawsuits in Texas state court seeking a determination of the relative priority of their constituent's construction

---

[2] The "**Stogsdill Declaration**" is the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* [D.I. 3].

liens, which they claim are "Senior Prior Liens," with respect to the liens of Inbursa and DAK. *See* Mot. at 3.

## OPPOSITION

A. **This Court Has Core Jurisdiction to Determine the Priority of Liens in Estate Property**

11. The Construction Lienholder Group makes the extraordinary claim that "this Court has no jurisdiction to adjudicate the relative priority of the claims between construction lienholders, Inbursa, and DAK." The Group is wrong.

12. This Court, pursuant to the District Court's February 29, 2012 order of reference, has jurisdiction over, among other things, "all civil proceedings . . . arising in . . . cases under title 11." 28 U.S.C. § 1334(b).

13. "It is well-settled that proceedings 'arising in' bankruptcy include those requiring the determinations of the validity, extent or priority of liens on property of the estate. . . ." *TSA Stores, Inc. v. M J Soffe, LLC* (*In re TSAWD Holdings, Inc.*), 565 B.R. 292, 297 (Bankr. D. Del. 2017); *accord Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006) ("The category of proceedings 'arising in' bankruptcy cases 'includes such things as . . . determinations of the validity, extent, or priority of liens.'") (quoting 1 Collier on Bankruptcy ¶ 3.01[4][c][iv] at 3-31). Indeed, Congress specifically designated proceedings to determine "the validity, extent, or priority of liens" core proceedings, 28 U.S.C. § 157(b)(2)(K), giving this Court not just jurisdiction but the power to finally determine such matters, *id.* at § 157(b)(1).

14. Further, determination of a lien priority dispute is a quasi in rem proceeding under Texas law. *Evans v. Young County Lumber Co.*, 368 S.W.2d 783, 785 (Tex. App. 1963). This Court's jurisdiction over property of the Debtors' estates is exclusive. 28 U.S.C. § 1334(e)(1). Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given

8

them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (internal citations omitted). To permit a quasi in rem proceeding to go forward in another court would unduly impinge on this Court's exclusive jurisdiction.

15. Courts have long recognized the importance of bankruptcy jurisdiction to resolve lien priority disputes. As the Seventh Circuit noted in *In re Xonics, Inc.*, "resolving competing claims to property that belonged to the debtor when it filed a petition in bankruptcy ***is one of the central functions of bankruptcy law***." 813 F.2d 127, 131-32 (7th Cir. 1987) (emphasis added). This Court's jurisdiction over the litigation contemplated by the Construction Lienholder Group is unassailable.

**B. The Automatic Stay Bars the Construction Lienholder Group's Contemplated State Court Litigation**

16. Importantly, Congress's broad grant of bankruptcy jurisdiction discussed above is intended "to centralize proceedings in the bankruptcy court." *Logan v. Credit Gen. Ins. Co.* (*In re PRS Ins. Grp., Inc.*), 335 B.R. 77, 83 (Bankr. D. Del. 2005) (citing *Sunshine Dev. Co. v. FDIC*, 33 F.3d 106, 114 (1st Cir. 1994)). "'Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.'" *Id.* (quoting *Pacor, Inc. v. Higgins* (*In re Pacor, Inc.*), 743 F.2d 984, 994 (3d Cir. 1984)); *cf. In re Wheeling-Pittsburgh Steel Corp.*, 108 B.R. 82, 85 (Bankr. W.D. Pa. 1989) ("Public policy favors centralization of bankruptcy proceedings in the bankruptcy court where the case is pending.").

17. The Bankruptcy Code's complement to this jurisdictional scheme and means of effectuating its underlying policies is section 362(a)—the Code's automatic stay provision. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990) ("The Bankruptcy Code provides for centralized jurisdiction and administration of the debtor, its estate and its reorganization in the

9

Bankruptcy Court, and this policy is effectuated by Sections 362 and 105 of the Code.") (internal quotations and modifications omitted). Like the broad jurisdictional grant under 28 U.S.C. § 1334, "the automatic stay allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *Id.*

18. Uncoordinated proceedings in other arenas are precisely what the Construction Lienholder Group is requesting. There are at least twenty-three members in the Group, and they purport to seek relief for themselves "and any others similarly situated and so inclined" to "commence lawsuits in a court of competent jurisdiction in the State of Texas to determine the relative priority of the liens held by the construction lienholders and two non-debtors [Inbursa and DAK]." Mot. 1-2 & n.3. Their proposal to present, to one or more state court judges, questions of priority in a significant asset of the Debtors' estates is barred by the automatic stay.

19. It is not possible to simply "determine the relative priority of [liens]" in a vacuum. *Id.* at 2. There are certain things a lien claimant must show before it can establish priority over other lien claimants, including that it has a valid lien in the first place. *See Gravel & Shea v. Vt. Nat'l Bank*, 162 B.R. 961, 969 (D. Vt. 1993) (determination of priority of liens in bankruptcy context requires determinations "that the property in question is property of the estate, that the liens asserted by the various creditors are valid, the extent of those liens, and the priority of the liens.").

20. Under Texas law, a construction lien claimant must prove, among other things, that, through its labor or contribution of materials, it improved the property upon which it seeks to impose a lien. Tex. Prop. Code § 53.021. It must also prove the value of such improvement. *Id.* at § 53.054(a)(1) (lien claim must include sworn statement of the amount of the claim). Thus,

10

in order to determine the priority of a construction lien, a Texas state court would need to determine the existence of a lien. In doing so, the court would necessarily determine the amount of a claim against the Debtors' estates. *See* 11 U.S.C. § 502(b)(1) (claim enforceable against property of debtor constitutes claim against the debtor).

21. Section 362(a)(6) of the Bankruptcy Code prohibits "any act to collect, assess, or recover a claim against the debtor." In the Bankruptcy Code, the term "claim against the debtor" must be read alternatively as a "claim against property of the debtor." 11 U.S.C. § 102(2). Accordingly, the commencement of an action which necessarily determines the existence of a lien in the Debtors' property is barred by section 362(a)(6) as assessing or recovering a claim against property of the debtor.

22. The Group's contemplated state court litigation would also constitute an attempt to exercise control over property of the Debtors' estates in contravention of section 362(a)(3) of the Bankruptcy Code. The Official Committee of Unsecured Creditors (the "**Committee**") has filed a motion [D.I. 876] to recharacterize, equitably subordinate, and avoid the liens securing DAK's claims. If the Committee is successful, section 510(c) of the Bankruptcy Code would preserve DAK's liens for the benefit of the estate. Section 551 of the Bankruptcy Code would preserve any avoided liens in the same manner. An action by a construction lienholder to establish priority over the DAK liens that could become estate property would thus affect those actions being pursued by the Committee for the benefit of the estate. This is properly characterized as an attempt to exercise control over estate property. *Cf. Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc.* (*In re Palmdale Hills Prop., LLC*), 654 F.3d 868 (9th Cir. 2011) (subordination of secured claim held by debtor to other claims deprives debtor of property is and therefore stayed pursuant to 11 U.S.C. § 362(a)).

C. **There Is Not "Cause" to Lift the Stay**

23. Because the stay applies to the Construction Lienholder Group's contemplated action, they have the burden to show that cause exists to lift the stay. They have not done so. There is no rigid test for determining whether sufficient cause exists to modify an automatic stay. *In re Cont'l Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993). In evaluating a motion for relief from the automatic stay for "cause," courts generally consider three factors: (1) the prejudice that would be suffered should the stay be lifted; (2) the balance of the hardships facing the parties; and (3) the probable success on the merits if the stay is lifted. *See id.* Here, the factors weigh in favor of denying the Motion.

   1. **Bancomext and the Debtors' Unsecured Creditors Would Suffer Prejudice if the Stay Were Lifted**

24. The Motion requests relief from the automatic stay to permit the Group to litigate the priority of their liens in the Corpus Christi Plant in Texas. They claim that a Texas court would be both more accessible to construction claimants and more familiar with Texas law. They further argue that the Debtors' estate and third parties are simply not involved in their disputes with Imbursa and DAK and would not be prejudiced by the granting of stay relief. These arguments do not withstand scrutiny.

25. Most importantly, the lien priority dispute between the Group and the Debtors' prepetition secured creditors is only one of many disputes that exist with respect to the Corpus Christi Plant. Granting relief from stay would create multiple proceedings in different venues concerning the Corpus Christi Plant, risking inconsistent results and undermining judicial economy. This result would benefit no one. Moreover, the Fourth Circuit has recognized that state law procedures are ill equipped for resolving complex lien disputes among multiple parties in interest, such that "bankruptcy court[s] ha[ve] judicial tools better suited and more specifically

tailored to the task of resolving competing claims," including secured claims, "involving a large corporation with multiple places of business in different districts and thousands of creditors." *See Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 308 (4th Cir. 2001). This Court is perfectly suited to the task of resolving all interests in the Debtors' properties and denying the Motion preserves this Court's ability to provide the various parties in interest in the Chapter 11 Cases full relief.

26. As discussed above, Bancomext believes that a significant portion of the proceeds of its loans were wrongfully used to fund the construction of the Corpus Christi Plant.[3] Among other things, the Debtors have disclosed that the Mexican Entities "loaned" M&G USA, the direct parent of M&G Resins, close to $550 million over the last two years in clear violation of the Revolving Credit Agreements. *See* [D.I. 143], at Ex. B. Bancomext believes that a significant portion of such funds consisted of improperly (and, perhaps, fraudulently) diverted loan proceeds from Bancomext. Further, the Debtors admit that historically the Debtors and the Mexican Entities did not maintain separate bank accounts and, instead, deposited the funds received by the Mexican Entities (including loan proceeds) into a single pooling account until October of 2017. [D.I. 7] at 5. They further concede that such "pooling account" funded the operations M&G USA and M&G Resins, which necessarily included the construction of the Corpus Christi Plant. *See id*.

27. Importantly, the Mexican Entities, at the very least with the acquiescence of the Debtors and their management, continued to make draws under the Revolving Credit

---

[3] The resolution of Bancomext's asserted interest in the Corpus Christi Plant, any related collateral, and the Debtors' cash will necessarily be resolved by this Court. *See Canal Corp. v. Finnman* (*In re Johnson*), 960 F.2d 396, 402 (4th Cir. 1992) ("Clearly, the only proper forum for determining whether assets held by a debtor are held in constructive trust is the bankruptcy court, and such proceedings must be considered core proceedings . . . . The finding of a constructive trust by the bankruptcy court and a determination of the proper distribution of that trust are intimately tied to the traditional bankruptcy functions and estate, and, therefore, are core matters within the clear jurisdiction of the bankruptcy court.").

Agreements throughout the life of the loans with full knowledge that the proceeds of such draws were not going to be used for their intended purposes. Adding insult to injury, the Altamira Facility was shut down in early September of 2017 (after the Mexican Entities made hundreds of millions of dollars of "loans" to the Debtors) and, immediately thereafter, the Mexican Entities were looted one last time and made a $354 intercompany "loan" to M&G USA. *See* Stogsdill Decl. ¶ 47; [D.I. 143], at Ex. B. If Bancomext can establish these facts, it is well on its way to establishing a constructive trust on the Debtors' cash and some or all of the Corpus Christi Plant. Such a trust would be senior to the interests of DAK and the Group and has implications concerning when and how the Corpus Christi Plant can be sold. *See, e.g., Redrock Admin. Servs. LLC v. Magna Entm't Corp.* (*In re Magna Entm't Corp.*), 438 B.R. 380, 386 (Bankr. D. Del. 2010) ("It is well-settled that debtors do not own an equitable interest in property they hold in trust for another, and that therefore [property] held in trust [is] not property of the estate.") (internal citations omitted). This Court is the proper venue to resolve all of these disputes, not a Texas state court.

28. In addition to Bancomext's constructive trust claims, as noted above, the Committee is pursuing various remedies—recharacterization, avoidance, and equitable subordination—with respect to DAK's secured claims—the very liens whose priority the Group also hope to challenge in Texas. Under such circumstances, any determination of the relative priority of the construction lienholder's liens and DAK's liens will necessarily have a large impact on the estate and its unsecured creditors.

29. If the Committee succeeds in subordinating DAK's asserted liens, section 510(c) of the Bankruptcy Code would preserve those liens for the benefit of the estate. Section 551 of the Bankruptcy Code would preserve any avoided liens in the same manner. Under these

circumstances, the priority of the liens held by the construction lienholders in the Corpus Christi Plant (to the extent no constructive trust exists) could well have a significant impact upon recoveries for unsecured creditors. Under these circumstances, it is this Court, and not a court in Texas, that should determine the priority between DAK's liens and those purportedly held by the Group's constituents.

### 2. The Balance of Hardships Favors Denial of the Motion

30. The balance of the hardships also weighs in favor of denying the Motion. As noted above, granting the Motion would require the various disputes concerning the Corpus Christi Plant to be decided in numerous forums, pursuant to inadequate procedures, and at the risk of inconsistent results. Moreover, it would place the Texas court in the position of determining a lien priority dispute that may have a significant impact on unsecured creditors.

31. On the other hand, this Court is uniquely equipped to resolve all of the various disputes in a single forum. *See Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d at 308 (noting that bankruptcy courts are particularly well suited to resolve complex priority disputes). Moreover, this Court regularly adjudicates complex state law issues and is more than capable of determining the relative priority of liens under Texas law. *See e.g.*, *Arrow Oil & Gas, Inc. v. J. Aron & Co.* (*In re SemCrude, L.P.*), 442 B.R. 258, 276-77 (Bankr. D. Del. 2010) (retaining jurisdiction even where the court would "be called upon to interpret state laws and regulations . . . including questions that appear largely unsettled.").

32. Finally, the issues regarding priority will most likely be common to all of the construction lienholders and the Group has already retained competent counsel that can adequately represent the interests of the construction lienholders in this Court. Under these circumstances, the construction lienholders will not suffer significant prejudice in having their claims litigated here. On the other hand, Bancomext and the estate face the significant risks of

15

multiple proceedings, inconsistent rulings, and inadequate procedures. The Motion should be denied.

### D. The Debtors Do Not Constitute Single Asset Real Estate Debtors

33. Finally, the Group argues that the automatic stay should be terminated because M&G Resins is a single asset real estate ("**SARE**") debtor and has failed to satisfy the requirements of section 362(d)(3) of the Bankruptcy Code. Mot. at ¶ 31. This argument fails.

34. Section 365(d)(3) was designed to prevent debtors that exist solely to sell or lease a single piece of real property from using bankruptcy protections "to cling to ownership of [that] real property in a depressed market." *In re Philmont Dev. Co.*, 181 B.R. 220, 223 (Bankr. E.D. Pa. 1995). Debtors with "businesses involving manufacturing, sales or services," do not fall within the intended scope of section 365(d)(3). *See id.*; *see also In re Triumph Inv. Grp., Inc.*, No. 09-10488, 2009 Bankr. LEXIS 2782, at *5-6 (Bankr. E.D. Pa. Apr. 23, 2009) (quoting 3 Collier on Bankruptcy, ¶ 362.07[5]). M&G Resins very clearly falls in the latter category and is not a SARE debtor.

35. To be considered a SARE debtor, three requirements must be met: (1) the property in question must be real property constituting a single property or project;[4] (2) that real property must generate substantially all of the income of the debtor; and (3) the debtor must not be involved in any substantial business other than the operation of its real property and the activities incidental thereto. *See Kara Homes, Inc. v. Nat'l City Bank* (*In re Kara Homes, Inc.*), 363 B.R. 399, 404 (Bankr. D.N.J. 2007) (quoting *Philmont*, 181 B.R. at 224); 11 U.S.C. § 101(51B). Courts have noted "[t]he term 'single asset real estate' is normally reserved for those situations in which a debtor merely owns real estate without noteworthy ancillary business

---

[4] Other than residential real property with fewer than four residential units.

16

operations." *In re CGE Shattuck LLC*, Bk. No. 99-12287-JMD, 1999 Bankr. LEXIS 1880, at *25 (Bankr D.N.H. Dec. 20, 1999) (citing *Philmont*, 181 B.R. at 224).

36. M&G Resins' is not a SARE debtor because its ownership of the Corpus Christi Plant is far more than "just a passive investment" in real estate. *See Kara Homes*, 363 B.R. at 405 (collecting cases that show courts decline to find a debtor is a SARE debtor where its real estate is "the site of various income producing activities," as opposed to "just a passive investment."). M&G Resins was created to construct **and operate** a PET manufacturing plant for the purpose of generating revenue through the production of PET. Together with three of the other Debtors, M&G Resins is responsible for conducting the Debtors' day-to-day operations. Stogsdill Decl. ¶ 18. Conducting the day-to-day operations of a significant PET production and PET plant engineering group is certainly more than a "noteworthy ancillary business" to M&G Resins' property ownership. *See CGE Shattuck LLC*, 1999 Bankr. LEXIS at *25 (citing *Philmont*, 181 B.R. at 224).

37. Moreover, one need look no further than the first page of M&G Resins' Statement of Financial Affairs to see that, in operating the Debtors' business, M&G Resins has in fact generated significant revenue. *Global Notes, Statement of Limitations, Methodology and Disclaimers and Specific Disclosures Regarding Debtors' Amended Schedules of Assets and Liabilities and Amended Statements of Financial Affairs* [D.I. 783] at 15 (reporting M&G Resins' revenue as $92,173,848.36 from January 1, 2016 until the Petition Date). Notably, Mr. Stogsdill declared under penalty of perjury that the source of M&G Resins' revenue was from "operating a business." *Id.*

38. Because neither M&G Resins nor any of the other Debtors constitute SARE debtors, section 362(d)(3) and the expedited relief provided therein is not applicable to the Chapter 11 Cases and the Group's request for relief from the automatic stay should be denied.

**NOTICE**

39. Notice of this Opposition will be provided pursuant to Local Rule 2004-1 to the following parties, through their counsel, if represented: (a) counsel for the Debtors, (b) counsel for the Group; (c) the Office of the United States Trustee; and (d) counsel for the Official Committee of Unsecured Creditors.

**CONCLUSION**

For the foregoing reasons, Bancomext respectfully requests that the Court deny the Motion.

Date: February 9, 2018      **FOX ROTHSCHILD LLP**

/s/ Jeffrey M. Schlerf
Jeffrey M. Schlerf (DE No. 3047)
919 North Market Street, Suite 300
Wilmington, DE 19801
Telephone:   (302) 654-7444
Facsimile:    (302) 656-8920
jschlerf@foxrothschild.com

—and—

Roberto J. Kampfner (admitted pro hac vice)
Aaron Colodny (admitted pro hac vice)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:   (213) 620-7700
Facsimile:    (213) 452-2329
rkampfner@whitecase.com
aaron.colodny@whitecase.com

*Attorneys for Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Desarrollo*