# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------X
:
In re: : Chapter 11
:
M & G CORPORATION, *et al.*,[1] :
: Case No. 17-12307 (BLS)
Debtors. :
: (Jointly Administered)
:
: **Re: Docket Nos. 824 & 936**
---------------------------------------------------------------X

## OBJECTION OF INBURSA TO THE MOTION OF THE CONSTRUCTION LIENHOLDER GROUP FOR RELIEF FROM THE AUTOMATIC STAY TO COMMENCE CERTAIN ACTIONS IN TEXAS

Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa ("Inbursa"), in its capacity as lender under the pre-petition first lien facility, hereby joins in the *Debtors' Objection to Motion of the Construction Lienholder Group for Relief From the Automatic Stay, to the Extent Necessary, to Commence Actions in Texas to Determine the Relative Priority of Construction Lienholders and Nondebtors, Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa and DAK Americas LLC* [Docket No. 936] (the "Debtors' Objection") and hereby objects (this "Objection") to the *Motion of the Construction Lienholder Group for Relief From the Automatic Stay, to the Extent Necessary, to Commence Actions in Texas to Determine the Relative Priority of Construction Liens Between the Construction Lienholders and Nondebtors, Banco Inbursa, S.A., Institución de Banca Múltiple,*

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (1022), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 Cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

01:22844271.2

*Grupo Financiero Inbursa and DAK Americas LLC* [Docket No. 824] (the "Motion")[2]. In support of this Objection, Inbursa respectfully represents as follows:

## PRELIMINARY STATEMENT

1.  The Debtors have focused substantial efforts over the last few months towards a value-maximizing sale process of the Debtors' assets, culminating in an auction that is only a few weeks away. They also have obtained approval of settlement procedures related to mechanics lien claims, intended to further the sale process and streamline the resolution of such claims, to the extent that can be done consensually. The Construction Lienholder Group's request to initiate an "appropriate action" in Texas to determine the priority of the Construction Lienholder Group's liens asserted against the Corpus Christi plant as compared with the liens of Inbursa and DAK (the "Proposed DJ Action") is not legally well-founded, and would be particularly unwarranted now, when diverting the parties' attention and resources to the Proposed DJ Action would distract from the upcoming sale process and efforts to resolve these issues consensually in parallel to the pending sale process.

2.  Any assertion by the Construction Lienholder Group that the automatic stay does not apply to the Proposed DJ Action is baseless because the Proposed DJ Action implicates the Debtors and their estates in numerous ways. The Construction Lienholder Group notably does not attach a proposed complaint and rather merely asserts that it would like to file an "appropriate action" in Texas state court that would not implicate the interests of the Debtors. However, even its Motion suggests that the Proposed DJ Action necessarily would warrant a determination of validity of the Construction Lienholder Group's liens as against the Debtors (where their liens and claims have not yet been determined or allowed in these Cases), and any

---

[2] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Motion.

01:22844271.2

determinations requested through the Proposed DJ Action would directly implicate the distribution of any sale proceeds pursuant to the requirements of the Final DIP Order[3] and DIP Loan Documents (as defined in the Final DIP Order), and therefore the ultimate disposition and distribution of the Debtors' assets in connection with the pending sale process.[4]

3. The Construction Lienholder Group's further assertion that "cause" exists to lift the automatic stay similarly fails, where the "balance of hardships" decidedly tips against lifting the automatic stay to allow this ill-defined action to proceed in Texas at this time. Allowing this litigation to be commenced will multiply the costs of these Cases and consume the parties' attention. At the same time, it will not yield any benefits to the Debtors, or even the Construction Lienholder Group, in the near term as it is inconceivable that any substantial progress could be made in determining the validity of their claims, much less the relative priority of those claims as compared to Inbursa and DAK's secured claims, in the next few months in a manner that could streamline the sale process or narrow any potential disputes regarding the distribution of sale proceeds.

4. Under the current circumstances of these cases, lifting the automatic stay would cause an unnecessary burden by squandering estate time and expenses and would not achieve any helpful result. To the contrary, within one month from today it will be clear whether a determination of relative priority is necessary at all, given that the sale proceeds may exceed the

---

[3] "Final DIP Order" means the *Final Order Granting Debtors' Motion to (A) Authorize Certain Debtors In Possession To Obtain Post Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (B) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant To 11 U.S.C. §§ 364 and 507; (C) Provide Adequate Protection to the Pre-Petition First Lien Lender and the DAK Americas LLC; (D) Modify Automatic Stay Pursuant To 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (E) Granting Related Relief* [Docket No. 479].

[4] The Construction Lienholder Group premises its Motion on a litany of purported facts that include various assertions subject to further review and potential dispute by Inbursa, including without limitation their assertions regarding the validity and perfection of their own liens and their interpretation of Inbursa's lien against the Corpus Christi plant. The failure to specifically address any particular factual assertions or arguments is not intended to be acquiescence as to the validity of such arguments and assertions, and all rights are reserved.

total asserted liens on the Corpus Christi plant. Alternatively, even if the sale proceeds were not sufficient to satisfy all asserted liens, the Proposed DJ Action would not streamline litigation or benefit the Debtors, where the Construction Lienholder Group does not contemplate joining all parties that have asserted liens against the Corpus Christi plant (including Debtor Chemtex International Inc. ("Chemtex")[5]) and therefore any relief granted would not finally resolve these issues. As such, the Motion should be denied in its entirety.

### A. Determinations of Lien Priority Fit Squarely Within the Bankruptcy Court's Jurisdiction

5.  The Construction Lienholder Group is mistaken in its assertion that this Court lacks jurisdiction to adjudicate lien priority, much less the full scope of issues that one would expect would need to be decided in any "appropriate action" that the Construction Lienholder Group would contemplate filing. Pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference dated February 29, 2012, all cases "under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 are referred to bankruptcy judges for this district." Section 157(b) sets forth a non-exhaustive list of "core" proceedings which bankruptcy judges are statutorily authorized to hear and determine. 28 U.S.C. § 157(b). Among those explicitly listed as core proceedings are "determinations of the validity, extent, or priority of liens." 28 U.S.C. § 157 (b)(2)(K).

6.  The Third Circuit has stated that courts should first look to the "illustrative list of 'core' proceedings found in [28 U.S.C.] § 157(b)(2) [and] then conduct [a] two-step test, according to which a claim will be deemed core if (1) it invokes a substantive right provided by title 11 or (2) [ ] it is a proceeding, that by its nature, could arise only in the context of a

---

[5] The lien filed by Chemtex contains little detail regarding the basis for the asserted claim, and Inbursa reserves all rights to dispute the validity, priority or amount of such lien and to seek all relief and pursue all objections to any such claim.

01:22844271.2

4

bankruptcy case." In re Exide Techs., 544 F.3d 196, 206 (3d Cir. 2008) (internal citations omitted). The Proposed DJ Action, which would appear to necessarily require a court to scrutinize and determine the validity and priority of dozens of mechanics' lien claims and also to determine the relative priority of such claims against the secured claims of Inbursa and DAK, Chemtex and other parties who have asserted liens is both a proceeding that has been made necessary by these Cases, and one that invokes substantive rights regarding claim allowance and estate distributions. Thus, the Court should determine that the Proposed DJ Action is in fact a core proceeding of these Cases. Alternatively, to the extent that the Construction Lienholder Group does not intend to include all parties that have asserted liens against the Corpus Christi plant, any such action would only make resolution of these issues more prolonged and vexatious, and would not yield any sort of final determination.

7. Even if this Court were to determine that, despite the statutory language in 28 U.S.C. § 157 (b)(2)(K), an action to assess lien priority against the Debtors' property is not a core proceeding, such an action would certainly be "related to" the assets of the Debtors, thereby affording this Court jurisdiction pursuant to 28 U.S.C. § 1334(b), given that any determination of lien priority is inherently intertwined with the distribution of the Debtors' assets in the upcoming sale process. In the Third Circuit, "related to" jurisdiction exists over a proceeding where the "outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy" and "[t]he proceeding need not necessarily be against the debtor or against the debtor's property." Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis added). The grant of jurisdiction to bankruptcy courts is intended to be "comprehensive . . . so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate" and "the 'related to' language of § 1334(b) must be read to give . . . bankruptcy courts . . .

jurisdiction over more than simple proceedings involving the property of the debtor or the estate." Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995) (internal citations omitted). It is beyond question that the Proposed DJ Action could conceivably have an effect on the administration of these Cases: the Debtors would be required to expend significant time and resources to produce documents and information in connection with the proceedings in Texas and to redirect attention away from the sale process during an integral time to that process. Moreover, while the Motion stylized the Proposed DJ Action as merely an intercreditor dispute between known lienholders against a single asset, the reality is that the Construction Lienholder Group's claims have not been determined or allowed either individually or collectively, nor has there been any determination that their claims are against M&G Resins USA LLC ("M&G Resins"). In fact, most lienholders do not have direct contracts with M&G Resins, in some cases their own claims interrelate with each other (as in the case of subcontractors), and perfection disputes could include determinations regarding the relative role of Chemtex and M&G Resins in the construction process. As a general matter, and even more so at this point in these cases, the Court is best positioned to oversee these issues as part of its role in dealing efficiently and expeditiously with oversight of the sale process and the resolution of various claims and disputes (including the pending Committee (as defined in the Final DIP Order) motion seeking relief with respect to the liens and claims held by DAK).

8. The Construction Lienholder Group incorrectly argues that "even if [the] Court were to conclude that the Proposed Declaratory Judgment Action is related to the Debtors' bankruptcy case, [it] should conclude that it does not have jurisdiction and therefore abstain from hearing the action." ¶¶ 20-21 of Motion. This is a misinterpretation of the abstention doctrine, which implicates questions of judicial efficiency but not jurisdiction. In fact, "[t]he act of

abstaining presumes that proper jurisdiction otherwise exists." In re S.G. Phillips Constructors, Inc., 45 F.3d 702, 708 (2nd Cir. 1995). The Construction Lienholder Group has not even attempted to develop an argument that the Court should abstain based on the relevant factors, and no such persuasive grounds exist.

B. **The Construction Lienholder Group's Proposed DJ Action Implicates the Automatic Stay**

9. In light of the facts before this Court, the automatic stay takes on heightened importance in these Cases, highlighting its role as "one of the fundamental debtor protections provided by the bankruptcy laws." In re Aleris Int'l, Inc., 456 B.R. 35, 46 (Bankr. D. Del. 2011) (quoting Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot., 474 U.S. 494, 503 (1986)). The Proposed DJ Action implicates the automatic stay in various ways including, without limitation, by constituting a "perfect[ion], or enforce[ment of] any lien against property of the estate", an "act to . . . perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case . . ." as well an "act to . . . assess a claim against the debtor . . . ." 11 U.S.C. § 362(a)(4)-(6).

10. The Proposed DJ Action would detract from efforts integral to the sale process and directly implicate the sale proceeds of the Debtors' assets, and thus is properly subject to the automatic stay.[6] The Proposed DJ Action is far from a mere intercreditor dispute, and instead requires determinations of the priority of purported secured claims against the Debtors' property. Any such determination necessarily rests on the premise that such claim is valid, enforceable

---

[6] As part of their argument that the automatic stay would not be implicated by the Proposed DJ Action, the Construction Lienholder Group suggests that a Texas court would have greater familiarity with the applicable law than this Court, that the matter could be dispatched more quickly in Texas due to a lower case volume than this Court, and that the Texas court has more of a "vested interest in determining the underlying issues." Motion ¶ 14. As a preliminary matter, the relative merits of different potential fora in which the matter could be heard has no bearing on whether the automatic stay is implicated, so the argument is inapt. It may well be true that the Texas court would have pre-existing familiarity with the applicable lien law, but nowhere in the automatic stay analysis is the Court asked to weigh the caseloads of different tribunals, and the Motion has not marshalled any evidence to support its argument in any case.

and properly secured.[7] The Construction Lienholder Group has not recognized that a determination of priority requires a determination of validity, nor have they asserted a single basis for such a determination. As a result, any court adjudicating the priority of the Construction Lienholder Group's liens will need to first determine whether its liens are valid, as the Debtors, Inbursa and DAK (as well as other parties in interest in the Debtors' cases) can argue that any claims or liens of the Construction Lienholder Group are invalid. Furthermore, Inbursa and DAK could not adequately or fairly participate in the Proposed DJ Action without obtaining information regarding the various purported lienholders, and their contracts and business dealings with the Debtors from the Debtors' records and their representatives. As such, any litigation would undeniably require the Debtors to produce documents and information and to actively participate in the litigation of these issues. Indeed, while the Construction Lienholder Group has not detailed the nature of the action they would file, it is likely the Debtors would want to intervene or would even be a necessary party under the relevant state law procedures and statutes.[8]

    **C.    The Construction Lienholder Group's Attempt to Demonstrate Cause to Lift the Stay Falls Flat**

11.    Pursuant to section 362(d)(1) of the Bankruptcy Code, courts may lift the automatic stay for "cause." See 11 U.S.C. § 362(d)(1). "Cause" is not defined in the Bankruptcy Code but "courts generally consider the policies underlying the automatic stay in addition to the

---

[7]    Moreover, while the Proposed DJ Action does implicate the Debtors and their property, even if it could be recast as a mere intercreditor dispute (which it cannot), the commencement of the DJ Action should be stayed given that at this time, the Debtors should not be distracted from the pending sale process in order to have to incur further costs and efforts to address this litigation. See e.g., In re Union Tr. Phila, LLC, 460 B.R. 644, 657-58 (E.D. Pa. 2011) (stay may be extended to non-debtor actions where stay protection is essential to the debtor's efforts of reorganization).

[8]    Additionally, the Construction Lienholder Group is quick to assert that several of their members hold liens for "removables" at the Corpus Christi plant, but to the extent that the Motion intends to imply that its members are seeking a determination that they would be entitled to bring an action to recover property secured by a "removables" lien under Texas law, such determinations would further implicate the Debtors' assets and whether actions are being taken in furtherance of obtaining possession over those assets.

01:22844271.2

8

competing interests of the debtor and the movant' when determining whether there is sufficient cause to grant relief from the automatic stay." In re W.R. Grace & Co., No. 01-01139, 2007 WL 1129170 (JFK), at *2 (Bankr. D. Del. Apr. 13, 2007) (internal quotation omitted).

12. Courts in this jurisdiction consider "the totality of the circumstances in each particular case" to assess whether sufficient "cause" exists to justify lifting the automatic stay. Aleris, 456 B.R. at 47 (quoting Baldino v. Wilson (In re Wilson), 116 F.3d 87, 90 (3d Cir. 1997)). The moving party, here the Construction Lienholder Group, carries the initial burden of demonstrating sufficient cause to lift the stay and must demonstrate that the "balance of hardships from not obtaining relief tips significantly in [its] favor." Id. (citation and quotation marks omitted).

13. Courts in the Third Circuit assess three factors, commonly referred to as the "Rexene factors," to analyze the balance of the hardships: (a) "whether any great prejudice to either the bankrupt estate or the debtor will result from lifting the stay;" (b) "whether the hardship to the non-bankrupt party by the maintenance of the stay considerably outweighs the hardship to the debtor if the stay is lifted;" and (c) "whether it is probable that the creditor will prevail on the merits of its case against the debtor." Aleris, 456 B.R. at 47-48 (citing, inter alia, Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.), 141 B.R. 574, 576 (Bankr. D. Del. 1992)); see also In re Samson Res. Corp., 559 B.R. 360, 370 (Bankr. D. Del. 2016) (applying Rexene factors).

14. Lifting the automatic stay to permit the Construction Lienholder Group to commence the Proposed DJ Action would prejudice the Debtors as well as their creditors. The Debtors and their key creditor constituencies have been working for several months towards an efficient and value-maximizing sale process to dispose of the Debtors' main assets. To that end,

01:22844271.2

9

the Debtors have already obtained approval of the sale of the Apple Grove Assets (as defined in the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order[9]) for $33.5 million, and the sale process for the Corpus Christi Assets (as defined in the Bidding Procedures) has been proceeding in parallel. Where the Debtors have a limited number of employees and resources at their disposal and are not generating revenues, they should be permitted to use their resources efficiently and in a manner expected to further the sale process and to maximize value for the Debtors' creditors, rather than be forced to participate in a separate state court action with no near term promise of resolving disputes or narrowing issues.

15. The potential hardship to the Construction Lienholder Group, if any, from denying their Motion is certainly not considerably greater than the hardship to the Debtors from allowing the action to go forward. To the contrary, any prospect of hardship to the Construction Lienholder Group is purely speculative, where the auction of the Corpus Christi plant ultimately could generate sale proceeds that obviate or substantially narrow any potential lien priority disputes. In sum, while the burdens imposed by the Proposed DJ Action are a sure thing, the potential benefits to the Construction Lienholder Group are unclear at present and potentially nonexistent.[10]

16. Finally, while the Construction Lienholder Group acknowledges that consideration of the probability of success is somewhat inapt here, the Construction Lienholder

---

[9] "<u>Bidding Procedures Order</u>" means the *Order (I)(A) Approving Bidding Procedures for the Sale of Certain of The Debtors' Assets, (B) Authorizing the Debtors to Enter Into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [Docket No. 490].

[10] The Construction Lienholder Group's hardship argument that centers on the potential for the Proposed DJ Action to occur in Delaware versus Texas downplays the hardship that would be imposed on the other parties that would be forced to litigate and defend their claims in two fora rather than just the Bankruptcy Court. Moreover, any denial of the Motion as premature or adjournment of the Motion would not finally decide these issues and the parties' rights would be reserved on where such claims should be properly resolved.

Group has not demonstrated any probability of success in proving that their liens will be afforded a certain priority much less a probability that the commencement of the litigation would succeed in furthering the sale process or resolving disputes in these cases. Additionally, there are structural hurdles to instituting the Proposed DJ Action at all: for one, the Construction Lienholder Group does not contemplate including all construction lienholders as parties, and further, the Motion does not seek to include all other parties who have asserted liens (potentially including certain of the Debtors) in any such action. Thus, there is an obvious and inherent weakness in the Construction Lienholder Group's ability to demonstrate it can properly initiate the "appropriate action" it seeks permission to commence, let alone finally succeed on its merits.

### D. Section 362(d)(3) Is Inapplicable Here

17. The Construction Lienholder Group's alternative argument that the automatic stay should be lifted pursuant to 11 U.S.C § 362(d)(3), which applies to "single asset real estate" cases, is facially inapplicable where the Bankruptcy Code and relevant case law make clear this provision is intended to protect against bankruptcy cases filed to avoid a mortgage foreclosure against a specific property where the property value is under water. See 11 U.S.C. § 101(51B); In re Triumph Inv. Grp., Inc., No. 09-10488BF, 2009 WL 2916986, at *2 (Bankr. E.D. Pa. Apr. 23, 2009) (quoting 3 Collier on Bankruptcy, ¶ 362.07[5], [b]); In re Curtis Ctr. Ltd. P'ship, 192 B.R. 648, 653 (Bankr. E.D. Pa 1996) (holding that a case involving a "two-party dispute between [a single creditor] and the Debtor" was a single asset real estate case in which the "automatic stay . . . holds only [the creditor] hostage to [the] Chapter 11 case because there [was] no value available [in the estate]"); In re Philmont Dev. Co., 181 B.R. 220, 223 (Bankr. E.D. Pa. 1995) (noting that the single asset real estate provision is for "real estate entities attempting to cling to ownership of real property in a depressed market . . . rather than businesses involving manufacturing, sales or services," and holding that where a single creditor's claim against a

"single project" was clearly valid, the single asset real estate process was appropriate). These Cases, which involve three partially completed commercial facilities—a PET plant, a PTA plant and a desalination facility owned by M&G Waters USA, LLC, multiple Debtors and a group of mechanics lienholders whose claims remain subject to potential dispute regarding the validity and perfection of their claims, is a far cry from the type of cases that fall within this statutory provision.

### E. Any Argument to Lift the Stay Is Premature and the Proposed DJ Action Would Not Eliminate Any Future Priority Determinations

18. In addition to the various other infirmities with the Motion, the ultimate infirmity is that it is premature at best. By the Construction Lienholder Group's own assertion, the Motion seeks "determination of the relative priorities of nondebtors to the proceeds from the sale." Motion ¶ 19. If the sale proceeds ultimately turn out to be sufficient to cover all construction liens held by members of the Construction Lienholder Group as well as Inbursa's liens, any action to determine relative priority as against Inbursa will be unnecessary and its only impact will be to squander estate assets and distract from advancing the value-maximizing sale process. The same issues exist with respect to the mechanics lienholders and DAK, with the added complexity that DAK's liens are subject to a pending challenge before this Court.

19. If, following the auction process, a determination as to lien priority is necessary between some or all of the various secured parties, the parties can discuss the best way to determine and resolve these issues at that time. The initiation of the Proposed DJ Action would not obviate the need to address these issues at a later time anyway, where issues of priority for lienholders that are not members of the group vis-a-vis the members of the Construction Lienholder Group, Inbursa and/or DAK are still being proposed to be left for another day.

Accordingly, there is no need to consider the proper forum for resolving these sorts of disputes until the nature and scope of such disputes crystalizes more clearly as the sale process progresses.

## CONCLUSION

20. For the reasons set forth herein and in the Debtors' Objection, and any additional arguments to be made at the hearing, Inbursa respectfully requests that the Court deny the relief requested in the Motion in its entirety and grant such other and further relief as the Court may deem proper.

Dated: February 9, 2018

        CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Lisa M. Schweitzer
        Luke A. Barefoot
        One Liberty Plaza
        New York, New York 10006
        Telephone: (212) 225-2000
        Facsimile: (212) 225-3999

        */s/ Ian J. Bambrick*
        YOUNG CONAWAY STARGATT &
        TAYLOR, LLP
        Pauline K. Morgan (No. 3650)
        Joel A. Waite (No. 2925)
        Ian J. Bambrick (No. 5455)
        Allison S. Mielke (No. 5934)
        Rodney Square
        1000 North King Street
        Wilmington, Delaware 19801
        Telephone: (302) 571-6600
        Facsimile: (302) 571-1253

        Attorneys for Inbursa