# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>M & G USA CORPORATION, *et al.*,[1]<br><br>Debtors. | : Chapter 11<br>:<br>: Case No. 17- 12307 (BLS)<br>:<br>: (Jointly Administered)<br>:<br>: **[REQUESTED] Hearing Date:  March 14, 2018 at 10:00 a.m. (ET)**<br>: **[REQUESTED] Obj. Deadline:  March 7, 2018 at 4:00 p.m. (ET)** |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' EQUITY INTERESTS IN NON-DEBTOR SUBSIDIARIES FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

move the Court pursuant to sections 105(a), 363 and 365 of title 11 of the U.S. Code

(the "Bankruptcy Code"), Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), for entry of an order substantially in the form attached hereto as Exhibit A (the "Sale

Order"):  (i) authorizing the Debtors to enter into the stock purchase agreement (the "Stock

---

[1]     The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M&G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

Purchase Agreement")² dated February 21, 2018, by and between Debtor Chemtex Far East, Ltd.

("Chemtex Far East"), Debtor Chemtex International, Inc. ("CII") and Debtor Mossi & Ghisolfi

International S.à r.l. ("MGI" and together with Chemtex Far East and CII, the "Sellers"),

Chemtex Global Corporation, a Chinese company (the "Purchaser"), and Shiner Management &

Consulting Co., Ltd. (the "Purchaser's Affiliated Lender") to sell one hundred percent (100%) of

Sellers' respective equity interests in the following non-debtor subsidiaries (collectively, the

"Shares"): (a) Chemtex Consulting of India (Pvt.) Ltd., an Indian company ("Chemtex India"),³

(b) Chemtex Engineering Co., Ltd., a Chinese company ("Chemtex Engineering"); (c) Chemtex

International Trading Co., Ltd., a Chinese company ("Chemtex Trading"); (d) Chemtex

(Shanghai) Chemical Engineering Co., Ltd., a Chinese company ("Chemtex Shanghai" and,

together with Chemtex India, Chemtex Engineering and Chemtax Trading, the "Chemtex

Entities"), together with certain assets necessary for conducting the business of the Chemtex

Entities and assets related to the tradename "CHEMTEX", to the Purchaser (the "Sale" or "Sale

Transaction"), (ii) approving the assumption and assignment of certain contracts and

(iii) granting related relief. In support of this motion, the Debtors submit the *Declaration of

Dennis Stogsdill in Support of First Day Pleadings* (the "First Day Declaration") [Docket No. 3]

and the *Declaration of Dennis Stogsdill in Support of Debtors' Sale Motion* attached hereto as

Exhibit C (the "Stogsdill Declaration") and respectfully represent as follows:

---

²     A copy of the Stock Purchase Agreement is attached hereto as Exhibit B. Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the Stock Purchase Agreement.

³     MGI owns 99% of the equity interests and issued and outstanding capital stock (the "Chemtex India Shares") of Chemtex India. The remaining one percent (1%) of the equity interests of the issued and outstanding capital stock of Chemtex India are owned by Jimmy Spencer and Kedar Nath Chatterjee (the "Minority Shareholders").

## JURISDICTION AND VENUE

1.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.     General Background

2.     On October 24, 2017, Debtor M&G Polymers USA, LLC ("M&G Polymers") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, thereafter, on October 30, 2017 (the "Petition Date"), each of the other Debtors commenced chapter 11 cases before this Court (together with the chapter 11 case of M&G Polymers, the "Cases").  The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     An Official Committee of Unsecured Creditors (the "Committee") was appointed in these Cases on November 13, 2017 (Docket No. 146).  Additional information regarding the Debtors and these Cases, including the Debtors' businesses, corporate structure and financial condition, is set forth in the First Day Declaration and incorporated herein by reference.

### B.     Sale Transaction Overview

4.     The Chemtex Entities are comprised of four entities that are domiciled and do business solely in China and India.  The Chemtex Entities are in the businesses of providing engineering, procurement and construction services to third parties seeking to design and build PET and liquefied natural gas plants, primarily, but not exclusively, in China.  Stogsdill Decl., ¶ 7. Furthermore the Chemtex Entities have been engaged as subcontractors providing services to CII in its dealings with BioChemtex S.p.A. ("BioChemtex"), a non-debtor entity of the Mossi & Ghisolfi Group, controlled by M&G Finanziaria S.p.A.  *Id.*  Given BioChemtex's non-

payment of obligations pursuant to the existing subcontracts with CII, the Chemtex Entities have been suffering from a lack of liquidity and have, as result, accumulated material amounts of overdue payments to vendors and suppliers and are currently at risk of losing their direct customers unless operations are normalized in the near term. *Id.* The business and ongoing operation of the Chemtex Entities is not essential to the Debtors' maintenance of their United States-based plants or to the continued maintenance and ownership of any such plant by a potential purchaser. *Id.* Moreover, the Sellers bear the burden of administering the Chemtex Entities and related costs. *Id.*

5.     As a result, since prior to the Petition Date, the Debtors have endeavored to seek a beneficial resolution of their ownership of the Chemtex Entities, through a sale thereof or otherwise. During such time, the Debtors have explored opportunities to sell the Chemtex Entities and in the course of such exploration discussed a sale transaction with third parties, including the Purchaser. Stogsdill Decl., ¶ 8.

6.     Such discussions have led to the Debtors and the Purchaser to enter into good faith negotiations with respect to the terms of the Stock Purchase Agreement and the Sale Transaction. In September 2017, Mr. Ma, who is familiar with the operations of the Chemtex Entities in his role as Chief Executive Officer ("CEO") and director of certain of the Chemtex Entities,[4] proposed a transaction to the Debtors involving the purchase of the Shares. Stogsdill Decl., ¶ 9. As the Debtors believed that few, if any, third parties would be willing to purchase the Shares, given the complexity of the Chemtex Entities' businesses and such businesses being

---

[4]     Mr. Ma is the CEO and a director of Chemtex (Shanghai) International Trading Co., Ltd., Chemtex Shanghai Chemical Engineering Co. Ltd. and Chemtex Engineering Co. Ltd. and the CEO of Chemtex Consulting India Pvt. Limited.

DOCS_DE:218112.1 54032/001

significantly different from the other Debtors' activities, the Debtors, when approached by Mr. Ma, determined it was in their best interests to pursue the transaction. *Id.*

7.     In September 2017, the Debtors also received a non-binding indication of interest from another third party for the purchase of the shares of Chemtex Engineering, Chemtex Trading and Chemtex Shanghai (together, "Chemtex China"), which indication of interest was supplemented in October 2017. Stogsdill Decl., ¶ 10. The Debtors determined that the terms of this offer were inferior to the terms of the transaction proposed by Mr. Ma, which did not require material diligence and could be completed rapidly while the Chemtex Entities' businesses remained viable. *Id.* Specifically, the aggregate purchase price under the third party proposal was less than the purchase price under Mr. Ma's proposal. *Id.* In addition, the third party proposal was contingent on significant due diligence, whereas Mr. Ma's proposal required no additional due diligence and, thus, offered lower transaction costs in addition to better terms and a higher aggregate purchase price. *Id.* Around this time, given the population of likely buyers residing in China and the Debtors' lack of financial and human resources to expand the scope of their efforts to a China-based sales process, the Debtors determined that any further marketing of the Assets (defined below) aside from the sales process being conducted in these Cases pursuant to the Bidding Procedures[5] could easily exceed the value that could be received from the Sale of the Assets to Mr. Ma and would otherwise not likely be capable of conclusion and subsequent

---

[5]     *Order (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* (Docket No. 490), Ex. A (the "Bidding Procedures").

DOCS_DE:218112.1 54032/001

closing before the availability of funding under the DIP Facility[6] runs out at the end of March 2018. *Id.*

8.     In sum, the Sale Transaction provides that, at Closing, the Purchaser, a newly formed entity controlled by Mr. Ma, shall pay (a) $700,000 to MGI for 100% of the shares in Chemtex India (the "Chemtex India Shares"), (b) $300,000 to CII for 100% of the shares in Chemtex China (the "Chemtex China Shares" and, together with the Chemtex India Shares, the "Shares") and (c) $50,000 to MGI in respect of certain assets necessary for conducting the business and operation of the Companies, including relevant historical and current data to the extent necessary to run the business of the Chemtex Entities in the ordinary course of business (the "Transition Data"); provided that, the foregoing payments shall be less the Purchase Price Deposit of $105,000, which shall be proportionately deducted from each payment.  In addition, at the Closing, the Purchaser shall pay $3.1 million in overdue amounts owing to certain vendors of CII in exchange for a waiver of approximately $10 million in claims against the Sellers' estates[7] and pay the cure costs associated with the Invista IP Licenses (defined below).  Further, pursuant to Section 7.11 of the Stock Purchase Agreement, the Chemtex Entities transfer to M&G Resins USA, LLC and M&G Waters USA, LLC any Intellectual Property related to the Corpus Christi Plant and the operation thereof and the Desalination Assets and the operation thereof, respectively.  Notably, the Purchaser is not entitled to a termination fee or expense reimbursement or like amounts under any circumstance.  Stogsdill Decl., ¶ 11.

---

[6]     As defined in the *Final Order Granting Debtors' Motion to (1) Authorize Certain Debtors In Possession To Obtain Post Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant To 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant To 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (5) Granting Related Relief* [Docket No. 479] (the "Final DIP Order").

[7]     Prior to or promptly following the Closing, the Debtors shall file on certification of counsel the stipulations that have been entered into with the relevant vendors and shall request that the Court enter orders approving each such stipulation.

DOCS_DE:218112.1 54032/001

9.     Approving the Stock Purchase Agreement will enable the Sellers to generate near-term value for their estates from an otherwise illiquid asset. Stogsdill Decl., ¶ 12. The Sale Transaction will infuse $1 million into the Sellers' estates while also eliminating approximately $11.1 million in liabilities that could potentially have been asserted against them. *Id.* In addition, to the extent the Chemtex Entities themselves underwent insolvency proceedings in China and India, which the Debtors believe would have been likely absent this Sale Transaction, the Sellers are now spared the burden of what undoubtedly would have been a long, complex and potentially costly process. *Id.* Accordingly, the Debtors, in a reasonable exercise of their sound business judgment, determined that entering into the Stock Purchase Agreement with the Purchaser was in the best interests of their creditors and estates.

10.     Although Mr. Ma, in addition to being a CEO and/or director of certain of the Chemtex Entities, is the CEO of Seller CII (with responsibility solely with respect to matters unrelated to the Corpus Christi Assets), Mr. Ma was not involved in the negotiation of the Stock Purchase Agreement or the Sale Transaction on behalf of CII. Stogsdill Decl., ¶ 14. Rather, the Sellers and their advisors negotiated the terms of the Sale Transaction described herein at arms' length and in good faith. *Id.*

**C.     The Stock Purchase Agreement**

11.     On February 21, 2018, the Sellers and the Purchaser entered into the Stock Purchase Agreement, which is attached hereto as <u>Exhibit B</u>. In accordance with Rule 6004-1 of the Local Rules, the material terms of the Stock Purchase Agreement and proposed Sale Order are set forth in the following table:[8]

---

[8]     Capitalized terms used but not otherwise defined in this table have the meanings given to them in the Stock Purchase Agreement.

| | |
|---|---|
| **Sellers** | Chemtex Far East, Ltd., a Delaware Corporation, Chemtex International Inc., a Delaware Corporation, Mossi & Ghisolfi International S.à r.l., a Luxembourg société à responsabilité limitée<br><br>Stock Purchase Agreement, Preamble. |
| **Purchaser** | Chemtex Global Corporation, a Georgia Corporation<br><br>Stock Purchase Agreement, Preamble. |
| **Purchaser's Affiliated Lender** | Shiner Management & Consulting Co. Ltd., a Chinese Company.<br><br>The Purchaser's Affiliated Lender shall fund an amount sufficient to satisfy the Vendor Liabilities set forth in Schedule 9.2 thereto.<br><br>Stock Purchase Agreement, Preamble, § 3.2. |
| **Assets** | The assets subject to the Stock Purchase Agreement are:<br><br>a) the Shares;<br><br>b) the Transition Data;<br><br>c) the Invista IP Licenses (together with the Transition Data and any other assets listed on Schedule 2.1(b) of the Stock Purchase Agreement, the "Purchased Assets"); and<br><br>d) CII's rights to the trade name "CHEMTEX" and related logo and domain name(s) (collectively, the "Brand Name").<br><br>((a) through (d) together, the "Assets").<br><br>Stock Purchase Agreement, Preliminary Statements A-G; Schedule 2.1(b). |
| **Structure of Transaction** | See paragraph 8 above. |
| **Purchase Price** | The aggregate consideration for the Shares, the Purchased Assets and the Brand Name will be: (a) $1,050,000 in cash, which represents consideration for (i) the Chemtex India Shares of $700,000, (ii) consideration for the China Shares of $300,000 and (iii) consideration for the Transition Data of $50,000; and (b) the assumption of the Vendor Liabilities.<br><br>Stock Purchase Agreement § 3.1. |
| **Fee and Expense Reimbursement** | None. |

DOCS_DE:218112.1 54032/001

| | |
|---|---|
| **Conditions to Closing** | The following conditions to closing exist under the Stock Purchase Agreement:<br><br>a) the Sale Order will be final and non-appealable in all respects and will not be subject to any stay, reversal, modification or amendment;<br><br>b) the Parties will have obtained any required Regulatory Approval;<br><br>c) the Counterparty Releases will have been obtained;<br><br>d) no law or order will be in effect which has the impact of making illegal or otherwise restricting, preventing or prohibiting the consummation of the China Transaction;<br><br>e) the representations and warranties of the Parties contained in <u>Article 6</u> that are not qualified by materiality or Purchaser/Seller Material Adverse Effect will be true and correct in all material respects as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of the Parties contained in <u>Article 6</u> that are qualified by materiality or Purchaser/Seller Material Adverse Effect will be true and correct in all respects as of the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Purchaser or Seller, as applicable, will have received a certificate signed by an authorized officer of the other Party, dated as of the Closing Date, to the foregoing effect;<br><br>f) Purchaser and Sellers will have performed and complied, in all material respects, with the agreements, covenants and obligations required by this Agreement to be performed or complied with by the Purchaser or Sellers, as applicable, at or before the Closing;<br><br>g) Purchaser will have performed and complied, in all material respects, with the agreements, covenants and obligations required by this Agreement to be performed or complied with by Purchaser at or before the Closing; and<br><br>h) Purchaser will have made the payments in satisfaction of the Vendor Liabilities listed on <u>Schedule 9.1</u> of the Stock Purchase Agreement.<br><br>Stock Purchase Agreement § 8.1-8.4. |

| | |
|---|---|
| **Sale to Insider**<br><br>*Del. Bankr. L.R. 6004-1(b)(iv)(A)* | The Purchaser and the Purchaser's Affiliated Lender are controlled by Mr. Sean Ma, who is also the Chief Executive Officer ("CEO") and/or a director of certain of the Chemtex Entities whose Shares are being sold pursuant to the Stock Purchase Agreement. Mr. Ma is the CEO and a director of Chemtex (Shanghai) International Trading Co., Ltd., Chemtex Shanghai Chemical Engineering Co. Ltd. and Chemtex Engineering Co. Ltd. and the CEO of Chemtex Consulting India Pvt. Limited. In addition, Mr. Ma is the CEO of CII (with responsibility solely with respect to matters unrelated to the Corpus Christi Assets); however, Mr. Ma was not involved in the negotiation of the Stock Purchase Agreement or the Sale Transaction on behalf of CII.<br><br>In order to ensure the fairness of the sale process and the proposed transaction, the Sellers are permitted to pursue Alternative Transactions (discussed below). In addition, there is no termination fee or expense reimbursement or like amount owing to the Purchaser under any circumstances.<br><br>As an additional protection, the Debtors negotiated a post-closing contingency payment (the "Post-Closing Contingency Payment") whereby the Purchaser will pay to the Sellers, in accordance with Section 3.4(b) of the Stock Purchase Agreement, an aggregate amount equal to 25% of the value received or to be received by the Purchaser or any of its Affiliates in connection with any sale by or on behalf of the Purchaser or any of its Affiliates to an unaffiliated third Party of all, or substantially all of the Chemtex Entities, or a sale of all or substantially all of the assets of any Company pursuant to which all, or substantially all, of Purchaser's or any of its Affiliates' rights in the Acquired Assets are to be transferred to any unaffiliated third Party, and regardless of whether in a single transaction or series of related transactions; provided, however, that the Purchaser is only obligated to pay the Post-Closing Contingency Payment to Sellers in the event that forgoing occurs on or prior to the first anniversary of the Closing.<br><br>Sale Order ¶ P; Stock Purchase Agreement §§ 3.4, 7.9. |
| **Releases**<br><br>*Del. Bankr. L.R. 6004-1(b)(iv)(C)* | Purchaser will cause the counterparties to the Acquired Contracts to, prior to the Closing, irrevocably waive and release in full any claims it may now or in the future have against the Joint Debtors (the "Counterparty Releases"). The Counterparty Releases will be in writing and in form and substance reasonably acceptable to Sellers.<br><br>At the Closing, the Purchaser will deliver to the Sellers with respect to the purchase and sale of the Shares a waiver and release of claims against the Debtors in the form attached as Exhibit A to the Stock Purchase Agreement duly executed by the Companies, Purchaser and Mr. Ma.<br><br>Stock Purchase Agreement §§ 4.3, 9.2; Sale Order ¶ V. |

| | |
|---|---|
| **Private Sale/No Competitive Bidding**<br><br>*Del. Bankr. L.R. 6004-1(b)(iv)(D)* | No auction is contemplated, <u>provided</u>, <u>however</u>, as noted above, the Sellers are permitted to cause their respective representatives and Affiliates to initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of any of the Chemtex Entities or the assets of the Chemtex Entites, the Brand Name or the Purchased Assets to a purchaser(s) other than Purchaser or effecting any other transaction (including a plan of reorganization or liquidation) the consummation of which would be substantially inconsistent with the transactions contemplated herein (an "<u>Alternative Transaction</u>") to the extent that the respective boards of directors or similar governing bodies of any Seller determines in good faith that doing so is permitted or required in the exercise of its fiduciary duties.<br><br>Stock Purchase Agreement, § 7.9. |
| **Termination and Milestones**<br><br>*Del. Bankr. L.R. 6004-1(b)(iv)(E)* | The Stock Purchase Agreement may be terminated before the Closing by Purchaser and Sellers, if the Closing has not occurred by the close of business on March 30, 2018, subject to mutually agreeable extension, if necessary.<br><br>Stock Purchase Agreement § 4.4; Sale Order ¶ J. |
| **Good Faith Deposits**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(F)* | The Purchaser has deposited the amount of $105,000 (the "<u>Purchase Deposit Amount</u>"), which will be released and delivered to either Purchaser or Sellers in accordance with Section 3.3 of the Stock Purchase Agreement. The Purchase Price Deposit Amount shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of Purchaser or Sellers. The Purchase Price Deposit Amount (together with all accrued investment income thereon) will be distributed as follows:<br><br>a) if the Closing occurs, the Purchase Price Deposit Amount and all accrued investment income thereon will be delivered to the Sellers and applied towards the amount payable by Purchaser under <u>Section 3.2</u> of the Stock Purchase Agreement;<br><br>b) if the Stock Purchase Agreement is terminated by Sellers pursuant to <u>Section 4.6(d)</u> of the Stock Purchase Agreement, the Purchase Price Deposit Amount, together with all accrued investment income thereon, will be delivered to Sellers; and<br><br>c) if the Stock Purchase Agreement is terminated for any other reason than by Sellers pursuant to <u>Section 4.6(d)</u> thereof, the Purchase Price Deposit Amount, together with all accrued investment income thereon, will be returned to Purchaser.<br><br>Stock Purchase Agreement § 3.3; Sale Order ¶ 5. |

| | |
|---|---|
| **Record Retention**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(J)* | The Debtors shall retain originals or copies of all hard documents and data and information that constitute Assets and any other document, data or information stored on or in servers, backup devices, mobile devices, electronic storage devices, or miscellaneous IT equipment, in each case, that constitutes Assets, currently in the Debtors' possession, custody, or control pertaining to pending or threatened litigation or necessary to administer these Cases.<br><br>Sale Order ¶ 39. |
| **Successor Liability**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(L)* | The Purchaser shall incur no successor liability with respect to the purchased Assets.<br><br>Sale Order ¶¶ K, X, 13-18. |
| **Relief from Bankruptcy Rule 6004(h) Stay**<br>*Del. Bankr. L.R. 6004-1(b)(iv)(O)* | The Debtors seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) with respect to the effectiveness of the Sale Order.<br><br>Sale Order ¶¶ J, 38. |

## RELIEF REQUESTED

12.     By this Motion, pursuant to sections 105(a) and 363 of the Bankruptcy Code, Rules 2002, 6004 and 9014 of the Bankruptcy Rules and Rule 6004-1 of the Local Rules, the Debtors request that the Court enter the Sale Order (a) authorizing the sale of the Assets free and clear of all liens, claims, interests, and encumbrances; (b) the assumption and assignment of certain contracts and (c) granting related relief.

## BASIS FOR RELIEF

### A.     Approval of the Sale is Warranted Under Section 363 of the Bankruptcy Code

13.     Section 363 of the Bankruptcy Code provides that the debtor may, "after a notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363. In turn, section 105(a) of the Bankruptcy Code provides that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

-12-

14.     While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts uniformly agree that the business judgment standard applies. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). Courts typically apply four factors in determining whether a section 363 sale is appropriate under the business judgment standard—namely, whether: (a) a sound business justification exists for the sale; (b) adequate and reasonable notice of the sale was provided to interested parties; (c) the sale will produce a fair and reasonable price for the property; and (d) the parties have acted in good faith. *Id.* at 1070 (setting forth the "sound business" purpose standard for the sale of the debtor's assets under section 363 of the Bankruptcy Code); *In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (citing *Guilford Transportation Industries, Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)). As such, it follows that when a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkcom*, 488 A.2d 858, 872 (Del. 1985)).

### 1.     The Debtors Have Demonstrated a Sound Business Justification for the Sale of the Shares

15. A sound business justification exists where a sale of the debtor's assets are necessary to preserve the value of the debtor's estates. *See, e.g., In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . ."); *In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale).

16. As set forth above and in the Stogsdill Declaration, the Debtors have demonstrated a sound business justification for the entry into the Stock Purchase Agreement. The Sellers are no longer able to operate the businesses of the Chemtex Entities and have not received an offer for the Assets that is higher or better than the offer from the Purchaser. Stogsdill Decl., ¶ 16. The only other proposal the Debtors received was non-binding, for less consideration, contingent on further diligence and potentially not capable of timely closing. *Id.* Further, the Stock Purchase Agreement will bring approximately $1 million into the Sellers' estates while at the same time eliminating approximately $11.1 million in potential liabilities. Thus, the Sale is necessary to maximize the value of the Assets, consistent with the Debtors' fiduciary duties to their economic stakeholders.

17. In addition, under the Stock Purchase Agreement, the Debtors negotiated a "fiduciary out," whereby they retain the ability to initiate, respond to and participate in discussions with third parties and ultimately terminate the Stock Purchase Agreement to pursue a superior alternative transaction if such alternative transaction reflects the Debtors' exercise of their sound business judgment.[9] Notwithstanding this provision, the Purchaser is not entitled to a

---

[9] Section 7.9 of the Stock Purchase Agreement provides:

> This Agreement is subject to approval by the Bankruptcy Court. From and after the date hereof, Sellers are permitted to cause their respective representatives and Affiliates to initiate contact with, or solicit or encourage

termination fee or an expense reimbursement or like amounts under any circumstances. In addition, the Sellers negotiated the Post-Closing Contingency Payment, whereby the Sellers shall receive 25% of the value received by the Purchaser in the event that the Purchaser sells the Chemtex Entities within one year of the Closing. Thus, based on the terms of the Stock Purchase Agreement, the Debtors retain the ability pursue a value-maximizing Sale of the Shares without suffering any additional cost under the Stock Purchase Agreement for doing so.

18.     For the reasons set forth above and in the Stogsdill Declaration, the Debtors have demonstrated sound business justifications for the Sale of the Assets.

### 2.     The Debtors Have Provided Adequate and Reasonable Notice of the Sale, in Compliance with Bankruptcy Rule 2002

19.     Bankruptcy Rule 2002 (a) and (c) require the Debtors to notify parties in interest of the Sale, including, among other items, a disclosure of the terms and conditions of the sale and the deadline for filing any objections. Attached to this Motion is the Stock Purchase Agreement, which shall also be served on the Notice Parties (defined below) and published on the website maintained by the Debtors' claim and noticing agent, Prime Clerk, LLC, located at http://cases.primeclerk.com/mgusa. In addition, upon service of this Motion and the corresponding Notice of Hearing, the Debtors shall have provided the Notice Parties with adequate notice of the Hearing, which is to be held on March 14, 2018, and the Objection Deadline of March 7, 2018. Accordingly, upon completion of the foregoing, the Debtors submit

submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of any of the Companies or the assets of the Companies, the Brand Name or the Purchased Assets to a purchaser(s) other than Purchaser or effecting any other transaction (including a plan of reorganization or liquidation) the consummation of which would be substantially inconsistent with the transactions contemplated herein (a "Alternative Transaction") to the extent that the respective boards of directors or similar governing bodies of any Seller determines in good faith that doing so is permitted or required in the exercise of its fiduciary duties.

-15-

that they shall have provided adequate and timely notice of the Sale to all creditors and known parties in interest, consistent with Bankruptcy Rule 2002.

### 3. The Proposed Sale Will Yield a Fair and Reasonable Purchase Price

20.     As set forth above and in the Stogsdill Declaration, the Debtors believe that the proposed Sale will yield a fair and reasonable price for the Assets and is the Debtors' best option to reduce the Debtors' liabilities related to the Chemtex Entities. Not only will the Sale bring $1 million into the Sellers' estates, it also will reduce Chemtex International's liabilities to vendors and other contract counterparties by approximately $11.1 million. In addition, the Sale will extricate Chemtex International and MGI from, and potentially altogether avoid, what could have been a long, complex and potentially costly liquidation of the Chemtex Entities in multiple foreign jurisdictions. In addition, as stated above, the Debtors, together with their advisors, determined that the terms of the Stock Purchase Agreement, including the purchase price for the Assets, were superior to the terms that were offered by another interested party for purchase of the shares of the Chemtex Entities. Stogsdill Decl., ¶ 16. Accordingly, the purchase price for the Assets, as set forth in the Stock Purchase Agreement, is fair and adequate.

### 4. The Stock Purchase Agreement Ensures a Good Faith Process and the Ultimate Purchaser of the Assets Is Entitled to the Protections of Section 363(m) and 363(n) of the Bankruptcy Code.

21.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good faith purchaser. Specifically, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . .were stayed pending appeal.

11 U.S.C. § 363(m).

22.     While the Bankruptcy Code does not define good faith, the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn., Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983) (other citations omitted); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) (noting that the type of "misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders.").

23.     Section 363(n) of the Bankruptcy Code provides that "[t]he trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which the sale was consummated . . . ." 11 U.S.C. § 363(n); *see also In re Edwards*, 228 B.R. 552, 566-67 (Bankr. E.D. Pa. 1998) ("Congress intended in Section 363(n) to prohibit only agreements that are intended to control a sale price, and not all agreements having the unintended consequence of influencing a sale price--i.e., not all agreements that affect a sale price.") (quoting *Lone Star Industries, Inc. v. Compania Naviera Perez Companc, et al. ( In re New York Trap Rock Corp.)*, 42 F.3d 747, 752 (2d Cir. 1994) (internal quotation marks omitted)).

24.     The Debtors submit that the Sale is entitled to the requested protections and that the Purchaser—notwithstanding its technical status under the Bankruptcy Code as an "insider"—is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  Prior

to the Petition Date, the Sellers and Purchaser began negotiating the terms of the Stock Purchase Agreement without collusion and in good faith. As set forth above, although Mr. Ma is the CEO of Chemtex International, he did not act on behalf of Chemtex International in the negotiation of the Sale Transaction and the Stock Purchase Agreement, the parties were separately represented and the board of directors for each of the Sellers independently approved the Sale Transaction.

25.     The terms and conditions of the Stock Purchase Agreement, as negotiated between the Debtors and the Purchaser, were conducted at arm's length and represent the best terms and conditions obtainable by the Sellers. In particular, and as described above as further support of the parties' good faith negotiations, the Debtors negotiated a "fiduciary out" in the Stock Purchase Agreement and retain the benefit of the Post-Closing Contingency Payment. Importantly, this fiduciary-out does not result in any additional expense to the Debtors' estates in the event that the Stock Purchase Agreement is terminated prior to Closing—the Debtors face no termination fees or like amount in the event that the Stock Purchase Agreement is terminated under such circumstances. Moreover, as described in the Stogsdill Declaration, the consideration received by the Sellers pursuant to the Stock Purchase Agreement is substantial, fair and reasonable and reflective of the highest and best value for such the Assets. Finally, the Sale is not the result of any fraud or collusion, as that term is defined in the Bankruptcy Code, or any similar conduct that would cause or permit the Sale to be avoided under section 363(m) or 363(n) of the Bankruptcy Code.

26.     Accordingly, the Debtors request that the Court finds that (a) the Purchaser will be purchasing and acquiring the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code and, thus, is entitled to the protections of section 363(m) of Bankruptcy Code

-18-

and (b) the Sale or any part of the transaction contemplated by the Purchase Agreement will not

be avoidable under section 363(n) of the Bankruptcy Code.

**B.  The Sale of the Chemtex Equity Interets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code**

27.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and

clear of all liens, claims, interests and encumbrances provided that one of the following

conditions are met:

> a.  applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> b.  such entity consents;
>
> c.  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> d.  such interest is in bona fide dispute; or
>
> e.  such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5).

28.  As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when

proceeding pursuant to section 363(b), it is only necessary for a debtor to meet one of the five

conditions of section 363(f).  *See id.*; *Mich. Employment Sec. Comm'n v. Wolverine Radio Co.

(In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy

Code section 363(f) written in disjunctive; holding that court may approve sale "free and clear"

provided at least one of the subsections of Bankruptcy Code 363(f) is met); *In re Zeigler*, 320

B.R. 362, 381 (Bankr. N.D.Ill. 2005); *In re Dundee Equity Corp.*, No. 89-B-10233 1992 Bankr.

LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such

-19-

that the sale free of the interest concerned may occur if any one of the conditions of §363(f) have been met"); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

29.    The Debtors represent that the Sale will satisfy one of the five requirements set forth under section 363(f) of the Bankruptcy Code, either because there are proceeds sufficient to cover such liens or interests, the affected parties consent to the Sale of the applicable Assets or some other bases exist under section 363(f) of the Bankruptcy Code to warrant the sale of the applicable Assets free and clear of such liens or interests. Specifically, the DIP Lender has consented or otherwise does not object to the portion of the Stock Purchase Agreement providing for the sale of the assets of CII, an obligor under the DIP Facility. Accordingly, the Debtors anticipate that one or more prongs of section 363(f) of the Bankruptcy Code will be satisfied with respect to parties that assert liens on or interests in the Assets. A sale free and clear of liens, claims and encumbrances is necessary to effect the Sale and is required by section 2.1 of the Stock Purchase Agreement.

30.    Accordingly, the Debtors respectfully request that the Court authorize the Sale of the Assets free and clear of any liens, claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

**C.    Assumption and Assignment of Executory Contracts and Unexpired Leases**

31.    Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease . . ." 11 U.S.C. § 365(a).

32.    Courts employ a business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and

-20-

can only be overturned if decision was product of bad faith, whim or caprice); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the Court. . ."). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

33.     The Stock Purchase Agreement designates certain Contracts (the "'Acquired Contracts") for possible assumption and assignment in connection with the Sale Transaction. Pursuant to Section 9.1 of the Stock Purchase Agreement, at the Closing, Purchaser will (i) either assume all liabilities ("Vendor Liabilities") under the purchase orders set forth on Schedule 9.1 to the Stock Purchase Agreement (the "Vendor Purchase Orders") or will cause the counterparties thereunder to terminate the Vendor Purchase Orders with Chemtex International and enter into new contracts or purchase orders with one or more of the Companies (as defined in the Stock Purchase Agreement) or Purchaser, and (ii) will deliver the Counterparty Releases (as defined below) with respect to such Vendor Contracts to Sellers as contemplated by Section 9.2 of the Stock Purchase Agreement. Pursuant to Section 9.2 of the Stock Purchase Agreement, Purchaser will cause the counterparties to the Acquired Contracts to, prior to the Closing, irrevocably waive and release in full any claims it may now or in the future have against the Debtors (the "Counterparty Releases"). In addition, pursuant to the Stock Purchase Agreement, the Sellers shall assume and assign, with the consent of INVISTA Technologies S.à r.l. or INVISTA Textiles (U.K.) Limited (collectively, "Invista"), the Technical Information License Agreement dated as of November 22, 2016 between Chemtex International and INVISTA Technologies S.à r.l. and the Technical Information License Agreement dated February 13, 2017

-21-

between Chemtex International and INVISTA Textiles (U.K.) Limited, and the Purchaser shall be responsible for the payment of any Cure Costs with respect to the Invista IP Licenses. Given the status of the Invista IP Licenses as licenses of intellectual property by Invista as licensor, Invista has consented or does not otherwise object to the assumption and assignment of the Invista IP Licenses, subject to Purchaser's payment to Invista in full in cash of applicable Cure Costs at Closing. Accordingly, the Debtors shall not bear any costs associated with the assumption and assignment of the Acquired Contracts and the Invista IP Licenses, and, therefore, the assumption and assignment of the Acquired Contracts and the Invista IP Licenses is a sound exercise of the Debtors' business judgment.

34. Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract." 11 U.S.C. § 365(f)(2). Section 365(b), which codifies the requirements for assuming an executory contract, provides, in pertinent part that the debtor may only assume an executory contract if it:

> (A) cures, or provides adequate assurance that the [debtor] will promptly cure[s] [any defaults existing under the executory contract];
>
> (B) compensates, or provides adequate assurance that the [debtor] will promptly compensate, a party other than the debtor to such contract . . . for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).

35. While undefined by the Bankruptcy Code, adequate assurance is guided by "a practical, pragmatic construction based upon the facts and circumstances of each case." *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988)

-22-

(quoting *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1995)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations."). While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance." *In re Carlisle Homes, Inc.*, 103 B.R. at 538. Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

36.     The Stock Purchase Agreement requires the Purchaser, upon request of the Sellers, to provide financial and other information that would provide counterparties to Acquired Contracts with adequate assurance of future performance of the applicable obligations under any Acquired Contracts included as part of Sale. Stock Purchase Agreement, § 7.1. In addition, counterparties unsatisfied with the proposed adequate assurance of future performance provided to them will be able to lodge objections with respect thereto by the Objection Deadline.

37.     Accordingly, the Debtors have satisfied the requirements of section 365 of the Bankruptcy Code with respect to the assumption and assignment of the Proposed Assumed Contracts.

38.     In order to facilitate the assumption and assignment of the Proposed Assumed Contracts, the Debtors respectfully request that the Court find that all anti-assignment provisions

included in the Acquired Contracts, including those Acquired Contracts that have the effect of restricting or limiting assignment, to be unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code,[10] subject to any right of a counterparty of an Acquired Contract under section 365(c) of the Bankruptcy Code.

## REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY

39.     Pursuant to Bankruptcy Rule 6004(h), the Debtors seek (a) immediate entry of an order granting the relief sought herein and (b) a waiver of any stay of the effectiveness of such an order. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

40.     As set forth above and in the Stogsdill Declaration, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders. Accordingly, the Debtors submit that ample cause exists to justify (a) the immediate entry of an order granting the relief sought herein and (b) a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## NOTICE

41.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) the Committee and its counsel Milbank, Tweed, Hadley & McCoy LLP and Cole Schotz P.C.; (c) the Internal Revenue Service, the Securities and Exchange Commission and any other federal, state or local governmental agency to the extent

---

[10]     Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease. . ." 11 U.S.C. § 365(f)(1). Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

-24-

required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or order of the Court; (d) Magnate S.à r.l. and its counsel, Kirkland & Ellis LLP and Klehr Harrison Harvey Branzburg LLP; (e) DAK Americas LLC and its counsel, Weil, Gotshal & Manges LLP and Morris, Nichols, Arsht & Tunnell LLP; (f) Trimont Real Estate Advisors, LLC and its counsel, Thompson & Knight LLP, (g) Control Empresarial de Capitales, S.A. De C.V., and Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financiero Inbursa and its counsel, Cleary Gottlieb Steen & Hamilton LLP and Young Conaway Stargatt & Taylor, LLP; (h) Macquarie Investments US Inc. and its counsel, Sidley Austin LLP and Ashby & Geddes, P.A., (i) the Debtors' non-Debtor affiliates; (j) those creditors holding the 30 largest unsecured claims against the Sellers' estates; (k) all parties that have expressed an interest in acquiring the Assets; (l) all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors); (m) all non-Debtor parties to any executory contracts or unexpired leases of the Sellers that are proposed to be assumed or rejected in connection with any Sale Transaction; and (n) all persons and entities that have filed a request for service of filings in these Cases pursuant to Bankruptcy Rule 2002 (the foregoing clauses (a) through (n), the "Notice Parties"). The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

42.     No prior request for the relief sought herein has been made to this Court or any other court.

DOCS_DE:218112.1 54032/001

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Sale Order, substantially in the form attached hereto as Exhibit A and (ii) grant such other and further relief to the Debtors as the Court may be appropriate.

Dated: February 22, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                joneill@pszjlaw.com
                jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Michael J. Cohen
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:     (212) 326-3939
Facsimile:      (212) 755-7306
Email:          sgreenberg@jonesday.com
                mcohen@jonesday.com
                scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, OH 44114
Telephone:     (216) 586-7035
Facsimile:      (216) 579-0212
Email:          ceblack@jonesday.com

Co-Counsel for the Debtors and Debtors in Possession

-26-