# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| M & G USA CORPORATION, *et al.*,[1] | : | Case No. 17- 12307 (BLS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER ESTABLISHING A LIENHOLDER CLAIMS RESERVE AND GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") move the Court (the "Motion"), pursuant to sections 105(a) and 502(c) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3021 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order, in substantially the form attached as Exhibit A (the "Proposed Order"), approving the establishment and amount of a reserve in the amount of $350,149,728.43 from the sale of applicable assets of the Debtors' estates (the "Lienholder Claims Reserve") to satisfy the claims (collectively, the "Lienholder Claims") of certain alleged holders of mechanics' and materialmen's liens (collectively, the "Lienholders"). In support of this Motion, the Debtors (i) submit the declaration of Dennis Stogsdill (the "Stogsdill Declaration") attached hereto as Exhibit B and incorporated by reference herein and (ii) respectfully represent as follows:

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

NAI-1503436205v9

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A. General Background

2. On October 24, 2017, Debtor M&G Polymers USA, LLC ("M&G Polymers") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Thereafter, on October 30, 2017 (the "Petition Date"), each of the other Debtors commenced chapter 11 cases before this Court (together with the chapter 11 case of M&G Polymers, the "Chapter 11 Cases"). The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. An official committee of unsecured creditors (the "Committee") was appointed in these Chapter 11 Cases on November 13, 2017 (Docket No. 146). Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' businesses, corporate structure and financial condition, is set forth in the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* (Docket No. 3) (the "First Day Declaration"), filed on October 31, 2017 and incorporated herein by reference.

### B. Background Regarding the Lienholder Claims

4. As set forth in the First Day Declaration, in April 2013, the Debtors began construction on a vertically integrated PTA/PET plant in Corpus Christi, Texas (the "Corpus Christi Plant"). Debtor M & G Resins USA, LLC ("M&G Resins") owns the Corpus Christi Plant and the real estate on which it stands. Substantially all of the construction work on the

Corpus Christi Plant was furnished through one of two entities, Sinopec Engineering Group America, LLC ("Sinopec") or Debtor Chemtex International Inc. ("Chemtex"), that contracted directly with M&G Resins. Stogsdill Decl. at ¶ 6. Nevertheless, numerous other contractors, subcontractors and third parties (collectively, with Sinopec and Chemtex, the "Contractors") provided services, materials or labor in connection with the construction, and, together with Chemtex and Sinopec, have asserted Lienholder Claims for amounts allegedly owing and unpaid as of the Petition Date. *Id.* Each Lienholder Claim is evidenced by: (a) the recording of one or more affidavits claiming mechanics' and materialman's liens and/or constitutional liens (a "Lien Affidavit") in the official real property records or deeds records of Nueces County, Texas (the county in which the Corpus Christi Plant is located); (b) the filing in the Chapter 11 Cases of one or more notices of perfection of lien pursuant to section 546(b)(2) of the Bankruptcy Code (a "Section 546 Notice"); and/or (c) the submission in the Chapter 11 Cases of one or more statement of lien forms (a "Statement of Lien Form") in accordance with the *Order (I) Establishing Lien Identification Procedures and (II) Granting Related Relief* (Docket No. 457) (the "Lien Identification Order"), as more fully described below.

5. Various orders of the Court address issues relating to the treatment of Lienholder Claims. On December 13, 2017, the Court entered the *Final Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363,*

*364 and 507; and (5) Granting Related Relief* (Docket No. 479) (the "Final DIP Order").[2] In the Final DIP Order, the Court acknowledged certain stipulations among the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party and the Debtors (collectively, the "Final DIP Order Sale Stipulations"). Final DIP Order, at ¶ B(vii). The Final DIP Order Sale Stipulations contemplate that the procedures for any CC Sale would provide for the establishment of an appropriate reserve as determined by the Court for obligations secured by Senior Prior Liens in escrow for the sole purpose of satisfying such obligations.[3] *Id.*

6. On December 14, 2017, the Court entered the *Order (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* (Docket No. 490) (the "Bidding Procedures Order").[4] The Bidding Procedures Order approved certain Bidding Procedures attached as Exhibit 1 thereto for the sale of some or all of the Debtors' assets, including the Corpus Christi Plant. Consistent with the Final DIP Order, the Bidding Procedures

---

[2] Capitalized terms in this paragraph 5 not otherwise defined in this Motion have the meanings given to them in the Final DIP Order.

[3] The Final DIP Order defines "Senior Prior Liens" as:

> valid, enforceable, non-avoidable and perfected Liens, whether choate or inchoate, arising prior to the Petition Date that (a) were either perfected prior to the Petition Date or have been perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and (b) are senior in priority to all or any portion of the Pre-Petition First Lien Security Interests (solely to the extent of such portion)

Final DIP Order, at ¶ 3(b)(i).

[4] Capitalized terms in this paragraph 6 not otherwise defined in this Motion have the meanings given to them in the Bidding Procedures Order.

require that potential purchasers submitting credit bids "deliver a written commitment to fund into an escrow account established by the Debtors upon the closing of the Sale Transaction . . . an amount of cash sufficient to satisfy," among other things,

> any obligations secured by liens on such Corpus Christi Assets that are senior to the obligations that are the subject of such Credit Bid, including any Senior Prior Liens (only in the event the Assets that are the subject of such Sale Transaction are being sold free and clear of the applicable liens securing such obligations pursuant to section 363(f) of the Bankruptcy Code) . . . .

Bidding Procedures, at § VI.A.5.

7. Shortly prior to entry of the Final DIP Order and the Bidding Procedures Order, on December 11, 2017, the Court entered the Lien Identification Order. The Lien Identification Order required that Lienholders that had not previously filed a Lien Affidavit or a Section 546 Notice with respect to any Lienholder Claim submit a Statement of Lien Form evidencing such claim by no later than February 15, 2018 (the "Lienholder Bar Date") to be eligible (a) to vote on any chapter 11 plan propounded in the Chapter 11 Cases and (b) to receive a distribution from the Debtors' estates. Lienholder Identification Order, at ¶ 10.

8. The Lienholder Identification Order further provides that neither the Debtors nor the purchaser of the Corpus Christi Plant shall be required to establish a reserve from the proceeds of the sale of the Corpus Christi Plant on account of any Lien for which, on or prior to the Lienholder Bar Date: (a) no Section 546 Notice has been filed on the docket in the Chapter 11 Cases, (b) no Lien Affidavit has been recorded in the Nueces County real property records and (c) no Statement of Lien Form has been received by the Debtors by the Lienholder Bar Date. *Id.* at ¶ 11.

9. On January 19, 2018, the Court entered the *Order Establishing Lienholder Claim Settlement Procedures* (Docket No. 721) (the "Lienholder Claim Settlement Procedures Order"). The Lienholder Claim Settlement Procedures Order established certain procedures for

the settlement of Lienholder Claims (any such settlement, a "Lienholder Settlement").  Although the Debtors have been diligently pursuing Lienholder Settlements, as of the date of filing of this Motion, no Lienholder Settlements have been reached and approved in accordance with the requirements of the Lienholder Claim Settlement Procedures Order.  Stogsdill Decl. at ¶ 7.  Accordingly, all Lienholder Claims currently remain subject to potential dispute by the Debtors.  *Id.*

        **C.**      **The Debtors' Development of the Proposed Lienholder Claims Reserve**

        10.      The Debtors determined that the prompt establishment of a Lienholder Claims Reserve following the Lienholder Bar Date would provide potential bidders with the clearest available guidance regarding the maximum aggregate scope of Lienholder Claim liabilities, which would promote interest in the assets of the Debtors' estates and the likelihood of a successful sale for the benefit of all stakeholders.  Stogsdill Decl. at ¶ 8.  To this end, the Debtors and their advisors conducted an analysis of the Lienholder Claims to develop an appropriate proposed Lienholder Claims Reserve.  *Id.*  The Debtors' analysis sought to identify the total amount of liabilities asserted in the Lienholder Claims on a nonduplicative basis without consideration of any potential defenses or counterclaims that the Debtors may possess to such Lienholder Claims, provided that, for the reasons discussed below, the Debtors have not included specific reserves in the Lienholder Claims Reserve for any liquidated or unliquidated amounts asserted in the Lienholder Claims on account of attorneys' fees and/or interest ("Interest and Fee Claims").  *Id.*

        11.      As of the Lienholder Bar Date, approximately 229 Lienholder Claims in the aggregate amount of more than $800 million have been asserted against the Debtors' estates by the filing of a Lien Affidavit, a Section 546 Notice and/or a Statement of Lien Form.  *Id.*

at ¶ 9. Based upon their analysis, the Debtors and their advisors have determined that, among other potential defenses and counterclaims, many of the liabilities asserted in the Lienholder Claims are duplicated by other Lienholder Claims, whether such duplicative Lienholder Claims are asserted by the same Lienholder or one or more other Lienholders with whom the subject Lienholder contracted, directly or indirectly (the "<u>Duplicated Liabilities</u>"). *Id.*

12. In developing the proposed Lienholder Claims Reserve, the Debtors have used their good faith best efforts to eliminate the Duplicated Liabilities. *Id.* at ¶ 10. This process has been complicated by several factors, including, among other things, that in many cases, Lienholders contracted with multiple other Contractors, directly or indirectly, for the goods or services they provided. *Id.*

13. Attached as <u>Exhibit C</u> hereto is a schedule (the "<u>Lienholder Schedule</u>") setting forth the results of the Debtors' analysis and the proposed aggregate Lienholder Claims Reserve amount of $350,149,728.43. *Id.* at ¶ 11. For each Lienholder Claim, the Lienholder Schedule identifies: (a) the name of the applicable Lienholder; (b) any Lien Affidavit, Section 546 Notice and/or Statement of Lien Form filed by the Lienholder with respect to such Lienholder Claim; (c) the full amount of any liability asserted in each such filing; and (d) the proposed amount to be reserved in the Lienholder Claims Reserve on account of such Lienholder Claim (each, an "<u>Individual Reserve Amount</u>"). *Id.* For convenience and to clearly demonstrate the Debtors' process for eliminating Duplicated Liabilities, the Lienholder Schedule displays the various Lienholder Claims grouped by tier under the applicable Contractors with whom they

contracted. *Id.* As a result, the Lienholder Claims of a Lienholder that contracted with more than one other Contractor are accounted for separately within the Lienholder Schedule.[5] *Id.*

        14. Except as set forth below with respect to Lienholder Settlements, the Debtors intend that the Lienholder Claims Reserve will be an aggregate reserve for the satisfaction, in any amounts ultimately allowed, of all Lienholder Claims with respect to which: (a) the Debtors' applicable assets are sold free and clear pursuant to section 363(f) of the Bankruptcy Code; and (b) any underlying contract is not assumed and assigned by the Debtors in connection with any such sale pursuant to section 365 of the Bankruptcy Code. *Id.* at ¶ 11. Although the proposed amount of the Lienholder Claims Reserve is determined as the sum of the Individual Reserve Amounts (as is evident from the Lienholder Schedule), because the Lienholder Claims Reserve is an aggregate reserve, it is not relevant which Lienholder is associated with any Duplicated Liability in the Lienholder Schedule, so long as such Duplicated Liability is identified only once therein. *Id.* The Debtors generally have associated Duplicated Liabilities with the lowest tier Lienholder that asserts such liabilities and have eliminated such liabilities from the proposed Individual Reserve Amount of higher tier Lienholders. *Id.* For that reason, the proposed Individual Reserve Amount for any Lienholder may differ materially from the amounts asserted in any Lien Affidavit, Section 546 Notice and/or Statement of Lien Form filed by the applicable Lienholder, particularly with respect to higher tier Lienholders. *Id.* Nevertheless, the Debtors reiterate that they have eliminated amounts from the proposed Lienholder Claims Reserve <u>only</u> on the basis that such amounts constitute Duplicated Liabilities or Interest and Fee Claims and not on the basis of any other potential defenses or counterclaims

---

[5] Note that, for clarity and to show the relationships between Contractors, the Lienholder Schedule also identifies several Contractors that did not file Lienholder Claims. The entry of each such Contractor is marked "No lien filed," and no reserve is proposed for such Contractors.

that the Debtors may possess to any Lienholder Claims, all of which arguments and defenses the Debtors expressly reserve. *Id.*

15. In contrast to disputed Lienholder Claims, the Debtors propose to reserve the precise amounts contemplated by any Lienholder Settlements solely on account of such settled Lienholder Claims and to seek the Court's authorization to distribute such amounts as soon as reasonably practicable following the closing of any applicable sale. Stogsdill Decl. at ¶ 13. As set forth above, as of the date of this Motion, no Lienholder Settlements have been approved in accordance with the requirements of the Lienholder Claim Settlement Procedures Order. *Id.* The Debtors (a) anticipate modifying the Lienholder Schedule prior to the hearing on this Motion to reflect any Lienholder Settlements entered into as of such date and (b) propose that they be authorized to make further modifications to the Lienholder Schedule in accordance with the rules of administration set forth below. *Id.*

### D. Rules of Administration of Lienholder Claims Reserve

16. The Debtors propose that they be authorized to administer the Lienholder Claims Reserve in accordance with the following procedures (the "Lienholder Reserve Administration Procedures"):

> (a) The Lienholder Claims Reserve shall apply solely to Lienholder Claims with respect to which (i) the Debtors' applicable assets are sold free and clear pursuant to section 363(f) of the Bankruptcy Code and (ii) any underlying contract is not assumed and assigned by the Debtors in connection with any such sale pursuant to section 365 of the Bankruptcy Code. In the event that any purchaser purchases assets subject to – as opposed to free and clear of – any Lienholder Claims, or the Debtors assume and assign any applicable contract in connection with such sale, the Debtors shall be authorized immediately upon approval of such sale to reduce the required amount of the Lienholder Claims Reserve by the applicable proposed Individual Reserve Amounts associated with such Lienholder Claims.

(b) Immediately upon entry of a final order of the Court or any other tribunal with jurisdiction over any Lienholder Claim reducing or disallowing the Lienholder Claim, and without further notice to any party, the Debtors shall be authorized to reduce the amount of the Lienholder Claims Reserve by the amount of such reduction or the full amount originally allocated on account of such Lienholder Claim, as applicable.

(c) If the Debtors enter into any Lienholder Settlement pursuant to the Lienholder Claim Settlement Procedures Order with respect to one or more Lienholder Claims, the Debtors shall be authorized, without further notice to any party, (i) to reduce the Lienholder Claims Reserve to the secured amount provided for under such Lienholder Settlement (the "Settlement Amount") and (ii) to treat such Settlement Amount in the Lienholder Claims Reserve as available solely for the satisfaction of the Lienholder Claims that are the subject of the Lienholder Settlement and not for the satisfaction of other Lienholder Claims.

(d) Under no circumstances shall the Debtors or any purchaser of the Debtors' assets be required to reserve amounts over and above the Lienholder Claims Reserve on account of any Lienholder Claims.

E. **Reservation of Rights/No Admission of Liability**

17. The Debtors have proposed the Lienholder Claims Reserve described herein in good faith, based on the information reasonably available as of the date of this Motion. The proposed Individual Reserve Amounts set forth on the Lienholder Schedule in no way constitute a reflection or admission of actual liabilities that the Debtors believe are owed. Nothing herein constitutes an admission as to the validity, nature, amount or priority of any claim, and the Debtors reserve all of its rights to dispute the validity, nature, amount or priority of any claim reserved for in the Lienholder Claims Reserve, including, without limitation, with respect to whether: (a) any Lienholder Claim is actually secured and validly perfected and (b) the priority of any such Lienholder Claim relative to any other claim. In addition, the inclusion or omission of any potential liability on the Lienholder Schedule does not constitute an

admission by the Debtors that such claim is, or is not, a Lienholder Claim, and the Debtors reserve all of their rights with respect to such arguments.

## RELIEF REQUESTED

18. Pursuant to sections 105(a) and 502(c) of the Bankruptcy Code, the Debtors request entry of an order, in substantially the form of the Proposed Order, (a) establishing the Lienholder Claims Reserve in the total amount of $350,149,728.43 and (b) approving the Lienholder Reserve Administration Procedures. For the avoidance of doubt, at this time, the Debtors do not seek authority to make any distributions from the Lienholder Claims Reserve or to establish procedures to make any such distributions.

## BASIS FOR RELIEF

**A.     Establishment of the Lienholder Claims Reserve is Warranted**

19. Section 105(a) of the Bankruptcy Code provides in part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

20. Section 502(c) of the Bankruptcy Code provides as follows with respect to the estimation of contingent or unliquidated claims:

> There shall be estimated for purpose of allowance under this section – (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . .

11 U.S.C. § 502(c).

21. Section 502(c) of the Bankruptcy Code "is designed for two purposes: (1) to avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcomes of these actions, and (2) to promote a fair distribution to creditors through a realistic assessment of uncertain claims."

*In re Enron Corp.*, Case No. 01-16034, 2006 WL 544463, at *10 (Bankr. S.D.N.Y. Jan. 17, 2006) (citing *O'Neill v. Continental Airlines, Inc. (In re Continental Airlines)*, 981 F.2d 1450, 1461 (5th Cir. 1993)); *see also In re Garlock Sealing Techs., LLC*, No. 10-31607, 2012 Bankr. LEXIS 6236, at *8-9 (Bankr. W.D.N.C. Apr. 13, 2012) ("While section 502(c) requires that certain claims *shall* be estimated, it does not purport to be exclusive or to limit the circumstances in which claims *may* be estimated . . . . [E]stimation has been deemed appropriate . . . in any circumstance where it promotes and expedites the purposes of the Code.") (emphasis in original).

        22.      Notwithstanding that section 502(c) of the Bankruptcy Code provides for the estimation of claims "for purpose of allowance," courts have often estimated claims under section 502(c) for purposes of establishing reserves. *See, e.g., In re Chemtura Corp.*, 448 B.R. 635, 649-50 n. 45 (Bankr. S.D.N.Y. 2011) ("Reserves are frequently established to permit distributions to creditors and other stakeholders with undisputed claims and interests, to avoid prejudice to them resulting from having to wait for distributions that otherwise could be materially delayed by residual litigation on the disputed claims, or by needs to hold back value in reserve that could far exceed the likely distributions on the contested claims."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 279 (Bankr. S.D.N.Y. 2007), *aff'd*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ("Consistent with past practice in this Court and elsewhere, I am estimating [claimant's] future expenses for the purposes of establishing a fair reserve, and not for the purposes of ultimate allowance."); *In re Enron Corp.*, 2006 WL 544463, at *1 (approving the debtors' motion to estimate claims for purposes of establishing reserves, and setting the reserve amount as the maximum recovery amount). Courts have also permitted the estimation of claims pursuant to section 502(c) of the Bankruptcy Code for the purpose of

facilitating credit bidding at a section 363 sale.  *See, e.g.*, *In re RML Dev., Inc.*, 528 B.R. 150, 156 (Bankr. W.D. Tenn. 2014) ("Though the court cannot resolve the objection to a claim in a § 363 sale proceeding, the court may, however, estimate the allowed claim to avoid unduly delaying the administration of the estate — here, the § 363 sale.").

23. In addition, section 502(c) of the Bankruptcy Code permits a bankruptcy court to utilize any valuation model that best suits the circumstances of the case at hand when estimating the value of claims.  *See*, *e.g.*, *Owens v. Murray*, 365 B.R. 348, 839-40 (M.D. Tenn. 2007) (stating that bankruptcy courts "have broad discretion to employ a method that best fits the circumstances"); *In re Wallace's Bookstores, Inc.*, 317 B.R. 720, 725 (Bankr. E.D. Ky. 2004) ("[T]he bankruptcy court has broad discretion to fashion estimation procedures using whatever method is best suited to the circumstances.") (quotation marks omitted) (collecting cases); *Bruno v. Mona Lisa at Celebration, LLC (In re Mona Lisa at Celebration, LLC)*, 410 B.R. 710, 717 (Bankr. M.D. Fla. 2009) ("In outlining estimation procedures pursuant to Section 502(c)(1) of the Bankruptcy Code, a bankruptcy court should use whatever method is best suited to the circumstances of the case.") (citation omitted); *Foster v. Granite Broad. Corp. (In re Granite Broad. Corp.)*, 385 B.R. 41, 49 (S.D.N.Y. 2008) ("Bankruptcy judges have wide discretion in selecting a method for estimating claims, and may use whatever method is best suited to the circumstances.") (citations and quotation marks omitted).  The wide discretion afforded bankruptcy courts in their choice of claims estimation procedures "embodies Congress' determination that the bankruptcy courts are better equipped to evaluate the evidence supporting a particular claim within the context of a particular bankruptcy proceeding."  *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 136 (3d Cir. 1982).

24. Section 105(a) of the Bankruptcy Code provides the Court with further authority to employ section 502(c) for the purpose of authorizing the Lienholder Claims Reserve. 11 U.S.C. § 105(a); *see also United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) ("The Code also states that bankruptcy courts may 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions' of the Code. § 105(a). These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.").

25. The amount of the proposed Lienholder Reserve reflects a fair and conservative analysis of the maximum potential liability to the Debtors' estates arising from the Lienholder Claims arrived at in good faith based on appropriate review. Stogsdill Decl. at ¶ 15. As set forth above, except with respect to any Lienholder Settlements, the reserve is based on the full amount of any liability asserted in each Lien Affidavit, Section 546 Notice and/or Statement of Lien Form filed by the Lienholder with respect to the applicable Lienholder Claim, excluding any amounts asserted on account of Duplicated Liabilities and for Interest and Fee Claims. The Lienholder Claims Reserve has not been reduced to reflect any other potential defenses or counterclaims that the Debtors may possess with respect to any Lienholder or Lienholder Claims. *Id.* Based on the foregoing, establishing the Lienholder Claims Reserve as proposed herein is reasonable, conservative and will not unfairly prejudice the Debtors' creditors.

26. Prompt determinations in connection with establishing the Lienholder Claims Reserve are needed to ensure a competitive auction for the Corpus Christi Assets (as defined in the Bidding Procedures), and specifically to provide clarity as to the cash amount necessary for bidders to submit a credit bid for the assets that accounts for the Lienholder Claims that constitute Senior Prior Claims with respect to such credit bid, and also the payment of any

amounts due under Lienholder Settlements. *Id.* at ¶ 16. In addition, by establishing the Lienholder Claims Reserve now, the Debtors will be better positioned to make distributions on account of Lienholder Claims from the proceeds of any sale, pursuant to a subsequent Court order, or in relation to a Lienholder Settlement. *Id.* Accordingly, the relief requested in this Motion is necessary and appropriate to facilitate the sale process and the overall administration of the Debtors' estates.

27. As discussed above, the establishment of the Lienholder Claims Reserve is specifically contemplated by the Final DIP Order, the Bidding Procedures and the Lienholder Claim Settlement Procedures. Both the Final DIP Order and the Biddings Procedures reference the creation of a reserve for the eventual satisfaction of obligations secured by Senior Prior Liens (as defined in the Final DIP Order). In addition, the Lienholder Claim Settlement Procedures provide that the Debtors and the applicable Lienholder may "agree on an amount to be reserved from the proceeds of the sale of the Corpus Christi Plant solely on account of such Lienholder's Lienholder Claim . . . , without settling the amount and/or validity of such Lienholder Claim." Lienholder Claim Settlement Procedures Order, ¶ 2(d). Accordingly, establishment of the Lienholder Claims Reserve is consistent with applicable law and supported by the Court's prior orders.

28. In summary, the Lienholder Claims Reserve and the Lienholder Reserve Administration Procedures will promote the expeditious administration of these Chapter 11 Cases, are fair and appropriate under the circumstances and are consistent with the terms of the Lienholder Identification Procedures, the Lienholder Settlement Procedures, the Final DIP Order and the Bidding Procedures. Accordingly, the Debtors request that this Court approve the

Lienholder Claims Reserve and the Lienholder Reserve Administration Procedures, as requested herein.

### B. No Additional Reserve is Necessary or Appropriate for Interest and Fee Claims

29. Certain of the Lienholder Claims assert entitlements to Interest and Fee Claims, typically in unliquidated amounts. The Lienholder Claims Reserve does not include additional reserves for such claims, however, because they are either prohibited or, at best, contingent and speculative, and because ample cushion exists in the Lienholder Claims Reserve to satisfy any such obligations, if ultimately established.

30. Nothing in applicable nonbankruptcy law establishes any secured entitlement to the payment of Interest and Fee Claims. Texas law provides that a construction lien secures payment for:

> (1) the labor done or the material furnished for the construction or repair;
>
> (2) the specially fabricated material, even if the material has not been delivered or incorporated into the construction or repair, less its fair salvage value; or
>
> (3) the preparation of a plan or plat by an architect, engineer, or surveyor . . . .

TEX. PROP. CODE ANN. §52.023 (West 2017). Because attorneys' fees and interest are not "labor" or "materials" and do not otherwise fall in the other categories listed above, payment of such amounts is not secured by a lien under Texas law. *E.g.*, *Palomita v. Medley*, 747 S.W.2d 575, 578 (Tex. App.—Corpus Christi 1988, no writ); *Dossman v. Nat;'l Loan Inv'rs, L.P.*, 845 S.W.2d 384, 387 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *Ambassador Dev. Corp. v. Valdez*, 791 S.W.2d 612, 624 (Tex. App.—Fort Worth 1990, no writ); *In re Crusader Energy*

*Group, Inc.*; 2011 WL 479565, at *5 (Bankr. N.D. Tex. Feb. 3, 2011). *See also, Import Systems Intern. v. Houston Central Industries*, 752 F. Supp. 745, 748 (S.D. Tex. 1990).

31. Although section 506(b) of the Bankruptcy Code generally allows a holder of an oversecured claim "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose," courts hold that section 506(b) is inapplicable to claims for attorneys' fees arising in connection with involuntary liens where no such entitlement is established in the applicable statute, even where an underlying agreement provides for the payment of such fees.

> The plain language of [section 506(b) of the Bankruptcy Code] assumes that creditors who seek fees possess a security agreement that authorizes the charging of collection fees; a general agreement for fees, such as a clause in a labor/supply contract, does not qualify, if it is not the agreement under which the "allowed secured claim" arose. In this case, it is undisputed that state involuntary lien laws, not the work orders or invoices delivered by the creditors to [the debtor], constituted the only basis for Appellants' allowed secured claims. Absent security agreements, the claims fail to satisfy the statute's requirement for oversecured creditors' recovery of collection fees.

*Bridgeport Tank Trucks v. Lien Agent (In re EnRe LP)*, 457 F.3d 493, 493-94 (5th Cir. 2006) (citations omitted); *accord In re Gledhill v. State Bank of S. Utah*, 164 F.3d 1338, 1342-43 (10th Cir. 1999) (holding in the context of a judgment lien that an oversecured creditor's "allowed secured claim" did not include an entitlement to attorneys' fees provided for in its underlying agreement with the debtors because the secured claim in question "arose not by [the] agreement but by operation of law, and gave rise only to a nonconsensual claim"). Because applicable Texas mechanics' and materialmen's law provides no right to recover attorneys' fees, under no circumstances would section 506(b) of the Bankruptcy Code provide Lienholders with a right to such fees as part of their Lienholder Claims. *See also In re Astle*, 364 B.R. 735, 738 (Bankr. D. Idaho 2007) (holding that an oversecured creditor could not claim attorneys' fees under the state's

general fee statute on account of its statutory lien because the claim did not arise under the general fee statute within the meaning of section 506(b) of the Bankruptcy Code).

32. In addition to the outright prohibition on claims for attorneys' fees under applicable Texas law and section 506(b) of the Bankruptcy Code, any claims for prejudgment interest are contingent and speculative. Such claims generally are asserted in Lienholder Claims in unliquidated amounts and would be allowable, if at all, at a rate to be established by the Court and only upon a showing by any applicable Lienholder that its "allowed secured claim is secured by property the value of which, after any recovery under [section 506(c) of the Bankruptcy Code], is greater than the amount of such claim." 11 U.S.C. § 506(b).

33. In the event that any Lienholder ultimately is able to demonstrate an entitlement to interest under section 506(b) of the Bankruptcy Code, the Debtors believe that the current proposed Lienholder Claims Reserve incorporates ample cushion to satisfy such claims. For example, the Debtors and, upon information and belief, other key stakeholders in the Chapter 11 Cases believe that substantial defenses may exist to all of the largest Lienholder Claims asserted in these Chapter 11 Cases. If successful, these defenses would make available significant amounts reserved on account of such Lienholder Claims. Moreover, as set forth in the Lienholder Schedule, the Debtors propose to reserve almost $210 million in the Lienholder Claims Reserve on account of parties that contracted with Chemtex, whereas the books and records of Chemtex show only approximately $151 million of accounts payable to such Contractors for approved work as of the Petition Date. Stogsdill Decl. at ¶ 14. Reserving for these potentially overstated Lienholder Claims, therefore, gives rise to a substantial potential cushion to satisfy any contingent or unliquidated liabilities, in the event they are ultimately

allowed. Accordingly, no further provision is necessary in the proposed Lienholder Claims Reserve for the satisfaction of any Interest and Fee Claims.

## NOTICE

34. Notice of this Motion shall be given to (a) the U.S. Trustee; (b) the Committee and its counsel, Milbank, Tweed, Hadley & McCloy LLP; (c) any federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware or order of the Court; (d) Magnate S.á r.l. and its counsel, Kirkland & Ellis LLP; (e) DAK Americas LLC and its counsel, Weil, Gotshal & Manges LLP; (f) Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financiero Inbursa, the DIP Lender and its counsel, Cleary Gottlieb Steen & Hamilton LLP; (g) any party that has requested notice pursuant to Bankruptcy Rule 2002 at the time of noticing; and (h) all known Lienholders. The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

35. No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order and grant such other and further relief as may be appropriate.

Dated: March 2, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Joseph M. Mulvihill*
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  ljones@pszjlaw.com
  joneill@pszjlaw.com
  jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Michael J. Cohen
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Email:  sgreenberg@jonesday.com
  mcohen@jonesday.com
  scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, OH 44114
Telephone:  (216) 586-7035
Facsimile:  (216) 579-0212
Email:  ceblack@jonesday.com

Co-Counsel for the Debtors
and Debtors in Possession