# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>M & G USA CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 17-12307 (BLS)<br>Jointly Administered<br>Related to D.I. 173, 490, 1061<br>Hearing Date: March 23, 2018 at 9:30 a.m. |

### OBJECTION OF BANCOMEXT TO THE SALE OF THE DEBTORS' CORPUS CHRISTI ASSETS, DESALINATION ASSETS, AND OTHER ASSETS

TO THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE:

Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Desarrollo ("**Bancomext**") hereby files this objection (the "**Objection**") to the sale of the Assets, and in particular the Corpus Christi Assets and Desalination Assets, as such terms are defined in the Bidding Procedures (the "**Bidding Procedures**") approved pursuant to the Court's *Order (i)(a) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (b) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (c) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (d) Approving Assumption and Assignment Procedures and (e) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (ii) Granting Related Relief* [D.I. 490] (the "**Bid Procedures Order**"). In support of its

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M&G USA Corporation (3449) ("**M&G USA**"), M & G Resins USA, LLC (3236) ("**M&G Resins**"), M&G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M & G Waters USA, LLC (2195) ("**M&G Waters**"), Mossi & Ghisolfi International, S.à r.l. (1270), M&G Chemicals S.A. (1022), M&G Capital S.à.r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

Objection, and with reference to the *Declaration of Aaron Colodny in Support of Objection of Bancomext to the Sale of the Debtors' Corpus Christi Assets, Desalination Assets, and Other Assets* (the "**Colodny Declaration**") filed concurrently herewith, Bancomext states:

## PRELIMINARY STATEMENT

1. Bancomext objects to the Debtors' proposed sale of the Assets, including the Corpus Christi Assets and Desalination Assets, because Bancomext holds equitable interests in such assets. Bancomext's interests arise as a result of a fraud perpetrated on Bancomext by the Debtors and two of their non-debtor affiliates, M&G Mexico Holding, S.A. de C.V. ("**M&G Holding**") and M&G Polimeros Mexico, S.A. de C.V. ("**M&G Polimeros**," and, together with M&G Holding, the "**Mexican Entities**"). Under the Debtors' control, the Mexican Entities borrowed $190 million from Bancomext subject to narrow use restrictions. Bancomext believes that the Debtors then diverted those funds for their own purposes, including to build the Corpus Christ Assets and Desalination Assets. As a result, Bancomext is the beneficiary of a constructive trust to the extent of its wrongfully diverted funds and their proceeds, including the Corpus Christi Assets, the Desalination Assets, and other Assets, which are now in the hands of the Debtors.

2. On March 7, 2018, Bancomext filed its *Complaint for Fraudulent Misrepresentation, Avoidance of Fraudulent Transfers, and Imposition of a Constructive Trust* [D.I. 1089] (the "**Complaint**") to vindicate its rights against the Debtors and their properties. The Debtors must not be permitted to use their section 363 sale to prejudice Bancomext's rights to recover on the claims asserted in the Complaint. Bancomext requests that the Court withhold approval of the sale ***unless*** the proceeds are made subject to Bancomext's interests to the extent they exist in the Corpus Christi Assets, Desalination Assets, and other Assets.

## BACKGROUND

3. Bancomext's Objection is based upon the allegations contained in the Complaint. On those allegations, Bancomext asserts claims against the Debtors for fraudulent misrepresentation, aiding and abetting fraud, conspiracy, actual fraudulent transfer, constructive fraudulent transfer, and conversion. Under the circumstances alleged therein, Bancomext seeks relief in the form of, among other things, a constructive trust in the Debtors' Assets, including the Corpus Christi Assets and the Desalination Assets, in the amount of up to $190 million.

4. Though Bancomext has not yet had the benefit of formal discovery, its allegations are well supported by the record in these Chapter 11 Cases and Bancomext's own records. Bancomext believes that it will prevail on the claims alleged in the Complaint and establish that it is the beneficiary of a constructive trust in the Assets identified. Without limiting the generality of the foregoing, Bancomext provides the following background in support of its Objection.

**1. Bancomext Extended Loans to the Mexican Entities and the Debtors Wrongfully Diverted the Proceeds to the Debtors**

5. Bancomext is a Mexican state-owned bank established to contribute to the development of Mexico's economy and to increase Mexican employment through the financing of international commerce. Bancomext accomplishes its mission both through the issuance of direct credit and credit guarantees, in each case with a view toward making Mexican companies more productive and competitive in the world economy. Bancomext plays a critical role in Mexico's development strategy.

6. On March 31, 2010, based on representations made by the Mexican Entities, Bancomext, as lender, and M&G Holding, as borrower, entered into that certain revolving credit agreement titled "Contrato de Apertura de Credito en Cuenta Corriente" (as amended, modified,

or supplemented from time to time, the "**M&G Holding Revolving Credit Agreement**"), initially providing credit of up to $50 million in principal amount. A certified translation of the M&G Holding Revolving Credit Agreement is attached to the Colodny Declaration as **Exhibit A**. Through certain amendments, Bancomext agreed to increase the availability under the M&G Holding Revolving Credit Agreement to $120 million.[2] The purpose of the M&G Holding Revolving Credit Agreement was to finance exports of PTA, a form of plastic used to make bottles and other containers. Such revolving loans were secured by certain accounts receivable held by M&G Holding and guaranteed by M&G Polimeros.

7. On August 3, 2015, based on representations made by the Mexican Entities, Bancomext, as lender, and M&G Polimeros, as borrower, entered into a "Contrato de Apertura de Credito en Cuenta Corriente" (as amended, modified, or supplemented, the "**M&G Polimeros Revolving Credit Agreement**" and together with the M&G Holding Revolving Credit Agreement, the "**Revolving Credit Agreements**"), providing credit of up to $70 million in principal amount. A certified translation of the M&G Polimeros Revolving Credit Agreement is attached to the Colodny Declaration as **Exhibit D**. The purpose of the M&G Polimeros Revolving Credit Agreement was to provide working capital for the plant that M&G Polimeros owned in Altamira, Mexico (the "**Altamira Plant**"), and to refinance its debt. Loans pursuant to the M&G Polimeros Revolving Credit Agreement are secured by certain accounts receivable and inventory.

8. In extending its loans, Bancomext knew that the Mexican Entities were part of a larger international corporate group including the Debtors. Indeed, the Mexican Entities are controlled by the Debtors, including Mossi & Ghisolfi International, S.à r.l. ("**M&G International**"), their ultimate corporate parent. Feb. 22 Hr'g Tr. at 43:9-11 (counsel

---

[2] Those amendments are attached to the Colodny Declaration as **Exhibits B and C**.

for Mexican Entities stating that they are "subsidiar[ies]" that "don't make decisions the same way someone who is actually in charge of everything does"). In order to ensure that the proceeds of Bancomext's loans were used only in a manner consistent with its institutional mandate to develop the Mexican economy, Bancomext bargained for provisions in the Revolving Credit Agreements restricting the use of such proceeds.

9. For example, the M&G Holding Revolving Credit Agreement explicitly provides that the funds borrowed thereunder may only be used to finance exports. M&G Holding Revolving Credit Agreement, Clause 2.[3] Further, it prohibits M&G Holding from issuing any dividends without Bancomext's consent. *Id.*, Clause 8(d).

10. The M&G Polimeros Revolving Credit Agreement provides that M&G Polimeros is only authorized to use the proceeds of the revolving loans made thereunder as working capital for itself and its direct subsidiaries and to refinance their debt. M&G Polimeros Revolving Credit Agreement, Clause 3. Additionally, the M&G Polimeros Revolving Credit Agreement explicitly provided that M&G Polimeros could not draw down the credit unless M&G Holding was in complete compliance with the M&G Holding Revolving Credit Agreement. *Id.*, Clause 4 ("[M&G Polimeros] may not draw down the CREDIT until the following have taken place . . . 3. M&G Mexico Holding, S.A. de C.V. is in complete compliance with its obligations as stipulated in the [M&G Holding Revolving Credit Agreement] . . . .").

11. The Mexican Entities, under the control of the Debtors, agreed to such restrictions and, in reliance on such agreement, Bancomext extended credit. Notwithstanding their assent to Bancomext's conditions and affirmative representations of compliance, the Mexican Entities, under the control of the Debtors, used the proceeds of Bancomext's loans for non-permitted

---

[3] Indeed, the use of the proceeds of the M&G Holding Revolving Credit Agreement for any purpose other than financing exports constitutes an Event of Default under that agreement. M&G Holding Revolving Credit Agreement, Clause 11(b).

purposes. A substantial portion of those proceeds was transferred to the Debtors in direct contravention of the applicable loan documents and the representations made by the Mexican Entities to obtain their loans.

12. The proceeds of Bancomext's loans were deposited into a pooling account shared with some or all of the Debtors (the "**Pooling Account**"). While nominally owned by M&G Polimeros, disbursements from the Pooling Account were controlled entirely by the Debtors to use as they pleased. As counsel for the Mexican Entities explained on the record, "the Mexican entities are subsidiaries of the American debtors. . . . [M&G] Polimeros is the holder of the [Pooling] [A]ccount . . . but it doesn't control it. So whoever paid whoever, these Mexican Entities weren't responsible for discharging funds out of that pooling account even if [they] put them in." Feb 22, 2018 Hr'g Tr. at 39:12-20.

13. The Mexican Entities and the Debtors actively concealed the nature of the Pooling Account from Bancomext. Among other things, they never told Bancomext that it was ultimately disbursing funds into a concentration account used by and under the control of the Debtors. The Debtors used the Pooling Account to circumvent the Revolving Credit Agreements' restrictions on the use of proceeds without Bancomext's knowledge.

14. In total, approximately $550 million was transferred from the Mexican Entities to the Debtors. *See* Notice of Revised Exhibit to First Day Declaration, Ex. 1 [D.I. 143]. In the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* [D.I. 3] (the "**Stogsdill Declaration**"), the Debtors' CRO Dennis Stogsdill disclosed the following intercompany loans from the Mexican Entities to M&G USA Corporation:

| Borrower | Lender | Date | Amount (USD$) |
|---|---|---|---|
| M&G USA | M&G Holding | 12/27/16 | 44,100,000 |
| M&G USA | M&G Holding | 12/31/16 | 124,430,000 |
| M&G USA | M&G Holding | 3/31/17 | 13,910,000 |
| M&G USA | M&G Holding | 6/30/17 | 10,722,000 |
| M&G USA | M&G Polimeros | 9/19/17 | 354,000,000 |
| | | **TOTAL** | **547,162,000** |

D.I. 143, Ex. 1.

15. Bancomext is informed and believes that a majority of its loan proceeds were among those funds used to extend intercompany loans to M&G USA and that such loan proceeds were used to fund construction of the Corpus Christi Assets and Desalination Assets owned by M&G Resins and M&G Waters, which are both wholly-owned subsidiaries of M&G USA.

16. Construction of those assets began in April 2013 and was expected to be completed by December 2015. Stogsdill Decl. at ¶ 9-10. However, the Corpus Christi plant was not completed on schedule. As a result of the delay and other factors, the costs of construction exceeded the budgeted costs.

17. Unable to obtain third party financing necessary to fund the cost overruns and complete construction of the Corpus Christi plant, Bancomext is informed and believes that the Debtors determined to exploit anyone they could for badly needed credit. The record in the case indicates they surreptitiously turned their short-term trade creditors into long-term lenders, racking up an estimated $350 million in unpaid debts to asserted construction lienholders. And, it further appears that the Debtors directed the Mexican Entities to fully exhaust all available credit from Bancomext and divert the proceeds to the Debtors, notwithstanding the prohibited nature of the scheme.

18. Between mid-June and early-September 2017, the Debtors caused the Mexican Entities to draw $190 million under the Revolving Credit Agreements. In the first five days of September 2017 alone, M&G Holding drew $70 million from Bancomext (which, as set forth above, could only be used to finance M&G Holding's exports). Despite this massive draw, on September 5, 2017, the Mexican entities shut down the Altamira Plant, claiming that they lacked the liquidity to purchase necessary raw materials. *See* Stogsdill Decl. ¶ 47. When Bancomext's representatives inspected the plant in the following days, they were shocked to find that the proceeds of their loans, their collateral, and all of the Mexican Entities' cash had vanished.

19. At a meeting with the Mexican Entities held at Bancomext's offices in late October of 2017, Bancomext demanded to know what had happed to its loan proceeds and collateral. Mr. Dennis Stogsdill, who at that time was employed by both the Debtors and the Mexican Entities, told Bancomext that the money had been transferred to the Debtors; that there was no way to get it back; and that Bancomext should consider it lost and move on.

### 2. The Debtors Seek to Sell Their Assets Free and Clear of All Interests, Including Bancomext's

20. On October 24, 2017 and October 31, 2017, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

21. Shortly thereafter, on November 16, 2017, the Debtors filed a motion [D.I. 173] (the "**Sale Motion**") seeking various forms of relief, including approval of: (i) the Bid Procedures governing the auction of the Assets, including the Corpus Christi Assets and the Desalination Assets; and (ii) the sale of such assets pursuant to the Bid Procedures free and clear of any liens, claims or interests.

22. On December 14, 2017, the Court entered the Bid Procedures Order. The Bid

Procedures Order establishes procedures and a schedule for the auction and sale of the Assets. Bids for most of the Assets, including the Corpus Christi Assets and the Desalination Assets, are due March 6, objections to their sale are due March 9, and the auction of those assets will be held March 19, 2018. *See* D.I. 1061. The hearing to consider approval of the proposed sale is scheduled to be held on March 23, 2018. *Id.*

23. Pursuant to Court's *Final Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 365 and 507; and (5) Granting Related Relief* [D.I. 479] (the "**Final DIP Order**"), the Debtors admitted that (i) Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa ("**Inbursa**") has valid, legal and enforceable liens in the Debtors' property securing the Pre-Petition First Lien Obligations (as defined in the DIP Order), which total in excess of $436 million, *see* Final DIP Order, at 11-12; and (ii) DAK Americas, LLC ("**DAK**" and together with Inbursa, the "**Prepetition Secured Lenders**") has valid, legal and enforceable liens in the Debtors' property[4] securing the Pre-Petition Second Lien Obligations (as defined in the DIP Order), which total in excess of $435 million. Final DIP Order, at 12-13. DAK's liens have since been challenged by the Committee. *See Motion of the Official Committee of Unsecured Creditors to Recharacterize, Equitably Subordinate, and Avoid the Liens Securing the Claims of DAK Americas, LLC* [D.I. 955] (the "**Committee Challenge Motion**").

---

[4] Importantly, any liens that the Debtors may have granted necessarily attached only to the Debtors' interests in such property and not the interests of any third party, including Bancomext.

24. The Final DIP Order further contemplates credit bidding by the Prepetition Secured Lenders. DAK specifically has expressed an interest in credit bidding for the Corpus Christi Assets and the Desalination Assets. *See* Committee Challenge Motion, ¶ 3.

25. Recognizing that the proposed sale of the Assets, and particularly the Corpus Christi Assets and Desalination Assets, posed a substantial threat to Bancomext's interests, it sought information from the Mexican Entities and the Debtors concerning the transfers and circumstances that Bancomext asserts give rise to its claims. Unable to get cooperation from the Mexican Entities, who presumably hold the primary records and accounts of how their borrowings under the Revolving Credit Agreements were obtained and transferred, Bancomext filed its *Motion for Examination of M&G México Holding, S.A. de C.V. and M&G Polimeros México, S.A. de C.V. Pursuant to Bankruptcy Rule 2004* [D.I. 770] (the "**2004 Motion**"). On March 6, 2018, the Court granted the 2004 Motion in part. *See* D.I. 1085. Bancomext has yet to receive any information from the Mexican Entities pursuant to the Court's order.

26. As of the date of this Objection, the outstanding principal amount of loans under the M&G Holding Revolving Credit Agreement is $120 million and the outstanding principal amount of loans under the M&G Polimeros Revolving Credit Agreement is $70 million. The Mexican Entities are the subject of restructuring efforts in Mexico and Bancomext expects only *de minimis*, if any, recovery from the Mexican Entities on account of their loans.

27. Through its Complaint, Bancomext will prosecute its claims and rights against the Debtors and their property. In the interim, Bancomext objects to the Sale Motion to the extent it will affect Bancomext's ability to recover on account of such claims and rights.

# ARGUMENT

## A. Bancomext Asserts a Constructive Trust over the Assets to the Extent of the Proceeds of Its Misappropriated Loans

28. The propriety for imposition of a constructive trust is governed in the first instance, by state law. *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-96 (3d Cir. 1994); *Fluor Enters. v. Orion Ref. Corp.* (*In re Orion Ref. Corp.*), 341 B.R. 476, 484 (Bankr. D. Del. 2006).

29. A constructive trust may be imposed under state law as a remedy under a range of circumstances to prevent inequity. *See, e.g.*, *Kammer Asphalt Paving Co. v. E. China Twp. Sch.*, 443 Mich. 176, 188 (1993) (Michigan law) ("[A constructive] trust may be imposed when property has been obtained through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness, or necessities, or any other similar circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property.") (internal quotations and modifications omitted); *Latham v. Father Divine*, 299 N.Y. 22, 27 (1949) (New York law) ("A constructive trust will be erected whenever necessary to satisfy the demands of justice. Since a constructive trust is merely the formula through which the conscience of equity finds expression, its applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them.")[5] (internal quotations and citations omitted); *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015) (Texas law) ("[Constructive trusts] have historically been applied to remedy or ameliorate harm arising from a wide variety of misfeasance. . . . Three elements are generally required for a constructive trust to be imposed under Texas law[:] . . . (1) breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) unjust enrichment of the wrongdoer;

---

[5] While New York courts are guided by certain factors as a general matter, the "constructive trust doctrine is not rigidly limited." *Simonds v. Simonds*, 45 N.Y.2d 233, 241 (1978).

and (3) an identifiable res that can be traced back to the original property.").

30. The fundamental purpose of the constructive trust remedy is the prevention of unjust enrichment. *Kammer Asphalt Paving*, 443 Mich. at 188 ("A constructive trust may be imposed where such trust is necessary to do equity or to prevent unjust enrichment.") (internal quotations and modifications omitted); *Simonds*, 45 N.Y.2d at 242 ("[T]he purpose of the constructive trust is prevention of unjust enrichment . . . ."); *KCM Fin.*, 457 S.W.3d 87 ("A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment.").

31. In the Complaint, Bancomext asserts claims against the Debtors for fraudulent misrepresentation, aiding and abetting fraud, civil conspiracy, actual fraudulent transfer, constructive fraudulent transfer, and conversion. In each case, the claims seek to remediate the Debtors' diversion of the proceeds of the Revolving Credit Agreements from their permitted uses by the Mexican Entities to the Debtors for non-permitted uses, including for use in constructing the Debtors' Corpus Christi Assets and the Desalination Assets. The Debtors would be unjustly enriched to the extent that they were entitled to retain the benefits of their malfeasance. Accordingly, Bancomext submits that it is the beneficiary of a constructive trust.

32. Even without the benefit of formal discovery, available evidence persuasively demonstrates that the Debtors orchestrated a scheme whereby the Mexican Entities' credit from Bancomext would be exploited and wrongfully diverted to benefit the Debtors. The Debtors acknowledge that M&G USA received $550 million from the Mexican Entities. *See* D.I. 143. M&G USA is the parent company of M&G Resins, which owns the Corpus Christi Assets, and M&G Waters, which owns the Desalination Assets. Importantly, one of the reasons that the Debtors wound up in chapter 11 is that the Debtors were unable to obtain third party financing required to complete the Corpus Christi plant as a result of its massive cost overruns. It does not

take any great leap of faith or logic to surmise that the diversion of over half a billion dollars from the Mexican Entities to the corporate silo holding the Corpus Christi Assets was to meet budget shortfalls that could not be met through commercial (and legal) means.

33. It is also manifestly evident that Bancomext's loan proceeds constituted part of what was wrongfully transferred from the Mexican Entities to the Debtors. For example, in the first five days of September 2017 alone, M&G Holding drew $70 million from Bancomext—a draw that M&G Holding was restricted to use to finance exports. On the fifth day of September 2017, the Mexican Entities shut down the Altamira Plant, claiming that they lacked the liquidity to purchase necessary raw materials. With $70 million in fresh draws, this explanation is not credible. Shortly thereafter, Bancomext's representatives inspected the plant and related records. They found no cash, no accounts receivable, and no inventory. The $70 million drawn in the five days preceding closure was simply gone.

34. Where it went is no secret. Dennis Stogsdill, the Debtors' CRO, candidly revealed to Bancomext that its loan proceeds had been transferred from the Mexican Entities—wholly controlled by the Debtors—to the Debtors for their use and benefit. Reconciling this admission with the schedule of transfers Mr. Stogsdill disclosed in his declaration, it is clear to see that the $70 million drawn from Bancomext in September of 2017 was shipped off to M&G USA as part of the $354 million "intercompany loan" booked on September 19, 2017.[6] This

---

[6] Counsel to the Mexican Entities offered a contrary explanation of this amount at a hearing before the Court on February 22, 2018. Rather than a loan having been made on September 19, 2017 as Mr. Stogsdill declared, counsel stated that the amount reflected an "an accounting clean-up matter." Feb. 22, 2018 Hr'g Tr. at 40:6-9. Debtors' counsel further explained that the amount reflected an "unwinding of the pooling agreement" and that the loan "represents an extended history of inter-companies that were on the balance sheet, but when they unwound the pooling agreement they had a note issue to, essentially, reflect the outstanding obligations owing between the entities." *Id.* at 46:17-47:4. The need to "clean up" a staggering $354 million of inadequately documented loans—undoubtedly involving proceeds of Bancomext's loans—further indicates the Debtors' concealment of their behavior and knowledge of its prohibited character.

transfer to an insolvent debtor left the Mexican Entities without any material assets other than a worthless note from an entity that was less than six weeks from its bankruptcy filing. While the most obvious, this transfer is surely not the only one which diverted Bancomext's loan proceeds from their restricted use borrowers to the Debtors.

35. The Debtors must not be allowed to use section 363 to extinguish Bancomext's rights to recover what was wrongfully taken from it.

### B. The Debtors Cannot Sell Pursuant to Section 363 Property That Does Not Belong to the Estate

36. Section 541(d) of the Bankruptcy Code excludes from the bankruptcy estate property that is subject to a constructive trust in favor of a non-debtor. *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) ("Congress clearly intended the exclusion [of trust funds from the debtor's estate] created by § 541(d) to include not only funds held in express trust, but also funds held in constructive trust."); *Equity Title v. Aegis Wholesale Corp.* (*In re Aegis Mortg. Corp.*), 385 B.R. 102, 108 n.5 (Bankr. D. Del. 2008) ("Property held by a debtor subject to a constructive trust is not property of the debtor's estate."); *Elec. M&R v. Aultman* (*In re Aultman*), 223 B.R. 481, 484 (W.D. Pa. 1998) (property subject to constructive trust is excluded from estate pursuant to 11 U.S.C. § 541(d)). For the reasons set forth above, the Debtors hold the Corpus Christi Assets, the Desalination Assets, and any other Assets constituting proceeds of Bancomext's misappropriated loans in constructive trust for Bancomext. Accordingly, these assets do not constitute property of the Debtors' bankruptcy estate.

37. Section 363 of the Bankruptcy Code authorizes the use, lease, or sale only of "property of the estate." 11 U.S.C. § 363(b). Bankruptcy courts therefore lack authority to order the sale of property that is not owned by the estate under administration. *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252, 263 (3d Cir. 2000) (noting that property not

14

part of the bankruptcy estate is not subject to sale pursuant to 11 U.S.C. § 363); *Novacare Holdings, Inc. v. Mariner Post-Acute Network, Inc.* (*In re Mariner Post-Acute Network, Inc.*), 267 B.R. 46, 60 (Bankr. D. Del. 2001) (answering "no" to the question of whether a bankruptcy court "could have . . . transfer[red] property in which the Debtors had no equitable interest to another").

38. In short, the Bankruptcy Code does not permit the Debtors to sell property they hold for Bancomext in constructive trust. Bancomext is prepared to consent to the sale of the Assets, within the construct proposed in the Sale Motion (and subject to the right to object to any procedural irregularities or other deficiencies in the process that result in a depressed price for the assets) provided that the purchase price be paid in cash or backstopped by a letter of credit or similar instrument and that Bancomext is afforded an interest in the proceeds commensurate with its interests in the Assets.

### C. To the Extent the Debtors Establish Bancomext's Interest in the Assets Is Subject to a Bona Fide Dispute, Bancomext Must Be Adequately Protected

39. Section 363(f)(4) of the Bankruptcy Code provides that a debtor in possession may sell an asset free and clear of a third party's interest if "such interest is in bona fide dispute." 11 U.S.C. § 363(f)(4). The phrase "bona fide dispute" is not defined in the Bankruptcy Code. In interpreting this language, courts have read it to apply where there is an objective basis for a factual or legal dispute as to the validity of the asserted interest. *See, e.g.*, *In re Scimeca Found., Inc.*, 497 B.R. 753, 773 (Bankr. E.D. Pa. 2013); *In re Railyard Co.*, 572 B.R. 766, 772 (Bankr. D.N.M. 2017); *In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996). The burden lies with the debtor to establish the existence of a bona fide dispute. *Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 564 (3d Cir. 2015).

40. If the Debtors carry their burden pursuant to section 363(f)(4), a sale of the Assets

may proceed only if Bancomext's interests can be adequately protected. Section 363(e) provides, in relevant part, that "on request of an entity that has an interest in property . . . proposed to be . . . sold . . . by the trustee, the court . . . shall prohibit or condition such . . . sale . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Adequate protection under section 363(e) is mandatory. *In re Dewey Ranch Hockey, LLC*, 414 B.R. 577, 592 (Bankr. D. Ariz. 2009). "If adequate protection cannot be provided, [the proposed] sale must be prohibited." *Id.* (citing 3 Collier on Bankruptcy P 363.05[2], at p. 363-42 (15th ed. rev. 2007)).

41. Adequate protection may be provided by, among other things, granting such relief as "will result in the realization by [an entity asserting an interest in property] of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(3). "Equity imposes a constructive trust in order to prevent the constructive trustee from disposing of property without accounting for the beneficiary's equitable interest." *Hodges v. Phillips* (*In re Randle*), 2003 Bankr. LEXIS 2022, at *6 (E.D. Va. Dec. 9, 2003). With this purpose in mind, the only means of adequately protecting Bancomext's interest in the Assets is to (a) require that the assets be sold only for cash or a bonded credit bid; and (b) maintain the proceeds in an escrow account pending resolution of Bancomext's asserted interest. This relief is consistent with how other courts have adequately protected the rights of putative constructive trust beneficiaries under similar circumstances. *See In re DVI, Inc.*, 306 B.R. 496 (Bankr. D. Del. 2004) ("Courts have permitted the sale of property free and clear of constructive trust claims or equitable liens, so long as they attach to the proceeds of sale.").

42. As to the proposed bid limitations, a bare credit bid by DAK or another entity would deprive Bancomext of its rights as the beneficiary of a constructive trust. Neither DAK

16

nor any other entity can hold a lien in property which was not the Debtors' to pledge by virtue of the constructive trust in favor of Bancomext. This Court has already acknowledged issues with respect to and imposed limitations on DAK's ability to credit bid for the Debtors' assets in response to the Committee Challenge Motion. Bancomext understands that the Court has already determined that DAK must either backstop with cash or a letter of credit any credit bid it may seek to make for the Debtors' assets in order to ensure value to the estates in the event that DAK's liens are determined to be invalid. Bancomext requests that, in order to adequately protect its interest in the Assets, the Court impose this same restriction on any entity seeking to make a credit bid for such assets, with the cash or letter of credit backstop to remain in place until a final determination of Bancomext's interests in such assets.

43. Bancomext's request for an escrow of proceeds is self-explanatory. "Property held by a debtor in constructive trust for another cannot be used by the debtor to pay its creditors." *Mariner Post-Acute Network*, 267 B.R. at 58 (citing *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters, Inc.*, 960 F.2d 366, 372 (3d Cir. 1992)). Escrowing funds until a final determination of Bancomext's asserted claim will ensure that Bancomext's property is not improperly distributed to pay the Debtors' other creditors. The court in *DVI* approved such an arrangement. *See* 306 B.R. at 504-05 ("[Disputed constructive trust claimant's] interests, if any, can be protected by placing the proceeds in escrow until his rights can be determined."). So too have other courts. *See, e.g.*, *In re Balco Equities Ltd*., 323 B.R. 85, 92 (Bankr. S.D.N.Y. 2005) (constructive trust claim subject to bona fide dispute did not prevent sale where proceeds would be held in escrow pending determination of interests in property sold); *In re Surplus Furniture Liquidators*, 199 B.R. 136, 145 (Bankr. M.D.N.C. 1995) (proceeds of sale of property subject to disputed equitable lien to remain escrowed pending determination of dispute); *cf. Lubman v.*

*Wells* (*In re Wells*), 296 B.R. 728, 734 (Bankr. E.D. Va. 2003) (adjudicated constructive trust beneficiary's interest to attach to proceeds of a section 363 sale).

44. Notably, the Debtors have already proposed to escrow the proceeds of the Assets for the benefit of certain putative construction lienholders. *See Debtors' Motion for Entry of an Order Establishing a Lienholder Claims Reserve and Granting Related Relief* [D.I. 1075]. The Debtors should not be allowed to consummate the proposed sale of those assets without establishing a separate $190 million escrow for the benefit of Bancomext.

45. Finally, Pursuant to the Revolving Credit Agreements and Bancomext's exercise of rights thereunder, Bancomext is the assignee of any accounts receivable owed by M&G International to M&G Holding. In addition, Bancomext has an assignment of any receivables owed by M&G Polymers to M&G Polimeros. To the extent any such receivables are paid as a cure in connection with the sale of any of the Assets, they should be paid to Bancomext and not to the Mexican Entities.

## CONCLUSION

For all of the foregoing reasons, Bancomext requests that the Court (a) either (i) deny the Sale Motion, or (ii) condition the sale of the subject Assets on (1) bidding by cash or cash equivalent backstop and (2) retention of sale proceeds in escrow subject to Bancomext's interests pending determination thereof; and (b) grant such other and further relief as the Court deems just and proper.

Dated: March 9, 2018  **FOX ROTHSCHILD LLP**

By: /s/ *Jeffrey M. Schlerf*
Jeffrey M. Schlerf (DE No. 3047)
919 North Market Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
jschlerf@foxrothschild.com

—and—

Roberto J. Kampfner (admitted pro hac vice)
Aaron Colodny (admitted pro hac vice)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
rkampfner@whitecase.com

*Attorneys for Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Dessarrollo*