# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------X
:
In re: : Chapter 11
:
M & G CORPORATION, *et al.*,[1] :
: Case No. 17-12307 (BLS)
Debtors. :
: (Jointly Administered)
:
: **Re: Docket No. 1075**
---------------------------------------------------------------X

### RESPONSE AND LIMITED OBJECTION OF CEC AND INBURSA TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ESTABLISHING A LIENHOLDER CLAIMS RESERVE AND GRANTING RELATED RELIEF

Control Empresarial de Capitales, S.A. de C.V., in its capacity as initial DIP lender ("CEC" or the "DIP Lender") and Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa, in its capacity as lender under the Pre-Petition First Lien Loan Documents (as provided in the DIP Orders) ("Inbursa" or the "Pre-Petition First Lien Lender"), hereby file this response and limited objection (this "Response") to the *Debtors' Motion for Entry of an Order Establishing a Lienholder Claims Reserve and Granting Related Relief* [Docket No. 1075] (the "Reserve Motion" or the "Motion").[2] In support of this Response, CEC and Inbursa respectfully represent as follows:

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (1022), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these Chapter 11 Cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Motion and any exhibits to the Motion.

**PRELIMINARY STATEMENT**

1.  As the Debtors have stated in the Reserve Motion, "the prompt establishment of a Lienholder Claims Reserve . . . would provide potential bidders with the clearest available guidance regarding the maximum aggregate scope of Lienholder Claim liabilities," which in turn would help to secure purchaser interest in the Corpus Christi Plant and facilitate a successful Section 363 sale. Mot. at ¶ 10. CEC and Inbursa agree with the establishment of a Lienholder Claims Reserve for these same reasons: clarity and certainty that will permit the closing of this sale and the expeditious distribution of sales proceeds, while protecting all parties concerned.

2.  The establishment of a Lienholder Claims Reserve and adoption of Lienholder Administration Procedures will promote an efficient and value-maximizing sale process, however, only if the reserve is realistic and not overly inflated. To that end, CEC and Inbursa agree that any such escrow should not reserve for duplicate claims, attorneys' fees or interest amounts.

3.  In estimating the size of the reserve, the Court also should account for potential counterclaims and defenses, and for particular bidder considerations. As such, Inbursa and CEC suggest that a proper escrow should be adjusted as follows. *First*, to the extent a bid includes a credit bid of CEC's DIP Obligations (as defined in the DIP Orders), no reserve should be required for the $87 million mechanic's lien claim asserted by Chemtex International, Inc. ("Chemtex"), as such a claim is pledged as collateral and subordinated to the repayment of the DIP Loan under the Final DIP Order, as well as pledged as collateral to Inbursa by virtue of the Pre-Petition First Lien Lender Adequate Protection Claim; moreover, given the likely existence of defenses to the Chemtex claim, the need for any Chemtex claim reserve should be substantially reduced, if not wholly eliminated, regardless of bidder. *Second*, any escrow should

only be required to reserve for claims senior to other claims being paid from sale proceeds (or credit bid), such that, for example, even if there were not adequate sale proceeds to reserve for all secured claims, only claims secured by "removable improvements" would need to be reserved for prior to payment to Inbursa of its first $250 million in principal extended to Resins under the Pre-Petition First Lien Loan Agreement, as defined in the Final DIP Order (the execution and recordation of which precede the commencement of any visible work by any of the Lienholders). Final DIP Order ¶ B(i), B(v).

## BACKGROUND

4. The need to establish a Lienholder Claims Reserve arises because, while the secured claims held by Inbursa and CEC have been finally allowed without challenge, the same is not true for any of the Lienholders. Pursuant to the DIP Orders,[3] the Cash Collateral Orders[4] and the Polymers DIP Orders,[5] (i) Inbursa is a secured creditor of M&G Resins USA LLC

---

[3] "DIP Orders" means, collectively (i) the *Interim Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C.§§ 104, 362, 363 and 364;(2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C.§§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2; and (6) Grant Related Relief* [Docket No. 62] (the "Interim DIP Order") and (ii) *Final Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C.§§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C.§§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (5) Granting Related Relief* [Docket No. 479] (the "Final DIP Order").

[4] "Cash Collateral Orders" means, collectively, (i) the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay and (4) Scheduling a Final Hearing* [Docket No. 91] and (ii) the *Final Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay and (4) Granting Related Relief* [Docket No. 487].

[5] "Polymers DIP Orders" means, collectively (i) *the Interim Order (I) Authorizing Debtor M&G Polymers USA, LLC to Incur Postpetition Secured Superpriority Indebtedness Pursuant to Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d); (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (IV) Granting Related Relief* [Docket No. 720] and (ii) the *Final Order (I) Authorizing Debtor M&G Polymers USA, LLC to Incur Postpetition Secured Superpriority Indebtedness*

("Resins") and M&G Polymers USA LLC ("Polymers"), holding a valid, allowed secured claim against each of Resins and Polymers, their estates and the property of their estates in the aggregate principal amount of $430,000,000, plus any additional amounts to the extent allowed under the Pre-Petition First Lien Loan Documents (as defined in the DIP Orders) and all accrued and accruing unpaid interest, fees, expenses and costs not included in the foregoing; and (ii) CEC, as the DIP Lender, is a secured creditor of each of the Debtors that are Obligors (as defined in the DIP Orders) and holds a valid, allowed secured claim against each of the Obligors, their estates and the property of their estates in the aggregate principal amount of up to $100,000,000, plus any additional amounts to the extent allowed under the DIP Loan Documents (as defined in the DIP Orders), and all accrued and accruing unpaid interest, fees, expenses and costs not included in the foregoing. Inbursa also holds secured claims against Polymers and certain other Debtors based on the various adequate protection claims granted to it in these cases, including: the Pre-Petition First Lien Lender Adequate Protection Claim (as defined in the DIP Orders), the Adequate Protection Superpriority Claim (as defined in the Cash Collateral Orders) and the Supplemental Inbursa Adequate Protection Claim (as defined in the Polymers DIP Orders). Pursuant to the DIP Orders and the Cash Collateral Orders, all parties in interest were afforded an opportunity to challenge Inbursa's and/or CEC's secured claims and liens, and no such challenge was timely asserted.

5. In sharp contrast, there has been no determination as to the amount, validity or priority of the liens and claims filed by the Lienholders, either individually or collectively. All parties in interest still possess the right to challenge the claims and liens asserted by each of the Lienholders. Indeed, the Debtors reference that there is "ample cushion" in the proposed

---

*Pursuant to Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d); (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [Docket No. 865].

Lienholder Claims Reserve and that they, as well as other key stakeholders in the cases, believe that "substantial defenses may exist to all of the largest Lienholder Claims[.]" Mot. at ¶¶ 29, 33.

## ARGUMENT

### A. CEC and Inbursa Support Establishing a Lienholder Claims Reserve

6. For the reasons set forth in the Reserve Motion, CEC and Inbursa support the establishment of a Lienholder Claims Reserve in order to further the sale of the Corpus Christi Plant and to expedite distributions to creditors. Mot. at ¶¶ 19–28. Such procedures are necessary to further the sale process, expedite distributions, and to prevent purported lienholders with unproven claims from unduly tying up sale proceeds and attempting to extract unwarranted payments in order to allow the sale to proceed. CEC and Inbursa agree with the Debtors that any reserve should exclude duplicated claims as well as unrecoverable attorneys' fees or interest.

7. In their Reserve Motion, the Debtors state that "[a]s of the Lienholder Bar Date, approximately 229 Lienholder Claims in the aggregate amount of more than $800 million have been asserted against the Debtors' estates[.]" *Id*. at ¶ 11. This is an exorbitant figure, especially where it apparently is comprised of various duplicate claims rather than unique proven claims.

8. The proposed Lienholder Claims Reserve does not estimate the expected allowed amount of Lienholder Claims that may be disputed, and the Debtors posit that the Lienholder Claims Reserve need not account for: (i) amounts not ultimately allowed by the Court; (ii) liens not subject to the free and clear provisions of Section 363(f) of the Bankruptcy Code; and (iii) liens asserted by parties whose contracts are being assumed and assigned by the Debtors. *Id*. at ¶ 14. The Debtors calculated the proposed total amount of the Lienholder Claims Reserve by taking into account only two factors: duplication of claims and the exclusion of attorneys' fees and interest. *Id*. at ¶ 10.

      a. <u>The Court Should Not Require the Purchaser to Escrow a Reserve Amount for Duplicative Lienholder Claims</u>

9.       As a threshold matter, CEC and Inbursa agree that any final order establishing a Lienholder Claims Reserve must exclude duplicative claims. In their Motion, the Debtors eliminated Duplicated Liabilities based on tier of contractor, ultimately eliminating close to $450 million in claims. *Id*. at ¶¶ 13–15. In de-duplicating such claims, the Debtors did not make further adjustments to account for any underlying counterclaims or defenses. *Id*. at ¶ 14. Such de-duplication is required to ensure that the sale process is not unduly burdened by, and other creditors are not prejudiced by, requiring the establishment of an inflated escrow amount, and to ensure sale proceeds or cash escrows funded by a winning bidder are not unduly trapped for a prolonged period without a valid basis to do so. To hold otherwise would prejudice other creditors without providing incremental benefit to the Lienholder Claimants.

      b. <u>The Court Should Not Require the Purchaser to Escrow a Reserve Amount for Attorneys' Fees</u>

10.       Inbursa and CEC also support the Debtors' position that no amount need be escrowed for the value of Lienholders' claims for attorneys' fees and interest. Mot. at ¶ 16. Neither state law nor bankruptcy law entitles Lienholders to recover on these claims; accordingly, any escrow amount need not account for such fees and interest.

11.       Indeed, as set forth in the Motion, applicable bankruptcy law does not entitle the Lienholders to assert secured claims for the payment of attorneys' fees. Mot. at ¶ 31. Section 506(b) of the Bankruptcy Code permits the holder of a secured claim to recover "any reasonable fees, costs, or charges *provided for under the agreement or State statute under which such claim arose*." 11 U.S.C. § 506(b) (emphasis added). Crucially, "the oversecured lien creditor relying on a 'State statute' is entitled to [Section] 506(b) fees only if the State statute under which the

claim itself arose provides for recovery of fees." *In re Astle*, 364 B.R. 735, 741 (Bankr. D. Idaho 2007). In this case, the Lienholders' Claims arise statutorily because "[i]f state law did not authorize these liens, Appellants would have pure unsecured claims." *In re EnRe LP*, 457 F.3d 493, 495 (5th Cir. 2006).

12. However, Texas law does not provide for a mechanic's lien to secure attorneys' fees, whether such fees arose during construction or in prosecution of the claim; as such, Bankruptcy Code Section 506(b) affords no greater remedy. Rather, Texas Property Code Section 53.023 restricts debts that may be secured by a mechanic's lien to labor and materials furnished for construction or repair of an improvement to real property. Tex. Prop. Code § 53.023. Obviously, attorneys' fees incurred as the result of the lien itself are not incurred as part of the construction or repair of the property. *See Palomita, Inc. v. Medley*, 747 S.W.2d 575, 578 (Tex. App.—Corpus Christi 1988, no writ) ("Had the legislature intended the lien to secure payment for attorney's fees and court costs, it logically should have added these to § 53.023 as well."); *see also Dossman v. Nat'l Loan Inv'rs, L.P.*, 845 S.W.2d 384, 386 (Tex. App.—Houston [1st Dist.] 1992, writ denied). However, Texas law goes one step further: even attorneys' fees incurred *during the course of the project* are not eligible to be secured by a mechanic's lien. *See Am. Sur. Co. v. Stuart*, 151 S.W.2d 886, 888 (Tex. Civ. App.—Fort Worth 1941, no writ) (attorney's settlement of a labor dispute on the worksite did not constitute "labor" under the Texas mechanic's liens statutes).[6]

---

[6] Thus, to the extent the amount of the proposed Lienholder Claims Reserve includes amounts for liquidated claims for attorneys' fees, this number should be further adjusted downwards.

### c. The Court Should Not Require the Purchaser to Escrow a Reserve Amount for Interest

13. CEC and Inbursa also agree with the Debtors that the escrow amount also should not include any reserve for interest, which would not be recoverable from the sale proceeds under applicable Texas law or bankruptcy law.

14. Texas law does not allow a mechanic's lien to secure prejudgment interest on the underlying debt. *Ambassador Dev. Corp. v. Valdez*, 791 S.W.2d 612, 624 (Tex. App.—Fort Worth 1990, no writ) ("nowhere is there any indication in the statutes that the lien should include prejudgment interest on a subcontractor's claim"); *see also Palomita, Inc.*, 747 S.W.2d at 578. A mechanic's lien does not secure everything: "the Texas legislature specifically delineated the items which could be included in a mechanic's and materialman's lien." *Ambassador Dev. Corp.*, 791 S.W.2d at 624. In the bankruptcy context, therefore, any of the Lienholders' claims for interest are merely *unsecured* claims against the Debtors. *See In re Crusader Energy Grp., Inc.*, No. 09-31797-BJH-11, 2011 Bankr. LEXIS 453, at *15 (Bankr. N.D. Tex. Feb. 3, 2011) (holding that secured mechanic's lienholder was entitled to "an allowed *unsecured* claim for both prejudgment interest and its reasonable attorney's fees, which *unsecured* claim shall be paid by the [trustee] pursuant to the terms of the Plan.") (emphasis added).

15. The Lienholders also have not established an entitlement to postpetition interest under the Bankruptcy Code. *See* 11 U.S.C. § 506(b). There would be hurdles to doing so, including the Lienholders' ability to demonstrate that any such entitlement should not be offset by a surcharge to the collateral. *See* 11 U.S.C. § 506(c). In the instant case, the Debtors have incurred substantial expenses in connection with the upcoming sale of the Corpus Christi Plant, which proceeds would secure any valid and allowable mechanic's liens. To date, however, the

Lienholders have not provided the Debtors even a cent in furtherance of the preservation of the Corpus Christi Plant or maximization of its sale value at auction.

          d.    <u>The Lienholder Claims Reserve As Proposed Contains an Ample Cushion</u>

16.    At last count, more than 225 claims asserting mechanic's or materialmen's liens over the plant had been filed, including twenty seven claims for over $1 million. *See* Lienholder Schedule, Ex. C. to Mot. The Debtors themselves note that the Lienholder Claims are subject to additional defenses and counterclaims, including "substantial defenses . . . to all of the largest Lienholder Claims asserted." Mot. at ¶ 25. However, the Debtors have not attempted to quantify those defenses and counterclaims to reduce the size of the reserve, instead creating a "substantial potential cushion." *Id.* As a result, even the Debtors concede that the reserve represents a "conservative analysis of the maximum potential liability to [the] Debtors' estates arising from the Lienholder Claims." *Id*.

17.    The Debtors state in their Motion that they believe that "substantial defenses may exist to all of the largest Lienholder Claims asserted in these Chapter 11 Cases. If successful, these defense would make available significant amounts reserved on account of such Lienholder Claims." *Id*. at ¶ 33. CEC and Inbursa agree that reserving these claims at their face value appears to set a healthy cushion. For example, just four large lienholder claims comprise over one third of all Lienholder Claims listed in the Lienholder Schedule. *See* Ex. C. to Mot. None of these claims has been allowed; each is scheduled and disputed by the Debtors on their schedule; and, as one example, the claim of WFS Construction Company, LLC is being actively contested by the Debtors, and the parties had started on the path to arbitration proceedings. *See Motion for Modification of the Automatic Stay to Permit a Pending Arbitration Proceeding to Continue to Determine the Validity and Amount of Filed Mechanics' Liens* at 2 [Docket No. 549].

9

### B. The Chemtex Claim Should Be Excluded from the Lienholder Claims Reserve

18. On January 12, 2018, Chemtex filed a claim of $238,750,375.34 in Nueces County, Texas. The Chemtex escrow reserve amount of $87,034,689.00 proposed in the Lienholder Reserve Schedule apparently reflects the difference between the total filed claim of $238.7 million less the amount reflected on the Debtors' books and records as payable to third-party contractors of $151 million. *See Declaration of Dennis Stogsdill in Support of the Debtors' Motion for Entry of an Order Establishing a Lienholder Claims Reserve and Granting Related Relief* ¶ 14, Ex. B to Mot.[7]

19. As a matter of law, Chemtex—like all lienholders—must sufficiently support its non-duplicative claim of $87,034,689.00. *See In re United Cos. Fin. Corp.*, 267 B.R. 524, 527 (Bankr. D. Del. 2000) (the burden of persuasion lies with the claimant); *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20–21 (2000) ("[W]e have long held the burden of proof to be a 'substantive' aspect of a claim . . . . That is, the burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to the burden of proof that normally comes with it."). It is unlikely Chemtex will be able to do so, and accordingly, the Chemtex reserve amount should be substantially reduced or eliminated. Moreover, CEC should not be required to reserve for the Chemtex claim, given that it would be the sole beneficiary of any such proceeds, and that recovery on this intercompany claim is subordinated to repayment of the DIP loan.

    a. <u>CEC and Inbursa Should Not Be Required To Escrow Funds for the Chemtex Claim</u>

20. As DIP Lender, CEC was granted, as security for the prompt payment of the DIP Facility and all other obligations of the Obligors under the DIP Loan Documents, perfected

---

[7] Inbursa and CEC have not had an opportunity to fully review and consider all potential defenses to these claims. All rights and defenses with regard to such claims are reserved.

security interests in and liens upon all of each Obligor's Property (as defined in the DIP Loan Documents), including, without limitation, all Pre-Petition First Lien Collateral (as defined in the DIP Loan Documents) of Resins. *See* Final DIP Order ¶ 3. These perfected security interests and liens also apply to substantially all assets of Chemtex, including but not limited to any valid receivables, as Chemtex is an Obligor under the DIP Facility. *See* Final DIP Order ¶ 3; DIP Loan § 1.1. CEC, as DIP Lender, therefore, has a perfected security interest in and lien upon Chemtex's asserted non-duplicative claim of $87,034,689.00, and is entitled to receive all proceeds from such claim.

21. In addition, under the Final DIP Order, Inbursa, in its capacity as Pre-Petition First Lien Lender, was granted valid, perfected additional security interests in and liens on all of the DIP Collateral to secure the amount of any diminution in value of the Pre-Petition First Lien Collateral of Resins, junior only to the liens granted to CEC, in its capacity as the DIP Lender. *See* Final DIP Order ¶ 3. To the extent of any such diminution, the Pre-Petition First Lien Lender is to be recompensed, in addition to other forms of adequate protection, through its adequate protection security interest in and liens upon the collateral of the DIP Obligors, again, including the assets of Chemtex.

22. Moreover, Section 7.7 of the DIP Loan provides that the Chemtex claim against Resins, as an intercompany claim, is subordinated to repayment of the DIP Loan. As a result, CEC and Inbursa are the ultimate beneficiaries of any receivables paid on account of Chemtex's asserted claim, and such claim to repayment is subordinated to the obligation to repay the DIP Loan. As such, the Chemtex claim is not entitled to payment in priority over the DIP Loan or the funds extended under the Pre-Petition First Lien Loan Agreement, and CEC and Inbursa should not be required to escrow for or satisfy such claim as part of a credit bid of their debt. It would

be unduly onerous, and indeed would be a useless exercise, to require CEC or Inbursa to reserve funds on account of any claim asserted by Chemtex, to the extent the claim was proven to be valid ,as such funds would simply be released and distributed to CEC or Inbursa based on their respective allowed claims arising under the DIP Loan Documents or the Pre-Petition First Lien Loan Documents.

        b. <u>Substantial Defenses Likely Exist to the Chemtex Claim</u>

23.     In addition to the foregoing reasons why there does not need to be any reserve for the Chemtex claim, substantial defenses would likely exist to such claim if pursued. *First*, construction of the Corpus Christi Project was originally governed by a fixed-price EPC contract between Resins and Sinopec Engineering (Group) Co., Ltd. ("SEG"). *See Decl. of Dennis Stogsdill in Support of First Day Pleadings* [Docket No. 3] ("Stogsdill First Day Decl.") ¶ 16. Subsequently, SEG's assignee Sinopec Engineering Group America, LLC apparently engaged Chemtex as a subcontractor to perform on-shore works at the plant. The Corpus Christi Project suffered substantial delays and cost overruns under Chemtex's watch and remains only partially built after hundreds of millions of dollars have been spent. *See* Stogsdill First Day Decl. ¶¶ 39–41. As such, a claim by Chemtex related to its work on the project is likely subject to defenses and counterclaims. Further, any claim would be subject to set-off on the basis of any intercompany receivable claims owed to Resins by Chemtex.

24.     Moreover, even a preliminary review of the information produced by the Debtors evidencing payments allegedly made by Chemtex in relation to the construction of the Corpus Christi Plant suggests that certain charges—such as $2,034,653.90 in attorneys' fees—do not involve the furnishing of "labor" or "materials" for the construction or repair of an improvement of real property as required under the Texas Code and therefore are not secured by a mechanic's

lien. *See* Tex. Prop. Code § 52.023 (providing that a mechanic's and materialmen's lien secures payment for: (1) the labor done or the material furnished for the construction or repair; (2) the specially fabricated material, even if the material has not been delivered or incorporated into the construction or repair, less its fair salvage value; or (3) the preparation of a plan or plat by an architect, engineer, or surveyor). Other such payments appear to include, among others, promotional products and dispute resolution, accounting, benefits and healthcare services—also not labor or materials. In short, ample grounds would exist to reduce the reserve for the Chemtex claim, even if it were otherwise properly entitled to a reserve, which it is not.

### C. Depending on the Sale Proceeds Ultimately Received, the Court Can and Should Establish Lower Escrows for the Lienholder Claims

25. Pursuant to the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order and the Final DIP Order, if Inbursa or CEC credit bids, any further bid for any of the relevant assets "must provide for, at the closing of such Sale Transaction, indefeasible cash payments of the DIP Obligations and the Pre-Petition First Lien Obligations to the DIP Lender and the Pre-Petition First Lien Lender, respectively, in at least the dollar amount equivalent of the Credit Bid submitted by the DIP Lender and the Pre-Petition First Lien Lender (as applicable). . . ." Bidding Procedures § VI.A.5; *see also* Final DIP Order at ¶¶ B(vii)2(c), 15(e). Additionally, any bid by DAK Americas LLC by credit bid or otherwise must provide for the payment in full of the DIP Obligations (as defined in the DIP Orders) and the Pre-Petition First Lien Obligations (as defined in the DIP Orders) in cash at closing of the applicable sale transaction. Bidding Procedures § VI.A.5; Final DIP Order at ¶ B(vii)2(c).

26. The Debtors seek to establish reserves for the full amount of the Lienholder Claims, without further considering the relative priority of such claims as compared with each other or to other claims, to determine the *maximum* amount that would need to be reserved.

13

However, to the extent sale proceeds are not available to pay all such claims in full, the Lienholder Claimants are not entitled to demand a preferential escrow of their claims, and rather smaller escrows may and should be established, and any remaining proceeds should be distributed to other creditors.

      a. <u>Inbursa Need Only Reserve for Lienholder Claims Senior to the Initial $250 Million Extended Under the Pre-Petition First Lien Loan Documents</u>

27. While Inbursa, CEC, and the Lienholder Claimants have reserved their rights with respect to any disputes regarding the relative priority of their claims, such disputes are not endless and rather center on the lien priority of: (i) any subsequent advances made by Inbursa under the Pre-Petition First Lien Loan Documents after the commencement of construction on or delivery of materials to the Corpus Christi Project, as compared to any Lienholder Claims related to the Corpus Christi Project; and (ii) any Lienholder Claimant's ability to prove it has a claim to "removables" at the Corpus Christi Project. While Inbursa and CEC do not concede the validity and priority of the Lienholder Claims, to the extent sale proceeds are not available to reserve for the full Lienholder Claims Reserve amount, lesser reserves could be established to account for these disputes while releasing the remaining sale proceeds.

28. Pursuant to the DIP Orders, the secured claims of Inbursa and of CEC have been determined to be legal, valid and perfecting binding and enforceable obligations (without any defense, offset, recoupment or counterclaim of any kind), whereas there has been no determination regarding the validity and allowability of the Lienholder Claims. Moreover, as stated above, the Lienholder Claimants have the burden of persuasion on their own claims against the Debtors. *See In re United Cos. Fin. Corp.*, 267 B.R. 524 at 527.

29. As a matter of Texas law, the first $250 million lent by Inbursa under the Pre-Petition First Lien Loan Agreement, which occurred prior to the commencement of work on the

14

Corpus Christi Project, is senior to the Lienholder Claims.[8] Inbursa executed the Senior Deed of Trust with Resins on March 21, 2013 and recorded it on March 23, 2013. Final DIP Order ¶ B(iii).

30. The Lienholder Claims do not have priority over Inbursa's claims relating to the initial $250 million in principal funded under the Pre-Petition First Lien Loan Agreement because no holder of a Lienholder Claim can establish that its claim relates to work commenced prior to such funding, or relates back to a date prior to such funding. Under Section 53.124 of the Texas Property Code, the inception of a mechanic's lien is the earliest of: (i) the commencement of visible construction of improvements on the land on which the improvements are to be located, (ii) the first delivery of materials to be used in the construction of the improvements to the land on which the improvements are to be located or (iii) the filing of an Affidavit of Commencement pursuant to Section 53.124(c) of the Code. *See* Tex. Prop. Code § 53.124. Even under this generous standard, however, Inbursa's secured claim retains seniority. The Debtors admit $250 million was lent prior to commencement of work on the project. *See* Stogsdill First Day Decl. ¶ 9.[9]

31. Certain Lienholder Claimants have suggested in their court submissions and in arguments before the Court that they hold claims for "removables" that are senior to Inbursa's

---

[8] Inbursa maintains that the entire $430 million advanced under the Pre-Petition First Lien Loan Documents is senior to any other secured claims, including the Lienholder Claims. All advances made under the Pre-Petition First Lien Loan Documents are secured by the future indebtedness clause in the Senior Deed of Trust. Texas courts enforce provisions in security agreements that secure future advances made pursuant to the same deed. *F. Groos & Co. v. Chittim*, 100 S.W. 1006, 1011 (Tex. Civ. App. 1907, no writ).

[9] Inbursa and CEC do not concede work actually started as early as April 2013 and not a later date, and documents produced by the Debtors—including photographs and e-mail correspondence—suggest that work started significantly later.

claim;[10] however, on information and belief, even if such claims are proven, they would be relatively small amounts and can be separately reserved for if required.

32. Under Texas law, a deed of trust lienholder whose lien predates the inception date of any mechanic's lien on the property is preferentially entitled to the proceeds from the sale of any property that secures the liens. *See* Tex. Prop. Code § 53.123(b); *First Fed. Sav. & Loan Ass'n v. Stewart Title Co.*, 732 S.W.2d 98, 110 (Tex. App.—Beaumont 1987, writ denied). However, the Construction Lienholder Group and individual Lienholder Claimants have argued that they may possess potentially superior liens with respect to "removables."

33. Removable improvements are "fixtures which may be removed without material injury to the land and preexisting improvements or to the fixtures themselves." *See First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974); *Exch. Sav. & Loan Ass'n v. Monocrete Pty., Ltd.*, 629 S.W.2d 34, 36 (Tex. 1982). Without conceding such removables claims are entitled to priority over any portion of Inbursa's First Lien Pre-Petition Claim, it can be determined from even a facial review of the Lienholder Claims as asserted that only a portion of such claims could even be entitled to be asserted as removables claims, given that Lienholder Claims that relate to pure labor, or to certain goods, such as poured concrete, for example, are not susceptible to be asserted as removables claims. Removables claims are expected to be no more than a fractional share of the total Lienholder Claims.[11] Inbursa and CEC continue to investigate such claims in connection with this Motion.

---

[10] *See Joinder of Construction Lienholder Group to the Motion of the Official Committee of Unsecured Creditors for an Order (I) Extending the objection Deadline and Adjourning the Final Hearings on the DIP Financing Motion and Cash Collateral Motion; and (II) Extending the Objection Deadline and Adjourning Hearing for Proposed Bidding Procedures* [Docket No. 200] ¶ 15; *see also*, *e.g.*, *Notice of Perfection, Maintenance, and Continuation of Lien of TCI Business Capital as Assignee of Integrity Mechanical Specialists, LLC Under 11 U.S.C. § 546(b)*.

[11] Moreover, any claim to "removables" likely would not be valued at the contract amount, but rather at a lesser foreclosure sale value.

34. As such, while CEC and Inbursa hope that the auction process yields sufficient proceeds to pay all secured creditors in full, if that is not the case, the Court still may establish a Lienholder Claims Reserve to account for senior purported claims such as claims to "removables," while permitting the release of sale proceeds in the amount of $250 million to Inbursa on account of its pre-petition lien. The Court could accomplish this without delving into potential lien priority disputes between and among Inbursa/CEC and Lienholder Claimants, as discussed above. Given that the auction has not yet occurred, Inbursa and CEC reserve all rights with respect to such further and alternative relief or any further objection that may be warranted based on such results.

b. <u>Depending on the Successful Bidder, the Court Can and Should Establish Alternative Reserve Administration Procedures</u>

35. The Debtors also have proposed Lienholder Reserve Administration Procedures, to govern the release of escrowed proceeds upon resolution of the applicable mechanic's lien claims. *See* Mot. at ¶ 16. CEC and Inbursa agree that administration procedures to facilitate the orderly adjustment to the amount of and release of cash from escrow upon the distribution, settlement and release of any Lienholder Claims should be established in this case. However, CEC and Inbursa note that the proposed Lienholder Reserve Administration Procedures, as drafted, contemplate the Debtors would control the resolution of claims and release of cash from the reserve. *Id*.

36. CEC and Inbursa agree in principle with the necessity of administration procedures and the general concepts in the Debtors' procedures; however, given that the auction has not yet occurred and the amount and terms of the Successful Bid and size of the escrow have not yet been determined, Inbursa and CEC reserve their right to propose alternative procedures in any bid they may resubmit and with respect to the proposed procedures generally until such time

as the Successful Bidder and any Backup Bidder are announced. Inbursa or CEC also reserve the right to file a further response or objection to the proposed Lienholder Reserve Administration Procedures or to propose procedures in the event of a Successful Bid by either entity.

## CONCLUSION

37. For the reasons set forth herein, and any additional arguments to be made at the Hearing, CEC and Inbursa respectfully request that the Court partially grant the relief requested in the Debtors' Reserve Motion by establishing a reserve but deny the Debtors' request to set the amount of the reserve at $350 million, as well as grant such other and further relief as the Court may deem proper.

Dated: March 16, 2018

    CLEARY GOTTLIEB STEEN & HAMILTON LLP
    Lisa M. Schweitzer
    Boaz S. Morag
    One Liberty Plaza
    New York, New York 10006
    Telephone: (212) 225-2000
    Facsimile: (212) 225-3999

    *- and -*

    */s/ Ian J. Bambrick*
    YOUNG CONAWAY STARGATT & TAYLOR, LLP
    Pauline K. Morgan (No. 3650)
    Joel A. Waite (No. 2925)
    Ian J. Bambrick (No. 5455)
    Allison S. Mielke (No. 5934)
    Rodney Square
    1000 North King Street
    Wilmington, Delaware 19801
    Telephone: (302) 571-6600
    Facsimile: (302) 571-1253

    Attorneys for CEC and Inbursa