# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| M & G USA CORPORATION, *et al.*,[1] | ) | Case No. 17-12307 (BLS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **D.I. 1075** |

## OBJECTION OF THE CONSTRUCTION LIENHOLDER GROUP TO DEBTORS' MOTION FOR ENTRY OF AN ORDER ESTABLISHING A LIENHOLDER CLAIMS RESERVE AND GRANTING RELATED RELIEF

Certain construction lien[2] claimants (collectively, the "Construction Lienholder Group"),[3] by and through their undersigned counsel, hereby file this objection and reservation of rights to the motion (the "Reserve Motion"), of the above-captioned debtors (the "Debtors") to establish a lienholder claims reserve of $350,149,728.43 (the "Proposed Reserve") and in support of its objection, the Construction Lienholder Group respectfully submits the following:

---

[1]     The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M & G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à.r.l. (1270), M & G Chemicals, S.A. (1022), M & G Capital S.à.r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062), and Indo American Investments Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2]     The term "construction lien" is intended to encompass all mechanic's, contractors' or materialman's liens arising under and pursuant to Texas property law.

[3]     The members of the Construction Lienholder Group are (i) Apache Industrial, Services, Inc., (ii) Arc Energy Services, Inc., (iii) Axis Industrial Services, LLC, (iv) Bay Ltd, (v) CCC group, Inc., (vi) Dawkins On-Site Concrete, LLC, (vii) Fagioli, Inc., (viii) Garrett Mechanical, Inc. (ix) TCI Business Capital as assignee of Integrity Mechanical Specialists, (x) Lexicon, Inc., (xi) MC Welding, Inc., (xii) MEITEC, Inc., (xiii) Mirage Industrial Group, LLC, (xiv) MMR Constructors, Inc., (xv) Montcalm USA, Inc. (xvi) N&A Project Management USA, Inc., (xvii) Repcon, Inc., (xviii) SimplexGrinnell, LP, (xix) Sunbelt Rentals, Inc., (xx) TNT Crane & Rigging Inc., (xxi) WFS Construction Company LLC, and (xxii) Wholesale Electric Supply of Houston, Inc.

## INTRODUCTION

As a prefatory matter, the Construction Lienholder Group agrees with the Debtors that there needs to be a reserve from the sale proceeds. At first blush, the Debtors' Reserve Motion makes sense: establish a reserve from which construction lienholder claims can be paid, and a procedure by and through which the Debtors can remit payments. Unfortunately, the relief sought by the Reserve Motion simply doesn't work on any level.

As an initial matter, the Debtors are required by Sections 363(e) and 361 to provide construction lienholders with adequate protection. The Bankruptcy Code does not provide any statutory basis for the relief requested by the Reserve Motion. Section 502(c) is inapplicable because none of the construction lienholders' liens are unliquidated or contingent. Further, because there is no underlying section of the Bankruptcy Code upon which the relief sought herein may be granted, the Court cannot create a new substantive right under Section 105(a).

There is, however, under Texas Law a basis by through which the Debtors can provide adequate protection. Section 53.171 of the Texas Property Code, titled "Bond," provides among other things that, "If a lien, other than a lien granted by the owner in a written contract, is fixed or is attempted to be fixed by a recorded instrument under this chapter, any person may file a bond to indemnify against the lien." Tex Prop. Code § 53.171(a). Section 53.172 of the Texas Property Code, titled "Bond Requirements" provides, among other things, that where the total amount of the liens exceed $40,000, the bond must be in an amount that is the greater of 1-1/2 times the amount of the liens.

Aside from the deficient statutory basis, the reserve sought by the Reserve Motion is also inadequate. Despite that there are over $800 million of presumptively valid liens, the Debtors seek to establish a reserve of only $350 million for claims without filing an objection to any of the

2

secured claims, commencing an adversary proceeding, or even getting each of the affected lienholder's consent.

Even assuming that the Debtors' analysis of the construction liens is correct, the proposed reserve does not provide construction lienholders with adequate protection because the proposed reserve does not account for construction lienholders' legal fees, expenses, and interest, as allowed by the Texas Prompt Pay for Contractors and Subcontractors Act, Section Section 53.156 of the Texas Property Code, and Section 38.001 of the Texas Civil Practice and Remedies Code, as well as Section 506(b) of the Bankruptcy Code.

Finally, the proposed resolution would prejudice constructive lienholders by permitting all funds not reserved to leave the estate (and the United States). If despite their best good faith efforts, Mr. Stogsdill and the Debtors are wrong, and the liens turn out to be larger than the Debtors expect because (i) legal fees are subsequently allowed, (ii) interest on account of construction liens are allowed, (iii) the Debtors' analysis with respect to duplication of claims turns out to be incorrect, or (iv) for any other reason by which there are more claims than the Debtors anticipated, there will be no adequate means to compensate those construction lienholders for whom there is no money available to pay their valid claims.

Accordingly, the Reserve Motion should be denied, absent significant and substantive changes that will provide adequate protection to construction lienholders.

## BACKGROUND

1. In April 2013, the Debtors began construction on the Corpus Christi Plant. Upon information and belief, construction of the Corpus Christi Plant was expected to be completed in December 2015, however the construction ceased prior to October 24, 2017 at only 85% complete.

2.     The claims and liens of all or substantially all of the members of the Construction Lienholder Group arose from the construction of the Corpus Christi Plant. Each of the members of the Construction Lienholder Group has perfected their construction liens against the Corpus Christi Plant by filing and recording their liens in the proper land records of Nueces County, Texas. The members of the Construction Lienholder Group have asserted over $179,800,000 of liens on the Corpus Christi Plant. Other construction lienholders have also filed and recorded liens against the Corpus Christi Plant.

3.     On October 24, 2017, M & G Polymers USA, LLC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On October 30, 2017, the other Debtors commenced these chapter 11 cases before this Court (together with the chapter 11 case of M & G Polymers, the "Cases").

4.     Prior to the Petition Date, DAK Americas LLC ("DAK") Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa ("Inbursa") and the construction lienholders each asserted liens upon the Debtors' assets in Corpus Christi, Texas (the "Corpus Christi Assets").

## A.     The Debtors' Postpetition Financing

5.     On December 13, 2017, this Court entered a final order [Docket No. 479] (the "DIP Financing Order") on the Debtor's motion for post-petition financing [Docket No. 14]. The DIP Financing Order provided that any of the financing provided therein did *not* prime any valid prior liens of construction lienholders, but that Inbursa's postpetition security interest would prime the liens of DAK. The DIP Financing Order also expressly did *not* determine the relative priority among the liens of construction lienholders, Inbursa and DAK. See DIP Financing Order at fn.5.

6.     Accordingly, thus far, there has been no determination as to the relative priority of liens upon the Corpus Christi Assets.

**B.     Construction Lienholder Bar Date Motion**

7.     On November 20, 2018, the Debtors filed a Motion for Entry of an Order (I) Establishing Lien Identification Procedures and (II) Granting Related Relief [Docket No 214] (the "Construction Bar Date Motion"). By and through the Construction Bar Date Motion, the Debtors sought to establish a deadline of January 15, 2018, by which all parties asserting construction liens must have filed a form with information with respect to the lien and underlying claim. On December 4, 2017, the Construction Lienholder Group filed an objection to the Construction Bar Date Motion [Docket No. 341].

8.     Ultimately, the parties were able to reach agreement as to a form of order that set a deadline of February 15, 2018, for construction lienholders to either perfect their liens by filing in Nueces County, by filing a notice of perfection of lien pursuant to Section 546(b) of the Bankruptcy Code on the docket in these cases, or return a modified form to the Debtors' claims agent. Accordingly, more than a month ago, the Debtors knew the universe of construction liens.

**C.     The Sale Motion and Sale Process**

9.     On November 16, 2017, the Debtors filed a Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and

(B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [Docket No. 173] (the "Sale Procedures Motion"). On December 14, 2017, the Court entered an Order approving the Sale Procedure Motion [Docket No. 490] (the "Sale Procedures Order").

10. By and through the Sale Procedures Order, the Court set the following deadlines for the Debtors' assets:[4]

- Bid Deadline: March 6, 2018 at 5:00 p.m.;
- Objection Deadline: March 7, 2018 at 5:00 p.m.;
- Auction: March 8, 2018 at 10:00 a.m.;
- Adequate Assurance Deadline: March 12, 2018 at noon; and
- Sale Hearing: March 14, 2018 at 10:00 a.m.

11. By and through the sale, the Debtors are seeking to sell substantially all of their remaining assets, including the Corpus Christi Plant owned by M&G Resins, and the desalination plant, which is allegedly owned by M&G Waters but located on the same parcel of real property as the Corpus Christi Plant.

12. In connection with litigation between DAK and the Creditors Committee, the deadlines for objections to the proposed sale, the auction, and sale hearing were moved to March 9, March 19, and March 23, 2018, respectively. See Debtors' Notice of Certain Modifications to Bidding Procedures [Docket No. 1061]. On March 9, 2018, the Construction Lienholder Group filed a preliminary objection to the Sale Motion [Docket No. 1113].

**D. The Construction Lienholder Group's Motion for Relief**

13. On January 29, 2018, the Construction Lienholder Group filed a Motion for Relief from the Automatic Stay, to the Extent Necessary, to Commence Actions in Texas to Determine

---

[4] This sale does not include the Debtors' sale of their Apple Grove, WV facility, research facility in Sharon Center and related asset.

the Relative Priority of Construction Liens Between the Construction Lienholders and Nondebtors, Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa and DAK Americas LLC [Docket No. 824] (the "Automatic Stay Motion"). The Debtors, DAK, Inbursa, and the official committee of unsecured creditors (the "Committee") all filed objections to the Automatic Stay Motion (collectively, the "Objections"). Among other things, each of the Objections asserted that an action to determine the relative priority of the construction liens was premature; that the parties should wait until after the conclusion of the sale of the Debtors' Corpus Christi Assets.

14. At a hearing on February 22, 2018, the Court heard oral argument and considered the Automatic Stay Motion and Objections, and determined that the parties should wait until after the sale was concluded, at which time the Court would reconsider the Automatic Stay Motion. Accordingly, the Motion was adjourned and continued until the hearing scheduled for March 23, 2018.

**E.     The Reserve Motion**

15. On March 2, 2018, the Debtors filed the Reserve Motion, by and through which they seek to establish a reserve of $350,149,728.43 for all construction liens. Further, by and through the Reserve Motion, the Debtors seek approval of the following procedures:

(a)     The Lienholder Claims Reserve shall apply solely to Lienholder Claims with respect to which (i) the Debtors' applicable assets are sold free and clear pursuant to section 363(f) of the Bankruptcy Code and (ii) any underlying contract is not assumed and assigned by the Debtors in connection with any such sale pursuant to section 365 of the Bankruptcy Code. In the event that any purchaser purchases assets subject to – as opposed to free and clear of – any Lienholder Claims, or the Debtors assume and assign any applicable contract in connection with such sale, the Debtors shall be authorized immediately upon approval of such sale to reduce the required amount of the Lienholder Claims Reserve by the applicable proposed Individual Reserve Amounts associated with such Lienholder Claims.

(b)     Immediately upon entry of a final order of the Court or any other tribunal with jurisdiction over any Lienholder Claim reducing or disallowing the Lienholder Claim, and without further notice to any party, the Debtors shall be authorized to reduce the amount

of the Lienholder Claims Reserve by the amount of such reduction or the full amount originally allocated on account of such Lienholder Claim, as applicable.

(c)    If the Debtors enter into any Lienholder Settlement pursuant to the Lienholder Claim Settlement Procedures Order with respect to one or more Lienholder Claims, the Debtors shall be authorized, without further notice to any party, (i) to reduce the Lienholder Claims Reserve to the secured amount provided for under such Lienholder Settlement (the "Settlement Amount") and (ii) to treat such Settlement Amount in the Lienholder Claims Reserve as available solely for the satisfaction of the Lienholder Claims that are the subject of the Lienholder Settlement and not for the satisfaction of other Lienholder Claims.

(d)    Under no circumstances shall the Debtors or any purchaser of the Debtors' assets be required to reserve amounts over and above the Lienholder Claims Reserve on account of any Lienholder Claims.

(the "Lienholder Reserve  Administration Procedures").

16.    In the Reserve Motion, the Debtors stated that they "determined that the prompt establishment of a Lienholder Claims Reserve following the Lienholder Bar Date would provide potential bidders with the clearest available guidance regarding the maximum aggregate scope of Lienholder Claim liabilities, which would promote interest in the assets of the Debtors' estates and the likelihood of a successful sale for the benefit of all stakeholders." Reserve Motion, p. 6. To that end, "the Debtors and their advisors conducted an analysis of the Lienholder Claims to develop an appropriate proposed Lienholder Claims Reserve." Id.

17.    Further, the Debtors' asserted that their analysis sought to identify the total amount of liabilities asserted in the Lienholder Claims on a nonduplicative basis without consideration of any potential defenses or counterclaims that the Debtors may possess to such Lienholder Claims, provided that, for the reasons discussed below, the Debtors have not included specific reserves in the Lienholder Claims Reserve for any liquidated or unliquidated amounts asserted in the Lienholder Claims on account of attorneys' fees and/or interest. . . " Id.

18.    In support of the Reserve Motion, the Debtors rely upon the Declaration of Dennis Stogsdill ("Stogsdill Declaration"), which provides, among other things, "In developing the

proposed Lienholder Claims Reserve, the Debtors have used their good faith best efforts to eliminate the Duplicated Liabilities." Stogsdill Declaration at ¶ 10.

## BASIS FOR OBJECTION

### A.    The Proposed Reserve Does Not Provide Construction Lienholders with Adequate Protection

19.    Section 363(e) of the Bankruptcy Code requires that the Debtors provide construction lienholders with adequate protection of their security interest by prohibiting the use, sale, or lease of their collateral, as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e).[5]  Adequate protection, in turn, is governed by Section 361 of the Bankruptcy Code.  Among other things, Section 361 requires the debtor to make a cash or periodic cash payments to an entity in the interest of property, providing an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or grant such other relief that will result in the realization by to the creditor the indubitable equivalent of its interest in such property.

20.    By the Reserve Motion, the Debtors seek to establish a reserve through an admittedly clever use of an inapplicable section and, of course, every debtor's favorite standby: Section 105(a).  Unfortunately, there is no statutory basis for the Reserve Motion under Section 502(c) as the claims at issue are neither contingent nor unliquidated.  The Debtors also cannot rely solely upon this Court's equitable powers to fashion a remedy out of whole cloth where there is no underlying provision of the Bankruptcy Code upon which such remedy can be crafted,

---

[5]    The Construction Lienholder Group, on behalf of its members, and other construction lienholders have requested adequate protection from this Court.  To the extent necessary, by this objection, the Construction Lienholder Group reiterates its request.

particularly where the proposed reserve will not actually provide construction lienholders with adequate protection.

1. **Sections 502(c) and 105(a) of the Bankruptcy Code Do Not Provide Any Basis for the Relief Sought by the Reserve Motion.**[6]

21.     The Debtors' proposed estimation under 11 U.S.C. §§ 105(a) and 502(c) is without any viable legal basis. Section 502 of the Bankruptcy Code provides, in relevant part, as follows:

> (c)     There shall be estimated for purpose of allowance under this section—
> (1)     any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
> (2)     any right to payment arising from a right to an equitable remedy for breach of performance.

11 U.S.C. § 502(c). The construction lienholder claims are neither contingent nor unliquidated. Rather, they are simply claims which may be disputed by the Debtors. At this point, however, they are valid claims.

22.     The terms "contingent" and "noncontingent" are not defined in the Bankruptcy Code, but courts have generally agreed that debts are contingent if they do not become obligations until the occurrence of a future event, but are noncontingent when all of the events giving rise to liability for the debt occurred prior to the debtor's filing for bankruptcy. See, e.g., In re Mazzeo, 131 F.3d 295, 303 (2d Cir. 1997) (citing In re Knight, 55 F.3d, 23, 236 (7th Cir. 1995); In re Nicholes, 184 B.R. 82, 88 (9th Cir. BAP 1995); Brockenbrough v. Comm'r, 61 B.R. 685, 686-87 (W.D.Va. 1986); In re All Media Properties, Inc., 5 B.R. 126, 133 (Bankr. S.D.Tex.1980), aff'd, 646 F.2d 193 (5th Cir. 1981)).

---

[6]     The factual predicate upon which Reserve Motion is based is the Declaration of Dennis Stogsdill. The Construction Lienholders Group has noticed Mr. Stogsdill's deposition prior to the hearing to consider the Reserve Motion, and the reserves the right to raise any factual issues upon which the Reserve Motion is premised.

23.     Nor are debtors able to transmogrify claims from disputed to contingent simply by their assertion that they may dispute those claims. Nicholes, 184 B.R. at 89 ("even a bona fide dispute over liability for a claim does not make the debt contingent"). Although the construction lienholders' ability to collect upon their claims may ultimately depend upon adjudication of a claim objection – if one is filed – that does not make the debt itself contingent. Mazzeo, 131 F.3d at 303. The concept of contingency involves the nature or origin of liability. Mazzeo, 131 F.3d at 303. In this case, the amounts and allowance of the construction lienholders' claims were fixed before the Petition Date when the construction lienholders performed services and/or delivered goods to the Debtors. Accordingly, the construction lienholders' claims are not contingent.

24.     Similarly, the terms "liquidated" and "unliquidated" also are not defined in the Bankruptcy Code. Instead, those terms refer to a claim's value (and the size of the corresponding debt) as well as the ease with which that value can be ascertained. See, e.g., Mazzeo, 131 F.3d at 303 (citing United States v. Verdunn, 89 F.3d 799, 802 (11th Cir.1996); In re Knight, 55 F.3d at 235; In re Fostvedt, 823 F.2d 305, 306 (9th Cir.1987)). "If the value of the claim is easily ascertainable, it is generally viewed as liquidated." Mazzeo, 131 F.3d at 303 (citing Knight, 55 F.3d at 235). Only where the value of a claim depends instead on the future exercise of discretion, not restricted by specific criteria, is the claim unliquidated. United States v. Verdunn, 89 F.3d at 802).

25.     Courts have generally held that a debt is liquidated where the claim is determinable by reference to an agreement or by a simple computation. Mazzeo, 131 F.3d at 303. See also In re Knight, 55 F.3d at 235 (debt is liquidated if its value has been ascertained or can readily be calculated); In re Fostvedt, 823 F.2d at 306 (debt is liquidated if it is subject to ready determination and precision in computation of the amount due (internal quotation marks omitted)); In re

Nicholes, 184 B.R. at 89 (The test for "ready determination" is whether the amount due is fixed or certain or otherwise ascertainable by reference to an agreement or by a simple computation.).

26.     Here, there is no question that the construction lienholders' claims are liquidated. Each of the construction lienholders have filed claims in exact amounts based upon the services or goods provided to the Debtors. In fact, the Debtors agree that that the construction lienholders' claim are liquidated. M&G Resins filed its schedules on January 22, 2018 [Docket No. 751]. Although the schedules listed every single construction lienholder claim as being contingent and disputed, the Debtors did not list any of those claims as unliquidated.

27.     As stated by the Fifth Circuit, in cases where a claim is neither contingent nor unliquidated, estimation is "simply inappropriate." See In re Ford, 967 F.3d 1047, 1053 (5th Cir. 1992). Accordingly, the Debtors' reliance upon Section 502(c) is misplaced.

28.     In an effort to try to fit a square peg into a round hole, the Debtors have cited a number of cases to expand the limits of Section 502(c), none of which are applicable here. This is not a situation like In re Chemtura, 448 B.R. 635 (Bankr. S. D.N.Y. 2011), where the debtors had already filed an objection to the claim that was the subject of estimation, and the proposed estimation procedure was being done pursuant to a confirmed a plan of reorganization. Nor is it a case like Enron, 2006 WL 544463 (Bankr. S.D.N.Y. 2006), where a plan had been confirmed and the claims were all unliquidated. Or a case like either Bittner v Borne Chem. Co., Inc., 691 F.2d 134 (3d Cir. 1982), or In re Garlock Sealing Techs., LLC, No. 10-31607, 2012 Bankr. LEXIS 6236, at *8-9 (Bankr. W.D.N.C. Apr. 13, 2012), where the court found that all of the claims were either contingent or unliquidated.

29.     Because the Court cannot establish a reserve under Section 502(c), the Debtors seek to rely upon Section 105(a). Section 105(a) is similarly unavailing as the sole basis for estimating

claims for the establishment of a reserve, particularly where, as here, such a reserve would leave those creditors without any assets from which to recover in the event that the reserve was insufficient.

30.     As stated by the First Circuit in In re Jamo: "Section 105(a) does not provide bankruptcy courts with a roving writ, much less a free hand. The authority bestowed thereunder may be invoked only if, and to the extent that, the equitable remedy dispensed by the court is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code." 283 F.3d 392, 403 (1st Cir. 2002).  This is, of course, consistent with the United States Supreme Court's statement that a bankruptcy court's equitable powers "can only be exercised within the confines of the Bankruptcy Code." Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988). See also In re Padilla, 389 B.R. 409, 430 (Bankr. E.D. Pa. 2008) ("The essence of the boundary of § 105(a) equity power is that the provision cannot provide the basis for requested relief that would either (1) create a new substantive right or (2) conflict with another provision of the Bankruptcy Code.").

31.     No other provision of the Bankruptcy Code provides an independent basis for the relief sought by the Reserve Motion.  Accordingly, there is no legal basis under the Bankruptcy Code for this Court to establish a reserve for construction lienholders' claims.

## 2.   There is a Basis to Provide Adequate Protection under Texas Law.

32.     Although the Bankruptcy Code does not provide a basis for establish a reserve for construction lienholders' claims, if the Debtors want to sell free and clear of all claims, liens and encumbrances of construction lienholders, the Texas Property Code does provide the Debtors with an option by allowing them to provide a bond as security to indemnify them against the construction liens.

33.     Specifically, Section 53.171 of the Texas Property Code, titled "Bond," provides among other things that, "If a lien, other than a lien granted by the owner in a written contract, is fixed or is attempted to be fixed by a recorded instrument under this chapter, any person may file a bond to indemnify against the lien." Tex Prop. Code § 53.171(a). Section 53.171(c) further provides that a mechanic's lien claim against an owner's property is discharged if it complies with Sections 53.172, provides notice as required under 53.173, and that the bond and notice are recorded as required by Section 53.172.

34.     Section 53.172 of the Texas Property Code, titled "Bond Requirements" provides, among other things, that the bond must:

> (3) be in an amount that is double the amount of the liens referred to in the bond unless the total amount claimed in the liens exceeds $40,000, in which case the bond must be in an amount that is the greater of 1-1/2 times the amount of the liens or the sum of $40,000 and the amount of the liens

Tex Prop. Code § 53.171(a).

35.     While the Bankruptcy Code obviously has provisions which address certain rights of claimants, the determination of substantive law and property rights with respect to the assets of a bankrupt's estate are determined by applicable non-bankruptcy (i.e., state) law, subject to any qualifying or contrary provisions in the Bankruptcy Code. See, e.g., Raleigh v. Illinois Dept. of Revenue, 530 U. S. 15, 20 (2000); Butner v. United States, 440 U.S. 48, 49 (1979). Accordingly, if the Debtors wish to sell their property free and clear of the construction lienholders' liens, they need to establish a reserve in an amount consistent with the requirements under Texas law, which is a reserve or other security equal to 150% of the amount of the asserted construction liens.

**B.     There is no Basis to Establish a Reserve of Only $350 Million for Claims totaling $800 million**

36.     Even if this Court were to get beyond the fact that all of the claims are presumptively valid, and even assuming that the Debtors' analysis was correct with respect to the duplication of claims, the proposed reserve is still insufficient. First, there is no evidentiary basis that the Debtors' analysis was correct with respect to the issue of duplication,[7] the reserve is inappropriate because it does not include any provision for legal fees, expenses, and interest.

> 1.   The construction lienholders' liens are presumptively valid and should not be estimated without an adversary proceeding, claim objection, or even the lienholder's consent.

37.     As set forth in the Reserve Motion, as of the Lienholder Bar Date, approximately 229 lienholder claims were asserted against the Debtors' estates in the aggregate amount of more than $800 million. See Reserve Motion, ℗ 9. Under Texas law, filed liens are presumed to be valid, unless later invalidated. Wood v. HSBC Bank, 2016 WL 2993923, at * 6 (Tex. 2016); Slaughter v. Qualls, 162 S.W.2d 671, 676 (Tex. 1942); Roe v. Davis, 106 Tex. 537, 172 S.W. 708 (1915); Jacobson v. National Western Life Insurance Company, 403 S.W.2d 528 (Tex. Civ. App. Houston 1966, no writ).

38.     Despite that these claims are presumptively valid, and therefore should be subject to either an adversary proceeding or a claim objection (or at least obtain each lienholder's consent), the Debtors are essentially seeking to have the liens reduced through the Reserve Motion. Unless and until those liens have been successfully challenged[8] or the lienholder consents otherwise, there is no basis for reducing any of the liens.

---

[7]     The Construction Lienholder Group expressly reserves its rights to challenge all factual statements in the Motion and the Stogsdill Declaration, including with respect to the underlying reserve.

[8]     Early in these case, the Debtors requested a bar date for construction lienholder claims. The basis for that bar date was so that the Debtors could "obtain sufficient information to determine the existence, priority and validity of all purported Liens asserted against the Corpus Christi Plant ahead of the deadlines proposed as part of the sale

## 2. Construction lienholders are entitled to legal fees and expenses

39. In support of their request to deny a reserve for legal fees and expenses, the Debtors rely chiefly upon the cases of <u>Palomita v. Medley</u>, 747 S.W.2d 575, 578 (Tex. App.—Corpus Christi 1988, no writ), and its progeny, including <u>Dossman v. Nat;'l Loan Inv'rs</u>, L.P., 845 S.W.2d 384, 387 (Tex. App.—Houston 1992), <u>Ambassador Dev. Corp. v. Valdez</u>, 791 S.W.2d 612, 624 (Tex. App.—Fort Worth 1990), and <u>In re Crusader Energy Group, Inc.</u>, 2011 WL 479565, at *5 (Bankr. N.D. Tex. Feb. 3, 2011). Those decisions are contrary to the majority view of Texas courts that have addressed the issue of legal fees and expenses. Instead, this Court should be guided by the decision of <u>In re Bigler</u>, 458 B.R. 345 (Bankr. S.D. Tex. 2011), which intricately analyzed Sections 53.023 and 53.156 of the Texas Property Code and expressly rejected <u>Palomita</u>.

40. Specifically, the <u>Bigler</u> Court considered Section 53.023 of the Texas Property Code,[9] which was the basis for the <u>Palomita</u> decision, and found that, although Section 53.023 does not specifically include attorneys' fees and costs as obligations that are secured by a lien, the construction lienholder was entitled to legal fees and expenses pursuant to Section 53.156 of the Texas Property Code, which specifically requires reasonable attorneys' fees and expenses as are

---

process." Despite that the overwhelming majority of lien notices and claims were filed well ahead of the bar date established by the Court, the Debtors now come before the Court to, in essence disallow, these liens without having filed any claim objections or commenced any adversary proceedings.

[9]    Section 53.023 of the Texas Property Code provides Section 53.023, titled "Payment Secured by Lien," provides for payment of:

(1)    the labor done or material furnished for the construction or repair;

(2)    the specially fabricated material, even if the material has not been delivered or incorporated into the construction or repair, less its fair salvage value;  or

(3)    the preparation of a plan or plat by an architect, engineer, or surveyor in accordance with Section 53.021(c). Section 53.156 provides in any action to foreclose a lien or to declare any lien or claim invalid, the court is authorized, in its discretion, to award costs and reasonable attorneys' fees as "are equitable and just."

equitable and just.[10] Accordingly, in <u>Bigler</u>, the court explicitly rejected the holdings of <u>Palomita</u> and other cases cited by the Debtors as follows:

> This Court disagrees with <u>Palomita</u> and its progeny. And, because this Court is not bound by the holdings in these cases, this Court rejects the holdings for the reasons set forth herein. Section 53.156 is a very specific statute, whereas § 53.023, while specific, is not as specific as § 53.156. Section 311.026 of the Texas Government Code states, "If the conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment and the manifest intent is that the general provision prevail." Tex. Gov't Code Ann. § 311.026(b) (West 2010). Moreover, several Texas courts have held that a specific statute governs over a general statute, regardless of the order in which the statutes were enacted. <u>Powell v. State</u>, 632 S.W.2d 842, 844 (Tex.App.-Houston [14th Dist.] 1982, no writ); <u>Cuellar v. State</u>, 521 S.W.2d 277, 279 (Tex.Crim.App.1975). The principle behind the general rule—that general statutes are limited or controlled by specific statutes—is that a specific statute "more clearly evidences the intention of the Legislature." <u>City of W. Lake Hills v. Westwood Legal Def. Fund</u>, 598 S.W.2d 681, 682 (Tex.Civ.App.-Waco 1980, no writ). Accordingly, because § 53.156 is more specific than § 53.023, this Court concludes that it does have discretion to award attorneys' fees to Halgo because the suit at bar: (i) is governed by § 53.156; and (ii) has been an action whereby Amegy has attempted to convince this Court that Halgo has no valid lien in the first instance, or, even if it does, Halgo's lien is inferior to the lien of Amegy.

<u>Bigler</u>, 458 B.R. at 387 (footnotes omitted).

     41.     Further, the <u>Bigler</u> Court cited a number of decisions that have either implicitly or expressly awarded attorneys' fees and costs to mechanic's lienholders despite the existence of § 53.023. <u>See</u> <u>Bigler</u>, 458 B.R. at 387-88 (citing <u>Roland v. Gen. Brick Sales, Inc.</u>, 818 S.W.2d 896, 897 (Tex.App.-Fort Worth 1991, no writ); <u>Gill Sav. Ass'n v. Int'l Supply</u>, 759 S.W.2d 697, 702 (Tex.App.-Dallas 1988, writ denied)); <u>Efficient Energy Sys., Inc. v. J. Hoyt Kniveton, Inc.</u>, 631 S.W.2d 538, 540 (Tex.App.-El Paso 1982, no writ); <u>Brooks v. Erbar</u>, 186 S.W.2d 372, 376–77

---

[10]     Section 53.156 of the Texas Property Code, titled "Costs and Attorneys Fees" provides: "In any proceeding to foreclose a lien or to enforce a claim against a bond issued under Subchapter H, I, or J or in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part, the court <u>shall award</u> costs and reasonable attorney's fees as are equitable and just. With respect to a lien or claim arising out of a residential construction contract, the court is not required to order the property owner to pay costs and attorney's fees under this section." (emphasis added)

(Tex. App.1945, writ ref'd w.o.m.); <u>Garza v. Hammond</u>, 39 S.W. 610, 611 (Tex.Civ.App.1897 writ ref'd)).

42.     The <u>Bigler</u> Court further found that, even if it was wrong, and there was a conflict between § 53.023 and § 53.156, there is a second basis to permit the construction lienholder to recover its attorneys' fees because the construction lienholder could still recover its attorneys' fees under Texas Civil Practice and Remedies Code § 38.001, which unambiguously provides that a person may recover attorneys' fees if the claim is for "(1) rendered services, (2) performed labor; (3) furnished material." <u>Bigler</u> 458 at 388 (<u>citing</u> Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (West 2010)). In support of its analysis, the <u>Bigler</u> Court cited the decision of in <u>West v. Triple B Services LLP</u>, 264 S.W.3d 440, 451 (Tex. App.-Houston [14th Dist.] 2008, no pet.) in which the court upheld the trial court's award of attorneys' fees, expressly noting that the appellee had pleaded for attorneys' fees under both § 53.156 of the Property Code and § 38.001 of the Civil Practice and Remedies Code. See <u>Triple B Services</u>, 264 S.W.3d at 451 ("However, we need not address Classic's contention that the trial court erred in awarding the full amount of attorney's fees under Chapter 53, because the record supports an alternative basis for awarding the full amount of attorney's fees against Classic. Triple B's petition included a claim for breach of contract, and Triple B pleaded for attorney's fees under both Property Code section 53.156 and Civil Practice and Remedies Code section 38.001, which allows a party to recover reasonable attorney's fees for a valid claim on an oral or written contract.")

43.     Additionally, the Debtors' argument that attorneys' fees and expenses should not be permitted because it arose by operation of law, rather than pursuant to a contract, is similarly unavailing. The language of Section 506(b) is clear:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the

amount of such claim, there shall be allowed to the holder of such claim, interest
on such claim, and any reasonable fees, costs, or charges provided for under the
agreement **or State statute under which such claim arose**.

11 U.S.C. § 506(b) (emphasis added). In this case, the claim arose under and pursuant to Texas

law, which addresses claims of mechanics and materialmen, such as the construction lienholders

here.

44.     The fact that the Texas Bankruptcy Court allowed attorneys' fees and expenses in

Bigler is telling, particularly since Bigler was decided after In re EnRe LP, 457 F.3d 493, 494 (5th

Cir. 2006), the Fifth Circuit decision cited in the Debtors' motion, and the Texas Bankruptcy Court

was bound by decisions of the Fifth Circuit.  EnRE is highly distinguishable and has been

superseded by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and was

interpreting the prior version 506(b). See EnRe LP, 457 F.3d at 494 ("Congress recently amended

§ 506(b) as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L.

No. 109-8, 119 Stat. 23. . . . .Nonetheless, as the parties agree, the Act's amendments are not

retroactive, and the prior version of the statute controls. See id. § 1501, 119 Stat. at 216.").[11]

Accordingly, the Debtors' reliance on EnRe is misplaced.

45.     Based upon the applicable Texas statutes, as set forth in Bigler and other cases

decided by Texas courts[12], this Court should conclude that construction lienholders are entitled to

legal fees and expenses, and raise any reserve accordingly.

---

[11]     As this Court likely recalls, prior to BAPCPA, Section 506(b) of the Bankruptcy Code allowed to the holder
of an oversecured claim is entitled to "interest on such claim, and any reasonable fees, costs, or charges provided for
under the agreement under which such claim arose." Section 506(b) now provides that the holder of an oversecured
claim is entitled to "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement
or state statute under which such claim arose."(emphasis added).

[12]     In the event and to the extent that construction lienholders have contractual provisions which specifically
provide for legal fees and expenses, those contractual provisions may be an alternative basis for allowance.

3.   Construction lienholders are entitled to interest.

46.   The Texas Prompt Pay for Contractors and Subcontractors Act, set forth at Texas Property Code §§ 28.001-28.004 could not be clearer: "If any owner or person authorized to act on behalf of the owner receives a written payment request from a contractor for an amount that is allowed to the contractor under the contract for properly performed work or suitably stored or specially fabricated materials, the owner shall pay the amount to the contractor, less any amount withheld as authorized by statute, not later than the 35th day after the date the owner receives the request." Tex. Prop. Code § 28.002. Any unpaid amount required under this chapter begins to accrue interest on the day after the date on which the payment becomes due, Tex. Prop. Code § 28.002(a), and the unpaid amount bears interest at the rate of 1.5% per month. Tex. Prop. Code § 28.002(b). Such interest on an unpaid amount stops accruing under this section on the earlier of (i) the date of delivery, (ii) the date of mailing, if payment is mailed and delivery occurs within three days; or (iii) the date a judgment is entered in an action brought under this chapter. The sole exception is whether there is a good faith dispute with respect to the amount owed for a payment requested, in which case the responsible party may withhold from the payment owed not more than 100 percent of the difference between the amount that the obligee claims is due and the amount that the obligor claims is due. Tex. Prop. Code § 28.003.

47.   Further, the case law with respect to interest under the Texas Prompt Pay Act is unambiguous: As a matter of right, contractors are entitled to prejudgment when an ascertainable sum of money is found due and payable at a definite date before judgment. See, e.g., Gordon v. Leasman, 365 S.W.3d 109, 118-19 (Tex. App.—Hous. [1st Dist.] 2011) (citing Jarrin v. Sam White Oldsmobile Co., 929 S.W.2d 21, 24 (Tex. App.-Houston [1st Dist.] 1996, writ denied); Henry Bldg., Inc. v. Milam, No. 05–99–01400–CV, 2001 WL 246882, at *3–4 (Tex. App.-Dallas Mar.

14, 2001, pet. denied)). See also Zorrilla v. Aypco Const. II, LLC, 469 S.W.3d 143, 158 (Tex. 2015); RAJ Partners, Ltd. v. Darco Construction Corp., 217 S.W.3d 638, 646 (Tex. App.— Amarillo 2006, no pet.); Patel v. Creation Const., Inc., 2013 WL 1277874, *4 (Feb. 27, 2013 Tex. App.-Dallas). Further, Texas Courts have held that trial courts do not even have the equitable power to toll the accrual of prejudgment interest under the Prompt Payment to Contractors Act. See, e.g., AMX Enterprises, L.L.P. v. Master Realty Corp., 283 S.W.3d 506, 510-12 (Tex. App. – Ft. Worth 2009). Ulmer v. Moore, 2012 WL 3238241, *3 (Tex.App.-Amarillo (Tex. App. – Amarillo, Aug. 9, 2012).

48.     Based upon the clear language of the Texas Prompt Pay Act and the Texas decisions addressing claims for interest due to mechanics and materialmen for unpaid invoices, and consistent with Section 506(b), unless and until the Debtors remitted payment or received a judgment, interest of 1.5% per month[13] has been and continues to accrue upon the underlying obligations to construction lienholders unless there is a good faith dispute with respect to those invoices. Accordingly, any reserve must necessarily include a provision for interest which has and will continue to accrue until such time as the construction liens claims are satisfied.

### C.    The Debtors' Proposed Resolution Does Not Resolve the Underlying Issues and Would Prejudice Construction Lienholders

49.     The Construction Lienholder Group wants the Debtors to be able to make distributions to construction lienholders, but the proposed procedures simply do not work. And there is no need for a reserve at this point. Throughout this case, the Debtors, and substantially all of the major constituencies have advised that the most important thing is to get to and through the

---

[13]     In the event and to the extent that construction lienholders have contractual provisions which provide for payment of interest on account of late-paid or unpaid invoices, those contractual provisions may be an alternative basis for allowance of interest on account of those lienholders' claims.

sale process. In that vein, the Debtors, the Committee, DAK and Inbursa all filed objections resisting the Construction Lienholders Group's Automatic Stay Motion, arguing that granting such relief was premature.

50. It is therefore ironic that the Debtors seek entry of an Order that would seek to satisfy their obligations through a prematurely establishing a reserve and the Lienholder Reserve Administration Procedures, particularly in light of the fact that there has not yet been any determination as to the relative priority of the claims of the secured creditors, and it would prejudice constructive lienholders by forcing the Court to make a determination as to important legal issues during a hearing where this Court already has scheduled (i) a highly contested matter between the Committee and DAK for the subordination and/or recharacterization of DAK's claim, (ii) a (presumably) contested motion to approve the sale of the Debtors' most valuable assets, and (iii) at least two automatic stay motions.

51. As noted herein, the proposed reserve and related procedures which would not account for potentially significant claims, which would significantly prejudice construction lienholders. The Construction Lienholder Group expects that the balance of the money received from the sale of the Corpus Christi Plant will go to Inbursa and/or DAK on account of their secured claims. Of course, once that money has been transferred to Mexico, if the proposed reserve ultimately proves to be insufficient, getting the money back will be virtually impossible and will leave the construction lienholders with few viable options to receive payment on account of their claims.

52. Additionally, the Lienholder Reserve Administration Procedures seeks to allow to the Debtors to reduce the amount of the Lienholder Claims Reserve and remove without need for court order, the full amount of each reserved claim every time the Debtors enter into a settlement

with a construction lienholder. Further, by the Lienholder Reserve Administration Procedures, there would never be available any reserve amounts for any lienholder whose claim (or claims) exceed the amounts in the chart attached to the Reserve Motion.

53.     It is telling that in his declaration, Mr. Stogsdill could not affirmatively state that the proposed reserve is accurate with respect to duplicative claims. See Stogsdill Declaration ¶ 10 ("In developing the proposed Lienholder Claims Reserve, the Debtors have used their good faith best efforts to eliminate the Duplicated Liabilities.") The Construction Lienholder Group has no doubt that Mr. Stogsill and the other people tasked by the Debtors to evaluate the construction liens did their best to evaluate all of the liens accurately, but "good faith best efforts" are not synonymous with "accurate." 34 Accepting that the Debtors used good faith best efforts does not mean that there will not be more claims than what was anticipated.

54.     Because the Lienholder Reserve Administration Procedures specifically contemplate that there will not be any money available in the proposed reserve to pay a construction lienholder if the liens turn out to be larger than they expect, if (i) legal fees are subsequently allowed, (ii) interest on account of construction liens are allowed, (iii) the Debtors' analysis with respect to duplication of claims turns out to be incorrect, or (iv) for any other reason by which there are more claims than the Debtors anticipated.[14]  Accordingly, if despite their best good faith efforts, Mr. Stogsdill and the Debtors are wrong, and the money is gone, there will no adequate means to compensate those construction lienholders for whom there is no money available to pay their valid claims.

55.     Rather than improvidently entering an order that does not account for all potential

---

[14]     There are any number of other reasons why the liens could be larger than anticipated, including but not limited to excusable neglect by the lienholder, or an error by the Debtors, its professionals, or the Debtors' claims agent.

claims, the Construction Lienholder Group respectfully submits that this Court should require that the Debtors provide adequate protection to construction lienholders by establishing a reserve in an the amount equal to 150% of the $350,149,728.43 of construction liens ($525,224,592.60).[15]

**D.      Nothing in the Reserve Motion Should Prejudice Construction Lienholders**

56.      By and through the Reserve Motion, the Debtors have implicitly asserted that construction lienholders are subject to certain "levels" based upon the parties with whom they contracted.  See Reserve Schedule attached as Exhibit C to the Reserve Motion.  Nothing in the Reserve Motion seeks a factual or legal determination as to the level (or levels) of each lienholder, and nothing in the Reserve Motion should be determinative or prejudice constructive lienholders with respect to the level (or levels) of each lienholder.

## RESERVATION OF RIGHTS

57.      The Construction Lienholder Group expressly reserves and preserves its right to supplement this objection, including but not limited to any facts learned from the deposition of Mr. Stogsdill, and to join in any other well-founded objections not inconsistent with this objection.

[Remainder of Page Left Intentionally Blank]

---

[15]      Obviously, to the extent that the sale proceeds are less than $525,224,592.60, all sale procedures should be held pending a determination as to the underlying claim amounts, or a determination as to the relative priority of Inbursa, DAK, and construction lienholders.

WHEREFORE, the Construction Lienholder Group respectfully requests that the Reserve Motion be denied, absent significant and substantive changes that will provide adequate protection to construction lienholders, including denying any disbursement of any sale proceeds unless the Debtors establish a reserve sufficient to ensure payment of all construction liens, including interest, legal fees, and expenses in full.

Dated: March 16, 2018

**MORRIS JAMES LLP**

Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899-2306
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: ckunz@morrisjames.com
E-mail: jwaxman@morrisjames.com
E-mail: emonzo@morrisjames.com

*Counsel to the Construction Lienholder Group*