# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| M & G USA CORPORATION, *et al.*,[1] | Case No. 17-12307 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Ref: Docket No. 1075** |

## DEBTORS' OMNIBUS REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF AN ORDER ESTABLISHING A LIENHOLDER CLAIMS RESERVE AND GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this omnibus reply (this "Reply") in support of, the *Debtors' Motion for Entry of an Order Establishing a Lienholder Claims Reserve and Granting Related Relief* (Docket No. 1075) (the "Motion").[2] In support of this Reply, the Debtors respectfully represent as follows:

### Preliminary Statement

1. From the inception of these Chapter 11 Cases, all key stakeholders have been aware of, and many have participated in, the Debtors' development of a strategy to provide a reserve for the satisfaction of Lienholder Claims. Paragraph B(vii) of the Final DIP Order, for example, reflects the Court's resolution of a disagreement between the Debtors and the Construction Lienholder Group over the appropriate wording for the Court's role in setting the

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

NAI-1503538468v2

amount of the Lienholder Claims Reserve. Final DIP Order, at ¶ B(vii). From the outset, the structure of the Debtors' postpetition financing facility (the "DIP Facility") contemplated that the Court would establish an appropriate reserve from available proceeds of the sale of the Corpus Christi Plant to provide for the satisfaction of Senior Prior Lien claims. This structure is intended to protect the interests of Lienholders while allowing (a) holders of potentially junior secured claims to credit bid for the Corpus Christi Plant assets and (b) Control Empresarial de Capitales, S.A. de C.V. (the "DIP Lender"), Banco Inbursa, S.A. ("Inbursa") and potentially DAK Americas, LLC ("DAK") and other claim holders to promptly recover at least a portion of the proceeds of such sale on account of their claims without waiting unnecessarily for months or possibly years for the validity, amount and priority of each and every Lienholder Claim to be established by settlement or litigation.

2. The DIP Facility provided the Debtors with the liquidity crucial to funding these Chapter 11 Cases and the sale process, which process adequately protected the Lienholders' interests and from which they stand to gain greatly. As the Court made clear in the final hearing approving the DIP Facility:

> I also find that there is additional adequate protection provided [to the mechanics' lien claimants] by virtue of the process that is contemplated within the DIP financing order and in tandem the bid procedures order, which provide funding and a path to a very prompt disposition of their collateral in a process that has been designed and considered by the court with the intention of maximizing value for all creditors and all stakeholders, including the mechanics' lien claimants.

*See* Tr. of 12/12/2017 Hr'g, at 98.

3. The Debtors' Motion seeking to establish the Lienholder Claims Reserve, consistent with the Final DIP Order and the Lienholder Identification Order, was generally well received by Lienholders. As discussed below, in response to constructive formal and informal comments received from parties in interest, the Debtors have made several adjustments to the

-2-

Lienholder Schedule to modify (a) relationships among Lienholders, (b) amounts asserted as subject to any Lienholder Claim or (c) the satisfaction of lower tier Lienholder Claims by higher tier Lienholders. In addition, the Debtors propose certain modifications to the Lienholder Claims Reserve Administration Procedures, as described below.

4. Of the approximately 229 Lienholder Claims reflected on the Lienholder Schedule, a total of 12 parties filed formal objections, joinders, reservations of rights or other responses (collectively, the "Responses") to the Motion. Of these Responses, (a) four were filed by parties that do not purport to hold Lienholder Claims[3] and (b) four more were filed by the Construction Lienholder Group or certain of its 22 members.[4] Several of the Responses question the Court's authority to establish the Lienholder Claims Reserve or suggest that the Court must defer completely to provisions of Texas law in establishing it. In addition, certain of the Responses demand that the Debtors inflate the proposed Lienholder Claims Reserve further to provide specific coverage for Interest and Fee Claims that are, at best, speculative. For the reasons set forth below, the Debtors dispute these contentions and certain other arguments raised in the Responses and believe that the establishment of the Lienholder Claims Reserve, as modified herein, is in the best interests of the Lienholders and other parties in interest in these Chapter 11 Cases.

**The Revised Lienholder Schedule**

5. The Debtors' modifications to the Lienholder Schedule are summarized below. Attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively, are a revised Lienholder

---

[3] *See* Responses of (a) the DIP Lender and Inbursa (Docket No. 1185), (b) DAK Americas, LLC ("<u>DAK</u>") (Docket No. 1197), (c) Banco Nacional de Comercio Exterior, S.N.C. ("<u>Bancomext</u>") (Docket No. 1184) and (d) Macquarie Investments US Inc. ("<u>Macquarie</u>") (Docket No. 1198).

[4] *See* Responses of (a) the Construction Lienholder Group (Docket No. 1199), (b) Fagioli, Inc. ("<u>Fagioli</u>") (Docket No. 1168); (c) MMR Constructors, Inc. ("<u>MMR</u>") (Docket No. 1201) and (d) TCI Business Capital ("<u>TCI/IMS</u>") (Docket No. 1202).

-3-

Schedule (the "Revised Lienholder Schedule") and a redline document showing the modifications to the original Lienholder Schedule. These modifications result in a net increase to the proposed Lienholder Claims Reserve of $629,985.02 to $350,779,713.45.

(a) Fagioli. In connection with the Response of Fagioli, and based upon the representations made therein, the Debtors have reallocated to Fagioli certain amounts previously allocated to Fagioli's subcontractors, whose claims Fagioli asserts it has now satisfied. Fagioli Response, at ¶ 9-10; 16-23. This reallocation has no effect on the aggregate amount of the Lienholder Claims Reserve.[5]

(b) Momentum Rental and Sales, Inc. The Debtors received informal communications from counsel to Momentum Rental and Sales, Inc. ("Momentum") clarifying that Momentum's Statement of Lien Form asserted unsecured liabilities that are intended to be discrete from the liabilities asserted in its Lien Affidavit. Accordingly, the Debtors have reserved the full amount asserted in Momentum's Lien Affidavit ($106,450.75) as an Individual Reserve Amount for Momentum under Fagioli and reduced Fagioli's Individual Reserve Amount by that amount to avoid reserving twice for the same liability. This reallocation has no net effect on the aggregate amount of the Lienholder Claims Reserve.

(c) Ahern Rentals, Inc. The Debtors received informal communications from Ahern Rentals, Inc. ("Ahern") indicating that the Debtors had omitted one of the ten Lien Affidavits filed by Ahern from the Lienholder Schedule, relating to a contract between Ahern and Integrity Mechanical Specialists, LLC ("IMS"). The Debtors have added the additional Ahern Lien Affidavit in the amount of $139,205.34 and have discounted the IMS Lien Affidavit by the same amount. This inclusion has no net effect on the aggregate amount of the Lienholder Claims Reserve.

(d) Cital US, LLC. In connection with the Response (Docket No. 1183) filed by Cital US, LLC ("Cital"), the Debtors have added $1,059,941.52 – the principal amount asserted by Cital in its Response and Statement of Lien Form – to the Lienholder Claims Reserve on behalf of Cital under Chemtex International, Inc. ("Chemtex").[6]

(e) Sinopec Engineering Group America, LLC. Sinopec Engineering Group America, LLC and Sinopec Engineering (Group) Co., Ltd. (together "Sinopec") asserts in its Response (Docket No. 1190) that the subcontractors allocated to Sinopec in the Lienholder Reserve Schedule did not provide goods or services under any contract with Sinopec. Sinopec Response, at ¶ 17. Upon further analysis, the Debtors believe that these Lienholder Claims

---

[5] In addition, the Debtors have reduced the Individual Reserve Amount for one of Fagioli's subcontractors, TNT Crane and Rigging, Inc., to $495,066.28 to eliminate a Duplicated Liability noted by Fagioli in its Objection. Id. at ¶ 11-15. This modification also has no effect on the aggregate Lienholder Claims Reserve.

[6] Based upon the Debtors' analysis, Cital was the only party to assert a lien under the Texas Constitution in a Statement of Lien Form that did not also file a statutory Lien Affidavit reflected in the original Lienholder Schedule.

-4-

should be reallocated to Chemtex. This revision increases the amount of the Lienholder Claims Reserve by $574,719.25.

(f) <u>Macquarie Investments US Inc.</u> Following informal communications with counsel to Macquarie Investments US Inc. ("<u>Macquarie</u>"), the Debtors agreed to annotate the Revised Lienholder Schedule to reflect amounts that they have identified as asserted with respect to work performed on assets of M&G Waters USA, LLC. These annotations have no effect on the aggregate amount of the Lienholder Claims Reserve.

(g) <u>Additional Duplicated Liabilities.</u> Following the filing of the Motion, the Debtors identified the following additional Duplicated Liabilities in the Lienholder Schedule: (i) a duplicative Individual Reserve Amount assigned to CCC Group, Inc. in the amount of $596,872.02 and (ii) an Individual Reserve Amount assigned to Mechanical Reps Inc. that had not been discounted from the Individual Reserve Amount of its contract counterparty, Mechanical Innovation, Inc., in the total amount of $407,803.73. The Revised Lienholder Schedule reflects the elimination of these duplicative amounts.

## The Revised Lienholder Claims
## Reserve Administration Procedures

6. Certain Lienholders note in their Responses that any reduction of the Lienholder Claims Reserve by the full Individual Reserve Amount allocated to a lower tier Lienholder – upon settlement, adjudication or assumption of the applicable liability, for example – could potentially have a detrimental effect on the rights of any higher tier Lienholder from whose Lienholder Claim that Individual Reserve Amount was discounted in the Lienholder Claims Reserve. *See* TCI/IMS Response, at ¶ 10; MMR Response, at ¶ 10.

7. The Debtors acknowledge this concern and propose that the Lienholder Claims Reserve Administration Procedures be modified to provide that:

(a) With respect to any Lienholder Claims on account of which no other Lienholder Claim has been discounted under the Revised Lienholder Schedule, upon the settlement, adjudication or assumption (whether directly via assumption of the lien or by assumption and cure of any underlying contract pursuant to section 365 of the Bankruptcy Code) of the Lienholder Claim, the Lienholder Claims Reserve shall be reduced by the Individual Reserve Amount allocated to such Lienholder Claim.[7]

---

[7] Fluor argues in its Response that the funds in the Lienholder Claims Reserve should be maintained until all Lienholder Claims have been resolved. Fluor Response, at ¶ 5(b). The Debtors believe that this proposed modification addresses that argument.

-5-

(b) With respect to any Lienholder Claims on account of which one or more other Lienholder Claims have been discounted under the Revised Lienholder Schedule, upon the settlement, adjudication or assumption of the Lienholder Claim the Lienholder Claims Reserve shall be reduced by the Individual Reserve Amount allocated to such Lienholder Claim <u>provided</u> that all Lienholder Claims arising under direct or indirect contracts with such discounted Lienholder Claims (other than Chemtex) are also resolved in connection with such settlement, adjudication or assumption, and the Lienholder Claims Reserve shall also be reduced by the Individual Reserve Amount allocated to such Lienholder Claims.

(c) With respect to any Lienholder Claims on account of which one or more other Lienholder Claims have been discounted under the Revised Lienholder Schedule and with respect to which any settlement, adjudication or assumption does not also resolve all Lienholder Claims arising under direct or indirect contractual relationships with such discounted Lienholder Claims (other than Chemtex) the Lienholder Claims Reserve shall be discounted by such amount as the Court may determine.

(d) The Debtors (or such other party as the Court may authorize to administer the Lienholder Claims Reserve) may request authority to reduce the amount of the Lienholder Claims Reserve no sooner than 120 days following the closing date of the sale and every 120 days thereafter.

8. The Debtors believe that these revisions to the Lienholder Claims Reserve Administration Procedures protect the interests of higher tier Lienholders while preserving as much as possible the efficient administration of the Lienholder Claims Reserve.

9. In addition, in response to a request from Inbursa and the DIP Lender, the Debtors intend to modify the Lienholder Claims Reserve Administration Procedures to the extent necessary to provide that the Lienholder Claims Reserve shall be subject to the Lienholder Claims Reserve Administration Procedures or such other administrative procedures as the Court may approve in connection with its approval of any sale. *See* Inbursa/DIP Lender Response, at ¶ 35-36.

---

Fluor was also the only party to state that it does not understand the relationships among Level 1 through Level 5 Contractors, as depicted in the Lienholder Schedule. *Id.* at ¶ 5(a). Level 1 Contractors contracted directly with M&G Resins. Any Level 2 Contractor contracted directly with the immediately preceding Level 1 Contractor (only Chemtex under the Revised Lienholder Schedule). Any Level 3 Contractor contracted directly with the preceding Level 2 Contractor, and so on. Hence Fluor is identified as a Level 1 Contractor with respect to its lien arising from its contract with M&G Resins, the owner, and a Level 2 Contractor with respect to its lien arising from its contract with Chemtex.

NAI-1503538468v2

**REPLY**

### A. The Court is Authorized to Approve the Lienholder Claims Reserve

10. The Court is authorized to estimate the amount of the Lienholder Claims for purposes of establishing the Lienholder Claims Reserve under section 105(a) of the Bankruptcy Code. The Construction Lienholder Group's argument that section 105(a) can be used only where another provision of the Bankruptcy Code already provides an independent basis for the relief goes too far and would render section 105(a) a nullity. See Construction Lienholder Group Response, at ¶ 30-31. Certainly, courts are not authorized to invoke section 105(a) in a manner that directly conflicts or otherwise is inconsistent with other provisions of the Bankruptcy Code. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) ("The general grant of equitable power contained in [section] 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself."). Nevertheless, section 105(a) provides the basis upon which bankruptcy courts "are able to craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567-68 (3d Cir. 2003). Here, the establishment of the Lienholder Claims Reserve is consistent with various provisions of the Bankruptcy Code – including the estimation of claims pursuant to section 502(c) and the authority for courts to grant adequate protection to holders of interests in property under section 363(e) of the Bankruptcy Code – and does not conflict with any other provision. Accordingly, the Court possesses authority to authorize establishment of the Lienholder Claims Reserve under section 105(a) of the Bankruptcy Code.

### B. The Proposed Amount of the Lienholder Claims Reserve Is Reasonable and Conservative

11. Couching the Motion in terms of a request for adequate protection under section 363(e) of the Bankruptcy Code, several objecting parties argue that Texas law requires the Court to condition the free-and-clear sale of the Corpus Christi Plant upon the posting of a bond in the amount of 150% of the face amount of Lienholder Claims (or approximately $1.2 billion in the aggregate). *See* Construction Lienholder Group Response, at ¶ 32-35; Response of Fluor Enterprises, Inc. ("Fluor") (Docket No. 1195), at ¶ 5(c). The fact that the Court's authority is not restricted to this practical impossibility is to the benefit of all parties, including the Lienholders themselves.

12. The Construction Lienholder Group's reliance on *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15 (2000) and *Butner v. United States*, 440 U.S. 48 (1979) for its argument that the Court is constrained in approving the reserve by the 150% bonding requirement under Texas law is misplaced. Construction Lienholder Group Response, at ¶ 35. As a threshold matter, the statements in both *Raleigh* and *Butner* that state laws generally define the extent of a party's interest in property are expressly subject to any limitations or qualifications of federal law. *See Raleigh*, 530 U.S. at 20 ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, *subject to any qualifying or contrary provisions of the Bankruptcy Code*.") (emphasis added); *Butner*, 440 U.S. at 55 ("*Unless some federal interest requires a different result*, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.") (emphasis added).

13. More significantly, the fact that property interests generally are determined with reference to applicable state law in no way compels the Court to defer to Texas

-8-

bonding requirements in determining what constitutes adequate protection of those interests. To the contrary, courts agree that "exactly what constitutes adequate protection must be decided on a case by case basis." *In re Revel AC, Inc.*, 525 B.R. 12, 30 (D.N.J.) *rev'd on other grounds* 802 F.3d 558 (3d Cir. 2015); *see also Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994) ("a determination of whether there is adequate protection is made on a case by case basis"); *Sharon Steel Corp. v. Citibank, N.A. (In re Sharon Steel Corp.)*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for. The means of adequate protection provided by section 361 are not exclusive. Exactly what constitutes adequate protection must be decided on a case by case basis.") (citations omitted). "Given this, adequate protection would not appear to require full, nor ideal, protection. Rather, adequate protection would appear to include that which suffices under the circumstances." *Revel AC*, 525 B.R. at 30. In this case, any ruling that a purchaser could adequately protect the interests of Lienholders only by satisfying the Texas Property Code's 150% bonding requirement almost certainly would doom the sale of the Corpus Christi Plant assets.

14. In addition to being unavailable as a practical matter, the posting of 150% of the face amount of Lienholder Claims would provide unnecessary and extravagant levels of protection to the Lienholders because many of the liabilities asserted in the Lienholder Claims are duplicated in other Lienholder Claims. The Debtors reasonably determined, based on the analysis of their special mechanics' lien counsel, that the liabilities asserted in Lienholder Claims of subcontractors generally are duplicated in the Lienholder Claims of the parties with whom they contracted. This determination is consistent with applicable law[8] and has been borne out:

---

[8] *See*, *e.g.*, Tex. Prop. Code Ann. § 53.153 (providing that a property owner may deduct the amount of any judgment and costs issued to a subcontractor from the claim of the applicable original contractor).

NAI-1503538468v2

(a) in settlement negotiations with higher tier Lienholders, which typically have contemplated that the contractor would satisfy and obtain releases of the liens asserted by its subcontractors; (b) by Lienholders' formal and informal responses to the Motion, which sometimes suggested revisions to the Lienholder Schedule but do not generally dispute the methodology upon which it is based; and (c) by the absence of Objections from many Lienholders, all of whom received notice of the Motion. In addition, the Debtors reasonably determined that certain of the Lienholder Claims are duplicative of other Lienholder Claims asserted by the same Lienholder.[9] Accordingly, the Debtors believe that the de-duplication process has been an effective means of avoiding over-inflation of the Lienholder Claims Reserve while protecting Lienholder interests.

15. The Motion does not seek the *de facto* disallowance of $450,000,000 in secured claims, as dramatically claimed by various objecting parties. *See* Response of AC Plastiques USA, LLC ("AC Plastiques") (Docket No. 1160), at ¶ 5; MMR Response, at ¶ 10; TCI/IMS Response, at ¶ 10; Construction Lienholder Group Objection, at ¶ 36-38. The purpose of the Motion is to establish a conservative but reasonable reserve that is expected in good faith to be ample to fully satisfy the Lienholder Claims in the amounts ultimately allowed. The need for this reserve is conceded by the Construction Lienholder Group at least (*see* Construction Lienholder Group Objection, at 2) and has been contemplated by all key parties since the outset of these Chapter 11 Cases. To protect the interests of Lienholders, the Debtors did not discount in any way the principal amount of any of the Lienholder Claims beyond the de-duplication process described above, even though the Debtors believe that substantial defenses and/or counterclaims exist with respect to many Lienholder Claims, which the Debtors anticipate will have a material impact on their aggregate allowed amount. Thus, the establishment and amount

---

[9] In its comprehensive Response, Fagioli, for example, does not dispute that the eight liens it filed ranging in amount from approximately $11.6 million to $14.6 million are duplicative of each other. *See* Fagioli Response, at ¶ 1-24.

of the Lienholder Claims Reserve (a) adequately protects the interests of the Lienholders, (b) affords the DIP Lender, Inbursa and DAK the benefit of their bargain in jointly providing for the financing of these Chapter 11 Cases and the sale process and (c) allows potential purchasers of the Corpus Christi Plant to credit bid their secured claims.

16. The Debtors agree with the DIP Lender and Inbursa that the Lienholder Claims Reserve potentially could be further reduced to reflect available counterclaims and defenses while still providing sufficient protection of Lienholders' interests. Inbursa/DIP Lender Response, at ¶ 3. Nevertheless, the Debtors believe that the inclusion in the Lienholder Claims Reserve of every Lienholder Claim in its face amount, subject only to reduction on account of the Duplicated Liabilities and for any liquidated Interest and Fee Claims, is appropriate because it better balances protecting Lienholders' interests from unfair risk without the need for mini-trials on specific claims while still promoting a successful sale and providing for an expeditious distribution of remaining sale proceeds.

C. **The Lienholders Have No Secured Entitlement to Attorney's Fees**

17. Several Responses assert an entitlement to attorney's fees as provided for by Section 53.156 of the Texas Property Code, Section 38.001 of the Texas Civil Practice and Remedies Code and/or other provisions of Texas law. *See, e.g.,* Construction Lienholder Group Response, at ¶ 39-42; Sinopec Response, at ¶ 13-14. Any such entitlements are unsecured, however, because they are not included within the exclusive list of items secured by a lien under Section 53.023 of the Texas Property Code, as explained in the Motion.

18. The *Bigler* case relied upon by the Construction Lienholder Group and Sinopec is an outlier. In fact, of the five cases that the Construction Lienholder Group claims *Bigler* cites in support of its position, three are inconsistent or adverse. *See Amegy Bank N.A. v. Brazos M & E, Ltd. (In re Bigler)*, 458 B.R. 345 (Bankr. S.D. Tex. 2011) (citing, under the signal

"*but see*," *Efficient Energy Sys., Inc. v. J. Hoyt Kniveton, Inc.*, 631 S.W.2d 538, 540 (Tex. App. El Paso 1982, no writ), which reversed an order of attorney's fees under prior law, *Brooks v. Erbar*, 186 S.W.2d 372, 376–77 (Tex. Civ. App. 1945, writ ref'd w.o.m.) and *Garza v. Hammond*, 39 S.W. 610, 611 (Tex. Civ. App. 1897 writ ref'd). Moreover, the two cases actually cited by the *Bigler* court in support of its position merely confirm the entitlement to attorney's fees provided under Section 53.156 of the Texas Property Code, not that the entitlement is itself part of or secured by the lien. *See Roland v. Gen. Brick Sales, Inc.*, 818 S.W.2d 896, 897 (Tex. App. 1991); *Gill Sav. Ass'n v. Int'l Supply*, 759 S.W.2d 697, 702 (Tex. App.-Dallas 1988, writ denied).

        19.        The *Bigler* court's analysis is incorrect because it resorts to cannons of statutory construction in reliance on the perception of a conflict in the Texas Property Code that does not exist. *Bigler*, 458 B.R. at 387 (reasoning that Sections 53.156 and 53.023 of the Texas Property Code are in conflict and resolving the perceived conflict in favor of Section 53.156 under the justification that it is the more specific statute). None of the courts in the wealth of Texas authority cited by the Debtors in the Motion had any such difficulty harmonizing the plain meaning of Section 53.156 of the Texas Property Code (which provides for an award of such attorney's fees as are equitable and just) with that of Section 53.023 (which does not include attorney's fees among the items included in a lien). *See Palomita v. Medley*, 747 S.W.2d 575, 578 (Tex. App.—Corpus Christi 1988, no writ) (reversing trial court's holding that attorney's fees and interest were included in amount of statutory mechanics' lien; reasoning that "[h]ad the legislature intended the lien to secure payment for attorney's fees and court costs, it logically should have added these to § 53.023 as well."); *Dossman v. Nat;'l Loan Inv'rs, L.P.*, 845 S.W.2d 384, 387 (Tex. App.—Houston [1st Dist.] 1992, writ denied) ("[T]he 1989 amendment does not purport to extend the lien to the attorney's fees, but merely restates that the court may award

attorney's fees."); *In re Crusader Energy Group, Inc.*, 2011 WL 479565, at *5 (Bankr. N.D. Tex. Feb. 3, 2011) ("Under Texas law, prejudgment interest and attorney's fees are not added to the amount for which a mechanic's lien secures payment."); *see also Import Systems Intern. v. Houston Central Industries*, 752 F. Supp. 745, 748 (S.D. Tex. 1990) (agreeing with the analysis of the *Palomita* court); *Ambassador Dev. Corp. v. Valdez*, 791 S.W.2d 612, 624 (Tex. App.—Fort Worth 1990, no writ) (applying an analogous reasoning to *Palomita* in the context of a claim for prejudgment interest).

20. The natural result is simply that the entitlement to attorney's fees is not secured by the lien, which is the precise question at issue here. Since the language is clear and not absurd, it is well established that the legislature "says in a statute what it means and means in a statute what it says there." *Singer v. Franklin Boxboard Co. (In re Am. Pad & Paper Co.)*, 478 F.3d 546, 554 (3d Cir. 2007) (*quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)) (internal quotation marks and citation omitted). Because Section 53.023 of the Texas Property Code does not include any entitlement to costs and attorney's fees among those items that are supported by the lien, neither Section 53.156 nor any similar statutory provision give rise to a *secured* entitlement to such fees.

21. For the same reasons, the Lienholders cannot rely on section 506(b) of the Bankruptcy Code to secure an entitlement to attorney's fees that is not secured under applicable state law. *See* Construction Lienholder Group Response, at ¶ 43-45; Sinopec Response, at ¶ 15-16. Plainly, section 506(b) provides for the allowance of costs and attorney's fees only under "the agreement or State statute under which such [allowed secured] claim arose." 11 U.S.C. § 506(b). Since the weight of Texas authority holds that no entitlement to attorney's

fees is provided for under the statute that gives rise to the Lienholders' secured claims (*i.e.*, Section 53.023 of the Texas Property Code), section 506(b) provides no greater remedy.

### D. The Lienholders Have No Secured Entitlement to Interest Under Texas Law

22. The Construction Lienholder Group cites a variety of cases for the undisputed proposition that a right to payment of interest exists on account of the Lienholder Claims under Texas law. *See* Construction Lienholder Group Response, at ¶ 47. It cites none, however, in support of the proposition that there in any entitlement to interest included in the lien provided for by Section 53.023 of the Texas Property Code.[10] Just as with respect to attorney's fees, the Texas law entitlement to prejudgment interest is not secured by the Lienholders' liens. *See Ambassador Dev. Corp.*, 791 S.W.2d at 624 ("we do agree the Texas Property Code does not make any provision for the inclusion of prejudgment interest in the statutory lien"); *Crusader Energy Group*, 2011 WL 479565, at *5 (holding that Texas mechanic's liens do not secure payment for prejudgment interest). Because the statutory entitlement to interest is not included in the Lienholders' liens, they have no secured claim for prepetition interest under Texas law.

23. Of course, application of section 506(b) of the Bankruptcy Code to postpetition interest differs from costs and attorney's fees because no statutory or contractual right to interest is required under section 506(b). *See United States v. Ron Pair Enters.*, 489 U.S. 235, 235 (1989) (distinguishing between the recovery of postpetition interest, which is unqualified under section 506(b) and fees, costs and charges, which must be provided for in the agreement – or more recently, the statute – under which the claim arose). Nevertheless, any independent entitlement to postpetition interest under section 506(b) of the Bankruptcy Code is speculative because it would require the Lienholders to establish that their secured claims are

---

[10] This point was expressly conceded in the Lienholders' only relevant authority in support of their claim for attorney's fees. *See Bigler*, 458 B.R. at 390 (noting that counsel conceded that no entitlement to prejudgment interest was included in the lien).

allowed and are oversecured following all applicable deductions for the costs of preserving and disposing of the applicable property under section 506(c) of the Bankruptcy Code, none of which has been established. *See* 11 U.S.C. 506(b).

24. Moreover, the rate of postpetition interest that would be payable if Lienholders were able to satisfy the requirements of section 506(b) has not been determined. The Construction Lienholder Group and Sinopec assert that the 18% rate provided for under the Texas Prompt Pay Act applies. *See* Construction Lienholder Group Response, at ¶ 48; Sinopec Response, at ¶ 13; *see also* Tex. Prop. Code Ann. § 28.004 (providing for interest on unpaid amounts at the rate of 1.5% per month). But the Texas Prompt Pay Act applies only to parties (a) that contracted directly with the owner of the property or (b) that contracted with another party that already was paid. *See* Tex. Prop. Code Ann. § 28.002. Since it appears that none of the Construction Lienholder Group's members contracted directly with M&G Resins, such parties would need to establish that the counterparty to their contracts had been paid in full for the Prompt Pay Act rate of 18% potentially to apply under Texas law, let alone under section 506(b) of the Bankruptcy Code.

25. Alternatively, under Texas law, rates provided for in individual agreements among the parties may be applicable or, where no such rates exist, the six percent provided for under the Texas Finance Code. *See* Tex. Fin. Code Ann. § 302.002 (providing an interest rate of six percent where no other rate is specified). Or the Court is authorized to determine that a lesser rate than those provided by Texas statute or the applicable agreements is appropriate based upon a balancing of the equities. *See In re La Guardia Assocs., L.P.*, No. BKR. 04-34512 SR, 2006 WL 6601650, at *38 (Bankr. E.D. Pa. Sept. 13, 2006) (stating that Bankruptcy Courts have "the equitable power and duty to examine the circumstances of the

oversecured creditor in each particular case and consider notions of fairness and equity" in determining the proper interest rate to apply under section 506(b) of the Bankruptcy Code); *In re Nixon*, 404 F. App'x 575, 579 (3d Cir. 2010) (the "Bankruptcy Court may exercise some degree of discretion in determining the appropriate rate of postpetition interest on an oversecured claim") (*quoting In re DeMaggio*, 175 B.R. 144, 148 (Bankr. D.N.H. 1994); *see also In re 400 Walnut Assocs., L.P.*, 473 B.R. 603, 609 (E.D. Pa. 2012) (distinguishing postpetition interest claims under section 506(b) of the Bankruptcy Code from interest claims under section 502 because the rate under section 506(b) is subject to modification by the Court).

26. In summary, the amount of interest payable under section 506(b) of the Bankruptcy Code, if any, is not currently ascertained and may vary between Lienholders. In the event some or all of the Lienholders ultimately are able to demonstrate an entitlement to postpetition interest under section 506(b) of the Bankruptcy Code, the Debtors believe, as stated in the Motion and the accompanying Stogsdill Declaration, that ample cushion exists in the Lienholder Claims Reserve to satisfy such claims. Accordingly, the Debtors should not be required to further inflate the Lienholder Claims Reserve to provide for the satisfaction of these contingent obligations.

### E. The Bancomext Response Should Be Overruled

27. Bancomext objects to the establishment of the Lienholder Claims Reserve because the Debtors have not also sought to establish a separate reserve to satisfy Bancomext's claim under the constructive trust theory of liability described in its Response. Bancomext Response, at 1. For the reasons to be discussed in the Debtors' reply in support of the sale transaction, the Debtors believe that there is no basis under law for Bancomext's speculative theory of liability and unjustified effort to attach its cause of action to the proceeds of any sale of the Corpus Christi Plant. More significantly for the matter before the Court, however,

-16-

Bancomext fails to articulate any reason why its purported entitlement to a separate reserve constitutes grounds for denial of the Motion seeking to establish the Lienholder Claims Reserve, and the Debtors are aware of none. Bancomext is free to present its arguments in connection with the sale of the Corpus Christi Plant, and the Debtors reserve all of their defenses and counterarguments, but the issues raised by Bancomext in its Response are irrelevant to the relief requested in this Motion.

F. **Removables Reserve**

28. Inbursa and the DIP Lender request in their Response that the Debtors establish a reserve as a subset of the Lienholder Claims Reserve related solely to "removables," as defined by Texas law (a "Removables Reserve"), which claims have been alleged to be senior to the Senior Pre-Petition First Lien Obligations (as defined in the Final DIP Order). *See* Inbursa/DIP Lender Response, at ¶ 27-34. The establishment of a Removables Reserve enables Inbursa to credit bid some or all of the Senior Pre-Petition First Lien Obligations only, while protecting the rights of Lienholders with potential removables claims. *Id.* at ¶ 31.

29. Removable improvements are "fixtures which may be removed without material injury to the land and preexisting improvements or to the fixtures themselves." *See First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974); *Exch. Sav. & Loan Ass'n v. Monocrete Pty., Ltd.*, 629 S.W.2d 34, 36 (Tex. 1982). What constitutes a removable is a question of fact but, in general terms, materials that are incorporated into the structure of a building and that cannot otherwise be removed without damage to the building are unlikely to be removable improvements. *E.g.*, *Exch. Sav. & Loan Ass'n*, 629 S.W.2d at 37 (roofing tiles not removables); *Chamberlain v. Dollar Savings Bank*, 451 S.W.2d 518, 520 (Tex. Civ. App.-Amarillo 1970, no writ) (brick used for construction not removable); *Cameron County Lumber Co. v. Al & Lloyd Parker, Inc.*, 62 S.W.2d 63, 65 (1933) (lumber used in structure of building not

removable); *Bigler*, 458 B.R. at 380 (insulation, primer and paint, bolts and gaskets not removable); *In re Orah Wall Fin. Corp.*, 84 B.R. 442 (Bankr. W.D Tex. 1986) (sheet rock, electrical conduit, wiring, junction and wall boxes, insulation not removable). In addition, rental materials and materials standing in laydown yards are not removables because they are not fixtures as required by *Whirlpool*. 517 S.W.2d at 36.

30. In response to Inbursa and the DIP Lender's request, the Debtors have analyzed the Revised Lienholder Schedule and eliminated Lienholder Claims filed by entities that realistically cannot possess allowable removables claims given the nature of the goods and services they provided to develop an estimate of the Debtors' maximum potential liability for removables claims. Attached hereto as Exhibit C and incorporated herein is the Declaration of Pedro Losa (the "Losa Declaration") in further support of the Motion and the sale, which describes the Debtors' analysis and concludes that the aggregate amount of allowable removables claims reasonably cannot exceed $21 million based upon the goods and services provided by the applicable Lienholders, and likely is much less.[11] Accordingly, the Debtors believe that a proposed Removables Reserve in the amount of $25 million would be ample to satisfy all potential removables claims with a comfortable cushion.

---

[11] Mr. Losa also provides testimony in the Losa Declaration as to the date that construction began at the Corpus Christi Plant. This date is relevant to the analysis of removables claims because only removables claims potentially may be senior under applicable Texas law to loans extended prior to the commencement of construction.

31. For the foregoing reasons, the Debtors respectfully request that the Court overrule the Responses to the extent not resolved by this Reply, and grant the relief requested in the Motion.

Dated: March 20, 2018 PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
joneill@pszjlaw.com
jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Email: sgreenberg@jonesday.com
scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-7035
Facsimile: (216) 579-0212
Email: ceblack@jonesday.com

Co-Counsel for the Debtors
and Debtors in Possession