## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | :   Chapter 11 |
|  | : |
| M & G USA CORPORATION, et al., | :   Case No. 17-12307 (BLS) |
|  | : |
| Debtors. | :   (Jointly Administered) |
|  | : |

## NOTICE OF (I) SUCCESSFUL BIDDER
## AND BACKUP BIDDER AND (II) PROPOSED ASSUMED
## AND ASSIGNED EXECUTORY CONTRACTS AND UNEXPIRED
## LEASES IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On March 20, 2018, the Debtors held an auction (the "Auction") for the sale of the Corpus Christi Assets and other related assets in accordance with the *Order (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [Docket No. 490] (the "Bidding Procedures Order").[1]

Prior to the Auction and in accordance with the Bidding Procedures Order, the Debtors, in consultation with the Consultation Parties,[2] designated two (2) bids as Qualified Bids. Following the conclusion of the Auction, the bid by Corpus Christi Polymers LLC was determined to be the Successful Bid and the bid by Banibu II Holdings, Inc. was determined to be the Backup Bid.

The asset purchase agreement for the Successful Bid ("Successful Bid APA") and the proposed sale order approving the Successful Bid are appended hereto substantially in the forms set forth as Exhibit A and Exhibit B, respectively, of Schedule 1 attached hereto. The asset purchase agreement for the Backup Bid (the "Backup Bid APA") and the proposed sale

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order [Docket No. 490] or the Stalking Horse Order, as applicable [Docket No. 719].

[2] The "Consultation Parties" are (a) the DIP Agent and its counsel Thompson & Knight LLP, (b) the DIP Lender and the Pre-Petition First Lien Lender and their counsel Cleary Gottlieb Steen & Hamilton LLP and Young Conaway Stargatt & Taylor, LLP, (c) the Committee and its counsel Milbank, Tweed, Hadley & McCoy LLP and Cole Schotz P.C., (d) with respect to an Apple Grove Bid (as defined in the Bidding Procedures), (i) the United Steelworkers and its counsel Cohen, Weiss and Simon LLP and The Law Office of Susan E. Kaufman, LLC and (ii) Comerica Bank and its counsel Miller Canfield, (e) with respect to matters related to the Corpus Christi Plant at the Auction, the Construction Lienholder Group and its counsel Morris James LLP and (f) Macquarie with respect to any bid involving any assets of or equity in M&G Waters, and its counsel Ashby & Geddes.

order approving the Backup Bid are appended hereto, substantially in the form set forth in <u>Exhibit C</u> and <u>Exhibit D</u>, respectively, of <u>Schedule 1</u> attached hereto.

The Proposed Assumed Contracts being assumed and assigned to the Successful Bidder are included as <u>Exhibit A</u> in <u>Schedule 2</u> attached hereto, and the Proposed Assumed Contracts being assumed and assigned to the Backup Bidder are included as <u>Exhibit B</u> in <u>Schedule 2</u> attached hereto. The inclusion of any Contract on <u>Schedule 2</u> does not constitute an admission that a particular Contract is an executory contract or unexpired lease nor is the inclusion of such Contract a promise or guarantee that such Contract will be assumed or assigned, and all rights of the Debtors with respect thereto are reserved.

Attached as Exhibit C to the Successful Bid APA and as Exhibit B to the Backup Bid APA is the form of Intercompany License.

**The Sale Hearing with respect to the Assets will take place on March 23, 2018 at 9:30 a.m.** before the Honorable Brendan L. Shannon, Chief United States Bankruptcy Judge, in the Bankruptcy Court, located at 824 N. Market St., Wilmington, DE 19801. At the Sale Hearing, the Debtors will present the Successful Bid to the Bankruptcy Court for approval. Presentation of the Successful Bid does not constitute the Debtors' acceptance of such bid. The Debtors will have accepted the terms of the Successful Bid only when such bid has been approved by the Bankruptcy Court pursuant to a Sale Order.

In accordance with the Bidding Procedures Order, any Counterparty to a Proposed Assumed Contract that wishes to object to the proposed assumption, assignment and sale of the Proposed Assumed Contract, the subject of which objection is a Successful Bidder's proposed form of adequate assurance of future performance with respect to such contract (each, an "<u>Adequate Assurance Objection</u>") shall file with the Court and serve on: (i) the Debtors, M & G USA Corporation, 450 Gears Road, Suite 240, Houston, Texas 77067 (Attn: Dennis Stogsdill); (ii) counsel for the Debtors, (1) Jones Day, 250 Vesey Street, New York, NY 100281 (Attn: Scott J. Greenberg, Esq., Michael J. Cohen, Esq. and Stacey L. Corr-Irvine, Esq.) and 901 Lakeside Avenue, Cleveland, OH 44114 (Attn: Carl E. Black, Esq.) and (2) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Attn: Laura Davis Jones, Esq., James E. O'Neill, Esq., and Joseph M. Mulvihill, Esq.); (iii) counsel for the Committee (1) Milbank, Tweed, Hadley & McCoy LLP, 28 Liberty Street, New York, NY 10005 (Attn: Dennis F. Dunne, Esq., Abhilash M. Raval, Esq. and Lauren C. Doyle, Esq.) and (2) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801 (Attn: J. Kate Stickles, Esq. and David R. Hurst, Esq.); (iv) counsel for Trimont Real Estate Advisors, LLC, Thompson & Knight LLP, 900 Third Avenue, 20th floor, New York, NY 10122 (Attn: Michael V. Blumenthal, Esq.); (v) counsel for Control Empresarial de Capitales, S.A. De C.V. and Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa, (1) Cleary Gottlieb Steen & Hamilton LLP, 1 Liberty Plaza, New York, NY 10006 (Attn: Lisa M. Schweitzer, Esq.) and (2) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Pauline K. Morgan, Esq.); (vi) counsel to DAK Americas LLC, (1) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Alfredo R. Perez, Esq.) and (2) Morris, Nichols, Arsht and Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19899 (Attn: Curtis S. Miller, Esq.); (vii) counsel for the Stalking Horse, (1) Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, NJ 07068 (Attn: Paul Kizel, Esq. and Nicole Fulfree, Esq.) and (2) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: John H. Knight, Esq. and David T. Queroli, Esq.); (viii) counsel (if applicable) of any applicable Successful Bidder(s); (ix) counsel (if applicable) of any

Backup Bidder(s); and (x) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Hannah McCollum, Esq.) (collectively, the "Objection Recipients") an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof, including any appropriate documentation in support thereof, by no later than **March 21, 2018, at 12:00 p.m. (prevailing Eastern Time)** (the "Adequate Assurance Objection Deadline"); provided that, if the Sale Hearing with respect to the Assets is adjourned to a later date, the Adequate Assurance Objection Deadline shall be at 5:00 p.m. (Prevailing Eastern Time) two days prior to the Sale Hearing.

**If a Counterparty fails to timely file with the Court and serve on the Objection Recipients an Adequate Assurance Objection, the Counterparty shall be deemed to have consented to the assumption and assignment of the applicable Proposed Assumed Contract and adequate assurance of future performance in connection therewith to the applicable Successful Bidder and, unless the Court orders otherwise, forever shall be barred from asserting any objection with regard to such assumption and assignment (unless the Counterparty has filed a timely Cure Objection with respect to the Proposed Assumed Contract) or adequate assurance of future performance in connection therewith or any other claims related to such Proposed Assumed Contract against the Debtors or any Successful Bidder(s) or their respective property. The applicable Successful Bidder shall be deemed to have provided adequate assurance of future performance with respect to the applicable Proposed Assumed Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code, notwithstanding anything to the contrary in the Proposed Assumed Contract, or any other document.**

The Debtors' assumption and/or assignment of a Contract is subject to approval by the Bankruptcy Court and consummation of one or more Sale Transactions. Absent consummation of one or more Sale Transactions and entry of a Sale Order approving the assumption and/or assignment of the Contracts, the Contracts shall be deemed neither assumed nor assigned, and shall in all respects be subject to subsequent assumption or rejection by the Debtors.

Copies of the Bidding Procedures Order and the Bidding Procedures may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk LLC (http://cases.primeclerk.com/mgusa). Copies of these documents are also available for inspection during regular business hours at the Office of the Clerk of the Bankruptcy Court, located at 824 N. Market Street, 3rd Floor, Wilmington, DE 19801, and may be viewed for a fee on the internet at the Bankruptcy Court's website (http://www.deb.uscourts.gov/) by following the directions for accessing the ECF system on such website.

Dated: March 21, 2018
       Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

/s/  *Joseph M. Mulvihill*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
Email:      ljones@pszjlaw.com
            joneill@pszjlaw.com
            jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Michael J. Cohen
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:   (212) 326-3939
Facsimile:   (213) 755-7306
Email:       sgreenberg@jonesday.com
             mcohen@jonesday.com
             scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, OH 44114
Telephone:   (216) 586-3939
Facsimile:   (212) 579-0112
Email:       ceblack@jonesday.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

## Schedule 1

## Exhibit A

**Successful Bid**

**ASSET PURCHASE AGREEMENT**

**among**

**M&G Resins USA, LLC,**
**M&G Polymers USA, LLC,**
**M&G Waters USA, LLC,**
**M&G USA Corporation,**
**Chemtex International Inc.,**
**Mossi & Ghisolfi International S.à.r.l.**

**and**

**Corpus Christi Polymers LLC**

**Dated as of March 20, 2018**

# TABLE OF CONTENTS

**Page**

I.     DEFINITIONS ........................................................................................ 2

1.1.   Certain Definitions ........................................................................... 2
1.2.   Terms Defined Elsewhere in this Agreement ........................................ 15
1.3.   Other Definitional and Interpretive Matters ......................................... 17

II.    PURCHASE AND SALE OF ASSETS; ASSUMPTION OF
       LIABILITIES ...................................................................................... 18

2.1.   Purchase and Sale of Assets ............................................................. 18
2.2.   Excluded Assets ............................................................................... 20
2.3.   Assumption of Liabilities .................................................................. 21
2.4.   Excluded Liabilities .......................................................................... 22
2.5.   Cure Costs ...................................................................................... 23
2.6.   Non-Assignment of Assets ................................................................ 23
2.7.   Further Conveyances and Assumptions .............................................. 24

III.   CONSIDERATION; ADJUSTMENT ..................................................... 24

3.1.   Consideration .................................................................................. 24
3.2.   Purchase Price Deposit ..................................................................... 26
3.3.   Payment of Purchase Price and Other Payments ................................. 26
3.4.   Apportionments ............................................................................... 27
3.5.   Application and Release of Escrow Amounts ...................................... 27

IV.    CLOSING AND TERMINATION ......................................................... 30

4.1.   Closing Date .................................................................................... 30
4.2.   Deliveries by Sellers and MGI ........................................................... 30
4.3.   Deliveries by Purchaser .................................................................... 31
4.4.   Termination of Agreement ................................................................ 32
4.5.   Procedure Upon Termination ............................................................ 34
4.6.   Effect of Termination ....................................................................... 35

V.     REPRESENTATIONS AND WARRANTIES OF SELLERS AND
       MGI ................................................................................................. 35

5.1.   Organization and Good Standing ....................................................... 35
5.2.   Authorization of Agreement .............................................................. 36
5.3.   Conflicts; Consents of Third Parties ................................................... 36
5.4.   [RESERVED] .................................................................................... 37
5.5.   Real Property ................................................................................... 37
5.6.   Title to Purchased Assets .................................................................. 38
5.7.   Intellectual Property ......................................................................... 38
5.8.   MGI Trademarks .............................................................................. 39
5.9.   Purchased Contracts ......................................................................... 39
5.10.  All Business Assets Owned by Sellers ................................................ 39

-i-

5.11.   Affiliate Transactions.................................................................40
5.12.   Bankruptcy and Litigation...........................................................40
5.13.   Environmental Matters ...............................................................40
5.14.   Financial Advisors ......................................................................41
5.15.   Taxes.........................................................................................41
5.16.   Compliance with Law; Permits....................................................42
5.17.   Labor Matters.............................................................................43
5.18.   Employee Benefits......................................................................44
5.19.   Insurance....................................................................................44
5.20.   Undue Influence..........................................................................45
5.21.   Project Package...........................................................................45
5.22.   Absence of Certain Changes. .....................................................45
5.23.   Utilities........................................................................................46
5.24.   Other Facilities............................................................................46
5.25.   Sufficiency of Purchased Assets.................................................46
5.26.   Operations of the Plant Sellers; Binding Obligations ..................46
5.27.   No Other Representations or Warranties; Schedules. ..................47

VI.       REPRESENTATIONS AND WARRANTIES OF PURCHASER..............48

6.1.     Organization and Good Standing................................................48
6.2.     Authorization of Agreement .......................................................48
6.3.     Conflicts; Consents of Third Parties...........................................48
6.4.     Litigation ....................................................................................49
6.5.     Financial Advisors ......................................................................49
6.6.     Financial Capability....................................................................49
6.7.     Condition of the Purchased Assets ............................................49

VII.      BANKRUPTCY COURT MATTERS .......................................................50

7.1.     Sale Order ..................................................................................50
7.2.     Purchaser Cooperation ..............................................................50

VIII.     COVENANTS .........................................................................................50

8.1.     Access to Information .................................................................50
8.2.     Conduct of the Business Pending the Closing............................51
8.3.     Consents.....................................................................................52
8.4.     Further Assurances ....................................................................52
8.5.     Publicity ......................................................................................52
8.6.     Confidentiality.............................................................................53
8.7.     Other Transition Matters ............................................................53
8.8.     Supplementation and Amendment of Schedules .......................54
8.9.     Regulatory Approvals..................................................................54
8.10.   Intellectual Property Matters ......................................................56
8.11.   Taiwan Approvals .......................................................................56

IX.     CONDITIONS TO CLOSING ..................................................................... 57

9.1.   Conditions Precedent to Obligations of Purchaser .................................. 57
9.2.   Conditions Precedent to Obligations of Sellers....................................... 58
9.3.   Conditions Precedent to Obligations of Purchaser, Sellers and MGI...... 59
9.4.   Frustration of Closing Conditions ............................................................ 59

X.      Employees ............................................................................................... 59

10.1.  Employees and Benefit Plans .................................................................. 59
10.2.  Employment Tax Reporting ..................................................................... 60
10.3.  Access to Information .............................................................................. 60
10.4.  WARN Act................................................................................................ 60
10.5.  No Obligations ........................................................................................ 60

XI.    TAXES ..................................................................................................... 60

11.1.  Transfer Taxes........................................................................................ 60
11.2.  Purchase Price Allocation. ...................................................................... 61
11.3.  Certain Periodic Non-Income Taxes. ...................................................... 62
11.4.  Cooperation ............................................................................................ 62

XII.   MISCELLANEOUS .................................................................................. 62

12.1.  No Survival of Representations and Warranties ...................................... 62
12.2.  Expenses ................................................................................................ 63
12.3.  Injunctive Relief ...................................................................................... 63
12.4.  Submission to Jurisdiction; Consent to Service of Process .................... 63
12.5.  Waiver of Right to Trial by Jury ............................................................... 64
12.6.  Entire Agreement; Amendments and Waivers ........................................ 64
12.7.  Governing Law......................................................................................... 64
12.8.  Notices .................................................................................................... 64
12.9.  Severability ............................................................................................. 66
12.10. Assignment ............................................................................................. 66
12.11. Non-Recourse......................................................................................... 66
12.12. Counterparts........................................................................................... 66
12.13. Bulk Sales.............................................................................................. 67

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of March 20, 2018 among M&G Resins USA, LLC, a Delaware limited liability company ("<u>Resins</u>"), M&G Polymers USA, LLC, a Delaware limited liability company ("<u>Polymers</u>"), M&G Waters USA, LLC, a Nevada limited liability company ("<u>Waters</u>"), M&G USA Corporation, a Delaware corporation ("<u>M&G Corp</u>"), Chemtex International Inc., a Delaware corporation ("<u>Chemtex</u>") (each of Resins, Polymers, Waters, M&G Corp and Chemtex, a "<u>Seller</u>" and collectively "<u>Sellers</u>"), Corpus Christi Polymers LLC, a Delaware limited liability company ("<u>Purchaser</u>") and, upon execution of a counterpart hereto, Mossi & Ghisolfi International S.à.r.l., a limited liability company organized under the Laws of Luxembourg ("<u>MGI</u>").

## RECITALS:

A.      Sellers are debtors and debtors in possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>");  Polymers filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 24, 2017 (the "<u>Polymers Petition Date</u>") and those Sellers other than Polymers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on October 30, 2017 (the "<u>Resins Petition Date</u>," and each of the Polymers Petition Date and the Resins Petition Date, a "<u>Petition Date</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), where Sellers' bankruptcy cases are jointly administered under Case No. 17- 12307 (such Sellers' cases collectively, the "<u>Bankruptcy Case</u>");

B.      Sellers (i) are in the process of constructing the plants located in Corpus Christi, Texas (the "<u>Corpus Christi Plants</u>") for the purpose of (A) producing and selling purified terephthalic acid ("<u>PTA</u>") and (B) producing, selling and distributing polyethylene terephthalate resin ("<u>PET</u>") at such plants, (ii) own the Corpus Christi Assets (as defined in the Bidding Procedures) (the "<u>Corpus Christi Assets</u>"), (iii) own a desalination plant and related real property assets in the proximity of the Corpus Christi Plants (the "<u>Desalination Plant</u>") and (iv) own certain Intellectual Property comprised of the Purchased Intellectual Property (defined below);

C.      Sellers desire to sell to Purchaser the Purchased Assets (defined below) and transfer to Purchaser the Assumed Liabilities (defined below) and Purchaser desires to purchase from Sellers the Purchased Assets and assume the Assumed Liabilities, in each case upon the terms and conditions hereinafter set forth;

D.      MGI owns, and, subject to execution of this Agreement by MGI, desires to sell to Purchaser, the MGI Assets (defined below) and Purchaser desires to purchase from MGI the MGI Assets;

E.      Purchaser is the Successful Bidder as such term is defined in the Bidding Procedures Order (defined below);

F.   The execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the selection of Purchaser as the Successful Bidder (as defined in the Bidding Procedures Order (defined below)) for each of the Purchased Assets, the entry of the Sale Order (defined below) under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, and the entry of the New DIP Orders (defined below) authorizing certain of the Sellers to enter into the New DIP Loan Agreement with Purchaser (as Lender (defined below)) and granting certain liens and other protections to Purchaser (as Lender), including but not limited to those set forth in the New DIP Term Sheet (defined below); and

G.   The parties desire to consummate the transactions contemplated by this Agreement as promptly as practicable after the Bankruptcy Court enters the Sale Order.

**NOW**, **THEREFORE**, the parties hereby agree as follows:

## I.   DEFINITIONS

1.1.   <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms, when used herein with initial capital letters, have the meanings specified in this <u>Section 1.1</u> or in other Sections of this Agreement identified in <u>Section 1.2</u>:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one (1) or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise; <u>provided</u>, <u>however</u>, that the Affiliates of each Seller shall only include Persons that are Debtors (as defined in the Bidding Procedures Order); provided, further, that MGI will not be deemed to be an Affiliate of Sellers.

"<u>APG Purchase Agreement</u>" means that certain Asset Purchase Agreement between Polymers and M&G Corp, on the one hand, and Far Eastern Investment (Holding) Limited, on the other hand, filed on the docket of the Bankruptcy Court on January 30, 2018, as Exhibit A to Schedule 1 of the *Notice of Designation of Successful Bid and Backup Bid for the Purchased Assets* [Docket No. 843], and approved by the Bankruptcy Court on February 1, 2018 pursuant to the *Order Authorizing (i) the Sale of Certain Assets of M&G USA Corp. and Polymers Free and Clear of Encumbrances and Liens; (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (iii) Related Relief* [Docket No. 864].

"<u>Avoidance Action</u>" means any claim, right or cause of action of Sellers arising under chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Purchased Assets, the Assumed Liabilities, or the Business.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, Sections 101 et seq.

"Benefit Plan" means any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA) (including a Multiemployer Plan), or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA, including any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life, Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, in each case, that (x) is sponsored, maintained or contributed to by Sellers, or for which Sellers have any obligation to sponsor, maintain or contribute to, or for which Sellers have any direct or indirect Liability, whether contingent or otherwise and (y) under which any current or former Employee (or their respective beneficiaries) have any present or future right to benefits.

"Bidding Procedures" means the procedures employed with respect to the proposed sale of the Purchased Assets and the assumption of the Assumed Liabilities, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order [Docket No. 490, Ex. 1].

"Bidding Procedures Order" means the Order of the Bankruptcy Court dated December 14, 2017 entered on the docket of the Bankruptcy Case as document number 490.

"Business" means (i) the construction, maintenance and operation of the Plants, (ii) the production of purified terephthalic acid, as currently contemplated by Sellers to be conducted at the Corpus Christi Plant, (iii) the production, sale and distribution of polyethylene terephthalate resin, as contemplated to be conducted at the Corpus Christi Plants, and (iv) the operation and maintenance of the Desalination Plant as currently operated and maintained or as intended by Sellers to be operated and maintained, in each case, as communicated to Purchaser in that certain M&G Chemical USA Corporation Confidential Information Memorandum dated January 9, 2018 and made available to Purchaser prior to the date hereof in the virtual data room in connection with the Auction (doc id #17.4.1) and/or that certain M&G Waters Desalination Assets Confidential Information Memorandum dated February 2019 and made available to Purchaser prior to the date hereof in the virtual data room in connection with the Auction (doc id #17.4.2).

"Business Day" means any day of the year on which banking institutions in New York City are open to the public for conducting business and are not required or authorized to close.

"Carve-Out Expenses" shall have the meaning ascribed to such term in the Final DIP Order.

"Carve-Out Trigger Date" shall have the meaning ascribed to such term in the Final DIP Order.

"Carve-Out Trigger Date Expenses" shall have the meaning ascribed to such term in the Final DIP Order.

"Chemtex Claim" means any Claim (as defined in the Bankruptcy Code) held by Chemtex International, Inc. against certain of the Sellers, purported to be secured by certain mechanics and materialmen's liens on the Corpus Christi Assets or other Purchased Assets pursuant to Texas Property Code section 53, the Constitution of the State of Texas or otherwise arising prior to the applicable Petition Date.

"Chemtex Purchase Agreement" means that certain Stock Purchase Agreement, dated on or about February 21, 2018, by and among Chemtex Global Corporation, Shiner Management & Consulting Co. Ltd., MGI, Chemtex, Chemtex Far East Ltd., Chemtex Consulting of India (Pvt.) Ltd., Chemtex Engineering Co. Ltd., Chemtex (Shanghai) International Trading Co. Ltd. and Chemtex (Shanghai) Chemical Engineering Co. Ltd., as filed on the docket of the Bankruptcy Court as Exhibit B to the Motion of the Debtors for Entry of an Order (i) Authorizing the Sale of Certain of the Debtors' Equity Interests in Non-Debtor Subsidiaries Free and Clear of Liens, Claims, Interests and Encumbrances; (ii) Approving the Assumption and Assignment of Contracts, and (iii) Granting Related Relief [Docket No. 1018].

"Closing Date Permitted Exceptions" means (i) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (ii) title of a lessor under a capital or operating lease; (iii) any other imperfections in title, charges, easements, restrictions, licenses and encumbrances that do not affect, in any material respect, the marketability, value or use of the affected asset (and in the case of Real Property, the insurability of title at standard commercially reasonable rates); (iv) Liens for Taxes that constitute Assumed Liabilities; (v) agreements granting a third-party non-exclusive rights to Purchased Intellectual Property or MGI Trademarks as provided in a Contract listed on Schedule 5.9(a); and (vi) the purported mechanics and materialmen's liens and claims against certain assets of one or more of the Sellers, which liens and claims are held by (A) WFS Construction Company, LLC or (B) Blanchard Contractors, Inc., in each case, or their respective assignees (collectively, the "Retained M&M Claims and Liens"), subject to any and all defenses, counterclaims, and offsets available to any of the Sellers (collectively, the "Retained M&M Counterclaims and Defenses"). For the avoidance of doubt, Closing Date Permitted Exceptions shall not include (A) mechanics' or materialmens' liens (other than the Retained M&M Claims and Liens), and (B) Liens held by the following parties, each as defined in the final DIP financing order entered at Docket No. 479 in the Bankruptcy Case: DIP Secured Parties, DIP Lender, DIP Agent, Pre-Petition First Lien Lender, Pre-Petition Second Lien Secured Party, and Macquarie.

"Code" means the Internal Revenue Code of 1986.

"<u>Contract</u>" means any contract, indenture, note, bond, lease, license or other agreement.

"<u>Committee Professional Excess Expenses</u>" shall have the meaning ascribed to such term in the Final DIP Order.

"<u>Completion Fees</u>" means those fees payable to Alvarez & Marsal North America, LLC, Rothschild Inc., Rothschild S.p.A. and any New Advisor (as defined in the *Declaration of Stephen Antinelli in Support of the Debtors' Application for Entry of an Order (I) Authorizing Them to Employ and Retain Rothschild Inc. and Rothschild S.p.A. as Financial Advisors and Investment Bankers to the Debtors effective Nunc Pro Turn to the Petition Date, (II) Approving the Terms of the Engagement Letter, (III) Waiving Certain Time-Keeping Requirements and (IV) Granting Related Relief* [docket no. 845]), in their capacity as Professionals retained by the Obligors, in respect of the successful completion of the sale of the Corpus Christi Plant and Corpus Christi Assets, which fees shall be (i) in an aggregate amount of up to $7,500,000, *plus* (solely for Rothschild Inc., Rothschild S.p.A., the New Advisor and/or their respective Affiliate designees) any additional incremental amounts calculated based on the sale price of the Corpus Christi Plant and Corpus Christi Assets as set forth in the engagement letter between Rothschild Inc. and Rothschild S.p.A. and M&G Corp., dated as of September 1, 2017 (which such incremental amount shall not exceed $6,000,000**)** being acknowledged and agreed that such amounts are incremental and (ii) approved by the Bankruptcy Court.

"<u>Completion Fees Escrow Amount</u>" means cash in an aggregate amount equal to $13,500,000.

"<u>Copyright</u>" means any copyright, any copyrightable work, any registration or recording of any copyright or copyrightable work, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other country or jurisdiction, and any renewal of any of the foregoing.

"<u>Creditors' Committee</u>" means the statutory committee of creditors appointed in the Bankruptcy Case.

"<u>Cure Costs</u>" means all monetary Liabilities, including pre-petition monetary Liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary and other defaults under the Purchased Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment of the Purchased Contracts to Purchaser as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

"<u>Cure Notice</u>" means the notice filed by Sellers in the Bankruptcy Case pursuant to the Bidding Procedures Order setting forth, among other things, the Cure Cost amount with respect to the Contracts identified therein.

"<u>Deposit Escrow Agreements</u>" means collectively, (a) that certain escrow agreement, dated as of March 6, 2018, by and among Purchaser, Resins and the Escrow Agent and (b) that certain escrow agreement, dated as of March 6, 2018, by and among Far Eastern Investment (Holding) Limited, Resins and the Escrow Agent.

"<u>Final DIP Order</u>" means the *Final Order Granting Debtors' Motion to (1) Authorize Certain Debtors In Possession To Obtain Post Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant To 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant To 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (5) Granting Related Relief* entered in the Bankruptcy Case at Docket No. 479.

"<u>Employees</u>" means all individuals who as of the date hereof are employed by Sellers in connection with the Business, whether or not actively at work, and including, with respect to <u>Article X</u>, individuals who are hired after the date hereof and prior to the Closing Date who are employed in connection with the Business, whether or not actively at work; provided that Employees will not in any event include any individuals providing services under the TSA.

"<u>Environmental Law</u>" means any Law or Order in effect at the relevant date or for the relevant period relating to the protection of human health and safety (with respect to exposure to Hazardous Materials) or the environment or natural resources, including compensation for damages thereto, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601, et seq.) ("<u>CERCLA</u>"), the Hazardous Materials Transportation Act (49 U.S.C. App. §§ 1801, et seq.), the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Clean Water Act (33 U.S.C. §§ 1251, et seq.), the Clean Air Act (42 U.S.C. §§ 7401, et seq.) the Toxic Substances Control Act (15 U.S.C. §§ 2601, et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136, et seq.), and the regulations promulgated pursuant thereto.

"<u>Environmental Permit</u>" means any and all Permits required under any applicable Environmental Law.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974.

"<u>ERISA Affiliates</u>" means any Person that would be considered a single employer with Sellers under Section 414(b), (c), (m), or (o) of the Code.

"<u>Escrow Agent</u>" means Citibank, N.A.

"<u>Escrow Agreement</u>" means that certain escrow agreement, to be entered into on the Closing Date by and among Purchaser, Resins and the Escrow Agent and in form and substance reasonably acceptable to Purchaser and Resins.

"<u>Excluded IP</u>" means (i) Intellectual Property related to biomass- or plant-based technologies referred to as PROESA, MOGHI and GREG; and (ii) Intellectual Property that has been sold, has been agreed to be sold or is required to be sold pursuant to either the APG Purchase Agreement or the Chemtex Purchase Agreement.

"<u>Final Order</u>" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Purchaser) and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, re-argument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, re-argument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, re-argument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, re-argument or rehearing shall have expired, as a result of which such Legal Proceeding or Order shall have become final in accordance with Bankruptcy Rule 8002; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"<u>Governmental Body</u>" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"<u>Hazardous Material</u>" means petroleum and its by-products, asbestos, polychlorinated biphenyls, and any material, waste or substance which is defined, classified, characterized or otherwise regulated as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste," "toxic substance" or words of similar import under any provision of Environmental Law.

"<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"<u>IFRS</u>" means the International Financial Reporting Standards, consistently applied.

"<u>Indebtedness</u>" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (other than trade payables and other expense accruals arising in the Ordinary Course of Business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) all indebtedness of

such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of Sellers or lender under such agreement in the event of default are limited to repossession or sale of such property), other than inventory or other property purchased by such Person in the Ordinary Course of Business; (e) all obligations of such Person under leases which have been or should be, in accordance with IFRS, recorded as capital leases, to the extent required to be so recorded; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities, in each case only to the extent drawn; (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness; (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness; (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered); or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness; and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means (i) any rights in intellectual property, whether arising under the United States, multinational, or foreign Laws, including Copyrights, Patents, Trademarks and Know-How, and (ii) all rights to sue at law or in equity for past, present, and future infringement, impairment, or misappropriation thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany License" means the cross-license of Intellectual Property to be entered into by the parties thereto in substantially the form of **Exhibit C**.

"Interim Compensation Order" means that certain *Order Authorizing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* entered by the Bankruptcy Court on December 1, 2017 as docket no. 308.

"Inventory" means inventories, materials, parts, raw materials, packaging materials, supplies, work-in-process, and finished goods and products, if any.

"IP Records" means any and all prosecution files and dockets, registration certificates, litigation filed and related opinion of counsel owned and in the possession of Sellers and relating to the Purchased Intellectual Property.

"IRS" means the Internal Revenue Service.

"<u>Know-How</u>" means trade secrets and other know-how, including specifications, processes, manufacturing techniques, recipes, formulas, inventions which have not been patented or for which an application for patent has not been filed, data, databases, technical or business information, customer and supplier lists, pricing and cost information and business and marketing plans and proposals, and other confidential or proprietary information.

"<u>Knowledge of Purchaser</u>" means the actual knowledge of those individuals identified on <u>Schedule 1.1(b)(i)</u> after due inquiry with their direct reports.

"<u>Knowledge of Sellers</u>" means the actual knowledge of those officers of a Seller identified on <u>Schedule 1.1(b)(ii)</u> after due inquiry with their direct reports.

"<u>Law</u>" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, guidance or common law requirement or other similar legal requirement.

"<u>Leased Real Property</u>" means (i) the real property leased by a Plant Seller and (ii) the real property leased by an Other Seller and related to the Business, in each case (A) as set forth on <u>Schedule 5.5</u> and (B) pursuant to a Purchased Contract to be assumed hereunder.

"<u>Legal Proceeding</u>" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"<u>Liability</u>" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"<u>Lien</u>" means any "Interest" as that term is used in Section 363(f) of the Bankruptcy Code, lien (including any mechanics lien), encumbrance, pledge, mortgage, indenture, deed of trust, security interest, pledge, hypothecation, claim, lease, charge, escrow, option, right of first offer, right of first refusal, preemptive right, easement, servitude, reservation, covenant, encroachment, right of use, right of way, security agreement or other similar agreement, arrangement, contract, commitment, understanding or obligation (whether written or oral and whether or not relating in any way to credit or the borrowing of money) of any kind, or any proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset of such Person.

"<u>M&G Affiliates</u>" means, with respect to Sellers, any other Person that, directly or indirectly through one (1) or more intermediaries, controls, or is controlled by, or is under common control with (as such terms are defined in the definition of "Affiliate"), the Sellers.

"<u>Material Adverse Effect</u>" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events,

states of fact or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (1) the Purchased Assets, taken as a whole or (2) the ability of Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but excluding in the case of clause (1) any change, event, state of facts or occurrence to the extent that it results from or arises out of (i) any reasonably anticipated effects of the commencement or prosecution of the Bankruptcy Case; (ii) the announcement and pendency of this Agreement; (iii) changes in Law or accounting regulations (including IFRS); (iv) any specific action expressly required to be taken (or omitted) by this Agreement or taken (or omitted) at the written request of Purchaser; (v) any actions taken or required to be taken by Purchaser or any of its Affiliates, (vii) general changes in the industries in which Sellers compete; (viii) any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; or (ix) any change or effect of economic or political conditions, in each of clauses (iii), (vii), (viii) or (ix) solely to the extent that such conditions do not materially disproportionately and adversely affect Sellers, taken as a whole.

"Mechanics Lien Amounts" means the amounts, in cash, actually used to satisfy Mechanics Lien Claims that are allowed by the Bankruptcy Court.

"Mechanics Lien Claim" means any Claim (as defined in the Bankruptcy Code) allowed by the Bankruptcy Court and secured by a valid, enforceable, non-avoidable and perfected mechanics' or materialmens' Lien on the Corpus Christi Assets or other Purchased Assets pursuant to Texas Property Code section 53, the Constitution of the State of Texas or otherwise, whether choate or inchoate, arising prior to the applicable Petition Date that was either perfected prior to the applicable Petition Date or has been perfected subsequent to the applicable Petition Date as permitted by Section 546(b) of the Bankruptcy Code.

"Mechanics Lien Escrow Amount" means cash in an aggregate amount equal to the reserve amount approved by the Bankruptcy Court pursuant to the Sale Order or other Order for the payment of Mechanics Lien Claims, provided, however, that in no event shall the Mechanics Lien Escrow Amount exceed $230,000,000.

"Mechanics Lien Litigation Rights" means all litigation rights, claims, causes of action, defenses and counterclaims related to or arising out of or in connection with any and all Mechanics Lien Claims against Sellers.

"MGI Purchase Price" means the amount, if any, that may be agreed in writing among Purchaser and MGI in connection with MGI's execution of a counterpart hereto, pursuant to Section 8.12.

"MGI Trademark License" means that certain Trademark Assignment and License Agreement, dated February 27, 2018, between Mossi & Ghisolfi International, S.à.r.l., and FE Polytech, LLC.

"MGI Trademarks" means the Trademarks listed on Schedule 1.1(c) and owned by MGI.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

"New DIP Loan Agreement" means that certain debtor-in-possession financing agreement between certain of the Sellers and Purchaser, as lender (the "Lender") to be entered into following entry into this Agreement providing for debtor-in-possession financing pursuant to the terms and conditions set forth in the New DIP Term Sheet and the New DIP Orders.

"New DIP Orders" mean (i) an interim order (the "Interim New DIP Order") in form acceptable to Sellers and Purchaser approving Seller's entry into the New DIP Loan Agreement, and (ii) a Final Order (the "Final New DIP Order") in form acceptable to Sellers and Purchaser approving Seller's entry into the New DIP Loan Agreement.

"New DIP Term Sheet" means the term sheet in the form attached hereto as **Exhibit A** (or as otherwise modified with the consent of Purchaser) setting forth the proposed material terms and conditions upon which Purchaser, as Lender, would enter into the New DIP Loan Agreement with certain of the Sellers as set forth therein.

"Obligors" means Resins, M&G Corp, Waters, Chemtex, M&G Finance Corporation, M&G USA Holding LLC, Chemtex Far East, Ltd. and Indo American Investments, Inc.

"Order" means any administrative or judicial order, injunction, judgment, decree, decision, verdict, settlement, award, ruling, writ, and assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business as of the date of this Agreement.

"Other Seller" means each of Polymers and Chemtex.

"Patents" means any letters patent, applications for letters patent, and any reissues, divisionals, continuations, and continuations-in-part thereof, including any patents or patent applications in the United States Patent and Trademark Office, the World Intellectual Property Organization, or any other country or jurisdiction.

"Periodic Non-Income Taxes" means any real or personal property Taxes or other similar periodic Taxes not based on income or receipts.

"Permits" means any approvals, consents, licenses, permits waivers, accreditations, registrations, certifications, exemptions, clearances and any other authorization or certificates of a Governmental Body necessary for the lawful construction or contemplated operation of the Plants, Business or Real Property.

"<u>Permitted Exceptions</u>" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record or disclosed in policies of title insurance or any judicial lien searches which have been made available to Purchaser prior to the date hereof; (ii) statutory Liens for Taxes not yet due and payable, assessments or other governmental charges; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business and that will be released by the Sale Order; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body, <u>provided</u> that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; (vi) any other imperfections in title, charges, easements, restrictions, licenses and encumbrances that do not affect, in any material respect, the marketability, value or use of the affected asset; (vii) Liens for Taxes that constitute Assumed Liabilities; (viii) Liens that will be released by the Sale Order as of Closing; and (ix) agreements granting a third-party rights to Purchased Intellectual Property or MGI Trademarks as provided in a Contract listed on Schedule 5.9(a).

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Plant Seller</u>" means each of Resins, Waters and M&G Corp.

"<u>Plant Seller Purchased Assets</u>" means all assets and rights of each of the Plant Sellers, other than any Excluded Assets.

"<u>Plants</u>" means the Corpus Christi Plants, the Desalination Plant, and any improvements and modifications to the Corpus Christi Plants and the Desalination Plant.

"<u>Post-Closing Tax Period</u>" means any Tax period or year, or portion thereof, that begins after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any Tax period or year, or portion thereof, that ends on or before the Closing Date.

"<u>Professional</u>" means a Person who is an attorney, financial advisor, accountant, appraiser, monitor, auctioneer or other professional Person and who is retained, with Bankruptcy Court approval, by (i) the Obligors pursuant to any one (1) or more of Sections 327, 328(a) and 363 of the Bankruptcy Code or (ii) the Creditors' Committee pursuant to Section 1103(a) of the Bankruptcy Code.

"<u>Professional Payment Amounts</u>" means, with respect to the applicable Professional, to the extent allowed by the Bankruptcy Court pursuant to a Final Order or payable pursuant to the Interim Compensation Order, the amount equal to (i) any Carve-Out Expenses incurred through and including March 31, 2018 (or, if a Carve-Out Trigger Date has occurred, the Carve-Out Trigger Date Expenses); (ii) if no Carve-Out Trigger Date has occurred, any Committee Professional Excess Expenses incurred through and including March 31, 2018; and (iii) any Sale Excess Fees incurred through

and including March 31, 2018.  Professional Payment Amounts shall not include any amounts in respect of Completion Fees.

"<u>Professional Payment Escrow Amount</u>" means cash in an aggregate amount equal to $17,300,000; provided, however, that such amount shall be increased prior to the Closing by any amounts allocated to Professionals in the DIP Budget that have not been paid to such Professionals as of the Closing (provided, that to the extent such amounts are added to the Professional Payment Escrow Amount, they will no longer be payable under the DIP Budget).

"<u>Purchased Contracts</u>" means all Contracts of Sellers listed on <u>Schedule 2.1(b)(vii)</u> that are unexpired as of the Closing Date and related to the construction, maintenance or operation of the Plants (as it may be amended and updated in accordance with this Agreement); <u>provided</u>, that notwithstanding anything herein to the contrary, Purchaser may revise such <u>Schedule 2.1(b)(vii)</u> with the addition or deletion of Contracts therefrom (<u>provided</u>, that any such additional Contracts are primarily related to the construction, maintenance or operation of the Plants) at any time prior to the Closing to the extent permitted by <u>Section 2.6(c)</u>.

"<u>Purchased Intellectual Property</u>" means (i) all Intellectual Property owned by Sellers and used or held for use  in connection with the construction of the Plants, or the operation or conduct of the Business (as currently conducted or currently contemplated to be conducted), but excluding (A) the Excluded IP and (B) the Retained Trademarks, and (ii) the Intellectual Property listed on <u>Schedule 1.1(d)</u>.

"<u>Purchased Software</u>" means all Software owned by Sellers which is related to the Business and used or held for use in connection with the construction of the Plants, or the operation or conduct of the Business as currently conducted, excluding any Software that has been sold, has been agreed to be sold or is required to be sold pursuant to the APG Purchase Agreement.

"<u>Purchaser Material Adverse Effect</u>" means a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement.

"<u>Real Property</u>" means (i) the Owned Real Property and (ii) the Leased Real Property.

"<u>Release</u>" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal or leaching into the environment, including any "release" as defined in Section 101 of CERCLA, 42 U.S.C. § 9601.

"<u>Remedial Action</u>" means all actions to (i) clean up, remove, treat or remediate any Hazardous Material; (ii) prevent the Release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

"Representative" means, with respect to any Person, any and all directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents, including potential financing sources of such Person.

"Retained Trademarks" means the trademarks listed on Schedule 1.1(f).

"Sale Excess Fees" shall have the meaning ascribed to such term in the Final DIP Order.

"Sale Hearing" means the hearing before the Bankruptcy Court held pursuant to the Bidding Procedures Order to determine the highest or best bid for the Purchased Assets.

"Sale Order" means the Order of the Bankruptcy Court, which is not subject to a stay pending appeal, substantially in the form attached hereto as **Exhibit B** approving this Agreement and all of the terms and conditions hereof and approving and authorizing Sellers to consummate the transactions contemplated hereby pursuant to Sections 363 and 365 of the Bankruptcy Code and providing, among other things, substantially as follows: (i) the Purchased Assets will be transferred to Purchaser free and clear of all Claims (as defined in the Bankruptcy Code) and Liens (other than Liens created by Purchaser and other than Closing Date Permitted Exceptions), such Liens to attach to the proceeds of such transactions, including the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court will retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach thereof as provided in Section 12.4; (v) this Agreement and the rights of Purchaser hereunder may be enforced against, and not subject to rejection or avoidance by Sellers or any chapter 7 or chapter 11 trustee of Sellers; (vi) neither Purchaser nor any of its Affiliates or owners will have any derivative, successor, transferee or vicarious Liability of any kind or character whether known or unknown as of the Closing, whether now existing or hereafter arising, or whether fixed or contingent, for Liabilities of Sellers (whether under federal or state Law or otherwise) on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Sellers' business prior to the Closing or in connection with the transactions contemplated by this Agreement and the Sale Order, other than the Assumed Liabilities; (vii) the so-called "bulk sales," "bulk transfer" and similar Laws, including those related to Taxes, shall be waived in all necessary jurisdictions; and (viii) the Sale Order shall be served on the Tax Authorities for all jurisdictions in which Sellers file Tax Returns.

"Schedules" means the disclosure schedules dated as of the date hereof delivered by Sellers to Purchaser on the date hereof, which form a part of this Agreement.

"Software" means software, programs, applications, source code, object code, firmware, and documentation.

"<u>Tax Authority</u>" means any Governmental Body charged with the administration of any Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"<u>Tax</u>" or "<u>Taxes</u>" means (i) any federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, alternative or add-on minimum, transfer, registration, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, real property, personal property, estimated and payment in lieu of taxes, or other taxes of any kind whatsoever, and (ii) all interest, penalties and additions to tax imposed by any Tax Authority in connection with any item described in clause <u>(i)</u>, whether disputed or not.

"<u>Tax Return</u>" means any return, declaration, report, estimate, information return or statement filed or required to be filed in respect of any Taxes (including any attachments thereto or amendments thereof).

"<u>Trademark</u>" means any trademark, trade name, corporate name, business name, domain name, trade style, trade dress, service mark, logo, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other country, and all extensions or renewals of any of the foregoing.

"<u>Treasury Regulations</u>" means the Treasury regulations promulgated under the Code.

"<u>WARN Act</u>" means the Worker Adjustment and Retraining Notification Act of 1988, and any similar state or local Law.

1.2.    <u>Terms Defined Elsewhere in this Agreement</u>.    For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| <u>Term</u> | <u>Section</u> |
|---|---|
| Agreement | Preamble |
| Allocation Notice of Objection | 11.2(a) |
| Antitrust Division | 8.4(a) |
| Antitrust Laws | 8.4(b) |
| Antitrust Order | 8.4(b) |
| Assumed Liabilities | 2.3 |
| Assumed Periodic Non-Income Taxes | 11.3(a) |
| Avoidance Actions | 2.2(f) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |

| Term | Section |
|------|---------|
| Business | Recitals |
| CERCLA | 1.1, definition of "Environmental Law" |
| Chemtex | Preamble |
| Closing | 4.1 |
| Closing Allocation | 3.1(a) |
| Closing Date | 4.1 |
| Closing Payment | 3.1(a) |
| Confidentiality Agreement | 8.7 |
| Contract Designation Deadline | 2.6(c) |
| control | 1.1, definition of "Affiliate" |
| Corpus Christi Assets | Recitals |
| Corpus Christi Plants | Recitals |
| Deposit Amount | 3.2 |
| Desalination Plant | Recitals |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| FENC | 8.11 |
| Final Allocation Statement | 11.2(a) |
| FTC | 8.4(a) |
| M&G Corp | Preamble |
| Mechanics Lien Escrow Account | 3.3(d) |
| Member Pro Rata Share | 3.6 |
| MGI | Preamble |
| MGI Assets | 2.1(a) |
| MGI Execution Date | 8.12(a) |
| Necessary Consent | 2.6(a) |
| Other Payments | 3.1 |
| Owned Real Property | 5.4 |
| Periodic Non-Income Tax Cash Amount | 3.1(b) |
| Periodic Non-Income Taxes | 11.3(a) |
| PET | Recitals |
| Petition Date | Recitals |
| Polymers | Preamble |
| Polymers Petition Date | Recitals |
| Professional Payment Escrow Account | 3.3(c) |
| Project Budget | 5.20 |
| Project Package | 5.20 |
| Proposed Allocation Statement | 11.2(a) |
| PTA | Recitals |
| Purchased Assets | 2.1(b) |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Resins | Preamble |
| Resins Petition Date | Recitals |

| Term | Section |
|------|---------|
| Seller or Sellers | Preamble |
| Taiwan Approval Documents | 8.11 |
| Termination Date | 4.4(a) |
| Transfer Taxes | 11.1 |
| Transferred Employees | 10.1 |
| TSA | 8.8 |
| Waters | Preamble |

1.3. <u>Other Definitional and Interpretive Matters</u>. (a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i) <u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.

(ii) <u>Dollars</u>. Any reference in this Agreement to $ will mean U.S. dollars.

(iii) <u>Exhibits/Schedules</u>. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

(iv) <u>IFRS</u>. Terms used herein which are defined in IFRS are, unless specifically defined herein, used herein as defined in IFRS.

(v) <u>Gender and Number</u>. Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

(vi) <u>Headings</u>. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Article" or "Section" are to the corresponding Article or Section, of this Agreement unless otherwise specified.

(vii) <u>Herein</u>. The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(viii)    Including.    The word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)    Amendments and Supplements; Laws.    Unless otherwise specified herein, references to any agreement, document or instrument herein shall mean such agreement, document or instrument as amended, supplemented and modified from time to time in accordance with its terms. Reference to any Law means such Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder.

(b)    The parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## II.    PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1.    Purchase and Sale of Assets.    (a) On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, (i) Purchaser will purchase, acquire and accept from Sellers, and Sellers will sell, transfer, convey and deliver to Purchaser, all of Sellers' right, title and interest in, to and under the Purchased Assets, and (ii) Purchaser will purchase, acquire and accept from MGI, and MGI will sell, transfer, convey and deliver to Purchaser, all of MGI's right, title and interest in, to and under the MGI Trademarks and MGI Trademark License (collectively the "MGI Assets"), in each case free and clear of all Claims (as defined in the Bankruptcy Code) and Liens (other than those Liens created by Purchaser and other than Closing Date Permitted Exceptions).

(b)    The term "Purchased Assets" means (x) subject to Section 2.6(c), all of the Plant Seller Purchased Assets, (y) the MGI Assets and (z) all of the Other Sellers' right, title and interest to and under all assets used in or related to the Business, including the following assets of the Other Sellers (in each case other than the Excluded Assets), wherever situated or located, as the same shall exist on the Closing Date:

(i)    all rights of any Seller with respect to (A) the real property set forth on Schedule 2.1(b)(i)(A) (the "Owned Real Property"), together with all facilities, improvements, fixtures and other appurtenances thereto and rights in respect thereof; and (B) the Leased Real Property;

(ii)    the Plants;

(iii)    all rights held by Sellers to utilize roads, easements and other rights of way used in the operation of the Business;

(iv) all equipment, machinery, forklifts, vehicles, fixtures, furniture, furnishings, apparatus, appliances, implements, telephone systems, signage, Inventory (if any), spare parts, leasehold improvements, tooling and all other tangible personal property of every kind and description (including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents (and including all warranties of the vendors applicable thereto in the possession of Sellers)) (collectively the "Tangible Personal Property"), that are owned by Sellers and (A) located on or at the Plants, (B) primarily used or held for primary use in connection with the Business, wherever located or (C) set forth on Schedule 2.1(b)(iv), in each case, excluding any Intellectual Property therein not constituting Purchased Intellectual Property (collectively, the "Purchased Tangible Personal Property");

(v) the Purchased Intellectual Property and IP Records;

(vi) the Purchased Software;

(vii) subject to Section 2.5 and Section 2.6, the Purchased Contracts listed on Schedule 2.1(b)(vii) as of the Closing;

(viii) the Chemtex Claim;

(ix) all Permits, including Environmental Permits, used or held for use by Sellers in connection with the construction, maintenance or operation of the Plants to the extent transferable under applicable Law;

(x) all warranties, guarantees and similar rights to the extent related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets (including, for the avoidance of doubt, warranties and licenses received from manufacturers of Tangible Personal Property), and claims against suppliers and other third parties in connection with the Purchased Contracts;

(xi) all rights to insurance proceeds for recoupment, reimbursement or coverage under property damage insurance policies with respect to the Purchased Assets that have been damaged or destroyed and not replaced by Closing;

(xii) all books, records, files, invoices, and supplier lists, promotional materials, technical documentation and other papers whether in hard copy or electronic format (collectively, the "Records") to the extent related to or necessary for the construction of the Plants or the conduct or contemplated operation of the Purchased Assets or Business, excluding the Intellectual Property therein not constituting Purchased Intellectual Property (the "Purchased Records"); provided, however, that (A) any

Seller will have the right to make copies of any Records or portion thereof that relate to any business other than the Business, and (B) any Seller may redact any portions of the Purchased Records that relate solely to any businesses other than the Business; and

(xiii)   all claims and counterclaims and causes of action to the extent related to the Purchased Assets or the Assumed Liabilities, including the Mechanics Lien Litigation Rights (which rights include but are not limited to the Retained M&M Counterclaims and Defenses).

2.2.   <u>Excluded Assets</u>.  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers will retain all right, title and interest to, in and under the Excluded Assets.  The term "<u>Excluded Assets</u>" means all assets of the Other Sellers (or any of their Affiliates) other than the Purchased Assets, and, with respect to Sellers, the following:

(a)   all cash and cash equivalents, bank accounts and marketable securities of any kind;

(b)   all accounts receivable;

(c)   all rights, claims, causes of action and credits to the extent relating to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of Sellers in respect of an Excluded Asset or Excluded Liability;

(d)   any shares of capital stock or other equity interest of Sellers or their Affiliates or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Sellers or their Affiliates;

(e)   (i) any Records other than the IP Records and Purchased Records and (ii) any Records other than the Purchased Records, and any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by Law to retain or that Sellers determine is necessary or advisable to retain, including Tax Returns, financial statements and corporate or other entity filings; <u>provided</u>, <u>however</u>, that Purchaser will have the right to make copies of any portions of such retained files, books and records that relate (in the case of Tax Returns, only Tax Returns for Periodic Non-Income Taxes that relate) to the Purchased Assets and Sellers agree to preserve such records in accordance with <u>Section 8.2(b)</u>;

(f)   all Avoidance Actions;

(g)   all postpetition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to Sellers on a prepetition or postpetition basis;

(h)   any real property owned by an Other Seller other than the Owned Real Property;

(i) all Excluded IP and Retained Trademarks;

(j) any Contract that is (i) not a Purchased Contract, or (ii) a Purchased Contract for which a Necessary Consent has not been obtained by the Closing to the extent a Final Order has not been entered authorizing the assumption and assignment of such Purchased Contract;

(k) all refunds, credits and rebates of (i) Taxes for any Pre-Closing Tax Period and (ii) any other Taxes for which any Seller remains liable under this Agreement;

(l) all rights in or to assets or Real Property leased by Sellers except to the extent the Liabilities under the associated lease are assumed by Purchaser and such lease is assigned to Purchaser as a Purchased Contract;

(m) all of the assets, properties and rights (including any Intellectual Property and Software) sold, agreed to be sold or required to be sold by any Seller (or, in the case Intellectual Property, by MGI) pursuant to the APG Purchase Agreement;

(n) all of the assets, properties and rights owned by any of the entities sold, agreed to be sold or required to be sold pursuant to the Chemtex Purchase Agreement.

(o) all Benefit Plans and all assets held with respect to such Benefit Plans;

(p) all real property, facilities, improvements, fixtures and other appurtenances thereto and rights in respect thereof other than the Owned Real Property, Plants, Leased Real Property and rights set forth in <u>Section 2.1(b)(i)</u>, <u>(ii)</u>, <u>(iii)</u> and <u>(iv)</u>;

(q) any Tangible Personal Property other than the Purchased Tangible Personal Property; and

(r) all rights, claims, causes of action, defenses and counterclaims with respect to or against any former or current directors and officers of any of the Debtors (as defined in the Bidding Procedures Order).

2.3.    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, only the following Liabilities of Sellers existing as of the Closing Date (collectively, the "<u>Assumed Liabilities</u>"):

(a) all Liabilities (including Liabilities for Taxes) arising from the ownership or operation of the Business and the Purchased Assets by Purchaser after the Closing;

(b)     all Liabilities for Periodic Non-Income Taxes borne by Purchaser pursuant to Section 11.3;

(c)     all Transfer Taxes;

(d)     all Liabilities of Sellers under the Purchased Contracts, to the extent arising on or after the Closing Date;

(e)     any Cure Costs that Purchaser is required to pay pursuant to Section 2.5;

(f)     all obligations, if any, as an owner or operator of the Purchased Assets to conduct Remedial Action to the extent required by applicable Environmental Laws  arising from or relating to any presence or Release of any Hazardous Material at, on, under or migrating from the Real Property or Purchased Assets to the extent occurring or existing as of the Closing Date;

(g)     all Liabilities listed on Schedule 2.3(g) that Purchaser has agreed to assume, pay or discharge pursuant to this Agreement.

2.4.     Excluded Liabilities.  Notwithstanding anything to the contrary herein or otherwise, Purchaser shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of, or Liability against Sellers, Sellers' Affiliates, the Business or the Purchased Assets, of any kind or nature, whether direct or indirect, and Sellers will remain liable with respect to all Liabilities of Sellers, other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including the following to the extent they are not an Assumed Liability: (i) all Liabilities with respect to Legal Proceedings pending on or before the Closing Date or to the extent against or giving rise to Liability related to, arising from or in respect of the Business or the Purchased Assets prior to the Closing Date even if instituted after the Closing Date (including in respect of any violation of Law (including any export control law) occurring prior to the Closing), (ii) all Indebtedness of Sellers other than pursuant to any Purchased Contract, (iii) all trade accounts payable by Sellers to the extent in respect of periods prior to Closing, (iv) all Liabilities existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code, (v) Liabilities under any contract that is not a Purchased Contract, (vi) all Liabilities arising out of, relating to or with respect to: (1) the employment or termination of employment of any Employee or former Employee; (2) workers' compensation claims against Sellers that relate to periods occurring on or before the Closing Date, irrespective of whether such claims are made prior to, on or following the Closing; (3) any Benefit Plans and all Liabilities with respect thereto; and (4) the WARN Act and any similar non-U.S. or state or local "mass layoff" or "plant closing" law to the extent relating to actions occurring prior to the Closing, (vii) any Liability for Taxes of any Seller or their Affiliates, whether arising prior to, on or after the Closing Date (excluding, for the avoidance of doubt, any Taxes described in Section 2.3), (viii) any Liability for Taxes relating to the Purchased Assets for any Pre-Closing Tax Period (excluding, for the avoidance of doubt, any Taxes described in Section 2.3, and (ix) all fines and penalties for violations of

Environmental Law prior to Closing arising out of or relating to the Business or the Purchased Assets, provided, however, that after the Closing Purchaser shall be obligated to maintain and operate the Plants and Business in accordance with applicable Environmental Laws.

2.5.   Cure Costs.  At the Closing and pursuant to Section 365 of the Bankruptcy Code, Sellers will assume the Purchased Contracts (to the extent not previously assumed) and assign the Purchased Contracts to Purchaser, and Purchaser will assume all Liabilities pursuant to the Purchased Contracts.  The Cure Costs necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts will be paid by Purchaser at the Closing, provided that, subject to Section 2.6(c), solely to the extent any such Cure Costs remain disputed as of the Closing Date, Purchaser shall pay such Cure Costs as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order, and Sellers will have no Liability for any such Cure Costs.

2.6.   Non-Assignment of Assets.  (a)  Notwithstanding any other provision of this Agreement to the contrary,  this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or of any Law or Order or in any way adversely affect the rights of Purchaser thereunder and (ii) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.   In such event, Sellers and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that neither Sellers nor Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would adversely affect the rights of Sellers thereunder so that Purchaser would not in fact receive all such rights, such Sellers and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to such Sellers, under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Purchaser, or under which such Sellers would enforce its rights thereunder for the benefit of Purchaser with Purchaser assuming such Sellers' obligations and any and all rights of such Sellers against a third party thereto.

(b)      Subject to Section 2.6(a), if after the Closing (i) Purchaser holds any Excluded Assets or Excluded Liabilities or (ii) Sellers hold any Purchased Assets or Assumed Liabilities, Purchaser or the applicable Sellers, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other party. Prior to any such transfer, the party receiving or possessing any such asset will hold it in trust for such other party.

(c)     Notwithstanding anything herein to the contrary, but only to the extent consistent with the Bidding Procedures Order and the Bidding Procedures, at any time prior to the date that is the latest of (i) the Closing Date, (ii) five (5) days after the resolution of any dispute with a non-debtor party to a Purchased Contract relating to a Cure Cost or adequate assurance thereunder, and (iii) the conclusion of the cure objection hearing relating to any particular Purchased Contract as to which a cure objection has been timely filed (the "<u>Contract Designation Deadline</u>"), Purchaser will be entitled, in consultation with Sellers, to (x) add any such Contract to the Excluded Assets (and delete any such Contract from the list of Purchased Contracts set forth in <u>Schedule 2.1(b)(vii)</u>) by providing written notice thereof to Sellers and any Contract so added will cease to be a Purchased Contract and Purchased Asset and will be deemed to be an Excluded Asset for all purposes hereunder, or (y) add any Contract to which any Seller is a party or is bound to the extent primarily related to the Business to the Purchased Contracts set forth in <u>Schedule 2.1(b)(vii)</u> so long as (1) such Contract to be added to the Purchased Contracts is not a Contract to be assumed or available to be assumed pursuant to any other sale previously approved by the Bankruptcy Court in connection with the Bankruptcy Case; and (2) such Contract is added to the Purchased Contracts set forth in <u>Schedule 2.1(b)(vii)</u> prior to the entry of any Order of the Bankruptcy Court approving the rejection of such Contract, subject to the party to such Contract receiving information evidencing Purchaser's adequate assurance of future performance and having an opportunity to object within seven (7) days or such other period of time set forth in an Order of the Bankruptcy Court of the receipt of such information to the assignment of such Contract on the ground that Purchaser has not demonstrated adequate assurance of future performance of such Contract pursuant to Section 365 of the Bankruptcy Code.  No change referred to in this <u>Section 2.6(c)</u> shall reduce or increase the amount of the Purchase Price, except to the extent of any increase or decrease in (a) the assumption of the Assumed Liabilities or (b) the Cure Costs to be paid by Purchaser, as a result of the Contracts being added to or removed from the list of Purchased Contracts set forth in <u>Schedule 2.1(b)(vii)</u> by Purchaser.

2.7.     <u>Further Conveyances and Assumptions</u>.  From time to time following the Closing, Sellers and Purchaser (and MGI, with respect to the MGI Assets) will, and will use commercially reasonable efforts to cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary, advisable or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Sellers and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby.

### III.     CONSIDERATION; ADJUSTMENT

3.1.     <u>Consideration</u>.  The aggregate consideration for the Purchased Assets (the "<u>Purchase Price</u>") will be:

(a)     cash in amount sufficient to satisfy the Pre-Petition First Lien Obligations (as defined in the Final DIP Order), which the Parties hereto anticipate to be equal to approximately $430,000,000 *less* $14,500,000 (the "First Lien Payment");

(b)     cash in amount sufficient to satisfy the obligations owed to Macquarie (as defined in the Final DIP Order) arising under or in connection with that certain Credit Agreement, dated as of November 9, 2016, among Macquarie, as administrative and collateral agent, the lenders that are party thereto from time to time, and M&G Waters USA, LLC, as borrower, provided that such amount shall not exceed $57,000,000 (the "Macquarie Payment");

(c)     cash in amount sufficient to satisfy the DIP Obligations (as defined in the Final DIP Order), which the Parties hereto anticipate to be equal to approximately $73,000,000 (the "DIP Payment");

(d)     cash in an amount equal to $50,000,000 (assuming the payment of the $14,500,000 deduct set forth in Section 3.1(a) has been paid in full with respect to the First Lien Obligations) (the "Additional Cash Closing Payment", together with the First Lien Payment, the Macquarie Payment, and the DIP Payment, are collectively, the "Closing Payment"). For the avoidance of doubt, the Closing Payment shall not exceed $595,500,000, of which $57,000,000 is for the Desalination Plant and related assets, $7,900,000 is for Intellectual Property owned by Sellers, and the remainder is for the Corpus Christi Plants and the remainder of the Purchased Assets (such allocation, the "Closing Allocation");

(e)     pursuant to Section 11.3, an additional amount in cash, if any, on account of (i) Periodic Non-Income Taxes attributable to any Post-Closing Tax Period that were paid by Sellers on or prior to the Closing Date and (ii) Assumed Periodic Non-Income Taxes attributable to any Pre-Closing Tax Period (the "Periodic Non-Income Tax Cash Amount"), which the Parties hereto anticipate the total amount to be equal to approximately $9,500,000;

(f)     cash in an amount equal to the MGI Purchase Price for the MGI Assets; and

(g)     the assumption of the Assumed Liabilities (including the amount of any Cure Costs).

In addition, in connection with the acquisition of the Purchased Assets, Purchaser shall pay the following in accordance with the terms of this Agreement ("Other Payments"):

(a)     cash in an amount equal to the Professional Payment Escrow Amount;

(b)     cash in an amount equal to the Completion Fee Escrow Amount; and

(c)     cash in an amount equal to the Mechanics Lien Escrow Amount.

3.2.    <u>Purchase Price Deposit</u>.  Pursuant to the terms of the Deposit Escrow Agreements, Purchaser, together with its Affiliates, has deposited with the Escrow Agent $95,000,000 (together with all accrued investment income thereon, if any, the "<u>Deposit Amount</u>"), which will be released by the Escrow Agent and delivered to either Purchaser or Resins (or such other Seller as Resins may designate) in accordance with the provisions of the Deposit Escrow Agreements.  Pursuant to the Deposit Escrow Agreements, the Deposit Amount (together with all accrued investment income thereon) will be distributed as follows:

(a)     if the Closing occurs, the Deposit Amount and all accrued investment income thereon will be delivered to Resins (or such other Seller as Resins may designate) and applied towards the amount payable by Purchaser under <u>Section 3.3</u>;

(b)     if this Agreement is terminated by Resins pursuant to <u>Section 4.4(d)</u>, the Deposit Amount, together with all accrued investment income thereon, will be delivered to Resins (or such other Seller as Resins may designate); and

(c)     if this Agreement is terminated for any reason other than by Resins pursuant to <u>Section 4.4(d)</u>, the Deposit Amount, together with all accrued investment income thereon, will be returned to Purchaser.

3.3.    <u>Payment of Purchase Price and Other Payments</u>.  On the Closing Date:

(a)     Purchaser will pay the Cure Costs by wire transfer of immediately available funds to the accounts designated in writing by Resins at least three (3) Business Days prior to the Closing Date; <u>provided</u> that, for the avoidance of doubt, Purchaser shall pay the Cure Costs in cash and in addition to the consideration otherwise set forth in <u>Sections 3.1</u>;

(b)     (i) Purchaser will pay the Closing Payment *plus* the Periodic Non-Income Tax Cash Amount, if any, *less* the Deposit Amount (which will be released to Resins pursuant to the Deposit Escrow Agreements and <u>Section 3.2(a)</u>) in immediately available funds to an account designated by Resins, and (ii) Purchaser and Resins will cause the Deposit Amount and all accrued investment income thereon to be paid to Resins as provided in <u>Section 3.2(a)</u> above;

(c)     Purchaser will deposit the Professional Payment Escrow Amount into a segregated escrow account (the "<u>Professional Payment Escrow Account</u>") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement and released in accordance with the terms hereof and thereof;

(d)     Purchaser will deposit the Completion Fee Escrow Amount into a segregated escrow account (the "<u>Completion Fee Escrow Account</u>") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement and released in accordance with the terms hereof and thereof; and

(e)     Purchaser will deposit the Mechanics Lien Escrow Amount into a segregated escrow account (the "Mechanics Lien Escrow Account") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement and released in accordance with the terms hereof and thereof; and

(f)     Purchaser will pay the Macquarie Payment Amount by wire transfer of immediately available funds to the account(s) designated by Macquarie.

3.4.    Apportionments.  (a) Except with respect to any Cure Costs payable under Section 2.5, to the extent the following costs and expenses (and credits therefor to the extent paid prior to the Closing Date) of the Business relate to a Purchased Contract, to Owned Real Property or to Leased Real Property, in each case, for a period that begins prior to the Closing Date and ends after the Closing Date, such costs and expenses are to be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, as of 11:59 P.M. local time on the Closing Date:

(i)     a portion of monthly rent for the number of days remaining, as of the Closing Date, in the month during which Closing occurs;

(ii)     annual utility assessments, water meter charges, and sewer rents, if any, on the basis of the year for which assessed; and

(iii)     charges and fees payable for telephone services, water, heat, steam, electric power, gas and other utilities, at the price charged by the suppliers, including any taxes thereon and based upon applicable meter readings, where available, made on or immediately prior to or immediately after the Closing Date.

(b)     If, after apportioning the foregoing expenses, a party has borne more than its allocable share of such expenses, the other parties will promptly make the appropriate compensating payment(s) to such party

(c)     Withholding. Purchaser shall be entitled to deduct and withhold from the Purchase Price otherwise payable pursuant to this Agreement to Sellers or MGI such amounts as Purchaser is required to deduct and withhold under applicable Tax Law as reasonably determined by Purchaser.  In the event that Purchaser reasonably determines that withholding is required pursuant to applicable Tax Law, Purchaser shall provide Sellers with written notice of its intent to deduct and withhold from the Purchase Price as soon as reasonably practicable (and, in any case, no later than five (5) Business Days prior to the date on which such amount is to be paid) and Purchaser shall (i) consider in good faith any certification, statement or other documentation submitted by Sellers to establish a reduction in or exemption from withholding and (ii) otherwise cooperate in the efforts by Sellers to obtain a reduction in or exemption from such withholding.  To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to Sellers or MGI, as applicable.

3.5.    Application and Release of Escrow Amounts.

(a)     Promptly and in no event later than the earlier of (x) three (3) Business Days following a Final Order having been entered by the Bankruptcy Court approving payment of any Professional Payment Amount and (y) one (1) Business Day after the applicable Seller's filing of a certification of counsel or certificate of no objection in accordance with paragraph 2(c) of the Interim Compensation Order with respect to the applicable Monthly Fee Application (as defined in the Interim Compensation Order) pertaining to such Professional Payment Amount, the applicable Person authorized under the Escrow Agreement shall instruct the Escrow Agent to release from the Professional Payment Escrow Account to the approved recipient thereof, an amount in cash equal to such approved Professional Payment Amount due to such recipient. Promptly and in no event later than three (3) Business Days following the final resolution and payment of all Professional Payment Amounts to all Professionals, Resins and Purchaser shall jointly instruct (provided, however, that to the extent that the Resins chapter 11 bankruptcy case is converted to chapter 7 or dismissed or a chapter 11 trustee is appointed, Purchaser shall instruct) the Escrow Agent to release from the Professional Payment Escrow Account (A) first, to Lender, an amount in cash equal to the outstanding obligations owed to Lender pursuant to the New DIP Loan Agreement (or, in the event that the Professional Payment Escrow Account does not contain an amount sufficient to satisfy such obligations, all remaining amounts in the Professional Payment Escrow Account), and (B) second, to Purchaser an amount in cash equal to the balance, if any, then remaining in the Professional Payment Escrow Account after payment of the amounts described in the preceding clause (A).  In the event the Bankruptcy Court enters an Order for the final payment of the fees and expenses of an applicable Professional that directs such Professional to disgorge any amounts previously released from the Professional Payment Escrow Account, the applicable Professional shall transfer such disgorged amount into the Professional Payment Escrow Account or to Purchaser.  For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, in no event shall Purchaser be responsible for any Professional Payment Amounts in excess of the funds available in the Professional Payment Escrow Account.

(b)     Promptly and in no event later than three (3) Business Days following the resolution of any Mechanics Lien Claim and a Final Order having been entered by the Bankruptcy Court approving payment of the applicable Mechanics Lien Amount in respect thereof, Resins and Purchaser shall jointly instruct (provided, however, that to the extent that the Resins chapter 11 bankruptcy case is converted to chapter 7 or dismissed or a chapter 11 trustee is appointed, Purchaser shall instruct) the Escrow Agent to release from the Mechanics Lien Escrow Account (i) to the approved recipient thereof, an amount in cash equal to such Mechanics Lien Amount and (ii) if reserve amounts shall have been so established in respect of the Mechanics Lien Claims, to Purchaser, an amount in cash equal to the amount, if any, by which the individual reserve amount approved by the Bankruptcy Court in respect of such Mechanics Lien Claim exceeds the applicable Mechanics Lien Amount. Promptly and in no event later than three (3) Business Days following a Final Order having been entered by the Bankruptcy Court disallowing any Mechanics Lien Claim, if reserve amounts shall have been so established in respect of the Mechanics Lien Claims, Purchaser shall instruct the Escrow Agent to release from the Mechanics Lien Escrow

Account to Purchaser an amount in cash equal to the individual reserve amount approved by the Bankruptcy Court in respect of such Mechanics Lien Claim. Nothing in this Agreement shall restrict Purchaser from seeking relief from the Bankruptcy Court to reduce the amount then being held in the Mechanics Lien Escrow Account from time to time to account for the then unresolved Mechanics Lien Claims and, in the event that the Bankruptcy Court shall enter any Final Order reducing the amount then required to be held in the Mechanics Lien Escrow Account, Purchaser shall instruct the Escrow Agent to release from the Mechanics Lien Escrow Account to Purchaser an amount in cash equal to the amount of such reduction. Promptly and in no event later than three (3) Business Days following the final resolution of all Mechanics Lien Claims, Resins and Purchaser shall jointly instruct the Escrow Agent to release from the Mechanics Lien Escrow Account to Purchaser an amount in cash equal to the balance, if any, then remaining in the Mechanics Lien Escrow Account. Sellers shall use commercially reasonable efforts to cause any amounts released from the Mechanics Lien Escrow Account pursuant to clause (i) of the first sentence of this Section 3.5(b) not actually used to satisfy Mechanics Lien Claims or otherwise thereafter determined to have been improperly paid to be transferred to Purchaser. For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, in no event shall Purchaser be responsible for any Mechanics Lien Claims or Mechanics Lien Amounts in excess of the funds available in the Mechanics Lien Escrow Account.

(c)     Promptly and in no event later than three (3) Business Days following the applicable Final Order having been entered by the Bankruptcy Court approving payment of any Completion Fees, the applicable Person authorized under the Escrow Agreement shall instruct the Escrow Agent to release from the Completion Fees Escrow Account to the approved recipient an amount in cash equal to the approved Completion Fees. For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, in no event shall Purchaser be responsible for any Completion Fees in excess of the funds available in the Completion Fees Escrow Account.

(d)     The other terms and conditions governing the Professional Payment Escrow Account, the Completion Fees Escrow Account and the Mechanics Liens Escrow Account shall be governed by the Escrow Agreement. Purchaser and Sellers agree to negotiate in good faith the terms and conditions of the Escrow Agreement prior to the Closing, the terms of which shall be consistent with Section 3.3 and this Section 3.5.

3.6.     Adjustment of Deposit Amount. Each member of Purchaser shall bear 33 1/3% of the Deposit Amount (the "Member Pro Rata Share"). To the extent any member of Purchaser deposited less than its Member Pro Rata Share with the Escrow Agent, such member shall promptly, and in any event within one (1) Business Day after the date of this Agreement, deposit cash with the Escrow Agent in the aggregate amount of such shortfall in accordance with the applicable Deposit Escrow Agreement. To the extent any member of Purchaser deposited more than its Pro Rata Share with the Escrow Agent, Resins and Purchaser shall, within one (1) Business Day after the receipt of the funds required to be deposited with the Escrow Agent pursuant to the

preceding sentence, jointly instruct the Escrow Agent to release cash in the aggregate amount of such excess to the applicable member of Purchaser. For the avoidance of doubt, no portion of the Deposit Amount shall be released to any member of Purchaser pursuant to this <u>Section 3.6</u> until all members of Purchaser who deposited less than their Member Pro Rata Share have deposited the funds required to be deposited by it pursuant to this <u>Section 3.6</u> with the Escrow Agent. Nothing in this <u>Section 3.6</u> shall be construed so as to allow a reduction of the aggregate Deposit Amount held by the Escrow Agent.

## IV. CLOSING AND TERMINATION

4.1. <u>Closing Date</u>. Subject to the satisfaction of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> (the "<u>Closing</u>") shall take place remotely via the exchange of documents and signatures by electronic mail and/or facsimile on the date that is three (3) Business Days following the satisfaction or waiver of the conditions set forth in <u>Article IX</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at or prior to the Closing), unless another place, date or time are agreed to in writing by the parties. The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>."

4.2. <u>Deliveries by Sellers and MGI</u>.

(a)    At the Closing, Sellers will deliver to Purchaser:

(i)    one or more duly executed bills of sale in a form to be reasonably agreed upon by the parties;

(ii)    one or more duly executed assignment and assumption agreements for the Purchased Assets and Assumed Liabilities in a form to be reasonably agreed upon by the parties;

(iii)    duly executed special or limited warranty deeds (or applicable state equivalent) conveying title to the Owned Real Property in recordable form;

(iv)    the officers certificate required to be delivered pursuant to <u>Sections 9.1(a)</u> and <u>9.1(b)</u>;

(v)    from each Seller (or, if a Seller is a disregarded entity for U.S. federal income tax purposes, such Seller's regarded owner) that is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code, an executed certification of non-foreign status prepared in accordance with Section 1.1445-2(b)(2) of the Treasury Regulations;

(vi)     a copy of the Sale Order as entered by the Bankruptcy Court;

(vii)    the duly executed TSA;

(viii)   the duly executed Intercompany License;

(ix)     one or more duly executed assignments of Copyrights, Patents and Trademarks conveying title to the Purchased Intellectual Property, in a form suitable for recording in (i) the U.S. Copyright Office or Patent and Trademark Office, or (ii) for non-U.S. Copyrights, Patents and Trademarks, in forms suitable for recording in the intellectual property offices of each applicable jurisdiction to which any such Copyright, Patent or Trademark relates; provided, however, that without limiting Section 2.7, the delivery of assignments described in the preceding clause (ii) will only be required at Closing to the extent that Purchaser has delivered all such requested form(s) to Sellers in a form reasonably acceptable to Sellers no later than ten (10) Business Days prior to the Closing Date;

(x)      the duly executed Escrow Agreement;

(xi)     a consent pursuant to which Invista North America S.à.r.l ("Invista") shall have consented in writing to the assignment by Resins to Purchaser of that certain Technical Information Agreement for Polyester Polymer dated May 14, 2013 (the "Invista Agreement"); and

(xii)    such other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser.

(b)      At the Closing, MGI will deliver to Purchaser:

(i)      one or more duly executed bills of sale with respect to the MGI Assets in a form to be reasonably agreed upon by the parties; and

(ii)     one or more duly executed assignments of Trademarks conveying title to the MGI Trademarks, in a form suitable for recording in (i) the U.S. Trademark Office, or (ii) for non-U.S. Trademarks, in the intellectual property offices of each applicable jurisdiction to which any such Trademark relates; provided, however, that without limiting Section 2.7, the delivery of assignments described in the preceding clause (ii) will only be required to the extent that Purchaser has delivered all such requested form(s) to Sellers and MGI in a form reasonably acceptable to MGI no later than ten (10) Business Days prior to the Closing Date.

4.3.    Deliveries by Purchaser.  At the Closing, Purchaser will deliver to Sellers:

(a)      the consideration specified in Section 3.3;

(b)     one or more duly executed bills of sale in a form to be reasonably agreed upon by the parties;

(c)     one or more duly executed assignment and assumption agreements in a form to be reasonably agreed upon by the parties, including an assignment and assumption agreement in which Purchaser shall assume all rights and obligations of MGI in and under the MGI Trademark License;

(d)     the officers certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b);

(e)     the duly executed TSA;

(f)     the duly executed assignment and assumption agreement in which Purchaser shall assume all rights and obligations of M&G Corp., Polymers, and Resins in and under the Intercompany License with respect to the Purchased Intellectual Property;

(g)     the duly executed Escrow Agreement; and

(h)     such other documents, instruments and certificates as Sellers may reasonably request.

4.4.     <u>Termination of Agreement</u>.   This Agreement may be terminated at any time prior to the Closing as follows:

(a)     by mutual written consent of Resins and Purchaser;

(b)     by written notice of either Purchaser or Resins to such other party, if:

(i)     the Closing shall not have been consummated on or prior to October 1, 2018 (such date, the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that the Termination Date may be extended by Sellers for a period up to January 1, 2019 in the event that the condition set forth in either Section 9.3(c) have not been satisfied and all other conditions to the respective obligations of the parties to close hereunder that are capable of being fulfilled by the Termination Date have been so fulfilled or waived; <u>provided</u>, <u>further</u>, <u>however</u>, that a party shall not be permitted to terminate this Agreement pursuant to this Section 4.4(b)(i) if such party is in material breach of this Agreement; or

(ii)     there is in effect a final and non-appealable Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (an "<u>Adverse Determination</u>"), it being agreed that the parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence.

(c)     so long as Purchaser is not in breach of its obligations under this Agreement, by Purchaser by written notice to Resins if:

(i)     Sellers file a motion to have the Bankruptcy Court enter an Order dismissing, or converting the Bankruptcy Case into cases under chapter 7 of the Bankruptcy Code or appointing a trustee in the Bankruptcy Case or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(ii)     an Order is entered dismissing the Bankruptcy Case, converting the Bankruptcy Case into cases under chapter 7 of the Bankruptcy Code or appointing a trustee or examiner in the Bankruptcy Case and such Order is not reversed or vacated within fourteen (14) days after entry thereof;

(iii)     the Sale Order and Interim New DIP Order (a) shall not have been entered by the Bankruptcy Court by March 30, 2018, (b) shall have been entered in a form not acceptable to Purchaser, or (c) shall have been stayed, vacated, modified, or supplemented without Purchaser's prior written consent; provided that Purchaser shall not be able to terminate this Agreement pursuant to clause (a) of this Section 4.4(c)(iii) if, prior to such termination, the Bankruptcy Court shall have entered the Sale Order and Interim New DIP Order;

(iv)     the Final New DIP Order (a) shall not have been entered by the Bankruptcy Court by April 13, 2018, (b) shall have been entered in a form not acceptable to Purchaser, or (c) shall have been stayed, vacated, modified, or supplemented without Purchaser's prior written consent; provided that Purchaser shall not be able to terminate this Agreement pursuant to section (a) of this Section 4.4(c)(iv) if, prior to such termination, the Bankruptcy Court shall have entered the Final New DIP Order;

(v)     the Sale Order has not become a Final Order by April 13, 2018; provided that Purchaser shall not be able to terminate this Agreement pursuant to this Section 4.4(c)(v) if, prior to such termination, the Bankruptcy Court shall have entered the Sale Order and the Sale Order has not been appealed, stayed, withdrawn or modified in a manner not acceptable to Purchaser;

(vi)     the Final New DIP Order has not become a Final Order by April 28, 2018; provided that Purchaser shall not be able to terminate this Agreement pursuant to this Section 4.4(c)(vi) if, prior to such termination, the Bankruptcy Court shall have entered the Final New DIP Order and the

Final New DIP Order has not been appealed, stayed, withdrawn or modified in a manner not acceptable to Purchaser;

(vii)     an event of default under the New DIP Loan Agreement has occurred;

(viii)    any condition to the obligations of Purchaser set forth in Section 9.1 and Section 9.3 has become incapable of fulfillment, and such condition is not waived by Purchaser;

(ix)     Sellers breach any representation or warranty or any covenant or agreement contained in this Agreement, and such breach would result in a failure of a condition set forth in Section 9.1 or Section 9.3 and such breach has not been cured by the earlier of (a) ten (10) Business Days after the giving of written notice by Purchaser to Sellers of such breach and (b) the Termination Date;

(x)     a Material Adverse Effect has occurred;

(xi)     there is a legal proceeding by a Governmental Entity under any Antitrust Law of the United States threatened in writing or pending against the Purchaser or Sellers that is reasonably likely to temporarily or permanently enjoin, restrain, delay or prevent the consummation of the transactions; or

(xii)    Sellers publicly announce, file, or take material steps in furtherance of any chapter 11 plan(s) of reorganization or plan(s) of liquidation with respect to the Bankruptcy Case that fail to provide for or otherwise contemplate the Closing pursuant to the terms hereof.

(d)     so long as Sellers are not in breach of their obligations under this Agreement, by Resins by written notice to Purchaser if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, and such breach would result in a failure of a condition set forth in Section 9.2 or Section 9.3 and such breach has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Sellers to Purchaser of such breach and (ii) the Termination Date.

Each event of termination set forth in this Section 4.4, pursuant to which this Agreement may be terminated, shall be considered separate and distinct from each other event of termination.  If more than one of the events set forth in this Section 4.4 is applicable, the applicable party shall have the right to choose the termination event pursuant to which this Agreement is to be terminated.

4.5.     Procedure Upon Termination.   In the event of termination pursuant to Section 4.4, the terminating party will give written notice thereof to the other party or parties, and this Agreement will terminate and the purchase and assumption of the Purchased Assets and Assumed Liabilities hereunder will be abandoned, without further

action by Purchaser or Sellers.  If this Agreement is terminated as provided herein, each party will use reasonable efforts, subject to applicable law, to destroy all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof.

4.6.    Effect of Termination.

(a)    In the event that this Agreement is validly terminated as provided in Section 4.4, then each of the parties hereto will be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination will be without liability to Purchaser, Sellers or any of their respective Representatives; provided, however, that the provisions of Section 4.5, this Section 4.6 and Article XII (other than Section 12.3) and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1 hereof, will survive any such termination and will be enforceable hereunder; provided, further, that except as otherwise provided in Section 4.6(b) below, nothing in this Section 4.6(a) will be deemed to release any party from Liability (a) for any breach of its obligations under this Agreement, or (b) arising under any other agreement between the parties in connection with the transactions contemplated by this Agreement.

(b)    If this Agreement is terminated pursuant to Section 4.4(d), then (i) Sellers' sole damages remedy against Purchaser or any of its affiliates shall be limited to the amount of the Deposit Amount (the "Damages Cap") and notwithstanding anything to the contrary contained in this Agreement, such Damages Cap shall constitute the amount of Sellers' full and complete liquidated damages and (ii) Sellers' sole and exclusive remedy against Purchaser or any of its affiliates or their respective partners, officers, directors and shareholders for any and all damages suffered or incurred by Sellers in connection with this Agreement or any related document, any of the transactions contemplated hereby or thereby (or the abandonment or termination thereof) or any matters forming the basis for such abandonment or termination.

## V.    REPRESENTATIONS AND WARRANTIES OF SELLERS AND MGI

Sellers hereby severally and not jointly represent and warrant to Purchaser and, with respect to Section 5.8 only, MGI hereby individually represents and warrants to Purchaser, that:

5.1.    Organization and Good Standing.  Each Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and, subject to the limitations imposed on such Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary for the operation of the Business as now conducted, except where the failure to be so

qualified, licensed or in good standing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.2.    Authorization of Agreement.  Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate action on the part of each Seller.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of each Seller enforceable against such Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3.    Conflicts; Consents of Third Parties.    (a) Except as set forth on Schedule 5.3, the execution and delivery by Sellers of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation of the transactions contemplated hereby and thereby and compliance by such Sellers with any of the provisions hereof will not result in the creation of any Lien upon the properties or assets of such Sellers being sold or transferred hereunder and do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation, modification or acceleration under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of such Seller, (ii) subject to entry of the Sale Order, any Contract listed as a Purchased Contract on Schedule 2.1(b)(vii) as of the date of this Agreement or any Permit to which such Seller is a party or by which any of the properties or assets of such Seller is bound, (iii) subject to entry of the Sale Order, any Order or approval of, or registration, declaration or filings with, any Governmental Body applicable to such Seller or any of the properties or assets of such Seller as of the date hereof, or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Except as set forth on Schedule 5.3 and except to the extent not required if the Sale Order is entered, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of each Seller in connection with the

execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Sellers of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, if any, (ii) the entry of the Sale Order, and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.4.    [RESERVED]

5.5.    <u>Real Property</u>.

(a)    <u>Schedule 5.5(a)</u> lists all real property included in the Purchased Assets owned by Sellers ("<u>Owned Real Property</u>") and all material Leased Real Property.  Sellers have good and marketable fee simple title to the Owned Real Property, free and clear of all Liens (except for Permitted Exceptions) and at Closing will hold such good and marketable title free and clear of all Liens (except for Closing Date Permitted Exceptions). Except for any defaults related to the Bankruptcy Case or the Sellers' financial condition or as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) as of the date of this Agreement, there is no pending or, to the Knowledge of Sellers, threatened condemnation proceeding, administrative action or judicial proceeding of any type relating to the Real Property or other matters affecting adversely the current use, occupancy or value of the Real Property; (b) the Real Property does not serve any adjoining property for any purpose inconsistent with the use of the Real Property, and, to the Knowledge of Sellers, the Real Property is not located within any flood plain or subject to any similar type of restriction for which any permits or licenses necessary to the use thereof have not been obtained; (c) the current use of the Real Property by Sellers do not violate any instrument of record or agreement affecting the Real Property or any applicable Law; and (d) there are no outstanding options or rights of first refusal to purchase any of the Owned Real Property or any interest therein. Sellers possess valid and enforceable leasehold estates, as lessee, of the Leased Real Property of the leases subleases and licenses of the Leased Real Property, free and clear of all Liens (except for Permitted Exceptions) (the "<u>Lessee Leases</u>"). To the Knowledge of Sellers, (i) the Lessee Leases are in full force and effect and Sellers party thereto enjoy peaceable and undisturbed possession thereunder, and (ii) no event has occurred which with the giving of notice or passage of time, or both, would cause a breach or a default by either party under any Lessee Leases.

(b)    <u>Lessor Leases</u>. <u>Schedule 5.5(b)</u> lists, as of the date hereof, all material unexpired leases, subleases, licenses, sublicenses, occupancy or other agreements whereby Sellers leases, subleases, licenses or grants an interest in any Owned Real Property to a third party (the "<u>Lessor Leases</u>"). Sellers have made available, to the extent that they are in Sellers' possession or control, true, complete and correct copies of the Lessor Leases to Purchaser, including any amendments thereto.

Other than as set forth on Schedule 5.5(b) or as a result of the Bankruptcy Case, Sellers are not in material breach of or in default under the Lessor Leases and, to the Knowledge of Sellers, no party to any Lessor Lease has given Sellers written notice of or, to the Knowledge of Sellers, made a claim with respect to any material breach or material default by Sellers thereunder (other than as a result of the Bankruptcy Case).

5.6. <u>Title to Purchased Assets</u>. Sellers own the Purchased Assets (other than the Purchased Intellectual Property and MGI Assets) and, subject to the entry of the Sale Order and receipt of any Necessary Consents, at the Closing, Purchaser will be vested with good and valid title to such Purchased Assets (other than Purchased Intellectual Property and MGI Assets), free and clear of all Claims (as defined in the Bankruptcy Code) and Liens (other than Closing Date Permitted Exceptions), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

5.7. <u>Intellectual Property</u>.

(a) <u>Schedule 1.1(d)</u> sets forth a complete and accurate list of all registered, applied for or issued items of Intellectual Property included in the Purchased Intellectual Property, including, for each item listed, the owner, jurisdiction and issuance, registration or application number and date, as applicable, of such item.

(b) Except as set forth on <u>Schedule 5.7(b)(i)</u>, as of the date of this Agreement, no claims are pending against Sellers before a Governmental Body or, to the Knowledge of Sellers, threatened in the one (1) year period prior to the Closing Date, with regard to the ownership by Sellers, validity or enforceability of any Purchased Intellectual Property. Notwithstanding anything to the contrary in this Agreement, except as disclosed on <u>Schedule 5.7(b)(ii)</u>, as of the date of this Agreement, (i) to the Knowledge of Sellers, the conduct of the Business, as currently conducted and as currently contemplated to be conducted, has not and does not infringe, misappropriate or otherwise violate any other Person's Intellectual Property, (ii) no Legal Proceedings are pending, or, to the Knowledge of Sellers, threatened in writing alleging that the conduct of the Business infringes, misappropriates or otherwise violates any other Person's Intellectual Property, (iii) to the Knowledge of Sellers, no Person is infringing, misappropriating or otherwise violating any Purchased Intellectual Property, and (iv) no Legal Proceeding is pending, or, to the Knowledge of Sellers, threatened in writing alleging that any Person has infringed, misappropriated or otherwise violated any Purchased Intellectual Property.

(c) Except as disclosed on <u>Schedule 5.7(c)</u>, no Seller or any of their respective Affiliates or any other Person has any license under any of the Purchased Intellectual Property.

(d) Except as disclosed on <u>Schedule 5.7(d)</u>, the Purchased Intellectual Property, the Retained Trademarks, the MGI Trademarks and the Intellectual Property licensed to Sellers or any of their respective Affiliates from third parties pursuant to any Contracts listed on <u>Schedule 5.9(a)</u> includes all material Intellectual Property owned,

used or contemplated to be used by any Seller in the conduct of the Business as currently conducted, and as currently contemplated to be conducted.

5.8.   MGI Trademarks.

(a)   Except as set forth on Schedule 5.8(a), as of the date of this Agreement, no claims are pending against MGI before a Governmental Body or, to the Knowledge of Sellers, threatened in the one (1) year period prior to the Closing Date, with regard to the ownership by MGI, validity or enforceability of any material MGI Trademarks.

(b)   Except as disclosed on Schedule 5.8(b), neither MGI nor any of its Affiliates or any other Person has any license or other rights to any of the MGI Trademarks.

(c)   This Section 5.8 represents the sole and exclusive representations and warranties of MGI regarding Intellectual Property matters.

5.9.   Purchased Contracts.

(a)   Schedule 5.9(a) sets forth each material Contract to which a Plant Seller is a party and each material Contract related to the Business to which an Other Seller is a Party. Except as set forth on Schedule 5.9(a), the Purchased Contracts as set forth on Schedule 2.1(b)(vii) as of the date hereof do not include any Contract providing for an expenditure or aggregate expenditures by one or more Seller in excess of $100,000.

(b)   Each Contract listed on Schedule 5.9(a) is a valid and binding obligation of the Seller(s) party thereto and, to the Knowledge of Sellers, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (i) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, (ii) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (iii) the obligation to pay Cure Costs under Section 365 of the Bankruptcy Code and Section 2.5.   No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Contract or would cause the acceleration of any obligation of Sellers or, to the Knowledge of Sellers, any other party thereto or the creation of a Lien upon any Purchased Asset, except for such events that would not reasonably be expected to be material to the Business taken as a whole.

5.10.   All Business Assets Owned by Sellers.  The Purchased Assets (other than Purchased Intellectual Property and MGI Assets), whether real or personal, tangible or intangible, comprise all of the material assets, properties and rights that are owned or held by Sellers and the M&G Affiliates in connection with the construction, maintenance and operation of the Plants, other than (a) rights to or under Contracts which are not assumed by Purchaser pursuant to this Agreement (including pursuant to Section 2.6(c)), (b) assets disposed of following the date hereof and prior to the Closing in

compliance with Section 8.2(a)(v), (c) any real property in which Mossi & Ghisolfi Logistics & Engineering Co. has a fee simple interest, (d) any accounts payable and (e) any assets of Affiliates other than Debtors that are used to provide services under the TSA.

5.11.  Affiliate Transactions.  Except as set forth on Schedule 5.11, no director, officer, employee or member of the M&G Affiliates or any individual related by blood, marriage or adoption to any such Person is a party to any Purchased Contract.

5.12.  Bankruptcy and Litigation.  Sellers have commenced their Bankruptcy Case, which may include contested matters and adversary proceedings on a variety of disputed matters.  Sellers are also parties to the other legal actions set forth on Schedule 5.12.  The filing of the Bankruptcy Case vests in Sellers potential causes of action under chapter 5 of the Bankruptcy Code.  Except (x) for the Bankruptcy Case (and proceedings related thereto) and (y) as set forth on Schedule 5.12, there is no Proceeding or Order pending, outstanding or, to Knowledge of Sellers, threatened in writing against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Body, nor, to Knowledge of Sellers, are there any investigations relating to the Business pending or, to Knowledge of Sellers, threatened in writing by or before any arbitrator or any Governmental Body, which would reasonably be expected to be material to the Business or the Purchased Assets, taken as a whole.

5.13.  Environmental Matters.  Except as set forth on Schedule 5.13, to the Knowledge of Sellers, as of the date of this Agreement: (a) the construction of the Plants and contemplated operations of the Business are, and have been for the past three (3) years, in material compliance with all applicable Environmental Laws, (b) with respect to the Purchased Assets or the Business, Sellers are not the subject of any outstanding material Order with any Governmental Body respecting (i) Environmental Laws or (ii) a Remedial Action, (c) there is no investigation, action or proceeding pending, or threatened in writing against Sellers that could reasonably be expected to result in Sellers incurring any material Liability pursuant to any applicable Environmental Law in connection with the Purchased Assets, (d) the Real Property do not contain any Hazardous Material in amounts or concentrations which (i) constitute a material violation of, or (ii) would reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental Law, (e) neither Sellers nor, to the Knowledge of Sellers, any other Person on behalf of Sellers, have treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled or released any Hazardous Material in a manner that would reasonably be expected to give rise to material liability for response costs, corrective action costs, personal injury, property damage or natural resources damage under any applicable Environmental Law with respect to the Purchased Assets, (f) no material Legal Proceeding is pending or, to the Knowledge of Sellers, threatened under any Environmental Law against Sellers with respect to the Plants, Real Property or the Business, nor are there any material Orders outstanding under any Environmental Law with respect to the Plants, Real Property or the Business, (g) Sellers (i) hold and are, and have been for the past three (3) years in

material compliance with all Environmental Permits (each of which is in full force and effect and is not subject to appeal, except in such instances where the requirement to hold a Permit is being contested in good faith by Sellers by appropriate proceedings diligently conducted) for any of their Business operations or for the current ownership, construction, operation or use of the Real Property, or, to the extent currently required, any pending construction or expansion related thereto; (ii) for the past three (3) years have used commercially reasonable efforts to cause all contractors, lessees and other Persons occupying, operating or using the Real Property to materially comply with Environmental Law and obtain all necessary material Permits required under Environmental Law; and (iii) have not received any written notice that the material Environmental Permits will not be renewed, and (h) Sellers have made available copies of all material environmental assessments, audits (including compliance audits), evaluations, studies, and tests from the past five (5) years within their possession relating to the Owned Real Property of the Plants, whether generated by Sellers or others, including environmental audits and environmental site assessments.

5.14. <u>Financial Advisors</u>. Except as set forth on <u>Schedule 5.14</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

5.15. <u>Taxes</u>. Except as set forth on <u>Schedule 5.15</u>:

(a) (i) Each Seller has timely filed all material Tax Returns for Periodic Non-Income Taxes with respect to the Purchased Assets required to be filed by such Seller with the appropriate Tax Authority (taking into account any extension of time to file granted to such Seller), (ii) all such Tax Returns are true, correct and complete in all material respects, and (iii) all material Periodic Non-Income Taxes required to be paid by a Seller relating to the Business and/or the Purchased Assets, that are due and payable, whether or not shown to be payable on such Tax Returns, have been timely paid in full, except for any Taxes that such Seller is prohibited from paying by the Bankruptcy Code or the Bankruptcy Court.

(b) As of the date hereof, with respect to the Purchased Assets, (i) no examination or audit of any Tax Return for Periodic Non-Income Taxes of a Seller is currently in progress by any Tax Authority, (ii) Sellers have not received written notice of any contemplated examination or audit of any such Tax Return, (iii) no material deficiency or adjustment has been proposed in writing with respect to any such Tax Return by any Tax Authority, and (iv) Sellers have not executed any waiver of any statute of limitations in respect of Taxes, nor agreed to any extension of time with respect to a Tax assessment or deficiency with respect to the Purchased Assets that is currently in effect.

(c) As of the date hereof, there are no Liens (other than Permitted Exceptions) on any of the assets of the Sellers that arose in connection with any failure (or alleged failure) to pay any Tax.

(d)    No claim has been made in writing by any Tax Authority in a jurisdiction where a Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction.

5.16.    <u>Compliance with Law; Permits</u>.

(a)    Except as set forth in <u>Schedule 5.16(a),</u> and except with respect to Permits required under any Environmental Law, which Permits are addressed in <u>Section 5.13</u>, Sellers hold all of the Permits necessary for the current operation and conduct of the Business and the Purchased Assets in compliance with Law, the absence of which would be immaterial to the operation of the Business or the Purchased Assets from and after the Closing. The Permits set forth on <u>Schedule 5.16(a)</u> are all of the Permits (including Environmental Permits) held, or applied for, by Sellers with respect to the ownership, construction and maintenance of the Purchased Assets and the Plants, and the operation and conduct of the Business.

(b)    Except (x) as set forth on <u>Schedule 5.16(b)</u> or with respect to compliance with Environmental Laws, which is covered by <u>Section 5.13</u>, (y) for fully paid, discharged and finally settled citations and notices of violations issued by the Texas Commission on Environmental Quality or other Governmental Bodies and (z) as would not reasonably be expected to be material to the Business or the Purchased Assets, for the past five (5) years Sellers have owned and operated the Purchased Assets in accordance, in all material respects, with all Law, Orders and Permits applicable to Sellers and the Purchased Assets during such period, and the Business is in compliance in all material respects with all applicable Law, Orders and Permits (including any export control or any anti-bribery Law) and has obtained all approvals necessary for owning and operating the Purchased Assets and the Business and has made all necessary filings with all Governmental Bodies having jurisdiction necessary for owning and operating the Purchased Assets and the Business.

(c)    Except (x) as set forth on <u>Schedule 5.16(c)</u> or with respect to Legal Proceedings under Environmental Law, which are covered under <u>Section 5.13</u>, (y) for fully paid, discharged and finally settled citations and notices of violations issued by the Texas Commission on Environmental Quality or other Governmental Bodies, and (z) as would not reasonably be expected to be material to the Business or the Purchased Assets neither Sellers, nor to the Knowledge of Sellers, any of their Representatives have received within the past three (3) years any written notice or other communication from a Governmental Body that alleges that the Purchased Assets or the Business is not in compliance with any Law, Order or Permit or that threatens or states the intention on the part of any issuing Governmental Body to revoke, cancel, suspend or modify any Permit necessary for the ownership, construction and operation or conduct of the Business and the Purchased Assets (except with respect to regular periodic expirations and renewals thereof). Except as would not reasonably be expected to be material to the Business or the Purchased Assets: (i) Sellers have not had any Permits that are necessary for the current operation and conduct of the Business and the Purchased Assets appealed, denied, revoked, restricted or suspended during the past three (3) years; and (ii) Sellers are not currently a party to any proceedings involving the possible

appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current operation and conduct of the Business and the Purchased Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Court).

5.17. Labor Matters.

(a)    Except as set forth on Schedule 5.17(a), (i) Sellers are not party to, bound by, subject to, or have any obligations under any current or expired collective bargaining agreements, works council agreements, trade union agreements, or other similar agreements with any union, works council, or other labor organization, and (ii) no collective labor organizing activity involving any Employee or former Employee is pending or threatened, nor has there ever been collective labor representation involving any of them (in all cases, in their capacities as such).

(b)    Except as set forth on Schedule 5.17(b), there are no, and in the past three (3) years have not been any, (i) any Liabilities incurred by Sellers under the WARN Act, or under applicable Law for employees outside the United States regarding the termination or layoff of employees, (ii) picketing actions, strikes, work stoppages, work slowdowns, lockouts or other material job actions pending or, to the Knowledge of Sellers, threatened against or involving Sellers, or (iii) unfair labor practice charges, or any material grievances or complaints pending or, to the Knowledge of Sellers, threatened by or on behalf of any Employee or former Employee of Sellers.  There are no, and in the past three (3) years have not been any, complaints, charges or claims against Sellers pending or, to the Knowledge of Sellers, threatened, brought or filed with any public or governmental authority, arbitrator or court based on, arising out of, in connection with or otherwise relating to the employment or termination of employment or failure to employ by Sellers, of any individual.

(c)    Except as set forth on Schedule 5.17(c), for the past three (3) years, Sellers have been in compliance in all material respects with applicable Law relating to labor and employment, including all Law relating to employment practices, discrimination, equal employment opportunities, labor relations, wages and hours, classification of independent contractors, immigration, workers' compensation, background and credit checks, occupational safety and health and family and medical leave.

(d)    Schedule 5.17(d) sets forth a true, complete and accurate list of the following information as of the date of this Agreement for each Employee: employer, job title, location, date of hiring, date of commencement of employment, Fair Labor Standards Act designation, whether the individual is on a leave of absence, and if so, the cause of the leave of absence and when the individual is expected to return to active service, vacation and/or paid time off accrual, workers compensation code and current base compensation paid or payable and bonus and commission compensation during the current calendar year.

5.18.  <u>Employee Benefits</u>.

(a)  <u>Schedule 5.18(a)</u> sets forth a complete list of all Benefit Plans.

(b)  Except as would not result in any Liability to Purchaser, neither Sellers nor any of their ERISA Affiliates sponsored, or was obligated to contribute within the past six (6) years or currently sponsors, is obligated to contribute to or has any Liability in respect of (i) an "employee pension plan", as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code (including any Multiemployer Plan); (ii) a "multiple employer plan" as defined in Section 413(c) of the Code; and (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(c)  Each Benefit Plan has been established, maintained and administered by Sellers in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Laws. Other than routine claims for benefits, no liens, lawsuits or complaints to or by any Person or Governmental Body are pending against any Benefit Plan or against Sellers with respect to any Benefit Plan and, to the Knowledge of Sellers, no such material liens, lawsuits or complaints are threatened with respect to any Benefit Plan.

(d)  All contributions required by Law or by the terms of any Benefit Plan or any agreement relating thereto have been timely made (taking into account any waivers granted with respect thereto) to any funds or trusts established thereunder or in connection therewith or have been reflected on the applicable financial statements.

(e)  Sellers have no obligation to provide or make available post-employment benefits under any Benefit Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA), except as may be required under COBRA or similar Law, and at the sole expense of such individual.

(f)  Except as set forth in <u>Schedule 5.18(f)</u> or expressly provided herein, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due and payable from Sellers, or increase the amount of any compensation due and payable from Sellers, to any Employees as of the date hereof, (ii) increase any benefits otherwise payable under any Benefit Plan, (iii) result in the acceleration of the time of payment or vesting of any compensation or benefits under any Benefit Plan, or (iv) result in the triggering or imposition of any restrictions or limitations on the rights of Sellers or any of their ERISA Affiliates to amend or terminate any Benefit Plan.

5.19.  <u>Insurance</u>.  <u>Schedule 5.19</u> sets forth all insurance policies held by Sellers covering the Purchased Assets and the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect (subject to periodic renewals thereof). Except as set forth on <u>Schedule 5.19</u>, Sellers have paid all premiums on such policies due and payable prior to the date hereof

or, if not yet due, have properly accrued for such payables. To the Knowledge of Sellers, Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.20.  Undue Influence.  In connection with the operation of the Business, neither Sellers nor, to the Knowledge of Sellers, any director, officer, agent, employee or Affiliate of Sellers, has taken any action with respect to the Business that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "FCPA"). Sellers, and, to the Knowledge of Sellers, its Affiliates, have conducted the Business in compliance with the FCPA in all material respects and maintain procedures which are reasonably designed to ensure compliance therewith.

5.21.  Project Package.  Sellers have provided to the Purchaser the documentation and materials set forth on Schedule 5.21, including the proposed construction budget (the "Project Budget") (all such materials on Schedule 5.21, the "Project Package").  The Sellers have prepared the Project Package, including the Project Budget, in good faith and, to the Knowledge of Sellers, the Project Package is based on reasonable assumptions.

5.22.  Absence of Certain Changes.

(a)  Since the Petition Date through the date hereof, there has not been a Material Adverse Effect.

(b)  Except as set forth on Schedule 5.22, or as expressly contemplated by this Agreement or any Orders entered in the Bankruptcy Case from and after the Petition Date through the date hereof, Sellers have not:

(i)  except for executory contracts and unexpired leases (A) rejected by Sellers with the prior written consent of Purchaser or (B) listed on a rejection motion filed before the date hereof, terminated, modified or amended any material Contract other than due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such material Contract;

(ii)  purchased or otherwise acquired any material properties or assets (tangible or intangible) or sold, leased, transferred or otherwise disposed of any material properties or assets (tangible or intangible) that would be Purchased Assets if owned by Sellers on the date of this Agreement;

(iii)  (A) permitted, allowed or suffered any of the Purchased Assets to be subjected to any Lien (other than Permitted Exceptions), or (B) removed any equipment or other material tangible assets from the Plants;

(iv)  suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(v)     allowed any material Permit held by Sellers to terminate; or

(vi)     agreed or committed in writing to do any of the foregoing.

5.23.   <u>Utilities</u>.  Except as would not reasonably be expected to be material to the Plants, all utility services necessary for the construction and the operation of the Plants for their intended purposes are available at the Plants or would reasonably be expected to be so available as and when required upon commercially reasonable terms.

5.24.   <u>Other Facilities</u>.

(a)     All roads necessary for the construction and full utilization of the Plants for their intended purposes have either been completed or the Sellers possess the necessary rights of way therefor, other than rights of way that would reasonably be expected to be available on commercially reasonable terms as and when needed.

(b)     The Sellers possess all necessary easements, rights of way, licenses, agreements and other rights for the construction, interconnection and utilization of Plants (including fuel, water, wastewater and electrical).

5.25.   <u>Sufficiency of Purchased Assets</u>.

(a)     Other than those services that would reasonably expected to be commercially available when and as required on commercially reasonable terms, the Purchased Assets (other than Purchased Intellectual Property and MGI Assets):

(i)     comprise all of the property interests necessary to secure any right material to the acquisition, leasing, development, construction, installation, completion, operation and maintenance of the Plants in accordance with all Laws;

(ii)     are sufficient to enable the Plants to be located, constructed, developed, owned, occupied, operated, maintained and used on the Owned Real Property and the Leased Real Property; and

(iii)     provide adequate ingress and egress from the Owned Real Property for any reasonable purpose in connection with the construction and operation of the Plants.

(b)     Except as would not reasonably be expected to be material to the construction, maintenance or operation of the Plants, there are no services, materials or rights required for the construction or operation of the Plants, other than those that would reasonably be expected to be commercially available at or for delivery to the Owned Real Property on commercially reasonable terms.

5.26.   <u>Operations of the Plant Sellers; Binding Obligations</u>.

(a)     Aside from being party to certain intercompany Contracts listed on Schedule 5.26(a), Resins and Waters do not, and have at no time in the past, directly conducted any material business other than the ownership, construction, operation and maintenance of the Plants.

(b)     There is no judgment, injunction, order or decree to which any Seller is a party, which has or may reasonably be expected to have the effect of prohibiting or impairing any business practice of the Sellers with respect to the Purchased Assets, the Business, or the conduct of the Business, except that Sellers may enter into a consent decree, hold separate Order or otherwise in order to obtain clearance under or to terminate any waiting period required by any Antitrust Law or to avoid the entry of, or to effect the dissolution of, any Antitrust Order consistent with Section 8.9(c) of this Agreement.

5.27.   Chemtex Purchase Agreement.  All of the (a) Intellectual Property that has been sold, has been agreed to be sold or is required to be sold pursuant the Chemtex Purchase Agreement and (b) assets, properties and rights owned by any of the entities sold, agreed to be sold or required to be sold pursuant to the Chemtex Purchase Agreement, are not material to the operations of the Business.

5.28.   No Other Representations or Warranties; Schedules.   Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto) and excluding in all respects claims based on fraud or intentional misrepresentation, neither Sellers, MGI nor any other Person make any other express or implied representation or warranty with respect to Sellers, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers and MGI disclaim any other representations or warranties, whether made by Sellers, MGI, any Affiliate of Sellers or MGI, or any of Sellers', MGI's or their Affiliates' respective Representatives.   Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto) and excluding in all respects claims based on fraud or intentional misrepresentation, Sellers and MGI (a) expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Business or the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Sellers, MGI or any of their Affiliates).   Sellers and MGI make no representations or warranties to Purchaser regarding the probable success or profitability of the Business or the Purchased Assets or the use thereof.   The disclosure of any matter or item in any Schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

# VI.   REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers and MGI that:

6.1.   <u>Organization and Good Standing</u>.  Purchaser is an entity duly organized, validly existing and in good standing under the Laws of the state of its incorporation and has the requisite corporate power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2.   <u>Authorization of Agreement</u>.  Purchaser has the requisite corporate power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3.   <u>Conflicts; Consents of Third Parties</u>.  (a) The execution and delivery by Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Purchaser; (ii) any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound; (iii) any Order of any Governmental Body applicable to Purchaser or any of the properties or assets of Purchaser as of the date hereof; or (iv) any applicable Law, other than, in the case of clauses <u>(ii)</u>, <u>(iii)</u> and <u>(iv)</u>, such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b)   No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby

or thereby to which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order, (iii) Foreign Investment approval required under the Law of Taiwan, and (iv) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.4.    <u>Litigation</u>.  There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.5.    <u>Financial Advisors</u>.  Except as set forth on <u>Schedule 6.5</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

6.6.    <u>Financial Capability</u>.    Purchaser has, and will have at the Closing, sufficient funds available in cash to pay the Purchase Price, the Other Payments and any fees and expenses incurred by or otherwise required to be paid by Purchaser in connection with the transactions contemplated by this Agreement.    Upon the consummation of the transactions contemplated hereby, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.    For the avoidance of doubt, Purchaser's obligations to complete the transactions contemplated hereby are not dependent upon or conditioned on receipt of financing.

6.7.    <u>Condition of the Purchased Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Sellers and MGI are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers and MGI in <u>Article V</u> (as modified by the Schedules hereto), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis. Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation.

## VII. BANKRUPTCY COURT MATTERS

7.1. <u>Sale Order</u>. On or prior to March 30, 2018 (or such later date as agreed in writing by all of the parties hereto), the Bankruptcy Court shall have convened one or more hearings to consider entry of the Sale Order and the New Interim DIP Order and shall have entered the Sale Order and New Interim DIP Order.

7.2. <u>Purchaser Cooperation</u>. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser of the Purchased Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Bidding Procedures Order or the Sale Order is appealed, Sellers and Purchaser will use their respective reasonable efforts to defend such appeal(s).

## VIII. COVENANTS

8.1. <u>Access to Information</u>. Prior to the Closing Date, Sellers shall (a) afford Purchaser and its Representatives full and free access to and the right to inspect all of the Real Property, properties, assets, premises, Records, Contracts and other documents and data related to the Purchased Assets and the Assumed Liabilities as it reasonably requests, <u>provided</u>, that Purchaser will not be entitled to conduct any Phase II environmental assessment or environmental sampling or testing without Sellers' prior written consent, which may be withheld in Sellers' sole discretion; (b) furnish Purchaser and its Representatives with such financial, operating and other data and information related to the Purchased Assets and the Assumed Liabilities as Purchaser or any of its Representatives may reasonably request; and (c) instruct the Representatives of Sellers to reasonably cooperate with Purchaser in its investigation of the Purchased Assets and the Assumed Liabilities. Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances and will be subject to restrictions under applicable Law. Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Sellers to disclose information that would cause material competitive harm to a Seller or would violate attorney-client privilege. Following the Closing, Sellers and Purchaser shall preserve and keep the records held by themselves or their Affiliates relating to the Business and shall make such records, together with any personnel, available to Sellers or Purchaser, as applicable, as may be reasonably required by the other party in connection with, among other things, Legal Proceedings, the Bankruptcy Case, the administration, wind-down and liquidation of Sellers' estates, Tax audits, or in order to enable Sellers to comply with their obligations under the APG Purchase Agreement (and related agreements), the Chemtex Purchase Agreement (and related agreements) or this Agreement and the TSA. If any of Purchaser or Sellers wishes to destroy such records, such party will give Resins ninety (90) days' prior written notice and Resins will have the right to take possession of the records within such ninety (90) day period.

8.2.    Conduct of the Business Pending the Closing.

(a)    Except (1) as set forth on Schedule 8.2, (2) as required by applicable Law or by Order of the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement, or (4) with the prior written consent of Purchaser or the approval of the Bankruptcy Court, from the date of this Agreement until the Closing Date, Sellers will use commercially reasonable efforts to:

(i)    maintain the Purchased Assets (except for Purchased Intellectual Property and MGI Trademarks) in the condition in which they exist as of the date hereof, ordinary wear and tear excepted;

(ii)    with respect to all Purchased Intellectual Property and MGI Trademarks, maintain any such Purchased Intellectual Property or MGI Trademarks free from lapse or abandonment;

(iii)    maintain their books and records to the extent related to the Purchased Assets or the Business in the ordinary course of business as of the date hereof;

(iv)    maintain in full force and effect all material Permits used or held for use by Sellers in connection with the construction, maintenance and operation of the Plants;

(v)    use commercially reasonable efforts to maintain in full force and effect (and not to lapse), and to renew prior to the expiration thereof with coverages substantially identical to the coverages in effect on the date hereof, each of the insurance policies covering the Purchased Assets and the Business set forth on Schedule 5.19;

(vi)    not assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except for (A) the purpose of disposing of obsolete assets in the Ordinary Course of Business, (B) disposal of Inventory in accordance with obligations under cash collateral Orders), or (C) pursuant to the Intercompany License and the MGI Trademark License);

(vii)    take reasonable actions to defend and protect the Purchased Assets from infringement or deterioration;

(viii)    not enter into or amend any Purchased Contract other than (A) in the Ordinary Course of Business, (B) in connection with the Intercompany License, or (C) as required by Law;

(ix)    comply with applicable Laws in all material respects and comply with any Order of the Bankruptcy Court requiring Sellers to perform its obligations under a Purchased Contract in all material respects; and

(x)    not license the right to use any Purchased Intellectual Property to any Person except as required under the APG Purchase Agreement, the Order of the Bankruptcy Court approving such Contract, the Intercompany License or the MGI Trademark License.

(b)    Prior to the Closing, Sellers shall, subject to applicable Law, use their commercially reasonable efforts to take such action as may be reasonably requested by Purchaser to preserve intact, or to protect, the Purchased Assets.  To the extent that any such action reasonably requested by Purchaser requires Sellers to incur any expense, including recording documents to evidence chain of title with respect to Purchased Intellectual Property, Sellers will not be obligated to take any such action unless Purchaser agrees to bear (or to be directly responsible for) any such expenses.  Only upon any such agreement will Sellers be required to take any such action so reasonably requested by Purchaser.

8.3.    <u>Consents</u>.  Sellers will use their commercially reasonable efforts, and Purchaser will cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to in <u>Section 5.3(b)</u> and any consents and approvals necessary to transfer or reissue the Permits set forth on <u>Schedule 5.16(a)</u>; <u>provided</u>, <u>however</u>, that neither Purchaser nor Sellers will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceedings to obtain any such consent or approval.

8.4.    <u>Further Assurances</u>.  Subject to the other provisions of this Agreement, each of Purchaser and Sellers will use its commercially reasonable efforts to (i) execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such further or other actions, as may be reasonably necessary or appropriate to consummate the transactions contemplated by this Agreement, including the transfer or reissuance of an Environmental Permit required for the construction of the Plants, and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

8.5.    <u>Publicity</u>.  The initial press release concerning this Agreement and the transactions contemplated hereby will be in substantially the form previously agreed by the parties.  None of the parties will issue any press release concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law, stock exchange requirements or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, <u>provided</u>, <u>however</u>, that the party intending to make such release uses its commercially reasonable efforts consistent with such applicable Law, stock exchange requirements or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.6.    Confidentiality.  Purchaser acknowledges that confidential and proprietary information of Sellers and their Affiliates has been, and in the future may be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of (a) the confidentiality agreement dated September 26, 2017 between M&G Chemicals S.A., an Affiliate of Sellers, and Indorama Ventures Public Company Ltd., (b) the confidentiality agreement dated November 16, 2017 between the M&G Chemicals S.A. and Far Eastern New Century Corporation as the same may be supplemented by that certain Clean Team Agreement dated January 8, 2018 between M&G Chemicals S.A. and Far Eastern New Century Corporation, (c) that certain Clean Team Agreement dated January 24, 2018 between M&G Chemicals S.A. and Indorama Ventures Public Company Ltd. and (d) any other existing confidentiality or non-disclosure arrangements between M&G Chemicals S.A., on one hand, and any of Purchaser or DAK Americas LLC, on the other hand (collectively, the "Confidentiality Agreements"), the terms of which are incorporated herein by reference.  Purchaser acknowledges and understands that this Agreement and the Schedules may be publicly filed in the Bankruptcy Court and further made available by Sellers to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreements or otherwise.  Effective upon, and only upon, the Closing, the Confidentiality Agreements will terminate solely with respect to the Purchased Assets.  Sellers acknowledge that from and after the Closing, all non-public information relating to the Purchased Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates.  Sellers agree that, from and after the Closing, Sellers will not disclose to any Person any information relating to Purchaser and its Affiliates, the Purchased Assets or the Assumed Liabilities, except as required by Law or as otherwise becomes available in the public domain other than through any action by Sellers in violation of its obligations under this Section 8.6.  Sellers acknowledge and agree that the remedies at law for any breach or threatened breach of this Section 8.6 by Sellers are inadequate to protect Purchaser and its Affiliates and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms.  Accordingly, without prejudice to any other rights or remedies otherwise available to Purchaser or its Affiliates, each party acknowledges and agrees that upon any breach or threatened breach by Sellers of the terms and conditions of this Section 8.6, Purchaser and its Affiliates, as applicable, will be entitled to immediate injunctive relief and to seek an Order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 8.6 will survive the Closing.

8.7.    Other Transition Matters.  Prior to the Closing, Purchaser and Sellers agree to negotiate in good faith to agree upon a transition services agreement (the "TSA") under which (a) Purchaser will provide or cause to be provided to Sellers such services associated with the Purchased Assets as are reasonably required to facilitate the administration, wind-down and liquidation of Sellers' estates and (b) Sellers will provide or cause to be provided to Purchaser among other things, IT and other services consistent with the terms outlined on Schedule 8.7; provided, that the TSA term will end on the earlier of (a) June 30, 2018 and (b) such date as (i) Sellers and each Affiliate(s)

providing such service liquidate, cease to be able to provide the services, or otherwise cease to exist, (ii) the Bankruptcy Court enters an Order dismissing the Bankruptcy Case of Sellers and each such Affiliate or converting the Bankruptcy Case of Sellers and each such Affiliate to a case under chapter 7 of the Bankruptcy Code, or (iii) after entering an order confirming a chapter 11 plan for Sellers in the Bankruptcy Case, the Bankruptcy Court enters an Order closing the Bankruptcy Case.

8.8. <u>Supplementation and Amendment of Schedules</u>. Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, will not be deemed to be an acknowledgment or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule to which its relevance is reasonably apparent on the face of such disclosure. Notwithstanding anything to the contrary herein or otherwise, in no event will Seller be permitted to supplement or amend any Schedule without the prior written consent of Purchaser (except to the extent necessary as a result of agreed upon additions or deletions to the Purchased Assets or the Excluded Assets), and no such supplement or amendment, shall, in any event, have any effect in any manner on the satisfaction of the conditions to Closing set forth in <u>Section 9.1(a)</u> or any of the rights of Purchaser hereunder. During the period commencing on the date of this Agreement and terminating upon the earlier to occur of the Closing or the termination of this Agreement, Sellers shall promptly notify Purchaser of any event that would reasonably be expected to cause any of the conditions set forth in <u>Article IX</u> not to be fulfilled by the Termination Date.

8.9. <u>Regulatory Approvals</u>.

(a) Purchaser and Sellers will (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Antitrust Laws (as defined below) with respect to the transactions contemplated hereby as promptly as practicable and advisable, and, in any event, within ten (10) Business Days after the date of this Agreement in the case of all filings required under the HSR Act and as soon as reasonably practicably but diligently in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable and advisable date with any request under the HSR Act or other Antitrust Laws for additional information, documents or other materials received by each of them or any of their respective subsidiaries from Federal Trade Commission (the "<u>FTC</u>"), the Antitrust Division of the United States Department of Justice (the "<u>Antitrust Division</u>") or any other Governmental Body in respect of such filings or such transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each

such party will use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement. Each such party will use commercially reasonable efforts to promptly inform the other parties of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto will independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable Law, the parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party relating to proceedings under the HSR Act or other Antitrust Laws. Sellers and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.9 as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Purchaser, as the case may be).

(b)     Each of Purchaser and Sellers will use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"); provided, however, that notwithstanding anything to the contrary contained in this Agreement, in no case shall the Purchaser or its affiliates be obligated to agree to, consent to, become subject to, or otherwise take any action with respect to, any requirement, condition, understanding, agreement, or order to sell or otherwise dispose of, or to conduct, restrict, operate, invest, or otherwise change its assets or business or the Purchased Assets.

(c)     In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any Antitrust Law, each of Purchaser and Sellers will cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order whether temporary, preliminary or permanent ("Antitrust Order"), that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Sellers decide that litigation is not in their respective best interests. Each of Purchaser and Sellers will use its commercially reasonable efforts to take such action as may be required to cause the

expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement.

(d)     Notwithstanding anything to the contrary herein, the provisions of this Section 8.9 do not require Purchaser (1) to share confidential portions of HSR Filing Forms, Exhibits or other documents with Sellers (but such information may in Purchaser's sole discretion be shared on an outside counsel only basis), or (2) to share or allow comment upon any materials submitted to the FTC in connection with any investigation of anyone other than Purchaser acquiring the Assets or any other assets or to participate in any meetings or interviews with the FTC in that regard. Without limiting the generality of Sellers' undertakings pursuant to this Section 8.9, and notwithstanding anything to the contrary contained in this Agreement, Purchaser shall have the principal responsibility for devising and implementing the strategy for obtaining any necessary approvals, clearances, and authorizations for the proposed transaction under the Antitrust Laws, provided, that such strategy shall be reasonably designed to obtain such approvals, clearances, and authorizations in a manner consistent with this Section 8.9, as promptly as reasonably practicable, and Purchaser shall take the lead in all meetings and communications with the FTC, the United States Department of Justice, or any other Governmental Body in connection with obtaining any necessary Antitrust Laws or competition clearances.

8.10.   Intellectual Property Matters.

(a)     License to Retained Trademarks.  Effective as of the Closing Date, Sellers and MGI hereby grant (and shall use commercially reasonable efforts to cause each of their respective Affiliates to grant) to Purchaser a non-exclusive, paid-up, royalty-free license to use the Retained Trademarks on signage and in such other usages that are existing at the Plants as of the Closing Date, provided, that such usage remains consistent with the usages in effect as of the Closing Date, and further provided that Purchaser will use reasonable efforts to discontinue such usages of the Retained Trademarks within a reasonable time after the Closing Date.  The foregoing license shall survive any transfer, whether in whole or in part, of any such Retained Trademarks, and each Sellers shall make any such transfer subject to the foregoing license.  Nothing in this Agreement or the Sale Order will be construed as creating an obligation on Sellers or MGI to prosecute, register, renew, defend, police or otherwise maintain the Retained Trademarks.

(b)     Technical Documentation. Sellers will use commercially reasonable efforts to ensure that all operating copies of all procedures, specifications and other information that is in existence and related to the operation of the Plants (all of which shall be deemed to be included in the Purchased Records) are located at the Plants or otherwise made available to Purchaser as soon as reasonably possible following the Closing.

8.11.   Taiwan Approvals.  Promptly following the execution hereof (and in any event within fifteen (15) Business Days following the date hereof), Purchaser will use commercially reasonable efforts, including enforcing its contractual rights, to cause Far

Eastern Investment (Holding) Limited or its applicable Affiliate ("<u>FENC</u>"), to prepare drafts of such documents and filings as shall be required to obtain all Foreign Investment approvals required under the Laws of Taiwan (the "<u>Taiwan Approval Documents</u>").  Purchaser shall notify Sellers when the Taiwan Approval Documents are filed and shall keep Sellers reasonably informed as to the status of such filings and approvals.  Purchaser shall, and shall cause FENC to, use reasonable best efforts to obtain all Foreign Investment approvals required under the Laws of Taiwan as promptly as practicable following the date hereof.

       8.12.  <u>MGI Obligations</u>.

       (a)   MGI shall become a party hereto only upon its execution of a counterpart hereto.  The parties acknowledge and agree that, unless and until such time as MGI executes a counterpart to this Agreement (the "<u>MGI Execution Date</u>"), MGI shall have no obligations hereunder and, notwithstanding anything in this Agreement to the contrary, until the MGI Execution Date: (i) MGI shall retain all of its right, title and interest in and to the MGI Assets, and such right, title and interest in and to the MGI Assets, and the MGI Assets shall be Excluded Assets and shall not be transferred to Purchaser at the Closing pursuant to Section 2.1; (ii) MGI shall have no delivery obligations with respect to the MGI Assets pursuant to this Agreement; (iii) the representations and warranties relating to MGI set forth in Article V shall have no force and effect; (iv) Section 8.2 shall not be binding on MGI; and (v) Purchaser shall not assume or receive any rights or obligations under the MGI Trademark License.  For the avoidance of doubt, if MGI does not execute a counterpart to this Agreement, all references to MGI in Article IX shall be deemed to be removed and shall not have any effect on satisfaction of the conditions to Closing contained therein.

       (b)   If the MGI Execution Date is less than fourteen (14) days prior to the Closing Date, the obligations of MGI under <u>Section 4.2(b)</u> shall not be conditions to Closing under Article IX, but will be delivered by MGI as soon as reasonably practicable after the Closing.  Upon MGI's execution of a counterpart hereto, the MGI Purchase Price shall be the amount agreed upon in writing between MGI and Purchaser at the time of such execution.

       (c)   For the avoidance of doubt, MGI may execute a counterpart to this Agreement following the date hereof and prior to the Closing, and such later execution, if so executed after the date hereof, shall not affect the binding nature of this Agreement as of the date hereof between the other signatories hereto.

## IX.   CONDITIONS TO CLOSING

       9.1.  <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Sellers contained in this Agreement that are not qualified by materiality or Material Adverse Effect shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Sellers contained in this Agreement that are qualified by materiality or Material Adverse Effect shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Purchaser shall have received a certificate signed by an authorized officer of Sellers, dated the Closing Date, to the foregoing effect;

(b)     Sellers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Resins, dated the Closing Date, to the forgoing effect;

(c)     Sellers and MGI, as applicable, shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 4.2;</u>

(d)     From the date hereof until Closing, no Material Adverse Effect shall have occurred; and

(e)     The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably acceptable to Sellers and Purchaser, and the Sale Order shall have become a Final Order.

9.2.    <u>Conditions Precedent to Obligations of Sellers</u>.  The obligations of Sellers and MGI to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers and MGI in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser contained in this Agreement that are not qualified by materiality or Purchaser Material Adverse Effect shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Purchaser contained in this Agreement that are qualified by materiality or Purchaser Material Adverse Effect shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Sellers and MGI shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Sellers

and MGI shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)     Purchaser shall have delivered to Sellers and MGI all of the items set forth in <u>Section 4.3</u>.

9.3.    <u>Conditions Precedent to Obligations of Purchaser, Sellers and MGI</u>.  The respective obligations of Purchaser, Sellers and MGI to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the Bankruptcy Court shall have entered the Sale Order and the effectiveness of such Sale Order shall not have been stayed;

(c)     all applicable requirements for compliance under the HSR Act and any other applicable Antitrust Laws, if any, shall have been satisfied; the applicable waiting period under the HSR Act (and any extension thereof) relating to the transaction(s) shall have expired or been earlier terminated, and any Agreement with or commitments made to any Governmental Body not to close the transaction shall have expired or been terminated, and all approvals, clearances, and authorizations for the proposed transaction under other Antitrust Laws deemed necessary or advisable shall have been obtained and remain in full force and effect and all applicable waiting periods shall have expired, lapsed or been terminated (as appropriate), in each case in connection with the transactions, under the Antitrust Laws of any jurisdiction;

(d)     all Foreign Investment approvals required under the Law of Taiwan shall have been obtained; and

(e)     there shall be no legal proceeding by a Governmental Entity under any Antitrust Law of the United States threatened in writing or pending against the Purchaser or Sellers that is reasonably likely to temporarily or permanently enjoin, restrain or prevent the consummation of the transactions.

9.4.    <u>Frustration of Closing Conditions</u>.  No party may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## X.     EMPLOYEES

10.1.    <u>Employees and Benefit Plans</u>.    Purchaser shall determine which Employees, if any, to offer employment to, in its sole discretion (such Employees who are offered employment,    accept such offers of employment with Purchaser based upon the terms and conditions set by Purchaser, and commence employment with

Purchaser, the "Transferred Employees").  Purchaser shall provide Sellers with a list of the Employees that will receive offers no later than five (5) Business Days prior to the Closing Date.  Purchaser shall not be obligated to provide severance, separation pay, or other payments or benefits, to any Employee on account of any termination of such Employee's employment on or before the Closing Date, and such benefits, if any, shall remain obligations of Sellers.

10.2.  Employment Tax Reporting.  With respect to the Transferred Employees, Purchaser and Sellers will use the standard procedure set forth in Revenue Procedure 2004-53, 2004-2 CB 320, for purposes of employment tax reporting.

10.3.  Access to Information.  After the execution hereof by Purchaser, Sellers shall provide Purchaser, its Affiliates and their Representatives with reasonable access to the Employees and with information, including employee records and Benefit Plan data, reasonably requested by Purchaser and such Affiliates, except as otherwise prohibited by Law.

10.4.  WARN Act.  With respect to Transferred Employees, Purchaser will have full responsibility under the WARN Act relating to any act or omission of Purchaser after the Closing Date.  With respect to the Employees, Sellers will have full responsibility under the WARN Act relating to any act or omission of Sellers prior to and on the Closing Date.  Sellers shall be responsible for all other WARN Act Liabilities relating to the periods prior to and on the Closing Date, including any such Liabilities that result from Employees' separation of employment from Sellers and/or Employees not becoming Transferred Employees pursuant to Section 10.1; provided, however, that Sellers shall not be responsible for any WARN Act claims based on the terms of Purchaser's offer of employment to any Employee.  Sellers and Purchaser shall cooperate in fulfilling each of their respective WARN obligations, if any.

10.5.  No Obligations.  No provision in this Article X or otherwise in this Agreement, whether express or implied, shall (i) create any third-party beneficiary or other rights in any union, employee or former employee of Sellers or any of their subsidiaries or Affiliates (including any beneficiary or dependent thereof), any other participant in any Benefit Plan or any other Person; (ii) create any rights to continued employment with Sellers, Purchaser or any of their respective subsidiaries or Affiliates or in any way limit the ability of Sellers, Purchaser or any of their respective subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason; or (iii) constitute or be deemed to constitute an amendment to any Benefit Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by Sellers, Purchaser or any of their subsidiaries or Affiliates.

## XI.    TAXES

11.1.  Transfer Taxes.  Purchaser will be responsible for all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any interest, penalties and additions with respect to such Taxes and fees) arising from

or relating to the consummation of the transactions contemplated by this Agreement (collectively, "Transfer Taxes"), regardless of the party on whom Liability is imposed under the provisions of the Laws relating to such Transfer Taxes. Sellers and Purchaser will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take commercially reasonable efforts to obtain any available exemptions from or reductions in such Transfer Taxes. To the extent any Seller or MGI is required by Law to pay any Transfer Taxes to a Tax Authority (including pursuant to a post-Closing adjustment or Order), Purchaser will remit an amount equal to such Transfer Taxes to Sellers or MGI, as applicable, not less than five (5) Business Days prior to the due date for such payment.

11.2. Purchase Price Allocation.

(a) As promptly as practicable, but no later than thirty (30) days after the Closing Date, Purchaser will deliver to Sellers a draft of an allocation statement setting forth the proposed allocation of the Purchase Price and the Assumed Liabilities among the Purchased Assets (the "Proposed Allocation Statement"). The Proposed Allocation Statement will be prepared consistent with the Closing Allocation and in accordance with Section 1060 of the Code, the applicable Treasury Regulations promulgated thereunder and any similar provision of applicable state, local or foreign Law. Sellers will have twenty (20) Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections. If Sellers fail to deliver an Allocation Notice of Objection in accordance with this Section 11.2(a), then the Proposed Allocation Statement will be conclusive and binding on all parties and will become the "Final Allocation Statement". If Sellers submit an Allocation Notice of Objection, then for twenty (20) Business Days (subject to extension upon the mutual agreement of the parties) after the date Purchaser receives the Allocation Notice of Objection, Purchaser and Sellers will work in good faith and use their commercially reasonable efforts to resolve all objections raised in such Allocation Notice of Objection and agree on the allocation. In the event that the parties are not able to resolve all objections raised in the Allocation Notice of Objection within such twenty (20) Business Day period (or such longer period as mutually agreed upon by the parties), then the parties shall refer such dispute to an independent nationally recognized accounting firm ("Independent Accountant") at that time to review the Proposed Allocation Statement and the Allocation Notice of Objection, and make a determination as to the resolution of the allocation. The determination of the Independent Account regarding the allocation shall be delivered as soon as practicable following engagement of the Independent Accountant, but in no event more than sixty (60) days thereafter, and shall be final, conclusive, and binding upon all parties. Purchaser shall bear the cost of the Independent Accountant.

(b) Sellers and Purchaser will report, act and file (and will use commercially reasonable efforts to cause their respective Affiliates to report, act and file) Tax Returns (including IRS Form 8594) in all respects and for all purposes

consistent with the Final Allocation Statement and neither Sellers nor Purchaser will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with such Final Allocation Statement, except, in each case, to the extent otherwise required by applicable Law or Order.

11.3. <u>Certain Periodic Non-Income Taxes</u>.

(a)    Purchaser will assume and be responsible for, and will pay, any and all Periodic Non-Income Taxes assessed on, or in respect of, the Purchased Assets or relating to the conduct or operation of the Business that are unpaid as of the Closing Date or that become payable after the Closing Date, whether arising or assessed prior to, on, or after the Closing Date (collectively, the "<u>Assumed Periodic Non-Income Taxes</u>").

(b)    With respect to any Periodic Non-Income Taxes that are assessed on, or in respect of, the Purchased Assets or relating to the conduct or operation of the Business attributable to any Post-Closing Tax Period, if any Seller pays such Periodic Non-Income Taxes on or prior to the Closing Date, then the Purchase Price will be increased by the amount of such Taxes paid by such Sellers.  For purposes of this <u>Section 11.3(b)</u>, Periodic Non-Income Taxes for a Tax period that includes but does not end on the Closing Date will be apportioned between the portion of such Tax period up to and including the Closing Date and the portion of such Tax period beginning after the Closing Date on a per diem basis.

11.4. <u>Cooperation</u>.    Sellers and Purchaser will use commercially reasonable efforts to furnish or cause to be furnished to each other, upon written request, as promptly as practicable, such information relating to the Business and the Purchased Assets (including access to books and records and non-income Tax Returns that relate exclusively to the Purchased Assets and related working papers dated before the Closing) as is reasonably necessary and as is reasonably practicable for: (a) the filing of all non-income Tax Returns and (b) the preparation for any non-income Tax audit by any Tax Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and (c) the claiming by Purchaser of any local business Tax credits or incentives that Purchaser may qualify for in Nueces County, Texas (and the local taxing jurisdiction therein); <u>provided</u>, that none of Sellers or any of their respective Affiliates shall be required to incur any unreimbursed cost or expense; <u>provided</u>, <u>further</u>, that neither Purchaser nor Sellers shall be required to disclose the contents of its income Tax Returns to any Person other than the parties.

## XII.    MISCELLANEOUS

12.1. <u>No Survival of Representations and Warranties</u>.    The parties agree that the representations and warranties contained in this Agreement will not survive the Closing, and none of the parties will have any Liability to each other after the Closing for any breach thereof.  The parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing, and each party will be

liable to the other after the Closing for any breach thereof.  None of Sellers will have any future Liability under any post-Closing covenant herein or in any other agreement, document or instrument entered into in connection with the transactions contemplated hereby in the event that all of the Sellers effect a plan of liquidation on a date that is no earlier than ninety (90) days following the Closing Date.

12.2.  <u>Expenses</u>.  Each of Sellers and Purchaser will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby.  Without limiting the foregoing, Purchaser will pay the filing fee required in connection with (a) any HSR Act filing or any other filing in connection with any Antitrust Laws and (b) any fee required to be paid to the Escrow Agent in connection with the Escrow Agreement.

12.3.  <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto will be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an Order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 12.3</u> will be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement.

12.4.  <u>Submission to Jurisdiction; Consent to Service of Process</u>.  (a) Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 12.8</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Case has been closed pursuant to Section 350 of the Bankruptcy Code and the Bankruptcy Court declines to accept jurisdiction upon a motion to reopen the Bankruptcy Case, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Legal Proceeding in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.8.

12.5.   Waiver of Right to Trial by Jury.   Each party waives to the fullest extent permitted by Law, any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.   Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement, by, among other things, the mutual waivers and certifications in this Section 12.5.

12.6.   Entire Agreement; Amendments and Waivers.   This Agreement (including the Schedules and Exhibits hereto) represents the entire understanding and agreement between the parties with respect to the subject matter hereof.   This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.   No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.   The waiver by any party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.   No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.   All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

12.7.   Governing Law.   This Agreement will be governed by and construed in accordance with the Laws of the State of Delaware applicable to Contracts made and performed in such State, without regard to the conflicts of law principles of such State (except that the transfer of the Owned Real Property located in Texas will be implemented in accordance with the laws of Texas).

12.8.   Notices.   All notices and other communications under this Agreement will be in writing and will be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile or electronic mail (with written confirmation of transmission) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers or e-mail addresses (or to such other address, facsimile number or e-mail address as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers, to:

M&G Resins, LLC
450 Gears Road, Suite 420
Houston, TX 77067
Facsimile: N/A
Attention: Dennis Stogsdill
E-mail: DStogsdill@alvarezandmarsal.com

With a copy (which will not constitute notice) to:

Jones Day
250 Vesey Street
New York, NY 10281
Facsimile:  (212) 755-7306
Attention:   Jeffrey Symons
E-mail: jsymons@jonesday.com

If to Purchaser, to:

Corpus Christi Polymers LLC
c/o Corporation Service Company
251  Little Falls Dr.
Wilmington, Delaware 19808
Facsimile: +66 2 661-6664
E-mail: Sanjay_a@indorama.net

With copies (which will not constitute notice) to:

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, NY 10020
Facsimile: 973-597-2573; 973-597-2479; and
973-597-6373
Attention:  Nicholas San Filippo, Paul Kizel,
and Sam Khan
E-mail: nsanfilippo@lowenstein.com;
pkizel@lowenstein.com;
skhan@lowenstein.com

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
Facsimile: 212-310-8007
Attention:  Jon-Paul Bernard
E-mail: jon-paul.bernard@weil.com

and

Duane Morris LLP
Suite 5010
600 Grant Street
Pittsburgh, PA 15219
Facsimile: 412-497-1042
Attention: Joel M. Walker
E-mail: jmwalker@duanemorris.com

12.9.   Severability.   If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.10. Assignment.   This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties and any attempted assignment without the required consents will be void, provided, however, that (a) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more wholly-owned subsidiaries formed by it prior to the Closing and (b) Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court.  No assignment of any obligations hereunder will relieve the parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Sellers or Purchaser will also apply to any such assignee unless the context otherwise requires.

12.11. Non-Recourse.   No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Sellers will have any Liability for any obligations or liabilities of Sellers under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.12. Counterparts.   This Agreement may be executed by facsimile or electronic delivery of original signatures, and in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when such counterparts have been signed by each of the parties and delivered, including by facsimile or other electronic means, to the other parties. A signed copy of this Agreement transmitted by facsimile, email or other means of electronic transmission will

be deemed to have (to the extent legally permitted) the same legal effect as delivery of an original executed copy of this Agreement for all purposes.

12.13. <u>Bulk Sales</u>.   Purchaser hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Purchaser. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets (other than Closing Date Permitted Exceptions), including any Liens or claims arising out of the bulk transfer Laws and any derivative, successor, transferee or vicarious Liability of any kind or character and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**PURCHASER**:

**CORPUS CHRISTI POLYMERS LLC**

By: _____
     Name:
     Title:

**SELLERS**:

M&G RESINS USA, LLC

By: _____
  Name:
  Title:

M&G WATERS USA, LLC

By: _____
  Name:
  Title:

M&G USA CORPORATION

By: _____
  Name:
  Title:

M&G POLYMERS USA, LLC

By: _____
  Name:
  Title:

CHEMTEX INTERNATIONAL INC.

By: _____
  Name:
  Title:

**MGI (for the limited purposes set forth herein**:

MOSSI & GHISOLFI INTERNATIONAL S.À.R.L.

By: _____
  Name:
  Title:

**<u>Exhibit A</u>**

**INTENTIONALLY OMITTED**

**Exhibit B**

**INTENTIONALLY OMITTED**

# Exhibit C

# LICENSE AGREEMENT

BETWEEN

M&G USA CORPORATION ("M&G USA"),
M&G POLYMERS USA LLC ("M&G POLYMERS"),
M&G RESINS USA LLC ("M&G RESINS"),
M&G POLÍMEROS MEXICO, S.A. DE C.V. ("M&G MEXICO"), AND
M&G POLÍMEROS BRASIL S.A. ("M&G BRAZIL")

DATED AS OF

_____, 2018

# LICENSE AGREEMENT

This License Agreement ("<u>Agreement</u>") dated as of this ___ of _____, 2018 ("<u>Effective Date</u>"), is between M&G USA Corporation, a Delaware corporation, having a registered business address at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, USA, ("<u>M&G USA</u>"), M&G Polymers USA LLC, a Delaware limited liability company, having a business address at 450 Gears Road, Suite 240, Houston, Texas, USA ("<u>M&G Polymers</u>"), M&G Resins USA LLC, a Delaware limited liability company, having a registered business address at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, USA ("<u>M&G Resins</u>"), M&G Polímeros México, S.A. de C.V., a *sociedad anonoima de capital variable* company organized and existing under the laws of Mexico, with its registered office at Petrocel Km. 2, Puerto Industrial de Altamira, C.P. 89603, Altamira, Tamaulipas ("<u>M&G Mexico</u>"), and M&G Polímeros Brasil S.A., a corporation (sociedade anônima) duly organized and validly existing under the Laws of the Federative Republic of Brazil, with its headquarters in the City of Ipojuca, State of Pernambuco, at Rodovia PE-60, Km 10 – Engenho Massangana, SUAPE, TDR – Sul S/Nº, Complexo Industrial Portuário, CEP 55590-000, enrolled with the Brazil Corporate Taxpayers' Registry - CNPJ/MF under no. 07.079.511/0001-90 and with its corporate documents filed with the Commercial Registry of the State of Pernambuco under NIRE 26300013673 ("<u>M&G Brazil</u>"). Each of M&G USA, M&G Resins, M&G Polymers, M&G Mexico, and M&G Brazil may be referred to hereinafter individually as a "<u>Party</u>" and together as the "<u>Parties</u>".

## RECITALS

A.  M&G USA and M&G Polymers are the owners of certain patents and know-how (including product formulations and associated technology) relating to the manufacture and commercialization of polyester polymers, including know-how which was developed by or for M&G Polymers and M&G USA in the course of their conduct of business at a research and development facility in Sharon Center, Ohio, and a polyester plant in Apple Grove, West Virginia.

B.  M&G USA and M&G Polymers are the owners of certain trademark rights and associated goodwill relating to the commercialization of polyester polymer products.

C.  M&G Resins is the owner of certain know-how relating to the manufacture and commercialization of PET, including know-how which was developed by or for M&G Resins in the course of its ownership and construction of and planned conduct of business at a polyester polymer plant in Corpus Christi, Texas.

D.  M&G Brazil is the owner of certain know-how relating to the manufacture and commercialization of PET, including know-how which was developed by or for M&G Brazil in the course of its ownership and conduct of business at a polyester polymer plant in Suape Port, Brazil.

E.  M&G Mexico is the owner of certain know-how relating to the manufacture and commercialization of PET, including know-how which was developed by or for M&G Mexico in the course of its ownership and conduct of business at a polyester polymer plant in Altamira, Mexico.

F.      M&G Brazil is the owner of certain patents relating to the manufacture and commercialization of PET.

G.      The Parties are willing to enter into license agreements to provide clarity with respect to each Party's Intellectual Property in the conduct of their respective businesses.

## AGREEMENT

Now therefore, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

## INTERPRETATION

### 1.1      **Definitions.**

Capitalized terms used in this Agreement will have the meanings ascribed to them or referenced in Exhibit A.

### 1.2      **Construction.**

Except where expressly stated otherwise in this Agreement, the following rules of interpretation apply to this Agreement: (i) "include", "includes" and "including" are not limiting and mean include, includes and including, without limitation; (ii) definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; (iii) references to an agreement, statute or instrument mean such agreement, statute or instrument as from time to time amended, modified or supplemented; (iv) references to a Person are also to its permitted successors and assigns; (v) references to an "Article", "Section", "Exhibit" or "Schedule" refer to an Article or Section of, or any Exhibit or Schedule to, this Agreement unless otherwise indicated; (vi) the word "will" will be construed to have the same meaning and effect as the word "shall" and vice versa; (vii) the word "any" will mean "any and all" unless otherwise indicated by context; (viii) the word "or" means in the alternative or together, i.e., "and/or"; and (ix) the symbol $ means United States Dollars, and all monetary amounts referenced herein refer to United States Dollars unless otherwise specified.

## ARTICLE 2

## INTELLECTUAL PROPERTY LICENSES

### 2.1      **M&G Mexico Rights.**

2.1.1      M&G Polymers and M&G USA ("Licensors") grant to M&G Mexico a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or a Change of Control of M&G Mexico), non-sublicenseable (except in connection with the products and services of the M&G Mexico Plant) license under Licensors' rights in the M&G Mexico Licensed Patents and the M&G Mexico Non-

Barrier Formulations to make and use, in the M&G Mexico Plant, and offer for sale and sell, in the M&G Mexico Territory, the M&G Mexico Licensed Products, such license to terminate on the Mexico License Termination Date.

2.1.2   Licensors grant to M&G Mexico a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant or a Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under Licensors' rights in the M&G Mexico Licensed Trademarks to market and sell the M&G Mexico Licensed Products in the M&G Mexico Territory, such license to:

(a)     terminate on the Mexico License Termination Date; and

(b)     be subject to (i) M&G Mexico submitting to M&G USA or M&G USA's designated representative(s) samples of M&G Mexico Licensed Products and of proposed uses of the M&G Mexico Licensed Trademarks for review and approval (such approval not to be unreasonably withheld or delayed) by M&G USA or M&G USA's designated representative(s) (on behalf of both Licensors) from time to time at the request of M&G USA; (ii) M&G Mexico ensuring that the M&G Mexico Licensed Products with which it uses the M&G Mexico Licensed Trademarks meet a standard of quality that is no less than the standard of quality maintained by M&G USA or its Affiliates with respect to any products which used the M&G Mexico Licensed Trademarks prior to the Effective Date; and (iii) M&G Mexico taking no action that may negatively impact Licensors' rights, or any rights of any future owner of the M&G Mexico Licensed Trademarks, in the M&G Mexico Licensed Trademarks, including, but not limited to, applying for registration of any same or similar trademark or using or adopting any confusingly similar trademark.

2.1.3   Licensors grant to M&G Mexico a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or a Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under Licensors' rights in the M&G Marks to (a) use the M&G Marks on signage and for other usages at the M&G Mexico Plant, consistent with the usages in effect as of the Effective Date, and (b) market and sell the M&G Mexico Licensed Products within the M&G Mexico Territory, such license under (a) and (b) to be subject to the same terms as in <u>Section 2.1.2(b(</u>, and to terminate on earlier of (i) the Mexico License Termination Date, or (ii) 120 days subsequent to a Change of Control of M&G Mexico or a sale of all or substantially all of the M&G Mexico Plant.

2.1.4   If, in connection with a sale of all or substantially all assets of the M&G Resins Plant (an "<u>M&G Resins Plant Sale</u>"), (i) the entity acquiring such assets will also acquire ownership of any trademarks from MGI or its Affiliates that consist of the M&G Mexico Licensed

Trademarks (the "<u>M&G Mexico MGI Trademarks</u>"), and (ii) this Agreement will be assigned to the entity acquiring such assets, then the Parties will, in advance of the closing of such M&G Resins Plant Sale, use commercially reasonable efforts to cause the exhibits of this Agreement to be amended, to be effective upon the closing of the M&G Resins Plant Sale, to include the M&G Mexico MGI Trademarks as necessary to give the intended effect of <u>Section 2.1.2</u>, the license of which shall be subject to the terms of <u>Section 2.1.2</u>.

2.2     **M&G Brazil Rights.**

2.2.1     Licensors grant to M&G Brazil an irrevocable, royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Easy-Up Patents and the Easy-Up Know-How to make and use, solely in the M&G Brazil Plant, and offer for sale and sell, in the M&G Brazil Territory, polymer-related products (excluding, for the avoidance of doubt, any M&G Proprietary Products except as explicitly permitted by the Licensors pursuant to a license granted in this Agreement) made in the M&G Brazil Plant, such license to continue:

>       (a)     with respect to the M&G Easy-Up Patents, until the date that the last claim of the M&G Easy-Up Patents expires or is found invalid or unenforceable by a court of competent jurisdiction, and
>
>       (b)     with respect to the Easy-Up Know-How, perpetually.

2.2.2     Licensors grant to M&G Brazil a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Easy-Up Marks to market and sell the M&G Brazil Licensed Products in the then-current Licensed M&G Brazil Territory, such license to:

>       (a)     terminate on (i) the Brazil Interim License Termination Date with respect to the M&G Brazil Territory, and (ii) the M&G Brazil License Extension Termination Date with respect to the M&G Brazil License Extension Territory; and
>
>       (b)     be subject to (i) M&G Brazil submitting to M&G USA or M&G USA's designated representative(s) samples of M&G Brazil Licensed Products and proposed uses of the M&G Easy-Up Marks for review and approval (such approval not to be unreasonably withheld or delayed) by M&G USA or M&G USA's designated representative(s) (on behalf of both Licensors) from time to time at the request of M&G USA; (ii) M&G Brazil ensuring that the M&G Brazil Licensed Products with which it uses the M&G Easy-Up Marks meet a standard of quality that is no less than the standard of

quality maintained by M&G USA or its Affiliates with respect to any products which used the M&G Easy-Up Marks prior to the Effective Date; and (iii) M&G Brazil taking no action that may negatively impact Licensors' rights, or any rights of any future owner of the M&G Easy-Up Marks, in the M&G Easy-Up Marks, including, but not limited to, applying for registration of any same or similar trademark or using or adopting any confusingly similar trademark.

2.2.3    Licensors grant to M&G Brazil a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Brazil Licensed Patents and the M&G Brazil Non-Barrier Formulations to make and use, in the M&G Brazil Plant, and offer for sale and sell, in the then-current Licensed M&G Brazil Territory, the M&G Brazil Licensed Products, such license to terminate on (i) the Brazil Interim License Termination Date with respect to the M&G Brazil Territory, and (ii) the M&G Brazil License Extension Termination Date with respect to the M&G Brazil License Extension Territory.

2.2.4    Licensors grant to M&G Brazil a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Brazil Licensed Trademarks to market and sell the M&G Brazil Licensed Products in the then-current Licensed M&G Brazil Territory, such license to:

(a)    terminate on (i) the Brazil Interim License Termination Date with respect to the M&G Brazil Territory, and (ii) the M&G Brazil License Extension Termination Date with respect to the M&G Brazil License Extension Territory; and

(b)    be subject to (i) M&G Brazil submitting to M&G USA or M&G USA's designated representative(s) samples of M&G Brazil Licensed Products and proposed uses of the M&G Brazil Licensed Trademarks for review and approval (such approval not to be unreasonably withheld or delayed) by M&G USA or M&G USA's designated representative(s) from time to time at the request of M&G USA; (ii) M&G Brazil ensuring that the M&G Brazil Licensed Products with which it uses the M&G Brazil Licensed Trademarks meet a standard of quality that is no less than the standard of quality maintained by M&G USA or its Affiliates with respect to any products which used the M&G Brazil Licensed Trademarks prior to the Effective Date; and (iii) M&G Brazil taking no action that may negatively impact M&G USA's rights, or any rights of any future owner of the M&G Brazil Licensed Trademarks, in the M&G Brazil Licensed Trademarks, including, but not limited

to, applying for registration of any same or similar trademark or using or adopting any confusingly similar trademark.

2.2.5   Licensors grant to M&G Brazil a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Marks to (a) use the M&G Marks on signage and for other usages at the M&G Brazil Plant, consistent with usages in effect as of the Effective Date and (b) market and sell the M&G Brazil Licensed Products in the M&G Brazil Territory, such licenses under 2.2.5 and 2.2.5 to be subject to the same terms as in Section 2.2.4(b) and to terminate on earlier of (i) the Brazil Interim License Termination Date, or (ii) 120 days subsequent to a Change of Control of M&G Brazil or a sale of all or substantially all of the M&G Brazil Plant.

2.2.6   If, in connection with the M&G Resins Plant Sale, (i) the entity acquiring such assets will also acquire ownership of of any trademarks from MGI or its Affiliates that consist of the M&G Brazil Licensed Trademarks (the "M&G Brazil MGI Trademarks"), and (ii) this Agreement will be assigned to the entity acquiring such assets, then the Licensors will, in advance of the closing of the M&G Resins Plant Sale, use commercially reasonable efforts to cause the exhibits of this Agreement to be amended, to be effective upon the closing of the M&G Resins Plant Sale, to include the M&G Brazil MGI Trademarks, as necessary to give the intended effect of Section 2.2.4, the license of which shall be subject to the terms of Section 2.2.4.

2.3   **Cross-Licensed Rights.**

2.3.1   M&G Mexico grants to M&G Resins a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Resins Plant, whether by assignment or Change of Control of M&G Resins), non-sublicenseable (except in connection with products and services of the M&G Resins Plant) license under the M&G Mexico Know-How to use and otherwise exploit such M&G Mexico Know-How for the present and future operation of the M&G Resins Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid.

2.3.2   M&G Mexico grants to M&G Brazil a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under the M&G Mexico Know-How to use and otherwise exploit such M&G Mexico Know-How for the present and future operation of the M&G Brazil Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid.

2.3.3   M&G Brazil grants to M&G Resins a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Resins Plant, whether by assignment or Change of Control of M&G Resins), non-sublicenseable (except in connection with products and services of the M&G Resins Plant) license under the M&G Brazil Know-How to use and otherwise exploit such M&G Brazil Know-How for the present and future

operation of the M&G Resins Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid.

2.3.4    M&G Brazil grants to M&G Mexico a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under the M&G Brazil Know-How to use and otherwise exploit such M&G Brazil Know-How for the present and future operation of the M&G Mexico Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid.

2.3.5    M&G Resins grants to M&G Mexico a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under the M&G Resins Know-How to use and otherwise exploit such M&G Resins Know-How for the present and future operation of the M&G Mexico Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid (but, for the avoidance of doubt, after the Mexico License Termination Date excluding any M&G Proprietary Products).

2.3.6    M&G Resins grants to M&G Brazil a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under the M&G Resins Know-How to use and otherwise exploit such M&G Resins Know-How for the present and future operation of the M&G Brazil Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid (but, for the avoidance of doubt, after the M&G Brazil License Extension Termination Date excluding any M&G Proprietary Products).

2.3.7    M&G Polymers grants to M&G Mexico a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under the M&G Polymers Non-Barrier Know-How, to the extent used in the M&G Mexico Plant, to use and otherwise exploit such M&G Polymers Non-Barrier Know-How for the present and future operation of the M&G Mexico Plant and for the manufacture of polymer-related products and/or any other products, including PET resins and terephthalic acid (but, for the avoidance of doubt, after the Mexico License Termination Date excluding any M&G Proprietary Products), in the M&G Mexico Plant.

2.3.8    M&G Polymers grants to M&G Brazil a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under the M&G

Polymers Non-Barrier Know-How, to the extent used in the M&G Brazil Plant, to use and otherwise exploit such M&G Polymers Non-Barrier Know-How for the present and future operation of the M&G Brazil Plant and for the manufacture of polymer-related products and/or any other products, including PET resins and terephthalic acid (but for the avoidance of doubt, after the M&G Brazil License Extension Termination Date excluding any M&G Proprietary Products), in the M&G Brazil Plant.

2.3.9    M&G USA grants to M&G Mexico a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under the M&G USA Non-Barrier Know-How, to the extent used in the M&G Mexico Plant, to use and otherwise exploit such M&G USA Non-Barrier Know-How for the present and future operation of the M&G Mexico Plant and for the manufacture of polymer-related products and/or any other products, including PET resins and terephthalic acid (but for the avoidance of doubt, after the Mexico License Termination Date excluding any M&G Proprietary Products), in the M&G Mexico Plant.

2.3.10  M&G USA grants to M&G Brazil a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under the M&G USA Non-Barrier Know-How (excluding any patents or patent applications), to the extent used in the M&G Brazil Plant, to use and otherwise exploit such M&G USA Non-Barrier Know-How for the present and future operation of the M&G Brazil Plant and for the manufacture of polymer-related products and/or any other products (but for the avoidance of doubt, after the M&G Brazil License Extension Termination Date excluding any M&G Proprietary Products), including PET resins and terephthalic acid, in the M&G Brazil Plant.

2.4    **Additional Patent Matters.**

2.4.1    M&G Mexico represents and warrants that it does not own any patents or patent applications.  To the extent the foregoing is not accurate, any patents or patent applications owned by M&G Mexico as of the Effective Date are hereby deemed licensed to M&G Resins and M&G Brazil for M&G Resins and M&G Brazil to make and use, offer for sale, sell, and import polymer-related products or use any process for the manufacture or commercialization of polymer-related products and/or any other products, including PET resins or terephthalic acid, such license to continue until the date that the last claim of such patent or any patent issuing from such patent application expires or is found invalid or unenforceable by a court of competent jurisdiction.

2.4.2    M&G Brazil grants to M&G Resins and M&G Mexico an irrevocable, royalty-free, non-exclusive license, with the right to sublicense, under M&G Brazil's rights in the M&G Brazil Patents to (a) make and use, offer for sale, sell, and import any product that is covered by, or that would infringe any claim of, any M&G Brazil Patent, including PET, or terephthalic acid, or (b) use any process that is covered by, or that would infringe any claim of any M&G Brazil Patent, such license under 2.4.2 and 2.4.2 to continue with respect to the M&G Brazil Patents until

the date that the last claim of the M&G Brazil Patents expires or is found invalid or unenforceable by a court of competent jurisdiction.

2.5 **Reservation of Rights.**

Except as expressly stated in this Agreement, no rights or licenses are granted under this Agreement by any Party or its Affiliates under any Intellectual Property of such Party or its Affiliates to any other Party or its Affiliates, whether by implication, estoppel or otherwise, and all such rights not expressly granted are hereby reserved by each Party and its Affiliates. For the avoidance of doubt, other than the obligations expressly set forth in this Agreement, no Party has any further obligations.

2.6 **Licenses Attach to Intellectual Property**.

Each license or release granted under this ARTICLE 2 attaches to each item of Intellectual Property subject to such license. Each subsequent assignee of such Intellectual Property rights takes title to such Intellectual Property subject to the licenses or releases granted in this Agreement. Each license or release granted under this ARTICLE 2 shall survive any transfer, whether in whole or in part, of any of the Intellectual Property subject to such license or release, and the Licensors shall make any such transfer subject to such licenses.

2.7 **Release**.

Each Party hereby fully, finally and forever releases and discharges each other Party and their respective directors, officers, employees, agents, representatives and shareholders (and, solely with respect to their use and distribution of such other Party's products, customers and distributors) from any and all claims, causes of action, liabilities, losses, damages and demands of whatever kind or nature, whether known or unknown, suspected or unsuspected, patent or latent, or fixed or contingent (collectively, "Claim") that such releasing Party may, as of the Effective Date, hold or own, or has at any time prior to the Effective Date, held or owned with respect to any activity that would have been licensed pursuant this Agreement if such activity occurred after the Effective Date; *provided that*, notwithstanding anything to the contrary, the foregoing release and discharge (and the grant of any royalty-free licenses hereunder) shall not apply to any Claim based on royalties due but not yet paid by M&G Brazil under that certain Trademark Sub-License Contract by and between M&G Brazil and M&G Finanziaria S.r.l. (as amended and assigned to M&G Polymers). M&G Mexico represents and warrants that as of the Effective Date it has paid all invoiced amounts due and payable under that certain Trademark License Contract by and between M&G Mexico and M&G Finanziaria S.r.l. (as assigned to M&G Polymers).

2.8 **Termination of Research and Development Agreement**.

M&G Mexico and M&G Polymers hereby agree and vote to terminate the CSA pursuant to Section 14 of the CSA. To the extent any further action by either M&G Mexico or M&G Polymers is necessary or required to give full effect to such termination of the CSA, both M&G Mexico and M&G Polymers agree that they will take any such action upon the request of either M&G Mexico or M&G Polymers.

# ARTICLE 3

## NEGOTIATION OF FUTURE LICENSE

3.1     **M&G Mexico Option.**

Subject to <u>Section 3.3</u>, Licensors grant an option to M&G Mexico to negotiate commercially reasonable terms, including with respect to royalty rates, duration, and territory (including without limitation Mexico), for a non-exclusive, royalty-bearing license, for a term to be agreed upon by Licensors and M&G Mexico, under the M&G Mexico Licensed Patents, the M&G Mexico Non-Barrier Formulations, the M&G Mexico Licensed Trademarks, and/or the M&G Marks to make and use some or all of the M&G Mexico Licensed Products in the M&G Mexico Plant, and offer for sale and sell such M&G Mexico Licensed Products in countries to be mutually agreed on by Licensors and M&G Mexico.

3.2     **M&G Brazil Option.**

Subject to <u>Section 3.3</u>, Licensors grant an option to M&G Brazil to negotiate commercially reasonable terms, including with respect to royalty rates, duration, and territory, for a non-exclusive, royalty-bearing license, for a term to be agreed upon by Licensors and M&G Brazil, under the M&G Brazil Licensed Patents, the M&G Brazil Licensed Trademarks and the M&G Brazil Non-Barrier Formulations, to make and use some or all of the M&G Brazil Licensed Products in the M&G Brazil Plant, and offer for sale, sell (and, if applicable, export) such M&G Brazil Licensed Products in countries to be mutually agreed on by Licensors and M&G Brazil. For the avoidance of doubt, in no event will M&G Brazil be required to pay any royalties under such license with respect to any manufacture, marketing or sale of M&G Brazil Licensed Products for the Brazil market during the period between the Brazil Interim License Termination Date and the M&G Brazil License Extension Termination Date.

3.3     **Exercising Option Rights.**

3.3.1     The options granted pursuant to <u>Sections 3.1</u> and <u>3.2</u> will be exercisable by the Party in receipt of the option (the "<u>Option Grantee</u>") by providing written notice to the Party that is under an obligation to grant an option to such Option Grantee pursuant to <u>Sections 3.1</u> and <u>3.2</u> (the "<u>Option Grantor</u>"), on or after the date that falls ninety (90) days prior to the Brazil Interim License Termination Date (as applied to M&G Brazil) or ninety (90) days prior to the Mexico License Termination Date (as applied to M&G Mexico).

3.3.2     Upon receipt of written notice by an Option Grantee, the Option Grantor and Option Grantee agree to negotiate in good faith between the date such written notice is received and the Brazil Interim License Termination Date (as applied to M&G Brazil) or ninety (90) days prior to the Mexico License Termination Date (as applied to M&G Mexico) (the "<u>Option Period</u>"). The Option Grantor is not obligated to enter into a license agreement with the Option Grantee and no Party will be liable to another Party for failure to enter into a license agreement during the Option Period.

# ARTICLE 4

## PATENTS AND INFRINGEMENT

### 4.1 Prosecution and Abandonment of M&G Patents and Trademarks.

As between the Parties, the owner of Intellectual Property licensed hereunder retains the exclusive right, but not the obligation, to prepare, file, prosecute, maintain or renew such Intellectual Property.

### 4.2 Enforcement of M&G Patents and Trademarks.

As between the Parties, the owner of Intellectual Property licensed hereunder retains the exclusive right, but not the obligation, to enforce such Intellectual Property.

# ARTICLE 5

## CONFIDENTIALITY

### 5.1 Confidentiality Obligation.

The Parties acknowledge that all Know-How, including Formulations, owned by a Party are the Confidential Information of that Party.  Subject to Section 5.2, during the Term and for ten (10) years thereafter, a recipient of any Confidential Information will keep confidential, and will cause its Representatives to keep confidential, all of the discloser's Confidential Information that is disclosed to it under this Agreement.  The recipient of any Confidential Information agrees to take such action, and to cause its Representatives to take such action, to preserve the confidentiality of the discloser's Confidential Information as it would customarily take to preserve the confidentiality of the recipient's own similar types of Confidential Information.  The recipient of Confidential Information will, and will cause its respective Representatives (i) to use the discloser's Confidential Information only as expressly permitted in this Agreement and (ii) subject to Section 5.2, not to disclose the discloser's Confidential Information to any Third Parties without the prior written consent of the discloser, except as expressly permitted in this Agreement.

### 5.2 Permitted Disclosures.

Notwithstanding anything to the contrary in this ARTICLE 5, the recipient of any Confidential Information and its Representatives may disclose the discloser's Confidential Information in connection with the exercise of rights granted to it hereunder: (a) to Governmental Authorities to the extent necessary to seek, obtain or maintain Regulatory Approvals; (b) to Representatives; (c) to consultants, contractors, sublicensees, agents and service providers; *provided, however,* that the recipient of the Confidential Information will enter into a confidentiality agreement with the respective consultant, contractor, or service provider before disclosing any of the discloser's Confidential Information; (d) in connection with prosecuting or defending litigation; *provided, however*, that the recipient or Representative will use reasonable efforts to limit the dissemination of such information, including by use of protective orders and

the like, as such recipient would use for its own similar types of Confidential Information; (e) in connection with the resolution of disputes under this Agreement; *provided, however*, that such recipient will use reasonable efforts to limit the dissemination of such information, including by use of protective orders and the like, as such recipient would use for its own similar types of Confidential Information; and (f) in connection with filings required by security regulations and the rules and regulations of any securities exchanges upon which the recipient's securities are traded; *provided, however*, that such recipient will use reasonable efforts to limit the dissemination of such information, including by use of protective orders and the like, as such recipient would use for its own similar types of Confidential Information.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES

6.1     **Representations and Warranties.**

Each Party represents and warrants to each other Party that, as of the Effective Date, it has the corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery and performance of this Agreement by it has been duly and validly authorized and approved by proper corporate action on the part of the Party, and the Party has taken all other action required by Law, its certificate of incorporation, by-laws or other organizational documents to authorize such execution, delivery and performance. Assuming due authorization, execution and delivery on the part of the other Parties, this Agreement constitutes a legal, valid and binding obligation of the Party, enforceable against the Party in accordance with its terms, except as enforceability may be limited by applicable equitable principles or bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally.

6.2     **DISCLAIMER.**

EXCEPT AS OTHERWISE EXPRESSLY STATED IN SECTIONS 6.1 AND 2.4.1, NO PARTY MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND WITH RESPECT TO ANY PRODUCTS, TECHNOLOGY, INTELLECTUAL PROPERTY OR ANY OTHER SUBJECT MATTER UNDER THIS AGREEMENT. EXCEPT AS OTHERWISE PROVIDED IN SECTIONS 6.1 AND 2.4, EACH PARTY EXPRESSLY DISCLAIMS ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR AGAINST INFRINGEMENT.

6.3     **LIMITATION OF LIABILITY.**

NO PARTY SHALL BE LIABLE UNDER THIS AGREEMENT FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER BASED IN CONTRACT, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, INCLUDING LOSS OF PROFITS OR REVENUE, SUFFERED BY A PARTY OR ANY OF ITS RESPECTIVE REPRESENTATIVES, EXCEPT (i) TO THE EXTENT OF ANY SUCH

DAMAGES THAT MUST BE PAID TO A THIRD PARTY IN CONNECTION WITH A THIRD PARTY CLAIM THAT IS SUBJECT TO A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER ARTICLE 7, OR (ii) IN THE EVENT OF AN INTENTIONAL AND WILLFUL BREACH IN BAD FAITH OF ANY REPRESENTATION, WARRANTY, COVENANT OR AGREEMENT CONTAINED IN THIS AGREEMENT BY THE OTHER PARTY.

## ARTICLE 7

## INDEMNIFICATION

7.1     **Indemnification by Indemnifying Party.**

7.1.1     Each Party (an "<u>Indemnifying Party</u>") under this Agreement will indemnify, defend, pay reasonable defense costs, and hold harmless from and against, and shall reimburse each other Party (an "<u>Indemnified Party</u>") any and all Losses incurred as a result of any Third Party Claim arising out of or relating to (i) a breach of any covenant, representation or warranty made by such Indemnifying Party under this Agreement or (ii) gross negligence, recklessness, or willful misconduct of such Indemnifying Party or its Representatives.

7.1.2     M&G Mexico or M&G Brazil (each, an Indemnifying Party) will indemnify, defend, pay reasonable defense costs, and hold harmless from and against, and shall reimburse Licensors (each, an Indemnified Party) any and all Losses incurred as a result of any Third Party Claim arising out of or relating to (a) in the case of M&G Mexico's obligations as the Indemnifying Party, any product sold or offered for sale by M&G Mexico or its respective Representatives or agents under the M&G Mexico Licensed Trademarks or M&G Marks, as applicable ("<u>M&G Mexico Claims</u>") or (b) in the case of M&G Brazil's obligations as the Indemnifying Party, any product sold or offered for sale by M&G Brazil or its respective Representatives or agents under the M&G Brazil Licensed Trademarks or M&G Marks, as applicable ("<u>M&G Brazil Claims</u>").  For the avoidance of doubt, M&G Mexico's obligations under this <u>Section 7.1.2</u> are limited to M&G Mexico Claims and M&G Brazil's obligations under this <u>Section 7.1.2</u> are limited to M&G Brazil Claims.

7.1.3     Notwithstanding the foregoing, the Indemnifying Party will not be obligated to so indemnify, defend or hold the Indemnified Party and or its Representatives harmless to the extent that such Losses are caused by (i) the breach of any covenant of, or warranty or representation made by the Indemnified Party under this Agreement or (ii) the gross negligence, recklessness or wilful misconduct of the Indemnified Party or any of its Representatives.

7.2     **Indemnification Procedure.**

7.2.1     In the event that any Third Party asserts a claim with respect to any matter for which an Indemnified Party is entitled to indemnification under <u>Section 7.1</u> (a "<u>Third Party Claim</u>"), then the Indemnified Party will promptly notify the Indemnifying Party thereof; *provided that* no delay on the part of the Indemnified Party in notifying the Indemnifying Party will relieve the Indemnifying Party from any obligation hereunder unless (and then only to the extent that) the Indemnifying Party is prejudiced thereby.

7.2.2    The Indemnifying Party will have the right, exercisable by notice to the Indemnified Party, within twenty (20) days after receipt of notice from the Indemnified Party of the commencement of or assertion of any Third Party Claim, to assume direction and control of the defense, litigation, settlement, appeal or other disposition of the Third Party Claim (including the right to settle the claim solely for monetary consideration) with counsel selected by the Indemnifying Party and reasonably acceptable to the Indemnified Party, and the Indemnifying Party may do so without prejudice to its right to dispute whether such claim involves a Third Party Claim subject to valid indemnification obligation hereunder.    During such time as the Indemnifying Party is controlling the defense of such Third Party Claim, the Indemnified Party will cooperate, and will cause its Representatives to cooperate, upon the reasonable request of the Indemnifying Party and at the Indemnifying Party's cost, in the defense or prosecution of the Third Party Claim, including by furnishing such records, information and testimony and attending such conferences, discovery proceedings, hearings, trials or appeals as may reasonably be requested by the Indemnifying Party.    In the event that the Indemnifying Party does not notify the Indemnified Party of the Indemnifying Party's intent to defend any Third Party Claim within twenty (20) days after notice thereof (including by affirmatively denying responsibility to defend the Third Party Claim), the Indemnified Party may (without further notice to the Indemnifying Party) undertake the defense thereof with counsel of the Indemnified Party's choice and at the Indemnifying Party's expense (including reasonable, out-of-pocket attorneys' fees and costs and expenses of enforcement or defense).    The Indemnifying Party or the Indemnified Party, as the case may be, will have the right to join in (including the right to conduct discovery, interview and examine witnesses and participate in all settlement conferences), but not control, at its own expense, the defense of any Third Party Claim that the other Party is defending as provided in this Agreement.

7.2.3    The Indemnifying Party will not, without the prior written consent of the Indemnified Party, which will not be unreasonably withheld, enter into any compromise or settlement that commits the Indemnified Party to take, or to forbear to take, any action.    The Indemnified Party will have the sole and exclusive right to settle any Third Party Claim, on such terms and conditions as it deems reasonably appropriate, to the extent such Third Party Claim involves equitable or other non-monetary relief, but will not have the right to settle such Third Party Claim to the extent such Third Party Claim involves monetary damages without the prior written consent of the Indemnifying Party.    Each of the Indemnifying Party and the Indemnified Party will not make any admission of liability in respect of any Third Party Claim without the prior written consent of the other Party, and the Indemnified Party will use reasonable efforts to mitigate losses arising from the Third Party Claim.

## ARTICLE 8

## GOVERNMENT APPROVAL

8.1    **Cooperation**.

8.1.1    At the election of Licensors or their successors or assigns, Licensors or their successors or assigns will register M&G Mexico as an authorized user of the M&G Mexico Licensed Patents, M&G Mexico Licensed Trademarks and/or M&G Marks with the Instituto Mexicano de la Propiedad Industrial ("IMPI").    M&G Mexico will cooperate with Licensors or

their successors or assigns, when reasonably requested by Licensors or their successors or assigns, to register M&G Mexico as an authorized user of the M&G Mexico Licensed Patents, M&G Mexico Licensed Trademarks and/or M&G Marks before IMPI and to cancel the registration of M&G Mexico before IMPI upon termination or expiration of this Agreement. M&G Mexico hereby authorizes Licensors or their successors or assigns or their respective designees, solely to register this Agreement or a summary with minimum elements of the same, according to local law, before IMPI, in accordance with Articles 136, 142, 142Bis and all other applicable provisions of the Mexican Industrial Property Law, Article 10 and other applicable Articles of the Regulations, to such law. Likewise, M&G Mexico hereby authorizes Licensors or their successors or assigns or their respective designees to register and to cancel registration of any other agreement executed by and between the parties in connection with M&G Mexico Licensed Patents, M&G Mexico Licensed Trademarks and/or M&G Marks that was recorded with the IMPI, to the extent necessary to effect termination of such agreements. The parties further agree that the recordation of this Agreement before IMPI may be cancelled, to the extent allowed by applicable law, at the written request from Licensors or their successors or assigns and without the need for consent, authorization or hearing of M&G Mexico upon the expiration or earlier termination of this Agreement, and M&G Mexico agrees to execute any termination agreement or document at the reasonable request of Licensors or their successors or assigns. Licensors or their successors or assigns and M&G Mexico will bear their own costs and expenses of obtaining approval of, and/or registering or recording this Agreement and any amendment with the appropriate governmental authorities.

8.1.2    At the election of Licensors or their successors or assigns, Licensors or their successors or assigns will register M&G Brazil as an authorized user of the M&G Brazil Licensed Patents, M&G Brazil Licensed Trademarks and/or M&G Marks with the Instituto Nacional da Propriedade Industrial ("INPI"). M&G Brazil will cooperate with Licensors or their successors or assigns, when reasonably requested by Licensors or their successors or assigns, to register M&G Brazil as an authorized user of the M&G Brazil Licensed Patents, M&G Brazil Licensed Trademarks and/or M&G Marks with INPI and to cancel the registration of M&G Brazil with INPI upon termination or expiration of this Agreement. M&G Brazil hereby authorizes Licensors or their successors or assigns or their respective designees, solely to register this Agreement or a summary with minimum elements of the same, according to local law, before INPI, in accordance with Articles 61, 62, 139, 140, 211 and all other applicable provisions of the Brazilian Industrial Property Law and any other applicable law. Likewise, M&G Brazil hereby authorizes Licensors or their successors or assigns or their respective designees to register and to cancel registration of any other agreement executed by and between the parties in connection with M&G Brazil Licensed Patents, M&G Brazil Licensed Trademarks and/or M&G Marks, if applicable. The parties further agree that the recordation of this Agreement with INPI may be cancelled, to the extent allowed by applicable law, at the written request from Licensors or their successors or assigns and without the need for consent, authorization or hearing of M&G Brazil upon the expiration or earlier termination of this Agreement, and M&G Brazil agrees to execute any termination agreement or document at the reasonable request of Licensors or their successors or assigns. M&G Brazil will execute the Irrevocable Power of Attorney attached hereto as Exhibit I concurrently with the signing of this Agreement, authorizing the Licensors or their successors or assigns, or their designated representative, solely to cancel the registration of this Agreement with INPI following

a written demand by Licensors or assigns or upon termination or expiration of this Agreement. Licensors or their successors or assigns and M&G Brazil will bear their own costs and expenses of obtaining approval of, and/or registering or recording this Agreement and any amendment with the appropriate governmental authorities.

8.2 **Licensors' Approval**.

8.2.1 M&G Mexico agrees not to submit any information to governmental authorities with respect to this Agreement without the prior written approval of Licensors or their successors or assigns, which approval will not be unreasonably withheld; provided that, the foregoing restriction will not apply if formal or informal proceedings are instituted against a party or if a dispute between the parties is submitted to any tribunal having jurisdiction over such matters.

8.2.2 M&G Brazil agrees not to submit any information to governmental authorities with respect to this Agreement without the prior written approval of Licensors or their successors or assigns, which approval will not be unreasonably withheld; provided that, the foregoing restriction will not apply if formal or informal proceedings are instituted against a party or if a dispute between the parties is submitted to any tribunal having jurisdiction over such matters.

# ARTICLE 9

# TERM AND TERMINATION

9.1 **Term.**

9.1.1 The licenses granted under this Agreement will remain effective as long as any of the Intellectual Property associated therewith remain enforceable, subject to Section 9.2. This Agreement will be effective in its entirety until none of the Intellectual Property associated with the licenses granted hereunder remain enforceable.

9.1.2 The period from the Effective Date until termination (for any reason) of this Agreement in its entirety is the "Term" of this Agreement.

9.2 **Termination Rights.**

9.2.1 Subject to Section 9.3.2, if a Party is in material breach of this Agreement (including any breach of a representation or warranty) the applicable non-breaching Parties may terminate the licenses granted by or to the breaching Party under Sections 2.1 and 2.2 upon sixty (60) days' written notice to the breaching Party if the breaching Party has not cured the breach within such sixty (60) day notice period. Upon termination of the licenses, all rights granted to the breaching Party under such licenses shall immediately cease, and the breaching Party shall promptly return or destroy all Confidential Information of the non-breaching Party in its possession, such return or destruction to be confirmed in writing upon request of the non-breaching Party.

9.3 **Effects of Termination.**

9.3.1    Termination of this Agreement or any license granted under this Agreement for any reason will not release a Party hereto from any indebtedness, liability, right to damages or other obligation incurred hereunder by such Party before the date of termination.

9.3.2    The provisions of <u>ARTICLE 1</u>, <u>ARTICLE 4</u>, <u>ARTICLE 5</u>, <u>ARTICLE 6</u>, <u>ARTICLE 7</u>, <u>ARTICLE 8</u>, and <u>ARTICLE 10</u> and <u>Sections 2.2.1</u>, <u>2.3</u>, <u>2.4</u>, <u>2.5</u>, <u>2.6</u> and <u>9.3</u> as well as any other Sections or defined terms referred to in such Sections or necessary to give them effect will survive any termination or expiration of this Agreement and remain in force until discharged in full.  Furthermore, any other provisions required to interpret and enforce the Parties' rights and obligations or to wind up their outstanding obligations under this Agreement will survive to the extent required.

# ARTICLE 10

## MISCELLANEOUS

10.1    **Governing Law.**

This Agreement will be governed by Texas law, without reference to any rules of conflicts of law, and the exclusive jurisdiction for any disputes arising hereunder will be the Bankruptcy Court.  In the event that the Bankruptcy Case has been closed, each Party hereto consents to personal jurisdiction in the federal and state courts of Nueces County, Texas and agrees that the exclusive venue of any action or proceeding arising out of or relating to this Agreement will be the federal and state courts of Nueces County, Texas.

10.2    **Specific Performance**.

The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached.  It is accordingly agreed that the Parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the performance of the terms and provisions of this Agreement without proof of actual damages, this being in addition to any other remedy to which any Party is entitled at law or in equity.

10.3    **Bankruptcy.**

All rights and licenses granted under or pursuant to this Agreement by a Party are, and will otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code or any analogous provisions in any other country or jurisdiction, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code.  Each Party will retain and may fully exercise all of its rights and elections under the U.S. Bankruptcy Code or any analogous provisions in any other country or jurisdiction, and such rights and elections shall survive, to the fullest extent permitted under law, any bankruptcy or similar proceeding under the laws of any country or jurisdiction.  In the event of the commencement of a bankruptcy proceeding by or

against a Party under the U.S. Bankruptcy Code or any analogous or similar proceeding in any other country or jurisdiction, the other Party will be entitled to a complete duplicate of (or complete access to, as appropriate) any such intellectual property and all embodiments of such intellectual property, which, if not already in such other Party's possession, will be promptly delivered to it (i) upon any such commencement of a bankruptcy proceeding upon such other Party's written request therefor, unless the Party subject to the bankruptcy proceeding elects to continue to perform all of its obligations under this Agreement, or (ii) if not delivered under clause (i) above, following the rejection of this Agreement by or on behalf of the Party subject to the bankruptcy proceeding upon written request therefor by the other Party.

10.4    **Severability.**

If any of the provisions contained in this Agreement is held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein will not in any way be affected or impaired thereby, unless the absence of the invalidated provision(s) adversely affects the substantive rights of the Parties.  The Parties will in such an instance use their best efforts to replace the invalid, illegal or unenforceable provision(s) with valid, legal and enforceable provision(s) which, insofar as practical, implement the purposes of this Agreement.

10.5    **Waivers.**

Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver will be effective unless set forth in a written instrument duly executed by or on behalf of the Party or Parties waiving such term or condition. Neither the waiver by any Party of any term or condition of this Agreement nor the failure on the part of any Party, in one or more instances, to enforce any of the provisions of this Agreement or to exercise any right or privilege, will be deemed or construed to be a waiver of such term or condition for any similar instance in the future or of any subsequent breach hereof.  All rights, remedies, undertakings, obligations and agreements contained in this Agreement will be cumulative and none of them will be a limitation of any other remedy, right, undertaking, obligation or agreement.

10.6    **Entire Agreements; Amendments.**

This Agreement sets forth the entire agreement and understanding between the Parties as to the subject matter hereof and supersedes all agreements or understandings, verbal or written, made between and/or among the Parties or any predecessors in interest before the date hereof with respect to the subject matter hereof; *provided* that, notwithstanding anything to the contrary, this Agreement shall not supersede that certain Trademark Sub-License Contract by and between M&G Brazil and M&G Finanziaria S.r.l. (as amended and assigned to M&G Polymers) with respect to any Claim as described in Section 2.7.  All Confidential Information disclosed by either Party to the other Party before the Effective Date will be deemed to have been disclosed pursuant to this Agreement.  None of the terms of this Agreement will be amended, supplemented or modified except in writing signed by the Parties.

10.7 **Assignment of this Agreement.**

10.7.1  No Party may assign this Agreement without the consent of all other Parties, except that without the consent of any Party:

(a)　　each Party may assign its entire interest in this Agreement to an Affiliate or in connection with a Change of Control of such Party or a sale or other transfer of the Plant owned by such Party;

(b)　　M&G Polymers, M&G USA and M&G Resins may assign their entire respective interests in this Agreement, in whole or in part, in connection with a sale of all or substantially all assets pertaining to the M&G Resins Plant, and any subsequent assignment will be subject to Section 10.7.1(a).

10.7.2  Any attempted assignment not in accordance with this Section 10.7 will be void.

10.7.3  Any permitted assignee will assume all obligations of its assignor under this Agreement.

10.7.4  Subject to Section 2.6, nothing in this Agreement will be construed to prevent a Party from selling, assigning, transferring, or encumbering any property right or asset it owns.

10.7.5  Upon the assignment of this Agreement by a Party or in the event of a Change of Control of such Party or a sale or other transfer of the Plant owned by such Party, such Party shall promptly provide written notice to all other Parties of such assignment, Change of Control, or sale or other transfer of such Plant, and provide to all other Parties an updated notice address for such Party's successor in interest for the purpose of Section 10.9.

10.8 **Independent Contractor.**

The relationship between each of the Parties is that of independent contractors.  The Parties are not joint venturers, partners, principal and agent, or employer and employee, and have no other relationship other than independent contracting Parties.  The Parties' obligations and rights in connection with the subject matter of this Agreement are solely and specifically as set forth in this Agreement, and the Parties acknowledge and agree that no Party owes any other any fiduciary or similar duties or obligations by virtue of the relationship created by this Agreement.

10.9 **Notices.**

All notices which are required or permitted hereunder will be in writing and sufficient if delivered personally, sent by facsimile (and promptly confirmed by personal delivery, registered or certified mail or overnight courier), sent by a nationally-recognized overnight courier or sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to M&G USA, M&G Polymers, or M&G Resins:

M&G Resins USA, LLC
c/o M&G Polymers USA, LLC
450 Gears Road, Suite 240
Houston, Texas 77607
USA
Attn: Dennis Stogsdill
Contact Email: dstogsdill@alvarezandmarsal.com

>With a copy (which will not constitute notice) to:

Jones Day
250 Vesey Street
New York, NY 10281
USA
Facsimile: (212) 755-7306
Attention: Michael Cohen; Ann Bomberger
Contact phone: (212) 326-3939
Contact email: mcohen@jonesday.com; ambomberger@jonesday.com

<u>If to M&G Mexico</u>:

M&G Polímeros México, S.A. de C.V.
Att'n: Luís Rafael Apperti Llovet; Rodolfo Pérez Vázquez
Petrocal Km. 2
Puerto Industrial de Altamira
C.P. 89603
Altamira, Tamaulipas
Mexico
Contact phone: (+52) 833 229 2924
Contact email:   luis.apperti@mg-chemicals.com; rodolfo.perez@mg-chemicals.com

With a copy (which will not constitute notice) to each of:

Cervantes Sainz, S.C.
Att'n: Alejandro Sainz; Rodrigo Guaida Azar
Torre del Bosque, Blvd. M Ávila Camacho 24, piso 20,
Lomas de Chapultepec, 11000, Ciudad de México.
Mexico
Contact phone: (+52) 559 178 4566
Contact email:  asainz@cervantessainz.com; rguaida@cervantessainz.com

Morgan, Lewis & Bockius LLP
Att'n: Timothy B. DeSieno; Susan Baker Manning
101 Park Avenue

New York, NY 10178
U.S.A.
Contact phone: (212) 309-6000
Contact email:  tim.desieno@morganlewis.com; susan.manning@morganlewis.com

<u>If to M&G Brazil</u>:

M&G Polímeros Brasil S.A.
Avenida das Nações Unidas, 12.551, 8º floor
Part I, Brooklin Novo
04578-903 São Paulo - SP – Brasil
Attention: João Luis de Freitas Teixeira; Jose Veiga Veiga
Contact phone: +55 11 2111-1543
Contact Email: joao.luis@gruppomg.com.br

or to such other address as the Party to whom notice is to be given may have furnished to the other Parties in writing in accordance herewith.  Any such notice will be deemed to have been given: (i) when delivered if personally delivered or sent by facsimile on a Business Day; (ii) on the Business Day after dispatch if sent by a nationally recognized overnight courier; or (iii) on the fifth Business Day following the date of mailing if sent by mail.

10.10  **Third Party Beneficiaries.**

None of the provisions of this Agreement will be for the benefit of or enforceable by any Third Party, including any creditor of any Party.  No Third Party will obtain any right under any provision of this Agreement or will by reason of any such provision make any claim in respect of any debt, liability or obligation (or otherwise) against any Party.

10.11  **Performance by Representatives.**

To the extent that this Agreement imposes obligations on Representatives of a Party, such Party agrees to cause its Representatives to perform such obligations.

10.12  **Binding Effect.**

This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns.

10.13  **Counterparts.**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  This Agreement may be executed by delivery of duly authorized and executed signature pages by facsimile or by scanned pdf.

**<Signature page follows.>**

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their duly authorized officers to be effective as of the Effective Date.

**M&G USA CORPORATION**

By:_____

    Name: Dennis Stogsdill

    Title: Chief Restructuring Officer

**M&G USA POLYMERS USA LLC**

By:_____

    Name: Dennis Stogsdill

    Title: Chief Restructuring Officer

**M&G RESINS USA LLC**

By:_____

    Name: Dennis Stogsdill

    Title: Chief Restructuring Officer

**M&G POLÍMEROS MÉXICO, S.A. de C.V.**

By:_____

    Name: Luís Rafael Apperti Llovet

    Title: Chairman of the Board of Directors

**M&G POLÍMEROS BRASIL S.A.**

By:_____

    Name: Jose Veiga Veiga

    Title:  Diretor Presidente (President)

and

By:_____

    Name: Joao Luis de Freitas Teixeira

    Title: Diretor (Officer)

**Definitions**

"Affiliate" means, with respect to a first Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with, such first Person.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Bankruptcy Case" means Case No. 17-12307, currently pending in the Bankruptcy Court.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Barrier IP Purchase Agreement" means that certain Asset Purchase Agreement between M&G Polymers, M&G USA, and Far Eastern Investment (Holding) Limited, dated as of January 30, 2018, as amended by that certain First Amendment to Asset Purchase Agreement between M&G Polymers, M&G USA, Far Eastern Investment (Holding) Limited, and FE Polytech, LLC, dated as of March 1, 2018.

"Barrier PET Product" means any polyethylene terephthalate resin which contains one or more additives targeted for achieving high-level gas barrier properties of end products made from such resins, including the PoliProtect™ line of products and line extensions thereto.

"Brazil Interim License Termination Date" means the later of: (i) June 30, 2019, or (ii) the date that is the earlier of (A) thirty (30) days prior to the date on which the PET production plant within the M&G Resins Plant is anticipated to be commissioned, where such date will be communicated by M&G Resins in writing to M&G Brazil as soon as reasonably practicable or (B) September 30, 2019.

"Business Day" means a day other than a Saturday, Sunday, or bank or other public holiday in the United States.

"Change of Control" means, with respect to a first Person, a single transaction or series of related transactions pursuant to which another Person or group of Persons who did not Control such first Person before the transaction(s) do Control such first Person after the transaction(s). A Change of Control will be presumed to occur to a first Person upon the occurrence of any of the following: (i) any other Person becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the voting securities of the first Person; (ii) the sale or other disposition of all or substantially all of the assets of the Person; (iii) a consolidation or merger of the first Person with any other Person, other than a merger or consolidation which would result in the voting securities of the first Person outstanding immediately prior thereto continuing to represent at least fifty percent (50%) of the total voting power represented by the voting securities of the Person outstanding immediately after such merger or consolidation.

"Claim" has the meaning set forth in Section 2.7.

"Confidential Information" means any information regarding the business and operations of a Party or any of its Affiliates, that is or has been disclosed (whether orally or in writing) by such Party or its Affiliates ("Discloser") to the other Party or its Affiliates ("Recipient") to the extent that such information is not (i) as of the date of disclosure to the Recipient, known to the Recipient (other than pursuant to an obligation of confidentiality to the Discloser); or (ii) disclosed in published literature, or otherwise generally known to the public through no breach by the Recipient of this Agreement; or (iii) obtained by the Recipient from a Third Party free from any obligation of confidentiality to the Discloser; or (iv) independently developed by the Recipient without use of the information disclosed to the Recipient by the Discloser.

"Control" including its correlative meanings "Controls", "Controlled by" and "under common Control with" means the possession, directly or indirectly, of the power to direct or cause direction of the management or policies of another Person (whether through ownership of securities or other ownership interests, by contract or otherwise). A first Person will be presumed to Control another Person if such first Person actually owns or has beneficial ownership of at least 50% of the voting securities or other comparable equity interests of such other Person (whether directly, indirectly or pursuant to any option, warrant or other similar arrangement).

"CSA" means the Research and Development Cost Sharing Agreement by and between M&G Mexico, M&G Polymers and M&G Polimeri Italia S.p.A., effective as of January 1, 2003.

"Easy-Up Know-How" means all Know-How owned by M&G Polymers or M&G USA as of the Effective Date relating to the technology for the solid state polymerization of PET, polyesters and other polymers and which is referred to as "Easy-Up™."

"Effective Date" has the meaning set forth in the preamble to this Agreement.

"Formulations" means all recipes, formulas, and specifications, including manufacturing specifications, quality control specifications, and raw material specifications, relating to the manufacture of PET products at any of the Plants.

"Governmental Authority" means any court, agency, department, authority or other instrumentality of any international, national, regional, province, state, county, city or other political subdivision, including a Regulatory Authority.

"IMPI" has the meaning set forth in Section ARTICLE 88.1.

"Indemnified Party" has the meaning set forth in Section 7.1.1.

"Indemnifying Party" has the meaning set forth in Section 7.1.1.

"INPI" has the meaning set forth in Section 8.1.2

"Intellectual Property" means any intellectual property or proprietary rights existing anywhere in the world, including (i) copyrights, (ii) patents, utility models and designs, (iii) trademarks, trade names, domain names, trade dress or service marks, and all goodwill associated therewith, and (iv) Know-How; in each cases of (i) through (iv), whether registered or unregistered, and including any registrations or applications for registration of any of the foregoing, and any reissues, renewals, extensions, reexaminations, revisions, divisionals, continuations-in-part and foreign counterparts thereof.

"Know-How" means all Formulations, discoveries, improvements, ideas, designs, models, data collections, drawings, blueprints, mask works, devices, methods, techniques, processes, instructions, know how, proprietary information, technical information and trade secrets related to the operation of, or manufacture and commercialization of products in, a polymer processing plant.

"Laws" means all laws, statutes, rules, regulations, orders, judgments or ordinances of any Governmental Authority, as such may be revised from time to time.

"Licensed M&G Brazil Territory" means (a) during the period from the Effective Date until the Brazil Interim License Termination Date, anywhere in the M&G Brazil Territory and (b) during the period from the Brazil Interim License Termination Date until the M&G Brazil License Extension Termination Date, the M&G Brazil License Extension Territory.

"Licensors" has the meaning set forth in Section 2.1.1.

"Losses" means any and all costs, expenses, claims, losses, liabilities, damages, fines, royalties, governmental penalties or punitive damages, deficiencies, interest, settlement amounts, awards, and judgments, including any and all reasonable, out-of-pocket costs and expenses properly incurred as a result of a claim (including reasonable, out-of-pocket attorneys' fees and all other expenses reasonably incurred in investigating, preparing or defending any litigation or proceeding, commenced or threatened).

"Mexico License Termination Date" means the later of: (i) August 30, 2019, or (ii) the date that is the earlier of (A) ninety (90) days prior to the date on which the last performance test for the PET production plant within the M&G Resins Plant is scheduled, where such date will be communicated in writing by M&G Resins to M&G Mexico as soon as reasonably practicable or (B) March 31, 2020.

"MGI" means Mossi & Ghisolfi International S.a.r.l.

"M&G Brazil" has the meaning set forth in the preamble to this Agreement.

"M&G Brazil Know-How" means the Know-How owned by M&G Brazil as of the date of this Agreement and to the extent related to the past or present operation of any of the M&G Plants or the past or present manufacture or commercialization of polymer-related products at any of the M&G Plants.

"M&G Brazil Licensed Patents" means the M&G Standard PET Patents.

"M&G Brazil Licensed Products" means the products listed in Exhibit E (*M&G Products*) and made at the M&G Brazil Plant, excluding any and all Barrier PET Products.

"M&G Brazil Licensed Trademarks" means the M&G Product Trademarks designated as being licensed to M&G Brazil in Exhibit D (*M&G Product Trademarks*).

"M&G Brazil License Extension Termination Date" means March 31, 2020.

"M&G Brazil License Extension Territory" means the country of Brazil.

"M&G Brazil MGI Trademarks" has the meaning set forth in Section 2.2.6.

"M&G Brazil Non-Barrier Formulations" means the respective M&G Non-Barrier Formulations corresponding to the M&G Brazil Licensed Products as listed in Exhibit E.

"M&G Brazil Plant" means that certain polymer manufacturing plant at Suape Port, Ipojuca, Brazil, operated as of September 1, 2017 by M&G Brazil.

"M&G Brazil Territory" means worldwide.

"M&G Easy-Up Patents" means the patents and patent applications listed on Exhibit C.

"M&G Easy-Up Marks" means the trademarks listed in Exhibit G.

"M&G Formulations" means the Formulations owned by M&G Polymers and/or M&G USA as of the date of this Agreement, but excluding any and all Formulations constituting "Purchased Intellectual Property" under the Barrier IP Purchase Agreement.

"M&G Marks" means the marks listed in Exhibit F.

"M&G Mexico" has the meaning set forth in the preamble to this Agreement.

"M&G Mexico Know-How" means the Know-How owned by M&G Mexico as of the date of this Agreement and to the extent related to the past or present operation of any of the M&G Plants or the past or present manufacture or commercialization of polymer-related products at any of the M&G Plants.

"M&G Mexico Licensed Patents" means the M&G Standard PET Patents.

"M&G Mexico Licensed Products" means the products listed in Exhibit E (*M&G Products*) and made at the M&G Mexico Plant, excluding any and all Barrier PET Products.

"M&G Mexico Licensed Trademarks" means the M&G Product Trademarks designated as being licensed to M&G Mexico in Exhibit D (*M&G Product Trademarks*).

"M&G Mexico MGI Trademarks" has the meaning set forth in Section 2.1.32.1.4.

"M&G Mexico Non-Barrier Formulations" means the respective M&G Non-Barrier Formulations corresponding to the M&G Mexico Licensed Products as listed in Exhibit E.

"M&G Mexico Plant" means that certain polymer manufacturing plant at Altamira, Tamaulipas, Mexico, operated as of September 1, 2017 by M&G Mexico.

"M&G Mexico Territory" means worldwide.

"M&G Non-Barrier Formulations" means the M&G Formulations excluding Formulations exclusively relating to Barrier PET.

"M&G Plants" means, collectively, the M&G Brazil Plant, the M&G Mexico Plant, the M&G Polymers Plant, and the M&G Resins Plant.

"M&G Brazil Patents" means the patents and patent applications owned or purported to be owned by M&G Brazil (including any and all patents previously owned or purported to be owned by M&G Poliester S.A) on the Effective Date, including, but not limited to the patents listed in Exhibit H.

"M&G Polymers" has the meaning set forth in the preamble to this Agreement.

"M&G Polymers Know-How" means the Know-How, excluding any M&G Formulations and any Easy-Up Know-How, owned by M&G Polymers as of the date of this Agreement and to the extent related to the past or present operation of the M&G Mexico Plant or the M&G Brazil Plant or the past or present manufacture or commercialization of polymer-related products in the M&G Mexico Plant or the M&G Brazil Plant.

"M&G Polymers Non-Barrier Know-How" means the M&G Polymers Know-How, excluding (i) any Know-How exclusively relating to Barrier PET, (ii) any Know-How exclusively relating to the BicoPET™ technology, and (iii) any Know-How constituting "Purchased Intellectual Property" under the Barrier IP Purchase Agreement.

"M&G Polymers Plant" means that certain polymer manufacturing plant at Apple Grove, West Virginia, USA, and operated as of September 1, 2017 by M&G Polymers (whether or not M&G Polymers owns such Plant on the Effective Date).

"M&G Products" means any products produced at any of the M&G Plants, including the products listed in Exhibit E.

"M&G Product Trademarks" means the trademarks listed in Exhibit D (*M&G Product Trademarks*).

"M&G Proprietary Products" means the M&G Brazil Licensed Products and the M&G Mexico Licensed Products, as well as any other products (i) formed, in whole or in part, from or produced using any Formulations owned by Licensors, or (ii) that is covered by, or would

infringe any claim of, any patent or patent application owned by Licensors other than M&G Easy-Up Patents.

"M&G Resins" has the meaning set forth in the preamble to this Agreement.

"M&G Resins Know-How" means the Know-How owned by M&G Resins as of the date of this Agreement and to the extent related to the past or present operation of the M&G Mexico Plant or the M&G Brazil Plant or the past or present manufacture or commercialization of polymer-related products in the M&G Mexico Plant or the M&G Brazil Plant, but excluding Easy-Up Know-How.

"M&G Resins Plant" means that certain polymer manufacturing plant at Corpus Christi, Texas, USA and owned as of September 1, 2017 by M&G Resins.

"M&G Resins Plant Sale" has the meaning set forth in Section 2.1.4.

"M&G Standard PET Patents" means the patents and patent applications owned by Licensors on the Effective Date, including but not limited to patents and patent applications listed on Exhibit B, and including all reissues, renewals, extensions, reexaminations, revisions, divisionals, continuations, continuations-in-part, and foreign counterparts thereof, but excluding the M&G Easy-Up Patents, any "Purchased Intellectual Property" under the Barrier IP Purchase Agreement, and any patents and patent applications listed in Exhibit J.

"M&G USA" has the meaning set forth in the preamble to this Agreement.

"M&G USA Know-How" means the Know-How, excluding any M&G Formulations and excluding any Easy-Up Know-How, owned by M&G USA as of the date of this Agreement and to the extent related to the past or present operation of the M&G Mexico Plant or the M&G Brazil Plant or the past or present manufacture or commercialization of polymer-related products in the M&G Mexico Plant or the M&G Brazil Plant.

"M&G USA Non-Barrier Know-How" means the M&G USA Know-How, excluding (i) any Know-How exclusively relating to Barrier PET, (ii) any Know-How exclusively relating to the BicoPET$^{TM}$ technology, and (iii) any Know-How constituting "Purchased Intellectual Property" under the Barrier IP Purchase Agreement.

"Option Grantor" has the meaning set forth in Section 3.3.1.

"Option Grantee" has the meaning set forth in Section 3.3.1.

"Option Period" has the meaning set forth in Section 3.3.2.

"Party" and "Parties" have the meanings set forth in the preamble to this Agreement.

"<u>Plant</u>" means with respect to: (i) M&G Brazil, the M&G Brazil Plant, (ii) M&G Mexico, the M&G Mexico Plant; (iii) M&G Resins, the M&G Resins Plant; and (iv) M&G Polymers, the M&G Polymers Plant.

"<u>Person</u>" means any (i) natural person, (ii) form of for-profit or non-profit business entity recognized by any Governmental Authority, including any corporation, partnership, limited liability company, association, or trust, or (iii) Governmental Authority.

"<u>PET</u>" means polyethylene terephthalate.

"<u>Recipient</u>" has the meaning set forth in the definition of Confidential Information.

"<u>Regulatory Approval</u>" means, with respect to any jurisdiction, any and all approvals or authorizations of a Regulatory Authority that are legally necessary for the commercial manufacture, distribution, use, marketing or sale of products in such jurisdiction, including, as applicable, any associated regulatory or data exclusivity associated with such approvals or authorizations.

"<u>Regulatory Authority</u>" means, with respect to any jurisdiction, the Governmental Authority having responsibility for granting Regulatory Approvals in such country or jurisdiction, including the FDA in the United States.

"<u>Representatives</u>" means with respect to a Party, such Party's Affiliates, and each of such Party's and its Affiliates' respective officers, directors, managers and employees.

"<u>Term</u>" has the meaning set forth in <u>Section 9.1.2</u>.

"<u>Third Party</u>" means any person or entity other than a Party to this Agreement.

"<u>Third Party Claim</u>" has the meaning set forth in <u>Section 7.2.1</u>.

## Exhibit B

## M&G Standard PET Patents[1]

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.006.AU | AU - Australia | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | 664388 | 5 March, 1996 |
| MG.P.006.BE | BE - Belgium | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.CA | CA - Canada | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | 2096640 | 18 March, 2003 |
| MG.P.006.DE | DE - Germany | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.EP | EP - European Patent Office | Utility | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.ES | ES - Spain | EP Regional Validation | Process for the production of high molecular weight polyester resins | 2208634 | 19 November, 2003 |
| MG.P.006.FR | FR - France | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.GB | GB - United Kingdom | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.IT | IT - Italy | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.JP | JP - Japan | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | 2790917 | 12 June, 1998 |
| MG.P.006.NL | NL - Netherlands | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.TW | TW - Taiwan | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | NI-62878 | 8 November, 1993 |
| MG.P.006.US | US - United States | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | 5376734 | 27 December, 1994 |
| MG.P.016.MX | MX - Mexico | Utility | Polyester resins having improved rheological properties | 209084 | 22 July, 2002 |
| MG.P.016.US | US - United States | Utility | Polyester resins having improved rheological properties | 6447711 | 10 September, 2002 |
| MG.P.017.AU | AU - Australia | Utility | Polyester resin with improved color characteristics | 705353 | 26 August, 1999 |

[1] Some listed patents and patent applications may be expired, lapsed or abandoned.

31

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.017.BE | BE - Belgium | EP Regional Validation | Polyester resin with improved color characteristics | 758663 | 9-May-01 |
| MG.P.017.CA | CA - Canada | Utility | Polyester resin with improved color characteristics | 2181870 | 9 October, 2007 |
| MG.P.017.DE | DE - Germany | EP Regional Validation | Polyester resin with improved color characteristics | 758663 | 9-May-01 |
| MG.P.017.ES | ES - Spain | EP Regional Validation | Polyester resin with improved color characteristics | 758663 | 9-May-01 |
| MG.P.017.FR | FR - France | EP Regional Validation | Polyester resin with improved color characteristics | 758663 | 9-May-01 |
| MG.P.017.IT | IT - Italy | Utility | Polyester resin with improved color characteristics | 1277362 | 10 November, 1997 |
| MG.P.017.MX | MX - Mexico | Utility | Polyester resin with improved color characteristics | 193168 | 27 August, 1999 |
| MG.P.017.TW | TW - Taiwan | Utility | Polyester resin with improved color characteristics | NI-118960 | 19 December, 2000 |
| MG.P.017.US | US - United States | Utility | Polyester resin with improved color characteristics | 5618908 | 8 April, 1997 |
| MG.P.021.BE | BE - Belgium | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.DE | DE - Germany | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.ES | ES - Spain | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.FR | FR - France | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.GB | GB - United Kingdom | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.IT | IT - Italy | Utility | Improved process for the production of polyester resins | 1283166 | 7 April, 1998 |
| MG.P.021.KR | KR - South Korea | Utility | Improved process for the production of polyester resins | 526589 | 29 October, 2005 |
| MG.P.021.MX | MX - Mexico | Utility | Improved process for the production of polyester resins | 200771 | 2 February, 2001 |
| MG.P.021.NL | NL - Netherlands | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.US | US - United States | Utility | Process for the production of polyester resins | 5902864 | 11-May-99 |
| MG.P.021.US.C1 | US - United States | Continuation | Process for the production of polyester resins | 6245863 | 12 June, 2001 |
| MG.P.022.DE | DE - Germany | EP Regional Validation | Blown polyester film | 819728 | 8 January, 2003 |
| MG.P.022.FR | FR - France | EP Regional Validation | Blown polyester film | 819728 | 8 January, 2003 |
| MG.P.022.GB | GB - United Kingdom | EP Regional Validation | Blown polyester film | 819728 | 8 January, 2003 |
| MG.P.022.IT | IT - Italy | Utility | Blown polyester film | 1283160 | 7 April, 1998 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.022.MX | MX - Mexico | Utility | Blown polyester film | 201017 | 9 March, 2001 |
| MG.P.022.US | US - United States | Utility | Blown polyester film | 6013360 | 11 January, 2000 |
| MG.P.023.BE | BE - Belgium | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.CA | CA - Canada | Utility | Improved process for the production of polyester resins | 2210205 | 13 August, 2002 |
| MG.P.023.DE | DE - Germany | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.ES | ES - Spain | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.FR | FR - France | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.GB | GB - United Kingdom | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.IT | IT - Italy | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.KR | KR - South Korea | Utility | Improved process for the production of polyester resins | 681569 | 5 February, 2007 |
| MG.P.023.MX | MX - Mexico | Utility | Improved process for the production of polyester resins | 210105 | 4 September, 2002 |
| MG.P.023.US | US - United States | Utility | Process for the production of polyester resins | 6228302 | 8-May-01 |
| MG.P.024.DE | DE - Germany | EP Regional Validation | Process for the dimensional stabilization of containers in polyethylene | 877770 | 19 November, 2003 |
| MG.P.024.FR | FR - France | EP Regional Validation | Process for the dimensional stabilization of containers in polyethylene | 877770 | 19 November, 2003 |
| MG.P.024.US | US - United States | PCT National Phase Filing | Process for the dimensional stabilization of containers in polyethylene | 6458314 | 1 October, 2002 |
| MG.P.028.AT | AT - Austria | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.BE | BE - Belgium | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.CA | CA - Canada | Utility | Polyester resins with improved properties | 2265319 | 09 March 2010 |
| MG.P.028.DE | DE - Germany | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.ES | ES - Spain | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.FR | FR - France | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.GB | GB - United Kingdom | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.IT | IT - Italy | EP Regional Validation | Polyester resins with improved properties | 1298635 | 12 January 2000 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.028.JP | JP - Japan | Utility | Polyester resins with improved properties | 11-69640 | 16 March 1999 |
| MG.P.028.NL | NL - Netherlands | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.SE | SE - Sweden | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.US | US - United States | Utility | Polyester resins with improved properties | 6057016 | 02 May 2000 |
| MG.P.032.DE | DE - Germany | EP Regional Validation | Transparent articles of polyester resin | 1024169 | 26 November 2003 |
| MG.P.032.ES | ES - Spain | EP Regional Validation | Transparent articles of polyester resin | 1024169 | 26 November 2003 |
| MG.P.032.FR | FR - France | EP Regional Validation | Transparent articles of polyester resin | 1024169 | 26 November 2003 |
| MG.P.032.IT | IT - Italy | EP Regional Validation | Transparent articles of polyester resin | 1307930 | 26 November 2003 |
| MG.P.032.JP | JP - Japan | Utility | Transparent articles of polyester resin | 14477/00 | 24 January 2000 |
| MG.P.032.KR | KR - South Korea | Utility | Transparent articles of polyester resin | 620640 | 29 August 2006 |
| MG.P.032.MX | MX - Mexico | Utility | Transparent articles of polyester resin | 219099 | 10 February 2004 |
| MG.P.032.US | US - United States | Utility | Transparent articles of polyester resin | 6258452 | 10 July 2001 |
| MG.P.033.CA | CA - Canada | Utility | Process for the preparation of polyester resin | 2292986 | 03 March 2009 |
| MG.P.033.DE | DE - Germany | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |
| MG.P.033.ES | ES - Spain | EP Regional Validation | Process for the preparation of polyester resin | 2235429 | 26 January 2005 |
| MG.P.033.FR | FR - France | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |
| MG.P.033.GB | GB - United Kingdom | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |
| MG.P.033.IT | IT - Italy | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.033.JP | JP - Japan | Utility | Process for the preparation of polyester resin | 362649/99 | 21 December 1999 |
| MG.P.033.KR | KR - South Korea | Utility | Process for the preparation of polyester resin | 620665 | 29 August 2006 |
| MG.P.033.MX | MX - Mexico | Utility | Process for the preparation of polyester resin | 240013 | 05 September 2006 |
| MG.P.033.NL | NL - Netherlands | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |
| MG.P.033.TW | TW - Taiwan | Utility | Process for the preparation of polyester resin | NI-146787 | 10 April 2002 |
| MG.P.033.US | US - United States | Utility | Process for the preparation of polyester resin | 6143837 | 07 November 2000 |
| MG.P.044.AR | AR- Argentina | Utility | Flexible bottles of polyester resin | 039057 | 30 July 2009 |
| MG.P.044.AT | AT - Austria | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.BE | BE - Belgium | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.BR | BR - Brazil | PCT National Phase Filing | Flexible bottles of polyester resin | PI0211233 | 19 February 2013 |
| MG.P.044.CZ | CZ - Czech Republic | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.DE | DE - Germany | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.ES | ES - Spain | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.FR | FR - France | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.GB | GB - United Kingdom | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.GR | GR - Greece | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.IT | IT - Italy | Utility | Flexible bottles of polyester resin | 1325813 | 21 December 2004 |
| MG.P.044.IT.EP | IT - Italy | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.MX | MX - Mexico | PCT National Phase Filing | Flexible bottles of polyester resin | 248151 | 17 August 2007 |
| MG.P.044.NL | NL - Netherlands | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.SE | SE - Sweden | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.044.US | US - United States | PCT National Phase Filing | Flexible bottles of polyester resin | 7226648 | 05 June 2007 |
| MG.P.067.AT | AT - Austria | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.BE | BE - Belgium | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.CA | CA - Canada | PCT National Phase Filing | Process for fast heat-up polyesters | 2395252 | 09 February 2010 |
| MG.P.067.DE | DE - Germany | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.EP | EP - European Patent Office | PCT National Phase Filing | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.ES | ES - Spain | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.FR | FR - France | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.GB | GB - United Kingdom | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.ID | ID - Indonesia | PCT National Phase Filing | Process for fast heat-up polyesters | ID0020121 | 16 November 2007 |
| MG.P.067.IT | IT - Italy | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.JP | JP - Japan | PCT National Phase Filing | Process for fast heat-up polyesters | 4363812 | 28 August 2009 |
| MG.P.067.KR | KR - South Korea | PCT National Phase Filing | Process for fast heat-up polyesters | 715920 | 02 May 2007 |
| MG.P.067.NL | NL - Netherlands | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.MX | MX - Mexico | PCT National Phase Filing | Process for fast heat-up polyesters | 261756 | 29 October 2008 |
| MG.P.067.PT | PT - Portugal | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.TR | TR - Turkey | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.US | US - United States | Utility | Process for fast heat-up polyesters | 6660792 | 09 December 2003 |
| MG.P.076.AU | AU - Australia | PCT National Phase Filing | Apparatus for checking the quality of preforms each having a body made of plastic material | 2004240757 | 22 January 2009 |
| MG.P.076.DE | DE - Germany | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 60315138 | 25 July 2007 |
| MG.P.076.EP | EP - European Patent Office | PCT National Phase Filing | Apparatus for checking the quality of preforms each having a body made of plastic material | 1479454 | 25 July 2007 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.076.ES | ES - Spain | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 2290422 | 25 July 2007 |
| MG.P.076.FR | FR - France | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 1479454 | 25 July 2007 |
| MG.P.076.GB | GB - United Kingdom | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 1479454 | 25 July 2007 |
| MG.P.076.IT | IT - Italy | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 1479454 | 25 July 2007 |
| MG.P.076.US | US - United States | PCT National Phase Filing | Apparatus for checking the quality of preforms each having a body made of plastics material | 7541556 | 02 June 2009 |
| MG.P.078.BE | BE - Belgium | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.BR | BR - Brazil | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | PI0706982-0 | 09 February 2007 |
| MG.P.078.CN | CN - China | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 200780004722.2 | 09 February 2007 |
| MG.P.078.DE | DE - Germany | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.EP | EP - European Patent Office | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.FR | FR - France | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.GB | GB - United Kingdom | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.078.IN | IN - India | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 260258 | 15 April 2014 |
| MG.P.078.IT | IT - Italy | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.JP | JP - Japan | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 2008-553774 | 09 February 2007 |
| MG.P.078.MX | MX - Mexico | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 290776 | 05 October 2011 |
| MG.P.078.NL | NL - Netherlands | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.RU | RU - Russian Federation | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 2428437 | 10 September 2011 |
| MG.P.078.US | US - United States | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 11673014 | 09 February 2007 |
| MG.P.085.BR | BR - Brazil | PCT National Phase Filing | Poss compounds for manufacture of polycondensation polymers | PI0713175 | 18 July 2007 |
| MG.P.085.CN | CN - China | PCT National Phase Filing | Poss metal compounds for manufacture of polycondensation polymers | 200780034430.3 | 18 September 2013 |
| MG.P.085.EP | EP - European Patent Office | PCT National Phase Filing | Novel poss compounds, manufacturing routes and their uses | 2052008 | 10 May 2017 |
| MG.P.085.IN | IN - India | PCT National Phase Filing | Poss compounds for manufacture of polycondensation polymers | 262031 | 30 July 2014 |
| MG.P.085.MX | MX - Mexico | PCT National Phase Filing | Poss compounds for manufacture of polycondensation polymers | 318386 | 07 March 2014 |
| MG.P.085.RU | RU - Russian Federation | PCT National Phase Filing | Poss metal compounds for the manufacture of polycondensation polymers | 2009105502 | 18 July 2007 |
| MG.P.085.US | US - United States | PCT National Phase Filing | Novel poss compounds, manufacturing routes and their uses | 12373968 | 15 January 2009 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.th1112.CA | CA - Canada | PCT National Phase Filing | polyesters containing an infrared absorbing material | 2330962 | 12 February 2008 |
| MG.th1112.JP | JP - Japan | PCT National Phase Filing | polyesters containing an infrared absorbing material | 4287052 | 03 April 2009 |
| MG.th1112.MX | MX - Mexico | PCT National Phase Filing | polyesters containing an infrared absorbing material | 241305 | 20 October 2006 |

# Exhibit C

## M&G Easy-Up Patents[2]

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/APP NO | GRANT DATE/FILING DATE |
|---|---|---|---|---|---|
| MG.P.079.AM | AM - Armenia | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.AT | AT - Austria | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.AU | AU - Australia | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 2003246367 | 27 March 2008 |
| MG.P.079.AZ | AZ - Azerbaijan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.BE | BE - Belgium | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.BR | BR - Brazil | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | PI0312987 | 16 July 2013 |
| MG.P.079.BY | BY - Belarus | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.CH | CH - Switzerland | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.CN | CN - China | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | zl03817595,9 | 02 May 2007 |
| MG.P.079.CZ | CZ - Czech Republic | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.DE | DE - Germany | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.EAPO | EA - Eurasiatic Patent Office | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.EP | EP - European Patent Office | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |

---

[2] Some listed patents and patent applications may be expired, lapsed or abandoned.

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/APP NO | GRANT DATE/FILING DATE |
|---|---|---|---|---|---|
| MG.P.079.ES | ES - Spain | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.FR | FR - France | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.GB | GB - United Kingdom | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.GR | GR - Greece | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.ID | ID - Indonesia | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | ID P 0024455 | 30 October 2009 |
| MG.P.079.IN | IN - India | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 230209 | 25 February 2009 |
| MG.P.079.IT | IT - Italy | Utility | Continuous process for solid phase polymerisation of polyesters | 1338026 | 20 February 2007 |
| MG.P.079.IT.EP | IT - Italy | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.KG | KG - Kyrgyzstan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.KZ | KZ - Kazakhstan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.LT | LT - Lithuania | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.MD | MD - Republic of Moldova | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.MX | MX - Mexico | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 255993 | 04 April 2008 |
| MG.P.079.NL | NL - Netherlands | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.RU | RU - Russian Federation | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.TJ | TJ - Tajikstan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.TM | TM - Turkmenistan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/APP NO | GRANT DATE/FILING DATE |
|---|---|---|---|---|---|
| MG.P.079.TR | TR - Turkey | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.US | US - United States | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 8293850 | 23 October 2012 |
| MG.P.094.AR | AR - Argentina | Utility | Radial mixing devices for rotating inclined reactors | AR 0651560 B1 | 21 October 2015 |
| MG.P.094.AU | AU - Australia | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 2008212914 | 17 May 2012 |
| MG.P.094.BE | BE - Belgium | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.BR | BR - Brazil | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | PI0806379 | 05 February 2008 |
| MG.P.094.CA | CA - Canada | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 2677344 | 05 February 2008 |
| MG.P.094.CH | CH - Switzerland | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.CN | CN - China | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 200880011314.4 | 30 October 2013 |
| MG.P.094.DE | DE - Germany | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.EAPO | EA - Eurasiatic Patent Office | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 014970 | 29 April 2011 |
| MG.P.094.EP | EP - European Patent Office | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.ES | ES - Spain | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.FR | FR - France | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.GB | GB - United Kingdom | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.GR | GR - Greece | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/APP NO | GRANT DATE/FILING DATE |
|--------|---------|------------|-------|------------------|------------------------|
| MG.P.094.HK | HK - Hong Kong | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 10103763.7 | 19 April 2010 |
| MG.P.094.ID | ID - Indonesia | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | ID P0030051 | 17 January 2012 |
| MG.P.094.IN | IN - India | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 277529 | 23 November 2016 |
| MG.P.094.IT | IT - Italy | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.KR | KR - South Korea | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 10-1451609 | 10 October 2014 |
| MG.P.094.MX | MX - Mexico | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 288024 | 01 July 2011 |
| MG.P.094.NL | NL - Netherlands | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.PL | PL - Poland | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.TH | TH - Thailand | Utility | Radial mixing devices for rotating inclined reactors | 801000411 | 28 January 2008 |
| MG.P.094.TR | TR - Turkey | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.TW | TW - Taiwan | Utility | Radial mixing devices for rotating inclined reactors | I418399 | 11 December 2013 |
| MG.P.094.UA | UA - Ukraine | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 96319 | 25 October 2011 |
| MG.P.094.US | US - United States | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 8454896 | 04 June 2013 |
| MG.P.094.US.C1 | US - United States | Continuation | Radial mixing devices for rotating inclined reactors | 8454865 | 04 June 2013 |
| MG.P.094.US.C2 | US - United States | Continuation | Radial mixing devices for rotating inclined reactors | 8790580 | 29 July 2014 |

## Exhibit D

## M&G Product Trademarks

### Trademark Registrations and Applications:

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date | Licensed Parties |
|---|---|---|---|---|---|---|---|
| M&G USA Corporation | Argentina | CLEARTUF | 3597012 | 4/20/2017 | 2918751 | 11/30/2017 | M&G Brazil, M&G Mexico |
| M&G USA Corporation | Brazil | CLEARTUF | 819954810 | 6/9/1997 | 819954810 | 9/28/1999 | |
| M&G USA Corporation | Canada | CLEARTUF | 447875-00 | 12/17/1979 | TMA250977 | 10/2/1980 | |
| M&G USA Corporation | Chile | CLEARTUF | 804498 | 01/23/2008 | 837360 | 01/23/2008 | |
| M&G USA Corporation | Colombia | CLEARTUF | 97 30206 | 5/30/1997 | 205089 | 1/24/2008 | |
| M&G USA Corporation | Ecuador | CLEARTUF | 6417-IEPI | 10/16/1998 | 6192.98 | 10/16/1998 | |
| M&G USA Corporation | Mexico | CLEARTUF | 1274230 | 5/16/2012 | 1315597 | 9/27/2012 | |
| M&G USA Corporation | Paraguay | CLEARTUF | 820039 | 6/9/2008 | 318157 | 11/7/2008 | |
| M&G USA Corporation | Peru | CLEARTUF | 326193-2007 | 5/27/1997 | P00038516 | 8/25/1997 | |
| M&G USA Corporation | Uruguay | CLEARTUF | 389401 | 3/5/2008 | 389401 | 3/11/2008 | |
| M&G USA Corporation | USA | CLEARTUF | 73146308 | 10/27/1977 | 1094154 | 6/27/1978 | |
| M&G USA Corporation | Venezuela | CLEARTUF | | | 206.669-P | 7/31/1998 | |
| M&G USA Corporation | Argentina | CLEARTUF MAX | 3268850 | 8/8/2013 | 2668480 | 7/22/2014 | M&G Brazil, M&G Mexico |
| M&G USA Corporation | Bolivia | CLEARTUF MAX | 2749-2002 | 8/22/2002 | 91906 C | 12/11/2003 | |

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date | Licensed Parties |
|---|---|---|---|---|---|---|---|
| M&G USA Corporation | Brazil | CLEARTUF MAX | 824774060 | 8/27/2002 | 824774060 | 4/29/2008 | M&G Brazil, M&G Mexico |
| M&G USA Corporation | Canada | CLEARTUF MAX | 1140415-00 | 5/13/2002 | TMA650563 | 10/17/2005 | |
| M&G USA Corporation | Chile | CLEARTUF MAX | 1047388 | 2/26/2013 | 1028719 | 8/4/2013 | |
| M&G USA Corporation | Colombia | CLEARTUF MAX | 02 75058 (2-75058) | 8/26/2002 | 269146 | 3/5/2013 | |
| M&G USA Corporation | Costa Rica | CLEARTUF MAX | 2002-0005920 | 8/29/2002 | 139635 | 8/5/2003 | |
| M&G USA Corporation | Ecuador | CLEARTUF MAX | 126743 | 8/21/2002 | 21502 | 4/14/2003 | |
| M&G USA Corporation | El Salvador | CLEARTUF MAX | 32566 | 8/12/2003 | 00222 | 12/8/2003 | |
| M&G USA Corporation | Honduras | CLEARTUF MAX | 11346-02 | 1/23/2003 | 86607 | 1/20/2003 | |
| M&G USA Corporation | Mexico | CLEARTUF MAX | 560928 | 8/13/2002 | 817902 | 1/20/2004 | |
| M&G USA Corporation | Panama | CLEARTUF MAX | 122608 | 8/20/2002 | 122608 | 8/20/2002 | |
| M&G USA Corporation | Paraguay | CLEARTUF MAX | 133312 | 1/29/2013 | 380272 | 5/16/2013 | |
| M&G USA Corporation | Paraguay | CLEARTUF MAX | 304940 | 8/14/2002 | 258921 | 7/2/2003 | |
| M&G USA Corporation | Paraguay | CLEARTUF MAX | 219747 | 8/14/2002 | 258921 | 7/2/2003 | |
| M&G USA Corporation | Peru | CLEARTUF MAX | 160549-2002 | 8/27/2002 | P00095656 | 3/16/2004 | |
| M&G USA Corporation | Uruguay | CLEARTUF MAX | 442494 | 1/25/2013 | | 5/26/2013 | |
| M&G USA Corporation | Uruguay | CLEARTUF MAX | 343085 | 8/21/2002 | 343085 | 5/26/2003 | |

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date | Licensed Parties |
|---|---|---|---|---|---|---|---|
| M&G USA Corporation | USA | CLEARTUF MAX | 76376635 | 2/28/2002 | 2811346 | 2/3/2004 | M&G Brazil, M&G Mexico |
| M&G USA Corporation | Venezuela | CLEARTUF MAX | 2002-012800 | 8/19/2002 | P249219 | 11/11/2003 | |
| M&G USA Corporation | USA | REPETE | 78206496 | 1/23/2003 | 2791444 | 12/9/2003 | M&G Mexico |
| M&G USA Corporation | USA | TRAYTUF | 74471359 | 12/20/1993 | 1864466 | 11/29/1994 | |
| M&G USA Corporation | USA | TRAYTUF | 73692534 | 10/28/1987 | 1498197 | 8/2/1988 | |

**Unregistered trademarks (in jurisdictions where a Licensor owns rights):**

| Mark | Licensed Parties |
|---|---|
| CLEARTUF<br>Cleartuf MAX<br>Cleartuf Turbo B<br>Cleartuf 8006 HP | M&G Brazil |
| CLEARTUF<br>REPETE<br>TRAYTUF<br>ViTUF<br>Cleartuf MAX<br>Cleartuf EUROMAX<br>Cleartuf RETA<br>REPETE MAX<br>Cleartuf Turbo II<br>Cleartuf Turbo IIB<br>Cleartuf 8006C<br>Cleartuf 8006 HPG<br>Cleartuf 8006 HP<br>ViTUF 10690<br>ViTUF ClearVU<br>TrayTuf 8906<br>TrayTuf 7300<br>TrayTuf 8100 | M&G Mexico |

## Exhibit E

## M&G Products

**M&G Brazil Licensed Products:**

| | | |
|---|---|---|
| Cleartuf MAX | Cleartuf Turbo B | Cleartuf 8006 HP |

**M&G Mexico Licensed Products:**

| | | |
|---|---|---|
| Cleartuf MAX | Cleartuf Turbo IIB | ViTuf ClearVU |
| Cleartuf EUROMAX | Cleartuf 8006C | TrayTuf 8906 |
| Cleartuf RETA | Cleartuf 8006 HPG | TrayTuf 7300 |
| REPETE MAX | Cleartuf 8006 HP | TrayTuf 8100 |
| Cleartuf Turbo II | ViTUF 10690 | |

## Exhibit F

## M&G Marks

### Trademark Registrations and Applications:

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date |
|-------|--------------|------|---------------|-------------|---------------------|-------------------|
| M&G Polymers USA LLC | Brazil | M&G | 827899920 | 11/25/2005 | 827899920 | 2/26/2008 |
| M&G Polymers USA LLC | Brazil | M&G | 827899912 | 11/25/2005 | 827899912 | 7/5/2016 |
| M&G Polymers USA LLC | Brazil | M&G | 827899890 | 11/25/2005 | N/A | N/A |
| M&G Polymers USA LLC | Brazil | M&G | 827899904 | 11/25/2005 | 827899904 | 2/26/2008 |
| M&G Polymers USA LLC | EU | M&G | 004730966 | 11/8/2005 | 004730966 | 11/2/2006 |
| M&G Polymers USA LLC | Mexico | M&G | 752590 | 11/24/2005 | 915301 | 12/21/2005 |
| M&G Polymers USA LLC | Mexico | M&G | 752589 | 11/24/2005 | 914032 | 12/15/2005 |
| M&G Polymers USA LLC | Mexico | M&G | 752591 | 11/24/2005 | 920636 | 2/23/2006 |
| M&G Polymers USA LLC | Mexico | M&G | 752588 | 11/24/2005 | 939127 | 6/21/2006 |

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date |
|---|---|---|---|---|---|---|
| M&G Polymers USA LLC | USA |  M&G | 78761643 | 11/28/2005 | 3853638 | 9/28/2010 |
| M&G Polymers USA LLC | Brazil | MOSSI & GHISOLFI | 827899866 | 11/25/2005 | 827899866 | 9/20/2008 |
| M&G Polymers USA LLC | Brazil | MOSSI & GHISOLFI | 827899858 | 11/25/2005 | 827899858 | 12/7/2010 |
| M&G Polymers USA LLC | Brazil | MOSSI & GHISOLFI | 827899882 | 11/25/2005 | 827899882 | 8/19/2008 |
| M&G Polymers USA LLC | Brazil | MOSSI & GHISOLFI | 827899874 | 11/25/2005 | 827899874 | 9/30/2008 |
| M&G Polymers USA LLC | EU | MOSSI & GHISOLFI | 004729554 | 11/8/2005 | 004729554 | 11/2/2006 |
| M&G Polymers USA LLC | Mexico | MOSSI & GHISOLFI | 752595 | 11/24/2005 | 912274 | 11/30/2005 |
| M&G Polymers USA LLC | Mexico | MOSSI & GHISOLFI | 752593 | 11/24/2005 | 912272 | 11/30/2005 |
| M&G Polymers USA LLC | Mexico | MOSSI & GHISOLFI | 752594 | 11/24/2005 | 912273 | 11/30/2005 |
| M&G Polymers USA LLC | Mexico | MOSSI & GHISOLFI | 752592 | 11/24/2005 | 912271 | 11/30/2005 |
| M&G Polymers USA LLC | USA | MOSSI & GHISOLFI | 78761641 | 11/28/2005 | 3853637 | 9/28/2010 |

<u>Unregistered trademarks (in jurisdictions where a Licensor owns rights):</u>



**M&G**

MOSSI & GHISOLFI

**<u>Exhibit G</u>**
**Easy-Up Marks**


**In jurisdictions where a Licensor own rights:**

EASY-UP

# Exhibit H

## M&G Brazil Patents[3]

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.BRA.001 .CL | CL - Chile | Utility | Politereftalato de etileno glicol homo ou copolimero para aplicação em artigos moldados com garrafas, embalagens e outros com caracteristicas de glicol | 41086 | 8 August, 2001 |
| MG.BRA.003 .AR | AR- Argentina | Utility | A process for manufacturing polyester | ar021394 | 15-May-06 |
| MG.BRA.003 .BR | BR - Brazil | PCT National Phase Filing | A process for manufacturing polyester | PI9916751 | 18 November, 2008 |
| MG.BRA.003 .CA | CA - Canada | PCT National Phase Filing | A process for manufacturing polyester | 2352664 | 6 March, 2010 |
| MG.BRA.003 .MX | MX - Mexico | PCT National Phase Filing | A process for manufacturing polyester | 220723 | 2 June, 2004 |
| MG.BRA.003 .US | US - United States | Utility | A process for manufacturing polyester | 6590060 | 8 July, 2003 |
| MG.BRA.004 .AR | AR- Argentina | Utility | A process for manufacturing polyester | P99010599 8 | 25 November, 1999 |
| MG.BRA.004 .BR | BR - Brazil | PCT National Phase Filing | A process for manufacturing polyester | PI 9917609 | 10 March, 2010 |
| MG.BRA.004 .MX | MX - Mexico | PCT National Phase Filing | A process for manufacturing polyester | 224678 | 6 December, 2004 |
| MG.BRA.005 .MX | MX - Mexico | PCT National Phase Filing | Polyester-based compositions having improved thermomechanical properties and process to produce said compositions. | 255700 | 28 March, 2008 |
| MG.BRA.005 .UY | UY - Uruguay | PCT National Phase Filing | Polyester-based compositions having improved thermomechanical properties and process to produce said compositions. | 26645 | 29 March, 2001 |
| MG.Design0 1.BR | BR - Brazil | Design | Jar | DI 5700936.8 | 31 March, 1998 |
| MG.Design0 2.BR | BR - Brazil | Design | Oil bottle | DI 5801041 | 30 November, 1999 |

---

[3] Some listed patents and patent applications may be expired, lapsed or abandoned.

Exhibit I

**Irrevocable Power of Attorney**

**TO THE LICENSE AGREEMENT**
**BETWEEN M&G USA CORPORATION,**
**M&G POLYMERS USA LLC,**
**M&G RESINS USA LLC,**
**M&G POLIMEROS MEXICO, S.A. DE C.V., AND**
**M&G POLIMEROS BRASIL S.A.,**

| IRREVOCABLE SPECIAL POWER OF ATTORNEY | PROCURAÇÃO ESPECIAL IRREVOCÁVEL |
|---|---|
| We M&G Polímeros Brasil S.A. hereby grant ample, sufficient and full Special Power of Attorney so that jointly or severally M&G Polymers USA, LLC and M&G USA Corporation. represent it before the Brazilian Patent and Trademark Office ("BPTO"), the Copyright Office of the National Library and other administrative authorities. | Por meio da presente procuração, M&G Polímeros Brasil S.A. concede amplos, suficientes e totais poderes para que conjunta ou separadamente, M&G Polymers USA, LLC y M&G Resins US, LLC. a represente perante o Instituto Nacional da Propriedade Industrial ("INPI"), Escritório de Direitos Autorais ("EDA") da Biblioteca Nacional e outras autoridades administrativas. |
| I, _____, a resident of the Brazil, on behalf of M&G Polimeros Brasil S.A., a company established under the laws of Brazil, am duly authorized to grant this Irrevocable Special Power of Attorney on behalf of M&G Polímeros Brasil S.A., and my authority has neither been revoked or limited as of the date of execution of this instrument. | Eu, _____, residente no Brasil, em nome da M&G Polimeros Brasil S.A., uma empresa constituída conforme as leis do Brasil, estou devidamente autorizado a conceder esta procuração especial e irrevogável em nome da M&G Polímeros Brasil S.A., e minha autoridade não foi revogada nem limitada até a data de execução deste instrumento. |
| On _____, 2018, M&G USA Corporation, M&G Polymers USA LLC, M&G Resins USA LLC, M&G Polímeros México, S.A. de C.V., and M&G Polímeros Brasil S.A. entered into a License Agreement ("License Agreement") and pursuant to it, M&G Polymers USA LLC and M&G USA Corporation granted M&G Polímeros Brasil S.A., as Licensee, the non-exclusive right and license to use the M&G | Em _____ de 2018, M&G USA Corporation, M&G Polymers EUA LLC, M&G Resins EUA LLC, M&G Polímeros México, S.A. de C.V. e M&G Polímeros Brasil S.A., celebraram um Contrato de Licença ("Contrato de Licença") pelo qual a M&G Polymers USA LLC e M&G USA Corporation concederam à M&G Polímeros Brasil S.A., atuando na qualidade de |

| | |
|---|---|
| Brasil Patents, M&G Brasil Licensed Trademarks and M&G Marks (as defined and listed in the License Agreement) in Brazil solely as set forth in the License Agreement. | licenciado, uma licença direta e não exclusiva para usar as "Patentes M&G do Brasil", "Marcas M&G do Brasil" e "Marcas M&G" (conforme definido pelo Contrato de Licença) dentro do Brasil, de acordo com as disposições do Contrato de Licença. |
| That pursuant to Section 8.1 of the License Agreement, M&G Polymers USA LLC and M&G USA Corporation directly or through its designees has agreed [(at their election or upon M&G Brazil's reasonable written request)] to register M&G Polímeros Brasil S.A. as an authorized user of the M&G Brazil Patents, M&G Brazil Licensed Trademarks and M&G Marks with the Brazilian Patent and Trademark Office, as well as to in due course cancel such registration either upon termination for any cause or upon expiration of the License Agreement. | Que, de acordo com a Cláusula 8.1 do Contrato de Licença, a M&G Polymers USA LLC e a M&G USA Corporation agindo diretamente ou através de seus representantes legais concordaram em registrar a M&G Polímeros do Brasil S.A. como um usuário autorizado "Patentes M&G do Brasil", "Marcas M&G do Brasil" e "Marcas M&G" perante o Instituto Nacional da Propriedade Industrial, bem como, no devido momento, cancelar a referida inscrição devido a rescisão por qualquer motivo ou devido ao vencimento do Contrato de Licença. |
| To ensure compliance with the obligations assumed by M&G Polímeros Brasil S.A. as a condition to executing and pursuant to the terms of the License Agreement, M&G Polímeros Brasil S.A. wishes to grant a Special Irrevocable Power of Attorney for said purpose in favour of M&G Polymers USA LLC and M&G USA Corporation and its designees mentioned above. | Para garantir o cumprimento das obrigações assumidas pela M&G Polímeros do Brasil S.A., de acordo com e como condição para a conclusão do Contrato de Licença, M&G Polímeros do Brasil S.A., deseja conceder esta Procuração Especial Irrevogável em favor da M&G Polymers USA LLC e da M&G USA Corporation e seus representantes mencionados acima. |
| FIRST.                    M&G Polímeros Brasil S.A. hereby grants a Special Irrevocable Power of Attorney as broad as may be required by law in favour of M&G Polymers USA LLC and M&G USA Corporation and their successors or assigns, to be exercised jointly or severally, so that said attorneys-in-fact may register M&G Polímeros Brasil S.A. as authorized user of the M&G Brazil Patents, M&G Brazil Licensed Trademarks and M&G Marks with the Brazilian Patent and Trademark Office and in due course cancel such registration as authorized user either upon expiration or termination for any cause, according to the terms established in the License | PRIMEIRO. Através da presente M&G Polímeros do Brasil S.A., concede esta Procuração Especial Irrevogável, tão ampla quanto apropriado de acordo com a lei, em favor da M&G Polymers USA LLC e da M&G USA Corporation e seus representantes mencionados acima, para serem exercidos conjunta ou separadamente, para permitir que os referidos procuradores inscrevam M&G Polímeros do Brasil S.A., como usuário autorizado das "Patentes M&G do Brasil", "Marcas M&G do Brasil" e "Marcas M&G" perante o Instituto Nacional da Propriedade Industrial e, no devido momento, após o |

| | |
|---|---|
| Agreement. This power of attorney will survive the termination or expiration of the License Agreement. | vencimento ou término por qualquer motivo, de acordo com as disposições do Contrato de Licença, cancele tal registro. Esta procuração sobreviverá mesmo após a rescisão ou expiração do Contrato de Licença. |
| The power granted to the attorneys-in-fact includes, but is not limited to, the authority to present applications, to pay government fees, to authorize documents, to submit and answer questions, to receive and provide notices, to execute or sign any kind of public or private documents necessary or suitable for exercising the Power of Attorney granted in this document; and in general, to take all steps that may be necessary with respect to the above mentioned matters, including authority that requires a special clause pursuant to law (except to assign property), as well as to totally or partially substitute this Irrevocable Power of Attorney. M&G Polímeros Brasil S.A. in this act irrevocably authorizes the attorneys-in-fact to request the registration and cancellation of the License Agreement before the Brazilian Patent and Trademark Office without any restriction or limitation other than those set forth in the License Agreement, for all legal purposes, in the understanding that the representatives may show such authority with an original of this power of attorney without the need to show additional documents or authorizations. | Os poderes concedidos aos procuradores incluem, sem limitação, poderes para de apresentar pedidos, pagar taxas governamentais, autorizar documentos, apresentar e responder perguntas, enviar e receber notificações, celebrar ou assinar qualquer tipo de documentos públicos ou privados necessários ou adequado para exercer o presente mandato; e em geral, tomar todas as medidas necessárias em relação aos assuntos acima mencionados, incluindo poderes que exigem uma cláusula especial de acordo com a lei (exceto para alienar propriedade), bem como para substabelecer total ou parcialmente a presente Procuração Irrevogável Especial. M&G Polímeros do Brasil S.A., neste ato autoriza irrevogavelmente os procuradores a solicitar o registro e cancelamento do Contrato de Licença perante o Instituto Nacional da Propriedade Industrial, sem qualquer restrição ou limitação que não os contidos no Contrato de Licença, para todos os fins legais, com o entendimento de que os procuradores podem demonstrar tais poderes apenas com a apresentação do original desta procuração, sem requerer qualquer outro documento ou autorização adicional. |
| This power of attorney authorizes  M&G Polymers USA LLC and M&G USA Corporation to perform all acts that are necessary for the faithful performance of this power of attorney before the Brazilian National Institute of Industrial Property and also to delegate, wholly or in part, the powers granted hereunder, and to ratify all the acts performed previously in the name of M&G Polímeros Brasil S.A.. This power of attorney is a | A presente procuração autoriza M&G Polymers USA LLC e M&G USA Corporation a praticar  todos os atos necessários ao fiel cumprimento deste mandato junto ao Instituto Nacional da Propriedade Industrial, podendo, ainda, substabelecer os poderes aqui outorgados no todo ou em parte, ratificando todos os atos anteriormente praticados em nome de M&G Polímeros Brasil S.A., ficando desde já |

| | |
|---|---|
| condition for M&G Polymers USA LLC's and M&G USA Corporation's obligations under the License Agreement and the Agreement, and therefore, it is <u>irrevocable</u>. | ratificados todos os todos os atos praticados nas transações para as quais lhe demos a presente procuração. Esta procuração é uma condição para as obrigações da M&G Polymers USA LLC e M&G USA Corporation ao abrigo do Contrato de Licença e do Contrato e, portanto, é <u>irrevogável</u>. |

## Exhibit J[4]

## Excluded Patents

## Patents Previously Sold Pursuant To Barrier IP Purchase Agreement And Which Are No Longer Owned By Any Of The Licensors

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.030.AT | AT - Austria | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.AU | AU - Australia | Utility | Polyester resin blends with high-level gas barrier properties | 754308 | 27 February 2003 |
| MG.P.030.BE | BE - Belgium | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.BR | BR - Brazil | Utility | Polyester resin blends with high level gas barrier properties | PI 9902233-8 | 10 February 2009 |
| MG.P.030.CA | CA - Canada | Utility | Polyester resin blends with high-level gas barrier properties | 2273701 | 12 February 2008 |
| MG.P.030.CH | CH - Switzerland | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.DE | DE - Germany | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 69916174 | 14 April 2005 |
| MG.P.030.EP | EP - European Patent Office | Utility | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.ES | ES - Spain | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.FI | FI - Finland | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.FR | FR - France | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.GB | GB - United Kingdom | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |

---

[4] Some listed patents and patent applications may be expired, lapsed or abandoned.

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.030.IN | IN - India | Utility | Polyester resin blends with high-level gas barrier properties | 202599 | 02 March 2007 |
| MG.P.030.IT | IT - Italy | EP Regional Validation | Polyester resin blends with high-level gas barrier properties | 1301690 | 07 April 2004 |
| MG.P.030.JP | JP - Japan | Utility | Polyester resin blends with high level gas barrier properties | 4412763 | 27 November 2009 |
| MG.P.030.JP.DIV | JP - Japan | Divisional | Polyester resin blends with high level gas barrier properties | 5416516 | 22 November 2013 |
| MG.P.030.KR | KR - South Korea | Utility | Polyester resin blends with high-level gas barrier properties | 10-0609422 | 03 August 2006 |
| MG.P.030.MX | MX - Mexico | Utility | Polyester resin blends with high-level gas barrier properties | 226199 | 09 February 2005 |
| MG.P.030.NL | NL - Netherlands | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.SE | SE - Sweden | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.TW | TW - Taiwan | Utility | Polyester resin blends with high-level gas barrier properties | I235756 | 11 July 2005 |
| MG.P.030.US | US - United States | Utility | Polyester resin blends with high level gas barrier properties | 6346307 | 12 February 2002 |
| MG.P.030.US.R | US - United States | Reissue | Polyester resin blends with high level gas barrier properties | RE42925 | 15 November 2011 |
| MG.P.040.AU | AU - Australia | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 777598 | 10 February 2005 |
| MG.P.040.BE | BE - Belgium | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.CA | CA - Canada | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 2351758 | 16 February 2010 |
| MG.P.040.DE | DE - Germany | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 60118659 | 21 September 2006 |
| MG.P.040.ES | ES - Spain | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.040.FR | FR - France | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.GB | GB - United Kingdom | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.IT | IT - Italy | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1318600 | 27 August 2003 |
| MG.P.040.IT.EP | IT - Italy | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.JP | JP - Japan | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 3605376 | 08 October 2004 |
| MG.P.040.MX | MX - Mexico | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 220276 | 27 June 2004 |
| MG.P.040.NL | NL - Netherlands | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.TW | TW - Taiwan | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | NI 194364 | 28 April 2004 |
| MG.P.040.US | US - United States | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 6630542 | 07 October 2003 |
| MG.P.041.B.AT | AT - Austria | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.AU | AU - Australia | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 2002338703 | 16 March 2007 |
| MG.P.041.B.BE | BE - Belgium | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.BG | BG - Bulgaria | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.BR | BR - Brazil | PCT National Phase Filing | Transparent polyester resins and articles therefrom | PI 0213080-7 | 16 September 2002 |
| MG.P.041.B.CA | CA - Canada | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 2461911 | 26 June 2012 |
| MG.P.041.B.CZ | CZ - Czech Republic | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.DE | DE - Germany | EP Regional Validation | Transparent polyester resins and articles therefrom | 60230431 | 17 December 2008 |
| MG.P.041.B.DK | DK - Denmark | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.041.B.EP | EP - European Patent Office | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.ES | ES - Spain | EP Regional Validation | Transparent polyester resins and articles therefrom | 2319746 | 17 December 2008 |
| MG.P.041.B.FI | FI - Finland | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.FR | FR - France | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.GB | GB - United Kingdom | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.IT | IT - Italy | Utility | Transparent polyester resins and articles therefrom | 1326956 | 11 March 2005 |
| MG.P.041.B.IT.EP | IT - Italy | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.KR | KR - South Korea | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 10-0883295 | 05 February 2009 |
| MG.P.041.B.MX | MX - Mexico | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 249337 | 24 September 2007 |
| MG.P.041.B.NL | NL - Netherlands | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.PL | PL - Poland | PCT National Phase Filing | Transparent polyester resins and articles therefrom | P-367488 | 16 September 2002 |
| MG.P.041.B.RU | RU - Russian Federation | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 2289598 | 20 December 2006 |
| MG.P.041.B.SK | SK - Slovakia | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.TR | TR - Turkey | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.US | US - United States | PCT National Phase Filing | Transparent polyester resins and articles there from | 7048981 | 23 May 2006 |
| MG.P.041.IT | IT - Italy | Utility | Transparent polyester resins and articles therefrom | 1326581 | 08 February 2005 |
| MG.P.048.AT | AT - Austria | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.AU | AU - Australia | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 2004209002 | 26 August 2010 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.048.AU.DIV | AU - Australia | Divisional | Article comprising light absorbent composition to mask visual haze | 2010201027 | 17 March 2010 |
| MG.P.048.AU.DIV.II | AU - Australia | Divisional | Article comprising light absorbent composition to mask visual haze | 2013216620 | 25 August 2016 |
| MG.P.048.BE | BE - Belgium | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.BG | BG - Bulgaria | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.BR | BR - Brazil | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | PI 0406993-5 | 15 September 2015 |
| MG.P.048.CA | CA - Canada | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 2513686 | 27 September 2011 |
| MG.P.048.CH | CH - Switzerland | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.CN | CN - China | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 100378149 | 02 April 2008 |
| MG.P.048.CZ | CZ - Czech Republic | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.DE | DE - Germany | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 602004005823 | 20 July 2017 |
| MG.P.048.DK | DK - Denmark | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.EP | EP - European Patent Office | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 1590398 | 11 April 2007 |
| MG.P.048.ES | ES - Spain | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.048.FR | FR - France | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.GB | GB - United Kingdom | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.GR | GR - Greece | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.HU | HU - Hungary | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.ID | ID - Indonesia | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | IDP000024449 | 30 October 2009 |
| MG.P.048.IN | IN - India | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 220888 | 10 June 2008 |
| MG.P.048.IT | IT - Italy | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.JP | JP - Japan | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 4950655 | 16 March 2012 |
| MG.P.048.JP.DIV | JP - Japan | Divisional | Product comprising light absorbent composition to mask visual haze and related method | 5715790 | 13 May 2015 |
| MG.P.048.KR | KR - South Korea | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 1055230 | 02 August 2011 |
| MG.P.048.MX | MX - Mexico | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 268806 | 30 July 2009 |
| MG.P.048.NL | NL - Netherlands | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.048.PL | PL - Poland | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 28 July 2014 |
| MG.P.048.PL.DIV | PL - Poland | Divisional | Article comprising light absorbent composition to mask visual haze and related methods | 217218 | 28 July 2014 |
| MG.P.048.PT | PT - Portugal | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.RO | RO - Romania | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.RU | RU - Russian Federation | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 2323229 | 27 April 2008 |
| MG.P.048.SE | SE - Sweden | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.TR | TR - Turkey | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.US | US - United States | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 7833595 | 16 November 2010 |
| MG.P.048.US.CONT.F1 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8053050 | 08 November 2011 |
| MG.P.048.US.CONT.F2 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8067074 | 29 November 2011 |
| MG.P.048.US.CONT.M1 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8110264 | 07 February 2012 |
| MG.P.048.US.CONT.M2 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8057874 | 15 November 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.048.US. CONT.M3 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 13340936 | 30 December 2011 |
| MG.P.048.US. CONT.M4 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8535772 | 17 September 2013 |
| MG.P.048.US. CONT.M5 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8927076 | 06 January 2015 |
| MG.P.048.US. CONT.M6 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8999468 | 07 April 2015 |
| MG.P.048.US. CONT.M7 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 9266638 | 23 February 2016 |
| MG.P.048.US. CONT.M8 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 9546012 | 17 January 2017 |
| MG.P.048.US. CONT.M9 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 15407710 | 17 January 2017 |
| MG.P.048.US. CONTA | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 7438960 | 21 October 2008 |
| MG.P.048.US. DIVA | US - United States | Divisional | Article comprising light absorbent composition to mask visual haze and related methods | 8052917 | 08 November 2011 |
| MG.P.048.ZA | ZA - South Africa | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 2005/05735 | 27 September 2006 |
| MG.P.050.AR | AR - Argentina | Utility | Compartmentalized resin pellets | AR050503 B1 | 19 November 2012 |
| MG.P.050.AR. DIVI | AR - Argentina | Divisional | Compartmentalized resin pellets | AR088338 B2 | 30 September 2014 |
| MG.P.050.AR. DIVII | AR - Argentina | Divisional | Compartmentalized resin pellets | AR088339 B2 | 30 September 2014 |
| MG.P.050.AT | AT - Austria | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.AT. DIVI | AT - Austria | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.AT. DIVII | AT - Austria | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.AU | AU - Australia | PCT National Phase Filing | Compartmentalized resin pellets | 2005243901 | 06 May 2010 |
| MG.P.050.BE | BE - Belgium | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.BE. DIVI | BE - Belgium | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.BE. DIVII | BE - Belgium | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.BG | BG - Bulgaria | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.BG. DIVI | BG - Bulgaria | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.BG. DIVII | BG - Bulgaria | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.BR | BR - Brazil | PCT National Phase Filing | Compartmentalized resin pellets | PI 0510880-2 | 08 November 2016 |
| MG.P.050.BR. DIVI | BR - Brazil | Divisional | Compartmentalized resin pellets | BR 12 2015 024275-4 | 06 September 2016 |
| MG.P.050.BR. DIVII | BR - Brazil | Divisional | Compartmentalized resin pellets | BR 12 2015 024276-2 | 06 September 2016 |
| MG.P.050.CA | CA - Canada | PCT National Phase Filing | Compartmentalized resin pellets | 2565922 | 19 March 2013 |
| MG.P.050.CH | CH - Switzerland | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.CH. DIVI | CH - Switzerland | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.CH. DIVII | CH - Switzerland | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.CN | CN - China | PCT National Phase Filing | Compartmentalized resin pellets | 100594109 | 17 March 2010 |
| MG.P.050.CN. DIVI | CN - China | Divisional | Compartmentalized resin pellets | 101693782 | 30 May 2012 |
| MG.P.050.CN. DIVII | CN - China | Divisional | Compartmentalized resin pellets | 101693781 | 30 October 2013 |
| MG.P.050.CZ | CZ - Czech Republic | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.CZ. DIVI | CZ - Czech Republic | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.CZ. DIVII | CZ - Czech Republic | EP Regional Validation | Compartmentalized resin pellets | 2159028 | 12 December 2012 |
| MG.P.050.DE | DE - Germany | EP Regional Validation | Compartmentalized resin pellets | 6020050336 43 | 11 April 2012 |
| MG.P.050.DE. DIVI | DE - Germany | EP Regional Validation | Compartmentalized resin pellets | 6020050381 76 | 13 February 2013 |
| MG.P.050.DE. DIVII | DE - Germany | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 6020050374 46 | 12 December 2012 |
| MG.P.050.DK | DK - Denmark | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.DK. DIVI | DK - Denmark | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.DK. DIVII | DK - Denmark | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.EG | EG - Egypt | PCT National Phase Filing | Compartmentalized resin pellets | 26720 | 16 June 2014 |
| MG.P.050.EG. DIVI | EG - Egypt | Divisional | Compartmentalized resin pellets | 26707 | 12 June 2014 |
| MG.P.050.EG. DIVII | EG - Egypt | Divisional | Compartmentalized resin pellets | 26884 | 18 November 2014 |
| MG.P.050.EP | EP - European Patent Office | PCT National Phase Filing | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.EP.D IVI | EP - European Patent Office | Divisional | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.EP.D IVII | EP - European Patent Office | Divisional | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.ES | ES - Spain | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.ES.D IVI | ES - Spain | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.ES.D IVII | ES - Spain | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.FR | FR - France | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.FR.D IVI | FR - France | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.FR.D IVII | FR - France | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.GB | GB - United Kingdom | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.GB. DIVI | GB - United Kingdom | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.GB. DIVII | GB - United Kingdom | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.GR | GR - Greece | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.GR. DIVI | GR - Greece | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.GR. DIVII | GR - Greece | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.HK | HK - Hong Kong | Utility | Compartmentalized resin pellets | HK1100363 | 14 December 2012 |
| MG.P.050.HK. DIVI | HK - Hong Kong | Divisional | Compartmentalized resin pellets | 10108297.1 | 06 August 2007 |
| MG.P.050.HK. DIVII | HK - Hong Kong | Divisional | Compartmentalized resin pellets | 10108296.2 | 06 August 2007 |
| MG.P.050.HU | HU - Hungary | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.HU. DIVI | HU - Hungary | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.HU. DIVII | HU - Hungary | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.ID | ID - Indonesia | PCT National Phase Filing | Compartmentalized resin pellets | IDP0000264 47 | 20 August 2010 |
| MG.P.050.IN | IN - India | PCT National Phase Filing | Compartmentalized resin pellets | 240736 | 26 May 2010 |
| MG.P.050.IN.D IVI | IN - India | Divisional | Compartmentalized resin pellets | 282315 | 04 April 2017 |
| MG.P.050.IN.D IVII | IN - India | Divisional | Compartmentalized resin pellets | 1225/chen p/2010 | 03 March 2010 |
| MG.P.050.IT | IT - Italy | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.IT.D IVI | IT - Italy | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.IT.D IVII | IT - Italy | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.JP | JP - Japan | PCT National Phase Filing | Compartmentalized resin pellets | 5356685 | 06 September 2013 |
| MG.P.050.JP.D IV.I | JP - Japan | Divisional | Compartmentalized resin pellets | 5411219 | 15 November 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.JP.DIV.II | JP - Japan | Divisional | Compartmentalized resin pellets | 5357314 | 06 September 2013 |
| MG.P.050.KR | KR - South Korea | PCT National Phase Filing | Compartmentalized resin pellets | 10-1182869 | 07 September 2012 |
| MG.P.050.KR.DIV | KR - South Korea | Divisional | Compartmentalized resin pellets | 10-1227921 | 24 January 2013 |
| MG.P.050.MX | MX - Mexico | PCT National Phase Filing | Compartmentalized resin pellets | 280849 | 11 November 2010 |
| MG.P.050.NL | NL - Netherlands | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.NL.DIVI | NL - Netherlands | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.NL.DIVII | NL - Netherlands | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.NO | NO - Norway | PCT National Phase Filing | Compartmentalized resin pellets | 339442 | 15 December 2016 |
| MG.P.050.NO.DIV.I | NO - Norway - Norway | Divisional | Compartmentalized resin pellets | 340677 | 29 May 2017 |
| MG.P.050.NO.DIV.II | NO - Norway - Norway | Divisional | Compartmentalized resin pellets | 20161217 | 22 July 2016 |
| MG.P.050.PH | PH - Philippines | PCT National Phase Filing | Compartmentalized resin pellets | 1-2006-502300 | 14 January 2011 |
| MG.P.050.PL | PL - Poland | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.PL.DIVI | PL - Poland | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.PL.DIVII | PL - Poland | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.PT | PT - Portugal | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.PT.DIVI | PT - Portugal | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.PT.DIVII | PT - Portugal | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.RO | RO - Romania | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.RO.DIVI | RO - Romania | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.RO. DIVII | RO - Romania | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.RU | RU - Russian Federation | PCT National Phase Filing | Compartmentalized resin pellets | 2370365 | 20 October 2009 |
| MG.P.050.SE | SE - Sweden | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.SE.D IVI | SE - Sweden | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.SE.D IVII | SE - Sweden | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.SG | SG - Singapore | PCT National Phase Filing | Compartmentalized resin pellets | 127365 | 30 June 2009 |
| MG.P.050.TR | TR - Turkey | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.TR. DIVI | TR - Turkey | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.TR. DIVII | TR - Turkey | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.TW | TW - Taiwan | Utility | Compartmentalized resin pellets | I450809 | 01 September 2014 |
| MG.P.050.UA | UA - Ukraine | PCT National Phase Filing | Compartmentalized resin pellets | 200613398 | 17 May 2005 |
| MG.P.050.US | US - United States | PCT National Phase Filing | Compartmentalized resin pellets | 7550203 | 23 June 2009 |
| MG.P.050.US. CONT | US - United States | Continuation | Compartmentalized resin pellets | 7816008 | 19 October 2010 |
| MG.P.050.VN | VN - Vietnam | PCT National Phase Filing | Compartmentalized resin pellets | 9506 | 02 August 2011 |
| MG.P.050.ZA | ZA - South Africa | PCT National Phase Filing | Compartmentalized resin pellets | 2006/10518 | 25 June 2008 |
| MG.P.060.AU | AU - Australia | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 2006207499 | 23 September 2010 |
| MG.P.060.BE | BE - Belgium | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.060.BR | BR - Brazil | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | PI 0606206-7 | 31 October 2017 |
| MG.P.060.CA | CA - Canada | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 2595008 | 18 December 2012 |
| MG.P.060.CN | CN - China | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 101107109 | 26 January 2011 |
| MG.P.060.DE | DE - Germany | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 602006021536 | 27 April 2011 |
| MG.P.060.EP | EP - European Patent Office | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.ES | ES - Spain | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.FR | FR - France | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.GB | GB - United Kingdom | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.GR | GR - Greece | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.HK | HK - Hong Kong | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | HK 1117097 | 09 September 2011 |
| MG.P.060.HU | HU - Hungary | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.ID | ID - Indonesia | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | IDP000031335 | 16 July 2012 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.060.IN | IN - India | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 245855 | 03 February 2011 |
| MG.P.060.IT | IT - Italy | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.KR | KR - South Korea | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 10-1275132 | 10 June 2013 |
| MG.P.060.MX | MX - Mexico | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 295681 | 07 February 2012 |
| MG.P.060.NL | NL - Netherlands | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.PL | PL - Poland | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.RU | RU - Russian Federation | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 2397866 | 27 August 2010 |
| MG.P.060.TR | TR - Turkey | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.UA | UA - Ukraine | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 88048 | 10 September 2009 |
| MG.P.060.US | US - United States | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 7981510 | 19 July 2011 |
| MG.P.060.US. DIV | US - United States | Divisional | Compartmentalized chips with similar polymers of different viscosities for improved processability | 8231937 | 31 July 2012 |
| MG.P.062.CN | CN - China | Utility | High-oxygen barrier container wall containing the combination of active and passive barrier | 2003101177 92.2 | 08 December 2003 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.062.KR | KR - South Korea | Utility | High-oxygen barrier container wall containing the combination of active and passive barrier | 10-1071031 | 29 September 2011 |
| MG.P.064.BR | BR - Brazil | PCT National Phase Filing | Polyester composition comprising an organo-metallic compound | PI 0613373-8 | 25 May 2006 |
| MG.P.064.DE | DE - Germany | EP Regional Validation | Polyester composition comprising an organo-metallic compound | 6020060056 61 | 11 March 2009 |
| MG.P.064.EP | EP - European Patent Office | PCT National Phase Filing | Polyester composition comprising an organo-metallic compound | 1893679 | 11 March 2009 |
| MG.P.064.FR | FR - France | EP Regional Validation | Polyester composition comprising an organo-metallic compound | 1893679 | 11 March 2009 |
| MG.P.064.GB | GB - United Kingdom | EP Regional Validation | Polyester composition comprising an organo-metallic compound | 1893679 | 11 March 2009 |
| MG.P.064.IT | IT - Italy | EP Regional Validation | Polyester composition comprising an organo-metallic compound | 1893679 | 11 March 2009 |
| MG.P.064.MX | MX - Mexico | PCT National Phase Filing | Polyester composition comprising an organo-metallic compound | 280871 | 11 November 2010 |
| MG.P.064.US | US - United States | PCT National Phase Filing | Polyester composition comprising an organo-metallic compound | 11439869 | 24 May 2006 |
| MG.P.065.BR | BR - Brazil | PCT National Phase Filing | Polyester composition | PI 0613200-6 | 17 May 2006 |
| MG.P.065.EP | EP - European Patent Office | PCT National Phase Filing | Polyester composition | 1885801 | 17 May 2006 |
| MG.P.065.MX | MX - Mexico | PCT National Phase Filing | Polyester composition | MX/A/2007/014612 | 17 May 2006 |
| MG.P.065.US | US - United States | Utility | Water activated organic scavenger | 11383799 | 17 May 2006 |
| MG.P.066.BR | BR - Brazil | PCT National Phase Filing | Polyester organo iron compositions | PI 0613374-6 | 25 May 2006 |
| MG.P.066.DE | DE - Germany | EP Regional Validation | Polyester organo iron compositions | 6020060056 60 | 11 March 2009 |
| MG.P.066.EP | EP - European Patent Office | PCT National Phase Filing | Polyester organo iron compositions | 1893665 | 11 March 2009 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.066.FR | FR - France | EP Regional Validation | Polyester organo iron compositions | 1893665 | 11 March 2009 |
| MG.P.066.GB | GB - United Kingdom | EP Regional Validation | Polyester organo iron compositions | 1893665 | 11 March 2009 |
| MG.P.066.IT | IT - Italy | EP Regional Validation | Polyester organo iron compositions | 1893665 | 11 March 2009 |
| MG.P.066.MX | MX - Mexico | PCT National Phase Filing | Polyester organo iron compositions | 280873 | 11 November 2010 |
| MG.P.066.US | US - United States | Utility | Polyester organo iron compositions | 11439583 | 24 May 2006 |
| MG.P.068.AU | AU - Australia | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 2006207500 | 08 July 2010 |
| MG.P.068.BE | BE - Belgium | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.BR | BR - Brazil | PCT National Phase Filing | Zoned pellet for improved contaminant removal | PI 0606255-5 | 13 June 2017 |
| MG.P.068.CA | CA - Canada | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 2595089 | 11 September 2012 |
| MG.P.068.CN | CN - China | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 101107110 | 19 May 2010 |
| MG.P.068.DE | DE - Germany | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 602006022159 | 25 May 2011 |
| MG.P.068.EP | EP - European Patent Office | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.ES | ES - Spain | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.FR | FR - France | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.GB | GB - United Kingdom | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.GR | GR - Greece | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.HU | HU - Hungary | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.068.ID | ID - Indonesia | PCT National Phase Filing | Zoned pellet for improved contaminant removal | IDP0000246 7 8 | 11 December 2009 |
| MG.P.068.IN | IN - India | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 246722 | 14 March 2011 |
| MG.P.068.IT | IT - Italy | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.KR | KR - South Korea | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 10-1275137 | 10 June 2013 |
| MG.P.068.MX | MX - Mexico | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 268334 | 15 July 2009 |
| MG.P.068.NL | NL - Netherlands | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.PL | PL - Poland | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.RU | RU - Russian Federation | PCT National Phase Filing | Zoned pellet for improved contaminant removal | 2397867 | 27 August 2010 |
| MG.P.068.TR | TR - Turkey | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.UA | UA - Ukraine | PCT National Phase Filing | Zoned pellet for improved contaminant removal | 91534 | 10 August 2010 |
| MG.P.068.US | US - United States | Utility | Compartmentalized pellet for improved contaminant removal | 7931968 | 26 April 2011 |
| MG.P.068.US. DIV | US - United States | Divisional | Compartmentalized pellet for improved contaminant removal | 8696960 | 15 April 2014 |
| MG.P.068.US. C1 | US - United States | Continuation | Compartmentalized pellet for improved contaminant removal | 8986582 | 24 March 2015 |
| MG.P.069.1.US | US - United States | Utility | Compartmentalized thermoplastic pellet | 5627218 | 06 May 1997 |
| MG.P.069.2.US | US - United States | Utility | Compartmentalized thermoplastic pellet | 5747548 | 05 May 1998 |
| MG.P.072.AU | AU - Australia | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2006301554 | 25 August 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.072.AT.DIV | AT - Austria | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.BE | BE - Belgium | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.BE.DIV | BE - Belgium | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.BG.DIV | BG - Bulgaria | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.BR | BR - Brazil | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | PI 0617993-2 | 16 January 2018 |
| MG.P.072.CA | CA - Canada | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2624384 | 23 July 2013 |
| MG.P.072.CH.DIV | CH - Switzerland | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.CN | CN - China | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 101321823 | 22 February 2012 |
| MG.P.072.CZ | CZ - Czech Republic | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.CZ.DIV | CZ - Czech Republic | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.DE | DE - Germany | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 602006023390 | 27 July 2011 |
| MG.P.072.DE.DIV | DE - Germany | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 602006051685 | 01 February 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.072.DK.DIV | DK - Denmark | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.EP | EP - European Patent Office | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.EP.DIV | EP - European Patent Office | Divisional | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.ES | ES - Spain | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.ES.DIV | ES - Spain | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.FR | FR - France | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.FR.DIV | FR - France | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.GB | GB - United Kingdom | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.GB.DIV | GB - United Kingdom | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.HU | HU - Hungary | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.HU.DIV | HU - Hungary | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.IN | IN - India | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 258022 | 27 November 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.072.IT | IT - Italy | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.IT.D IV | IT - Italy | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.JP | JP - Japan | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 5435950 | 20 December 2013 |
| MG.P.072.KR | KR - South Korea | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 10-1309108 | 10 September 2013 |
| MG.P.072.LT.D IV | LT - Lithuania | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.MX | MX - Mexico | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 296124 | 14 February 2012 |
| MG.P.072.MX. DIV | MX - Mexico | Divisional | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | MX/A/2011/ 012858 | 01 December 2011 |
| MG.P.072.NL | NL - Netherlands | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.NL. DIV | NL - Netherlands | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.PL | PL - Poland | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.PL.D IV | PL - Poland | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.RO | RO - Romania | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.072.RO. DIV | RO - Romania | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.RU | RU - Russian Federation | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2414494 | 20 March 2011 |
| MG.P.072.SK. DIV | SK - Slovakia | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.TR. DIV | TR - Turkey | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.US | US - United States | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 8465818 | 18 June 2013 |
| MG.P.072.US. C1 | US - United States | Continuation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 13919422 | 17 June 2013 |
| MG.P.072.US. C2 | US - United States | Continuation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 14886143 | 19 October 2015 |
| MG.P.072.ZA | ZA - South Africa | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2008/03709 | 30 September 2009 |
| MG.P.074.AR | AR - Argentina | Utility | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | AR058817B 1 | 26 May 2015 |
| MG.P.074.AT | AT - Austria | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.AU | AU - Australia | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 2006307492 | 15 December 2011 |
| MG.P.074.BE | BE - Belgium | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.074.BG | BG - Bulgaria | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.BR | BR - Brazil | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | PI 0619343-9 | 25 October 2006 |
| MG.P.074.CA | CA - Canada | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 2626862 | 28 January 2014 |
| MG.P.074.CH | CH - Switzerland | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.CN | CN - China | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 101460566 | 12 December 2012 |
| MG.P.074.CZ | CZ - Czech Republic | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.DE | DE - Germany | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 602006051997 | 15 March 2017 |
| MG.P.074.DK | DK - Denmark | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.EP | EP - European Patent Office | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.ES | ES - Spain | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.FR | FR - France | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.GB | GB - United Kingdom | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.074.HU | HU - Hungary | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.IN | IN - India | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 256866 | 05 August 2013 |
| MG.P.074.IT | IT - Italy | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.JP | JP - Japan | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 5219821 | 15 March 2013 |
| MG.P.074.KR | KR - South Korea | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 10-1328135 | 05 November 2013 |
| MG.P.074.LT | LT - Lithuania | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.MX | MX - Mexico | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 306006 | 10 December 2012 |
| MG.P.074.NL | NL - Netherlands | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.PL | PL - Poland | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.RO | RO - Romania | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.RU | RU - Russian Federation | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 2420543 | 10 June 2011 |
| MG.P.074.SK | SK - Slovakia | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.074.TR | TR - Turkey | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.TW | TW - Taiwan | Utility | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | I402304 | 21 July 2013 |
| MG.P.074.US | US - United States | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 8314174 | 20 November 2012 |
| MG.P.074.US.C1 | US - United States | Continuation | Improved dispersions of high carboxyl polyamides into polyesters | 9018293 | 28 April 2015 |
| MG.P.074.ZA | ZA - South Africa | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 2008/04450 | 30 September 2009 |
| MG.P.075.AR | AR - Argentina | Utility | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | AR058495 B1 | 25 October 2013 |
| MG.P.075.AU | AU - Australia | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 2006307493 | 17 May 2012 |
| MG.P.075.BE | BE - Belgium | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.BR | BR - Brazil | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | PI 0619344-7 | 25 October 2006 |
| MG.P.075.CA | CA - Canada | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 2626878 | 16 December 2014 |
| MG.P.075.CN | CN - China | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 101374907 | 31 August 2011 |
| MG.P.075.CZ | CZ - Czech Republic | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.075.DE | DE - Germany | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 6020060081 76 | 29 July 2009 |
| MG.P.075.DK | DK - Denmark | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.EP | EP - European Patent Office | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.ES | ES - Spain | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.FR | FR - France | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.GB | GB - United Kingdom | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.HU | HU - Hungary | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.IN | IN - India | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 257985 | 25 November 2013 |
| MG.P.075.IT | IT - Italy | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.JP | JP - Japan | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 5219822 | 15 March 2013 |
| MG.P.075.KR | KR - South Korea | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 10-1323835 | 24 October 2013 |
| MG.P.075.MX | MX - Mexico | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 275559 | 28 April 2010 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.075.NL | NL - Netherlands | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.PL | PL - Poland | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.RU | RU - Russian Federation | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 2415163 | 27 March 2011 |
| MG.P.075.SK | SK - Slovakia | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.TR | TR - Turkey | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.TW | TW - Taiwan | Utility | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | I432513 | 01 April 2014 |
| MG.P.075.US | US - United States | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 11552612 | 25 October 2006 |
| MG.P.075.ZA | ZA - South Africa | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 2008/04449 | 29 July 2009 |
| MG.P.089.AT | AT - Austria | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.AU | AU - Australia | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 2006243352 | 16 September 2010 |
| MG.P.089.BE | BE - Belgium | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.BR | BR - Brazil | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | PI 0612422-4 | 16 January 2018 |
| MG.P.089.BU | BG - Bulgaria | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 14439 | 21 October 2015 |
| MG.P.089.CA | CA - Canada | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 2606539 | 05 February 2013 |
| MG.P.089.CH | CH - Switzerland | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.089.CN | CN - China | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 101213059 | 19 September 2012 |
| MG.P.089.CZ | CZ - Czech Republic | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.DE | DE - Germany | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 60 2006 047 012.6 | 21 October 2015 |
| MG.P.089.DK | DK - Denmark | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.EG | EG - Egypt | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 26375 | 09 September 2013 |
| MG.P.089.EP | EP - European Patent Office | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging and process for thermally treating said resin pellets | 1883516 | 21 October 2015 |
| MG.P.089.ES | ES - Spain | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.FI | FI - Finland | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.FR | FR - France | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.GR | GR - Greece | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 2016040010 5 | 21 October 2015 |
| MG.P.089.HK | HK - Hong Kong | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | HK1115350 | 26 August 2016 |
| MG.P.089.HU | HU - Hungary | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.ID | ID - Indonesia | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | IDP0000289 49 | 08 August 2011 |
| MG.P.089.IN | IN - India | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 250937 | 08 February 2012 |
| MG.P.089.IE | IE - Ireland | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.IT | IT - Italy | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 5020160000 05672 | 21 October 2015 |
| MG.P.089.JP | JP - Japan | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 5203187 | 22 February 2013 |
| MG.P.089.KR | KR - South Korea | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 10-1354582 | 16 January 2014 |
| MG.P.089.LV | LV - Latvia | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.LT | LT - Lithuania | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.089.MX | MX - Mexico | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 304723 | 30 October 2012 |
| MG.P.089.NL | NL - Netherlands | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.NO | NO - Norway | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 338119 | 01 August 2016 |
| MG.P.089.PH | PH - Philippines | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 1-2007-502349 | 27 February 2012 |
| MG.P.089.PL | PL - Poland | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.PT | PT - Portugal | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.RO | RO - Romania | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | EP/00072/2016 | 21 October 2015 |
| MG.P.089.RU | RU - Russian Federation | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 2401735 | 20 October 2010 |
| MG.P.089.SE | SE - Sweden | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.SG | SG - Singapore | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 200717420-4 | 05 May 2006 |
| MG.P.089.SK | SK - Slovakia | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.SI | SI - Slovenia | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 200632018 | 21 October 2015 |
| MG.P.089.TR | TR - Turkey | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | TR 2016 00865 T4 | 21 October 2015 |
| MG.P.089.UA | UA - Ukraine | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 89823 | 10 March 2010 |
| MG.P.089.US | US - United States | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 7,541,091 | 02 June 2009 |
| MG.P.089.VN | VN - Vietnam | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 10525 | 03 August 2012 |
| MG.P.089.ZA | ZA - South Africa | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 2007/10381 | 26 August 2009 |
| MG.P.096.AU | AU - Australia | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2008290555 | 15 June 2013 |
| MG.P.096.BE | BE - Belgium | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.096.BR | BR - Brazil | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | PI 0815296-9 | 22 August 2008 |
| MG.P.096.CA | CA - Canada | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2695422 | 14 June 2016 |
| MG.P.096.CN | CN - China | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2008801040 42.2 | 22 August 2008 |
| MG.P.096.CN. DIV | CN - China | Divisional | Polyester-polyamide blends maintaining good color under thermal treatment | 2015101749 18.2 | 14 April 2015 |
| MG.P.096.CZ | CZ - Czech Republic | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.DE | DE - Germany | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 6020080499 69.3 | 26 April 2017 |
| MG.P.096.EP | EP - European Patent Office | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.ES | ES - Spain | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.FR | FR - France | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.GB | GB - United Kingdom | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.HU | HU - Hungary | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.IN | IN - India | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 1604/CHEN P/2010 | 22 August 2008 |
| MG.P.096.IR | IE - Ireland | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.IT | IT - Italy | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 5020170000 81410 (EP 2181158) | 26 April 2017 |
| MG.P.096.JP | JP - Japan | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 5300845 | 28 June 2013 |
| MG.P.096.KR | KR - South Korea | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 10-1533698 | 29 June 2015 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.096.MX | MX - Mexico | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 315531 | 20 November 2013 |
| MG.P.096.NL | NL - Netherlands | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.PL | PL - Poland | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.PT | PT - Portugal | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.RO | RO - Romania | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.RU | RU - Russian Federation | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2475508 | 20 February 2013 |
| MG.P.096.US | US - United States | PCT National Phase Filing | Composition for maintaining good color when thermally treating polyester-polyamide blends | 8,436,080 | 07 May 2013 |
| MG.P.096.US.C1 | US - United States | Continuation | Composition for maintaining good color when thermally treating polyester-polyamide blends | 9,540,507 | 10 January 2017 |
| MG.P.096.ZA | ZA - South Africa | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2010/00476 | 30 March 2011 |
| MG.P.101.BR | BR - Brazil | PCT National Phase Filing | Method to manufacture a compartmentalized pellet directly from a reactor | PI 0807312-0 | 26 February 2008 |
| MG.P.101.MX | MX - Mexico | PCT National Phase Filing | Method to manufacture a compartmentalized pellet directly from a reactor | 319063 | 03 April 2014 |
| MG.P.101.US | US - United States | PCT National Phase Filing | Method to manufacture a compartmentalized pellet directly from a reactor | 12038455 | 27 February 2008 |
| MG.P.104.AU | AU - Australia | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2008287888 | 17 October 2013 |
| MG.P.104.BR | BR - Brazil | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | PI 0815299-3 | 22 August 2008 |
| MG.P.104.CA | CA - Canada | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2695466 | 07 June 2016 |
| MG.P.104.CN | CN - China | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 200880104049.4 | 22 August 2008 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.104.CZ | CZ - Czech Republic | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.DE | DE - Germany | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 602008028451 | 30 October 2013 |
| MG.P.104.EP | EP - European Patent Office | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.FR | FR - France | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.GB | GB - United Kingdom | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.IN | IN - India | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 276881 | 03 November 2016 |
| MG.P.104.IT | IT - Italy | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.JP | JP - Japan | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 5264909 | 10 May 2013 |
| MG.P.104.KR | KR - South Korea | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 10-1524118 | 22 May 2015 |
| MG.P.104.MX | MX - Mexico | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 307683 | 05 March 2013 |
| MG.P.104.RU | RU - Russian Federation | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2480493 | 27 April 2013 |
| MG.P.104.US | US - United States | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 12/196499 | 22 August 2008 |
| MG.P.104.US.DIV1 | US - United States | Divisional | Phosphite stabilizers for ionomeric polyester compounds | 8,063,124 | 22 November 2011 |
| MG.P.104.ZA | ZA - South Africa | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2010/00481 | 30 March 2011 |
| MG.P.105.AT | AT - Austria | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.BE | BE - Belgium | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.105.BR | BR - Brazil | PCT National Phase Filing | Copper containing polyester-polyamide compositions | PI 0906157-6 | 11 March 2009 |
| MG.P.105.CA | CA - Canada | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 2716725 | 11 March 2009 |
| MG.P.105.CH | CH - Switzerland | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.CN | CN - China | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 101970575 | 25 June 2014 |
| MG.P.105.CZ. DIV | CZ - Czech Republic | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.DE | DE - Germany | EP Regional Validation | Copper containing polyester-polyamide compositions | 6020090212 89 | 08 January 2014 |
| MG.P.105.DE. DIV | DE - Germany | EP Regional Validation | Copper containing polyester-polyamide compositions | 6020090251 63 | 02 July 2014 |
| MG.P.105.DK. DIV | DK - Denmark | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.EP | EP - European Patent Office | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.EP.D IV | EP - European Patent Office | Divisional | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.FR | FR - France | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.FR.D IV | FR - France | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.GB. DIV | GB - United Kingdom | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.IT | IT - Italy | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.IT.D IV | IT - Italy | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.LT.D IV | LT - Lithuania | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.MX | MX - Mexico | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 333601 | 28 September 2015 |
| MG.P.105.MX. DIV | MX - Mexico - Mexico | Divisional | Copper containing polyester-polyamide compositions | MX/A/2015/ 013814 | 11 March 2009 |
| MG.P.105.PL.D IV | PL - Poland | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.RO. DIV | RO - Romania | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.105.US | US - United States | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 12/399499 | 06 March 2009 |
| MG.P.107.AT | AT - Austria | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.AU | AU - Australia | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 2010258627 | 22 January 2015 |
| MG.P.107.BE | BE - Belgium | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.BR | BR - Brazil | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | PI 1009680-9 | 11 June 2010 |
| MG.P.107.CA | CA - Canada | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 2763121 | 11 April 2017 |
| MG.P.107.CH | CH - Switzerland | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.CN | CN - China | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 102802947 | 09 September 2015 |
| MG.P.107.CZ | CZ - Czech Republic | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.DE | DE - Germany | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 602010013144 | 15 January 2014 |
| MG.P.107.DK | DK - Denmark | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.EP | EP - European Patent Office | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.ES | ES - Spain | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.FR | FR - France | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.GB | GB - United Kingdom | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.GR | GR - Greece | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.107.HR | HR - Croatia | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.HU | HU - Hungary | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.IN | IN - India | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 291301 | 02 January 2018 |
| MG.P.107.IT | IT - Italy | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.KR | KR - South Korea | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 10-2012-7000762 | 11 June 2010 |
| MG.P.107.LT | LT - Lithuania | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.MX | MX - Mexico | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 329044 | 30 March 2015 |
| MG.P.107.NL | NL - Netherlands | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.PL | PL - Poland | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.RO | RO - Romania | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.RU | RU - Russian Federation | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 2011153692 | 11 June 2010 |
| MG.P.107.SE | SE - Sweden | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.TR | TR - Turkey | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.TW | TW - Taiwan | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | I486394 | 01 June 2015 |
| MG.P.107.TW.DIV | TW - Taiwan | Divisional | Polyamide-polydiene blends with improved oxygen reactivity | I605089 | 01 August 2015 |
| MG.P.107.US | US - United States | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 8,409,680 | 02 April 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.107.US.C1 | US - United States | Continuation | Polyamide-polydiene blends with improved oxygen reactivity | 13/803528 | 14 March 2013 |
| MG.P.110.AT | AT - Austria | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.BE | BE - Belgium | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.BG | BG - Bulgaria | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.BR | BR - Brazil | PCT National Phase Filing | Polar soluble scavenging compositions | BR 11 2013 021037 0 | 17 February 2012 |
| MG.P.110.CA | CA - Canada | PCT National Phase Filing | Polar soluble scavenging compositions | 2827540 | 17 February 2012 |
| MG.P.110.CN | CN - China | PCT National Phase Filing | Polar soluble scavenging compositions | 2012800093 94.6 | 17 February 2012 |
| MG.P.110.CZ | CZ - Czech Republic | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.DE | DE - Germany | EP Regional Validation | Polar soluble scavenging compositions | 6020120050 47 | 21 January 2015 |
| MG.P.110.EP | EP - European Patent Office | PCT National Phase Filing | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.ES | ES - Spain | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.FR | FR - France | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.GB | GB - United Kingdom | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.IN | IN - India | PCT National Phase Filing | Polar soluble scavenging compositions | 7783/DELN P/2013 | 17 February 2012 |
| MG.P.110.IT | IT - Italy | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.LT | LT - Lithuania | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.MX | MX - Mexico | PCT National Phase Filing | Polar soluble scavenging compositions | 39191 | 13 May 2016 |
| MG.P.110.NL | NL - Netherlands | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.PCT | PCT - Patent Cooperation Treaty | PCT Application | Polar soluble scavenging compositions | PCT/US20 12/025744 | 17 February 2012 |
| MG.P.110.PL | PL - Poland | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.110.RO | RO - Romania | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.RU | RU - Russian Federation | PCT National Phase Filing | Polar soluble scavenging compositions | 2593453 | 12 July 2016 |
| MG.P.110.SK | SK - Slovakia | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.US | US - United States | PCT National Phase Filing | Polar soluble scavenging compositions | 13/982832 | 31 July 2013 |
| MG.P.112.EP | EP - European Patent Office | PCT National Phase Filing | Color control of polyester-cobalt compounds and polyester-cobalt compositions | 12795224.0 | 26 May 2014 |
| MG.P.112.PCT | PCT - Patent Cooperation Treaty | PCT Application | Color control of polyester-cobalt compounds and polyester-cobalt compositions | PCT/US2012/065351 | 15 November 2012 |
| MG.P.112.US | US - United States | Utility | Color control of acid based polyester-cobalt compounds | 13/677345 | 15 November 2012 |
| MG.P.112.US.2 | US - United States | PCT National Phase Filing | Color control of polyester-cobalt compounds and polyester-cobalt compositions | 14/357662 | 12 May 2014 |
| MG.P.114.BR | BR - Brazil | PCT National Phase Filing | Oxygen scavengers | BR 11 2014004148 2 | 18 July 2012 |
| MG.P.114.EP | EP - European Patent Office | PCT National Phase Filing | Articles containing Oxygen-scavenging materials | 12743010.6 | 18 July 2012 |
| MG.P.114.MX | MX - Mexico | PCT National Phase Filing | Oxygen scavengers | MX/A/2014/02154 | 18 July 2012 |
| MG.P.114.PCT | PCT - Patent Cooperation Treaty | PCT Application | Oxygen scavengers | PCT/US2012/047259 | 18 July 2012 |
| MG.P.114.US | US - United States | PCT National Phase Filing | Oxygen scavengers | 14/240,612 | 18 July 2012 |
| MG.P.117.PCT | PCT - Patent Cooperation Treaty | PCT Application | Oxygen scavenging polyester compositions for containers | PCT/US2016/037016 | 10 June 2016 |
| MG.P.117.US.P | US - United States | Provisional | Oxygen scavenging polyester compositions for containers | 62/174593 | 12 June 2015 |
| MG.P.117.US.P 2 | US - United States | Provisional | Oxygen scavenging polyester compositions for containers | 62/180861 | 17 June 2015 |
| MG.P.117.CA | CA - Canada | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 2992430 | 15 December 2016 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.117.CN | CN - China | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 2016800474 86.1 | 11 February 2018 |
| MG.P.117.EP | EP - European Patent Office | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 16 731 473.1 | 12 January 2018 |
| MG.P.117.KR | KR - South Korea | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 10-2018-7001197 | 12 January 2018 |
| MG.P.117.RU | RU - Russian Federation | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 2018100993 | 12 January 2018 |
| MG.P.117.UA | UA - Ukraine | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | a2018 00349 | 12 January 2018 |
| MG.P.117.US | US - United States | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 15/735631 | 12 December 2017 |
| MG.P.117.ZA | ZA - South Africa | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 2018/00232 | 12 January 2018 |
| MG.P.120.PCT | PCT - Patent Cooperation Treaty | PCT Application | Polyester blends with improved oxygen scavenging ability | PCT/US20 16/037028 | 10 June 2016 |
| MG.P.120.US.P | US - United States | Provisional | Polyester blends with improved oxygen scavenging ability | 62/174603 | 12 June 2015 |
| MG.P.120.CA | CA - Canada | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 2992433 | 15 December 2016 |
| MG.P.120.CN | CN - China | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 2016800475 15.4 | 12 February 2018 |
| MG.P.120.EP | EP - European Patent Office | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 16 731 474.9 | 12 January 2018 |
| MG.P.120.KR | KR - South Korea | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 10-2018-7001198 | 12 January 2018 |
| MG.P.120.RU | RU - Russian Federation | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 2018100994 | 12 January 2018 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.120.UA | UA - Ukraine | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | a2018 00348 | 12 January 2018 |
| MG.P.120.US | US - United States | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 15/735642 | 12 December 2017 |
| MG.P.120.ZA | ZA - South Africa | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 2018/00234 | 12 January 2018 |
| MG.P.121.PCT | PCT - Patent Cooperation Treaty | PCT Application | Oxygen scavenging polyester blends having improved aesthetic characteristics | PCT/US20 16/037034 | 10 June 2016 |
| MG.P.121.US.P | US - United States | Provisional | Oxygen scavenging polyester blends having improved aesthetic characteristics | 62/174631 | 12 June 2015 |
| MG.P.121.CA | CA - Canada | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 2992435 | 15 December 2016 |
| MG.P.121.CN | CN - China | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAIG IMPROVED AESTHETIC CHARACTERISTICS | 2016800475 26.2 | 12 February 2018 |
| MG.P.121.EP | EP - European Patent Office | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 16 732 130.6 | 12 January 2018 |
| MG.P.121.KR | KR - South Korea | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 10-2018-7001199 | 12 January 2018 |
| MG.P.121.RU | RU - Russian Federation | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 2018100995 | 12 January 2018 |
| MG.P.121.UA | UA - Ukraine | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | a2018 00350 | 12 January 2018 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.121.US | US - United States | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 15/735739 | 12 December 2017 |
| MG.P.121.ZA | ZA - South Africa | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 2018/00233 | 12 January 2018 |
| MG.P.122.PCT | PCT - Patent Cooperation Treaty | PCT Application | Compartmentalized resin pellets | PCT/US2016/035816 | 03 June 2016 |
| MG.P.122.US.P | US - United States | Provisional | Compartmentalized resin pellets | 62/171746 | 05 June 2015 |
| MG.P.122.US | US - United States | Utility | COMPARTMENTALIZED RESIN PELLETS | 15578878 | 01 December 2017 |

## "PTA Technology" Patents

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.081.BE | BE - Belgium | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.BR | BR - Brazil | PCT National Phase Filing | A process for preparing high purity terephtalic acid | PI0520801-7 | 9 December, 2005 |
| MG.P.081.CN | CN - China | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 200580052245.8 | 24 September, 2011 |
| MG.P.081.DE | DE - Germany | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.IN | IN - India | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 257418 | 30 September, 2013 |
| MG.P.081.EP | EP - European Patent Office | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.FR | FR - France | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.GB | GB - United Kingdom | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.IT | IT - Italy | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |

| | | | | | |
|---|---|---|---|---|---|
| MG.P.081.MX | MX - Mexico | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 294662 | 13 January, 2012 |
| MG.P.081.RU | RU - Russian Federation | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 2399610 | 20 September, 2010 |
| MG.P.081.US | US - United States | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 12095926 | 3 June, 2008 |
| MG.P.083.A.BE | BE - Belgium | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.BR | BR - Brazil | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | PI0621496-7 | 3 April, 2006 |
| MG.P.083.A.CH | CH - Switzerland | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.CN | CN - China | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2006800540 17.9 | 3 April, 2006 |
| MG.P.083.A.DE | DE - Germany | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.EP | EP - European Patent Office | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.ES | ES - Spain | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.FR | FR - France | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.GB | GB - United Kingdom | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.IN | IN - India | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 259063 | 24 February, 2014 |
| MG.P.083.A.IT | IT - Italy | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.MX | MX - Mexico | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 276278 | 31-May-10 |
| MG.P.083.A.NL | NL - Netherlands | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.TR | TR - Turkey | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |

| MG.P.083.A.US | US - United States | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 12293901 | 22 September, 2008 |
|---|---|---|---|---|---|
| MG.P.091.BR | BR - Brazil | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | pi0621743 | 21 June, 2006 |
| MG.P.091.CN | CN - China | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 200680055041.4 | 5 September, 2012 |
| MG.P.091.EP | EP - European Patent Office | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 6780572.1 | 21 January, 2009 |
| MG.P.091.IN | IN - India | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 261228 | 13 June, 2014 |
| MG.P.091.KR | KR - South Korea | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2009-7001167 | 21 June, 2006 |
| MG.P.091.MX | MX - Mexico | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | MX/A/2008/016450 | 21 June, 2006 |
| MG.P.091.US | US - United States | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 12305451 | 18 December, 2008 |

**Exhibit B**

**Proposed Sale Order for Successful Bid**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| M & G USA CORPORATION, *et al.*,[1] | : Case No. 17-12307 (BLS) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| | : Related Docket Nos. 173, 490, [___] |

## ORDER (I) APPROVING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF

This Court having considered the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures; and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related*

---

[1]    The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

*Relief* (the "<u>Motion</u>") [Docket No. 173],[2] filed by the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") and upon the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* [Docket No. 3] (the "<u>First Day Declaration</u>") and upon the *Declaration of Neil Augustine in Support of Debtors' Sale and Bidding Procedures Motion* [Docket No. 173, Ex. C] (the "<u>Augustine Declaration</u>"); [and upon the *Supplemental Declaration of Neil Augustine in Further Support of the Debtors' Sale Motion* [Docket No. ___] (the "<u>Supplemental Augustine Declaration</u>");] and upon the *Order (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [Docket No. 490] (the "<u>Bidding Procedures Order</u>"); and an auction (the "<u>Auction</u>") having been held on March 20,2018 in accordance with the Bidding Procedures Order; and the Debtors having filed the *Notice of Designation of Successful Bid and Backup Bid for the Assets* on _____ [Docket No. __] (the "<u>Auction Results Notice</u>"), designating Corpus Christi Polymers LLC, a Delaware limited liability company, as the Successful Bidder for the purchase of the Purchased Assets as defined in that certain Asset Purchase Agreement dated March [__], 2018 (the "<u>Purchase Agreement</u>") between certain of the Debtors and the Purchaser, which Purchase Agreement is attached hereto as <u>Exhibit 1</u>; and the Sale Hearing having been held on March [23], 2018 to consider the remaining relief requested in the Motion and approval of the Purchase Agreement; and appearances of all interested parties having been noted on the record

---

[2]     Capitalized terms not otherwise defined herein have the meanings given to them in the Motion or the Purchase Agreement, as applicable.

NAI-1503546228v1

of the Sale Hearing; and upon all of the proceedings had before this Court (including the testimony and other evidence proffered or adduced at the Sale Hearing); and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been given under the circumstances and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor;

### IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.     <u>Jurisdiction</u>:     This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1134.  Approval of the Debtors' entry into the Purchase Agreement and the transactions contemplated thereby (the "<u>Sale Transaction</u>") is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), (N) and (O).

B.     <u>Venue</u>:     Venue of these Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

C.     <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

D.     <u>Statutory Predicates</u>:     The statutory predicates for the approval of the Purchase Agreement and Sale Transaction contemplated thereby are sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004 and 9014 of the Bankruptcy Rules, and Rule 6004-1 of

---

[3]     The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

NAI-1503546228v1

the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

E.    Notice:  Proper, timely, adequate and sufficient notice of the Motion and the Sale Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 6004, and in compliance with the Local Rules and Bidding Procedures Order, including to the Notice Parties (as defined below) and more broadly by publication as set forth in the *Affidavit of Publication* [Docket No. 545] on December 26, 2017.   The foregoing notice was good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Sale Hearing, the Purchase Agreement or the Sale Transaction is required.  The disclosures made by the Debtors concerning the Purchase Agreement, the Sale Transaction and the Sale Hearing were sufficient, complete and adequate.

F.    Opportunity to be Heard:    A reasonable opportunity to object or be heard regarding the relief requested in the Motion and the Sale Transaction has been afforded to all interested persons and entities, including the following:  (i) Cleary Gottlieb Steen & Hamilton LLP and Young Conaway Stargatt & Taylor, LLP, as counsel to Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo and Control Empresarial de Capitales, S.A. De C.V.; (ii) Thompson & Knight LLP, as counsel to Trimont Real Estate Advisors, LLC; (iii) Weil Gotshal & Manges LLP and Morris, Nichols, Arsht & Tunnell LLP, as counsel to DAK Americas, LLC; (iv) Sidley Austin LLP and Ashby & Geddes, P.A., as counsel to Macquarie Investments US Inc. "Macquarie"); (v) counsel for the Committee; (vi) Duane Morris LLP, Lowenstein Sandler LLP and Weil Gotshal & Manges, LLP, as counsel for the Successful Bidder in accordance with the Purchase Agreement; (vii) all persons and entities known by the

-4-

Debtors to have expressed an interest to the Debtors in any sale transaction involving any of the Purchased Assets during the past twelve (12) months, including any person or entity that has submitted a bid for any of the Assets, as applicable; (viii) all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors); (ix) all non-Debtor parties to any executory contracts or unexpired leases of the Debtors (collectively, the "Contracts") that are proposed to be assumed or rejected in connection with the Sale Transaction; (x) any governmental authority known to have a claim against the Debtors in the Cases; (xi) the United States Attorney General; (xii) the Antitrust Division of the United States Department of Justice; (xiii) the United States Attorney for the District of Delaware; (xiv) the Office of the Attorney General in each state in which the Debtors operate; (xv) the Federal Trade Commission; (xvi) the Office of the United States Trustee for the District of Delaware; (xvii) the Internal Revenue Service; (xviii) the United States Securities and Exchange Commission; (xix) all of the Debtors' known creditors (for whom identifying information and addresses are known to the Debtors); (xx) all parties who have filed a notice of appearance and request for service of papers in the Cases pursuant to Bankruptcy Rule 2002; and (xxi) all other persons and entities as directed by the Bankruptcy Court (the parties listed in (i) through (xxi) collectively, the "Notice Parties"). Objections, if any, to the Motion have been withdrawn or resolved and, to the extent not withdrawn or resolved, are hereby overruled.

G. <u>Marketing Process</u>: As demonstrated by (i) the First Day Declaration, the Augustine Declaration [and the Supplemental Augustine Declaration], (ii) the testimony and other evidence proffered or adduced at the hearing with respect to the approval of the bidding procedures held on December 11, 2017 (the "'<u>Bidding Procedures Hearing</u>") and the Sale

Hearing and (iii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, the Debtors and their advisors thoroughly marketed the Assets (including the Purchased Assets) and conducted the marketing and sale process as set forth in and in accordance with the Motion and the Bidding Procedures Order. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

H.  <u>Compliance with Bidding Procedures</u>: The Debtors conducted a fair and open sale process in a manner reasonably calculated to produce the highest or otherwise best offer for the Purchased Assets in compliance with the Bidding Procedures Order. The sale process and the Bidding Procedures were non-collusive, substantively and procedurally fair to all parties and to each person or entity that desired to participate in the Auction and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer for the Purchased Assets. The Bidding Procedures, as they may have been amended or modified, have been complied with in all material respects by the Debtors and the Purchaser.

I.  <u>Highest and Best Offer</u>: After the conclusion of the Auction held on March 20, 2018 and in accordance with the Bidding Procedures, the Debtors determined in a valid and sound exercise of their business judgment that the highest and best Qualified Bid for the Purchased Assets was that of the Purchaser. The consideration provided by the Purchaser for the Purchased Assets provides fair and reasonable consideration to the Debtors for the sale of the Purchased Assets and the assumption of all "<u>Assumed Liabilities</u>" (as defined and limited in the Purchase Agreement), and the performance of the other covenants set forth in the Purchase Agreement will provide a greater recovery for Debtors' estates than would have been

NAI-1503546228v1

provided by any other available alternative.

J.  Court Approval Required.  Entry of an order approving and authorizing the Debtors' entry into the Purchase Agreement and the Debtors' performance of all the provisions thereof is a necessary condition precedent to the Purchaser's consummation of the Sale Transaction.

K.  Business Judgment:  The Debtors' decisions to (i) enter into the Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License), and (ii) perform under and make payments, if any, required by such Purchase Agreement, constitute reasonable exercises of the Debtors' sound business judgment consistent with their fiduciary duties and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.  Good and sufficient reasons for the approval of the Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License) have been demonstrated by the Debtors.  The Debtors have established that compelling circumstances exist for the Sale Transaction outside: (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the value of the Debtors' estates.  To maximize the value of the Purchased Assets and preserve the viability of the Business (as defined in the Purchase Agreement), it is essential that the Sale Transaction occur promptly.

L.  Time is of the Essence:  Time is of the essence to implement the Purchase Agreement and to consummate the Sale Transaction without interruption.  Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing and in

the First Day Declaration, the Augustine Declaration [and the Supplemental Augustine Declaration], the Sale Transaction contemplated by the Purchase Agreement must be consummated as soon as possible following entry of this Sale Order, and in any event by the Termination Date (as defined in and may be extended in accordance with the Purchase Agreement), to maximize the value that the Purchaser may realize from the Sale Transaction, and the value that the Debtors may realize from entering into the Purchase Agreement. Accordingly, cause exists to lift the stay to the extent necessary, as contemplated by Bankruptcy Rules 4001(a) and 6004(h), and permit the immediate effectiveness of this Sale Order.

      M.    <u>Sale Free and Clear</u>: Except for the Assumed Liabilities (as defined in the Purchase Agreement) and Closing Date Permitted Exceptions (as defined in the Purchase Agreement), a sale of the Purchased Assets other than one free and clear of all Liens (as defined in the Purchase Agreement), defenses (including rights of setoff and recoupment) and interests, in each case, in, on, or related to the Purchased Assets, including security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens (including but not limited to mechanics' and materialman's liens), encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>"), Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 <u>et</u> <u>seq.</u>

("CERCLA"), alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature in, on, or related to the Purchased Assets (including all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable, including any and all such liabilities, causes of action, contract rights and claims arising out of Debtors' continued operations following the Closing Date (as defined in the Purchase Agreement), (collectively, "Encumbrances") and without the protections of this Sale Order would hinder the Debtors' ability to obtain the consideration provided for in the Purchase Agreement and, thus, would impact materially and adversely the value that the Debtors' estates would be able to obtain for the sale of such Purchased Assets. But for the protections afforded to the Purchaser under the Bankruptcy Code and this Sale Order, the Purchaser would not have offered to pay the consideration contemplated in the Purchase Agreement. In addition, each entity with a Lien or an Encumbrance (other than Assumed Liabilities and Closing Date Permitted Exceptions) upon the Purchased Assets, (i) has consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens and Encumbrances (other than Closing Date Permitted Exceptions and Assumed Liabilities) who did not object, or who withdrew their objections, to

-9-

the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All holders of Liens and Encumbrances are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their Liens and Encumbrances, if any, attach to the proceeds of the Sale Transaction, in the same order of priority and with the same validity, force and effect that such Liens and Encumbrances had before the Sale Transaction, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein. Therefore, approval of the Purchase Agreement and the consummation of the Sale Transaction free and clear of L i e n s a n d Encumbrances is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtors' estates, their creditors and other parties in interest.

N. The recitation, in the immediately preceding paragraph of this Sale Order, of specific agreements, plans or statutes is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, commitments or obligations referred to as "Encumbrances" therein.

O. In addition to the foregoing, the Court finds and concludes that the Purchased Assets may be sold to the Purchaser free and clear of any mechanics' and materialman's liens on the Purchased Assets (other than the Retained M&M Claims and Liens (as defined in the Purchase Agreement)).

P. The Purchaser would not have entered into the Purchase Agreement and would not consummate the sale of Purchased Assets, thus adversely affecting the Debtors, their estates, creditors, employees and other parties in interest, if such sale was not free and clear of all Liens and Encumbrances (other than Closing Date Permitted Exceptions and Assumed Liabilities). A sale of the Purchased Assets, other than one free and clear of all Liens and

NAI-1503546228v1

Encumbrances, would yield substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

Q. <u>Arms'-length Sale</u>: The consideration to be paid by the Purchaser under the Purchase Agreement was negotiated at arm's-length and constitutes reasonably equivalent value and fair and adequate consideration for the Purchased Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and the laws of the United States, any state, territory, possession thereof or the District of Columbia. The terms and conditions set forth in the Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License) are fair and reasonable under these circumstances and were not entered into with the intent to nor for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtors or their creditors under any applicable laws. None of the Debtors or the Purchaser is entering into the Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License) or proposing to consummate the Sale Transaction fraudulently, for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction.

R. <u>Good Faith</u>: The Debtors, their management and their boards of directors or equivalent governing bodies and the Purchaser and its management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers and representatives actively participated in the bidding process and respectively acted in good faith. The Purchase Agreement between the Purchaser and the Debtors was negotiated and entered

into based upon arm's-length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code. The Purchaser is entering into the Sale Transaction in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and the court decisions applying or interpreting such provision, and is therefore entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code with respect to all aspects of the Sale Transaction, including the acquisition of the Purchased Assets, and otherwise has proceeded in good faith in all respects in connection with this proceeding. The Debtors were free to deal with any other party interested in buying or selling on behalf of the Debtors' estate some or all of the Purchased Assets. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Sale Transaction, the Purchase Agreement, or any related action or the Sale Transaction to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of the Bankruptcy Code. The Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction. Specifically, the Purchaser has not acted in a collusive manner with any person or entity nor was its bidding or participation in the Auction controlled by any agreement among bidders. The Purchaser's prospective performance and payment of amounts owing under the Purchase Agreement will be undertaken in good faith and for valid business purposes and uses.

S.     Insider Status:  The Purchaser is not an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors, officers, members, managers or controlling stockholders exists between the Purchaser and the Debtors.

T.     Corporate Authority:   The Debtors have (i) full corporate or other power to execute, deliver and perform their obligations under the Purchase Agreement and all other

transactions contemplated thereby and entry into the Purchase Agreement has been duly and validly authorized by all necessary corporate or similar action, (ii) all of the corporate or other power and authority necessary to consummate the Sale Transaction, and (iii) taken all actions necessary to authorize and approve the Purchase Agreement and the Sale Transaction. No consents or approvals, other than those expressly provided for herein or in the Purchase Agreement, are required for the Debtors to consummate such transaction.

U.      The Purchaser shall have no obligations with respect to any Liens or Encumbrances against or in respect of any of the Debtors or the Purchased Assets (other than Closing Date Permitted Exceptions and Assumed Liabilities).

V.      The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m) and 363(n) of the Bankruptcy Code.

W.      The Purchased Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Debtors are the sole and rightful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein, subject to the following liens and claims: the liens and claims described in that certain *Final Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C.§§ 104, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C.§§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (5) Grant Related Relief* [Docket No. 479] (the "Final DIP Order") and

together with the Interim DIP Order[4], the "DIP Orders"), as applicable. The sale of the Purchased Assets to the Purchaser will be, as of the Closing Date or such later date as such Purchased Assets are transferred under the Purchase Agreement, a legal, valid and effective transfer of such assets, and each transfer and assignment vests or will vest the Purchaser with all right, title and interest of the Debtors to the Purchased Assets free and clear of all Liens and Encumbrances (other than Closing Date Permitted Exceptions and Assumed Liabilities).

X.     Assumption and Assignment of Contracts: The assumption and assignment of the Contracts to be assumed and assigned under the Purchase Agreement are an integral part of the Purchase Agreement and may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of this Court with the consent of the Debtors, the applicable counterparty(s) and the Purchaser. The assumption and assignment of the Purchased Contracts (as defined in the Purchase Agreement) and any other Contracts to be assumed and assigned under the Purchase Agreement does not constitute unfair discrimination, is in the best interests of the Debtors, their estates, their creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

Y.     The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Contracts. Pursuant to the Purchase Agreement, the Debtors, and, solely

---

[4]     The Interim DIP Order shall mean that certain *Interim Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C.§§ 104, 362, 363 and 364;(2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C.§§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2; and (6) Grant Related Relief* [Docket No. 62].

NAI-1503546228v1

with respect to assumed Cure Costs (as defined in the Purchase Agreement), the Purchaser, have (i) cured any default existing prior to the assignment of the Contracts to the Purchaser in accordance with the terms of the Purchase Agreement, under each of the Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the assignment of any of the Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  Each of the Contracts shall be assumed and assigned to the Purchaser free and clear of all Liens and Encumbrances (other than the Closing Date Permitted Exceptions and Assumed Liabilities or otherwise as set forth in the Purchase Agreement) against the Purchaser.

Z.     The Purchaser has demonstrated adequate assurance of its future performance within the meaning of section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code under each Purchased Contract and any other Contract to be assumed and assigned pursuant to the Purchase Agreement.  Pursuant to section 365(f) of the Bankruptcy Code, the Contracts to be assumed and assigned under the Purchase Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in the Contracts or other restrictions prohibiting their assignment or transfer.

AA.     No monetary or non-monetary defaults exist in the Debtors' performance under the Contracts as of the date of this Sale Order other than the failure to pay amounts equal to the Cure Costs (as defined below) or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.  In accordance with the terms set forth in the Purchase Agreement and this Sale Order, the Purchaser shall pay the Cure Costs for each of the Purchased Contracts and any other Contracts to be assumed and assigned to Purchaser

pursuant to the Purchase Agreement.

BB.    <u>No Successor Liability</u>:    No sale, transfer or other disposition of the Purchased Assets pursuant to the Purchase Agreement or entry into the Purchase Agreement will subject the Purchaser to any liability for claims, obligations Liens or Encumbrance asserted against the Debtors or the Debtors' interests in such Purchased Assets by reason of such transfer under any laws, including any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories. By virtue of the consummation of the transactions contemplated by the Purchase Agreement, (i) the Purchaser is not a continuation of the Debtors and their respective estates, there is no continuity or continuity of enterprise between Purchaser and the Debtors, there is no common identity between the Debtors and the Purchaser, (ii) the Purchaser is not holding itself out to the public as a continuation of the Debtors or their respective estates, and (iii) the Sale Transaction does not amount to a consolidation, merger or *de facto* merger of Purchaser and the Debtors and/or the Debtors' estates. Accordingly, the Purchaser is not and shall not be deemed a successor to the Debtors or their respective estates as a result of the consummation of the transactions contemplated by the Purchase Agreement, and except with respect to any Assumed Liabilities and Closing Date Permitted Exceptions, Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever. Purchaser would not acquire the Purchased Assets but for the protections against any claims based upon "successor liability" theories.

CC.    <u>No Sub Rosa Plan</u>:    Entry into the Purchase Agreement and the transactions contemplated thereby neither impermissibly restructure the rights of the Debtors' creditors, nor impermissibly dictate the terms of a chapter 11 plan of reorganization for the Debtors. Entry

-16-

into the Purchase Agreement does not constitute a sub rosa chapter 11 plan.

DD. <u>No Third Party Beneficiaries</u>. Other than expressly set forth in the Purchase Agreement, nothing in the Purchase Agreement creates any third party beneficiary rights in any entity not a party to the Purchase Agreement.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:[5]

## A. Motion Granted, Objections Overruled

1. The relief requested in the Motion is GRANTED as set forth herein. Any remaining objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections are overruled on the merits with prejudice and denied. All parties and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein.

2. This Court's findings of fact and conclusions of law in the Bidding Procedures Order and the record of the Bidding Procedures Hearing are incorporated herein by reference.

## B. The Purchase Agreement Is Approved and Authorized

3. The Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License) are approved pursuant to sections 105 and 363 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules. The Debtors are hereby authorized and directed to perform under the Purchase Agreement and all ancillary documents (including the Intercompany License) (and each of the transactions contemplated thereby is hereby approved in its entirety and is incorporated herein

---

[5]   To the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*.

by reference). The failure to include specifically any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Purchase Agreement, and all of its provisions and the payments and transactions provided for therein shall be authorized and approved in their entirety. Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

4. Subject to the provisions of this Sale Order, the Debtors and the Purchaser are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to consummate the Sale Transaction in accordance with the Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License).

5. Pursuant to section 363(b) of the Bankruptcy Code, and without any further corporate action or orders of this Court, the Debtors, the Purchaser and each of their respective officers, employees, agents, members and managers are hereby authorized and directed to fully perform under, consummate and implement the terms of the Purchase Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License), this Sale Order and the Sale Transaction.

6. The Debtors are hereby authorized and directed to instruct an escrow agent to (i) hold the Good Faith Deposit (as increased by any Incremental Deposit Amount (as defined in the Bidding Procedures), if applicable) funded by the Successful Bidder in accordance with the Purchase Agreement and release and deliver such Good Faith Deposit pursuant to the terms of such Purchase Agreement, and (b) hold the Good Faith Deposit (as increased by any

Incremental Deposit Amount (as defined in the Bidding Procedures), if applicable) funded by any Backup Bidder, in accordance with the Bidding Procedures, and release and deliver such Good Faith Deposit upon the earlier of (i) three business days after the closing of a Sale Transaction with the Successful Bidder for the applicable Purchased Assets and (ii) 75 days after the date of the Sale Hearing.

## C.    Sale and Transfer Free and Clear of Encumbrances

7.    Upon the Closing Date, all of the Debtors' legal, equitable and beneficial right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in the Purchaser pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code free and clear of all Liens and Encumbrances (other than Closing Date Permitted Exceptions and Assumed Liabilities); provided, however, that the proceeds of the Sale Transaction shall be applied as set forth herein and thereafter all remaining Liens and Encumbrances[6] shall attach to the proceeds of the Sale Transaction in the order of their priority, with the same validity, force and effect that they now have against the Purchased Assets (subject with respect to such proceeds to any rights, claims and defenses the Debtors or any parties in interest may possess with respect thereto).  On the Closing Date, this Sale Order shall be considered, and constitute for any and all purposes, a legal, valid, binding, effective and compete general assignment, conveyance and transfer of the Purchased Assets and a bill of sale or assignment transferring

---

[6]    For the avoidance of doubt, Encumbrances include obligations secured by the liens asserted against the Corpus Christi Plant and/or other property sold pursuant to the Purchase Agreement on account of the 2017 and 2018 ad valorem property taxes assessed by the ad valorem taxing authorities of Nueces County, Harris County, and Hopkins County, all in the state of Texas (together, the "Texas Tax Authorities"), to the extent that such liens are determined to be valid and are not otherwise satisfied pursuant to the Purchase Agreement.  The claims and liens of the Texas Tax Authorities shall remain subject to any objections any party, including but not limited to the Debtors, would otherwise be entitled to raise as to the priority, validity, extent or amount of such liens or claims.

.

indefeasible title in the Purchased Assets to the Purchaser and shall vest Purchaser with good and marketable title to the Purchased Assets.

8. The holders of claims related solely to the Closing Date Permitted Exceptions and Assumed Liabilities shall have the right to seek payment directly from the Purchaser on account of the Closing Date Permitted Exceptions and Assumed Liabilities; provided, however, that the Purchaser reserves any and all rights, defenses or objections with regard to such Closing Date Permitted Exceptions and Assumed Liabilities, including the Purchaser's rights hereunder and under the Purchase Agreement.

**D. Order Binding**

9. All (i) entities, including all filing agents, filing officers, title agents, title companies or title agents, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state and local officials, and (ii) other persons, in each case, who may be required by operation of law, the duties of their office, or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets, shall be authorized and directed to take any such actions in connection with the Sale Transaction or this Sale Order, and this Sale Order shall be binding upon such entities or persons. All entities or persons described in this paragraph are authorized and specifically directed to strike all recorded Liens and Encumbrances against the Purchased Assets from their records, official and otherwise.

10. This Sale Order and the terms and provisions of the Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License) shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, the Purchaser, and each of their respective affiliates, successors and assigns, and any

affected third parties, including all persons asserting an interest in the Purchased Assets, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or other fiduciary, such terms and provisions likewise shall be binding. The provisions of this Sale Order and the terms and provisions of the Purchase Agreement, and any actions taken pursuant hereto or thereto shall survive the dismissal of any of the Debtors' Chapter 11 or 7 cases or entry of any order, which may be entered confirming or consummating any plan(s) of the Debtors or converting these Cases from chapter 11 to chapter 7, and the terms and provisions of the Purchase Agreement, as well as the rights and interests granted pursuant to this Sale Order and the Purchase Agreement, shall continue in these or any superseding cases and shall be binding upon the Debtors, the Purchaser and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed in these Cases shall be and hereby is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Sale Order and the Purchase Agreement, and the Purchaser and the trustee shall be and hereby are authorized to perform under the Purchase Agreement upon the appointment of such trustee without the need for further order of this Court. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Sale Order, including the rights granted to the Purchaser hereunder, shall remain effective and, notwithstanding such conversion of dismissal, shall remain binding on the Debtors, Sellers, their estates, successor, assigns and creditors.

NAI-1503546228v1

11.     Except with respect to the Assumed Liabilities and Closing Date Permitted Exceptions, all persons and entities (and their respective successors and assigns), including all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Liens or Encumbrances arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the ownership, sale or operation of the Purchased Assets and the Business (as defined in the Purchase Agreement) prior to the Closing Date or the transfer of the Purchased Assets to Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting such Liens or Encumbrances against the Purchaser, its property or the Purchased Assets.  Following the Closing Date, no holder of any Lien or Encumbrance shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to any such Lien or  Encumbrance, or based on any action the Debtors may take in these Cases.

12.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens or Encumbrances against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date of the Sale Transaction in proper form for filing and executed by the appropriate parties termination statements or instruments of satisfaction or release of all Liens and Encumbrances that such person or entity has with respect to such Purchased Assets, then only with regard to the Purchased Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and this Sale Order, (a) the Debtors are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets that are necessary or appropriate to

-22-

effectuate the Sale Transaction, any related agreements and this Sale Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units[7] or as any of the officers of the Debtors may determine are necessary or appropriate and (b) the Purchaser is hereby authorized and empowered to cause to be filed, registered or otherwise recorded a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against the Purchaser and the applicable Purchased Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

**E.     Good Faith**

13.     Neither the Debtors nor the Purchaser (including, but not limited to their equity owners, officers, directors, employees, professionals and other agents thereof) has engaged in any action or inaction that would cause or permit the Sale Transaction to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. Entry into the Purchase Agreement is undertaken by the parties thereto, without collusion and in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and the Purchaser shall be entitled to all of the benefits of and protections under sections 363(m) and 364(e) of the Bankruptcy Code. The reversal or modification on appeal of the authorization provided herein to enter into the Purchase Agreement and consummate the Sale Transaction shall not affect

---

7       As used in this Order, the term "governmental unit" shall have the meaning given to it in sections 101(27) and 101(41) of the Bankruptcy Code.

NAI-1503546228v1

the validity of such Sale Transaction, unless such authorization is duly stayed pending such appeal. The Sale Transaction is not subject to avoidance pursuant to section 363(n) or chapter 5 of the Bankruptcy Code and the Purchaser is entitled to all the protections and immunities thereunder.

## F. No Successor or Transferee Liability

14. The Purchaser shall not be deemed, as a result of any action taken in connection with the Purchase Agreement, the consummation of the Sale Transaction, or the transfer, operation or use of the Purchased Assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Purchaser, with respect to any obligations arising after the Closing Date as an assignee under the Contracts); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation or successor in any respect of the Debtors, including within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

15. Except as expressly provided in the Purchase Agreement with respect to Assumed Liabilities, the Purchaser shall have no liability whatsoever with respect to the Debtors' (or their predecessors or affiliates) respective businesses or operations or any of the Debtors' (or their predecessors' affiliates') obligations (as described below, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of labor law, employment law, ERISA and benefits law, antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability,

-24-

whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction, or any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets or the business prior to the Closing Date or such later time as the Purchaser is assigned and assumes any Contract.  The Purchaser shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.), CERCLA or any foreign, federal, state or local labor, employment or environmental law, whether of similar import or otherwise, by virtue of the Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities.

16.     The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the holders of any Lien or Encumbrance.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of Successor or Transferee Liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of any Lien or Encumbrance.

17.     Except as expressly provided in the Purchase Agreement with respect to the Assumed Liabilities, nothing in this Sale Order or the Purchase Agreement shall require the Purchaser to (a) continue or maintain in effect, or assume any liability in respect of any employee, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors or their affiliates are a party or have any responsibility therefor including medical, welfare and pension benefits payable after retirement or other termination of employment, or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including pension

NAI-1503546228v1

plans) or the termination of any such plan, arrangement or agreement.

18.     Effective upon the Closing Date, other than with respect to Assumed Liabilities or Closing Date Permitted Exceptions, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, or its assets (including the Purchased Assets), or its successors and assigns, with respect to any (a) Encumbrance or (b) Successor or Transferee Liability, including the following actions with respect to clauses (a) and (b):  (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Lien or Encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets.

19.     Notwithstanding anything in this Sale Order or Agreement, nothing contained in this Sale Order or the Agreement (a) releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) that any entity would be subject to as the owner or operator of the assets transferred pursuant to the Agreement after the date of entry of this Sale Order; provided, however, that the foregoing shall not limit, diminish or otherwise alter the Debtors', Sellers' or Purchaser's, as applicable, defenses, claims, causes of action, or other rights under

applicable non-bankruptcy law with respect to any liability that may exist to a governmental unit at such owned or operated property; (b) shall be construed to create for any governmental unit any substantive right that does not already exist under applicable law or (c) authorizes the transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law governing such transfer or assignment; provided that, notwithstanding the foregoing, nothing herein shall be construed to permit a governmental unit to assert, assess or obtain penalties, fines, or other fees from Purchaser for violations of any such requirement that occurred prior to the Closing Date as a result of the operation of the Purchased Assets; provided, further, if any such violation continues after the Closing Date such governmental unit may seek to assert, assess or obtain penalties, fines or other fees from Purchaser for the period of time after the Closing Date that such violations occurred.

G.      **Assumption and Assignment of Contracts**

20.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors are authorized and directed to assume and assign the Contracts (including the Purchased Contracts and any other Contracts identified in the Purchase Agreement to be assumed and assigned to Purchaser, including but not limited to that certain Technical Information Agreement for Polyester Polymer entered into as of May 14, 2013 between INVISTA North America S.a r.l. and M&G Resins USA LLC) to the Purchaser, pursuant to the terms of the Purchase Agreement, free and clear of all Encumbrances.  The payment of the cure costs due under each Contract listed in the Purchase Agreement to be assumed pursuant to section 365(b) of the Bankruptcy Code by the Purchaser under the Purchase Agreement (a) cures all monetary defaults existing thereunder as of the assignment of the Contracts to the Purchaser in

-27-

accordance with the terms of the Purchase Agreement; (b) compensates the applicable counterparties to the Contracts for any actual pecuniary loss resulting from such default; and (c) together with the assumption of the Contracts by the Debtors and the assignment of the Contracts to the Purchaser constitutes adequate assurance of future performance thereof. The Purchaser has provided adequate assurance of future performance under the Contracts within the meaning of sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code.

21.     Any Adequate Assurance Objections must be made in writing, must clearly specify the grounds for the objection and have been filed with the Court by, and served so as to be received on the Objection Recipients (as defined in the Bidding Procedures) by no later than **March 21, 2018 at noon (prevailing Eastern Time)** (the "Adequate Assurance Objection Deadline"). If no timely Adequate Assurance Objection with respect to a Contract has been filed and served on the Objection Recipients by the Adequate Assurance Objection Deadline, (a) the applicable Contract will be deemed subject to assumption and assignment as proposed by the Debtors and the Successful Bidder and (b) the Successful Bidder will be deemed to have provided or to be able to provide adequate assurance of future performance of the applicable Contract in satisfaction of section 365(f)(2)(B) of the Bankruptcy Code.

22.     To the extent that any counterparty to a Contract did not timely file a Cure Objection by the deadline to file a Cure Objection, such counterparty is deemed to have consented to the proposed Cure Cost set forth in the Purchase Agreement. The counterparties to the Contracts are forever bound by the applicable Cure Costs and, upon payment of such Cure Costs as provided for herein and in the Purchase Agreement, are hereby enjoined from taking any action against the Purchaser with respect to any claim for cure under the Contracts, except as set forth in the Purchase Agreement.

NAI-1503546228v1

23.     Any provision in any Contract that prohibits or conditions the assignment of such Contract or allows the counterparty to such Contract to impose any penalty, fee, increase in payment, profit sharing arrangement or other condition on renewal or extension, or to modify any term or condition upon the assignment of such Contract, constitutes an unenforceable anti-assignment provision that is void and of no force and effect in connection with the Sale Transaction.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Contract have been satisfied.  Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Contracts to be assumed and assigned to Purchaser pursuant to the Purchase Agreement (including all Purchased Contracts), and such Contracts shall remain in full force and effect for the benefit of the Purchaser.

24.     Upon the assignment of the Contracts to the Purchaser (including all Purchased Contracts and any other Contracts to be assumed and assigned to Purchaser pursuant to the Purchase Agreement) in accordance with the terms of the Purchase Agreement, the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Contract, and the Debtors and their estates shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Contract occurring after such assignment.  The Purchaser shall pay any Cure Costs in accordance with the Purchase Agreement.  There shall be no assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Contracts pursuant to the Purchase Agreement.

25.     Each counterparty to a Contract is forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Purchaser or their respective property in

connection with the Sale Transaction (a) any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing Date, including, any breach related to or arising out of a change-in-control resulting from the Sale Transaction of any provision of such Contract, or any purported written or oral modification to the Contract; or (b) any claim, counterclaim, defense, breach, default, condition, setoff or other claim asserted or capable of being asserted against the Debtors existing as of the Closing Date.

26.     Other than the Contracts as set forth in the Purchase Agreement to be assumed and assigned to Purchaser, the Purchaser shall assume none of the Debtors' other contracts or leases and shall have no liability whatsoever thereunder.

**H.     Other Provisions**

27.     <u>Application of Sale Transaction Proceeds</u>.[8]  All sale proceeds from the DIP Collateral and Pre-Petition Collateral shall be distributed in accordance with the terms of the Final DIP Order, the DIP Loan Documents and any other applicable orders of this Court (and with respect to the proceeds of the sale of the assets of M&G Waters USA LLC ("<u>M&G Waters</u>"), the terms of the Senior Loan Documents[9]), including without limitation (a) distributions to be made on the Closing Date to the DIP Lender, the Pre-Petition First Lien Lender and, Macquarie with respect to obligations arising under the Senior Loan Documents, in accordance with the terms of the DIP Loan Documents, the Final DIP Order, including

---

[8]     Capitalized terms used in this paragraph but not otherwise defined in this Sale Order have the meanings given to them in the Final DIP Order or in the DIP Loan Agreement (Final DIP Order, Annex A), as applicable.

[9]     "Senior Loan Documents" means that certain Credit Agreement, dated as of November 9, 2016, among Macquarie, as administrative and collateral agent, the lenders party thereto from time to time, and M&G Waters, and the related security documents.

NAI-1503546228v1

paragraphs B(vii), B(viii),13 and 38 of the Final DIP Order and, with respect to the proceeds of the sale of the assets of M&G Waters, the Senior Loan Documents; and (b) the transfer to be made on the Closing Date by the CC Selling Parties (not including M&G Waters) into an escrow account not subject to the control of the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party or any party that purports to have a validly, perfected security interest in any of the Debtors' deposit accounts or cash (the "Carve-Out Account") of the sale proceeds from the Pre-Petition Collateral in an amount equal to the Sale Professional Fees Amounts, Sale Excess Fees Hold-Back Amounts (to the extent applicable and in accordance with the order of priorities set forth in the Final DIP Order) and Sale Excess Fee Amounts (to the extent applicable and in accordance with the order of priorities set forth in the Final DIP Order), in each case in this clause (b), as authorized pursuant to paragraph 13 of the Final DIP Order; provided that any excess amounts remaining in the Carve-Out Account shall be governed by and distributed in accordance with the Final DIP Order and the DIP Loan Documents.[10]

28.     Good Faith Deposit.  In the event that (a) the Successful Bidder does not close the Sale Transaction and there is no Backup Bidder or (b) each of the Successful Bidder and the Backup Bidder does not close the Sale Transaction and any Good Faith Deposit is not required to be returned to the Successful Bidder or Backup Bidder, the Debtors shall be authorized to transfer cash comprising the necessary portion of such Good Faith Deposit (as and to the extent set forth pursuant to the Purchase Agreement) into the Carve-Out Account and to pay, upon

---

[10]     Any application of sale proceeds to specific CC Assets or the assets of M&G Waters, shall be done in good faith and shall not violate the priorities or protections provided in the DIP Facility or the Pre-Petition First Lien Obligations under the DIP Loan Documents, the Interim DIP Order, the Final DIP Order, the Pre-Petition First Lien Loan Documents, or any other order of the Court, as the case may be.

NAI-1503546228v1

approval by the Court of the allowance of such professional fees, the Sale Professional Fees Amounts that are determined to be owing to those professionals retained by the Obligors (as defined in the DIP Loan Agreement) whose retention is approved by the Court pursuant to any one or more of sections 327, 363 and 1103 of the Bankruptcy Code. Any amounts deposited to fund the Carve-Out Account shall reduce any obligation under the DIP Loan and/or the Final DIP Order to fund the Carve-Out Account and/or to pay the Sale Professional Fees Amounts on an equal dollar basis, and shall not constitute DIP Collateral, except that the DIP Lender shall retain security interests in any residual interests in the Carve-Out Account available following satisfaction in full of all obligations benefitting from the Carve Out, and shall receive distributions on account of such residual interests.

29.    No Alteration of DIP Agent/DIP Lender Claims or Liens.[11]    Notwithstanding anything contained in this Sale Order to the contrary, nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights (including, without limitation, the liens, security interests or superpriority claims) of the DIP Agent and/or the DIP Lender pursuant to the DIP Orders or the DIP Loan Documents, or in respect of the DIP Obligations or the liens, security interests, or superpriority claims of the DIP Lender, until the Closing Date, at which point any such DIP Obligations, liens, security interests, and superpriority claims of the DIP Lender shall be deemed satisfied in full and/or released, as applicable.

30.    No Alteration of Macquarie's Claims or Liens.    Notwithstanding anything contained in this Sale Order to the contrary, nothing in the Purchase Agreement or this Sale

---

[11]    Capitalized terms used in this paragraph but not otherwise defined have the meanings given to them in the Final DIP Order.

NAI-1503546228v1

Order shall be deemed to amend, modify, or limit the rights (including, without limitation, the liens, security interests or claims) of Macquarie pursuant to the DIP Orders or the Senior Loan Documents, or in respect of the obligations arising under the Senior Loan Documents, the liens, security interests, or claims of Macquarie until the Closing Date and upon the payment by the Purchaser pursuant to the Purchase Agreement, the obligations, liens and security interests of Macquarie shall be deemed satisfied in full and/or released, as applicable.

31.    No Alteration of Obligations Owed Under Pre-Petition First Lien Loan Documents/Pre-Petition Second Lien Documents.[12]  Except for the purpose of allowing the Assets to be transferred to the Purchaser free and clear of Liens and Encumbrances, nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights and claims of the Pre-Petition First Lien Lender and/or Pre-Petition Second Lien Secured Party pursuant to the DIP Orders, the Pre-Petition First Lien Loan Documents or the Pre-Petition Second Lien Documents until the Closing date, at which point any such liens, security interests, and superpriority claims of the Pre-Petition First Lien Lender and/or Pre-Petition Second Lien Secured Party shall be deemed satisfied in full and/or released, as applicable.

32.    Excluded Liabilities.  All persons, all governmental units and all holders of Liens and Encumbrances, including those based upon or arising out of the Excluded Liabilities (as defined in the Purchase Agreement), are hereby barred and estopped from taking any action against the Purchaser or the Purchased Assets to recover property on account of any Adverse Interests or on account of any Liabilities of the Debtors other than Assumed Liabilities pursuant

---

[12]    Capitalized terms used in this paragraph but not otherwise defined have the meanings given to them in the Final DIP Order.

NAI-1503546228v1

to the Purchase Agreement and Closing Date Permitted Exceptions. All persons holding or asserting any Encumbrances with respect to the Excluded Assets are hereby enjoined from asserting or prosecuting such Liens or Encumbrances against the Purchaser or the Purchased Assets for any Liability whatsoever associated with the Excluded Assets.

33. <u>No Bulk Sales; No Brokers</u>. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction. Other than the professionals retained by the Debtors pursuant to orders of this Court, no brokers were involved in consummating the Sale Transaction, and no brokers' commissions shall be due to any person or entity in connection with the Sale Transaction. The Purchaser is not obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Sale Transaction. Notwithstanding the foregoing, the Debtors may be obligated to pay their retained financial advisor or investment banker for services rendered in connection with the sale in accordance with other orders of this Court.

34. <u>Failure to Specify Provisions; Conflicts</u>. The failure specifically to mention any particular provisions of the Purchase Agreement or any related agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court, the Debtors, and the Purchaser that the Purchase Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties thereto in accordance with this Sale Order. In the event there is a direct conflict between the terms of this Sale Order and the terms of the Purchase Agreement, the terms of this Sale Order shall control.

35. <u>Allocation of Consideration</u>. Except as otherwise set forth in the Purchase Agreement, all rights of the respective Debtors' estates with respect to the allocation of

-34-

consideration received from the Purchaser in connection with the Sale Transaction are expressly

reserved for later determination by this Court and, to the extent consideration is received by any

Debtor that is determined to be allocable to another Debtor, such other Debtor shall have a

claim against the recipient Debtor with the status of an expense of administration in the case of

the recipient Debtor under section 503(b) of the Bankruptcy Code.

36.     <u>Subsequent Plan Provisions and Orders of the Court</u>.  Nothing contained in any

chapter 11 plan to be confirmed in these cases or any order to be entered in these Cases shall

alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Sale

Order.  In the event there is a conflict between the terms of this Sale Order and the terms of any

subsequent chapter 11 plan or any order to be entered in these Cases , the terms of this Sale

Order shall control.

37.     The Sellers shall not propose a chapter 11 plan or request entry of an order in

these Cases that conflicts with or derogates from the terms of this Sale Order.

38.     <u>Further Assurances</u>.  From time to time, as and when requested, all parties to the

Sale Transaction shall execute and deliver, or cause to be executed and delivered, all such

documents and instruments and shall take, or cause to be taken, all such further or other actions

as the requesting party may reasonably deem necessary or desirable to consummate the Sale

Transaction, including such actions as may be necessary to vest, perfect, or confirm or record or

otherwise in the Purchaser its right, title and interest in and to the Purchased Assets.

39.     <u>Governing Terms</u>.  To the extent this Sale Order is inconsistent with any prior

order or pleading in these Cases, the terms of this Sale Order shall govern.  To the extent there

is any inconsistency between the terms of this Sale Order and the terms of the Purchase

Agreement (including all ancillary documents executed in connection therewith), the terms of

this Sale Order shall govern.

40.     [Approval of Backup Bidder.  The Backup Bidder is hereby approved and the bid submitted by the Backup Bid is hereby approved and authorized, including the order in substantially the form attached as Schedule 1, Exhibit D to the Auction Results Notice (the "Backup Bidder Order") approving the sale to the Backup Bidder and the purchase agreement in substantially the form attached as Schedule 1, Exhibit C to the Auction Results Notice by and between the Sellers and the Backup Bidder (the "Backup Bidder APA"). In accordance with the Bidding Procedures, the bid submitted by the Backup Bidder for, among other things, the Assets shall remain binding on the Backup Bidder until the closing of the Sale Transaction pursuant to the Successful Bid.  In the event the Purchase Agreement is terminated pursuant to its terms and the sale of the Purchased Assets to the Purchaser is not consummated, then the Backup Bidder will be deemed the Successful Bidder in accordance with the Bidding Procedures.  In such case, the the Debtors shall, within one business day of the selection of the Backup Bid as the Successful Bidder, file with the Court a certification of counsel (with a copy concurrently provided by email to respective counsel to the following parties (each, as defined in the DIP Orders):  (i) counsel for the Committee, (ii) the DIP Agent, (iii) the DIP Lender, (iv) the Pre-Petition First Lien Lender; (v) the Pre-Petition Second Lien Secured Party; (vi) Macquarie; and (vii) the Construction Lienholder Group) advising (w) that the Purchase Agreement with the Purchaser has not been consummated, (x) that the Backup Bid has become the Successful Bid pursuant to this Sale Order, (y) of the Closing Date of the Sale Transaction under the Backup Bid and (z) seeking entry of the Backup Bidder Order approving the Backup Bidder APA.]

41.     Modifications. The Purchase Agreement and any related agreements, documents

-36-

or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court; provided that the Sellers or the Purchaser shall deliver any such proposed modification, amendment or supplement to counsel for the Committee by email on three (3) Business Days' notice (or such shorter time period agreed to by the Committee) and any such proposed modification, amendment or supplement that is not determined by the Court (solely following a motion filed by the Committee within such five (5) Business Day period) to be material shall be authorized and not require the entry of a further order of the Court. On and after the date of any such modification, amendment or supplement, each reference herein to the Purchase Agreement shall mean a reference to the Purchase Agreement as amended by such modification, amendment or supplement.

42. <u>Limitation on Liability</u>. If the Agreement is terminated by Sellers pursuant to Section 4.4(d) of the Purchase Agreement, then Sellers' sole damages remedy against Purchaser shall be limited to the amount of the Deposit Amount (as defined in the Purchase Agreement) and payable to Sellers as set forth in the Purchase Agreement. The retention of all or a portion of the Good Faith Deposit) as provided for in the Purchase Agreement shall constitute Sellers' full and complete liquidated damages and Sellers' sole and exclusive remedy for any and all damages against Purchaser or any of its affiliates or their respective partners, officers, directors and shareholders for any and all damages suffered or incurred by Sellers in connection with the Purchase Agreement or any related document, any of the transactions contemplated hereby or thereby (or the abandonment or termination thereof) or any matters forming the basis for such abandonment or termination.

43. <u>Automatic Stay</u>. The automatic stay pursuant to section 362 of the Bankruptcy

Code is hereby modified with respect to the Debtors to the extent necessary, without further order of this Court, to allow the Purchaser to deliver any notice provided for in the Purchase Agreement and allow the Purchaser to take any and all actions permitted or required under the Purchase Agreement in accordance with the terms and conditions thereof. The Purchaser shall not be required to seek or obtain any further relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement or any other sale-related document.

44. <u>No Stay of Order</u>. Notwithstanding Bankruptcy Rules 6004(h), 6006(d) and 7062, this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and obtaining a stay prior to the Closing Date or risk its appeal being foreclosed as moot.

45. <u>Servers and IT Equipment</u>. Upon consummation of the Sale, and to the extent applicable, the Debtors may retain originals or copies of, and preserve in accordance with their discovery obligations, all hard copy documents and data and information that constitute Purchased Assets and any other document, data or information stored on or in servers, backup devices, mobile devices, electronic storage devices, or miscellaneous IT equipment, in each case, that constitutes Purchased Assets, currently in the Debtors' possession, custody, or control pertaining to pending or threatened litigation or necessary to administer these Cases.

46. <u>Intellectual Property Matters</u>. Sellers, any other Debtors (to the extent applicable) and Purchaser are authorized and directed to (a) take any and all actions necessary to grant to

Purchaser any and all intellectual property licenses set forth in section 8.10(a) of the Purchase Agreement and pursuant to the terms thereof (together, the "New IP Licenses"), and (b) implement, effectuate and perform under any such New IP Licenses. Additionally, Sellers or any other Debtors (to the extent applicable) respectively, shall not (i) reject, terminate, transfer or otherwise assign any of the New IP Licenses other than pursuant to the terms of the Purchase Agreement, or (ii) knowingly take any action that would render the New IP Licenses unenforceable by Purchaser; provided that nothing in the Purchase Agreement or this Order creates an obligation on Sellers or MGI to prosecute, renew, defend or otherwise maintain the Retained Trademarks (as defined in the Purchase Agreement).

47.     Notice of Sale Closing Date.  Within one (1) business day of the occurrence of the Closing Date of the Sale Transaction, the Debtors shall file and serve a notice of same in a form to be agreed upon by Purchaser and Debtor.

48.     Retention of Jurisdiction.  This Court shall retain exclusive jurisdiction to interpret, implement, and enforce the terms and provisions of this Sale Order, the Bidding Procedures Order, and the Purchase Agreement, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, and decide any issues or disputes concerning this Sale Order and the Purchase Agreement or the rights and duties of the parties hereunder or thereunder, including the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Purchased Assets.

49.     The Sale Transaction contemplated hereunder is not receiving an exemption under section 1146(a) of the Bankruptcy Code.

50.     The Purchaser has standing to seek to enforce the terms of this Order.

51.    The Debtors and the Purchaser are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Order.  The requirements set forth in Bankruptcy Rule 6004(a) and Local Rule 6004-1 are satisfied.

52.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

Dated: _____          _____
       Wilmington, Delaware                  HONORABLE BRENDAN L. SHANNON
                                             CHIEF UNITED STATES BANKRUPTCY JUDGE

NAI-1503546228v1

**Exhibit 1**

**Exhibit C**

**Backup Bid**

**ASSET PURCHASE AGREEMENT**

among

**M&G Resins USA, LLC,**
**M&G Waters USA, LLC,**
**M&G USA Corporation,**
**M&G Polymers USA, LLC,**
**Chemtex International Inc.,**
**M&G Finance Corporation,**
**M&G USA Holding LLC,**
**Chemtex Far East, Ltd.,**
**Indo American Investments, Inc.,**

and

**Banibu II Holdings, Inc.**

and, upon its execution of a counterpart hereto,

**Mossi & Ghisolfi International S.à.r.l.**

**Dated as of March 20, 2018**

**TABLE OF CONTENTS**

**Page**

I. DEFINITIONS ................................................................................................ 2

    1.1    Certain Definitions ............................................................... 2

    1.2    Terms Defined Elsewhere in this Agreement ........................................... 23

    1.3    Other Definitional and Interpretive Matters ............................................ 25

II. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ................. 27

    2.1    Purchase and Sale of Assets .................................................... 27

    2.2    Excluded Assets ................................................................. 31

    2.3    Assumption of Liabilities ........................................................ 33

    2.4    Excluded Liabilities ............................................................. 34

    2.5    Assumption of Purchased Contracts; Cure Amounts ............................. 35

    2.6    Non-Assignment of Assets ...................................................... 36

    2.7    Further Conveyances and Assumptions ......................................... 39

III. CONSIDERATION; ADJUSTMENT .................................................................. 40

    3.1    Consideration .................................................................... 40

    3.2    Purchase Price Deposit .......................................................... 41

    3.3    Interim Loan. ..................................................................... 41

    3.4    Payment of Purchase Price ...................................................... 42

    3.5    Application and Release of Escrow Amounts. ................................... 43

    3.6    Apportionments .................................................................. 46

IV. CLOSING AND TERMINATION ...................................................................... 47

    4.1    Closing Date ..................................................................... 47

    4.2    Deliveries by Sellers and MGI ................................................... 47

    4.3    Deliveries by Purchaser ......................................................... 49

    4.4    Termination of Agreement ....................................................... 50

    4.5    Procedure Upon Termination .................................................... 53

    4.6    Effect of Termination. ............................................................ 53

V. REPRESENTATIONS AND WARRANTIES OF SELLERS AND MGI ..................... 54

    5.1    Organization and Good Standing ............................................... 54

    5.2    Authorization of Agreement ..................................................... 54

    5.3    Conflicts; Consents of Third Parties ............................................. 54

| | | |
|---|---|---|
| 5.4 | Real Property | 55 |
| 5.5 | Title to and Sufficiency of Purchased Assets | 56 |
| 5.6 | Intellectual Property. | 57 |
| 5.7 | MGI Trademarks. | 59 |
| 5.8 | Contracts. | 59 |
| 5.9 | Affiliate Transactions | 60 |
| 5.10 | Bankruptcy and Litigation | 60 |
| 5.11 | Environmental Matters | 61 |
| 5.12 | Labor and Employee Benefits Matters. | 62 |
| 5.13 | Financial Advisors | 64 |
| 5.14 | Taxes | 64 |
| 5.15 | Compliance with Law; Permits. | 65 |
| 5.16 | Insurance | 66 |
| 5.17 | FCPA | 66 |
| 5.18 | Financial Statements | 67 |
| 5.19 | Absence of Certain Changes | 67 |
| 5.20 | NDAs.. | 68 |
| 5.21 | No Other Representations or Warranties; Schedules | 68 |
| VI. | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 69 |
| 6.1 | Organization and Good Standing | 69 |
| 6.2 | Authorization of Agreement | 69 |
| 6.3 | Conflicts; Consents of Third Parties | 69 |
| 6.4 | Litigation | 70 |
| 6.5 | Financial Advisors | 70 |
| 6.6 | Financial Capability | 70 |
| 6.7 | Condition of the Purchased Assets | 70 |
| VII. | BANKRUPTCY COURT MATTERS | 71 |
| 7.1 | Bankruptcy Court Filings | 71 |
| 7.2 | Sale Order | 71 |
| 7.3 | Purchaser Cooperation | 71 |

VIII. COVENANTS ........................................................................................... 71

    8.1    Access to Information ................................................................. 71

    8.2    Conduct of the Business Pending the Closing ........................... 72

    8.3    Consents ................................................................................... 74

    8.4    Regulatory Approvals ................................................................ 75

    8.5    Further Assurances ................................................................... 76

    8.6    Publicity .................................................................................... 77

    8.7    Confidentiality ........................................................................... 77

    8.8    Other Transition Matters ........................................................... 78

    8.9    Intellectual Property Matters ..................................................... 80

    8.10   Receivables .............................................................................. 82

    8.11   Shared Contracts ...................................................................... 82

    8.12   Post-Closing Assistance for Litigation ...................................... 83

    8.13   Interpretation of Schedules ...................................................... 83

    8.14   Notice of Developments ............................................................ 84

    8.15   Data & Systems Transfer .......................................................... 84

    8.16   MGI Obligations. ....................................................................... 85

IX. CONDITIONS TO CLOSING ...................................................................... 86

    9.1    Conditions Precedent to Obligations of Purchaser ................... 86

    9.2    Conditions Precedent to Obligations of Sellers ......................... 87

    9.3    Conditions Precedent to Obligations of Purchaser, Sellers ...... 87

    9.4    Frustration of Closing Conditions .............................................. 88

X. EMPLOYEES AND EMPLOYEE BENEFITS ................................................ 88

    10.1   Employment and Benefits Arrangements .................................. 88

    10.2   No Obligations .......................................................................... 89

XI. TAXES ....................................................................................................... 89

    11.1   Transfer Taxes .......................................................................... 89

    11.2   Purchase Price Allocation ......................................................... 89

    11.3   Certain Periodic Non-Income Taxes ......................................... 90

    11.4   Cooperation .............................................................................. 91

11.5    Tax Characterization of Payments Under This Agreement ..................... 91

11.6    Withholding Taxes.. ................................................................. 91

XII. MISCELLANEOUS ............................................................................ 92

12.1    No Survival of Representations and Warranties ..................................... 92

12.2    Expenses ................................................................................ 92

12.3    Injunctive Relief ...................................................................... 92

12.4    Submission to Jurisdiction; Consent to Service of Process .................... 92

12.5    Waiver of Right to Trial by Jury ................................................... 93

12.6    Entire Agreement; Amendments and Waivers ...................................... 93

12.7    Governing Law ......................................................................... 93

12.8    Notices ................................................................................. 93

12.9    Severability ........................................................................... 95

12.10   Assignment ............................................................................ 95

12.11   Non-Recourse .......................................................................... 95

12.12   Representation of Sellers and their Affiliates ................................. 96

12.13   Counterparts .......................................................................... 96

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of March 20, 2018, among Banibu II Holdings, Inc. ("<u>Purchaser</u>"), M&G Resins USA, LLC ("<u>Resins</u>" or "<u>Primary Seller</u>"), M&G Waters USA, LLC ("<u>Waters</u>"), M&G USA Corporation ("<u>M&G Corp.</u>"), M&G Polymers USA, LLC ("<u>Polymers</u>"), Chemtex International Inc. ("<u>CII</u>" ), M&G Finance Corporation ("<u>Finance</u>"), M&G USA Holding LLC  ("<u>Holding</u>"), Chemtex Far East, Ltd. ("<u>Chemtex FE</u>"), Indo American Investments, Inc. ("<u>IAI</u>" and, together with Resins, Waters, M&G Corp., Polymers, CII, Finance, Holding, Chemtex FE and IAI, each a "<u>Seller</u>" and, collectively "<u>Sellers</u>"), and, upon its execution of a counterpart hereto, Mossi & Ghisolfi International S.à.r.l. ("<u>MGI</u>").

## RECITALS:

A.      Sellers are debtors and debtors in possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>").  Polymers filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 24, 2017 (the "<u>Polymers Petition Date</u>") and those Sellers other than Polymers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on October 30, 2017 (the "<u>Resins Petition Date</u>", and each of the Polymers Petition Date and the Resins Petition Date, a "<u>Petition Date</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), where Sellers' bankruptcy cases are jointly administered under Case No. 17-12307 (such Sellers' cases collectively, the "<u>Bankruptcy Cases</u>");

B.      Sellers (i) are, among other things, in the process of constructing the plant located in Corpus Christi, Texas (together with all associated real property and buildings constructed thereon, including any improvements or modification thereto, the "<u>CC Plant</u>") for the purpose of (A) producing, selling and distributing purified terephthalic acid and related compositions ("<u>PTA</u>") and (B) producing, selling and distributing polyethylene terephthalate in any form and related compositions ("<u>PET</u>"), (ii) own a desalination plant and boiler facilities in the proximity of the CC Plant (including any improvement or modifications thereto, the "<u>Desalination Plant</u>"), and (iii) own certain Intellectual Property (defined below);

C.      Sellers desire to sell to Purchaser the Purchased Assets (defined below) and transfer to Purchaser the Assumed Liabilities (defined below) and Purchaser desires to purchase from Sellers the Purchased Assets and assume the Assumed Liabilities, in each case upon the terms and conditions hereinafter set forth;

D.      MGI owns, and desires to sell to Purchaser, the MGI Assets (defined below) and Purchaser desires to purchase from MGI the MGI Assets;

E.      Without limiting any of their obligations hereunder, to the Knowledge of Sellers, each of Finance, Holding, Chemtex FE and IAI severally and not jointly represents and warrants to the other Sellers that it does not have any right, title and interest in, to and under any Purchased Assets.

F.     The execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order (defined below) under, inter alia, Sections 363 and 365 of the Bankruptcy Code; and

G.     The parties desire to consummate the transactions contemplated by this Agreement as promptly as practicable after (i) the Bankruptcy Court enters the Sale Order and (ii) the Sale Order becomes a Final Order.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements set forth herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## I. DEFINITIONS

1.1     <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms, when used herein with initial capital letters, have the meanings specified in this <u>Section 1.1</u> or in other Sections of this Agreement identified in <u>Section 1.2</u>:

"<u>Accounts Payable</u>" means the accounts payable and accrued expenses set forth in <u>Schedule 1.1(a)</u> (as it may be amended and updated in accordance with this Agreement). For the avoidance of doubt, Purchaser may revise such <u>Schedule 1.1(a)</u> with the addition or deletion of accounts payable and accrued expenses at any time prior to the Closing Date, to the extent permitted by <u>Section 2.6(e)</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one (1) or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"<u>Alternative Transaction</u>" means (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of all or a substantial portion of Sellers (including pursuant to a plan of reorganization or any exchange of all or a substantial portion of Sellers' outstanding debt obligations for equity securities of any Seller) (A) by one (1) or more Persons other than Purchaser and/or its Affiliates, or (B) by a Successful Bidder other than Purchaser and/or its Affiliates, (ii) the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, tender offer, exchange offer, merger, amalgamation or other similar transaction, of all or a substantial portion of Sellers, the Business or the Purchased Assets, or any issuance, sale or transfer of equity interests in, any Seller, in each case, in a transaction or series of transactions (A) with one (1) or more Persons other than Purchaser and/or its Affiliates, or (B) with a Successful Bidder other than Purchaser and/or its Affiliates, or (iii) the retention by any Sellers (or their successor entities emerging from the

Bankruptcy Proceedings) of all or a substantial portion of the Business or the Purchased Assets taken as a whole, pursuant to a plan of reorganization, whether under a standalone plan of reorganization approved by the Bankruptcy Court, pursuant to Section 1129 of the Bankruptcy Code or otherwise. As used in this definition, "substantial portion" shall refer to 25% of the fair market value of the Business or the Purchased Assets, taken as a whole, as applicable.

"Antitrust Laws" means all antitrust, competition or trade regulation Laws of any Governmental Body or Laws issued by any Governmental Body that are otherwise designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization, restraint of trade or harm to competition.

"APG Purchase Agreement" means that certain Asset Purchase Agreement between Polymers and M&G Corp., on the one hand, and Far Eastern Investment (Holding) Limited, on the other hand, filed on the docket of the Bankruptcy Court on January 30, 2018, as Exhibit A to Schedule 1 of the *Notice of Designation of Successful Bid and Backup Bid for the Purchased Assets* [Docket No. 843], and approved by the Bankruptcy Court on February 1, 2018 pursuant to the *Order Authorizing (i) the Sale of Certain Assets of M&G USA Corp. and Polymers Free and Clear of Encumbrances and Liens; (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (iii) Related Relief* [Docket No. 864], as amended on March 1, 2018.

"Assumption Effective Date" means with respect to any Contract, the latest of (i) the Closing Date, (ii) the deadline for objecting to assumption and assignment of such Contract or to a proposed Cure Amount, if no such objection is submitted, and (iii) the fifth (5th) Business Day following the date of resolution of any objection to assumption and assignment of such Contract or to a proposed Cure Amount, if any such objection is timely submitted.

"Auction" has the meaning set forth in the Bidding Procedures.

"Backup Bidder" has the meaning set forth in the Bidding Procedures.

"Bankruptcy Proceedings" means the Bankruptcy Cases, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any Seller that are held from time to time.

"Bidding Procedures" means the procedures employed with respect to the proposed sale of the Purchased Assets and the assumption of the Assumed Liabilities, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order [Docket No. 490, Ex. 1], as amended pursuant to the Notice of Extended Proposal Deadline from January 16, 2018 at 5:00 P.M. (Prevailing Eastern Time) to January 30, 2018 at 5:00 P.M. (Prevailing Eastern Time) [Docket No. 557] and the Notice of Certain Modifications to Bidding Procedures [Docket No. 1061].

"Bidding Procedures Order" means the Order of the Bankruptcy Court dated December 14, 2017 entered on the docket of the Bankruptcy Cases as document number 490.

"Business" means the business of (i) engineering, construction, procurement of supplies and technology, management, design, supply of products, installation, start-up, testing and development in connection with or related to the development and construction of the CC Plant, in each case, as currently conducted, or currently anticipated or proposed by Sellers to be conducted, including as described on pages 23 to 57 of that certain M&G Chemical USA Corporation Confidential Information Memorandum dated January 9, 2018 and made available to Purchaser prior to the date hereof in the virtual data room in connection with the Auction (doc id #17.4.1) (the "M&G Chemicals CIM"), (ii) the operation and maintenance of the CC Plant for the research, development, processing, production, manufacture, licensing, sale and distribution of PET and PTA in the manner anticipated or proposed by Sellers, including as described in the M&G Chemicals CIM, as of (A) the applicable Petition Date or (B) the Closing Date, to be conducted following construction of the CC Plant, and (iii) the operation and maintenance of the Desalination Plant in the manner anticipated or proposed by Sellers, including as described in the M&G Chemicals CIM and that certain M&G Waters Desalination Assets Confidential Information Memorandum dated February 2018 and made available to Purchaser prior to the date hereof in the virtual data room in connection with the Auction (doc id #17.4.2), as of (A) the applicable Petition Date or (B) the Closing Date, to be conducted following construction of the Desalination Plant.

"Business Day" means any day excluding Saturday, Sunday and any day that is a legal holiday under the Laws of the State of New York, the State of Delaware or the United Mexican States, or is a day on which banking institutions located in any such state or country are authorized or required by Law or other governmental action to close.

"Business Employee" means each individual employed or leased by any Seller or any of its Affiliates as of the date hereof who is providing services primarily in connection with the Business.

"Carve-Out Expenses" means all allowed claims for unpaid fees, costs and expenses (excluding any Completion Fees) incurred by and payable to Professionals, if any, to the extent such claims for fees, costs and expenses are both (i) allowed by the Bankruptcy Court pursuant to a Final Order (which, for the avoidance of doubt, may include any Order authorizing the payment of interim compensation or sale Order that has not been stayed and is not subject to a pending appeal) at any time, whether prior to or after delivery of a Carve-Out Trigger Notice, and (ii) for amounts that are in accordance with, and solely up to the total respective amounts set forth in, the DIP Budget (including the permitted 10% variance in excess thereof in the case of any Professionals retained by the Obligors) for the applicable timeframe); provided, that in the event that Purchaser is the Backup Bidder with respect to the Purchased Assets, Carve-Out Expenses shall include only those such allowed claims incurred from and

after the time that Purchaser is deemed the new Successful Bidder pursuant to the Bidding Procedures.

"Carve-Out Trigger Date" means the date of a delivery of a Carve-Out Trigger Notice.

"Carve-Out Trigger Date Expenses" means, if a Carve-Out Trigger Date has occurred, (i) any Carve-Out Expenses incurred prior to the Carve-Out Trigger Date and (ii) any Carve-Out Expenses incurred following the Carve-Out Trigger Date and prior to the Closing Date; provided, that the aggregate amount of such Carve-Out Expenses incurred following the Carve-Out Trigger Date, if any, shall not exceed (A) $2,000,000 in the aggregate with respect to the Professionals retained by the Obligors and (B) $515,000 in the aggregate with respect to the Professionals retained by the Creditors' Committee.

"Carve-Out Trigger Notice" means a notice of the occurrence and continuation of an Event of Default (as defined in the DIP Credit Documents) or a default under the Interim DIP Order or Final DIP Order, delivered to the Obligors, the Creditors' Committee and the U.S. Trustee in accordance with the Final DIP Order.

"Cash Collateral Orders" means, collectively, (i) the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay and (4) Scheduling a Final Hearing* [Docket No. 91] and (ii) the *Final Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay and (4) Granting Related Relief* [Docket No. 487].

"CC Assets" means (i) the assets of Resins and (ii) the assets of the Guarantors that have been or may be useful to the current or future construction, business operations or uses of Resins' assets, including the CC Plant.

"Chemtex Purchase Agreement" means that certain Stock Purchase Agreement, dated on or about February 21, 2018, by and among Chemtex Global Corporation, Shiner Management & Consulting Co. Ltd., MGI, CII, Chemtex Far East Ltd., Chemtex Consulting of India (Pvt.) Ltd., Chemtex Engineering Co. Ltd., Chemtex (Shanghai) International Trading Co. Ltd. and Chemtex (Shanghai) Chemical Engineering Co. Ltd., as filed on the docket of the Bankruptcy Court on February 22, 2018 as Exhibit B to the *Motion of the Debtors for Entry of an Order (i) Authorizing the Sale of Certain of the Debtors' Equity Interests in Non-Debtor Subsidiaries Free and Clear of Liens, Claims, Interests and Encumbrances; (ii) Approving the Assumption and Assignment of Contracts, and (iii) Granting Related Relief* [Docket No. 1018] and approved by the Bankruptcy Court on March 12, 2018 pursuant to the *Order (I) Authorizing the Sale of Certain of the Debtors' Equity Interests in Non-Debtor Subsidiaries Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Contracts and (III) Granting Related Relief* [Docket No. 1137].

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986.

"Collective Bargaining Agreement" means any written Contract that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of the Employees.

"Committee Professional Excess Expenses" means the fees and expenses accrued prior to the Closing Date by the Professionals retained by the Creditors' Committee that are in excess of the amounts provided to be accrued by such Professionals in the DIP Budget (including the variance related thereto) prior to the Closing Date; provided, that in the event that Purchaser is the Backup Bidder with respect to the Purchased Assets, Committee Professional Excess Expenses shall include only those such fees and expenses accrued from and after the time that Purchaser is deemed the new Successful Bidder pursuant to the Bidding Procedures; provided, further, that in no event shall the Committee Professional Excess Expenses exceed the lesser of (i) $900,000 and (ii) the amount, if any, by which (A) the amounts provided to be accrued by the Professionals retained by the Obligors in the DIP Budget (including the variance related thereto) prior to the Closing Date exceed (B) the Carve-Out Expenses of the Professionals retained by the Obligors.

"Completion Fees" means those fees payable to Alvarez & Marsal North America, LLC and Rothschild Inc. and Rothschild S.p.A., and any New Advisor (as defined in the *Declaration of Stephen Antinelli In Support of the Debtors' Application for Entry of an Order (I) Authorizing Them to Employ and Retain Rothschild Inc. and Rothschild S.p.A. as Financial Advisors and Investment Bankers to the Debtors effective Nunc Pro Tunc to the Petition Date, (II) Approving the Terms of the Engagement Letter, (III) Waiving Certain Time - Keeping Requirements and (IV) Granting Related Relief* [docket no. 845]), in their capacity as Professionals retained by the Obligors, in respect of the successful completion of the sale of the CC Assets, which fees shall be (i) in an aggregate amount of up to $7,500,000, plus (solely for Rothschild Inc. and Rothschild S.p.A., the New Advisor and/or their respective Affiliate designees) any additional amounts calculated based on the sale price of the CC Assets as set forth in the engagement letter between Rothschild Inc. and Rothschild S.p.A. and M&G Corp., dated as of September 1, 2017 (without giving effect to any subsequent amendments thereto unless approved by the Bankruptcy Court and by the Requisite Lenders (as defined in the DIP Loan Documents)) and (ii) approved by the Bankruptcy Court.

"Completion Fees Escrow Amount" means cash in an aggregate amount equal to $7,500,000.

"Contract" means any contract, indenture, note, bond, lease, license, sublicense or other agreement, in each case whether written or oral.

"Controlled Affiliate" means, with respect to any party, a subsidiary of such party; provided, that none of M & Ghisolfi de Mexico, S.A. de C.V., M&G Mexico Holding, S.A. de C.V., M & G Polimeros Mexico, S.A. de C.V., Servicios Tamaulipas, S.A. de C.V. and Guozhen M&G (Anhui) Biomass Power Co. Ltd. (China) shall be deemed to be a Controlled Affiliate of Sellers for any purpose hereunder.

"Copyright" means any copyright, any copyrightable work, works of authorship (including any engineering, construction or architectural plans, files, designs or drawings), any registration or recording of any copyright or copyrightable work, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other country or jurisdiction, and any renewal of any of the foregoing.

"Creditors' Committee" means the statutory committee of creditors appointed in the Bankruptcy Cases.

"Cure Amounts" means the amounts (i) necessary to cure all defaults in existence under any Purchased Contract, if any, and (ii) required to be paid in connection with the assumption of any Purchased Contract, if any, pursuant to Section 365(b)(1)(A) and Section 365(b)(1)(B) of the Bankruptcy Code.

"Debtor" has the meaning set forth in the Bidding Procedures Order.

"Debtor Affiliate" means, with respect to any Seller, an Affiliate of such Seller that is a Debtor.

"Deposit Escrow Agreement" means that certain escrow agreement, dated as of March 5, 2018, by and among Purchaser, Primary Seller and the Escrow Agent.

"DIP Agent" means Trimont Real Estate Advisors, LLC in its separate capacities as administrative and collateral agent under the DIP Loan Documents, or any successor agent.

"DIP Agreement Credit Bid Amount" means an amount equal to (i) all Obligations (as defined under the Debtor-in-Possession Loan Agreement) outstanding under the DIP Loan Documents as of 5:00 p.m. (Eastern time) on the day before the date on which the Auction is commenced, plus (ii) the increase in the amount of any Obligations outstanding under the DIP Loan Documents (including, for the avoidance of doubt, as a result of (A) additional loan advances, (B) the accrual of interest, and (C) the accrual of fees, expenses or other amounts payable, in each case under and pursuant to the Debtor-in-Possession Loan Agreement) from 5:00 p.m. (Eastern time) on the day before the date on which the Auction is commenced through and including the Closing Date (including any amounts which become due and payable upon the Closing, including any exit fees), such increase reduced by any amounts paid in respect thereof prior to the Closing Date.

"<u>DIP Budget</u>" means the budget prepared in accordance with the DIP Loan Documents and attached as Exhibit B to the Final DIP Order (and as further amended, supplemented or updated in accordance with the DIP Loan Documents).

"<u>DIP Collateral</u>" means all Collateral (as defined in the Debtor-in-Possession Loan Agreement) and all products and proceeds thereof.

"<u>DIP Credit Documents</u>" means, collectively, (i) that certain M&G Resins USA LLC Summary of Terms and Conditions for DIP Facility attached as Annex A to the *Interim Order Granting Debtors' Motion to (A) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C §§ 105, 362, 363 and 364; (B) Grant Liens and Superpriority Administrative Expense Claims to the DIP Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (C) Provide Adequate Protection to the Pre-Petition First Lien Lender and the DAK Americas LLC; (D) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; (E) Schedule a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2; and (F) Grant Related Relief* [Docket No. 62] (the "<u>Interim DIP Order</u>"), (ii) that certain Super-Priority Senior Secured Debtor-In-Possession Senior Term Loan Agreement, dated as of December 20, 2017, among Resins, a debtor-in-possession, as Borrower, M&G Corp., M&G Finance Corporation, Waters, M&G USA Holding LLC, CII, Chemtex Far East, Ltd., Indo American Investments, Inc., each a debtor-in-possession, as guarantors (the "<u>Guarantors</u>"), the DIP Lender, the DIP Agent and the other parties thereto (the "<u>Debtor-in-Possession Loan Agreement</u>"), pursuant to which the DIP Lender has made available the "Loans" therein described, together with all other agreements, instruments or documents evidencing or securing the Loans, and the other related documents and agreements executed in connection with the Debtor-in-Possession Loan Agreement, including, notes, guaranties, security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements, assignments, trust agreements, amendments, waivers, consents, other modifications, intellectual property filings and other documents, as at any time amended, (iii) the Interim DIP Order, and (iv) the *Final Order Granting Debtors' Motion to (A) Authorize Certain Debtors In Possession To Obtain Post Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (B) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant To 11 U.S.C. §§ 364 and 507; (C) Provide Adequate Protection to the Pre-Petition First Lien Lender and the DAK Americas LLC; (D) Modify Automatic Stay Pursuant To 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (E) Granting Related Relief* [Docket No. 479] (the "<u>Final DIP Order</u>").

"<u>DIP Lender</u>" means Control Empresarial de Capitales, S.A. de C.V. in its capacity as the holder of any Liens, Claims or Indebtedness evidenced or secured by the DIP Credit Documents.

"<u>DIP Loan Documents</u>" means the DIP Credit Documents other than the Interim DIP Order and the Final DIP Order.

"<u>Employee Records</u>" means books, records, files or other documentation with respect to Transferred Employees.

"Employees" means, collectively, (i) the Business Employees and (ii) the Leave Employees.

"Environmental Law" means any Law relating to (i) the protection of human health and safety (with respect to exposure to Hazardous Materials), (ii) pollution, the protection or cleanup of the environment or natural resources, or (iii) the manufacture, generation, labeling, registration, use, treatment, storage, transportation, handling, disposal or actual or threatened Release of or exposure to Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. §§ 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Clean Water Act (33 U.S.C. §§ 1251, et seq.), the Clean Air Act (42 U.S.C. §§ 7401, et seq.) the Toxic Substances Control Act (15 U.S.C. §§ 2601, et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136, et seq.), and the regulations promulgated pursuant thereto.

"Environmental Permit" means any and all Permits required under any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any entity that is a member of (i) a controlled group of corporations (as defined in Section 414(b) of the Code), (ii) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), or (iii) an affiliated service group (as defined under Section 414(m) of the Code or the regulations under Section 414(o) of the Code), any of which includes any Seller.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means that certain escrow agreement, to be entered into on the Closing Date by and among Purchaser, Primary Seller and the Escrow Agent and in form and substance reasonably acceptable to Purchaser and Primary Seller.

"Excluded Intellectual Property" means Intellectual Property that has been sold or is required to be sold pursuant to either the APG Purchase Agreement or the Chemtex Purchase Agreement (other than, for the avoidance of doubt, any rights granted or transferred to a Seller in the APG Purchase Agreement or Chemtex Purchase Agreement).

"Excluded Matter" means any Effect to the extent arising out of or resulting from: (i) any change in the United States or foreign economies, business conditions or financial markets in general; (ii) any change that generally affects the industries and markets in which the Business and Sellers operate or compete; (iii) any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) any change in applicable Laws or accounting rules (including IFRS); (v) any actions taken or proposed to be taken by Purchaser or any of its Affiliates; (vi) the public

announcement of this Agreement in compliance with the terms of this Agreement, including Section 8.6, or the consummation of the transactions contemplated by this Agreement (excluding, for the avoidance of doubt, compliance by Sellers with Section 8.2); (vii) the filing of the Bankruptcy Cases, including Sellers' inability to pay certain obligations as a result of the filing of the Bankruptcy Cases; and (viii) any matter disclosed in any filings by Sellers with the Bankruptcy Court prior to the date of this Agreement; provided, however, that any Effect arising out of or resulting from any change or event referred to in clause (i), (ii), (iii), or (iv) shall not constitute an Excluded Matter if and only to the extent such change or event has a disproportionate impact on the Business, the Purchased Assets or the Assumed Liabilities compared to any other businesses that operate in the industries in which the Business operates and the assets and liabilities of such other businesses.

"Final Order" means an Order of the Bankruptcy Court or any other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect.

"Final Professional Payment Amounts" means Professional Payment Amounts to the extent allowed by the Bankruptcy Court pursuant to a Final Order; provided, that the Final Professional Payment Amounts to the extent not previously released in accordance with a certificate of counsel or certificate of no objection in accordance with paragraph 2(c) of the Interim Compensation Order, together with all Professional Payment Amounts previously released in accordance with a certificate of counsel or certificate of no objection in accordance with paragraph 2(c) of the Interim Compensation Order and paid to the applicable recipient thereof pursuant Section 3.5(b) shall not in the aggregate exceed the Professional Payment Escrow Amount.

"Governmental Body" means any government or governmental or quasi-governmental or regulatory body thereof, or political subdivision thereof, whether foreign, multinational, international, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hazardous Material" means petroleum and its by-products, asbestos and asbestos-containing materials, polychlorinated biphenyls, and any material, waste or substance which is defined, classified or regulated as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste," "toxic substance" or words of similar import under any provision of Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"IFRS" means the International Financial Reporting Standards consistently applied throughout the specified period and the immediately prior comparable period.

"Inbursa Adequate Protection Claims" means (i) the adequate protection claims with respect to the Guaranteed Obligations (as defined in the Pre-Petition First Lien Guaranty Mortgage) secured by adequate protection Liens under the Cash Collateral Orders or (ii) the Supplemental Inbursa Adequate Protection Claim (as defined in the Polymers DIP Orders).

"Indebtedness" means, at any time and with respect to any Person, all: (i) indebtedness for borrowed money; (ii) indebtedness for the deferred purchase price of property or services (other than trade payables, other expense accruals and deferred compensation items arising in the ordinary course of business of such Person); (iii) obligations evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business of such Person in respect of which liability remains contingent); (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), other than inventory or other property purchased in the ordinary course of business of such Person; (v) obligations under leases which have been or should be, in accordance with IFRS, recorded as capital leases, to the extent required to be so recorded; (vi) reimbursement, payment or similar obligations, contingent or otherwise, under acceptance, letter of credit or similar facilities, in each case only to the extent drawn; (vii) Indebtedness of others referred to in clauses (i) through (vi) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (A) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness; (B) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness; (C) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered); or (D) otherwise to assure a creditor against loss in respect of such Indebtedness; and (viii) Indebtedness referred to in clauses (i) through (vii) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means (i) any intellectual property and proprietary rights, whether arising under the United States, multinational, or foreign Laws, including Copyrights, Patents, Trademarks, Trade Secrets and Know-How and (ii) all rights to sue at law or in equity for past, present, and future infringement, impairment, or misappropriation thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany License(s)" means the cross-license(s) of Intellectual Property to be entered into by the operators/owners of certain PET plants previously owned by Sellers and certain Affiliates thereof and any other Affiliates of Sellers owning Intellectual Property relevant to the operations of a PET or PTA plant, substantially in the form of Exhibit B, or otherwise in form and substance reasonably acceptable to Purchaser.

"Interim Compensation Order" means that certain *Order Authorizing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* entered by the Bankruptcy Court on December 1, 2017 [Docket No. 308].

"Inventory" means all inventories of any kind or nature, including all inventories of materials, parts, raw materials, packaging materials, supplies, spare parts, work-in-process and finished goods and products, in each case whether or not related to the Business or any Purchased Asset and wherever maintained, held or stored, whether or not prepaid, and wherever located, held or owned, any prepaid deposits for the same, and including any goods in transit, other than any such items that are excluded pursuant to any subsection of Section 2.2.

"IP Records" means (i) any and all prosecution files and dockets, registration certificates, litigation files and related opinions of counsel relating to the Purchased Intellectual Property or MGI Trademarks, as applicable, as well as (ii) any tangible embodiments of the Purchased Intellectual Property, or the MGI Trademarks, as applicable.

"IRS" means the Internal Revenue Service.

"Jefferies Transaction Fees" means those fees payable to Jefferies LLC in its capacity as a Professional retained by the Creditors' Committee, in respect of the successful completion of the sale of the CC Assets, which fees shall be in an aggregate amount of up to $2,250,000.

"KEIP" means the key employee incentive plan of Resins approved by the Bankruptcy Court pursuant to the *Order Approving M&G Resins' Key Employee Retention Plan and Key Employee Incentive Plan* [Docket No. 629] entered on January 5, 2018.

"KERP" means the key employee retention plan of Resins approved by the Bankruptcy Court pursuant to the *Order Approving M&G Resins' Key Employee Retention Plan and Key Employee Incentive Plan* [Docket No. 629] entered on January 5, 2018.

"Know-How" means know-how, including specifications, processes, manufacturing techniques, recipes, formulas, inventions which have not been patented or for which an application for patent has not been filed and invention disclosures, data (including research and development data), databases, technical or business information, customer and supplier lists, pricing and cost information and business and marketing plans and proposals, and other confidential or proprietary information.

"Knowledge of MGI" means the actual knowledge of those individuals identified on Schedule 1.1(b), after reasonable inquiry.

"Knowledge of Sellers" means the actual knowledge of those individuals identified on Schedule 1.1(c), after reasonable inquiry.

"Law" means any national, federal, state, provincial, municipal, local or foreign law, statute, code, ordinance, rule, constitution, treaty, convention, or regulation or common law requirement.

"Lease" means a Contract under which a Person leases, uses or occupies, or has the right to use or occupy, any real property.

"Leased Real Property" means the real property leased, subleased, or otherwise used or occupied by a Seller, or which a Seller has the right to use or occupy, pursuant to a Purchased Contract to be assumed hereunder.

"Leave Employee" means each individual employed or leased by any Seller or any of its Affiliates as of the date hereof who, immediately prior to such individual's inactive status, provided services primarily in connection with the Business and who is on: (i) a leave of absence approved by any Seller or any of its Affiliates; (ii) military leave, pregnancy or parental leave, short-term disability leave, medical leave or jury duty; or (iii) any leave provided under applicable Law.

"Legal Proceeding" means any judicial, administrative or arbitral actions, hearings, investigations, suits, proceedings (public or private and including any civil, criminal, administrative, investigative or appellate proceedings), claims, petitions, pleas, charges, demands, hearings, inquiries, complaints, grievances, summonses, litigations, mediations, prosecutions, contests, inquests, audits, examinations or any similar matters or proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation of any kind (whether direct or indirect, known or unknown, express or implied, primary or secondary, absolute or contingent, accrued or unaccrued, asserted or unasserted, determined, determinable or otherwise liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" as applied to any Person means any lien (statutory or other), encumbrance, pledge, mortgage, indenture, deed of trust, security interest, claim, adverse interest, lease, license, sublicense, charge, escrow, option, preemptive right, right of first offer or refusal, easement, servitude, security agreement or other similar agreement, arrangement, commitment, understanding, community property interest, hypothecation, condition, equitable interest, encroachment, right of way, restriction or obligation (whether written or oral and whether or not relating in any way to credit or the borrowing of money) of any kind, or any proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset of such Person.

"Macquarie" means Macquarie Investments US Inc.

"Macquarie Claim" means the Claim by Macquarie arising under the Senior Loan Documents.

"Macquarie Payment Amount" means (a) in the event Purchaser is determined to be the Successful Bidder at the Auction, an amount equal to (i) if remitted to Macquarie on or prior to April 16, 2018, $57,300,000 (the "Initial Macquarie Payoff Amount"), (ii) if remitted to Macquarie following April 16, 2018 and on or prior to June 15, 2018, an amount equal to the sum of (A) the Initial Macquarie Payoff Amount, *plus* (B) any interest accrued at the regular applicable interest rate pursuant to the Senior Loan Documents during the period following April 16, 2018 through the date of remittance (the "Interim Period Interest Amount"), and (iii) if remitted to Macquarie following June 15, 2018, an amount equal to the sum of (A) the Initial Macquarie Payoff Amount, plus (B) Interim Period Interest Amount, plus (C) any interest accrued at the applicable default interest rate pursuant to the Senior Loan Documents during the period following June 15, 2018 through the date of remittance, and (b) in the event any Person other than Purchaser is determined to be the Successful Bidder and thereafter the governing agreement for the Sale Transaction (as defined in the Bidding Procedures) with such Person is terminated and Purchaser is deemed the new Successful Bidder (the date Purchaser is deemed to be the new Successful Bidder, the "Alternative APA Termination Date"), an amount equal to (i) if remitted to Macquarie on or prior to the date that is twenty-one (21) days following the Alternative APA Termination Date, the Initial Macquarie Payoff Amount, (ii) if remitted to Macquarie following the date that is twenty-one (21) days following the Alternative APA Termination Date and on or prior to the date that is eighty-one (81) days following the Alternative APA Termination Date, an amount equal to the sum of (A) the Initial Macquarie Payoff Amount, *plus* (B) any interest accrued at the regular applicable interest rate pursuant to the Senior Loan Documents during the period following the date that is twenty-one (21) days following the Alternative APA Termination Date through the date of remittance (the "Interim Post-Termination Interest Amount"), and (iii) if remitted to Macquarie following the date that is eighty-one (81) days following the Alternative APA Termination Date, an amount equal to the sum of (A) the Initial Macquarie Payoff Amount, plus (B) Interim Post-Termination Interest Amount, plus (C) any interest accrued at the applicable default interest rate pursuant to the Senior Loan Documents during the period following the date that is eighty-one (81) days following the Alternative APA Termination Date through the date of remittance.

"Mechanics Lien Amounts" means the amounts, in cash, actually used to satisfy Mechanics Lien Claims that are allowed by the Bankruptcy Court, which amounts in the aggregate shall not exceed the Mechanics Lien Escrow Amount.

"Mechanics Lien Claim" means any Lienholder Claims (as defined in the Mechanics Lien Motion) allowed by the Bankruptcy Court (after accounting for all available defenses, setoffs and counterclaims) for which a reserve amount has been established in accordance with the Mechanics Lien Motion, each such individual reserve amount as set forth in Exhibit A to the Debtors' Omnibus Reply in Support of the

Mechanics Lien Motion [Docket No. 1227], excluding CII's Claim in the amount of $87,034,689.00, and as approved by the Bankruptcy Court pursuant to a Final Order.

"Mechanics Lien Escrow Amount" means, at Purchaser's election, cash or a letter of credit in an aggregate amount equal to $263,745,024.45.

"Mechanics Lien Escrow Procedures" means the procedures proposed in the Mechanics Lien Motion, with such modifications as Purchaser may reasonably propose, or such other procedures to which Purchaser may consent in its sole discretion.

"Mechanics Lien Motion" means *Debtors' Motion for Entry of an Order Establishing a Lienholder Claims Reserve and Granting Related Relief* [Docket No. 1075].

"MGI Purchase Price" means the amount, if any, that may be agreed in writing among Purchaser and MGI in connection with MGI's execution of a counterpart hereto, pursuant to Section 8.16(b).

"MGI Trademark License" means that certain Trademark Assignment and License Agreement, dated February 27, 2018, between Mossi & Ghisolfi International, S.à.r.l., and FE Polytech, LLC.

"MGI Trademarks" means the Trademarks that are listed on Schedule 1.1(d).

"Obligors" means Resins, M&G Corp., M&G Finance Corporation, Waters, M&G USA Holding LLC, CII, Chemtex Far East, Ltd. and Indo American Investments, Inc.

"Order" means any administrative or judicial order, injunction, judgment, determination, decree, decision, verdict, settlement, award, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business consistent with past practices.

"Other Assets" means Purchased Assets other than the CC Assets.

"Other Senior Liens Amounts" means the amounts, other than the Mechanics Lien Amounts and the Macquarie Payment Amount, in cash, actually used to satisfy Claims ("Other Senior Liens Claims"), that are allowed by the Bankruptcy Court and secured by valid, enforceable, non-avoidable and perfected Liens, whether choate or inchoate, arising prior to the applicable Petition Date that are on any Purchased Asset that, in each case (A) were either perfected prior to the applicable Petition Date or have been perfected subsequent to the applicable Petition Date as permitted by Section 546(b) of the Bankruptcy Code and (B) are senior in priority to all or any portion of the obligations included in the Credit Bid that are secured by the applicable Purchased Asset; provided, that the Other Senior Liens Amounts in the aggregate shall not exceed the Other Senior Liens Escrow Amount. For the avoidance of doubt, in no event shall

any Pre-Petition Second Lien Claim, Mechanics Lien Claim, the Macquarie Claim or claim to be satisfied by the Tax Lien Amounts constitute an Other Senior Liens Claim.

"Other Senior Liens Escrow Amount" means cash in an aggregate amount equal to $0.

"Owned Real Property" means the real property set forth on Schedule 2.1(b)(i) (as it may be amended and updated in accordance with this Agreement) in which any Seller has any right, title or interest. For the avoidance of doubt, Purchaser may revise such Schedule 2.1(b)(i) with the addition or deletion of real property (provided, that a Seller has a right, title or interest in any such additional real property) at any time prior to the Closing Date, to the extent permitted by Section 2.6(d).

"Patents" means any patents, patent applications, utility models and designs, and any reissues, renewals, extensions, reexaminations, divisionals, continuations, continuations-in-part and foreign counterparts thereof, and all patents, applications and filings claiming priority thereto including any patents or patent applications in the United States Patent and Trademark Office, the World Intellectual Property Organization, or any other country or jurisdiction.

"Periodic Non-Income Taxes" means any real or personal property Taxes or other similar periodic Taxes not based on income or receipts.

"Permits" means any approvals, authorizations, consents, licenses, waivers, accreditations, registrations, certifications, exemptions, clearances, permits or certificates of a Governmental Body.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record or disclosed in policies of title insurance or any judicial lien searches which have been made available to Purchaser prior to the date hereof (other than any Mechanics Lien Claims) that, individually or in the aggregate, do not interfere in any material respect with or otherwise impair in any material respect the use, occupancy or value of the property subject thereto;(ii) statutory Liens for Taxes, assessments or other governmental charges that are not yet due and payable for which adequate reserves have specifically been established in accordance with IFRS in the Financial Statements; (iii) any Mechanics Lien Claims; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body, provided, that such regulations have not been violated and individually or in the aggregate, do not interfere in any material respect with or otherwise impair in any material respect the use or occupancy of the property subject thereto; (v) title of a lessor under a written capital or operating lease that constitutes a Purchased Contract and was made available to Purchaser prior to the date hereof; (vi) Liens for Taxes that constitute Assumed Liabilities; (vii) Liens that will be released by the Sale Order as of Closing; (viii) any Intellectual Property licenses listed on Schedule 2.1(b)(viii); and (ix) any Liens securing any Mechanics Lien Amounts or Other Senior Lien Amounts that remain on the Purchased Assets with the consent of Purchaser and the holder of such Lien; provided, however, that in no case shall any Lien be deemed to constitute a

Permitted Exception if such Lien secures the payment of borrowed money or any Excluded Asset or Excluded Liability.

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"<u>Plan</u>" means any employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, and all bonus, commission, deferred compensation, incentive compensation, equity or other equity-based incentive, employment, consulting, severance, termination, change in control, vacation, welfare, supplemental welfare, retiree health and welfare, death benefit, hospitalization or other medical, disability, life, retiree medical or other insurance, supplemental unemployment benefit, profit-sharing, pension, retirement or supplemental retirement plan, program, agreement or arrangement, and each other benefit plan, program, agreement or arrangement, that (i) is sponsored, maintained or contributed to by any Seller or any of its ERISA Affiliates, or for which any Seller or any of its ERISA Affiliates has any obligation to sponsor, maintain or contribute to, or for which any Seller or any of its ERISA Affiliates has any direct or indirect Liability and (ii) under which any current or former Employees (or their respective beneficiaries) has any present or future right to benefits.

"<u>Polymers DIP Orders</u>" means the *Interim Order (I) Authorizing Debtor M&G Polymers USA, LLC to Incur Postpetition Secured Superpriority Indebtedness Pursuant to Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d); (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (IV) Granting Related Relief* [Docket No. 720] and the *Final Order (I) Authorizing Debtor M&G Polymers USA, LLC to Incur Postpetition Secured Superpriority Indebtedness Pursuant to Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d); (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [Docket No. 865] (the "<u>Final Polymers DIP Order</u>").

"<u>Power of Attorney</u>" means, with respect to any Person, an irrevocable power of attorney constituting and appointing Purchaser or its designee as such Person's true and lawful agent and attorney-in-fact to take and execute in the name of such Person any and all actions and documents that may be deemed proper to effectuate, record, perfect or confirm the assignment of Purchased Intellectual Property and MGI Trademarks contemplated in this Agreement, effective if such Person liquidates or otherwise ceases to exist, or otherwise is unable to or fails to take any such action or execute any such document after written request by Purchaser.

"<u>Pre-Petition Credit Bid Amount</u>" means an amount equal to (i) all Pre-Petition First Lien Obligations outstanding under the Pre-Petition First Lien Loan Documents as of 5:00 p.m. (Eastern time) on the day before the date on which the Auction is commenced, plus (ii) the increase in the amount of any Pre-Petition First Lien Obligations outstanding under the Pre-Petition First Lien Loan Documents (including, for the avoidance of doubt, as a result of (A) the accrual of interest and (B) the accrual of

fees, expenses and other amounts payable, in each case under and pursuant to the Pre-Petition First Lien Loan Documents) from 5:00 p.m. (Eastern time) on the day before the date on which the Auction is commenced through and including the Closing Date (including any amounts which become due and payable upon the Closing, including any exit fees), such increase reduced by any amounts paid in respect thereof prior to the Closing Date.

"Pre-Petition First Lien Guaranty" means that certain guaranty, dated as of March 21, 2013, granted by M&G Polymers USA LLC for the benefit of the Pre-Petition First Lien Lender in connection with the Pre-Petition First Lien Loan Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Pre-Petition First Lien Guaranty Mortgage" means that certain Credit Line Deed of Trust, Assignment of Rents and Leases, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing (as at any time modified, amended or restated), executed as of March 15, 2013 and effective as of March 21, 2013, and recorded in the Office of the Clerk of the County Commission of Mason County, West Virginia in Trust Deed Book 394, at Page 556, by M&G Polymers for the benefit of the Pre-Petition First Lien Lender.

"Pre-Petition First Lien Lender" means Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa, in its capacity as the holder of any Liens, Claims or Indebtedness evidenced or secured by the Pre-Petition First Lien Loan Documents, the Interim DIP Order and the Final DIP Order.

"Pre-Petition First Lien Loan Documents" means, collectively, that certain Loan Agreement dated as of March 21, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, by and between Pre-Petition First Lien Lender and Resins, (the "Pre-Petition First Lien Loan Agreement") pursuant to which Pre-Petition First Lien Lender has made the "Loan" therein described (the "Pre-Petition First Lien Loan"), the Pre-Petition First Lien Mortgage, the Pre-Petition First Lien Guaranty, the Pre-Petition First Lien Guaranty Mortgage and all other agreements, instruments or documents evidencing or securing the Pre-Petition First Lien Loan, and the other related documents and agreements executed in connection with the Pre-Petition First Lien Loan Agreement, including, notes, guaranties, security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements, assignments, trust agreements, amendments, waivers, consents, other modifications, intellectual property filings and other documents, as at any time amended.

"Pre-Petition First Lien Mortgage" means that certain Deed of Trust, Assignment of Rents and Leases, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing (as at any time modified, amended or restated), dated as of March 21, 2013 and recorded as document number 2013010972 in the Official Public Records, Nueces County, Texas, by Resins as grantor for the benefit of the Pre-Petition First Lien Lender.

"<u>Pre-Petition First Lien Obligations</u>" means (i) the Obligations (as defined in the Pre-Petition First Lien Mortgage) owed by Resins outstanding under the Pre-Petition First Lien Loan Documents secured by Pre-Petition First Lien Resins Security Interests on the Pre-Petition First Lien Resins Collateral, and (ii) the Guaranteed Obligations (as defined in the Pre-Petition First Lien Guaranty Mortgage) secured by the Pre-Petition First Lien Polymers Security Interests on the Pre-Petition First Lien Polymers Collateral.

"<u>Pre-Petition First Lien Polymers Collateral</u>" means all Property (as defined in the Pre-Petition First Lien Guaranty Mortgage) in existence on the Polymers Petition Date and all products and proceeds thereof.

"<u>Pre-Petition First Lien Polymers Security Interests</u>" means the Liens on and security interests in the Pre-Petition First Lien Polymers Collateral securing the Guaranteed Obligations (as defined in Pre-Petition First Lien Guaranty Mortgage).

"<u>Pre-Petition First Lien Resins Collateral</u>" means all Property (as defined in the Pre-Petition First Lien Mortgage) in existence on the Resins Petition Date and all products and proceeds thereof.

"<u>Pre-Petition First Lien Resins Security Interests</u>" means the Liens on and security interests in the Pre-Petition First Lien Resins Collateral securing the Obligations (as defined in the Pre-Petition First Lien Mortgage).

"<u>Pre-Petition Second Lien Claim</u>" means any Claim with respect to any obligation owed by the Obligors under, or in connection with the Pre-Petition Second Lien Documents (as defined in the Debtor-in-Possession Loan Agreement).

"<u>Professional</u>" means a Person who is an attorney, financial advisor, accountant, appraiser, monitor, auctioneer or other professional Person and who is retained, with Bankruptcy Court approval, by (i) the Obligors pursuant to any one (1) or more of Sections 327, 328(a) and 363 of the Bankruptcy Code or (ii) the Creditors' Committee pursuant to Section 1103(a) of the Bankruptcy Code.

"<u>Professional Payment Amounts</u>" means an amount equal to the sum of (i) any Carve-Out Expenses incurred prior to the Closing Date (or, if a Carve-Out Trigger Date has occurred, the Carve-Out Trigger Date Expenses), plus (ii) if no Carve-Out Trigger Date has occurred, any Committee Professional Excess Expenses, plus (iii) any Sale Excess Fees. Professional Payment Amounts shall not include any amounts in respect of Completion Fees.

"<u>Professional Payment Escrow Amount</u>" means cash in an aggregate amount equal to $13,100,000; <u>provided</u>, <u>however</u>, that such amount shall be increased prior to the Closing by (i) an aggregate amount of all Professionals' good-faith estimates (such estimates subject to Purchaser's reasonable approval thereof) of their respective incremental accrued Carve-Out Expenses and Committee Professional Excess Expenses (as applicable) from 5:00 p.m. (Eastern time) on April 18, 2018 through the Termination Date, to the extent the Termination Date has been delayed by mutual agreement of the parties hereto pursuant to the terms of this Agreement, (ii) an

aggregate amount equal to the holdbacks for November and December 2017 to the extent such amounts have not been paid to Professionals in accordance with the DIP Budget as of the Closing, and (iii) any amounts allocated to Professionals in the DIP Budget that have not been paid to such Professionals as of the Closing (<u>provided</u>, that to the extent such amounts referred to in items <u>(ii)</u> or <u>(iii)</u> are added to the Professional Payment Escrow Amount, they will no longer be payable under the DIP Budget).

"<u>Purchased Avoidance Actions</u>" means any claims, rights, or causes of action of the Obligors arising under chapter 5 of the Bankruptcy Code and any analogous state law claims, in each case (i) relating to the Purchased Assets or the Assumed Liabilities, (ii) against a counterparty to any Purchased Contract related to such Purchased Contract or (iii) against a holder of any Mechanics Lien Claim or Other Senior Liens Claim related to such Mechanics Lien Claim or Other Senior Liens Claim, as applicable.

"<u>Purchased Contracts</u>" means all Contracts to which any Seller is a party or is bound set forth in <u>Schedule 2.1(b)(viii)</u> (as it may be amended and updated in accordance with this Agreement), solely to the extent such Contracts are assumed in accordance with <u>Section 2.5</u>. For the avoidance of doubt, Purchaser may revise such <u>Schedule 2.1(b)(viii)</u> with the addition or deletion of Contracts to which any Seller is a party or is bound at any time prior to the Contract Designation Deadline, to the extent permitted by <u>Section 2.6(c)</u>.

"<u>Purchased Intellectual Property</u>" means (i) all Intellectual Property owned or purported to be owned by any Seller and (ii) the Intellectual Property listed on <u>Schedule 1.1(e)</u>; in each case excluding the Excluded Intellectual Property.

"<u>Purchased Software</u>" means all Software owned by any Seller.

"<u>Purchaser Material Adverse Effect</u>" means a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement.

"<u>Real Property</u>" means (i) the Owned Real Property and (ii) the Leased Real Property.

"<u>Release</u>" means any release, spill, emission, leaking, pumping, pouring, injection, emptying, escaping, deposit, disposal, discharge, dispersal, migration or leaching into or through the environment.

"<u>Remedial Action</u>" means all actions to (i) clean up, remove, treat or remediate any Hazardous Material; (ii) prevent the actual or threatened Release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

"Representatives" means, with respect to any Person, any and all directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents, including potential financing sources of such Person.

"Retained Avoidance Actions" means any claims, rights, or causes of action of the Obligors arising under chapter 5 of the Bankruptcy Code and any analogous state law, in each case, other than the Purchased Avoidance Actions.

"Sale Excess Fees" means the amount equal to (i) the amount of claims for unpaid fees, costs and expenses incurred by and payable to Professionals in excess of the Carve-Out Expenses (or, if a Carve-Out Trigger Date has occurred, the Carve-Out Trigger Date Expenses); provided that (A) the amount of Sale Excess Fees for each Professional retained by the Obligors shall not exceed an amount equal to 10% of the aggregate amount of fees, costs and expenses for such Professional provided for under the DIP Budget and (B) the amount of Sale Excess Fees for all Professionals retained by the Creditors' Committee shall not exceed an amount equal to 10% of the aggregate amount of fees, costs and expenses for all such Professionals provided for collectively under the DIP Budget plus (ii) the Jefferies Transaction Fees.

"Sale Order" means the Order(s) of the Bankruptcy Court which are not subject to a stay pending appeal, which are substantially in the form attached hereto as Exhibit A, with such changes thereto as Purchaser may approve in its sole discretion, approving this Agreement and all of the terms and conditions hereof and approving and authorizing Sellers and MGI to consummate the transactions contemplated hereby pursuant to Sections 363 and 365 of the Bankruptcy Code and providing, among other things, substantially as follows: (i) the Purchased Assets will be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser or that Purchaser elects to assume under Section 3.1, and Permitted Exceptions (other than those Permitted Exceptions of the type described in items (iii), (vi) or (vii) of the definition thereof)) and claims, such Liens and claims to attach to the applicable proceeds of such transactions, including the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court will retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach thereof as provided in Section 12.4; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against, and not subject to rejection or avoidance by Sellers or any chapter 7 or chapter 11 trustee of Sellers.

"Seller Material Adverse Effect" means any state of facts, circumstance, condition, event, change, development, occurrence, result or effect (each, an "Effect") (regardless of whether such Effect constitutes a breach of any representation, warranty or covenant of Sellers or MGI hereunder) which, individually or in combination with any other Effect, has had or would reasonably be expected to have a material adverse effect on (i) the value of the Business or the Purchased Assets, (ii) the condition (financial or otherwise), assets (tangible or intangible, including the Purchased Assets), liabilities (including the Assumed Liabilities) or results of operations of the Business, or (iii) the

ability of Sellers and MGI to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement, other than, in the case of clauses (i) and (ii), to the extent such Effect arises out of or results from an Excluded Matter.

"Senior Loan Documents" means that certain Credit Agreement, dated as of November 9, 2016, among Macquarie, as administrative and collateral agent, the lenders party thereto from time to time, and Waters, and the related security documents.

"Shared Contract" means any Contract pursuant to which any Seller receives or provides goods or services for or on behalf of the Business and one (1) or more businesses of any Seller other than the Business.

"Software" means software, programs applications, source code, object code, firmware, and documentation.

"Successful Bidder" has the meaning set forth in the Bidding Procedures (and may include multiple bidders whose bids are combined).

"Tax Authority" means any Governmental Body charged with the administration of any Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"Tax Incentive Agreements" means the Contracts listed in Schedule 1.1(f).

"Tax Lien Amounts" means the amounts actually used to satisfy the Claims asserted by the Tax Authority of Nueces County, Texas (and the local taxing jurisdictions therein, including the local taxing jurisdictions party to the Tax Incentive Agreements) (the "Texas Tax Authority") in respect of obligations secured by the Liens asserted against the CC Plant on account of the 2017 *ad valorem* property Taxes assessed by the Texas Tax Authority to the extent such Liens and the related Claims are determined to be valid and are allowed by the Bankruptcy Court.

"Taxes" means (i) any federal, state, local or foreign tax or other similar charge, fee, levy or assessment in the nature of a tax imposed by any Tax Authority, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, alternative or add-on minimum, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security (or similar), unemployment, excise, severance, stamp, occupation, property, estimated and payment in lieu of taxes, and (ii) all interest, penalties and additions to tax imposed by any Tax Authority in connection with any item described in clause (i).

"Tax Return" means any return, declaration, report, estimate, form, information return or statement required to be filed or maintained in respect of any Taxes (including any attachments and schedules thereto or amendments thereof).

"Trademark" means any trademark, trade name, corporate name, business name, domain name, trade style, trade dress, service mark, logo, source identifier,

business identifier, certification mark, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other Governmental Body, and all extensions or renewals of any of the foregoing.

"Trade Secrets" means Know-How that are trade secrets under applicable Law.

"Transferred Employee" means any Offered Employee who (i) accepts Purchaser's offer of employment and (ii) commences employment with Purchaser effective (A) with respect to Business Employees, on the later of (x) the Closing Date and (y) the date on which such Business Employee may legally commence employment or service with Purchaser, as determined by Purchaser in its sole discretion, or (B) with respect to Leave Employees, on the first (1st) Business Day after the Leave Employee returns to active employment or service with Purchaser or any of its Affiliates.

"Transferred Permits" means the Permits set forth on Schedule 1.1(g) (as it may be amended and updated in accordance with this Agreement). For the avoidance of doubt, Purchaser may revise such Schedule 1.1(g) with the addition or deletion of Permits (provided, that a Seller or a Debtor Affiliate has a right, title or interest in any such additional Permit) at any time prior to the Closing Date, to the extent permitted by Section 2.6(f).

"U.S. Trustee" means the United States Trustee for the District of Delaware.

"WARN Act" means the Worker Adjustment and Retraining Notification Act.

"Wind-Down Amounts" means an amount in cash for the purpose of Sellers' performance of their respective obligations pursuant to this Agreement, including pursuant to Sections 2.5(a), 2.5(c), 2.5(e), 2.6, 8.12, 8.15 and 11.4, the winding down of their estates, administering the Bankruptcy Cases pending such wind-down and making related payments through the conclusion of the Bankruptcy Cases, in each case solely in accordance with the Wind-Down Budget.

"Wind-Down Budget" means the budget set forth in Exhibit D.

"Wind-Down Escrow Amount" means cash in an aggregate amount equal to $5,830,000.

1.2     Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the Sections indicated:

| Term | Section |
|------|---------|
| Accounting Referee | 11.2(a) |
| Additional Cash Payment Amount | 3.5(c) |
| Affiliate Asset | 8.5 |
| Agreement | Preamble |

| Term | Section |
|------|---------|
| Allocation Notice of Objection | 11.2(a) |
| Antitrust Consent | 8.4(b) |
| Antitrust Division | 8.4(a) |
| Assumed Liabilities | 2.3 |
| Assumed Plans | 2.1(b)(xv) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bio-based IP | 8.9(g) |
| Burdensome Condition | 8.4(b) |
| CC Plant | Recitals |
| Chemtex FE | Preamble |
| CII | Preamble |
| Closing | 4.1 |
| Closing Cure Amounts | 2.5(a) |
| Closing Date | 4.1 |
| Completion Fees Escrow Account | 3.5(b) |
| Contract Designation Deadline | 2.6(c) |
| Credit Bid | 3.1(a) |
| Debtor-in-Possession Loan Agreement | 1.1, definition of "DIP Credit Documents" |
| Deposit Amount | 3.2 |
| Deposit Escrow Account | 3.2 |
| Deposit Fund | 3.2 |
| Deposit Payment | 4.6(b) |
| Desalination Plant | Recitals |
| Effect | 1.1, definition of "Seller Material Adverse Effect" |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| FCPA | 5.17 |
| Final Allocation Statement | 11.2(a) |
| Final DIP Order | 1.1, definition of "DIP Credit Documents" |
| Finance | Preamble |
| Financial Statements | 5.18 |
| FTC | 8.4(a) |
| Guarantors | 1.1, definition of "DIP Credit Documents" |
| Holding | Preamble |
| IAI | Preamble |
| Interim DIP Order | 1.1, definition of "DIP Credit Documents" |
| Mechanics Lien Escrow Account | 3.4(d) |
| M&G Affiliate Third Party Software | 8.8(b) |

| Term | Section |
|------|---------|
| M&G Chemicals CIM | 1.1, definition of "Business" |
| M&G Corp. | Preamble |
| MGI | Preamble |
| MGI Assets | 2.1(b) |
| Necessary Consent | 2.6(a) |
| Offered Employees | 10.1(a) |
| Other Payments | 3.1 |
| Other Senior Liens Claims | 1.1, definition of "Other Senior Liens Amounts" |
| Other Senior Liens Escrow Account | 3.4(e) |
| PET | Recitals |
| Petition Date | Recitals |
| Polymers | Preamble |
| Polymers Petition Date | Recitals |
| Pre-Closing Payables | 2.6(e) |
| Pre-Petition First Lien Loan | 1.1, definition of "Pre-Petition First Lien Loan Documents" |
| Pre-Petition First Lien Loan Agreement | 1.1, definition of "Pre-Petition First Lien Loan Documents" |
| Primary Seller | Preamble |
| Professional Payment Escrow Account | 3.4(c) |
| Proposed Allocation Statement | 11.2(a) |
| PTA | Recitals |
| Purchased Assets | 2.1(b) |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Records | 2.1(b)(v) |
| Registered Intellectual Property | 5.6(a) |
| Resins | Preamble |
| Resins Petition Date | Recitals |
| Seller or Sellers | Preamble |
| Tangible Personal Property | 2.1(b)(iv) |
| Texas Tax Authority | Definition of "Tax Lien Amounts" |
| Termination Date | **Error! Reference source not found.** |
| Title IV Plans | 5.12(h)(i) |
| Transfer Taxes | 11.1 |
| TSA | 8.8 |
| Waters | Preamble |
| Wind-Down Escrow Account | 3.4(g) |

1.3    <u>Other Definitional and Interpretive Matters</u>.  (a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)     <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.

(ii)     <u>Dollars</u>.  Any reference in this Agreement to $ will mean U.S. dollars.

(iii)     <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

(iv)     <u>IFRS</u>.  Terms used herein which are defined in IFRS are, unless specifically defined herein, used herein as defined in IFRS.

(v)     <u>Gender and Number</u>.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

(vi)     <u>Headings</u>.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Article" or "Section" are to the corresponding Article or Section, of this Agreement unless otherwise specified.

(vii)     <u>Herein</u>.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(viii)     <u>Including</u>.  The word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)     <u>Other Terms</u>.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if".  The word "or" is used in the inclusive sense of "and/or".  The word "day(s)" means calendar day(s) unless specified as Business Days.

(x)     <u>Amendments and Supplements</u>.  Unless otherwise specified herein, references to any agreement, document or instrument herein shall mean such agreement, document or instrument as amended, supplemented and modified from time to time in accordance with its terms.

Reference to any Law means such Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder.

(xi)     References to documents or other materials "provided" or "made available" to Purchaser shall mean that such documents or other materials were delivered to Purchaser or its Representatives or were present in the online data room available to Purchaser and its Representatives and maintained by Sellers for purposes of the transactions contemplated by this Agreement as of 5:00 p.m. (Eastern time) time on the Business Day immediately prior to the date of this Agreement.

(b)     The parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## II.  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     <u>Purchase and Sale of Assets</u>.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Closing, (i) Purchaser will purchase, acquire and accept from Sellers (and, if applicable, Debtor Affiliates), and Sellers will (and, if applicable, will cause Debtor Affiliates to) sell, transfer, assign, convey and deliver to Purchaser, the Purchased Assets (other than the MGI Assets), and (ii) Purchaser will purchase, acquire and accept from MGI, and MGI will sell, transfer, convey and deliver to Purchaser, the MGI Assets, in each case, free and clear of all Liens (other than those Liens created by Purchaser or that Purchaser elects to assume under <u>Section 3.1</u>, if any, and other than Permitted Exceptions (other than those Permitted Exceptions of the type described in items <u>(iii)</u>, <u>(vi)</u> or <u>(vii)</u> of the definition thereof)).

(b)     The term "<u>Purchased Assets</u>" means (x) all of MGI's right, title and interest in, to and under the MGI Trademarks, and IP Records as applicable to MGI Trademarks (collectively, the "<u>MGI Assets</u>") and (y) all of Sellers' right, title and interest in, to and under any and all assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible, wherever located and whether now existing or hereafter acquired, that comprise Pre-Petition First Lien Polymers Collateral, Pre-Petition First Lien Resins Collateral or DIP Collateral (but in all cases, other than the Excluded Assets), it being understood and agreed that the following properties, assets and rights comprise Pre-Petition First Lien Polymers Collateral, Pre-Petition First Lien Resins Collateral or DIP Collateral:

(i)      subject to <u>Section 2.6</u>, the Owned Real Property together with all facilities, improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(ii)      all rights, title and interest of any Seller with respect to any Leased Real Property together with all facilities, improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(iii)      all rights held by any Seller to utilize roads, easements and other rights of way in connection with any Real Property or otherwise in the operation of the Business;

(iv)      all equipment, machinery, forklifts, vehicles, fixtures, furniture, furnishings, apparatus, appliances, implements, telephone systems, signage, supplies, in-store displays, computer hardware, servers, network equipment and other IT assets or telecommunication devices, leasehold improvements, tooling and other tangible personal property of every kind and description, whether or not installed and wherever located, including those set forth on <u>Schedule 2.1(b)(iv)</u>, but in each case for the avoidance of doubt excluding any Intellectual Property therein that does not constitute Purchased Intellectual Property (collectively, the "<u>Tangible Personal Property</u>");

(v)      originals or, where originals are not available, copies of all books, records and data used in, held for use in, or related to, the operation of the Business, including books of account, ledgers and general, financial and accounting records; Employee Records; machinery and equipment maintenance files relating to the Purchased Assets; supplier and customer lists, price lists, production data, quality control records and procedures, customer complaints and inquiry files and sales and billing records to the extent related to the operation of the Business; strategic plans, internal financial statements, and marketing and promotional materials (including website content) related to the operation of the Business; construction or engineering files, documents and other plans, designs, drawings, schematics or similar materials related to the CC Plant, any Purchased Asset or the Business; research and development files, operating manuals and handbooks, protocols and specifications to the extent related to the Business; records related to environmental, health and safety matters at the Owned Real Property or Leased Real Property; and any correspondence with any Governmental Body related to the operation of the Business or Purchased Assets; each of the foregoing, in any form or medium, including print and digital copies, and for the avoidance of doubt excluding any Intellectual Property therein that does not constitute Purchased Intellectual Property (collectively, the "<u>Records</u>"); <u>provided</u>, <u>however</u>, that (A) Sellers will have the right until April 30, 2018 to makes copies of any portions of the Records that relate to (I) any business or assets of Sellers or their Affiliates other than the

Business or Purchased Assets or (II) any Claim against any Seller or any rights, claims or defenses to such Claim and (B) Sellers may redact any portions of the Records that relate solely to (1) any business or assets of any Seller or Affiliate of Sellers other than the Business or Purchased Assets, (2) any business or assets sold by a Seller pursuant to the APG Purchase Agreement or (3) any business or assets sold pursuant to the Chemtex Purchase Agreement (but excluding, in each case of clauses (2) and (3), for the avoidance of doubt, any rights granted or transferred to a Seller in the APG Purchase Agreement or Chemtex Purchase Agreement);

(vi)     originals or, where originals are not available, copies of all IP Records;

(vii)     the Purchased Intellectual Property and the Purchased Software;

(viii)     subject to Section 2.6, the Purchased Contracts (including any Leases that constitute Purchased Contracts);

(ix)     all cash, cash equivalents, bank accounts and marketable securities of any kind that are Pre-Petition First Lien Resins Collateral, Pre-Petition First Lien Polymers Collateral or DIP Collateral;

(x)     the portion of any cash, cash equivalents, bank accounts and marketable securities of any kind owned by Polymers that is (i) subject to any Lien senior to the Pre-Petition First Lien Polymers Security Interest or (ii) subject to the Inbursa Adequate Protection Lien (as defined in the Cash Collateral Order) or the Supplemental Inbursa Adequate Protection Lien (as defined in the Final Polymers DIP Order and only to the extent such Lien has attached as of the Closing Date) equal to the amount of the Inbursa Adequate Protection Claims allowed pursuant to an Order of the Bankruptcy Court (if any), as determined with the same validity, force and effect that such Claims would have prior to the Closing Date, provided that any such amount described in the foregoing clauses (i) and (ii) shall be transferred to Purchaser and constitute Purchased Assets only as authorized pursuant to, and subject to the terms of the Cash Collateral Orders and the Polymers DIP Orders;

(xi)     all third party accounts receivable and any security, claim, remedy or other right related to any of the foregoing, including intercompany receivables owing to Sellers, but excluding the accounts receivable of Polymers;

(xii)     all proceeds comprising Pre-Petition First Lien Polymers Collateral, Pre-Petition First Lien Resins Collateral or DIP Collateral received by any Seller in respect of any assets sold thereby prior to the

Closing with such proceeds to be applied and paid in same the order of priority with the same validity, force and effect that the Pre-Petition First Lien Lender or the DIP Lender, as applicable, had prior to entry into this Agreement (and which for the avoidance of doubt include the proceeds from the transactions contemplated by the APG Purchase Agreement that are subject to the Pre-Petition First Lien Polymers Security Interest (including the Apple Grove facility and the Intellectual Property sold in that transaction));

(xiii)   the portion of any proceeds received by Polymers in respect of any assets sold thereby prior to the Closing that is (i) subject to any Lien senior to the Pre-Petition First Lien Polymers Security Interest or (ii) subject to the Inbursa Adequate Protection Lien (as defined in the Cash Collateral Order) or the Supplemental Inbursa Adequate Protection Lien (as defined in the Final Polymers DIP Order and only to the extent such Lien has attached as of the Closing Date), equal to the amount of the Inbursa Adequate Protection Claims allowed pursuant to an Order of the Bankruptcy Court (if any), as determined with the same validity, force and effect that such Claims would have prior to the Closing Date, provided that any such amount described in the foregoing clauses (i) and (ii) shall be transferred to Purchaser and constitute Purchased Assets only as authorized pursuant to, and subject to the terms of the Cash Collateral Orders and the Polymers DIP Orders;

(xiv)   subject to Section 2.6, the Transferred Permits;

(xv)   all prepaid expenses (including any prepaid Taxes), deferred charges, credits, deposits (including security deposits under any Leases and any utility deposits), claims, refunds, rights of recovery, rights of set-off, rights of recoupment and advance payments of any kind that relate to the Business, any Purchased Contracts or any other Purchased Assets;

(xvi)   all warranties, guarantees and similar rights to the extent related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets (including, for the avoidance of doubt, warranties and licenses received from manufacturers of Tangible Personal Property), and claims against suppliers and other third parties in connection with the Purchased Contracts;

(xvii)   the Plans set forth on Schedule 5.12(a) (including, for the avoidance of doubt, any Contracts related thereto) that Purchaser elects to assume, if any, in accordance with Section 10.1(b) (such Plans and related Contracts Purchaser so elects to assume, if any, the "Assumed Plans"), and all assets held with respect to the Assumed Plans.

(xviii)   all rights in connection with any Legal Proceedings of any nature available to or being pursued by any Seller, including (A) whether arising by way of counterclaim or otherwise, (B)  under all warranties, indemnities, representations, guarantees and similar rights in respect of the Purchased Assets or relating in any way to the operation and conduct of the Business and related claims, credits, rights of recovery and set off with respect thereto, including, in each case, in connection with any Assumed Liabilities, and (C) relating in any way to any Mechanics Lien Claim or any claim any Seller may have against any holder of any Mechanics Lien Claim (including the right to litigate, object to and settle the amount of any Mechanics Lien Claim and the validity, priority and extent of any Liens in respect of such Mechanics Lien Claim, and any available defenses and counterclaims);

(xix)    the Mechanics Lien Claim held by CII and all related rights and defenses;

(xx)    the Purchased Avoidance Actions, and any proceeds thereof (whether or not such proceeds are in existence at the time of the Closing);

(xxi)    all rights under insurance policies and all insurance claims and proceeds paid or payable to Sellers in respect of any casualty event, in each case related to the Business, any Purchased Asset or any Assumed Liability;

(xxii)   all goodwill and going-concern value associated with the Business, or any Purchased Assets, including the right to represent to third parties that Purchaser is the successor to the Business;

(xxiii)  all Inventory; and

(xxiv)  the assets, properties and rights set forth on Schedule 2.1(b)(xxiv).

2.2    Excluded Assets.  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign, convey or deliver the Excluded Assets to Purchaser, and Sellers will retain all right, title and interest to, in and under the Excluded Assets.  The term "Excluded Assets" means all right, title and interest of (x) MGI in, to or under any asset other than the MGI Assets, and (y) any Seller (or of any of Sellers' Affiliates) in, to or under any asset other than the Purchased Assets, including:

(a)    all cash, cash equivalents, bank accounts and marketable securities of any kind that are not included in Section 2.1(b)(ix), Section 2.1(b)(x), Section 2.1(b)(xii) and Section 2.1(b)(xiii);

(b)    all rights, claims, causes of action and credits to the extent relating to any Excluded Asset or Excluded Liability (except those set forth in Section 2.1(b)(xvi) and Section 2.1(b)(xviii)), including any such item to the extent arising under any

guarantee, warranty, indemnity or similar right in favor of a Seller in respect of an Excluded Asset or Excluded Liability;

(c)  any shares of capital stock or other equity interest of any Seller or any of their Affiliates or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller or any such Affiliates, including any proceeds thereof resulting from a sale of any such Excluded Assets;

(d)  any minute books, stock ledgers, corporate seals and stock certificates of Sellers or other similar books and records that Sellers are required by Law to retain, including Tax Returns, financial statements and corporate or other entity filings; provided, however, that Purchaser will have the right to make copies of any portions of such retained books and records (in the case of Tax Returns, only non-income Tax Returns after reasonable redactions) that relate to the Purchased Assets or the Business and Sellers agree to preserve such records in accordance with Section 8.7;

(e)  the Retained Avoidance Actions, and any proceeds thereof (whether or not such proceeds are in existence at the time of the Closing);

(f)  (i) any Contract (other than a Shared Contract) that is not a Purchased Contract, (ii) subject to Section 2.6, any Purchased Contract that requires the consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained, and (iii) subject to Section 8.11, any Shared Contract that is listed on Schedule 5.8(c) and was made available to Purchaser prior to the date hereof, except as prohibited under the confidentiality provisions of the applicable Contract (as indicated on Schedule 5.8(c));

(g)  the rights that accrue or will accrue to Sellers pursuant to this Agreement;

(h)  all real property owned by a Seller other than the Owned Real Property, including any proceeds thereof resulting from a sale of any such Excluded Assets;

(i)  all of the assets, properties and rights (including any Intellectual Property) sold or required to be sold by any Seller or MGI pursuant to the APG Purchase Agreement or the Chemtex Purchase Agreement (other than, for the avoidance of doubt, any rights granted or transferred to a Seller pursuant to the APG Purchase Agreement or Chemtex Purchase Agreement), other than assets, cash and proceeds that are Purchased Assets as set forth in Sections 2.1(b)(ix), 2.1(b)(x), 2.1(b)(xii) and 2.1(b)(xiii)

(j)  the Excluded Intellectual Property;

(k)  all rights in or to assets or Real Property leased by Sellers (as lessee) unless the associated Lease constitutes a Purchased Contract, including any proceeds thereof resulting from a sale of any such Excluded Assets;

(l)     all Plans and assets held with respect thereto, other than the Assumed Plans and assets held with respect thereto, if any, including any proceeds thereof resulting from a sale of any such Excluded Assets;

(m)     all cash, cash equivalents, bank accounts and marketable securities of any kind that do not comprise Pre-Petition First Lien Resins Collateral, Pre-Petition First Lien Polymers Collateral or DIP Collateral, including any proceeds thereof resulting from a sale of any such Excluded Assets;

(n)     all of the assets, properties and rights of Polymers that do not comprise Pre-Petition First Lien Polymers Collateral (it being understood that the Purchased Intellectual Property owned by Polymers and the proceeds of the transactions contemplated under the APG Purchase Agreement that relate to the Apple Grove facility and the Intellectual Property sold in that transaction all comprise Pre-Petition First Lien Polymers Collateral); and

(o)     all rights, claims, causes of action, defenses and counterclaims with respect to or against any former or current directors and officers of any of the Debtors.

2.3     <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, only the following Liabilities of Sellers existing as of the Closing Date (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities (including Liabilities for Taxes) arising from the ownership or operation of the Business and the Purchased Assets by Purchaser after the Closing;

(b)     all Liabilities for Periodic Non-Income Taxes assessed on, or in respect of, the Purchased Assets that are unpaid as of the Closing Date or that become payable after the Closing Date, whether arising or assessed prior to, on, or after the Closing Date, as provided in <u>Section 11.3</u>;

(c)     subject to <u>Section 2.6</u>, all Accounts Payable;

(d)     all Liabilities under the Purchased Contracts that (i) arise on or after the Closing Date or (ii) arise prior to the Closing Date but solely to the extent requiring performance after the Closing Date that, in each case, do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Sellers or any of their Affiliates;

(e)     any Cure Amounts that Purchaser is required to pay pursuant to <u>Section 2.5</u>;

(f)     all Transfer Taxes;

(g) all Liabilities, if any, as an owner or operator of the Purchased Assets arising from or relating to any presence or Release of any Hazardous Material at, on, under or migrating from the Real Property or Purchased Assets to the extent occurring or existing as of the Closing Date;

(h) all Liabilities that Purchaser has expressly agreed to assume, pay or discharge pursuant to the other Sections of this Agreement;

(i) all Liabilities with respect to the Assumed Plans, if any; and

(j) all Liabilities listed on Schedule 2.3(j).

2.4 Excluded Liabilities. Notwithstanding anything to the contrary herein or otherwise, Purchaser will not assume and will be deemed not to have assumed, and Sellers (and Sellers' Affiliates) will remain liable with respect to, any Liabilities of Sellers (and Sellers' Affiliates) other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of Sellers and their Affiliates:

(a) all Liabilities arising out of or relating to the ownership or operation of the Business and the Purchased Assets by Sellers or any of their Affiliates prior to the Closing, including as a result of the manufacture, design, use, operation, storage, acquisition, development or construction of a Purchased Asset during the period prior to the Closing, other than the Cure Amounts payable by Purchaser pursuant to Section 2.5 and the Assumed Liabilities;

(b) all Liabilities to the extent relating to or arising out of any Excluded Assets;

(c) without limiting Purchaser's obligation to make the payments expressly required by the other Articles of this Agreement, all Liabilities of Sellers arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Bankruptcy Cases (including bankruptcy administrative expenses) and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and other Representatives;

(d) all Liabilities occurring, arising out of or relating to acts or omissions of Sellers or their Affiliates, or any of their respective current or former directors, officers, employees, agents or independent contractors, in respect of any claimed failure to comply with or violation of any Law or Order (whether civil or criminal) prior to the Closing;

(e) all fines and penalties for violation of Environmental Laws prior to the Closing arising out of or relating to the Business or the Purchased Assets;

(f)     any Liability for any Taxes of any Seller or its Affiliates, whether arising prior to, on, or after the Closing Date (other than any Taxes described in Section 2.3(a), 2.3(b) or 2.3(f));

(g)     any Liability for Taxes arising from the ownership or operation of the Purchased Assets or relating to the conduct or operation of the Business by Sellers or their Affiliates prior to the Closing (other than any Taxes described in Section 2.3(a), 2.3(b) or 2.3(f));

(h)     without limiting Purchaser's obligation to make the payments expressly required by the other Articles of this Agreement, all Liabilities with respect to current or former Representatives of any Seller or any of its Affiliates (including the Transferred Employees), including any Liabilities in respect of any Seller's or any of its Affiliates' engagement, employment or termination thereof, other than the Assumed Liabilities described in Section 2.3(i);

(i)     all Liabilities in connection with any Legal Proceeding arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets by Sellers or their Affiliates prior to the Closing, including the Legal Proceedings listed in Schedule 5.10;

(j)     all accounts payable and trade payables, including intercompany payables payable by Sellers, other than the Accounts Payable;

(k)     without limiting Purchaser's obligation to make the payments expressly required by this Agreement, all Liabilities to indemnify, reimburse or advance amounts to any present or former Representative of Sellers or any of their Affiliates (including with respect to any breach of fiduciary obligations);

(l)     all Liabilities (other than, for the avoidance of doubt, for Taxes described in Section 2.3(b)) (i) under any Contracts of Sellers or any of their Affiliates other than the Purchased Contracts and (ii) under any Purchased Contract, other than the Assumed Liabilities described in Section 2.3(d) and Section 2.3(e);

(m)     all Liabilities in respect of Indebtedness (including intercompany Indebtedness), whether or not relating to the Business, other than any Indebtedness that constitutes an Assumed Liability; and

(n)     all Liabilities set forth on Schedule 2.4(n).

2.5     Assumption of Purchased Contracts; Cure Amounts.

(a)     At or prior to the Closing and pursuant to Section 365 of the Bankruptcy Code, Sellers will assume the Purchased Contracts (to the extent not previously assumed) and at the applicable Assumption Effective Date Sellers will assign the Purchased Contracts to Purchaser, and Purchaser will assume the Liabilities of Sellers under the Purchased Contracts to the extent required pursuant to Section 2.3(d). Purchaser shall pay in full in cash at the Closing all the Cure Amounts necessary to

cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults, under the Purchased Contracts ("Closing Cure Amounts"); provided that, subject to Sections 2.5(b) and 2.6(c), solely to the extent any such Cure Amounts remain disputed as of the Closing Date, Purchaser shall be entitled to prosecute disputes regarding Cure Amounts after the Closing and shall pay such Cure Amounts as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order; provided, further that, after the Closing, Sellers shall have no such obligation to appear in, respond to, file a pleading in connection with or otherwise prosecute such disputes except (i) as funded from the Wind-Down Escrow Account or (ii) to the extent Purchaser provides reasonable advance funding to Sellers for their reasonable and documented expenses for doing so.

(b)  All Contracts that are to be assumed pursuant to this Section 2.5 by Purchaser will be deemed assumed by and assigned to Purchaser on the applicable Assumption Effective Date, and each such Contract will be deemed a Purchased Contract under this Agreement; provided, however, that if the Bankruptcy Court determines that Sellers may not assume and assign to Purchaser any Contract, then such Contract will be deemed to be an Excluded Asset (and all Liabilities thereunder Excluded Liabilities) for all purposes under this Agreement.

(c)  Sellers will seek promptly after Closing to reject (a) any Contracts that (i) are executory Contracts or unexpired leases, (ii) are exclusive to the Business and (iii) Purchaser does not assume pursuant to this Section 2.5 and (b) the Contracts listed on Schedule 2.5(c) (it being understood that Purchaser will be entitled, in its sole discretion, to update such list of Contracts by providing written notice thereof to Primary Seller no later than five (5) Business Days prior to the Closing Date).  Upon rejection of any such Contract, such Contract will be deemed to be an Excluded Asset (and all Liabilities thereunder Excluded Liabilities) for all purposes under this Agreement. In the event any Contract that is not a Purchased Contract is rejected after Closing, such Contract will be deemed to be an Excluded Asset (and all Liabilities thereunder Excluded Liabilities) for all purposes under this Agreement.

(d)  Sellers and Purchaser will comply with the procedures set forth in the Bidding Procedures Order with respect to the assumption and assignment or rejection of any Purchased Contract pursuant to, and in accordance with, this Section 2.5.

(e)  In the event that any dispute relating to Cure Amounts exists, Sellers shall use commercially reasonable efforts to assist Purchaser in the prompt resolution of such dispute(s); provided, however, that no Seller or any Affiliate thereof will be obligated to make any payments in connection with such dispute unless Purchaser provides reasonable advance funding to Sellers relating thereto or to initiate any Legal Proceedings in connection with such dispute.

2.6  Non-Assignment of Assets.  (a)  Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not affect the assignment or transfer of any Purchased Asset

if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or of any Law or Order or in any way adversely affect the rights of Purchaser thereunder and (ii) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.  In such event, Sellers and Purchaser will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that neither Sellers nor Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceeding to obtain any such consent or approval, and that any costs to be incurred by Sellers will be drawn from the Wind-Down Escrow Account or otherwise paid in advance by Purchaser.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Purchaser would not in fact receive all such rights, such Seller and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to such Seller (unless Purchaser provides reasonable advance funding for any such expense), under which Purchaser (or its designated Affiliate) would obtain the benefits and assume the obligations thereunder that would otherwise constitute Assumed Liabilities in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Purchaser (or its designee), and under which such Seller would enforce its rights thereunder for the benefit of Purchaser (or its designee) with Purchaser (or its designee) assuming such Seller's obligations that would otherwise constitute Assumed Liabilities and any and all rights of such Seller against a third party thereto.

(b)     Subject to Section 2.6(a), if after the Closing Purchaser or any Seller discovers that (i) Purchaser or any of its Affiliates holds or is otherwise liable for any Excluded Assets or Excluded Liabilities or (ii) any Seller or any of their respective Affiliates holds any Purchased Assets or Assumed Liabilities, Purchaser or the applicable Seller will, and will cause their respective Controlled Affiliates to, and will use commercially reasonable efforts to cause their other Affiliates to, promptly transfer (or cause to be transferred) such assets or assume, pay or reimburse (or cause to be assumed, paid or reimbursed) such Liabilities to or from (as the case may be) the other party.  Prior to any such transfer, the party receiving or possessing any such asset will hold it in trust for such other party.

(c)     Notwithstanding anything herein to the contrary, but only to the extent consistent with the Bidding Procedures Order and the Bidding Procedures, at any time prior to the date that is the latest of (i) the Closing Date, (ii) five (5) days after the resolution of any dispute with a non-debtor party to a Purchased Contract relating to a Cure Amount or adequate assurance of future performance (under the meaning of Section 365 of the Bankruptcy Code) thereunder, and (iii) the conclusion of the hearing relating to any particular Purchased Contract as to which a cure or adequate assurance objection has been timely filed (the "Contract Designation Deadline"), Purchaser will be entitled, in its sole discretion, to add (x) any such Contract to the Excluded Assets by

providing written notice thereof to Primary Seller and any Contract so added will cease to be a Purchased Contract and Purchased Asset and will be deemed to be an Excluded Asset (and all Liabilities thereunder Excluded Liabilities) for all purposes hereunder or (y) any Contract to which any Seller is a party or is bound (other than any Shared Contract that is listed on Schedule 5.8(c) and was made available to Purchaser prior to the date hereof, except as prohibited under the confidentiality provisions of the applicable Contract (as indicated on Schedule 5.8(c))) to the Purchased Contracts set forth in Schedule 2.1(b)(viii) so long as (1) it is not a Contract to be assumed or available to be assumed pursuant to any other sale previously approved by the Bankruptcy Court in connection with the Bankruptcy Cases; and (2) it is prior to the entry of an Order of the Bankruptcy Court approving the rejection of such Contract, subject to the party to such Contract receiving information evidencing Purchaser's adequate assurance of future performance and having an opportunity to object within seven (7) days or such other period of time set forth in an Order of the Bankruptcy Court of the receipt of such information to the assignment of such Contract on the ground that Purchaser has not demonstrated adequate assurance of future performance of such Contract pursuant to Section 365 of the Bankruptcy Code. No change referred to in this Section 2.6(c) shall reduce or increase the amount of the Purchase Price, except to the extent of any increase or decrease in the assumption of the Assumed Liabilities as a result of the Contracts being added to or removed from the list of Purchased Contracts by Purchaser.

(d)     Notwithstanding anything herein to the contrary, at any time prior to the Closing Date, Purchaser will be entitled, in its sole discretion, to add (i) any Owned Real Property to the Excluded Assets by providing written notice thereof to Primary Seller and any such Owned Real Property so added will cease to be a Purchased Asset and will be deemed to be an Excluded Asset (and all Liabilities thereunder or relating thereto Excluded Liabilities) for all purposes hereunder or (ii) any real property in which any Seller or any Controlled Affiliate of any Seller has any right, title or interest and that comprises Pre-Petition First Lien Polymers Collateral, Pre-Petition First Lien Resins Collateral or DIP Collateral to the Owned Real Property set forth in Schedule 2.1(b)(i), by providing written notice thereof to Primary Seller and any such real property so added will be deemed to be Owned Real Property and a Purchased Asset. No change referred to in this Section 2.6(d) shall reduce or increase the amount of the Purchase Price, except to the extent of any increase or decrease in the assumption of the Assumed Liabilities as a result of the real property being added or removed from the list of Purchased Assets by Purchaser.

(e)     No later than five (5) Business Days prior to the Closing Date, Sellers shall provide Purchaser with a true, correct and complete list of all accounts payable and accrued expenses of each Seller and each Controlled Affiliate of any Seller arising out of the conduct of the Business on or after the applicable Petition Date (such accounts payable and accrued expenses, "Pre-Closing Payables"). Notwithstanding anything herein to the contrary, at any time prior to the Closing Date, Purchaser will be entitled, in its sole discretion, to add (i) any Accounts Payable to the Excluded Liabilities by providing written notice thereof to Primary Seller and any such Accounts Payable so added will cease to be an Assumed Liability and will be deemed to be an Excluded

Liability for all purposes hereunder or (ii) any Pre-Closing Payable to the Accounts Payable set forth in Schedule 1.1(a), by providing written notice thereof to Primary Seller and any such Pre-Closing Payable so added will be deemed to be an Account Payable and an Assumed Liability. No change referred to in this Section 2.6(e) shall reduce or increase the amount of the Purchase Price, except to the extent of any increase or decrease in the assumption of the Assumed Liabilities as a result of accounts payable or accrued expenses being added or removed from the list of Assumed Liabilities by Purchaser.

(f)     Notwithstanding anything herein to the contrary, at any time prior to the Closing Date, Purchaser will be entitled, in its sole discretion, to add (i) any Transferred Permits to the Excluded Assets by providing written notice thereof to Primary Seller and any such Transferred Permit so added will cease to be a Purchased Asset and will be deemed to be an Excluded Asset (and all Liabilities thereunder or relating thereto Excluded Liabilities) for all purposes hereunder or (ii) any Permits in which any Seller or any Controlled Affiliate of any Seller has any right, title or interest and that comprises Pre-Petition First Lien Polymers Collateral, Pre-Petition First Lien Resins Collateral or DIP Collateral to the Transferred Permits set forth in Schedule 1.1(g), by providing written notice thereof to Primary Seller and any such Permit so added will be deemed to be a Transferred Permit and a Purchased Asset. No change referred to in this Section 2.6(f) shall reduce or increase the amount of the Purchase Price, except to the extent of any increase or decrease in the assumption of the Assumed Liabilities as a result of the Permits being added or removed from the list of Purchased Assets by Purchaser.

(g)     From the date hereof until the applicable Assumption Effective Date, no Seller will (i) reject or seek to reject any Contract under the Bankruptcy Cases or any other Bankruptcy Proceeding, (ii) terminate, amend, supplement, modify or waive any rights under, or create any Lien with respect to, any Contract, or (iii) take any affirmative action with respect to any Contract that is not required by the terms thereof in each case, without the prior written consent of Purchaser.

2.7     Further Conveyances and Assumptions.  From time to time following the Closing, Sellers, MGI (with respect to the MGI Assets) and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary, advisable or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Seller and its Affiliates and their successors and assigns, the assumption of the Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby, in each case, on the terms and subject to the conditions set forth in this Agreement.  Notwithstanding anything to the contrary, if the activities required by this Section 2.7 impose any obligations on Sellers or MGI (with respect to the MGI Assets) with respect to their Affiliates, such obligations will be limited to causing its Controlled Affiliates to, and using commercially reasonable efforts to

cause its other Affiliates to comply with this <u>Section 2.7</u>.  Without limiting the generality of the foregoing, Sellers and MGI (with respect to the MGI Trademarks) further agree to, and to cause their Controlled Affiliates and to use commercially reasonable efforts to cause other Affiliates to, execute and deliver further instruments for the purpose of evidencing, perfecting and recording the assignment of the Purchased Intellectual Property and MGI Trademarks in each applicable jurisdiction, such instruments to be substantially in the form provided by Purchaser and reasonably acceptable to the applicable Seller or MGI, as applicable, and sufficient for recordation in the relevant jurisdiction (<u>provided</u>, that, if the foregoing activities will require out-of-pocket costs to be paid by any Seller to any third party, Sellers shall notify Purchaser of the amount of such costs and Sellers shall be required to proceed with such activities only if Purchaser agrees to bear such costs).

### III.  CONSIDERATION; ADJUSTMENT

3.1     <u>Consideration</u>.  The aggregate consideration for the Purchased Assets (the "<u>Purchase Price</u>") will consist of:

(a)     a credit bid pursuant to Section 363(k) of the Bankruptcy Code comprised of (i) all Obligations (as defined in the Debtor-in-Possession Loan Agreement) included in the DIP Agreement Credit Bid Amount and (ii) all Pre-Petition First Lien Obligations included in the Pre-Petition Credit Bid Amount (together, the "<u>Credit Bid</u>");

(b)     cash in an amount equal to the MGI Purchase Price for the MGI Assets; and

(c)     the assumption of the Assumed Liabilities at the Closing.

In addition, in connection with the acquisition of the Purchased Assets, Purchaser shall pay the following in accordance with the terms of this Agreement (the "<u>Other Payments</u>"):

(a)     cash in an amount equal to the Completion Fees;

(b)     cash in an amount equal to the Final Professional Payment Amounts;

(c)     cash in an amount equal to the Mechanics Lien Amounts (it being understood that, notwithstanding anything to the contrary in this Agreement, Purchaser may elect, no later than two (2) Business Days prior to the Closing, for any Purchased Asset subject to any Lien securing any Mechanics Lien Claim as of the Closing Date to be conveyed to Purchaser at the Closing subject to such Lien and, in such event, Purchaser shall have no obligation under this Agreement to make any payment, or deposit into the Mechanics Lien Escrow Account any amount, in respect thereof and the Mechanics Lien Escrow Amount shall be deemed to have been reduced accordingly for all purposes hereunder);

(d)     cash in an amount equal to the Macquarie Payment Amount;

(e)     cash in the amount of the Other Senior Liens Amounts to the extent that the Purchased Assets are transferred free and clear of Liens securing the Other Senior Liens Claims (it being understood that, notwithstanding anything to the contrary in this Agreement, Purchaser may elect (i) after the entry of the Sale Order, following the receipt of the consent of the relevant party to the Other Senior Liens Claim or (ii) before the entry of the Sale Order in its discretion, for any Purchased Asset subject to any Lien securing any Other Senior Liens Claim as of the Closing Date to be conveyed to Purchaser at the Closing subject to such Lien and, in such event, Purchaser shall have no obligation under this Agreement to make any payment, or deposit into the Other Senior Liens Escrow Account any amount, in respect thereof and the Other Senior Liens Escrow Amount shall be deemed to have been reduced accordingly for all purposes hereunder);

(f)     cash in an amount equal to the Tax Lien Amounts; and

(g)     cash in an amount equal to the Wind-Down Amount.

Notwithstanding anything to the contrary herein, under no circumstances shall any portion of the Credit Bid be converted into or otherwise require a cash payment.

3.2     Purchase Price Deposit.  Pursuant to the terms of the Deposit Escrow Agreement, on March 5, 2018, Purchaser deposited into a segregated account established and maintained by the Escrow Agent (the "Deposit Escrow Account") an amount equal to $20,000,000 (the "Deposit Amount", and together with all accrued investment income thereon, if any, the "Deposit Fund"), which will be released by the Escrow Agent and delivered in accordance with the provisions of this Agreement, the Deposit Escrow Agreement and the Bidding Procedures.  Purchaser and Primary Seller shall jointly instruct the Escrow Agent to distribute the Deposit Fund as follows:

(a)     if the Closing occurs, the Deposit Fund will be paid or deposited by the Escrow Agent on behalf of Purchaser in partial satisfaction of Purchaser's payment and deposit obligations pursuant to Section 3.4;

(b)     if this Agreement is terminated by Primary Seller pursuant to Section 4.4(d)(ii), the Deposit Fund will be delivered to Primary Seller; and

(c)     if this Agreement is terminated for any reason other than by Primary Seller pursuant to Section 4.4(d)(ii), the Deposit Fund, will be returned to Purchaser.

3.3     Interim Loan.

(a)     On the date the Sale Order is entered, Purchaser and Sellers shall cause the DIP Lender and Obligors, to enter into an amendment to the Debtor-in-Possession Loan Agreement, in the form attached hereto as Exhibit E.

(b)     In the event Purchaser is determined to be the Backup Bidder, Sellers shall procure that each of (i) the purchase agreement with the Successful Bidder, (ii) all financing entered into by the Successful Bidder and the Obligors and (iii) any Order(s) of the Bankruptcy Court entered in connection with the foregoing shall comply in all respects with each of the DIP Loan Documents, the Final DIP Order, the Final Polymers DIP Order, the Cash Collateral Orders, the Bidding Procedures and the Bidding Procedures Order, in each case unless otherwise consented to by the Purchaser in its sole discretion.

3.4     <u>Payment of Purchase Price and Other Payments</u>.  On the Closing Date:

(a)     Purchaser will pay (which payment may be satisfied, in whole or in part, via release of cash from the Deposit Escrow Account) the Closing Cure Amounts by wire transfer of immediately available funds (to the accounts designated in writing by Primary Seller at least three (3) Business Days prior to the Closing Date); <u>provided</u>, that, for the avoidance of doubt, Purchaser shall pay the Closing Cure Amounts in cash and in addition to the consideration otherwise set forth in <u>Section 3.1</u>;

(b)     Purchaser will deposit (which deposit may be satisfied, in whole or in part, via transfer of cash from the Deposit Escrow Account) the Completion Fees Escrow Amount into a segregated escrow account (the "<u>Completion Fees Escrow Account</u>") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement and released in accordance with the terms hereof and thereof;

(c)     Purchaser will deposit (which deposit may be satisfied, in whole or in part, via transfer of cash from the Deposit Escrow Account) the Professional Payment Escrow Amount into a segregated escrow account (the "<u>Professional Payment Escrow Account</u>") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement and released in accordance with the terms hereof and thereof;

(d)     Purchaser will deposit (which deposit may be satisfied, in whole or in part, via transfer of cash from the Deposit Escrow Account) the Mechanics Lien Escrow Amount into a segregated escrow account (the "<u>Mechanics Lien Escrow Account</u>") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement and released in accordance with the terms hereof and thereof (it being understood that, in the event Purchaser elects for the Mechanics Lien Escrow Amount to include a letter of credit, the mechanics with respect thereto shall be as set forth in the Escrow Agreement);

(e)     Purchaser will deposit (which deposit may be satisfied, in whole or in part, via transfer of cash from the Deposit Escrow Account) an amount equal to the Other Senior Liens Escrow Amount into a segregated escrow account (the "<u>Other Senior Liens Escrow Account</u>") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement and released in accordance with the terms hereof and thereof;

(f)     Purchaser will pay the Macquarie Payment Amount (which payment may be satisfied, in whole or in part, via release of cash from the Deposit Escrow Account), by wire transfer of immediately available funds (to the accounts designated in writing by Macquarie at least three (3) Business Days prior to the Closing Date);

(g)     Purchaser will deposit (which deposit may be satisfied, in whole or in part, via transfer of cash from the Deposit Escrow Account) the Wind-Down Escrow Amount into a segregated escrow account (the "Wind-Down Escrow Account") to be established and maintained by the Escrow Agent pursuant to the Escrow Agreement and released in accordance with the terms hereof and thereof;

(h)     Purchaser will pay (which payment may be satisfied, in whole or in part, via release of cash from the Deposit Escrow Account) the Tax Lien Amounts by wire transfer of immediately available funds (to the accounts designated in writing by Primary Seller at least three (3) Business Days prior to the Closing Date); and

(i)     Purchaser will pay (which payment may be satisfied, in whole or in part, via release of cash from the Deposit Escrow Account) an amount equal to the MGI Purchase Price by wire transfer of immediately available funds (to the account designated in writing by MGI at least three (3) Business Days prior to the Closing Date).

3.5     Application and Release of Escrow Amounts.

(a)     Promptly and in no event later than three (3) Business Days following the applicable Final Order having been entered by the Bankruptcy Court approving payment of any Completion Fees, the applicable Person authorized under the Escrow Agreement shall instruct the Escrow Agent (with at least one (1) Business Day's notice to Purchaser) to release from the Completion Fees Escrow Account to the approved recipient an amount in cash equal to the approved Completion Fees. Promptly and in no event later than three (3) Business Days following the final resolution and payment of all Completion Fees, Primary Seller and Purchaser shall jointly instruct the Escrow Agent to release from the Completion Fees Escrow Account to Purchaser an amount in cash equal to the balance, if any, then remaining in the Completion Fees Escrow Account.  For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, in no event shall Purchaser be responsible for any Completion Fees in excess of the funds available in the Completion Fees Escrow Account.

(b)     Promptly and in no event later than the earlier of (x) three (3) Business Days following the applicable Final Order having been entered by the Bankruptcy Court approving payment of any Final Professional Payment Amount and (y) one (1) Business Day after the applicable Seller's or Professional's filing of a certificate of counsel or certificate of no objection in accordance with paragraph 2(c) of the Interim Compensation Order with respect to the applicable Monthly Fee Application (as defined in the Interim Compensation Order) pertaining to any Professional Payment Amount, the applicable Person authorized under the Escrow Agreement shall instruct the Escrow Agent (with notice to Purchaser) to release from the Professional Payment

Escrow Account to such Professional an amount in cash equal to (1) such Final Professional Payment Amount or (2) the applicable Professional Payment Amount released in accordance with a certificate of counsel or certificate of no objection in accordance with paragraph 2(c) of the Interim Compensation Order, as applicable. Promptly and in no event later than three (3) Business Days following the final resolution and payment of all Professional Payment Amounts to all applicable Professionals, Primary Seller and Purchaser shall jointly instruct the Escrow Agent to release from the Professional Payment Escrow Account to Purchaser an amount in cash equal to the balance, if any, then remaining in the Professional Payment Escrow Account. Sellers shall use commercially reasonable efforts to cause any amounts released from the Professional Payment Escrow Account pursuant to clause (i) of the first sentence of this Section 3.5(b) not actually used to satisfy approved Professional Payment Amounts, or otherwise thereafter determined to have been improperly paid, to be transferred to Purchaser. To the extent that the Bankruptcy Court enters a Final Order with respect to a final fee application of a Professional that reduces, or directs the disgorgement of, any excess Professional Payment Amount paid from the Professional Payment Escrow Account to such Professional, such excess amount shall be returned to the Professional Payment Escrow Account or, in the event the Professional Payment Escrow Account has been settled and terminated, to Purchaser. For the avoidance of doubt, no funds deposited in the Professional Payment Escrow Account shall be used for the payment of Completion Fees. For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, in no event shall Purchaser be responsible for any Professional Payment Amounts in excess of the funds available in the Professional Payment Escrow Account.

(c)     Sellers and Purchaser shall comply with the Mechanics Lien Escrow Procedures and instruct the Escrow Agent in accordance therewith to release from the Mechanics Lien Escrow Account (i) to the relevant holder of the applicable Mechanics Lien Claim, the amount instructed to be released in such instructions and (ii) to Purchaser, the amount instructed to be released to Purchaser in such instructions; provided, however, that an amount equal to 5% of the amount that Purchaser would otherwise be entitled to receive pursuant to the foregoing clause (ii) shall instead be deposited by the Escrow Agent into the Wind-Down Escrow Account, which deposit shall be in addition to the Wind-Down Escrow Amount; provided, further, that the aggregate amount of all deposits into the Wind-Down Escrow Account following the initial deposit of the Wind-Down Escrow Amount shall not exceed $2,000,000 (the amounts withheld from each payment from the Mechanics Lien Escrow Account to Purchaser and deposited into the Wind-Down Escrow Account, subject to such aggregate cap, the "Additional Cash Payment Amount"). Nothing in this Agreement shall restrict Purchaser from seeking relief from the Bankruptcy Court upon a motion with notice to all of the remaining holders of Mechanics Lien Claims subject to the Mechanics Lien Escrow Account to reduce the remaining amount then being held in the Mechanics Lien Escrow Account from time to time to account for the then unresolved Mechanics Lien Claims; provided, that such request shall be consistent with the terms of the Mechanics Lien Escrow Procedures. In the event that the Bankruptcy Court shall enter any Final Order reducing the amount then required to be held in the Mechanics Lien Escrow Account, Purchaser shall instruct the Escrow Agent to release from the

Mechanics Lien Escrow Account (x) to Purchaser an amount in cash equal to the amount of such reduction less an amount in cash equal to the applicable Additional Cash Payment Amount and (y) to the Wind-Down Escrow Account, an amount in cash equal to the applicable Additional Cash Payment Amount. Promptly and in no event later than three (3) Business Days following the final resolution of all Mechanics Lien Claims, Purchaser shall instruct the Escrow Agent to release from the Mechanics Lien Escrow Account to Purchaser an amount in cash equal to the balance, if any, then remaining in the Mechanics Lien Escrow Account. Any amounts released from the Mechanics Lien Escrow Account pursuant to this Section 3.5(c) not actually used to satisfy Mechanics Lien Claims or otherwise thereafter determined to have been improperly paid, shall be for the account of Purchaser (subject to reduction of such amounts in respect of any Additional Cash Payment Amount, which Additional Cash Payment Amount shall be for the account of the Wind-Down Escrow Account (and in addition to the Wind-Down Escrow Amount)). For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, in no event shall Purchaser be responsible for any Mechanics Lien Claims or Mechanics Lien Amounts in excess of the funds available in the Mechanics Lien Escrow Account.

(d)     Promptly and in no event later than three (3) Business Days following the resolution of any Other Senior Liens Claim and a Final Order having been entered by the Bankruptcy Court approving payment of the applicable Other Senior Liens Amount in respect thereof, Primary Seller and Purchaser shall jointly instruct the Escrow Agent to release from the Other Senior Liens Escrow Account (i) to the approved recipient thereof, an amount in cash equal to such Other Senior Liens Amount and (ii) if reserve amounts shall have been so established in respect of the Other Senior Liens Claims, to Purchaser, an amount in cash equal to the amount, if any, by which the individual reserve amount initially approved by the Bankruptcy Court in respect of such Other Senior Liens Claim exceeds the applicable Other Senior Liens Amount. Promptly and in no event later than three (3) Business Days following a Final Order having been entered by the Bankruptcy Court disallowing any Other Senior Liens Claim, if reserve amounts shall have been so established in respect of the Other Senior Liens Claims, Primary Seller and Purchaser shall jointly instruct the Escrow Agent to release from the Other Senior Liens Escrow Account to Purchaser an amount in cash equal to the individual reserve amount initially approved by the Bankruptcy Court in respect of such Other Senior Liens Claim. Nothing in this Agreement shall restrict Purchaser from seeking relief from the Bankruptcy Court to reduce the amount then being held in the Other Senior Liens Escrow Account from time to time to account for the then unresolved Other Senior Liens Claims and, in the event that the Bankruptcy Court shall enter any Final Order reducing the amount then required to be held in the Other Senior Liens Escrow Account, Primary Seller and Purchaser shall jointly instruct the Escrow Agent to release from the Other Senior Liens Escrow Account to Purchaser an amount in cash equal to the amount of such reduction. Promptly and in no event later than three (3) Business Days following the final resolution of all Other Senior Liens Claims, Primary Seller and Purchaser shall jointly instruct the Escrow Agent to release from the Other Senior Liens Escrow Account to Purchaser an amount in cash equal to the balance, if any, then remaining in the Other Senior Liens Escrow Account. Any amounts released from the Other Senior Lien Escrow Account pursuant to clause (i) of the first sentence of

this Section 3.5(d) not actually used to satisfy Other Senior Liens Claims or otherwise thereafter determined to have been improperly paid, shall be for the account of Purchaser. For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, in no event shall Purchaser be responsible for any Other Senior Liens Claims or Other Senior Liens Amounts in excess of the funds available in the Other Senior Liens Escrow Account.

(e)     From and after Closing, Primary Seller shall have the right to instruct the Escrow Agent (with notice to the Purchaser) to release cash from the Wind-Down Escrow Account to any Seller and such Sellers shall use such funds solely for the purpose of making payments in connection with performance of their respective obligations pursuant to this Agreement, including pursuant to Sections 2.5(a), 2.5(c), 2.5(e), 2.6, 8.12, 8.15 and 11.4, administering the Bankruptcy Cases pending the wind-down of Sellers' estates, and the winding down of the Debtors' estates and making related payments through the conclusion of the Bankruptcy Cases, in each case solely in accordance with the Wind-Down Budget.  In the event any Wind-Down Amount released from the Wind-Down Escrow Account is ultimately determined by Order of the Bankruptcy Court to be unauthorized, the applicable Seller shall, no later than three (3) Business Days after the entry of such Order, repay to Purchaser such amount. Promptly and in no event later than three (3) Business Days following the wind-down of the Debtors' estates and conclusion of the Bankruptcy Cases, Primary Seller and Purchaser shall jointly instruct the Escrow Agent to release from the Wind-Down Escrow Account to Purchaser an amount in cash equal to the balance, if any, then remaining in the Wind-Down Escrow Account.  For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, but subject to the Sale Order, in no event shall Purchaser be responsible for any Wind-Down Amounts in excess of the funds available in the Wind-Down Escrow Account.

(f)     From and after the earlier of the date that (i) Primary Seller shall liquidate or otherwise cease to exist or (ii) Primary Seller's Bankruptcy Case(s) shall convert into case(s) under chapter 7 of the Bankruptcy Code, any instructions to the Escrow Agent otherwise required to be issued jointly by Primary Seller and Purchaser shall instead be issued by Purchaser alone.  In addition, from and after the date that Primary Seller's Bankruptcy Case(s) shall convert into case(s) under chapter 7 of the Bankruptcy Code, any instructions to the Escrow Agent in respect of the Wind-Down Escrow Account otherwise required to be issued (i) by Primary Seller alone, shall instead be issued by the applicable trustee alone and (ii) jointly by Primary Seller and Purchaser, shall instead be issued jointly by Purchaser and the applicable trustee. The other terms and conditions governing the Completion Fees Escrow Account, Professional Payment Escrow Account, Mechanics Lien Escrow Account, Other Senior Liens Escrow Account and Wind-Down Escrow Account shall be governed by the Escrow Agreement.  Purchaser and Sellers agree to negotiate in good faith the terms and conditions of the Escrow Agreement prior to the Closing, the terms of which shall be consistent with Section 3.4 and this Section 3.5.

3.6     Apportionments.  (a) To the extent the following costs and expenses (and credits therefor to the extent paid prior to the Closing Date) of the Business relate to a

Purchased Contract, to Owned Real Property or to Leased Real Property, in each case, for a period that begins on or prior to the Closing Date and ends after the Closing Date, such costs and expenses are to be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, as of 11:59 P.M. local time on the Closing Date:

(i)     rent for the month in which the Closing Date occurs;

(ii)     annual utility assessments, water meter charges, and sewer rents, if any, on the basis of the year for which assessed; and

(iii)     charges and fees payable for telephone services, water, heat, steam, electric power, gas and other utilities, at the price charged by the suppliers, including any taxes thereon and based upon applicable meter readings, where available, made as close as reasonably practicable to (either prior to or after) 11:59 P.M. local time on the Closing Date.

(b)     If, after apportioning the foregoing expenses, a party has borne more than its allocable share of such expenses, the other parties will promptly make the appropriate compensating payment(s) to such party.

## IV.  CLOSING AND TERMINATION

4.1     <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> (or the waiver thereof by the party entitled to waive the applicable condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> (the "<u>Closing</u>") will take place remotely via the exchange of documents and signature by electronic mail and/or facsimile on the date that is three (3) Business Days following the satisfaction or waiver of the conditions set forth in <u>Article IX</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions as of the Closing), unless another place, date or time are agreed to in writing by the parties, <u>provided</u> that, if the Debtors designate Purchaser as the Backup Bidder and subsequently designate Purchaser as the new Successful Bidder, Purchaser may, upon prior written notice to Primary Seller, elect to delay the Closing by a period of up to fifteen (15) Business Days.  The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>."

4.2     <u>Deliveries by Sellers and MGI</u>.

(a)     At the Closing, Sellers will deliver to Purchaser:

(i)     one (1) or more duly executed (by each applicable Seller) bills of sale in form and substance reasonably acceptable to the parties;

(ii)     one (1) or more duly executed (by each applicable Seller) assignment and assumption agreements in form and substance reasonably acceptable to the parties; <u>provided</u>, <u>however</u>, that assignment and assumption agreements with respect to Purchased Intellectual

Property will be subject to Section 4.2(a)(iv), and short-form assignment agreements with respect to the Purchased Intellectual Property will be subject to Sections 4.2(a)(iv) and 8.9(d);

(iii)     one (1) or more duly executed assignment and assumption agreements with respect to the Purchased Intellectual Property in form and substance reasonably acceptable to the parties;

(iv)     assignments of the Purchased Intellectual Property, in form and substance reasonably acceptable to the parties and suitable for recording in the United States Patent and Trademark Office or other Intellectual Property office of any relevant jurisdiction that is reasonably requested by Purchaser, as applicable, duly executed by each applicable Seller that owns such Purchased Intellectual Property;

(v)     a Power of Attorney, substantially in the form attached hereto as Exhibit C, duly executed by each applicable Seller, the number of original and authenticated copies as required for the relevant jurisdictions, as reasonably requested by Purchaser;

(vi)     duly executed (by each applicable Seller) special or limited warranty deeds (or applicable state equivalent) conveying title to the Owned Real Property in recordable form;

(vii)     one (1) or more duly executed (by each applicable Seller) assignment and assumption agreements for the Leases relating to the Leased Real Property in form and substance reasonably acceptable to the parties;

(viii)     the officer's certificate required to be delivered pursuant to Sections 9.1(a), 9.1(b) and 9.1(f);

(ix)     from each Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, such Seller's regarded owner) that is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code, a duly executed certification of non-foreign status prepared in accordance with Section 1.1445-2(b)(2) of the Treasury regulations;

(x)     the duly executed (by each Seller party thereto) TSA;

(xi)     subject to Section 8.15, copies of all material Records in the possession or control of any Seller or any Controlled Affiliate of any Seller, including the items specified on Schedule 4.2(a)(xi);

(xii)     subject to Section 8.9, copies of all material IP Records in the possession of any Seller or any Controlled Affiliate of any Seller, and with respect to any other IP Records not in the possession of any Seller or Controlled Affiliate of any Seller, the identity of any outside counsel or

agent or Affiliate of any Seller that possesses or controls any such IP Records included in the Purchased Assets;

(xiii)   the duly executed (by Primary Seller and the Escrow Agent) Escrow Agreement;

(xiv)   a copy of the duly executed confirmation of and/or further assignment from Cobarr S.r.l. to M&G Corp. of Intellectual Property related to the technology referred to as "Easy-Up" in form and substance reasonably acceptable to Purchaser, or other similar assurance reasonably acceptable in form and substance to Purchaser; and

(xv)   such other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser, including as set forth on Schedule 4.2(a)(xv).

(b)   At the Closing, MGI will deliver to Purchaser:

(i)   one (1) or more duly executed bills of sale with respect to the MGI Trademarks in form and substance reasonably acceptable to the parties;

(ii)   one (1) or more duly executed assignment and assumption agreements with respect to the MGI Trademarks in form and substance reasonably acceptable to the parties;

(iii)   assignment of the MGI Trademarks, in form and substance reasonably acceptable to the parties and suitable for recording in the United States Patent and Trademark Office or other Intellectual Property office of any relevant jurisdiction or domain name registry, as applicable, as reasonably requested by Purchaser, duly executed by MGI;

(iv)   a Power of Attorney substantially in the form attached hereto as Exhibit C, duly executed by MGI, the number of original and authenticated copies as required for the relevant jurisdictions, as reasonably requested by Purchaser; and

(v)   subject to Section 8.9(f), copies of all material IP Records relating to the MGI Trademarks in the possession of MGI, and with respect to any other IP Records relating to the MGI Trademarks not in the possession of MGI, the identity of any outside counsel or agent or Affiliate of MGI that possesses or controls any such IP Records included in the MGI Assets.

4.3   Deliveries by Purchaser.  At the Closing, Purchaser will deliver to Primary Seller:

(a)     one (1) or more duly executed (by Purchaser) bills of sale in form and substance reasonably acceptable to the parties;

(b)     one (1) or more duly executed (by Purchaser) assignment and assumption agreements in form and substance reasonably acceptable to the parties;

(c)     one (1) or more duly executed (by Purchaser) assignment and assumption agreements for the Leases relating to the Leased Real Property in form and substance reasonably acceptable to the parties;

(d)     the officer's certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b);

(e)     the duly executed (by Purchaser) TSA;

(f)     the duly executed (by Purchaser) Escrow Agreement; and

(g)     such other instruments of conveyance and transfer, in form and substance reasonably acceptable to Primary Seller, as may be necessary to convey the Assumed Liabilities to Purchaser.

4.4     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     by mutual written consent of Primary Seller and Purchaser;

(b)     by either Purchaser or Primary Seller, if:

(i)     the Closing has not occurred by 5:00 p.m. (Eastern time) on April 18, 2018 (the "Termination Date"); provided, however, that in the event the Debtors designate Purchaser as the Backup Bidder and subsequently designate Purchaser as the new Successful Bidder, the Termination Date will be the date that is thirty (30) days after the date the Debtors designate Purchaser as the new Successful Bidder; provided, further, that the right to terminate this Agreement pursuant to this Section 4.4(b)(i) shall not be available to Purchaser or Primary Seller, as the case may be, if a material breach of this Agreement thereby or, in the case of Primary Seller, by any Seller, has resulted in the failure of the Closing to occur before the Termination Date;

(ii)     the Bankruptcy Court shall have entered an Order approving an Alternative Transaction and Purchaser is not the Backup Bidder; or

(iii)     there is in effect a final and non-appealable Order by a Governmental Body of competent jurisdiction (A) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or otherwise making the Closing illegal or (B) that

constitutes or imposes a Burdensome Condition (unless Purchaser shall have accepted such Burdensome Condition).

(c)     So long as Purchaser is not in material breach of its obligations under this Agreement, by Purchaser if:

(i)     (A) any Seller or any Debtor Affiliate shall have sought to have the Bankruptcy Court enter an Order dismissing, or converting such Seller's or any Debtor Affiliate's Bankruptcy Cases into a case or cases under chapter 7 of the Bankruptcy Code, or the Bankruptcy Court shall have entered such an Order for any reason (except with Purchaser's prior written consent), or (B) any Seller or any Debtor Affiliate shall have sought an Order of the Bankruptcy Court appointing a trustee in such Seller's or any Debtor Affiliate's Bankruptcy Cases or appointing an examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller or any Debtor Affiliate in any of Sellers' or any Debtor Affiliate's Bankruptcy Cases, or the Bankruptcy Court shall have entered such an Order for any reason (except with Purchaser's prior written consent);

(ii)     an Order shall have been entered dismissing the Bankruptcy Cases, converting the Bankruptcy Cases into cases under chapter 7 of the Bankruptcy Code or appointing a trustee or examiner in Seller's Bankruptcy Cases and such Order shall not have been reversed or vacated within fourteen (14) days after entry thereof;

(iii)     the Auction with respect to the Purchased Assets contemplated by the Bidding Procedures Order, if necessary, shall not have commenced by March 20, 2018, unless otherwise agreed by Purchaser;

(iv)     at the end of the Auction with respect to the Purchased Assets contemplated by the Bidding Procedures Order, if necessary, Purchaser shall not have been determined to be the Successful Bidder or the Backup Bidder with respect to the Purchased Assets;

(v)     the Sale Order (A) shall not have been entered, substantially in the form attached hereto as <u>Exhibit A</u>, with such changes thereto as Purchaser may approve in its sole discretion, by the Bankruptcy Court on March 23, 2018, unless otherwise agreed by Purchaser, (B) after so being entered, shall have failed to be in full force and effect or shall have been stayed, reversed, modified, vacated or amended without Purchaser's prior written consent (to be granted or withheld in its sole discretion), or (C) shall not have become a Final Order by April 7, 2018, unless otherwise agreed by Purchaser;

(vi)    an Event of Default (as defined in the DIP Credit Documents) shall have occurred and not have been waived in accordance with the terms of the DIP Credit Documents, subject to any applicable cure period;

(vii)    any condition to the obligations of Purchaser set forth in Section 9.1 and Section 9.3 shall be or have become incapable of fulfillment, and such condition shall not have been waived by Purchaser;

(viii)    any Seller shall have breached any representation or warranty or any covenant or agreement contained in this Agreement, which such breach (A) would result in a failure of a condition set forth in Section 9.1 or Section 9.3 and (B) shall not have been cured by the earlier of (1) fifteen (15) Business Days after the receipt of written notice by Purchaser to Primary Seller of such breach and (2) the Termination Date;

(ix)    any Seller shall have entered into or publicly announced its intention (including by means of any filings made with the Bankruptcy Court or any other Governmental Body) to enter into, an agreement in principle, letter of intent, memorandum of understanding, definitive agreement or other arrangement, whether binding or non-binding, or whether subject to terms and conditions, with any Person (other than Purchaser or its Affiliates) with respect to any Alternative Transaction; provided, however, that if Purchaser is the Backup Bidder with respect to the Purchased Assets, the right to terminate this Agreement pursuant to this Section 4.4(c)(ix) shall not be available to Purchaser until the earlier of (A) the consummation of a Sale Transaction (as defined in the Bidding Procedures) with the Successful Bidder and (B) seventy-five (75) days after the date of the Sale Hearing, unless otherwise agreed by Purchaser; or

(x)    any Seller shall have (A) failed to comply with the Bidding Procedures Order in any material respect after the date hereof, as determined by Order by the Bankruptcy Court and (B) failed to cure such failure by the earlier of (1) fifteen (15) Business Days after the receipt of written notice by Purchaser to Primary Seller stating with reasonable specificity the basis of such non-compliance if not otherwise stated in an Order of the Bankruptcy Court and (2) the Termination Date.

(d)    So long as neither any Seller nor MGI is in material breach of its obligations under this Agreement, by Primary Seller, if:

(i)    any condition to the obligations of Sellers and MGI set forth in Section 9.2 and Section 9.3 shall be or have become incapable of fulfillment, and such condition shall not have been waived by Primary Seller; or

(ii)     Purchaser shall have breached any representation or warranty or any covenant or agreement contained in this Agreement, which breach (A) would result in a failure of a condition set forth in Section 9.2 or Section 9.3 and (B) shall not have been cured by the earlier of (1) fifteen (15) Business Days after the receipt of written notice by Primary Seller to Purchaser of such breach and (2) the Termination Date.

4.5     Procedure Upon Termination.  In the event of termination pursuant to Section 4.4 (other than Section 4.4(a)), the terminating party will give written notice thereof to the other party or parties setting forth a brief description of the basis on which it is terminating this Agreement, and this Agreement will terminate and the transactions contemplated hereby will be abandoned, without further action by Purchaser or Sellers. If this Agreement is terminated as provided herein, each party will return to the applicable party all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6     Effect of Termination.

(a)     In the event that this Agreement is validly terminated as provided herein, then each of the parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination will be without liability to Purchaser, Sellers or any of their respective Representatives; provided, however, that the provisions of Section 3.2, this Section 4.6 and Article XII (other than Section 12.3) and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1, will survive any such termination and will be enforceable hereunder; provided, further, that nothing in this Section 4.6 will be deemed to release any party from liability for any willful and material breach of its obligations under this Agreement prior to such termination.  Notwithstanding anything to the contrary in this Agreement, termination of this Agreement will not affect any rights or remedies of the DIP Lender or the Pre-Petition First Lien Lender under the Pre-Petition First Lien Loan Documents, the DIP Credit Documents, the Interim DIP Order or the Final DIP Order, which shall remain in full force and effect.

(b)     If this Agreement is terminated pursuant to Section 4.4(d)(ii), then Sellers' and their Affiliates' (including MGI's) sole remedy for monetary damages against Purchaser shall be limited to its receipt of the Deposit Amount, together with all accrued investment income thereon (the "Deposit Payment") in accordance with the Deposit Escrow Agreement and Section 3.2(b), and notwithstanding anything to the contrary contained in this Agreement, the Deposit Payment shall constitute Sellers' and their Affiliates' (including MGI's) full and complete liquidated damages and Sellers' and their Affiliates' (including MGI's) sole and exclusive remedy for monetary damages against Purchaser or any of its Affiliates or their respective partners, officers, directors and shareholders for any and all damages suffered or incurred by any Seller or any of their Affiliates (including MGI) in connection with this Agreement or any related document, any of the transactions contemplated hereby or thereby (or the abandonment

or termination thereof) or any matters forming the basis for such abandonment or termination.

## V. REPRESENTATIONS AND WARRANTIES OF SELLERS AND MGI

Sellers hereby, severally and not jointly, represent and warrant to Purchaser and, with respect to Sections 5.1, 5.2, 5.3, 5.5 and 5.7 only, MGI hereby, individually represents and warrants to Purchaser, that:

5.1    Organization and Good Standing.  Each Seller and MGI is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and, subject to the limitations imposed on such Seller and MGI as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease, operate and use its properties and to carry on its business as now conducted.  Each Seller and MGI is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary for the operation of the Business as now conducted, except where the failure to be so qualified, licensed or in good standing would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.2    Authorization of Agreement.  Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Seller and MGI has the requisite power and authority to execute and deliver this Agreement on behalf of itself and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate action on the part of each Seller and MGI.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of each Seller and MGI enforceable against such Seller or MGI, as applicable, and in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 5.3(a), the execution and delivery by each Seller and MGI of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation of the transactions contemplated hereby and thereby and compliance by such Seller or

MGI with any of the provisions hereof will not result in the creation of any Lien upon any Purchased Assets and do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation, modification or acceleration under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of such Seller, MGI or any Debtor Affiliate thereof, (ii) subject to entry of the Sale Order, any Purchased Contract or Permit to which such Seller, MGI or any Debtor Affiliate thereof is a party or by which any of the properties or assets of such Seller, MGI or such Debtor Affiliate are bound, (iii) subject to entry of the Sale Order, any Order or approval of, or registration or filings with any Governmental Body applicable to such Seller or MGI or any of the properties or assets of such Seller or MGI as of the date hereof, or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses <u>(ii)</u>, <u>(iii)</u> and <u>(iv)</u>, such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)       Except as set forth on <u>Schedule 5.3(b)</u> and except to the extent not required if the Sale Order is entered or under the Bankruptcy Code, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Seller, MGI or any Debtor Affiliate thereof in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is a party, the compliance by any Seller or MGI with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by any Seller or MGI of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, if any, (ii) the entry of the Sale Order, and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.4       <u>Real Property</u>.

(a)       Sellers have good and marketable fee simple title to the Owned Real Property, free and clear of all Liens (except for Permitted Exceptions).  <u>Schedule 5.4(a)</u> sets forth a true, correct and complete list of all Owned Real Property.  Except as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect: (i) as of the date of this Agreement, there is no pending or, to the Knowledge of Sellers, threatened condemnation proceeding, administrative action or judicial proceeding of any type relating to any portion of the Real Property or other matters affecting adversely the current use, occupancy or value of the Real Property; (ii) the Real Property does not serve any adjoining property for any purpose inconsistent with the use of the Real Property, and, to the Knowledge of Sellers, the Real Property is not located within any flood plain or subject to any similar type of restriction for which any permits or licenses necessary to the use thereof have not been obtained; (iii) the current use of the Owned Real Property does not, and the use thereof during the three (3) years immediately preceding the date hereof did not, violate any instrument of

record or agreement affecting the Real Property or any applicable Law; and (iv) there are no rights of first refusal, options to purchase, purchase agreements, Contracts for deed or installment sale agreements in effect with respect to all or any part of the Owned Real Property or any interest therein.

(b)　　Schedule 5.4(b) sets forth a true, correct and complete list of all Leased Real Property. True, correct and complete copies of the Leases relating to the Leased Real Property have been delivered to or made available to Purchaser prior to the date hereof.  Other than as set forth on Schedule 5.4(b) or as a result of the Bankruptcy Cases, the applicable Seller has a valid leasehold or sublease interest relating to the Leased Real Property, free and clear of all Liens (except for Permitted Exceptions), and with respect to the Leased Real Property: (i) such Seller is in material compliance with the terms of all Leases relating to such Leased Real Property, and all such Leases are in full force and effect, enforceable in accordance with their terms against the Seller party thereto and, to the Knowledge of Sellers, the counterparties thereto; and (ii) no Seller has received or provided any written notice of any event or occurrence that has not been resolved and that has resulted or would reasonably be expected to result (with or without the giving of notice, the lapse of time or both) in a default with respect to any such Lease.

(c)　　All real property owned by any Seller or any Debtor Affiliates is set forth on Schedule 5.4(a).  All real property leased by any Seller or any Debtor Affiliates is set forth on Schedule 5.4(b). No Seller owns or leases any real property that is not Pre-Petition First Lien Polymers Collateral, Pre-Petition First Lien Resins Collateral or DIP Collateral.

(d)　　Other than the Owned Real Property and Leased Real Property, there is no real property that is used or held for use by any Seller or any of its Affiliates in connection with the conduct of the Business (including the construction, development and operation of the CC Plant and the Desalination Plant).

5.5　　Title to and Sufficiency of Purchased Assets.  Sellers and MGI (with respect to MGI Assets exclusive of the MGI Trademarks) own the Purchased Assets (other than Purchased Intellectual Property, Purchased Software  and MGI Trademarks), and, subject to the entry of the Sale Order and receipt of any Necessary Consents, at the Closing, Purchaser will be vested with good title to such Purchased Assets, free and clear of all Liens other than Permitted Exceptions (other than those Permitted Exceptions of the type described in items (iii), (vi) or (vii) of the definition thereof) and other than any Liens created by Purchaser or that Purchaser elects to assume pursuant to Section 3.1, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  As of the date of this Agreement and as of the Closing, the Purchased Assets and the Records described in Section 8.15 include all material properties, assets (including rights to or under Contracts), and physical and/or electronic copies of all Records (subject to redaction to the extent expressly permitted by Section 2.1(b)(v)) used or held for use by Sellers, MGI and their respective Affiliates in connection with the conduct of the Business (including the construction, development and operation of the CC Plant and the Desalination Plant), other than (a) rights to or

under Shared Contracts that are listed on Schedule 5.8(c) and were made available to Purchaser prior to the date hereof (except as prohibited by the confidentiality provisions of such Shared Contracts (as indicated on Schedule 5.8(c))), (b) rights to or under other Contracts and Leases that are listed on Schedule 5.8(a) and were made available to Purchaser prior to the date hereof (except as prohibited by the confidentiality provisions of such Contracts and Leases (as indicated on Schedule 5.8(a)) but which are not assumed by Purchaser pursuant to this Agreement and/or which were rejected prior to the date of this Agreement, (c) Software (and the assets used to deliver access to such Software) used to provide services under the TSA, (d) Inventory disposed of following the date hereof and prior to the Closing in compliance with Section 8.2(d), (e) the real property owned by Mossi & Ghisolfi Logistics & Engineering Co. listed on Schedule 5.5(e), (f) any Contract, Real Property, Account Payable or Permit that Purchaser elects to make an Excluded Asset pursuant to Sections 2.6(c), 2.6(d), 2.6(e) or 2.6(f) (respectively); and (g) Purchased Intellectual Property, Purchased Software and MGI Trademarks.

5.6     Intellectual Property.

(a)     Schedule 5.6(a) sets forth a true, correct and complete list of all U.S. and foreign (A) issued Patents and pending applications for Patents, (B) Trademark registrations and applications for Trademark registrations, (C) domain names, and (D) registered Copyrights and pending applications for Copyrights which are included in the Purchased Intellectual Property (collectively, the "Registered Intellectual Property"), including, as applicable, (i) registration information of such Registered Intellectual Property (including indicating the owner of such Registered Intellectual Property) and (ii) to the Knowledge of Sellers, the actions that must be taken within ninety (90) days after the date hereof with respect to any item of Registered Intellectual Property for the purposes of continuing the prosecution of, maintaining or renewing any such Registered Intellectual Property, including the payment of any registration, maintenance or renewal fees or the filing of any documents.

(b)     Except as set forth on Schedule 5.6(b)(i), a Seller exclusively owns, free and clear of all Liens, other than Permitted Exceptions, all right, title and interest in and to the Purchased Intellectual Property.  Except as set forth on Schedule 5.6(b)(ii), the Purchased Intellectual Property, the MGI Trademarks and the rights licensed to Sellers under the Purchased Contracts includes all material Intellectual Property that is used in, held for use in or necessary for the conduct of the Business (including the construction, development and operation of the CC Plant and Desalination Plant), all of which rights shall survive unchanged after the consummation of the transactions contemplated by this Agreement for the benefit of Purchaser. Except as set forth on Schedule 5.6(b)(iii), there are no (1) exclusive or (2) royalty-bearing licenses under or to Purchased Intellectual Property authorizing the use of such Purchased Intellectual Property within the field of the Business.

(c)     Except as set forth on Schedule 5.6(c)(i), as of the date hereof, no Legal Proceeding is pending before a Governmental Body or, to the Knowledge of Sellers, threatened, with regard to the ownership, validity or enforceability of any

Purchased Intellectual Property. Notwithstanding anything to the contrary in this Agreement, except as disclosed on Schedule 5.6(c)(ii), as of the date hereof, (i) to the Knowledge of Sellers, the conduct of the Business as conducted as of the date of this Agreement has not and does not infringe, misappropriate or otherwise violate any Person's Intellectual Property, (ii) no Legal Proceedings are pending or, to the Knowledge of Sellers, threatened in writing alleging that the conduct of the Business infringes, misappropriates or otherwise violates any Person's Intellectual Property, (iii) to the Knowledge of Sellers, no Person is infringing, misappropriating or otherwise violating any Purchased Intellectual Property, and (iv) no Legal Proceeding is pending, or, to the Knowledge of Sellers, threatened in writing, alleging that any Person has infringed, misappropriated or otherwise violated any Purchased Intellectual Property. Notwithstanding anything to the contrary in this Agreement, except as set forth on Schedule 5.6(c)(iii), no Purchased Intellectual Property is subject to any outstanding Order restricting the use thereof by the Business or restricting the licensing thereof by the Business to any Person.

(d)      To the Knowledge of Sellers, Sellers and their Affiliates have taken all reasonable measures to protect and maintain the secrecy and confidentiality of all material Trade Secrets used in or related to the Business. To the Knowledge of Sellers, all current and former employees, consultants and independent contractors of Sellers who are or were involved in the creation or development of any material Purchased Intellectual Property for or on behalf of the Business entered into agreements assigning or obligating them to assign such Intellectual Property to a Seller. In the past three (3) years, (i) to the Knowledge of Sellers, there has been no loss, misappropriation, theft or misuse of any Trade Secrets, personally identifiable information or other material data used in or related to the Business, or any Purchased Assets, (ii) to the Knowledge of Sellers, there have been no material failures, misuse, unauthorized access to or breaches of the security of the hardware, Software or information technology systems used by or on behalf of Sellers or in connection with the Business, and (iii) there have been no allegations or investigations by a Governmental Body concerning any of the foregoing.

(e)      To the Knowledge of Sellers, no funding, facilities or resources of any Governmental Body, public research institution, university, college or other educational institution that may be entitled to claim any ownership rights in or to the Purchased Intellectual Property or that would restrict or otherwise affect Sellers' use of, or Sellers' rights in, the Purchased Intellectual Property were used in the creation or development of any Purchased Intellectual Property, and no Governmental Body, public research institution, university, college or other educational institution has any claim or right (including license rights) in or to any of the Purchased Intellectual Property that would restrict or otherwise affect Sellers' use of, or Sellers' rights in, the Purchased Intellectual Property.

(f)      Except as set forth on Schedule 5.6(f), and except as will be provided to Purchaser pursuant to Section 8.8, the Purchased Software and the rights licensed to Sellers under the Purchased Contracts includes all Software that is used in, held for use in or necessary for the conduct of the Business as conducted as of the date

of this Agreement or the Closing Date (including the construction, development and operation of the CC Plant and Desalination Plant as of the date of this Agreement or the Closing Date), all of which rights shall survive unchanged after the consummation of the transactions contemplated by this Agreement for the benefit of Purchaser.  For the avoidance of doubt, Purchased Software may not include all of the Software necessary to operate the CC Plant upon commission of the CC Plant.

5.7     MGI Trademarks.

(a)     Schedule 5.7(a) sets forth a true, correct and complete list of all MGI Trademarks, including, as applicable, (i) registration information of such MGI Trademarks (including indicating the owner of such MGI Trademarks) and (ii) to the Knowledge of MGI, the actions that must be taken within ninety (90) days after the date hereof with respect to any item of MGI Trademarks for the purposes of continuing the prosecution of, maintaining or renewing any such MGI Trademarks, including the payment of any registration, maintenance or renewal fees or the filing of any documents.

(b)     Except as set forth on Schedule 5.7(b), MGI exclusively owns, free and clear of all Liens, other than Permitted Exceptions, all right, title and interest in and to the MGI Trademarks.

(c)     Except as set forth on Schedule 5.7(c)(i), as of the date hereof, no Legal Proceeding is pending before a Governmental Body or, to the Knowledge of MGI, threatened, with regard to the ownership, validity, enforceability of any MGI Trademark. Except as set forth on Schedule 5.7(c)(ii), no MGI Trademark is subject to any outstanding Order restricting the use thereof by the Business or restricting the licensing thereof by the Business to any Person.  To the Knowledge of MGI, no Person is infringing, misappropriating or otherwise violating any MGI Trademarks, and no Legal Proceeding is pending, or, to the Knowledge of Sellers, threatened in writing, alleging that any Person has infringed, misappropriated or otherwise violated any MGI Trademark.

5.8     Contracts.

(a)     Other than the Contracts set forth on Schedule 5.8(a), there are no Contracts to which any Seller or any Debtor Affiliate is a party or by which any Seller or any Debtor Affiliate is otherwise bound, or by which any Purchased Assets are bound or affected, that would reasonably be expected to be material to the Business.  Except as prohibited under the confidentiality provisions of the applicable Contract (as identified in Schedule 5.8(a)), Sellers have made available to Purchaser prior to the date hereof true, correct and complete copies of all Contracts set forth on Schedule 5.8(a).

(b)     Each Contract listed on Schedule 5.8(a) (including each Purchased Contract) is a valid and binding obligation of the Seller(s) and Debtor Affiliate(s) party thereto and, to the Knowledge of Sellers, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by

(i) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, (ii) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (iii) the obligation to pay Cure Amounts under Section 365 of the Bankruptcy Code in accordance with Section 2.5. No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Contract or would cause the acceleration of any obligation of any Seller or any Debtor Affiliate or, to the Knowledge of Sellers, any other party thereto or the creation of a Lien upon any Purchased Asset, except for such events that would not reasonably be expected to be, individually or in the aggregate, adverse in any material respect to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

(c)      Schedule 5.8(c) contains a true, correct and complete list, in all material respects, of Shared Contracts that would reasonably be expected to be material to the Business. Except as prohibited under the confidentiality provisions of the applicable Contract (as identified on Schedule 5.8(c)), Sellers have made available to Purchaser prior to the date hereof true, correct and complete copies of all Contracts set forth on Schedule 5.8(c).

(d)      Sellers have made available to Purchaser prior to the date hereof true, correct and complete copies of each Other TSA in effect as of the date hereof and will promptly provide each Other TSA entered into after the date hereof. Each Other TSA is, or will be when signed, a valid and binding obligation of the Seller(s) party thereto and, to the Knowledge of Sellers, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (i) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally and (ii) equitable principles of general applicability (whether considered in a proceeding at law or in equity). No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Other TSA or would cause the acceleration of any obligation of any Seller or any Affiliate thereof or, to the Knowledge of Sellers, any other party thereto.

5.9      Affiliate Transactions. Except as set forth on Schedule 5.9, no director, officer, employee or Affiliate of a Seller or a Debtor Affiliate, or any individual related by blood, marriage or adoption to any such Person, or any entity controlled, directly or indirectly by any such Person, is a party to any Purchased Contract.

5.10      Bankruptcy and Litigation. Sellers have commenced their Bankruptcy Cases, which may include contested matters and adversary proceedings on a variety of disputed matters. The filing of the Bankruptcy Cases vests in Sellers potential causes of action under chapter 5 of the Bankruptcy Code. Except for (a) the Bankruptcy Cases, and (b) as set forth on Schedule 5.10, there are no Legal Proceedings or Orders pending, outstanding, or to the Knowledge of Sellers, threatened against or related to the Business or any Purchased Asset, nor, to the Knowledge of Sellers, are there any investigations relating to the Business or any Purchased Asset pending or threatened by any Governmental Body, which would reasonably be expected to be, individually or

in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

5.11   Environmental Matters.  Except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole or as set forth on Schedule 5.11:

(a)   the operations of the Business are, and have been for the previous three (3) years, in compliance with all applicable Environmental Laws;

(b)   with respect to the Purchased Assets or the Business, no Seller is the subject of any outstanding Order with any Governmental Body or has received any written unresolved notice alleging noncompliance respecting (i) Environmental Laws or (ii) a Remedial Action;

(c)   there is no investigation, action or proceeding pending, or, to the Knowledge of Sellers, threatened in writing against Sellers that could reasonably be expected to result in Sellers incurring any Liability pursuant to any applicable Environmental Law in connection with the Purchased Assets or the Business;

(d)   there has been no Release or threatened Release by Sellers or in connection with the operation of the Business of, and to the Knowledge of Sellers, the Real Property and the Purchased Assets do not contain, any Hazardous Material in amounts or concentrations which (i) constitute a violation of, or (ii) would reasonably be expected to give rise to Liability, including Liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental Law;

(e)   no Legal Proceeding is pending or, to the Knowledge of Sellers, threatened under any Environmental Law against any Seller with respect to the Real Property, the Business or any of the Purchased Assets;

(f)   each Seller (i) holds all Environmental Permits (except in such instances where the requirement to hold an Environmental Permit is being contested in good faith by a Seller by appropriate proceedings diligently conducted) required for any of their current Business operations or for the current ownership, operation or use of the Real Property, or, to the extent currently required, any construction or expansion related thereto, (ii) is, and has been for the past three (3) years, in compliance with all Environmental Permits, except in such instances where the requirement of an Environmental Permit is being contested in good faith by a Seller by appropriate proceedings diligently conducted, (iii) for the past three (3) years has used commercially reasonable efforts to cause all contractors, lessees and other Persons occupying, operating or using the Real Property to comply with Environmental Law and obtain all necessary Environmental Permits, and (iv) has not received any written notice that the Environmental Permits will not be renewed; and

(g)   Sellers have made available to Purchaser, prior to the date hereof, copies of all environmental assessments, audits (including compliance audits),

evaluations, studies, and tests from the past five (5) years within their possession, relating to the Real Property, the Purchased Assets or the Business, whether generated by a Seller or others, including environmental audits and environmental site assessments.

5.12    Labor and Employee Benefits Matters.

(a)    Schedule 5.12(a) contains a true, correct and complete list of all Plans.  True, correct and complete copies or descriptions of each of the Plans, including any amendments thereto, and all current summary plan descriptions (including any material modifications); for the past three (3) years preceding the date hereof, all material written communication to or from any Governmental Body regarding issues that remain outstanding with respect to the operation of the Plans; the most recently filed IRS Form 5500 and the most recent determination or opinion letter from the IRS with respect to any Plan, have been made available to Purchaser prior to the date hereof.

(b)    (i) Each Plan has been and is being administered, maintained and operated in all material respects in compliance with all applicable Laws and in accordance with its terms, (ii) each Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter, opinion letter or advisory letter from the IRS, stating that its related trust is exempt from taxation under Section 501(a) of the Code, and no event or circumstance exists that has affected or is likely to adversely affect the qualified status of any such Plan, (iii) no Plan is subject to Title IV of ERISA or Part 3 of Subtitle B of Title I of ERISA, (iv) there are no proceedings, audits or investigations relating to any Plan or the assets, fiduciaries or administrators thereof pending or, to the Knowledge of Sellers, threatened, other than routine claims for benefits, (v) no Plan is a multiemployer plan (as defined in Section 3(37) of ERISA, and (vi) all contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made to or in respect of any Plan under the terms of such Plan or in accordance with Law, as of the date hereof, have been timely made or reflected on the applicable financial statements.

(c)    No Seller or any of its ERISA Affiliates has any obligation to provide or make available post-employment benefits to any Employee under any Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA), except as may be required under COBRA or similar Law, and at the sole expense of such individual.

(d)    The information contained in Schedule 5.12(d) is true, correct and complete in all material respects as of the date hereof, and sets forth with respect to each Employee and all individuals providing services to Sellers as independent contractors as of the date hereof: (i) name; (ii) date of hire; (iii) position; (iv) annual base salary or hourly rate or other basis of compensation; (v) annual target bonus incentive and/or commission compensation; (vi) work location; (vii) visa type, if any; (viii) the applicable Collective Bargaining Agreement, if any; (ix) vacation and/or paid time off accrual rate; (x) Fair Labor Standards Act designation; (xi) telecommuter arrangement,

if any; (xii) status as a Leave Employee, the cause of any such leave, and expected date of return to work, if known; and (xiii) workers compensation code.

(e)       (i) No union or group of Employees or former Employees of any Seller has organized any Employees for purposes of collective bargaining, sought to bargain collectively with any Seller, made a demand or recognition or certification as an employee representative for purposes of collective bargaining or filed a petition for recognition with any Governmental Body, (ii) except as set forth on Schedule 5.12(e)(ii), as of the date hereof, no Seller or any of their respective Affiliates is a party to, bound by, subject to, or has any obligations under any current or expired Collective Bargaining Agreement and no Collective Bargaining Agreement is being negotiated by any Seller or any of their respective Affiliates, (iii) in the past three (3) years, there have not been any strikes, lockouts, slowdowns, work stoppages, boycotts or other forms of organized labor disruption with respect to any Seller, and (iv) the execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not (A) result in any breach or other violation of any Collective Bargaining Agreement or (B) give rise to any notification or consultation obligations with respect to any employee representative body.

(f)       Except as set forth on Schedule 5.12(f), neither Sellers nor any of their Affiliates (i) have incurred any Liability under the WARN Act regarding the termination or layoff of employees or (ii) have, during the ninety (90) day period preceding the date hereof effectuated a "plant closing" or a "mass layoff" (as such terms are defined in the WARN Act) affecting any site or employment or facility of Sellers or any of their Affiliates relating to the Business without complying with applicable Law.

(g)       Except as set forth on Schedule 5.12(g), (i) Sellers and their Affiliates are in material compliance with all applicable Laws respecting labor and employment and employment practices, including all Laws respecting terms and conditions of employment, health and safety, wages and hours, classification of independent contractors, child labor, immigration, employment discrimination, disability rights, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, background and credit checks, labor relations, employee leave issues and unemployment insurance, (ii) there are no pending, or to the Knowledge of Sellers, threatened, Legal Proceedings against any Seller or any of their Affiliates brought by or on behalf of any applicant for employment, any current or former Employee, independent contractor or leased employee of any Seller or any Governmental Body, alleging violation of any labor or employment Law, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with an employment relationship, (iii)  each of the Employees has all required work permits, visas, or other authorizations required by Law for such Employee to be employed in the Employee's current position, and (iv) no Employee has been improperly excluded from, or wrongly denied benefits under, any Plan.

(h)       Except as would not result in any Liability to Purchaser, (i) neither Sellers nor their respective ERISA Affiliates maintain or contribute to, or have any Liability in respect of, in the six (6) years prior to the date hereof, a "defined benefit

pension plan" (within the meaning of ERISA) or a Plan that is subject to Section 412 or 430 of the Code, Section 302 or 303 of ERISA or Title IV of ERISA or that is subject to Section 4063, 4064 or 4069 of ERISA ("Title IV Plans"), (ii) no Title IV Plan has failed to meet the minimum funding standard (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA, (iii) no Liability under Title IV or Section 302 of ERISA has been incurred by any Seller or any ERISA Affiliate that has not been satisfied in full, and no condition exists that presents a risk to Sellers or any ERISA Affiliate of incurring any such Liability, (iv) all contributions required to be made by Sellers of any of their respective ERISA Affiliates with respect to any Title IV Plan on or prior to the Closing Date have been timely made, and (v) no Seller nor any ERISA Affiliate has now or at any time contributed to, sponsored, or maintained a "multiemployer plan" (as defined in Section 3(37) of ERISA).

(i) Except as set forth in the KEIP and the KERP (with respect to which any and all Liabilities shall constitute Excluded Liabilities for all purposes under this Agreement), the consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (i) increase any benefits or result in the acceleration of the timing of payment, vesting or funding of any benefits under any Plan, (ii) entitle any Employee or other service provider to any Seller or any of its Affiliates who, as of the date of this Agreement, is providing services in connection with the Business, to, or accelerate the time of payment or vesting, or increase the amount of, any compensation or benefit due any Employee or other service provider to any Seller or any of its Affiliates who, as of the date of this Agreement, is providing services primarily in connection with the Business, or (iii) result in the triggering or imposition of any restrictions or limitations on the rights of any Seller or any of its ERISA Affiliates to amend or terminate any Plan.

5.13    Financial Advisors.  Except as set forth on Schedule 5.13, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

5.14    Taxes.  Except as set forth on Schedule 5.14:

(a) Except as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, (i) All Tax Returns for Periodic Non-Income Taxes relating to the Business, Purchased Assets or Assumed Liabilities required to be filed by a Seller have been timely filed (including extensions), (ii) such Tax Returns are true, correct, and complete in all respects, and (iii) all Periodic Non-Income Taxes (whether or not reflected on such Tax Returns) relating to the Business, Purchased Assets or Assumed Liabilities required to be paid by a Seller have been timely paid in full (including extensions), except for any Taxes that a Seller is prohibited from paying by the Bankruptcy Code or the Bankruptcy Court.

(b) As of the date hereof and (except as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect) as of the Closing Date, no claims for Taxes have been asserted in writing, no Taxes have

been assessed and no proposals or deficiencies for Taxes have been asserted, proposed or threatened in writing by any Governmental Body against a Seller, in each case (i) relating to the Business, Purchased Assets or Assumed Liabilities and (ii) except for any claims filed with the Bankruptcy Court or any claims, assessments, proposals or deficiencies that have been paid or resolved.

(c)     As of the date hereof and (except as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect) as of the Closing Date, to the Knowledge of Sellers, no claim has ever been made in writing by a Governmental Body that Tax Returns are required to be filed in relation to the Business, Purchased Assets or Assumed Liabilities in a jurisdiction where no such Tax Returns are currently filed.

(d)     No agreement or waiver extending the period for assessment, reassessment or collection of any material Periodic Non-Income Taxes beyond the date hereof relating to the Business, Purchased Assets or Assumed Liabilities has been executed or filed by a Seller with any Governmental Body.

(e)     No material Liens for Taxes (other than statutory Liens for Taxes, assessments or other governmental charges that are not yet due and payable for which adequate reserves have specifically been established in accordance with IFRS in the Financial Statements and Liens that will be released upon payment of the Tax Lien Amounts at Closing) exist with respect to any of the Purchased Assets.

5.15    Compliance with Law; Permits.

(a)     Except as set forth in Schedule 5.15(a)(i), or with respect to Permits required under any Environmental Law (which Permits are addressed in Section 5.11), Sellers hold all of the Permits necessary for the current operation and conduct of the Business and the Purchased Assets and the continued construction and development of the CC Plant in compliance with Law, other than any such Permits the absence of which would be immaterial to the operation of the Business or the Purchased Assets and the continued construction, development and completion of the CC Plant from and after the Closing. Schedule 5.15(a)(ii) set forth a true, correct and complete list of all Permits (including Permits required under any Environmental Law) held by any Seller or any Debtor Affiliate with respect to the operation and conduct of the Business and the Purchased Assets.

(b)     Except (i) as set forth on Schedule 5.15(b) or with respect to compliance with Environmental Laws (which is addressed in Section 5.11) or (ii) as would not reasonably be expected to be material to the Business or the Purchased Assets, Sellers have conducted the Business for the past three (3) years and currently own and operate the Business and the Purchased Assets in accordance, in all material respects, with all Law, Orders and Permits applicable to Sellers and the Purchased Assets, and the Business is, and during such period has been, in compliance in all material respects with all applicable Law, Orders and Permits (including any anti-bribery Law) and has obtained all approvals necessary for owning and operating the Purchased

Assets and the Business and has made all necessary filings with all Governmental Bodies having jurisdiction necessary for owning and operating the Business and the Purchased Assets.

(c)     Except (i) as set forth on Schedule 5.15(c) or with respect to actions under Environmental Law (which are covered under Section 5.11), or (ii) as would not reasonably be expected to be material to the Business or the Purchased Assets, neither any Seller, nor to the Knowledge of Sellers, any of their respective Representatives have received within the past three (3) years any written notice or other communication from a Governmental Body that alleges that the Business or the Purchased Assets is not in compliance with any Law, Order or Permit applicable to the Business or the operations or properties of the Business or the Purchased Assets or that threatens or states the intention on the part of any issuing Governmental Body to revoke, cancel, suspend or modify any Permit necessary for the current or future operation and conduct of the Business and the Purchased Assets (except with respect to periodic expirations and renewals thereof in the Ordinary Course of Business). Except as would not reasonably be expected to be material to the Business or the Purchased Assets: (A) Sellers have not had any Permits that are necessary for the current operation and conduct of the Business and the Purchased Assets appealed, denied, revoked, restricted or suspended during the past three (3) years; and (B) no Seller is currently a party to any proceedings involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current operation and conduct of the Business and the Purchased Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Court).

5.16     Insurance.  Schedule 5.16 sets forth all material insurance policies held by Sellers covering the property, assets, Employees and operations of the Business or the Purchased Assets (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect (subject to periodic renewals thereof).  Except as set forth on Schedule 5.16, Sellers have paid all premiums on such policies due and payable prior to the date hereof, or, if not yet due, have properly accrued for such payables. To the Knowledge of Sellers, no Seller has done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.17     FCPA.  In connection with the operation of the Business or the Purchased Assets, no Seller nor, to the Knowledge of Sellers, any director, officer, agent, employee or Debtor Affiliate of any Seller, has taken any action with respect to the Business or the Purchased Assets that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "FCPA"). Sellers, and, to the Knowledge of Sellers, their respective Debtor Affiliates, have conducted the Business and operated the Purchased Assets in compliance with the FCPA in all material respects and maintain procedures which are reasonably designed to ensure compliance therewith.

5.18    Financial Statements.  Sellers have made available to Purchaser prior to the date hereof true, correct and complete copies of the unaudited balance sheets for each Seller as of December 31, 2017 (the "Financial Statements"). The Financial Statements have been prepared in accordance with IFRS in all material respects consistently applied in accordance with the relevant Seller's past practice except for the absence of footnotes and customary year-end adjustments. The Financial Statements (i) were prepared based on the books and records of the relevant Seller and (ii) fairly present in all material respects the financial position of the relevant Seller at and as of the dates specified and the results of their operations for the period covered, subject to customary year-end adjustments and the absence of footnotes.

5.19    Absence of Certain Changes.

(a)    Since the Polymers Petition Date through the date hereof, there has not been a Seller Material Adverse Effect.

(b)    Except as set forth in the relevant subsection of Schedule 5.19(b), or as expressly contemplated by this Agreement or any Orders entered in the Bankruptcy Cases from and after the Polymers Petition Date with respect to Polymers or the Resins Petition Date with respect to the other Sellers through the date hereof, no Seller or Debtor Affiliate has:

(i)    except for executory Contracts and unexpired leases rejected by a Seller in connection with the Bankruptcy Cases and in compliance with Section 2.6(g), terminated, modified or amended any Purchased Contract other than due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such Purchased Contract;

(ii)    purchased or otherwise acquired any material properties or assets (tangible or intangible) or assigned, licensed, conveyed, sold, leased, transferred or otherwise disposed of any material properties or assets (tangible or intangible) that would be Purchased Assets if a Seller or Debtor Affiliate had any right, title or interest therein on the date of this Agreement, except for (A) purchases of materials and sales of surplus equipment and Inventory in the Ordinary Course of Business, (B) dispositions of obsolete assets, or (C) dispositions of Inventory in accordance with obligations under the Cash Collateral Orders;

(iii)    (A) permitted, allowed or suffered any of the Purchased Assets to be subjected to any Lien (other than Permitted Exceptions), or (B) removed any (non-surplus) equipment or other material tangible assets (other than Inventory disposed of in accordance with obligations under the Cash Collateral Orders) from the CC Plant other than in the Ordinary Course of Business;

(iv)     suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(v)     changed in any material respect any Seller's accounting methods, principles or practices other than required by changes in IFRS;

(vi)     allowed any material Permit held by any Seller or Debtor Affiliate to terminate; or

(vii)     agreed or committed in writing to do any of the foregoing.

5.20     NDAs.  Schedule 5.20 sets forth a true, correct and complete list of all non-disclosure and confidentially Contracts entered into by any Seller or any Affiliate thereof in connection with the sale process relating to any of the Purchased Assets. Except as identified in Schedule 5.20, Sellers have made available to Purchaser prior to the date hereof true, correct and complete copies of all Contracts set forth on Schedule 5.20.

5.21     No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the applicable Schedules hereto) or in any document, instrument or certificate delivered pursuant hereto, none of Sellers, MGI nor any other Person makes any other express or implied representation or warranty with respect to Sellers, MGI, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and each Seller and MGI disclaims any other representations or warranties, whether made by Sellers, MGI, any Affiliate of Sellers or MGI, or any of Sellers', MGI's or their Affiliates' respective Representatives.  Except for the representations and warranties contained in this Article V (as modified by the applicable Schedules hereto) or in any document, instrument or certificate delivered pursuant hereto, each Seller and MGI (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Business or the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials), (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Sellers, MGI or any of their Affiliates), and (c) makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business or the Purchased Assets or the use thereof. Notwithstanding the foregoing, nothing in this Agreement shall limit or restrict the ability of Purchaser to assert any claim based on fraud or intentional misrepresentation.

## VI. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers and MGI that:

6.1 <u>Organization and Good Standing</u>. Purchaser is an entity duly organized, validly existing and in good standing under the Laws of the state of its incorporation and has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2 <u>Authorization of Agreement</u>. Purchaser has the requisite corporate power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Purchaser. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3 <u>Conflicts; Consents of Third Parties</u>. (a) The execution and delivery by Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of: (i) the certificate of incorporation and by-laws or comparable organizational documents of Purchaser; (ii) any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound; (iii) any Order of any Governmental Body applicable to Purchaser or any of the properties or assets of Purchaser as of the date hereof; or (iv) any applicable Law, other than, in the case of clauses <u>(ii)</u>, <u>(iii)</u> and <u>(iv)</u>, such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b) No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to

which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, if any, (ii) the Comisión Nacional Bancaria y de Valores taking due notice of the transactions subject matter of this Agreement, (iii) the entry of the Sale Order, and (iv) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.4     Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.5     Financial Advisors.  Except for FTI Consulting, Inc., no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

6.6     Financial Capability.  Purchaser will have at the Closing sufficient funds available in cash to pay the Purchase Price, the Other Payments and any fees and expenses incurred by or otherwise required to be paid by Purchaser in connection with the transactions contemplated by this Agreement.  Upon the consummation of the transactions contemplated hereby, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.  For the avoidance of doubt, Purchaser's obligations to complete the transactions contemplated hereby are not dependent upon or conditioned on receipt of financing.

6.7     Condition of the Purchased Assets.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Sellers and MGI are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers and MGI in Article V (as modified by the applicable Schedules hereto) or in any document, instrument or certificate delivered pursuant hereto, and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis. Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation.

Notwithstanding the foregoing, nothing in this Agreement shall limit or restrict the ability of Purchaser to assert any claim based on fraud or intentional misrepresentation.

## VII. BANKRUPTCY COURT MATTERS

7.1     <u>Bankruptcy Court Filings</u>.  Sellers have filed with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order and the Sale Order.  The Bankruptcy Court has entered the Bidding Procedures Order, and Sellers will pursue diligently the entry of the Sale Order, substantially in the form attached hereto as <u>Exhibit A</u>, with such changes thereto as Purchaser may approve in its sole discretion.

7.2     <u>Sale Order</u>.  Sellers shall request the Bankruptcy Court to, on or prior to March 23, 2018 (or such later date as agreed in writing by Purchaser), enter the Sale Order substantially in the form as set forth in <u>Exhibit A</u> hereto, with such changes thereto as Purchaser may approve in its sole discretion.  In the event Sellers cancel the Auction with respect to the Purchased Assets, Sellers shall nonetheless be obligated to request at the hearing on the Sale Order that the Bankruptcy Court enter the Sale Order.

7.3     <u>Purchaser Cooperation</u>.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser of the Purchased Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Bidding Procedures Order or the Sale Order is appealed, Sellers and Purchaser will use their respective commercially reasonable efforts to defend such appeal(s).

## VIII. COVENANTS

8.1     <u>Access to Information</u>.

(a)     Prior to the Closing Date, Purchaser will be entitled, through its officers, employees, consultants and representatives (including its legal advisors and accountants), to make such investigation of the Purchased Assets and the Assumed Liabilities as it reasonably requests; <u>provided</u>, that Purchaser will not be entitled to conduct any Phase II environmental assessment or environmental sampling or testing without Sellers' prior written consent, which may be withheld in Sellers' sole discretion. Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances and will be subject to restrictions under applicable Law.  From the date of this Agreement until the Closing Date, Sellers shall, and shall cause their relevant Controlled Affiliates to, provide Purchaser, its Affiliates and its Representatives with reasonable access to all employees and Representatives of Sellers and the Business and with information, including employee records and Plan data, reasonably requested by Purchaser and its Affiliates and Representatives, except as otherwise prohibited by Law. Notwithstanding anything herein to the contrary, no

such investigation or examination will be permitted to the extent that it would require Sellers to disclose information that would cause material competitive harm to a Seller or would violate attorney-client privilege; provided, however, that Sellers shall inform Purchaser of the general nature of any requested information being withheld for this reason and shall use commercially reasonable efforts to provide such requested information to Purchaser and its Affiliates in a manner which would not cause such harm or violate such privilege (including through provision of redacted documents or utilization of "outside counsel only" review procedures). For a period of one (1) year following the Closing, Purchaser shall preserve and keep the Records held by it or its Affiliates relating to the Business and shall provide Sellers with reasonable access to such Records upon reasonable advance notice and under reasonable circumstances and subject to restrictions under applicable Law, in each case as may be reasonably required by Sellers in connection with Legal Proceedings, the Bankruptcy Cases, the administration, wind-down and liquidation of Sellers' estates, Tax audits, or in order to enable Sellers to comply with their obligations under the APG Purchase Agreement (and related agreements), the Chemtex Purchase Agreement (and related agreements), or this Agreement and the TSA; provided, that Purchaser may destroy any such Records at any time so long as Purchaser gives Primary Seller ninety (90) days' prior written notice and permits Primary Seller to take possession or make copies (at Primary Seller's cost and expense) of such Records within such ninety (90)-day period.

(b)     The information or knowledge obtained in any investigation by Purchaser or its Affiliates or Representatives or other information received by Purchaser or its Affiliates or Representatives pursuant to Section 8.1(a) or otherwise (including from Sellers pursuant to Section 8.14) shall not (i) operate as a waiver or be deemed to affect or modify any representation, warranty, covenant or agreement contained herein, the conditions to the obligations of the parties to consummate the Closing in Article IX or otherwise prejudice in any way the rights and remedies of Purchaser hereunder, (ii) operate as a waiver or be deemed to affect or modify Purchaser's reliance on the representations, warranties, covenants and agreements made by Sellers in this Agreement or in any certificate, document or other instrument delivered in connection herewith, or (iii) operate as a waiver or be deemed to amend or supplement the Schedules hereto or prevent or cure any misrepresentation, breach of warranty or breach of covenant by Sellers hereunder or in any certificate, document or other instrument delivered in connection herewith.

8.2     Conduct of the Business Pending the Closing.  Except (1) as set forth on Schedule 8.2, (2) as required by applicable Law or by Order of the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement, or (4) with the prior written consent of Purchaser or the approval of the Bankruptcy Court, from the date of this Agreement until the Closing Date, MGI, with respect to MGI Assets only, and each Seller shall (and shall cause its respective Controlled Affiliates to):

(a)     use commercially reasonable efforts to maintain and preserve the Purchased Assets (other than the Purchased Intellectual Property and MGI Trademarks), in their current condition (ordinary wear and tear excepted), except for Inventory disposed of in compliance with Section 8.2(d);

(b)    use commercially reasonable efforts to maintain their books and records to the extent related to the Purchased Assets or the Business in the Ordinary Course of Business;

(c)    use commercially reasonable efforts to maintain in full force and effect all material Permits (including all Environmental Permits) used or held for use in connection with the Purchased Assets or the Business;

(d)    not assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except for (i) the purpose of disposing of obsolete assets in the Ordinary Course of Business, (ii) disposal of Inventory in accordance with obligations under the Cash Collateral Orders), or (iii) pursuant to the Intercompany License(s));

(e)    not change in any material respect its policies or practices regarding accounts receivable or accounts payable;

(f)    not make any capital expenditures except to the extent permitted by the DIP Credit Documents;

(g)    not incur, assume or guarantee any Indebtedness or Liability of any other Person in connection with the Business, other than any Indebtedness or Liability that will be repaid at or prior to the Closing or constitute an Excluded Liability;

(h)    not grant, and use commercially reasonable efforts to not suffer to exist, any Lien on any of the Purchased Assets, other than any Permitted Exceptions and the Intercompany License(s);

(i)    not concede, settle, pay, discharge or satisfy any material Legal Proceeding that would constitute a Purchased Asset or Assumed Liability, including any such settlement, payment, discharge or satisfaction that would impose any restrictions or limitations upon the operations of the Business, whether before or after the Closing;

(j)    not terminate or materially amend or modify, and use commercially reasonable efforts not to let lapse, any insurance policy maintained by any Seller or Debtor Affiliate in connection with the Business unless such policy is replaced by a reasonably comparable policy (but only to the extent such insurance policy, or any rights thereunder or claims or proceeds with respect thereto, would constitute a Purchased Asset);

(k)    maintain and not abandon, cancel or let lapse, continue to prosecute, protect or defend, or otherwise dispose of or license, any Purchased Intellectual Property or MGI Trademarks except pursuant to the Intercompany License(s);

(l)    use commercially reasonable efforts to defend and protect the Purchased Assets from infringement or deterioration;

(m)     not (i) enter into, accelerate, terminate, cancel, renew or amend any Purchased Contract, Other TSA or Permit, other than the Intercompany License(s) or in the Ordinary Course of Business, or (ii) enter into any related party transaction (other than the Intercompany License(s));

(n)     not make any changes in any accounting methods, principles or practices in connection with the Business except as required by a change in IFRS (or authoritative interpretation thereof);

(o)     not (i) make (other than in the Ordinary Course of Business), change, or rescind any material election relating to Taxes, (ii) amend any Tax Return, (iii) surrender any material right or claim to a refund of Taxes, or (iv) consent to any extension or waiver of the statute of limitations period applicable to any Taxes, Tax Returns or claims for Taxes, in each case to the extent relating to the Business or the Purchased Assets or Assumed Liabilities;

(p)     not grant or announce any increase in the compensation, perquisites or benefits (whether through the payment of, agreement to pay or otherwise) of any Employee, other than increases required by applicable Law or required by the terms of Plans in effect as of the date hereof;

(q)     not enter into, amend, terminate or renew (i) any Contracts with any Employee or (ii) any Plan or any other agreement, plan, or arrangement that would be a Plan as in effect on the date hereof (including any Contracts for the administration of any Plans);

(r)     not transfer the employment of any Employee to any business or unit of Sellers or any of their Affiliates other than the Business;

(s)     not enter into, amend, terminate or negotiate to enter into or amend any Collective Bargaining Agreement;

(t)     comply with all applicable Laws in all material respects;

(u)     except for actions taken in accordance with the Bidding Procedures, not take, or agree to commit to assist any other Person in taking, any action that (i) would reasonably be expected to result in failure of any of the conditions to the Closing or (ii) would reasonably be expected to impair the ability of Sellers or Purchaser to consummate the Closing in accordance with the terms hereof or to materially delay such consummation; and

(v)     not authorize, resolve, commit, agree (by Contract or otherwise) or otherwise become obligated to take any of the actions in the foregoing clauses of this Section 8.2.

8.3     Consents.  Sellers will use their commercially reasonable efforts, and Purchaser will cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and

approvals referred to in Section 5.3; provided, however, that no Seller or Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceeding to obtain any such consent or approval.

8.4    Regulatory Approvals.

(a)    Purchaser and Sellers shall use commercially reasonable efforts to (i) make or cause to be made all filings that may be required of each of them or any of their respective Affiliates (in the case of any Seller, its Controlled Affiliates) under any Antitrust Laws (other than under the HSR Act, which filings were made on March 9, 2018 and March 12, 2018 with respect to Sellers and Purchaser, respectively) with respect to the transactions contemplated hereby as promptly as reasonably practicable, (ii) respond reasonably promptly to any request under the HSR Act or other Antitrust Laws for additional information, documents or other materials received by each of them or any of their respective subsidiaries from Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other Governmental Body in respect of such filings or such transactions, and (iii) reasonably cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction.  Each such party will use commercially reasonable efforts to furnish to each other all information reasonably required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.  Each such party will promptly inform the other parties of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction.  No party hereto will independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.  Subject to applicable Law, the parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party relating to proceedings under the HSR Act or other Antitrust Laws.  Sellers and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Purchaser, as the case may be).  Notwithstanding anything herein to the contrary, Purchaser shall have, except where prohibited by applicable Law, sole and complete responsibility for determining the strategy for dealing with any Governmental Body regarding the application of any Antitrust Laws to the

transactions contemplated by this Agreement, but shall consult with Primary Seller and reasonably consider Primary Seller's views with respect to such strategy.

(b)     Each of Purchaser and Sellers will use its commercially reasonable efforts to resolve such objections under the Antitrust Laws, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement.  Each of Purchaser and Sellers will use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as practicable after the execution of this Agreement.  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall require, or be construed to require, Purchaser or any of its Affiliates to (and each Seller shall not, shall cause its Controlled Affiliated not to, and shall use commercially reasonable efforts to cause each of its other relevant Affiliates not to, without the prior written consent of Purchaser, which consent may be withheld for any reason), in connection with obtaining any approval, authorization, consent, ratification, permission or exemption (including the waiver, expiration, lapse or termination of any waiting period (including any extension thereof) (each, an "<u>Antitrust Consent</u>"), pursuant to the HSR Act or under any other Antitrust Laws, (i) agree to (A) any sale, license, divestiture or other disposition or holding separate (through establishment of a trust or otherwise) of any capital stock, businesses, assets (tangible or intangible), properties or other interests of Purchaser, Sellers or any of their respective Affiliates, (B) the imposition of any limitation, restriction or condition on the ability of Purchaser, Sellers or any of their respective Affiliates to conduct their respective businesses or own, acquire, hold or exercise full rights of ownership of any capital stock, businesses, assets (tangible or intangible), properties or other interests, (C) the imposition of any limitation, restriction or condition on Purchaser, Sellers or any of their respective Affiliates under any Antitrust Law, or (D) any material modification or waiver of the terms and conditions of this Agreement (any such occurrence described in clause <u>(A)</u>, <u>(B)</u>, <u>(C)</u> or <u>(D)</u> above, a "<u>Burdensome Condition</u>") or (ii) litigate with or otherwise participate in any Legal Proceeding with any Governmental Body in connection with obtaining any Antitrust Consent pursuant to this Agreement.

8.5     <u>Further Assurances</u>.  Subject to the other provisions of this Agreement (including the limitations set forth in <u>Section 8.4</u> with respect to Antitrust Law matters), each of Purchaser and each Seller will, and will cause their respective Affiliates (in the case of any Seller, its Controlled Affiliates) to, use its commercially reasonable efforts to (a) take all actions reasonably necessary, advisable or appropriate to carry out the provisions hereof and consummate the transactions contemplated by this Agreement (including in connection with Purchaser's efforts to obtain title insurance policies for any Real Property), and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement; <u>provided</u>, that Sellers shall not be required to make any payments or incur any out of-pocket-expense in connection with any of the actions described in clause <u>(a)</u> to the extent taken following the Closing unless Purchaser provides reasonable advance funding to Sellers. Sellers shall promptly notify Purchaser in writing if any Seller identifies any asset, property or right used or held for use in connection with the conduct of the Business prior to the Closing in which any Affiliate of any Seller has

any right, title or interest (such Affiliate's right, title and interest therein, an "Affiliate Asset").  At any time following the date hereof (whether prior to or following the Closing), at Purchaser's request with respect to any Affiliate Asset (whether or not identified by Sellers pursuant to the immediately preceding sentence), Sellers shall cooperate with Purchaser and use commercially reasonable efforts to facilitate the acquisition of such Affiliate Asset by Purchaser or one or more of its Affiliates for reasonable consideration; provided, that Sellers shall not be required to make any payments or incur any out of-pocket-expense in connection with such acquisition and in no circumstance shall the receipt of any such Affiliate Asset by Purchaser be deemed to be a condition to the Closing of the transactions contemplated hereby.

8.6     Publicity.  Unless otherwise agreed by Purchaser and Primary Seller, the initial press release concerning this Agreement and the transactions contemplated hereby will be in form and substance reasonably acceptable to the parties.  None of the parties will issue any press release or other public statement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of Purchaser or Primary Seller, as applicable, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Primary Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided, however, that the party intending to make such release or statement uses its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser or Primary Seller, as applicable, with respect to the text thereof.

8.7     Confidentiality.

(a)     Purchaser acknowledges that confidential and proprietary information of Sellers and their Affiliates has been and in the future may be provided to it in connection with this Agreement and certain of that information is subject to the provisions of any existing confidentiality or non-disclosure arrangement between Purchaser and M&G Chemicals S.A.; provided, that Purchaser's obligations to maintain such information in confidence will expire with respect to the Purchased Assets and Assumed Liabilities at the Closing.  Purchaser acknowledges and understands that this Agreement and its Schedules may be publicly filed in the Bankruptcy Court and further made available by Sellers to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise.  Sellers acknowledge that from and after the Closing, all non-public information relating to the Purchased Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates.  Sellers agree that, from and after the Closing, no Seller will and Sellers will cause their Controlled Affiliates not to disclose to any Person any information relating to Purchaser and its Affiliates, the Purchased Assets or the Assumed Liabilities, except as required by Law or as otherwise becomes available in the public domain other than through any action by any Seller or any Controlled Affiliate thereof in violation of its obligations under this Section 8.7.  Sellers will, and will direct their Representatives to, enforce the provisions of any existing confidentiality or non-disclosure agreement

entered into by Sellers or any of their Controlled Affiliates with any other Person in connection with the sale process of the Business, the Purchased Assets and the Assumed Liabilities.  Within three (3) Business Days following the Closing Date, Sellers shall request (and thereafter use commercially reasonable efforts to cause) the prompt return or destruction of any confidential or proprietary information provided to any Person in connection with the sale process of the Business, the Purchased Assets and the Assumed Liabilities, other than Purchaser and its Affiliates and Representatives. Sellers acknowledge and agree that the remedies at law for any breach or threatened breach of this <u>Section 8.7</u> are inadequate to protect Purchaser and its Affiliates and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms.  Accordingly, without prejudice to any other rights or remedies otherwise available to Purchaser or its Affiliates, each party acknowledges and agrees that upon any breach or threatened breach by a Seller of the terms and conditions of this <u>Section 8.7</u>, Purchaser and its Affiliates, as applicable, will be entitled to immediate injunctive relief and  an Order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy.  The provisions of this <u>Section 8.7</u> will survive the Closing.

(b)     At the Closing, Sellers will, and will cause their respective Affiliates (including M&G Chemicals S.A.) to, assign to Purchaser all of their respective rights in respect of the portions of any non-disclosure or non-use of non-public information related to the Business under all Contracts entered into by Sellers and their respective Affiliates in connection with the sale process relating to any of the Purchased Assets (including those Contracts listed on <u>Schedule 5.20</u>), except to the extent otherwise requested by Purchaser prior to the Closing.  As soon as practicable following the date hereof, taking into account any confidentiality restrictions in such Contracts, Sellers shall deliver to Purchaser true, correct and complete copies of all such Contracts not made available to Purchaser prior to the date hereof.

8.8     <u>Other Transition Matters</u>.

(a)     Sellers shall either: (i) (A) fully complete the Carve-out and Cut-over stages (each as described in <u>Schedule 8.8(a)</u>) prior to the Closing and (B) deliver to Purchaser the Standalone Business Systems and Data (as defined in <u>Schedule 8.8(a)</u>) in a form reasonably acceptable to Purchaser at the Closing, or (ii) until the conclusion of the Transition Period, provide (and cause their Affiliates to provide) Purchaser with certain transition services and other services to facilitate Purchaser's transition to independent systems and operations sufficient to support the continued construction and development of, and sufficient for the completion of, the CC Plant and the Desalination Plant, and sufficient for the conduct of the Business after the Closing as currently conducted and as conducted immediately prior to the Closing (the "<u>Services</u>") pursuant to a transition services agreement (the "<u>TSA</u>") as set forth in more detail in and consistent with the terms outlined in <u>Schedule 8.8(a)</u>.  Sellers and Purchaser agree to negotiate in good faith, the terms and conditions of the TSA not otherwise set forth in <u>Schedule 8.8(a)</u>, to the extent required, prior to the Closing, but in

any event from and after the Closing the terms and conditions in <u>Schedule 8.8(a)</u> shall be binding unless and until a definitive TSA is executed by both parties.

(b) "<u>Transition Period</u>" shall mean the period from the Closing Date through the earliest to occur of (i) 5:00 p.m. (Eastern time) on June 30, 2018; (ii) the termination of the TSA pursuant to its terms; and (iii) such date as (A) Sellers and each of their Affiliates who are providing Services pursuant to the TSA liquidate or otherwise cease to exist, or (B) the Bankruptcy Court enters an Order dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code. Sellers shall provide Purchaser with at least five (5) Business Days' prior written notice in the event Sellers reasonably expect the TSA may terminate as a result of the occurrence of any of the events described in clause <u>(iii)</u> of the definition of Transition Period.

(c) During the Transition Period, Sellers shall, and shall cause their Controlled Affiliates to, use their respective commercially reasonable efforts to facilitate Purchaser's receipt of services directly from any third party service providers as necessary or appropriate in connection with any transition services, including transfer or assignment of any relevant Contract. At any time prior to the conclusion of the Transition Period, Purchaser may elect to (i) acquire any or all of the operations, resources and assets (including any amounts prepaid in respect of any Contract listed on <u>Schedule 8.8(c)</u> (such Contracts, the "<u>Other TSAs</u>")) in each case that are being utilized by Sellers and their Affiliates exclusively to provide the Services to Purchaser or to provide transition services to any other Person pursuant to any Other TSA (the "<u>TSA Assets</u>") (ii) obtain access to all operations, resources and assets in each case that are being otherwise utilized by Sellers and their Affiliates to provide the Services to Purchaser or to provide transition services to any other Person pursuant to any Other TSA ("<u>Other TSA Assets</u>"), and (iii) make offers of employment to any personnel engaged in providing, the Services to Purchaser or to provide transition services to any other Person pursuant to any Other TSA (the "<u>TSA Personnel</u>"), provided that to the extent any TSA Assets or Other TSA Assets constitute M&G Affiliate Third Party Software, Sellers shall comply with their obligations pursuant to <u>Section 8.8(e)</u> with respect thereto.

(d) In the event Purchaser so elects to acquire any TSA Assets or access to Other TSA Assets, Sellers shall, and shall cause their Affiliates to, promptly transfer, assign, convey and deliver to Purchaser all of their right, title and interest in, to and under any such TSA Assets, free and clear of all Liens (other than Permitted Exceptions (other than those Permitted Exceptions of the type described in items <u>(iii)</u>, <u>(vi)</u> or <u>(vii)</u> of the definition thereof)), in consideration for Purchaser's assumption of Sellers' and their Affiliates' obligations and Liabilities under the Other TSAs (as in effect as of the date hereof or as amended or modified after the date hereof with Purchaser's prior written consent) following the time of the transfer thereof (it being understood that Purchaser shall in no case assume or become responsible for any such obligations or Liabilities that relate to any failure to perform, improper performance, breach, default or violation by any Seller or any of their Affiliates), <u>provided</u> that such obligations and Liabilities shall only be assumed to the extent the TSA Assets include prepaid amounts

in respect of the applicable Other TSA.  Notwithstanding the foregoing, none of the assets described on <u>Schedule 8.15</u> shall constitute TSA Assets, unless otherwise agreed by Sellers.

(e)     Purchaser acknowledges that the "M&G Affiliate Third Party Software" (as defined below) is provided by a third party under a contract to M&G Finanziaria S.R.L or other Persons which are not Affiliates of the Debtors, and therefore such software will be available to Purchaser only to the extent such software remains available to Sellers, <u>provided</u> that, effective as of the date of this Agreement, Sellers will use their commercially reasonable efforts to (i) provide comparable alternative arrangements (including by acquiring a short-term license directly from such third parties, if (A) the cost thereof is acceptable to Purchaser and (B) Purchaser agrees, in advance, to be solely responsible for such cost) and (ii) take reasonable measures to mitigate the potential impact of any such occurrence, including by undertaking the Carve-out and Cut-over stages (as described on <u>Schedule 8.8(a)</u>) as soon as reasonably possible.  As used above, the "<u>M&G Affiliate Third Party Software</u>" refers to those software platforms set forth on Annex 1 to <u>Schedule 8.8(a)</u>.

(f)     Notwithstanding anything to the contrary in this Agreement or its Schedules, Sections A.4, A.14, A.15 and A.16 of <u>Schedule 8.8(e)</u><u>8.8(a)</u> shall be binding on Sellers as from the date hereof, subject to receipt by Primary Seller of the Service Fee (as defined in <u>Schedule 8.8(a)</u>).

8.9    <u>Intellectual Property Matters</u>.

(a)     Sellers shall provide an updated <u>Schedule 5.6(a)</u> and MGI shall provide an updated <u>Schedule 5.7(a)</u> in writing within fourteen (14) days of the Closing Date but no later than one (1) week prior to the Closing Date.  Any Intellectual Property applications, filings or registrations listed therein shall be considered Registered Intellectual Property or MGI Trademarks, as applicable, for all purposes under this Agreement.

(b)     Prior to the Closing, Sellers and MGI shall use commercially reasonable efforts to, and use commercially reasonable efforts to cause their applicable Affiliates to, obtain and file documents with the appropriate Governmental Body as necessary to record the applicable Seller (or, if applicable, Controlled Affiliate) or MGI as, or correct the record such that the applicable Seller (or, if applicable, Controlled Affiliate) or MGI is, the sole owner of the Registered Intellectual Property or MGI Trademarks, as applicable, including as necessary to correct any chain of title issues that may be identified by Purchaser at least thirty (30) days prior to Closing, all at Purchaser's preapproved expense; <u>provided</u>, that in the event the parties are not able to obtain or file any such documents prior to the Closing, Sellers and MGI shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause their Affiliates to, assist Purchaser to do so as soon as reasonably practicable thereafter (<u>provided</u>, that, if the foregoing activities will require out-of-pocket costs to be paid by any Seller or to a third party, such Seller shall notify Purchaser of the amount of

such costs and such Seller shall be required to proceed with such activities only if Purchaser agrees to bear such cost).

(c) As of the date hereof and following the Closing, upon Purchaser's reasonable request, MGI (with respect to the MGI Trademarks) and Sellers shall, at Purchaser's pre-approved expense, use commercially reasonable efforts to cooperate with Purchaser and provide reasonable information and assistance in connection with the prosecution, enforcement, defense and/or maintenance of any registrations or applications therefore included in the Purchased Intellectual Property and MGI Trademarks or the proper recordation of the assignment of ownership thereof to Purchaser in all jurisdictions, as applicable, throughout the world (including by means of executing and notarizing assignments suitable for recordation in each jurisdiction's applicable patent and trademark office). In the event that any Purchased Intellectual Property and/or any MGI Trademark is not properly transferred to Purchaser in accordance with the provisions of this Agreement or otherwise, unless and until such Intellectual Property and/or MGI Trademark is transferred, effective from and after the Closing Sellers and MGI (and on behalf of their Controlled Affiliates, if applicable) hereby grant to Purchaser a non-exclusive, worldwide, perpetual, irrevocable, fully paid-up, royalty-free, transferable license under any such Intellectual Property and/or MGI Trademark, which license shall survive any transfer, whether in whole or in part, of any such Intellectual Property, and Sellers shall make any such transfer subject to such license.

(d) To the extent not delivered pursuant to Section 4.2(a)(iv) or Section 4.2(b)(vi), upon the request of Purchaser (and at Purchaser's pre-approved expense, to the extent Purchaser requests any efforts of Sellers or MGI which incur out of pocket costs owed to third parties), at or promptly following the Closing, MGI (with respect to the MGI Trademarks) and Sellers (and, as applicable, any Controlled Affiliate) will deliver to Purchaser duly executed assignments (and any other necessary accompanying documentation) of all non-U.S. registrations and pending applications for Patents and Trademarks (or other Intellectual Property that would or does constitute Registered Intellectual Property) that are included in the Purchased Intellectual Property or MGI Trademarks, to be substantially in the form provided by Purchaser and reasonably acceptable to the applicable Seller or MGI (with respect to the MGI Trademarks), which are suitable for recording in the Intellectual Property office (or other registry) of each applicable jurisdiction to which any such Intellectual Property relates.

(e) Sellers will ensure that all operating copies of all procedures, specifications and other information used by Sellers or held for use by Sellers for the operation of the Business are located at the CC Plant or the Desalination Plant, or are otherwise made available to Purchaser as soon as reasonably practicable following the Closing.

(f) Sellers and MGI (with respect to the MGI Trademarks) will use commercially reasonable efforts to (i) ensure that all IP Records not delivered to Purchaser pursuant to Sections 4.2(a)(xii) or 4.2(b)(v), including any in the possession or control of any non-Seller Affiliate of any Seller (other than MGI), are delivered to

Purchaser at the Closing or as soon as reasonably practicable after the Closing and (ii) ensure that all IP Records in the possession or control or any outside Intellectual Property counsel or agent of any Seller or MGI are delivered to Purchaser within thirty (30) days of Purchaser's written notice to Primary Seller or MGI requesting such IP Records (provided, that, if the foregoing activities will require out-of-pocket costs to be paid by any Seller or to a third party, such Seller shall notify Purchaser of the amount of such costs and such Seller shall be required to proceed with such activities only if Purchaser agrees to bear such cost).

(g)     Notwithstanding the foregoing and notwithstanding Section 4.2(a)(xii), Sellers shall have no obligation to deliver any Records or IP Records specific to the biomass or plant-based technologies referred to as PROESA, MOGHI and GREG (the "Bio-based IP"), to the extent any such Bio-based IP is included within the Purchased Intellectual Property; provided, however, that if Sellers discover any such Records or IP Records in their Controlled Affiliates' possession or control that in Sellers' reasonable discretion and without duty of inquiry is determined to be Records or IP Records, they shall use their good faith efforts to deliver such IP Records to Purchaser. Delivery by Sellers of any Records or IP Records related to Bio-based IP is not, and will not, be a representation of ownership of such Records or IP Records or any Intellectual Property embodied therein.

(h)     At the Closing or promptly thereafter, Purchaser and MGI shall execute an assignment and assumption agreement, in form and substance reasonably acceptable to the parties, in which Purchaser shall assume all rights and obligations of MGI in the MGI Trademark License insofar as such rights and obligations relate to the MGI Trademarks acquired by Purchaser pursuant to this Agreement.

8.10     Receivables.  From and after the Closing, if any party receives any (a) funds intended for or otherwise the property of another party pursuant to the terms of this Agreement, the receiving party shall promptly (i) notify and (ii) forward such funds to, the applicable other party (and, for the avoidance of doubt, the parties acknowledge and agree that there is no right of offset with respect to such funds, whether in connection with a dispute under this Agreement or otherwise) or (b) mail, courier package, facsimile transmission, purchase order, invoice, service request or other document intended for or otherwise the property of the applicable other party pursuant to the terms of this Agreement, the receiving party shall promptly (i) notify and (ii) forward such document to, the applicable other party.  From and after the Closing, Purchaser shall have the right and authority to collect for its own account all receivables and other related items that are included in the Purchased Assets and to endorse with the name of Sellers or any applicable Controlled Affiliate of Sellers any checks or drafts received with respect to any such receivables or other related items.

8.11     Shared Contracts.  Upon the request of Purchaser at any time prior to the Closing Date or within sixty (60) days thereafter, with respect to each Shared Contract, to the extent permitted by applicable Law and by the terms of such Shared Contract, each Seller shall provide Purchaser with contact information for the applicable counterparties and introduce Representatives of Purchaser to such Seller's contacts at

such counterparties and otherwise use its commercially reasonable efforts to facilitate Purchaser's entry into alternative arrangements to replace each Shared Contract effective as of the Closing on terms no less favorable than those set forth in such Shared Contracts; provided, that no Seller shall be required to share terms of any Shared Contracts prohibited under the confidentiality provisions of the applicable Shared Contract (as identified in Schedule 5.8(c))

8.12  Post-Closing Assistance for Litigation and Resolution of Claims.  For so long as reasonably practicable after the Closing, Sellers shall, upon the request of Purchaser, and at Purchaser's cost (including reasonable advance funding of out of pocket expenses of Sellers (including fees of counsel and other advisors) and payment of a reasonable per diem to Sellers which per diem shall be based on the total compensation of the affected employees at the time), require their employees to make themselves reasonably available and cooperate in all reasonable respects with Purchaser and its Affiliates in the preparation for, and defense of, any Legal Proceeding filed or claimed against Purchaser, any of its Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning or relating to the operation or conduct of the Business or the Purchased Assets and Assumed Liabilities prior to the Closing; provided, that the obligations of Sellers and their Affiliates hereunder shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of Purchaser's request and shall not apply to former employees no longer employed by such Sellers or Sellers' Affiliates as of such date and shall not require Sellers or Sellers' Affiliates to continue the employment of any such employee.  Sellers and Purchaser have agreed to the Mechanics Lien Escrow Amount Administration Procedures attached as Exhibit 4 to the Sale Order.  With respect to any Mechanics Lien Claims and Assumed Liabilities, at Purchaser's request, Sellers shall enter into a common interest agreement with Purchaser and provide reasonable access to Sellers' legal counsels and other outside advisors and their workpapers (only to the extent that funds are available in the Wind-Down Escrow Account to compensate such legal counsels and other outside advisors or such counsel and other advisors have otherwise entered into different compensation arrangements with Purchaser) in order for Purchaser to pursue any and all available defenses and objections to any such Claims and Assumed Liabilities.

8.13  Interpretation of Schedules.  Sellers may, at their option, include in the Schedules corresponding to any Section of Article V, items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, will not be deemed to be an acknowledgment or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information provided in one Schedule corresponding to any Section of Article V, will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule corresponding to a Section in Article V to which its relevance is reasonably apparent on its face.  The disclosure of any matter or item in any Schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Seller Material Adverse Effect.  Notwithstanding anything to the contrary herein or otherwise, in no event will Sellers be permitted to

supplement or amend any Schedule without the prior written consent of Purchaser (except to the extent necessary as a result of agreed upon additions or deletions to the Purchased Assets or the Excluded Assets), and no such supplement or amendment shall, in any event, have any effect in any manner on the satisfaction of the condition to Closing set forth in <u>Article IX</u> or any of the rights of Purchaser hereunder.

8.14   <u>Notice of Developments</u>.  During the period commencing on the date of this Agreement and terminating upon the earlier to occur of the Closing or the termination of this Agreement, Primary Seller will give Purchaser prompt written notice of (i) any breach or inaccuracy of any representation or warranty or breach of any covenant contain in this Agreement and (ii) any development of which it becomes aware that would make the satisfaction of any of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u> on the Closing Date reasonably unlikely or impossible.  No such notification, by itself, shall be given any effect for purposes of determining the accuracy of the representations and warranties made by Sellers pursuant to this Agreement or determining whether the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u> have been satisfied.

8.15   <u>Data & Systems Transfer</u>.  Sellers (to the extent not subject to <u>Sections 4.2(a)(xi)</u>) shall, and shall cause their Affiliates (including MGI, Mossi & Ghisolfi Logistics & Engineering Co., M&G Finanziaria S.p.A., M&G Polimeri Italia S.p.A. and Biochemtex S.p.A.) to, deliver or cause to be delivered to Purchaser all Records and other information and data in which Sellers or any of their Affiliates have any right, title or interest, as well as all Software and other Tangible Personal Property used in the storage, processing or delivery thereof in which Sellers, MGI or any of their Affiliates have any right, title or interest, in each case, (i) contained within the Purchased Assets that are not located at the CC Plant or Desalination Plant or (ii) that are otherwise used or intended for use in or otherwise related to the CC Plant, the Desalination Plant or the Business, (x) with respect to all such Records, information, data, Software and Tangible Personal Property that are material to the Business, as of the Closing Date, and (y) (1) with respect to all other such Records, information, data, Software and Tangible Personal Property in the possession of Sellers or their Controlled Affiliates, as of the Closing Date or as soon as reasonably practicable thereafter, and (2) with respect to all other such Records, information, data, Software and Tangible Personal Property in the possession of Sellers' Affiliates that are not Controlled Affiliates, Sellers shall use their commercially reasonable efforts to cause such Affiliates (including MGI) to deliver or cause to be delivered as of the Closing Date or as soon as reasonably practicable thereafter; in the case of each of <u>(x)</u> and <u>(y)</u>, in a manner that is reasonably accessible to Purchaser without the need for further support.  Sellers shall, and shall cause their Affiliates to, transfer, process and disclose all such data, including any personally identifiable information, in compliance with all Laws regarding privacy, data protection or information security obligations (including, as may be applicable, the European Union directive 95/46/EC of 24 October 1995, together with any applicable Laws implementing such directive).  Notwithstanding anything to the contrary, if any of the activities described in this <u>Section 8.15</u> will require out-of-pocket costs to be paid by any Seller or to a third party, such Seller shall notify Purchaser of the amount of such costs and such Seller shall be required to proceed with such activities only if Purchaser agrees to bear

such costs (either directly or via the Wind-Down Escrow Account).  In addition, notwithstanding anything to the contrary in this Agreement, to the extent any information, data or Software is necessary to provide services to Purchaser under the TSA or to other parties under any Other TSA, such information, data and Software will not be transferred to Purchaser until Sellers have ceased utilizing such information, data or Software to provide such services, _provided_ that Sellers shall provide copies of any such information or data and copies of or access to any such Software (subject to Section 8.8(e)), in each case, to the extent not otherwise provided to Purchaser pursuant to this Agreement or the TSA.  Notwithstanding anything to the contrary in this Section 8.15, this Section 8.15 does not require Sellers' Affiliates to transfer the assets described on Schedule 8.15 to Purchaser.

8.16    MGI Obligations.

(a)    MGI shall become a party hereto only upon its execution of a counterpart hereto.  The parties acknowledge and agree that, unless and until such time as MGI executes a counterpart to this Agreement (the "MGI Execution Date"), MGI shall have no obligations hereunder and, notwithstanding anything in this Agreement to the contrary, until the MGI Execution Date: (i) MGI shall retain all of its right, title and interest in and to the MGI Assets, and such right, title and interest shall be Excluded Assets and shall not be transferred to Purchaser pursuant to Section 2.1; (ii) MGI shall have no delivery obligations with respect to the MGI Assets (including under Section 2.7, 4.2(b), Sections 8.9(a)-8.9(d) and Section 8.9(f)); (iii) the representations and warranties of MGI set forth in Article V shall have no force and effect; (iv) Section 8.9(h) shall have no force and effect; (v) Section 8.2, 11.2(b) and 11.4 shall not be binding on MGI; and (vi) Purchaser shall not assume or receive any rights or obligations under the MGI Trademark License.  For the avoidance of doubt, if MGI does not execute a counterpart to this Agreement, all references to MGI in Article IX shall be deemed to be removed and shall not have any effect on satisfaction of the conditions to Closing contained therein.

(b)    Upon MGI's execution of a counterpart to this Agreement on the MGI Execution Date, from and after the MGI Execution Date, the provisions of this Agreement that apply to MGI shall be binding on and enforceable against MGI for the express purposes stated therein, except that if the MGI Execution Date is less than fourteen (14) days prior to the Closing Date, the obligations of MGI under Section 4.2(b) shall not be conditions to Closing under Article IX, but will be delivered by MGI as soon as reasonably practicable after the Closing, if not before the Closing.  If MGI becomes a party hereto, Sellers' obligations and rights under this Agreement will be unaffected.  Upon MGI's execution of a counterpart hereto, the MGI Purchase Price shall be the amount agreed upon in writing between MGI and Purchaser at the time of such execution.

(c)    For the avoidance of doubt, MGI may execute a counterpart to this Agreement following the date hereof and prior to the Closing, and such later execution, if so executed after the date hereof, shall not affect the binding nature of this Agreement as of the date hereof between the other signatories hereto.

## IX.  CONDITIONS TO CLOSING

9.1     <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Sellers and MGI contained in this Agreement that are not qualified by materiality or Seller Material Adverse Effect shall be true and correct in all material respects at and as of the Closing as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Sellers and MGI contained in this Agreement that are qualified by materiality or Seller Material Adverse Effect shall be true and correct in all respects at and as of the Closing as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Purchaser shall have received a certificate signed by an authorized officer of Primary Seller, dated the Closing Date, to the foregoing effect;

(b)     Sellers and MGI shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them prior to the Closing Date; <u>provided</u>, <u>however</u>, that with respect to any such agreements and covenants that are qualified by materiality, Sellers and MGI shall have performed or complied with such agreements and covenants, as so qualified, in all respects and Purchaser shall have received a certificate signed by a duly authorized officer of Primary Seller, dated the Closing Date, to the foregoing effect;

(c)     The Intercompany License(s) shall have been duly executed and delivered prior to and as a condition to (i) the sale or transfer of any assets of Sellers or their Affiliates that are party to the Intercompany License(s) or (ii) any change in control of Sellers or their Affiliates that are party to the Intercompany License(s), in each case after the date hereof;

(d)     Sellers and MGI, as applicable, shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 4.2</u>;

(e)     from the date of this Agreement until the Closing, no Seller Material Adverse Effect shall have occurred;

(f)     Sellers shall have performed and complied with all obligations and agreements required by <u>Section 8.8</u> to be performed or complied with by any Seller on or prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of the relevant Sellers, dated the Closing Date, to the foregoing effect; and

(g)     Sellers shall have delivered to Purchaser documentary evidence of receipt of consents pursuant to the Contracts set forth on <u>Schedule 9.1(g)</u>, in form and substance reasonably acceptable to Purchaser and such consents shall be in full force and effect and shall not have been revoked.

9.2     <u>Conditions Precedent to Obligations of Sellers and MGI</u>.  The obligations of Sellers and MGI to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Primary Seller (on behalf of all Sellers and MGI) in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser contained in this Agreement that are not qualified by materiality or Purchaser Material Adverse Effect shall be true and correct in all material respects on and as of the Closing as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Purchaser contained in this Agreement that are qualified by materiality or Purchaser Material Adverse Effect shall be true and correct in all respects on and as of the Closing as if made at and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Sellers and MGI shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date; <u>provided</u>, <u>however</u>, that with respect to any such agreements and covenants that are qualified by materiality, Purchaser shall have performed or complied with such agreements and covenants, as so qualified, in all respects and Sellers and MGI shall have received a certificate signed by a duly  authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)     Purchaser shall have delivered to Primary Seller and MGI all of the items set forth in <u>Section 4.3</u>.

9.3     <u>Conditions Precedent to Obligations of Purchaser, Sellers and MGI</u>.  The respective obligations of Purchaser, Sellers and MGI to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Primary Seller (on behalf of all Sellers and MGI) in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction (i) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, or otherwise making the Closing illegal or (ii) that constitutes or imposes a Burdensome Condition (unless Purchaser shall have accepted such Burdensome Condition);

(b) the Sale Order, which shall be substantially in the form attached hereto as Exhibit A, with such changes as approved by Purchaser in accordance with Section 7.2, shall have been entered by the Bankruptcy Court and become a Final Order; and

(c) the waiting period (and any extension thereof) applicable to the transactions contemplated by this Agreement under the HSR Act and any other applicable Antitrust Laws, if any, shall have expired or early termination shall have been granted without the imposition of a Burdensome Condition (unless Purchaser shall have accepted such Burdensome Condition).

9.4 Frustration of Closing Conditions. No party may rely on the failure of any condition set forth in Sections 9.1, 9.2 or 9.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## X. EMPLOYEES AND EMPLOYEE BENEFITS

10.1 Employment and Benefits Arrangements.

(a) To the extent Purchaser elects, in its sole discretion, to offer employment to any Employee, such offer shall be on employment terms and conditions that are set by Purchaser, including wages, benefits, job duties and responsibility and work assignment. Purchaser shall provide Sellers with a list of the Employees that will receive such offers no later than the earlier of (x) the Closing and (y) fifteen (15) days after Purchaser is determined to be the Successful Bidder with respect to the Purchased Assets (such Employees, the "Offered Employees"). Purchaser shall not be obligated to provide severance, separation pay, or other payments or benefits, to any Employee, independent contractor or other service provider to any Seller or any of its Affiliates, on account of any termination of such Person's employment or engagement with any Seller or any of its Affiliates on or before the date such Employee becomes a Transferred Employee, if applicable, and such benefits (if any) shall remain obligations of Sellers and their Affiliates. For the avoidance of doubt, Sellers agree that Sellers shall be solely responsible for satisfying the continuation coverage requirements of Section 4980B of the Code for all individuals who are "M&A qualified beneficiaries" as such term is defined in Section 54.4980B-9 of the Treasury regulations.

(b) As soon as practicable following the date of this Agreement, but in no event later than the earlier of (i) the day immediately preceding the Closing Date and (ii) fifteen (15) days after Purchaser is determined to be the Successful Bidder with respect to the Purchased Assets, Purchaser shall provide Primary Seller with a list of the Assumed Plans. Sellers shall cooperate with Purchaser and take, or cause to be taken, any and all necessary steps to assign and transfer sponsorship of the Assumed Plans, if any, to Purchaser. Prior to the Closing, Sellers shall reasonably cooperate with Purchaser and its Affiliates and use commercially reasonable efforts to provide assistance as Purchaser may reasonably request in order to effectuate the foregoing. Nothing herein shall prohibit Purchaser or its Affiliates, as applicable, from terminating,

amending, or otherwise affecting any Assumed Plan, at any time and from time to time following the Closing.

(c)    Sellers and their Affiliates shall be responsible for all WARN Act Liabilities relating to the periods prior to and on the Closing Date, including any such Liabilities that result from Employees' separation of employment from Sellers or any of their Affiliates and/or Employees not becoming Transferred Employees.  Purchaser shall be responsible for all WARN Act Liabilities exclusively with respect to the Transferred Employees that relate to the period following the Closing Date.

10.2    No Obligations.  No provision in this Article X or otherwise in this Agreement, whether express or implied, shall (a) create any third party beneficiary or other rights in any employee or former employee of Sellers or any of their subsidiaries or Affiliates (including any beneficiary or dependent thereof), any other participant in any Plan or any other Person; (b) create any rights to continued employment with Sellers, Purchaser or any of their respective subsidiaries or Affiliates or in any way limit the ability of Sellers, Purchaser or any of their respective subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason; or (c) constitute or be deemed to constitute an amendment to any Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by Sellers, Purchaser or any of their subsidiaries or Affiliates.

## XI.  TAXES

11.1    Transfer Taxes.  Purchaser will be responsible for all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees, however denominated (and any interest, penalties and additions with respect to such Taxes and fees), arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "Transfer Taxes"), regardless of the party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  Sellers and Purchaser will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise use commercially reasonable efforts to obtain any available exemptions from or reductions in such Transfer Taxes.  To the extent any Seller is required by Law to pay any Transfer Taxes to a Tax Authority (including pursuant to a post-Closing adjustment or Order), Purchaser will remit an amount equal to such Transfer Taxes to Sellers not less than three (3) Business Days prior to the due date for such payment.  Upon request from a Seller, Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by Purchaser under this Section 11.1.

11.2    Purchase Price Allocation.

(a)    Within forty-five (45) days following the Closing, Purchaser will deliver to Primary Seller a draft of an allocation statement setting forth the proposed

allocation of the Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for Tax purposes) (the "Proposed Allocation Statement").  The Proposed Allocation Statement will be prepared in accordance with (to the extent necessary to comply with) Section 1060 of the Code, the applicable Treasury regulations promulgated thereunder and any similar provision of applicable state, local or foreign Law.  Primary Seller will have twenty (20) Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of its objections.  If Primary Seller fails to deliver an Allocation Notice of Objection in accordance with this Section 11.2(a), then the Proposed Allocation Statement will be conclusive and binding on all parties (subject to Section 11.2(b)) and will become the "Final Allocation Statement".  If Primary Seller timely submits an Allocation Notice of Objection, then for twenty (20) Business Days after the date Purchaser receives the Allocation Notice of Objection, Purchaser and Primary Seller will work in good faith and use their commercially reasonable efforts to agree on the allocation.  In the event that the parties are not able to resolve all objections raise in the Allocation Notice of Objection within such twenty (20) Business Day period, then the Proposed Allocation Statement will be amended to reflect all undisputed items to which the parties have agreed and all disputed items shall be resolved, at Purchaser's option, either (i) by an independent firm of nationally recognized accountants reasonably chosen and mutually accepted by the parties (the "Accounting Referee"), whose determination shall be conclusive and binding on the parties or (ii) in the manner determined by Sellers, and the Proposed Allocation Statement as so amended will become the Final Allocation Statement.  In the event that Purchaser elects to submit disputed items to an Accounting Referee pursuant to the immediately preceding clause (i), (x) the parties will instruct the Accounting Referee to render its final determination within twenty (20) Business Days and (y) Purchaser will be responsible for and pay 100% of all fees, expenses and other charges of the Accounting Referee and any other amounts incurred in connection with the submission of any disputed items to the Accounting Referee.

(b)    (i) Sellers, MGI and Purchaser will report, act and file (and will use commercially reasonable efforts to cause their respective Affiliates to report, act and file) Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement and (ii) neither Sellers, MGI nor Purchaser will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with such allocation, except, in each case, to the extent otherwise required by applicable Law or Order; provided, that the obligations of Sellers and MGI under this Section 11.2(b) with respect to their Affiliates extend only to Controlled Affiliates.

11.3    Certain Periodic Non-Income Taxes. Purchaser will assume and be responsible for, and will pay, any and all Periodic Non-Income Taxes assessed on, or in respect of, the Purchased Assets or relating to the conduct or operation of the Business

that are unpaid as of the Closing Date or that become payable after the Closing Date, whether arising or assessed prior to, on, or after the Closing Date.

11.4    Cooperation.  Sellers, MGI and Purchaser will use commercially reasonable efforts (in the case of clause (c) of this Section 11.4, only through June 30, 2018 if Sellers and MGI are unable to use such efforts thereafter) to furnish or cause to be furnished to each other, upon written request, as promptly as practicable, such information relating to the Business and the Purchased Assets (including access to books and records and non-income Tax Returns that relate exclusively to the Purchased Assets and related working papers dated before the Closing) as is reasonably necessary and as is reasonably practicable for:  (a) the filing of all non-income Tax Returns, (b) the preparation for any non-income Tax audit by any Tax Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and (c) the claiming or negotiation by Purchaser of such property or business tax credits, abatements or incentives relating to each of the Tax Incentive Agreements, in each case, for Tax periods or years ending on or before or including the Closing Date; provided, that none of Sellers, MGI or any of their respective Affiliates shall be required to incur any cost or expense unless Purchaser provides reasonable advance funding to Sellers; provided, further, that neither Purchaser nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person.

11.5    Tax Characterization of Payments Under This Agreement.  Sellers, MGI and Purchaser agree to treat all payments made either to or for the benefit of the other party under this Agreement as adjustments to the Purchase Price for Tax purposes, except to the extent otherwise required by applicable Law.

11.6    Withholding Taxes.  Purchaser shall be entitled to deduct and withhold from the Purchase Price such amounts as Purchaser is required to deduct and withhold under the Code, or any provision of state, local or foreign Tax Law.  In the event that Purchaser determines that withholding may be required under applicable Tax Law, then Purchaser shall provide Primary Seller with written notification of its intent to deduct or withhold any amount on account of any Tax as soon as reasonably practicable (and, in any case, no later than five (5) Business Days prior to the date on which such amount is to be paid to Sellers) and such notification shall include an explanation of the legal requirement for such deduction or withholding, and Purchaser shall (i) consider in good faith any certification, statement, or other documentation submitted by Sellers to establish an exemption from or reduction in withholding and (ii) discuss with the applicable Seller in good faith whether such amounts can be mitigated under applicable Law and otherwise cooperate in efforts to obtain a reduction in or exemption from withholding; provided, that Purchaser's failure to provide such notice shall not affect Purchaser's rights or the treatment of any amounts deducted or withheld under this Section 11.6. To the extent such amounts are so withheld by Purchaser, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the relevant Seller or MGI, as applicable, in respect of whom such deduction and withholding was made by Purchaser.

## XII.  MISCELLANEOUS

12.1  <u>No Survival of Representations and Warranties</u>.  The parties agree that the representations and warranties contained in this Agreement will not survive the Closing, and none of the parties will have any liability to each other after the Closing for any breach thereof.  The parties agree that the covenants contained in this Agreement will survive the Closing, and each party will be liable to the other after the Closing for any breach thereof.

12.2  <u>Expenses</u>.  Subject to <u>Section 4.6</u>, each of Sellers, MGI and Purchaser will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby.  Without limiting the foregoing, Purchaser will pay (a) any filing fee required in connection with the HSR Act filing contemplated by <u>Section 8.4(a)</u> and (b) any fee or expense to be paid to the Escrow Agent in connection with the Escrow Agreement.

12.3  <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto will be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an Order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 12.3</u> will be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement.

12.4  <u>Submission to Jurisdiction; Consent to Service of Process</u>.  (a) Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 12.8</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Legal Proceeding in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12.8</u>.

12.5     <u>Waiver of Right to Trial by Jury</u>.  Each party waives to the fullest extent permitted by Law, any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement, by, among other things, the mutual waivers and certifications in this <u>Section 12.5</u>.

12.6     <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the exhibits, schedules and appendices hereto) represents the entire understanding and agreement between the parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party or parties against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.  Notwithstanding the foregoing, in the case of any action to be taken by or on behalf of Sellers or MGI, the parties agree that the action of Primary Seller shall be sufficient for any and all purposes.

12.7     <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the Laws of the State of Delaware applicable to Contracts made and performed in such State, without regard to the conflicts of law principles of such State.

12.8     <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile or electronic mail (with written confirmation of transmission, it being understood that the recipient of each such communication by electronic mail shall be required to promptly provide such confirmation if requested by its sender), or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers or e-mail addresses (or to such other address, facsimile number or e-mail address as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers or MGI, to Primary Seller on behalf of Sellers and MGI to:

M&G Resins USA, LLC
450 Gears Road, Suite 240
Houston, TX 77067
Attention: Dennis Stogsdill
E-mail: DStogsdill@alvarezandmarsal.com

With a copy (which will not constitute notice) to:

Jones Day
250 Vesey Street
New York, NY 10281
Facsimile:   (212) 755-7306
Attention:   Jeffrey Symons
E-mail:       jsymons@jonesday.com

If to Purchaser, to:

Banco Inbursa, S.A., Institución de Banca
Múltiple, Grupo Finaciero Inbursa
Paseo de Las Palmas 736, Col. Lomas de
Chapultepec, Ciudad de México C.P. 11000,
México.
Attention:   Luis Roberto Frias Humphrey
Email:        lfriash@inbursa.com

and

Banco Inbursa, S.A., Institución de Banca
Múltiple, Grupo Finaciero Inbursa
Paseo de Las Palmas 750, Col. Lomas de
Chapultepec, Ciudad de México C.P. 11000,
México.
Attention:   Guillerno Rene Caballero Padilla
Email:        gcaballerop@inbursa.com

With copies (which will not constitute notice) to:

> Cleary Gottlieb Steen & Hamilton, LLP
> One Liberty Plaza
> New York, NY 10006
> Facsimile: 212-225-3999
> Attention: Aaron J. Meyers
> Lisa M. Schweitzer
> Email: ameyers@cgsh.com
> lschweitzer@cgsh.com

12.9   Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect as long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.10   Assignment.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, MGI or Purchaser (by operation of Law or otherwise) without the prior written consent of Primary Seller (on behalf of Sellers and MGI) or Purchaser, as the case may be, and any attempted assignment without the required consent will be void; provided, however, that (a) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one (1) or more of its Affiliates and (b) Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court.  No delegation of any obligations hereunder will relieve the parties of any such obligations.  Upon any such permitted assignment or delegation, the references in this Agreement to Sellers or Purchaser will also apply to any such assignee or delegate unless the context otherwise requires.

12.11   Non-Recourse.  Notwithstanding anything to the contrary herein, this Agreement may only be enforced against, and any Legal Proceeding that may be based upon, arise out of, or relate to this Agreement, the negotiation, execution or performance of this Agreement or the transactions contemplated hereby, may only be brought against each Person that is expressly named as a party in such Person's capacity as such, and only with respect to the specific obligations set forth herein with respect to such party, and no past, present or future director, officer, employee,

incorporator, member, partner or direct or indirect equityholder or Affiliate, agent, attorney or other Representative of any party or any Affiliate of any party will have any liability for any obligations or Liabilities of any party under this Agreement or any agreement entered into in connection herewith of or for any claim or other Legal Proceeding (whether at law or in equity, in tort, contract or otherwise) based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.12  <u>Representation of Sellers and their Affiliates</u>.  The legal and financial advisors of each of the parties are known to the other parties.  Following the Closing, such advisors may serve as advisers to any other party and their respective Affiliates in connection with any matters related to this Agreement and the transactions contemplated hereby, including any Legal Proceeding, claim or obligation arising out of or relating to this Agreement or the transactions contemplated by this Agreement notwithstanding any representation by any such advisor of another party or any of its Affiliates.  Purchaser (on behalf of itself and its Controlled Affiliates) hereby (i) waives any claim they have or may have that any such advisor has a conflict of interest or is otherwise prohibited from engaging in such representation and (ii) agrees that, in the event that a dispute arises after the Closing between Purchaser or any of its Controlled Affiliates and any Seller or any of its Affiliates, any such advisor may represent any Seller or any of its Affiliates in such dispute even though the interests of such Person(s) may be directly adverse to Purchaser or its Controlled Affiliates and even though such advisor may have represented Purchaser or its Controlled Affiliates in a matter substantially related to such dispute.  Purchaser (on behalf of itself and its Controlled Affiliates) also further agrees that, as to all communications among counsel and any Seller or its Affiliates and representatives of any Seller or its Affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege and the expectation of client confidence belongs to the applicable Seller or Affiliate and may be controlled by the applicable Seller or Affiliate and will not pass to or be claimed by Purchaser or any of its Controlled Affiliates.

12.13  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  A signed copy of this Agreement transmitted by facsimile, email or other means of electronic transmission shall be deemed to have (to the extent legally permitted) the same legal effect as delivery of an original executed copy of this Agreement for all purposes.

<p style="text-align:center">[<em>Signature page follows</em>]</p>

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officer thereunto duly authorized, as of the date first above written.

**<u>Purchaser</u>**

Banibu II Holdings, Inc.

By:

_____
   Name:
   Title:

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the first date above written.

<div align="center">

**Sellers**

**M&G Resins USA, LLC**

By: _____

    Name:
    Title:

**M&G Waters USA, LLC**

By: _____

    Name:
    Title:

**M&G USA Corporation**

By: _____

    Name:
    Title:

**M&G Polymers USA, LLC**

By: _____

    Name:
    Title:

</div>

Chemtex International Inc.

By:
_____
    Name:
    Title:

M&G Finance Corporation

By:
_____
    Name:
    Title:

M&G USA Holding LLC

By:
_____
    Name:
    Title:

Chemtex Far East, Ltd.

By:
_____
    Name:
    Title:

Indo American Investments, Inc.

By:
_____
    Name:
    Title:

**MGI**

Mossi & Ghisolfi International S.à.r.l.

By:
_____
    Name:
    Title:

**INTENTIONALLY OMITTED**

# LICENSE AGREEMENT


BETWEEN


M&G USA CORPORATION ("M&G USA"),
M&G POLYMERS USA LLC ("M&G POLYMERS"),
M&G RESINS USA LLC ("M&G RESINS"),
M&G POLÍMEROS MEXICO, S.A. DE C.V. ("M&G MEXICO"), AND
M&G POLÍMEROS BRASIL S.A. ("M&G BRAZIL")


DATED AS OF


_____, 2018

# LICENSE AGREEMENT

This License Agreement ("<u>Agreement</u>") dated as of this ___ of _____, 2018 ("<u>Effective Date</u>"), is between M&G USA Corporation, a Delaware corporation, having a registered business address at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, USA, ("<u>M&G USA</u>"), M&G Polymers USA LLC, a Delaware limited liability company, having a business address at 450 Gears Road, Suite 240, Houston, Texas, USA ("<u>M&G Polymers</u>"), M&G Resins USA LLC, a Delaware limited liability company, having a registered business address at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, USA ("<u>M&G Resins</u>"), M&G Polímeros México, S.A. de C.V., a *sociedad anonoima de capital variable* company organized and existing under the laws of Mexico, with its registered office at Petrocel Km. 2, Puerto Industrial de Altamira, C.P. 89603, Altamira, Tamaulipas ("<u>M&G Mexico</u>"), and M&G Polímeros Brasil S.A., a corporation (sociedade anônima) duly organized and validly existing under the Laws of the Federative Republic of Brazil, with its headquarters in the City of Ipojuca, State of Pernambuco, at Rodovia PE-60, Km 10 – Engenho Massangana, SUAPE, TDR – Sul S/Nº, Complexo Industrial Portuário, CEP 55590-000, enrolled with the Brazil Corporate Taxpayers' Registry - CNPJ/MF under no. 07.079.511/0001-90 and with its corporate documents filed with the Commercial Registry of the State of Pernambuco under NIRE 26300013673 ("<u>M&G Brazil</u>"). Each of M&G USA, M&G Resins, M&G Polymers, M&G Mexico, and M&G Brazil may be referred to hereinafter individually as a "<u>Party</u>" and together as the "<u>Parties</u>".

## RECITALS

A.      M&G USA and M&G Polymers are the owners of certain patents and know-how (including product formulations and associated technology) relating to the manufacture and commercialization of polyester polymers, including know-how which was developed by or for M&G Polymers and M&G USA in the course of their conduct of business at a research and development facility in Sharon Center, Ohio, and a polyester plant in Apple Grove, West Virginia.

B.      M&G USA and M&G Polymers are the owners of certain trademark rights and associated goodwill relating to the commercialization of polyester polymer products.

C.      M&G Resins is the owner of certain know-how relating to the manufacture and commercialization of PET, including know-how which was developed by or for M&G Resins in the course of its ownership and construction of and planned conduct of business at a polyester polymer plant in Corpus Christi, Texas.

D.      M&G Brazil is the owner of certain know-how relating to the manufacture and commercialization of PET, including know-how which was developed by or for M&G Brazil in the course of its ownership and conduct of business at a polyester polymer plant in Suape Port, Brazil.

E.      M&G Mexico is the owner of certain know-how relating to the manufacture and commercialization of PET, including know-how which was developed by or for M&G Mexico in the course of its ownership and conduct of business at a polyester polymer plant in Altamira, Mexico.

F.    M&G Brazil is the owner of certain patents relating to the manufacture and commercialization of PET.

G.    The Parties are willing to enter into license agreements to provide clarity with respect to each Party's Intellectual Property in the conduct of their respective businesses.

## AGREEMENT

Now therefore, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

## INTERPRETATION

1.1    **Definitions.**

Capitalized terms used in this Agreement will have the meanings ascribed to them or referenced in Exhibit A.

1.2    **Construction.**

Except where expressly stated otherwise in this Agreement, the following rules of interpretation apply to this Agreement: (i) "include", "includes" and "including" are not limiting and mean include, includes and including, without limitation; (ii) definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; (iii) references to an agreement, statute or instrument mean such agreement, statute or instrument as from time to time amended, modified or supplemented; (iv) references to a Person are also to its permitted successors and assigns; (v) references to an "Article", "Section", "Exhibit" or "Schedule" refer to an Article or Section of, or any Exhibit or Schedule to, this Agreement unless otherwise indicated; (vi) the word "will" will be construed to have the same meaning and effect as the word "shall" and vice versa; (vii) the word "any" will mean "any and all" unless otherwise indicated by context; (viii) the word "or" means in the alternative or together, i.e., "and/or"; and (ix) the symbol $ means United States Dollars, and all monetary amounts referenced herein refer to United States Dollars unless otherwise specified.

## ARTICLE 2

## INTELLECTUAL PROPERTY LICENSES

2.1    **M&G Mexico Rights.**

2.1.1    M&G Polymers and M&G USA ("Licensors") grant to M&G Mexico a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or a Change of Control of M&G Mexico), non-sublicenseable (except in connection with the products and services of the M&G Mexico Plant) license under Licensors' rights in the M&G Mexico Licensed Patents and the M&G Mexico Non-

Barrier Formulations to make and use, in the M&G Mexico Plant, and offer for sale and sell, in the M&G Mexico Territory, the M&G Mexico Licensed Products, such license to terminate on the Mexico License Termination Date.

2.1.2    Licensors grant to M&G Mexico a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant or a Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under Licensors' rights in the M&G Mexico Licensed Trademarks to market and sell the M&G Mexico Licensed Products in the M&G Mexico Territory, such license to:

(a)    terminate on the Mexico License Termination Date; and

(b)    be subject to (i) M&G Mexico submitting to M&G USA or M&G USA's designated representative(s) samples of M&G Mexico Licensed Products and of proposed uses of the M&G Mexico Licensed Trademarks for review and approval (such approval not to be unreasonably withheld or delayed) by M&G USA or M&G USA's designated representative(s) (on behalf of both Licensors) from time to time at the request of M&G USA; (ii) M&G Mexico ensuring that the M&G Mexico Licensed Products with which it uses the M&G Mexico Licensed Trademarks meet a standard of quality that is no less than the standard of quality maintained by M&G USA or its Affiliates with respect to any products which used the M&G Mexico Licensed Trademarks prior to the Effective Date; and (iii) M&G Mexico taking no action that may negatively impact Licensors' rights, or any rights of any future owner of the M&G Mexico Licensed Trademarks, in the M&G Mexico Licensed Trademarks, including, but not limited to, applying for registration of any same or similar trademark or using or adopting any confusingly similar trademark.

2.1.3    Licensors grant to M&G Mexico a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or a Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under Licensors' rights in the M&G Marks to (a) use the M&G Marks on signage and for other usages at the M&G Mexico Plant, consistent with the usages in effect as of the Effective Date, and (b) market and sell the M&G Mexico Licensed Products within the M&G Mexico Territory, such license under (a) and (b) to be subject to the same terms as in <u>Section 2.1.2(b(</u>, and to terminate on earlier of (i) the Mexico License Termination Date, or (ii) 120 days subsequent to a Change of Control of M&G Mexico or a sale of all or substantially all of the M&G Mexico Plant.

2.1.4    If, in connection with a sale of all or substantially all assets of the M&G Resins Plant (an "<u>M&G Resins Plant Sale</u>"), (i) the entity acquiring such assets will also acquire ownership of any trademarks from MGI or its Affiliates that consist of the M&G Mexico Licensed

Trademarks (the "M&G Mexico MGI Trademarks"), and (ii) this Agreement will be assigned to the entity acquiring such assets, then the Parties will, in advance of the closing of such M&G Resins Plant Sale, use commercially reasonable efforts to cause the exhibits of this Agreement to be amended, to be effective upon the closing of the M&G Resins Plant Sale, to include the M&G Mexico MGI Trademarks as necessary to give the intended effect of Section 2.1.2, the license of which shall be subject to the terms of Section 2.1.2.

2.2    **M&G Brazil Rights.**

2.2.1    Licensors grant to M&G Brazil an irrevocable, royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Easy-Up Patents and the Easy-Up Know-How to make and use, solely in the M&G Brazil Plant, and offer for sale and sell, in the M&G Brazil Territory, polymer-related products (excluding, for the avoidance of doubt, any M&G Proprietary Products except as explicitly permitted by the Licensors pursuant to a license granted in this Agreement) made in the M&G Brazil Plant, such license to continue:

>       (a)    with respect to the M&G Easy-Up Patents, until the date that the last claim of the M&G Easy-Up Patents expires or is found invalid or unenforceable by a court of competent jurisdiction, and

>       (b)    with respect to the Easy-Up Know-How, perpetually.

2.2.2    Licensors grant to M&G Brazil a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Easy-Up Marks to market and sell the M&G Brazil Licensed Products in the then-current Licensed M&G Brazil Territory, such license to:

>       (a)    terminate on (i) the Brazil Interim License Termination Date with respect to the M&G Brazil Territory, and (ii) the M&G Brazil License Extension Termination Date with respect to the M&G Brazil License Extension Territory; and

>       (b)    be subject to (i) M&G Brazil submitting to M&G USA or M&G USA's designated representative(s) samples of M&G Brazil Licensed Products and proposed uses of the M&G Easy-Up Marks for review and approval (such approval not to be unreasonably withheld or delayed) by M&G USA or M&G USA's designated representative(s) (on behalf of both Licensors) from time to time at the request of M&G USA; (ii) M&G Brazil ensuring that the M&G Brazil Licensed Products with which it uses the M&G Easy-Up Marks meet a standard of quality that is no less than the standard of

quality maintained by M&G USA or its Affiliates with respect to any products which used the M&G Easy-Up Marks prior to the Effective Date; and (iii) M&G Brazil taking no action that may negatively impact Licensors' rights, or any rights of any future owner of the M&G Easy-Up Marks, in the M&G Easy-Up Marks, including, but not limited to, applying for registration of any same or similar trademark or using or adopting any confusingly similar trademark.

2.2.3 Licensors grant to M&G Brazil a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Brazil Licensed Patents and the M&G Brazil Non-Barrier Formulations to make and use, in the M&G Brazil Plant, and offer for sale and sell, in the then-current Licensed M&G Brazil Territory, the M&G Brazil Licensed Products, such license to terminate on (i) the Brazil Interim License Termination Date with respect to the M&G Brazil Territory, and (ii) the M&G Brazil License Extension Termination Date with respect to the M&G Brazil License Extension Territory.

2.2.4 Licensors grant to M&G Brazil a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Brazil Licensed Trademarks to market and sell the M&G Brazil Licensed Products in the then-current Licensed M&G Brazil Territory, such license to:

(a) terminate on (i) the Brazil Interim License Termination Date with respect to the M&G Brazil Territory, and (ii) the M&G Brazil License Extension Termination Date with respect to the M&G Brazil License Extension Territory; and

(b) be subject to (i) M&G Brazil submitting to M&G USA or M&G USA's designated representative(s) samples of M&G Brazil Licensed Products and proposed uses of the M&G Brazil Licensed Trademarks for review and approval (such approval not to be unreasonably withheld or delayed) by M&G USA or M&G USA's designated representative(s) from time to time at the request of M&G USA; (ii) M&G Brazil ensuring that the M&G Brazil Licensed Products with which it uses the M&G Brazil Licensed Trademarks meet a standard of quality that is no less than the standard of quality maintained by M&G USA or its Affiliates with respect to any products which used the M&G Brazil Licensed Trademarks prior to the Effective Date; and (iii) M&G Brazil taking no action that may negatively impact M&G USA's rights, or any rights of any future owner of the M&G Brazil Licensed Trademarks, in the M&G Brazil Licensed Trademarks, including, but not limited

to, applying for registration of any same or similar trademark or using or adopting any confusingly similar trademark.

2.2.5    Licensors grant to M&G Brazil a royalty-free, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under Licensors' rights in the M&G Marks to (a) use the M&G Marks on signage and for other usages at the M&G Brazil Plant, consistent with usages in effect as of the Effective Date and (b) market and sell the M&G Brazil Licensed Products in the M&G Brazil Territory, such licenses under 2.2.5 and 2.2.5 to be subject to the same terms as in Section 2.2.4(b) and to terminate on earlier of (i) the Brazil Interim License Termination Date, or (ii) 120 days subsequent to a Change of Control of M&G Brazil or a sale of all or substantially all of the M&G Brazil Plant.

2.2.6    If, in connection with the M&G Resins Plant Sale, (i) the entity acquiring such assets will also acquire ownership of of any trademarks from MGI or its Affiliates that consist of the M&G Brazil Licensed Trademarks (the "M&G Brazil MGI Trademarks"), and (ii) this Agreement will be assigned to the entity acquiring such assets, then the Licensors will, in advance of the closing of the M&G Resins Plant Sale, use commercially reasonable efforts to cause the exhibits of this Agreement to be amended, to be effective upon the closing of the M&G Resins Plant Sale, to include the M&G Brazil MGI Trademarks, as necessary to give the intended effect of Section 2.2.4, the license of which shall be subject to the terms of Section 2.2.4.

2.3    **Cross-Licensed Rights.**

2.3.1    M&G Mexico grants to M&G Resins a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Resins Plant, whether by assignment or Change of Control of M&G Resins), non-sublicenseable (except in connection with products and services of the M&G Resins Plant) license under the M&G Mexico Know-How to use and otherwise exploit such M&G Mexico Know-How for the present and future operation of the M&G Resins Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid.

2.3.2    M&G Mexico grants to M&G Brazil a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under the M&G Mexico Know-How to use and otherwise exploit such M&G Mexico Know-How for the present and future operation of the M&G Brazil Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid.

2.3.3    M&G Brazil grants to M&G Resins a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Resins Plant, whether by assignment or Change of Control of M&G Resins), non-sublicenseable (except in connection with products and services of the M&G Resins Plant) license under the M&G Brazil Know-How to use and otherwise exploit such M&G Brazil Know-How for the present and future

operation of the M&G Resins Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid.

2.3.4    M&G Brazil grants to M&G Mexico a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under the M&G Brazil Know-How to use and otherwise exploit such M&G Brazil Know-How for the present and future operation of the M&G Mexico Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid.

2.3.5    M&G Resins grants to M&G Mexico a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under the M&G Resins Know-How to use and otherwise exploit such M&G Resins Know-How for the present and future operation of the M&G Mexico Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid (but, for the avoidance of doubt, after the Mexico License Termination Date excluding any M&G Proprietary Products).

2.3.6    M&G Resins grants to M&G Brazil a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under the M&G Resins Know-How to use and otherwise exploit such M&G Resins Know-How for the present and future operation of the M&G Brazil Plant and for the manufacture and commercialization of polymer-related products and/or any other products, including PET resins and terephthalic acid (but, for the avoidance of doubt, after the M&G Brazil License Extension Termination Date excluding any M&G Proprietary Products).

2.3.7    M&G Polymers grants to M&G Mexico a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under the M&G Polymers Non-Barrier Know-How, to the extent used in the M&G Mexico Plant, to use and otherwise exploit such M&G Polymers Non-Barrier Know-How for the present and future operation of the M&G Mexico Plant and for the manufacture of polymer-related products and/or any other products, including PET resins and terephthalic acid (but, for the avoidance of doubt, after the Mexico License Termination Date excluding any M&G Proprietary Products), in the M&G Mexico Plant.

2.3.8    M&G Polymers grants to M&G Brazil a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under the M&G

Polymers Non-Barrier Know-How, to the extent used in the M&G Brazil Plant, to use and otherwise exploit such M&G Polymers Non-Barrier Know-How for the present and future operation of the M&G Brazil Plant and for the manufacture of polymer-related products and/or any other products, including PET resins and terephthalic acid (but for the avoidance of doubt, after the M&G Brazil License Extension Termination Date excluding any M&G Proprietary Products), in the M&G Brazil Plant.

2.3.9    M&G USA grants to M&G Mexico a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Mexico Plant, whether by assignment or Change of Control of M&G Mexico), non-sublicenseable (except in connection with products and services of the M&G Mexico Plant) license under the M&G USA Non-Barrier Know-How, to the extent used in the M&G Mexico Plant, to use and otherwise exploit such M&G USA Non-Barrier Know-How for the present and future operation of the M&G Mexico Plant and for the manufacture of polymer-related products and/or any other products, including PET resins and terephthalic acid (but for the avoidance of doubt, after the Mexico License Termination Date excluding any M&G Proprietary Products), in the M&G Mexico Plant.

2.3.10  M&G USA grants to M&G Brazil a royalty-free, perpetual, irrevocable, non-exclusive, non-transferable (except in connection with a transfer of the M&G Brazil Plant, whether by assignment or a Change of Control of M&G Brazil), non-sublicenseable (except in connection with products and services of the M&G Brazil Plant) license under the M&G USA Non-Barrier Know-How (excluding any patents or patent applications), to the extent used in the M&G Brazil Plant, to use and otherwise exploit such M&G USA Non-Barrier Know-How for the present and future operation of the M&G Brazil Plant and for the manufacture of polymer-related products and/or any other products (but for the avoidance of doubt, after the M&G Brazil License Extension Termination Date excluding any M&G Proprietary Products), including PET resins and terephthalic acid, in the M&G Brazil Plant.

2.4    **Additional Patent Matters.**

2.4.1    M&G Mexico represents and warrants that it does not own any patents or patent applications.  To the extent the foregoing is not accurate, any patents or patent applications owned by M&G Mexico as of the Effective Date are hereby deemed licensed to M&G Resins and M&G Brazil for M&G Resins and M&G Brazil to make and use, offer for sale, sell, and import polymer-related products or use any process for the manufacture or commercialization of polymer-related products and/or any other products, including PET resins or terephthalic acid, such license to continue until the date that the last claim of such patent or any patent issuing from such patent application expires or is found invalid or unenforceable by a court of competent jurisdiction.

2.4.2    M&G Brazil grants to M&G Resins and M&G Mexico an irrevocable, royalty-free, non-exclusive license, with the right to sublicense, under M&G Brazil's rights in the M&G Brazil Patents to (a) make and use, offer for sale, sell, and import any product that is covered by, or that would infringe any claim of, any M&G Brazil Patent, including PET, or terephthalic acid, or (b) use any process that is covered by, or that would infringe any claim of any M&G Brazil Patent, such license under 2.4.2 and 2.4.2 to continue with respect to the M&G Brazil Patents until

the date that the last claim of the M&G Brazil Patents expires or is found invalid or unenforceable by a court of competent jurisdiction.

2.5    **Reservation of Rights.**

Except as expressly stated in this Agreement, no rights or licenses are granted under this Agreement by any Party or its Affiliates under any Intellectual Property of such Party or its Affiliates to any other Party or its Affiliates, whether by implication, estoppel or otherwise, and all such rights not expressly granted are hereby reserved by each Party and its Affiliates.  For the avoidance of doubt, other than the obligations expressly set forth in this Agreement, no Party has any further obligations.

2.6    **Licenses Attach to Intellectual Property**.

Each license or release granted under this ARTICLE 2 attaches to each item of Intellectual Property subject to such license.  Each subsequent assignee of such Intellectual Property rights takes title to such Intellectual Property subject to the licenses or releases granted in this Agreement.  Each license or release granted under this ARTICLE 2 shall survive any transfer, whether in whole or in part, of any of the Intellectual Property subject to such license or release, and the Licensors shall make any such transfer subject to such licenses.

2.7    **Release**.

Each Party hereby fully, finally and forever releases and discharges each other Party and their respective directors, officers, employees, agents, representatives and shareholders (and, solely with respect to their use and distribution of such other Party's products, customers and distributors) from any and all claims, causes of action, liabilities, losses, damages and demands of whatever kind or nature, whether known or unknown, suspected or unsuspected, patent or latent, or fixed or contingent (collectively, "Claim") that such releasing Party may, as of the Effective Date, hold or own, or has at any time prior to the Effective Date, held or owned with respect to any activity that would have been licensed pursuant this Agreement if such activity occurred after the Effective Date; *provided that*, notwithstanding anything to the contrary, the foregoing release and discharge (and the grant of any royalty-free licenses hereunder) shall not apply to any Claim based on royalties due but not yet paid by M&G Brazil under that certain Trademark Sub-License Contract by and between M&G Brazil and M&G Finanziaria S.r.l. (as amended and assigned to M&G Polymers).  M&G Mexico represents and warrants that as of the Effective Date it has paid all invoiced amounts due and payable under that certain Trademark License Contract by and between M&G Mexico and M&G Finanziaria S.r.l. (as assigned to M&G Polymers).

2.8    **Termination of Research and Development Agreement**.

M&G Mexico and M&G Polymers hereby agree and vote to terminate the CSA pursuant to Section 14 of the CSA.  To the extent any further action by either M&G Mexico or M&G Polymers is necessary or required to give full effect to such termination of the CSA, both M&G Mexico and M&G Polymers agree that they will take any such action upon the request of either M&G Mexico or M&G Polymers.

## ARTICLE 3

## NEGOTIATION OF FUTURE LICENSE

3.1  **M&G Mexico Option.**

Subject to <u>Section 3.3</u>, Licensors grant an option to M&G Mexico to negotiate commercially reasonable terms, including with respect to royalty rates, duration, and territory (including without limitation Mexico), for a non-exclusive, royalty-bearing license, for a term to be agreed upon by Licensors and M&G Mexico, under the M&G Mexico Licensed Patents, the M&G Mexico Non-Barrier Formulations, the M&G Mexico Licensed Trademarks, and/or the M&G Marks to make and use some or all of the M&G Mexico Licensed Products in the M&G Mexico Plant, and offer for sale and sell such M&G Mexico Licensed Products in countries to be mutually agreed on by Licensors and M&G Mexico.

3.2  **M&G Brazil Option.**

Subject to <u>Section 3.3</u>, Licensors grant an option to M&G Brazil to negotiate commercially reasonable terms, including with respect to royalty rates, duration, and territory, for a non-exclusive, royalty-bearing license, for a term to be agreed upon by Licensors and M&G Brazil, under the M&G Brazil Licensed Patents, the M&G Brazil Licensed Trademarks and the M&G Brazil Non-Barrier Formulations, to make and use some or all of the M&G Brazil Licensed Products in the M&G Brazil Plant, and offer for sale, sell (and, if applicable, export) such M&G Brazil Licensed Products in countries to be mutually agreed on by Licensors and M&G Brazil. For the avoidance of doubt, in no event will M&G Brazil be required to pay any royalties under such license with respect to any manufacture, marketing or sale of M&G Brazil Licensed Products for the Brazil market during the period between the Brazil Interim License Termination Date and the M&G Brazil License Extension Termination Date.

3.3  **Exercising Option Rights.**

3.3.1  The options granted pursuant to <u>Sections 3.1</u> and <u>3.2</u> will be exercisable by the Party in receipt of the option (the "<u>Option Grantee</u>") by providing written notice to the Party that is under an obligation to grant an option to such Option Grantee pursuant to <u>Sections 3.1</u> and <u>3.2</u> (the "<u>Option Grantor</u>"), on or after the date that falls ninety (90) days prior to the Brazil Interim License Termination Date (as applied to M&G Brazil) or ninety (90) days prior to the Mexico License Termination Date (as applied to M&G Mexico).

3.3.2  Upon receipt of written notice by an Option Grantee, the Option Grantor and Option Grantee agree to negotiate in good faith between the date such written notice is received and the Brazil Interim License Termination Date (as applied to M&G Brazil) or ninety (90) days prior to the Mexico License Termination Date (as applied to M&G Mexico) (the "<u>Option Period</u>"). The Option Grantor is not obligated to enter into a license agreement with the Option Grantee and no Party will be liable to another Party for failure to enter into a license agreement during the Option Period.

# ARTICLE 4

## PATENTS AND INFRINGEMENT

4.1     **Prosecution and Abandonment of M&G Patents and Trademarks.**

As between the Parties, the owner of Intellectual Property licensed hereunder retains the exclusive right, but not the obligation, to prepare, file, prosecute, maintain or renew such Intellectual Property.

4.2     **Enforcement of M&G Patents and Trademarks.**

As between the Parties, the owner of Intellectual Property licensed hereunder retains the exclusive right, but not the obligation, to enforce such Intellectual Property.

# ARTICLE 5

## CONFIDENTIALITY

5.1     **Confidentiality Obligation.**

The Parties acknowledge that all Know-How, including Formulations, owned by a Party are the Confidential Information of that Party.  Subject to <u>Section 5.2</u>, during the Term and for ten (10) years thereafter, a recipient of any Confidential Information will keep confidential, and will cause its Representatives to keep confidential, all of the discloser's Confidential Information that is disclosed to it under this Agreement.  The recipient of any Confidential Information agrees to take such action, and to cause its Representatives to take such action, to preserve the confidentiality of the discloser's Confidential Information as it would customarily take to preserve the confidentiality of the recipient's own similar types of Confidential Information.  The recipient of Confidential Information will, and will cause its respective Representatives (i) to use the discloser's Confidential Information only as expressly permitted in this Agreement and (ii) subject to <u>Section 5.2</u>, not to disclose the discloser's Confidential Information to any Third Parties without the prior written consent of the discloser, except as expressly permitted in this Agreement.

5.2     **Permitted Disclosures.**

Notwithstanding anything to the contrary in this <u>ARTICLE 5</u>, the recipient of any Confidential Information and its Representatives may disclose the discloser's Confidential Information in connection with the exercise of rights granted to it hereunder: (a) to Governmental Authorities to the extent necessary to seek, obtain or maintain Regulatory Approvals; (b) to Representatives; (c) to consultants, contractors, sublicensees, agents and service providers; *provided, however,* that the recipient of the Confidential Information will enter into a confidentiality agreement with the respective consultant, contractor, or service provider before disclosing any of the discloser's Confidential Information; (d) in connection with prosecuting or defending litigation; *provided, however*, that the recipient or Representative will use reasonable efforts to limit the dissemination of such information, including by use of protective orders and

the like, as such recipient would use for its own similar types of Confidential Information; (e) in connection with the resolution of disputes under this Agreement; *provided, however*, that such recipient will use reasonable efforts to limit the dissemination of such information, including by use of protective orders and the like, as such recipient would use for its own similar types of Confidential Information; and (f) in connection with filings required by security regulations and the rules and regulations of any securities exchanges upon which the recipient's securities are traded; *provided, however*, that such recipient will use reasonable efforts to limit the dissemination of such information, including by use of protective orders and the like, as such recipient would use for its own similar types of Confidential Information.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES

6.1 **Representations and Warranties.**

Each Party represents and warrants to each other Party that, as of the Effective Date, it has the corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery and performance of this Agreement by it has been duly and validly authorized and approved by proper corporate action on the part of the Party, and the Party has taken all other action required by Law, its certificate of incorporation, by-laws or other organizational documents to authorize such execution, delivery and performance. Assuming due authorization, execution and delivery on the part of the other Parties, this Agreement constitutes a legal, valid and binding obligation of the Party, enforceable against the Party in accordance with its terms, except as enforceability may be limited by applicable equitable principles or bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally.

6.2 **DISCLAIMER.**

EXCEPT AS OTHERWISE EXPRESSLY STATED IN <u>SECTIONS 6.1</u> AND <u>2.4.1</u>, NO PARTY MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND WITH RESPECT TO ANY PRODUCTS, TECHNOLOGY, INTELLECTUAL PROPERTY OR ANY OTHER SUBJECT MATTER UNDER THIS AGREEMENT. EXCEPT AS OTHERWISE PROVIDED IN <u>SECTIONS 6.1 AND 2.4</u>, EACH PARTY EXPRESSLY DISCLAIMS ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR AGAINST INFRINGEMENT.

6.3 **LIMITATION OF LIABILITY.**

NO PARTY SHALL BE LIABLE UNDER THIS AGREEMENT FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER BASED IN CONTRACT, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, INCLUDING LOSS OF PROFITS OR REVENUE, SUFFERED BY A PARTY OR ANY OF ITS RESPECTIVE REPRESENTATIVES, EXCEPT (i) TO THE EXTENT OF ANY SUCH

DAMAGES THAT MUST BE PAID TO A THIRD PARTY IN CONNECTION WITH A THIRD PARTY CLAIM THAT IS SUBJECT TO A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER ARTICLE 7, OR (ii) IN THE EVENT OF AN INTENTIONAL AND WILLFUL BREACH IN BAD FAITH OF ANY REPRESENTATION, WARRANTY, COVENANT OR AGREEMENT CONTAINED IN THIS AGREEMENT BY THE OTHER PARTY.

<div align="center">

**ARTICLE 7**

**INDEMNIFICATION**

</div>

7.1     **Indemnification by Indemnifying Party.**

7.1.1     Each Party (an "<u>Indemnifying Party</u>") under this Agreement will indemnify, defend, pay reasonable defense costs, and hold harmless from and against, and shall reimburse each other Party (an "<u>Indemnified Party</u>") any and all Losses incurred as a result of any Third Party Claim arising out of or relating to (i) a breach of any covenant, representation or warranty made by such Indemnifying Party under this Agreement or (ii) gross negligence, recklessness, or willful misconduct of such Indemnifying Party or its Representatives.

7.1.2     M&G Mexico or M&G Brazil (each, an Indemnifying Party) will indemnify, defend, pay reasonable defense costs, and hold harmless from and against, and shall reimburse Licensors (each, an Indemnified Party) any and all Losses incurred as a result of any Third Party Claim arising out of or relating to (a) in the case of M&G Mexico's obligations as the Indemnifying Party, any product sold or offered for sale by M&G Mexico or its respective Representatives or agents under the M&G Mexico Licensed Trademarks or M&G Marks, as applicable ("<u>M&G Mexico Claims</u>") or (b) in the case of M&G Brazil's obligations as the Indemnifying Party, any product sold or offered for sale by M&G Brazil or its respective Representatives or agents under the M&G Brazil Licensed Trademarks or M&G Marks, as applicable ("<u>M&G Brazil Claims</u>").  For the avoidance of doubt, M&G Mexico's obligations under this <u>Section 7.1.2</u> are limited to M&G Mexico Claims and M&G Brazil's obligations under this <u>Section 7.1.2</u> are limited to M&G Brazil Claims.

7.1.3     Notwithstanding the foregoing, the Indemnifying Party will not be obligated to so indemnify, defend or hold the Indemnified Party and or its Representatives harmless to the extent that such Losses are caused by (i) the breach of any covenant of, or warranty or representation made by the Indemnified Party under this Agreement or (ii) the gross negligence, recklessness or wilful misconduct of the Indemnified Party or any of its Representatives.

7.2     **Indemnification Procedure.**

7.2.1     In the event that any Third Party asserts a claim with respect to any matter for which an Indemnified Party is entitled to indemnification under <u>Section 7.1</u> (a "<u>Third Party Claim</u>"), then the Indemnified Party will promptly notify the Indemnifying Party thereof; *provided that* no delay on the part of the Indemnified Party in notifying the Indemnifying Party will relieve the Indemnifying Party from any obligation hereunder unless (and then only to the extent that) the Indemnifying Party is prejudiced thereby.

7.2.2　The Indemnifying Party will have the right, exercisable by notice to the Indemnified Party, within twenty (20) days after receipt of notice from the Indemnified Party of the commencement of or assertion of any Third Party Claim, to assume direction and control of the defense, litigation, settlement, appeal or other disposition of the Third Party Claim (including the right to settle the claim solely for monetary consideration) with counsel selected by the Indemnifying Party and reasonably acceptable to the Indemnified Party, and the Indemnifying Party may do so without prejudice to its right to dispute whether such claim involves a Third Party Claim subject to valid indemnification obligation hereunder.　During such time as the Indemnifying Party is controlling the defense of such Third Party Claim, the Indemnified Party will cooperate, and will cause its Representatives to cooperate, upon the reasonable request of the Indemnifying Party and at the Indemnifying Party's cost, in the defense or prosecution of the Third Party Claim, including by furnishing such records, information and testimony and attending such conferences, discovery proceedings, hearings, trials or appeals as may reasonably be requested by the Indemnifying Party.　In the event that the Indemnifying Party does not notify the Indemnified Party of the Indemnifying Party's intent to defend any Third Party Claim within twenty (20) days after notice thereof (including by affirmatively denying responsibility to defend the Third Party Claim), the Indemnified Party may (without further notice to the Indemnifying Party) undertake the defense thereof with counsel of the Indemnified Party's choice and at the Indemnifying Party's expense (including reasonable, out-of-pocket attorneys' fees and costs and expenses of enforcement or defense).　The Indemnifying Party or the Indemnified Party, as the case may be, will have the right to join in (including the right to conduct discovery, interview and examine witnesses and participate in all settlement conferences), but not control, at its own expense, the defense of any Third Party Claim that the other Party is defending as provided in this Agreement.

7.2.3　The Indemnifying Party will not, without the prior written consent of the Indemnified Party, which will not be unreasonably withheld, enter into any compromise or settlement that commits the Indemnified Party to take, or to forbear to take, any action.　The Indemnified Party will have the sole and exclusive right to settle any Third Party Claim, on such terms and conditions as it deems reasonably appropriate, to the extent such Third Party Claim involves equitable or other non-monetary relief, but will not have the right to settle such Third Party Claim to the extent such Third Party Claim involves monetary damages without the prior written consent of the Indemnifying Party.　Each of the Indemnifying Party and the Indemnified Party will not make any admission of liability in respect of any Third Party Claim without the prior written consent of the other Party, and the Indemnified Party will use reasonable efforts to mitigate losses arising from the Third Party Claim.

## ARTICLE 8

## GOVERNMENT APPROVAL

8.1　**Cooperation**.

8.1.1　At the election of Licensors or their successors or assigns, Licensors or their successors or assigns will register M&G Mexico as an authorized user of the M&G Mexico Licensed Patents, M&G Mexico Licensed Trademarks and/or M&G Marks with the Instituto Mexicano de la Propiedad Industrial ("<u>IMPI</u>").　M&G Mexico will cooperate with Licensors or

their successors or assigns, when reasonably requested by Licensors or their successors or assigns, to register M&G Mexico as an authorized user of the M&G Mexico Licensed Patents, M&G Mexico Licensed Trademarks and/or M&G Marks before IMPI and to cancel the registration of M&G Mexico before IMPI upon termination or expiration of this Agreement. M&G Mexico hereby authorizes Licensors or their successors or assigns or their respective designees, solely to register this Agreement or a summary with minimum elements of the same, according to local law, before IMPI, in accordance with Articles 136, 142, 142Bis and all other applicable provisions of the Mexican Industrial Property Law, Article 10 and other applicable Articles of the Regulations, to such law. Likewise, M&G Mexico hereby authorizes Licensors or their successors or assigns or their respective designees to register and to cancel registration of any other agreement executed by and between the parties in connection with M&G Mexico Licensed Patents, M&G Mexico Licensed Trademarks and/or M&G Marks that was recorded with the IMPI, to the extent necessary to effect termination of such agreements. The parties further agree that the recordation of this Agreement before IMPI may be cancelled, to the extent allowed by applicable law, at the written request from Licensors or their successors or assigns and without the need for consent, authorization or hearing of M&G Mexico upon the expiration or earlier termination of this Agreement, and M&G Mexico agrees to execute any termination agreement or document at the reasonable request of Licensors or their successors or assigns. Licensors or their successors or assigns and M&G Mexico will bear their own costs and expenses of obtaining approval of, and/or registering or recording this Agreement and any amendment with the appropriate governmental authorities.

8.1.2    At the election of Licensors or their successors or assigns, Licensors or their successors or assigns will register M&G Brazil as an authorized user of the M&G Brazil Licensed Patents, M&G Brazil Licensed Trademarks and/or M&G Marks with the Instituto Nacional da Propriedade Industrial ("INPI"). M&G Brazil will cooperate with Licensors or their successors or assigns, when reasonably requested by Licensors or their successors or assigns, to register M&G Brazil as an authorized user of the M&G Brazil Licensed Patents, M&G Brazil Licensed Trademarks and/or M&G Marks with INPI and to cancel the registration of M&G Brazil with INPI upon termination or expiration of this Agreement. M&G Brazil hereby authorizes Licensors or their successors or assigns or their respective designees, solely to register this Agreement or a summary with minimum elements of the same, according to local law, before INPI, in accordance with Articles 61, 62, 139, 140, 211 and all other applicable provisions of the Brazilian Industrial Property Law and any other applicable law. Likewise, M&G Brazil hereby authorizes Licensors or their successors or assigns or their respective designees to register and to cancel registration of any other agreement executed by and between the parties in connection with M&G Brazil Licensed Patents, M&G Brazil Licensed Trademarks and/or M&G Marks, if applicable. The parties further agree that the recordation of this Agreement with INPI may be cancelled, to the extent allowed by applicable law, at the written request from Licensors or their successors or assigns and without the need for consent, authorization or hearing of M&G Brazil upon the expiration or earlier termination of this Agreement, and M&G Brazil agrees to execute any termination agreement or document at the reasonable request of Licensors or their successors or assigns. M&G Brazil will execute the Irrevocable Power of Attorney attached hereto as Exhibit I concurrently with the signing of this Agreement, authorizing the Licensors or their successors or assigns, or their designated representative, solely to cancel the registration of this Agreement with INPI following

a written demand by Licensors or assigns or upon termination or expiration of this Agreement. Licensors or their successors or assigns and M&G Brazil will bear their own costs and expenses of obtaining approval of, and/or registering or recording this Agreement and any amendment with the appropriate governmental authorities.

8.2     **Licensors' Approval**.

8.2.1   M&G Mexico agrees not to submit any information to governmental authorities with respect to this Agreement without the prior written approval of Licensors or their successors or assigns, which approval will not be unreasonably withheld; provided that, the foregoing restriction will not apply if formal or informal proceedings are instituted against a party or if a dispute between the parties is submitted to any tribunal having jurisdiction over such matters.

8.2.2   M&G Brazil agrees not to submit any information to governmental authorities with respect to this Agreement without the prior written approval of Licensors or their successors or assigns, which approval will not be unreasonably withheld; provided that, the foregoing restriction will not apply if formal or informal proceedings are instituted against a party or if a dispute between the parties is submitted to any tribunal having jurisdiction over such matters.

# ARTICLE 9

# TERM AND TERMINATION

9.1     **Term.**

9.1.1   The licenses granted under this Agreement will remain effective as long as any of the Intellectual Property associated therewith remain enforceable, subject to Section 9.2. This Agreement will be effective in its entirety until none of the Intellectual Property associated with the licenses granted hereunder remain enforceable.

9.1.2   The period from the Effective Date until termination (for any reason) of this Agreement in its entirety is the "Term" of this Agreement.

9.2     **Termination Rights.**

9.2.1   Subject to Section 9.3.2, if a Party is in material breach of this Agreement (including any breach of a representation or warranty) the applicable non-breaching Parties may terminate the licenses granted by or to the breaching Party under Sections 2.1 and 2.2 upon sixty (60) days' written notice to the breaching Party if the breaching Party has not cured the breach within such sixty (60) day notice period.  Upon termination of the licenses, all rights granted to the breaching Party under such licenses shall immediately cease, and the breaching Party shall promptly return or destroy all Confidential Information of the non-breaching Party in its possession, such return or destruction to be confirmed in writing upon request of the non-breaching Party.

9.3    **Effects of Termination.**

9.3.1    Termination of this Agreement or any license granted under this Agreement for any reason will not release a Party hereto from any indebtedness, liability, right to damages or other obligation incurred hereunder by such Party before the date of termination.

9.3.2    The provisions of <u>ARTICLE 1</u>, <u>ARTICLE 4</u>, <u>ARTICLE 5</u>, <u>ARTICLE 6</u>, <u>ARTICLE 7</u>, <u>ARTICLE 8</u>, and <u>ARTICLE 10</u> and <u>Sections 2.2.1</u>, <u>2.3</u>, <u>2.4</u>, <u>2.5</u>, <u>2.6</u> and <u>9.3</u> as well as any other Sections or defined terms referred to in such Sections or necessary to give them effect will survive any termination or expiration of this Agreement and remain in force until discharged in full.  Furthermore, any other provisions required to interpret and enforce the Parties' rights and obligations or to wind up their outstanding obligations under this Agreement will survive to the extent required.

<h2 align="center">ARTICLE 10</h2>

<h2 align="center">MISCELLANEOUS</h2>

10.1    **Governing Law.**

This Agreement will be governed by Texas law, without reference to any rules of conflicts of law, and the exclusive jurisdiction for any disputes arising hereunder will be the Bankruptcy Court.  In the event that the Bankruptcy Case has been closed, each Party hereto consents to personal jurisdiction in the federal and state courts of Nueces County, Texas and agrees that the exclusive venue of any action or proceeding arising out of or relating to this Agreement will be the federal and state courts of Nueces County, Texas.

10.2    **Specific Performance**.

The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached.  It is accordingly agreed that the Parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the performance of the terms and provisions of this Agreement without proof of actual damages, this being in addition to any other remedy to which any Party is entitled at law or in equity.

10.3    **Bankruptcy.**

All rights and licenses granted under or pursuant to this Agreement by a Party are, and will otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code or any analogous provisions in any other country or jurisdiction, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code.  Each Party will retain and may fully exercise all of its rights and elections under the U.S. Bankruptcy Code or any analogous provisions in any other country or jurisdiction, and such rights and elections shall survive, to the fullest extent permitted under law, any bankruptcy or similar proceeding under the laws of any country or jurisdiction.  In the event of the commencement of a bankruptcy proceeding by or

against a Party under the U.S. Bankruptcy Code or any analogous or similar proceeding in any other country or jurisdiction, the other Party will be entitled to a complete duplicate of (or complete access to, as appropriate) any such intellectual property and all embodiments of such intellectual property, which, if not already in such other Party's possession, will be promptly delivered to it (i) upon any such commencement of a bankruptcy proceeding upon such other Party's written request therefor, unless the Party subject to the bankruptcy proceeding elects to continue to perform all of its obligations under this Agreement, or (ii) if not delivered under clause (i) above, following the rejection of this Agreement by or on behalf of the Party subject to the bankruptcy proceeding upon written request therefor by the other Party.

10.4 **Severability.**

If any of the provisions contained in this Agreement is held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein will not in any way be affected or impaired thereby, unless the absence of the invalidated provision(s) adversely affects the substantive rights of the Parties. The Parties will in such an instance use their best efforts to replace the invalid, illegal or unenforceable provision(s) with valid, legal and enforceable provision(s) which, insofar as practical, implement the purposes of this Agreement.

10.5 **Waivers.**

Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver will be effective unless set forth in a written instrument duly executed by or on behalf of the Party or Parties waiving such term or condition. Neither the waiver by any Party of any term or condition of this Agreement nor the failure on the part of any Party, in one or more instances, to enforce any of the provisions of this Agreement or to exercise any right or privilege, will be deemed or construed to be a waiver of such term or condition for any similar instance in the future or of any subsequent breach hereof. All rights, remedies, undertakings, obligations and agreements contained in this Agreement will be cumulative and none of them will be a limitation of any other remedy, right, undertaking, obligation or agreement.

10.6 **Entire Agreements; Amendments.**

This Agreement sets forth the entire agreement and understanding between the Parties as to the subject matter hereof and supersedes all agreements or understandings, verbal or written, made between and/or among the Parties or any predecessors in interest before the date hereof with respect to the subject matter hereof; *provided* that, notwithstanding anything to the contrary, this Agreement shall not supersede that certain Trademark Sub-License Contract by and between M&G Brazil and M&G Finanziaria S.r.l. (as amended and assigned to M&G Polymers) with respect to any Claim as described in Section 2.7. All Confidential Information disclosed by either Party to the other Party before the Effective Date will be deemed to have been disclosed pursuant to this Agreement. None of the terms of this Agreement will be amended, supplemented or modified except in writing signed by the Parties.

10.7    **Assignment of this Agreement.**

10.7.1  No Party may assign this Agreement without the consent of all other Parties, except that without the consent of any Party:

(a)    each Party may assign its entire interest in this Agreement to an Affiliate or in connection with a Change of Control of such Party or a sale or other transfer of the Plant owned by such Party;

(b)    M&G Polymers, M&G USA and M&G Resins may assign their entire respective interests in this Agreement, in whole or in part, in connection with a sale of all or substantially all assets pertaining to the M&G Resins Plant, and any subsequent assignment will be subject to Section 10.7.1(a).

10.7.2  Any attempted assignment not in accordance with this Section 10.7 will be void.

10.7.3  Any permitted assignee will assume all obligations of its assignor under this Agreement.

10.7.4  Subject to Section 2.6, nothing in this Agreement will be construed to prevent a Party from selling, assigning, transferring, or encumbering any property right or asset it owns.

10.7.5  Upon the assignment of this Agreement by a Party or in the event of a Change of Control of such Party or a sale or other transfer of the Plant owned by such Party, such Party shall promptly provide written notice to all other Parties of such assignment, Change of Control, or sale or other transfer of such Plant, and provide to all other Parties an updated notice address for such Party's successor in interest for the purpose of Section 10.9.

10.8    **Independent Contractor.**

The relationship between each of the Parties is that of independent contractors.  The Parties are not joint venturers, partners, principal and agent, or employer and employee, and have no other relationship other than independent contracting Parties.  The Parties' obligations and rights in connection with the subject matter of this Agreement are solely and specifically as set forth in this Agreement, and the Parties acknowledge and agree that no Party owes any other any fiduciary or similar duties or obligations by virtue of the relationship created by this Agreement.

10.9    **Notices.**

All notices which are required or permitted hereunder will be in writing and sufficient if delivered personally, sent by facsimile (and promptly confirmed by personal delivery, registered or certified mail or overnight courier), sent by a nationally-recognized overnight courier or sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to M&G USA, M&G Polymers, or M&G Resins:

M&G Resins USA, LLC
c/o M&G Polymers USA, LLC
450 Gears Road, Suite 240
Houston, Texas 77607
USA
Attn: Dennis Stogsdill
Contact Email: dstogsdill@alvarezandmarsal.com

       With a copy (which will not constitute notice) to:

Jones Day
250 Vesey Street
New York, NY 10281
USA
Facsimile: (212) 755-7306
Attention: Michael Cohen; Ann Bomberger
Contact phone: (212) 326-3939
Contact email: mcohen@jonesday.com; ambomberger@jonesday.com

<u>If to M&G Mexico</u>:

M&G Polímeros México, S.A. de C.V.
Att'n: Luís Rafael Apperti Llovet; Rodolfo Pérez Vázquez
Petrocal Km. 2
Puerto Industrial de Altamira
C.P. 89603
Altamira, Tamaulipas
Mexico
Contact phone: (+52) 833 229 2924
Contact email:   luis.apperti@mg-chemicals.com; rodolfo.perez@mg-chemicals.com

With a copy (which will not constitute notice) to each of:

Cervantes Sainz, S.C.
Att'n: Alejandro Sainz; Rodrigo Guaida Azar
Torre del Bosque, Blvd. M Ávila Camacho 24, piso 20,
Lomas de Chapultepec, 11000, Ciudad de México.
Mexico
Contact phone: (+52) 559 178 4566
Contact email:  asainz@cervantessainz.com; rguaida@cervantessainz.com

Morgan, Lewis & Bockius LLP
Att'n: Timothy B. DeSieno; Susan Baker Manning
101 Park Avenue

New York, NY 10178
U.S.A.
Contact phone: (212) 309-6000
Contact email:  tim.desieno@morganlewis.com; susan.manning@morganlewis.com

<u>If to M&G Brazil</u>:

M&G Polímeros Brasil S.A.
Avenida das Nações Unidas, 12.551, 8º floor
Part I, Brooklin Novo
04578-903 São Paulo - SP – Brasil
Attention: João Luis de Freitas Teixeira; Jose Veiga Veiga
Contact phone: +55 11 2111-1543
Contact Email: joao.luis@gruppomg.com.br

or to such other address as the Party to whom notice is to be given may have furnished to the other Parties in writing in accordance herewith.  Any such notice will be deemed to have been given: (i) when delivered if personally delivered or sent by facsimile on a Business Day; (ii) on the Business Day after dispatch if sent by a nationally recognized overnight courier; or (iii) on the fifth Business Day following the date of mailing if sent by mail.

10.10   **Third Party Beneficiaries.**

None of the provisions of this Agreement will be for the benefit of or enforceable by any Third Party, including any creditor of any Party.  No Third Party will obtain any right under any provision of this Agreement or will by reason of any such provision make any claim in respect of any debt, liability or obligation (or otherwise) against any Party.

10.11   **Performance by Representatives.**

To the extent that this Agreement imposes obligations on Representatives of a Party, such Party agrees to cause its Representatives to perform such obligations.

10.12   **Binding Effect.**

This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns.

10.13   **Counterparts.**

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  This Agreement may be executed by delivery of duly authorized and executed signature pages by facsimile or by scanned pdf.

<p style="text-align:center"><b>&lt;Signature page follows.&gt;</b></p>

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their duly authorized officers to be effective as of the Effective Date.

**M&G USA CORPORATION**

By:_____

    Name: Dennis Stogsdill

    Title: Chief Restructuring Officer

**M&G USA POLYMERS USA LLC**

By:_____

    Name: Dennis Stogsdill

    Title: Chief Restructuring Officer

**M&G RESINS USA LLC**

By:_____

    Name: Dennis Stogsdill

    Title: Chief Restructuring Officer

**M&G POLÍMEROS MÉXICO, S.A. de C.V.**

By:_____

    Name: Luís Rafael Apperti Llovet

    Title: Chairman of the Board of Directors

**M&G POLÍMEROS BRASIL S.A.**

By:_____

    Name: Jose Veiga Veiga

    Title:  Diretor Presidente (President)

and

By:_____

    Name: Joao Luis de Freitas Teixeira

    Title: Diretor (Officer)

**Definitions**

"Affiliate" means, with respect to a first Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with, such first Person.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Bankruptcy Case" means Case No. 17-12307, currently pending in the Bankruptcy Court.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Barrier IP Purchase Agreement" means that certain Asset Purchase Agreement between M&G Polymers, M&G USA, and Far Eastern Investment (Holding) Limited, dated as of January 30, 2018, as amended by that certain First Amendment to Asset Purchase Agreement between M&G Polymers, M&G USA, Far Eastern Investment (Holding) Limited, and FE Polytech, LLC, dated as of March 1, 2018.

"Barrier PET Product" means any polyethylene terephthalate resin which contains one or more additives targeted for achieving high-level gas barrier properties of end products made from such resins, including the PoliProtect™ line of products and line extensions thereto.

"Brazil Interim License Termination Date" means the later of: (i) June 30, 2019, or (ii) the date that is the earlier of (A) thirty (30) days prior to the date on which the PET production plant within the M&G Resins Plant is anticipated to be commissioned, where such date will be communicated by M&G Resins in writing to M&G Brazil as soon as reasonably practicable or (B) September 30, 2019.

"Business Day" means a day other than a Saturday, Sunday, or bank or other public holiday in the United States.

"Change of Control" means, with respect to a first Person, a single transaction or series of related transactions pursuant to which another Person or group of Persons who did not Control such first Person before the transaction(s) do Control such first Person after the transaction(s). A Change of Control will be presumed to occur to a first Person upon the occurrence of any of the following: (i) any other Person becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the voting securities of the first Person; (ii) the sale or other disposition of all or substantially all of the assets of the Person; (iii) a consolidation or merger of the first Person with any other Person, other than a merger or consolidation which would result in the voting securities of the first Person outstanding immediately prior thereto continuing to represent at least fifty percent (50%) of the total voting power represented by the voting securities of the Person outstanding immediately after such merger or consolidation.

"Claim" has the meaning set forth in Section 2.7.

"Confidential Information" means any information regarding the business and operations of a Party or any of its Affiliates, that is or has been disclosed (whether orally or in writing) by such Party or its Affiliates ("Discloser") to the other Party or its Affiliates ("Recipient") to the extent that such information is not (i) as of the date of disclosure to the Recipient, known to the Recipient (other than pursuant to an obligation of confidentiality to the Discloser); or (ii) disclosed in published literature, or otherwise generally known to the public through no breach by the Recipient of this Agreement; or (iii) obtained by the Recipient from a Third Party free from any obligation of confidentiality to the Discloser; or (iv) independently developed by the Recipient without use of the information disclosed to the Recipient by the Discloser.

"Control" including its correlative meanings "Controls", "Controlled by" and "under common Control with" means the possession, directly or indirectly, of the power to direct or cause direction of the management or policies of another Person (whether through ownership of securities or other ownership interests, by contract or otherwise). A first Person will be presumed to Control another Person if such first Person actually owns or has beneficial ownership of at least 50% of the voting securities or other comparable equity interests of such other Person (whether directly, indirectly or pursuant to any option, warrant or other similar arrangement).

"CSA" means the Research and Development Cost Sharing Agreement by and between M&G Mexico, M&G Polymers and M&G Polimeri Italia S.p.A., effective as of January 1, 2003.

"Easy-Up Know-How" means all Know-How owned by M&G Polymers or M&G USA as of the Effective Date relating to the technology for the solid state polymerization of PET, polyesters and other polymers and which is referred to as "Easy-Up™."

"Effective Date" has the meaning set forth in the preamble to this Agreement.

"Formulations" means all recipes, formulas, and specifications, including manufacturing specifications, quality control specifications, and raw material specifications, relating to the manufacture of PET products at any of the Plants.

"Governmental Authority" means any court, agency, department, authority or other instrumentality of any international, national, regional, province, state, county, city or other political subdivision, including a Regulatory Authority.

"IMPI" has the meaning set forth in Section ARTICLE 88.1.

"Indemnified Party" has the meaning set forth in Section 7.1.1.

"Indemnifying Party" has the meaning set forth in Section 7.1.1.

"INPI" has the meaning set forth in Section 8.1.2

"Intellectual Property" means any intellectual property or proprietary rights existing anywhere in the world, including (i) copyrights, (ii) patents, utility models and designs, (iii) trademarks, trade names, domain names, trade dress or service marks, and all goodwill associated therewith, and (iv) Know-How; in each cases of (i) through (iv), whether registered or unregistered, and including any registrations or applications for registration of any of the foregoing, and any reissues, renewals, extensions, reexaminations, revisions, divisionals, continuations-in-part and foreign counterparts thereof.

"Know-How" means all Formulations, discoveries, improvements, ideas, designs, models, data collections, drawings, blueprints, mask works, devices, methods, techniques, processes, instructions, know how, proprietary information, technical information and trade secrets related to the operation of, or manufacture and commercialization of products in, a polymer processing plant.

"Laws" means all laws, statutes, rules, regulations, orders, judgments or ordinances of any Governmental Authority, as such may be revised from time to time.

"Licensed M&G Brazil Territory" means (a) during the period from the Effective Date until the Brazil Interim License Termination Date, anywhere in the M&G Brazil Territory and (b) during the period from the Brazil Interim License Termination Date until the M&G Brazil License Extension Termination Date, the M&G Brazil License Extension Territory.

"Licensors" has the meaning set forth in Section 2.1.1.

"Losses" means any and all costs, expenses, claims, losses, liabilities, damages, fines, royalties, governmental penalties or punitive damages, deficiencies, interest, settlement amounts, awards, and judgments, including any and all reasonable, out-of-pocket costs and expenses properly incurred as a result of a claim (including reasonable, out-of-pocket attorneys' fees and all other expenses reasonably incurred in investigating, preparing or defending any litigation or proceeding, commenced or threatened).

"Mexico License Termination Date" means the later of: (i) August 30, 2019, or (ii) the date that is the earlier of (A) ninety (90) days prior to the date on which the last performance test for the PET production plant within the M&G Resins Plant is scheduled, where such date will be communicated in writing by M&G Resins to M&G Mexico as soon as reasonably practicable or (B) March 31, 2020.

"MGI" means Mossi & Ghisolfi International S.a.r.l.

"M&G Brazil" has the meaning set forth in the preamble to this Agreement.

"M&G Brazil Know-How" means the Know-How owned by M&G Brazil as of the date of this Agreement and to the extent related to the past or present operation of any of the M&G Plants or the past or present manufacture or commercialization of polymer-related products at any of the M&G Plants.

"M&G Brazil Licensed Patents" means the M&G Standard PET Patents.

"M&G Brazil Licensed Products" means the products listed in Exhibit E (*M&G Products*) and made at the M&G Brazil Plant, excluding any and all Barrier PET Products.

"M&G Brazil Licensed Trademarks" means the M&G Product Trademarks designated as being licensed to M&G Brazil in Exhibit D (*M&G Product Trademarks*).

"M&G Brazil License Extension Termination Date" means March 31, 2020.

"M&G Brazil License Extension Territory" means the country of Brazil.

"M&G Brazil MGI Trademarks" has the meaning set forth in Section 2.2.6.

"M&G Brazil Non-Barrier Formulations" means the respective M&G Non-Barrier Formulations corresponding to the M&G Brazil Licensed Products as listed in Exhibit E.

"M&G Brazil Plant" means that certain polymer manufacturing plant at Suape Port, Ipojuca, Brazil, operated as of September 1, 2017 by M&G Brazil.

"M&G Brazil Territory" means worldwide.

"M&G Easy-Up Patents" means the patents and patent applications listed on Exhibit C.

"M&G Easy-Up Marks" means the trademarks listed in Exhibit G.

"M&G Formulations" means the Formulations owned by M&G Polymers and/or M&G USA as of the date of this Agreement, but excluding any and all Formulations constituting "Purchased Intellectual Property" under the Barrier IP Purchase Agreement.

"M&G Marks" means the marks listed in Exhibit F.

"M&G Mexico" has the meaning set forth in the preamble to this Agreement.

"M&G Mexico Know-How" means the Know-How owned by M&G Mexico as of the date of this Agreement and to the extent related to the past or present operation of any of the M&G Plants or the past or present manufacture or commercialization of polymer-related products at any of the M&G Plants.

"M&G Mexico Licensed Patents" means the M&G Standard PET Patents.

"M&G Mexico Licensed Products" means the products listed in Exhibit E (*M&G Products*) and made at the M&G Mexico Plant, excluding any and all Barrier PET Products.

"M&G Mexico Licensed Trademarks" means the M&G Product Trademarks designated as being licensed to M&G Mexico in Exhibit D (*M&G Product Trademarks*).

"M&G Mexico MGI Trademarks" has the meaning set forth in <u>Section 2.1.32.1.4</u>.

"M&G Mexico Non-Barrier Formulations" means the respective M&G Non-Barrier Formulations corresponding to the M&G Mexico Licensed Products as listed in <u>Exhibit E</u>.

"M&G Mexico Plant" means that certain polymer manufacturing plant at Altamira, Tamaulipas, Mexico, operated as of September 1, 2017 by M&G Mexico.

"M&G Mexico Territory" means worldwide.

"M&G Non-Barrier Formulations" means the M&G Formulations excluding Formulations exclusively relating to Barrier PET.

"M&G Plants" means, collectively, the M&G Brazil Plant, the M&G Mexico Plant, the M&G Polymers Plant, and the M&G Resins Plant.

"M&G Brazil Patents" means the patents and patent applications owned or purported to be owned by M&G Brazil (including any and all patents previously owned or purported to be owned by M&G Poliester S.A) on the Effective Date, including, but not limited to the patents listed in <u>Exhibit H</u>.

"M&G Polymers" has the meaning set forth in the preamble to this Agreement.

"M&G Polymers Know-How" means the Know-How, excluding any M&G Formulations and any Easy-Up Know-How, owned by M&G Polymers as of the date of this Agreement and to the extent related to the past or present operation of the M&G Mexico Plant or the M&G Brazil Plant or the past or present manufacture or commercialization of polymer-related products in the M&G Mexico Plant or the M&G Brazil Plant.

"M&G Polymers Non-Barrier Know-How" means the M&G Polymers Know-How, excluding (i) any Know-How exclusively relating to Barrier PET, (ii) any Know-How exclusively relating to the BicoPET™ technology, and (iii) any Know-How constituting "Purchased Intellectual Property" under the Barrier IP Purchase Agreement.

"M&G Polymers Plant" means that certain polymer manufacturing plant at Apple Grove, West Virginia, USA, and operated as of September 1, 2017 by M&G Polymers (whether or not M&G Polymers owns such Plant on the Effective Date).

"M&G Products" means any products produced at any of the M&G Plants, including the products listed in <u>Exhibit E</u>.

"M&G Product Trademarks" means the trademarks listed in <u>Exhibit D</u> (*M&G Product Trademarks*).

"M&G Proprietary Products" means the M&G Brazil Licensed Products and the M&G Mexico Licensed Products, as well as any other products (i) formed, in whole or in part, from or produced using any Formulations owned by Licensors, or (ii) that is covered by, or would

infringe any claim of, any patent or patent application owned by Licensors other than M&G Easy-Up Patents.

"M&G Resins" has the meaning set forth in the preamble to this Agreement.

"M&G Resins Know-How" means the Know-How owned by M&G Resins as of the date of this Agreement and to the extent related to the past or present operation of the M&G Mexico Plant or the M&G Brazil Plant or the past or present manufacture or commercialization of polymer-related products in the M&G Mexico Plant or the M&G Brazil Plant, but excluding Easy-Up Know-How.

"M&G Resins Plant" means that certain polymer manufacturing plant at Corpus Christi, Texas, USA and owned as of September 1, 2017 by M&G Resins.

"M&G Resins Plant Sale" has the meaning set forth in Section 2.1.4.

"M&G Standard PET Patents" means the patents and patent applications owned by Licensors on the Effective Date, including but not limited to patents and patent applications listed on Exhibit B, and including all reissues, renewals, extensions, reexaminations, revisions, divisionals, continuations, continuations-in-part, and foreign counterparts thereof, but excluding the M&G Easy-Up Patents, any "Purchased Intellectual Property" under the Barrier IP Purchase Agreement, and any patents and patent applications listed in Exhibit J.

"M&G USA" has the meaning set forth in the preamble to this Agreement.

"M&G USA Know-How" means the Know-How, excluding any M&G Formulations and excluding any Easy-Up Know-How, owned by M&G USA as of the date of this Agreement and to the extent related to the past or present operation of the M&G Mexico Plant or the M&G Brazil Plant or the past or present manufacture or commercialization of polymer-related products in the M&G Mexico Plant or the M&G Brazil Plant.

"M&G USA Non-Barrier Know-How" means the M&G USA Know-How, excluding (i) any Know-How exclusively relating to Barrier PET, (ii) any Know-How exclusively relating to the BicoPET™ technology, and (iii) any Know-How constituting "Purchased Intellectual Property" under the Barrier IP Purchase Agreement.

"Option Grantor" has the meaning set forth in Section 3.3.1.

"Option Grantee" has the meaning set forth in Section 3.3.1.

"Option Period" has the meaning set forth in Section 3.3.2.

"Party" and "Parties" have the meanings set forth in the preamble to this Agreement.

"Plant" means with respect to: (i) M&G Brazil, the M&G Brazil Plant, (ii) M&G Mexico, the M&G Mexico Plant; (iii) M&G Resins, the M&G Resins Plant; and (iv) M&G Polymers, the M&G Polymers Plant.

"Person" means any (i) natural person, (ii) form of for-profit or non-profit business entity recognized by any Governmental Authority, including any corporation, partnership, limited liability company, association, or trust, or (iii) Governmental Authority.

"PET" means polyethylene terephthalate.

"Recipient" has the meaning set forth in the definition of Confidential Information.

"Regulatory Approval" means, with respect to any jurisdiction, any and all approvals or authorizations of a Regulatory Authority that are legally necessary for the commercial manufacture, distribution, use, marketing or sale of products in such jurisdiction, including, as applicable, any associated regulatory or data exclusivity associated with such approvals or authorizations.

"Regulatory Authority" means, with respect to any jurisdiction, the Governmental Authority having responsibility for granting Regulatory Approvals in such country or jurisdiction, including the FDA in the United States.

"Representatives" means with respect to a Party, such Party's Affiliates, and each of such Party's and its Affiliates' respective officers, directors, managers and employees.

"Term" has the meaning set forth in Section 9.1.2.

"Third Party" means any person or entity other than a Party to this Agreement.

"Third Party Claim" has the meaning set forth in Section 7.2.1.

# Exhibit B

## M&G Standard PET Patents[1]

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.006.AU | AU - Australia | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | 664388 | 5 March, 1996 |
| MG.P.006.BE | BE - Belgium | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.CA | CA - Canada | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | 2096640 | 18 March, 2003 |
| MG.P.006.DE | DE - Germany | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.EP | EP - European Patent Office | Utility | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.ES | ES - Spain | EP Regional Validation | Process for the production of high molecular weight polyester resins | 2208634 | 19 November, 2003 |
| MG.P.006.FR | FR - France | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.GB | GB - United Kingdom | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.IT | IT - Italy | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.JP | JP - Japan | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | 2790917 | 12 June, 1998 |
| MG.P.006.NL | NL - Netherlands | EP Regional Validation | Process for the production of high molecular weight polyester resins | 563354 | 19 November, 2003 |
| MG.P.006.TW | TW - Taiwan | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | NI-62878 | 8 November, 1993 |
| MG.P.006.US | US - United States | PCT National Phase Filing | Process for the production of high molecular weight polyester resins | 5376734 | 27 December, 1994 |
| MG.P.016.MX | MX - Mexico | Utility | Polyester resins having improved rheological properties | 209084 | 22 July, 2002 |
| MG.P.016.US | US - United States | Utility | Polyester resins having improved rheological properties | 6447711 | 10 September, 2002 |
| MG.P.017.AU | AU - Australia | Utility | Polyester resin with improved color characteristics | 705353 | 26 August, 1999 |

[1] Some listed patents and patent applications may be expired, lapsed or abandoned.

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.017.BE | BE - Belgium | EP Regional Validation | Polyester resin with improved color characteristics | 758663 | 9-May-01 |
| MG.P.017.CA | CA - Canada | Utility | Polyester resin with improved color characteristics | 2181870 | 9 October, 2007 |
| MG.P.017.DE | DE - Germany | EP Regional Validation | Polyester resin with improved color characteristics | 758663 | 9-May-01 |
| MG.P.017.ES | ES - Spain | EP Regional Validation | Polyester resin with improved color characteristics | 758663 | 9-May-01 |
| MG.P.017.FR | FR - France | EP Regional Validation | Polyester resin with improved color characteristics | 758663 | 9-May-01 |
| MG.P.017.IT | IT - Italy | Utility | Polyester resin with improved color characteristics | 1277362 | 10 November, 1997 |
| MG.P.017.MX | MX - Mexico | Utility | Polyester resin with improved color characteristics | 193168 | 27 August, 1999 |
| MG.P.017.TW | TW - Taiwan | Utility | Polyester resin with improved color characteristics | NI-118960 | 19 December, 2000 |
| MG.P.017.US | US - United States | Utility | Polyester resin with improved color characteristics | 5618908 | 8 April, 1997 |
| MG.P.021.BE | BE - Belgium | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.DE | DE - Germany | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.ES | ES - Spain | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.FR | FR - France | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.GB | GB - United Kingdom | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.IT | IT - Italy | Utility | Improved process for the production of polyester resins | 1283166 | 7 April, 1998 |
| MG.P.021.KR | KR - South Korea | Utility | Improved process for the production of polyester resins | 526589 | 29 October, 2005 |
| MG.P.021.MX | MX - Mexico | Utility | Improved process for the production of polyester resins | 200771 | 2 February, 2001 |
| MG.P.021.NL | NL - Netherlands | EP Regional Validation | Improved process for the production of polyester resins | 819716 | 24 April, 2002 |
| MG.P.021.US | US - United States | Utility | Process for the production of polyester resins | 5902864 | 11-May-99 |
| MG.P.021.US.C1 | US - United States | Continuation | Process for the production of polyester resins | 6245863 | 12 June, 2001 |
| MG.P.022.DE | DE - Germany | EP Regional Validation | Blown polyester film | 819728 | 8 January, 2003 |
| MG.P.022.FR | FR - France | EP Regional Validation | Blown polyester film | 819728 | 8 January, 2003 |
| MG.P.022.GB | GB - United Kingdom | EP Regional Validation | Blown polyester film | 819728 | 8 January, 2003 |
| MG.P.022.IT | IT - Italy | Utility | Blown polyester film | 1283160 | 7 April, 1998 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.022.MX | MX - Mexico | Utility | Blown polyester film | 201017 | 9 March, 2001 |
| MG.P.022.US | US - United States | Utility | Blown polyester film | 6013360 | 11 January, 2000 |
| MG.P.023.BE | BE - Belgium | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.CA | CA - Canada | Utility | Improved process for the production of polyester resins | 2210205 | 13 August, 2002 |
| MG.P.023.DE | DE - Germany | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.ES | ES - Spain | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.FR | FR - France | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.GB | GB - United Kingdom | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.IT | IT - Italy | EP Regional Validation | Improved process for the production of polyester resins | 0822214 | 2 November, 2006 |
| MG.P.023.KR | KR - South Korea | Utility | Improved process for the production of polyester resins | 681569 | 5 February, 2007 |
| MG.P.023.MX | MX - Mexico | Utility | Improved process for the production of polyester resins | 210105 | 4 September, 2002 |
| MG.P.023.US | US - United States | Utility | Process for the production of polyester resins | 6228302 | 8-May-01 |
| MG.P.024.DE | DE - Germany | EP Regional Validation | Process for the dimensional stabilization of containers in polyethylene | 877770 | 19 November, 2003 |
| MG.P.024.FR | FR - France | EP Regional Validation | Process for the dimensional stabilization of containers in polyethylene | 877770 | 19 November, 2003 |
| MG.P.024.US | US - United States | PCT National Phase Filing | Process for the dimensional stabilization of containers in polyethylene | 6458314 | 1 October, 2002 |
| MG.P.028.AT | AT - Austria | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.BE | BE - Belgium | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.CA | CA - Canada | Utility | Polyester resins with improved properties | 2265319 | 09 March 2010 |
| MG.P.028.DE | DE - Germany | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.ES | ES - Spain | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.FR | FR - France | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.GB | GB - United Kingdom | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.IT | IT - Italy | EP Regional Validation | Polyester resins with improved properties | 1298635 | 12 January 2000 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|--------|---------|------------|-------|-------------------|-------------------------|
| MG.P.028.JP | JP - Japan | Utility | Polyester resins with improved properties | 11-69640 | 16 March 1999 |
| MG.P.028.NL | NL - Netherlands | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.SE | SE - Sweden | EP Regional Validation | Polyester resins with improved properties | 943649 | 20 August 2003 |
| MG.P.028.US | US - United States | Utility | Polyester resins with improved properties | 6057016 | 02 May 2000 |
| MG.P.032.DE | DE - Germany | EP Regional Validation | Transparent articles of polyester resin | 1024169 | 26 November 2003 |
| MG.P.032.ES | ES - Spain | EP Regional Validation | Transparent articles of polyester resin | 1024169 | 26 November 2003 |
| MG.P.032.FR | FR - France | EP Regional Validation | Transparent articles of polyester resin | 1024169 | 26 November 2003 |
| MG.P.032.IT | IT - Italy | EP Regional Validation | Transparent articles of polyester resin | 1307930 | 26 November 2003 |
| MG.P.032.JP | JP - Japan | Utility | Transparent articles of polyester resin | 14477/00 | 24 January 2000 |
| MG.P.032.KR | KR - South Korea | Utility | Transparent articles of polyester resin | 620640 | 29 August 2006 |
| MG.P.032.MX | MX - Mexico | Utility | Transparent articles of polyester resin | 219099 | 10 February 2004 |
| MG.P.032.US | US - United States | Utility | Transparent articles of polyester resin | 6258452 | 10 July 2001 |
| MG.P.033.CA | CA - Canada | Utility | Process for the preparation of polyester resin | 2292986 | 03 March 2009 |
| MG.P.033.DE | DE - Germany | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |
| MG.P.033.ES | ES - Spain | EP Regional Validation | Process for the preparation of polyester resin | 2235429 | 26 January 2005 |
| MG.P.033.FR | FR - France | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |
| MG.P.033.GB | GB - United Kingdom | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |
| MG.P.033.IT | IT - Italy | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.033.JP | JP - Japan | Utility | Process for the preparation of polyester resin | 362649/99 | 21 December 1999 |
| MG.P.033.KR | KR - South Korea | Utility | Process for the preparation of polyester resin | 620665 | 29 August 2006 |
| MG.P.033.MX | MX - Mexico | Utility | Process for the preparation of polyester resin | 240013 | 05 September 2006 |
| MG.P.033.NL | NL - Netherlands | EP Regional Validation | Process for the preparation of polyester resin | 1013691 | 26 January 2005 |
| MG.P.033.TW | TW - Taiwan | Utility | Process for the preparation of polyester resin | NI-146787 | 10 April 2002 |
| MG.P.033.US | US - United States | Utility | Process for the preparation of polyester resin | 6143837 | 07 November 2000 |
| MG.P.044.AR | AR- Argentina | Utility | Flexible bottles of polyester resin | 039057 | 30 July 2009 |
| MG.P.044.AT | AT - Austria | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.BE | BE - Belgium | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.BR | BR - Brazil | PCT National Phase Filing | Flexible bottles of polyester resin | PI0211233 | 19 February 2013 |
| MG.P.044.CZ | CZ - Czech Republic | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.DE | DE - Germany | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.ES | ES - Spain | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.FR | FR - France | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.GB | GB - United Kingdom | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.GR | GR - Greece | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.IT | IT - Italy | Utility | Flexible bottles of polyester resin | 1325813 | 21 December 2004 |
| MG.P.044.IT.EP | IT - Italy | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.MX | MX - Mexico | PCT National Phase Filing | Flexible bottles of polyester resin | 248151 | 17 August 2007 |
| MG.P.044.NL | NL - Netherlands | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |
| MG.P.044.SE | SE - Sweden | EP Regional Validation | Flexible bottles of polyester resin | 1417141 | 25 July 2007 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.044.US | US - United States | PCT National Phase Filing | Flexible bottles of polyester resin | 7226648 | 05 June 2007 |
| MG.P.067.AT | AT - Austria | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.BE | BE - Belgium | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.CA | CA - Canada | PCT National Phase Filing | Process for fast heat-up polyesters | 2395252 | 09 February 2010 |
| MG.P.067.DE | DE - Germany | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.EP | EP - European Patent Office | PCT National Phase Filing | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.ES | ES - Spain | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.FR | FR - France | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.GB | GB - United Kingdom | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.ID | ID - Indonesia | PCT National Phase Filing | Process for fast heat-up polyesters | ID0020121 | 16 November 2007 |
| MG.P.067.IT | IT - Italy | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.JP | JP - Japan | PCT National Phase Filing | Process for fast heat-up polyesters | 4363812 | 28 August 2009 |
| MG.P.067.KR | KR - South Korea | PCT National Phase Filing | Process for fast heat-up polyesters | 715920 | 02 May 2007 |
| MG.P.067.NL | NL - Netherlands | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.MX | MX - Mexico | PCT National Phase Filing | Process for fast heat-up polyesters | 261756 | 29 October 2008 |
| MG.P.067.PT | PT - Portugal | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.TR | TR - Turkey | EP Regional Validation | Process for fast heat-up polyesters | 1280851 | 21 August 2013 |
| MG.P.067.US | US - United States | Utility | Process for fast heat-up polyesters | 6660792 | 09 December 2003 |
| MG.P.076.AU | AU - Australia | PCT National Phase Filing | Apparatus for checking the quality of preforms each having a body made of plastic material | 2004240757 | 22 January 2009 |
| MG.P.076.DE | DE - Germany | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 60315138 | 25 July 2007 |
| MG.P.076.EP | EP - European Patent Office | PCT National Phase Filing | Apparatus for checking the quality of preforms each having a body made of plastic material | 1479454 | 25 July 2007 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.076.ES | ES - Spain | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 2290422 | 25 July 2007 |
| MG.P.076.FR | FR - France | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 1479454 | 25 July 2007 |
| MG.P.076.GB | GB - United Kingdom | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 1479454 | 25 July 2007 |
| MG.P.076.IT | IT - Italy | EP Regional Validation | Apparatus for checking the quality of preforms each having a body made of plastics material | 1479454 | 25 July 2007 |
| MG.P.076.US | US - United States | PCT National Phase Filing | Apparatus for checking the quality of preforms each having a body made of plastics material | 7541556 | 02 June 2009 |
| MG.P.078.BE | BE - Belgium | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.BR | BR - Brazil | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | PI0706982-0 | 09 February 2007 |
| MG.P.078.CN | CN - China | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 200780004722.2 | 09 February 2007 |
| MG.P.078.DE | DE - Germany | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.EP | EP - European Patent Office | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.FR | FR - France | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.GB | GB - United Kingdom | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.P.078.IN | IN - India | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 260258 | 15 April 2014 |
| MG.P.078.IT | IT - Italy | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.JP | JP - Japan | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 2008-553774 | 09 February 2007 |
| MG.P.078.MX | MX - Mexico | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 290776 | 05 October 2011 |
| MG.P.078.NL | NL - Netherlands | EP Regional Validation | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 1989245 | 09 March 2011 |
| MG.P.078.RU | RU - Russian Federation | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 2428437 | 10 September 2011 |
| MG.P.078.US | US - United States | PCT National Phase Filing | Polyester solid phase polymerization catalyst for low acetaldehyde generating resins | 11673014 | 09 February 2007 |
| MG.P.085.BR | BR - Brazil | PCT National Phase Filing | Poss compounds for manufacture of polycondensation polymers | PI0713175 | 18 July 2007 |
| MG.P.085.CN | CN - China | PCT National Phase Filing | Poss metal compounds for manufacture of polycondensation polymers | 200780034430.3 | 18 September 2013 |
| MG.P.085.EP | EP - European Patent Office | PCT National Phase Filing | Novel poss compounds, manufacturing routes and their uses | 2052008 | 10 May 2017 |
| MG.P.085.IN | IN - India | PCT National Phase Filing | Poss compounds for manufacture of polycondensation polymers | 262031 | 30 July 2014 |
| MG.P.085.MX | MX - Mexico | PCT National Phase Filing | Poss compounds for manufacture of polycondensation polymers | 318386 | 07 March 2014 |
| MG.P.085.RU | RU - Russian Federation | PCT National Phase Filing | Poss metal compounds for the manufacture of polycondensation polymers | 2009105502 | 18 July 2007 |
| MG.P.085.US | US - United States | PCT National Phase Filing | Novel poss compounds, manufacturing routes and their uses | 12373968 | 15 January 2009 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|---|---|---|---|---|---|
| MG.th1112.CA | CA - Canada | PCT National Phase Filing | polyesters containing an infrared absorbing material | 2330962 | 12 February 2008 |
| MG.th1112.JP | JP - Japan | PCT National Phase Filing | polyesters containing an infrared absorbing material | 4287052 | 03 April 2009 |
| MG.th1112.MX | MX - Mexico | PCT National Phase Filing | polyesters containing an infrared absorbing material | 241305 | 20 October 2006 |

Exhibit C

# M&G Easy-Up Patents[2]

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/APP NO | GRANT DATE/FILING DATE |
|---|---|---|---|---|---|
| MG.P.079.AM | AM - Armenia | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.AT | AT - Austria | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.AU | AU - Australia | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 2003246367 | 27 March 2008 |
| MG.P.079.AZ | AZ - Azerbaijan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.BE | BE - Belgium | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.BR | BR - Brazil | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | PI0312987 | 16 July 2013 |
| MG.P.079.BY | BY - Belarus | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.CH | CH - Switzerland | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.CN | CN - China | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | zl03817595,9 | 02 May 2007 |
| MG.P.079.CZ | CZ - Czech Republic | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.DE | DE - Germany | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.EAPO | EA - Eurasiatic Patent Office | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.EP | EP - European Patent Office | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |

---

[2] Some listed patents and patent applications may be expired, lapsed or abandoned.

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/APP NO | GRANT DATE/FILING DATE |
|---|---|---|---|---|---|
| MG.P.079.ES | ES - Spain | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.FR | FR - France | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.GB | GB - United Kingdom | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.GR | GR - Greece | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.ID | ID - Indonesia | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | ID P 0024455 | 30 October 2009 |
| MG.P.079.IN | IN - India | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 230209 | 25 February 2009 |
| MG.P.079.IT | IT - Italy | Utility | Continuous process for solid phase polymerisation of polyesters | 1338026 | 20 February 2007 |
| MG.P.079.IT.EP | IT - Italy | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.KG | KG - Kyrgyzstan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.KZ | KZ - Kazakhstan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.LT | LT - Lithuania | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.MD | MD - Republic of Moldova | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.MX | MX - Mexico | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 255993 | 04 April 2008 |
| MG.P.079.NL | NL - Netherlands | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.RU | RU - Russian Federation | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.TJ | TJ - Tajikstan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |
| MG.P.079.TM | TM - Turkmenistan | EuroAsiatic Nat Phase | Continuous process for solid phase polymerisation of polyesters | 007910 | 06 October 2006 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/APP NO | GRANT DATE/FILING DATE |
|---|---|---|---|---|---|
| MG.P.079.TR | TR - Turkey | EP Regional Validation | Continuous process for solid phase polymerisation of polyesters | 1527119 | 13 February 2008 |
| MG.P.079.US | US - United States | PCT National Phase Filing | Continuous process for solid phase polymerisation of polyesters | 8293850 | 23 October 2012 |
| MG.P.094.AR | AR - Argentina | Utility | Radial mixing devices for rotating inclined reactors | AR 0651560 B1 | 21 October 2015 |
| MG.P.094.AU | AU - Australia | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 2008212914 | 17 May 2012 |
| MG.P.094.BE | BE - Belgium | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.BR | BR - Brazil | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | PI0806379 | 05 February 2008 |
| MG.P.094.CA | CA - Canada | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 2677344 | 05 February 2008 |
| MG.P.094.CH | CH - Switzerland | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.CN | CN - China | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 200880011314.4 | 30 October 2013 |
| MG.P.094.DE | DE - Germany | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.EAPO | EA - Eurasiatic Patent Office | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 014970 | 29 April 2011 |
| MG.P.094.EP | EP - European Patent Office | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.ES | ES - Spain | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.FR | FR - France | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.GB | GB - United Kingdom | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.GR | GR - Greece | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/APP NO | GRANT DATE/FILING DATE |
|---|---|---|---|---|---|
| MG.P.094.HK | HK - Hong Kong | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 10103763.7 | 19 April 2010 |
| MG.P.094.ID | ID - Indonesia | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | ID P0030051 | 17 January 2012 |
| MG.P.094.IN | IN - India | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 277529 | 23 November 2016 |
| MG.P.094.IT | IT - Italy | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.KR | KR - South Korea | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 10-1451609 | 10 October 2014 |
| MG.P.094.MX | MX - Mexico | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 288024 | 01 July 2011 |
| MG.P.094.NL | NL - Netherlands | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.PL | PL - Poland | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.TH | TH - Thailand | Utility | Radial mixing devices for rotating inclined reactors | 801000411 | 28 January 2008 |
| MG.P.094.TR | TR - Turkey | EP Regional Validation | Radial mixing devices for rotating inclined reactors | 2109501 | 29 September 2010 |
| MG.P.094.TW | TW - Taiwan | Utility | Radial mixing devices for rotating inclined reactors | I418399 | 11 December 2013 |
| MG.P.094.UA | UA - Ukraine | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 96319 | 25 October 2011 |
| MG.P.094.US | US - United States | PCT National Phase Filing | Radial mixing devices for rotating inclined reactors | 8454896 | 04 June 2013 |
| MG.P.094.US.C1 | US - United States | Continuation | Radial mixing devices for rotating inclined reactors | 8454865 | 04 June 2013 |
| MG.P.094.US.C2 | US - United States | Continuation | Radial mixing devices for rotating inclined reactors | 8790580 | 29 July 2014 |

# Exhibit D

## M&G Product Trademarks

### Trademark Registrations and Applications:

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date | Licensed Parties |
|---|---|---|---|---|---|---|---|
| M&G USA Corporation | Argentina | CLEARTUF | 3597012 | 4/20/2017 | 2918751 | 11/30/2017 | M&G Brazil, M&G Mexico |
| M&G USA Corporation | Brazil | CLEARTUF | 819954810 | 6/9/1997 | 819954810 | 9/28/1999 | |
| M&G USA Corporation | Canada | CLEARTUF | 447875-00 | 12/17/1979 | TMA250977 | 10/2/1980 | |
| M&G USA Corporation | Chile | CLEARTUF | 804498 | 01/23/2008 | 837360 | 01/23/2008 | |
| M&G USA Corporation | Colombia | CLEARTUF | 97 30206 | 5/30/1997 | 205089 | 1/24/2008 | |
| M&G USA Corporation | Ecuador | CLEARTUF | 6417-IEPI | 10/16/1998 | 6192.98 | 10/16/1998 | |
| M&G USA Corporation | Mexico | CLEARTUF | 1274230 | 5/16/2012 | 1315597 | 9/27/2012 | |
| M&G USA Corporation | Paraguay | CLEARTUF | 820039 | 6/9/2008 | 318157 | 11/7/2008 | |
| M&G USA Corporation | Peru | CLEARTUF | 326193-2007 | 5/27/1997 | P00038516 | 8/25/1997 | |
| M&G USA Corporation | Uruguay | CLEARTUF | 389401 | 3/5/2008 | 389401 | 3/11/2008 | |
| M&G USA Corporation | USA | CLEARTUF | 73146308 | 10/27/1977 | 1094154 | 6/27/1978 | |
| M&G USA Corporation | Venezuela | CLEARTUF | | | 206.669-P | 7/31/1998 | |
| M&G USA Corporation | Argentina | CLEARTUF MAX | 3268850 | 8/8/2013 | 2668480 | 7/22/2014 | M&G Brazil, M&G Mexico |
| M&G USA Corporation | Bolivia | CLEARTUF MAX | 2749-2002 | 8/22/2002 | 91906 C | 12/11/2003 | |

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date | Licensed Parties |
|---|---|---|---|---|---|---|---|
| M&G USA Corporation | Brazil | CLEARTUF MAX | 824774060 | 8/27/2002 | 824774060 | 4/29/2008 | M&G Brazil, M&G Mexico |
| M&G USA Corporation | Canada | CLEARTUF MAX | 1140415-00 | 5/13/2002 | TMA650563 | 10/17/2005 | |
| M&G USA Corporation | Chile | CLEARTUF MAX | 1047388 | 2/26/2013 | 1028719 | 8/4/2013 | |
| M&G USA Corporation | Colombia | CLEARTUF MAX | 02 75058 (2-75058) | 8/26/2002 | 269146 | 3/5/2013 | |
| M&G USA Corporation | Costa Rica | CLEARTUF MAX | 2002-0005920 | 8/29/2002 | 139635 | 8/5/2003 | |
| M&G USA Corporation | Ecuador | CLEARTUF MAX | 126743 | 8/21/2002 | 21502 | 4/14/2003 | |
| M&G USA Corporation | El Salvador | CLEARTUF MAX | 32566 | 8/12/2003 | 00222 | 12/8/2003 | |
| M&G USA Corporation | Honduras | CLEARTUF MAX | 11346-02 | 1/23/2003 | 86607 | 1/20/2003 | |
| M&G USA Corporation | Mexico | CLEARTUF MAX | 560928 | 8/13/2002 | 817902 | 1/20/2004 | |
| M&G USA Corporation | Panama | CLEARTUF MAX | 122608 | 8/20/2002 | 122608 | 8/20/2002 | |
| M&G USA Corporation | Paraguay | CLEARTUF MAX | 133312 | 1/29/2013 | 380272 | 5/16/2013 | |
| M&G USA Corporation | Paraguay | CLEARTUF MAX | 304940 | 8/14/2002 | 258921 | 7/2/2003 | |
| M&G USA Corporation | Paraguay | CLEARTUF MAX | 219747 | 8/14/2002 | 258921 | 7/2/2003 | |
| M&G USA Corporation | Peru | CLEARTUF MAX | 160549-2002 | 8/27/2002 | P00095656 | 3/16/2004 | |
| M&G USA Corporation | Uruguay | CLEARTUF MAX | 442494 | 1/25/2013 | | 5/26/2013 | |
| M&G USA Corporation | Uruguay | CLEARTUF MAX | 343085 | 8/21/2002 | 343085 | 5/26/2003 | |

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date | Licensed Parties |
|---|---|---|---|---|---|---|---|
| M&G USA Corporation | USA | CLEARTUF MAX | 76376635 | 2/28/2002 | 2811346 | 2/3/2004 | M&G Brazil, M&G Mexico |
| M&G USA Corporation | Venezuela | CLEARTUF MAX | 2002-012800 | 8/19/2002 | P249219 | 11/11/2003 | |
| M&G USA Corporation | USA | REPETE | 78206496 | 1/23/2003 | 2791444 | 12/9/2003 | M&G Mexico |
| M&G USA Corporation | USA | TRAYTUF | 74471359 | 12/20/1993 | 1864466 | 11/29/1994 | |
| M&G USA Corporation | USA | TRAYTUF | 73692534 | 10/28/1987 | 1498197 | 8/2/1988 | |

**Unregistered trademarks (in jurisdictions where a Licensor owns rights):**

| Mark | Licensed Parties |
|---|---|
| CLEARTUF<br>Cleartuf MAX<br>Cleartuf Turbo B<br>Cleartuf 8006 HP | M&G Brazil |
| CLEARTUF<br>REPETE<br>TRAYTUF<br>ViTUF<br>Cleartuf MAX<br>Cleartuf EUROMAX<br>Cleartuf RETA<br>REPETE MAX<br>Cleartuf Turbo II<br>Cleartuf Turbo IIB<br>Cleartuf 8006C<br>Cleartuf 8006 HPG<br>Cleartuf 8006 HP<br>ViTUF 10690<br>ViTUF ClearVU<br>TrayTuf 8906<br>TrayTuf 7300<br>TrayTuf 8100 | M&G Mexico |

<u>**Exhibit E**</u>

**M&G Products**

**M&G Brazil Licensed Products:**

| | | |
|---|---|---|
| Cleartuf MAX | Cleartuf Turbo B | Cleartuf 8006 HP |

**M&G Mexico Licensed Products:**

| | | |
|---|---|---|
| Cleartuf MAX | Cleartuf Turbo IIB | ViTuf ClearVU |
| Cleartuf EUROMAX | Cleartuf 8006C | TrayTuf 8906 |
| Cleartuf RETA | Cleartuf 8006 HPG | TrayTuf 7300 |
| REPETE MAX | Cleartuf 8006 HP | TrayTuf 8100 |
| Cleartuf Turbo II | ViTUF 10690 | |

# Exhibit F

## M&G Marks

### Trademark Registrations and Applications:

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date |
|---|---|---|---|---|---|---|
| M&G Polymers USA LLC | Brazil | M&G | 827899920 | 11/25/2005 | 827899920 | 2/26/2008 |
| M&G Polymers USA LLC | Brazil | M&G | 827899912 | 11/25/2005 | 827899912 | 7/5/2016 |
| M&G Polymers USA LLC | Brazil | M&G | 827899890 | 11/25/2005 | N/A | N/A |
| M&G Polymers USA LLC | Brazil | M&G | 827899904 | 11/25/2005 | 827899904 | 2/26/2008 |
| M&G Polymers USA LLC | EU | M&G | 004730966 | 11/8/2005 | 004730966 | 11/2/2006 |
| M&G Polymers USA LLC | Mexico | M&G | 752590 | 11/24/2005 | 915301 | 12/21/2005 |
| M&G Polymers USA LLC | Mexico | M&G | 752589 | 11/24/2005 | 914032 | 12/15/2005 |
| M&G Polymers USA LLC | Mexico | M&G | 752591 | 11/24/2005 | 920636 | 2/23/2006 |
| M&G Polymers USA LLC | Mexico | M&G | 752588 | 11/24/2005 | 939127 | 6/21/2006 |

| Owner | Jurisdiction | Mark | Serial Number | Filing Date | Registration Number | Registration Date |
|-------|--------------|------|---------------|-------------|---------------------|-------------------|
| M&G Polymers USA LLC | USA |  M&G | 78761643 | 11/28/2005 | 3853638 | 9/28/2010 |
| M&G Polymers USA LLC | Brazil | MOSSI & GHISOLFI | 827899866 | 11/25/2005 | 827899866 | 9/20/2008 |
| M&G Polymers USA LLC | Brazil | MOSSI & GHISOLFI | 827899858 | 11/25/2005 | 827899858 | 12/7/2010 |
| M&G Polymers USA LLC | Brazil | MOSSI & GHISOLFI | 827899882 | 11/25/2005 | 827899882 | 8/19/2008 |
| M&G Polymers USA LLC | Brazil | MOSSI & GHISOLFI | 827899874 | 11/25/2005 | 827899874 | 9/30/2008 |
| M&G Polymers USA LLC | EU | MOSSI & GHISOLFI | 004729554 | 11/8/2005 | 004729554 | 11/2/2006 |
| M&G Polymers USA LLC | Mexico | MOSSI & GHISOLFI | 752595 | 11/24/2005 | 912274 | 11/30/2005 |
| M&G Polymers USA LLC | Mexico | MOSSI & GHISOLFI | 752593 | 11/24/2005 | 912272 | 11/30/2005 |
| M&G Polymers USA LLC | Mexico | MOSSI & GHISOLFI | 752594 | 11/24/2005 | 912273 | 11/30/2005 |
| M&G Polymers USA LLC | Mexico | MOSSI & GHISOLFI | 752592 | 11/24/2005 | 912271 | 11/30/2005 |
| M&G Polymers USA LLC | USA | MOSSI & GHISOLFI | 78761641 | 11/28/2005 | 3853637 | 9/28/2010 |

<u>Unregistered trademarks (in jurisdictions where a Licensor owns rights):</u>



**M&G**

MOSSI & GHISOLFI

**<u>Exhibit G</u>**
**Easy-Up Marks**


**In jurisdictions where a Licensor own rights:**

EASY-UP

# Exhibit H

## M&G Brazil Patents[3]

| MG REF | COUNTRY | QPAPPLTYPE | TITLE | PATENT NO/ APP NO | GRANT DATE/ FILING DATE |
|--------|---------|------------|-------|-------------------|-------------------------|
| MG.BRA.001.CL | CL - Chile | Utility | Politereftalato de etileno glicol homo ou copolimero para aplicação em artigos moldados com garrafas, embalagens e outros com caracteristicas de glicol | 41086 | 8 August, 2001 |
| MG.BRA.003.AR | AR-Argentina | Utility | A process for manufacturing polyester | ar021394 | 15-May-06 |
| MG.BRA.003.BR | BR - Brazil | PCT National Phase Filing | A process for manufacturing polyester | PI9916751 | 18 November, 2008 |
| MG.BRA.003.CA | CA - Canada | PCT National Phase Filing | A process for manufacturing polyester | 2352664 | 6 March, 2010 |
| MG.BRA.003.MX | MX - Mexico | PCT National Phase Filing | A process for manufacturing polyester | 220723 | 2 June, 2004 |
| MG.BRA.003.US | US - United States | Utility | A process for manufacturing polyester | 6590060 | 8 July, 2003 |
| MG.BRA.004.AR | AR-Argentina | Utility | A process for manufacturing polyester | P990105998 | 25 November, 1999 |
| MG.BRA.004.BR | BR - Brazil | PCT National Phase Filing | A process for manufacturing polyester | PI 9917609 | 10 March, 2010 |
| MG.BRA.004.MX | MX - Mexico | PCT National Phase Filing | A process for manufacturing polyester | 224678 | 6 December, 2004 |
| MG.BRA.005.MX | MX - Mexico | PCT National Phase Filing | Polyester-based compositions having improved thermomechanical properties and process to produce said compositions. | 255700 | 28 March, 2008 |
| MG.BRA.005.UY | UY - Uruguay | PCT National Phase Filing | Polyester-based compositions having improved thermomechanical properties and process to produce said compositions. | 26645 | 29 March, 2001 |
| MG.Design01.BR | BR - Brazil | Design | Jar | DI 5700936.8 | 31 March, 1998 |
| MG.Design02.BR | BR - Brazil | Design | Oil bottle | DI 5801041 | 30 November, 1999 |

---

[3] Some listed patents and patent applications may be expired, lapsed or abandoned.

Exhibit I

## Irrevocable Power of Attorney

**TO THE LICENSE AGREEMENT
BETWEEN M&G USA CORPORATION,
M&G POLYMERS USA LLC,
M&G RESINS USA LLC,
M&G POLIMEROS MEXICO, S.A. DE C.V., AND
M&G POLIMEROS BRASIL S.A.,**

| IRREVOCABLE SPECIAL POWER OF ATTORNEY | PROCURAÇÃO ESPECIAL IRREVOCÁVEL |
|---|---|
| We M&G Polímeros Brasil S.A. hereby grant ample, sufficient and full Special Power of Attorney so that jointly or severally M&G Polymers USA, LLC and M&G USA Corporation. represent it before the Brazilian Patent and Trademark Office ("BPTO"), the Copyright Office of the National Library and other administrative authorities. | Por meio da presente procuração, M&G Polímeros Brasil S.A. concede amplos, suficientes e totais poderes para que conjunta ou separadamente, M&G Polymers USA, LLC y M&G Resins US, LLC. a represente perante o Instituto Nacional da Propriedade Industrial ("INPI"), Escritório de Direitos Autorais ("EDA") da Biblioteca Nacional e outras autoridades administrativas. |
| I, _____, a resident of the Brazil, on behalf of M&G Polimeros Brasil S.A., a company established under the laws of Brazil, am duly authorized to grant this Irrevocable Special Power of Attorney on behalf of M&G Polímeros Brasil S.A., and my authority has neither been revoked or limited as of the date of execution of this instrument. | Eu, _____, residente no Brasil, em nome da M&G Polimeros Brasil S.A., uma empresa constituída conforme as leis do Brasil, estou devidamente autorizado a conceder esta procuração especial e irrevogável em nome da M&G Polímeros Brasil S.A., e minha autoridade não foi revogada nem limitada até a data de execução deste instrumento. |
| On _____, 2018, M&G USA Corporation, M&G Polymers USA LLC, M&G Resins USA LLC, M&G Polímeros México, S.A. de C.V., and M&G Polímeros Brasil S.A. entered into a License Agreement ("License Agreement") and pursuant to it, M&G Polymers USA LLC and M&G USA Corporation granted M&G Polímeros Brasil S.A., as Licensee, the non-exclusive right and license to use the M&G | Em _____ de 2018, M&G USA Corporation, M&G Polymers EUA LLC, M&G Resins EUA LLC, M&G Polímeros México, S.A. de C.V. e M&G Polímeros Brasil S.A., celebraram um Contrato de Licença ("Contrato de Licença") pelo qual a M&G Polymers USA LLC e M&G USA Corporation concederam à M&G Polímeros Brasil S.A., atuando na qualidade de |

| | |
|---|---|
| Brasil Patents, M&G Brasil Licensed Trademarks and M&G Marks (as defined and listed in the License Agreement) in Brazil solely as set forth in the License Agreement. | licenciado, uma licença direta e não exclusiva para usar as "Patentes M&G do Brasil", "Marcas M&G do Brasil" e "Marcas M&G" (conforme definido pelo Contrato de Licença) dentro do Brasil, de acordo com as disposições do Contrato de Licença. |
| That pursuant to Section 8.1 of the License Agreement, M&G Polymers USA LLC and M&G USA Corporation directly or through its designees has agreed [(at their election or upon M&G Brazil's reasonable written request)] to register M&G Polímeros Brasil S.A. as an authorized user of the M&G Brazil Patents, M&G Brazil Licensed Trademarks and M&G Marks with the Brazilian Patent and Trademark Office, as well as to in due course cancel such registration either upon termination for any cause or upon expiration of the License Agreement. | Que, de acordo com a Cláusula 8.1 do Contrato de Licença, a M&G Polymers USA LLC e a M&G USA Corporation agindo diretamente ou através de seus representantes legais concordaram em registrar a M&G Polímeros do Brasil S.A. como um usuário autorizado "Patentes M&G do Brasil", "Marcas M&G do Brasil" e "Marcas M&G" perante o Instituto Nacional da Propriedade Industrial, bem como, no devido momento, cancelar a referida inscrição devido a rescisão por qualquer motivo ou devido ao vencimento do Contrato de Licença. |
| To ensure compliance with the obligations assumed by M&G Polímeros Brasil S.A. as a condition to executing and pursuant to the terms of the License Agreement, M&G Polímeros Brasil S.A. wishes to grant a Special Irrevocable Power of Attorney for said purpose in favour of M&G Polymers USA LLC and M&G USA Corporation and its designees mentioned above. | Para garantir o cumprimento das obrigações assumidas pela M&G Polímeros do Brasil S.A., de acordo com e como condição para a conclusão do Contrato de Licença, M&G Polímeros do Brasil S.A., deseja conceder esta Procuração Especial Irrevogável em favor da M&G Polymers USA LLC e da M&G USA Corporation e seus representantes mencionados acima. |
| FIRST.                    M&G Polímeros Brasil S.A. hereby grants a Special Irrevocable Power of Attorney as broad as may be required by law in favour of M&G Polymers USA LLC and M&G USA Corporation and their successors or assigns, to be exercised jointly or severally, so that said attorneys-in-fact may register M&G Polímeros Brasil S.A. as authorized user of the M&G Brazil Patents, M&G Brazil Licensed Trademarks and M&G Marks with the Brazilian Patent and Trademark Office and in due course cancel such registration as authorized user either upon expiration or termination for any cause, according to the terms established in the License | PRIMEIRO. Através da presente M&G Polímeros do Brasil S.A., concede esta Procuração Especial Irrevogável, tão ampla quanto apropriado de acordo com a lei, em favor da M&G Polymers USA LLC e da M&G USA Corporation e seus representantes mencionados acima, para serem exercidos conjunta ou separadamente, para permitir que os referidos procuradores inscrevam M&G Polímeros do Brasil S.A., como usuário autorizado das "Patentes M&G do Brasil", "Marcas M&G do Brasil" e "Marcas M&G" perante o Instituto Nacional da Propriedade Industrial e, no devido momento, após o |

| | |
|---|---|
| Agreement. This power of attorney will survive the termination or expiration of the License Agreement. | vencimento ou término por qualquer motivo, de acordo com as disposições do Contrato de Licença, cancele tal registro. Esta procuração sobreviverá mesmo após a rescisão ou expiração do Contrato de Licença. |
| The power granted to the attorneys-in-fact includes, but is not limited to, the authority to present applications, to pay government fees, to authorize documents, to submit and answer questions, to receive and provide notices, to execute or sign any kind of public or private documents necessary or suitable for exercising the Power of Attorney granted in this document; and in general, to take all steps that may be necessary with respect to the above mentioned matters, including authority that requires a special clause pursuant to law (except to assign property), as well as to totally or partially substitute this Irrevocable Power of Attorney. M&G Polímeros Brasil S.A. in this act irrevocably authorizes the attorneys-in-fact to request the registration and cancellation of the License Agreement before the Brazilian Patent and Trademark Office without any restriction or limitation other than those set forth in the License Agreement, for all legal purposes, in the understanding that the representatives may show such authority with an original of this power of attorney without the need to show additional documents or authorizations. | Os poderes concedidos aos procuradores incluem, sem limitação, poderes para de apresentar pedidos, pagar taxas governamentais, autorizar documentos, apresentar e responder perguntas, enviar e receber notificações, celebrar ou assinar qualquer tipo de documentos públicos ou privados necessários ou adequado para exercer o presente mandato; e em geral, tomar todas as medidas necessárias em relação aos assuntos acima mencionados, incluindo poderes que exigem uma cláusula especial de acordo com a lei (exceto para alienar propriedade), bem como para substabelecer total ou parcialmente a presente Procuração Irrevogável Especial. M&G Polímeros do Brasil S.A., neste ato autoriza irrevogavelmente os procuradores a solicitar o registro e cancelamento do Contrato de Licença perante o Instituto Nacional da Propriedade Industrial, sem qualquer restrição ou limitação que não os contidos no Contrato de Licença, para todos os fins legais, com o entendimento de que os procuradores podem demonstrar tais poderes apenas com a apresentação do original desta procuração, sem requerer qualquer outro documento ou autorização adicional. |
| This power of attorney authorizes  M&G Polymers USA LLC and M&G USA Corporation to perform all acts that are necessary for the faithful performance of this power of attorney before the Brazilian National Institute of Industrial Property and also to delegate, wholly or in part, the powers granted hereunder, and to ratify all the acts performed previously in the name of M&G Polímeros Brasil S.A.. This power of attorney is a | A presente procuração autoriza M&G Polymers USA LLC e M&G USA Corporation a praticar  todos os atos necessários ao fiel cumprimento deste mandato junto ao Instituto Nacional da Propriedade Industrial, podendo, ainda, substabelecer os poderes aqui outorgados no todo ou em parte, ratificando todos os atos anteriormente praticados em nome de M&G Polímeros Brasil S.A., ficando desde já |

| | |
|---|---|
| condition for M&G Polymers USA LLC's and M&G USA Corporation's obligations under the License Agreement and the Agreement, and therefore, it is <u>irrevocable</u>. | ratificados todos os todos os atos praticados nas transações para as quais lhe demos a presente procuração. Esta procuração é uma condição para as obrigações da M&G Polymers USA LLC e M&G USA Corporation ao abrigo do Contrato de Licença e do Contrato e, portanto, é <u>irrevogável</u>. |

**Excluded Patents**

**Patents Previously Sold Pursuant To Barrier IP Purchase Agreement And Which Are No Longer Owned By Any Of The Licensors**

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.030.AT | AT - Austria | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.AU | AU - Australia | Utility | Polyester resin blends with high-level gas barrier properties | 754308 | 27 February 2003 |
| MG.P.030.BE | BE - Belgium | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.BR | BR - Brazil | Utility | Polyester resin blends with high level gas barrier properties | PI 9902233-8 | 10 February 2009 |
| MG.P.030.CA | CA - Canada | Utility | Polyester resin blends with high-level gas barrier properties | 2273701 | 12 February 2008 |
| MG.P.030.CH | CH - Switzerland | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.DE | DE - Germany | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 69916174 | 14 April 2005 |
| MG.P.030.EP | EP - European Patent Office | Utility | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.ES | ES - Spain | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.FI | FI - Finland | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.FR | FR - France | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.GB | GB - United Kingdom | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |

---

[4] Some listed patents and patent applications may be expired, lapsed or abandoned.

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.030.IN | IN - India | Utility | Polyester resin blends with high-level gas barrier properties | 202599 | 02 March 2007 |
| MG.P.030.IT | IT - Italy | EP Regional Validation | Polyester resin blends with high-level gas barrier properties | 1301690 | 07 April 2004 |
| MG.P.030.JP | JP - Japan | Utility | Polyester resin blends with high level gas barrier properties | 4412763 | 27 November 2009 |
| MG.P.030.JP.DIV | JP - Japan | Divisional | Polyester resin blends with high level gas barrier properties | 5416516 | 22 November 2013 |
| MG.P.030.KR | KR - South Korea | Utility | Polyester resin blends with high-level gas barrier properties | 10-0609422 | 03 August 2006 |
| MG.P.030.MX | MX - Mexico | Utility | Polyester resin blends with high-level gas barrier properties | 226199 | 09 February 2005 |
| MG.P.030.NL | NL - Netherlands | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.SE | SE - Sweden | EP Regional Validation | Polyester resin blends with high level gas barrier properties | 0964031 | 07 April 2004 |
| MG.P.030.TW | TW - Taiwan | Utility | Polyester resin blends with high-level gas barrier properties | I235756 | 11 July 2005 |
| MG.P.030.US | US - United States | Utility | Polyester resin blends with high level gas barrier properties | 6346307 | 12 February 2002 |
| MG.P.030.US.R | US - United States | Reissue | Polyester resin blends with high level gas barrier properties | RE42925 | 15 November 2011 |
| MG.P.040.AU | AU - Australia | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 777598 | 10 February 2005 |
| MG.P.040.BE | BE - Belgium | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.CA | CA - Canada | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 2351758 | 16 February 2010 |
| MG.P.040.DE | DE - Germany | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 60118659 | 21 September 2006 |
| MG.P.040.ES | ES - Spain | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.040.FR | FR - France | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.GB | GB - United Kingdom | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.IT | IT - Italy | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1318600 | 27 August 2003 |
| MG.P.040.IT.EP | IT - Italy | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.JP | JP - Japan | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 3605376 | 08 October 2004 |
| MG.P.040.MX | MX - Mexico | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 220276 | 27 June 2004 |
| MG.P.040.NL | NL - Netherlands | EP Regional Validation | Preparation of polyester resins using a masterbatch of polyaryleneamide | 1167447 | 12 April 2006 |
| MG.P.040.TW | TW - Taiwan | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | NI 194364 | 28 April 2004 |
| MG.P.040.US | US - United States | Utility | Preparation of polyester resins using a masterbatch of polyaryleneamide | 6630542 | 07 October 2003 |
| MG.P.041.B.AT | AT - Austria | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.AU | AU - Australia | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 2002338703 | 16 March 2007 |
| MG.P.041.B.BE | BE - Belgium | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.BG | BG - Bulgaria | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.BR | BR - Brazil | PCT National Phase Filing | Transparent polyester resins and articles therefrom | PI 0213080-7 | 16 September 2002 |
| MG.P.041.B.CA | CA - Canada | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 2461911 | 26 June 2012 |
| MG.P.041.B.CZ | CZ - Czech Republic | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.DE | DE - Germany | EP Regional Validation | Transparent polyester resins and articles therefrom | 60230431 | 17 December 2008 |
| MG.P.041.B.DK | DK - Denmark | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.041.B.EP | EP - European Patent Office | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.ES | ES - Spain | EP Regional Validation | Transparent polyester resins and articles therefrom | 2319746 | 17 December 2008 |
| MG.P.041.B.FI | FI - Finland | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.FR | FR - France | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.GB | GB - United Kingdom | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.IT | IT - Italy | Utility | Transparent polyester resins and articles therefrom | 1326956 | 11 March 2005 |
| MG.P.041.B.IT.EP | IT - Italy | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.KR | KR - South Korea | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 10-0883295 | 05 February 2009 |
| MG.P.041.B.MX | MX - Mexico | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 249337 | 24 September 2007 |
| MG.P.041.B.NL | NL - Netherlands | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.PL | PL - Poland | PCT National Phase Filing | Transparent polyester resins and articles therefrom | P-367488 | 16 September 2002 |
| MG.P.041.B.RU | RU - Russian Federation | PCT National Phase Filing | Transparent polyester resins and articles therefrom | 2289598 | 20 December 2006 |
| MG.P.041.B.SK | SK - Slovakia | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.TR | TR - Turkey | EP Regional Validation | Transparent polyester resins and articles therefrom | 1432762 | 17 December 2008 |
| MG.P.041.B.US | US - United States | PCT National Phase Filing | Transparent polyester resins and articles there from | 7048981 | 23 May 2006 |
| MG.P.041.IT | IT - Italy | Utility | Transparent polyester resins and articles therefrom | 1326581 | 08 February 2005 |
| MG.P.048.AT | AT - Austria | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.AU | AU - Australia | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 2004209002 | 26 August 2010 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.048.AU. DIV | AU - Australia | Divisional | Article comprising light absorbent composition to mask visual haze | 2010201027 | 17 March 2010 |
| MG.P.048.AU. DIV.II | AU - Australia | Divisional | Article comprising light absorbent composition to mask visual haze | 2013216620 | 25 August 2016 |
| MG.P.048.BE | BE - Belgium | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.BG | BG - Bulgaria | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.BR | BR - Brazil | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | PI 0406993-5 | 15 September 2015 |
| MG.P.048.CA | CA - Canada | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 2513686 | 27 September 2011 |
| MG.P.048.CH | CH - Switzerland | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.CN | CN - China | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 100378149 | 02 April 2008 |
| MG.P.048.CZ | CZ - Czech Republic | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.DE | DE - Germany | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 6020040058 23 | 20 July 2017 |
| MG.P.048.DK | DK - Denmark | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.EP | EP - European Patent Office | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 1590398 | 11 April 2007 |
| MG.P.048.ES | ES - Spain | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.048.FR | FR - France | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.GB | GB - United Kingdom | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.GR | GR - Greece | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.HU | HU - Hungary | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.ID | ID - Indonesia | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | IDP000024 449 | 30 October 2009 |
| MG.P.048.IN | IN - India | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 220888 | 10 June 2008 |
| MG.P.048.IT | IT - Italy | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.JP | JP - Japan | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 4950655 | 16 March 2012 |
| MG.P.048.JP.DIV | JP - Japan | Divisional | Product comprising light absorbent composition to mask visual haze and related method | 5715790 | 13 May 2015 |
| MG.P.048.KR | KR - South Korea | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 1055230 | 02 August 2011 |
| MG.P.048.MX | MX - Mexico | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 268806 | 30 July 2009 |
| MG.P.048.NL | NL - Netherlands | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.048.PL | PL - Poland | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 28 July 2014 |
| MG.P.048.PL.DIV | PL - Poland | Divisional | Article comprising light absorbent composition to mask visual haze and related methods | 217218 | 28 July 2014 |
| MG.P.048.PT | PT - Portugal | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.RO | RO - Romania | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.RU | RU - Russian Federation | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 2323229 | 27 April 2008 |
| MG.P.048.SE | SE - Sweden | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.TR | TR - Turkey | EP Regional Validation | Article comprising light absorbing composition to mask the visual haze and related method | 1590398 | 11 April 2007 |
| MG.P.048.US | US - United States | PCT National Phase Filing | Article comprising light absorbent composition to mask visual haze and related methods | 7833595 | 16 November 2010 |
| MG.P.048.US.CONT.F1 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8053050 | 08 November 2011 |
| MG.P.048.US.CONT.F2 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8067074 | 29 November 2011 |
| MG.P.048.US.CONT.M1 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8110264 | 07 February 2012 |
| MG.P.048.US.CONT.M2 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8057874 | 15 November 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.048.US. CONT.M3 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 13340936 | 30 December 2011 |
| MG.P.048.US. CONT.M4 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8535772 | 17 September 2013 |
| MG.P.048.US. CONT.M5 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8927076 | 06 January 2015 |
| MG.P.048.US. CONT.M6 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 8999468 | 07 April 2015 |
| MG.P.048.US. CONT.M7 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 9266638 | 23 February 2016 |
| MG.P.048.US. CONT.M8 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 9546012 | 17 January 2017 |
| MG.P.048.US. CONT.M9 | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 15407710 | 17 January 2017 |
| MG.P.048.US. CONTA | US - United States | Continuation | Article comprising light absorbent composition to mask visual haze and related methods | 7438960 | 21 October 2008 |
| MG.P.048.US. DIVA | US - United States | Divisional | Article comprising light absorbent composition to mask visual haze and related methods | 8052917 | 08 November 2011 |
| MG.P.048.ZA | ZA - South Africa | PCT National Phase Filing | Article comprising light absorbing composition to mask the visual haze and related method | 2005/05735 | 27 September 2006 |
| MG.P.050.AR | AR - Argentina | Utility | Compartmentalized resin pellets | AR050503 B1 | 19 November 2012 |
| MG.P.050.AR. DIVI | AR - Argentina | Divisional | Compartmentalized resin pellets | AR088338 B2 | 30 September 2014 |
| MG.P.050.AR. DIVII | AR - Argentina | Divisional | Compartmentalized resin pellets | AR088339 B2 | 30 September 2014 |
| MG.P.050.AT | AT - Austria | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.AT. DIVI | AT - Austria | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.AT. DIVII | AT - Austria | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.AU | AU - Australia | PCT National Phase Filing | Compartmentalized resin pellets | 2005243901 | 06 May 2010 |
| MG.P.050.BE | BE - Belgium | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.BE. DIVI | BE - Belgium | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.BE. DIVII | BE - Belgium | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.BG | BG - Bulgaria | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.BG. DIVI | BG - Bulgaria | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.BG. DIVII | BG - Bulgaria | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.BR | BR - Brazil | PCT National Phase Filing | Compartmentalized resin pellets | PI 0510880-2 | 08 November 2016 |
| MG.P.050.BR. DIVI | BR - Brazil | Divisional | Compartmentalized resin pellets | BR 12 2015 024275-4 | 06 September 2016 |
| MG.P.050.BR. DIVII | BR - Brazil | Divisional | Compartmentalized resin pellets | BR 12 2015 024276-2 | 06 September 2016 |
| MG.P.050.CA | CA - Canada | PCT National Phase Filing | Compartmentalized resin pellets | 2565922 | 19 March 2013 |
| MG.P.050.CH | CH - Switzerland | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.CH. DIVI | CH - Switzerland | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.CH. DIVII | CH - Switzerland | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.CN | CN - China | PCT National Phase Filing | Compartmentalized resin pellets | 100594109 | 17 March 2010 |
| MG.P.050.CN. DIVI | CN - China | Divisional | Compartmentalized resin pellets | 101693782 | 30 May 2012 |
| MG.P.050.CN. DIVII | CN - China | Divisional | Compartmentalized resin pellets | 101693781 | 30 October 2013 |
| MG.P.050.CZ | CZ - Czech Republic | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.CZ. DIVI | CZ - Czech Republic | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.CZ. DIVII | CZ - Czech Republic | EP Regional Validation | Compartmentalized resin pellets | 2159028 | 12 December 2012 |
| MG.P.050.DE | DE - Germany | EP Regional Validation | Compartmentalized resin pellets | 6020050336 43 | 11 April 2012 |
| MG.P.050.DE. DIVI | DE - Germany | EP Regional Validation | Compartmentalized resin pellets | 6020050381 76 | 13 February 2013 |
| MG.P.050.DE. DIVII | DE - Germany | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 6020050374 46 | 12 December 2012 |
| MG.P.050.DK | DK - Denmark | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.DK. DIVI | DK - Denmark | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.DK. DIVII | DK - Denmark | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.EG | EG - Egypt | PCT National Phase Filing | Compartmentalized resin pellets | 26720 | 16 June 2014 |
| MG.P.050.EG. DIVI | EG - Egypt | Divisional | Compartmentalized resin pellets | 26707 | 12 June 2014 |
| MG.P.050.EG. DIVII | EG - Egypt | Divisional | Compartmentalized resin pellets | 26884 | 18 November 2014 |
| MG.P.050.EP | EP - European Patent Office | PCT National Phase Filing | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.EP.D IVI | EP - European Patent Office | Divisional | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.EP.D IVII | EP - European Patent Office | Divisional | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.ES | ES - Spain | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.ES.D IVI | ES - Spain | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.ES.D IVII | ES - Spain | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.FR | FR - France | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.FR.D IVI | FR - France | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.FR.D IVII | FR - France | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.GB | GB - United Kingdom | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.GB. DIVI | GB - United Kingdom | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.GB. DIVII | GB - United Kingdom | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.GR | GR - Greece | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.GR. DIVI | GR - Greece | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.GR. DIVII | GR - Greece | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.HK | HK - Hong Kong | Utility | Compartmentalized resin pellets | HK1100363 | 14 December 2012 |
| MG.P.050.HK. DIVI | HK - Hong Kong | Divisional | Compartmentalized resin pellets | 10108297.1 | 06 August 2007 |
| MG.P.050.HK. DIVII | HK - Hong Kong | Divisional | Compartmentalized resin pellets | 10108296.2 | 06 August 2007 |
| MG.P.050.HU | HU - Hungary | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.HU. DIVI | HU - Hungary | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.HU. DIVII | HU - Hungary | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.ID | ID - Indonesia | PCT National Phase Filing | Compartmentalized resin pellets | IDP0000264 47 | 20 August 2010 |
| MG.P.050.IN | IN - India | PCT National Phase Filing | Compartmentalized resin pellets | 240736 | 26 May 2010 |
| MG.P.050.IN.D IVI | IN - India | Divisional | Compartmentalized resin pellets | 282315 | 04 April 2017 |
| MG.P.050.IN.D IVII | IN - India | Divisional | Compartmentalized resin pellets | 1225/chen p/2010 | 03 March 2010 |
| MG.P.050.IT | IT - Italy | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.IT.D IVI | IT - Italy | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.IT.D IVII | IT - Italy | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.JP | JP - Japan | PCT National Phase Filing | Compartmentalized resin pellets | 5356685 | 06 September 2013 |
| MG.P.050.JP.D IV.I | JP - Japan | Divisional | Compartmentalized resin pellets | 5411219 | 15 November 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.JP.DIV.II | JP - Japan | Divisional | Compartmentalized resin pellets | 5357314 | 06 September 2013 |
| MG.P.050.KR | KR - South Korea | PCT National Phase Filing | Compartmentalized resin pellets | 10-1182869 | 07 September 2012 |
| MG.P.050.KR.DIV | KR - South Korea | Divisional | Compartmentalized resin pellets | 10-1227921 | 24 January 2013 |
| MG.P.050.MX | MX - Mexico | PCT National Phase Filing | Compartmentalized resin pellets | 280849 | 11 November 2010 |
| MG.P.050.NL | NL - Netherlands | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.NL.DIVI | NL - Netherlands | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.NL.DIVII | NL - Netherlands | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.NO | NO - Norway | PCT National Phase Filing | Compartmentalized resin pellets | 339442 | 15 December 2016 |
| MG.P.050.NO.DIV.I | NO - Norway - Norway | Divisional | Compartmentalized resin pellets | 340677 | 29 May 2017 |
| MG.P.050.NO.DIV.II | NO - Norway - Norway | Divisional | Compartmentalized resin pellets | 20161217 | 22 July 2016 |
| MG.P.050.PH | PH - Philippines | PCT National Phase Filing | Compartmentalized resin pellets | 1-2006-502300 | 14 January 2011 |
| MG.P.050.PL | PL - Poland | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.PL.DIVI | PL - Poland | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.PL.DIVII | PL - Poland | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.PT | PT - Portugal | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.PT.DIVI | PT - Portugal | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.PT.DIVII | PT - Portugal | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.RO | RO - Romania | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.RO.DIVI | RO - Romania | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.050.RO.DIVII | RO - Romania | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.RU | RU - Russian Federation | PCT National Phase Filing | Compartmentalized resin pellets | 2370365 | 20 October 2009 |
| MG.P.050.SE | SE - Sweden | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.SE.DIVI | SE - Sweden | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.SE.DIVII | SE - Sweden | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.SG | SG - Singapore | PCT National Phase Filing | Compartmentalized resin pellets | 127365 | 30 June 2009 |
| MG.P.050.TR | TR - Turkey | EP Regional Validation | Compartmentalized resin pellets | 1750916 | 11 April 2012 |
| MG.P.050.TR.DIVI | TR - Turkey | EP Regional Validation | Compartmentalized resin pellets | 2159027 | 13 February 2013 |
| MG.P.050.TR.DIVII | TR - Turkey | EP Regional Validation | Compartmentalized resin pellets and process for thermally treating said pellets | 2159028 | 12 December 2012 |
| MG.P.050.TW | TW - Taiwan | Utility | Compartmentalized resin pellets | I450809 | 01 September 2014 |
| MG.P.050.UA | UA - Ukraine | PCT National Phase Filing | Compartmentalized resin pellets | 200613398 | 17 May 2005 |
| MG.P.050.US | US - United States | PCT National Phase Filing | Compartmentalized resin pellets | 7550203 | 23 June 2009 |
| MG.P.050.US.CONT | US - United States | Continuation | Compartmentalized resin pellets | 7816008 | 19 October 2010 |
| MG.P.050.VN | VN - Vietnam | PCT National Phase Filing | Compartmentalized resin pellets | 9506 | 02 August 2011 |
| MG.P.050.ZA | ZA - South Africa | PCT National Phase Filing | Compartmentalized resin pellets | 2006/10518 | 25 June 2008 |
| MG.P.060.AU | AU - Australia | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 2006207499 | 23 September 2010 |
| MG.P.060.BE | BE - Belgium | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.060.BR | BR - Brazil | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | PI 0606206-7 | 31 October 2017 |
| MG.P.060.CA | CA - Canada | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 2595008 | 18 December 2012 |
| MG.P.060.CN | CN - China | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 101107109 | 26 January 2011 |
| MG.P.060.DE | DE - Germany | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 602006021536 | 27 April 2011 |
| MG.P.060.EP | EP - European Patent Office | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.ES | ES - Spain | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.FR | FR - France | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.GB | GB - United Kingdom | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.GR | GR - Greece | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.HK | HK - Hong Kong | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | HK 1117097 | 09 September 2011 |
| MG.P.060.HU | HU - Hungary | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.ID | ID - Indonesia | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | IDP000031335 | 16 July 2012 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.060.IN | IN - India | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 245855 | 03 February 2011 |
| MG.P.060.IT | IT - Italy | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.KR | KR - South Korea | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 10-1275132 | 10 June 2013 |
| MG.P.060.MX | MX - Mexico | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 295681 | 07 February 2012 |
| MG.P.060.NL | NL - Netherlands | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.PL | PL - Poland | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.RU | RU - Russian Federation | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 2397866 | 27 August 2010 |
| MG.P.060.TR | TR - Turkey | EP Regional Validation | Compartmentalized chips with similar polymers of different viscosities for improved processability | 1841575 | 27 April 2011 |
| MG.P.060.UA | UA - Ukraine | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 88048 | 10 September 2009 |
| MG.P.060.US | US - United States | PCT National Phase Filing | Compartmentalized chips with similar polymers of different viscosities for improved processability | 7981510 | 19 July 2011 |
| MG.P.060.US.DIV | US - United States | Divisional | Compartmentalized chips with similar polymers of different viscosities for improved processability | 8231937 | 31 July 2012 |
| MG.P.062.CN | CN - China | Utility | High-oxygen barrier container wall containing the combination of active and passive barrier | 2003101177 92.2 | 08 December 2003 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.062.KR | KR - South Korea | Utility | High-oxygen barrier container wall containing the combination of active and passive barrier | 10-1071031 | 29 September 2011 |
| MG.P.064.BR | BR - Brazil | PCT National Phase Filing | Polyester composition comprising an organo-metallic compound | PI 0613373-8 | 25 May 2006 |
| MG.P.064.DE | DE - Germany | EP Regional Validation | Polyester composition comprising an organo-metallic compound | 6020060056 61 | 11 March 2009 |
| MG.P.064.EP | EP - European Patent Office | PCT National Phase Filing | Polyester composition comprising an organo-metallic compound | 1893679 | 11 March 2009 |
| MG.P.064.FR | FR - France | EP Regional Validation | Polyester composition comprising an organo-metallic compound | 1893679 | 11 March 2009 |
| MG.P.064.GB | GB - United Kingdom | EP Regional Validation | Polyester composition comprising an organo-metallic compound | 1893679 | 11 March 2009 |
| MG.P.064.IT | IT - Italy | EP Regional Validation | Polyester composition comprising an organo-metallic compound | 1893679 | 11 March 2009 |
| MG.P.064.MX | MX - Mexico | PCT National Phase Filing | Polyester composition comprising an organo-metallic compound | 280871 | 11 November 2010 |
| MG.P.064.US | US - United States | PCT National Phase Filing | Polyester composition comprising an organo-metallic compound | 11439869 | 24 May 2006 |
| MG.P.065.BR | BR - Brazil | PCT National Phase Filing | Polyester composition | PI 0613200-6 | 17 May 2006 |
| MG.P.065.EP | EP - European Patent Office | PCT National Phase Filing | Polyester composition | 1885801 | 17 May 2006 |
| MG.P.065.MX | MX - Mexico | PCT National Phase Filing | Polyester composition | MX/A/2007/014612 | 17 May 2006 |
| MG.P.065.US | US - United States | Utility | Water activated organic scavenger | 11383799 | 17 May 2006 |
| MG.P.066.BR | BR - Brazil | PCT National Phase Filing | Polyester organo iron compositions | PI 0613374-6 | 25 May 2006 |
| MG.P.066.DE | DE - Germany | EP Regional Validation | Polyester organo iron compositions | 6020060056 60 | 11 March 2009 |
| MG.P.066.EP | EP - European Patent Office | PCT National Phase Filing | Polyester organo iron compositions | 1893665 | 11 March 2009 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.066.FR | FR - France | EP Regional Validation | Polyester organo iron compositions | 1893665 | 11 March 2009 |
| MG.P.066.GB | GB - United Kingdom | EP Regional Validation | Polyester organo iron compositions | 1893665 | 11 March 2009 |
| MG.P.066.IT | IT - Italy | EP Regional Validation | Polyester organo iron compositions | 1893665 | 11 March 2009 |
| MG.P.066.MX | MX - Mexico | PCT National Phase Filing | Polyester organo iron compositions | 280873 | 11 November 2010 |
| MG.P.066.US | US - United States | Utility | Polyester organo iron compositions | 11439583 | 24 May 2006 |
| MG.P.068.AU | AU - Australia | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 2006207500 | 08 July 2010 |
| MG.P.068.BE | BE - Belgium | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.BR | BR - Brazil | PCT National Phase Filing | Zoned pellet for improved contaminant removal | PI 0606255-5 | 13 June 2017 |
| MG.P.068.CA | CA - Canada | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 2595089 | 11 September 2012 |
| MG.P.068.CN | CN - China | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 101107110 | 19 May 2010 |
| MG.P.068.DE | DE - Germany | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 602006022159 | 25 May 2011 |
| MG.P.068.EP | EP - European Patent Office | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.ES | ES - Spain | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.FR | FR - France | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.GB | GB - United Kingdom | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.GR | GR - Greece | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.HU | HU - Hungary | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.068.ID | ID - Indonesia | PCT National Phase Filing | Zoned pellet for improved contaminant removal | IDP0000246 7 8 | 11 December 2009 |
| MG.P.068.IN | IN - India | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 246722 | 14 March 2011 |
| MG.P.068.IT | IT - Italy | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.KR | KR - South Korea | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 10-1275137 | 10 June 2013 |
| MG.P.068.MX | MX - Mexico | PCT National Phase Filing | Compartmentalized pellet for improved contaminant removal | 268334 | 15 July 2009 |
| MG.P.068.NL | NL - Netherlands | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.PL | PL - Poland | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.RU | RU - Russian Federation | PCT National Phase Filing | Zoned pellet for improved contaminant removal | 2397867 | 27 August 2010 |
| MG.P.068.TR | TR - Turkey | EP Regional Validation | Compartmentalized pellet for improved contaminant removal | 1846207 | 25 May 2011 |
| MG.P.068.UA | UA - Ukraine | PCT National Phase Filing | Zoned pellet for improved contaminant removal | 91534 | 10 August 2010 |
| MG.P.068.US | US - United States | Utility | Compartmentalized pellet for improved contaminant removal | 7931968 | 26 April 2011 |
| MG.P.068.US. DIV | US - United States | Divisional | Compartmentalized pellet for improved contaminant removal | 8696960 | 15 April 2014 |
| MG.P.068.US. C1 | US - United States | Continuation | Compartmentalized pellet for improved contaminant removal | 8986582 | 24 March 2015 |
| MG.P.069.1.US | US - United States | Utility | Compartmentalized thermoplastic pellet | 5627218 | 06 May 1997 |
| MG.P.069.2.US | US - United States | Utility | Compartmentalized thermoplastic pellet | 5747548 | 05 May 1998 |
| MG.P.072.AU | AU - Australia | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2006301554 | 25 August 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.072.AT.DIV | AT - Austria | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.BE | BE - Belgium | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.BE.DIV | BE - Belgium | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.BG.DIV | BG - Bulgaria | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.BR | BR - Brazil | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | PI 0617993-2 | 16 January 2018 |
| MG.P.072.CA | CA - Canada | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2624384 | 23 July 2013 |
| MG.P.072.CH.DIV | CH - Switzerland | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.CN | CN - China | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 101321823 | 22 February 2012 |
| MG.P.072.CZ | CZ - Czech Republic | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.CZ.DIV | CZ - Czech Republic | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.DE | DE - Germany | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 602006023390 | 27 July 2011 |
| MG.P.072.DE.DIV | DE - Germany | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 602006051685 | 01 February 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.072.DK. DIV | DK - Denmark | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.EP | EP - European Patent Office | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.EP.D IV | EP - European Patent Office | Divisional | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.ES | ES - Spain | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.ES.D IV | ES - Spain | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.FR | FR - France | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.FR.D IV | FR - France | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.GB | GB - United Kingdom | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.GB. DIV | GB - United Kingdom | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.HU | HU - Hungary | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.HU. DIV | HU - Hungary | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.IN | IN - India | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 258022 | 27 November 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.072.IT | IT - Italy | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.IT.D IV | IT - Italy | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.JP | JP - Japan | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 5435950 | 20 December 2013 |
| MG.P.072.KR | KR - South Korea | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 10-1309108 | 10 September 2013 |
| MG.P.072.LT.D IV | LT - Lithuania | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.MX | MX - Mexico | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 296124 | 14 February 2012 |
| MG.P.072.MX. DIV | MX - Mexico | Divisional | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | MX/A/2011/ 012858 | 01 December 2011 |
| MG.P.072.NL | NL - Netherlands | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.NL. DIV | NL - Netherlands | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.PL | PL - Poland | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |
| MG.P.072.PL.D IV | PL - Poland | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.RO | RO - Romania | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 1931727 | 27 July 2011 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.072.RO.DIV | RO - Romania | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.RU | RU - Russian Federation | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2414494 | 20 March 2011 |
| MG.P.072.SK.DIV | SK - Slovakia | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.TR.DIV | TR - Turkey | EP Regional Validation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2366734 | 01 February 2017 |
| MG.P.072.US | US - United States | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 8465818 | 18 June 2013 |
| MG.P.072.US.C1 | US - United States | Continuation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 13919422 | 17 June 2013 |
| MG.P.072.US.C2 | US - United States | Continuation | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 14886143 | 19 October 2015 |
| MG.P.072.ZA | ZA - South Africa | PCT National Phase Filing | Polyamides and polyesters blended with a lithium salt interfacial tension reducing agent | 2008/03709 | 30 September 2009 |
| MG.P.074.AR | AR - Argentina | Utility | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | AR058817B1 | 26 May 2015 |
| MG.P.074.AT | AT - Austria | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.AU | AU - Australia | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 2006307492 | 15 December 2011 |
| MG.P.074.BE | BE - Belgium | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.074.BG | BG - Bulgaria | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.BR | BR - Brazil | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | PI 0619343-9 | 25 October 2006 |
| MG.P.074.CA | CA - Canada | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 2626862 | 28 January 2014 |
| MG.P.074.CH | CH - Switzerland | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.CN | CN - China | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 101460566 | 12 December 2012 |
| MG.P.074.CZ | CZ - Czech Republic | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.DE | DE - Germany | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 602006051997 | 15 March 2017 |
| MG.P.074.DK | DK - Denmark | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.EP | EP - European Patent Office | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.ES | ES - Spain | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.FR | FR - France | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.GB | GB - United Kingdom | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.074.HU | HU - Hungary | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.IN | IN - India | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 256866 | 05 August 2013 |
| MG.P.074.IT | IT - Italy | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.JP | JP - Japan | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 5219821 | 15 March 2013 |
| MG.P.074.KR | KR - South Korea | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 10-1328135 | 05 November 2013 |
| MG.P.074.LT | LT - Lithuania | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.MX | MX - Mexico | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 306006 | 10 December 2012 |
| MG.P.074.NL | NL - Netherlands | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.PL | PL - Poland | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.RO | RO - Romania | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.RU | RU - Russian Federation | PCT National Phase Filing | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 2420543 | 10 June 2011 |
| MG.P.074.SK | SK - Slovakia | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.074.TR | TR - Turkey | EP Regional Validation | Improved dispersions of high carboxyl polyamides into polyester using an interfacial tension reducing agent | 1943310 | 15 March 2017 |
| MG.P.074.TW | TW - Taiwan | Utility | Dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | I402304 | 21 July 2013 |
| MG.P.074.US | US - United States | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 8314174 | 20 November 2012 |
| MG.P.074.US.C1 | US - United States | Continuation | Improved dispersions of high carboxyl polyamides into polyesters | 9018293 | 28 April 2015 |
| MG.P.074.ZA | ZA - South Africa | PCT National Phase Filing | Improved dispersions of high carboxyl polyamides into polyesters using an interfacial tension reducing agent | 2008/04450 | 30 September 2009 |
| MG.P.075.AR | AR - Argentina | Utility | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | AR058495 B1 | 25 October 2013 |
| MG.P.075.AU | AU - Australia | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 2006307493 | 17 May 2012 |
| MG.P.075.BE | BE - Belgium | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.BR | BR - Brazil | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | PI 0619344-7 | 25 October 2006 |
| MG.P.075.CA | CA - Canada | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 2626878 | 16 December 2014 |
| MG.P.075.CN | CN - China | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 101374907 | 31 August 2011 |
| MG.P.075.CZ | CZ - Czech Republic | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.075.DE | DE - Germany | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 6020060081 76 | 29 July 2009 |
| MG.P.075.DK | DK - Denmark | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.EP | EP - European Patent Office | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.ES | ES - Spain | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.FR | FR - France | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.GB | GB - United Kingdom | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.HU | HU - Hungary | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.IN | IN - India | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 257985 | 25 November 2013 |
| MG.P.075.IT | IT - Italy | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.JP | JP - Japan | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 5219822 | 15 March 2013 |
| MG.P.075.KR | KR - South Korea | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 10-1323835 | 24 October 2013 |
| MG.P.075.MX | MX - Mexico | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 275559 | 28 April 2010 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.075.NL | NL - Netherlands | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.PL | PL - Poland | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.RU | RU - Russian Federation | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 2415163 | 27 March 2011 |
| MG.P.075.SK | SK - Slovakia | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.TR | TR - Turkey | EP Regional Validation | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 1951810 | 29 July 2009 |
| MG.P.075.TW | TW - Taiwan | Utility | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | I432513 | 01 April 2014 |
| MG.P.075.US | US - United States | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 11552612 | 25 October 2006 |
| MG.P.075.ZA | ZA - South Africa | PCT National Phase Filing | Stable polyamides for simultaneous solid phase polymerization of polyesters and polyamides | 2008/04449 | 29 July 2009 |
| MG.P.089.AT | AT - Austria | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.AU | AU - Australia | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 2006243352 | 16 September 2010 |
| MG.P.089.BE | BE - Belgium | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.BR | BR - Brazil | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | PI 0612422-4 | 16 January 2018 |
| MG.P.089.BU | BG - Bulgaria | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 14439 | 21 October 2015 |
| MG.P.089.CA | CA - Canada | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 2606539 | 05 February 2013 |
| MG.P.089.CH | CH - Switzerland | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.089.CN | CN - China | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 101213059 | 19 September 2012 |
| MG.P.089.CZ | CZ - Czech Republic | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.DE | DE - Germany | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 60 2006 047 012.6 | 21 October 2015 |
| MG.P.089.DK | DK - Denmark | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.EG | EG - Egypt | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 26375 | 09 September 2013 |
| MG.P.089.EP | EP - European Patent Office | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging and process for thermally treating said resin pellets | 1883516 | 21 October 2015 |
| MG.P.089.ES | ES - Spain | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.FI | FI - Finland | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.FR | FR - France | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.GR | GR - Greece | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 2016040010 5 | 21 October 2015 |
| MG.P.089.HK | HK - Hong Kong | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | HK1115350 | 26 August 2016 |
| MG.P.089.HU | HU - Hungary | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.ID | ID - Indonesia | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | IDP0000289 49 | 08 August 2011 |
| MG.P.089.IN | IN - India | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 250937 | 08 February 2012 |
| MG.P.089.IE | IE - Ireland | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.IT | IT - Italy | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 5020160000 05672 | 21 October 2015 |
| MG.P.089.JP | JP - Japan | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 5203187 | 22 February 2013 |
| MG.P.089.KR | KR - South Korea | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 10-1354582 | 16 January 2014 |
| MG.P.089.LV | LV - Latvia | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.LT | LT - Lithuania | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.089.MX | MX - Mexico | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 304723 | 30 October 2012 |
| MG.P.089.NL | NL - Netherlands | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.NO | NO - Norway | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 338119 | 01 August 2016 |
| MG.P.089.PH | PH - Philippines | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 1-2007-502349 | 27 February 2012 |
| MG.P.089.PL | PL - Poland | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.PT | PT - Portugal | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.RO | RO - Romania | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | EP/00072/2016 | 21 October 2015 |
| MG.P.089.RU | RU - Russian Federation | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 2401735 | 20 October 2010 |
| MG.P.089.SE | SE - Sweden | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.SG | SG - Singapore | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 200717420-4 | 05 May 2006 |
| MG.P.089.SK | SK - Slovakia | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 1883516 | 21 October 2015 |
| MG.P.089.SI | SI - Slovenia | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | 200632018 | 21 October 2015 |
| MG.P.089.TR | TR - Turkey | EP Regional Validation | Compartmentalized resin pellets for oxygen scavenging | TR 2016 00865 T4 | 21 October 2015 |
| MG.P.089.UA | UA - Ukraine | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 89823 | 10 March 2010 |
| MG.P.089.US | US - United States | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 7,541,091 | 02 June 2009 |
| MG.P.089.VN | VN - Vietnam | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 10525 | 03 August 2012 |
| MG.P.089.ZA | ZA - South Africa | PCT National Phase Filing | Compartmentalized resin pellets for oxygen scavenging | 2007/10381 | 26 August 2009 |
| MG.P.096.AU | AU - Australia | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2008290555 | 15 June 2013 |
| MG.P.096.BE | BE - Belgium | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.096.BR | BR - Brazil | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | PI 0815296-9 | 22 August 2008 |
| MG.P.096.CA | CA - Canada | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2695422 | 14 June 2016 |
| MG.P.096.CN | CN - China | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2008801040 42.2 | 22 August 2008 |
| MG.P.096.CN. DIV | CN - China | Divisional | Polyester-polyamide blends maintaining good color under thermal treatment | 2015101749 18.2 | 14 April 2015 |
| MG.P.096.CZ | CZ - Czech Republic | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.DE | DE - Germany | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 6020080499 69.3 | 26 April 2017 |
| MG.P.096.EP | EP - European Patent Office | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.ES | ES - Spain | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.FR | FR - France | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.GB | GB - United Kingdom | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.HU | HU - Hungary | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.IN | IN - India | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 1604/CHEN P/2010 | 22 August 2008 |
| MG.P.096.IR | IE - Ireland | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.IT | IT - Italy | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 5020170000 81410 (EP 2181158) | 26 April 2017 |
| MG.P.096.JP | JP - Japan | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 5300845 | 28 June 2013 |
| MG.P.096.KR | KR - South Korea | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 10-1533698 | 29 June 2015 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.096.MX | MX - Mexico | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 315531 | 20 November 2013 |
| MG.P.096.NL | NL - Netherlands | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.PL | PL - Poland | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.PT | PT - Portugal | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.RO | RO - Romania | EP Regional Validation | Polyester-polyamide blends maintaining good color under thermal treatment | 2181158 | 26 April 2017 |
| MG.P.096.RU | RU - Russian Federation | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2475508 | 20 February 2013 |
| MG.P.096.US | US - United States | PCT National Phase Filing | Composition for maintaining good color when thermally treating polyester-polyamide blends | 8,436,080 | 07 May 2013 |
| MG.P.096.US.C1 | US - United States | Continuation | Composition for maintaining good color when thermally treating polyester-polyamide blends | 9,540,507 | 10 January 2017 |
| MG.P.096.ZA | ZA - South Africa | PCT National Phase Filing | Polyester-polyamide blends maintaining good color under thermal treatment | 2010/00476 | 30 March 2011 |
| MG.P.101.BR | BR - Brazil | PCT National Phase Filing | Method to manufacture a compartmentalized pellet directly from a reactor | PI 0807312-0 | 26 February 2008 |
| MG.P.101.MX | MX - Mexico | PCT National Phase Filing | Method to manufacture a compartmentalized pellet directly from a reactor | 319063 | 03 April 2014 |
| MG.P.101.US | US - United States | PCT National Phase Filing | Method to manufacture a compartmentalized pellet directly from a reactor | 12038455 | 27 February 2008 |
| MG.P.104.AU | AU - Australia | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2008287788 | 17 October 2013 |
| MG.P.104.BR | BR - Brazil | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | PI 0815299-3 | 22 August 2008 |
| MG.P.104.CA | CA - Canada | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2695466 | 07 June 2016 |
| MG.P.104.CN | CN - China | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2008801040 49.4 | 22 August 2008 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.104.CZ | CZ - Czech Republic | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.DE | DE - Germany | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 6020080284 51 | 30 October 2013 |
| MG.P.104.EP | EP - European Patent Office | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.FR | FR - France | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.GB | GB - United Kingdom | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.IN | IN - India | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 276881 | 03 November 2016 |
| MG.P.104.IT | IT - Italy | EP Regional Validation | Phosphite stabilizers for ionomeric polyester compounds | 2181152 | 30 October 2013 |
| MG.P.104.JP | JP - Japan | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 5264909 | 10 May 2013 |
| MG.P.104.KR | KR - South Korea | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 10-1524118 | 22 May 2015 |
| MG.P.104.MX | MX - Mexico | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 307683 | 05 March 2013 |
| MG.P.104.RU | RU - Russian Federation | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2480493 | 27 April 2013 |
| MG.P.104.US | US - United States | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 12/196499 | 22 August 2008 |
| MG.P.104.US. DIV1 | US - United States | Divisional | Phosphite stabilizers for ionomeric polyester compounds | 8,063,124 | 22 November 2011 |
| MG.P.104.ZA | ZA - South Africa | PCT National Phase Filing | Phosphite stabilizers for ionomeric polyester compounds | 2010/00481 | 30 March 2011 |
| MG.P.105.AT | AT - Austria | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.BE | BE - Belgium | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.105.BR | BR - Brazil | PCT National Phase Filing | Copper containing polyester-polyamide compositions | PI 0906157-6 | 11 March 2009 |
| MG.P.105.CA | CA - Canada | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 2716725 | 11 March 2009 |
| MG.P.105.CH | CH - Switzerland | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.CN | CN - China | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 101970575 | 25 June 2014 |
| MG.P.105.CZ. DIV | CZ - Czech Republic | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.DE | DE - Germany | EP Regional Validation | Copper containing polyester-polyamide compositions | 6020090212 89 | 08 January 2014 |
| MG.P.105.DE. DIV | DE - Germany | EP Regional Validation | Copper containing polyester-polyamide compositions | 6020090251 63 | 02 July 2014 |
| MG.P.105.DK. DIV | DK - Denmark | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.EP | EP - European Patent Office | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.EP.D IV | EP - European Patent Office | Divisional | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.FR | FR - France | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.FR.D IV | FR - France | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.GB. DIV | GB - United Kingdom | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.IT | IT - Italy | EP Regional Validation | Copper containing polyester-polyamide compositions | 2271710 | 08 January 2014 |
| MG.P.105.IT.D IV | IT - Italy | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.LT.D IV | LT - Lithuania | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.MX | MX - Mexico | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 333601 | 28 September 2015 |
| MG.P.105.MX. DIV | MX - Mexico - Mexico | Divisional | Copper containing polyester-polyamide compositions | MX/A/2015/ 013814 | 11 March 2009 |
| MG.P.105.PL.D IV | PL - Poland | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |
| MG.P.105.RO. DIV | RO - Romania | EP Regional Validation | Copper containing polyester-polyamide compositions | 2468819 | 02 July 2014 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.105.US | US - United States | PCT National Phase Filing | Copper containing polyester-polyamide compositions | 12/399499 | 06 March 2009 |
| MG.P.107.AT | AT - Austria | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.AU | AU - Australia | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 2010258627 | 22 January 2015 |
| MG.P.107.BE | BE - Belgium | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.BR | BR - Brazil | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | PI 1009680-9 | 11 June 2010 |
| MG.P.107.CA | CA - Canada | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 2763121 | 11 April 2017 |
| MG.P.107.CH | CH - Switzerland | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.CN | CN - China | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 102802947 | 09 September 2015 |
| MG.P.107.CZ | CZ - Czech Republic | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.DE | DE - Germany | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 602010013144 | 15 January 2014 |
| MG.P.107.DK | DK - Denmark | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.EP | EP - European Patent Office | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.ES | ES - Spain | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.FR | FR - France | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.GB | GB - United Kingdom | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.GR | GR - Greece | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.107.HR | HR - Croatia | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.HU | HU - Hungary | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.IN | IN - India | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 291301 | 02 January 2018 |
| MG.P.107.IT | IT - Italy | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.KR | KR - South Korea | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 10-2012-7000762 | 11 June 2010 |
| MG.P.107.LT | LT - Lithuania | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.MX | MX - Mexico | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 329044 | 30 March 2015 |
| MG.P.107.NL | NL - Netherlands | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.PL | PL - Poland | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.RO | RO - Romania | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.RU | RU - Russian Federation | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 2011153692 | 11 June 2010 |
| MG.P.107.SE | SE - Sweden | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.TR | TR - Turkey | EP Regional Validation | Polyamide-polydiene blends with improved oxygen reactivity | 2440407 | 15 January 2014 |
| MG.P.107.TW | TW - Taiwan | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | I486394 | 01 June 2015 |
| MG.P.107.TW. DIV | TW - Taiwan | Divisional | Polyamide-polydiene blends with improved oxygen reactivity | I605089 | 01 August 2015 |
| MG.P.107.US | US - United States | PCT National Phase Filing | Polyamide-polydiene blends with improved oxygen reactivity | 8,409,680 | 02 April 2013 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.107.US.C1 | US - United States | Continuation | Polyamide-polydiene blends with improved oxygen reactivity | 13/803528 | 14 March 2013 |
| MG.P.110.AT | AT - Austria | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.BE | BE - Belgium | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.BG | BG - Bulgaria | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.BR | BR - Brazil | PCT National Phase Filing | Polar soluble scavenging compositions | BR 11 2013 021037 0 | 17 February 2012 |
| MG.P.110.CA | CA - Canada | PCT National Phase Filing | Polar soluble scavenging compositions | 2827540 | 17 February 2012 |
| MG.P.110.CN | CN - China | PCT National Phase Filing | Polar soluble scavenging compositions | 2012800093 94.6 | 17 February 2012 |
| MG.P.110.CZ | CZ - Czech Republic | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.DE | DE - Germany | EP Regional Validation | Polar soluble scavenging compositions | 6020120050 47 | 21 January 2015 |
| MG.P.110.EP | EP - European Patent Office | PCT National Phase Filing | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.ES | ES - Spain | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.FR | FR - France | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.GB | GB - United Kingdom | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.IN | IN - India | PCT National Phase Filing | Polar soluble scavenging compositions | 7783/DELN P/2013 | 17 February 2012 |
| MG.P.110.IT | IT - Italy | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.LT | LT - Lithuania | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.MX | MX - Mexico | PCT National Phase Filing | Polar soluble scavenging compositions | 39191 | 13 May 2016 |
| MG.P.110.NL | NL - Netherlands | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.PCT | PCT - Patent Cooperation Treaty | PCT Application | Polar soluble scavenging compositions | PCT/US20 12/025744 | 17 February 2012 |
| MG.P.110.PL | PL - Poland | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.110.RO | RO - Romania | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.RU | RU - Russian Federation | PCT National Phase Filing | Polar soluble scavenging compositions | 2593453 | 12 July 2016 |
| MG.P.110.SK | SK - Slovakia | EP Regional Validation | Polar soluble scavenging compositions | 2675848 | 21 January 2015 |
| MG.P.110.US | US - United States | PCT National Phase Filing | Polar soluble scavenging compositions | 13/982832 | 31 July 2013 |
| MG.P.112.EP | EP - European Patent Office | PCT National Phase Filing | Color control of polyester-cobalt compounds and polyester-cobalt compositions | 12795224.0 | 26 May 2014 |
| MG.P.112.PCT | PCT - Patent Cooperation Treaty | PCT Application | Color control of polyester-cobalt compounds and polyester-cobalt compositions | PCT/US20 12/065351 | 15 November 2012 |
| MG.P.112.US | US - United States | Utility | Color control of acid based polyester-cobalt compounds | 13/677345 | 15 November 2012 |
| MG.P.112.US.2 | US - United States | PCT National Phase Filing | Color control of polyester-cobalt compounds and polyester-cobalt compositions | 14/357662 | 12 May 2014 |
| MG.P.114.BR | BR - Brazil | PCT National Phase Filing | Oxygen scavengers | BR 11 2014004148 2 | 18 July 2012 |
| MG.P.114.EP | EP - European Patent Office | PCT National Phase Filing | Articles containing Oxygen-scavenging materials | 12743010.6 | 18 July 2012 |
| MG.P.114.MX | MX - Mexico | PCT National Phase Filing | Oxygen scavengers | MX/A/2014/ 02154 | 18 July 2012 |
| MG.P.114.PCT | PCT - Patent Cooperation Treaty | PCT Application | Oxygen scavengers | PCT/US20 12/047259 | 18 July 2012 |
| MG.P.114.US | US - United States | PCT National Phase Filing | Oxygen scavengers | 14/240,612 | 18 July 2012 |
| MG.P.117.PCT | PCT - Patent Cooperation Treaty | PCT Application | Oxygen scavenging polyester compositions for containers | PCT/US20 16/037016 | 10 June 2016 |
| MG.P.117.US.P | US - United States | Provisional | Oxygen scavenging polyester compositions for containers | 62/174593 | 12 June 2015 |
| MG.P.117.US.P 2 | US - United States | Provisional | Oxygen scavenging polyester compositions for containers | 62/180861 | 17 June 2015 |
| MG.P.117.CA | CA - Canada | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 2992430 | 15 December 2016 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.117.CN | CN - China | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 2016800474 86.1 | 11 February 2018 |
| MG.P.117.EP | EP - European Patent Office | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 16 731 473.1 | 12 January 2018 |
| MG.P.117.KR | KR - South Korea | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 10-2018-7001197 | 12 January 2018 |
| MG.P.117.RU | RU - Russian Federation | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 2018100993 | 12 January 2018 |
| MG.P.117.UA | UA - Ukraine | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | a2018 00349 | 12 January 2018 |
| MG.P.117.US | US - United States | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 15/735631 | 12 December 2017 |
| MG.P.117.ZA | ZA - South Africa | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER COMPOSITIONS | 2018/00232 | 12 January 2018 |
| MG.P.120.PCT | PCT - Patent Cooperation Treaty | PCT Application | Polyester blends with improved oxygen scavenging ability | PCT/US20 16/037028 | 10 June 2016 |
| MG.P.120.US.P | US - United States | Provisional | Polyester blends with improved oxygen scavenging ability | 62/174603 | 12 June 2015 |
| MG.P.120.CA | CA - Canada | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 2992433 | 15 December 2016 |
| MG.P.120.CN | CN - China | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 2016800475 15.4 | 12 February 2018 |
| MG.P.120.EP | EP - European Patent Office | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 16 731 474.9 | 12 January 2018 |
| MG.P.120.KR | KR - South Korea | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 10-2018-7001198 | 12 January 2018 |
| MG.P.120.RU | RU - Russian Federation | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 2018100994 | 12 January 2018 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.120.UA | UA - Ukraine | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | a2018 00348 | 12 January 2018 |
| MG.P.120.US | US - United States | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 15/735642 | 12 December 2017 |
| MG.P.120.ZA | ZA - South Africa | PCT National Phase Filing | POLYESTER BLENDS WITH IMPROVED OXYGEN SCAVENGING ABILITY | 2018/00234 | 12 January 2018 |
| MG.P.121.PCT | PCT - Patent Cooperation Treaty | PCT Application | Oxygen scavenging polyester blends having improved aesthetic characteristics | PCT/US20 16/037034 | 10 June 2016 |
| MG.P.121.US.P | US - United States | Provisional | Oxygen scavenging polyester blends having improved aesthetic characteristics | 62/174631 | 12 June 2015 |
| MG.P.121.CA | CA - Canada | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 2992435 | 15 December 2016 |
| MG.P.121.CN | CN - China | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAIG IMPROVED AESTHETIC CHARACTERISTICS | 2016800475 26.2 | 12 February 2018 |
| MG.P.121.EP | EP - European Patent Office | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 16 732 130.6 | 12 January 2018 |
| MG.P.121.KR | KR - South Korea | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 10-2018- 7001199 | 12 January 2018 |
| MG.P.121.RU | RU - Russian Federation | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 2018100995 | 12 January 2018 |
| MG.P.121.UA | UA - Ukraine | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | a2018 00350 | 12 January 2018 |

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.121.US | US - United States | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 15/735739 | 12 December 2017 |
| MG.P.121.ZA | ZA - South Africa | PCT National Phase Filing | OXYGEN SCAVENGING POLYESTER BLENDS HAVING IMPROVED AESTHETIC CHARACTERISTICS | 2018/00233 | 12 January 2018 |
| MG.P.122.PCT | PCT - Patent Cooperation Treaty | PCT Application | Compartmentalized resin pellets | PCT/US2016/035816 | 03 June 2016 |
| MG.P.122.US.P | US - United States | Provisional | Compartmentalized resin pellets | 62/171746 | 05 June 2015 |
| MG.P.122.US | US - United States | Utility | COMPARTMENTALIZED RESIN PELLETS | 15578878 | 01 December 2017 |

## "PTA Technology" Patents

| MG REF | COUNTRY | QP APPL TYPE | TITLE | PATENT NO /APP NO | GRANT DATE /FILING DATE |
|---|---|---|---|---|---|
| MG.P.081.BE | BE - Belgium | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.BR | BR - Brazil | PCT National Phase Filing | A process for preparing high purity terephtalic acid | PI0520801-7 | 9 December, 2005 |
| MG.P.081.CN | CN - China | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 200580052245.8 | 24 September, 2011 |
| MG.P.081.DE | DE - Germany | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.IN | IN - India | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 257418 | 30 September, 2013 |
| MG.P.081.EP | EP - European Patent Office | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.FR | FR - France | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.GB | GB - United Kingdom | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |
| MG.P.081.IT | IT - Italy | EP Regional Validation | A process for preparing high purity terephtalic acid | 1971566 | 12 November, 2014 |

| MG.P.081.MX | MX - Mexico | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 294662 | 13 January, 2012 |
|---|---|---|---|---|---|
| MG.P.081.RU | RU - Russian Federation | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 2399610 | 20 September, 2010 |
| MG.P.081.US | US - United States | PCT National Phase Filing | A process for preparing high purity terephtalic acid | 12095926 | 3 June, 2008 |
| MG.P.083.A.BE | BE - Belgium | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.BR | BR - Brazil | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | PI0621496-7 | 3 April, 2006 |
| MG.P.083.A.CH | CH - Switzerland | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.CN | CN - China | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2006800540 17.9 | 3 April, 2006 |
| MG.P.083.A.DE | DE - Germany | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.EP | EP - European Patent Office | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.ES | ES - Spain | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.FR | FR - France | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.GB | GB - United Kingdom | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.IN | IN - India | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 259063 | 24 February, 2014 |
| MG.P.083.A.IT | IT - Italy | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.MX | MX - Mexico | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 276278 | 31-May-10 |
| MG.P.083.A.NL | NL - Netherlands | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |
| MG.P.083.A.TR | TR - Turkey | EP Regional Validation | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2016038 | 11 November, 2009 |

| MG.P.083.A.US | US - United States | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 12293901 | 22 September, 2008 |
|---|---|---|---|---|---|
| MG.P.091.BR | BR - Brazil | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | pi0621743 | 21 June, 2006 |
| MG.P.091.CN | CN - China | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2006800550 41.4 | 5 September, 2012 |
| MG.P.091.EP | EP - European Patent Office | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 6780572.1 | 21 January, 2009 |
| MG.P.091.IN | IN - India | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 261228 | 13 June, 2014 |
| MG.P.091.KR | KR - South Korea | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 2009-7001167 | 21 June, 2006 |
| MG.P.091.MX | MX - Mexico | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | MX/A/2008/016450 | 21 June, 2006 |
| MG.P.091.US | US - United States | PCT National Phase Filing | Recovery of aromatic dicarboxylic acids from waste polyester resin | 12305451 | 18 December, 2008 |

**Exhibit C**

# POWER OF ATTORNEY

WHEREAS, [Seller] a business organized under the laws of [•] having its registered office at [•] ("**Seller**") and Banibu II Holdings, Inc. a business organized under the laws of [•] having its registered office at [•] ("**Purchaser**") have entered into that certain Asset Purchase Agreement, dated as of [•], 2018 by and between M&G Resins USA, LLC; M&G Waters USA, LLC; M&G USA Corporation; M&G Polymers USA, LLC; Chemtex International Inc.; M&G Finance Corporation; M&G USA Holding LLC; Chemtex Far East, Ltd.; Indo American Investments, Inc.; Mossi & Ghisolfi International S.à.r.l.;[1] and [Purchaser] ("**APA**"), pursuant to which, Seller has assigned to [Purchaser][Assignee, ("Assignee"), an affiliate of Purchaser] certain Seller-owned intellectual property as set forth in Schedule A ("**Intellectual Property**") subsisting in numerous jurisdictions around the world; and

WHEREAS, Seller wishes to assist [Purchaser][Assignee] with the effective and/or proper effectuation of recording, perfecting and/or confirming assignment of the Intellectual Property in the event Seller liquidates or otherwise ceases to exist, or otherwise is unable to or fails to take any action or execute any document necessary to effectuate such transfer;

NOW THEREFORE, THIS POWER OF ATTORNEY is hereby granted by Seller to [Purchaser][Assignee]:

1  Appointment of Agent.  Effective upon _____, 2018, Seller hereby appoints [Purchaser][Assignee] as Seller's true and lawful agent and attorney-in-fact to take and execute in the name of Seller any and all actions and documents to effectuate, record, perfect, transfer or confirm the assignment of the Intellectual Property throughout the world (collectively "**Assign**"), as further set forth in Section 2, if Seller liquidates or otherwise ceases to exist, or otherwise is unable to or fails to take any such action or execute any such document thirty (30) business days after receipt of a written request by [Purchaser][Assignee].

Seller agrees, and [Purchaser][Assignee] accepts, that [Purchaser][Assignee] shall have the right to appoint one or more agents anywhere in the world to act on [Purchaser's][Assignee's] behalf for all purposes of this Power of Attorney.

Seller agrees, and [Purchaser][Assignee] accepts, that this Power of Attorney shall be valid and effective in each and every jurisdiction in which Intellectual Property subsists.

2  Term of Appointment.

2.1  [Purchaser][Assignee] may exercise its powers at attorney-in-fact after the occurrence of any one or more of the following events:

a.  Seller liquidates, dissolves or otherwise ceases to exist or operate;

b.  Seller fails to take any action or execute any document necessary to Assign any Intellectual Property to or for the benefit of [Purchaser][Assignee] within thirty (30) business days of any written request by [Purchaser][Assignee] to Seller to do so. The thirty (30) business day period shall commence on the date on which such notice is received by Seller from [Purchaser][Assignee].

---

[1] Parties to be conformed to finalized APA.

2.2     After the occurrence of one or more of the events in 2.1, [Purchaser's][Assignee's] right to exercise its powers as attorney-in-fact shall be perpetual, irrevocable and non-terminable.

3     <u>Execution and Copies</u>.  Seller and [Purchaser][Assignee] agree to duly execute the number of original and authenticated copies of this Power of Attorney as necessary or convenient for the jurisdictions in which the Intellectual Property subsists, as reasonably requested by [Purchaser][Assignee].

4     <u>Non-Interference</u>.  Seller and its subsidiaries and controlled affiliates and their agents shall not, and shall not assist any third party (including any current or former affiliate of Seller) to, contest or inquire as to the legality or propriety of [Purchaser][Assignee] or its agents exercising, performing or doing or purporting or agreeing to exercise, perform or do in the name of Seller any power, duty or thing under this Power of Attorney.

5     <u>Ratification</u>.  Seller agrees to ratify all that [Purchaser][Assignee] lawfully does or causes to be done under this Power of Attorney.

**IN WITNESS WHEREOF**:

       [SELLER] hereby grants to [PURCHASER][ASSIGNEE] this Power of Attorney and  has caused this instrument to be executed by its duly authorized representative.

<div align="center">

**[SELLER]**

</div>

By    _____

           Name:

           Title:

           Date:

<div align="center">

**<u>Corporate Seal/Stamp:</u>**

</div>

This ____ day of ____, 20___, before me personally came the above _____, to me personally known as the individual who executed the foregoing assignment, who acknowledged to me that he executed the same of his own free will for the purposes therein set forth.

                                                _____

                                                Notary Public

[PURCHASER][ASSIGNEE] hereby accepts from [SELLER] this Power of Attorney and has caused this instrument to be executed by its duly authorized representative.

**[BANIBU II HOLDINGS, INC.][ASSIGNEE]**

By _____

Name:

Title:

Date:

**Corporate Seal/Stamp:**

This ____ day of ____, 20___, before me personally came the above _____, to me personally known as the individual who executed the foregoing assignment, who acknowledged to me that he executed the same of his own free will for the purposes therein set forth.

_____
Notary Public

**Schedule A**

[•]

**[SELLER]**

By  _____

Name:

Title:

Date:

**<u>Corporate Seal/Stamp:</u>**

This ____ day of _____, 20___, before me personally came the above _____, to me personally known as the individual who executed the foregoing assignment, who acknowledged to me that he executed the same of his own free will for the purposes therein set forth.

_____

Notary Public

**[BANIBU II HOLDINGS, INC.][ASSIGNEE]**

By  _____

Name:

Title:

Date:

**<u>Corporate Seal/Stamp:</u>**

SCHEDULE A TO POWER OF ATTORNEY FROM [SELLER] TO [BANIBU II HOLDINGS, INC.][ASSIGNEE]

This _____ day of _____, 20___, before me personally came the above _____, to me personally known as the individual who executed the foregoing assignment, who acknowledged to me that he executed the same of his own free will for the purposes therein set forth.

_____
Notary Public

**Exhibit D**

**Corpus Christi**
Post Closing Budget

| $ in 000s | | 1 4/6/18 | 2 4/13/18 | 3 4/20/18 | 4 4/27/18 | 5 5/4/18 | 6 5/11/18 | 7 5/18/18 | 8 5/25/18 | 9 6/1/18 | 10 6/8/18 | 11 6/15/18 | 12 6/22/18 | 13 6/29/18 | | Total 13-Wks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Estate Related Costs** | | | | | | | | | | | | | | | | |
| Health Care Claims | $ | 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ | 130 |
| Polymers Funding | | – | – | 250 | – | – | – | 250 | – | – | – | 250 | – | – | | 750 |
| S&U Taxes | | – | – | 32 | – | – | – | – | 686 | – | – | – | 32 | – | | 750 |
| | | **10** | **10** | **292** | **10** | **10** | **10** | **260** | **696** | **10** | **10** | **260** | **42** | **10** | | **1,630** |
| **Estate Professional Fees** | | | | | | | | | | | | | | | | |
| Jones Day | | | | | | 800 | | | | 800 | | | | 800 | | 2,400 |
| Pachulski | | | | | | 150 | | | | 100 | | | | 100 | | 350 |
| A&M | | | | | | 500 | | | | 400 | | | | 400 | | 1,300 |
| UST | | | | | | | | | | | | | | 150 | | 150 |
| UCC | | | | | | TBD | | | | TBD | | | | TBD | | TBD |
| | | **–** | **–** | **–** | **–** | **1,450** | **–** | **–** | **–** | **1,300** | **–** | **–** | **–** | **1,450** | | **4,200** |
| **Total Post-Closing Costs** | $ | **10** | $ **10** | $ **292** | $ **10** | $ **1,460** | $ **10** | $ **260** | $ **696** | $ **1,310** | $ **10** | $ **260** | $ **42** | $ **1,460** | $ | **5,830** |

**Exhibit E**

**INTENTIONALLY OMITTED**

**Exhibit D**

**Proposed Sale Order for Backup Bid**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 17-12307 (BLS) |
| M & G USA CORPORATION, *et al.*,[1] | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | Related Docket Nos. 173, 490 |

## ORDER (I) APPROVING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF

This Court having considered the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures; and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related*

---

[1]     The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

*Relief* (the "<u>Motion</u>") [Docket No. 173],[2] filed by the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") and upon the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* [Docket No. 3] (the "<u>First Day Declaration</u>") and upon the *Declaration of Neil Augustine in Support of Debtors' Sale and Bidding Procedures Motion* [Docket No. 173, Ex. C] (the "<u>Augustine Declaration</u>"); and upon the *Supplemental Declaration of Neil Augustine in Support of Debtors' Motions for Approval of, Among Other Things, (A) Postpetition Financing and (B) Bidding Procedures* [Docket No. 451] (the "<u>Supplemental Augustine Declaration</u>"); and upon [**the other declarations filed in support of the sale**] and upon the *Order (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [Docket No. 490] (the "<u>Bidding Procedures Order</u>"); and upon the *Notice of Extended Proposal Deadline from January 16, 2018 at 5:00 P.M. (Prevailing Eastern Time) to January 30, 2018 at 5:00 P.M. (Prevailing Eastern Time)* [Docket No. 557] and the *Notice of Certain Modifications to Bidding Procedures* [Docket No. 1061] (collectively, the "<u>Bidding Procedures Modifications</u>"); and an auction (the "<u>Auction</u>") having been held on **March 20, 2018** in accordance with the Bidding Procedures Order and the Bidding Procedures Modifications; and the Debtors having filed the *Notice of Designation of Successful Bid and Backup Bid for the Assets* on **[March __, 2018]** [Docket No. __] (the "<u>Auction Results</u>

---

[2]      Capitalized terms not otherwise defined herein have the meanings given to them in the Purchase Agreement (as defined below), and, if not defined in the Purchase Agreement, the Motion.

Notice"), designating the Purchaser (as defined in the Purchase Agreement) as the Successful

Bidder for the Purchased Assets pursuant to the Asset Purchase Agreement among the

Purchaser and M&G Resins USA, LLC, M&G Waters USA, LLC, M&G USA Corporation,

M&G Polymers USA, LLC, Chemtex International Inc., M&G Finance Corporation, M&G

USA Holding LLC, Chemtex Far East, Ltd. and Indo American Investments, Inc. and, upon its

execution of a counterparty thereto, Mossi & Ghisolfi International S.à.r.l. (the "APA Sellers"),

dated as of March 20, 2018 (the "Purchase Agreement"), which Purchase Agreement is attached

hereto as Exhibit 1; and the Sale Hearing having been held on **March 23, 2018** to consider

approval of the Purchase Agreement and related relief; and appearances of all interested parties

having been noted on the record of the Sale Hearing; and upon all of the proceedings held

before this Court (including the testimony and other evidence proffered or adduced at the Sale

Hearing); and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b);

and this Court having determined that the relief requested in the Motion is in the best interests

of the Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that

proper and adequate notice of the Motion has been given under the circumstances and that no

other or further notice is necessary; and after due deliberation thereon; and good and sufficient

cause appearing therefor;

## IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    Jurisdiction:    This Court has jurisdiction to consider the Motion and the relief

requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  Approval of the APA Sellers' entry

---

[3]    The findings of fact and the conclusions of law stated herein shall constitute the
Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made
applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact shall
be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law
shall be determined to be a finding of fact, it shall be so deemed.

into the Purchase Agreement and the transactions contemplated thereby (the "Sale Transaction") is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), (N) and (O).

B.     Venue:   Venue of these Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

C.     Final Order.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

D.     Statutory Predicates:    The statutory predicates for the approval of the Purchase Agreement and Sale Transaction contemplated thereby are sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004 and 9014 of the Bankruptcy Rules, and Local Rule 6004-1.

E.     Notice:  Proper, timely, adequate and sufficient notice of the Motion, the Auction and the Sale Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 6004, and in compliance with the Local Rules, the Bidding Procedures Order and the Bidding Procedures Modifications, including to the Notice Parties (as defined below) and more broadly by publication as set forth in the *Affidavit of Publication* [Docket No. 545] on December 26, 2017.   The foregoing notice was good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Sale Hearing, the Purchase Agreement or the Sale Transaction is required.  The disclosures made by the Debtors concerning the Purchase Agreement, the Sale Transaction and the Sale Hearing were sufficient, complete and adequate.

F.     Opportunity to be Heard:    A reasonable opportunity to object or be heard regarding the relief requested in the Motion and the Sale Transaction has been afforded to all interested persons and entities, including the following:  (i) Cleary Gottlieb Steen & Hamilton

LLP and Young Conaway Stargatt & Taylor, LLP, as counsel to Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa and Control Empresarial de Capitales, S.A. de C.V. and as counsel to the Purchaser; (ii) Thompson & Knight LLP, as counsel to Trimont Real Estate Advisors, LLC; (iii) Weil Gotshal & Manges LLP and Morris, Nichols, Arsht & Tunnell LLP, as counsel to DAK Americas, LLC; (iv) Sidley Austin LLP and Ashby & Geddes, P.A., as counsel to Macquarie Investments US Inc. ("Macquarie"); (v) Milbank, Tweed, Hadley & McCloy LLP and Cole Schotz P.C., as counsel to the Committee; (vi) all persons and entities known by the Debtors to have expressed an interest to the Debtors in any Sale Transaction involving any of the Purchased Assets during the past twelve (12) months, including any person or entity that has submitted a bid for any of the Purchased Assets, as applicable; (vii) all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in the Purchased Assets (for whom identifying information and addresses are available to the Debtors); (viii) all non-Debtor parties to any executory contracts or unexpired leases of the Debtors (collectively, the "Contracts") that are proposed to be assumed or rejected in connection with any Sale Transaction; (ix) any governmental authority known to have a claim against the Debtors in the Cases; (x) the United States Attorney General; (xi) the Antitrust Division of the United States Department of Justice; (xii) the United States Attorney for the District of Delaware; (xiii) the Office of the Attorney General in each state in which the Debtors operate; (xiv) the Federal Trade Commission; (xv) the Office of the United States Trustee for the District of Delaware; (xvi) the Internal Revenue Service; (xvii) the United States Securities and Exchange Commission; (xviii) all of the Debtors' known creditors (for whom identifying information and addresses are known to the Debtors); (xix) all parties who have filed a notice of

appearance and request for service of papers in the Cases pursuant to Bankruptcy Rule 2002; and (xx) all other persons and entities as directed by the Bankruptcy Court (the parties listed in (i) through (xx) collectively, the "Notice Parties"). Objections, if any, to the Motion have been withdrawn or resolved and, to the extent not withdrawn or resolved, are hereby overruled.

G. Marketing Process: As demonstrated by (i) the First Day Declaration, the Augustine Declaration, the Supplemental Augustine Declaration and [**the further supplemental declarations filed in support of the sale**], (ii) the testimony and other evidence proffered or adduced at the hearing with respect to the approval of the bidding procedures held on December 11, 2017 (the "Bidding Procedures Hearing") and the Sale Hearing and (iii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, the Debtors and their advisors thoroughly marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion, the Bidding Procedures Order and the Bidding Procedures Modifications. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

H. Compliance with Bidding Procedures: The Debtors conducted a fair and open sale process in a manner reasonably calculated to produce the highest or otherwise best offer for the Purchased Assets in compliance with the Bidding Procedures Order and the Bidding Procedures Modifications. The sale process and the Bidding Procedures were non-collusive, substantively and procedurally fair to all parties and to each person or entity that desired to participate in the Auction and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer for the Purchased Assets. The Bidding

Procedures have been complied with in all material respects by the Debtors and the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser.

I.     <u>Highest and Best Offer</u>:     After the conclusion of the Auction held on **March 20, 2018** and in accordance with the Bidding Procedures, the Debtors determined in a valid and sound exercise of their business judgment that the highest and best Qualified Bid for the Purchased Assets was that of the Purchaser.   The consideration provided by the Purchaser for the Purchased Assets provides fair and reasonable consideration to the APA Sellers for the sale of the Purchased Assets and the assumption of all Assumed Liabilities (as defined and limited in the Purchase Agreement), and the performance of the other covenants set forth in the Purchase Agreement will provide a greater recovery for Debtors' estates than would have been provided by any other available alternative.   No other entity or group of entities has presented a higher or otherwise better offer to the APA Sellers to purchase the Purchased Assets than the Purchaser.

J.     <u>Secured Claims</u>.   Pursuant to the Final DIP Order, the Cash Collateral Orders and the Polymers DIP Orders, (i) the Pre-Petition First Lien Lender is a secured creditor of Resins and Polymers, holding a valid, allowed secured claim against each of Resins and Polymers, their estates and the property of their estates in the aggregate principal amount of $430,000,000, plus such additional amounts to the extent allowed under the Pre-Petition First Lien Loan Documents and all accrued and accruing unpaid interest, fees, expenses and costs not included in the foregoing amount and (ii) the DIP Lender is a secured creditor of the Obligors holding a valid, allowed secured claim against each of the Obligors, their estates and the property of their estates in the aggregate principal amount of up to $100,000,000, plus such additional amount to the extent allowed under the DIP Loan Documents, and all accrued and

accruing unpaid interest, fees, expenses and costs not included in the foregoing amount (items (i) and (ii), together, the "Credit Bid Claims").  Pursuant to the Bidding Procedures, the Pre-Petition First Lien Lender, the DIP Agent and the DIP Lender were authorized to credit bid any or all of such Credit Bid Claims at the Auction, subject to certain requirements as set forth in the Bidding Procedures and the Final DIP Order.  Pursuant to the Final DIP Order, the Cash Collateral Orders and the Polymers DIP Orders, the Credit Bid Claims are valid, allowed and secured.  The assignment of the claims of the DIP Lender and the Pre-Petition First Lien Lender to the Purchaser in the amount of the DIP Agreement Credit Bid Amount and the Pre-Petition Credit Bid Amount, respectively, will take place on the Closing Date.

K.      Purchaser and Purchase Price.  The Purchaser was formed by the DIP Lender on February 27, 2018, and as of March 5, 2018 is owned by the Pre-Petition First Lien Lender, and each of the DIP Lender and the Pre-Petition First Lien Lender holds valid claims described above as the Credit Bid Claims.  The DIP Lender and Pre-Petition First Lien Lender have the right under the Bankruptcy Code, and were authorized by this Court pursuant to the Bidding Procedures, to credit bid any or all of such Credit Bid Claims, and were a Qualified Bidder with respect thereto, at the Auction.  At the Auction, pursuant to the Purchase Agreement, the Purchaser agreed to pay the Purchase Price, which includes the DIP Agreement Credit Bid Amount and the Pre-Petition Credit Bid Amount that are transferred to the Purchaser at the Closing Date.  Pursuant to the Purchase Agreement the Purchaser shall (i) submit a credit bid pursuant to section 363(k) of the Bankruptcy Code of the Credit Bid Claims in an amount equal to the DIP Agreement Credit Bid Amount and the Pre-Petition Credit Bid Amount (the "Credit Bid"), (ii) assume the Assumed Liabilities on the Closing Date, (iii) transfer cash (unless otherwise specified) to be paid by Purchaser into segregated escrow accounts (such

cash, the "Escrowed Funds") in an amount equal to the (a) Completion Fees, (b) Final

Professional Payment Amounts, (c) Mechanics Lien Amounts (it being understood that,

notwithstanding anything to the contrary in the Purchase Agreement or this Sale Order,

Purchaser may elect up to two (2) Business Days prior to the Closing, for any Purchased Asset

subject to any Lien securing any Mechanics Lien Claim as of the Closing Date to be conveyed

to Purchaser at the Closing subject to such Lien and, in such event, Purchaser shall have no

obligation under the Purchase Agreement to make any payment, or deposit into the Mechanics

Lien Escrow Account any amount in respect thereof and the Mechanics Lien Escrow Amount

shall be deemed to have been reduced accordingly for all purposes hereunder), (d) cash in the

amount of the Other Senior Liens Amounts to the extent that the Purchased Assets are

transferred free and clear of Liens securing the Other Senior Liens Claims (it being understood

that, notwithstanding anything to the contrary in the Purchase Agreement, Purchaser may elect

(1) after the entry of the Sale Order, following the receipt of the consent of the relevant party

to the Other Senior Liens Claim or (2) before the entry of the Sale Order in its discretion, for

any Purchased Asset subject to any Lien securing any Other Senior Liens Claim as of the

Closing Date to be conveyed to Purchaser at the Closing subject to such Lien and, in such

event, Purchaser shall have no obligation under this Sale Order or the Purchase Agreement to

make any payment, or deposit into the Other Senior Liens Escrow Account any amount, in

respect thereof and the Other Senior Liens Escrow Amount shall be deemed to have been

reduced accordingly for all purposes hereunder); (e) the Wind-Down Amount; and (iv) pay in

cash (a) the Tax Lien Amounts, (b) the MGI Purchase Price for the MGI Assets (if applicable),

and (c)  the Macquarie Payment Amount.  For the avoidance of doubt, the Escrowed Funds

shall not constitute property of the Debtors' estates (as defined in section 541 of the

Bankruptcy Code). The Purchased Assets constitute (i) collateral pledged in favor of the obligations owed on account of the Credit Bid Claims and (ii) MGI Assets which will be paid for in cash in an amount equal to the MGI Purchase Price.

L.    Court Approval Required. Entry of an order approving and authorizing the APA Sellers' entry into the Purchase Agreement and the APA Sellers' performance of all the provisions thereof is a necessary condition precedent to the Purchaser's consummation of the Sale Transaction.

M.    Business Judgment:    The Debtors' decisions to (i) enter into the Purchase Agreement and all ancillary documents (including the Intercompany License), and (ii) perform under and make payments, if any, required by such Purchase Agreement constitute reasonable exercises of the Debtors' sound business judgment consistent with their fiduciary duties and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest. Good and sufficient reasons for the approval of the Purchase Agreement and all ancillary documents (including the Intercompany License) have been demonstrated by the Debtors. The Debtors have established that compelling circumstances exist for the Sale Transaction outside (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the value of the Debtors' estates. To maximize the value of the Purchased Assets and preserve the viability of the business to which the Purchased Assets relate, it is essential that the Sale Transaction occur promptly.

N.    Time is of the Essence:  Time is of the essence to implement the Purchase Agreement and to consummate the Sale Transaction contemplated thereby without interruption.

Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale

Hearing and in the First Day Declaration, the Augustine Declaration, the Supplemental

Augustine Declaration and the [**other declarations filed in support of the sale**], the Sale

Transaction contemplated by the Purchase Agreement must be consummated as soon as

possible following entry of this Sale Order, and in any event by 3 business days after the

satisfaction or waiver of all closing conditions set forth in the Purchase Agreement, including

all necessary regulatory approvals, to maximize the value that the Purchaser may realize from

the Sale Transaction, and the value that the APA Sellers may realize from entering into the

Purchase Agreement.   Accordingly, cause exists to lift the stay to the extent necessary, as

contemplated by Bankruptcy Rules 4001(a) and 6004(h), and permit the immediate

effectiveness of this Sale Order.

   O. <u>Sale Free and Clear</u>:  Except for liabilities assumed by the Purchaser pursuant to

the Purchase Agreement, a sale of the Purchased Assets other than one free and clear of liens,

defenses (including rights of setoff and recoupment) and interests, in each case, in, on, or

related to the Purchased Assets, including security interests of whatever kind or nature,

mortgages, deeds of trust, conditional sales or title retention agreements, pledges, deeds of

trust, hypothecations, Liens, mechanics' liens, materialmen's liens, other consensual and non-

consensual liens, statutory liens, encumbrances, assignments, preferences, debts, easements,

liabilities, losses, penalties, leases, charges, offsets, contracts, options, rights of first refusal,

rights of first offer, rights of first sale, rights of notice, easements, servitudes, proxies, voting

trusts or agreements, transfer restrictions under any agreements, conditional sale or other title

retention agreements, recoupment, hypothecations, demands, guaranties, contractual

commitments, charges, suits, options, rights-of-recovery, judgments, orders and decrees of any

court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, sublicenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, Employee Retirement Income Security Act of 1974 ("ERISA"), Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq. ("CERCLA"), alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature in, on, or related to the Purchased Assets (including all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, direct or indirect, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable, including any and all such liabilities, causes of action, contract rights and claims arising out of the Debtors' continued operations following the Closing Date (collectively, the "Encumbrances") and without the protections of this Sale Order would hinder the APA Sellers' ability to obtain the consideration provided for in the Purchase Agreement and, thus, would impact materially and adversely the value that the APA Sellers' estates would be able to obtain for the sale of such Purchased Assets. But for the protections afforded to the Purchaser under the Bankruptcy Code and this Sale Order, the Purchaser would not have offered to pay the consideration contemplated in the Purchase Agreement. In addition, each entity with an Encumbrance (other than Permitted Encumbrances (as defined below)) upon the Purchased Assets, (i) has consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept

money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1) through (5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances (other than Permitted Encumbrances) who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those entities who did object fall within one or more of the subsections of section 363(f) of the Bankruptcy Code other than section 363(f)(2) of the Bankruptcy Code and are adequately protected by (i) with respect to any holders of a claim on the Mechanics Lien Escrow Amount, having their liens, if any, attach to the letters of credit or cash proceeds placed in the Mechanics Lien Escrow Account in accordance with the Purchase Agreement, with respect to any holders of a claim on the Professional Payment Escrow Amount, having their liens, if any, attach to the cash proceeds placed in the Professional Payment Escrow Account, and with respect to any holders of a claim on the Other Senior Liens Escrow Amount, having their liens, if any, attach to the cash proceeds placed in the Other Senior Lien Escrow Account; and (ii) with respect to all other Encumbrances (other than Permitted Encumbrances), if any, in each instance, against the APA Sellers, the APA Sellers' estates, or any of the Purchased Assets, attach to the remaining cash proceeds of the Sale Transaction ultimately attributable to the Purchased Assets in which such creditor alleges an interest in the same order of priority, with the same validity, force, and effect that such creditor had prior to the Sale Transaction, in each case, subject to any rights, claims and defenses the APA Sellers or the APA Sellers' estates, as applicable, may possess with respect thereto or as otherwise provided herein.  Therefore, approval of the Purchase Agreement and the consummation of the Sale Transaction free and clear of Encumbrances (other than (1) Assumed Liabilities and (2)

any Encumbrances described in items (i), (ii), (iv), (v), (viii) and (ix) of the definition of "Permitted Exceptions" in the Purchase Agreement that do not secure the payment of borrowed money or any Excluded Asset or Excluded Liability (together with the Assumed Liabilities, the "Permitted Encumbrances")) is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtors' estates, their creditors and other parties in interest.

P.      The recitation, in the immediately preceding paragraph of this Sale Order, of specific agreements, plans or statutes is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, commitments or obligations referred to as "Encumbrances" therein.

Q.      In addition to the foregoing, the Bankruptcy Court finds and concludes that the Purchased Assets may be sold to the Purchaser free and clear of any Encumbrances other than Permitted Encumbrances on the Purchased Assets.

R.      The Purchaser would not have entered into the Purchase Agreement and would not consummate the sale of Purchased Assets, thus adversely affecting the Debtors, their estates, creditors, employees and other parties in interest, if such sale was not free and clear of all Encumbrances (other than Permitted Encumbrances).  A sale of the Purchased Assets, other than one free and clear of all Encumbrances (other than Permitted Encumbrances), would yield substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

S.      Arm's-length Sale:  The consideration to be paid by the Purchaser under the Purchase Agreement was negotiated at arm's-length, is fair and adequate, constitutes reasonably equivalent value and fair and adequate consideration for the Purchased Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent

Conveyance Act, the Uniform Voidable Transactions Act, and the laws of the United States, any state, territory, possession thereof or the District of Columbia, and will provide a greater recovery for the APA Sellers and the APA Sellers' estates than would be provided by any other reasonably practicable available alternative. The terms and conditions set forth in the Purchase Agreement and all ancillary documents filed therewith (including the Intercompany License) are fair and reasonable under these circumstances and were not entered into with the intent to nor for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtors or their creditors under any applicable laws. None of the APA Sellers nor the Purchaser is entering into the Purchase Agreement and all ancillary documents filed therewith (including the Intercompany License) or proposing to consummate the Sale Transaction fraudulently, for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction.

T. <u>Good Faith</u>: The Debtors, their management and their boards of directors or equivalent governing bodies and the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser and their respective officers, directors, agents and representatives actively participated in the bidding process and respectively acted in good faith. The Purchase Agreement between the Purchaser and the APA Sellers was negotiated and entered into based upon arm's-length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code. The Purchaser is entering into the Sale Transaction in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and the court decisions applying or interpreting such provision, and is

therefore entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code with respect to all aspects of the transactions contemplated by the Purchase Agreement and all ancillary documents filed therewith (including the Intercompany License), including the acquisition of the Purchased Assets, and otherwise has proceeded in good faith in all respects in connection with this proceeding. The APA Sellers were free to deal with any other party interested in buying or selling on behalf of the APA Sellers' estates some or all of the Purchased Assets. Neither the APA Sellers nor the Purchaser have engaged in any conduct that would cause or permit the Sale Transaction, the Purchase Agreement and all ancillary documents filed therewith (including the Intercompany License), or any related action or the transactions contemplated thereby to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of the Bankruptcy Code. N e i t h e r the Purchaser nor any of its affiliates, officers, directors, members, partners, principals or shareholders (or equivalent) or any of their representatives, attorneys, successors or assigns have engaged in any conduct that would cause or permit the Purchase Agreement and all ancillary documents filed therewith (including the Intercompany License) or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. Specifically, neither the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender nor the Purchaser has acted in a collusive manner with any person or entity nor was its bidding or participation in the Auction controlled by any agreement among bidders. The Purchaser's prospective performance and payment of amounts owing under the Purchase Agreement will be undertaken in good faith and for valid business purposes and uses.

U.    <u>Insider Status</u>: Neither the DIP Agent, the DIP Lender, the Pre-Petition First

Lien Lender nor the Purchaser is an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling stockholders exists between (1) on the one hand, the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser, and (2) on the other hand, the Debtors.

V.     Corporate Authority:  The APA Sellers have (i) full corporate or other power and authority to execute and deliver the Purchase Agreement and each other agreement, document or instrument contemplated hereby and thereby to which an APA Seller is a party, and perform its respective obligations under the Purchase Agreement and all other transactions contemplated thereby, including the Sale Transaction, and the entry into, and delivery of, the Purchase Agreement and each other agreement, document or instrument contemplated hereby and thereby have been duly and validly authorized by all requisite corporate or similar actions on the part of each APA Seller, (ii) all of the corporate or other power and authority necessary to consummate all transactions contemplated hereby and thereby, including the Sale Transaction, and (iii) taken all actions necessary to authorize and approve the Purchase Agreement and each other agreement, document or instrument contemplated hereby and thereby to which an APA Seller is a party and all transactions contemplated hereby and thereby, including the Sale Transaction.   No consents or approvals, other than those expressly provided for herein or in the Purchase Agreement, are required for the APA Sellers to execute and deliver the Purchase Agreement and each other agreement, document or instrument contemplated hereby and thereby to which an APA Seller is a party or to consummate any transaction contemplated hereby and thereby, including the Sale Transaction. The Purchase Agreement and each other agreement, document or instrument filed therewith to which an APA Seller is a party constitutes legal, valid and binding obligations of each APA Seller

enforceable against such APA Seller and in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

W.    The Purchaser shall have no obligations with respect to any Encumbrances against or in respect of any of the Debtors or the Purchased Assets (other than Permitted Encumbrances).

X.    The consummation of the Sale Transaction and all transactions contemplated thereby are legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m) and 363(n) of the Bankruptcy Code.

Y.    The Purchased Assets constitute property of the APA Sellers' estates and title thereto is presently vested in the APA Sellers' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Sellers are the sole and rightful owners of the Purchased Assets, and no other person has any ownership right, title, or interest therein, subject to the following liens and claims:  (i) the liens and claims described in that certain *Final Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C.§§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C.§§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (5) Granting Related Relief* [Docket No. 479] (the "Final DIP Order")

and together with the Interim DIP Order[4], the "<u>DIP Orders</u>"), including the Pre-Petition First Lien Security Interests and the Senior Prior Liens (as defined in the Final DIP Order), as applicable; (ii) the secured credit facility by and among Macquarie Investments US Inc. and M&G Waters USA, LLC as described in the *Motion for Entry of Interim and Final Orders to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2; and (6) Grant Related Relief* [Docket No. 14]; and (iii) the liens of the Texas Tax Authority in respect of obligations secured by the Liens asserted against the CC Plant on account of the 2017 *ad valorem* property taxes assessed by the Texas Tax Authority. The sale of the Purchased Assets to the Purchaser will be, as of the Closing Date or such later date as such Purchased Assets are transferred under the Purchase Agreement, a legal, valid and effective transfer of such assets, and each transfer and assignment vests or will vest the Purchaser with all right, title and interest of the Sellers to the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances).

       Z.      All persons or entities which, presently or on or after the Closing Date, are in

---

[4] The Interim DIP Order shall mean that certain *Interim Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C.§§ 104, 362, 363 and 364;(2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C.§§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2; and (6) Grant Related Relief* [Docket No. 62].

possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date or at such time thereafter as the Purchaser may request or as otherwise ordered by the Bankruptcy Court.

AA. <u>Designation Rights</u>.  Pursuant to Section 2.5 and 2.6 of the Purchase Agreement, the Purchaser shall maintain certain rights to modify the list of Purchased Contracts after the date of this Sale Order up to the applicable Contract Designation Deadline as set forth in such sections.  Such modification rights include, but are not limited to, the right of the Purchaser, prior to the applicable Contract Designation Deadline, to designate certain Contracts for assumption by the Debtors and assignment to the Purchaser, or as an Excluded Asset pursuant to and subject to the terms of the Purchase Agreement.  The Purchaser would not have agreed to the transactions set forth in the Purchase Agreement without such modification rights.  The notice and opportunity to object provided to the contract counterparties to such Contracts and to other parties in interest, as set forth in the Bidding Procedures Order, the Bidding Procedures Modifications and the Purchase Agreement, fairly and reasonably protects any rights that such contract counterparties and other parties in interest may have with respect to such Contracts.  As set forth in the Purchase Agreement, after entry of this Order, Purchaser may designate a Contract as a Purchased Contract not previously so designated only if (1) it is not a Contract to be assumed or available to be assumed pursuant to any other sale previously approved by the Bankruptcy Court in connection with the Cases; and (2) it is designated prior to the entry of an Order of the Bankruptcy Court approving the rejection of such Contract, subject to the party to such Contract receiving information evidencing Purchaser's adequate assurance of future performance and having an opportunity to object within seven (7) days or such other period of time set forth in an Order of the

Bankruptcy Court of the receipt of such information to the assignment of such Contract on the ground that Purchaser has not demonstrated adequate assurance of future performance of such Contract pursuant to section 365 of the Bankruptcy Code.

BB.    <u>Assumption and Assignment of Contracts</u>:  The assumption and assignment of the Contracts that are scheduled as Purchased Contracts as set forth in the Purchase Agreement are an integral part of the Purchase Agreement and the schedule of Purchased Contracts set forth in the Purchase Agreement may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of this Court in accordance with the Purchase Agreement.  The assumption and assignment of the Contracts that are scheduled as Purchased Contracts does not constitute unfair discrimination, is in the best interests of the APA Sellers, their estates, their creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the APA Sellers.  Pursuant to the Bidding Procedures Order and the Bidding Procedures Modifications, contract counterparties to the Debtors' executory contracts and unexpired leases were required to file objections (each a "<u>Cure Objection</u>"), if any, to the Cure Amounts set out in Schedule 1 of the *Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale* ("<u>Assumption and Assignment Notice</u>") [Docket No. 537], in Exhibit A to the *Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale* ("<u>Supplemental Assumption and Assignment Notice</u>") [Docket No. 565] and in Exhibits A and B to the *Second Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale* ("<u>Second Supplemental Assumption and Assignment Notice</u>" [Docket No. 775], together with the *Assumption and Assignment Notice*

and *Supplemental Assumption and Assignment Notice*, the "Assumption and Assignment Notices") by no later than January 3, 2018, at 5:00 p.m. (prevailing Eastern Time) for counterparties named in the Assumption and Assignment Notice, January 4, 2018, at 5:00 p.m. (prevailing Eastern Time) for counterparties named in the Supplemental Assumption and Assignment Notice and February 1, 2018, at 5:00 p.m. (prevailing Eastern Time) for counterparties named in the Second Supplemental Assumption and Assignment Notice, or, in each case, as otherwise agreed by the Debtors or permitted by the Court. The Assumption and Assignment Notices, the Bidding Procedures Order and the Bidding Procedures Modifications provided that in the absence of a timely filed Cure Objection, the Cure Amounts set forth in the applicable Assumption and Assignment Notices would be controlling and will be the only amount necessary to cure outstanding defaults under Proposed Assumed Contracts (as defined in the Bidding Procedures) under section 365(b) of the Bankruptcy Code, notwithstanding anything to the contrary in any Proposed Assumed Contract, or any other document, and the contract counterparty shall be deemed to have consented to the Cure Amounts set forth in the Assumption and Assignment Notices.

CC.     The APA Sellers have met all requirements of section 365(b) of the Bankruptcy Code for each of the Contracts that are scheduled as Purchased Contracts. Pursuant to the Purchase Agreement, the Sellers, and, solely with respect to the assumed Cure Amounts, the Purchaser, has (i) cured any default existing prior to the assignment of the Contracts that are scheduled as Purchased Contracts to the Purchaser in accordance with the terms of the Purchase Agreement, under each of the Contracts that are scheduled as Purchased Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary

loss to such party resulting from a default prior to the assignment of any of the Contracts that are scheduled as Purchased Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. Each of the Contracts that are scheduled as Purchased Contracts shall be assumed and assigned to the Purchaser free and clear of all Encumbrances (other than the Permitted Encumbrances) against the Purchaser.

DD.    The Purchaser has demonstrated adequate assurance of its future performance under each Contract scheduled as a Purchased Contract within the meaning of section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. If, after entry of this Order, Purchaser designates a Contract as a Purchased Contract not previously so designated, Purchaser shall be required to demonstrate adequate assurance of its future performance with respect to such newly designated Purchased Contracts in accordance with this Order, including Paragraph AA of this Order. Pursuant to section 365(f) of the Bankruptcy Code, the Contracts scheduled as Purchased Contracts to be assumed and assigned under the Purchase Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in the Contracts scheduled as Purchased Contracts or other restrictions prohibiting their assignment or transfer. Pursuant to the Bidding Procedures Order and the Bidding Procedures Modifications, contract counterparties to the Sellers' executory contracts were required to file objections (each an "Adequate Assurance Objection"), if any, to the proposed form of adequate assurance of future performance with respect to such contract as set out in the Assumption and Assignment Notices by no later than March 21, 2018, at noon (prevailing Eastern Time) with respect to the sale of any other Assets (other than Apple Grove Assets previously sold separately) and any Residual Apple Grove Assets (each, as defined in the Bidding Procedures). The Assumption and Assignment Notices, the Bidding Procedures

Order and the Bidding Procedures Modifications provided that in the absence of a timely filed Adequate Assurance Objection, the counterparty would be deemed to have consented to the assumption and assignment of the applicable Proposed Assumed Contract and adequate assurance of future performance in connection therewith to the Purchaser, and, unless the Bankruptcy Court orders otherwise, forever shall be barred from asserting any objection with regard to such assumption and assignment (unless the counterparty has filed a timely Cure Objection with respect to the Proposed Assumed Contract) or adequate assurance of future performance in connection therewith or any claims related to such Proposed Assumed Contract against the Debtors or the Purchaser or their respective property. The Assumption and Assignment Notices, the Bidding Procedures Order and the Bidding Procedures Modifications also provided that in the absence of a timely filed Adequate Assurance Objection, the Purchaser shall be deemed to have provided adequate assurance of future performance with respect to the applicable Proposed Assumed Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code, notwithstanding anything to the contrary in the Proposed Assumed Contract, or any other document.

EE.     No monetary or non-monetary defaults exist in the APA Sellers' performance under the Contracts scheduled as Purchased Contracts as of the date of this Sale Order other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code. In accordance with the terms set forth in the Purchase Agreement and this Sale Order, the Purchaser shall pay the Cure Amounts for each of the Contracts scheduled as Purchased Contracts.

FF.     <u>No Successor Liability</u>:    No sale, transfer or other disposition of the Purchased Assets pursuant to the Purchase Agreement or entry into the Purchase Agreement will subject

the Purchaser to any liability for claims, obligations or Encumbrances asserted against the APA Sellers' or the APA Sellers' interests in such Purchased Assets by reason of such transfer under any laws, including any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories. By virtue of the consummation of the Sale Transaction contemplated by the Purchase Agreement, (i) the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser are not a continuation of the Debtors and their respective estates, there is no continuity or continuity of enterprise between the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser and the Debtors, and there is no common identity between the Debtors and the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser, (ii) the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser are not holding themselves out to the public as a continuation of the Debtors or their respective estates and (iii) the Sale Transaction does not amount to a consolidation, merger or *de facto* merger of the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser and the Debtors and/or the Debtors' estates. Accordingly, the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser are not and shall not be deemed a successor to the Debtors or their respective estates as a result of the consummation of the Sale Transaction contemplated by the Purchase Agreement.

GG.    No Sub Rosa Plan:   Entry into the Purchase Agreement and the transactions contemplated thereby neither impermissibly restructure the rights of the Debtors' creditors, nor impermissibly dictate the terms of a chapter 11 plan of reorganization for the Debtors. Entry into the Purchase Agreement does not constitute a sub rosa chapter 11 plan.

HH.    No Third Party Beneficiaries.  Other than as expressly set forth in the Purchase

Agreement, nothing in the Purchase Agreement creates any third party beneficiary rights in any entity not a party to the Purchase Agreement.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:[5]

## A.   Motion Granted, Objections Overruled

1.    The relief requested in the Motion is GRANTED as set forth herein.  Any remaining objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections are overruled on the merits with prejudice and denied.  All parties and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein.

2.    This Court's findings of fact and conclusions of law in the Bidding Procedures Order, the Bidding Procedures Modifications and the record of the Bidding Procedures Hearing are incorporated herein by reference.

## B.   The Purchase Agreement Is Approved and Authorized

3.    The Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License) are approved, including the Credit Bid pursuant to section 363(k) of the Bankruptcy Code of the DIP Agreement Credit Bid Amount and the Pre-Petition Credit Bid Amount, pursuant to sections 105 and 363 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules.  The APA Sellers are hereby authorized and directed to perform under the Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License) (and each of the transactions contemplated thereby is hereby approved in its entirety and is incorporated

---

[5]    To the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*.

herein by reference).  The failure to include specifically any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Purchase Agreement, and all of its provisions and the payments and transactions provided for therein shall be authorized and approved in their entirety.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

4.     Subject to the provisions of this Sale Order, the APA Sellers and the Purchaser are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to consummate the Sale Transaction in accordance with the Purchase Agreement and all ancillary documents filed therewith or described therein (including the Intercompany License).

5.     Pursuant to section 363(b) of the Bankruptcy Code, and without any further corporate action or orders of this Court, the APA Sellers, the Purchaser and each of their respective officers, employees and agents are hereby authorized and directed to fully perform under, consummate and implement the terms of the Purchase Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Purchase Agreement (including the Intercompany License), this Sale Order and the Sale Transaction.

6.     The APA Sellers are hereby authorized and directed to instruct an escrow agent to (a) hold the Good Faith Deposit funded by the Purchaser as the Successful Bidder in accordance with the Purchase Agreement and release and deliver such Good Faith Deposit pursuant to the terms of such Purchase Agreement, and (b) hold the Good Faith Deposit (as increased by the Incremental Deposit Amount (as defined in the Bidding Procedures), if applicable) funded by any Backup Bidder, in accordance with the Bidding Procedures, and

release and deliver such Good Faith Deposit upon the earlier of (i) three business days after the closing of a Sale Transaction with the Purchaser for the applicable Purchased Assets and (ii) 75 days after the date of the Sale Hearing.

## C.    Sale and Transfer Free and Clear of Encumbrances

7.      Upon the Closing Date, all of the APA Sellers' legal, equitable and beneficial right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in the Purchaser pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code free and clear of Encumbrances (other than Permitted Encumbrances); provided, however, that (a) the cash proceeds of the Sale Transaction shall be applied as set forth herein and, as set forth in the Purchase Agreement, deposited in the applicable escrow accounts and (b) thereafter, all remaining Encumbrances[6] shall attach to the applicable escrowed cash proceeds of the Sale Transaction in the order of their priority, with the same validity, force and effect that they now have against the Purchased Assets (subject with respect to such cash proceeds to any rights, claims and defenses the APA Sellers or any parties in interest may possess with respect thereto) to the extent such Encumbrances have rights in such escrowed cash proceeds pursuant to the Purchase Agreement.  On the Closing Date, this Sale Order shall be considered, and constitute for any and all purposes, a legal, valid, binding, effective and complete general assignment, conveyance and transfer of the Purchased Assets and a bill of sale or assignment transferring

---

[6]      For the avoidance of doubt, Encumbrances include obligations secured by the liens asserted against the Corpus Christi Plant and other property sold pursuant to the Purchase Agreement on account of the 2017 and 2018 ad valorem property taxes assessed by the taxing authorities of Nueces County, Harris County and Hopkins County, all in the state of Texas (the "Texas Tax Authority"), to the extent that such liens are determined to be valid and are not otherwise satisfied pursuant to the Purchase Agreement.  The claims and liens of the Texas Tax Authority shall remain subject to any objections any party, including but not limited to the Debtors, would otherwise be entitled to raise as to the priority, validity, extent or amount of such liens or claims.

indefeasible title in the Purchased Assets to the Purchaser and shall vest the Purchaser with good and marketable title to the Purchased Assets.

8. The amount of cash placed in the Completion Fees Escrow Account by the Purchaser on the Closing Date shall be equal to the Completion Fees Escrow Amount and shall be deposited in accordance with Section 3.4(b) of the Purchase Agreement. Promptly and in no event later than three (3) Business Days following the applicable Final Order having been entered by the Bankruptcy Court approving payment of any Completion Fees, the applicable Person authorized under the Escrow Agreement shall instruct the Escrow Agent (with at least 1 Business Days' notice to the Purchaser) to release from the Completion Fees Escrow Account to the approved recipient an amount in cash equal to the approved Completion Fees. Promptly and in no event later than three (3) Business Days following the final resolution and payment of all Completion Fees, Primary Seller and the Purchaser shall jointly instruct the Escrow Agent to release from the Completion Fees Escrow Account to the Purchaser an amount in cash equal to the balance, if any, then remaining in the Completion Fees Escrow Account. For the avoidance of doubt, no funds deposited in the Completion Fees Escrow Account shall constitute property of the Debtors' estates (as defined in section 541 of the Bankruptcy Code) or be used for the payment of Professional Payment Amounts. For the further avoidance of doubt, and notwithstanding anything in this Sale Order or the Purchase Agreement to the contrary, in no event shall the Purchaser be responsible for any Completion Fees in excess of the funds available in the Completion Fees Escrow Account. Any holder of an asserted claim of Completion Fees shall not assert any further claims against the Purchaser or the Purchased Assets with respect to such amounts and rather shall assert such claim only against the amounts in the Completion Fees Escrow Account or against the Debtors' estates. This Court shall have

exclusive jurisdiction over any dispute as to the amount and priority of any claim on the Completion Fees Escrow Account until the Completion Fees Escrow Account is exhausted.

9. The amount of cash placed in the Professional Payment Escrow Account by the Purchaser on the Closing Date shall be equal to the Professional Payment Escrow Amount and shall be deposited in accordance with Section 3.4(c) of the Purchase Agreement. Promptly and in no event later than the earlier of (a) three (3) Business Days following the applicable Final Order having been entered by the Bankruptcy Court approving payment of any Final Professional Payment Amount and (b) one (1) Business Day after the applicable APA Seller's or Professional's filing of a certificate of counsel or certificate of no objection in accordance with paragraph 2(c) of the Interim Compensation Order with respect to the applicable Monthly Fee Application (as defined in the Interim Compensation Order) pertaining to any Professional Payment Amount, the applicable Person authorized under the Escrow Agreement shall instruct the Escrow Agent (with notice to the Purchaser) to release from the Professional Payment Escrow Account to such Professional an amount in cash equal to (1) such Final Professional Payment Amount or (2) the applicable Professional Payment Amount released in accordance with a certificate of counsel or certificate of no objection in accordance with paragraph 2(c) of the Interim Compensation Order, as applicable. Promptly and in no event later than three (3) Business Days following the final resolution and payment of all Professional Payment Amounts to all applicable Professionals, Primary Seller and the Purchaser shall jointly instruct the Escrow Agent to release from the Professional Payment Escrow Account to the Purchaser an amount in cash equal to the balance, if any, then remaining in the Professional Payment Escrow Account. The APA Sellers and the Purchaser shall be entitled to request a hearing and entry of an order of the Court to compel the turnover of any amounts released from the Professional

Payment Escrow Account that are not actually used by the applicable recipient to satisfy Professional Payment Amounts or that are otherwise thereafter determined to have been improperly paid.  Any amounts released from the Professional Payment Escrow Account pursuant to clause (a) of the second sentence of this paragraph not actually used to satisfy approved Professional Payment Amounts or otherwise thereafter determined to have been improperly paid, shall be to be transferred to Purchaser.  To the extent that the Bankruptcy Court enters a Final Order with respect to a final fee application of a Professional that reduces, or directs the disgorgement of, any excess Professional Payment Amount paid from the Professional Payment Escrow Account to such Professional, such excess amount shall be returned to the Professional Payment Escrow Account or, in the event the Professional Payment Escrow Account has been settled or terminated, to Purchaser.  For the avoidance of doubt, no funds deposited in the Professional Payment Escrow Account shall constitute property of the Debtors' estates (as defined in section 541 of the Bankruptcy Code) or be used for the payment of Completion Fees.  For the further avoidance of doubt, and notwithstanding anything in this Sale Order or the Purchase Agreement to the contrary, in no event shall the Purchaser be responsible for any Professional Payment Amounts in excess of the funds available in the Professional Payment Escrow Account.  Any holder of an asserted claim of Professional Payment Amounts shall not assert any further claims against the Purchaser or the Purchased Assets with respect to such amounts and rather shall assert such claim only against the amounts in the Professional Payment Escrow Account or against the Debtors' estates.  This Court shall have exclusive jurisdiction over any dispute as to the amount and priority of any claim on the Professional Payment Escrow Account until the Professional Payment Escrow Account is exhausted.

10.     The amount of the letters of credit or cash placed in the Mechanics Lien Escrow Account by the Purchaser on the Closing Date shall be equal to the Mechanics Lien Escrow Amount and shall be deposited in accordance with Section 3.4(d) of the Purchase Agreement. APA Sellers and Purchaser shall comply with the Mechanics Lien Escrow Procedures and the Purchaser shall instruct the Escrow Agent in accordance therewith to release from the Mechanics Lien Escrow Account (a) to the relevant holder of the applicable Mechanics Lien Claim, the amount instructed to be released in such instructions and (b) to Purchaser, the amount instructed to be released to Purchaser in such instructions; provided, however, that an amount equal to 5% of the amount that Purchaser would otherwise be entitled to receive pursuant to the foregoing clause (b) shall instead be deposited by the Escrow Agent into the Wind-Down Escrow Account, which deposit shall be in addition to the Wind-Down Escrow Amount; provided, further that the aggregate amount of all deposits into the Wind-Down Escrow Account following the initial deposit of the Wind-Down Escrow Amount shall not exceed $2 million (the amounts withheld from each payment from the Mechanics Lien Escrow Account to the Purchaser and deposited into the Wind-Down Escrow Account, subject to such aggregate cap, the "Additional Cash Payment Amount").  Nothing in the Purchase Agreement or the Sale Order shall restrict the Purchaser from seeking relief from the Bankruptcy Court upon a motion with notice to all of the remaining holders of Mechanics Lien Claims subject to the Mechanics Lien Escrow Account to reduce the remaining amount then being held in the Mechanics Lien Escrow Account from time to time to account for the then unresolved Mechanics Lien Claims, provided that such request shall be consistent with the terms of the Mechanics Lien Escrow Procedures.  In the event that the Bankruptcy Court shall enter any Final Order reducing the amount then required to be held in the Mechanics Lien Escrow

Account, the Purchaser shall instruct the Escrow Agent to release from the Mechanics Lien Escrow Account to (a) the Purchaser, an amount in cash equal to the amount of such reduction less an amount in cash equal to the applicable Additional Cash Payment Amount and (b) to the Wind-Down Escrow Account, an amount in cash equal to the applicable Additional Cash Payment Amount.  Promptly and in no event later than three (3) Business Days following the final resolution of all Mechanics Lien Claims the Purchaser shall instruct the Escrow Agent to release from the Mechanics Lien Escrow Account to the Purchaser an amount in cash equal to the balance, if any, then remaining in the Mechanics Lien Escrow Account.  Any amounts released from the Mechanics Lien Escrow Account pursuant to  this paragraph not actually used to satisfy Mechanics Lien Claims or otherwise thereafter determined to have been improperly paid, shall be for the account of the Purchaser (subject to reduction of such amounts in respect of any Additional Cash Payment Amount, which Additional Cash Payment Amount shall be for the account of the Wind-Down Escrow Account (and in addition to the Wind-Down Escrow Amount)).  For the avoidance of doubt, and notwithstanding anything in this Sale Order or the Purchase Agreement to the contrary, in no event shall the Purchaser be responsible for any Mechanics Lien Claims or Mechanics Lien Amounts in excess of the funds available in the Mechanics Lien Escrow Account.  The Purchaser, the APA Sellers and any claimant of Mechanic Liens Claims shall make a good faith effort to resolve all disputes with respect to the amount and/or priority of any asserted claims of Mechanics Lien Amounts as promptly as practicable.  Any holder of an asserted claim of Mechanics Lien Amounts shall not assert any further claims against the Purchaser or the Purchased Assets with respect to such amounts and rather shall assert such claim only against the amounts in the Mechanics Lien Accounts which shall be deemed to be sufficient in amount to satisfy any Mechanics Lien Claims.  This Court

shall have exclusive jurisdiction over any dispute as to the amount and priority of any claim on the Mechanics Lien Escrow Account until the Mechanics Lien Escrow Account is exhausted. The Mechanics Lien Escrow Account shall apply solely to Mechanics Lien Claims with respect to which (a) the Debtors' applicable assets are sold free and clear pursuant to section 363(f) of the Bankruptcy Code and (b) any underlying contract is not assumed and assigned by the Debtors in connection with any such sale pursuant to section 365 of the Bankruptcy Code.

11. Effective as of the Closing, the Purchaser shall have the right to litigate, object to, seek disallowance of and/or settle the amount of any Mechanics Liens Claims and the validity, priority and extent of any Liens in respect of such Mechanics Lien Claims and shall be entitled to assert all defenses and counterclaims against any Mechanics Lien Claims and the Liens in respect of such Mechanics Lien Claims that belonged to the Debtors prior to the Sale Transaction, which actions shall be pursued in accordance with the Mechanics Lien Escrow Procedures. For the avoidance of doubt, from and after Closing, the Debtors shall have no obligation to initiate litigation, contest, resolve or settle any Mechanics Lien Claims. With respect to any Mechanics Lien Claims and Assumed Liabilities, in order for the Purchaser to pursue any and all available defenses and objections to any such Claims and Assumed Liabilities, at the Purchaser's request, Sellers shall enter into a common interest agreement with the Purchaser and provide reasonable access to APA Sellers' legal counsels and other outside advisors and their workpapers (only to the extent that funds are available in the Wind-Down Escrow Account to compensate such legal counsels and other outside advisors or such counsel and other advisors have otherwise entered into different compensation arrangements with the Purchaser). If Purchaser elects to take any action in accordance with this paragraph, the Purchaser shall be solely responsible for the fees of such legal counsels and other outside

advisors in connection with such actions.

12.     The amount of cash placed in the Other Senior Liens Escrow Account by the Purchaser on the Closing Date shall be equal to the Other Senior Liens Escrow Amount and shall be deposited in accordance with Section 3.4(e) of the Purchase Agreement.  Promptly and in no event later than three (3) Business Days following the resolution of any Other Senior Liens Claim and a Final Order having been entered by the Bankruptcy Court approving payment of the applicable Other Senior Liens Amount in respect thereof, Primary Seller and the Purchaser shall jointly instruct the Escrow Agent to release from the Other Senior Liens Escrow Account (a) to the approved recipient thereof, an amount in cash equal to such Other Senior Liens Amount and (b) if reserve amounts shall have been so established in respect of the Other Senior Liens Claims, to the Purchaser, an amount in cash equal to the amount, if any, by which the individual reserve amount initially approved by the Bankruptcy Court in respect of such Other Senior Liens Claim exceeds the applicable Other Senior Liens Amount.  Promptly and in no event later than three (3) Business Days following a Final Order having been entered by the Bankruptcy Court disallowing any Other Senior Liens Claim, if reserve amounts shall have been so established in respect of the Other Senior Liens Claims, Primary Seller and the Purchaser shall jointly instruct the Escrow Agent to release from the Other Senior Liens Escrow Account to the Purchaser an amount in cash equal to the individual reserve amount initially approved by the Bankruptcy Court in respect of such Other Senior Liens Claim.  Nothing in the Purchase Agreement shall restrict the Purchaser from seeking relief from the Bankruptcy Court to reduce the amount then being held in the Other Senior Liens Escrow Account from time to time to account for the then unresolved Other Senior Liens Claims and, in the event that the Bankruptcy Court shall enter any Final Order reducing the amount then required to be held in

the Other Senior Liens Escrow Account, Primary Seller and the Purchaser shall jointly instruct the Escrow Agent to release from the Other Senior Liens Escrow Account to the Purchaser an amount in cash equal to the amount of such reduction. Promptly and in no event later than three (3) Business Days following the final resolution of all Other Senior Liens Claims, Primary Seller and the Purchaser shall jointly instruct the Escrow Agent to release from the Other Senior Liens Escrow Account to the Purchaser an amount in cash equal to the balance, if any, then remaining in the Other Senior Liens Escrow Account. Any amounts released from the Other Senior Lien Escrow Account pursuant to clause (a) of the second sentence of this paragraph not actually used to satisfy Other Senior Liens Claims or otherwise thereafter determined to have been improperly paid, shall be for the account of Purchaser. For the avoidance of doubt, and notwithstanding anything in this Sale Order or the Purchase Agreement to the contrary, in no event shall the Purchaser be responsible for any Other Senior Liens Claims or Other Senior Liens Amounts in excess of the funds available in the Other Senior Liens Escrow Account. The Purchaser, the APA Sellers and any claimant of Other Senior Liens Amounts shall make a good faith effort to resolve all disputes with respect to the amount and/or priority of any asserted claims of Other Senior Liens Amounts as promptly as practicable. Any holder of an asserted claim of Other Senior Liens Amounts shall not assert any further claims against the Purchaser or the Purchased Assets with respect to such amounts and rather shall assert such claim only against the amounts in the Other Senior Liens Escrow Accounts. This Court shall have exclusive jurisdiction over any dispute as to the amount and priority of any claim on the Other Senior Liens Escrow Account until the Other Senior Liens Escrow Account is exhausted.

13. From and after Closing, Primary Seller shall have the right to instruct the Escrow Agent (with notice to the Purchaser) to release cash from the Wind-Down Escrow Account to

such Seller and Sellers shall use such funds solely for the purpose of making payments in connection with performance of their respective obligations pursuant to the Purchase Agreement, including pursuant to Sections 2.5(a), 2.5(c), 2.5(e), 2.6, 8.12, 8.15, 11.4 of the Purchase Agreement, administering the Bankruptcy Cases pending the wind-down of the Seller's estates  and the winding down of the Debtors' estates and making related payments through the conclusion of the Bankruptcy Cases.  In the event any Wind-Down Amount released from the Wind-Down Escrow Account is ultimately determined by Order of this Court to be unauthorized, the applicable Seller shall, no later than three (3) Business Days after the entry of such Order, repay to Purchaser such amount.  Promptly and in no event later than three (3) Business Days following the wind-down of the Debtors' estates and conclusion of these Cases, Primary Seller and the Purchaser shall jointly instruct the Escrow Agent to release from the Wind-Down Escrow Account to Purchaser an amount in cash equal to the balance, if any, then remaining in the Wind-Down Escrow Account.  For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, but subject to the Sale Order, in no event shall Purchaser be responsible for any Wind-Down Amounts in excess of the funds available in the Wind-Down Escrow Account.

14.     From and after the earlier of the date that (i) Primary Seller shall liquidate or otherwise cease to exist or (ii) Primary Seller's Bankruptcy Case(s) shall convert into case(s) under chapter 7 of the Bankruptcy Code, any instructions to the Escrow Agent otherwise required to be issued jointly by Primary Seller and Purchaser shall instead be issued by Purchaser alone.  In addition, from and after the date that Primary Seller's Bankruptcy Case(s) shall convert into case(s) under chapter 7 of the Bankruptcy Code, any instructions to the Escrow Agent in respect of the Wind-Down Escrow Account otherwise required to be issued (i)

by Primary Seller alone, shall instead be issued by the applicable trustee alone and (ii) jointly by Primary Seller and Purchaser, shall instead be issued jointly by Purchaser and the applicable trustee. The other terms and conditions governing the Completion Fees Escrow Account, Professional Payment Escrow Account, Mechanics Lien Escrow Account, Other Senior Liens Escrow Account and Wind-Down Escrow Account shall be governed by the Escrow Agreement. Purchaser and APA Sellers agree to negotiate in good faith the terms and conditions of the Escrow Agreement prior to the Closing, the terms of which shall be consistent with Sections 3.4 and 3.5 of the Purchase Agreement.

15. The holders of claims related solely to the Permitted Encumbrances shall have the right to seek payment directly from the Purchaser on account of the Permitted Encumbrances; provided, however, that the Purchaser reserves any and all rights, defenses and objections with regard to such Permitted Encumbrances and Assumed Liabilities, including the Purchaser's rights hereunder and under the Purchase Agreement.

**D. Order Binding**

16. All (i) entities, including all filing agents, filing officers, title agents, title companies or title agents, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state and local officials, and (ii) other persons, in each case, who may be required by operation of law, the duties of their office, or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets, shall be authorized and directed to take any such actions in connection with the Sale Transaction or this Sale Order, and this Sale Order shall be binding upon such entities or persons. All entities or persons described in this paragraph are authorized and specifically directed to strike all recorded Encumbrances (other than Permitted

Encumbrances) against the Purchased Assets from their records, official and otherwise.

17.     On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the APA Sellers' interests in the Purchased Assets.  This Sale Order is and shall be effective as a determination that, on the Closing Date, pursuant to section 363(f) of the Bankruptcy Code and the provisions of this Order, the Purchased Assets will be sold "free and clear" of any interest existing in the Purchased Assets prior to the Closing Date other than the Permitted Encumbrances, and that the conveyances described herein have been effected; provided, however, that, for the avoidance of doubt, any claims with respect to the Mechanics Lien Amounts or the Other Senior Liens Amounts shall attach to the letters of credit or cash proceeds placed in the Mechanics Lien Escrow Account or the cash proceeds placed in the Other Senior Liens Escrow Account, as applicable, and such claims against the Debtors shall not be discharged, released, terminated and/or cancelled until paid (including in an amount as may be consensually agreed), and any other claims and interests shall attach to any remaining cash proceeds of the Sale Transaction in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets.

18.     By the execution of any document or the taking of any action in furtherance of the Sale Transaction, the DIP Agent shall not be deemed to have assumed any possession, title, control, liability or obligation with respect to or over any of the Purchased Assets or any liability or obligation in respect of any of the Permitted Encumbrances or under the Purchase Agreement, except as expressly contemplated in the Purchase Agreement with respect to any extension of or related modification to the Debtors' DIP Loan Agreement (as defined in the Final DIP Order).

19.     This Sale Order and the terms and provisions of the Purchase Agreement shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, the Purchaser, and each of their respective affiliates, successors and assigns, and any affected third parties, including all persons asserting an interest in the Purchased Assets, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or other fiduciary, such terms and provisions likewise shall be binding. The provisions of this Sale Order and the terms and provisions of the Purchase Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order, which may be entered (a) confirming or consummating any plan(s) of the Debtors, (b) converting these Cases from chapter 11 to chapter 7 of the Bankruptcy Code, (c) dismissing these Cases, or (d) pursuant to which this Court abstains from hearing these Cases; and the terms and provisions of this Sale Order and the Purchase Agreement, as well as the rights and interests granted pursuant to this Sale Order and the Purchase Agreement, shall continue in these or any superseding cases and shall be binding upon the Debtors, the Purchaser and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed in these Cases shall be and hereby is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Sale Order and the Purchase Agreement, and the Purchaser and the trustee shall be and hereby are authorized to perform under the Purchase Agreement upon the appointment of such trustee without the need for further order of this Court.

20.     Except with respect to the Permitted Encumbrances, all persons and entities (and

their respective successors and assigns), including all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Encumbrances arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the ownership, sale or operation of the Purchased Assets and the Business prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser are hereby forever barred, estopped and permanently enjoined from asserting such Encumbrances against the Purchaser or the Purchased Assets, including the following: (a) commencing or continuing in any manner any action or other proceeding in respect of an Encumbrance against the Purchaser or the Purchased Assets; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order in respect of an Encumbrance against the Purchaser or the Purchased Assets; (c) creating, perfecting, or enforcing any claims and interests in respect of an Encumbrance against the Purchaser or the Purchased Assets; (d) asserting any setoff, right of subrogation or recoupment of any kind in respect of an Encumbrance against any obligation due the Purchaser or the Purchased Assets; (e) commencing or continuing any action in respect of an Encumbrance, in any manner or place, that does not comply with or is inconsistent with the provisions of this Sale Order, other orders of the Bankruptcy Court, or the Purchase Agreement or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets, except to the extent any such entity is a governmental unit[7] authorized to take such action under

---

[7] As used in this Order, the term "governmental unit" shall have the meaning given to it in sections 101(27) and 101(41) of the Bankruptcy Code.

applicable non-bankruptcy law.

21. This Sale Order shall be effective as a determination that all Encumbrances, other than to the extent set forth in this Sale Order or the Purchase Agreement, shall be and are without further action by any Person released with respect to the Purchased Assets as of the Closing Date. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Encumbrances against or in the Purchased Assets shall not have delivered to the APA Sellers prior to the Closing Date of the Sale Transaction in proper form for filing and executed by the appropriate parties termination statements or instruments of satisfaction or release of all Encumbrances that such person or entity has with respect to such Purchased Assets, then only with regard to the Purchased Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and this Sale Order, (a) the APA Sellers are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets that are necessary or appropriate to effectuate the Sale Transaction, any related agreements and this Sale Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the APA Sellers may determine are necessary or appropriate and (b) the Purchaser is hereby authorized and empowered to cause to be filed, registered or otherwise recorded a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against the Purchaser and the Purchased Assets of any kind or nature (except as otherwise assumed under, or permitted by, the Purchase

Agreement); provided that, notwithstanding anything in this Sale Order or the Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order or the Purchase Agreement. For the avoidance of doubt, upon consummation of the Sale Transaction as set forth in the Purchase Agreement, the Purchaser is authorized to file termination statements, lien terminations and releases or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Sale Order under section 363 and the related provisions of the Bankruptcy Code. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

**E.     Good Faith**

22.     Neither the Debtors nor the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender or the Purchaser has engaged in any action or inaction that would cause or permit the Sale Transaction to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. Entry into the Purchase Agreement is undertaken by the parties thereto, without collusion and in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser shall be entitled to all of the benefits of and protections under sections 363(m) and 364(e) of the Bankruptcy Code. The reversal or modification on appeal of the authorization provided herein to enter into the Purchase Agreement and consummate the Sale Transaction shall not affect the validity of such Sale Transaction, unless such authorization is duly

stayed pending such appeal. The Sale Transaction is not subject to avoidance pursuant to section 363(n) or chapter 5 of the Bankruptcy Code and the Purchaser is entitled to all the protections and immunities thereunder.

**F.      No Successor or Transferee Liability**

23.      The DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser shall not be deemed, as a result of any action taken in connection with the Purchase Agreement, the consummation of the Sale Transaction, or the transfer, operation or use of the Purchased Assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Purchaser, with respect to any obligations arising after the Closing Date as an assignee under the Contracts scheduled as Purchased Contracts); (b) have, *de facto* or otherwise, merged with or into any Debtor; or (c) be an alter ego or a mere continuation or substantial continuation or successor in any respect of the APA Sellers, including within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to any Debtor's liability under such law, rule or regulation or doctrine.

24.      The Purchaser shall have no liability whatsoever with respect to any Debtor's (or their predecessors or affiliates) respective businesses or operations or any Debtor's (or their predecessors' or affiliates') obligations (as described below, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of labor law, employment law, ERISA and benefits law, antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed

or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction, or any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets or the Business prior to the Closing Date or such later time as the Purchaser is assigned and assumes any Contract scheduled as a Purchased Contract. Except as set forth in the Purchase Agreement, the Purchaser shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.), CERCLA or any foreign, federal, state or local labor, employment or environmental law, whether of similar import or otherwise, by virtue of the Purchaser's purchase of the Purchased Assets subject to the Permitted Encumbrances and assumption of the Assumed Liabilities.

25. The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the holders of any Encumbrance. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of Successor or Transferee Liability of the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser, which releases shall be deemed to have been given in favor of the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser by all holders of any Encumbrance.

26. Except as expressly provided in the Purchase Agreement with respect to the Permitted Encumbrances, nothing in this Sale Order or the Purchase Agreement shall require the Purchaser to (a) continue or maintain in effect, or assume any liability in respect of any employment, pension, welfare, collective bargaining, fringe benefit or any other benefit plan, trust arrangement or other agreements, arrangements or policies which any Debtor or any of their affiliates sponsor, maintain, administer, contribute to or have any responsibility for,

including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment, (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, policy, arrangement or agreement (including pension plans) or the termination of any such plan, arrangement or agreement or (c) assume any liability in respect of any employees, directors or independent contractors of any Debtor or any of their respective affiliates.

27.     Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, its assets (including the Purchased Assets) or any of its successors or assigns, with respect to any (a) Encumbrance or (b) Successor or Transferee Liability, including the following actions with respect to clauses (a) and (b):  (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets, except to the extent any such

entity is a governmental unit[8] authorized to take such action under applicable non-bankruptcy law.

28.     Notwithstanding anything in this Sale Order or Agreement, nothing contained in this Sale Order or the Agreement (a) releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) that any entity would be subject to as the owner or operator of the assets transferred pursuant to the Agreement after the date of entry of this Sale Order; provided, however, that the foregoing shall not limit, diminish or otherwise alter any Debtor's, the DIP Agent's, the DIP Lender's, the Pre-Petition First Lien Lender's, or the Purchaser's, as applicable, defenses, claims, causes of action, or other rights under applicable non-bankruptcy law with respect to any liability that may exist to a governmental unit at such owned or operated property; (b) shall be construed to create for any governmental unit any substantive right that does not already exist under applicable law or (c) authorizes the transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law governing such transfer or assignment; provided that, notwithstanding the foregoing, nothing herein shall be construed to permit a governmental unit to assert, assess or obtain penalties, fines, or other fees from the Purchaser for violations of any such requirement that occurred prior to the Closing Date as a result of the operation of the Purchased Assets; provided, further, if any such violation continues after the Closing Date such governmental unit may seek to assert, assess or obtain

---

[8] As used in this Order, the term "governmental unit" shall have the meaning given to it in sections 101(27) and 101(41) of the Bankruptcy Code.

penalties, fines or other fees from Purchaser for the period of time after the Closing Date that such violations occurred.

## G.    Assumption and Assignment of Contracts

29.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the APA Sellers are authorized and directed to assume and assign the Contracts scheduled as Purchased Contracts to the Purchaser, pursuant to the terms of the Purchase Agreement, free and clear of all Encumbrances (other than Permitted Encumbrances).  The payment of the Cure Amounts due under each Contract scheduled as a Purchased Contract pursuant to section 365(b) of the Bankruptcy Code by the Purchaser under the Purchase Agreement in the amounts set forth in Schedule 2.1(b)(viii) of the Purchase Agreement and on Exhibit 2 to this Sale Order (each of which may be modified pursuant to the terms of the Purchase Agreement and without limiting the Purchaser's right to remove or designate additional Purchased Contracts under Section 2.6(c) of the Purchase Agreement) (a) cures all monetary defaults existing thereunder as of the assignment of the Contracts scheduled as Purchased Contracts to the Purchaser in accordance with the terms of the Purchase Agreement; (b) compensates the applicable counterparties to the Contracts scheduled as Purchased Contracts for any actual pecuniary loss resulting from such default; and (c) together with the assumption of the Contracts scheduled as Purchased Contracts by the APA Sellers and the assignment of the Contracts scheduled as Purchased Contracts to the Purchaser constitutes adequate assurance of future performance thereof.  The Purchaser has provided adequate assurance of future performance under the Contracts scheduled as Purchased Contracts within the meaning of sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code.

30.    Any Adequate Assurance Objections must have been made in writing, must have clearly specified the grounds for such objection and have been filed with the Bankruptcy Court

by, and, except as provided in the following sentence, served so as to be received on the Objection Recipients (as defined in the Bidding Procedures) by no later than **March 21, 2018 at noon (prevailing Eastern Time)** (the "Adequate Assurance Objection Deadline"). If, after entry of this Order, Purchaser, pursuant to the terms of the Purchase Agreement, designates a Contract as a Purchased Contract not previously so designated, the corresponding Adequate Assurance Objection for such Contract must be served by no later than seven (7) days after notice of such designation. If no timely Adequate Assurance Objection with respect to a Contract has been filed and served on the Objection Recipients by the Adequate Assurance Objection Deadline, (a) the applicable Contract will be deemed subject to assumption and assignment as proposed by the APA Sellers and the Successful Bidder and (b) the Successful Bidder will be deemed to have provided or to be able to provide adequate assurance of future performance of the applicable Contract in satisfaction of section 365(f)(2)(B) of the Bankruptcy Code.

31.     To the extent that any counterparty to a Contract did not timely file a Cure Objection by the deadline to file a Cure Objection, such counterparty is deemed to have consented to the proposed Cure Amounts set forth in the Purchase Agreement. The counterparties to the Contracts are forever bound by the applicable Cure Amounts and, upon payment of such Cure Amounts as provided for herein and in the Purchase Agreement, are hereby enjoined from taking any action against the Purchaser with respect to any claim for cure under the Contracts, except as set forth in the Purchase Agreement.

32.     Any provision in any Contract that prohibits or conditions the assignment of such Contract or allows the counterparty to such Contract to impose any penalty, fee, increase in payment, profit sharing arrangement or other condition on renewal or extension, or to modify

any term or condition upon the assignment of such Contract, constitutes an unenforceable anti-assignment provision that is void and of no force and effect in connection with the Sale Transaction. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the APA Sellers and assignment to the Purchaser of the Contracts scheduled as Purchased Contracts have been satisfied. Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Sellers under the Contracts scheduled as Purchased Contracts, and such Contracts scheduled as Purchased Contracts shall remain in full force and effect for the benefit of the Purchaser.

33.    Upon the assignment of the Contracts scheduled as Purchased Contracts to the Purchaser in accordance with the terms of the Purchase Agreement, the Purchaser shall be deemed to be substituted for the APA Sellers as a party to the applicable Contract scheduled as a Purchased Contract, and the APA Sellers and their estates shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Contract scheduled as a Purchased Contract occurring after such assignment. The Purchaser shall pay any Cure Amounts in accordance with the Purchase Agreement. There shall be no assignment fees, increases or any other fees charged to the Purchaser or the APA Sellers as a result of the assumption and assignment of the Contracts scheduled as Purchased Contracts.

34.    Each counterparty to a Contract is forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Purchaser or their respective property in connection with the Sale Transaction (a) any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing Date, including, any breach related to or arising out of a change-in-control resulting

from the Sale Transaction of any provision of such Contract, or any purported written or oral modification to the Contract; or (b) any claim, counterclaim, defense, breach, default, condition, setoff or other claim asserted or capable of being asserted against the Debtors or the APA Sellers existing as of the Closing Date.

35.     Other than the Contracts scheduled as Purchased Contracts, the Purchaser shall assume none of the APA Sellers' other contracts or leases and shall have no liability whatsoever thereunder.

## H.     Other Provisions

36.     <u>Sale Transaction Proceeds</u>.  On the Closing Date, pursuant to the terms of the Purchase Agreement, the Purchaser shall make the following payments via cash or letter of credit (as applicable) to the appropriate parties or escrow account (as applicable):  (a) the Closing Cure Amounts, (b) the Completion Fees Escrow Amount; (c) the Professional Payment Escrow Amount; (d) the Mechanics Lien Escrow Amount; (e) the Other Senior Liens Escrow Amounts; (f) the Macquarie Payment Amount; (g) Wind-Down Escrow Amount; (h) the Tax Lien Amounts; and (i)  the MGI Purchase Price, if applicable.  For the avoidance of doubt, any amounts placed into escrow upon the Closing shall be released in accordance with the provisions of the Purchase Agreement.

37.     <u>Good Faith Deposit</u>. In the event that  the Purchaser does not close the Sale Transaction, the Good Faith Deposit shall be released to the Purchaser or the APA Sellers, as applicable, in accordance with the terms of the Deposit Escrow Agreement, and the APA Sellers shall be authorized to transfer cash comprising the necessary portion of such Good Faith Deposit that is released to them in accordance with the Deposit Escrow Agreement (if any) into an escrow account not subject to the control of the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party (as defined in the Final DIP

Order) or any party that purports to have a validly perfected security interest in any of the APA

Sellers' deposit accounts or cash (the "Carve-Out Account"), and to pay, upon approval by the

Bankruptcy Court of the allowance of such professional fees, or as contemplated by the Interim

Compensation Order, the Sale Professional Fees Amounts that are determined to be owing, or

are otherwise payable under the Interim Compensation Order and in accordance with the DIP

Budget (as defined in the DIP Loan Documents), to those Professionals whose retention is

approved by the Bankruptcy Court pursuant to any one or more of sections 327, 363 and 1103

of the Bankruptcy Code; provided that in the event a Carve-Out Trigger Notice (as defined in

the Final DIP Order) is delivered in accordance with the Final DIP Order payment of such

professional fees shall be limited as set forth in the Final DIP Order and the DIP Loan

Agreement. Any amounts deposited to fund the Carve-Out Account shall reduce any obligation

under the DIP Loan (as defined in the Final DIP Order) and/or the Final DIP Order to fund the

Carve-Out Account and/or to pay the Sale Professional Fees Amounts on an equal dollar basis,

and shall not constitute DIP Collateral, except that the DIP Agent and DIP Lender shall retain

security interests in any residual interests in the Carve-Out Account available following

satisfaction in full of all obligations benefitting from the Carve Out, and shall receive

distributions on account of such residual interests. To the extent such Good Faith Deposit

amounts deposited in the Carve-Out Account are insufficient to satisfy all applicable Sale

Professional Fee Amounts (such unfunded amount, the "Unfunded Amount"), the DIP Lender,

the DIP Agent and the Pre-Petition First Lien Lender shall remain obligated to fund additional

cash in the amount of the Unfunded Amount into the Carve-Out Account as set forth in and

subject to the terms of the Final DIP Order and the DIP Loan Agreement.

     38.    No Alteration of DIP Agent/DIP Lender Claims or Liens. Notwithstanding

anything contained in this Sale Order to the contrary, nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights (including the liens, security interests or superpriority claims) of the DIP Agent and/or the DIP Lender pursuant to the DIP Credit Documents, or in respect of the DIP Obligations or the liens, security interests, or superpriority claims of the DIP Lender, until the Closing of the Sale Transaction and only to the extent permitted and as contemplated by the Purchase Agreement and the Sale Transaction.

39.    <u>No Alteration of Obligations Owed Under Pre-Petition First Lien Loan Documents</u>.  Nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights and claims of the Pre-Petition First Lien Lender pursuant to the Final DIP Order, the Pre-Petition First Lien Loan Documents, or in respect of the Pre-Petition First Lien Loan Obligations or the liens, security interests, or claims of the Pre-Petition First Lien Lender, until the Closing of the Sale Transaction and only to the extent permitted and as contemplated by the Purchase Agreement and the Sale Transaction.

40.    <u>No Alteration of Obligations Owed Under the Cash Collateral Orders</u>.  Nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights and claims of the Pre-Petition First Lien Lender or Comerica Bank ("<u>Comerica</u>") pursuant to the Cash Collateral Orders, until the Closing of the Sale Transaction and only to the extent permitted and as contemplated by the Purchase Agreement and the Sale Transaction.

41.    <u>No Alteration of the Obligations Owed Under the Polymers DIP Orders</u>. Nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights and claims of the Pre-Petition First Lien Lender or Comerica pursuant to the Polymers DIP Orders, until the Closing of the Sale Transaction and only to the extent permitted and as

contemplated by the Purchase Agreement and the Sale Transaction.

42.    No Alteration of Macquarie's Claims or Liens.  Notwithstanding anything contained in this Sale Order to the contrary, nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights (including, without limitation, the liens, security interests or claims) of Macquarie pursuant to the DIP Orders or the Senior Loan Documents,[9] or in respect of the obligations arising under the Senior Loan Documents, the liens, security interests, or claims of Macquarie until the Closing Date and the payment of the Macquarie Payment Amount.

43.    Excluded Liabilities.  All persons, all governmental units and all holders of Encumbrances, based upon or arising out of the Excluded Liabilities, are hereby barred and estopped from taking any action against the Purchaser or the Purchased Assets to recover property on account of any Liabilities of the APA Sellers other than Permitted Encumbrances pursuant to the Purchase Agreement.  All persons holding or asserting any Encumbrances with respect to the Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrances against the Purchaser or the Purchased Assets for any Liability whatsoever associated with the Excluded Assets.

44.    No Bulk Sales; No Brokers.  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.  Other than the professionals retained by the Debtors or the Committee pursuant to orders of this Court, no brokers were involved in consummating the Sale Transaction, and no brokers' commissions shall be due to

---

[9] "Senior Loan Documents" means that certain Credit Agreement, dated as of November 9, 2016, among Macquarie, as administrative and collateral agent, the lenders party thereto from time to time, and M&G Waters, and the related security documents.

any person or entity in connection with the Sale Transaction. The DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser are not obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Sale Transaction. Notwithstanding the foregoing, the Debtors may be obligated to pay their retained financial advisor or investment banker for services rendered in connection with the sale in accordance with other orders of this Court, which amounts shall be funded pursuant to the Purchaser's funding of the Completion Fees Escrow Amount under the terms of the Purchase Agreement.

45. <u>Failure to Specify Provisions; Conflicts</u>. The failure specifically to mention any particular provisions of the Purchase Agreement or any related agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court, the Debtors and the Purchaser that the Purchase Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties thereto in accordance with this Sale Order. In the event there is a direct conflict between the terms of this Sale Order and the terms of the Purchase Agreement, the terms of this Sale Order shall control.

46. <u>Allocation of Consideration</u>. Except as otherwise set forth in the Purchase Agreement, all rights of the respective APA Sellers' estates with respect to the allocation among the APA Sellers of consideration received from the Purchaser in connection with the Sale Transaction are expressly reserved for later determination by this Court and, to the extent consideration is received by any APA Sellers that is determined to be allocable to another APA Sellers, such other APA Sellers shall have a claim against the recipient APA Sellers with the status of an expense of administration in the case of the recipient APA Sellers under section

503(b) of the Bankruptcy Code.

47.     Subsequent Plan Provisions and Orders of the Court.  The APA Sellers shall not

propose a chapter 11 plan or request entry of an order in these Cases that conflicts with or

derogates from the terms of this Sale Order.  Nothing contained in any chapter 11 plan to be

confirmed in these Cases or any order to be entered in these Cases (including any order entered

after conversion of these chapter 11 cases under chapter 7 of the Bankruptcy Code) shall alter,

conflict with, or derogate from, the rights, benefits, protections and consideration provided to

the Purchaser under the Purchase Agreement or this Sale Order, and to the extent of any

inconsistency, this Sale Order shall govern.

48.     Further Assurances.  From time to time, as and when requested, all parties to the

Sale Transaction shall execute and deliver, or cause to be executed and delivered, all such

documents and instruments and shall take, or cause to be taken, all such further or other actions

as the requesting party may reasonably deem necessary or desirable to consummate the Sale

Transaction, including such actions as may be necessary to vest, perfect, or confirm or record or

otherwise in the Purchaser its right, title and interest in and to the Purchased Assets.

49.     Governing Terms.  To the extent this Sale Order is inconsistent with any prior

order or pleading in these Cases, the terms of this Sale Order shall govern.  To the extent there

is any inconsistency between the terms of this Sale Order and the terms of the Purchase

Agreement (including all ancillary documents executed in connection therewith), the terms of

this Sale Order shall govern.

50.     Modifications. The Purchase Agreement and any related agreements, documents

or other instruments may be modified, amended or supplemented by the parties thereto and in

accordance with the terms thereof, without further order of this Court; provided that the

proposed modification, amendment or supplement is not material and substantially conforms to and effectuates the Purchase Agreement. The Purchaser shall deliver notice of any such proposed modification, amendment or supplement to the Committee and the Committee shall notify the Debtors and the Purchaser within two (2) Business Days' if they assert any such proposed modification, amendment or supplement is material, in which case the Debtors and the Purchaser shall seek a Bankruptcy Court determination which may be done on an expedited basis that the modification, amendment or supplement is not material or is approved. On and after the date of any such modification, amendment or supplement, each reference herein to the Purchase Agreement shall mean a reference to the Purchase Agreement as amended by such modification, amendment or supplement.

51. <u>Automatic Stay</u>. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary, without further order of this Court, to allow the Purchaser to deliver any notice provided for in the Purchase Agreement and allow the Purchaser to take any and all actions permitted or required under the Purchase Agreement in accordance with the terms and conditions thereof and to otherwise implement the provisions of this Sale Order and the Purchase Agreement, including the post-closing actions contemplated in the Purchase Agreement. The Purchaser shall not be required to seek or obtain any further relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement or any other sale-related document.

52. <u>No Stay of Order</u>. Notwithstanding Bankruptcy Rules 6004(h), 6006(d) and 7062, this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Neither the Debtors nor the Purchaser shall be required to

execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and obtaining a stay prior to the Closing Date or risk its appeal being foreclosed as moot.

53. Effective upon the Closing, the Debtors and each of their respective subsidiaries, successors and assigns (collectively, in their capacities as parties granting releases pursuant to this paragraph, the "Seller Releasing Parties"), hereby release, remise, acquit and forever discharge the DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser (solely in its capacity as assignee of the DIP Agreement Credit Bid Amount and the Pre-Petition Credit Bid Amount) and each of their respective directors, managers, officers, employees, shareholders, members, agents or representatives (collectively, in their capacities as parties being released pursuant to this paragraph, the "Purchaser Released Parties"), from any and all liabilities, claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, which any Seller Releasing Party has, may have had or may hereafter assert against any Purchaser Released Party arising out of or relating to transactions or circumstances that relate to the DIP Facility (as defined in the Final DIP Order), the Pre-Petition First Lien Loan Documents (as defined in the Final DIP Order), the DIP Loan Documents (as defined in the Final DIP Order), the DIP Orders or any other extension of credit by the DIP Lender or the Pre-Petition First Lien Lender to the Obligors (as defined in the Final DIP Order) and their affiliates; provided, however, that the foregoing release shall not apply to the Sellers' rights or

the Purchaser's obligations under the Purchase Agreement and/or any other agreements entered into in connection with the transactions contemplated hereby. Subject to entry of the Sale Order, the foregoing release shall be binding on any trustee or estate representative appointed in the Debtors' Chapter 11 cases or any successor Chapter 7 case.

54. <u>Intellectual Property Matters</u>. The APA Sellers and the Purchaser are authorized and directed, pursuant to the terms of the Purchase Agreement, to (a) take any and all actions necessary to grant to Purchaser any and all intellectual property licenses set forth in Section 8.9(c) of the Purchase Agreement (collectively, the "<u>IP Licenses</u>"), and (b) implement, effectuate and perform under any such IP Licenses. Additionally, the APA Sellers and Purchaser respectively, shall not (i) reject, terminate, transfer or otherwise assign any of the IP License, or (ii) knowingly take any action that would render the IP Licenses unenforceable by Purchaser, in either case in any manner inconsistent with the terms of the Purchase Agreement.

55. <u>Servers and IT Equipment</u>. Upon consummation of the Sale Transaction, and to the extent applicable, each Debtor shall retain originals or copies of, and preserve in accordance with their discovery obligations, all hard copy documents and data and information that constitute Purchased Assets and any other document, data or information stored on or in servers, backup devices, mobile devices, electronic storage devices, or miscellaneous IT equipment, in each case, that constitutes Purchased Assets, currently in such Debtors' possession, custody, or control pertaining to pending or threatened litigation or necessary to administer these Cases.

56. <u>Notice of Sale Closing Date</u>. Within one (1) Business Day of the occurrence of the Closing Date of the Sale Transaction, the Debtors shall file and serve a notice of same, substantially in the form attached hereto as <u>Exhibit 2</u> (the "<u>Notice of Sale Closing Date</u>").

57.     <u>Post-Closing Claims Administration</u>.  Neither the Debtors nor any successor in interest, including any chapter 11 or chapter 7 trustee in these chapter 11 cases or any successor chapter 7 cases, shall consent or agree to the allowance of any claim to the extent it would constitute an Assumed Liability or Permitted Encumbrance without the prior written consent of the DIP Lender, the DIP Agent, the Pre-Petition First Lien Lender and the Purchaser.  The DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender and the Purchaser shall have standing to object to any claim against any Debtors and its estate to the extent that, if allowed, it would constitute an Assumed Liability or Permitted Encumbrance, and the Bankruptcy Court will retain jurisdiction to hear and determine any such objections.

58.     <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Sale Order, the Bidding Procedures Order, the Bidding Procedures Modifications and the Purchase Agreement, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, and decide any issues or disputes concerning this Sale Order and the Purchase Agreement or the rights and duties of the parties hereunder or thereunder, including the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Purchased Assets, and any post-closing actions contemplated in the Purchase Agreement.

59.     <u>DIP Amendment</u>.  The Second Amendment to the DIP Loan Agreement and the Updated DIP Budget (as defined in the DIP Loan Documents) substantially in the form attached to the Purchase Agreement as <u>Exhibit E</u> is incorporated by reference and approved in its entirety.

60.     The Sale Transaction contemplated hereunder is not receiving an exemption

under section 1146(a) of the Bankruptcy Code.

61.     The DIP Agent, the DIP Lender, the Pre-Petition First Lien Lender, and the Purchaser have standing to seek to enforce the terms of this Order.

62.     The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Order.

63.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

64.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).


Dated: _____
        Wilmington, Delaware

_____
HONORABLE BRENDAN L. SHANNON
CHIEF UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Purchase Agreement**

**Exhibit 2**

**Cure Amounts**

| Contract Description | Cure Amount (in $) | Cure Objection Amounts (in $) |
|---|---|---|
| PowerSupply Coordination Service Agreement by and between M&G Resins USA LLC and Direct Energy Business, LLC dated as of December 5, 2014, as amended on July 15, 2015 | 69,366 | – |
| Technical Information Agreement for Polyester Polymer by and between Invista North America S.a.r.l. and M&G Resins USA LLC, dated as of May 14, 2013 | 0 | – |
| Letter agreement by and between M&G Chemicals and LCRA Transmission Services Corporation, dated as of August 2017 | 0 | – |
| Operating Lease by and between M&G Resins USA, LLC and Modular Space Corporation, dated as of June 14, 2016 | 706 | – |
| Operating Lease by and between M&G Resins USA, LLC and Modular Space Corporation, dated as of September 26, 2016 | 0 | – |
| Tax Abatement Agreement by and between County of Nueces and M&G Resins USA, LLC, dated as of December 13, 2012, as amended on July 26, 2017 | 2,523,421 | – |
| Partial Assignment and Assumption of Tax Abatement Agreement by and between the County of Nueces and M&G Resins USA, LLC, dated December 13, 2012 | 0 | – |
| Tax Abatement Agreement by and between Del Mar College District and M&G Resins USA, LLC, dated as of November 20, 2012 | 36,299 | – |
| Partial Assignment and Assumption of Tax Abatement Agreement by and between the Del Mar College District and M&G Resins USA, LLC, dated March 13, 2017 | 0 | – |
| Industrial Districting Agreement No. 87 by and between the City of Corpus Christi and M&G Resins USA, LLC, dated as of April 28, 2014, as amended | 84,346 | – |
| Industrial Districting Agreement No. 87B by and between the City of Corpus Christi and M&G Waters USA, LLC, dated as of May 25, 2017 | 0 | – |

| Contract Description | Cure Amount (in $) | Cure Objection Amounts (in $) |
|---|---|---|
| Agreement for Limitation on Appraised Value of Property for School District Maintenance and Operations Taxes by and among Tuloso-Midway Independent School District and M&G USA Corporation and M&G Resins USA, LLC, dated as of November 18, 2013 | 4,051,242 | – |
| Notice of Partial Assignment of Agreement for Limitation on Appraised Value of Property for School District Maintenance and Operations Taxes No. 277 by and between Tuloso-Midway Independent School District and M&G USA Corporation DBA Mossi & Ghisolfi USA Corporation and M&G Resins USA, LLC to M&G Waters USA LLC, dated as of November 18, 2013 | 0 | – |
| Pipeline Easement by and between M&G Resins USA, LLC and Oxy Ingleside Oil Pipeline, LLC, dated as of April 7, 2015 | 0 | – |
| Rail Car Storage Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of February 29, 2016[1] | 184,000 | 306,000 |
| Foreign Trade Zone (FTZ) subzone site operations agreement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of August 18, 2015[2] | 0 | – |
| Surface Site Lease and Option Agreement dated as of May 15, 2015 | 0 | – |
| Construction and Priority Use Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 28, 2013 | 33,500 | – |
| Agreement of the Frequent Users and the Port of Corpus Christi Authority by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 28, 2013 | 0 | – |

---

[1]  Agreement has not been provided to Purchaser due to confidentiality restrictions.

[2]  Agreement has not been provided to Purchaser due to confidentiality restrictions.

| Contract Description | Cure Amount (in $) | Cure Objection Amounts (in $) |
|---|---|---|
| Lease Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 28, 2013 | 1,140,000 | – |
| Memorandum of Surface Site Lease and Option Agreement by and between M&G Resins USA, LLC and Port of Corpus Christi Authority of Nueces County, Texas, dated as of May 15, 2015 | 0 | – |
| Memorandum of Lease by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 28, 2013 | 0 | – |
| Lease Agreement for the West Transfer Facility by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA LLC the dated as of June 20, 2017 | 28,500 | – |
| Surface Site Lease and Option Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA LLC dated as of May 19, 2015 | 0 | – |
| Additional Work Reimbursement Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas and Chemtex International Inc. dated as of January 2015 | 491,750 | – |
| Purchase, Leaseback and Construction Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 20, 2013 | 0 | – |
| Port Letter Agreement – reimbursement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 28, 2013 | 0 | – |
| Cost of Sharing Agreement for M&G Resins Wetlands Mitigation Plan by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of October 13, 2014 | 0 | – |
| Water Intake and Outfall Dredging Easement Agreement by and between Port of Corpus Christi Authority of Nueces County, TX, and M&G Resins USA, LLC, dated as of October 18, 2016 | 0 | – |

| Contract Description | Cure Amount (in $) | Cure Objection Amounts (in $) |
|---|---|---|
| Electrical Power Line Relocation Agreement by and between Port of Corpus Christi Authority of Nueces County, TX, and M&G Resins USA, LLC, dated as of June 28, 2013 | 0 | – |
| 1949 Power Line Easement, dated June 17, 1949 | 0 | – |
| 1960 Power Line Easement, dated May 23, 1960, as amended on January 27, 2003 | 0 | – |
| Deed of Trust, Assignment of Rents and Leases, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing by M&G Resins USA, LLC to F-T Service Corp. for the benefit of Banco Inbursa, S.A., Institución de Banca Mútiple, Grupo Financiero Inbursa, dated as of March 21, 2013 | 0 | – |
| Amendment to Deed of Trust, Assignment of Rents & Leases, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing by and between M&G Resins USA, LLC and Banco Inbursa, S.A., Institución de Banca Mútiple, Grupo Financiero Inbursa, dated as of June 28, 2013 | 0 | – |
| Notice of Holdover for COPPA Land Lease from Port of Corpus Christi Authority of Nueces County Texas to M&G Resins USA, LLC | 0 | – |
| Partial Release of Driveway Easements by M&G Resins USA, LLC, dated as of June 28, 2013 | 0 | – |
| Special Warranty Deed by and between M&G Resins USA, LLC and Port of Corpus Christi Authority of Nueces County, Texas, dated as of June 28, 2013 | 0 | – |
| Access and Utility Easement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 28, 2013 | 0 | – |
| Rail Spur Easement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 28, 2013 | 0 | – |
| Pipeline and Utility Bank Easement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 28, 2013 | 0 | – |

| Contract Description | Cure Amount (in $) | Cure Objection Amounts (in $) |
|---|---|---|
| Rail Access Easement and License by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA, LLC, dated as of June 28, 2013 | 0 | – |
| Memorandum of Lease between M&G Resins USA, LLC and the Port of Corpus Christi Authority dated as of June 28, 2013 | 0 | – |
| Amended and Restated Lease Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas, as landlord, and M&G Resins USA, LLC, as tenant, dated as of June 20, 2017 (10 acre tract of land) | 12,500 | 25,000 |
| Lease Agreement between M&G Resins USA, LLC and the Port of Corpus Christi Authority, dated as of June 20, 2017 | 28,500 | 45,000 |
| Image Management Plus Agreement by and between Ricoh USA, Inc. and M&G Resins USA LLC, dated as of February 2, 2016 (for printer in use at CC Plant) | 1,630 | – |
| Contract for Security Services by and between Chemtex International Inc. and Sec-Ops, Inc., dated as of March 2, 2017, as amended | 0 | – |
| Lease Agreement by and between M&G Resins USA, LLC and The Marlene Super 2012 Irrevocable Trust, dated as of February 11, 2016 | 0 | – |
| Lease Agreement by and between M&G Resins USA, LLC and Williams Scotsman, Inc., dated as of February 8, 2017 | 6,754 | – |
| All Non-Disclosure Agreements entered into by Sellers or any of their Affiliates in connection with the sale process for the sale of Sellers' assets | N/A | N/A |
| Patent Transfer and Sale Agreement by and between M&G USA Corporation and Cobarr S.r.l., dated as of September 27, 2013 (Part A) | 0 | – |
| Patent Transfer and Sale Agreement by and between M&G USA Corporation and Cobarr S.r.l., dated as of September 27, 2013 (Part B) | 0 | – |
| Patent Transfer and Sale Agreement by and between M&G USA Corporation and Cobarr S.r.l., dated as of September 27, 2013 (Part C) | 0 | – |

| Contract Description | Cure Amount (in $) | Cure Objection Amounts (in $) |
|---|---|---|
| Trademark Transfer and Sale Agreement by and between M&G Polymers USA, LLC and M&G Finanziaria S.p.A., dated as of December 15, 2015 | 0 | – |
| Contract for License, Know-How, and Services for A 1.2 Million Metric Tons Per Year Terephthalic Acid Plant, dated as of May 20, 2015, by and between Resins, Grupo Petrotemex, S.A. de C.V., M&G Chemicals S.A., Chemtex International Inc. and M&G Finanziaria S.r.l., as amended by that certain First Amendment to the License Agreement, dated as of November 10, 2015, as further amended by that certain Second Amendment to the License Agreement, dated as of December 7, 2015 (the "PTA License") | 0 | – |
| PET License Agreement by and between Chemtex Italia S.p.A. and Beta Renewables S.p.A., dated as of October 26, 2011, as assigned to M&G Polymers USA LLC from Biochemtex S.p.A. pursuant to the Agreement dated as of September 27, 2013 | 0 | – |

## **Exhibit 3**

**Notice of Sale Closing Date**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| M & G USA CORPORATION, *et al.*,[1] | Case No. 17-12307 (BLS) |
| | (Jointly Administered) |
| Debtors. | |
| | **Related Docket Nos. 173, 490, [●]** |

## NOTICE OF SALE CLOSING

**PLEASE TAKE NOTICE** that, on [●], 2018, the United States Bankruptcy Court for the District of Delaware entered the *Order (I) Approving the Sale of Certain Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith; and (III) Granting Related Relief* [Docket No. ●] (the "Sale Order"),[2] thereby approving the sale of certain of the Debtors' assets to Banibu II Holdings, Inc. (the "Purchaser") pursuant to that certain asset purchase agreement entered into by and between certain of the Debtors and the Purchaser dated as of [●], 2018 (the "Purchase Agreement"), attached to the Sale Order as Exhibit 1.[3]

**PLEASE TAKE FURTHER NOTICE** that the sale to the Purchaser, pursuant to the provisions of the Purchase Agreement, closed on [●], 2018.

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Order are available for review free of charge by accessing the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk LLC (http://cases.primeclerk.com/mgusa).  In addition, copies of the Sale Order are available for inspection during regular business hours at the Office of the Clerk of the Court, located at 824 N. Market Street, 3rd Floor, Wilmington, DE 19801, and may be viewed for a fee on the internet at

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2]  All capitalized terms used herein, but not otherwise defined, have the meanings given to them in the Sale Order.

[3]  The Purchase Agreement is attached to the Sale Order.

NAI-1503546200v1

the Court's website (http://www.deb.uscourts.gov/) by following the directions for accessing the ECF system on such website.

Dated: [●], 2018                                PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                joneill@pszjlaw.com
                jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:      (212) 326-3939
Facsimile:      (212) 755-7306
Email:          sgreenberg@jonesday.com
                scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:      (216) 586-7035
Facsimile:      (216) 579-0212
Email:          ceblack@jonesday.com

Co-Counsel for the Debtors and Debtors in Possession

NAI-1503546200v1

**Schedule 2**

# Exhibit A

**Proposed Assumed Contracts
(Successful Bidder)**

| Debtor | Counterparty Name and Address | Contract Description | Contract Cure Amount | Cure Objection Amount |
|--------|-------------------------------|---------------------|---------------------|----------------------|
| M & G Resins USA, LLC | AEP American Electric Power<br>2901 E. Mockingbird Lane<br>Victoria, TX 77904<br>Customer_Service@AEP.com | Substation contribution | - | - |
| M & G Resins USA, LLC | AEP American Electric Power<br>2901 E. Mockingbird Lane<br>Victoria, TX 77904<br>Customer_Service@AEP.com | Substation contribution | - | - |
| M & G Resins USA, LLC | Chemtex International Inc.<br>1979 Eastwood Road<br>Wilmington, NC 28403<br>Pedro.Losa@Chemtex.com | IP License to M&G Resins | - | - |
| M & G Resins USA, LLC | City Of Corpus Christi - Central Cashiers A/R<br>Industrial District<br>1201 Leopard St<br>Corpus Christi, TX 78401 | Industrial District Agreement - Property Tax Discount - Amendment 1 | 84,346 | - |
| M & G Resins USA, LLC | City Of Corpus Christi - Central Cashiers A/R<br>Industrial District<br>1201 Leopard St<br>Corpus Christi, TX 78401 | Industrial District Agreement - Property Tax Discount - Attachments | - | - |
| M & G Resins USA, LLC | City Of Corpus Christi - Central Cashiers A/R<br>Industrial District<br>1201 Leopard St<br>Corpus Christi, TX 78401 | Industrial District Agreement - Property Tax Discount - 2015 to 2024 | - | - |
| M&G Waters USA, LLC | City Of Corpus Christi - Central Cashiers A/R<br>Industrial District<br>1201 Leopard St<br>Corpus Christi, TX 78401 | Tax abatement agreement | - | - |
| M & G Resins USA, LLC | Del Mar College<br>101 Baldwin Blvd<br>Corpus Christi, TX 78404<br>Colrel@Delmar.edu | Tax Abatement | 36,299 | - |
| M & G Resins USA, LLC | Del Mar College<br>101 Baldwin Blvd<br>Corpus Christi, TX 78404<br>Colrel@Delmar.edu | Tax Abatement | - | - |
| M & G Resins USA, LLC | Direct Energy Business<br>1001 Liberty Avenue, #1200<br>Pittsburgh, PA 15222<br>Customerrelations@Directenergy.com | Power service agreement - Plant Electricity Agreement - Dec 2014 | 69,336 | - |
| M & G Resins USA, LLC | Direct Energy Business<br>1001 Liberty Avenue, #1200<br>Pittsburgh, PA 15222<br>Customerrelations@Directenergy.com | Power service agreement - Plant Electricity Agreement - Addendum to add leases (Feb 15) | - | - |
| M & G Resins USA, LLC | Direct Energy Business<br>1001 Liberty Avenue, #1200<br>Pittsburgh, PA 15222<br>Customerrelations@Directenergy.com | Power service agreement - Plant Electricity Agreement - Addendum to add new meter (July 15) | - | - |
| M & G Resins USA, LLC | Direct Energy Business<br>1001 Liberty Avenue, #1200<br>Pittsburgh, PA 15222<br>Customerrelations@Directenergy.com | Power service agreement - Plant Electricity Agreement - Addendum to add new meter (Mar 15) | - | - |
| M & G Resins USA, LLC | Direct Energy Business<br>1001 Liberty Avenue, #1200<br>Pittsburgh, PA 15222<br>Customerrelations@Directenergy.com | Power service agreement - Plant Electricity Agreement - Dec 2014 - Index | | - |
| M & G Resins USA, LLC | H&E Equipment Services, Inc.<br>7500 Pecue Ln<br>Baton Rouge, KA 70809<br>Payments@He-Equipment.com | Lease - Equipment - Generators | 38,740 | - |
| M & G Resins USA, LLC | Hartford Fire Insurance Company<br>One Hartford Plaza<br>Hartford, CT 06155<br>Herlinda.Jimenez@Thehartford.com,<br>Michael.Dulanjr@Thehartford.com | Insurance policy - Inland Marine | - | - |
| M & G Resins USA, LLC | Invista North America Sarl<br>4123 East 37th Street<br>North Wichita, KS 67220<br>Michael.L.Massa@Invista.com | License Agreement | - | - |
| M & G Resins USA, LLC | John L Wortham & Son LLP<br>Attn: William L. Hixon - Managing Director<br>2727 Allen Parkway<br>Houston, TX 77019<br>Naintara.Goswami@Worthaminsurance.com | Insurance policy - Indian harbor insurance/ Incoming/Reverse Flow Unit | - | - |
| M & G Resins USA, LLC | John L Wortham & Son LLP<br>Attn: William L. Hixon - Managing Director<br>2727 Allen Parkway<br>Houston, TX 77019<br>Naintara.Goswami@Worthaminsurance.com | Insurance Policy - Contractor Equipment insurance | - | - |

| Debtor | Counterparty Name and Address | Contract Description | Contract Cure Amount | Cure Objection Amount |
|---|---|---|---|---|
| M & G Resins USA, LLC | Johnson Service Group, Inc.<br>1000 Parkwood Circle<br>Suite 800<br>Atlanta, GA 30339<br>Accountsreceivable@Jsginc.com | Master Services Agreement - Equipment Maintenance - Chillers | - | - |
| M & G Resins USA, LLC | Koch Chemical Technology Group Sa D<br>4111 East 37th St North<br>Wichita, KS 67220<br>Jorge.Ortiz@Johnzink.com | Connection Agreement | - | - |
| M & G Resins USA, LLC | LCRA Transmission Services Corporation<br>3700 Lake Austin Blvd.<br>Austin, TX 78703<br>Clara.Tuma@Lcra.org | Agreement for placement, operation, and maintenance of equipment | - | - |
| M & G Resins USA, LLC | Miller Insurance Services LLP<br>Dawson House<br>5 Jewry Street<br>London EC3N 2PJ<br>England<br>Jason.Sidgwick@Miller-Insurance.com | Insurance | - | - |
| M & G Resins USA, LLC | National Union Fire Insurance Co.<br>175 Water Street<br>18th Floor<br>New York, NY 10038<br>Nazrizam.Zamani@Aig.com | Insurance Policy - Marine Open Cargo | - | - |
| M & G Resins USA, LLC | Nueces County Tax Assessor<br>201 N. Chaparral St<br>Suite 206<br>Corpus Christi, TX 78401<br>Glen.Sullivan@Nuecesco.com | Tax Abatement | 2,523,421 | - |
| M & G Resins USA, LLC | Nueces County Tax Assessor<br>201 N. Chaparral St<br>Suite 206<br>Corpus Christi, TX 78401<br>Glen.Sullivan@Nuecesco.com | Tax Abatement - Amendment | - | - |
| M & G Resins USA, LLC | Nueces County Tax Assessor<br>201 N. Chaparral St<br>Suite 206<br>Corpus Christi, TX 78401<br>Glen.Sullivan@Nuecesco.com | Tax Abatement - Partial Assignment | - | - |
| M & G Resins USA, LLC | Oxy Ingleside Oil Pipeline, LLC<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX 77046 | Pipeline Easement - Tract 1 | - | - |
| M & G Resins USA, LLC | Oxy Ingleside Oil Pipeline, LLC<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX 77046 | Pipeline Easement - Tract 2 (Wetlands) | - | - |
| M & G Resins USA, LLC | Philadelphia Indemnity Insurance Company<br>Attn: Cormack Mulcahy<br>875 Greentree Road, Building 7, Suite 240<br>Pittsburgh, PA 15220<br>Cormack.Mulcahy@Tmsic.com | Insurance | - | - |
| M & G Resins USA, LLC | Philadelphia Indemnity Insurance Company<br>Attn: Cormack Mulcahy<br>875 Greentree Road, Building 7, Suite 240<br>Pittsburgh, PA 15220<br>Cormack.Mulcahy@Tmsic.com | Insurance | - | - |
| M & G Resins USA, LLC | Philadelphia Indemnity Insurance Company<br>Attn: Cormack Mulcahy<br>875 Greentree Road, Building 7, Suite 240<br>Pittsburgh, PA 15220<br>Cormack.Mulcahy@Tmsic.com | Insurance | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Land lease to store Materials for construction | 70,295 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Land lease to store Materials for construction | 9,000 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Land lease to store Materials for construction | 12,500 | - |

| Debtor | Counterparty Name and Address | Contract Description | Contract Cure Amount | Cure Objection Amount |
|---|---|---|---|---|
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Land lease to store Materials for construction | 12,000 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Notice of Holdover for COPPA land lease | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Sale and Leaseback of land with POCCA | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Sale and Leaseback of land with POCCA | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Sale and Leaseback of land with POCCA | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Cost of Sharing  Agreement for M&G resins Wetlands Mitigation Plan | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Land lease to store Materials for construction | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Dredging required for Desalination Plant | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Lease Agreement | 1,140,000 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Construction and Priority Use Agreement | 33,500 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Pipeline and Utility Bank Easement | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Rail Access Easement and License | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX  78401<br>Ar@Pocca.com | Memorandum of Lease | - | - |

| Debtor | Counterparty Name and Address | Contract Description | Contract Cure Amount | Cure Objection Amount |
|---|---|---|---|---|
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Agreement of the Frequent Users and the Port | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Port Letter Agreement - reimbursement | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | 1949 Power Line Easement | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | 1960 Power Line Easement | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | First Amendment to Power Line Agreement | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Purchase Leaseback and Construction Agreement | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Deed of Trust, Assignment of Rents and Leases | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Amendment to Deed of Trust, Assignment of Rents & Leases | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | M&G Secretary's Certificate & Company Documents | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Affidavit as to Debts & Liens | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Closing Acknowledgment and Disclosure Form | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Sellers Escrow Instructions | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Request for Taxpayer ID | - | - |

| Debtor | Counterparty Name and Address | Contract Description | Contract Cure Amount | Cure Objection Amount |
|---|---|---|---|---|
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Port Easement Fee Schedule for Pipeline & Utility Crossings | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Settlement Statement | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Partial Release of Driveway Easements | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Special Warranty Deed | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Access and Utility Easement | - | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Rail Spur Easement | - | - |
| M & G Resins USA, LLC | Texas Eastern Transmission LP<br>5400 Westheimer Court<br>Houston, TX 77056<br>Bwlehde@Spectraenergy.com | Exhibit C to Executed Contract Nov 20 2014.pdf | - | - |
| M & G Resins USA, LLC | Texas Eastern Transmission LP<br>5400 Westheimer Court<br>Houston, TX 77056<br>Bwlehde@Spectraenergy.com | Exhibit D to Executed Contract Nov 20 2014.pdf | - | - |
| M & G Resins USA, LLC | Texas Eastern Transmission LP<br>5400 Westheimer Court<br>Houston, TX 77056<br>Bwlehde@Spectraenergy.com | Exhibit E to Executed Contract Nov 20 2014.pdf | - | - |
| M & G Resins USA, LLC | Texas Eastern Transmission LP<br>5400 Westheimer Court<br>Houston, TX 77056<br>Bwlehde@Spectraenergy.com | Supply Contract - Natural Gas | - | - |
| M & G Resins USA, LLC | Texas Eastern Transmission LP<br>5400 Westheimer Court<br>Houston, TX 77056<br>Bwlehde@Spectraenergy.com | Supply Contract - Natural Gas | - | - |
| M & G Resins USA, LLC | Texas Eastern Transmission LP<br>5400 Westheimer Court<br>Houston, TX 77056<br>Bwlehde@Spectraenergy.com | Supply Contract - Natural Gas | - | - |
| M & G Resins USA, LLC | Texas Eastern Transmission LP<br>5400 Westheimer Court<br>Houston, TX 77056<br>Bwlehde@Spectraenergy.com | Supply Contract - Natural Gas -Drain Drawing | - | - |
| M & G Resins USA, LLC | Texas Eastern Transmission LP<br>5400 Westheimer Court<br>Houston, TX 77056<br>Bwlehde@Spectraenergy.com | Supply Contract - Natural Gas - Power Supply Coordination Service Agreement | - | - |
| M & G Resins USA, LLC | Texas Mutual<br>6210 East Highway 290<br>Auston, TX 78723-1098<br>Mattpeterson@Texasmutual.com | Workers Compensation | - | - |
| M & G Resins USA, LLC | Tuloso-Midway ISD<br>Po Drawer 10900<br>Corpus Christi, TX 78460<br>Aprichard@Tmisd.Us | Limitation on Appraised Value of Property - Partial Assignment to M&G Waters | 4,051,242 | - |
| M & G Resins USA, LLC | Tuloso-Midway ISD<br>Po Drawer 10900<br>Corpus Christi, TX 78460<br>Aprichard@Tmisd.Us | Tax Benefits | - | - |

| Debtor | Counterparty Name and Address | Contract Description | Contract Cure Amount | Cure Objection Amount |
|---|---|---|---|---|
| M & G Resins USA, LLC | Williams Scotsman, Inc.<br>16847 Interstate 35 North #2<br>Selma, TX  78154<br>Rinnie.Massey@As.Willscot.com | Lease Agreement - desalination plex | 6,754 | - |
| M & G Resins USA, LLC | XL Catlin<br>Piazza Gae Aulenti, 8<br>3rd Floor<br>Milan, MI  20154<br>Italy<br>Simona.Fumagalli@Xlcatlin.com | Insurance policy - Construction Liability | - | - |
| M & G Resins USA, LLC | XL Catlin<br>Piazza Gae Aulenti, 8<br>3rd Floor<br>Milan, MI  20154<br>Italy<br>Simona.Fumagalli@Xlcatlin.com | Insurance policy - Construction Liability - Second Layer extension | - | - |

**Exhibit B**

**Proposed Assumed Contracts
(Backup Bidder)**

| Debtor | Counterparty Name and Address | Contract Description | Cure Amount | Cure Objection Amount |
|---|---|---|---|---|
| M & G Resins USA, LLC | Tuloso-Midway ISD<br>Po Drawer 10900<br>Corpus Christi, TX 78460<br>Aprichard@Tmisd.Us | Agreement for Limitation on Appraised Value of Property for School District Maintenance and Operations Taxes - Partial Assignment to M&G Waters | $4,051,242.00 | - |
| M & G Resins USA, LLC | Nueces County Tax Assessor<br>201 N. Chaparral St<br>Suite 206<br>Corpus Christi, TX 78401<br>Glen.Sullivan@Nuecesco.com | Tax Abatement | $2,523,420.91 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Lease Agreement | $1,140,000.00 | - |
| Chemtex International | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Additional Work Reimbursement Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas and Chemtex International Inc. dated as of January 2015 | $491,750.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Rail Car Storage Agreement | $184,000.00 | - |
| M & G Resins USA, LLC | City Of Corpus Christi - Central Cashiers A/R Industrial District<br>1201 Leopard St<br>Corpus Christi, TX 78401 | Industrial Districting Agreement No. 87 - Property Tax Discount - Amendment 1 | $84,346.00 | - |
| M & G Resins USA, LLC | Direct Energy Business<br>1001 Liberty Avenue, #1200<br>Pittsburgh, PA 15222<br>Customerrelations@Directenergy.com | Power service agreement - Plant Electricity Agreement - Dec 2014 | $69,366.25 | - |
| M & G Resins USA, LLC | Del Mar College<br>101 Baldwin Blvd<br>Corpus Christi, TX 78404<br>Colrel@Delmar.edu | Tax Abatement Agreement | $36,299.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Construction and Priority Use Agreement | $33,500.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Land Lease Agreement for the West Transfer Facility by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA LLC the dated as of June 20, 2017 (to store Materials for construction) | $28,500.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Amended and Restated Lease Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas, as landlord, and M&G Resins USA, LLC, as tenant, dated as of June 20, 2017 (10 acre tract of land) | $12,500.00 | - |
| M & G Resins USA, LLC | Williams Scotsman, Inc.<br>16847 Interstate 35 North #2<br>Selma, TX 78154<br>Rinnie.Massey@As.Willscot.com | Lease Agreement - desalination plex | $6,754.00 | - |
| M & G Resins USA, LLC | Ricoh USA Inc.<br>70 Valley Stream Parkway<br>Malvern, PA 19355 | Image Management Plus Agreement, Printer Lease - Corpus Christi | $1,630.00 | - |

| Debtor | Counterparty Name and Address | Contract Description | Cure Amount | Cure Objection Amount |
|--------|-------------------------------|---------------------|-------------|------------------------|
| M & G Resins USA, LLC | Modular Space Corporation<br>6161 Ayers<br>Corpus Christi, TX 78415<br>Modefaxcashreceipts@Modspace.com | Operating Lease - 6 plex trailer - Renewal | $706.16 | - |
| M&G Waters USA, LLC | City Of Corpus Christi - Central Cashiers A/R Industrial District<br>1201 Leopard St<br>Corpus Christi, TX 78401 | Industrial Districting Agreement No. 87B | $0.00 | - |
| M & G USA Corporation | Cobarr S.P.A.<br>Strada Ribrocca 11<br>Tortona, AL 15057<br>Italy | Assignment Agreement for PET License (Part A) | $0.00 | - |
| M & G USA Corporation | Cobarr S.P.A.<br>Strada Ribrocca 11<br>Tortona, AL 15057<br>Italy | Assignment Agreement for PET License (Part B) | $0.00 | - |
| M & G USA Corporation | Cobarr S.P.A.<br>Strada Ribrocca 11<br>Tortona, AL 15057<br>Italy | Assignment Agreement for PET License (Part C) | $0.00 | - |
| M & G Resins USA, LLC | Del Mar College<br>101 Baldwin Blvd<br>Corpus Christi, TX 78404<br>Colrel@Delmar.edu | Partial Assignment and Assumption of Tax Abatement | $0.00 | - |
| M & G Resins USA, LLC | Grupo Petrotemex S.A. De C.V.<br>Belisario Dominguez No. 2002<br>Colonia Obispado<br>Monterrey, NL 64 060<br>Mexico<br>Jgarcia@Petrotemex.com | License Agreement to Resins - Know How and Services for A 1.2 Million Metric Tons Per Year Terephthalic Acid Plant | $0.00 | - |
| M & G Resins USA, LLC | Grupo Petrotemex S.A. De C.V.<br>Belisario Dominguez No. 2002<br>Colonia Obispado<br>Monterrey, NL 64 060<br>Mexico<br>Jgarcia@Petrotemex.com | License Agreement to Resins - Know How and Services for A 1.2 Million Metric Tons Per Year Terephthalic Acid Plant - First Amendment | $0.00 | - |
| M & G Resins USA, LLC | Grupo Petrotemex S.A. De C.V.<br>Belisario Dominguez No. 2002<br>Colonia Obispado<br>Monterrey, NL 64 060<br>Mexico<br>Jgarcia@Petrotemex.com | License Agreement to Resins - Know How and Services for A 1.2 Million Metric Tons Per Year Terephthalic Acid Plant - Second Amendment | $0.00 | - |
| M & G Resins USA, LLC | Invista North America Sarl<br>4123 East 37th Street<br>North Wichita, KS 67220<br>Michael.L.Massa@Invista.com | Technical Information Agreement | $0.00 | - |
| M & G Resins USA, LLC | Modular Space Corporation<br>6161 Ayers<br>Corpus Christi, TX 78415<br>Modefaxcashreceipts@Modspace.com | Operating Lease - 2 plex trailer | $0.00 | - |
| M & G Resins USA, LLC | Nueces County Tax Assessor<br>201 N. Chaparral St<br>Suite 206<br>Corpus Christi, TX 78401<br>Glen.Sullivan@Nuecesco.com | Tax Abatement - Amendment | $0.00 | - |
| M & G Resins USA, LLC | Oxy Ingleside Oil Pipeline, LLC<br>5 Greenway Plaza<br>Suite 110<br>Houston, TX 77046 | Pipeline Easement - Tract 1 | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Foreign trade zone (FTZ) subzone site operations agreement | $0.00 | - |

| Debtor | Counterparty Name and Address | Contract Description | Cure Amount | Cure Objection Amount |
|---|---|---|---|---|
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Notice of Holdover for COPPA land lease | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Memorandum of Lease between M&G Resins USA, LLC and the Port of Corpus Christi Authority dated as of June 28, 2013 | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Memorandum of Surface Site Lease and Option Agreement by and between M&G Resins USA, LLC and Port of Corpus Christi Authority of Nueces County, Texas, dated as of May 15, 2015 | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Cost of Sharing Agreement for M&G Resins Wetlands Mitigation Plan | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Dredging required for Desalination Plant | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Pipeline and Utility Bank Easement | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Rail Access Easement and License | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Memorandum of Lease | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Agreement of the Frequent Users and the Port of Corpus Christi Authority | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | 1949 Power Line Easement | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | 1960 Power Line Easement | $0.00 | - |

| Debtor | Counterparty Name and Address | Contract Description | Cure Amount | Cure Objection Amount |
|---|---|---|---|---|
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of Attn: Executive Director 222 Power Street PO Box 1541 Corpus Christi, TX 78401 Ar@Pocca.com | Electrical Power Line Relocation Agreement by and between Port of Corpus Christi Authority of Nueces County, TX, and M&G Resins USA, LLC, dated as of June 28, 2013 | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of Attn: Executive Director 222 Power Street PO Box 1541 Corpus Christi, TX 78401 Ar@Pocca.com | Deed of Trust, Assignment of Rents and Leases, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of Attn: Executive Director 222 Power Street PO Box 1541 Corpus Christi, TX 78401 Ar@Pocca.com | Amendment to Deed of Trust, Assignment of Rents & Leases, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of Attn: Executive Director 222 Power Street PO Box 1541 Corpus Christi, TX 78401 Ar@Pocca.com | Partial Release of Driveway Easements | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of Attn: Executive Director 222 Power Street PO Box 1541 Corpus Christi, TX 78401 Ar@Pocca.com | Special Warranty Deed | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of Attn: Executive Director 222 Power Street PO Box 1541 Corpus Christi, TX 78401 Ar@Pocca.com | Surface Site Lease and Option Agreement by and between Port of Corpus Christi Authority of Nueces County, Texas and M&G Resins USA LLC dated as of May 19, 2015 | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of Attn: Executive Director 222 Power Street PO Box 1541 Corpus Christi, TX 78401 Ar@Pocca.com | Rail Spur Easement | $0.00 | - |
| Chemtex International, Inc. | Sec-Ops, Inc 5729 Leonard Street Bldg. 8 Corpus Christi, TX 78408-2358 Robert@Secopsinc.com | Contract for Security Services | $0.00 | - |
| M & G Resins USA, LLC | The Marlene Super 2012 Irrevocable Trust C/O Super Commercial Properties 4531 Ayers St, Suite 201 Corpus Christi, TX 78415 | Lease agreement | $0.00 | |
| M & G Resins USA, LLC | Tuloso-Midway ISD Po Drawer 10900 Corpus Christi, TX 78460 Aprichard@Tmisd.Us | Notice of Partial Assignment of Agreement for Limitation on Appraised Value of Property for School District Maintenance and Operations Taxes No. 277 | $0.00 | - |
| M & G Polymers USA, LLC | Biochemtex S.P.A. Strada Ribrocca 11 Tortona, AL 15057 Italy Nadia.Carli@Gruppomg.com | PET License Agreement by and between Chemtex Italia S.p.A. and Beta Renewables S.p.A., dated as of October 26, 2011, as assigned to M&G Polymers USA LLC from Biochemtex S.p.A. pursuant to the Agreement dated as of September 27, 2013 | $0.00 | - |

| Debtor | Counterparty Name and Address | Contract Description | Cure Amount | Cure Objection Amount |
|---|---|---|---|---|
| M & G Resins USA, LLC | LCRA Transmission Services Corporation<br>3700 Lake Austin Blvd.<br>Austin, TX 78703<br>Clara.Tuma@Lcra.org | Agreement for placement, operation, and maintenance of equipment (Letter Agreement) | $0.00 | - |
| M & G Polymers USA, LLC | M&G Finanziaria S.P.A<br>Strada Ribrocca 11<br>Tortona, AL 15057<br>Italy | Trademark Transfer and Sale Agreement | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Port Letter Agreement - reimbursement | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Purchase, Leaseback and Construction Agreement | $0.00 | - |
| M & G Resins USA, LLC | Port Of Corpus Christi Authority Of<br>Attn: Executive Director<br>222 Power Street<br>PO Box 1541<br>Corpus Christi, TX 78401<br>Ar@Pocca.com | Access and Utility Easement | $0.00 | - |