# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| M & G USA CORPORATION, et al.,[1] | Case No. 17-12307 (BLS) <br> (Jointly Administered) |
| Debtors. | D.I. 173, 490, 1113, 1231 |

## SUPPLEMENTAL OBJECTION AND RESERVATION OF RIGHTS OF THE CONSTRUCTION LIENHOLDER GROUP TO DEBTORS' MOTION TO SELL SUBSTANTIALLY ALL OF THE DEBTORS' REMAINING ASSETS

Certain construction lien[2] claimants (collectively, the "Construction Lienholder Group"),[3] by and through their undersigned counsel, hereby file this supplemental objection[4] and reservation of rights to the motion of the above-captioned debtors (the "Debtors") to sell substantially all of their remaining assets (the "Proposed Sale"), and in support of this supplemental objection, the Construction Lienholder Group respectfully submits the following:

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M & G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à.r.l. (1270), M & G Chemicals, S.A. (1022), M & G Capital S.à.r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062), and Indo American Investments Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2] The term "construction lien" is intended to encompass all mechanic's, contractors' or materialman's liens arising under and pursuant to Texas property law.

[3] The members of the Construction Lienholder Group are (i) Apache Industrial, Services, Inc., (ii) Arc Energy Services, Inc., (iii) Axis Industrial Services, LLC, (iv) Bay Ltd, (v) CCC group, Inc., (vi) Dawkins On-Site Concrete, LLC, (vii) Fagioli, Inc., (viii) Garrett Mechanical, Inc. (ix) TCI Business Capital as assignee of Integrity Mechanical Specialists, (x) Lexicon, Inc., (xi) MC Welding, Inc., (xii) MEITEC, Inc., (xiii) Mirage Industrial Group, LLC, (xiv) MMR Constructors, Inc., (xv) Montcalm USA, Inc. (xvi) N&A Project Management USA, Inc., (xvii) Repcon, Inc., (xviii) SimplexGrinnell, LP, (xix) Sunbelt Rentals, Inc., (xx) TNT Crane & Rigging Inc., (xxi) WFS Construction Company LLC, and (xxii) Wholesale Electric Supply of Houston, Inc.

[4] On March 9, 2018, the Construction Lienholder Group filed a Preliminary Objection and Reservation of Rights in Opposition to the Debtors' Motion to Sell Substantially all of their Remaining Assets [Docket No. 1113].

10090997/1

# INTRODUCTION

Since the beginning of this case, the Debtors, the official committee of unsecured creditors, Inbursa and DAK have sought to establish procedures that would deny payment of claims of legitimate liens by construction lienholders. The proposed sale of substantially all of the Debtors' remaining assets is now the culmination of those efforts.

By the proposed sale to the consortium and the reserve motion which is being heard contemporaneously therewith, the Debtors are seeking to pay claims for which there is an issue with respect to priority relative to construction lienholders, but also to pay money to other parties whose claims are indisputably junior to the rights of construction lienholders. At the same time, the Debtors and Creditors Committee is seeking to limit funds available to pay construction lienholders to an amount that may not, and likely will not, be sufficient to pay their liens in full.

The terms of the proposed sale contemplates an agreement to loan money to the estates to finance the estates through closing. The Construction Lienholder Group has not seen any budget or even seen any fixed amount for such loan, but it cannot be senior to the rights of construction lienholders. To the extent that such financing it is being considered, it must include adequate protection payments due to construction lienholders, as required by Section 363 and 361.

Ultimately, the immediate issue before this Court is the sale, not the issue of the party who is entitled to the proceeds from that sale. There has not been any judicial determination as to the priority of construction lienholders' secured claims, relative to the secured claims of Inbursa, Macquarie, and DAK. Thus, all money should be held pending a determination of those liens unless the estate provides a sufficient reserve for payment, in full, including interest, expenses, and attorneys' fees.

## BACKGROUND

1. Prior to the October 31, 2017, petition date, there were a total of over $300 million of construction liens (whether choate or inchoate) on the Debtors property in Corpus Christi, not including interest, legal fees or expenses. The Members of the Construction Lienholder Group have asserted more than $179,800,000 of those liens, again not including interest, legal fees or expenses.

### A. The Debtors' Postpetition Financing

2. On October 31, 2017, the Debtors filed a motion for authority for postpetition financing (the "DIP Motion"). As set forth in the DIP Motion, the postpetition security interests of the proposed lender (the "DIP Lien") would not prime Senior Prior Claims (which are defined are to include construction liens). Following the hearing on December 13, 2017, the Court entered a final Order approving the DIP Motion [Docket No. 479] (the "DIP Order"). Among the provisions in the DIP Order was that nothing in the DIP Order was intended to determine the relative priorities of the Pre-Petition First Lien Security Interests or the Pre-Petition Second Lien Security Interests compared to any valid, perfected and unavoidable mechanics' or materialmen's liens. See DIP Order, p. 5, n 5. Accordingly, to date, there has been no judicial determination as to the relative priority of the secured claims asserted by the construction lienholders, Inbursa, and DAK, except that the construction liens are senior to the DIP Lien

### B. The Debtors' Sale Motion

3. On November 16, 2017, the Debtors filed a Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of

Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [Docket No. 173] (the "Sale Procedures Motion"). On December 14, 2017, the Court entered an Order approving the Sale Procedure Motion [Docket No. 490] (the "Sale Procedures Order").

### C. The Construction Lienholder Automatic Stay Motion

4. On January 29, 2018, the Construction Lienholder Group filed a Motion for Relief from the Automatic Stay, to the Extent Necessary, to Commence Actions in Texas to Determine the Relative Priority of Construction Liens Between the Construction Lienholders and Nondebtors, Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa and DAK Americas LLC [Docket No. 824] (the "Automatic Stay Motion"). Objections to the Automatic Stay Motion were filed by the Debtors [Docket No. 936], Banco Nacional de Comercio Exterior, S.N.C., Institucion de Banca de Dessarrollo [Docket No. 938], DAK Americas LLC ("DAK") [Docket No. 939]; Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa ("Inbursa") [Docket No. 941], and the official committee of unsecured creditors (the "Unsecured Creditors Committee") [Docket No. 942] (collectively, the "Objections"). On February 19, 2018, the Construction Lienholder Group filed a reply in support of the Motion [Docket No. 995].

5. On February 22, 2018, the Bankruptcy Court considered the Motion and Objections thereto, and at the conclusion of the hearing, the Bankruptcy Court stated it would give the Construction Lienholder Group an option of either having the Motion denied without prejudice or having the Motion adjourned and continued until the hearing in the above-captioned bankruptcy

cases scheduled for March 23, 2018. The Construction Lienholder Group elected to have the Motion adjourned and continued until the March 23, 2018 hearing.

**D.      The Debtors' Postpetition Lienholder Reserve Motion**

6.      On March 2, 2018, the Debtors filed a Motion for Entry of an Order Establishing a Lienholder Claims Reserve and Granting Related Relief Filed by M & G USA Corporation [Docket No. 1075] by and through which they sought to establish a reserve in the amount of $350,149,728.43 from the sale of applicable assets of the Debtors' estates (the "Lienholder Reserve Motion").[5] This reserve may not include money sufficient to pay all construction liens in full, and would not include money sufficient to pay interest, legal fees, and expenses of the construction lienholders. On March 16, 2018, the Construction Lienholders Group filed an objection to the Lienholder Reserve Motion.

**E.      The Proposed Sale.**

7.      Following an auction that started at 10:00 a.m. on March 19, 2018 and lasted until after 11:00 p.m. on March 20, the Debtors determined that the bid submitted by Corpus Christi Polymers LLC, a joint venture of DAK, Far Eastern New Century Corporation and Far Eastern International (Holding) Limited and Induorama Ventures Montreal L.P. or their respective affiliates (the "Consortium Bid"). See Notice of (I) Successful Bidder and Backup Bidder and (II) Proposed Assumed and Assigned Executory Contracts and Unexpired Leases in Connection with the Sale of the Debtors' Assets [Docket No. 1231]. Among other things, the Consortium Bid provides for the following:

---

[5]      By their Omnibus Reply in Support of the Reserve Motion, the Debtors have increased the reserve to $350,779,713.45 to address errors in the original Reserve Motion.

(i) cash in amount sufficient to satisfy the Pre-Petition First Lien Obligations (as defined in the Final DIP Order), which the Debtors and the Consortium anticipate to be equal to approximately $430,000,000 less $14,500,000;[6]

(ii) cash in amount sufficient to satisfy the obligations owed to Macquarie (as defined in the Final DIP Order) arising under or in connection with that certain Credit Agreement, dated as of November 9, 2016, among Macquarie, as administrative and collateral agent, the lenders that are party thereto from time to time, and M&G Waters USA, LLC, as borrower, provided that such amount shall not exceed $57,000,000;[7]

(iii) cash in amount sufficient to satisfy the DIP Obligations (as defined in the Final DIP Order), which the Parties hereto anticipate to be equal to approximately $73,000,000 (the "DIP Payment");[8]

(iv) cash in an amount equal to $50,000,000 (assuming the payment of the $14,500,000 deduct set forth in Section 3.1(a) has been paid in full with respect to the First Lien Obligations)[9]

(v) an additional amount in cash, if any, on account of (i) Periodic Non-Income Taxes attributable to any Post-Closing Tax Period that were paid by Sellers on or prior to the Closing Date and (ii) Assumed Periodic Non-Income Taxes attributable to any Pre-Closing Tax Period (the "Periodic Non-Income Tax Cash Amount"), which the Parties hereto anticipate the total amount to be equal to approximately $9,500,000;

(vi) cash in an amount equal to the MGI Purchase Price for the MGI Assets; and the assumption of the Assumed Liabilities (including the amount of any Cure Costs).

(vii) cash in an amount equal to the Professional Payment Escrow Amount;

(viii) cash in an amount equal to the Completion Fee Escrow Amount; and (finally)

(ix) cash in an amount equal to the Mechanics Lien Escrow Amount.

8. The term "Mechanics Lien Escrow Amount" is defined as "cash in an aggregate amount equal to the reserve amount approved by the Bankruptcy Court pursuant to the Sale Order or other Order for the payment of Mechanics Lien Claims, provided, however, that **in no event**

---

[6] The Construction Lienholder Group has not, and does not, concede than any of the Pre-Petition First Lien Obligations are superior to the construction lienholders' liens.

[7] Again, the Construction Lienholder Group does not, concede that Macquarie's lien is senior to construction lienholders' liens.

[8] The DIP Payment is made on account of a lien that is indisputably junior to the construction lienholders' liens.

[9] This payment to unsecured creditors is also indisputably junior to the construction lienholders' liens.

**shall the Mechanics Lien Escrow Amount exceed $230,000,000."** See Consortium Bid APA, p. 10 (emphasis added).

9. Accordingly, the Consortium Bid would provide to construction lienholders $120 million less than the face amount of total construction liens acknowledged by the Debtors in the Lienholder Reserve Motion, and $30 million less than the face amount of total amount of acknowledged construction liens, even if the construction liens of Chemtex International are removed.[10] And that is the Debtors' best case scenario: neither of those numbers include the additional amounts which Construction Lienholders are owed for legal fees, interest and expense.

10. At the conclusion of the auction, Inbursa's affiliate, Banibu II Holdings, Inc., was determined to be the back-up bidder (the "Back-Up Bid"). The consideration in the back-up Bid included for the following:

(i) a credit bid pursuant to Section 363(k) of the Bankruptcy Code comprised of (i) all Obligations (as defined in the Debtor-in-Possession Loan Agreement) included in the DIP Agreement Credit Bid Amount and (ii) all Pre-Petition First Lien Obligations included in the Pre-Petition Credit Bid Amount
(ii) cash in an amount equal to the MGI Purchase Price for the MGI Assets; and
(iii) the assumption of the Assumed Liabilities at the Closing.
(iv) cash in an amount equal to the Completion Fees;
(v) cash in an amount equal to the Final Professional Payment Amounts;
(vi) cash in an amount equal to the Mechanics Lien Amounts
(vii) cash in an amount equal to the Macquarie Payment Amount;
(viii) cash in the amount of the Other Senior Liens Amounts to the extent that the Purchased Assets are transferred free and clear of Liens securing the Other Senior Liens Claims
(ix) cash in an amount equal to the Tax Lien Amounts; and
(x) cash in an amount equal to the Wind-Down Amount.

See Back Up Bid, Article III. The Mechanics Lien Escrow Amount" means, "at Purchaser's election, cash or a letter of credit in an aggregate amount equal to $263,745,024.45." Back Up Bid,

---

[10] Construction lienholders who are "under" Chemtex International may have a right to assert claims to any payment received by Chemtex that is superior to the claims of Chemtex' lenders.

Article I.1. That is still approximately, $90 million less than the Debtors have acknowledge is owed.

## BASES FOR OBJECTION

11. The Construction Lienholder Group objects to the proposed sale pursuant to the terms of the Consortium Bid (and to a lesser extent to the Back-Up Bid), because they propose to sell the assets that are the collateral of construction lienholders, and to pay claims for which there is an issue with respect to priority relative to construction lienholders (i.e., Inbursa's prepetition secured claim, and Macquarie prepetition secured claim). What's worse is that the Debtors are seeking to sell the construction lienholders' collateral to pay money on account of claims that are indisputably junior to the rights of construction lienholders, such as the claims to repay the DIP lender and the unsecured creditors. At the same time, the Debtors and Creditors Committee is seeking to limit funds available to pay construction lienholders to an amount that may not, and likely will not, be sufficient to pay their liens in full. Any such allocation on account of claims junior to construction liens is a clear violation of the priorities under Bankruptcy Code, including Section 363(f) of the Bankruptcy Code, the absolute priority rule, and applicable non-bankruptcy law.

    **A.    The Proposed Sale Does Not Meet the Requirements of 11 U.S.C. § 363(f)**

12. Section 363 of the Bankruptcy Code provides, in relevant part as follows:

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an <u>entity</u> other than the estate, only if—
    (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
    (2) such entity consents;
    (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
    (4) such interest is in bona fide dispute; or

> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). By any standard, the proposed sale pursuant to the consortium bid does not satisfy the requirements of Section 363(f).

13. Texas law does not permit a sale free and clear of the construction lienholders' liens. Specifically, if the Debtors wish to sell the construction lienholders' collateral, they have to post a bond pursuant to Texas Property Code §§ 53.157, 53.171, and 53.172 which require, among other things, that absent payment, the Debtors post a bond of at least 150% of the amount of the liens.

14. Nor have the Debtors' received the consent to the proposed sale by construction lienholders.

15. The allocation to be provided on account of the construction lienholders' liens is not greater than the aggregate value of construction liens on such property.

16. There is no *bona fide* dispute of the liens of the members of the Construction Lienholder Group. Despite the bar date set by this Court, and the information publicly available to the Debtors prior to bankruptcy, no party has objected to any claims before this Court.

17. The Debtors cannot demonstrate that construction lienholders could be compelled to take less than payment in full in satisfaction of its claims and there is no theoretical possibility that outside of bankruptcy, the Debtors or a court could compel construction lienholders to take less than its full amount of their claim, absent payment of a bond equal to at least 150% of the amount of the construction lienholders' liens).

B.  **The Proposed Sale Violates the Absolute Priority Rule and other Statutory Provisions of the Bankruptcy Code and Applicable Non-Bankruptcy Law through Allocation and Proposed Payment to Junior Claims.**

18.  The Construction Lienholder Group is aware that courts are loathe to find that sales and settlements are sub rosa plans, but the proposed sale is not simply a sale, but an attempt by the Debtors, the Consortium, and the Committee to allocate and make payments from proceeds from the construction lienholders' collateral. Such a scheme goes far beyond what was requested by the sale motion, and contains all of the hallmarks of a plan, other than releases and exculpations, many of which were already contained within the DIP Order.

19.  The Bankruptcy Code's protections for creditors ensure that creditors are treated fairly. Accordingly, courts have rejected proposed post petition agreements between debtors and select creditors that have the effect of dictating material terms of a plan of reorganization without complying with the Bankruptcy Code's procedural requirements for plan confirmation. PBGC v. Braniff Airways, Inc. (In re Braniff Airways,Inc.), 700 F.2d 935, (5th Cir. 1983) ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets"); see also In re Swallen's, Inc., 269 B.R. 634, 638 (BAP 6th Cir. 2001) ("At least when a party in interest objects, a bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be."). See also In re Decora Indus., 2002 WL 32332749 at *8 (D. Del. May 20, 2002) (stating "[T]he focus of 'sub rosa' plan analysis is oriented toward those situations in which a debtor proposes to sell 'all' or 'substantially all' of its assets without the benefit of a confirmed plan or a court-approved disclosure statement."). Although the Decora Court found that the

proposed sale transaction was not a "sub rosa" plan, it did indicate that it was persuaded to approve the transaction because a liquidating plan would be proposed to effect distributions under the Bankruptcy Code. Id.

20. In Braniff, the seminal case concerning sub rosa plans, the debtor sought approval of a settlement with certain of its secured and unsecured creditors that called for the debtor to sell aircraft, equipment, landing slots and airport terminal leases to a buyer in exchange for travel scrip, secured notes and a profit participation in the buyer's future operation but leaving the estate of virtually all value and leave "little prospect or occasion for further reorganization."). Braniff, 700 F.2d at 939. The travel scrip could only be used by employees, shareholders and designated unsecured creditors. Id. Moreover, certain secured creditors would be required to vote their deficiency claims in favor of any future plan of reorganization. Id. at 940. The Fifth Circuit determined that the provision requiring the secured creditors to vote a portion of their deficiency claim to support any plan approved by a majority of the unsecured creditors' committee "thwarts the Code's carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned." Id. The Fifth Circuit held that such a sale could not be approved under section 363(b) because it would dictate the terms of any future plan of reorganization but would not have provided creditors with the procedural protections of a plan. Id.

21. While this proposed sale is obviously factually distinguishable from Braniff because the sale would leave money for the estates to theoretically prepare a plan,[11] the proposed sale before this Court addresses the issues before the Court in both was at issue in Braniff and Decora because it seeks to avert the requirements for distribution in accordance with the

---

[11] The Construction Lienholder Group cannot determine at this time how the Debtors intend to use the funds allocated under the proposed postpetition financing included in the sale or whether the formulation of a plan in these cases is actually necessary or better than a conversation to Chapter 7.

11

requirements for distribution under 1129(a) and the other provisions for confirmation of a plan pursuant to which distributions may be made in bankruptcy.

C. **No Waiver Under 6004(h)**

22. The Construction Lienholder Group opposes any waiver under Bankruptcy Rule 6004(h). To the extent that the sale is approved, there is no need to grant relief from the stay of the order as otherwise required by the Federal Bankruptcy Rules. In this particular case, it is unlikely that any sale would be consummated for months, if ever.

D. **Construction Lienholders Are Entitled to Adequate Protection**

23. In connection with the DIP Motion, the Construction Lienholder Group previously requested adequate protection on account of their security interests of construction lienholders, a request that was denied because this Court concluded that it was receiving adequate protection through the Debtors' sale process. Once this sale has concluded, the Debtors sale process will no longer be serving as adequate protection for construction lienholders' security interests. In fact, the Debtors and the Committee will be seeking to use that collateral to challenge construction lienholders' liens. Pursuant to Sections 363 and 361 of the Bankruptcy Code, the Construction Lienholder Group renews its request for adequate protection.

24. Ultimately, as this Court previously advised in connection with the Construction Lienholders' Automatic Stay Motion: Smart lawyers wait to see if there is anything to fight over. Now, the parties know, and the construction lienholders (and presumably, the Debtors, the Committee, Inbursa and other parties), are ready for the fight. Until a court (or arbitrator, as applicable) determines the amount and extent of the validity, priority and amount of the underlying liens, the proceeds of the sale should remain in an escrow account at a bank agreeable to the parties pending a judicial determination.

## RESERVATION OF RIGHTS

25. The Construction Lienholder Group expressly reserves and preserves its right to supplement this objection with respect to any issue arising from or relating to the sale of the Debtors' assets which may affect or impair the rights of any member of the Construction Lienholder Group, and to join any other well-founded objection to the proposed sale.

**WHEREFORE**, the Construction Lienholder Group opposes the proposed sale to the extent that it allocates the payments from the of proceeds of the sale of construction lienholders' collateral or seeks to allow any distribution of any funds to any party prior to a judicial determination that such payments on are on account of claims senior to the liens of construction lienholders.

Dated: March 22, 2018        **MORRIS JAMES LLP**

/s/ Jeffrey R. Waxman
Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Eric J. Monzo (DE Bar No. 5214)
Brenna A. Dolphin (DE Bar No. 5604)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899-2306
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: ckunz@morrisjames.com
E-mail: jwaxman@morrisjames.com
E-mail: emonzo@morrisjames.com

*Counsel to the Construction Lienholder Group*