# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| M & G USA CORPORATION, *et al.*,[1] | : | Case No. 17-12307 (BLS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING CERTAIN DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS TO THE SALE DIP LENDERS PURSUANT TO 11 U.S.C. §§ 364 AND 507; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND LOCAL RULE 4001-2; AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

move the Court (this "Motion"), pursuant to sections 105, 362, 363, 364 and 507 of title 11 of the

United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), for entry of an interim order in substantially the form attached

hereto as Exhibit A (the "New Interim DIP Order") and a final order (the "New Final DIP

Order"):

> (i)     authorizing the Obligors (as defined below) to obtain postpetition
> superpriority debtor-in-possession financing (the "New DIP Facility")
> pursuant to the terms set forth in that certain *Term Sheet with Respect to
> Proposed Debtor-in-Possession Financing*, by and between Corpus Christi
> Polymers LLC ("CCP" or the "New DIP Lender"), Debtors M&G Resins
> USA, LLC, as borrower ("Borrower") and M&G USA Corporation, M&G

---

**1**     The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M&G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

Finance Corporation, M&G Waters USA, LLC, M&G USA Holding LLC, Chemtex International Inc., Chemtex Far East, Ltd. and Indo American Investments, Inc. (collectively, with the Borrower, the "Obligors"), a copy of which is attached to the New Interim DIP Order as Exhibit 1 (the "DIP Term Sheet");[2]

(ii)     authorizing the Obligors to enter into all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, modified or supplemented from time to time, the "New DIP Loan Agreement");

(iii)    authorizing the use of the proceeds of the New DIP Facility on an interim basis in a manner consistent with the terms and conditions of the New DIP Loan Agreement;

(iv)    granting liens and superpriority administrative claims in connection with the New DIP Loan Agreement;

(v)     authorizing and directing the Obligors to pay, without further order of the Court, the obligations payable to the New DIP Lender under the DIP Term Sheet and New DIP Loan Agreement;

(vii)   vacating and modifying the automatic stay as necessary to effectuate the terms of the New DIP Facility;

(viii)  scheduling a final hearing (the "Final Hearing") with respect to the relief requested herein; and

(ix)    granting related relief.[3]

In support of this Motion, the Debtors submit (i) the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* (the "First Day Declaration") [Docket No. 3]; (ii) the *Declaration of Neil A. Augustine* dated October 31, 2017 (the "CEC DIP Declaration");[4] (iii) the *Declaration of*

---

[2]     Capitalized terms not otherwise defined herein have the meanings given to them in the DIP Term Sheet.

[3]     For the avoidance of doubt, nothing in this Motion, the New Interim DIP Order, or the New Final DIP Order, shall constitute or result in an extension of the Challenge Deadline in paragraph 23 the Inbursa Final DIP Order.

[4]     *Declaration of Neil A. Augustine in Support of Motion for Entry of Interim and Final Orders to (1) Authorize Certain Debtors in Possession to Obtain Post Petition Financing Pursuant To 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to Dip Lender Pursuant to 11 U.S.C. §§ 364 And 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and The Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; (5) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2; and (6) Grant Related Relief* [Docket No. 51].

*Jonathan Brownstein in Support of Debtors' Motions for Entry of Orders Approving (I) the Sale of Certain Assets of the Debtors and (II) the New DIP Facility* filed substantially contemporaneously herewith (the "Brownstein Declaration"); and (iv) the *Declaration of Dennis Stogsdill in Support of Debtors' Motions for Entry of Orders Approving (I) the Sale of Certain Assets of the Debtors and (II) the New DIP Facility* filed substantially contemporaneously herewith (the "Stogsdill Declaration" and, together with the First Day Declaration, the CEC DIP Declaration and the Brownstein Declaration, the "Declarations") and respectfully represent as follows:

## JURISDICTION AND VENUE

1.       The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.     General Background

2.     On October 24, 2017 ("Polymers Petition Date"), Debtor M&G Polymers filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, thereafter, on October 30, 2017 (the "Petition Date"), each of the other Debtors commenced chapter 11 cases before this Court (together with the chapter 11 case of M&G Polymers, the "Cases"). The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     An Official Committee of Unsecured Creditors (the "Committee") was appointed in these Cases on November 13, 2017 (Docket No. 146).  Additional information regarding the Debtors and these Cases, including the Debtors' businesses, corporate structure and financial condition, is set forth in the First Day Declaration, filed on October 31, 2017.

### B.     The CEC DIP Facility

4.     On December 14, 2017, this Court entered a final order [Docket No. 479] authorizing certain Debtors to enter into a $100 million debtor-in-possession financing facility (the "CEC DIP Facility"; the loan agreement evidencing such facility, the "CEC DIP Loan Agreement") with Control Empresarial de Capitales, S.A. de C.V. ("CEC") as the lender thereunder.  Subject to certain restrictions, the CEC DIP Facility has provided certain of the Debtors with the funding necessary to maintain limited operations and administer these Cases through a sale of the certain of the Debtors' assets, with a current budget that runs through March 31, 2018.  As described in further detail below, the Debtors have now concluded that marketing process and have announced a winning bidder for the Corpus Christi Plant and related assets.  On April 1, 2018, the Debtors will no longer be able to access any funding under the CEC DIP Facility under the current budget in place.

### C.    The Marketing of the Debtors' Corpus Christi Plant and Related Assets

5.    Shortly after the Debtors filed for chapter 11 protection in late October 2017, the Debtors began an M&A process to explore a sale of substantially all of the Debtors' assets.  Chief among the Debtors' assets is the Debtors' vertically integrated PTA/PET plant located in Corpus Christi, Texas (the "Corpus Christi Plant").

6.    To establish clear guidelines for a sale of their assets, on November 16, 2017, the Debtors filed the Sale Motion,[5] which sought, among other things, approval of bidding procedures and ultimately the sale of the Debtors' assets, including the Corpus Christi Plant and the other Purchased Assets (as defined below).  On December 14, 2017, the Court entered an order approving such bidding procedures (the "Bidding Procedures").[6]

7.    In the Bidding Procedures, the Debtors anticipated the need for the New DIP Facility.  Specifically, the Bidding Procedures required prospective bidders to submit as part of their binding Final Bids (as defined in the Bidding Procedures) "a written commitment by the Prospective Bidder to provide the Debtors with financing to fund the Debtors' Cases from March 31, 2018 through the closing of the applicable Sale Transaction (or, with respect to a Final Bid for any of the Apple Grove Assets, from the date of the bid through the closing of the applicable Sale Transaction therefor)."  Bidding Procedures § IV.A.6(c).

---

[5]    *See Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 173] (the "Sale Motion")

[6]    *See Order (I) (A) Approving Bidding Procedures For The Sale Of Certain Of The Debtors' Assets, (B) Authorizing The Debtors To Enter Into One Or More Stalking Horse Purchase Agreements And to Provide Bid Protections Thereunder, (C) Scheduling An Auction And Approving The Form And Manner Of Notice Thereof, (D) Approving Assumption And Assignment Procedures And (E) Scheduling A Sale Hearing And Approving The Form And Manner Of Notice Thereof And (II) Granting Related Relief* [Docket No. 490] (the "Bidding Procedures Order").

8. In connection with the sale process, which has spanned over four months, Rothschild Inc. ("Rothschild"), the Debtors' investment banker, invited prospective purchasers to bid on any and/or all of such assets. During the sale process, Rothschild engaged in extensive sale and marketing efforts, contacting 111 potential strategic and financial buyers that might be interested in acquiring all or a portion of the Corpus Christi Plant and related assets. Of these 111 potential strategic and financial buyers, 38 parties signed non-disclosure agreements and were provided with access to a virtual dataroom and extensive diligence materials, including detailed financial information, detailed information regarding the status of construction of the Corpus Christi Plant and information on the Debtors' intellectual property, among other information. In addition, Rothschild arranged for site visits and discussions with management as requested by prospective bidders. *See* Brownstein Decl. ¶¶ 8-9.

9. At the culmination of this marketing process, on March 6, 2018, the Debtors received seven bids (the "Initial Bids") for certain of their assets. Three of the Initial Bids were for the Corpus Christi Plant and substantially all of the Debtors' other assets (the "All-Asset Initial Bids"). The remaining four Initial Bids were limited to only the Desalination Assets or certain of the Debtors' real property.[7] Again, in consultation with their advisors, the Debtors pursued the All-Asset Initial Bids, largely for the same reasons discussed above: (a) the Initial Bids solely for the Desalination Assets and the Debtors' real property were too contingent; (b) the Desalination Assets Initial Bids provided significantly less value than the values in the All-Asset Initial Bids; (c) none of the All-Asset Initial Bids would accept anything less than essentially the entirety of the Corpus Christi Plant; and/or (d) the Debtors believed that the All-Asset Initial Bids would provide the best opportunity for the Debtors to maximize the value of their estates. *See* Brownstein Decl. ¶ 13.

---

[7] All of the Initial Bids for the Desalination Assets included the Debtors' boiler assets. One of such Initial Bids, however, also had an option without the Debtors' boiler assets.

10.    In accordance with the Bidding Procedures Order, on March 19, 2018 the Debtors convened all relevant parties for an auction for the Corpus Christi Plant and related assets (the "Auction"), and on March 20, 2018, the Debtors conducted the Auction.  At the Auction, the Debtors announced that they had received the following two qualified bids for the Corpus Christi Plant and related assets:  (a) a bid from Banibu (the "Banibu Bid") and (b) a bid from CCP (the "CCP Bid").  Aside from these two bids, there were no other qualified bids at the Auction.  Based on the results of the Auction, and in consultation with Rothschild and the Debtors' other advisors, the Debtors' board of directors selected the CCP Bid as the Successful Bid at the Auction. *See* Brownstein Decl. ¶¶ 16-17.

11.    Subsequent to the conclusion of the Auction, the Debtors filed an Auction Results Notice,[8] which attached, as Exhibit 1 thereto, the Asset Purchase Agreement evidencing the CCP Bid (the "Purchase Agreement"; the sale transaction contemplated thereby, the "Corpus Christi Plant Sale").  The Purchase Agreement contemplates that certain of the Debtors will sell to CCP all of their right, title and interest in the Purchased Assets (as defined in the Purchase Agreement), which includes the Corpus Christi Plant, the Debtors' intellectual property and related assets.

### D.    The New DIP Facility

12.    The Debtors have an urgent need for additional financing during the period from April 1, 2018, at which time the Debtors have no further ability to borrow under the CEC DIP Facility, through the closing of the Sale.  As set forth in the First Day Declaration, the Corpus Christi Plant is not operational and thus generates no revenue to maintain the Debtors' assets and to continue the administration of these Cases.  In addition, the CEC DIP Facility, for which the budget expires on March 31, 2018, does not provide the Debtors with adequate funding to either

---

[8]    *See Notice of (I) Successful Bidder and Backup Bidder and (II) Proposed Assumed and Assigned Executory Contracts and Unexpired Leases in Connection with the Sale of the Debtors' Assets* [Docket No. 1231] (the "Auction Results Notice").

close the Sale of the Purchased Assets to the Purchaser or to pursue anything other than a conversion or dismissal of these Cases. Thus, from and after April 1, 2018, the Debtors will lack funding to continue to administer these Cases. As such, the Debtors require the financing necessary to maintain these Cases and their assets through the closing of the Sale. *See* Brownstein Decl. ¶ 24.

13. In connection with the Debtors' proposed entry into the Purchase Agreement, CCP agreed to enter into the New DIP Facility with the Obligors and provide, subject to the terms and conditions set forth in the DIP Term Sheet, liquidity in an aggregate amount of at least $55 million. The New DIP Facility largely mirrors the CEC DIP Facility in collateral scope and structure. Both share identical obligors and the underlying collateral is the same, with the liens proposed to secure the New DIP Facility ranking junior to the liens securing the CEC DIP Facility. *See* Brownstein Decl. ¶ 25.

14. The Debtors do not believe that new financing is available to the Obligors on terms more favorable than the New DIP Facility. As an initial matter, certain of the New DIP Facility's terms are very favorable to the Debtors. For example, upon closing of the sale pursuant to the CCP Bid, the Obligors have no obligation to repay the New DIP Facility. No other Qualified Bids received by the Debtors provided for a similar financing structure. *See* Brownstein Decl. ¶ 26.

15. Moreover, given the challenges that the Debtors have previously faced in raising postpetition financing, the New DIP Facility's beneficial terms seemed even more attractive. As set forth in greater detail in the CEC DIP Declaration, the Debtors conducted an extensive process to obtain funding prior to the Petition Date. This experience led the Debtors to conclude that a wider market search for unsecured financing would be futile. This conclusion applies with even

greater force now, given that the Debtors have concluded the sale process and are in the process of seeking Court approval of the sale of the Purchased Assets.  *See* Brownstein Decl. ¶ 27.

16.     In addition to being the only financing available, the New DIP Facility provides significant benefits to the Debtors.  The New DIP Facility will ensure that the Obligors can administer these Cases and preserve the Purchased Assets through the closing of the sale of the Corpus Christi Plant.  Given the value generated by the sale of the Corpus Christi Plant, the New DIP Facility will make it possible for the Debtors to potentially confirm a chapter 11 plan. *See* Brownstein Decl. ¶ 28.

17.     The New DIP Facility will require the consent of CEC to, among other things, permit the incurrence of the New DIP Facility and to extend the maturity date of the CEC DIP Facility to allow for sufficient time to the close the Corpus Christi Plant Sale.  Certain terms of this consent would be effectuated through an amendment to the CEC DIP Loan Agreement.  At this time, such consent terms have not been fully agreed among the Debtors, CEC and the New DIP Lender.  While discussions are ongoing, the Debtors anticipate filing the CEC DIP Loan Agreement amendment and any additional changes to the proposed New Interim DIP Order to reflect these consent terms.

18.     In accordance with Bankruptcy Rule 4001(c) and Local Rule 4001-2 the principal terms of the New DIP Facility are as follows:[9]

| REQUIRED DISCLOSURE | SUMMARY OF MATERIAL TERMS | |
|---|---|---|
| **Parties**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>*DIP Term Sheet* | Borrower: | M & G Resins USA, LLC |
| | Guarantors: | M&G USA Corporation, M&G Finance Corporation, M&G Waters USA, LLC, M&G USA Holding LLC, Chemtex International Inc., Chemtex Far East, Ltd. and Indo American Investments, Inc. |
| | Obligors: | The Borrower and the Guarantors |
| | New DIP Lender: | Corpus Christi Polymers LLC |

---

[9]     This summary is qualified in its entirety by the provisions of the DIP Loan Agreement. Capitalized terms not otherwise defined herein have the meanings given to them in the DIP Term Sheet.

| Required<br>Disclosure | Summary of<br>Material Terms |
|---|---|
| **Commitment**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br><br>*DIP Term Sheet* | Senior debtor-in-possession credit facility in the aggregate principal amount not to exceed $15 million from entry of the Interim DIP Order until the day prior to entry of the Final New DIP Order, and the aggregate principal amount of at least $55 million upon and after entry of the Final New DIP Order. |
| **Maturity/Termination Date**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br><br>*DIP Term Sheet* | The earliest of: (a) August 1, 2018; (b) the date of closing of an Alternative Transaction (as defined in the Corpus Christi APA) is approved by the Bankruptcy Court; (c) the date the New DIP Lender accelerates the New DIP Obligations following an Event of Default (as defined below) subject to compliance with the Interim New DIP Order and the Final New DIP Order, as then applicable; (d) the date a sale of all or a portion of the Purchased Assets to a buyer(s) other than Purchaser or Banibu (the "Back-Up Bidder") is approved by the Bankruptcy Court; (e) the date of filing of any reorganization plan by any of the Obligors which is not acceptable to the New DIP Lender (provided that any Acceptable Chapter 11 Plan (as defined in the Bid Support Term Sheet) shall be acceptable to the Lender); and (f) the date on which the New DIP Lender is granted relief from the automatic stay. |
| **Interest Rate and Premiums**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br><br>*DIP Term Sheet* | Interest Rate:    LIBOR plus 9.5% per annum.<br><br>Default Rate:    Interest Rate plus 2% |
| **Expenses**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br><br>*DIP Term Sheet;<br>Interim DIP Order ¶ 15* | On the DIP Termination Date, the Obligors shall be jointly and severally obligated to pay the New DIP Lender for (a) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel and financial advisors) of the New DIP Lender or any of its members, solely in connection with the New DIP Facility or any of the lending transactions contemplated thereby, whether accrued on, prior to or after the Closing Date, whether or not the Closing Date occurs, and (b) all reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of outside counsel and financial advisors) of the New DIP Lender or any of its members for enforcement costs and documentary taxes associated with the New DIP Facility and the transactions contemplated thereby. |
| **Use of Funds**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br><br>*DIP Term Sheet;<br>Interim DIP Order ¶ I* | The Borrower shall use the proceeds of Advances only for the purpose of funding (i) certain employee-related, maintenance and other related expenses of the Borrower, (ii) fees and expenses incurred by estate professionals, (iii) interest and professional fees to Control Empresarial de Capitales, S.A. de C.V., in its capacity as Initial Lender (as defined in the CEC DIP Loan Documents) and in accordance with the CEC DIP Loan Documents and the Final Inbursa DIP Order, (iv) interest and professional fees to the Pre-Petition First Lien Lender in accordance with the Pre-Petition First Lien Loan Documents and the Final Inbursa DIP Order and (v) other items, all (i.e., (i) – (v)) strictly in accordance with the allowed disbursements set forth in the Budget (subject to permitted variances), the Interim New DIP Order and Final New DIP Order, and consistent with the terms and conditions set forth in the Bid Support Term Sheet.<br><br>The New DIP Obligations shall be deemed indefeasibly satisfied in full and the New DIP Liens deemed released upon the Closing Date as defined in the APA. |
| **Funding Conditions**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br><br>*DIP Term Sheet* | Usual and customary conditions precedent to funding of the New DIP Loan, including, without limitation (a) satisfactory New DIP Agreement documentation, (b) approved (including by the New DIP Lender) Budget, (c) any required governmental consents (if any are required), (d) CEC's consent to the DIP Term Sheet and the transactions contemplated hereby, (e) entry of Sale Order (with the Purchaser having been |

| Required Disclosure | Summary of Material Terms |
|---|---|
| | approved by the Bankruptcy Court as the successful bidder for the Purchased Assets), (f) entry of Interim New DIP Order and Final New DIP Order in form satisfactory to the New DIP Lender, the Obligors, CEC and the Pre-Petition First Lien Lender, (g) confirmation of no outstanding prior liens on the New DIP Collateral other than as set forth in the New Final DIP Order, and (h) such other information and documents as the New DIP Lender may require from time to time in its reasonable discretion.<br><br>In addition, the following conditions also must be satisfied prior to entry into the New DIP Facility and/or funding any Advances:<br><br>• a certificate of the chief restructuring officer of the Debtors confirming that: (a) the representations and warranties set forth in the New DIP Agreement are true and correct (with respect to any Advance made from and after the entry of the Final New DIP Order, such representations and warranties shall be true and correct in all material respects on the date of such Advance as if such representations and warranties were made on and as of such date); and (b) the Advances requested do not exceed, on a weekly basis, the disbursements permitted pursuant to the Budget for the relevant week (subject to permitted variances) together with any amounts carried forward from a prior budget period in accordance with the terms hereof;<br><br>• the Interim New DIP Order and Sale Order shall have been entered by the Bankruptcy Court by March 30, 2018 and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the New DIP Lender;<br><br>• the Obligors and the Purchaser shall have entered into the Corpus Christi APA, and the Corpus Christi APA shall be in full force and effect and shall not have been terminated pursuant to Section 4.4 of the Corpus Christi APA;<br><br>• no Event of Default shall have occurred; and<br><br>• there shall not be any order entered by the Bankruptcy Court that results in an Event of Default. |
| **Security and Priority**<br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)(i, vii)<br><br>*DIP Term Sheet;*<br>*Interim DIP Order ¶¶*<br>vi; 7; 9 | The New DIP Lender shall be granted new liens (the "New DIP Liens") on and security interests in all assets (other than the assets excluded from the scope of the DIP Collateral) of each of the Obligors (including but not limited to Avoidance Proceeds) (the "New DIP Collateral") pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, which shall rank senior in priority to all liens other than those valid, perfected, and unavoidable liens existing on the Obligors' assets either recognized by or described in the Final Inbursa DIP Order [Dkt. No. 479], including, without limitation, the liens and security interests (the "Macquarie Liens") held by Macquarie Investments US Inc. ("Macquarie") under that certain Credit Agreement, dated November 9, 2016, among Macquarie, as administrative and collateral agent, the lenders that are party thereto from time to time, and M&G Waters USA, LLC (the "Macquarie Credit Agreement") (collectively, the "Existing Liens"); *provided*, that notwithstanding anything to the contrary, (a) the New DIP Collateral shall not include and the New DIP Liens shall not extend or attach to any property of the Obligors to which at least one or more of the Existing Liens have not attached (and without in any way impairing, releasing or otherwise adversely affecting any rights of the Committee to challenge any claims asserted by DAK) and (b) the New DIP Collateral shall not include and the New DIP Liens shall not extend or attach to the Excluded Avoidance Actions (as defined in the Final Inbursa DIP Order).<br><br>The New DIP Lender shall also be granted, pursuant to Bankruptcy Court approval in Interim New DIP Order and Final New DIP Order, a superpriority administrative expense claim (the "New DIP Superpriority Claim") with respect to the New DIP |

| REQUIRED DISCLOSURE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | Obligations that will, in accordance with Section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against any of the Obligors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code other than any administrative expense claims granted pursuant to the Final Inbursa DIP Order [Docket No. 479, as to which the New DIP Superpriority Claim will rank junior in priority.[10] <br><br> For the avoidance of doubt the New DIP Liens and the New DIP Superpriority Claim will rank junior in priority to the liens and claims of the DIP Secured Parties and the Pre-Petition First Lien Lender under the Pre-Petition First Lien Loan Documents. The New DIP Agreement shall be subject to a subordination agreement (the "Subordination Agreement"), consistent with the terms set forth on Exhibit B to the DIP Term Sheet and reasonably satisfactory to the New DIP Lender, the Initial Lender, the Pre-Petition Lender and the Obligors, among the New DIP Lender and, as applicable, the Pre-Petition First Lien Lender and/or CEC pursuant to which all obligation under the New DIP Agreement shall be subordinated in payment and priority to the obligations under the Pre-Petition First Lien Loan Documents and the obligations under the CEC DIP Loan Documents, and other customary provisions, including standstill (*e.g.*, other than in respect of the termination of the commitment to Advance (subject to Carve-Out below) and the right to accelerate), turnover, and deemed to consent to actions permitted to be taken under the CEC DIP Loan Documents (including future extensions of loans thereunder) and the asset purchase agreement among the Obligors and Banibu dated March 20, 2018 (the "Inbursa Back-up Bid APA"), as applicable. |
| **Adequate Protection / Lien Priming** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(ii) <br> Del. Bankr. L.R. 4001-2(a)(i)(G) | The DIP Term Sheet does not propose to prime the liens of any party. |
| **Acknowledgements / Validity of Prepetition Liens** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(iii) <br> Del. Bankr. L.R. 4001-2(a)(i)(B) <br><br> *DIP Term Sheet; Interim DIP Order ¶ G* | The DIP Agreement, the Interim New DIP Order and the Final New DIP Order shall include customary terms, including, but not limited to, typical representations and warranties, and covenants for transactions of this type, including, but not limited to: <br><br> • stipulations concerning the extent, validity and perfection of the New DIP Lender's liens; <br><br> • an acknowledgment that the New DIP Loans were made in good faith; and <br><br> • an acknowledgement that the proceeds of the New DIP Loans shall be used strictly in accordance with the approved Budget (subject to permitted variances). |
| **Automatic Stay** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The Interim New DIP Order and Final New DIP Order (as applicable) will provide the following notice in respect of any Event of Default: <br><br> Any automatic stay otherwise applicable to the Lender is hereby modified so that after the occurrence of any Event of Default and at any time thereafter, upon five (5) |

---

[10] For the avoidance of doubt, the New DIP Superpriority Claim shall have recourse against the Avoidance Proceeds (as defined in the Inbursa Final DIP Order) only to the extent that the Superpriority Claim (as defined in the Inbursa Final DIP Order) would have had recourse against such Avoidance Proceeds pursuant to Paragraph 4(b) of the Inbursa Final DIP Order.

| Required Disclosure | Summary of Material Terms |
|---|---|
| *Interim DIP Order ¶ 18* | business days' prior written notice given by email or facsimile of such occurrence, in each case, given to counsel for the Borrower, the Official Committee of Unsecured Creditors, the United States Trustee, the CEC DIP Lender and the Pre-Petition First Lien Lender (collectively, the "Notice Parties"), the Lender shall be entitled to exercise all rights and remedies in accordance with the New DIP [Term Sheet][Loan Agreement] and this [Interim][Final] Order, as applicable. Following the giving of written notice by the Lender of the occurrence of an Event of Default, the Notice Parties shall be entitled to an emergency hearing before this Court. If the right of the Lender to exercise its remedies is not contested or otherwise stayed or enjoined by this Court, after notice and hearing, the automatic stay as to the Lender shall automatically terminate at the end of such notice period. Subject to the provisions of this paragraph, upon the occurrence of an Event of Default, the Lender is authorized to exercise its remedies and proceed under or pursuant to the New DIP Loan Agreement and this [Interim][Final] Order. Nothing included herein shall prejudice, impair, or otherwise affect the Lender's rights to seek any other or supplemental relief in respect of the Borrower nor the Lender's rights, as provided in the New DIP [Term Sheet][Loan Agreement], to suspend or terminate the making of any further Advances under the New DIP [Term Sheet][Loan Agreement]. |
| **Milestones**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(v, vi)<br><br>*DIP Term Sheet* | The New DIP Loan Agreement sets forth the following milestones:<br><br>• The Obligors will seek entry of the Interim New DIP Order approving the New DIP Facility and an order approving the Corpus Christi APA at a single hearing scheduled for March 23, 2018; and<br><br>• the definitive New DIP Agreement (and related loan documents) or the Final New DIP Order shall have been entered into by April 13, 2018 (and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the New DIP Lender). |
| **Release**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The DIP Loan Agreement does not contain any material affirmative releases by either Borrower or the New DIP Lender. |
| **Indemnity**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii)<br><br>*DIP Term Sheet* | The Obligors, jointly and severally, will indemnify and hold harmless the New DIP Lender, its respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") from and against all documented costs, expenses (including reasonable and documented out-of-pocket fees, disbursements and other charges of outside counsel but subject to the limitations set forth two paragraphs below) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the New DIP Loan Agreement, any of the orders referenced herein, or the transactions contemplated thereby; provided that, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted (a) from such Indemnified Person's bad faith, gross negligence or willful misconduct, (b) from a claim brought by any Obligor against an Indemnified Person for material breach of such Indemnified Person's obligations under the New DIP Facility or under any documents or agreements executed in connection therewith, or (c) from a dispute solely among Indemnified Persons.<br><br>No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any of the Obligors or any of their respective subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non- |

| REQUIRED DISCLOSURE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's bad faith, gross negligence, willful misconduct or material breach of its obligations hereunder. In no event, however, shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages.<br><br>The amounts which are the subject of this section shall be payable on the DIP Termination Date. Notwithstanding anything to the contrary, no claim of an Indemnified Person shall be payable as a GUC Pool Administrative Expense and Priority Claim (as defined in the Bid Support Term Sheet). |
| **506(c) Waiver**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(x)<br>Del. Bankr. L.R. 4001-2(a)(i)(C)<br><br>*DIP Term Sheet; Interim DIP Order ¶ H* | As a further condition of the New DIP Loan Agreement and any obligation of the DIP Lender to make credit extensions pursuant to the New DIP Loan Agreement, upon entry of the New Interim DIP Order, the Borrower and its estate shall be deemed to have waived all rights to assert section 506(c) surcharge claims against the DIP Lender. |
| **Liens on Avoidance Actions**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(x)<br>Del. Bankr. L.R. 4001-2(a)(i)(D)<br><br>*DIP Term Sheet; Interim DIP Order ¶ 9* | The New DIP Liens shall have a lien on the Avoidance Proceeds, junior in priority to the first-priority liens on the Avoidance Action Proceeds granted in favor of CEC pursuant to the Final Inbursa DIP Order. |
| **Fees Carve Out**<br>Del. Bankr. L.R. 4001-2(a)(i)(F)<br><br>*DIP Term Sheet; Interim DIP Order ¶ 11* | Notwithstanding anything to the contrary in the DIP Term Sheet, in the New DIP Loan Agreement or any other order of the Court to the contrary, the rights and claims of the New DIP Lender, including the New DIP Liens (and all liens junior or senior to the New DIP Liens, except for the Macquarie Liens), shall be subject and subordinate in all respects to the payment of the Carve-Out from the Carve-Out Reserves (each as defined below). Following the occurrence and during the continuance of an Event of Default or default under the Final New DIP Order (each, a "Carve-Out Trigger Event"), and delivery of notice thereof (the "Carve-Out Trigger Notice") (which may be by email) to the Borrower, the Committee and the United States Trustee (the date of a delivery of such notice, the "Carve-Out Trigger Date"), the Borrower shall be entitled to use remaining availability (if any) under the New DIP Facility for the following purposes only and without duplication (the sum of (a) through (b) below, the "Carve-Out"): (a) (1) the amount of accrued and unpaid professional fees and expenses incurred by persons or firms retained by the Obligors or the Committee for services rendered by such professionals for the period beginning on the date of the Final Order through and including the Carve-Out Trigger Date that is subsequently allowed by Court order, and strictly in accordance with the Budget (plus amounts for permitted variances therefrom in respect thereof) (the "Professional Compensation") and (2) the amount of Professional Compensation for the period beginning from and after the Carve-Out Trigger Date, which amount shall not exceed (i) $2,000,000 in aggregate with respect to the Obligors' professionals and (ii) $515,000 in aggregate with respect to the Committee's professionals; and (b) all statutory fees required to be paid by Borrower to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a).<br><br>The Borrower shall be authorized to establish a separate deposit account for the amounts set forth in clauses (a) through (b) in the paragraph above (collectively, the "Carve-Out Reserve"). Upon the occurrence of the Carve-Out Trigger Date, the Borrower shall be authorized to transfer cash from the [DIP Cash Collateral Account] |

| REQUIRED DISCLOSURE | SUMMARY OF MATERIAL TERMS |
|---|---|
| | and/or to borrow under the New DIP Facility in an aggregate amount equal to the amount sufficient to fully fund the Carve-Out Reserve into a segregated deposit account not in the control of the Lender or CEC. Once funded in accordance with this paragraph, the Carve-Out Reserve may only (subject to the provisions of the immediately succeeding paragraph) be used to pay those obligations for which the Carve-Out Reserve was established. For the avoidance of doubt, all Carve-Out amounts funded pursuant to this paragraph shall be deemed a New DIP Obligation. |
| | The Carve-Out Reserve and the proceeds on deposit in respect thereof shall be available only to satisfy obligations to which the Carve-Out expressly relates, except that the DIP Lender shall retain liens and security interests, which shall be a superpriority lien (superior to other liens, but junior to the liens in favor of CEC), in any remaining amounts left in the Carve-Out Reserve (the "Unused Carve-Out Amounts") following satisfaction in full of all obligations to which the Carve-Out expressly relates, and shall receive distributions, on demand, on account of any unpaid New DIP Obligations from such Unused Carve-Out Amounts after distributions to satisfy obligations senior to the New DIP Obligations. |
| | For the avoidance of doubt, any amounts funded under the Carve-Out or into the Carve-Out Reverse shall reduce dollar for dollar the amounts required to be funded under the Carve-Out under the CEC DIP Loan Documents and vice versa. |
| **Cross-Collateralization** Del. Bankr. L.R. 4001-2(a)(i)(A) | None. |
| **Roll-Up Provisions** Del. Bankr. L.R. 4001-2(a)(i)(E) | None. |
| **552(b)(1) Waiver** Del. Bankr. L.R. 4001-2(a)(i)(H) *DIP Term Sheet; Interim DIP Order ¶ 25* | Recourse to the New DIP Collateral or other security for the DIP Obligations will not at any time be required, and the Borrower shall waive any right of marshaling the Borrower may have. |

## RELIEF REQUESTED

19. By this Motion, pursuant to sections 105, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and Local Rule 4001-2, the Debtors request entry of the Interim New DIP Order: (a) approving the New DIP Facility on an interim basis; (b) authorizing the Obligors to enter into the New DIP Loan Agreement; (c) authorizing the use of the proceeds of the New DIP Facility on an interim basis in a manner consistent with the terms and conditions of the New DIP Loan Agreement; (d) granting liens and superpriority administrative claims in connection with the New DIP Facility; (e) authorizing and directing the Obligors to pay, without further order of the Court, the obligations payable to the New Sale DIP

Lender under the New DIP Loan Agreement; (f) vacating and modifying the automatic stay as necessary to effectuate the terms of the New DIP Facility; (g) scheduling the Final Hearing; and (h) granting related relief.

**BASIS FOR RELIEF**

A.    **Entry into the New DIP Facility is an Appropriate Exercise of the Debtors' Business Judgment**

20.    As described above and in more detail in the Stogsdill Declaration and the Brownstein Declaration, the Debtors' management, after consultation with their advisors, has determined that the New DIP Facility provides the best option for ensuring that the Debtors are able to bridge to a closing of the Corpus Christi Plant Sale to the benefit of the Debtors' stakeholders. Unless a decision to borrow money is arbitrary or capricious, bankruptcy courts will generally defer to a debtor's business judgment. *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994). Indeed, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

21.    The New DIP Facility provides tangible and immediate benefits to the Debtors' estates. Entry into the New DIP Facility ensures that the Debtors will close the Corpus Christi Plant Sale and satisfy the conditions and milestones set forth in the Purchase Agreement. Obtaining the New DIP Facility is essential to preserving the value of the Purchased Assets, ensuring that critical employees are retained and securing the liquidity necessary to conclude the sales process and potentially propose a liquidating chapter 11 plan that may provide meaningful

recoveries to creditors.  Absent entry into the New DIP Facility, the Debtors would likely be required to convert their chapter 11 cases to chapter 7 cases without having closed the Corpus Christi Plant Sale and, in the best-case scenario in such context, the Purchased Assets would be sold by a chapter 7 trustee at "fire-sale" prices on a liquidation basis and for a value materially less than the purchase price contemplated by the Corpus Christi APA.  *See* Stogsdill Decl. ¶¶ 16-19.

22.     Combined with the fact that the Obligors are not currently operating and generating revenues to sustain their liquidity needs, the lack of further liquidity under the CEC DIP Facility as of April 1, 2018 will leave the Obligors without funding with which to administer these Cases.  Consequently, the New DIP Facility is necessary to ensure the consummation of a value-maximizing sale of the Purchased Assets and further provides the Obligors with a potential avenue to propose a liquidating chapter 11 plan.  *See* Stogsdill Decl. ¶¶ 16-19.

**B.      The Obligors Should be Authorized to Obtain Postpetition Financing under Section 364(c) of the Bankruptcy Code**

23.     Section 364(b) of the Bankruptcy Code provides that if a debtor in possession cannot obtain unsecured postpetition credit, a bankruptcy court may authorize the debtor to incur debt entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, secured by a junior lien on encumbered property, or a combination of the three.  11 U.S.C. § 364(c).

24.     If, after notice and a hearing, the bankruptcy court finds that a debtor is "unable to obtain unsecured credit allowable under [section 503(b)(1) of the Bankruptcy Code] as an administrative expense," then a debtor may obtain postpetition credit under section 364(c) of the Bankruptcy Code.  11 U.S.C. § 364(c).  Key to this is a showing that the debtor "has made a reasonable effort to seek other sources of credit available under sections 364(a) and (b) [of the Bankruptcy Code]."  *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

25.     To determine whether a debtor may obtain postpetition financing under section

364(c) of the Bankruptcy Code, courts have articulated the following three-part test:

> (a)     the debtor is unable to obtain unsecured credit under section 364(b)
>         (i.e., by granting a lender administrative expense priority);
>
> (b)     the credit transaction is necessary to preserve the assets of the
>         estate; and
>
> (c)     the terms of the transaction are fair, reasonable and adequate, given
>         the circumstances of the debtor-borrower and the proposed lender.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying

factors); In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (same); Ames Dep't

Stores, 115 B.R. at 39.  The DIP Facility satisfies each factor.

### 1.     The Obligors Are Unable to Obtain Financing on an Unsecured Basis

26.     The Obligors were unable to obtain unsecured postpetition financing.  To

demonstrate that unsecured credit was not available, a debtor only needs to show "by a good

faith effort that credit was not available" without the protections provided by section 364(c) of

the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789

F.2d 1085, 1088 (4th Cir. 1986).  A debtor is not required to conduct an exhaustive search for

credit, as "[t]he statute imposes no duty to seek credit from every possible lender before

concluding that such credit is unavailable." Id.  Where few lenders are likely to be able and

willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to

require [the] Debtor to conduct such an exhaustive search for financing." In re Sky Valley, Inc.,

100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley,

Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

27.     As detailed in the CEC DIP Declaration, the Debtors conducted an extensive

process to obtain funding prior to the Petition Date, but did not receive any proposals

contemplating unsecured financing.  CEC DIP Decl. ¶¶ 10-15, 20.  This experience led the

Debtors to conclude that a wider market search for unsecured financing would be futile. This conclusion applies with even greater force now, given that the Debtors have concluded the sale process and are in the process of seeking Court approval of the sale of the Purchased Assets. *See* Brownstein Decl. ¶ 27.

28.     As set forth above, the current budget for the CEC DIP Facility expires at the end of March. The expiration of the CEC DIP Facility does not provide the Debtors with adequate time to close the sale of the Purchased Assets to the New DIP Lender, assuming such sale is approved by the Court. Moreover, the Bidding Procedures contemplate a purchaser would provide the financing necessary to bridge to the closing of their sale. As such, the Obligors require the financing necessary to close a value maximizing sale for the benefit of its stakeholders. To that end, the Debtors, with the assistance of their advisors, determined that financing for the Obligors could only be obtained through the financing package offered by CCP—*i.e.*, a package that, pursuant to section 364(c) of the Bankruptcy Code, provided administrative expense claims and junior liens to CCP. *See* Brownstein Decl. ¶ 27.

**2.     The DIP Facility Is Necessary to Preserving and Maximizing the Value of the Obligors' Estates**

29.     The New DIP Facility is an essential element of the overall proposed sale of the Purchased Assets. Without the immediate liquidity provided by the New DIP Facility, the Debtors would be unable to maintain the Purchased Assets, retain key employees or finalize a sale process that would enable the Obligors to remain in chapter 11 through closing of the sale under the CCP Bid. In addition, the New DIP Facility is a critical part of the Purchase Agreement, through which the Debtors have obtained a value-maximizing sale of the Purchased Assets for the benefit of their stakeholders. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (debtors-in-possession have a duty to maximize their estates' assets).

### 3. The Terms of the New DIP Facility are Fair, Reasonable and Adequate Under the Circumstances

30. To determine whether the terms of postpetition financing are fair, reasonable and adequate, courts generally analyze the terms in light of the bargaining power and relative circumstances of the potential lender and the debtor. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 885-86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

31. The New DIP Facility is fair, reasonable and adequate under the circumstances. The Debtors negotiated the terms of the New DIP Facility with CCP in good faith and at arm's-length. In particular, the terms of the New DIP Facility are reasonable because CCP is providing the New DIP Facility as part of a value-maximizing agreement to purchase the Purchased Assets, the closing of which would not be possible absent the Obligors' entry into the New DIP Facility. Indeed, the liens granted pursuant to the New DIP Facility are appropriate as they relate primarily to the Purchased Assets. Based on the foregoing, the Debtors believe the terms of the New DIP Facility are fair, reasonable and adequate under the circumstances of these Cases. *See* Brownstein Decl. ¶ 29.

### Request for Modification of the Automatic Stay

32. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed Interim New DIP Order contemplates the modification of the automatic stay to the extent necessary to implement the provisions of the Interim New DIP Order and the New DIP Loan Documents, to file or record any UCC-1 financing statements, mortgages, deeds of trust, assignments, pledges, security deeds and other instruments and documents evidencing or validating the perfection of any the New DIP Liens on the New DIP Collateral as and to the extent authorized by the Interim New DIP Order.

Accordingly, the Debtors respectfully request that this Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim New DIP Order.

### Request for Interim Hearing and Authority to Make Interim Borrowings under the New DIP Facility

33.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that this Court conduct a hearing on the Debtors' request for interim relief, including for access to interim funding available under the New DIP Facility and for the other relief contemplated by the New Interim DIP Order.  Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Fed. R. Bankr. P. 4001(c).  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); *see also Ames Dep't Stores*, 115 B.R. at 38.  After the 14-day period prescribed by Bankruptcy Rule 4001(c), the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  *See*, *e.g.*, *Simasko Prod. Co.*, 47 B.R. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

34.     Pursuant to Bankruptcy Rule 4001(c), the Debtors respectfully respect that this Court conduct a preliminary hearing on the Motion and authorize the Obligors from the entry of the Interim New DIP Order until a final hearing on this Motion to obtain access to the funding contemplated in the DIP Term Sheet and the Interim New DIP Order to avoid immediate and irreparable harm to the Debtors' estates.

## NOTICE

35.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) the Internal Revenue Service, the Securities and Exchange Commission and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or order of the Court; (c) Magnate S.à r.l. and its counsel, Kirkland & Ellis LLP and Klehr Harrison Harvey Branzburg LLP; (d) DAK Americas LLC and its counsel, Weil, Gotshal & Manges LLP and Morris, Nichols, Arsht & Tunnell LLP; (e) Trimont Real Estate Advisors, LLC and its counsel, Thompson & Knight LLP, (f) Control Empresarial de Capitales, S.A. De C.V., and Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financiero Inbursa and its counsel, Cleary Gottlieb Steen & Hamilton LLP and Young Conaway Stargatt & Taylor, LLP; (g) Macquarie Investments US Inc. and its counsel, Sidley Austin LLP and Ashby & Geddes, P.A., h) the Committee and its counsel Milbank, Tweed, Hadley & McCoy LLP and Cole Schotz P.C.; (i) all parties that the Debtors are aware of that have an interest in the New DIP Collateral; (j) the Debtors' non-Debtor affiliates; and (k) all persons and entities that have filed a request for service of filings in these Cases pursuant to Bankruptcy Rule 2002 at the time of noticing.  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

36.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim New DIP Order substantially in the form attached hereto as <u>Exhibit A</u>, approving the New DIP Facility on an interim basis and scheduling the Final Hearing; and (ii) grant such other and further relief to the Debtors as the Court may be appropriate.

Dated:  March 22, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Joseph M. Mulvihill*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:           ljones@pszjlaw.com
                     joneill@pszjlaw.com
                     jmulvihill@pszjlaw.com
and

JONES DAY
Scott J. Greenberg
Michael J. Cohen
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:     (212) 326-3939
Facsimile:      (212) 755-7306
Email:            sgreenberg@jonesday.com
                     mcohen@jonesday.com
                     scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:     (216) 586-7035
Facsimile:      (216) 579-0212
Email:           ceblack@jonesday.com

*Co-Counsel for the Debtors and Debtors in Possession*