# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | : | Chapter 11 |
|---|---|---|
| In re: | : | |
| | : | Case No. 17- 17-12307 (BLS) |
| M & G USA CORPORATION, *et al.*,[1] | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

## DECLARATION OF JONATHAN BROWNSTEIN IN SUPPORT OF DEBTORS' MOTIONS FOR ENTRY OF ORDERS APPROVING (I) THE SALE OF CERTAIN ASSETS OF THE DEBTORS AND (II) THE NEW DIP FACILITY

I, Jonathan Brownstein, declare as follows:

1. I am a Director in the North American Debt Advisory and Restructuring Group at Rothschild Inc. ("Rothschild"), a financial advisory services and investment banking firm which has its principal office at 1251 Avenue of the Americas, 33rd Floor, New York, New York 10020. I am authorized to make this declaration (this "Declaration") on behalf of Rothschild. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.[2]

2. I submit this Declaration in support of the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and*

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (1022), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2] Certain disclosures herein relate to matters within the personal knowledge of other professionals at Rothschild and are based on information provided by them.

*Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 173] (the "<u>Sale Motion</u>"), the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Granting Liens and Superpriority Administrative Expense Claims to the Sale DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and Local Rule 4001-2; and (IV) Granting Related Relief* [Docket No. 1244] (the "<u>Sale DIP Motion</u>") and the *Debtors' Omnibus Reply to Objections to Motion of Debtors for Entry of an Order (A) Approving the Sale of Certain Assets of the Debtors Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases* (the "<u>Sale Reply</u>").[3]

3. Except where specifically noted, all statements in this Declaration are based on: (a) my personal knowledge developed during the course of Rothschild's engagement with the Debtors; (b) my discussions with the Debtors' senior management, the Debtors' other advisors and other members of my team at Rothschild; and (c) my review of relevant documents and/or my opinion based upon my experience. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents and/or opinion.

---

[3] Capitalized terms not otherwise defined herein have the meanings given to them in the Sale Motion, the Sale Reply, the Purchase Agreement or the Sale DIP Motion, as applicable.

**Qualifications**

4. I have over 18 years of experience as a restructuring advisor and investment banker to companies in a variety of sectors. During this time, my transactions experience has ranged from out-of-court restructurings to in-court insolvencies in the U.S., Canada, and Mexico. Additionally, my merger and acquisition experience includes troubled company buyside and sellside assignments. My capital raising expertise includes debtor-in-possession financings, secured debt, exit financing, second lien loans, convertible notes, rights offerings, and preferred and common stock.

5. Prior to joining Rothschild, I was a Managing Director in the restructuring group at Oppenheimer & Co. Inc. Previously, I was a member of the restructuring groups of Piper Jaffray & Co. and CIBC World Markets Corp. ("CIBC"), and prior to that a member of the leveraged finance and high yield group at CIBC.

6. I hold a BA degree from Bucknell University and a JD from Syracuse University.

**Rothschild's Retention**

7. The Company originally retained Rothschild in the summer of 2016 to investigate potential capital-raising alternatives to mitigate the effect of the dramatic cost overruns and delays at the Corpus Christi Plant. Since just prior to the chapter 11 filing, Rothschild's responsibilities have focused on identifying and/or initiating potential sale transactions for the Debtors' assets and conducting related services, including, among other things, facilitating interested parties' diligence of the Company's assets and negotiating the terms of such transactions. In connection with these services, Rothschild has worked closely with the Debtors' management and the Debtors' other professionals and has become well acquainted with the Debtors' assets, capital structure, liquidity needs and business operations.

## The Debtors' Marketing Efforts Regarding the Purchased Assets

**A. The Marketing Process**

8. Shortly after the Debtors filed for chapter 11 protection in late October 2017, the Debtors began an M&A process to explore a sale of substantially all of the Debtors' assets. Chief among the Debtors' assets is the Debtors' vertically integrated PTA/PET plant located in Corpus Christi, Texas (the "Corpus Christi Plant"). As part of this sale process, which has spanned over four months, Rothschild, the Debtors' financial advisor and investment banker, invited prospective purchasers to bid on any and/or all of such assets. Under the Bidding Procedures approved by the Court, potential bidders interested in bidding on the Corpus Christi Plant and certain related assets of the Debtors had (a) a deadline of January 30, 2018 to submit non-binding proposals and (b) a deadline of March 6, 2018 to submit binding bids.[4]

9. During the sale process, Rothschild engaged in extensive sale and marketing efforts, contacting 111 potential strategic and financial buyers that might be interested in acquiring all or a portion of the Corpus Christi Plant and related assets. Of these 111 potential strategic and financial buyers, 38 parties signed non-disclosure agreements and were provided with access to a virtual dataroom and extensive diligence materials, including detailed financial information, detailed information regarding the status of construction of the Corpus Christi Plant and information on the Debtors' intellectual property, among other information. In addition, Rothschild arranged for site visits and discussions with management as requested by prospective bidders.

---

[4] The Debtors employed a separate timeline to sell their manufacturing facility located in Apple Grove, West Virginia (the "Apple Grove Plant"); (b) the research and development center located in Sharon Center, Ohio ("Sharon Center"); and (c) certain other property related thereto, including, among other things, related real property, equipment, fixtures, permits, contracts and records (such property, with the Apple Grove Plant and Sharon Center, the "Apple Grove Assets"). After the Debtors concluded this separate sales process for the Apple Grove Assets, on February 1, 2018, the Court entered an order approving the sale of the Apple Grove Assets.

### B. The Non-Binding Proposals for the Purchased Assets

10. In late January 2018, certain of these parties provided the Debtors with 12 non-binding proposals (the "Proposals") to purchase certain of the Debtors' assets.[5] The Debtors categorized these Proposals as follows: (a) three of the Proposals contemplated the purchase of the Corpus Christi Plant and substantially all of the Debtors' other assets (the "All-Asset Proposals"); (b) eight of the Proposals were for the Debtors' desalination assets in the vicinity of the Corpus Christi Plant[6] (the "Desalination Assets"); and (c) one of the Proposals was for certain of the Debtors' real property located in Corpus Christi, Texas. Upon consultation with their advisors, including Rothschild, the Debtors focused their efforts on negotiating and improving the All-Asset Proposals.

11. The Debtors pursued the All-Asset Proposals primarily for four reasons. *First*, the substantial majority of the Proposals for the Desalination Assets and the Debtors' real property were too contingent to be considered able to become "Qualified Bids" by the final bid deadline of March 6, 2018. *Second*, the Proposals for the Desalination Assets that were comparatively less contingent provided for values significantly below the values in the All-Asset Proposals. *Third*, none of the All-Asset Proposals indicated a willingness to purchase anything less than essentially the entirety of the Corpus Christi Plant. *Fourth*, as a general matter, the Debtors believed that the All-Asset Proposals would provide the best opportunity for the Debtors to maximize the value of their estates.

12. Notwithstanding the Debtors' efforts, none of the All-Asset Proposals developed into a stalking horse bid for the Corpus Christi Plant. Nevertheless, the Debtors continued

---

[5] Two parties submitted two different Proposals.

[6] Most, but not all, of the Proposals for the Desalination Assets included the Debtors' boiler assets.

negotiations with the applicable bidders in an effort to improve such All-Asset Proposals in advance of the upcoming Auction.

### C. The Bids for Purchased Assets

13. Subsequently, on March 6, 2018, the Debtors received seven bids (the "Initial Bids") for certain of their assets. Three of the Initial Bids were for the Corpus Christi Plant and substantially all of the Debtors' other assets (the "All-Asset Initial Bids"). The remaining four Initial Bids were limited to only the Desalination Assets or certain of the Debtors' real property.[7] Again, in consultation with their advisors, the Debtors pursued the All-Asset Initial Bids, largely for the same reasons discussed above: (a) the Initial Bids solely for the Desalination Assets and the Debtors' real property were too contingent; (b) the Desalination Assets Initial Bids provided significantly less value than the values in the All-Asset Initial Bids; (c) none of the All-Asset Initial Bids would accept anything less than essentially the entirety of the Corpus Christi Plant; and/or (d) the Debtors believed that the All-Asset Initial Bids would provide the best opportunity for the Debtors to maximize the value of their estates.

14. As the Debtors reviewed the All-Asset Initial Bids, it quickly became apparent that the initial bids submitted by Far Eastern Investment (Holding) Limited ("Far Eastern") and Corpus Christi Polymers LLC ("CCP") were noncompliant with the Bidding Procedures in material respects and were not going to be modified sufficiently to make them actionable on a stand-alone basis. Accordingly, the Debtors, in consultation with the Committee, pursued a dual track path to foster a competitive bidding environment. *First*, on March 14, 2018, the Debtors and the Committee consented to those two bidders entering into discussions to determine if they could collectively develop an improved joint bid that could become a qualified bid and

---

[7] All of the Initial Bids for the Desalination Assets included the Debtors' boiler assets. One of such Initial Bids, however, also had an option without the Debtors' boiler assets.

participate in the upcoming Auction.  *Second*, in the following week, the Debtors negotiated exhaustively with the third bidder (Banibu II Holdings, Inc. ("Banibu")) with a view to qualifying its bid and obtaining the best value for the Debtors' estates.  In addition, the Debtors began to prepare for the possibility of having only a single bid for their primary asset—the Corpus Christi Plant.

15. In the evening of March 18, 2018, the Debtors received a new joint bid for the Corpus Christi Plant and certain related assets submitted by CCP with participation from Far Eastern.  Over the next two days, the Debtors engaged in intense, good faith, arm's-length negotiations in the hopes of qualifying both bids for participation in a competitive auction.

16. The Debtors' efforts were a success.  In accordance with the Bidding Procedures Order, on March 19, 2018 the Debtors convened all relevant parties for an auction for the Corpus Christi Plant and related assets (the "Auction"), and on March 20, 2018, the Debtors conducted the Auction.  At the Auction, the Debtors announced that they had received the following two qualified bids for the Corpus Christi Plant and related assets:  (a) a bid from Banibu (the "Banibu Bid") and (b) a bid from CCP (the "CCP Bid").  Aside from these two bids, there were no other qualified bids at the Auction.

**The CCP Bid Is the Highest and Best Bid for the Purchased Assets**

17. Based on the results of the Auction, and in consultation with Rothschild and the Debtors' other advisors, the Debtors' board of directors selected the CCP Bid as the Successful Bid at the Auction.

18. As an initial matter, the value of the CCP Bid (approximately $950 million[8]) exceeds the value of the Banibu Bid (as of the Auction, approximately $867 million) by material

---

[8] As of the filing of this Declaration, the Debtors, CCP, certain of the Debtors' lenders and each of their professionals were continuing to refine certain terms of the CCP Bid, and therefore, this number is subject to

amounts (over 9%). A portion of the CCP Bid is being provided in connection with the New DIP Facility (discussed in further detail below) to allow the Debtors to continue in chapter 11 while they work to consummate the sale. This consideration is a crucial piece of the underlying transaction, given that the Debtors would not be able to close the sale to CCP, or potentially pursue confirmation of a chapter 11 plan, without funding available to pay their administrative costs on an ongoing basis. Thus, on its face, the CCP Bid is clearly the "highest" bid for the Purchased Assets.

19. In addition to being the "highest" bid for the Purchased Assets, in my opinion the CCP Bid is also the "best" bid, given that the terms of the CCP Bid are superior to the terms of the Banibu Bid in significant respects. For example, while the Banibu Bid requires the Debtors to sell all cash on hand, the CCP Bid allows the Debtors to retain their cash. In addition, while the Banibu Bid requires the Debtors to sell certain proceeds of avoidance actions, the CCP Bid allows the Debtors to retain such proceeds for the benefit of their estates. Moreover, the CCP Bid includes a $50 million cash component to be used for distributions to holders of general unsecured claims. In contrast, the Banibu Bid provides no possibility for a recovery by general unsecured creditors.

20. Further, the CCP Bid offers the Debtors the ability to pursue a chapter 11 plan and wind down their estates while providing a recovery to general unsecured creditors. The CCP Bid provides the Debtors with an amount not less than $55 million in new financing (the "<u>New DIP Facility</u>"), which will ensure that the Debtors can remain funded in chapter 11 through the Closing of the Sale. Conversely, the Banibu Bid contemplates closing on a sale transaction in the near term followed by a short wind-down period and ultimately a conversion or dismissal of

---

change, although I do not expect such changes to be materially significant.

these Cases. Given that the CCP Bid provides the Debtors with a path to plan confirmation, I believe the CCP Bid is not only the highest bid, but also the best bid.

21. In my opinion, the CCP Bid is the result of an open and competitive process and, to the best of my knowledge, and as confirmed by representatives of CCP and Banibu on the record at the Auction, there was no collusion by or among any of the Debtors, potential bidders, Qualified Bidders or any of their representatives.

22. It is my belief that a sale of any of the Purchased Assets subject to a Successful Bid, other than one free and clear of all liens and encumbrances (other than assumed liabilities and permitted exceptions), would yield substantially less value for the Debtors' estates and with less certainty than the sale transaction currently contemplated.

23. Based on the foregoing facts, in my professional opinion I believe that the Debtors employed sound business judgment when they determined that the CCP Bid was the highest and best bid for the Purchased Assets.

## The New DIP Facility

24. The Debtors have an urgent need for additional financing during the period from April 1, 2018, at which time the Debtors have no further ability to borrow under the CEC DIP Facility, through the closing of the Sale. As set forth in the First Day Declaration, the Corpus Christi Plant is not operational and thus generates no revenue to maintain the Debtors' assets and to continue the administration of these Cases. In addition, the CEC DIP Facility, for which the budget expires on March 31, 2018, does not provide the Debtors with adequate funding to either close the Sale of the Purchased Assets to the Purchaser or to pursue anything other than a conversion or dismissal of these Cases. Thus, from and after April 1, 2018, the Debtors will lack

funding to continue to administer these Cases. As such, the Debtors require the financing necessary to maintain these Cases and their assets through the closing of the Sale.

25. In connection with the Debtors' proposed entry into the Purchase Agreement, CCP agreed to enter into the New DIP Facility with the Obligors and provide, subject to the terms and conditions set forth in the DIP Term Sheet, liquidity in an aggregate amount of at least $55 million. The New DIP Facility largely mirrors the CEC DIP Facility in collateral scope and structure. Both share identical obligors and the underlying collateral is the same, with the liens proposed to secure the New DIP Facility ranking junior to the liens securing the CEC DIP Facility.

26. I do not believe that new financing is available to the Obligors on terms more favorable than the New DIP Facility. As an initial matter, certain of the New DIP Facility's terms are very favorable to the Debtors. For example, upon closing of the sale pursuant to the CCP Bid, the Obligors have no obligation to repay the New DIP Facility. No other Qualified Bids received by the Debtors provided for a similar financing structure.

27. Moreover, given the challenges that the Debtors have previously faced in raising postpetition financing, the New DIP Facility's beneficial terms seemed even more attractive. As set forth in greater detail in the CEC DIP Declaration, the Debtors conducted an extensive process to obtain funding prior to the Petition Date. This experience led the Debtors to conclude that a wider market search for unsecured financing would be futile. This conclusion applies with even greater force now, given that the Debtors have concluded the sale process and are in the process of seeking Court approval of the sale of the Purchased Assets. For these reasons, I believe that financing for the Obligors could only be obtained through the financing package

offered by CCP—*i.e.*, a package that, pursuant to section 364(c) of the Bankruptcy Code, provided administrative expense claims and junior liens to CCP.

28. In addition to being the only financing available, I also believe that the New DIP Facility provides significant benefits to the Debtors. The New DIP Facility will ensure that the Obligors can administer these Cases and preserve the Purchased Assets through the closing of the sale of the Corpus Christi Plant. Given the value generated by the sale of the Corpus Christi Plant, the New DIP Facility will make it possible for the Debtors to potentially confirm a chapter 11 plan.

29. Finally, I believe the New DIP Facility is fair, reasonable and adequate under the circumstances. The Debtors negotiated the terms of the New DIP Facility with CCP in good faith and at arm's-length. In particular, the terms of the New DIP Facility are reasonable because CCP is providing the New DIP Facility as part of a value-maximizing agreement to purchase the Purchased Assets, the closing of which would not be possible absent the Obligors' entry into the New DIP Facility. Indeed, the liens granted pursuant to the New DIP Facility are appropriate as they relate primarily to the Purchased Assets. Based on the foregoing, I believe the terms of the New DIP Facility are fair, reasonable and adequate under the circumstances of these Cases.

30. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 22, 2018

Respectfully Submitted,

*/s/ Jonathan Brownstein*
Jonathan Brownstein
Director
Rothschild Inc.