# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| M & G USA CORPORATION, *et al.*,[1] | Case No. 17- 17-12307 (BLS) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF DENNIS STOGSDILL IN SUPPORT OF DEBTORS' MOTIONS FOR ENTRY OF ORDERS APPROVING (I) THE SALE OF CERTAIN ASSETS OF THE DEBTORS AND (II) THE NEW DIP FACILITY

I, Dennis Stogsdill, declare and state as follows:

1. I am the Chief Restructuring Officer ("CRO") of M&G Chemicals S.A. and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), with the exception of Chemtex International Inc. and Mossi & Ghisolfi International S.à r.l.. In addition to serving as CRO of certain of the Debtors, I am a Managing Director at Alvarez & Marsal North America LLC ("A&M"), the Debtors' financial advisor.

2. I submit this Declaration in support of the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof;*

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (1022), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

*(II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 173] (the "Sale Motion"), the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Granting Liens and Superpriority Administrative Expense Claims to the Sale DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and Local Rule 4001-2; and (IV) Granting Related Relief* [Docket No. 1244] (the "Sale DIP Motion") and the *Debtors' Omnibus Reply to Objections to Motion of Debtors for Entry of an Order (A) Approving the Sale of Certain Assets of the Debtors Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases* (the "Sale Reply").[2]

3. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management, a team from A&M that supports me in carrying out my duties (the "A&M Team") or the Debtors' other professionals that I believe in good faith to be reliable; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. The Debtors have authorized me to submit this Declaration.

---

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Sale Motion, the Sale Reply, the Purchase Agreement or the Sale DIP Motion, as applicable.

## Qualifications

4. In my capacity as CRO, I have become familiar with the Debtors' businesses, operations and financial affairs. As part of my duties as CRO, I oversee the Debtors in their day-to-day operations, development of restructuring strategies, budgets, cash flows and financial analysis, and I led the A&M team in, among other things, assisting the Debtors with forecasting their liquidity position, identifying and implementing cost-saving strategies, negotiating with key constituents, analyzing potential claims and preparing the filing of these Chapter 11 Cases. Accordingly, I have knowledge of the Debtors' cash flow needs and projections. I also am familiar with the Debtors' assets and liabilities and the status of the Debtors' relationships with their various vendors, suppliers, service providers and customers.

5. I have over twenty years of financial restructuring and management consulting experience. My industry experience includes all aspects of the reorganization process, including the development and negotiation of complex capital structure solutions, valuation, developing and evaluating strategic business plans and recapitalization strategies, implementing liquidity conservation, and advising on mergers and acquisitions and in-court and out-of-court restructurings. I am recognized as an Accredited Valuation Analyst by the National Association of Certified Valuation Analysts. Additionally, I have a certification in Distressed Business Valuation issued by the Association of Insolvency & Restructuring Advisors. I earned my B.S. in accounting from Rutgers University.

## The CCP Bid is the Highest and Best Offer for the Purchased Assets

6. Pursuant to the Bidding Procedures Order, the deadline for submitting bids for the Corpus Christi Assets and other related assets was March 6, 2018. Of the bids submitted by that deadline and in accordance with the Bidding Procedures, the Debtors designated two Qualified Bids—the CCP Bid and the Backup Bid. From the submission of the bids on March 6, 2018

through the conclusion of the Auction on March 20, 2018, the Debtors and their advisors worked tirelessly to review the bids and to negotiate the terms thereof with the bidders. For the reasons set forth below, the CCP Bid was ultimately designated the Successful Bid.

7. I believe that the CCP Bid is the highest or best offer for the Purchased Assets and that the CCP Bid confers substantial benefits on the Debtors' estates. The CCP Bid provided consideration for and in connection with the Purchased Assets of approximately $950 million,[3] comprised of (a) repayment of Pre-Petition First Lien Obligations, (b) the Macquarie Payment, (c) repayment of the Inbursa DIP Obligations, (d) the Additional Cash Closing Payment, (e) Assumed Liabilities and Cure Costs, (f) Completion Fees, (g) Professional Payment Amounts; (h) the Mechanics Lien Escrow Amount and the assumption or purchase of certain Mechanics Lien Claims and (i) the New DIP Facility. The Backup Bid, on the other hand, as of the Auction, provided consideration for and in connection with the Purchased Assets of approximately $867 million, comprised of (a) a credit bid of the Pre-Petition First Lien Obligations, (b) the Macquarie Payment Amount, (c) a credit bid of the Inbursa DIP Obligations, (d) Assumed Liabilities and Cure Costs, (f) Completion Fees, (g) Final Professional Payment Amounts; (h) the Mechanics Lien Escrow Amount and (i) the Wind-Down Amount. Based on the amount and form of consideration received, I believe that the CCP Bid is clearly the higher of the two bids.

8. The CCP Bid is also superior to the Backup Bid—the only other Qualified Bid at the Auction, as discussed in the Brownstein Declaration—for several reasons. First, the CCP Bid provides the Debtors with significantly more runway to conclude these Cases. In addition to

---

[3] As of the filing of this Declaration, the Debtors, CCP, certain of the Debtors' lenders and each of their professionals were continuing to refine certain terms of the CCP Bid, and therefore, this number is subject to change, although I do not expect such changes to be materially significant.

providing more value to the Debtors' estates, the CCP Bid also includes a DIP funding component that provides the Debtors with approximately four months of funding through the Closing of the Sale and, if possible, through a chapter 11 plan of liquidation that will provide recoveries to the Debtors' creditors. In addition, the CCP Bid leaves behind in the Debtors' estates certain assets and claims and causes of action, including Avoidance Actions and the Debtors' cash-on-hand, which may be helpful to the Debtors as they continue to administer these Cases and work toward a plan. The Backup Bid, on the other hand, seeks to purchase such assets and only provides the Debtors with a wind down budget of approximately $5.83 million for the purposes of funding the Debtors through the closing of the Backup Bidders' proposed sale transaction, which would in all likelihood be followed by a conversion of these Cases to cases under chapter 7 of the Bankruptcy Code or a dismissal. In sum, the CCP Bid permits the Debtors to continue to administer these Cases and maintain their assets pending the Closing of the Sale and therefore provides the Debtors the most promising pathway to a plan. In addition, the CCP Bid allows for the full payment of administrative and priority claims and for at least $50 million to be paid to general unsecured creditors of the Debtors' estates while the Backup Bid provides for neither.

9. For the reasons set forth above, the CCP Bid is the highest *and* best offer for the purchase of the Purchased Assets. Based on the results after a four-month long marketing process, an Auction and the totality of the circumstances of these Cases, the Debtors believe that entering into the Purchase Agreement and consummating the Sale Transaction is in the best interests of the Debtors' estates. It is my belief that a sale of Purchased Assets other than one free and clear of all claims, liens and encumbrances, would yield substantially less value for the Debtors' estates and result in less certainty than the sale transaction currently contemplated.

Therefore, the sale of Purchased Assets on the terms and at the price set forth in the CCP Bid represents a sound exercise of the business judgment of the Debtors and should be approved.

10. The Board of Directors of the Debtors convened on March 20, 2018 to consider and deliberate over the CCP Bid and the Backup Bid and ultimately voted to approve the CCP Bid as the Successful Bid at the Auction.

### The Intercompany License

11. A major category of assets being sold to the Purchaser includes substantially all of the Debtors' intellectual property, including registered patents, registered and unregistered trademarks, and know-how. Certain of this intellectual property will be essential to the future operations of the Corpus Christi Plant.

12. Accordingly, integrated into the CCP Bid is a cross-license of Intellectual Property to be entered into by certain Debtors and certain of the Debtors' non-Debtor affiliates in Mexico and Brazil who own and operate PET plants, as well as other Debtors owning intellectual property relevant to the operations of a PET or PTA plant and products made in those plants, in substantially the form attached as Exhibit C to the Purchase Agreement (the "Intercompany License"). The terms of the Intercompany License have already been agreed upon in form and substance between the relevant parties. The Intercompany License will provide the Purchaser rights with respect to certain unregistered know-how related to the operation of the Corpus Christi Plant and of unclear origin that had previously been shared between plants of the Debtors and the Debtors' non-Debtor affiliates. The Intercompany License also sets forth the rights and obligations of Debtors' non-Debtor affiliates with respect to their limited use of certain of Debtors' product-related intellectual property for a period of time before the commissioning of the Corpus Christi Plant. At that time, it will be at the option of the Purchaser whether to grant additional licenses with respect to the intellectual property.

13. The Intercompany License formalizes rights with respect to the ownership and use of the intellectual property which had not previously been expressly defined within the M&G Group. As such, the Intercompany License also minimizes the risk of unnecessary litigation between one or more of the involved parties in the future, including possible litigation initiated against the Purchaser by the Debtors' non-Debtor affiliates in Mexico and Brazil or their successors. The Intercompany License will assist the Debtors in accomplishing three critical objectives: (a) maintaining M&G-branded products in the marketplace while the Corpus Christi Plant is under construction, maximizing the value and the enforceability of the Debtors' intellectual property portfolio, (b) safeguarding the Purchaser from unnecessary litigation, and (c) providing clarity to the Purchaser and future operator of the Corpus Christi Plant with respect to its intellectual property rights.

### The Lienholder Claims Reserve Is Appropriate[4]

14. As I stated in my declaration in support of the Lienholder Claims Reserve Motion, attached as <u>Exhibit B</u> thereto and which is incorporated by reference herein, the Lienholder Claims Reserve (in the revised amount of $350,779,713.45) takes the full liquidated amount of any liability asserted by a Lienholder with respect to such Lienholder Claim and then excludes any amounts asserted on account of Duplicated Liabilities and for Interest and Fee Claims. The Lienholder Claims Reserve has not been reduced to reflect any other potential defenses or counterclaims that the Debtors may possess (which are many) with respect to any Lienholder or Lienholder Claims. In addition, as set forth in paragraph 14 of my declaration in support of the Lienholder Claims Reserve, I believe the proposed Lienholder Claims Reserve incorporates

---

[4] Capitalized terms used in this section but not otherwise defined have the meanings given to them in the Lienholder Claims Reserve Motion.

ample cushion to satisfy any additional contingent claims. Accordingly, I believe the amount of the proposed Lienholder Claims Reserve reflects a fair and conservative analysis of the maximum potential liability to the Debtors' estates arising from the Lienholder Claims arrived at in good faith based on appropriate review.

15. The CCP Bid includes a Mechanics Lien Escrow Amount of $230.4 million. In addition, the CCP Bid (a) provides for the purchase of the Chemtex Claim, which is estimated at approximately $87 million, and (b) assumes certain Mechanics' Lien Claims, which were reserved at approximately $33.3 million. Taking into account the CCP Bid's purchase and/or assumption of these Mechanics' Lien liabilities, the reserve established pursuant to the Purchase Agreement is appropriate and consistent with the Lienholder Claims Reserve amount proposed by the Debtors.

### The Consortium DIP Facility

16. The Debtors have an urgent need for additional financing during the period from April 1, 2018, at which time the Debtors have no further ability to borrow under the CEC DIP Facility, through the closing of the Sale. As set forth in my First Day Declaration, the Corpus Christi Plant is not operational and thus generates no revenue to maintain the Debtors' assets and to continue the administration of these Cases. In addition, the CEC DIP Facility, for which the budget expires on March 31, 2018, does not provide the Debtors with adequate funding to either close the Sale of the Purchased Assets to the Purchaser or to pursue anything other than a conversion or dismissal of these Cases. Thus, from and after April 1, 2018, the Debtors will lack funding to continue to administer these Cases. As such, the Debtors require the financing necessary to maintain these Cases and their assets through the closing of the Sale.

17. Based on the Debtors' constrained liquidity, part of the marketing process for the Purchased Assets, as discussed in more detail in the Brownstein Declaration in support of the

Sale DIP Motion, involved eliciting interest from potential bidders to also provide liquidity to fund the Debtors through at least the closing of a sale of the Purchased Assets. The CCP Bid provides such liquidity in the form of the New DIP Facility—*i.e.*, an amount not less than $55 million in financing that will ensure that the Debtors can remain funded in chapter 11 through the Closing of the Sale, which Closing may be delayed while the parties await approvals from the U.S. antitrust authorities.

18. I believe that terms of the New DIP Facility are reasonable under the circumstances of these Cases and the best and only option available to the Debtors. Although the Debtors also entered into discussions with the Backup Bidder regarding additional funding, the Backup Bidder informed the Debtors that it was only interested in providing such funding if selected as the Successful Bidder for the Assets. Notwithstanding the New DIP Facility being the only available source of financing for the Debtors, it also provides tangible and immediate benefits to the Debtors' estates. It was a key condition to the consummation of the Purchase Agreement, as the Debtors' management needed to ensure that sufficient liquidity existed to fund the closing of the Sale and the continued administration of the Cases, ideally through the consummation of a chapter 11 plan of liquidation, although the New DIP Facility does not guarantee this outcome. In addition, obtaining the New DIP Facility is essential to preserving the value of the Purchased Assets by ensuring that the Debtors can provide insurance for the Corpus Christ Plant and compensate employees who remain on site and take active steps to preserve the equipment, machinery and other assets at the location.

19. In sum, based on my experience, I believe the Debtors' decision to move forward with the New DIP Facility in connection with the Purchase Agreement is integral to and will preserve, protect and enhance the value these Cases.

## The Cash Pooling Account

20. On June 1, 2004, the Debtors opened the Cash Pooling Account as a means by which the pooling account's members would pool cash assets to fund their expenses and working capital needs.[5] The Mexican Entities and certain other Debtors (collectively, the "Members") joined the Cash Pooling Account, at the latest, on April 1 2011.[6] Contributions were made into the Cash Pooling Account from various different sources and were used to fund a wide variety of expenses and working capital needs.

21. Historically, the advances made by various of the Members were recorded in the respective Member's books and records as an intercompany receivable, while the funds used by any Member were recorded in that respective Member's books and records as an intercompany payable. However, on September 19, 2017, the Cash Pooling Account was terminated, at which time (a) the intercompany account receivables were reclassified as intercompany loan receivables and (b) the intercompany account payables were reclassified as intercompany loan payables.[7]

22. As part of terminating the Cash Pooling Account, and in connection with reclassifying intercompany account payables as intercompany loan payables, M&G USA reclassified a $354 million intercompany account payable into an intercompany loan payable. The reclassification of the intercompany account payables into loan payables and intercompany

---

[5] The following Debtors and non-Debtors were members of the Pooling Account before it was dismantled in September 19, 2017: M&G Polimeros, M&G Holding Mexico, M & G Resins USA, LLC ("M&G Resins"), M & G USA Holding LLC, M&G Chemicals S.A., Servicios Tamaulipas SA de C.V., M&Ghisolfi de Mexico S.A. de C.V., M&G Chemicals SA, M&G Finance Corporation, M & G Polymers USA, LLC ("M&G Polymers"), M&G International S.à r.l., M & G USA Corporation ("M&G USA") and Chemtex International, Inc.

[6] I have been informed that the Mexican Entities became members of the Cash Pooling Account at the latest on April 1, 2011, and as early as 2004.

[7] Attached hereto as Exhibit 1 is a schedule that lists the balance of the intercompany loan payable or receivable owing from or to each of the Members as of September 19, 2017.

account receivables into loan receivables reflected the unwinding of years of ordinary course transactions that were intended to fund expenses and the related working capital needs of the Members of the Cash Pooling Account.

## Bancomext Supplement

23. I have reviewed the supplemental objection filed by Bancomext in support of its objection to the sale, filed on March 21, 2018 (the "Bancomext Supplement"). In connection with reviewing the assertions made in the Bancomext Supplement, I or those under my supervision reviewed certain records in the Debtors' possession. Based on such review, ████ ████████████████████████████████████████████████████████████████ ████████████████████████. Attached hereto as Exhibit 2 is ██████████████ ██████████████████████████████████████████████. Further, based on a review of the records in the Debtors' possession, ██████████████████████████████████ ████████████████████████████████. Attached hereto as Exhibit 3 and Exhibit 4 are M&G Resins' bank account statement from June 2017 and July 2017, respectively. While M&G Resins drew ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████, and then transferred such amounts in the Cash Pooling Account.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 22, 2018
      New York, New York

_____
Dennis Stogsdill
Chief Restructuring Officer