# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| M & G USA CORPORATION, *et al.*,[1] | : | Case No. 17- 12307 (BLS) |
| Debtors. | : | (Jointly Administered) |
| | : | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT BY AND BETWEEN  M&G FINANZIARIA S.P.A., M&G POLIMERI S.P.A., M&G CHEMICALS S.A., MAGNATE S.À R.L., MOSSI & GHISOLFI INTERNATIONAL S.À R.L. AND CHEMTEX INTERNATIONAL INC.

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")

move the Court (the "Motion"), pursuant to sections 105 and 363 of title 11 of the United States

Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), for the entry of an order, in substantially the form attached hereto as

Exhibit A (the "Proposed Order"), approving the amended and restated settlement agreement

(the "Settlement Agreement")[2] by and between (i) M&G Finanziaria S.p.A. ("MGF"), (ii) M&G

Polimeri S.p.A. ("Polimeri"), (iii) M&G Chemicals S.A. ("MGC"), (iv) Magnate S.à r.l.

("Magnate"), (v) Mossi & Ghisolfi International S.à r.l. ("MGI") and (vi) Chemtex International

Inc. ("CII" and together with MGC and CII, the "Settling Debtors").  In support of this Motion,

---

[1]     The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2]     A copy of the Settlement Agreement is attached to the Proposed Order as Exhibit 1.  An original version of the Settlement Agreement was executed by the parties on April 20, 2018.  The Settlement Agreement, an amended and restated form of the original agreement, incorporates the results of certain negotiations and discussions that occurred  subsequent to execution of the original agreement.

the Debtors submit the (i) Losa Declaration,[3] (ii) the Van Der Slobe Declaration[4] and (iii) the Stogsdill Declaration,[5] and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     The Settlement Agreement is a critical component of MGF's efforts to obtain approval of a restructuring plan in Italy, which, if approved, provides a number of benefits to the Settling Debtors, including increasing the likelihood of a recovery in excess of $25 million on claims that the Settling Debtors have against MGF's affiliates and subsidiaries.  In exchange for the release or subordination of certain intercompany claims against MGF and its affiliates, the Settlement Agreement increases the probability that (a) CII recovers certain amounts owing to it from MGF's Italian subsidiaries, through the sale of such subsidiaries' business to a third party purchaser, (b) MGI recovers certain amounts owing to it from Brazil Fibras (as defined below) through a sale of Brazil Fibras' business to a third party purchaser and (c) MGC, as a creditor of, and guarantor of certain obligations incurred by, MGI, increases the likelihood that it, too, will obtain a recovery by virtue of the releases and subordination of claims contemplated herein.[6]  On the other hand, if the Settlement Agreement is not approved, MGF is likely to go into liquidation,

---

[3]     The "Losa Declaration" is the *Declaration of Pedro Losa in Support of the Debtors' Motion for Entry of an Order Approving Settling Agreement by and between M&G Finanziaria S.p.A., M&G Polimeri S.p.A., M&G Chemicals S.A., Magnate S.à r.l., Mossi & Ghisolfi S.à r.l. and Chemtex International Inc.*, attached hereto as Exhibit B.

[4]     The "Van Der Slobe Declaration" is the *Declaration of Evert-Jan W. Van Der Slobe in Support of the Debtors' Motion for Entry of an Order Approving Settling Agreement by and between M&G Finanziaria S.p.A., M&G Polimeri S.p.A., M&G Chemicals S.A., Magnate S.à r.l., Mossi & Ghisolfi S.à r.l. and Chemtex International Inc.*, attached hereto as Exhibit C.

[5]     The "Stogsdill Declaration" is the *Declaration of Dennis Stogsdill in Support of the Debtors' Motion for Entry of an Order Approving Settling Agreement by and between M&G Finanziaria S.p.A., M&G Polimeri S.p.A., M&G Chemicals S.A., Magnate S.à r.l., Mossi & Ghisolfi S.à r.l. and Chemtex International Inc.*, attached hereto as Exhibit D.

[6]     In addition, under the Settlement Agreement, CII proposes to sell certain claims that it has against certain of MGF's Italian subsidiaries to MGI for $5 million, which provides CII with $5 million upon approval of the Settlement Agreement.

placing each of these benefits in jeopardy and all but guaranteeing that the Settling Debtors make little to no recovery from MGF and its affiliates.

2.    The Settling Debtors are not the only parties being asked to compromise certain of their claims against MGF. MGF currently is in the process of securing releases in excess of $1 billion from unsecured creditors to reduce the total amount of claims against it to an amount that will permit MGF to provide at least a 20% recovery to its remaining unsecured creditors, as required for approval of a restructuring plan under Italian insolvency law and as is necessary to stave off a liquidation. Given MGF's financial condition and the number of claims asserted against it, the Settling Debtors do not believe that they could obtain any material recovery on the claims being released (totaling some $330 million). As such, the proposed Settlement Agreement essentially swaps valueless claims for an increased likelihood of cash recoveries of approximately $25 million.

3.    The Settlement Agreement was approved by a majority of the directors of each Settling Debtor that are neither officers, directors nor employees of MGF or Polimeri (the "<u>Disinterested Directors</u>"). The Settling Debtors submit that the Settlement Agreement is in the best interests of their creditors and estates and therefore respectfully request that this Motion be approved.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.     General Background

5.     On October 24, 2017, Debtor M&G Polymers USA, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, thereafter, on October 30, 2017 (the "Petition Date"), each of the other Debtors commenced chapter 11 cases before this Court (together with the chapter 11 case of M&G Polymers, the "Cases").  The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     An Official Committee of Unsecured Creditors (the "Committee") was appointed in these Cases on November 13, 2017 (Docket No. 146).  Additional information regarding the Debtors and these Cases, including the Debtors' businesses, corporate structure and financial condition, is set forth in the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* (Docket No. 3) (the "First Day Declaration"), filed on October 31, 2017 and incorporated herein by reference.

### B.     The Intercompany Claims[7]

7.     There are three categories of intercompany claims addressed by the Settlement Agreement.  *First*, in the ordinary course of intercompany dealings between MGI and certain of its non-Debtor affiliates, including MGF (a parent corporation of MGI) and Polimeri (MGI's non-Debtor affiliate and a subsidiary of MGF), MGI is owed certain intercompany payables (the "MGI Intercompany Credits") that MGI proposes to release or subordinate to certain other claims under the Settlement Agreement.  *See* Van Der Slobe Decl., ¶ 4.  *Second*, in the ordinary

---

[7]     For the avoidance of doubt, the Debtors reserve the right to dispute any claims, objections, defenses, or counterclaims that Beta, Biochemtex (each as defined below), Polimeri, MGF, Magnate and/or any other party may raise in the event that the Settlement Agreement is not approved.

course of intercompany dealings between CII and certain of its non-Debtor affiliates, including Biochemtex S.p.A. ("Biochemtex") and Beta Renewables S.p.A. ("Beta") (both non-Debtor affiliates of CII and subsidiaries of MGF), CII is owed certain intercompany payables (as defined below, the CII Bio Credits) that CII proposes to sell to MGI under the Settlement Agreement. *See* Losa Decl., ¶ 4. *Finally*, MGC proposes to release, and CII proposes to subordinate, certain claims against MGF relating, respectively, to (a) that certain *Cost Overrun and Makeup Agreement* that MGF and MGC entered into on January 14, 2015 (as amended and restated, the "Cost Overrun and Makeup Agreement")[8] (*see* Stogsdill Decl., ¶ 4) and (b) that certain *CII Cost Overrun Refund Agreement*, that MGF and CII entered into on December 29, 2016 (the "CII Cost Overrun Refund Agreement")[9] (*see* Losa Decl., ¶ 6), both in connection with construction of the Debtors' partially constructed, vertically integrated PTA/PET manufacturing plant in Corpus Christi, Texas (the "Corpus Christi Plant").

### 1. The MGI Intercompany Credits

8. The MGI Intercompany Credits to be released or subordinated are comprised of the following:

(a) *The MGI-MGF Credits*. MGF owes MGI an aggregate amount of $64,031,362.82 and €12,635,756.04 (the "MGI-MGF Credits"),[10] which, under the Settlement Agreement, MGI has proposed to subordinate to the claims of creditors to whom previous payment was made (referred to in the Settlement Agreement as preferred and privileged creditors) and certain other unsecured creditors receiving payment on account of 20% of their claims.[11] The MGI-MGF Credits include:

---

[8]     A copy of the Cost Overrun and Makeup Agreement, as amended, is attached hereto as Exhibit E.

[9]     A copy of the CII Cost Overrun Refund Agreement is attached hereto as Exhibit F.

[10]     These amounts do not include approximately $130,857.33 of outstanding interest owed by MGI to MGF. *See* Van Der Slobe Decl., ¶ 4.

[11]     The Settlement Agreement contemplates that MGI will recover up to 20% on the MGI-MGF Credit, but only if all preferred and privileged creditors are paid in full and certain "other" unsecured creditors obtain a 20% recovery on their claims in connection with the Relevant Italian Procedures (as defined below). In the event

(i)      principal payable under that certain revolving intercompany credit facility agreement (the "<u>Intercompany Credit Agreement</u>") dated December 13, 2013 in the amount of $47,479,985.00 and €9,762,000.00;

(ii)     interest payable under the Intercompany Credit Agreement in the amount of $16,551,377.82 and €161,332.16; and

(iii)    €2,712,423.88 due in connection with an intercompany set-off following an intercompany reorganization on September 30, 2013.

(b)    *The MGI-Polimeri Net Credits*. Polimeri owes MGI a net total of €984,683.00 (the "<u>MGI-Polimeri Net Credits</u>"), which MGI proposes to release under the Settlement Agreement. The MGI-Polimeri Net Credits have been calculated by netting the payables owed by Polimeri to MGI in the aggregate amount of €5,367,863.79 (the "<u>Polimeri Payables</u>") against the payables owed by MGI to Polimeri in the aggregate amount of €4,383,180.79 (the "<u>MGI Payables</u>").

(i)     The Polimeri Payables are comprised of the following:

(A)    debt notes for spot purchasing of PET in the amount of € 1,902,870.15;

(B)    principal payable under a certain intercompany credit letter agreement (the "<u>Intercompany Letter Agreement</u>") executed on June 23, 2017 in the amount of €3,170,000.00;

(C)    interest payable under the Intercompany Letter Agreement in the amount of €41,177.24; and

(D)    price adjustments payable in connection with a certain contract executed on June 5, 2017 for the sale of Polimeri's PET branch to MGI in the amount of €253,816.40.

(ii)    The MGI Payables are comprised of the following:

(A)    €4,243,401.87 in expenses paid by Polimeri in connection with letters of credit issued by Unicredit to MGI; and

(B)    sales commissions, price adjustments and reimbursement of travel expenses and car hires in the aggregate amount of €139,778.92.

*See* Van Der Slobe Decl., ¶ 4.

---

that such senior claims are satisfied, MGI will share pro rata with all other unsecured creditors, up to a maximum amount of 20% under any plan proposed by MGF. *See* Settlement Agreement, § 3(a)(ii).

## 2.    *The CII Bio Credits*

9.    The CII Bio Credits to be sold by CII to MGI are comprised of the following:

(a)    *The CII-Biochemtex Credits*.  Biochemtex owes CII an aggregate amount of $8,684,701.38 and €8,810,834.28 (the "CII-Biochemtex Credits").[12]  The CII-Biochemtex Credits include:

 (i)    two invoices for services rendered under a supply agreement in connection with a project referred to as CHENGOLD, the first of which was invoiced on March 29, 2016 in the amount of €11,016,500.00 and the second of which was invoiced on December 31, 2016 in the amount of €9,888,697.02;

 (ii)    an invoice dated November 30, 2017 for services rendered in connection with a project referred to as MING FAT in the amount of $101,163.36;

 (iii)    invoices dated April 13, 2017 for services rendered in connection with a project referred to as XINFENGMING in the aggregate amount of $4,668,538.00;

 (iv)    two invoices for services rendered under a supply agreement in connection with a project referred to as TONGKUN, one dated June 30, 2017 and the other dated September 27, 2017, in the aggregate amount of $71,076.00;

 (v)    two invoices dated December 28, 2016 for interest payable in connection with an intercompany loan between CII and Biochemtex in the aggregate amount of $10,029.77; and

 (vi)    an invoice dated November 30, 2017 in the amount of $3,833,894.25 for payments made by CII to a number of vendors on behalf of Biochemtex.

(b)    *The CII-Beta Credits*.  Beta owes CII an aggregate amount of $702,998.18 (the "CII-Beta Credits" and together with the CII-Biochemtex Credits, the "CII Bio Credits") due under a certain Services Agreement dated November 11, 2016.

*See* Losa Decl., ¶ 5.

---

[12]    In calculating the CII-Biochemtex Credits, the Settlement Agreement takes into account a €12,094,362.74 payment that Biochemtex made to CII on December 31, 2016.

### 3.    *The Cost Overrun and Makeup Agreement Payables*

10.    The Cost Overrun and Makeup Agreement provides that (a) in the event that EPC Cost Overruns[13] are incurred and become due and payable by Debtor M & G Resins USA, LLC ("M&G Resins"), MGF is required to pay MGC an amount equal to the EPC Cost Overruns and (b) in the event that there is a CII Shortfall Amount[14] under the CII Onshore Supply Agreement, MGF is required to pay MGC an amount equal to such CII Shortfall Amounts, subject to certain conditions. *See* Cost Overrun and Makeup Agreement, §§ C-F. The CII Cost Overrun Refund Agreement provides that MGF will indemnify CII for 10% of the costs incurred in the performance of the CII Onshore Supply Agreement, in excess of the budgeted amount. *See* CII Cost Overrun Refund Agreement, ¶ 1.

11.    Magnate—a holder of an approximately 31% equity interest in MGC—is a third party beneficiary of the Cost and Makeup Overrun Agreement. *See* Cost Overrun and Makeup Agreement, § 5.14. Specifically, Magnate entered into a certain subscription agreement dated October 2, 2014 (as subsequently amended, the "Subscription Agreement"), which sets forth, among other matters, the rights and obligations of Magnate in connection with making equity

---

[13]    The Cost Overrun and Makeup Agreement defines "EPC Cost Overruns" as "the amount by which (i) the Actual Costs exceed (ii) the Fixed EPC Cost." In turn, the Cost Overrun and Makeup Agreement defines (a) "Actual Costs" as all amounts paid or incurred by, or on behalf of, M&G Resins under (i) a certain agreement with Sinopec Engineering (Group) Co. Ltd. ("SEG") under which SEG agreed to provide project management, design, engineering, equipment, materials, construction and related installation, startup and testing services for the Corpus Christi Plant (and which M&G Resins later assigned, with M&G Resins' consent, to Sinopec Engineering Group America, L.L.C. ("SEGA")) (the "EPC Contract"), (ii) any contract(s) replacing the EPC Contract (subject to certain conditions) and (iii) any contract(s) related to the increase of capacity at the Corpus Christi Plant; and (b) the "Fixed EPC Cost" as the sum of the Original Fixed EPC Cost (*i.e.*, $1.15 billion) and the Fixed Jumbo Capacity Increase Cost (*i.e.*, $1.235 billion).

[14]    The Cost Overrun and Makeup Agreement defines the "CII Shortfall Amount" as the amount equal to the difference between (a) CII's fully burdened costs (including the labor costs of its employees) and all third party expenses (including expenses incurred by CII's affiliates), in each case that are incurred by CII in connection with the fulfillment of all its obligations under the CII Onshore Supply Agreement and (b) the total amount payable to CII under the CII Onshore Supply Agreement, subject to certain adjustments. In turn, the "CII Onshore Supply Agreement" refers to the agreement by and between SEGA and CII under which SEGA subcontracted certain portions of the EPC Contract to CII.

contributions to MGC and certain of its subsidiaries, which, the Subscription Agreement provides, will be used to fund overruns with respect to the EPC Contract and the CII Onshore Supply Agreement. *Id.* at § B.

12.     In connection with funding the EPC Cost Overruns and the CII Shortfall Amount, MGC and Magnate each have certain claims against MGF under the Cost Overrun and Makeup Agreement.[15]  *See* Stogsdill Decl., ¶ 4.  Further, MGF owes CII an aggregate amount of $51,513,271.45 (the "<u>CII-MGF Credit</u>") in connection with certain invoices issued by CII related to the CII Cost Overrun Refund Agreement.  *See* Losa Decl., ¶ 6.  Under the Settlement Agreement, (a) Magnate and MGC propose to release MGF (referred to in the Settlement Agreement in such capacity as the "<u>Cost Overrun Released Party</u>") from its obligations under the Cost Overrun and Makeup Agreement (subject to certain conditions set forth below) (*see* Stogsdill Decl., ¶ 4) and (b) CII proposes to subordinate the CII-MGF Credits to the claims of creditors to whom previous payment was made (referred to in the Settlement Agreement as the preferred and privileged creditors) and certain other unsecured creditors receiving payment on account of 20% of their claims (*see* Losa Decl., ¶ 6).[16]

## C.     The Relevant Italian Procedures

13.     On October 13, 2017, both MGF and Polimeri commenced proceedings before the Court of Alessandria, Italy (the "<u>Italian Court</u>") pursuant to the terms of article 161, section 6, of Italian Royal Decree No. 267, dated March 16, 1942 (the "<u>Italian Bankruptcy Law</u>").  The

---

[15]     The Settling Debtors understand that MGF asserts that the maximum amount that it owes MGC under the Cost Overrun and Makeup Agreement is $200 million.  *See* Stogsdill Decl., ¶ 4.  MGC believes that MGF's liability under the Cost Overrun and Makeup Agreement is substantially higher than $200 million.  *Id.*

[16]     The Settlement Agreement contemplates that CII will recover up to 20% on the CII-MGF Credit, but only if all preferred and privileged creditors are paid in full and certain "other" unsecured creditors obtain a 20% recovery on their claims in connection with the Relevant Italian Procedures.  In the event that such senior claims are satisfied, CII will share pro rata with all other unsecured creditors, up to a maximum amount of 20% under any plan proposed by MGF.  *See* Settlement Agreement, § 3(a)(ii).

Settling Debtors understand that MGF and Polimeri are now preparing to file their respective plans (each, a "*concordato*") and proposals to the Italian Court pursuant to article 161, sections 1 and 3 of the Italian Bankruptcy Law and/or pursuant to another insolvency instrument provided by the Italian Bankruptcy Law (the "Relevant Italian Procedures"). *See* Losa Decl., ¶ 7; Van Der Slobe Decl., ¶ 5; Stogsdill Decl., ¶ 5.

14. In order for a *concordato* to be approved, the Settling Debtors have been informed that, pursuant to article 160 of the Italian Bankruptcy Law, a *concordato* must pay at least 20% of all unsecured creditor claims. *See* Losa Decl., ¶ 7; Van Der Slobe Decl., ¶ 5; Stogsdill Decl., ¶ 5. The Settling Debtors understand that in excess of $1.128 billion in unsecured claims have been asserted against MGF. *See* Losa Decl., ¶ 7; Van Der Slobe Decl., ¶ 5; Stogsdill Decl., ¶ 5. As of the date of this Motion, the Settling Debtors further understand that MGF has secured releases from creditors holding in excess of $677.5 million in unsecured claims (including approximately $330 million in claims that the Settling Debtors propose to release by this Motion), and further that MGF is currently seeking similar releases from creditors holding in excess of $397 million in unsecured claims. *See* Losa Decl., ¶ 7; Van Der Slobe Decl., ¶ 5; Stogsdill Decl., ¶ 5. In the event that MGF is unable to obtain such releases, the Settling Debtors understand that MGF would be forced to liquidate, the result of which will be little, if any, return on such claims. *See* Losa Decl., ¶ 7; Van Der Slobe Decl., ¶ 5; Stogsdill Decl., ¶ 5.

15. Against that backdrop, MGF approached each of the Settling Debtors to negotiate the release of MGI-Polimeri Net Credits and claims that MGC has against MGF under the Cost Overrun and Makeup Agreement, and the subordination of the MGI-MGF Credits and the CII-MGF Credits to the claims of creditors to whom previous payment was made (referred to in the Settlement Agreement as the preferred and privileged creditors) and certain other unsecured

creditors receiving payment on account of 20% of their claims.  *See* Losa Decl., ¶ 9; Van Der Slobe Decl., ¶ 7; Stogsdill Decl., ¶ 7.  Among other things, MGF provided the Disinterested Directors with presentations concerning the Settling Debtors proposed treatment and anticipated recoveries under each *concordato*, as well as a settlement proposal releasing the Released Credits and the release of MGC's claims against MGF under the Cost Overrun and Makeup Agreement. *See* Losa Decl., ¶ 9; Van Der Slobe Decl., ¶ 7; Stogsdill Decl., ¶ 7.  Upon review and careful consideration of such presentations and proposals, the Disinterested Directors determined that the Settlement Agreement was in the best interests of the Settling Debtors, their estates and creditors.  *See* Losa Decl., ¶ 9; Van Der Slobe Decl., ¶ 7; Stogsdill Decl., ¶ 7.  Accordingly, in connection with the Relevant Italian Procedures and the execution of the Settlement Agreement, the Settling Debtors are proposing to forgive and release or subordinate (subject to approvals of this Court and the Italian Court) all of their rights to the MGI-Polimeri Net Credits, the MGI-MGF Credits and the CII-MGF Credits, while MGC and Magnate are agreeing to release all of its claims, rights, interests and benefits under the Cost Overrun and Makeup Agreement, each subject to certain conditions set forth below.

### D.     The Settlement Agreement

16.     The Settlement Agreement consensually resolves a number of intercompany claims, provides CII with a $5 million recovery shortly after approval of the Settlement Agreement and provides MGI with the ability to monetize up to approximately $17 million in intercompany claims[17] in due course (each subject to relevant approvals by this Court and the

---

[17]     Under the Settlement Agreement, MGI retains the benefit of the first $5,591,303 that it recovers on account of the CII Bio Credits, plus 10% of any additional recoveries that it receives in excess of $5,591,303.  In addition, it is possible that MGI will obtain a $16.3 million recovery in connection with the Brazil Fiber Sale.

Italian Court), which amounts are more than what the Settling Debtors believe that they could obtain in a liquidation scenario.

17. Because MGF is unable to make any payment to MGI on account of the MGI-MGF Credits, the subordination of such claims is of little to no detriment to MGI, but makes it more likely that MGF will be able to confirm a *concordato* in connection with Relevant Italian Procedures. In the event that MGF is able to confirm a *concordato*, the Settling Debtors have been informed that certain claims that MGF has against its Brazilian subsidiary M&G Fibras e Resinas ("Brazil Fibras") will be released, which is a condition precedent to the consummation of the sale of Brazil Fibras' fiber business (the "Brazil Fiber Sale"). Under the currently contemplated terms of the Brazil Fiber Sale, MGI would receive full payment of a $16.3 million intercompany balance owing to MGI by Brazil Fibras. Such a recovery, in turn, would potentially enhance the recovery of MGC, as a creditor of, and obligor under certain obligations incurred by, MGI. *See* Van Der Slobe Decl., ¶ 6; Stogsdill Decl., ¶ 6.

18. Similarly, while MGF is unable to make any payment to CII on account of the CII-MGF Credits, the subordination of such claims increases the likelihood that MGF will be able to confirm a *concordato*. If MGF is not able to confirm a *concordato*, the ability of each of Biochemtex and Beta (including certain of their affiliates, the "Bio Perimeter Entities") to confirm a *concordato* will be jeopardized because, should MGF be declared bankrupt, there is a risk that the proposed sale of the businesses of the Bio Perimeter Entities to a third-party (the "Bio Perimeter Sale") will not close. On the other hand, if the Bio Perimeter Sale is consummated, CII will receive a recovery of approximately $5.59 million on account of certain claims that it has against the Bio Perimeter Entities. To permit CII to monetize its claims against

the Bio Perimeter Entities now, MGI has agreed to purchase those claims for $5 million.  *See*

Losa Decl., ¶ 8.

19.     The principal terms of the Settlement Agreement are as follows:[18]

(a)     ***Effective Date***.  The "Effective Date" is the later of (i) the date that MGI pays CII an amount equal to $5,000,000 for the purchase of the CII Bio Credits in accordance with subsection (d) below (the "Payment Date")[19] and (ii) the date on which this Court enters the Proposed Order (or an order approving this Settlement Agreement).  The Settlement Agreement is expressly contingent on this Court's approval and approval of the Relevant Italian Procedures by the Italian Court. Settlement Agreement, § 1.1.

(b)     ***Payment Effective Date***.  The "Payment Effective Date" means the date that is five business days after this Court enters the Proposed Order (or an order approving this Settlement Agreement).  *Id.* at § 1.1.

(c)     ***Release Effective Date***.  The "Release Effective Date" is the later of (i) the Effective Date and (ii) the date on which the Italian Court accepts one or more plans that provide that the CII Bio Credits will be treated in the Relevant Italian Procedures in a manner that is no less favorable than the treatment of other similarly situated unsecured claims.  *Id.* at § 1.1.

(d)     ***Purchase of the CII Bio Credits***.

(i)     On the Effective Date, CII assigns, absolutely, to MGI, all rights, title and interest in and to each of the CII Bio Credits.  *Id.* at § 2(a).

(ii)    On the Payment Effective Date, MGI will pay to CII an amount equal to $5,000,000.  *Id.* at § 2(b).

(iii)   Within five business days of receipt of any CII BIO Excess Recovery by MGI, MGI shall remit such recovery to CII.  *Id.* at § 2(c).  The Settlement Agreement defines the "CII BIO Excess Recovery" as "90% of any recovery received by MGI on account of the CII Bio Credits in excess of $5,591,303.00.  *Id.* at § 1.1.

---

[18]     The following summary is qualified in its entirety by reference to the provisions of the Settlement Agreement.  In the event of any inconsistencies between the provisions of the Settlement Agreement and the terms set forth herein, the terms of the Settlement Agreement shall govern.

[19]     The Settlement Agreement provides that, on the Payment Date, the $5,000,000 paid to CII will be deposited by CII into a segregated account, and will not be utilized absent further order of this Court.  Settlement Agreement, § 1.1.

(e)    ***Release – Released Credits***.

  (i)    On the Release Effective Date:

    (A)    MGI and Polimeri agree to set-off the MGI Payables owed by MGI to Polimeri in full against the Polimeri Payables owed by Polimeri to MGI so that upon such set-off, all MGI Payables will have been discharged and the Polimeri Payables will have been discharged in an amount equal to €4,365,134.71; and

    (B)    Immediately after the set-off described in subparagraph (A) becoming effective, each of MGI and CII unconditionally and irrevocably (1) releases each of MGF and Polimeri (the "Credit Released Parties") from all present and future obligations and liabilities (both actual and contingent) under or in connection with the MGI-Polimeri Net Credits, and (2) subordinates (*posterga*) in the Relevant Italian Procedures all present obligations and liabilities owed to it under the MGI-MGF Credits and the CII-MGF Credits (other than any of the foregoing arising from the fraud or willful misconduct on the part of the Credit Released Parties): (i) to the previous payment made in favor of the other creditors (preferred and privileged); and (ii) to the previous payment up to 20% of each claim, to the other unsecured creditors, as listed under the Relevant Italian Procedure.  It is thus understood that, once the preferred and privileged creditors have been completely paid and unsecured have been paid in the amount of 20% of each claim, all the financial resources available to MGF will be relied upon to pay up to 20% of the MGI-MGF Credits and CII-MGF Credits and, subsequently, to pay pro quota and proportionally all the unsecured creditors (including the MGI-MGF Credits and the CII-MGF Credits).  MGI and CII accept the payment of the MGI-MGF Credits and CII-MGF Credits, in the terms of subsection (2) above, in line with the timetable set forth in the Relevant Italian Procedure.

    (C)    Immediately after the set-off in subparagraph (A) becoming effective, each of the Credit Released Parties unconditionally and irrevocably releases each of MGI and CII from all present and future obligations and liabilities (both actual and contingent) under or in connection with the Released Credits owed to it other than any of the foregoing arising from the fraud or willful misconduct on the part of MGI or CII.  *Id.* at § 3(a).

  (ii)    The set-off of claims in paragraph (e)(i) above constitutes a netting (compensation) under Luxembourg law, including in particular the Luxembourg law of 5 August 2005 on financial collateral arrangements. *Id*. at § 3(b).

(iii)     Each of MGF and Polimeri agree that they will not seek recovery from MGI or CII on account of any claim or receivable that it may have against MGI or CII other than pursuant to the set-off referred to in subsection (e)(i)(A) above.

(iv)     In the event that the Italian Court rejects or fails to approve, or once ratified, terminates the Relevant Italian Procedures, the set-off and the releases contemplated in this subsection (e) will cease to have effect.

(f)     ***Release – Cost Overrun and Makeup Agreement***.

(i)     As of the Release Effective Date, and subject to this Court approving and authorizing MGC and MGI to enter into and perform under that certain settlement agreement, dated as of April 10, 2018, among MGI, M&G Polimeros Brasil, S.A., MGC, M&G Polimeros Mexico, S.A. de C.V. and Aloke Empreendimentos e Participacoes Ltda.:[20]

    (A)     Magnate, as the Preferred Majority (as defined in the Settlement Agreement) for the purpose of (and as defined in) the MGC Shareholders Agreement and the MGC Articles (each as defined in the Settlement Agreement), grants its consent to the release by MGC referred to in subparagraph (B) below;

    (B)     each of Magnate (as the sole third party beneficiary of the Cost Overrun and Makeup Agreement) and MGC unconditionally and irrevocably releases the Cost Overrun Released Party (*i.e.*, MGF) from all present and future obligations and liabilities (both actual and contingent) under or in connection with the Cost Overrun and Makeup Agreement, other than any of the foregoing arising from fraud or willful misconduct on the part of the Cost Overrun Released Party (such released rights, the "Cost Overrun Released Rights"); and

    (C)     MGF unconditionally and irrevocably releases Magnate from all present and future obligations and liabilities (both actual and contingent) under or in connection with the Cost Overrun and Makeup Agreement other than any of the foregoing arising from the fraud or willful misconduct on the part of Magnate. *Id.* at § 4(a).

(ii)     MGF agrees that it will not seek recovery from Magnate or MGC on account of any claim or receivable that it may have against Magnate or MGC. *Id.* at § 4(b).

---

[20]     On April 20, 2018, the Debtors filed a motion (Docket No. 1387) seeking approval of such settlement. A hearing on that motion is currently scheduled for May 17, 2018.

(iii)     If the Italian Court rejects or fails to approve, or once ratified, terminates, the Relevant Italian Procedures, the consent and the releases contemplated in this subsection (f) will cease to have effect. *Id.* at § 4(c).

(g)     ***Relevant Italian Procedures***. Subject, in the case of the Settling Debtors, to the approval by this Court of their entry into the Settlement Agreement, each of the Releasing Parties hereby represents and warrants that each of its obligations under the Settlement Agreement is legal, valid, binding and enforceable against it. For the avoidance of doubt, all of MGI's, MGC's and CII's obligations hereunder are subject to approval of this Court. *Id.* at § 6.

## RELIEF REQUESTED

20.     The Debtors request entry of an order, pursuant to Bankruptcy Rule 9019 and sections 105 and 363 of the Bankruptcy Code, in substantially the form of the Proposed Order, approving the Settlement Agreement.

## BASIS FOR RELIEF

21.     Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the bankruptcy court may approve a compromise or settlement." Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts have held that a transaction involving property of the estate should generally be approved so long as the trustee can demonstrate "some articulated business justification for using, selling, or leasing property outside of the ordinary course of business." *In re Continental Airlines, Inc.*, 780 F. 2d 1223, 1226 (5th Cir. 1986); *accord In re Lionel Corp.*, 722 F. 2d 1063, 1071 (2nd Cir. 1983). Moreover, section 105(a) provides that a bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

22.     Compromises are favored in the bankruptcy context "[t]o minimize litigation and expedite the administration of a bankruptcy estate." *Martin v. Myers (In re Martin)*, 91 F. 3d

389, 393 (3d Cir. 1996). "The authority to approve a compromise [or] settlement is within the sound discretion of the bankruptcy court." *In re Northwestern Corp.*, 2008 WL 2704341, at *6 (Bankr. D. Del. Jul. 10, 2008) (quoting *Key3media Group, Inc. v. Pulver.Com, Inc. (In re Key3media Group, Inc.)*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) ("In exercising this discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate.")).

23.     When determining whether a settlement is fair and reasonable under Bankruptcy Rule 9019(a), courts in the Third Circuit consider the following factors (collectively, the "Martin Factors"):

(a)     the probability of success in litigation;

(b)     the likely difficulties of collection;

(c)     the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and

(d)     the paramount interest of the creditors.

*Martin*, 91 F. 3d at 393; *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006); *see also In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (in applying Bankruptcy Rule 9019(a), whether a court should approve a settlement depends on several factors, including the probability of success in the litigation, the complexity of the litigation, the attendant expense and delay, and the interests of the creditors); *In re Geller*, 74 B.R. 685, 688 (Bankr. E.D. Pa. 1987) (generally, a settlement will be approved as long as it clears a threshold of reasonableness); *Official Unsecured Creditors' Committee v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines, Inc.)*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd* 8 F. 3d 812 (3d Cir. 1993) (settlement must not fall below the lowest level in the range of reasonableness).

24. While bankruptcy courts are directed to determine whether settlements are in the "best interests of the estate," *In the Matter of Energy Cooperative, Inc.*, 886 F. 2d 921, 927 (7th Cir. 1989), the bankruptcy court should not substitute its judgment for that of a trustee or debtor in possession. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985); *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Indeed, the bankruptcy court is not to decide the numerous questions of law or fact raised in the litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See In re Penn Trans. Co.*, 596 F. 2d 1102, 1114 (3d Cir. 1979); *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F. 2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983); *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("[I]n approving a settlement, the court does not have to be convinced that the settlement is the best possible compromise . . . [it] must only conclude that the compromise or settlement . . . be above the lowest point in the range of reasonableness.") (internal quotation and citations omitted).

25. As set forth in greater detail below, the Settling Debtors believe that the weight of the Martin Factors favors approval of the Settlement Agreement. The Settlement Agreement was approved by the Disinterested Directors. Further, the Settling Debtors believe that their entry into the Settlement Agreement is a valid exercise of their respective business judgment. The Settling Debtors would recover little to nothing on their claims against MGF and Polimeri in a liquidation, which appears highly likely absent the Settlement Agreement. If the Settlement Agreement is approved, however, the Settling Debtors improve their chances of recovering approximately $25 million from certain of MGF's subsidiaries and affiliates, as detailed above. As such, the Debtors respectfully submit that the Settlement Agreement falls well above the lowest point in the range of reasonableness and should be approved by this Court.

26.     *Probability of Success*.  The Settling Debtors do not believe that the probability of success on the merits is relevant to determining whether the Settlement Agreement should be approved by this Court.  While the Settling Debtors believe that they would prevail if they were to press their claims against MGF and Polimeri, such entities lack the funds with which to satisfy the Settling Debtors' claims.  On the other hand, releasing claims against MGF and Polimeri will increase the likelihood of recoveries from certain of MGF's subsidiaries and affiliates.  Accordingly, to the extent that it is found by this Court to be relevant, this factor favors approval of the Settlement Agreement.

27.     *Difficulties of Collection.*  MGF and Polimeri are unable to make payment to the Settling Debtors on account of the MGI-Polimeri Net Credits, the MGI-MGF Credits and the CII-MGF Credits and MGF's obligations under the Cost Overrun and Makeup Agreement.  While the Settling Debtors believe that they have a right to enforce such claims, they have been advised by MGF that should they seek enforcement of their claims, MGF and Polimeri would not be able to confirm plans (each a *concordato*) in connection with the Relevant Italian Procedures, because, among other things, MFG cannot satisfy the requirement under Italian Bankruptcy Law that all unsecured creditors receive a recovery of at least 20% of their claims.  *See* Losa Decl., ¶ 7; Van Der Slobe Decl., ¶ 5; Stogsdill Decl., ¶ 5.  On the other hand, if such claims are released by the Settling Debtors, it becomes more likely that MGF will be able to confirm a *concordato* before the Italian Court, which provides a number of potential benefits to the Settling Debtors.  *See* Losa Decl., ¶ 8; Van Der Slobe Decl., ¶ 6; Stogsdill Decl., ¶ 6.

28.     For example, such plan approval (a) is a condition to the consummation of the Brazil Fiber Sale, which (if consummated) would provide a recovery to MGI on account of claims that it has against Brazil Fibras and (b) increases the odds that the Bio Perimeter Entities'

confirm their plans before the Italian Court—which includes the Bio Perimeter Sale—thereby

increasing the likelihood that MGI (upon purchasing the CII Bio Credits) makes a recovery on

account of the CII Bio Credits. Any recovery that MGI makes will inure to the benefit of MGC,

a creditor of, and guarantor of certain obligations incurred by, MGI. Accordingly, this factor

weighs heavily in favor of approval of the Settlement Agreement.

29. *Complexity of Litigation.* MGC's entry into the Settlement Agreement resolves

issues concerning MGF's obligations under the Cost Overrun and Makeup Agreement. While

MGC believes that it has valid and enforceable claims against MGF, MGF has taken the position

that it would dispute that it owes any amounts under the Cost Overrun and Makeup Agreement,

and in any event that its maximum exposure under such agreement is, at most, $200 million.

Litigating such a dispute to a conclusion likely would be costly, complicated and raise a variety

of jurisdictional issues. But more importantly, even if MGC obtained a judgment against MGF,

it does not appear to be collectible, which would counsel against the expenditure of any

meaningful funds for its pursuit.

30. *Paramount Interests of Creditors.* Finally, the Settlement Agreement is in the

paramount interest of Settling Debtors' creditors. The Settlement Agreement results in MGI

purchasing the CII Bio Credits for $5 million. Such purchase of claims provides CII with a

$5 million recovery now for the benefit of its estate and creditors, while also providing CII with

a future recovery in the event that certain conditions are met (*i.e.*, the CII Bio Excess Recovery).

On the other hand, MGI retains the benefit and upside of recovering approximately $600,000 on

account of the CII Bio Credits.

31. Moreover, in releasing all claims that it has against MGF under the Cost Overrun

and Makeup Agreement, MGC is releasing a claim that would likely be contested by MGF and,

more importantly, on which it is unable to collect (given MGF's financial condition), assuming that it is successful on such claim in the first instance (which the Settling Debtors believe is likely). The release of such claim, however, will potentially enable MGF to confirm a *concordato* in connection with the Relevant Italian Procedures that will, as described above, provide MGI with a path to recover approximately $16.3 million from Brazil Fibras, and improve the recoveries of MGI's creditors, including MGC.

32. For these reasons, entry into the Settlement Agreement is a sound exercise of the Settling Debtors business judgment, is in best interests of their creditors and their estates and falls well above the lowest point in the range of reasonableness. Accordingly, the Debtors respectfully request that the Court approve and authorize the Settling Debtors to enter into the Settlement Agreement.

## NOTICE

33. Notice of this Motion shall be given to (a) the U.S. Trustee; (b) the Committee and its counsel, Milbank, Tweed, Hadley & McCloy LLP; (c) any federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware or order of the Court; (d) Magnate and its counsel, Kirkland & Ellis LLP; (e) DAK Americas LLC and its counsel, Weil, Gotshal & Manges LLP; (f) Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financiero Inbursa and its counsel, Cleary Gottlieb Steen & Hamilton LLP; (g) any party that has requested notice pursuant to Bankruptcy Rule 2002 at the time of noticing; (h) MGF; and (i) Polimeri. The Debtors submit that no other or further notice need be provided.

## <u>NO PRIOR REQUEST</u>

34.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order and grant such other and further relief as may be appropriate.

Dated: May 18, 2018

PACHULSKI STANG ZIEHL & JONES LLP

Joseph M. Mulvihill

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:     ljones@pszjlaw.com
     joneill@pszjlaw.com
     jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:     (212) 326-3939
Facsimile:     (212) 755-7306
Email:     sgreenberg@jonesday.com
     scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, OH 44114
Telephone:     (216) 586-7035
Facsimile:     (216) 579-0212
Email:     ceblack@jonesday.com

Co-Counsel for the Debtors and Debtors in Possession