REDACTED COPY OF DOCUMENT FILED UNDER SEAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>M & G USA CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12307 (BLS)<br><br>Jointly Administered<br><br>Related to D.I. 1537<br><br>**Filed Under Seal Pursuant to D.I. 350 and 350-1, ¶ 11; and Del. Bankr. L.R. 9018-1(e)**<br><br>Hearing Date:    July 18, 2018 at 9:30 a.m.<br>Objections Due:    July 13, 2018 at 4:00 p.m. |

**OBJECTION OF BANCOMEXT TO MOTION OF DEBTORS M&G CAPITAL S.À R.L., M&G CHEMICALS S.A. AND MOSSI & GHISOLFI INTERNATIONAL S.À R.L. FOR AN ORDER DISMISSING THEIR CHAPTER 11 CASES AND GRANTING RELATED RELIEF**

Roberto J. Kampfner
Aaron Colodny
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071-2433
Telephone:  (213) 620-7729
Facsimile:  (213) 452-2329
rkampfner@whitecase.com
aaron.colodny@whitecase.com

Jeffrey M. Schlerf (DE No. 3047)
**FOX ROTHSCHILD LLP**
919 North Market Street, Suite 300
Wilmington, Delaware 19801-3062
Telephone:  (302) 654-7444
Facsimile:  (302) 656-8920
jschlerf@foxrothschild.com

*Counsel for*
*Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Desarrollo*

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M&G USA Corporation (3449), M&G Resins USA, LLC (3236), M&G Polymers USA, LLC (7593), M&G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International, S.à r.l. (1270), M&G Chemicals S.A. (1022), M&G Capital S.à r.l. (7812), M&G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...............................................................................................................5

LEGAL ARGUMENT.........................................................................................................17

A.     The Luxembourg Debtors Are Not Entitled to Dismissal Under 11 U.S.C. § 305(a) ...... 17

     1.     Factor 1: the economy and efficiency of administration ...................................... 20

     2.     Factor 2: whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court ............................ 27

     3.     Factor 3: whether federal proceedings are necessary to reach a just and equitable solution ........................................................................................... 28

     4.     Factor 4: whether there is an alternative means of achieving an equitable distribution of assets ........................................................................................ 30

     5.     Factor 5: whether the debtor and creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case.................................................................................................................... 31

     6.     Factor 6: whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process............................................................................... 33

     7.     Factor 7: the purpose for which bankruptcy jurisdiction has been sought ........... 34

B.     Dismissal Under § 1112 Is Also Inappropriate............................................................... 40

C.     The Luxembourg Debtors' Requests for Exculpation Should Be Denied........................ 42

CONCLUSION...................................................................................................................43

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Commonwealth Renewable Energy, Inc.* (*In re Commonwealth Renewable Energy, Inc.*), 550 B.R. 279 (Bankr. W.D. Pa. 2016)...........................40

*Bickerton v. Bozel, S.A.* (*In re Bozel S.A.*), 434 B.R. 108 (Bankr. S.D.N.Y. 2010).....................24

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).......................17

*In re 82 Milbar Boulevard, Inc.*, 91 B.R. 213 (Bankr. E.D.N.Y. 1988) .................................17, 40

*In re AMC Invs., LLC*, 406 B.R. 478 (Bankr. D. Del. 2009) ..................................................18, 19

*In re Brown*, 951 F.2d 564 (3d Cir. 1991) ..................................................................................40

*In re Cable & Wireless USA, Inc.*, 331 B.R. 568 (Bankr. D. Del. 2005)...................................19

*In re Camann*, 2001 Bankr. LEXIS 581 (Bankr. D.N.H. Mar. 19, 2001) ....................................41

*In re Corino*, 191 B.R. 283 (Bankr. N.D.N.Y. 1995) ...................................................................17

*In re Johnson*, 575 F.3d 1079 (10th Cir. 2009) .........................................................................27

*In re Monitor Single Lift I, Ltd.*, 381 B.R. 455 (Bankr. S.D.N.Y. 2008).........................18, 19, 34

*In re Northshore Mainland Servs., Inc.*, 537 B.R. 192 (Bankr. D. Del. 2015).......................17, 19

*In re Smith*, 866 F.2d 576 (3d Cir. 1989).....................................................................................27

*In re Starlite Houseboats, Inc.*, 426 B.R. 375 (Bankr. D. Kan. 2010)..........................................18

*Porges v. Gruntal & Co.* (*In re Porges*), 44 F.3d 159 (2d Cir. 1995) ..........................................27

*Querner v. Querner* (*In re Querner*), 7 F.3d 1199 (5th Cir. 1993)...............................................27

*Santa Fe Minerals, Inc. v. BEPCO, L.P.* (*In re 15375 Mem'l Corp.*), 382 B.R. 652 (Bankr. D. Del. 2008) .................................................................................17, 37

*Steinman v. Spencer* (*In re Argus Grp. 1700*), 206 B.R. 737 (Bankr. E.D. Pa. 1996) .....................................................................................19

*Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233 (3d Cir. 2001)......................37

## STATUTES AND RULES

11 U.S.C. § 305(a) ................................................................................................ passim

11 U.S.C. 1112(b) ..........................................................................................4, 14, 40, 42

11 U.S.C. § 1129 ........................................................................................................41

28 U.S.C. 1408(2) .....................................................................................................27

## MISCELLANEOUS

H. Rep. No. 959, 95th Cong., 1st Sess. 325 (1977) .....................................................18

Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Desarrollo

("**Bancomext**") hereby files this objection (the "**Objection**") to the *Motion of Debtors M&G Capital S.à r.l., M&G Chemicals S.A. and Mossi & Ghisolfi International S.à r.l. for an Order Dismissing Their Chapter 11 Cases and Granting Related Relief* [D.I. 1537] (the "**Motion**").[2]  In support of the Objection, Bancomext refers to (i) the *Declaration of Franz Fayot in Support of Bancomext's Objection to Motion of Debtors M&G Capital S.à r.l., M&G Chemicals S.A. and Mossi & Ghisolfi International S.à r.l. for an Order Dismissing Their Chapter 11 Cases and Granting Related Relief* (the "**Fayot Declaration**"); and (ii) the *Declaration of Aaron Colodny in Support of Bancomext's Objection to Motion of Debtors M&G Capital S.à r.l., M&G Chemicals S.A. and Mossi & Ghisolfi International S.à r.l. for an Order Dismissing Their Chapter 11 Cases and Granting Related Relief* (the "**Colodny Declaration**"), in each case filed concurrently herewith, states as follows:

<u>**PRELIMINARY STATEMENT**</u>

The Luxembourg Debtors have derived tremendous benefits from these Chapter 11 Cases.  By filing, they avoided appointment of a Luxembourg trustee and stayed all creditor actions against them for months.  Even now, while a handful of "small" debt holders are purportedly agitating for payment, the Luxembourg Debtors' largest creditors, including their affiliates, are respecting the automatic stay.

This freedom from a trustee and creditor aggression allowed the Luxembourg Debtors to significantly improve their financial position.  Though they arrived in these Chapter 11 Cases with just $1.5 million in cash, they recently pushed their cash balance to $25 million and hope to increase it by another approximately $21 million.  They did so by collecting receivables, earning

---

[2]   Where context requires, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such term in the Motion.

service fees and engaging in other revenue-generating activity that a Luxembourg trustee could not have done. Moreover, the chapter 11 process has allowed the Luxembourg Debtors to eliminate over half a billion dollars of liabilities from their balance sheets through favorable Court-approved settlements.

These benefits won, the Luxembourg Debtors now refuse to bear the burdens of chapter 11 and want out. They want out to make millions of dollars of payments to insiders, including their CEO and part-owner Marco Ghisolfi, that could not be paid in chapter 11. They want out so that they can negotiate settlements with and pay their favored creditors at the expense of their disfavored ones. They want out so that they can set off debts that cannot be set off under applicable law. And, they want out to make sure that their assets cannot be made available to the creditors of the U.S. Debtors, even before a proper allocation of administrative costs can be determined by the Court. Also, unsaid, they plainly want out to avoid this Court's scrutiny of their machinations.

Unsurprisingly, the interests of the insiders of the Luxembourg Debtors were served by the chapter 11 filing and would now be served by dismissal. By staving off appointment of a Luxembourg trustee with the October chapter 11 filing, the employees of the Luxembourg Debtors (most of which are insiders) protected their salaries. Indeed, Mr. Ghisolfi protected his ██████████████████████████████████████████████████████. Upon his separation from the company, he and other insiders are also slated to ████████████ ████████████████. If the Luxembourg Debtors' Chapter 11 Cases are not dismissed, their severance will largely constitute unsecured claims due to limitations under U.S. bankruptcy law. If these cases *are* dismissed, employees will get their full severance, whether out-of-court or in a Luxembourg insolvency proceeding. As the Luxembourg Debtors' local law expert notes,

severance payments are entitled to uncapped priority under Luxembourg insolvency law and no distinction is drawn between insiders and non-insiders for these purposes.

Importantly, the Luxembourg Debtors fail to satisfy their burden of showing that ***all other*** parties in interest would also benefit from dismissal. Indeed, at deposition, Mr. Ghilsolfi admitted ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ Abstention under section 305 of the Bankruptcy Code is "extraordinary relief" that is "sparingly" granted. It is appropriate only in "egregious situations" and the burden of showing universal benefit is a "heavy" one. Ordinarily, it is appropriate only where another pending proceeding pre-dated the bankruptcy filing. And rarely, if ever, is it sought by a debtor that voluntarily sought bankruptcy protections and exploited their benefits for months before deciding it had had its fill.

The Luxembourg Debtors cannot possibly say that dismissal would benefit all parties in interest because what will happen after dismissal is highly uncertain. They simply don't know. In the Motion, they express hope they can resolve all claims out of court, █████████████

██████████████████████████████████████████████████████

██████████. When they filed the Motion, the Luxembourg Debtors thought the only alternative to the out-of-court approach was a Luxembourg insolvency proceeding run by a trustee. Since then, however, Mr. Ghisolfi ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████, that, like a chapter 11, allows management to stay in place to shape a court-approved restructuring. The Luxembourg Debtors imagine that █████████████

████████████████████████████████████████████████████████. It is

certain to displease at least some of the U.S., Mexican, and Chinese creditors holding 85% of the Luxembourg Debtors' non-insider unsecured debt and who have already invested heavily in protecting their rights in these Chapter 11 Cases. That is to say, not everyone will benefit.

Importantly, these Chapter 11 Cases are not the futile endeavor they are made out to be in the Motion. Ms. Goebel's dim view about the prospects for recognition of a chapter 11 plan in a Luxembourg court is wrong. Indeed, as the Southern District of New York bankruptcy court has concluded, "foreign bankruptcy court orders are enforceable in Luxembourg, with the same capacity, enforceability and effect as they would have in their respective foreign jurisdictions." The Luxembourg Debtors' desire for a new venue is driven not by poor prospects for recognition, but by their desire to do things that U.S. bankruptcy won't allow, such as shoveling cash to insiders and giving preferential treatment to favored creditors.

Procedure and venue aside, dismissal would also severely prejudice the substantive rights of the U.S., Mexican, and Chinese creditors of the Luxembourg Debtors that, like Bancomext, are not among the Luxembourg Debtors' favored few. The Luxembourg Debtors seek to dismiss their cases so that they can take with them in excess of $20 million in cash generated by the Chapter 11 Cases to distribute as they see fit. Put another way, dismissal would replace the Bankruptcy Code's priority scheme with a priority scheme more to the liking of the Luxembourg Debtors, yielding benefits only to insiders and favored creditors. This result is simply incompatible with sections 305 and 1112 of the Bankruptcy Code.

The Luxembourg Debtors' request for dismissal is extraordinary. It is unwarranted. It should be denied.

**BACKGROUND**

1. The three Luxembourg Debtors are each direct or indirect parents of the nine U.S.-based Debtors in these Chapter 11 Cases. [D.I. 3 (the "**First Day Declaration**"), Ex. B]. Together, these twelve debtors voluntarily commenced the Chapter 11 Cases in this Court less than nine months ago, at the end of October 2017.

2. The Luxembourg Debtors filed their petitions on October 30. The day before, their respective boards met to consider whether to proceed with the chapter 11 filings. [Bankr. Nos. 17-12315, 17-12316 & 17-12317, D.I. 1 (the "**Luxembourg Petitions**") at 6]. Nine directors, including Marco Ghisolfi, considered the matter as to M&G Chemicals; six directors considered the matter as to M&G International; and three managers considered the matter as to M&G Capital. *Id.* After "evaluat[ing] the Company's alternatives in connection with a possible restructuring, and after due consideration taking into account the information available to it at th[e] time," and after "due deliberation of the corporate interest and benefit of the Company," each board unanimously authorized chapter 11 filings for the Luxembourg Debtors. They each had "determined that it [wa]s in the best interests of the Company, its stakeholders and its creditors to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code." *Id.* at 6-7. ███████████████████████████████████████████████████████████████
███████████████████████████████ Colodny Decl. Ex. B at D_E0351282.

3. In his declaration filed in support of the Motion [D.I. 1537-2] (the "**Ghisolfi Declaration**"), Mr. Ghisolfi claims two specific reasons that the Luxembourg Debtors sought chapter 11 protection together with their affiliated U.S. Debtors. First, they hoped to consummate a chapter 11 plan. Second, Luxembourg Debtor M&G International, through its contracts with various vendors, provided essential information technology services to the U.S. Debtors that would be necessary to support the Debtors' asset sale processes. Ghisolfi Decl., ¶ 7.

It was the Luxembourg Debtors' "hope" that a successful sale process would make a plan possible. *Id.*

4.      The Luxembourg Debtors are primarily holding companies that own the U.S. Debtors and other operating companies in Mexico and Brazil. As reflected in their respective schedules of assets and liabilities, each of the Luxembourg Debtors' primary assets consist of equity interests in their subsidiaries and intercompany obligations owed to them by those same entities. [D.I. 784 at 31, 34; D.I. 746 at 22, 28; D.I. 743 at 22].[3] As of May 31, 2018, the Luxembourg Debtors also held over $24 million of cash. [D.I. 1640].

5.      Each Luxembourg Debtor commenced its bankruptcy proceeding heavily burdened with debt. According to the Debtors' November 2017 operating report, M&G International had only approximately $2.5 million in cash and approximately $1 billion in liabilities. *See* [D.I. 570 at 3];[D.I. 784 at 15]. M&G Chemicals was even more deeply insolvent. It had no cash and its liabilities also exceeded $1 billion. [D.I. 745 at 15]. M&G Capital has *de minimis* cash and assets that exceeded its $39,269,268.96 in liabilities by approximately $4 million. [D.I. 743 at 15].

6.      Notably, while the Luxembourg Debtors had numerous Luxembourg and other EU creditors holding small claims as of the Petition Date, the vast majority of their non-insider general unsecured obligations were owed to U.S., Mexican, or Chinese creditors. At M&G International, $361.3 million (74.1%) of its $487.4 million non-insider unsecured debt was owed to Mexican or U.S. creditors. At M&G Capital, $39.1 million (99.6%) of $39.3 million was.

---

[3]      Specifically, intercompany obligations account for 79% of MGI's assets and virtually all of the assets of M&G Chemicals and M&G Capital. *Id.* The Debtors have not ascribed a value to their equity interests. The Luxembourg Debtors' other significant assets consist of cash, "Research & Development," and "Intangible Assets Under Construction" owned by MGI that it claims are worth approximately $47 million. [D.I. 784 at 30].

And, at M&G Chemicals, $995.3 million (89.3%) of $1.114 billion non-insider unsecured debt was owed to Mexican, U.S., or Chinese creditors.[4]

7.      The Debtors caution, however, that these numbers are not necessarily correct.  As explained in the global notes attached to each schedule and each statement of each Debtor, they simply cannot say for sure what assets and what liabilities are properly ascribed to which Debtors.  The reasons for this, they explain, include the following:

     (a)     certain assets may be primarily used by a Debtor other than the entity which holds title to such assets according to the Debtors' books and records;

     (b)     the Debtor entity that owns or holds title to certain assets may not be ascertainable given the consolidated manner in which the Debtors have operated their businesses;

     (c)     certain liabilities may have been nominally incurred by one Debtor, yet such liabilities may have actually been incurred by, or the invoices related to such liabilities may have been issued to or in the name of, another Debtor; and

     (d)     certain creditors of the Debtors may have treated one or more of the Debtors as a consolidated entity rather than as differentiated entities.

*Global Notes, Statement of Limitations, Methodology and Disclaimers and Specific Disclosures Regarding Debtors' Amended Schedules of Assets and Liabilities and Amended Statements of Financial Affairs* [e.g., D.I. 784] (the "**Global Notes**"), 3 (cmt. 6).  Further, the Debtors (i) have

---

[4]    The following information is derived from the most recent schedules of the Luxembourg Debtors [D.I. 743, 745, 784]:

| General Unsecured Claims Against Luxembourg Debtors (US$) | | | | |
|---|---|---|---|---|
| | International | Capital | Chemicals | Total |
| Total GUC | 895,423,926.03 | 39,269,268.95 | 1,126,752,944.62 | 2,061,446,139.60 |
| Insider | 408,048,376.90 | 0.00 | 12,323,961.81 | 420,372,338.71 |
| Non-Insider | 487,375,549.13 | 39,269,268.95 | 1,114,428,982.81 | 1,641,073,800.89 |
| U.S./Mexico/China | 361,331,860.36 | 39,112,217.17 | 995,347,878.79 | 1,395,791,956.32 |
| Non-Insider Remainder | 126,043,688.77 | 157,051.78 | 119,081,104.02 | 245,281,844.57 |
| U.S./Mexico/China % of Non-Insider GUC | **74.1%** | **99.6%** | **89.3%** | **85.0%** |

used consolidated financial statements to track results; (ii) share a unity of ownership[5];

(iii) issued parent and intercorporate guarantees on loans as a matter of common practice[6];

(iv) have transferred assets without observance of corporate formalities[7]; and (v) have

commingled assets and business functions.[8]

8.    The Debtors' claimed inability to definitively allocate assets and liabilities is a

byproduct of their operation—from Luxembourg Debtor M&G Chemicals on down—as a

unified group.  The Debtors refer to this group in their first day declaration as the "M&G

Chemicals Group," or, the "Company."[9]  First Day Decl., ¶ 4.  As explained in the First Day

Declaration, the Debtors' and non-Debtors' finances and operations are integrated, and, as direct

or indirect parents to each of the members of the M&G Chemicals Group, the Luxembourg

Debtors serve as the linchpin.  For example, the Luxembourg Debtors borrowed funds for

Company use and guaranteed the borrowings of other Debtors and non-Debtors as a matter of

prepetition practice.  First Day Decl., ¶¶ 24-33.  When M&G Resins could not independently

finance construction of the manufacturing facility under construction in Corpus Christi, Texas

(the "**Corpus Christi Plant**"), other Company entities, including Luxembourg Debtors M&G

International, M&G Chemicals, and certain non-Debtor affiliates, borrowed or offered

guarantees to help advance the project.  *See id.* at ¶¶ 11, 20-21.

---

[5]    First Day Decl., ¶ 17 ("M&G Chemicals, the direct or indirect parent of ten of the eleven other Debtors . . . .").

[6]    *See, e.g.*, *id.* at ¶¶ 20-38 (listing various financial obligations and intercompany guarantees thereof).

[7]    *See, e.g.*, Global Notes, 3 (cmt. 6); Declaration of Dennis Stogsdill in Support of Debtors' Motions for Entry of Orders Approving (i) the Sale of Certain Assets of the Debtors and (ii) the New DIP Facility [D.I. 1251], ¶¶ 20-22 (describing cash pooling account shared by Debtors and certain Luxembourg Debtors as "used to fund a wide variety of expenses and working capital needs).

[8]    *See, e.g.*, Global Notes, 3 (cmt. 6); Mot. ¶ 7 (describing sharing of IT resources).

[9]    "Historically, [M&G Capital] has not been considered part of the M&G Chemicals Group, but, because [it] has no employees or operations and its significant creditors are also creditors of certain of the other Debtors, M&G Capital is considered part of the Chemicals Division for the purposes of [the commencement of the Chapter 11 Cases]."  First Day Decl., ¶ 13, n.4.

9.     The Debtors also depended on one another for cash flows.  For example, when the Corpus Christi Plant was not operable on schedule, it "made it impossible for the ***Debtors and their affiliates*** to . . . service their existing debt, which depended, at least in part, on the revenue that was expected to be generated by the Corpus Christi Plant's operations." *Id.* (emphasis added).

10.     The Debtors' financial entanglements resulted in intercompany obligations initially estimated at $1.27 billion as of the Petition Date.  First Day Decl., ¶ 35.  The Debtors have purportedly continued to sort through these intercompany obligations as the Chapter 11 Cases progressed, but offer no assurance of success in this endeavor.  For example, on November 10, 2017, they increased the intercompany claim estimate by $354 million—described then as a loan made by non-Debtor M&G Polimeros Mexico S.A. de C.V. to M&G USA Corp. on September 17, 2017.  [D.I. 143, Ex. 1].  On March 22, 2018, the Debtors disclosed that no loan was actually made on September 17, 2017.  The $354 million instead "reflected the unwinding of years of ordinary course transactions that were intended to fund expenses and related working capital needs of the Members of the Cash Pooling Account."  [D.I. 1251, ¶ 22].

11.     The Debtors' operations are also deeply enmeshed.  They share management. *See, e.g.*, First Day Decl., ¶¶ 8, 18.[10]  They also share proprietary engineering and technology, customers, and suppliers.  *See, e.g.*, *id.* at ¶¶ 15, 18.  They provide goods and services, including procurement, engineering, and construction, to one another.  *See, e.g.*, *id.* at ¶¶ 16, 18.  And, they share operating infrastructure.  As explained in the Motion, Luxembourg Debtor M&G International provides "critical information technology and other services to the other Debtors."

---

[10]     On the Debtors' petitions, Mr. Toselli is listed as a director of Debtor M&G Resins a manager Debtors of M&G USA Corporation, M&G Polymers, and M&G USA Holding (where he is the sole manager).  Mr. Fournier is listed as a manager of Debtors M&G Resins, M&G USA Corporation, and M&G Polymers.  Both Mr. Toselli and Mr. Fournier are also managers of M&G International and directors of M&G Chemicals.

Mot., ¶ 1.  Mr. Ghisolfi testified at his July 12, 2018 deposition (the "**Ghisolfi Deposition**") that the Debtors ██████████████████████████████████████████.  Ghisolfi Depo. Tr. 29:14-19[11] (explaining that ████████████████████████████████████ ████████████████████████████████████; *see also id.* at 111:7-9 (same).

12.     Indeed, Bancomext has learned the hard way that the Company's servers, which store its email and other ESI, are located in Luxembourg and that the Company's management is unabashed about using this fact as a means of denying adverse parties access to information stored there.  *See* Apr. 24, 2018 Ltr. to Court [D.I. 1397] (explaining that non-Debtor affiliates subject to discovery order lacked custody, possession, or control of ESI stored on servers in Luxembourg because parent company had been uncooperative in providing access); *see also* Feb. 12, 2018 Discovery Ltr. to Court [D.I. 949] (outlining Marco Ghisolfi's personal resistance to providing consent purportedly required to provide documents responsive to 2004 request).

13.     In short, the M&G Chemicals Group is an integrated enterprise sharing management, infrastructure, assets and liabilities.  It is therefore little surprise that the entire M&G Chemicals Group voluntarily arrived together before this Court[12] to address its members' shared financial challenges.

14.     The Debtors have thus far derived from the chapter 11 process the benefits they sought—the sale of their primary assets located in the United States and the consummation, with Court approval, of various beneficial settlements.  Like every debtor under the Bankruptcy Code, they immediately received the protection of the automatic stay upon filing.  The Luxembourg

---

[11]   Citations to the Ghisolfi Deposition are to the transcript attached as Exhibit A to the Colodny Declaration.

[12]   Though certain members of the M&G Chemicals Group are non-Debtors, each of those non-Debtor affiliates is under the control of and wholly owned, directly or indirectly, by M&G Chemicals.

Debtors have used that protection to good effect, enjoying success in "keeping the majority of their creditors at bay, due in part to those creditors who do recognize the applicability of the automatic stay . . . ." Mot. at ¶ 5. The Luxembourg Debtors have also used the automatic stay to ███████████████████████████████████████████████████████████████. Ghisolfi Depo. Tr. 49:13-20. This freeze has worked to the detriment of Bancomext, which has been assigned some of the receivables owed to the Debtors' Mexican affiliates.

15.     Protected by the automatic stay, the Luxembourg Debtors focused their efforts on collecting receivables and generating service fees. As a result, M&G International increased its cash balance from ████████████████████████████████████████████████████. Ghisolfi Depo. Tr. 63:22-24. According to the Luxembourg Debtors, ████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████. Ghisolfi Depo. Tr. 31:15-32:15. Additionally, thanks to chapter 11, they were able to resolve between $500 million and $600 million in liabilities through Court-approved settlements. Ghisolfi Depo. Tr. 63:12-25.

16.     Shortly after the commencement of the Chapter 11 Cases, the Court approved procedures for the sale of the Debtors' assets. The Debtors quickly liquidated their Apple Grove assets pursuant to those procedures, leaving them to focus on the sale of their most important asset: the Corpus Christi Plant. The Debtors' ultimately obtained two bids, with the highest resulting in value to the Debtors of approximately $1 billion. The Debtors considered this full value for the assets. *See* Mar. 27, 2018 Hr'g Tr., 8:6-15.

17.     In addition to the substantive relief, the Debtors have subjected their creditors to certain procedural hurdles. For example, at the Debtors' request, the Court fixed a bar date for

filing claims against the Debtors in the Chapter 11 Cases. In response to the bar date notices, foreign and domestic creditors have filed approximately 970 proofs of claim against the Debtors, including at least 82 proofs of claim filed against the Luxembourg Debtors.[13]

18.     While the Debtors have received a great many benefits from the chapter 11 process, they have been less keen to accept its burdens. In particular the Debtors and their management have resisted production demands, twice thus far requiring Court intervention to address their behavior.

19.     The first such dispute—involving the Debtors, the Committee, and DAK—was briefed to the Court on February 12, 2018. At issue there was the Debtors' production of ESI stored on servers in Luxembourg—where all of the Debtors' email servers are located.[14] According to the Debtors, European data privacy law prevents them from producing ESI in these Chapter 11 Cases absent consent of the documents' respective custodians or an order of the Court duly served in accordance with the Hague Convention. The Debtors recognize that such service "can take several months to effect," making consent the only practical means of producing ESI in these Chapter 11 Cases. [D.I. 949, 3].

---

[13]     Bancomext has filed proofs of claim against various Debtors—including Luxembourg Debtor M&G International—in the amount of $190 million. So as to protect its rights against the Debtors and their property in the Chapter 11 Cases, Bancomext also commenced an adversary proceeding against the Debtors. On March 7, 2018, Bancomext filed a complaint [D.I. 1089] (the "**Initial Complaint**") alleging against various Debtors (collectively, the "**Defendants**")—including Luxembourg Debtor M&G International—various claims relating to $190 million in loans that Bancomext made to M&G México Holding, S.A. de C.V. ("**M&G Holding**") and M&G Polímeros México, S.A. de C.V. ("**M&G Polimeros**," and, together with M&G Holdings, the "**Mexican Entities**"). The Mexican Entities are non-Debtor members of the M&G Chemical Group and indirectly wholly owned by M&G International. On May 25, 2018, Bancomext filed an amended complaint [Adv. 18-150302 D.I. 5] (the "**FAC**"). Bancomext alleges in the FAC that the Defendants caused or conspired to cause the Mexican Entities to solicit loans from Bancomext under false pretenses and used the proceeds for the Defendants' own purposes. In particular, Bancomext alleges that, when they ran out of funding for the Corpus Christi Plant construction, the Defendants used M&G Polimeros to fraudulently obtain $70 million in credit from Bancomext and used the proceeds to fill shortfalls in their construction budget. And, less than a month before the chapter 11 cases were filed M&G International caused $70 million of Bancomext's loan proceeds to be inappropriately diverted to it. It is still unclear what became of that $70 million.

[14]     Ghisolfi Depo. Tr. 393:18:21.

20.     To facilitate necessary information sharing that is fundamental to the chapter 11 process, the Debtors presented to Marco Ghisolfi a form of consent that would permit the Debtors "to retrieve his ESI for purposes related to the chapter 11 cases generally and to share such ESI with other parties in interest." *Id.* at 4.  Importantly, Mr. Ghisolfi is the CEO of the entire M&G Group and chairman of the board of M&G Chemicals.  Ghisolfi Decl., ¶ 4.  M&G Chemicals, directly or indirectly, owns 100% of the equity in each of the Debtors.  *See* First Day Decl., Ex. B.  Mr. Ghisolfi is also a member of the Ghisolfi family.  According to the M&G Group corporate website, the Ghisolfi family owns M&G Finanziaria S.p.A., which, in turn, controls the entire M&G Group.[15]  Despite his preeminent position with respect to the Debtors and economic stake in their businesses, Mr. Ghisolfi rejected the Debtors' proposed form of consent and instead negotiated a far narrower version, limited to production to the Committee on a professional-eyes-only basis.  *Id.*  The other custodians—Marco Toselli and Fred Fournier— "followed suit on the same terms."  *Id.*  In short, Mr. Ghisolfi has readily accepted the benefits of chapter 11 for his companies but used a personal veto to shield them from the burdens of disclosure and discovery.

21.     The second dispute also arose from a lack of consent somewhere up the corporate chain.  Pursuant to Bankruptcy Rule 2004, Bancomext sought, and the Court ordered, document production by the Mexican Entities, including ESI.  In a letter filed on April 24, 2018, the Mexican Entities claimed that the ESI Bancomext sought was stored on servers located "in Italy and/or Luxembourg" and controlled by the Debtors' "ultimate parent corporation, Mossi & Ghisolfi S.p.A."[16]  According to the Mexican Entities (which are under common control with

---

[15]   *See* http://www.gruppomg.com/en/about/group-profile (last visited July 12, 2018) ("The Mossi Ghisolfi Group is controlled by M&G Finanziaria, which is owned by the Ghisolfi family.").

[16]   While the Mexican Entities contended that it is Mossi & Ghisolfi S.p.A. that controls the Debtors' servers in Luxembourg and Italy, this may be imprecise.  Mr. Ghisolfi testifies that M&G

each of the Debtors), an entity is not in possession, custody, or control of information—and therefore cannot produce information—which is controlled by a parent corporation.  [D.I. 1397 at 2] ("Within a corporate family, courts often find that a parent 'controls' the documents of its wholly owned subsidiary.").  During a teleconference on the matter held April 25, 2018, the Court rejected the Mexican Entities' excuses and directed them to obtain the requested ESI and produce it to Bancomext.  As of the date of this Objection, the Mexican Entities have yet to produce all documents requested and continue to blame their corporate parents for their failures.

22.     On June 5, 2018, the Luxembourg Debtors filed the Motion, asking the Court to (a) dismiss their Chapter 11 Cases; (b) exculpate them for all actions taken in connection with the Chapter 11 Cases; and (c) confirm that prior orders entered by the Court affecting the Luxembourg Entities will remain enforceable even after the dismissal.  The Luxembourg Debtors argue the relief is appropriate pursuant to sections 305(a) and 1112(b) of the Bankruptcy Code based on the same set of facts laid out in the Ghisolfi Declaration.  These facts are summarized as follows:

- the Luxembourg Debtors are engaged in negotiations with an undisclosed number of unnamed creditors holding claims of an unspecified value;

- for unstated reasons, Mr. Ghisolfi believes dismissal of the Luxembourg Debtors' Chapter 11 Cases would "streamline [these] negotiations and may facilitate a consensual resolution of the prepetition claims asserted against Luxembourg Debtors' estates";

- also for unstated reasons, Mr. Ghisolfi believes "an out-of-court resolution likely would enable Luxembourg creditors to recover at least as much as they would receive under a chapter 11 plan, and would increase the likelihood that [M&G International] will be able to recover additional amounts from its non-Debtor affiliates, thereby enhancing the recoveries of Luxembourg creditors";

- Even if there is no out-of-court resolution, Mr. Ghisolfi believes, without elaboration, "that commencing a bankruptcy proceeding in Luxembourg . . . would provide no worse

International (which is controlled by Mossi & Ghisolfi S.p.A.) is the entity directly responsible for providing "critical information technology and other services to the other Debtors," which it accomplishes by contracting with third parties.  Ghisolfi Decl., ¶ 7.

recoveries to creditors of [M&G International] than such creditors would receive in chapter 11";

- The prospect of a bankruptcy proceeding in Luxembourg is increasing because certain unnamed and unenumerated Luxembourg creditors holding "relatively small" claims have "obtained orders of payment" from Luxembourg courts and additional creditors are pursuing the same course of action;

- The risk of a possible bankruptcy proceeding in Luxembourg makes the Luxembourg Debtors' Chapter 11 Cases "vulnerable to disruption, if not cessation";

- Dismissal of the Luxembourg Debtors' Chapter 11 Cases in advance of manifestation of the Luxembourg bankruptcy risk would avoid "the jurisdictional complications parallel proceedings likely would present"; and

- An out-of-court resolution or a Luxembourg bankruptcy would both be preferable to a chapter 11 plan for the Luxembourg Debtors because "chapter 11 plans . . . likely would not be recognized in Luxembourg."

23.     Conspicuously absent from Mr. Ghisolfi's declaration is the fact that the

employees of M&G International, most of which are insiders, stand to receive millions of dollars

in severance if the Court credits his testimony and grants the Motion.  Mr. Ghisolfi alone ██████

███████████████████████████████████.  Ghisolfi Depo. Tr. 322:17-323:10; 327:17-328:5.

Under chapter 11, the severance claims of M&G International's insiders would be treated in

whole or large part as general unsecured claims.  Outside of chapter 11, the Luxembourg Debtors

would be free to pay such claims in full.  This is true even if the Luxembourg Debtors became

subject to Luxembourg insolvency proceedings.  *See* Goebel Declaration (defined below), ¶ 10,

sub-point fifth (noting privileged status of all employee claims, including severance); *see also*

Ghisolfi Depo. Tr. 104:1-4. ("████████████████████████████████████").

24.     The various legal conclusions in the Ghisolfi Declaration are propped up by the

further declaration of Marianne Goebel [D.I. 1537-2, 13-16] (the "**Goebel Declaration**").  Ms.

Goebel is the Luxembourg Debtors' counsel who claims no personal expertise in Luxembourg or

U.S. insolvency law.  *See id.* at ¶ 4.  Ms. Goebel's firm, Duro Goebel Avocats, is a creditor in

these Chapter 11 Cases. [D.I. 784 at 46 (§ 3.35); D.I. 745 at 34 (§ 3.13)]. Ms. Goebel will be eligible for immediate payment of these claims if the Motion is granted. If it is denied, she will have to await resolution of the Chapter 11 Cases and participate as a general unsecured creditor.

25. Based on Ms. Goebel's past experience as an attorney, a legal researcher, and a civil servant, she does not believe that EU regulations "providing for the recognition of foreign proceedings among European Union member states" would apply to the Luxembourg Debtors' Chapter 11 Cases and she is "not aware of any situation where a Luxembourg Court has granted recognition to orders from a bankruptcy proceeding in the United States." *Id.* at ¶ 7. She "believe[s] that . . . the ability of the Luxembourg Debtors to effectuate a [chapter 11 plan] in Luxembourg appears doubtful because the Luxembourg courts likely would not recognize or give effect to a confirmed chapter 11 plan or a confirmation order." *Id.*

26. She notes that Luxembourg law permits involuntary insolvency proceedings against Luxembourg debtors and also imposes an affirmative duty on Luxembourg debtors to commence insolvency proceedings when certain unspecified statutory conditions exist. She further states that, in all Luxembourg insolvency proceedings, a trustee supplants existing management in its decision-making authority. *Id.* at ¶ 8. Finally, Ms. Goebel notes that "Luxembourg insolvency proceedings are broadly similar to United States bankruptcy proceedings," *id.* at 9, subject only to (i) differences already noted, (ii) a more accelerated claims process; and (iii) a different priority scheme. All in all, Ms. Goebel submits that Luxembourg insolvency law "provides a fair and regular system for the resolution of claims against a debtor and, in general, adequately protects the rights of debtors and creditors." *Id.* at 11.

27. Bancomext now objects to the Motion.

<u>**LEGAL ARGUMENT**</u>

28.     The Luxembourg Debtors sought and received relief from this Court.  Having

derived the benefits they hoped to obtain, they now ask that the Court excuse them (and their

significant assets) from these proceedings so that they may negotiate with creditors out of court,

and, if that fails, start their bankruptcy process all over again in Luxembourg.  The Luxembourg

Debtors fail to credibly show how this would benefit their creditors, and completely ignore the

obvious harm and prejudice that would result.  The Court should deny the Motion and see that

the Luxembourg Debtors finish what they started here, bearing all burdens corresponding to the

benefits they have thus far received.

**A.      The Luxembourg Debtors Are Not Entitled to Dismissal Under 11 U.S.C. § 305(a)**

29.     The Luxembourg Debtors request dismissal first pursuant to section 305(a) of the

Bankruptcy Code, which is entitled "Abstention."  As an initial matter, federal courts have "a

virtually unflagging obligation to exercise the jurisdiction given them." *Colorado River Water*

*Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  Accordingly, it is the general rule

that "abstention rarely should be invoked." *Id.*

30.     Unsurprisingly, then, courts agree that the special brand of abstention permitted

under section 305(a) of the Bankruptcy Code "is a form of extraordinary relief," *In re*

*Northshore Mainland Servs., Inc*., 537 B.R. 192, 203 (Bankr. D. Del. 2015) (citing cases)

(internal quotations omitted), that must be used only "sparingly," *In re 82 Milbar Boulevard,*

*Inc*., 91 B.R. 213, 216 (Bankr. E.D.N.Y. 1988).  Indeed, it "should be granted only in egregious

situations." *Santa Fe Minerals, Inc. v. BEPCO, L.P.* (*In re 15375 Mem'l Corp*.), 382 B.R. 652,

685 (Bankr. D. Del. 2008), *rev'd on other grounds* 400 B.R. 420 (D. Del. 2009).

31.     As the parties seeking the relief, the Luxembourg Debtors therefore bear a "heavy

burden" to show it is warranted. *In re Corino*, 191 B.R. 283, 287 (Bankr. N.D.N.Y. 1995).  To

carry its burden, a section 305(a) movant must show that "'***both creditors and the debtor*** would be ***better*** served by a dismissal.'" *In re AMC Invs., LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) (quoting *In re Eastman*, 188 B.R. 621, 624 (B.A.P. 9th Cir. 1995)) (internal quotations omitted, emphases added). This "'requires more than a simple balancing of harm to the debtor and creditors; rather the interests of both the debtor and its creditors must be served by granting the requested relief." *Id.* (quoting *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008)). Put simply, both the debtor and its creditors must benefit from dismissal. *Id.*

32.     The legislative history sheds light on when abstention—i.e., dismissal—under section 305(a) might be appropriate by way of example: an involuntary proceeding "commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment" where the debtor and other creditors are working constructively out of court to reach a mutually beneficial resolution. *See* H. Rep. No. 959, 95th Cong., 1st Sess. 325 (1977). Collier identifies the following as the paradigmatic fact patterns for section 305(a) abstention:

> When a case is filed to obtain leverage in out-of-court restructuring negotiation; when there is an absence of bankruptcy purpose, such as discharge, debt adjustment, or need for a breathing spell from creditors; when state law liquidation proceedings are pending; when the bankruptcy is essentially a two party dispute; and comity to pending foreign insolvency proceedings.

*In re Starlite Houseboats, Inc*., 426 B.R. 375, 388 (Bankr. D. Kan. 2010) (citing 2 Collier on Bankruptcy P 305.02[2])).

33.     Importantly, except where there is no bankruptcy purpose at all, each illustration above involves some pre-bankruptcy process or proceeding in favor of which a court could abstain. ***None*** of the examples involves abstention in favor of another proceeding that was not pending when the bankruptcy case commenced. Indeed, in section 305(a) cases, and in abstention jurisprudence more broadly, the absence of some other proceeding pending as of the

commencement of the bankruptcy action is generally fatal to a request to abstain. *See In re Monitor Single Lift*, 381 B.R. at 467 at n.6 ("Perhaps most telling of all, the Ad Hoc Committee seeks to have this Court abstain . . . in favor of an as-yet unfiled proceeding in England. The Ad Hoc Committee cites no authority supporting abstention where no relevant foreign proceeding concerning the debtor was already pending."); *In re Cable & Wireless USA, Inc.*, 331 B.R. 568, 576 (Bankr. D. Del. 2005) ("'[28 U.S.C. 1334(c)] [a]bstention can exist only where there is a parallel proceeding in state court. That is, inherent in the concept of abstention is the presence of a pendant state action in favor of which the federal court must, or may, abstain.'"). Moreover, none of the examples contemplates a request for abstention by the party that originally invoked bankruptcy jurisdiction.

34. Courts have developed the following seven factors to aid them in analyzing the "overall best interests" in the context of a request for section 305(a) dismissal:

> (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Northshore Mainland Servs.*, 537 B.R. at 203-04 (citing *In re AMC Investors*, 406 B.R. at 488). "[T]he exact factors and the weight to be given each of them is 'highly sensitive to the facts of each individual case.'" *Steinman v. Spencer* (*In re Argus Grp. 1700*), 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996) (citing *In re Carl Mazzocone*, 200 B.R. 568, 575 (E.D. Pa. 1996)).

35. Here, though the Luxembourg Debtors lump them together to mask an unfavorable tally, the factors each weigh uniformly—and heavily—against abstention.

Moreover, the conclusory statements and speculation the Luxembourg Debtors offer in support of their request simply fails to satisfy their "heavy burden" of showing dismissal is warranted.

### 1. Factor 1: the economy and efficiency of administration

36.     The economy and efficiency of administration weighs heavily in favor of denying the Motion.  The Motion proposes to divide the restructuring efforts of Debtors that concededly commingle assets; share liabilities, management and operational infrastructure; and generally operate as an integrated corporate enterprise.  Doing so would disserve the economy and efficiency of administration by creating two proceedings where there is now just one.  As recognized by the Luxembourg Debtors in the Motion, "'a single primary proceeding minimizes the time, expense and administrative burdens of managing full cases in multiple jurisdictions.'" Mot., ¶ 21 (quoting *In re Multicanal S.A.*, 314 B.R. 486, 521 (S.D.N.Y. 2004)) (internal modifications omitted).

37.     The Luxembourg Debtors attempt to rationalize their counterintuitive proposal by explaining they are "hopeful" they can resolve "many, if not all, of the claims against their estates . . . in the near term, on an out-of-court basis"; they "believe that . . . dismissal . . . would increase the likelihood of out-of-court settlements," and that "consensual resolutions would be more economical and efficient for all parties than seeking confirmation of one or more chapter 11 plans that likely would not be recognized in Luxembourg."  Mot., ¶ 19.  They provide no details or elaboration on the bases for their hopes and beliefs.  Discovery has shown that out-of-court settlements are unlikely and the law shows that chapter 11 plans are likely to be recognized in Luxembourg.

38.     As an initial matter, the Luxembourg Debtors fail to explain why they could not reach the same "out-of-court settlements" they claim to favor in these Chapter 11 Cases.  The chapter 11 process is specifically designed to promote negotiation and settlements.  It provides

debtors various tools to drive consensus and bind parties in interest to the outcome, including the automatic stay, exclusivity, and ready access to court assistance in enforcing the debtor's rights and approving settlements they may reach. As the Debtors recognize, these tools have utility even as to creditors outside of the U.S. *See* Mot., ¶ 5 (noting that "the Luxembourg Debtors have been successful in keeping the majority of their creditors at bay, due in part to those creditors who do recognize the applicability of the automatic stay . . . ."). Indeed, even as they are running from the Chapter 11 Cases, the Luxembourg Debtors request that the Court confirm that its orders approving their valuable settlement agreements remain enforceable. *Id.* at ¶ 38. The Luxembourg Debtors' conclusory statements that settlements would become easier if their Motion were granted are unpersuasive.

39.     Mr. Ghisolfi's deposition testimony reveals that the Luxembourg Debtors want to cut their settlements outside of chapter 11 because they do not want to be subject to chapter 11's restrictions. Aside from the



, Ghisolfi Depo. Tr. 163:21-24,

. *Id.* at 164:18-24. The Luxembourg Debtors are manufacturing red herrings to justify dismissal. On March 29, 2018, Delta Lloyd and its agent filed not fewer than four proofs of claim in these Chapter 11 Cases, thereby submitting to the Court's jurisdiction. [Claim Nos. 525, 542, 552, 556]. The real reason the Luxembourg Debtors want to pursue settlements outside of chapter 11 is because



.  *See* Ghisolfi Depo. Tr. at 164:3-4; *id.* at

176:19-20 ("

.").  Among other things, he envisions

."  *Id.* at 145:13-19.  The Court

should not allow the Luxembourg Debtors' fealty to particular creditors to replace the

Bankruptcy Code's priority scheme to the detriment of creditors like Bancomext.

40.  The Luxembourg Debtors also want to be free of chapter 11 restrictions so that

they can pay millions of dollars in severance claims to their employees, including Mr. Ghisolfi.

Importantly, M&G International's "employees" is code for management of the M&G Chemicals

Group.  M&G International is a holding company that controls the other debtors.  The

individuals that work for it are substantially all senior management.  While in chapter 11, the

Luxembourg Debtors understand that they are constrained from making severance payments to

these individuals.  Ghisolfi Depo. Tr. 133:10-15 ("

").  They are desperate to be out from under this

restriction to share amongst themselves the cash the Luxembourg Debtors generated while

under—and by virtue of—chapter 11 protection.

41.  Importantly, the Luxembourg Debtors have been planning to pursue an out of

court restructuring since the beginning of their Chapter 11 Cases.  For example:

- *October 29, 2017*:  Two days before the Petition Date,

        *See* Colodny Decl. Ex. C at

- *November 23, 2017*:  Marco Ghisolfi

                                    *See* Colodny Decl. Ex. D at
  D_E0364347; D_E0364348.

- *December 14, 2017*:     Marco Ghisolfi ██████████████████████████ ████████████████████████ *See* Colodny Decl. Ex. E at D_E0350307.

- *January 4, 2018*: ████████████████████████████████████ ███████████████████████████ ██████████ Colodny Decl. Ex. F at D_0006293 at D_0006304.

42.     In Mr. Ghisolfi's detailed November 23, 2017 internal presentation, the

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ . Colodny Decl. Ex. G at D_E0364349- D_E0364350.

None of these plans were disclosed to the Court.

43.     Even if the out-of-court restructuring the Luxembourg Debtors want to pursue

were not patently inequitable, it would be unlikely to succeed.  Mr. Ghisolfi testified at his

deposition that ███████████████████████████████████████

██████████████████ . Ghisolfi Depo. Tr. 368:23-368:24. ████████████

██████████████████████████████████████████

██████████████████ ").  Out of 155 known creditors, the likelihood of at least one

dissenter holding out is extremely high.  Indeed Mr. Ghisolfi admits that an out-of-court

restructuring ██████████████████████ . *Id.* at 154:16-20 ███████████████

████████████████████████████████████████████

████████████████████████████ ).

44.     As to the contention that proceeding with the Chapter 11 Cases would be

inefficient because "chapter 11 plans [] likely would not be recognized in Luxembourg," the

Luxembourg Debtors are just wrong.  Mot., ¶ 19 (citing Ghisolfi Decl., ¶ 10); *see also* Goebel

Decl., ¶ 7 ("Luxembourg courts likely would not recognize or give effect to a confirmed chapter 11 plan or confirmation order.").[17]  To the contrary, "foreign bankruptcy court orders are enforceable in Luxembourg, with the same capacity, enforceability and effect as they would have in their respective foreign jurisdictions, so long as those orders are not fundamentally at odds with Luxembourg's notions of fair play and substantial justice."  *Bickerton v. Bozel, S.A.* (*In re Bozel S.A.*), 434 B.R. 108, 113 (Bankr. S.D.N.Y. 2010).[18]  Based on Ms. Goebel's comparative analysis of U.S. and Luxembourg insolvency law—which she characterizes as "broadly similar"—it is unlikely that this Court's U.S. bankruptcy law orders would offend "Luxembourg's notions of fair play and substantial justice."  Mr. Ghisolfi's deposition testimony solidifies Ms. Goebel's view as that of a lone minority.  His present understanding is that Luxembourg courts ███████████████████████████████████.  Ghisolfi Depo. Tr. 202:12-16 ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

  45. As to the possibility of a conflict between concurrent bankruptcy proceedings, the Luxembourg Debtors express concern only about "likely" "jurisdictional complications"; they do

---

[17] It is noteworthy that the Luxembourg Debtors' former Luxembourg counsel disagrees with Ms. Goebel.  Acting as M&G Chemical's "Luxembourg legal advisor" in connection with a share offering on the Hong Kong stock exchange, Allen & Overy LLP advised that "a judgment obtained from a court of competent jurisdiction in Hong Kong would be recognised and enforceable in Luxembourg," subject to the same modest limitations contained in articles 678 *et seq.* of Luxembourg's new code on civil procedure applicable to *all* foreign judgments.  *See* M&G Chemicals Global Offering, Nov. 29, 2013, Appx. IV at 22, *available at* http://www.hkexnews.hk/listedco/listconews/SEHK/2013/1129/LTN20131129081.pdf (last visited July 12, 2018).  Ms. Goebel makes no mention in her declaration of article 678 of Luxembourg's new code on civil procedures.

[18] Mr. Fayot confirms the conclusion Judge Gonzalez reached in *Bozel*.  He explains that "Luxembourg courts have consistently held that 'the declarative bankruptcy judgment, pronounced by a foreign court, has the authority of a precedent, concerning the capacity and the assets of the bankrupt party in Luxembourg, and has the same effects as in the foreign country, even before any enforcement order,'" Fayot Decl., ¶ 12 (*quoting* Kinsch P., *La faillite en droit international privé luxembourgeois*, Pasicrisie 1995, n°25, at 140).

not offer an opinion as to what those might be or how they might play out.  Mot., ¶ 20.  Mr.

Fayot suggests the Luxembourg Debtors' concerns are significantly overblown:

> In my opinion, Luxembourg courts would avoid a situation where there would be competing insolvency proceedings in multiple jurisdictions, and the Luxembourg court would not permit the initiation of another bankruptcy if a regularly opened chapter 11 procedure exists in relation to the same debtors in the Bankruptcy Court.  In considering the question. Luxembourg courts would likely examine whether the court opening the insolvency proceedings had proper jurisdiction.  It is my opinion that a Luxembourg court would consider (i) the voluntary decision of Luxembourg Debtors to submit to the jurisdiction of a U.S. bankruptcy court, (ii) the fact that the Chapter 11 Cases were opened first and create a situation in law and fact which a Luxembourg court cannot ignore without harming the sound administration of the insolvency and the interest of the creditors, and (iii) that the substance of the Luxembourg Debtors in Luxembourg was, as I understand it, very limited.
>
> Based on existing case law and assuming a Luxembourg court found that a U.S. bankruptcy court was an appropriate jurisdiction for an insolvency proceeding, it is my opinion that a Luxembourg court would likely refuse in principle to permit concurrent proceedings in Luxembourg.
>
> Further, a Luxembourg court would only permit parallel or controlled management proceedings in Luxembourg in order to further the sound administration of bankruptcy or insolvency cases.  As a result, even if parallel proceedings were allowed, a Luxembourg court could recognise the Chapter 11 Cases and work to coordinate the approaches between the U.S. and Luxembourg insolvency administrations.

Fayot Decl., ¶¶ 16-18 (internal citation omitted).  He goes on to provide two illustrations of

Luxembourg courts adopting a cooperative approach with other jurisdictions in the insolvency

context.  *Id.* at ¶ 18.

      46.    In any event, these unexplored hypothetical complications remain entirely

speculative at this point because there is no pending Luxembourg proceeding and the

Luxembourg Debtors and their assets are currently subject to this Court's jurisdiction.

      47.    Even if dismissal could avoid hypothetical jurisdictional conflicts arising from

parallel proceedings with respect to the Luxembourg Debtors, those conflicts would still arise

with respect to the remaining U.S. Debtors.  The Motion proposes that the Luxembourg Debtors

orphan their subsidiary U.S. Debtors in this Court.  Any scenario in which two different Courts were to exercise jurisdiction over different Debtors would result in inter-proceeding conflicts about who controls what, who owns what, who owes what, who can access what, and who is otherwise obligated to whom.  Dismissal cannot prevent these conflicts; in fact, it would make them more likely to occur by clearing the path to parallel proceedings.[19]

48.     Importantly, dismissing the Luxembourg Debtors would make getting information about the Debtors and their financial affairs even more difficult than it already is—a critical concern of Bancomext, which still must prosecute its adversary proceeding against the Debtors, including M&G International.  In shirking discovery obligations in these Chapter 11 Cases, the Debtors and their subsidiaries have hidden behind the fact that their data is physically stored in Luxembourg and that they, as subsidiaries, need the consent of their parent companies to produce documents.  If M&G International, the parent company that directly controls the Debtors' IT resources, were no longer a Debtor directly accountable before this Court, production would undoubtedly become even more difficult.

49.     Finally, allowing the Luxembourg Debtors to walk away from the Chapter 11 Cases would force their creditors to renew their claims in a new jurisdiction.  The Luxembourg Debtors' creditors have filed 82 claims in these Chapter 11 Cases, presumably expecting that these proceedings would ultimately yield distributions.  Bancomext has gone to still further expense and effort, filing an adversary proceeding and litigating a motion to dismiss by, among others, M&G International.[20]  To void creditors' efforts to enforce their rights here would be

---

[19]   As Mr. Fayot notes, the very fact that a chapter 11 proceeding in this Court with respect to the Luxembourg Debtors would make commencement of a Luxembourg insolvency proceeding substantially less likely.  Fayot Decl., ¶ 17.

[20]   The motion to dismiss is presently fully briefed but has not yet been heard.  The Luxembourg Debtors make no mention of any impact that the requested dismissal would have on Bancomext's adversary proceeding.  It should have none.  Courts uniformly recognized that they have discretion to retain

inefficient and impose a substantial burden on them to reassert their rights elsewhere, whether by chasing the Luxembourg Debtors to engage them out of court or monitoring the Luxembourg insolvency courts' dockets for any action by or against the Luxembourg Debtors.

2. **Factor 2: whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court**

50.    The "both parties" in this factor usually refers to the debtor opposing an involuntary petition and its petitioning creditors. As the Motion presents the unusual circumstance of a subset of intertwined debtors that voluntarily obtained relief now seeking dismissal, the interested non-moving parties must be considered more broadly to include the interests of the U.S. Debtors and their creditors.

51.    The Debtors, including the Luxembourg Debtors, have operated as "a highly integrated business enterprise with common ownership and control and shared financial and business systems."[21] This Court is the only single forum in which the entire M&G Chemicals Group can resolve its members' interrelated financial affairs for the benefit of their creditors. In filing their Chapter 11 Cases, the Luxembourg Debtors availed themselves of 28 U.S.C. § 1408(2)'s affiliate provision, piggybacking on the filings of their Delaware-domiciled subsidiaries. Ms. Goebel explains that the Luxembourg Debtors are also eligible to commence insolvency proceedings in Luxembourg because they are incorporated and maintain their principal offices there. Ms. Goebel does not suggest that the other Debtors could proceed in Luxembourg, and, more importantly, they are not proposed to. Dividing these proceedings

---

jurisdiction over adversary proceedings even after dismissal of the underlying bankruptcy case. *See, e.g.*, *Porges v. Gruntal & Co.* (*In re Porges*), 44 F.3d 159, 163 (2d Cir. 1995); *In re Smith*, 866 F.2d 576, 580 (3d Cir. 1989); *Querner v. Querner* (*In re Querner*), 7 F.3d 1199, 1202 (5th Cir. 1993); *In re Johnson*, 575 F.3d 1079, 1083 (10th Cir. 2009). An exercise of such discretion is warranted here, where the lead case in which the adversary proceeding was commenced, as well as the Chapter 11 Cases of M&G International's other affiliated co-defendants, will not be dismissed at this time.

[21]    Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases [D.I. 2], ¶ 13.

between this Court and a proceeding (or no proceeding) in Luxembourg would substantially prejudice the interests of the Debtors and their creditors. Indeed, creditors may have to seek relief concerning the same claims in uncoordinated proceedings.

52. In the likelihood that the Luxembourg Debtors ended up in Luxembourg insolvency proceedings, serious doubts exist as to whether they would be adequate to protect all interested parties. Notwithstanding Ms. Goebel's "belie[f] that the Luxembourg Code of Commerce provides a fair and regular system form the resolution of claims against a debtor and, in general, adequately protects the rights of debtors and creditors," Goebel Decl., ¶ 11, Mr. Fayot offers the following view, informed by his recent three-year stint as chair of a Luxembourg Ministry of Finance sub-committee on insolvency law and creditors rights:

> [I]t is widely accepted in Luxembourg that our country's insolvency laws are outdated and in need of serious reform. Luxembourg insolvency law is considered to be unfriendly to entrepreneurs because it does not provide for a second chance: personal liabilities of business people survive the closure of insolvency proceedings and hamper entrepreneurial endeavors. Luxembourg insolvency laws are also unfair to creditors, in particular unsecured creditors, who have no say in the administration of insolvency proceedings, with the relative exception of the controlled management procedure, which is rarely applied. I therefore disagree with the overall conclusion of Ms. Goebel set forth in paragraph 11.

Fayot Decl., ¶ 33. Dismissal would deprive parties in interest of the highly regarded chapter 11 procedure and likely subject them to a process with inferior protections in Luxembourg.

### 3. Factor 3: whether federal proceedings are necessary to reach a just and equitable solution

53. The Motion does not raise the issue of whether the Chapter 11 Cases are necessary. They clearly are. It challenges only the necessity of the Luxembourg Debtors' participation. For the same reasons that there is no other forum that would available to protect the interests of the remaining Debtors and their creditors, the continued participation of the

Luxembourg Debtors as Debtors in these Chapter 11 Cases is necessary to reach a just and equitable resolution.

54.     Implicit in the Motion is that the U.S. Debtors must and will complete the chapter 11 process they began with the Luxembourg Debtors last October.  Allowing the Luxembourg Debtors to make off with their assets and infrastructure while the remaining Debtors pursue a resolution alone would be unfair and inequitable.  It would require that administrative expenses incurred for the benefit of Luxembourg Debtors be borne exclusively by U.S. Debtors, thereby reducing creditor recoveries.  It would further put the Luxembourg Debtors' assets out of the reach of creditors and the jurisdiction of this Court before a determination of whether those assets should be made available to satisfy the claims of all Debtors.  And, it would impair the prosecution of the Chapter 11 Cases by depriving the Debtors and all parties in interest of the information necessary to complete this process.  In short, these federal proceedings, and the Luxembourg Debtors' participation, are necessary to reach a just and equitable solution.

55.     The Luxembourg Debtors attempt to justify dismissal of their Chapter 11 Cases largely due to a handful of small creditors that are violating the automatic stay by taking action in Luxembourg.  The solution to their agitation is not to give up on the bankruptcy process entirely.  To the extent economical,[22] the better response would be to pay these creditors so that the large creditors holding the vast majority of the claims against the Debtors can use the tools of bankruptcy to reach a fair and equitable resolution of the Chapter 11 Cases.  these large creditors are ***not*** violating the automatic stay and are, in fact, participating in the chapter 11 claims process.[23]  Considering that 85% of the non-insider GUC debt is held by U.S., Mexican, and

---

[22]   The Luxembourg Debtors leave this question unanswered in their Motion—yet another example of the lack of detail that leaves them woefully short of meeting the "heavy" evidentiary burden applicable to the relief requested.

[23]   At least as recently as December 5, 2017, Mr. Ghisolfi noted that "█████████████████████████

Chinese creditors, including multinational entities with assets in the United States, this is no surprise. Calling off the Luxembourg Debtors' Chapter 11 Cases over a few small claims is cutting off the nose to spite the face.

**4.      Factor 4: whether there is an alternative means of achieving an equitable distribution of assets**

56.     The Motion proposes two alternative scenarios, each of which involves keeping the U.S. Debtors before this Court in the Chapter 11 Cases while the Luxembourg Debtors retreat to Luxembourg. There, the Luxembourg Debtors propose to either resolve their debts privately—out of court—or in a Luxembourg insolvency proceeding.

57.     An equitable distribution of assets can be achieved only by keeping the Luxembourg Debtors in the Chapter 11 Cases together with the U.S. Debtors. The Luxembourg Debtors want out of these proceedings in order to cut private deals with their favored creditors. Failing that, they expect to end up in insolvency proceedings in Luxembourg. Either of these outcomes will result in the distribution of the Luxembourg Debtors' assets outside of these Chapter 11 Cases and in a manner different than the distribution of their related U.S. Debtors' assets.

58.     Freeing the Luxembourg Debtors from any Court oversight or limitations on the uses of their assets, as they request, will immediately allow them to pay preferred creditors as they please. As Mr. Ghisolfi candidly relayed in his deposition, ███████████████

███████████████████████████████████████████████████████████

███████████" Ghisolfi Depo. Tr. 151:4-8 (emphasis added). Insider and local Luxembourg

---

███████████████████████████████████████████" which he considered a ███

███████████████████████████████████████████████████████████

Colodny Decl. Ex. H at D_00004457.

creditors (particularly those that are already violating the automatic stay by pursuing their claims) will reap the benefits of dismissal.

59.     In contrast, Disfavored creditors are likely to be shut out of the process.  Mr. Ghisolfi's  Indeed, Mr. Ghisolfi "███████████████████████████████████."  Knowing there is no "████████████ ███████████████████████████," he is unconcerned to learn more. Ghisolfi Depo. Tr. 364:14-19.  With his dismissive attitude towards Bancomext's rights, Mr. Ghisolfi is liable to pay the claims of his preferred creditors before even speaking to Bancomext. This is inequitable.

60.     Mr. Ghisolfi is pursuing an alternative to these Chapter 11 Cases precisely because he does not want to "achieve an equitable distribution of assets."  This factor weighs in favor of denying the Motion.

**5.      Factor 5: whether the debtor and creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case**

61.     The Luxembourg Debtors express "hope" about an out-of-court workout resolving all claims against their estates "in the near term."  Mot. ¶ 19.  They offer no basis for this hope, except their unexplained "belie[f] that the dismissal of their chapter 11 cases would increase the likelihood of reaching out-of-court settlements."  *Id.*  And, they necessarily acknowledge that "a favorable outcome of post-dismissal negotiations cannot be assured."  *Id.* This is a far cry from establishing that the debtor and the creditors will be able to achieve an out-of-court settlement.  In any event, it is inconceivable that an out-of-court settlement would "better serve all interests in the case."

62. As already noted, liberating the Luxembourg Debtors from the Court's oversight would immediately allow them to make whatever deals they want with whatever creditors they choose. And for reasons already discussed, withdrawing the Luxembourg Debtors' assets from the Chapter 11 Cases will effectively put them out of reach of disfavored creditors, relieve the Luxembourg Debtors of their fair share of the costs of administration of these cases, and make administration of these cases more difficult by increasing barriers to access the Debtors' data.

63. It is also difficult to see how, as a practical matter, the Luxembourg Debtors could negotiate a consensual resolution with each of their creditors through an informal, out-of-court workout. The Luxembourg Debtors' schedules reflect an aggregate unsecured creditor headcount of 155 as of the Petition Date. Collective proceedings like the Chapter 11 Cases are necessary, in large part, because it is inefficient, often impossible,[24] and inevitably inequitable,[25] to resolve all claims in a large and diffuse creditor pool on a consensual out-of-court basis. While the Luxembourg Debtors claim to be in active discussions with various creditors concerning an out-of-court restructuring, they have certainly not approached Bancomext to discuss payment of the $190 million claim it asserts against M&G International.

64. The hopes expressed in his declaration notwithstanding, Mr. Ghisolfi recognizes the improbability of an out-of-court restructuring for the Luxembourg Debtors following a dismissal. In the past month, he ███████████████████████████████████████████ ██████████████████████████████████████ *See* Ghisolfi Depo. Tr. 173:3-174:22. *Gestion*

---

[24] Mr. Ghisolfi testified at his deposition that █████████████████████████████████ ███████████████ Ghisolfi Depo. Tr. 368:23-368:24. Out of 155 known creditors, the likelihood of at least one dissenter holding out is extremely high.

[25] The opportunity to treat creditors differently is top of mind as the Luxembourg Debtors look forward to exiting the chapter 11 process. They are well aware that the only impediment to them making █████████ preferential deal with their creditors is this Court. *See* Ghisolfi Depo. Tr. 150:2-3 (████████ ██████████████████████████████████████████ Releasing them from its oversight is certain to benefit some creditors to the prejudice of all others.

32

*contrôlée* is a court-supervised process that allows for the debtor to remain in control of its business and attempt to reorganize or liquidate its assets in an orderly fashion for the benefit of its creditors. Fayot Decl., ¶ 27. Mr. Ghisolfi now ████████████████████████████ ████████████████████████████████████████████. *See* Ghisolfi Depo. Tr. 150:5-151:17; 151:19-152:12.[26]

65. After forcing their creditors to participate in the chapter 11 process—one that is designed to be orderly, transparent, and equitable—it would disserve the Luxembourg Debtors' creditors and all other parties in interest in these Chapter 11 Cases to send them into the unstructured unknown of an out-of-court restructuring with dubious chances for success—or some other proceeding Mr. Ghisolfi just thought of. This factor, too, weighs against the relief requested in the Motion.

**6. Factor 6: whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process**

66. This factor illustrates just how ill-suited section 305(a) abstention is to the facts presented in the Motion. No one is asking that the Luxembourg Debtors "start afresh" with the federal bankruptcy process. Rather, nearly nine months have elapsed since *they* voluntarily sought chapter 11 relief from this Court. And, not only are non-federal proceedings not at an advanced stage; they have not commenced *at all*. The Luxembourg Debtors cite only to the *possibility* of Luxembourg proceedings (that are no more certain than "appear[ing] increasingly likely," Mot., ¶ 25) to support their request for abstention.

---

[26] ███████████████████████████████████████████████ is yet another indictment of Ms. Goebel's legal opinion that is central to the Motion. Based on Ms. Goebel's testimony, the Luxembourg Debtors assert that if they "[we]re forced into Luxembourg bankruptcy proceedings, either by a creditor or by an obligation to file arising under Luxembourg law, a trustee would be appointed and take immediate control of all decision-making authority for the Luxembourg Debtors." Mot., ¶ 4 (citing Goebel Decl., ¶ 8). ████████████████████████ ██████

33

67.     The Luxembourg Debtors cite no case where a court has dismissed a months-old chapter 11 case, voluntarily commenced, in favor of "increasingly likely" or any other hypothetical foreign proceedings.  Bancomext has located no such case and one authority cited by the Luxembourg Debtors suggests that no such case exists.  In *Monitor Single Lift*, bondholders sought abstention under section 305(a) as to the recently-commenced case of a single debtor in favor of insolvency proceedings in England.  However, no such proceedings had yet been commenced.  The court chided the bondholders for their request, noting that they had cited "***no authority supporting abstention where no relevant foreign proceeding concerning the debtor was already pending***."  381 B.R. at 467 n.6 (emphasis added).

68.     This factor weighs against the relief requested in the Motion.

**7.      Factor 7: the purpose for which bankruptcy jurisdiction has been sought**

69.     The Luxembourg Debtors commenced their Chapter 11 Cases last October because they had "determined that it [wa]s in the best interests of the Company, its stakeholders and its creditors to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code." Luxembourg Petitions at 6-7.  They reached this conclusion after "evaluat[ing] the Company's alternatives in connection with a possible restructuring, and after due consideration taking into account the information available to it at th[e] time."  *Id.*  The ███████████████████

████████████████████████████████████████████████████████████████████████

Ghisolfi Depo. Tr., 27:10-22.  Notably, the Company was not averse to running parallel proceedings for affiliated entities in different countries when the Luxembourg Debtors opted for chapter 11 relief in this Court—as of the Petition Date, at least one affiliate, M&G Finanziaria S.p.A, was the subject of an in-court restructuring proceeding in Italy.  First Day Decl., ¶ 38. Nonetheless, the Luxembourg Debtors chose the U.S. over Luxembourg to pursue their restructuring.  Mr. Ghisolfi believed ████████████████████████████████

██████████████████████████████████████.[27]  Ghisolfi Depo. Tr. 27:10-28:16.

While he characterizes his motivations as purely altruistic, holding off appointment of a

Luxembourg trustee protected his ██████████████████.  *Id.* at 75:4-8.

70.     The Debtors made clear from the outset that their objective in commencing these

Chapter 11 Cases was to sell their most important asset—the Corpus Christi Plant.  The Debtors

did so successfully.  Mr. Ghisolfi now attempts to put a finer point on that objective in order to

frame it as having failed, such that the relief requested in the Motion might appear warranted.

Mr. Ghisolfi's attempts to revise history are belied by the record.

71.     In his declaration, Mr. Ghisolfi asserts that "[t]he Luxembourg Debtors initially

filed their chapter 11 cases with the hope that asset sales consummated during these proceedings

would yield sufficient proceeds to provide a path to a confirmable chapter 11 plan for the

Luxembourg Debtors while minimizing the risk of a Luxembourg insolvency proceeding . . . ."

Ghisolfi Decl., ¶ 7.  As an initial matter, this claim contradicts one of the fundamental premises

of the Motion—that the Chapter 11 Cases are a pointless endeavor for the Luxembourg Debtors

because "chapter 11 plans . . . likely would not be recognized in Luxembourg."  Ghisolfi Decl.,

¶ 10.  For the reasons already explained, chapter 11 plans *would* likely be recognized in

Luxembourg and the Luxembourg Debtors presumably knew this when they determined that it

was in their best interests and the best interests of their stakeholders to seek relief under

chapter 11 with the purpose of pursuing a chapter 11 plan.

---

[27] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

72.     Just like doubts about the enforceability of a chapter 11 plan in Luxembourg, any disappointment about the proceeds generated from the sale of the Debtors' assets is newly manufactured to justify the extraordinary relief requested in the Motion.  In asking the Court to approve the sale of the Corpus Christi Plant and related assets, the Debtors made absolutely clear that the sale reflected the full value they ascribed to the assets:

> Your Honor, almost every one of our pleadings talks about the Corpus Christi plant. It's our most important asset. It's been a focal point of these cases.  It's been quite a process getting to this point where **we're able to maximize and truly maximize the value of the plant.**  It's quite an achievement to be able to deliver **the value that we all believed was inherent in that asset**.

Mar. 27, 2018 Hr'g Tr., 8:6-13 (counsel to the Debtors; emphases added); *see also* Ghisolfi Depo. Tr. 103:3-4 (Mr. Ghisolfi testifying ███████████████████████████ ████████████████████████████████").  It is simply not credible that the Luxembourg Debtors sought chapter 11 protection in hopes of confirming a chapter 11 plan given "sufficient proceeds" from their anticipated asset sales but, after selling their "most important asset" for its full inherent value, no longer have "a path to a confirmable chapter 11 plan."  Far more likely is that the Luxembourg Debtors no longer like the strictures of chapter 11 and want out of the Chapter 11 Cases to protect the interests of their favored constituencies.  This includes resolving intercompany claims favorably to the Luxembourg Debtors but in a manner that is prohibited by the Bankruptcy Code and taking other actions the Luxembourg Debtors want to do but cannot do if they stay in chapter 11.  *See, e.g.*, Ghisolfi Depo. Tr. 151:4-8.

73.     Mr. Ghisolfi states that the Luxembourg Debtors commenced Chapter 11 Cases for the additional reason that M&G International "coordinates the provision of critical information technology services to the other Debtors" and wished to "ensure that these essential services would not be interrupted during the marketing process" for the Debtors' assets.  The

Luxembourg Debtors' attempt to withdraw from these proceedings now is an attempt to abscond with the desired benefits of bankruptcy without bearing its full burdens. The Luxembourg Debtors—and Mr. Ghisolfi personally—have made no secret of their aversion to providing information in these proceedings.[28] While they may have wanted to support the Corpus Christi asset sale because they stood to benefit from it, the need for information did not end with the Court's order approving that sale. Among other things, the Debtors' rights against one another and to their respective assets remain unresolved. Letting the Luxembourg Debtors walk with the data resources necessary to determine those matters could ensure that they are never resolved. While this may benefit the Luxembourg Debtors, it would harm the remaining Debtors and their estates, as well as the integrity of this chapter 11 process.

74.     The "the purpose for which bankruptcy jurisdiction has been sought" factor is alternatively formulated as "the purpose of the party seeking to remain in the bankruptcy court." *See, e.g.*, *15375 Mem'l Corp.*, 382 B.R. at 686. As outlined above, Bancomext seeks to have the Luxembourg Debtors remain in the Chapter 11 Cases for the very reasons that bankruptcy law exists: efficiency of administration and an equitable distribution of assets. *See Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 251 (3d Cir. 2001) (identifying as "overarching" equitable purpose of bankruptcy "to provide for the efficient and equitable distribution of an insolvent debtor's remaining assets to its creditors").

75.     For the reasons already stated, granting the Motion would immediately reduce efficiency and the likelihood of an equitable resolution for all parties in interest. The

---

[28]     This was on display even in scheduling the Motion, which the Debtors set on the shortest possible notice for the very purpose of limiting access to discovery. *See* June 15, 2018 ltr. from Debtors' counsel to Court re scheduling Motion [D.I. 1577] ("If the hearing on the [Motion] is adjourned beyond the currently scheduled date, the Debtors understand that the Court would be unable to accommodate the parties until mid to late July. . . . The estates of the Lux[embourg] Debtors will incur substantial costs in terms of professional fees, as discovery inevitably will grow to fill the time available . . . .").

Luxembourg Debtors have numerous and far-flung creditors. They also control and have pervasive ties to their subsidiaries that are proposed to remain Debtors here. This Court offers a forum for all of the Debtors to resolve their debts, including those debts shared between Luxembourg Debtors and U.S. Debtors and debts between them. It is also open to all creditors to participate. This is just as true for their many EU creditors as it is for their non-EU counterparts holding approximately 85% of the non-insider unsecured claims as of the Petition Date. Dividing these proceedings so that the Luxembourg Debtors may pursue a speculative out-of-court restructuring or hypothetical foreign proceeding while their subsidiaries remain debtors in the Chapter 11 Cases defies logic.

76. Further, the Luxembourg Debtors chose this venue for themselves and the other Debtors. By doing so, they forced all of their creditors to invest in this process, whether passively as estate stakeholders bearing the costs of shared administrative expenses or directly as active participants. Their proposal to withdraw would undoubtedly disrupt this process by withdrawing assets and access to information, shifting administrative expenses, and generally complicating the resolution of the many intercompany claims, shared debts, and shared assets. Weighing these certainties against the Luxembourg Debtors' hopes, beliefs and speculation about unquantified risks and an uncertain path forward, this factor, too, weighs in favor of denying the Motion.

* * *

77. In sum, The Luxembourg Debtors simply fail to meet their heavy burden of showing that all parties in interest, including the U.S. Debtors and their creditors, would be better off if the Motion were granted. In fact, they do not even try to meet this burden. In addressing outcomes in either an out-of-court restructuring or under a Luxembourg insolvency proceeding,

they offer evidence **only** of the potential impact on Luxembourg and M&G International creditors, and this evidence is nothing more than Mr. Ghisolfi's bare belief that such creditors would fare **no worse** following a dismissal.  *See* Mot., ¶ 2 ("The Luxembourg Debtors believe that, if successful, [] **an out-of-court resolution likely would enable Luxembourg creditors to recover at least as much as they would receive under a chapter 11 plan**, and would increase the likelihood that [M&G International] will be able to recover additional amounts from its non-debtor affiliates, thereby enhancing the recoveries of Luxembourg creditors."); ¶ 26 ("[B]ased on their preliminary analysis of potential creditor distributions under the Code of Commerce and various potential chapter 11 plan alternatives, the Luxembourg Debtors believe that [**M&G International's**] **creditors likely would obtain no worse recoveries in a Luxembourg bankruptcy proceeding than in chapter 11**.") (citing Ghisolfi Decl., ¶ 8; emphases added).

78.     Mr. Ghisolfi's belief about comparative outcomes is supported by nothing more than his gut feeling.  At his deposition, he conceded that 

Ghisolfi Depo. Tr. 178:4-179:9.  In Mr. Ghisolfi's view,

."  *Id.* at 179:8-11.

This is an admission that it is **actually** impossible for the Luxembourg Debtors to meet their burden to show that dismissal would be more beneficial to all parties in interest.  Likewise, there has been

.  *Id.* at 180:182:7.  Indeed, Mr. Ghisolfi

.  *Id.*  This is yet a further illustration of just how ill-considered the Motion is.  It must be denied.

**B.** **Dismissal Under § 1112 Is Also Inappropriate**

79.     A request for dismissal under section 305(a) of the Bankruptcy Code is not intended as a substitute for a request under section 1112(b).  *See, e.g.*, *In re 82 Milbar Boulevard, Inc.*, 91 B.R. at 216.  It follows, then, that section 1112(b) is not a substitute for section 305(a).  Nonetheless, the Luxembourg Debtors make their Motion in the alternative under section 1112(b) on the same facts as they move under section 305(a).  For the same reasons as relief is inappropriate under section 305(a), it is also inappropriate under section 1112(b).

80.     As the movants, the burden lies with the Luxembourg Debtors to establish "cause" to dismiss their Chapter 11 Cases.  *Anderson v. Commonwealth Renewable Energy, Inc.* (*In re Commonwealth Renewable Energy, Inc.*), 550 B.R. 279, 283 (Bankr. W.D. Pa. 2016) (citing *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015)).  They contend such "cause" exists because their ability to successfully effectuate a plan (i) "is highly questionable given the increasing risk of a Luxembourg insolvency proceeding" and (ii) "appears doubtful" because, "[a]ccording to Luxembourg counsel, the Luxembourg courts likely would not recognize or give effect to a confirmed chapter 11 plan or a confirmation order."  Mot., ¶ 34.  The Luxembourg Debtors suggest that these facts satisfy the "inability to effectuate a plan" illustration of cause that used to be enumerated as section 1112(b)(2) before the 2005 amendments to the Bankruptcy Code.

81.     In interpreting the test of former section 1112(b)(2), the Third Circuit has held it "requires the moving party to prove that it is unreasonable to expect that a plan can be approved."  *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991).  Mere difficulty in obtaining confirmation is insufficient to establish an inability to effectuate a plan.  *Id.* ("Although [the debtor] would have faced difficulty, nothing in the record in the brief two months before denial

of dismissal establishes that the bank would reject all possible plans.").  Nowhere do the Luxembourg Debtors assert that they cannot obtain confirmation of a plan.  They contend only that the risks of a Luxembourg insolvency proceeding are "increasing" so that effectuating a plan is "highly questionable."  The abstract risk of a Luxembourg insolvency filing, in contravention of the automatic stay, is not incompatible with confirmation of a plan.  Indeed, even if such a filing were certain, a Luxembourg Court could defer to the Chapter 11 Cases or conduct complementary proceedings respectful of this Court's pending administration.  *See supra* at ¶ 45 (quoting Fayot Decl. ¶¶ 16-18).  Finally, such a filing might also be rejected because a Luxembourg court might not find that Luxembourg is the "real seat" of the Luxembourg Debtors.  *See* Fayot Decl., ¶ 22.

82.     Likewise, for the reasons set forth above, Ms. Goebel's assessment that "the Luxembourg courts likely would not recognize or give effect to a confirmed chapter 11 plan or a confirmation order," Goebel Decl., ¶ 7, is simply incorrect and therefore not a reason for dismissal.

83.     Finally, the Luxembourg Debtors assert, without elaboration, that "it is uncertain whether M&G Capital and M&G Chemicals can meet all of the requirements for plan confirmation under chapter 11 of the Bankruptcy Code in the first instance" unless they are substantively consolidated.  Mot., ¶ 35.  "[I]nability to satisfy one or more of the plan confirmation standards listed in 11 U.S.C. § 1129" does constitute "inability to effectuate a plan."  *In re Camann*, 2001 Bankr. LEXIS 581, *11 (Bankr. D.N.H. Mar. 19, 2001).  But, once again, the Luxembourg Debtors fall short of asserting, much less supporting, the necessary fact: that (and how) meeting these standards would be impossible.  Indeed, they say only that their

ability to meet the standards would be uncertain only if there is no substantive consolidation. This is a far cry of establishing the "inability" necessary to carry their burden on the Motion.

84.     The Luxembourg Debtors fail to establish cause pursuant to section 1112(b). Accordingly, they are not entitled to dismissal under this section.

## C.     The Luxembourg Debtors' Requests for Exculpation Should Be Denied

85.     In the same breath as they ask to be excused from the jurisdiction of the Court because its orders are of dubious value to them, the Luxembourg Debtors ask for affirmative relief.  Specifically, they ask for an exculpation for themselves, their affiliated Debtors, and each of their respective "directors, officers, employees, attorneys, consultants and advisors" for "any act taken or omitted, or to be taken, in connection with the dismissal of the Luxembourg Debtors' chapter 11 cases."  Carved out from this broad release are only acts constituting willful misconduct, gross negligence or violation of law."  Mot., ¶ 36.

86.     In support of their request, the Luxembourg Debtors cite three orders.  It appears that, in each case, the orders terminated or contemplated termination of chapter 11 proceedings entirely.[29]  While exculpations may be appropriate at the conclusion of a case where parties have the benefit of the full context for which the exculpations are proposed, these Chapter 11 Cases will not end with the dismissal of the Luxembourg Debtors if the Motion is granted.

87.     Indeed, the Luxembourg Debtors and most, if not all, persons proposed to be exculpated will continue to have a role in the Chapter 11 Cases going forward.  Even if limited to conduct relating to the Motion and relief requested therein, exculpation is inappropriate here. The consequences of the Luxembourg Debtors' dismissal will play out over the remainder of these Chapter 11 Cases.  To the extent subsequent events call into question the good faith, care

---

[29]     The order in *In re LTV Steel Co.*, No. 00-43866 (Bankr. D. Ohio), in which the Luxembourg Debtors counsel served as debtors' counsel, is not accessible on ECF.

or loyalty the Debtors' fiduciaries exercised in bringing the Motion, the Debtors and other appropriate parties in interest must retain their recourse against them.

## CONCLUSION

For all of the foregoing reasons, Bancomext requests that the Court (a) deny the Motion; and (b) grant such other and further relief as the Court deems just and proper.

Dated:    July 13, 2018        **FOX ROTHSCHILD LLP**

By:  /s/ Jeffrey M. Schlerf
    Jeffrey M. Schlerf (DE No. 3047)
    919 North Market Street, Suite 300
    Wilmington, DE 19801
    Telephone:    (302) 654-7444
    Facsimile:    (302) 656-8920
    jschlerf@foxrothschild.com

—and—

    Roberto J. Kampfner (admitted pro hac vice)
    Aaron Colodny (admitted pro hac vice)
    **WHITE & CASE LLP**
    555 South Flower Street, Suite 2700
    Los Angeles, CA 90071
    Telephone:    (213) 620-7700
    Facsimile:    (213) 452-2329
    rkampfner@whitecase.com

*Attorneys for Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Desarrollo*