**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| M&G USA CORPORATION, *et al.*,[1] | : | Case No. 17-12307 (BLS) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

## DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION
## OF THE U.S. DEBTORS AND DEBTORS IN POSSESSION

JONES DAY
Scott J. Greenberg (admitted *pro hac vice*)
Stacey L. Corr-Irvine (admitted *pro hac vice*)
250 Vesey Street
New York, New York 10281
Telephone:     (212) 326-3939
Facsimile:     (212) 755-7306
Email:          sgreenberg@jonesday.com
                 scorrirvine@jonesday.com
and

Carl E. Black (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:     (216) 586-7035
Facsimile:     (216) 579-0212
Email:          ceblack@jonesday.com

and

Daniel J. Merrett (admitted *pro hac vice*)
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309-3053
Telephone:     (404) 581-8476
Facsimile:     (404) 581-8330
Email:          dmerrett@jonesday.com

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                 joneill@pszjlaw.com
                 jmulvihill@pszjlaw.com

CO-COUNSEL FOR THE DEBTORS
AND DEBTORS IN POSSESSION

---

[1]     The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M&G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these Chapter 11 Cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

**IMPORTANT INFORMATION FOR YOU TO READ**

**THE DEADLINE TO VOTE ON THE PLAN IS NOVEMBER 12, 2018
AT 5:00 P.M. PREVAILING EASTERN TIME, UNLESS EXTENDED BY THE DEBTORS
(THE "VOTING DEADLINE").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE *ACTUALLY RECEIVED* BY
THE VOTING AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION
AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN
CAREFULLY BECAUSE IT MAY AFFECT YOUR RIGHTS.**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE U.S. DEBTORS SUPPORTS
THE PLAN AND URGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

_____

Certain of the above-captioned debtors and debtors in possession (as defined below, the "U.S. Debtors") are providing you with the information in this Disclosure Statement (this "Disclosure Statement") because you may be a creditor entitled to vote on the Plan.

_____

The U.S. Debtors urge each holder of a claim or an equity interest to consult with its own advisors with respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and all of the actions necessary to effectuate the Plan.

_____

This Disclosure Statement contains, among other things, summaries of the plan, certain statutory provisions, certain events in these Chapter 11 Cases and certain documents related to the Plan that may be attached hereto and are incorporated by reference herein. Although the U.S. Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. The information contained herein or attached hereto is made only as of the date of this Disclosure Statement, and there can be no assurances that the statements contained herein will be correct at any time after this date.

_____

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

_____

This Disclosure Statement contains forward-looking statements within the meaning of Section 27A and Section 21E of the Securities Act. Such statements may contain words such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue" or the negative thereof or comparable terminology, and may include without limitation, information regarding the U.S. Debtors' expectations with respect to future events. Forward-looking statements are inherently uncertain and are subject to certain risks and uncertainties that could cause actual results to differ from those expressed or implied in this Disclosure Statement and the forward-looking statements contained herein. Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is, therefore, speculative.

————————————————

In preparing this Disclosure Statement, the U.S. Debtors relied on financial data derived from their books and records or that was otherwise made available to them at the time of such preparation and on various assumptions regarding the U.S. Debtors' business. Although the U.S. Debtors believe that such financial information fairly reflects the financial conditions of the U.S. Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the U.S. Debtors' business and their future results and operations. Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction. The U.S. Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

————————————————

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. The U.S. Debtors and/or the Litigation Trust may object to claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such objections to Claims.

————————————————

The U.S. Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the U.S. Debtors may subsequently update the information in this Disclosure Statement, the U.S. Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed. Information contained herein is subject to completion or amendment. The U.S. Debtors reserve the right to file an amended plan and related amended disclosure statement from time to time, subject to the terms of the Plan.

————————————————

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described in Article VII of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived. You are encouraged to read this Disclosure Statement in its entirety, including, but not limited to, the Plan and Section VII of this Disclosure Statement entitled "Plan-Related Risk Factors," before submitting your ballot to vote to accept or reject the Plan.

————————————————

The U.S. Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The U.S. Debtors have not authorized any representations concerning the U.S. Debtors or the value of their property other than as set forth in this Disclosure Statement.

————————————————

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan and any transactions contemplated thereby.

————————————————

The U.S. Debtors and the Creditors' Committee support confirmation of the Plan and recommend all Holders of Claims entitled to vote on the Plan to vote to accept the Plan.

## QUESTIONS AND ADDITIONAL INFORMATION

**If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact Prime Clerk, the Voting Agent, by either (i) visiting the Document Website at http://www.cases.primeclerk.com/mgusa/ or (ii) calling (855) 388-4578.**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION AND OVERVIEW OF THE PLAN ............................................................ 1

    A.     The Plan ................................................................................................................ 1

    B.     Dismissal of the Luxembourg Debtors ................................................................ 1

    C.     Substantive Consolidation of the U.S. Debtors .................................................. 2

    D.     The Adequacy of This Disclosure Statement ...................................................... 3

    E.     Summary of Classes and Treatment of Claims and Interests Under the Plan ....................... 3

    F.     Voting on and Confirmation of the Plan .............................................................. 4

    G.     Classes Entitled to Vote on the Plan .................................................................... 4

    H.     Votes Required for Acceptance by a Class ........................................................... 5

    I.     Certain Factors to be Considered Prior to Voting ............................................... 5

    J.     Classes Not Entitled to Vote on the Plan ............................................................. 5

    K.     Solicitation Package ............................................................................................. 6

    L.     Voting Procedures ................................................................................................ 6

    M.    Plan Objection Deadline ...................................................................................... 7

    N.     Confirmation Hearing .......................................................................................... 7

II.     DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESS ............................ 7

    A.     The U.S. Debtors' Business and Corporate Structure .......................................... 7

    B.     Significant Prepetition Indebtedness .................................................................... 8

    C.     The U.S. Debtors' Workforce ............................................................................... 9

    D.     Other Significant Liabilities ............................................................................... 10

III.    EVENTS LEADING TO THE CHAPTER 11 CASES ................................................. 10

    A.     Overview of the Company ................................................................................... 10

    B.     Construction of the Corpus Christi Plant ........................................................... 10

    C.     The Decision to File Chapter 11 ........................................................................ 11

IV.    EVENTS DURING THE CHAPTER 11 CASES ........................................................ 11

    A.     First Day Relief .................................................................................................. 11

    B.     Appointment of the Creditors' Committee ......................................................... 12

    C.     Debtors' Retention of Professionals ................................................................... 13

    D.     The Debtors' Postpetition Financing .................................................................. 14

    E.     The U.S. Debtors' Sale Processes ...................................................................... 16

    F.     Schedules and Statements .................................................................................. 22

    G.     Bar Dates ............................................................................................................ 22

    H.     Key Employment Retention Plan and Key Employment Incentive Plan ........................... 23

    I.     Extension of Removal Deadline and Plan Exclusivity Period ............................. 23

NAI-1504131900v21

| | | |
|---|---|---|
| J. | Rejection of Non-Residential Real Property Leases, Unexpired Leases and Executory Contracts | 24 |
| K. | Settlements | 24 |
| L. | M&G Brasil Adversary Proceeding | 25 |
| M. | Employee Benefits Issues | 25 |
| **V.** | **SUMMARY OF THE PLAN** | 26 |
| A. | Classification and Treatment of Claims and Interests | 26 |
| B. | Means of Implementation | 34 |
| C. | Treatment of Executory Contracts and Unexpired Leases | 42 |
| D. | Provisions Governing Distributions | 44 |
| E. | Disputed, Contingent and Unliquidated Claims | 48 |
| F. | Conditions Precedent to Confirmation and Consummation of the Plan | 50 |
| G. | Non-Consensual Confirmation | 51 |
| H. | Effect of Confirmation | 51 |
| I. | Retention of Jurisdiction | 55 |
| J. | Miscellaneous Provisions | 56 |
| **VI.** | **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** | 58 |
| A. | Confirmation Hearing | 58 |
| B. | Requirements for the Confirmation of the Plan | 59 |
| C. | Alternative Plans | 60 |
| D. | Acceptance by Impaired Classes | 60 |
| E. | Requirements of Section 1129(b) of the Bankruptcy Code | 60 |
| **VII.** | **PLAN-RELATED RISK FACTORS** | 61 |
| A. | Certain Bankruptcy Considerations | 62 |
| B. | Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under the Plan | 63 |
| C. | Disclosure Statement Disclaimer | 64 |
| D. | Liquidation Under Chapter 7 | 66 |
| **VIII.** | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN** | 66 |
| A. | U.S. Federal Income Tax Consequences to Holders of Allowed Claims | 67 |
| B. | Backup Withholding and Information Reporting | 70 |
| C. | Importance of Obtaining Professional Tax Assistance | 71 |
| **IX.** | **RECOMMENDATION AND CONCLUSION** | 71 |

# I.    INTRODUCTION AND OVERVIEW OF THE PLAN

This Disclosure Statement provides information regarding the *Joint Plan of Liquidation of U.S. Debtors and Debtors in Possession* (as may be amended, supplemented or otherwise modified from time to time, the "Plan"), which the U.S. Debtors are seeking to have confirmed by the Bankruptcy Court.[2]  A copy of the Plan is attached hereto as Exhibit A.  The rules of construction set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement.

The U.S. Debtors believe that the Plan is in the best interests of their Estates.  The U.S. Debtors recommend that all Holders of Claims entitled to vote accept the Plan by returning their Ballots so as to be actually received by the Claims and Noticing Agent no later than November 12, 2018 at 5:00 p.m. (prevailing Eastern Time).  Assuming the requisite acceptances of the Plan are obtained, the U.S. Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing on November 27, 2018 at 11:00 a.m.

## A.    The Plan

Debtor M&G Polymers Filed for chapter 11 bankruptcy protection on October 24, 2017 and, thereafter, the remaining Debtors commenced their chapter 11 cases on October 30, 2017.  The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan.  To that end, the U.S. Debtors Filed the Plan, the terms of which are more fully described herein, contemporaneously with the Filing of this Disclosure Statement.  The Plan contemplates a liquidation of the U.S. Debtors and their Estates and is therefore referred to as a "plan of liquidation."  The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and to distribute all property of the U.S. Debtors' Estates that is or becomes available for distribution in accordance with the priorities established by the Bankruptcy Code.  The U.S. Debtors believe that the Plan accomplishes this objective and is in the best interests of their Estates, and therefore seek to confirm the Plan.  The U.S. Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of conversion to and completion of a liquidation under chapter 7 of the Bankruptcy Code.  The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below.

The Plan designates the Classes of Claims against and Interests in the U.S. Debtors and specifies which Classes are (1) Impaired or Unimpaired by the Plan, (2) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or (3) deemed to accept or reject the Plan.  Claims against the U.S. Debtors and Interests in the U.S. Debtors are classified in 11 separate Classes, as described herein.

## B.    Dismissal of the Luxembourg Debtors

On June 5, 2018, M&G Capital S.à r.l. ("M&G Capital"), M&G Chemicals S.A. ("M&G Chemicals") and Mossi & Ghisolfi International S.à r.l. ("MGI" and collectively with M&G Capital and M&G Chemicals, the "Luxembourg Debtors") moved for dismissal of their chapter 11 cases (Docket No. 1537) (the "Dismissal Motion") for the reasons described in the Dismissal Motion.  The Creditors' Committee and Bancomext filed objections (Docket Nos. 1681 and 1674, respectively) to the Dismissal Motion.  At the hearing on the Dismissal Motion, the Debtors and the Creditors' Committee announced a settlement in principle of the Creditors' Committee's objections to the Dismissal Motion in accordance with the provisions of a term sheet filed with the Bankruptcy Court (Docket No. 1706) (the "Motion to Dismiss Term Sheet").  According to the agreed stipulation definitively documenting the terms of the settlement embodied in the Motion to Dismiss Term Sheet (the "Motion to Dismiss Stipulation"), the parties agreed that, subject to certain conditions precedent, the Luxembourg Debtors' chapter 11 cases would be dismissed effective (the "Dismissal Effective Date") on the earlier of (1) the Effective Date of the Plan and (b) the date upon which a final and non-appealable order is entered approving a resolution of certain proofs of claim filed by the Debtors' Mexican non-debtor affiliates (collectively, the "Mexican Intercompany Claims").  In exchange, MGI agreed to make payments to the U.S. Debtors in the total amount of $6 million in the aggregate, subject to potential refund in part, upon the occurrence of certain events, including a refund of up to $3 million

---

[2]        Unless otherwise specified herein, capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

based upon the extent of any reduction of the Mexican Intercompany Claims.[3]  In exchange, the Creditors' Committee agreed to support approval of (a) a settlement of the Mexican Intercompany Claims, subject to certain consent rights; (2) a settlement of claims of Och-Ziff Capital Management Group LLP and its affiliates against the Luxembourg Debtors; (3) the Luxembourg Debtors' satisfaction of up to $300,000 in prepetition claims asserted against their Estates; and (4) the Luxembourg Debtors' retention of their cash in Luxembourg.

Although the Motion to Dismiss Stipulation resolved the Creditors' Committee's objection to the Dismissal Motion, Bancomext's objection remained outstanding.  As discussed in Section IV.E.3.e the parties ultimately reached a settlement of all proceedings involving Bancomext, the terms of which are set forth in the Bancomext Term Sheet (as defined below) in connection with which Bancomext has withdrawn its objection to the Dismissal Motion subject to, and pending the Bankruptcy Court's approval of, the terms of that settlement.

### C.       Substantive Consolidation of the U.S. Debtors

As part of Confirmation, the U.S. Debtors are proposing that, on the Effective Date, their Estates be deemed consolidated for all purposes related to the Plan, including for (1) purposes of implementing the Plan, (2) purposes of voting, (3) assessing whether the Confirmation standards have been met, (4) calculating and making distributions under the Plan and (5) filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee.  In addition, the U.S. Debtors are seeking, pursuant to the Plan, Bankruptcy Court approval of the substantive consolidation of the U.S. Debtors' estates.  If the Bankruptcy Court grants the U.S. Debtors' request for substantive consolidation, pursuant to the Confirmation Order, as of the Effective Date:  (1) all assets and liabilities of the U.S. Debtors will be deemed merged; (2) all guarantees by one U.S. Debtor of the obligations of any other U.S. Debtor will be deemed eliminated so that any Claim against any U.S. Debtor and any guarantee thereof executed by any other U.S. Debtor and any joint or several liability of any of the U.S. Debtors will be deemed to be one obligation of the U.S. Debtors; (3) each and every Claim Filed or to be Filed in the Chapter 11 Cases of the U.S. Debtors will be deemed Filed against the U.S. Debtors and will be deemed one Claim against and a single obligation of the U.S. Debtors, and the U.S. Debtors may File and the Bankruptcy Court will sustain objections to Claims for the same liability that are Filed against multiple U.S. Debtors; and (4) Intercompany Claims between U.S. Debtors will be eliminated and extinguished.  Such substantive consolidation will not affect (1) the legal and corporate structures of the U.S. Debtors, subject to the right of the U.S. Debtors to complete the Dissolution Transactions; (2) the vesting of assets in the Litigation Trust; (3) the right to distributions from any insurance policies or proceeds of such policies; or (4) the rights of the U.S. Debtors or the Litigation Trustee to contest alleged setoff or recoupment efforts by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and otherwise applicable law.

As described further in Section V.B.3 below, substantive consolidation is available in the Third Circuit where the debtors seeking such consolidation show that "prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity…."  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).  "A prima facie case for [substantive consolidation on this basis] typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity."  *Id.* at 212.  In addition, substantive consolidation may be available where "postpetition [the debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  *Id.* at 211.

In connection with Confirmation, the U.S. Debtors will present evidence in support of their request for the substantive consolidation of their Estates, for the limited purposes set forth in the Plan.  Among other things, the U.S. Debtors have operated as a consolidated enterprise for a number of years.  Prepetition, the U.S. Debtors believe that creditors relied on the breakdown of corporate entities in their dealings with the U.S. Debtors.  Further, postpetition, the U.S. Debtors' assets are so scrambled that separating them (or attempting to do so), is prohibitive and would be to the detriment of all creditors.  In particular, the principal assets of the U.S. Debtors that will be

---

[3]        The Motion to Dismiss Stipulation also provides that MGI shall be entitled to a full refund of the $6 million paid to the U.S. Debtors in the event of either (a) a successful appeal of the order approving the Motion to Dismiss Stipulation on a final and non-appealable basis or (b) the termination of the Corpus Christi Asset Purchase Agreement.

available for distribution to unsecured creditors consist of unallocated cash contributions from the proposed purchaser of certain of the U.S. Debtors' assets and MGI, in connection with the Motion to Dismiss Stipulation described above.  Attempting to allocate these assets among each of the U.S. Debtors would be unduly costly and burdensome, if at all possible.  Thus, the U.S. Debtors believe that they will satisfy applicable legal standards as part of Confirmation and that the Bankruptcy Court will ultimately order the substantive consolidation of the U.S. Debtors' Estates, which is necessary to effectuate the terms of the Plan and fair and reasonable under the circumstances.

### D.　　The Adequacy of This Disclosure Statement

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The U.S. Debtors submit this Disclosure Statement in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

- the Plan, including a summary, the procedures for voting on the Plan and projected recoveries thereunder (Section I hereof);

- the Debtors' organizational structure, business operations, prepetition indebtedness and assets and liabilities (Section II hereof);

- the events leading to the filing of these Chapter 11 Cases (Section III hereof);

- the major events during these Chapter 11 Cases, including significant pleadings Filed in these Chapter 11 Cases and certain relief granted by the Bankruptcy Court in connection therewith (Section IV hereof);

- the classification and treatment of Claims and Interests under the Plan, including identification of the Holders of Claims entitled to vote on the Plan (Section V.A hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims pursuant to the Plan, the procedures for resolving Disputed Claims, and other significant aspects of the Plan (Section V.B hereof);

- the releases contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Section V.H hereof);

- the statutory requirements for confirming the Plan (Section VI hereof);

- certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan (Section VII hereof); and

- certain United States federal income tax consequences of the Plan (Section VIII hereof).

### E.　　Summary of Classes and Treatment of Claims and Interests Under the Plan

The table below summarizes the classification and treatment of all classified Claims and Interests under the Plan.  The classification, treatment and projected recoveries of classified Claims are described in summary form below for illustrative purposes only.  **Recoveries available to Holders of Claims are estimates and actual recoveries may differ materially based on, among other things, the amount of Claims actually Allowed. Depending on the amount of Allowed Claims, the actual recoveries available to Holders of Allowed Claims could be materially higher or lower compared to the estimates provided below.  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.**

| CLASS | DESIGNATION | IMPAIRMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT ($000s) | PROJECTED PLAN RECOVERY |
|---|---|---|---|---|---|
| 1 | Priority Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote | $3,300 - $7,500 | 100% |
| 2 | Secured Pre-Petition First Lien Claims | Impaired | Entitled to Vote | $423,800[4] | 100% |
| 3 | Pre-Petition Second Lien Claims | Impaired | Entitled to Vote | $463,638 | 0% |
| 4 | Corpus Christi Mechanics' Lien Claims | Impaired | Entitled to Vote | $265,000 | 100% |
| 5 | Secured Comerica Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote | $50,117 | 100% |
| 6 | Secured Macquarie Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote | $56,300 | 100% |
| 7 | Other Secured Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote | Undetermined | 100% |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote | $1,200,000 – $1,850,000 | 2.4 – 5.0% |
| 9 | U.S. Debtor Intercompany Claims | Impaired | Deemed to Reject/ Not Entitled to Vote | Undetermined | 0% |
| 10 | Interests in Senior U.S. Debtors | Impaired | Deemed to Reject/Not Entitled to Vote | Undetermined | 0% |
| 11 | Interests in Subsidiary U.S. Debtors | Unimpaired | Deemed to Accept/ Not Entitled to Vote | Undetermined | 100% |

F.     **Voting on and Confirmation of the Plan**

By order of the Bankruptcy Court, the Disclosure Statement Order, among other things, (i) approved this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and (ii) established Plan voting tabulation procedures, which include certain vote tabulation rules that temporarily allow or disallow Claims for voting purposes (the "Solicitation Procedures").  A copy of the Solicitation Procedures approved by the Bankruptcy Court is attached hereto as Exhibit B.

G.     **Classes Entitled to Vote on the Plan**

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| CLASS | CLAIM | STATUS |
|---|---|---|
| 2 | Secured Pre-Petition First Lien Claims | Entitled to Vote |
| 3 | Pre-Petition Second Lien Claims | Entitled to Vote |
| 4 | Corpus Christi Mechanics' Lien Claims | Entitled to Vote |

---

[4]     Plus interest and fees outstanding as of the Effective Date.

| CLASS | CLAIM | STATUS |
|-------|-------|--------|
| 8 | General Unsecured Claims | Entitled to Vote |

If your Claim or Interest is not included in one of the Voting Classes, you are not entitled to vote, and you will not receive a Solicitation Package (as defined below) or a Ballot.  If your Claim or Interest is included in one of the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the U.S. Debtors, or the Claims and Noticing Agent on behalf of the U.S. Debtors, otherwise provide to you.

**H.      Votes Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan by a class of claims or interests is determined by calculating the amount and the number of claims or interests voting to accept, as a percentage of the allowed claims or interests, as applicable, in the class.  Each class of claims entitled to vote on the plan will have accepted the plan if:  (1) the holders of at least two-thirds in dollar amount of the claims validly voting in each class vote to accept the plan; and (2) the holders of more than one-half in number of the claims validly voting in each class vote to accept the plan.

**I.      Certain Factors to be Considered Prior to Voting**

There are a variety of factors that all Holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- the sale of the Corpus Christi Plant described in this Disclosure Statement has not yet been approved under all required regulatory laws, such as the Hart-Scott-Rodino Antitrust Improvements Act (the "HSR Act"), or any other applicable antitrust laws, and the U.S. Debtors cannot assure nor guarantee that such approvals will be obtained or that the Corpus Christi Sale will close;

- although the U.S. Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the U.S. Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the U.S. Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or consummation could result in, among other things, increased Administrative Claims or Professional Claims.

**J.      Classes Not Entitled to Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote (i) if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or (ii) if they will receive no property under the plan, in which case they are deemed to reject the proposed plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan.

| CLASS | DESIGNATION | TREATMENT | VOTING STATUS |
|-------|-------------|-----------|---------------|
| 1 | Priority Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 5 | Secured Comerica Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |

| CLASS | DESIGNATION | TREATMENT | VOTING STATUS |
|-------|-------------|-----------|---------------|
| 6 | Secured Macquarie Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 7 | Other Secured Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 9 | U.S. Debtor Intercompany Claims | Impaired | Deemed to Reject/ Not Entitled to Vote |
| 10 | Interests in Senior U.S. Debtors | Impaired | Deemed to Reject/ Not Entitled to Vote |
| 11 | Interests in Subsidiary U.S. Debtors | Unimpaired | Deemed to Accept/ Not Entitled to Vote |

### K.　Solicitation Package

The package of materials (the "Solicitation Package") to be sent to Holders of Claims entitled to vote on the Plan will contain:

- a cover letter describing (1) the contents of the Solicitation Package; (2) information about how to obtain access, free of charge, to the Plan, the Disclosure Statement and the Disclosure Statement Order, together with the exhibits thereto, on the Debtors' case administration website; and (3) information about how to obtain, free of charge, paper copies of any of the documents included in the Solicitation Package;

- a notice of the Confirmation Hearing;

- copies of the Plan and Disclosure Statement (in electronic format);

- the Disclosure Statement Order (excluding the exhibits thereto);

- for Holders of Claims in voting Classes (*i.e.*, Holders of Claims in Class(es) 2, 3, 4 and 8), an appropriate form of Ballot, instructions on how to complete the Ballot and a pre-paid, pre-addressed Ballot return envelope and such other materials as the Bankruptcy Court may direct; and

- any supplemental documents Filed with the Bankruptcy Court and any documents that the Bankruptcy Court orders to be included in the Solicitation Package, including any other letters in support of the Plan.

The U.S. Debtors will cause Prime Clerk to begin to distribute the Solicitation Packages to Holders of Claims in the Voting Classes on or before October 16, 2018.

The Solicitation Package (except for the Ballots) may also be obtained free of charge from Prime Clerk by: (1) visiting https://cases.primeclerk.com/mgusa; (2) writing to M&G USA Corporation et al. Ballot Processing, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022; or (3) calling (855) 388-4578.

The U.S. Debtors will file the Plan Supplement no later than ten days prior to the deadline to object to the Plan or such later date as may be approved by the Bankruptcy Court, except as otherwise provided under the Plan.

### L.　Voting Procedures

If you are entitled to vote to accept or reject the Plan, one or more Ballots have been enclosed in your Solicitation Package for the purpose of voting on the Plan.  Please vote and return your Ballot(s) to the Debtors' voting and balloting agent, Prime Clerk, LLC (in its capacity as such, the "Voting Agent"), M&G USA Corporation *et al*. Ballot Processing, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022, or by overnight delivery or by hand courier, unless you are a beneficial owner of a security who receives a Ballot from a broker, bank, dealer or other agent or nominee (each, a "Master Ballot Agent"), in which case you must return the Ballot to that Master Ballot Agent (or as otherwise instructed by your Master Ballot Agent).

In addition to accepting Ballots via first class mail, overnight courier and hand delivery, the Voting Agent will accept Ballots via electronic, online transmissions, solely through a customized online balloting portal at https://cases.primeclerk.com/mgusa. Parties entitled to vote may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing the online balloting portal. Instructions for electronic, online transmission of Ballots are set forth on the forms of the Ballots. The encrypted Ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this matter, and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

Ballots should not be sent directly to the Debtors, the Creditors' Committee or their agents (other than the Voting Agent).

### M. Plan Objection Deadline

The deadline to file objections to Confirmation of the Plan is November 13, 2018, at 5:00 p.m. (prevailing Eastern Time) (the "Plan Objection Deadline"). All objections to Confirmation of the Plan (the "Confirmation Objections") must be in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objection must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are actually received on or before the Plan Objection Deadline. Parties wishing to reply to any Confirmation Objection shall have until 5:00 p.m. on November 21, 2018 to file a reply.

### N. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. This Bankruptcy Court entered the Disclosure Statement Order which, among other things, scheduled a Confirmation Hearing.

The Confirmation Hearing will commence on November 27, 2018, at 11:00 a.m. (prevailing Eastern Time), before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, before, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

## II. DEBTORS' ORGANIZATIONAL STRUCTURE AND BUSINESS

### A. The U.S. Debtors' Business and Corporate Structure

Each of the U.S. Debtors is a direct or indirect subsidiary of Debtor MGI, a company organized under the laws of Luxembourg. U.S. Debtor M&G Waters is organized under the laws of Nevada and each of the remaining U.S. Debtors are organized under the laws of Delaware. A corporate organization chart depicting the ownership structure of the Debtors and certain non-Debtor affiliates is attached as Exhibit C.

The overall management of the U.S. Debtors is conducted by senior executives located in Luxembourg, Italy and Houston, Texas. However, prior to the Petition Date, the U.S. Debtors' day-to-day operations were conducted primarily through (1) M&G Polymers, which formerly owned the Apple Grove Plant and maintained offices in Houston, Texas and Sharon Center, Ohio, (2) M&G Resins, the owner of the Corpus Christi Plant and (3) Chemtex, which had offices in Wilmington, North Carolina and managed PET/PTA (each defined below) development projects throughout the world, including the Corpus Christi Plant.

As set forth in Section I.B, it is expected that the Luxembourg Debtors' chapter 11 cases will be dismissed on the Dismissal Effective Date and accordingly, those entities are not included in the Plan.

## B. Significant Prepetition Indebtedness

As of the Petition Date, the U.S. Debtors had outstanding funded debt in the aggregate principal amount of nearly $1.37 billion under seven financing arrangements, each of which are described below.

### 1. Pre-Petition First Lien Loan Agreement

In 2013, Debtor M&G Resins borrowed $250 million from the Pre-Petition First Lien Lender to partially fund the construction and development of the Corpus Christi Plant. However, as construction costs at the Corpus Christi Plant rose, the Debtors were forced to seek further funding. Subsequent borrowings and amendments to the Pre-Petition First Lien Loan Agreement increased the outstanding principal amount to approximately $436 million, exclusive of interest, fees and other expenses due and owing under that facility. M&G Resins' obligations under the Pre-Petition First Lien Loan Agreement are guaranteed by M&G Polymers and secured by a first priority lien on the Corpus Christi Plant and the Apple Grove Plant.

### 2. Pre-Petition Second Lien CRA

On May 20, 2015, M&G USA entered into the Pre-Petition Second Lien CRA with the Pre-Petition Second Lien Secured Party, pursuant to which the Pre-Petition Second Lien Secured Party purchased future production capacity of the Corpus Christi Plant at a cost of $435 million. M&G USA's obligations under the Pre-Petition Second Lien CRA are guaranteed by M&G Chemicals S.A. The Pre-Petition Second Lien Secured Party was also granted a lien on the Corpus Christi Plant and a security interest in M&G USA's 100% equity interest in M&G Resins. The Pre-Petition Second Lien Secured Party's security interest in the Corpus Christi Plant is subordinate to the Pre-Petition First Lien Lender's liens on the property and subject to a subordination agreement among the parties.

### 3. Macquarie Credit Documents

M&G Waters is the borrower under a $55.5 million secured credit facility by and among Macquarie, as administrative and collateral agent and the lenders from time to time party thereto (the "Macquarie Loan"). M&G Waters was formed to undertake construction of a water desalination plant to be operated in conjunction with the Corpus Christi Plant. The proceeds of the Macquarie Loan were used to partially finance the construction, installation and operation of such assets. M&G Waters' obligations under the Macquarie Loan are guaranteed by non-Debtor M&G Finanziaria S.p.A. ("M&G Finanziaria") and secured by a lien on substantially all of M&G Waters' assets and M&G USA's 100% equity interest in M&G Waters.

### 4. M&G Polymers' Revolving Credit Facilities

M&G Polymers is the primary obligor under a $10 million unsecured revolving loan with Banca Monte dei Paschi di Siena S.p.A., New York Branch (the "Monte dei Paschi Loan"). The Monte dei Paschi Loan is guaranteed by MGI. As of the Petition Date, the Monte dei Paschi Loan was fully drawn.

M&G Polymers is also the borrower under a $50 million revolving credit facility provided by Comerica (the "Comerica Loan") that is guaranteed by Debtors M&G Chemicals and MGI. The Comerica Loan is secured by certain accounts receivable of M&G Polymers, among other collateral.

On October 20, 2017, Comerica filed a complaint in the United States District Court for the Eastern District of Michigan seeking appointment of a receiver to take control of the collateral securing the Comerica Loan as well as certain of the Debtors' books and records (the "Comerica Complaint"). Following the filing of the Comerica Complaint, Comerica and the Debtors engaged in negotiations in an effort to reach a consensual resolution that would allow the Debtors' continued access to certain cash for limited purposes. Ultimately, however, the parties were not able to reach a resolution, and M&G Polymers commenced its Chapter 11 Case to preserve estate assets in the days leading up to the filing of the other Chapter 11 Cases.

As described in Section IV.D.2 of this Disclosure Statement, subsequent to the filing of the Chapter 11 Cases, the Debtors reached an agreement with Comerica regarding the use of Comerica's cash collateral for the purpose of maintaining M&G Polymers' operations and liquidating existing inventory.

### 5. Banco do Brasil Loan

In July 2017, the Debtors obtained an additional $35 million to be used for general corporate purposes pursuant to a senior secured term loan agreement by and among M&G Resins, as borrower; M&G Chemicals, as guarantor; and Banco do Brasil S.A., New York Branch ("Banco do Brasil"), as lender and administrative and collateral agent. M&G Resins pledged certain of its property, including certain receivables and proceeds from specified sales contracts to secure the loan. Receivables pledged to Banco do Brasil were collected in a collateral account M&G Resins maintained with Banco do Brasil. On May 31, 2018, Banco do Brasil drew down the $4,938,466.53 held in the collateral account pursuant to the *Stipulation Regarding Banco do Brasil's Collateral Account and Related Obligations* (Docket No. 1525) and maintains a general unsecured deficiency claim against each of M&G Resins and M&G Chemicals for the remainder of its claim.

### 6. ICBC Loan

To help finance the initial construction of the Corpus Christi Plant, M&G Resins borrowed $350 million under an unsecured credit facility with Industrial and Commercial Bank of China Limited. M&G Resins' obligation under this facility is guaranteed by M&G Chemicals. As of the Petition Date, the full $350 million remained outstanding.

### 7. Guarantee Obligations

Certain U.S. Debtors are also guarantors of debt obligations incurred by their non-Debtor affiliates. Specifically, M&G Polymers has guaranteed obligations owing to Polimeros Mexico under an $80 million revolving loan provided by Banco Mercantil del Norte, S.A. Additionally, M&G Polymers and M&G Resins have guaranteed floating rate notes issued by non-Debtor M&G Finance Luxembourg S.A. in the outstanding principal amount of €66.9 million.

### 8. Additional Unsecured Debt

Due to the severe liquidity constraints that the U.S. Debtors experienced prior to the filing of these Chapter 11 Cases, as of the Petition Date, the U.S. Debtors owed significant amounts to their raw materials suppliers.

### C. The U.S. Debtors' Workforce

Immediately prior to the Petition Date, the U.S. Debtors employed approximately 300 full-time employees, approximately 100 of which were members of the United Steelworkers Local 644L (the "USW"), subject to a collective bargaining agreement (the "CBA").[5] Prior to the Petition Date, the Debtors shut down production at the Apple Grove Plant and reduced the level of construction at the Corpus Christi Plant. However, certain employees continued to provide services to the Debtors during the course of these Chapter 11 Cases. As of the date of this Disclosure Statement, the U.S. Debtors' employ approximately 30 remaining employees, nearly all of whom are employed by M&G Resins. As described below, upon the closing of the Apple Grove Sale, M&G Polymers had no remaining employees and thereafter reached an agreement with the USW to terminate the CBA and resolve M&G Polymers' obligations under section 1114 of the Bankruptcy Code.

---

[5]     The employees subject to the CBA were employed only by Debtor M&G Polymers.

D.    **Other Significant Liabilities**

1.    **Environmental Liabilities**

As of the Petition Date, the Debtors faced the potential for significant environmental liabilities as a result of the ownership and operation of the Apple Grove Plant and, to a lesser extent, the Corpus Christi Plant.  Certain liabilities were substantially mitigated by the sale of the facilities.  In the respective asset purchase agreements for the Apple Grove and Corpus Christi Plants, the purchasers assumed the Debtors' owner and operator obligations to conduct any remedial actions required under environmental laws relating to contamination existing on the applicable closing dates at or migrating from the respective plants.

2.    **Employee Benefit Obligations**

a.    **Self-Insured Employee and Retiree Healthcare Obligations**

Prior to the Petition Date, M&G Polymers and M&G Resins provided health care coverage to certain of their eligible employees and their dependents through a self-insured plan administered by Aetna Life Insurance Company ("Aetna").  As discussed in greater detail in Section IV.D.2 below, in connection with the Creditors' Committee's objection to the proposed Final Cash Collateral Order, the Debtors and the Creditors' Committee secured from Comerica additional cash to be used for health care coverage for these eligible employees.  Moreover, the costs associated with this program were reduced during the course of these Chapter 11 Cases as the Debtors' workforce was reduced and employees obtained healthcare coverage through other sources; however, due to the self-insured nature of this program, it is impossible to predict with certainty the full extent of the Debtors' healthcare coverage obligations at this time.

b.    **The Pension Plans**

Certain of the Debtors also offered pension plans to their employees.  The Pension Benefit Guaranty Corporation (the "PBGC") is a wholly-owned United States government corporation that administers the defined benefit pension plan termination insurance program under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1301 1461 (2012 & Supp. IV 2016).  The PBGC asserted that each of the Debtors was either a sponsor or a controlled group member of a sponsor with respect to the M&G Polymers USA LLC Hourly Pension Plan ("Hourly Plan") and the M&G Polymers USA LLC Salaried Employees' Retirement Plan (the "Retirement Plan" and collectively with the Hourly Plan, the "Pension Plans").  As such, the PBGC filed claims against each of the twelve Debtors for each of the Pension Plans on a joint and several basis.  In June 2018, the PBGC assumed trusteeship of the Pension Plans.

III.    **EVENTS LEADING TO THE CHAPTER 11 CASES**

A.    **Overview of the Company**

Mossi & Ghisolfi S.p.A. (together with its direct and indirect subsidiaries, including the Debtors, the "M&G Group"), was the largest privately owned chemical company in Italy and is controlled through the holding company M&G Finanziaria.  The M&G Group—specifically, its chemicals division, which includes the Debtors—was one of the largest producers of polyethylene terephthalate ("PET") resin for packaging applications in the world. PET is a plastic polymer produced principally from purified terephthalic acid ("PTA") and monoethylene glycol, and is used to manufacture plastic bottles and other packaging for the beverage, food and personal care industries.

B.    **Construction of the Corpus Christi Plant**

In an effort to continue growing their businesses, in April 2013 the Debtors began construction on the Corpus Christi Plant.  When completed, it was intended that the Corpus Christi Plant would be the largest vertically integrated single line PTA/PET production facility in the world and the largest PTA plant in the Americas. The facility's PET line was planned to have a nominal production capacity of 1.1 million tons per year, and the integrated PTA line would have a nominal production capacity of 1.3 million tons per year.

Construction of the Corpus Christi Plant initially was expected to be completed in December 2015 at a cost of $1.1 billion. Construction costs, however, far exceeded what was budgeted, and the project suffered from disruptions caused by, among other things, Hurricane Harvey in August 2017. Completion of the Corpus Christi Plant was significantly delayed. As of the Petition Date, the Debtors estimated that they had spent $1.86 billion on construction of the Corpus Christi Plant and that a further $505 million would be required to complete construction and render the facility fully operational (further analysis from the Debtors demonstrates the cost to complete has since escalated to more than $520 million).

The delays and increased costs associated with the Corpus Christi Plant led to the Debtors incurring substantial additional debt in an attempt to complete the project. Specifically, as noted above, the Debtors engaged in additional borrowings under the Pre-Petition First Lien Loan Agreement and sold additional incremental future capacity to the Pre-Petition Second Lien Secured Party under the Pre-Petition Second Lien CRA with the expectation that the funds generated would be sufficient to fund working capital expenditures and competition of construction of the Corpus Christi Plant. At the same time, the Debtors attempted to stay their rising debt by scaling back on construction and further development of the Corpus Christi Plant. As a result, the plant's inoperability made it impossible for the Debtors and their affiliates to meet their obligations to future customers and to their existing debt, which relied partially on the revenue expected to be generated from the Corpus Christi Plant, thus leading to a further liquidity crisis.

### C. The Decision to File Chapter 11

The delays and cost overruns at the Corpus Christi Plant, coupled with other market forces—including (1) higher raw material costs due to supply shortages, (2) a wave of competing low-priced imports that flooded the U.S. market and (3) discounts the Debtors were forced to offer to certain customers in response to a competitor slashing prices as it exited the marketplace—placed the Debtors in a precarious liquidity position in the months leading to the Petition Date. Recognizing these liquidity constraints and the need to finish construction of the Corpus Christi Plant as quickly as possible, the Debtors, with the assistance of its investment banker, Rothschild, Inc. ("Rothschild"), pursued a variety of potential capital-raising efforts throughout the summer of 2017. As the summer ended, it became clear that the Debtors were not going to close a deal with any new capital source in the near term.

Accordingly, the Debtors engaged Jones Day as restructuring counsel on August 21, 2017 and engaged with its key stakeholders in order to seek additional liquidity. These discussions led to an agreement between the Pre-Petition First Lien Lender, the Pre-Petition Second Lien Secured Party and one of the M&G Chemicals' equity holders, Magnate S.á.r.l. ("Magnate"), to provide the Debtors with emergency financing to pay necessary expenses and prepare for a potential chapter 11 filing. On September 12, 2017, M&G Resins and the Pre-Petition First Lien Lender entered into an amendment to the Pre-Petition First Lien Loan Agreement pursuant to which the Pre-Petition First Lien Lender agreed to advance a total of $6 million in additional funds to the M&G Group (the "September Advance"), with the Pre-Petition Second Lien Secured Party and Magnate each participating in the amount of $2 million. Facing severely constrained liquidity and following unsuccessful negotiations with key suppliers over extending payment terms, however, the Debtors' affiliates were forced to shut down operations at the PET manufacturing facility in Altamira, Mexico on September 5, 2017, to mothball the construction of the Corpus Christi plant on September 15, 2017 and to shut down operations at the Apple Grove Plant on October 22, 2017. The Debtors initially filed for relief under chapter 11 of the Bankruptcy Code for M&G Polymers on October 24, 2017 and, on October 30, 2017, the remaining Debtors Filed for chapter 11 bankruptcy relief.

## IV. EVENTS DURING THE CHAPTER 11 CASES

### A. First Day Relief

Immediately after commencing these Chapter 11 Cases, the Debtors Filed a number of motions and other pleadings (the "First Day Motions") to stabilize their businesses in the initial days of these Chapter 11 Cases, ensure a smooth transition into chapter 11 with minimal disruptions and maintain the confidence of key creditor constituencies necessary to implement an effective sale and liquidation of the U.S. Debtors' assets.

The orders entered pursuant to the First Day Motions authorized the Debtors to, among other things:

- pay certain prepetition employee wages, benefits, reimbursable business expenses and related expenses (Docket No. 69);

- provide adequate assurance of payment to utility companies and establish procedures for resolving requests by utility companies for additional assurance of payment (Docket Nos. 66 and 410);

- pay certain prepetition taxes and fees (Docket Nos. 64 and 297);

- maintain their existing bank accounts and cash management system, and continue use of existing business forms and records (Docket Nos. 68, 310, 586, 869, 1214, 1392, 1498 and 1609);[6]

- pay certain prepetition claims of critical vendors and implement specific procedures with respect to such claims (Docket Nos. 71 and 292);

- honor prepetition and postpetition obligations under the Debtors' insurance policies, including related premiums, deductibles, reimbursement or retention amounts and amounts owed to brokers (Docket No. 63); and

- pay prepetition amounts owed to certain shippers and warehousemen and implement specific procedures with respect to such payments (Docket Nos. 70 and 296).

Additionally, on August 16, 2018, the Debtors filed the *Motion of the Luxembourg Debtors for Entry of an Order Authorizing Payment of Certain Prepetition Claims of Foreign Creditors* (Docket No. 1766), authorizing the Luxembourg Debtors to pay up to $300,000 in prepetition claims of certain creditors to minimize the possibility that the Luxembourg Debtors would be forced into an involuntary proceeding in Luxembourg. The motion is supported by the Creditors' Committee in accordance with the Motion to Dismiss Stipulation.

The First Day Motions were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the Creditors' Committee, the U.S. Trustee and other parties in interest. In particular, certain modifications were made to address issues raised by the Creditors' Committee concerning Intercompany Claims and related transfers and the Debtors' cash management system.

B.    **Appointment of the Creditors' Committee**

On November 13, 2017, the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases pursuant to section 1102(a)(1) of the Bankruptcy Code. The Creditors' Committee, fully formed, consists of the following seven members:

- **Industrial and Commercial Bank of China Limited**, Attn: Yanmei Wei, 680 5th Avenue, 20F, New York, NY, Phone: 646-873-9073; Fax: 646-381-6628;

---

[6]    Initially, the Court entered the *Interim Order (I) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts and Business Forms, (II) Extending the Debtors' Time to Comply with Section 345(b) of the Bankruptcy Code, (III) Approving Continuation of Ordinary Course Intercompany Transactions and (IV) Granting Related Relief* (Docket No. 68). After the Creditors' Committee and U.S. Trustee raised concerns with the proposed final relief requested, including with respect to the Debtors' compliance with section 345 of the Bankruptcy Code, interim orders extending the Debtors' time to comply with section 345 of the Bankruptcy Code were entered on December 1, 2017 (Docket No. 310), January 2, 2018 (Docket No. 586), February 1, 2018 (Docket No. 869), March 19, 2018 (Docket No. 1214), April 23, 2018 (Docket No. 1392) and May 22, 2018 (Docket No. 1498). On June 21, 2018, the Debtors entered a certification of counsel submitting a final proposed order which resolved all issues with respect to the treatment of the Debtors' cash management system and bank accounts other than with respect to the Luxembourg Debtors' bank accounts held outside the United States (Docket No. 1606). As such, the final cash management order was then entered on June 22, 2018 (Docket No. 1609). Subject to approval of the Motion to Dismiss Stipulation and effectiveness of the Bancomext Term Sheet, the Creditors' Committee has agreed to support the Luxembourg Debtors maintenance of their cash in foreign bank accounts pending dismissal of the Luxembourg Debtors' Chapter 11 Cases and subject to certain reporting requirements.

- **UniCredit S.p.A**, Attn: Pietro Rizzuto, Piazza Gae Aulenti (Tower B) 20124, Milan, Italia, Phone: + 39 02 86816163;
- **Banca Monte dei Paschi di Siena S.p.A**, Attn: Vincenzo Ciancio, 55 East 59th Street, New York, NY 10022, Phone: 212-891-3655, Fax: 212-891-3661;
- **Pepsi-Cola Advertising and Marketing, Inc.**, Attn: J.D. Fielder, 700 Anderson Hill Road, Purchase, NY 10577, Phone: 914-253-2165, Fax: 914-767-6799;
- **Amcor Group GmbH**, Attn: Victor E. Sears II, 935 Technology Drive, Ann Arbor, MI 48108, Phone: 734-302-2273, Fax: 734-302-2298;
- **United Steel Workers**, Attn: Nathan Kilbert, 60 Boulevard of the Allies, Room 807, Pittsburgh, PA 15222, Phone: 412-562-2548, Fax: 412-562-2574; and
- **Pension Benefit Guaranty Corporation**, Attn: Sven Serpinski, 1200 K. Street NW, Washington, DC 20005, Phone: 202-326-4000, Ext. 3516, Fax: 202-842-2543.

Following its appointment, pursuant to Bankruptcy Court approval, the Creditors' Committee retained, among others, the following professionals: (1) Milbank, Tweed, Hadley & McCloy LLP as counsel (Docket No. 554); (2) Cole Schotz P.C. as Delaware co-counsel and conflicts counsel (Docket No. 588); (3) Jefferies LLC as investment banker (Docket No. 624); (4) Berkeley Research Group, LLC as financial advisor (Docket No. 625); (5) Gattai, Minoli, Agostinelli, Partners as special counsel (Docket No. 677); and (6) Loyens & Loeff as special Luxembourg counsel (Docket No. 1717).

Since its appointment, the Creditors' Committee has been actively involved with the Debtors in overseeing the administration of the Chapter 11 Cases as a fiduciary for all unsecured creditors of all Debtors in these Chapter 11 Cases, and has consulted with the Debtors on various matters relevant to the Chapter 11 Cases. The Debtors have also discussed their business operations with the Creditors' Committee and its advisors and have negotiated with the Creditors' Committee regarding actions and transactions in respect of the sale and liquidation of the U.S. Debtors' assets. The Creditors' Committee has been proactively engaged in reviewing the Debtors' process for, and implementation of, the sale of the Apple Grove Assets, Corpus Christi Assets and other of the Debtors' related assets. After conducting an investigation of the Debtors, and their purportedly secured creditors, the Creditors' Committee filed the Challenge Litigation, as described in greater detail in Section E.3.b below. To resolve the Challenge Litigation, the Creditors' Committee, the Pre-Petition Second Lien Secured Party, the Purchaser and the Debtors, among others, entered into the Bid Support Term Sheet, which, among other things, requires the Purchaser to fund $50 million (subject to certain possible reductions, as set forth in the Bid Support Term Sheet) into an escrow on the Closing Date to be used to make distributions to Holders of Allowed General Unsecured Claims.

As discussed in greater detail below, the Creditors' Committee also has been actively involved in negotiating various settlements for the benefit of the U.S. Debtors' Estates, including (1) a settlement in connection with the Dismissal Motion, (2) a global settlement with Bancomext resolving its appeal of the Corpus Christi Sale Order and the Bancomext Adversary Proceeding, (3) a settlement of certain intercompany claims with certain of the Debtors' non-debtor Italian affiliates in Italy and (4) a settlement of certain intercompany claims in connection with the restructuring of certain of the Debtors' non-debtor Brazilian affiliates.[7]

The Creditors' Committee supports the Plan and encourages Holders of General Unsecured Claims to vote in favor thereof.

## C.     Debtors' Retention of Professionals

Pursuant to Bankruptcy Court approval, the Debtors retained, among others, (1) Jones Day as bankruptcy counsel (Docket No. 300), (2) Pachulski Stang Ziehl & Jones LLP as Delaware co-counsel (Docket No. 293), (3) Crain Caton & James, P.C. as special counsel (in connection with issues arising from the filing of mechanics' liens against the Corpus Christi Plant) (Docket No. 409), (4) Rothschild and Rothschild S.p.A. as financial advisors and investment bankers (Docket No. 307), (5) Alvarez & Marsal North America LLC to provide a chief restructuring officer ("<u>CRO</u>") and CRO support personnel (Docket No. 309) and (6) Greenhill & Co., LLC as co-

---

[7]     These settlements are described in further detail in Section IV.K, below.

financial advisor and co-investment banker (Docket No. 1603). The Bankruptcy Court also authorized the Debtors to retain, employ and compensate certain professionals utilized by the Debtors in the ordinary course of business (Docket No. 299).

These applications were granted with certain adjustments or modifications to accommodate the concerns of the Creditors' Committee and other parties in interest.

### D. The Debtors' Postpetition Financing

During the course of these Chapter 11 Cases, the Debtors secured access to liquidity to fund their remaining operations and sale processes through the use of cash collateral and three separate post-petition debtor-in-possession facilities.

#### 1. The CEC DIP Facility

At the outset of these Chapter 11 Cases, on November 1, 2017, the Bankruptcy Court entered an order (Docket No. 62) authorizing, on an interim basis, certain Debtors to enter into a $100 million postpetition debtor-in-possession credit facility (the "CEC DIP Facility") provided by Control Empresarial de Capitales, S.A. de C.V. ("CEC"), an affiliate of the Pre-Petition First Lien Lender. The CEC DIP Facility provided the Debtors that are obligors thereunder (collectively, the "DIP Obligors") with the funding necessary to maintain limited operations and administer these Chapter 11 Cases through a sale of their assets. The DIP Obligors' obligations under the CEC DIP Facility were secured by liens that are senior to all existing liens on their property except: (a) any liens existing as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code that were senior to any portion of the liens securing the Pre-Petition First Lien Loan Agreement (the "Senior Prior Liens") and (b) any liens securing the portion of the Pre-Petition First Lien Loan Agreement that is senior to the Senior Prior Liens.

The proposed CEC DIP Facility set forth a series of milestones related to the sale process to which the DIP Obligors were required to adhere. Those milestones included: (a) entry of an order approving bidding procedures for a sale of the Corpus Christi Plant and related assets no later than 25 days after the filing of the Sale Motion (as defined below); (b) a deadline for bids for the purchase of the Debtors' assets of no later than 75 days after entry of the Bidding Procedures Order (as defined below); and (c) the closing of any sale and distribution of sale proceeds within the later of (i) 25 days after the deadline for bids or (ii) five days following the receipt of necessary regulatory approvals.

The Creditors' Committee objected to the proposed CEC DIP Facility on several grounds, including principally that, from the Creditors' Committee's perspective, the proposed CEC DIP Facility provided an insufficient period and budget with which to conduct a robust auction for the sale of the Corpus Christi Assets and to investigate the liens and claims of the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party who were likely to credit bid for such assets.

As a result of the Creditors' Committee's objection, the Creditors' Committee negotiated with CEC, the Debtors and the Debtors' prepetition lenders (a) extensions of key sale process deadlines; (b) an increased budget and extension of the deadline to challenge the liens and claims of the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (c) an agreement that the Creditors' Committee would be deemed to have automatic standing to bring any challenge with respect to the validity or extent of the liens and claims of the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (d) deferrals of certain adequate protection payments to Inbursa; and (e) enhanced entitlements with respect to certain unencumbered assets, including the proceeds of Avoidance Actions.

On December 13, 2017, the Bankruptcy Court entered an order (Docket No. 479) approving the CEC DIP Facility on a final basis (the "CEC Final DIP Order").

The maturity of the CEC DIP Facility was initially scheduled to occur on the earlier of (a) 6 months after the Petition Date; (b) 183 days after the closing of the CEC DIP Facility; (c) the date of a sale of all or substantially all of the assets pledged as collateral for the CEC DIP Facility; or (d) upon acceleration of the obligations following

an event of default under the CEC DIP Facility. In connection with the sale of the Corpus Christi Plant described in more detail below, however, CEC agreed to extend the maturity of the CEC DIP Facility until the closing of the sale.

### 2. The Final Cash Collateral Order

The Debtors were not permitted to use proceeds of the CEC DIP Facility to fund the expenses of M&G Polymers. Therefore, the Debtors negotiated an agreement with Comerica to permit M&G Polymers to use a limited portion of Comerica's cash collateral to continue its operations for the purpose of liquidating its remaining PET supply. The Bankruptcy Court entered an interim order authorizing the use of Comerica's cash collateral (the "Comerica Cash Collateral") on November 2, 2017 (Docket No. 91). The order granted Comerica, as adequate protection for M&G Polymers' use of the cash collateral, a senior security interest in, and lien on, its existing collateral, all of M&G Polymer's interest in any and all property other than the Apple Grove Assets and a limited portion of the proceeds of the sale or other disposition of the Apple Grove Assets. The Comerica Cash Collateral was used for payment of employees' unpaid compensation and reimbursable business expenses, healthcare benefits and accrued and unpaid professional fee claims for services rendered for the period beginning on the Petition Date. The Creditors' Committee objected to the proposed Final Cash Collateral Order for many of the same reasons it objected to the proposed CEC DIP Facility, including that the proposed use of the Comerica Cash Collateral did not, from the Creditors' Committee's perspective, provide M&G Polymers with sufficient time and money to pursue a robust sale process for the Apple Grove Assets.

To address the Creditors' Committee's concerns, the Debtors, Comerica and the Pre-Petition First Lien Lender agreed to several adjustments and modifications to the proposed Final Cash Collateral Order, including an extension of the terms of use of the Comerica Cash Collateral from December 29, 2017 through January 31, 2018, so long as the Creditors' Committee did not bring a claim against Comerica or the Pre-Petition First Lien Lender (with respect to the extent and validity of its liens and in security interests on the Apple Grove Assets). After conducting an investigation of the liens on and secured claims against the Apple Grove Assets, the Creditors' Committee determined not to bring a claim against Comerica or the Pre-Petition First Lien Lender and, therefore, M&G Polymers had access to cash collateral through January 31, 2018 and was able to conduct a sale process that yielded a purchase price for the Apple Grove Assets that was two times higher than the initial bid for such assets.

### 3. The Polymers DIP Facility

Although the sale process for the Apple Grove Assets proved successful, it was clear that M&G Polymers' access to the Comerica's Cash Collateral through January 31, 2018 would be insufficient to provide the Debtors with enough liquidity to close a sale of the Apple Grove Assets. Therefore, as part of a stalking horse bid for the Apple Grove Assets from Indorama Ventures Holdings LP U.S., the Debtors obtained additional postpetition financing pursuant to a facility agreement with Indorama Netherlands B.V. (the "Polymers DIP Facility"). The Bankruptcy Court entered an interim order on January 19, 2018 (Docket No. 720) and a final order on February 1, 2018 (Docket No. 865) authorizing M&G Polymers to obtain postpetition superpriority debtor-in-possession financing from Indorama Netherlands B.V. ("Indorama") in an aggregate principal amount not to exceed $5 million for the purpose of funding M&G Polymers' postpetition operations, professional fees and expenses and other expenses through a sale of the Apple Grove Plant. The Creditors' Committee played an active role in negotiating and reviewing the terms of the Polymers DIP Facility.

If Indorama had been the successful purchaser at the auction for the Apple Grove Plant, the proceeds of the Polymers DIP Facility would have been credited towards the purchase price of the plant and related assets. However, as described below, Far Eastern Holdings, Ltd. ("Far Eastern") was the successful purchaser following an auction of the Apple Grove Plant, and a portion of the proceeds of that sale were used to repay the Polymers DIP Facility upon closing of such sale on March 1, 2018.

### 4. The CCP DIP Facility

With the CEC DIP Facility expiring on March 31, 2018, the Debtors had an urgent need for additional financing during the period from April 1, 2018 through the closing of the Corpus Christi Sale. To address this funding shortfall, the Debtors required potential bidders for the Corpus Christi Assets to incorporate into their bids liquidity to fund the Debtors through at least the closing of the Corpus Christi Sale. The bid from the Purchaser

provided such liquidity in the form of a new postpetition financing facility (the "CCP DIP"). The CCP DIP authorized the DIP Obligors to borrow up to a total amount of $57.6 million, with a stated maturity date up to 120 days after its interim approval. The DIP Obligors are permitted to use funding from the CCP DIP only for (a) their postpetition operations, (b) certain employee related maintenance and other related expenses, (c) professional fees and expenses and (d) fees to CEC in accordance with the CEC DIP Facility. The collateral pledged by the DIP Obligors under the CCP DIP mirrors, but is junior to, that of the CEC DIP.

After extensive negotiations with the Creditors' Committee, primarily in the context of negotiating the terms of the Bid Support Term Sheet (as described in greater detail in subsection E.2IV.E.3.c, below), the Debtors and the Purchaser made certain modifications to the CCP DIP aimed at addressing several of the Creditors' Committee's concerns. As such, the Creditors' Committee did not object to approval of the CCP DIP, which was subsequently approved by the Bankruptcy Court on April 12, 2018 (Docket No. 1366).

On July 30, 2018, the Debtors Filed the *Notice of Election of Extension of Postpetition Financing Facility and Related Budget* (Docket No. 1730) notifying parties in interest that they had elected to extend the CCP DIP termination date for two consecutive 30-day periods, with the first 30-day period commencing on August 3, 2018, as permitted by Section 1.1 of the CCP DIP credit agreement. As a result of the extension, the CEC DIP Facility is currently scheduled to mature on October 2, 2018.

### E. The U.S. Debtors' Sale Processes

#### 1. Bidding Procedures

The Debtors filed these Chapter 11 Cases with the goal of selling substantially all of their assets in a way that maximizes creditor recoveries. In furtherance of that goal, at the outset of these Chapter 11 Cases, on November 16, 2017, the Debtors Filed the *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into One or More Stalking Horse Purchase Agreements and to Provide Bid Procedures Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and (B) Approving the Assumption and Assignment of the Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (Docket No. 173) (the "Sale Motion"), which sought, among other things, approval of sale and auction procedures for a sale of substantially all of the Debtors' U.S. assets, including the Corpus Christi Plant.

The Committee filed an objection on December 6, 2017 to the Sale Motion (Docket No. 395), identifying several key issues with the proposed sale process, including, but not limited to, (i) the proposed sale timeline, (ii) the Pre-Petition First Lien Lender's and the Pre-Petition Second Lien Secured Party's automatic right to credit bid, (iii) the proposed distribution of sale proceeds and (iv) the lack of consultation and consent rights for the Creditors' Committee in respect of the sale process. As a result of negotiations with the Creditors' Committee to resolve its objections, the Debtors agreed to several adjustments and modifications to the proposed bidding procedures, including, among other things, various extensions of key sale process deadlines, granting the Creditors' Committee the right to contest credit bids and the extension of the deadline to challenge credit bids and enhanced consultation and consent rights for the Creditors' Committee in connection with the sale process. As described below, the extension of certain sale process deadlines contributed, in part, to competitive bidding, netting a significant topping bid for the Corpus Christi Assets.

On December 14, 2017, the Bankruptcy Court entered an order approving the modified bidding procedures (Docket No. 490) (the "Bidding Procedures Order").

#### 2. The Apple Grove Sale

##### a. The Bidding Process

The Debtors determined in their business judgement that, given the liquidity constraints at M&G Polymers, it was essential to pursue a sale of the Apple Grove Assets on a separate and expedited track. As such, the Debtors

engaged in accelerated discussions with interested parties regarding a potential sale of the Apple Grove Assets and Barrier IP Assets.[8]  On January 12, 2018, the Debtors filed a motion (Docket No. 665) (the "Stalking Horse Motion") seeking (i) approval and authorization to enter into a stalking horse asset purchase agreement with Indorama (the "Stalking Horse APA") to purchase the Apple Grove Assets for $10 million; and (ii) approval of bid protections, including a break-up fee and an expense reimbursement of up to a maximum of $350,000 for all reasonable and documented out-of-pocket costs incurred by the purchaser in connection with the transaction contemplated by the Stalking Horse APA.  As part of its Stalking Horse bid, Indorama also agreed to provide the $5 million Polymers DIP Financing described above.  Following the filing of the Stalking Horse Motion, the Debtors continued their sale and marketing efforts and ultimately engaged with 43 parties that expressed interest in purchasing some or all of the Apple Grove Assets and Barrier IP Assets.

Prior to the auction for the Apple Grove Assets and Barrier IP Assets, the Debtors received five additional bids (in addition to the Stalking Horse APA) for the purchase of some or all of the Apple Grove Assets and Barrier IP Assets, all of which were shared with and reviewed by the Creditors' Committee.  After consulting with their advisors, their board of directors and the Creditors' Committee, the Debtors qualified a bid from Far Eastern in addition to the Stalking Horse bid submitted by Indorama.

### b.      The Apple Grove Auction & Sale

On January 30, 2018, an auction for the Apple Grove Assets commenced with Far Eastern's bid as the baseline bid with a purchase price of $33.5 million, of which approximately $10 million would be allocated to the Barrier IP Assets and $23.5 million would be allocated to the remaining purchased assets, including the Sharon Center Facility and the Apple Grove Plant.  The extension of the sale timeline negotiated by the Creditor's Committee afforded Far Eastern additional time to develop its bid and proved critical to fostering a competitive bidding process.  After Indorama declined to submit a topping bid, Far Eastern was announced as the successful bidder, and the auction was closed.  Indorama was designated as the backup bidder with a purchase price of $16 million.

Shortly after the close of the auction, the Debtors sought approval of the sale to Far Eastern from the Bankruptcy Court at a hearing on February 1, 2018.  At the hearing, the sale was approved and the Bankruptcy Court entered the *Order Authorizing (I) The Sale of Certain Assets of M&G USA Corporation and M&G Polymers USA, LLC Free and Clear of Encumbrances and Liens; (II) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (III) Related Relief* (Docket No. 864).  The Debtors and Far Eastern closed the Apple Grove Sale on March 1, 2018

### 3.      The Corpus Christi Sale

### a.      Bidding Process

Immediately upon commencement of these Chapter 11 Cases, the Debtors took steps to market substantially all of their assets, with particular emphasis placed on the Corpus Christi Plant—the U.S. Debtors' single most valuable asset.  As part of this sale process, which spanned over four months, Rothschild invited prospective purchasers to bid on any and/or all of the Debtors' assets.  Under the Bidding Procedures Order, potential bidders interested in bidding on, among other things, the Corpus Christi Assets had (i) a deadline of January 30, 2018 to submit non-binding proposals and (ii) a deadline of March 6, 2018 to submit binding bids for such assets.  During the sale process, the Debtors engaged in extensive sale and marketing efforts, contacting 111 potential strategic and financial buyers.  Of these 111 potential buyers, 38 parties signed non-disclosure agreements and were provided access to a virtual dataroom and extensive diligence materials.  In late January, the Debtors received 12 non-binding proposals for some or all of the Corpus Christi Assets, all of which were shared with and reviewed by the Creditor's Committee.  Upon consultation with their advisors, the Debtors focused their

---

[8]      The "Barrier IP Assets" include the intellectual property (including all associated patents) exclusively pertaining to the production of the MGC PoliProtect barrier resin with or without the MGC Bico technology, which relates to the delivery system for PET pellets and is currently used in the Debtors' barrier resin products.  The Barrier IP Assets are owned by M&G USA.

efforts on negotiating with the parties that contemplated the purchase of substantially all of the Corpus Christi Assets. None of these proposals developed into a stalking horse bid, however.

On March 6, 2018, the Debtors received seven initial bids for all or portion of the Corpus Christi Assets. Three of these initial bids sought to purchase all such assets, and the Debtors pursued them as a priority. The Debtors determined that certain of the initial bids were deficient in many respects and potentially were noncompliant with the Bidding Procedures Order in material respects and that allowing certain bidders, including the Pre-Petition Second Lien Secured Party, to engage in discussions regarding a joint bid would make the acquisition more attractive and/or feasible for such bidders. In response, the Debtors, in consultation with the Creditors' Committee, pursued a dual track path to foster a competitive bidding environment and to ensure that the Debtors and their Estates would achieve the highest and best offer for the Corpus Christi Assets. On March 14, 2018, the Debtors and the Creditors' Committee consented to certain bidders entering into discussions to determine if they could jointly develop a bid that would be a qualified bid and participate in the upcoming auction.

### b. The Creditor Committee's Investigation and Challenge Litigation

Concurrently with the auction process for the Corpus Christi Assets, the Creditors' Committee conducted an investigation into the amount, validity, perfection, enforceability, priority and extent of the liens on and secured claims against the Corpus Christi Assets asserted by the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party, respectively. Absent a challenge to their liens or secured claims prior to the challenge deadline set forth in the CEC Final DIP Order, such parties would have been entitled to credit bid the full amount of their secured claims for the purchase of the Corpus Christi Assets. Prior to the deadline set forth in the CEC Final DIP Order, the Creditors' Committee commenced a challenge to the asserted liens and secured claims of the Pre-Petition Second Lien Secured Party, seeking to avoid, equitably subordinate and/or recharacterize the Pre-Petition Second Lien Claim (the "Challenge Litigation").[9] Moreover, the Creditors' Committee sought to deny, for cause, the Pre-Petition Second Lien Secured Party's ability to credit bid under section 363(k) of the Bankruptcy Code. As such, absent an order of the Bankruptcy Court resolving the Challenge Litigation in the Pre-Petition Second Lien Secured Party's favor, it could not credit bid without submitting a bid that was backed by cash or its equivalent in the event its liens were successfully avoided, recharacterized and/or subordinated. The Creditors' Committee and the Pre-Petition Second Lien Secured Party had fully briefed the Challenge Litigation, and a hearing to consider such litigation was initially scheduled for March 14, 2018.

On the eve of the Challenge Litigation, the Debtors, the Creditors' Committee, the Pre-Petition Second Lien Secured Party and the Purchaser reached an agreement on the framework of a resolution of the Challenge Litigation resolving the treatment of the Pre-Petition Second Lien Secured Party's claims and allowing the joint bid of the Purchaser as a qualified bid for purposes of the auction. As a result, the Creditors' Committee agreed to adjourn the Challenge Litigation to allow the Purchaser additional time to develop its joint bid, and the hearing on the Challenge Litigation was adjourned several times through late March 2018.

### c. The Bid Support Term Sheet

Following the decision to adjourn the Challenge Litigation, the Pre-Petition Second Lien Secured Party agreed to act as a consortium with certain other parties and formed the Purchaser, which submitted its joint bid on March 18, 2018. At this time, the Debtors were also negotiating exhaustively with the another bidder, Banibu, an affiliate of the Pre-Petition First Lien Lender.

After intense, good faith, arm's-length negotiations among the Debtors, the Creditors' Committee and the bidders, the Debtors qualified both the Purchaser's bid and the Banibu bid for participation in a competitive auction, which occurred on March 20, 2018. At the conclusion of the auction, the Debtors designated the bid of the Purchaser as the winning bid and the Banibu bid as the backup bid. The Purchaser's bid, including the terms of the

---

[9]     See Motion of the Official Committee of Unsecured Creditors to Recharacterize, Equitably Subordinate, and Avoid the Liens Securing the Claims of DAK Americas LLC (Docket No. 955). The CEC Final DIP Order contemplated that the Creditors' Committee could bring any challenge litigation against, among other parties, the Pre-Petition Second Lien Secured Party under the CEC Final DIP Order, by February 1, 2018.

Bid Support Term Sheet, resolved the majority of the formal and informal objections to the Corpus Christi Sale, including the objections of the Creditors' Committee and certain Holders of Corpus Christi Mechanic's Lien Claims. The Bid Support Term Sheet sets forth the terms of a global settlement of the Challenge Litigation and the Creditors' Committee's objections to the Corpus Christi Sale.

Specifically, the Bid Support Term Sheet provides that CCP will fund $50 million (subject to certain possible reductions, as set forth in the Bid Support Term Sheet) into an escrow (the "Escrowed Funds") simultaneously with the closing of the Corpus Christi Sale to be used solely to (i) make distributions to the Holders of Allowed General Unsecured Claims pursuant to a chapter 11 plan of liquidation, (ii) pay certain priority unsecured and administrative claims and (iii) fund the Litigation Trust. The Bid Support Term Sheet also provides that the Creditor's Committee will (i) support the Purchaser's bid for the Corpus Christi Assets, (ii) support the Corpus Christi Sale pursuant to a standalone sale in accordance with section 363 of the Bankruptcy Code and (iii) withdraw the Challenge Litigation.[10]  On March 29, 2018, the Bankruptcy Court entered an order authorizing the Debtors to enter into the Bid Support Term Sheet.[11]

As a result of the negotiations concerning the Bid Support Term Sheet and the parties' agreements with the Holders of Corpus Christi Mechanic's Lien Claims, all objections to the sale of the Corpus Christi Assets were consensually resolved other than the objection raised by Bancomext (as discussed below).  On March 29, 2018, the Bankruptcy Court overruled Bancomext's objection and entered an order approving the Corpus Christi Sale.[12]

### d.       The Bancomext Adversary Proceeding and Appeal

On March 7, 2018, Bancomext filed a complaint in the Chapter 11 Cases against MGI, M&G USA, M&G Resins, M&G Polymers, M&G Finance, Chemtex, M&G USA and M&G Waters (the "Debtor Defendants") seeking, among other relief, the imposition of a constructive trust in the amount of $190 million over certain of the Debtors' assets, including the Corpus Christi Assets.[13]  In support of its request for a constructive trust, Bancomext alleged that the Debtor Defendants caused M&G Mexico Holding, S.A. de C.V. ("Mexico Holding") and M&G Polimeros Mexico, S.A. de C.V. (together, the "Mexican Entities") to divert the proceeds of two separate revolving credit agreements between Bancomext and the Mexican Entities towards construction of the Corpus Christi Assets in contravention of the terms of such agreements.

On March 9, 2018, Bancomext filed an objection to the sale of the Corpus Christi Assets (the "Bancomext Sale Objection").[14]  Among other things, the Bancomext Sale Objection alleged that the Debtors could not sell the Corpus Christi Assets free and clear of Bancomext's putative constructive trust claim.  To that end, Bancomext sought adequate protection pursuant to section 363(e) of the Bankruptcy Code in the amount of $190 million pending resolution of the Bancomext Adversary Proceeding.  At the sale hearing, Bancomext withdrew its objection to the Corpus Christi Sale, seeking only adequate protection in the form of an order declaring that any constructive trust would attach to the $50 million in funds (subject to certain possible reductions, as set forth in the Bid Support Term Sheet) to be escrowed for the benefit of the Holders of Allowed General Unsecured Claims.  As explained

---

[10]      In accordance with the terms of the Bid Support Term Sheet, the prepetition rights and claims against any party and objections thereto are preserved in the event the Purchaser's bid is not the successful bid for the Corpus Christi Assets and/or the Corpus Christi Sale does not close.

[11]      *See Order Approving Stipulation Regarding Settlement and Agreement with Respect to Sale of Corpus Christi Assets and Related Matters* (Docket No. 1299).

[12]      *See Order (I) Approving the Sale of Certain Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith; and (III) Granting Related Relief* (Docket No. 1300).

[13]      *See Banco Nacional de Comercio Exterior v. Mossi & Ghisolfi International S.A.R.L, et al.,* Adv. Proc. No. 18 50302 (Bankr. D. Del. Mar. 7, 2018).

[14]      *See Objection of Bancomext to the Sale of the Debtors' Corpus Christi Assets, Desalination Assets, and Other Assets* (Docket No. 1115).

above, at the hearing on the sale of the Corpus Christi Assets, the Bankruptcy Court overruled the Bancomext Sale Objection.

On April 12, 2018, Bancomext appealed the Corpus Christi Sale Order to the United States District Court for the District of Delaware.[15] Upon consent of Bancomext and the Debtor Defendants, the Creditors' Committee intervened as a party to the Bancomext Appeal, with the District Court approving such intervention on May 1, 2018 (*see* Civ. Pro. No. 18-00546 Docket No. 13).[16] At the outset of the Bancomext Appeal, the parties agreed to engage in mediation while simultaneously proceeding with appellate briefing.

After the Bankruptcy Court overruled the Bancomext Sale Objection, Bancomext filed an amended complaint in the Bancomext Adversary Proceeding (*see* Adv. Proc. No. 18 50302 Docket No. 6) (the "Amended Complaint") seeking the imposition of a constructive trust over additional unspecified assets and alleging claims of fraud, fraudulent misrepresentation, aiding and abetting fraud, civil conspiracy, fraudulent transfer and conversion. The Debtor Defendants filed a motion to dismiss the Amended Complaint, to which the Creditors' Committee joined (in addition to filing its own motion to dismiss). In addition to other defenses, the Debtor Defendants argued in the motion to dismiss that Bancomext failed to allege facts sufficient to support its constructive trust claim because, among other things, it had failed to allege facts sufficient to support a finding that it could trace the proceeds of its loans into the assets over which it seeks to impose a constructive trust. With respect to its fraud claims, the Debtor Defendants argued that Bancomext failed to allege any facts with the requisite specificity to maintain such claims. In addition to endorsing the arguments made by the Debtor Defendants, the Creditors' Committee argued, among other things, that the Bancomext constructive trust claim was time barred, that a constructive trust cannot be imposed postpetition, and that the law of the case was such that Bancomext could not have a constructive trust over the cash pool earmarked for Holders of Allowed General Unsecured Claims.

Bancomext objected to the motions to dismiss of the Debtor Defendants and the Creditors' Committee on May 25, 2018 (*see* Adv. Proc. No. 18-50302 Docket No. 20), and the Debtor Defendants and the Creditors' Committee filed separate replies to such objection on June 12, 2018 (*see id.* Docket Nos. 25 and 27).

### e. Mediation of the Bancomext Appeal and Adversary Proceeding

Following confidential mediation of the Bancomext Appeal and the Bancomext Adversary Proceeding, the Debtors, the Committee and Bancomext agreed to settle both matters, along with Bancomext's objection to the Dismissal Motion (*see* Section I.B), pursuant to the terms of the *Mediation Term Sheet*, dated August 2, 2018 (Docket No. 1738-1) (the "Bancomext Term Sheet").

Under the Bancomext Term Sheet, Bancomext agreed to dismiss, with prejudice, the Bancomext Adversary Proceeding and the Bancomext Appeal in exchange for (i) an allowed $70 million general unsecured claim against the U.S. Debtors' substantively consolidated estates, provided that in the event that the Bankruptcy Court does not grant the U.S. Debtors' request to substantively consolidate their estates, Bancomext shall be permitted to allocate such claim in its reasonable discretion (subject to the U.S. Debtors' and the Creditors' Committee's right to object and seek a determination from the Bankruptcy Court) among the U.S. Debtors (without duplication) and (ii) the allowance of Proof of Claim No. 832 filed by M&G Polimeros against M&G Polymers in the amount of $55,515,900.90, any recovery of which shall be distributed to Bancomext (collectively, the "Bancomext Allowed Claims"). Bancomext has also agreed to support the Plan and that it will participate further in the Chapter 11 Cases only to the extent necessary to protect its interests under the Bancomext Term Sheet.

The Bancomext Term Sheet is subject to (i) definitive documentation pursuant to the Plan or otherwise and (ii) approval of the Creditors' Committee and Bancomext's credit committee. On August 28, 2018, the Bankruptcy Court entered the *Order Approving Stipulation Regarding Mediation Term Sheet and Related Matters* (Docket

---

[15]     *See Bancomext v. M&G USA Corp., et. al,* No. 18-cv-00546 (LPS) (D. Del. Apr. 12, 2018).

[16]     The Creditors' Committee also intervened in the Bancomext Adversary Proceeding with the consent of the Debtor Defendants and Bancomext. *See Order Granting Unopposed Motion of the Official Committee of Unsecured Creditors to Intervene Pursuant to Rules 24(a)(1), 24(a)(2), and/or 24(b)(1) of the Federal Rules of Civil Procedure* (Bancomext Adv. Proc. No. 18-50302 Docket No. 15).

No. 1800) (the "Bancomext Stipulation Order").  Among other things, the Bancomext Stipulation Order (i) binds the Bancomext Term Sheet on the parties thereto, (ii) allows the Bancomext Allowed Claims and (iii) disallows all other claims filed by Bancomext (unless to the extent necessary to allow the Bancomext Allowed Claims), subject to the dismissal of the Bancomext Appeal and Bancomext Adversary Proceeding.

### 4.     Plan Negotiations and Dismissal of the Luxembourg Debtors

The Bid Support Term Sheet requires that the Plan be consistent with the terms of the Bid Support Term Sheet and otherwise mutually acceptable to the Debtors and the Creditors' Committee.  In addition, the Bid Support Term Sheet requires that the Debtors and the Creditors' Committee work in good faith to agree upon an Acceptable Chapter 11 Plan (as such term is defined in the Bid Support Term Sheet).  In the weeks following the sale of the Corpus Christi Assets, the Debtors and the Creditors' Committee engaged in extensive discussions surrounding the structure of the Plan.  The parties disagreed, however, on the issue of whether the Plan should provide for substantive consolidation of all Debtors and their respective assets, or just the U.S. Debtors and their assets. The Creditors' Committee's concerns were compounded by the Debtors' contemporaneous motions (a) to further extend their exclusive filing periods to file a chapter 11 plan and solicit acceptances thereof (Docket No. 1601) and (b) to waive the requirements of Section 345(b) of the Bankruptcy Code with respect to foreign bank accounts (Docket No. 1539) held by the Luxembourg Debtors, which had accumulated approximately $20 million in cash since the commencement of the Debtors' cases.

Negotiations having reached an impasse, the Debtors filed the Dismissal Motion, arguing that dismissal of the Luxembourg Debtors was appropriate because they believed that such dismissal would streamline negotiations over prepetition claims asserted against the Luxembourg Debtors' Estates.  In addition, the Luxembourg Debtors raised concerns about protracted jurisdictional disputes.  In response, the Creditors' Committee filed an objection, arguing that, among other things:  (a) dismissal of the Luxembourg Debtors would contravene the Bankruptcy Court-approved settlement embodied in the Bid Support Term Sheet that facilitated the Corpus Christi Sale; (b) the Luxembourg Debtors failed to demonstrate that dismissal would benefit all creditors, including those of the U.S. Debtors; and (c) the Luxembourg Debtors did not satisfy their burden of proof with respect to showing cause under section 1112 of the Bankruptcy Code.  Bancomext similarly filed an objection on July 13, 2018.  The Debtors filed a reply on July 17, 2018.

The Bankruptcy Court began its hearing on the Dismissal Motion on July 18, 2018, which was then continued through July 19, 2018.  After taking initial witness testimony, the Debtors and the Creditors' Committee announced that they had reached a resolution of the Creditors' Committee's objection to the Dismissal Motion, as described in Section I.B, and filed the Motion to Dismiss Term Sheet reflecting that resolution.  Thereafter, the Debtors provided parties in interest with notice of the terms of the Motion to Dismiss Stipulation (*see* Docket No. 1777) and, on August 24, 2018, filed a motion (Docket No. 1789) seeking the Bankruptcy Court's approval of the Motion to Dismiss Stipulation.  A hearing on that motion is scheduled for September 13, 2018.

In addition to the resolution of the Creditors' Committee's objection to the Dismissal Motion, the Debtors and the Creditors' Committee ultimately entered into a global resolution of issues with Bancomext, as more fully described in Sections I.B and IV.E.3.e, which included Bancomext's withdrawal of its objection to the Dismissal Motion.  As such, all objections to the Dismissal Motion have been resolved.

### 5.     Lienholder Identification, Settlement Procedures and Reserve

Construction lien claims in Texas theoretically may arise under applicable provisions of the Texas Property Code or the Texas Constitution, and constitutional construction lien claims potentially may be valid even though not recorded in the applicable property records.  The Debtors, in consultation with the Creditors' Committee and its advisors and other parties in interest, therefore, sought relief from the Bankruptcy Court to allow the Debtors to identify the universe of Corpus Christi Mechanics' Lien Claims and to provide clarity to interested bidders. Ultimately, approximately 229 Corpus Christi Claims in the aggregate amount of more than $800 million were identified against some or all of the Corpus Christi Assets.

### a.    Lienholder Identification Order

On December 11, 2017, the Bankruptcy Court entered an order (Docket No. 457) requiring all Holders of Corpus Christi Mechanic's Lien Claims that had not previously recorded their lien in the property records for Nueces County, Texas or filed a notice in the Chapter 11 Cases pursuant to section 546 of the Bankruptcy Code to submit a statement of lien form in the Chapter 11 Cases by February 15, 2018.

### b.    Settlement Procedures Order

The Debtors believe that many of the Corpus Christi Mechanics Lien Claims are overstated or duplicative of other claims.  In an effort to reduce the amount of overstated or disputed mechanic's lien claims asserted against their Estates, the Debtors proposed efficient procedures for the settlement and approval of Corpus Christi Mechanic's Lien Claims.  On January 19, 2018, the Bankruptcy Court entered an order (Docket No. 721) approving the proposed settlement procedures.

### c.    Lienholder Reserve Motion

In March 2018, the Debtors filed a motion (Docket No. 1075) (the "Lienholder Reserve Motion") seeking the entry of an order approving the establishment of a reserve in the amount of approximately $350 million from the proceeds of the sale of the Corpus Christi Assets (the "Lienholder Claims Reserve") to satisfy the expected allowed amount of Corpus Christi Mechanics' Lien Claims to provide potential bidders with the clearest available guidance regarding the actual maximum aggregate scope of such Claim liabilities, which would promote the likelihood of a successful sale for the benefit of all stakeholders.

Objections to the Lienholder Reserve Motion were asserted by various parties, including an unofficial lienholder group, various individual lienholders and Bancomext.  All such objections ultimately were resolved or withdrawn in connection with the resolution of objections to the Corpus Christi Sale, and the Bankruptcy Court authorized the establishment of the Lienholder Claims Reserve, as modified, subject to procedures to be agreed upon among the lienholders and lienholder group, the bidders and the Creditors' Committee.

### F.    Schedules and Statements

On January 22 and 23, 2018, the Debtors Filed their *Schedules of Assets and Liabilities and Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs* (Docket Nos. 735-760) (as amended, the "Schedules").  On January 25, 2018 and August 15, 2018, the Debtors Filed amended Schedules with respect to certain Debtors (Docket Nos. 778-790 and 1764).  These documents contain information regarding, among other things, creditors holding unsecured priority and non-priority claims against the Debtors, secured claims, executory contracts and unexpired leases.  Copies of the Schedules are available for inspection on the Bankruptcy Court's website at https://ecf.deb.uscourts.gov/ and on the website maintained by Prime Clerk for these Chapter 11 Cases at https://cases.primeclerk.com/mgusa.

### G.    Bar Dates

#### 1.    The General Bar Date Order

Pursuant to the General Bar Date Order, the Bankruptcy Court established the following bar dates for filing proofs of claim in these Chapter 11 Cases:

- General Bar Date:  the general bar date for all Claims, except as noted below, of April 5, 2018 at 5:00 pm (prevailing Eastern time);
- Government Bar Date:  the deadline for all governmental units to file claims asserted against the Debtors is April 30, 2018 at 5:00 p.m. (prevailing Eastern time).
- Employee Claims Bar Date:  a bar date of May 9, 2018 at 5:00 pm (prevailing Eastern time) by which union members, retirees, employees or former employees must file any claim arising under any collective bargaining agreement between the United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy Allied Industrial and Service Workers International Union and the Debtors, including any claim related to medical or other healthcare benefits;[17]

- Amended Schedules Bar Date: a bar date for Claims amended or supplemented by the Debtors' amended Schedules (such schedules, the "Amended Schedules") will be the later of (a) the General Bar Date; and (b) 30 days after the date that the notice of the Amended Schedules is served on the claimant; and

- Rejection Bar Date: a bar date for any claims arising from or relating to the rejection of executory contracts or unexpired leases, in accordance with section 365 of the Bankruptcy Code and pursuant to an order of the Bankruptcy Court entered prior to the confirmation of the Plan (any such order, a "Rejection Order"), will be the later of (a) the General Bar Date; (b) 30 days after service of the applicable Rejection Order; and (c) any other date set by an order of the Bankruptcy Court.

The Debtors provided notice of the bar dates above as required by the General Bar Date Order.

## 2. Administrative Claims Interim Bar Date Order

On April 9, 2018, the Debtors Filed a motion requesting entry of an order establishing the Administrative Claims Interim Bar Date with respect to Administrative Claims that arose or accrued on or before May 1, 2018. The Bankruptcy Court entered an order on April 26, 2018 establishing June 11, 2018 as the Administrative Claims Interim Bar Date.

## H. Key Employment Retention Plan and Key Employment Incentive Plan

On December 18, 2017, the Debtors filed a motion (Docket No. 509) requesting the Bankruptcy Court's approval of a retention program in the amount of approximately $722,000 (the "KERP") and a key employee incentive plan in the amount of approximately $117,000 (the "KEIP").

The Debtors determined that the retention of certain key non-insider employees was necessary to maintain their Estates while conducting a controlled sale process. The KERP applied to 36 non-insider employees of M&G Resins, and was comprised of (1) 23 employees in the U.S. and (2) 13 employees in Italy. Under the KERP, participants would receive awards ranging from 4 to 12 weeks' salary in addition to an amount equal to any KERP participant's unused prepetition accrued vacation in excess of the $12,850 cap provided for by section 507(a)(4) of the Bankruptcy Code.

The KEIP applied to two employees and provided them with the following benefits: (1) 12 weeks of current salary and (2) as a supplemental benefit, an amount equal to each such employee's unused prepetition accrued vacation in excess of the $12,850 employee cap. The Creditors' Committee and the U.S. Trustee reviewed the terms of the KERP and the KEIP and determined not to file objections thereto. On January 5, 2018, the Bankruptcy Court approved the Debtors' proposed KERP and KEIP in their entirety pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code.

## I. Extension of Removal Deadline and Plan Exclusivity Period

On January 30, 2018, the Bankruptcy Court entered an order extending the period within which the Debtors were authorized to remove actions to the Bankruptcy Court through and including May 22, 2018, without prejudice to the Debtors' right to seek further extensions of the removal deadline (Docket No. 838). On May 18, 2018, the Debtors filed a motion seeking a further extension of the removal deadline through September 22, 2018 (Docket No. 1488), which the Bankruptcy Court granted on June 5, 2018 (Docket No. 1535). In addition, on March 12, 2018, the Bankruptcy Court entered an order extending (1) the exclusive period to file a chapter 11 plan through and including June 21, 2018 and (2) the period to solicit acceptances thereon through and including August 21, 2018 (Docket No. 1135). On June 20, 2018, the Debtors filed a second extension motion (Docket No. 1601), seeking to extend (1) the exclusive filing period to August 20, 2018 and (2) the exclusive solicitation period to October 19,

---

[17] The Employee Claims Bar Date was subsequently extended to June 8, 2018 in connection with M&G Polymers' agreement with the USW resolving the Debtors' section 1114 obligations.

2018. The Debtors agreed to defer consideration of the second plan exclusivity extension motion until after the resolution of the Dismissal Motion, and as a result, on August 20, 2018, with the support of the Creditors' Committee, the Debtors filed an amended second extension motion (Docket No. 1776) seeking to extend (1) the exclusive filing period to September 5, 2018 and (2) the exclusive solicitation period to November 4, 2018. Pursuant to Local Rule 9006-2, the filing of the second plan exclusivity extension motion and amended second plan exclusivity extension motion automatically granted the Debtors a bridge order extending such exclusive filing periods until the Court rules on the motion.

### J. Rejection of Non-Residential Real Property Leases, Unexpired Leases and Executory Contracts

On November 30, 2017, the Bankruptcy Court entered an order authorizing the Debtors to reject the premises located at Landfall Park North, Suite 100, 1985 Eastwood Road, Wilmington, NC 28403, and to sell certain personal property at the premises free and clear of liens (Docket No. 294). In addition, on January 30, 2018, the Bankruptcy Court entered an order authorizing the Debtors to reject the premises located at 450 Gears Road, Houston, Texas 77067, and sell certain *de minimis* assets to M&G Mexico for $39,014.75 (Docket No. 837). Finally, the Bankruptcy Court entered orders authorizing the Debtors to reject a number of executory contracts and unexpired leases, including railcar leases and the accompanying storage facilities, service and equipment contracts, transportation agreements and supply contracts (*see* Docket Nos. 641, 708, 1136, 1240 and 1718). In each such occasion, the Creditors' Committee reviewed the proposed rejections and consulted with the Debtors' advisors in advance of entry of the respective orders.

### K. Settlements

During the course of these Chapter 11 Cases, the Debtors worked with their advisors to collect outstanding receivables, reduce administrative expenses and generate other cost savings by entering into certain stipulations resulting in the settlement of claims and counterclaims without the need for potentially protracted and costly litigation. For instance, in March of 2018, M&G Polymers and Southeastern Container Corporation ("SCC") entered into a stipulation to modify the automatic stay and resolve issues concerning invoice payments owed to M&G Polymers (Docket No. 1134), whereby SCC effectuated a setoff of claims between the parties and agreed to pay the remaining $3,700,000.00 to M&G Polymers no later than five business days after an order approving such stipulation. The Debtors also obtained Bankruptcy Court approval to enter into a number of other stipulations, including (1) a stipulation between WFS Construction Services, M&G Resins and Chemtex modifying the automatic stay to permit the continuation of an arbitration proceeding between such parties (Docket No. 1328); (2) a stipulating between Eastman Kodak Company ("Eastman") and the Debtors through which Eastman agreed to pay the Debtors $2.1 million in full and final satisfaction of all outstanding amounts owed under the parties' prepetition supply agreement (Docket No. 696); and (3) a stipulation between Universal Resin Company Limited ("URC") and M&G Resins setting off amounts owed between the parties and removing URC's contract from the list of contracts subject to possible assumption in connection with the sale process (Docket No. 709). In each such occasion, the Creditors' Committee reviewed the proposed settlements and consulted with the Debtors' advisors in advance of entry of the respective settlement orders.

Additionally, on May 18, 2018, the Debtors filed a motion (Docket No. 1489) seeking Court approval to authorize certain of the Debtors, including Chemtex, M&G Chemicals and MGI, to enter into a settlement agreement with certain of their non-debtor affiliates, including M&G Finanziaria (the "Italian Settlement Agreement"). The Creditors' Committee was an active participant in negotiations over the terms of the Italian Settlement Agreement and certain modifications were made to address issues raised by it. As it concerns the U.S. Debtors, under the Italian Settlement Agreement, Chemtex agreed to sell certain intercompany claims that it has against its Italian non-debtor affiliates to MGI for an upfront cash payment of $5 million. Further, Chemtex agreed to subordinate certain claims that it has against M&G Finanziaria to the claims of other preferred and privileged creditors and unsecured creditors in connection with the restructuring of M&G Finanziaria in Italy. Given M&G Finanziaria's inability to provide Chemtex with any recovery on its claims and the requirement under Italian insolvency law that, in order to confirm a plan, a proponent must pay 20% of all unsecured claims, Chemtex agreed to subordinate such claims to increase the likelihood that Chemtex would obtain a recovery from certain of M&G Finanziaria's affiliates, in connection with the sale of those affiliates to a third party purchaser, a condition of which

is approval of M&G Finanziaria's plan in Italy.  The Bankruptcy Court approved the Italian Settlement Agreement on June 20, 2018 (Docket No. 1593).

Further, on April 20, 2018, the Debtors filed a motion (Docket No. 1387) (the "Brazilian Settlement Motion"), for entry of an order, approving (1) a settlement agreement (the "Brazilian Settlement Agreement") by and between MGI, M&G Polimeros Brasil, S.A. ("M&G Brasil"), M&G Chemicals, M&G Polimeros (together with MGI and M&G Chemicals, the "Other Obligors") and Aloke Empreendimentos Participações Ltda., and (2) a related side letter agreement.  The Brazilian Settlement Agreement, which was executed in connection with a restructuring of M&G Brasil, resulted in (1) the offset of approximately $52 million in intercompany claims of MGI against M&G Brasil of questionable collectability against approximately $5 million in intercompany claims of M&G Brasil against MGI and (2) the release of $120 million in obligations of MGI under a certain loan agreement between Inbursa, M&G Brasil and the Other Obligors (under which MGI was a principal obligor).  Further, under a side letter agreement executed in connection with the Brazilian Settlement Agreement, M&G Brasil and certain of its affiliates agreed to withdraw, with prejudice, in excess of $1 billion in claims asserted against the Luxembourg Debtors.

The Creditors' Committee filed a preliminary objection to approval of the Brazilian Settlement Agreement.[18]  The Debtors resolved the Creditors' Committee's objection to the Brazilian Settlement Motion by, among other things, amending the scope of the releases provided thereunder.  An order approving the settlement was entered by the Bankruptcy Court on May 22, 2018 (Docket No. 1493).

**L.      M&G Brasil Adversary Proceeding**

On January 16, 2018, M&G Brasil commenced an adversary proceeding against M&G Polymers and Comerica seeking the imposition of a constructive trust over certain inventory and receivables of M&G Polymers that constitute Comerica's collateral (the "M&G Brasil Adversary Proceeding").[19]  M&G Brasil alleges that it delivered approximately $25 million worth of PET to M&G Polymers in the three months prior to the Petition Date and that M&G Polymers never took ownership of such property, but rather, sold it on behalf of M&G Brasil as a matter of administrative convenience because M&G Brasil lacked the necessary infrastructure to facilitate such sales.  M&G Polymers and Comerica dispute these assertions and, on March 15, 2018, Comerica filed a motion to dismiss M&G Brasil's amended complaint, in which M&G Polymers joined.[20]  On August 29, 2018, the Bankruptcy Court entered an order denying Comerica's motion to dismiss (Docket No. 1801).

**M.      Employee Benefits Issues**

**1.      The Aetna Motion**

As noted above, prior to the Petition Date, M&G Polymers and M&G Resins provided health care coverage to certain of their eligible employees and their dependents through a self-insured plan administered by Aetna.[21]  Due

---

[18]      *See Preliminary Objection of Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order Approving (I) Settlement Agreement by and between Mossi & Ghisolfi International S.à r.l., M&G Polimeros Brasil, S.A., M&G Chemicals, S.A., M&G Polimeros Mexico, S.A. de C.V. and Aloke Empreendimentos E Participacoes Ltda. And (II) Related Letter Agreement* (Docket No. 1474).

[19]      *See M&G Polimeros Brasil S.A. v. M&G Polymers USA, LLC*, No. 18-50007 (BLS) (Bankr. D. Del. Jan. 16, 2018)

[20]      *Id.* at Adv. Pro. Docket Nos. 17-19.

[21]      Effective as of January 1, 2018, M&G Resins' employees transferred to a fully insured medical plan administered by United Healthcare, and thus were no longer eligible under the Aetna agreements for claims incurred on or after January 1, 2018.  Aetna will continue to administer and pay claims incurred prior to January 1, 2018 by eligible M&G Resins' employees (and related enrolled members), subject to the terms and conditions of the Aetna agreements and receipt of timely reimbursement from M&G Resins, through six months after the Debtors have terminated their agreements with Aetna.

to certain restrictions imposed by the Debtors' budgets approved in connection with their postpetition financing, Aetna was unable to process claims on a postpetition basis as it had for the Debtors prior to the Petition Date. Therefore, although employees retained coverage, Aetna suspended claims processing after the Petition Date. To resume claims processing and ensure continued coverage for their employees, M&G Polymers agreed to provide certain prefunding and other protections to Aetna, and on February 6, 2018, the Debtors filed a motion seeking to assume their agreements and implement their settlement with Aetna regarding the payment of claims (Docket No. 911). On February 20, 2018, the Bankruptcy Court authorized M&G Polymers' assumption of the agreements and authorized the Debtors to make payments to Aetna in connection therewith (Docket No. 1000).

## 2. 1114 Settlement

On June 5, 2018, the Debtors filed a motion pursuant to Bankruptcy Rule 9019 seeking court approval to enter into a stipulation between M&G Polymers and the United Steel Workers (Docket No. 1536) (the "1114 Stipulation"). The 1114 Stipulation consensually resolved a dispute with the United Steel Workers concerning the timing of the termination of "retiree benefits" (as that term is defined in section 1114 of the Bankruptcy Code) formerly provided to 364 former employees and/or their eligible spouses and dependents (the "Retirees"). It further resulted in the dismissal of prepetition litigation brought by certain of the Retirees against M&G Polymers concerning alleged violations of labor laws in connection with the provision of retiree benefits to the Retirees.[22] Consistent with the agreement reached with the United Steel Workers, M&G Polymers will have no further obligations to the Retirees arising under section 1114 of the Bankruptcy Code. In exchange for the termination of Retiree Benefits, the 1114 Stipulation provides that the United Steel Workers, on behalf of the Retirees, shall have an approximately $44 million allowed general unsecured claim against the Estate of M&G Polymers. An order approving the stipulation by and between M&G Polymers and United Steel Workers was entered on June 21, 2018 (Docket No. 1602).

## V. SUMMARY OF THE PLAN

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A.

The Plan controls the actual treatment of Claims against and Interests in the U.S. Debtors under the Plan, and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the U.S. Debtors and the U.S. Debtors' Estates, all parties receiving property under the Plan and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

### A. Classification and Treatment of Claims and Interests

All Claims and Interests, except for those Claims set forth in sub-section 1 below, are classified for voting and distribution pursuant to the Plan as set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in sub-section 1 below, are not classified herein. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes.

A Holder of a Claim that may be asserted against more than one of the U.S. Debtors shall be entitled to a single Distribution as if such Holder had a single Claim against the U.S. Debtors.

---

[22]     See Tackett v. M&G Polymers USA, LLC, No. 2:07-cv-126 (S.D. Ohio).

1. **Unclassified Claims**

   a. **Administrative Claims**

      i. **Administrative Claims in General**

Except as specified in this Section V.A.1.a, and subject to the bar date provisions herein and set forth in any applicable Bar Date Order, unless otherwise agreed by the Holder of an Administrative Claim and the applicable Debtor, the Litigation Trustee or the Purchaser, as applicable, or unless a Final Order provides otherwise, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on either (1) the Effective Date (or as soon thereafter as practicable) or (2) if the Administrative Claim is not allowed as of the Effective Date, within 60 days after the date on which such Administrative Claim becomes an Allowed Administrative Claim. Holders of Administrative Claims against more than one of the U.S. Debtors for the same Liability shall be entitled to Distributions as if such Holder had a single Administrative Claim against the U.S. Debtors. Allowed Purchaser Administrative Claims shall be paid by the Purchaser, provided, however, that any Purchaser Administrative Claims to the extent previously included in the CCP Budget and funded by the Purchaser pursuant to an Advance (as defined in the CCP DIP) shall be paid by the Estates and not the Purchaser. All other Allowed Administrative Claims shall be paid by the Estates; provided that, to the extent the funds in the Estates are not sufficient to pay all Allowed Administrative Claims in full, such Claims shall be paid from the Unsecured Claims Pool.

      ii. **Statutory Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the applicable U.S. Debtors in Cash equal to the amount of such Administrative Claims. Fees payable pursuant to 28 U.S.C. § 1930 for each Estate after the Effective Date will be paid from the Litigation Trust by the Litigation Trustee until the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

      iii. **Professional Compensation**

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Notice Parties, the Litigation Trustee and such other Entities as are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or another order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; provided, however, that any Professional whose compensation or reimbursement of expenses is authorized pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval. Objections to any Fee Claim must be Filed and served on the Notice Parties, the Litigation Trustee and the requesting party not later than 90 days after the Effective Date or such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claim. Allowed Fee Claims that were reserved for in the Professional Fee Reserve or the Completion Fee Reserve shall be satisfied from such reserve, to the extent applicable. Allowed Fee Claims in excess of any applicable reserves shall be satisfied: (A) by the Purchaser, with respect to Debtor Professionals and (B) from the Litigation Trust, with respect to Creditors' Committee Professionals.

      iv. **Post-Effective Date Professional Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Effective Date, subject only to the terms of the Litigation Trust Agreement, the Litigation Trustee may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court. Any such funding for Litigation Trustee professionals and/or expenses shall be paid from the Litigation Trust Assets.

### v.       Bar Date for Administrative Claims

Unless previously Filed or as otherwise governed by any Bar Date Order or another order of the Bankruptcy Court, requests for payment of Administrative Claims (other than Fee Claims) arising after May 1, 2018 must be Filed and served on the Notice Parties, pursuant to the procedures specified in the Confirmation Order no later than the Administrative Claims Final Bar Date.  Holders of Administrative Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code that have asserted such Claims as part of a Proof of Claim Filed in accordance with the General Bar Date Order and/or the Administrative Claims Interim Bar Date Order shall not be required to File additional requests for payment of Administrative Claims with the Bankruptcy Court to maintain their assertion of such Administrative Claims, and the General Bar Date shall continue to apply to such Claims.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the U.S. Debtors, the Litigation Trust or their respective property, and such Administrative Claims shall be discharged as of the Effective Date.  Objections to requests for payment of postpetition Administrative Claims (other than Fee Claims) must be Filed and served on the Notice Parties and the requesting party no later than the Administrative Claims Objection Deadline.  Nothing in this Section V.A.1.a.v shall waive, extend or lengthen any applicable Bar Date for the Holder of any such Claim, even if such Claim is an Administrative Claim.

### vi.       Bar Date for Ordinary Course Administrative Liabilities

Holders of Administrative Claims arising from Liabilities incurred by a U.S. Debtor in the ordinary course of its business on or after the Petition Date but prior to the Effective Date must, if not paid  by 20 days after the Effective Date, File with the Bankruptcy Court an Administrative Claim by no later than the Administrative Claims Final Bar Date, unless previously Filed or as otherwise governed by any applicable Bar Date Order, or in another order of the Bankruptcy Court, or Holders of such Administrative Claims shall be forever barred from asserting such Claims against the Estates.

### b.       Payment of Priority Tax Claims

### i.       Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the U.S. Debtors, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the U.S. Debtors, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement, satisfaction and release of such Claim, (A) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (B) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Litigation Trustee as they become due; provided, further, that, in the event an Allowed Priority Tax Claim that is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

### ii.       Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding anything to the contrary in Section V.A.1, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the U.S. Debtors or their respective property.

### c. DIP Claims

#### i. CEC DIP Claims

To the extent not previously satisfied in full, on the Closing Date, in full and final settlement, satisfaction and release of, and in exchange for, all CEC DIP Claims, in accordance with section 1129(a)(9) of the Bankruptcy Code, the Holder of the CEC DIP Claims shall receive Cash from the DIP Payment in an amount required to satisfy in full all Allowed CEC DIP Claims.; provided, that consistent with paragraph 17 of the CEC Final DIP Order, any additional fees and expenses incurred following the Closing Date by CEC and the DIP Agent (as defined in the CEC Final DIP Order) constitute Administrative Claims of the Estates and therefore must be satisfied in full in cash on the Effective Date.

In exchange for the foregoing treatment of Allowed CEC DIP Claims, on the Closing Date, any and all outstanding notes issued in connection with the CEC DIP Claims shall be canceled and shall be deemed terminated and of no further force and effect.

#### ii. CCP DIP Claims

On the Closing Date, the CCP DIP Claims (A) shall be deemed indefeasibly satisfied in full, and (B) any and all outstanding notes issued in connection with the CEC DIP Claims shall be canceled and shall be deemed terminated and of no further force and effect.

### 2. Classification of Claims and Interests

#### a. General

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for voting and distribution pursuant to the Plan, as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class. Except as otherwise specifically provided for herein, the Confirmation Order or any other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the Disclosure Statement Order indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan. The U.S. Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

Claims against and Interests in the U.S. Debtors are classified in 11 Classes as follows:

| Class | Designation |
|-------|-------------|
| 1 | Priority Claims |
| 2 | Secured Pre-Petition First Lien Claims |
| 3 | Pre-Petition Second Lien Claims |
| 4 | Corpus Christi Mechanics' Lien Claims |
| 5 | Secured Comerica Claims |
| 6 | Secured Macquarie Claims |
| 7 | Other Secured Claims |
| 8 | General Unsecured Claims |
| 9 | U.S. Debtor Intercompany Claims |
| 10 | Interests in Senior U.S. Debtors |

| Class | Designation |
|-------|-------------|
| 11 | Interests in Subsidiary U.S. Debtors |

**b.** **Identification of Classes of Claims Against and Interests in the U.S. Debtors**

The following table designates the Classes of Claims against and Interests in the U.S. Debtors and specifies which Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or (iii) deemed to accept or reject the Plan.

| CLASS | DESIGNATION | TREATMENT | VOTING STATUS |
|-------|-------------|-----------|---------------|
| 1 | Priority Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 2 | Secured Pre-Petition First Lien Claims | Impaired | Entitled to Vote |
| 3 | Pre-Petition Second Lien Claims | Impaired | Entitled to Vote |
| 4 | Corpus Christi Mechanics' Lien Claims | Impaired | Entitled to Vote |
| 5 | Secured Comerica Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 6 | Secured Macquarie Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 7 | Other Secured Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | U.S. Debtor Intercompany Claims | Impaired | Deemed to Reject/ Not Entitled to Vote |
| 10 | Interests in Senior U.S. Debtors | Impaired | Deemed to Reject/Not Entitled to Vote |
| 11 | Interests in Subsidiary U.S. Debtors | Unimpaired | Deemed to Accept/Not Entitled to Vote |

3. **Treatment of Claims**

a. **Priority Claims (Class 1)**

i. *Classification*. Class 1 consists of all Priority Claims.

ii. *Treatment*. On the later of (A) the Effective Date, or as soon as practical thereafter, and (B) the date on which such Priority Claim becomes an Allowed Priority Claim, unless otherwise agreed to by the U.S. Debtors, the Litigation Trustee or the Purchaser (as applicable) and the Holder of an Allowed Priority Claim (in which event such other agreement will govern), each Holder of an Allowed Priority Claim shall receive on account of and in full and complete settlement and release of such Claim, Cash in the amount of such Allowed Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code. All Allowed Priority Claims that are not due and payable on or before the Effective Date shall be paid by the Litigation Trustee (A) first, from the Estates' assets and (B) solely with respect to the Unsecured Claims Pool Priority Claims, to the extent the Estates' assets are insufficient to pay such Claims in full, from the Unsecured Claims Pool, in each case, when such Claims become due and payable in the ordinary course of business, or on an expedited basis pursuant to section 505(b) of the Bankruptcy Code upon request of the U.S. Debtors or the Litigation Trustee, in accordance with the terms thereof, or (ii) by the Purchaser to the extent such Claims are Purchaser Priority Claims, provided, however, that any Purchaser Priority Claims to the extent previously included in the CCP Budget and funded by the Purchaser pursuant to an Advance (as defined in the CCP DIP) shall be paid by the Estates and not the Purchaser.

iii. *Voting*. Claims in Class 1 are Unimpaired. Each Holder of an Allowed Claim in Class 1 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

b. **Secured Pre-Petition First Lien Claims (Class 2)**

i. *Classification*. Class 2 consists of all Secured Pre-Petition First Lien Claims.

ii. *Treatment*. The Secured Pre-Petition First Lien Claims shall be Allowed in the amount of the Pre-Petition First Lien Obligations. Unless otherwise agreed by the Holder of a Secured Pre-Petition First Lien Claim and the U.S. Debtors, on the Closing Date each Holder of an Allowed Secured Pre-Petition First Lien Claim, subject to the terms of the Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall receive such Holder's Pro Rata share of the First Lien Payment.

iii. *Voting*. Claims in Class 2 are Impaired. Each Holder of an Allowed Claim in Class 2 is thus entitled to vote on the Plan.

c. **Pre-Petition Second Lien Claims (Class 3)**

i. *Classification*. Class 3 consists of all Pre-Petition Second Lien Claims.

ii. *Treatment*. Unless otherwise agreed by the Holder of a Pre-Petition Second Lien Claim and the U.S. Debtors, on the Closing Date, the Pre-Petition Second Lien Obligations shall be deemed indefeasibly satisfied in full.

iii. *Voting*. Claims in Class 3 are Impaired. Each Holder of an Allowed Claim in Class 3 is thus entitled to vote on the Plan.

d. **Corpus Christi Mechanics' Lien Claims (Class 4)**

i. *Classification*. Class 4 consists of all Corpus Christi Mechanics' Lien Claims.

> ii.     *Treatment.*  Unless otherwise agreed by any Holder of a Corpus Christi Mechanics' Lien Claim and the U.S. Debtors or the Purchaser (as applicable), each Holder of an Allowed Corpus Christi Mechanics' Lien Claim, subject to the terms of the Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall be paid in Cash, solely from the funds available in the Corpus Christi Mechanics' Lien Reserve, and in accordance with the Corpus Christi Mechanics' Lien Reserve Procedures.

> iii.     *Voting.*  Claims in Class 4 are Impaired.  Each Holder of an Allowed Claim in Class 4 is thus entitled to vote on the Plan.

**e.     Secured Comerica Claims (Class 5)**

> i.     *Classification.*  Class 5 consists of all Secured Comerica Claims.

> ii.     *Treatment.*  Unless otherwise agreed by the Holder of a Secured Comerica Claim and the U.S. Debtors or the Litigation Trustee (as applicable), on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Comerica Claim, subject to the terms of the Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall be entitled to (a) such Holder's Pro Rata share of the proceeds of the Comerica Collateral Accounts until such Claims are satisfied in full and, to the extent that such Claims remain unsatisfied, (b) such Holder's Pro Rata share of the proceeds of the Comerica Adequate Protection Liens, up to the amount of Diminution in Value suffered by such Holder, as determined by the Bankruptcy Court, until such Claims are satisfied in full.

> iii.     *Voting.*  Claims in Class 5 are Unimpaired.  Each Holder of an Allowed Claim in Class 5 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

**f.     Macquarie Claims (Class 6)**

> i.     *Classification.*  Class 6 consists of all Macquarie Claims.

> ii.     *Treatment.*  The Macquarie Claims shall be deemed to be fully Secured and shall be Allowed in the aggregate amount of $57,300,000, plus, to the extent not previously paid, monthly 9% interest thereon commencing August 1, 2018.  Unless otherwise agreed by any Holder of a Macquarie Claim and the U.S. Debtors, on the Closing Date, each Holder of a Macquarie Claim, subject to the terms of the Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall receive such Holder's Pro Rata share of such Allowed amount in Cash from the Macquarie Payment.

> iii.     *Voting.*  Claims in Class 6 are Unimpaired.  Each Holder of an Allowed Claim in Class 6 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

**g.     Other Secured Claims (Class 7)**

> i.     *Classification.*  Class 7 consists of all Other Secured Claims.

> ii.     *Treatment.*  Unless otherwise agreed by any Holder of an Other Secured Claim and the U.S. Debtors or the Litigation Trustee (as applicable), on the later of (i) the Effective Date or as soon as reasonably practicable thereafter and (ii) the date on which such Other Secured Claim becomes an Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the U.S. Debtors or the Litigation Trustee (as applicable):  (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest thereon required to be paid under section 506(b) of the Bankruptcy Code; or (iii) such other recovery as is necessary to render such Claim Unimpaired.

        **iii.**    *Voting.* Claims in Class 7 are Unimpaired. Each Holder of an Allowed Claim in Class 7 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

        **h.**    **General Unsecured Claims (Class 8)**

        **i.**    *Classification.* Class 8 consists of all General Unsecured Claims.

        **ii.**    *Treatment.* Unless otherwise agreed by any Holder of a General Unsecured Claim and the U.S. Debtors or the Litigation Trustee (as applicable), on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim, subject to the terms of the Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall receive its Pro Rata share of the beneficial interests in the Litigation Trust Assets.

        **iii.**    *Voting.* Claims in Class 8 are Impaired. Each Holder of an Allowed Claim in Class 8 is thus entitled to vote on the Plan.

        **i.**    **U.S. Debtor Intercompany Claims (Class 9)**

        **i.**    *Classification.* Class 9 consists of all U.S. Debtor Intercompany Claims.

        **ii.**    *Treatment.* On the Effective Date, all U.S. Debtor Intercompany Claims shall be released, canceled or waived (including, potentially, by way of contribution to capital). No Distribution shall be made on account of the U.S. Debtor Intercompany Claims.

        **iii.**    *Voting.* Class 9 is Impaired. Each Holder of an Allowed Claim in Class 9 is conclusively presumed to have rejected the Plan and is, therefore, not entitled to vote on the Plan.

        **j.**    **Interests in Senior U.S. Debtors (Class 10)**

        **i.**    *Classification.* Class 10 consists of all Interests in the Senior U.S. Debtors.

        **ii.**    *Treatment.* On the Effective Date, all Interests in the Senior U.S. Debtors held by any Entity will be cancelled.

        **iii.**    *Voting.* Class 10 is Impaired. Each Holder of an Interest in Class 10 is conclusively presumed to have rejected the Plan and is, therefore, not entitled to vote on the Plan.

        **k.**    **Interests in Subsidiary U.S. Debtors (Class 11)**

        **i.**    *Classification.* Class 11 consists of all Interests in the Subsidiary U.S. Debtors.

        **ii.**    *Treatment.* On the Effective Date, all Interests in each of the Subsidiary U.S. Debtors will be reinstated, subject to the Dissolution Transactions.

        **iii.**    *Voting.* Class 11 is Unimpaired. Each Holder of an Interest in Class 11 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

        **4.**    **Reservation of Rights Regarding Claims**

Except as otherwise provided in the Plan, nothing shall affect the U.S. Debtors' or the Litigation Trustee's rights and defenses, whether legal or equitable, with respect to any Claim, including, without limitation, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

5. **Postpetition Interest on Claims**

Except as required by applicable bankruptcy law, postpetition interest shall not accrue or be payable on account of any General Unsecured Claim.

6. **Insurance**

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an insurance policy, such Claim shall first be paid from proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

B. **Means of Implementation**

1. **Corporate Existence**

On the Effective Date, the Senior U.S. Debtors will issue the New Equity Interests to the Litigation Trust. Consistent with Section III.B, of the Plan, each of the U.S. Debtors will be subject to one or more Dissolution Transactions after the Effective Date at the discretion of the Plan Administrator and in accordance with the Litigation Trust Agreement. Each U.S. Debtor shall continue to exist after the transfer of the property of their Estates to the Litigation Trust until dissolved by the Plan Administrator, pursuant to a Dissolution Transaction.

2. **Dissolution Transactions**

a. **Dissolution Transactions Generally**

At any time on or after the Effective Date, the Plan Administrator will enter into such Dissolution Transactions (including any transactions set forth on Exhibit F to the Plan) and will take such actions as may be necessary or appropriate on the U.S. Debtors' behalf to merge, dissolve or otherwise terminate the corporate existence of each of the U.S. Debtors in accordance with the Litigation Trust Agreement. The actions to effect the Dissolution Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation or dissolution containing terms that, among other things, are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and that satisfy the requirements of applicable law; (iii) the filing of appropriate certificates or articles of merger, consolidation, continuance or dissolution or similar instruments with the applicable governmental authorities; and (iv) the taking of all other actions that these entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions.

b. **Recourse Solely to Litigation Trust Assets**

All Claims against the U.S. Debtors are deemed satisfied, waived and released as to the U.S. Debtors in exchange for the treatment of such Claims under the Plan, and Holders of Allowed Claims against any Debtor will have recourse solely to the assets of the Litigation Trust for the payment of their Allowed Claims in accordance with the terms of the Plan and the Litigation Trust Agreement.

The Plan Administrator will be responsible for dissolving the U.S. Debtors and must pay certain liabilities of the U.S. Debtors, including taxes, from the Litigation Trust Assets. Various transactions occurring in connection with the implementation of the Plan will be taxable events for the U.S. Debtors. The U.S. Debtors expect that the transactions will result in a net tax loss for the U.S. Debtors for U.S. federal income tax purposes and, as a result, no U.S. federal income taxes will be payable with respect to the U.S. Debtors in connection with the implementation of the Plan. However, the precise tax consequences of the Plan to the U.S. Debtors will be determined after the Effective Date and if, contrary to these expectations, the Plan transactions give rise to net taxable income for the U.S. Debtors, or if the U.S. Debtors are liable for certain non-income taxes, the Plan Administrator will satisfy those taxes from the Litigation Trust Assets, thereby reducing amounts available for distribution to certain Holders of

Allowed Claims.

### 3. Substantive Consolidation

Early into the Chapter 11 Cases, upon the motion of the Debtors, the Bankruptcy Court ordered that the Chapter 11 Cases be administered on a joint rather than individual basis. Joint administration of the bankruptcy cases of affiliated debtors commonly occurs, as it greatly simplifies that administration, for the bankruptcy court, the debtors, and the debtors' claimants. Joint administration of the bankruptcy cases of affiliated debtors does not, in and of itself, displace or otherwise impact the substantive rights of any party in interest; nor does it necessarily presage the substantive consolidation of those affiliated debtors for any purpose.

Unlike joint administration, substantive consolidation does affect substantive rights, and is permissible only under certain prescribed circumstances. "Substantive consolidation, a construct of federal common law, emanates from equity. It 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.' Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery." *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), as amended (internal citation omitted).

The Third Circuit has confirmed that substantive consolidation exists as a remedy available to a bankruptcy court for use in appropriate circumstances over the objections of creditors. There is no specific set of "factors" the court considers in determining whether substantive consolidation is appropriate. Rather, the Third Circuit has established two alternate circumstances in which substantive consolidation is appropriate: (a) prepetition the applicable debtors disregarded separateness so significantly their creditors treated the applicable debtors as one legal entity or (b) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

As part of Confirmation, the U.S. Debtors are proposing that, on the Effective Date, their Estates be deemed consolidated for all purposes related to the Plan, including for (a) purposes of implementing the Plan, (b) purposes of voting, (c) assessing whether the Confirmation standards have been met, (d) calculating and making distributions under the Plan and (e) filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee. The U.S. Debtors are also proposing that they be substantively consolidated such that: (a) all assets and liabilities of the U.S. Debtors will be deemed merged, (b) all guarantees by one U.S. Debtor of the obligations of any other U.S. Debtor will be deemed eliminated so that any Claim against any U.S. Debtor and any guarantee thereof executed by any other U.S. Debtor and any joint or several liability of any of the U.S. Debtors will be deemed to be one obligation of the U.S. Debtors, (c) each and every Claim Filed or to be Filed in the Chapter 11 Cases of the U.S. Debtors will be deemed Filed against the U.S. Debtors and will be deemed one Claim against and a single obligation of the U.S. Debtors, and the U.S. Debtors may File and the Bankruptcy Court will sustain objections to Claims for the same liability that are Filed against multiple U.S. Debtors and (d) Intercompany Claims between U.S. Debtors will be eliminated and extinguished. Such substantive consolidation will not affect (a) the legal and corporate structures of the U.S. Debtors, subject to the right of the U.S. Debtors to complete the Dissolution Transactions, (b) the vesting of assets in the Litigation Trust, (c) the right to distributions from any insurance policies or proceeds of such policies or (d) the rights of the U.S. Debtors or the Litigation Trustee to contest alleged setoff or recoupment efforts by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and otherwise applicable law.

In connection with Confirmation, the U.S. Debtors will present evidence to support their request for the substantive consolidation of their Estates, for the purposes set forth in the Plan. Among other things, the U.S. Debtors have operated as a consolidated enterprise for a number of years. Prepetition, the U.S. Debtors believe that creditors relied on the breakdown of the U.S. Debtors' corporate separateness. Further, postpetition, the U.S. Debtors assets are so scrambled that separating them (or attempting to do so), is prohibitive and would be to the detriment of all creditors. Indeed, attempting to disentangle individual records and operations for each of the U.S. Debtors would be unduly costly and burdensome, if at all possible. Thus, the U.S. Debtors believe that they will be able to satisfy applicable legal standards as part of Confirmation and that the Bankruptcy Court will ultimately order the substantive consolidation of the U.S. Debtors' Estates, which is necessary to effectuate the terms of the Plan and fair and reasonable under the circumstances.

For the above reasons, the Debtors and the Creditors' Committee believe that substantive consolidation is justified in the Chapter 11 Cases.

Unless the Bankruptcy Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order consolidating the Estates in the manner and for the purposes set forth in the Plan. If no objection to such consolidation is timely filed and served, then the holders of Claims will be deemed to have consented to such consolidation in the manner and for the limited purposes of the Plan only, and the Bankruptcy Court may approve such consolidation of the Estates in the Confirmation Order. If an objection to the consolidation described above is timely filed and served, a hearing with respect to such consolidation and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may coincide with the Confirmation Hearing.

## 4. Litigation Trust

### a. Litigation Trust Generally

On or prior to the Effective Date, the Litigation Trust shall be established in accordance with the Litigation Trust Agreement for the purpose of liquidating the Litigation Trust Assets, resolving all Disputed Claims, making all distributions to Holders of Allowed Claims in accordance with the terms of the Plan and otherwise implementing the Plan. Subject to and to the extent set forth in the Plan, the Confirmation Order, the Litigation Trust Agreement or any other order of the Bankruptcy Court entered in connection therewith, the Litigation Trust shall be empowered to: (i) perform all actions and execute all agreements, instruments and other documents necessary to implement the Plan; (ii) establish, maintain and administer the Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan; (iii) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle and protect, as applicable, the Litigation Trust Assets (directly or through its professionals or a Third Party Disbursing Agent), in accordance with the Plan; (iv) review, reconcile, settle or object to all Claims that are Disputed Claims as of the Effective Date pursuant to the procedures for allowing Claims prescribed in the Plan; (v) calculate and make Distributions of the proceeds of the Litigation Trust Assets to the Holders of Allowed Claims; (vi) pursue the Litigation Trust Causes of Action transferred to the Litigation Trust in accordance with the Litigation Trust Agreement and the Bid Support Term Sheet; (vii) retain, compensate and employ professionals to represent the Litigation Trust; (viii) file appropriate Tax returns and other reports on behalf of the Litigation Trust and the U.S. Debtors and pay Taxes or other obligations owed by the Litigation Trust and the U.S. Debtors; (ix) exercise such other powers as may be vested in the Litigation Trust under the Litigation Trust Agreement and the Plan, or as are deemed by the Litigation Trustee to be necessary and proper to implement the provisions of the Plan and the Litigation Trust Agreement; (x) take such actions as are necessary or appropriate to close or dismiss all of the Chapter 11 Cases; and (xi) dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

Notwithstanding anything to the contrary in this Section V.B.4.a, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

### b. Funding of and Transfer of Assets Into the Litigation Trust

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the U.S. Debtors shall transfer the Litigation Trust Assets to the Litigation Trust, and all such assets shall vest in the Litigation Trust on such date, to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement. Except, as set forth in Section V.B.10 below, the Litigation Trust Assets shall be transferred to the Litigation Trust free and clear of all Liens.

The Litigation Trustee shall have the authority to create additional sub-accounts in the Trust Accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust.

The act of transferring the Litigation Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Litigation Trust as if the asset or right was still held by the applicable Debtor.

### c. Litigation Trust Oversight Committee

The Litigation Trust Oversight Committee shall be established to review and monitor the actions of the Litigation Trustee in administering the Litigation Trust. The Litigation Trust Oversight Committee shall have standing to be heard on all matters brought before the Bankruptcy Court after the Effective Date with respect to the U.S. Debtors or the Litigation Trust. The initial members of the Litigation Trust Oversight Committee are identified on Exhibit B to the Plan. The Litigation Trust Oversight Committee shall not be entitled to reimbursement from the U.S. Debtors or the Litigation Trust for any fees or expenses incurred in conducting its duties hereunder.

### d. Litigation Trustee

The initial Litigation Trustee is identified on Exhibit B of the Plan.

The Litigation Trustee shall be the successor to and representative of the Estate of each of the U.S. Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code. The powers, rights and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in Section V.B.4.a above, subject to the oversight of the Litigation Oversight Committee. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

### e. Litigation Trust Agreement

Prior to the Effective Date, the U.S. Debtors and the Litigation Trustee shall execute and deliver the Litigation Trust Agreement.

### f. Reports to be filed by the Litigation Trustee

Following the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Litigation Trust Agreement), no later than 31 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters relating to the implementation of the Plan.

### g. Fees and Expenses of the Litigation Trust

The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the U.S. Debtors or the Creditors' Committee) to assist in carrying out its duties under the Litigation Trust Agreement and may compensate and reimburse the expenses of these professionals from the appropriate Trust Account, based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Litigation Trust Agreement.

### h. Indemnification

The Litigation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Litigation Trustee, the members of the Litigation Trust Oversight Committee and/or other parties. Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.

### i. Tax Treatment; No Successor in Interest

The Litigation Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) and in part as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section 1.468B-9. For U.S. federal income tax purposes, the transfer of assets by the U.S. Debtors to the Litigation Trust will be treated (i) in part as the transfer of assets by the U.S. Debtors to the Holders of Allowed General Unsecured Claims, subject to any liabilities of the U.S. Debtors or the Litigation Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such Holders to the Litigation Trust in exchange for the beneficial interests in the Litigation Trust, and (ii) in part as the transfer of assets by the U.S. Debtors to one more Disputed Claims Reserves.

### j. Litigation Trust as a Liquidating Trust

The Litigation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries and not unduly prolong its duration. The Litigation Trust shall not be deemed a successor-in-interest of the U.S. Debtors for any purpose other than as specifically set forth in the Plan or in the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose.

The Litigation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Litigation Trust Beneficiaries treated as grantors and owners of the Litigation Trust. For all U.S. federal income tax purposes, all parties (including the U.S. Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat the transfer of the Litigation Trust Assets by the U.S. Debtors to the Litigation Trust, as set forth in the Litigation Trust Agreement, as a transfer of such assets by the U.S. Debtors to the Holders of Allowed Claims entitled to distributions from the Litigation Trust Assets, followed by a transfer by such Holders to the Litigation Trust. Thus, the Litigation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

As soon as practicable after the Effective Date, the Litigation Trustee shall make a good faith determination of the fair market value of the Litigation Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties (including the U.S. Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) for all U.S. federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Litigation Trust Assets.

The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Litigation Trustee may expend the Cash of the Litigation Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Litigation Trust during liquidation, (b) to pay the respective reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

### k. Disputed Claims Reserves

Litigation Trust Assets reserved for Holders of Disputed Claims shall be treated as one or more Disputed Claims Reserves. The Litigation Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment). The Litigation Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all Tax reporting and withholding required

by the Disputed Claims Reserves. No Holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such Holder receives or is allocated an interest in such asset. The Litigation Trustee will file all Tax returns on a basis consistent with the treatment of the Litigation Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation section 1.671-1(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds, and will pay all Taxes owed from Litigation Trust Assets.

### l.  Settlement of Claims

Except as otherwise provided in the Plan or the Litigation Trust Agreement, on and after the Effective Date, the Litigation Trustee may compromise or settle any Claims (other than Corpus Christi Claims, which may be compromised or settled by the Purchaser) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Litigation Trust expenses, professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of applications for payment of Fee Claims) without application to the Bankruptcy Court.

### m.  Sales of Assets by Litigation Trust

The Litigation Trustee may conduct any sales or liquidations of non-Cash Litigation Trust Assets on any terms it deems reasonable, without further order of the Bankruptcy Court. Upon the sale, liquidation, transfer or other disposition of the Litigation Trust Assets by the Litigation Trustee, the Litigation Trustee shall deposit the proceeds of all such sales, liquidations, transfers or dispositions into one or more of the Trust Accounts.

### 5.  Corporate Governance, Directors and Officers

### a.  Certificates of Incorporation and Bylaws

Consistent with Sections V.B.1 and V.B.2 above, in the discretion of the Plan Administrator, each of the U.S. Debtors will cease to exist at a point in time after the Effective Date, and all existing certificates of incorporation and by-laws will be canceled at that time. Accordingly, except to the extent necessary to effect the issuance of the New Equity Interests to the Litigation Trust on the Effective Date in accordance with Section III.A of the Plan, no new certificates of incorporation and by-laws will be necessary.

### b.  Directors and Officers

Effective as of the Effective Date, all directors, officers and voting trustees of the U.S. Debtors shall be discharged, and all such appointments rescinded for all purposes, without any necessity of taking any further action in connection therewith.

### c.  Corporate Action

The Dissolution Transactions and the following corporate actions and transactions will occur and be effective as of the date specified in the documents effectuating the applicable Dissolution Transactions (or other transactions), or the Effective Date if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the U.S. Debtors, the Plan Administrator, the Litigation Trustee or any other Person: (i) the establishment of the Litigation Trust; (ii) the appointment of the Litigation Trustee to act on behalf of the Litigation Trust; (iii) the transfer of the Litigation Trust Assets (including the issuance of the New Equity Interests) into the Litigation Trust, as set forth in the Plan; (iv) the distribution of Cash pursuant to the Plan; (v) the adoption, execution, delivery and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; (vi) the adoption, execution and implementation of the Litigation Trust Agreement; and (vii) the other matters provided for under the Plan involving the corporate structure of any U.S. Debtor or corporate action to be taken by or required of any U.S. Debtor, the Plan Administrator or the Litigation Trustee.

### 6. No Revesting of Assets

To the extent not otherwise Distributed in accordance with the Plan, the property of the U.S. Debtors' Estates shall not revest in the U.S. Debtors on or after the Effective Date but shall instead vest in the Litigation Trust to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement.

### 7. Creation and Maintenance of Trust Accounts

#### a. Creation of Trust Accounts

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Litigation Trust or, if applicable and appropriate, the Third Party Disbursing Agent. Cash deposited in the Trust Accounts will be invested, held and used solely as provided in the Litigation Trust Agreement. The Litigation Trustee is authorized to establish additional Trust Accounts after the Effective Date, consistent with the terms of the Litigation Trust Agreement.

#### b. Additional Funding of Trust Accounts

After the funding of the Trust Accounts on the Effective Date, each Trust Account will be funded by the Cash proceeds obtained through litigation or the disposition of the Litigation Trust Assets.

#### c. Closure of Trust Accounts

Upon obtaining an order of the Bankruptcy Court authorizing final Distribution and/or closure of the Chapter 11 Cases, any funds remaining in the Trust Accounts shall be distributed in accordance with the Plan and the Litigation Trust Agreement, and the Trust Accounts may be closed.

### 8. Preservation of Causes of Action; Compromise and Settlement of Disputes

#### a. Preservation of All Causes of Action Not Expressly Settled or Released

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Litigation Trustee will retain and may enforce any Litigation Trust Causes of Action (including Privilege Rights) that any Estate may hold against any Entity to the extent not released under Section V.H.3 hereof or otherwise, including the Avoidance Actions. The Litigation Trustee may pursue the Litigation Trust Causes of Action, as appropriate, in accordance with the best interests of the Litigation Trust Beneficiaries. A nonexclusive schedule of currently pending actions and claims brought by one or more U.S. Debtors that constitute Litigation Trust Causes of Action is attached as Exhibit D to the Plan. In accordance with and subject to any applicable law, the U.S. Debtors' inclusion or failure to include any Litigation Trust Cause of Action on Exhibit D to the Plan shall not be deemed an admission, denial or waiver of any claims, demands, rights or causes of action that any U.S. Debtor or Estate may hold against any entity. The U.S. Debtors intend to preserve Litigation Trust Causes of Action except to the extent any such claim is specifically released herein or otherwise during the Chapter 11 Cases.

#### b. Litigation Trust's Interest in Certain Corpus Christi Causes of Action

The Corpus Christi Causes of Action shall be transferred to the Purchaser as of the Closing Date in accordance with the Bid Support Term Sheet. If the Purchaser has not commenced litigation with respect to any Corpus Christi Cause of Action or otherwise settled such Corpus Christi Cause of Action in the Purchaser's sole discretion within 270 days after the Closing Date, all of the Purchaser's rights and interests in such Corpus Christi Cause of Action with respect to such party shall thereafter be automatically and irrevocably transferred to the Litigation Trust.

The Purchaser shall (in consultation with the Litigation Trustee) prosecute any Corpus Christi Causes of Action against Sinopec and fund such prosecution; provided, however, that any net recovery (in excess of

professional fees incurred in connection with such prosecution) on Corpus Christi Causes of Action against Sinopec in excess of any final, unwaived, Allowed Corpus Christi Mechanics' Lien Claims held by Sinopec shall be allocated 50% to the Litigation Trust and 50% to the Purchaser.

**c.**      **Comprehensive Settlement of Claims and Controversies**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates an integrated compromise and settlement designed to achieve a beneficial and efficient resolution of these Chapter 11 Cases for all parties in interest. Accordingly, in consideration of the Distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section V.H.3 of this Disclosure Statement, shall constitute a good-faith compromise and settlement of all Claims, disputes, and controversies relating to the rights that a Holder of a Claim may have against any U.S. Debtor or with respect to any Distribution to be made pursuant to the Plan on account of any such Claim.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, disputes, or controversies provided for herein, and the Bankruptcy Court's determination that such compromises and settlements are in the best interests of the U.S. Debtors, their Estates, creditors and all other parties in interest, and are fair, equitable and within the range of reasonableness. If the Effective Date does not occur, the settlements set forth herein shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

**9.**      **Cancellation and Surrender of Instruments, Securities and Other Documentation**

Except as provided in (1) any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, including the Litigation Trust Agreement, (2) any of the asset sales effectuated during the pendency of the Chapter 11 Cases or (3) Section II.C.11 of the Plan with respect to the reinstatement of the Interests in the Subsidiary U.S. Debtors, on the Effective Date and concurrently with the applicable Distributions made pursuant to Section V.A hereof, all notes, instruments, certificates and other documents evidencing Claims or Interests shall be deemed canceled and surrendered and of no further force and effect against the U.S. Debtors or the Litigation Trust, without any further action on the part of any U.S. Debtor or the Litigation Trust.

**10.**      **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all liens on the property of any U.S. Debtors' Estate shall be fully released and discharged, and all of the right, title and interest of any Holder of such liens, including any rights to any collateral securing such liens (including any net proceeds of any disposition of such collateral), shall attach to and be enforceable solely against the asset(s) to which the Holder's lien previously attached, as now owned by the Litigation Trust. All liens against the Litigation Trust Assets shall be released and discharged upon the Holders thereof receiving its Distribution in accordance with the terms of the Plan.

**11.**      **Effectuating Documents; Further Transactions**

On and after the Effective Date, the U.S. Debtors, the Plan Administrator, the Litigation Trust and the Litigation Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Plan and the Dissolution Transactions, in each case, in the name of and on behalf of the U.S. Debtors or the Litigation Trust, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

**12.**      **Substitution in Pending Legal Actions**

On the Effective Date, the Litigation Trustee shall be deemed to be substituted as a party to any litigation in which any U.S. Debtor is a party, including (but not limited to): (a) pending contested matters or adversary

proceedings in the Bankruptcy Court; (b) any appeals of orders of the Bankruptcy Court; and (c) any state court or federal or state administrative proceedings pending as of the Petition Date. The Litigation Trustee and its professionals are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

### C. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each of the U.S. Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for any Executory Contract or Unexpired Lease (a) identified on Exhibit E to the Plan (which shall be Filed as part of a Plan Supplement) as an Executory Contract or Unexpired Lease designated for assumption and assignment to the Litigation Trust, (b) that is the subject of a separate motion or notice to assume or reject Filed by a U.S. Debtor and pending as of the Confirmation Hearing, or (c) that previously expired or terminated pursuant to its own terms.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order , pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the assumptions and assignments and the rejections of such Executory Contracts and Unexpired Leases as set forth in the preceding paragraph. Unless otherwise indicated herein, assumptions and assignments and rejections of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall re-vest in and be fully enforceable by the Litigation Trust in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to section 365 of the Bankruptcy Code; provided that if an assignment is pending as of the Effective Date, the Litigation Trustee shall be authorized to take any and all actions necessary to implement such assignment.

To the maximum extent permitted by law, to the extent any provision (including, without limitation, any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the assumption and assignment contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, except for asserting and pursuing a Cure Claim. Notwithstanding anything to the contrary in the Plan, the U.S. Debtors reserve the right, with the consent of the Creditors' Committee, to alter, amend, modify or supplement Exhibit E to the Plan in their discretion prior to the Effective Date on no less than three days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

#### 2. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Claim shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Allowed amount of such Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to any particular Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (a) the Allowed amount of any Cure Claim, (b) the ability of the Litigation Trust or another assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption, no payments on account of the Cure Claim shall be made until such dispute is resolved by a Final Order. At least ten days before the Confirmation Hearing, the U.S. Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or the related amount of the Cure Claim must be Filed, served and actually received by the U.S. Debtors on the later of: (a) three days before the date of the Confirmation Hearing; and (b) seven days after receiving notice of the amendment, modification or supplement to Exhibit E of the Plan. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and assignment or Cure Claim will be deemed to have assented to such assumption and assignment or Cure Claim.

Payment of the Allowed Cure Claim upon the assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under such Executory Contract or Unexpired Lease occurring at any time prior to the effective date of the assumption and assignment. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned and with respect to which the Allowed Cure Claim has been paid shall be deemed disallowed and expunged without further notice, action, order or approval of the Bankruptcy Court.

### 3. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of any Executory Contracts and Unexpired Leases pursuant to the Plan must be filed with the Claims and Noticing Agent within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Proofs of Claim arising from the rejection of any Executory Contracts and Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any U.S. Debtor or the Litigation Trust without the need for any objection by the U.S. Debtors or the Litigation Trust or further notice to or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of any Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Section II of the Plan.

The Litigation Trust reserves the right to object to, settle, compromise or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

**Holders of Claims arising from the rejection of Executory Contracts and Unexpired Leases with respect to which no Proof of Claim is timely Filed will be forever barred from asserting a Claim against the U.S. Debtors, the Estates, the Litigation Trust or the property of any of the foregoing, unless otherwise expressly allowed by the Bankruptcy Court.**

### 4. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into or assumed by a U.S. Debtor, after the Petition Date that are not assigned to the Purchaser or the Litigation Trust shall be considered repudiated by the applicable U.S. Debtor as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must file a Claim within 30 days of the Effective Date in accordance with the Plan or have their rights forever waived and released.

### 5. Insurance Policies

All rights of the U.S. Debtors under any insurance policies under which they are the insured parties and all related insurance agreements shall automatically become vested in the Litigation Trust as of the Effective Date without necessity for further approvals or orders. To the extent that any such insurance policies or related insurance agreements are deemed executory contracts, then, unless such policies have been rejected pursuant to an order of the Bankruptcy Court (including the Confirmation Order), notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume and assign to the Litigation Trust, permit to "ride through," or ratify such insurance policies or insurance agreements. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute both approval of such assumption and assignment pursuant to section 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interests of the Estates. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed upon by the parties prior to the Effective Date, no payments shall be required to cure any defaults existing as of the Confirmation Date with respect to any insurance policy or insurance agreement assumed and assigned to the Litigation Trust pursuant to this Section V.C.5. Each applicable insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to these Chapter 11 Cases, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan for any insured Claims or Causes of Action. Nothing in the Plan shall

impair the rights of the Litigation Trust with respect to (or affect the coverage under) any insurance policy that provides liability coverage for officers, directors, and other fiduciaries of the Debtors and their affiliates.

### 6. Reservation of Rights

Neither the identification of any contract or lease as assumed, assumed and assigned or rejected in connection with the Sales nor anything contained in the Plan or Plan Supplement, nor the U.S. Debtors' delivery of a notice of proposed assumption and proposed Cure Claim to an applicable counterparty shall constitute an admission by the U.S. Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any U.S. Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired on the Effective Date, the Litigation Trustee shall have 30 days following entry of a Final Order resolving such dispute to determine whether to alter the treatment of such contract or lease hereunder.

### 7. Pre-Existing Obligations to the U.S. Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of the obligations owed by the counterparty to the applicable U.S. Debtor(s) under such Executory Contracts or Unexpired Leases. Notwithstanding any applicable non-bankruptcy law to the contrary, the U.S. Debtors and the Litigation Trustee expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations from the counterparties to rejected Executory Contracts or Unexpired Leases.

## D. PROVISIONS GOVERNING DISTRIBUTIONS

### 1. Distributions for Allowed Claims as of the Effective Date

Except as otherwise provided in this Section V.D, Distributions to be made on the Effective Date to Holders of Allowed Claims as provided by Section V.A or this Section V.D shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the U.S. Debtors or the Litigation Trustee.

### 2. Method of Distributions to Holders of Claims

All Distributions to be made under the Plan (including with respect to DIP Claims, Secured Pre-Petition First Lien Claims, Corpus Christi Mechanics' Lien Claims and Macquarie Claims) shall be made by the Disbursing Agent, or such Third Party Disbursing Agents as the Litigation Trustee may employ in its sole discretion. Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan, if approved by the Litigation Trustee.

### 3. Disbursing Agent; No Liability

#### a. Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (i) make all Distributions contemplated hereby; (ii) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

#### b. Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and

any reasonable compensation to the Disbursing Agent for services rendered shall be paid in Cash by the Litigation Trustee from the Litigation Trust Assets pursuant to the terms of the Litigation Trust Agreement.

### c. No Liability

Except on account of gross negligence or willful misconduct, the Disbursing Agent shall have no (i) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability to any party who does not hold a Claim against the U.S. Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

### 4. Disputed Claims Reserves and Fee Reserves

### a. Establishment of Disputed Claims Reserves

On the Effective Date or as soon thereafter as is reasonably practicable, the Litigation Trustee shall establish Disputed Claims Reserves for Disputed Administrative, Priority, Priority Tax and General Unsecured Claims, which reserves shall be administered by the Litigation Trustee. The Litigation Trustee shall reserve, in Cash or other property, the full asserted amount (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing in accordance with Section V.E hereof) with respect to each such Disputed Claim.

### b. Maintenance of Disputed Claims Reserves

To the extent that the property placed in a Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The property in the Disputed Reserves shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class. Each Disputed Claims Reserve shall be closed by the Litigation Trust when all Distributions required to be made under the Plan to the Holders of Claims in the applicable Class will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in that Disputed Claims Reserve shall be distributed in accordance with the Plan or the Litigation Trust Agreement, as applicable.

### c. Professionals Reserve

Upon the Closing Date, the Purchaser shall establish the Professionals Reserve and the Completion Fee Reserve, which shall be used for the sole purpose of paying the accrued and unpaid Allowed Fee Claims (and, in the case of fees and expenses of Inbursa Professionals, following satisfaction of the notice procedures under the CEC Final DIP Order) specified in the definitions of such reserves. The Purchaser shall hold the residual interest in the Professionals Reserve and the Completion Fee Reserve, and, upon the satisfaction of all claims associated therewith, any funds remaining in the applicable reserve shall revert to the Purchaser.

### 5. Investment of Trust Accounts

To assist in making Distributions under the Plan, Trust Accounts may be held in the name of the Litigation Trust or in the name of one or more Third Party Disbursing Agents, in each case, for the benefit of Holders of Allowed Claims in the applicable Class. The Litigation Trustee shall invest, or shall direct the Third Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to the limitations established by the Litigation Trust Agreement; provided, however, that should the Litigation Trustee determine, in its sole discretion, that the administrative costs associated with such investment exceeds the return on such investment, it may determine not to, and may direct the Third Party Disbursing Agent not to, invest such Cash. Any interest or other proceeds, if any, from such investment of Cash, net of any Taxes payable with respect thereto, shall be deposited into the applicable Trust Accounts and shall be available for Distribution to Holders of applicable Allowed Claims.

6. **Delivery of Distributions and Undeliverable Distributions to Holders of Claims**

   a. **Address for Delivery of Distributions**

Except as otherwise provided in the Plan, Distributions under the Plan shall be made to the Holders of record of Allowed Claims as of the Distribution Record Date by the applicable Disbursing Agent at the latest known address, as identified in: (i) the most recently Filed Proof of Claim; (ii) at the addresses set forth in any written notices of address change delivered to the U.S. Debtors after the date of the most recently Filed Proof of Claim or where no Proof of Claim was Filed; (iii) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the U.S. Debtors have not received a written notice of a change of address; (iv) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf; or (v) if clauses (i) through (iv) are not applicable, at the last address directed by such Holder after such Claim becomes an Allowed Claim. As set forth in Section V.D.3 hereof, the Disbursing Agent shall not incur any liability whatsoever on account of any Distributions made under the Plan.

   b. **Undeliverable Distributions**

The Disbursing Agent shall make one attempt to make Distributions in accordance with the procedures set forth herein. The Disbursing Agent in its sole discretion may, but shall have no obligation to, attempt to locate the Holders entitled to receive such undeliverable Distributions. Any Distributions returned to the Disbursing Agent as undeliverable shall remain in the possession of the Litigation Trust until such time as a Distribution becomes deliverable, and the Litigation Trustee shall invest such Distribution in a manner consistent with the Litigation Trust Agreement. No further Distributions shall be made to the applicable Holder unless such Holder notifies the Disbursing Agent of its then current address.

Any Holder of an Allowed Claim entitled to a Distribution under the Plan that does not notify the Disbursing Agent of such Holder's then current address, within 90 days of the Final Distribution Date shall have its Claim on account of which an undeliverable Distribution was being made discharged and shall be forever barred from asserting any such Claim against the U.S. Debtors, the Estates, the Litigation Trust or each of their respective property, and such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Litigation Trust for distribution to Holders of other Allowed Claims in the applicable Class in accordance with the Plan notwithstanding any federal or state escheat laws to the contrary.

7. **Distribution Record Date**

As of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Disbursing Agent shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those Holders who are Holders of Claims as of 5:00 p.m. on the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

8. **Minimum Distributions**

No Distribution of less than twenty-five dollars ($25.00) shall be made by the Disbursing Agent. Each such Distribution shall revest in the Litigation Trust for distribution to Holders of other Allowed Claims in the applicable Class in accordance with the Plan.

## 9.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the U.S. Debtors or the Litigation Trustee, as applicable, shall comply with all Tax withholding and reporting requirements imposed on them by any governmental unit (as defined in the Bankruptcy Code), and all Distributions shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding Taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate.  The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

The Disbursing Agent shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution.  The applicable Disbursing Agent shall provide advance written notice of such requirement to each Holder of a Claim affected thereby.  The notice shall provide each Holder of a Claim with a specified time period after the date of mailing of such notice to provide an executed Form W-9, Form W-8 or other tax form or documentation to the Disbursing Agent.  If a Holder of an Allowed Claim does not provide the Disbursing Agent with an executed Form W-9, Form W-8 or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case any such Distribution shall revert to the U.S. Debtors or the Litigation Trust, as applicable, for Distribution on account of other Allowed Claims and the Claim of the Holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.

## 10.    Manner of Payment Under the Plan

Unless a Holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## 11.    Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the Entity to whom such check was originally issued.  Any claim in respect of such a voided check shall be made within 30 days after the date upon which such check was deemed void.  If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed distribution shall be re-allocated as set forth in Section V.D.6.b of this Disclosure Statement, notwithstanding any federal or state escheat laws to the contrary.

## 12.    Setoffs

Except with respect to Claims released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim (and the Distributions to be made on account of such Claim), counterclaims, rights and causes of action of any nature that such U.S. Debtor may hold against the Holder of such Claim; provided, however, that the failure to effectuate such a setoff shall not constitute a waiver or release by the applicable U.S. Debtor, the Disbursing Agent or the Litigation Trust of any Causes of Action that the U.S. Debtors or the Litigation Trust may possess against the Holder of a Claim.

### 13. Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

### 14. Distributions to Holders of Disputed Claims

Notwithstanding any other provision of the Plan:  (a) no Distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever; and (b) except as otherwise agreed to by the relevant parties, no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, any Distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  On the Distribution Date that is at least 30 days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the Holder of such Claim shall receive any Distribution to which such Holder would have been entitled under the Plan as of the Effective Date (including any Distribution such Holder would have been entitled to on the Distribution Date on which such Holder is receiving its initial Distribution) if such claim had been Allowed as of the Effective Date, without any interest to be paid on account of such Claim.

### 15. Claims Paid or Payable by Third Parties

#### a. Claims Paid by Third Parties

To the extent that the Holder of an Allowed Claim receives a Third Party Payment, the Litigation Trustee shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the Third Party Payment, and such Claim shall be disallowed to the extent of the Third Party Payment without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

#### b. Claims Payable by Insurance

No Distributions shall be made on account of any Allowed Claim that is payable pursuant to one of the U.S. Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that any of the U.S. Debtors' insurers agrees to satisfy in full or in part an Allowed, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the U.S. Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### E. DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

#### 1. Allowance of Claims

After the Effective Date, the Litigation Trustee (or, with respect to the Corpus Christi Claims, the Purchaser) shall have any and all rights and defenses that the U.S. Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or released under the Plan.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

## 2. Prosecution of Objections to Claims

### a. Authority to Prosecute and Settle Claims

Except as otherwise specifically provided in the Plan, the U.S. Debtors, prior to the Effective Date, and the Litigation Trustee (or, with respect to the Corpus Christi Claims, the Purchaser), after the Effective Date, shall have the sole authority:  (i) to File, withdraw or litigate to judgment, objections to Claims; (ii) to settle or compromise any Disputed Claim (other than a Fee Claim) without any further notice to or action, order or approval by the Bankruptcy Court; and (iii) to direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order or approval by the Bankruptcy Court.

### b. Pending Objections

To the extent that the U.S. Debtors have Filed objections to Claims that remain pending as of the Effective Date, the Litigation Trustee shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

### c. Application of Bankruptcy Rules

To facilitate the efficient resolution of Disputed Claims, the Litigation Trustee shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to file omnibus objections to Claims.

### d. Authority to Amend Schedules

The U.S. Debtors and the Litigation Trustee, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make distributions based on such amended Schedules (if no Proof of Claim is timely filed in response thereto) without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the U.S. Debtors or the Litigation Trustee, in accordance with the Bar Date Orders, will provide the Holder of such Claim with notice of such amendment and such parties will have 30 days to File an objection to such amendment in the Bankruptcy Court.

### e. Request for Extension of Claims Objection Bar Date

Upon motion to the Bankruptcy Court, the Litigation Trustee may request one or more extensions to the Claims Objection Bar Date generally or with respect to a specific list of Claims.  Any extension granted by the Bankruptcy Court shall not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

## 3. Estimation of Claims

The U.S. Debtors, prior to the Effective Date, and the Litigation Trustee after the Effective Date, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the relevant U.S. Debtor, or the Litigation Trustee (as the case may be) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

### 4. Claims Subject to Pending Actions

Except as otherwise provided herein, any Claims held by Entities against which a Debtor, the Litigation Trustee or another party in interest Files a complaint seeking to recover property under sections 542, 543, 550 or 553 of the Bankruptcy Code to avoid a transfer under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed a Disputed Claim pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due as a result, if any, have been turned over by that Entity to the Litigation Trust.

### 5. Offer of Judgment

The U.S. Debtors (with the consent of the Creditors' Committee), before the Effective Date, and the Litigation Trustee, after the Effective Date, are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Disputed Claim must pay the costs incurred by the U.S. Debtors after the making of such offer, the U.S. Debtors are entitled to set off such amounts against the amount of any Distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

## F. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1. Conditions to Confirmation

The Bankruptcy Court shall not be requested to enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section V.F.3:

    **a.** The Bankruptcy Court shall have entered the Disclosure Statement Order; and

    **b.** The Plan and the Confirmation Order shall be in form and substance acceptable to the U.S. Debtors, the Creditors' Committee, the Pre-Petition First Lien Lender CEC and the Purchaser.

### 2. Conditions to the Effective Date

The Effective Date shall not occur, and the Plan shall not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section V.F.3:

    **a.** The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

    **b.** All other documents and agreements necessary to implement the Plan on the Effective Date, including without limitation the Litigation Trust Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable government unit in accordance with applicable laws, and all other actions required to be taken in connection with the Effective Date shall have occurred;

    **c.** The Litigation Trustee shall have been appointed and have accepted his or her appointment and the Litigation Trust Agreement shall have been executed;

    **d.** The Trust Accounts shall be created and funded as set forth herein;

    **e.** The Closing Date shall have occurred;

    **f.** The Dismissal Order shall have been entered by the Bankruptcy Court;

**g.** The Bancomext Settlement shall have been approved by the Bankruptcy Court; and

**h.** All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid in full.

### 3. Waiver of Conditions to the Effective Date

The conditions to consummation of the Plan set forth in this Section V.F may be waived by the U.S. Debtors, with the consent of the Creditors' Committee, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; provided that the condition that the Closing Date shall have occurred shall only be waived with the consent of the Purchaser, Inbursa and CEC and in no event shall the obligations of the Purchaser set forth herein (including any payment or funding obligations) be effective until the Closing Date occurs.

### 4. Effect of Nonoccurrence of Conditions to the Effective Date

The U.S. Debtors reserve the right to seek to withdraw the Plan at any time prior to the Effective Date. If the Bankruptcy Court denies approval of the Bancomext Settlement or denies entry of the Dismissal Order, the Plan shall be deemed immediately withdrawn. If the Plan is withdrawn pursuant to this Section: (i) each of the Plan and the Confirmation Order shall be null and void in all respects, including with respect to (a) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases and (b) the releases described in Section V.H.3; and (ii) nothing contained in the Plan or the Confirmation Order shall (a) constitute a waiver or release of any claims by or against, or any Interest in, any Debtor or (b) prejudice in any manner the rights of the U.S. Debtors or any other party in interest.

## G. NON-CONSENSUAL CONFIRMATION

In the event that any Impaired Class of Claims or Interests rejects the Plan, the U.S. Debtors reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (1) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief and/or (2) amend the Plan in accordance with Section V.J.1.

## H. EFFECT OF CONFIRMATION

### 1. Dissolution of Official Committees

Except to the extent provided herein, upon the Effective Date: (a) the Creditors' Committee shall be dissolved; (b) the current and former members of the Creditors' Committee and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases; and (iii) the Professionals retained by the Creditors' Committee will not be entitled to assert any Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Creditors' Committee, except to the extent necessary to: (a) prepare, File and, if necessary, litigate final applications for compensation; and (b) object to final fee applications Filed by other Professionals.

### 2. Exculpation

**From and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability from any Entity, and no Holder of a Claim against or Interest in, a U.S. Debtor, no other party in interest and none of their respective Representatives shall have any right of action against any Exculpated Party for any act taken or omitted to be taken before the Effective Date in connection with, related to or arising out of the Chapter 11 Cases, any of the U.S. Debtors or the Estates, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the**

Disclosure Statement, the Sales, or any other transactions proposed or consummated in connection with the Chapter 11 Cases, any Distributions made under or in connection with the Plan or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or with the Plan or the obligations assumed hereunder; provided, however, that the foregoing provisions of this Section V.H.2 shall have no effect on: (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; (b) the liability of any Exculpated Party that is the result of any act or omission of such Exculpated Party that is determined in a Final Order to have constituted gross negligence, fraud or willful misconduct; and (c) the Litigation Trust Causes of Action or any right of the Litigation Trust to assert any Corpus Christi Cause of Action pursuant to Section III.H.2 of the Plan.

### 3. Releases

#### a. Releases by U.S. Debtors

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, to the fullest extent permitted by law, the U.S. Debtors, on behalf of themselves, their Estates, their respective Representatives any and all Entities who may purport to claim by, through, for or because of them, shall forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party with respect to any of the U.S. Debtors, the Estates, the Chapter 11 Cases or the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, the Sales, the Dissolution Transactions or any other transactions proposed or consummated in connection with the Chapter 11 Cases, any Distributions, any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with the Plan or the obligations assumed thereunder; provided, however, that the foregoing provisions shall not affect (i) the liability of any Released Party the result of any act or omission determined in a Final Order to have constituted gross negligence, fraud or willful misconduct; (ii) any rights to enforce the Plan or any contracts, instruments, releases, agreements or documents to be, or previously, entered into or delivered in connection with the Plan; (iii) except as otherwise expressly set forth in the Plan, any objections by the U.S. Debtors or the Litigation Trust to Claims filed by any Entity against any U.S. Debtor and/or the Estates, including rights of setoff, refund or other adjustments; (iv) the rights of the U.S. Debtors or the Litigation Trust to assert any applicable defenses in litigation or other proceedings (including the rights to seek sanctions, fees and other costs); (v) any claim of the U.S. Debtors or the Litigation Trust, including (but not limited to) cross-claims or counterclaims or other Causes of Action against any parties, arising out of or relating to any litigation, judicial process, administrative proceeding or related proceeding, whether in law or in equity, to which the U.S. Debtors or the Litigation Trust are a party; or (vi) the Litigation Trust Causes of Action (including without limitation, the U.S. Debtors' and their Estates' Causes of Action against any current or former director or officer of any U.S. Debtor) and any right of the Litigation Trust to assert any Corpus Christi Cause of Action pursuant to Section III.H.2 of the Plan.

#### b. Releases by Holders of Claims

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the U.S. Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, unless otherwise provided in the Confirmation Order, each Holder of a Claim or Interest that (i) votes in favor of the Plan or is Unimpaired by and conclusively presumed to accept the Plan or (ii) either (A) abstains from voting, (B) votes to reject the Plan or (C) is deemed to reject this Plan and does not opt out of the voluntary release contained in Section IX.C.2 of the Plan (by, in the case of either (i) or (ii), checking the opt-out box on the Ballot and returning it in accordance with the instructions set forth thereon, indicating that such Holder opts not to grant the releases provided in the Plan or, in the case of (iii), timely objecting to the Plan's third-party release provisions), shall be deemed to forever release and waive and discharge all Liabilities in any way that such Entity has, had or may have against any Released Party (which release shall be in addition to the discharge of Claims and termination of Interests provided herein and under

the Confirmation Order and the Bankruptcy Code), in each case, relating to any of the U.S. Debtors, the Estates, the Chapter 11 Cases, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, the Sales, the Dissolution Transactions or any other transactions proposed or consummated in connection with the Chapter 11 Cases, any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with the Plan or the obligations assumed hereunder; **provided, however,** that the foregoing provisions of this Section V.H.3.b shall have no effect on: (i) the liability of (A) any Released Party that is the result of any act or omission of such Released Party determined in a Final Order to have constituted gross negligence, fraud or willful misconduct and (B) any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (ii) the Litigation Trust Causes of Action (including without limitation, the U.S. Debtors' and their Estates' Causes of Action against any current or former director or officer of any U.S. Debtor) and any right of the Litigation Trust to assert any Corpus Christi Cause of Action pursuant to Section III.H.2 of the Plan.

### 4. Injunction Related to Releases

The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution or rights of indemnification released pursuant to the Plan, including pursuant to the releases in Section IX of the Plan.

### 5. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the U.S. Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and pursuant to section 1125(e) of the Bankruptcy Code.

### 6. Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 7. Approval of the Bancomext Settlement

To the extent not previously approved pursuant to the Bancomext Settlement Order, as part of Confirmation, and pursuant to Bankruptcy Rule 9019 and sections 105 and 363 of the Bankruptcy Code, the Plan shall constitute a motion seeking approval of the Bancomext Settlement, as set forth in the Bancomext Term Sheet and the Bancomext Stipulation, whether or not restated herein, and this Section V.H.7 of this Disclosure Statement. To the extent of any conflict between the terms of the Bancomext Term Sheet, the Bancomext Stipulation and the Plan, the Plan shall govern.

#### a. <u>Allowance of Bancomext Allowed Claim.</u>

To the extent not previously Allowed pursuant to the Bancomext Settlement Order, the Bancomext Allowed Claim shall be Allowed as a General Unsecured Claim in the amount of $70,000,000 against the U.S. Debtors' substantively consolidated Estates; <u>provided</u> that in the event that the U.S. Debtors are not substantively consolidated pursuant the Plan as part of Confirmation, Bancomext shall be permitted to allocate the Bancomext Allowed Claim in its reasonable discretion among the U.S. Debtors, without duplication, subject to the Creditors' Committee and the U.S. Debtors' right to (i) object to such allocation of the Bancomext Allowed Claim and (ii) seek a determination from the Bankruptcy Court with respect to any such allocation. The Bancomext Allowed Claim shall not be subject to reconsideration, setoff, counterclaim, subordination or reduction in any manner or for any reason, including pursuant to section 502(j) of the Bankruptcy Code. Subject to the releases set forth in

Section V.H.7.d, the allowance of the Bancomext Allowed Claim shall not be deemed to prejudice or waive any defenses, arguments, claims, or causes of action, rights of setoff, or otherwise affect any other claims against Bancomext or any other claims asserted by Bancomext.

### b. Allowance of Mexico Polimeros Allowed Claim.

To the extent not previously Allowed pursuant to the Bancomext Settlement Order, the Mexico Polimeros Allowed Claim shall be Allowed as a General Unsecured Claim in the amount of $55,515,900.90 against M&G Polymers, as the same shall be substantively consolidated pursuant to the Plan. The Mexico Polimeros Allowed Claim shall not be subject to reconsideration, setoff, counterclaim, subordination or reduction in any manner or for any reason, including pursuant to section 502(j) of the Bankruptcy Code. Subject to the releases set forth in Section V.H.7.d, the allowance of the Mexico Polimeros Allowed Claim shall not be deemed to prejudice or waive any defenses, arguments, claims, or causes of action, rights of setoff, or otherwise against Mexico Polimeros or any other Claims asserted by Mexico Polimeros (unless otherwise provided in the Plan) or any other non-Debtor affiliate. In accordance with Bancomext's rights of assignment and collection set forth in section 10 of the Mexico Polimeros Revolver, any recovery on account of the Mexico Polimeros Allowed Claim shall be distributed to Bancomext pursuant to the Plan, and, to the extent not previously updated, the Claims and Noticing Agent is directed to update the U.S. Debtors' claim register to this effect.

### c. Bancomext Reservation of Rights

Bancomext shall retain the right to recover against Mexico Holding and Mexico Polimeros, or any non-Debtor, including with respect to its rights to consent to any restructuring of Mexico Holding and Mexico Polimeros, affecting their assets and liabilities in any process or proceeding, other than in the Chapter 11 Cases; provided that Bancomext shall not be entitled to any further distributions from the Debtors on account of the Bancomext Allowed Claim and the Mexico Polimeros Allowed Claim if Bancomext recovers in excess of $190,000,000 of principal in Cash (in the aggregate and accounting for recoveries from all sources) on account of claims relating to the Mexico Polimeros Revolver or the Mexico Holding Revolver, or the use of funds advanced thereunder. To the extent that Bancomext receives distributions in respect of the Bancomext Allowed Claim and the Mexico Polimeros Allowed Claim after it has received recoveries in excess of $190,000,000, Bancomext shall turn over such distributions, up to and to the extent of any such excess, to the Litigation Trust. Except as otherwise provided in the Bancomext Settlement (including as set forth in this Section V.H.7.c), (i) Bancomext's rights against the Debtors with respect to any Bancomext Acquired Claims shall be limited to the right to receive distributions on such Claims, to the extent that such Claims are Allowed, and (ii) Bancomext shall not participate or give any direction in respect of any vote, litigation, settlement, or similar action in the Chapter 11 Cases, whether before or after the effective date of Bancomext's acquisition of any such Bancomext Acquired Claim, with respect to any Bancomext Acquired Claim, including with respect to the liquidation of such Bancomext Acquired Claim pursuant to the Plan.

### d. Mutual Release

Effective as of the Effective Date, in consideration for the obligations under this Bancomext Settlement, to the fullest extent permitted by law: (i) each of the Debtors, on behalf of itself, its Estate and its successors, assigns and any and all entities who may purport to claim by, through, for or because of it, shall forever release, waive and discharge all claims, counterclaims, actions, Causes of Action, defenses or setoff rights that such Debtor may have against Bancomext and its successors and assigns, whether disputed or undisputed, at law or in equity or known or unknown, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provision of applicable state, federal or other law; (ii) the Creditors' Committee, on behalf of itself and its successors, assigns and any and all entities who may purport to claim by, though, for or because of it, including the Litigation Trust, shall forever release, waive and discharge all claims, counterclaims, actions, Causes of Action, defenses or setoff rights that the Creditors' Committee may have against Bancomext and its successors and assigns, whether disputed or undisputed, at law or in equity or known or unknown, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provision of applicable state, federal or other law; and (iii) Bancomext, on behalf of itself and its successors, assigns and any and all entities who may purport to claim by, though, for or because of it, shall forever release, waive and discharge all claims, counterclaims, actions, Causes of Action, defenses or setoff

rights that Bancomext may have against (a) the Debtors, their Estates and their successors and assigns and (b) the Creditors' Committee and its successors and assigns, including the Litigation Trust, whether disputed or undisputed, at law or in equity or known or unknown, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provision of applicable state, federal or other law; provided that the releases set forth in this Section V.H.7.d shall not affect any of the rights of the Debtors, Bancomext or the Creditors' Committee under the Bancomext Settlement, including the allowance of the Bancomext Allowed Claim and the Mexico Polimeros Allowed Claim; provided further that the Mutual Releases set forth herein shall apply only to civil liability and shall not encompass any criminal liability in any jurisdiction.

## I. RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date to the fullest legally permissible extent, including jurisdiction to:

        **1.** Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, and establish the priority or secured or unsecured status of any Claim, including any Administrative Claim;

        **2.** Grant or deny any applications for allowance of any Fee Claims for periods ending on or before the Effective Date;

        **3.** Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

        **4.** Ensure that Distributions are accomplished pursuant to the provisions of the Plan;

        **5.** Decide or resolve any motions, adversary proceedings, contested matters and any other matters Filed in the Bankruptcy Court involving any U.S. Debtor or the Litigation Trust that may be pending on the Effective Date or brought thereafter;

        **6.** Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Chapter 11 Cases, the Plan, the Confirmation Order, the Sales, the Bid Support Term Sheet the Dismissal Stipulation or the Bancomext Settlement;

        **7.** Resolve any controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is entered into or delivered in connection with the Plan and any Entity's rights arising from or obligations incurred in connection with the Plan or such documents, the Sales, the Bid Support Term Sheet; the Dismissal Stipulation or the Bancomext Settlement.

        **8.** Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Sales, the Bid Support Term Sheet, the Dismissal Stipulation or the Bancomext Settlement; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Sales, the Bid Support Term Sheet, the Dismissal Stipulation or the Bancomext Settlement, in such manner as may be necessary or appropriate to consummate the Plan and the transactions contemplated hereby;

        **9.** Hear and determine any matter, case, controversy, suit, dispute, or Cause of Action regarding the existence, nature and scope of the releases, injunctions, and exculpation provided under the Plan, and issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement

other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the consummation, implementation or enforcement of the Plan or the Confirmation Order, including the releases, injunctions, and exculpation provided under the Plan;

10. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan are enjoined or stayed;

11. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, the Confirmation Order, the Sales, the Bid Support Term Sheet, the Dismissal Stipulation or the Bancomext Settlement;

12. Grant, under section 505(b) of the Bankruptcy Code, an expedited determination with respect to Tax returns filed, or to be filed, on behalf of the U.S. Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date;

13. Enforce, clarify or modify any orders previously entered in the Chapter 11 Cases;

14. Enter a final decree closing the Chapter 11 Cases;

15. Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

16. Assist in the recovery of all assets of the U.S. Debtors and their Estates, wherever located; and

17. Hear any other matter over which the Bankruptcy Court has jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in this Section V.I, the provisions of Section X of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## J. MISCELLANEOUS PROVISIONS

### 1. Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the U.S. Debtors reserve the right, with the consent of the Creditors' Committee, the Pre-Petition First Lien Lender and CEC and the Purchasers and Bidders to alter, amend or modify the Plan before the Effective Date. Prior to the Effective Date, the U.S. Debtors, with the consent of the Creditors' Committee, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court. Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as amended, modified, or supplemented, if the proposed amendment, modification, or supplement does not materially and adversely change the treatment of such Claim; provided, however, that any Holders of Claims who were deemed to accept the Plan because such Claims were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment, modification or supplement, such Claims continue to be Unimpaired.

### 2. Revocation of the Plan or Non-Occurrence of the Confirmation Date or Effective Date

The U.S. Debtors reserve the right to revoke or withdraw the Plan, and the Creditors' Committee reserves its right to withdraw its support for the Plan, as to any (or all) of the U.S. Debtors prior to the Confirmation Date or at the Confirmation Hearing. If the Plan is revoked or withdrawn as to any (or all) of the U.S. Debtors, or if the

Confirmation Date or the Effective Date as to any (or all) of the U.S. Debtors does not occur, then the Plan shall be null and void in all respects solely with respect to such U.S. Debtors, and nothing contained in the Plan shall: (a) prejudice in any manner the rights of any U.S. Debtor or any other party in interest; (b) constitute a waiver or release of any claims by or against, or any interests in, any of the U.S. Debtors or any other Entity; or (c) constitute an admission of any sort by any U.S. Debtor or any other Entity. The revocation or withdrawal of the Plan with respect to one or more U.S. Debtors shall not require the re-solicitation of the Plan with respect to the remaining U.S. Debtors.

### 3. Conversion or Dismissal of Certain of the Chapter 11 Cases

If the requisite Classes do not vote to accept the Plan with respect to any U.S. Debtor or the Bankruptcy Court does not confirm the Plan with respect to any U.S. Debtor, such U.S. Debtor shall have the right to seek to have its Chapter 11 Case dismissed or converted, or to liquidate or dissolve itself under applicable non-bankruptcy law or chapter 7 of the Bankruptcy Code.

### 4. Inconsistency

In the event of any inconsistency among the Plan, the Disclosure Statement or any exhibit or schedule to the Disclosure Statement, the provisions of the Plan shall govern. In the event of any inconsistency among the Plan and any document or agreement filed in the Plan Supplement, such document or agreement shall control. In the event of any inconsistency among the Plan or any document or agreement filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

### 5. Exhibits / Schedules

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and constitute a part of the Plan as if set forth herein.

### 6. Severability

If prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, at the request of the U.S. Debtors, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 7. Governing Law

Except to the extent that (a) the Bankruptcy Code or other federal law is applicable or (b) an exhibit or schedule to the Plan or the Disclosure Statement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit, schedule or agreement), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

### 8. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## VI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### A. Confirmation Hearing

**The Bankruptcy Court has scheduled the Confirmation Hearing for November 27, 2018 at 11:00 a.m. (prevailing Eastern Time).** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the Disclosure Statement Order. Any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Practice & Procedure of the United States Bankruptcy Court for the District of Delaware; (3) state the name, address, phone number and email address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is <u>actually received</u> by the following notice parties set forth below no later than the Objection Deadline. **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

| COUNSEL TO THE DEBTORS | |
| --- | --- |
| Jones Day<br>250 Vesey Street<br>New York, NY 10281<br>Scott J. Greenberg, Esq.<br>Stacey L. Corr-Irvine, Esq.<br><br>and<br><br>901 Lakeside Avenue<br>Cleveland, Ohio 44114<br>Carl E. Black, Esq.<br><br>and<br><br>1420 Peachtree Street, N.E., Suite 800<br>Atlanta, GA 30309-3053<br>Daniel J. Merrett, Esq. | Pachulski Stang Ziehl & Jones LLP<br>919 N. Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705 (Courier 19801)<br>Laura Davis Jones, Esq.<br>James E. O'Neill, Esq.<br>Joseph M. Mulvihill, Esq. |
| COUNSEL TO THE CREDITORS' COMMITTEE | |
| Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, NY 10005<br>Dennis F. Dunne, Esq.<br>Abhilash M. Raval, Esq.<br>Lauren Doyle, Esq. | Cole Schotz P.C.<br>500 Delaware Avenue, Suite 1410<br>Wilmington, Delaware 19801<br>J. Kate Stickles, Esq.<br>David R. Hurst, Esq. |

| ***U.S. Trustee*** |
|---|
| United States Department of Justice |
| Office of the United States Trustee |
| J. Caleb Boggs Federal Building |
| 844 King Street, Suite 2207 |
| Wilmington, Delaware 19801 |
| Hannah McCollum, Esq. |

### B. Requirements for the Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The U.S. Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of the Bankruptcy Code. Specifically, the U.S. Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

#### 1. Feasibility

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless contemplated by the plan.

The Plan provides for the liquidation and distribution of the U.S. Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the U.S. Debtors.

#### 2. Best Interests of Creditors

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each Holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such Holder with a recovery that has a value at least equal to the value of the recovery that each such Holder would receive if the U.S. Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the U.S. Debtors were liquidated under chapter 7.

The U.S. Debtors believe that the Plan satisfies the best interests of creditors test because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a hypothetical chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established under the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are paid next. Unsecured creditors are paid from any remaining liquidation proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid in full.

The U.S. Debtors believe that the Plan provides their creditors with a significantly superior recovery than they could reasonably expect to realize in a hypothetical chapter 7 case. In particular, the funding and protections

provided by these Chapter 11 Cases have permitted the U.S. Debtors to maintain their assets and sell substantially all of them in fully marketed, competitive processes. These sales have yielded sufficient proceeds that the U.S. Debtors anticipate being in a position to satisfy in full all secured claims and potentially to provide a recovery to holders of unsecured claims from the U.S. Debtors' unencumbered assets, including the $50 million Unsecured Claims Escrow that the Purchaser agreed to contribute in connection with approval of the Corpus Christi Sale. As set forth in the liquidation analysis attached as <u>Exhibit D</u> hereto, these recoveries far exceed amounts that could be expected in any hypothetical chapter 7 liquidation of the U.S. Debtors' assets. The recoveries provided creditors under the Plan likely would be further improved over any chapter 7 proceeding commenced with respect to the U.S. Debtors because the U.S. Debtors would incur additional expenses in chapter 7, including as a result of the delay associated with the appointment of a chapter 7 trustee with no familiarity with the Debtors' assets and businesses and the establishment of a new bar date and the potential assertion of new claims. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Because recoveries to creditors under the Plan far exceed those in a hypothetical chapter 7 case, the Plan satisfies the best interests of creditors test.

### C. Alternative Plans

The U.S. Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the U.S. Debtors' Estates. The U.S. Debtors believe that the Plan, as described therein, enables Holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### D. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a plan unless, with respect to each claim or interest of such class, the plan: (1) leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) cures any default, reinstates the maturity of such claim or interest as such maturity existed before such default and compensates the holder of such claim or interest for any damages incurred.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of those actually voting cast their Ballots in favor of acceptance. Only Holders of Claims in the Voting Classes will be entitled to vote on the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds (2/3) in dollar amount of those interests who actually vote to accept or reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds (2/3) in amount actually voting cast their Ballots in favor of acceptance, not counting designated votes.

### E. Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (1) the plan otherwise satisfies the requirements for confirmation, (2) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (3) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. The U.S. Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for "cramdown," or non-consensual Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 1. Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the U.S. Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

#### a. Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

#### b. Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest on any property.

#### c. Interests

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirement that either: (i) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of equity interests junior to the nonaccepting class may receive a distribution under the plan.

### 2. Unfair Discrimination

A chapter 11 plan does not "discriminate unfairly" if a dissenting class is treated substantially equal with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests. The U.S. Debtors carefully designed the Plan, including calculating the distributions to Holders of General Unsecured Claims against each of the U.S. Debtors, to ensure that recoveries on account of Claims in a particular Class against each of the U.S. Debtors did not result in unfair discrimination among similarly situated Classes. The U.S. Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests.

## VII. PLAN-RELATED RISK FACTORS

Holders of Claims should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the U.S. Debtors' business or the Plan and its implementation.

A.     **Certain Bankruptcy Considerations**

1.     **The Corpus Christi Sale May Not Close**

Although the Bankruptcy Court has already approved and authorized the Debtors to enter into the Corpus Christi Sale, the Debtors and the Purchaser must obtain certain regulatory approvals for the transaction before the sale can be consummated.  Additionally, there are certain other conditions that must be met by both the Debtors and the Purchaser in order for the sale to close, such as delivery of specific items and performance of all obligations. There can be no assurance that the sale will comply with the HSR Act nor that all approvals will be obtained.  If the Corpus Christi Sale does not close, it is unclear what distributions, if any, Holders of Allowed Claims will receive under the Plan.

2.     **The U.S. Debtors May Not Be Able to Secure Confirmation of the Plan**

The U.S. Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation Procedures and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The U.S. Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

3.     **Failure to Satisfy Vote Requirements**

In the event that the votes received are sufficient in number and amount to enable the Bankruptcy Court to confirm the Plan, the U.S. Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the U.S. Debtors may seek to pursue another strategy to wind down the Estates, such as an alternative chapter 11 plan, a dismissal of these Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case(s) or other strategies.  There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

4.     **Parties in Interest May Object to the Plan's Classification of Claims and Interests or the Amount of Such Claims or Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The U.S.

Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the U.S. Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Further, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 5. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class. The U.S. Debtors believe that the Plan satisfies these requirements and the U.S. Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

### 6. Risk of Nonoccurrence of the Effective Date

Although the U.S. Debtors believe that the Effective Date could occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 7. Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be Allowed. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### B. Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under the Plan

### 1. The Amount of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims

The U.S. Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed, and thus the projected recoveries disclosed in this Disclosure Statement are highly speculative. A large amount of Allowed Claims may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims and Allowed Interests under the Plan. Some Holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the U.S. Debtors' various assumptions, even those Holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

### 2. Comerica May Not Prevail in the M&G Brasil Adversary Proceeding

Although the U.S. Debtors believe that M&G Brasil will not prevail in the M&G Brasil Adversary Proceeding, it is possible that M&G Brasil will be successful in asserting a claim over certain of the property that

constitutes collateral under the Comerica Loan and, therefore, that property (or proceeds therefrom) will be unavailable to satisfy the Comerica Claim or other Allowed Claims.

### 3. The U.S. Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes

The U.S. Debtors cannot know with certainty, at this time, the number or amount of Claims in Voting Classes that will ultimately be Allowed. Accordingly, because certain Claims under the Plan will be paid on Pro Rata, the U.S. Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

### 4. Any Valuation of Any Assets to be Distributed Under the Plan is Speculative

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the U.S. Debtors' creditors, including Holders of Claims in the Voting Classes.

### 5. The U.S. Debtors Cannot Guarantee Recoveries or the Timing of such Recoveries

Although the U.S. Debtors have made commercially reasonable efforts to disclose projected recoveries in this Disclosure Statement, it is possible that the amount of Allowed Claims will be materially higher than any range of possible Allowed Claims the U.S. Debtors have considered to date, and thus creditor recoveries could be materially reduced or eliminated. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the U.S. Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

### 6. Certain Tax Implications of the Debtors' Bankruptcies

Holders of Allowed Claims should carefully review Section VIII of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences of Consummation of the Plan," for a description of certain tax implications of the Plan and these Chapter 11 Cases.

## C. Disclosure Statement Disclaimer

### 1. The Financial Information Contained in this Disclosure Statement Has Not Been Audited

In preparing this Disclosure Statement, the U.S. Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the U.S. Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and although the U.S. Debtors believe that such financial information fairly reflects the financial condition of the U.S. Debtors, the U.S. Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

### 2. Information Contained in this Disclosure Statement Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

### 3. The Disclosure Statement was not Reviewed or Approved by the SEC

This Disclosure Statement was not Filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4.        **The Disclosure Statement May Contain Forward Looking Statements**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue" or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5.        **No Legal or Tax Advice is Provided to You by this Disclosure Statement**

*This Disclosure Statement is not legal advice to you*. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his, her or its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.        **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests or any other parties in interest.

7.        **Failure to Identify Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Litigation Trustee may object to Claims or Interests after Confirmation or the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies objections to such Claims or Interests.

8.        **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action or rights of the U.S. Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any claims or causes of action of the U.S. Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

9.        **Information was Provided by the Debtors and was Relied Upon by the Debtors' Advisors**

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.        **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the U.S. Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the U.S. Debtors have used their reasonable

business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the U.S. Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the U.S. Debtors may subsequently update the information in this Disclosure Statement, the U.S. Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11. No Representations Outside this Disclosure Statement are Authorized

No representations concerning or relating to the U.S. Debtors, these Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

### D. Liquidation Under Chapter 7

If no plan can be confirmed, these Chapter 11 Cases may be converted to a case(s) under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be elected or appointed to liquidate the assets of the U.S. Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.

## VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to certain Holders of Allowed Claims that are U.S. Holders (as defined below). The following summary is based on the Internal Revenue Code of 1986 (as amended, the "IRC"), Treasury Regulations promulgated thereunder, judicial decisions, administrative rules and pronouncements as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. This summary addresses certain U.S. federal income tax consequences only to Holders of Claims that are entitled to vote (*i.e.*, Holders of Secured Pre-Petition First Lien Claims, Pre-Petition Second Lien Claims, Holders of Corpus Christi Mechanics' Lien Claims and Holders of General Unsecured Claims) and it does not address the U.S. federal income tax consequences to the Debtors, to Holders of Interests or to Holders of Claims that are not entitled to vote on the Plan. The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of an Allowed Claim in light of such Holder's particular facts and circumstances. In addition, this summary addresses only U.S. federal income taxes. Thus, the following discussion does not address foreign, state or local tax consequences, or any estate, gift or other non-income tax consequences, of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to Holders of Allowed Claims that are subject to special treatment under the IRC (such as Persons who are related to the Debtors within the meaning of the IRC, Holders liable for the alternative minimum tax, Holders whose functional currency is not the U.S. dollar, Holders that received their Claims as compensation, S corporations, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships and Holders of Claims who are themselves in bankruptcy). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds an Allowed Claim, the tax treatment of a partner or other investor in such partnership will generally depend upon the status of the partner or investor and the activities of the partnership. If you are a partner or other investor in a partnership holding an Allowed Claim, you should consult your tax advisors.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (i) an individual citizen or resident of the United States for U.S. federal income tax purposes; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (as defined in the IRC).

The following discussion assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out. Furthermore, this discussion assumes that Holders of Allowed Claims only hold Claims in a single Class. This discussion further assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. In addition, a substantial amount of time may elapse between the confirmation date and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service (the "IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement. The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive and the U.S. federal income tax consequences to each Holders of an Allowed Claim will differ and will depend on factors specific to each such Holder, including (i) whether the Holder's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (ii) the origin of the Holder's Allowed Claim; (iii) whether the Holder reports income on the accrual or cash basis method; (iv) whether the Holder receives distributions under the Plan in more than one taxable year; (v) whether the Holder has previously included in income any accrued but unpaid interest with respect to the surrendered Allowed Claim; and (vi) whether the Holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed Claim. The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of an Allowed Claim. Accordingly, each Holder of an Allowed Claim is strongly urged to consult with its own tax advisor regarding the U.S. federal, state, local and foreign income and other tax consequences of the Plan.

## A. U.S. Federal Income Tax Consequences to Holders of Allowed Claims

### 1. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Pre-Petition Secured First Lien Claims

In accordance with the Plan, each Holder of an Allowed Pre-Petition Secured First Lien Claim generally shall be entitled to such Holder's Pro Rata share of the First Lien Payment.

Generally, where a U.S. Holder receives only Cash in respect of an Allowed Claim, such a Holder would recognize taxable gain or loss in an amount equal to the difference between the amount of the Cash received and such Holder's adjusted tax basis in its Allowed Claim. Any gain or loss recognized would be capital or ordinary, depending on the status of the Allowed Claim in the U.S. Holder's hands. Generally, any gain or loss recognized by a U.S. Holder of an Allowed Claim would be a long-term capital gain or loss if the Allowed Claim is a capital asset in the hands of such Holder and such Holder has held such Allowed Claim for more than one year, unless such Holder had previously claimed a bad debt deduction or such Holder had accrued market discount with respect to such Allowed Claim. *See* the discussions below under the headings "—Bad Debt or Worthless Securities Deduction" and "—Market Discount." The deductibility of capital losses is subject to limitations. To the extent any portion of a U.S. Holder's recovery is allocable to interest on such Holder's Allowed Claim that was not previously

included in such Holder's income, such portion would be treated as interest income to such Holder.  *See* the discussion below under the heading "—Accrued Interest."

**2.      U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Pre-Petition Second Lien Claims**

In accordance with the Plan, the Allowed Pre-Petition Second Lien Claims generally will be deemed satisfied on the Closing Date for no additional consideration in light of the fact that Pre-Petition Second Lien Secured Parties were entitled to credit bid their claims for certain assets pursuant to the Bid Support Term Sheet.

Generally, where a U.S. Holder exchanges an Allowed Claim for property, such a Holder would recognize taxable gain or loss in an amount equal to the difference between the fair market value of the property received and such Holder's adjusted tax basis in its Allowed Claim.  Any gain or loss recognized would be capital or ordinary, depending on the status of the Allowed Claim in the U.S. Holder's hands.  Generally, any gain or loss recognized by a U.S. Holder of an Allowed Claim would be a long-term capital gain or loss if the Allowed Claim is a capital asset in the hands of such Holder and such Holder has held such Allowed Claim for more than one year, unless such Holder had previously claimed a bad debt deduction or such Holder had accrued market discount with respect to such Allowed Claim.  *See* the discussions below under the headings "—Bad Debt or Worthless Securities Deduction" and "—Market Discount."  The deductibility of capital losses is subject to limitations.  To the extent any portion of a U.S. Holder's recovery is allocable to interest on such Holder's Allowed Claim that was not previously included in such Holder's income, such portion would be treated as interest income to such Holder.  *See* the discussion below under the heading "—Accrued Interest."  A U.S. Holder's tax basis in the property received generally will be equal to the fair market value of such property.  A U.S. Holder's holding period in the property would begin on the day following the day of receipt.

**3.      U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Corpus Christi Mechanics' Lien Claims**

In accordance with the Plan, each Holder of an Allowed Corpus Christi Mechanics' Lien Claim generally shall be entitled to Cash, solely from funds available in the Corpus Christi Mechanics' Lien Reserve, and in accordance with the Corpus Christi Mechanics' Lien Reserve Procedures.

Generally, where a U.S. Holder receives only Cash in respect of an Allowed Claim, such a Holder would recognize taxable gain or loss in an amount equal to the difference between the amount of the Cash received and such Holder's adjusted tax basis in its Allowed Claim.  Any gain or loss recognized would be capital or ordinary, depending on the status of the Allowed Claim in the U.S. Holder's hands.  Generally, any gain or loss recognized by a U.S. Holder of an Allowed Claim would be a long-term capital gain or loss if the Allowed Claim is a capital asset in the hands of such Holder and such Holder has held such Allowed Claim for more than one year, unless such Holder had previously claimed a bad debt deduction or such Holder had accrued market discount with respect to such Allowed Claim.  *See* the discussions below under the headings "—Bad Debt or Worthless Securities Deduction" and "—Market Discount."  The deductibility of capital losses is subject to limitations.  To the extent any portion of a U.S. Holder's recovery is allocable to interest on such Holder's Allowed Claim that was not previously included in the such Holder's income, such portion would be treated as interest income to such Holder.  *See* the discussion below under the heading "—Accrued Interest."

**4.      U.S. Federal Income Tax Consequences to U.S. Holders of Allowed General Unsecured Claims**

In accordance with the Plan, each Holder of an Allowed General Unsecured Claim shall be entitled to receive its Pro Rata share of the beneficial interests in the Litigation Trust Assets.  As discussed in Section V.B.4 above, on the Effective Date, the U.S. Debtors will generally transfer the Litigation Trust Assets to the Litigation Trust, which was established for the purpose of, among other things, liquidating such assets and making distributions to Holders of Allowed Claims.  The Litigation Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) and in part as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section 1.468B-9.  The remainder of this discussion assumes that this treatment is correct.  It is possible that the IRS

could require an alternative characterization of the Litigation Trust, which could result in different (and possibly adverse) tax consequences to the Litigation Trust or Holders of Allowed General Unsecured Claims.

Except to the extent of the Disputed Claims Reserves, the Litigation Trust is not expected to be treated as a taxable entity for U.S. federal income tax purposes. Accordingly, except to the extent distributions are made to Holders of Allowed General Unsecured Claims as of the Effective Date (as described below), the Debtors will be deemed to have distributed to the Holders of Allowed General Unsecured Claims an undivided interest in their Pro Rata shares of the Litigation Trust Assets, subject to any liabilities of the Debtors assumed by the Litigation Trust and any liabilities of the Litigation Trust itself, and such Holders will be deemed to have contributed such assets (subject to such liabilities) to the Litigation Trust in exchange for beneficial interests in the Litigation Trust.

Each U.S. Holder of an Allowed General Unsecured Claim (each such Holder is referred to in this discussion as a "Beneficial Owner") will recognize gain or loss upon receipt of such Pro Rata share equal to the difference between the "amount realized" by such Beneficial Owner and such Beneficial Owner's adjusted tax basis in his, her or its Claim. The amount realized is equal to the fair market value of such Beneficial Owner's Pro Rata share of the Litigation Trust Assets (subject to any applicable liabilities), less the amount (if any) allocable to accrued but unpaid interest, as discussed below under the heading "—Accrued Interest." Any gain or loss realized by a Beneficial Owner generally should constitute capital gain or loss to such creditor, unless such Claim is not a capital asset in the hands of such Beneficial Owner. If an Allowed General Unsecured Claim is a capital asset and it has been held for more than one year, the Beneficial Owner will realize long-term capital gain or loss. The deductibility of capital losses is subject to limitations. The tax basis of the applicable Litigation Trust Assets deemed received in the exchange will equal the amount realized by the Beneficial Owner and the holding period for such assets will begin on the day following the exchange. For the avoidance of doubt, U.S. Holders of Allowed General Unsecured Claims are not intended to be treated for U.S. federal income tax purposes as receiving Litigation Trust Assets that are contributed to any Disputed Claims Reserves until such time as distributions are made from such Disputed Claims Reserves, in which case (and at which time) U.S. Holders of Allowed General Unsecured Claims are intended to be treated as receiving the distributions actually received from the Disputed Claims Reserves, if any.

For U.S. federal income tax purposes, it is intended that each Beneficial Owner be treated as an owner of the Litigation Trust and, thus, will be subject to tax on such Beneficial Owner's Pro Rata share of taxable income or gain, if any, of the Litigation Trust, regardless of whether the corresponding Cash proceeds are distributed to each Beneficial Owner. Accordingly, each Beneficial Owner will be required to include in its annual taxable income, and pay tax to the extent due on, its allocable share of each item of income, gain, loss, deduction or credit recognized by the Litigation Trust, including interest or dividend income earned on bank accounts and other investments, and the Litigation Trustee will allocate such items to the Holders using any reasonable allocation method. If the Litigation Trust sells or otherwise disposes of a Litigation Trust Asset in a transaction in which gain or loss is recognized, each Beneficial Owner that is entitled to a distribution from such Litigation Trust Asset, or the proceeds thereof, will be required to include in income gain or loss equal to the difference between (i) the Beneficial Owner's Pro Rata share of the Cash or property received in exchange for the applicable Litigation Trust Asset sold or otherwise disposed of and (ii) the Beneficial Owner's adjusted basis in its Pro Rata share of the applicable Litigation Trust Asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Each Beneficial Owner will be required to report any income or gain recognized on the sale or other disposition of an applicable Litigation Trust Asset whether or not the Litigation Trust distributes the sale proceeds currently and may, as a result, incur a tax liability before the Beneficial Owner receives a distribution from the Litigation Trust.

Notwithstanding the foregoing, distributions made as of the Effective Date to U.S. Holders of Allowed General Unsecured Claims are intended to be treated for U.S. federal income tax purposes as made directly from the Debtors to such Holders of such Allowed Claims, and such Holders shall include in their taxable incomes any interest earned on such distributions from the Effective Date to the date on which the actual distribution is made.

### 5. Accrued Interest

A U.S. Holder of an Allowed Claim generally will recognize ordinary income to the extent that such Holder receives Cash or property that is allocable to accrued but unpaid interest that such Holder has not yet

included in its income. If an Allowed Claim includes interest, and if the U.S. Holder receives less than the amount of the Allowed Claim pursuant to the Plan, the U.S. Holder must allocate the Plan consideration between principal and interest. The Plan provides that all distributions to a U.S. Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such distributions, if any, shall apply to any interest accrued on such Claim after the Petition Date. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder, and attributable to principal under the Plan, is properly allocable to interest. U.S. Holders of Allowed Claims are urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the U.S. Holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

### 6. Post-Effective Date Cash Distributions

Because certain U.S. Holders of Allowed Claims may receive Cash distributions after the Effective Date, the imputed interest provisions of the IRC may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because U.S. Holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the U.S. Holder may be deferred. All U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

### 7. Market Discount

If a U.S. Holder of an Allowed Claim purchased the Claim for an amount that is less than its stated redemption price at maturity, the amount of the difference may be treated as "market discount" for U.S. federal income tax purposes, unless the difference is less than a specified de minimis amount. Under the market discount rules, the U.S. Holder is required to treat any gain on the sale, exchange, retirement or other disposition of the Allowed Claim as ordinary income to the extent of the market discount that the U.S. Holder has not previously included in income and which is treated as having accrued on the Allowed Claim at the time of its payment or disposition.

### 8. Bad Debt or Worthless Securities Deduction

A U.S. Holder who receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165(g) of the IRC. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 9. Medicare Surtax

Subject to certain limitations and exceptions, U.S. Holders who are individuals, estates or trusts may be required to pay a 3.8% Medicare surtax on all or part of that U.S. Holder's "net investment income," which includes, among other items, dividends on stock and interest (including original issue discount) on debt, and capital gains from the sale or other taxable disposition of stock or debt. U.S. Holders should consult their own tax advisors regarding the effect, if any, of this surtax on their receipt of distributions pursuant to the Plan.

### B. Backup Withholding and Information Reporting

Generally, information reporting requirements will apply to all payments or distributions under the Plan and by the Litigation Trust, unless you are an exempt recipient. Additionally, a U.S. Holder may be subject to backup withholding at applicable rates, unless the U.S. Holder (i) is a person exempt from backup withholding and, when required, demonstrates this or (ii) provides a correct taxpayer identification number ("TIN") on IRS Form W-9

(or a suitable substitute form) and timely provides the other information, makes the representations required by such form and complies with the other requirements of the backup withholding rules.  A U.S. Holder may become subject to backup withholding if, among other things, the U.S. Holder (i) fails to properly report interest and dividends for U.S. federal income tax purposes or (ii) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN.  A U.S. Holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS.  Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is properly furnished to the IRS

C.       **Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN U.S.  FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE U.S.  FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN.  SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM.  ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE U.S.  FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

IX.       **RECOMMENDATION AND CONCLUSION**

The U.S. Debtors believe that the confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the U.S. Debtors urge all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

Dated: _____, 2018                     Respectfully submitted,

On behalf of each of the U.S. Debtors other than
Chemtex International Inc.

By: _____
     Name:
     Title:

Chemtex International Inc.

By: _____
     Name:
     Title: