# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| M & G USA CORPORATION, *et al.*,[1] | : | Case No. 17- 12307 (BLS) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

---

## DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT BY AND BETWEEN DEBTORS, MEXICAN AFFILIATES, MAGNATE S.A R.L. BRAZILIAN AFFILIATES, ITALIAN AFFILIATES AND M&G CAPITAL 2 S.A R.L.

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")

move the Court (the "Motion"), pursuant to sections 105, 363 and 365 of title 11 of the United

States Code (the "Bankruptcy Code") and Rules 6006 and 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order, in substantially the

form attached hereto as Exhibit A (the "Proposed Order"), approving the settlement agreement

(the "Settlement Agreement")[2] by and between (i) the Mexican Affiliates,[3] (ii) the Debtors,

(iii) the Italian Affiliates,[4] (iv) M&G Capital 2 S.à r.l., (v) the Brazilian Affiliates[5] and

---

[1]      The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2]      A copy of the Settlement Agreement is attached to the Proposed Order as Exhibit 1.

[3]      The "Mexican Affiliates" are (i) M&G México Holding S.A. de C.V. ("Mexico Holding"), (ii) M&G Polímeros México S.A. de C.V. ("Polímeros"), (iii) Servícios Tamaulipas S.A. de C.V. ("Servícios"), (iv) M&Ghisolfi de México S.A. de C.V. ("M&Ghisolfi") and (v) Polymers Sales & Logistics, LLC.

[4]      The "Italian Affiliates" are (i) M&G Finanziaria S.p.A. ("Finanziaria"), (ii) M&G Polimeri S.p.A. ("Polimeri") and (iii) Mossi & Ghisolfi S.p.A.

[5]      The "Brazilian Affiliates" are (i) M&G Chemicals Brazil S.A. ("Chemicals Brazil") and (ii) M&G Polimeros Brasil S.A. ("Polimeros Brasil").

Magnate S.à r.l. ("Magnate" and together with the Debtors, the Mexican Affiliates, the Italian Affiliates, M&G Capital 2 S.à r.l. and the Brazilian Affiliates, the "Parties").  In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.      General Background

2.      On October 24, 2017 (the "Polymers Petition Date"), Debtor M & G Polymers USA, LLC ("Polymers") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, thereafter, on October 30, 2017 (the "Petition Date"), each of the other Debtors commenced chapter 11 cases before this Court (together with the chapter 11 case of Polymers, the "Cases").  The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      An official committee of unsecured creditors (the "Committee") was appointed in these Cases on November 13, 2017 (Docket No. 146).  Additional information regarding the Debtors and these Cases, including the Debtors' businesses, corporate structure and financial condition, is set forth in the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* (Docket No. 3) (the "First Day Declaration"), filed on October 31, 2017 and incorporated herein by reference.

4.      On September 5, 2018, all of the Debtors other than Debtors Mossi & Ghisolfi International S.à r.l. ("MGI"), M&G Chemicals S.A. ("MGC") and M&G Capital S.à r.l.

(together with MGI and MGC, the "<u>Luxembourg Debtors</u>" and all remaining Debtors, the "<u>U.S. Debtors</u>")[6] filed the *Joint Plan of Liquidation of the U.S. Debtors and Debtors in Possession* (Docket No. 1812) (as it may be modified, amended or supplemented, the "<u>Plan</u>") and related *Disclosure Statement for Joint Plan of Liquidation of the U.S. Debtors and Debtors in Possession* (Docket No. 1813).

**B.     The Dismissal Stipulation**

5.     On June 5, 2018, the Luxembourg Debtors filed a motion (Docket No. 1537) (the "<u>Dismissal Motion</u>"), seeking, among other things, the dismissal of the Luxembourg Debtors' Cases (the "<u>Luxembourg Cases</u>").  Following the filing of the Dismissal Motion, the Debtors, the Committee and Banco Nacional de Comercio Exterior, S.N.C. Institución de Banca de Desarrollo ("<u>Bancomext</u>") engaged in protracted, and often contentious, discovery and litigation concerning the dismissal of the Luxembourg Cases.  The Court held a hearing on the Dismissal Motion on July 18 and 19, 2018, which was thereafter continued to August 2, 2018. On the following day, and prior to the conclusion of witness testimony, the Debtors and the Committee announced a settlement in principle that resolved the Committee's objection to the Dismissal Motion.

6.     On September 13, 2018, the Court entered an order approving the dismissal of the Luxembourg Debtors' Cases (Docket No. 1859), pursuant to a stipulation with the Committee (Docket No. 1859-1) (the "<u>Dismissal Stipulation</u>"), effective on the earlier of (a) the effective date of the Plan and (b) the date upon which a final and non-appealable order is entered approving a resolution of intercompany claims asserted by the Mexican Affiliates.

---

[6]     The U.S. Debtors are M & G USA Corporation ("<u>M&G USA</u>"), M & G Resins USA, LLC ("<u>Resins</u>"), Polymers, M & G Finance Corporation ("<u>Finance</u>"), M&G Waters USA, LLC, M & G USA Holding, LLC ("<u>USA Holding</u>"), Chemtex International Inc. ("<u>Chemtex</u>"), Chemtex Far East, Ltd. and Indo American Investments, Inc.

The Dismissal Stipulation provides for a reduction of up to $3 million of the $6 million in consideration paid by MGI to the U.S. Debtors thereunder in the event that MGI obtains a reduction of the claims the Mexican Affiliates filed against the U.S. Debtors by at least $600 million in the aggregate. The Dismissal Stipulation further provides that the Committee shall not "object to the proposed allowed amount of the [claims filed by the Mexican Affiliates against the U.S. Debtors] if [any settlement reducing such claims] provides for a reduction by at least $600,000,000 in the aggregate amount of such claims (*i.e.*, allowed claims in the aggregate amount of no more than $200,414,627.89)." Dismissal Stipulation, ¶ 7.

###    C.    The Settlement Agreement

7.    The Settlement Agreement achieves the mutual release of all claims between the Debtors and the Mexican Affiliates, subject to certain exceptions detailed below. Specifically, the Settlement Agreement contemplates the release of in excess of (a) $600 million in scheduled, liquidated, undisputed and non-contingent claims against the U.S. Debtors' estates and (b) $105 million in scheduled liquidated, undisputed and non-contingent claims against the Luxembourg Debtors' estates (*plus* the release of the MGI Guarantee).[7] In exchange, (a) the U.S. Debtors have agreed to release approximately $40 million in claims against the Mexican Affiliates and contribute USA Holding's and M&G USA's respective equity interests in Mexico Holding and M&Ghisolfi (the "Mexico Equity") to a creditor trust to be established by the Mexican Affiliates for the benefit of their non-affiliated creditors (the "Mexico Creditor Trust")

---

[7]    It is a condition precedent to the effectiveness of the Settlement Agreement that Polimeros obtain an irrevocable release on account of MGI's guarantee (the "MGI Guarantee") of Polimeros' obligations in the amount of approximately $80 million under that certain *Credit Agreement* between Polimeros and Banco Mercantil del Norte, Sociedad Anonima, Institucion de Banca Multiple, Grupo Financiero Banorte.

and (b) the Luxembourg Debtors have agreed to release approximately $120 million in claims against the Mexican Affiliates.[8]

8.      Further, the Settlement Agreement results in the consensual rejection of all but two contracts between the Mexican Affiliates and the Debtors and the waiver of any rejection damages resulting therefrom.  Finally, the Settlement Agreement, if approved, will result in the dismissal of the Luxembourg Cases, consistent with the terms of the Dismissal Stipulation.

9.      The Debtors believe that this settlement is clearly in the best interests of their estates and creditors as it (a) reduces in excess of $800 million in unsecured claims relating to intercompany loans and product sales that were scheduled by the U.S. Debtors as undisputed, liquidated and non-contingent to allowed unsecured claims against the U.S. Debtors in the aggregate amount of $200 million and (b) eliminates approximately $105 million in unsecured claims (*plus* the MGI Guarantee) against the Luxembourg Debtors.  In exchange, the Debtors are giving up claims of highly questionable collectability due to the financial condition of the Mexican Affiliates and equity interests in the Mexican Affiliates that the Debtors believe have, at best, *de minimis* value.

1.      **The Claims Being Resolved by the Settlement Agreement**[9]

10.      In the ordinary course of business, the Debtors, the Mexican Affiliates, the Brazilian Affiliates and the Italian Affiliates engaged in certain intercompany transactions,[10]

---

[8]      The Debtors believe that they would obtain little to no recovery on account of such claims due to offset rights and the amount of priority debt, including secured debt, owed by the Mexican Affiliates.

[9]      For the avoidance of doubt, in the event that the Settlement Agreement is not approved, the Debtors reserve all rights to assert any claims and/or defenses against any party with respect to any claims proposed to be settled thereunder.

[10]      Prior to the Petition Date, certain of the Debtors and their non-debtor affiliates (including certain Mexican Affiliates) were members of a cash pooling account (the "Cash Pooling Account").  On September 19, 2017, the members of the Cash Pooling Account terminated the account and formalized the amounts owing thereunder between the parties through the execution of a number of *Intercompany Credit Facility Agreements*, which form the basis of the majority of the claims proposed to be released under the Settlement

which resulted in, among other claims, a number of intercompany claims between the Parties. Under the Settlement Agreement, the Debtors are proposing to settle and release intercompany claims between the Mexican Affiliates and the Debtors, subject to the allowance of certain claims reduced and settled thereunder. Specifically, under the Settlement Agreement, the Parties agree to:

(a) release and disallow six of the nine claims filed by the Mexican Affiliates against the U.S. Debtors in these Cases in the aggregate amount of $800,414,627.89 (the "<u>Mexico – U.S. Debtor Claims</u>"), including the following:

| Proof of Claim No. | Mexican Affiliate | Debtor | Proposed Amount Disallowed |
|---|---|---|---|
| 784 | Servicios | M&G USA | $2,097,916.00 |
| 808 | Polimeros | USA Holding | $369.34 |
| 810 | M&Ghisolfi | M&G USA | $29,938,705.06 |
| 823[11] | Polimeros | Resins | $3,521,210.15 |
| 824 | Polimeros | Finance | $9,991,487.47 |
| 830 | Polimeros | M&G USA | $360,887,981.69 |

(b) allow the remaining three Mexico – U.S. Debtor Claims in the aggregate amount of $200,000,000 (the "<u>Retained Claims</u>"), including:

| Proof of Claim No. | Mexican Affiliate | Debtor | Amount Asserted | Amount Allowed |
|---|---|---|---|---|
| 781 | Polimeros | Chemtex | $137,000,656.28 | $42,000,000.00 |
| 832[12] | Polimeros | Polymers | $55,515,900.90 | $55,515,900.90[13] |
| 840 | Mexico Holding | M&G USA | $201,460,401.00 | $102,484,099.10 |

Agreement. The agreement governing the Cash Pooling Account is governed by Italian law. The *Intercompany Credit Facility Agreements* between the U.S. Debtors and the respective counterparty are governed by New York law, while the intercompany credit facilities between the Luxembourg Debtors and the respective counterparties are governed by Luxembourg law.

[11] Through this claim ("<u>Polimeros Claim 823</u>"), Polimeros asserted that Polymers owed it approximately $3 million for products supplied under that certain *Product Supply Agreement*, executed on July 1, 2017 between the parties (the "<u>Resins Product Supply Agreement</u>"). The Resins Product Supply Agreement is governed by Mexican law.

[12] Through this claim ("<u>Polimeros Claim 832</u>"), Polimeros asserted that Polymers owed it approximately $40 million for products supplied under that certain *Product Supply Agreement* executed on February 1, 2004 between the parties (the "<u>Polymers Product Supply Agreement</u>"). The Polymers Product Supply Agreement is governed by Mexican law.

[13] In accordance with the *Order Approving Stipulation Regarding Mediation Term Sheet and Related Matters* (Docket No. 1798) (the "<u>Bancomext Order</u>"), Polimeros Claim 832 has already been allowed by the Court, and the distribution, if any, on account of Polimeros Claim 832 shall be made directly to Bancomext. Polimeros' obligations to Bancomext under a revolving credit facility between the parties is secured by Polimeros' accounts receivable under the Polymers Product Supply Agreement.

(c)     release and disallow two claims filed by the Mexican Affiliates against the Luxembourg Debtors in these Cases in the aggregate amount of $105,396,354.58 (the "Mexico – Lux Debtor Claims"), including:

| Proof of Claim No. | Mexican Affiliate | Debtor | Amount Disallowed |
|---|---|---|---|
| 822 | Polimeros | MGI | $99,010,676.68 |
| 838 | Polimeros | MGC | $6,385,677.90 |

(d)     release and waive three intercompany claims that Polymers, Resins and USA Holding have against the Mexican Affiliates in the aggregate amount of $41,427,106.50 (the "U.S. Debtor – Mexico Claims");

(e)     release and waive three intercompany claims that MGI has against the Mexican Affiliates in the aggregate amount of $120,654,656.42 (the "Lux Debtor – Mexico Claims"); and

(f)     mutually release and waive all claims between the Debtors and the Mexican Affiliates (defined more specifically in the Settlement Agreement as the "Other Claims"), including, without limitation, claims arising in these Cases under chapter 5 of the Bankruptcy Code (defined more specifically in the Settlement Agreement as the "Bankruptcy Claims"), subject to the Retained Claims and the Preserved Rights[14] (together with the Mexico – U.S. Debtor Claims, Mexico – Lux Debtor Claims, U.S. Debtor – Mexico Claims and Lux Debtor – Mexico Claims, the "Debtor – Mexican Affiliate Released Claims").

11.     In addition to the Debtor – Mexican Affiliate Released Claims, the Settlement

Agreement contemplates the release and waiver of:

(a)     two intercompany claims that Polimeros has against the Italian Affiliates in the aggregate amount of $5,756,713.57 (the "Mexico – Italian Affiliate Claims");

(b)     two intercompany claims that Polimeri and MGF have against the Mexican Affiliates in the aggregate amount of $4,903,910.65 (the "Italian Affiliate – Mexico Claims");[15] and

---

[14]     The "Preserved Rights" are defined as "any and all rights and obligations otherwise enforceable under (i) any order entered by a court of competent jurisdiction in the Proceedings [as defined in the Settlement Agreement] on or before the Settlement Effective Date [as defined below], (ii) the settlement approved pursuant to the *Order Approving (I) Settlement Agreement By and Between Mossi & Ghisolfi International S.A.R.L., M&G Polímeros Brasil, S.A., M&G Chemicals, S.A., M&G Polímeros Mexico, S.A. DE C.V. and Aloke Empreedimentos E Participacoes LTDA. And (II) Related Letter Agreement by and between Mossi & Ghisolfi International S.A.R.L., M&G Chemicals S.A. and M&G Polímeros Brasil, S.A.* (Docket No. 1493), (iii) the Surviving Contracts, or (iv) the [Settlement] Agreement."

[15]     Because certain of the Italian Affiliates, including Finanziaria and Polimeri, intend to enter into an arrangement with creditors (*accord di ristrutturazione*) before the Court of Alessandria, North-West Italy (the "Italian Court") pursuant to section 182-bis of Italian bankruptcy law, the Settlement Agreement provides that

(c)     an intercompany claim that Polimeros has against Chemicals Brazil in the amount of $994.85 (the "Mexico – Brazil Claim" and together with the Mexico – Italian Affiliate Claims, Italian Affiliate – Mexico Claims, Mexico – U.S. Debtor Claims, Mexico – Lux Debtor Claims, U.S. Debtor – Mexico Claims and Lux Debtor – Mexico Claims, the "Liquidated Claims").[16]

**2.      The Surviving and Rejected Contracts**

12.     In addition to the release and disallowance of the Debtor – Mexican Affiliates Released Claims and the allowance (as settled) of the Retained Claims, the Settlement Agreement contemplates that, with the exception of two surviving contracts between certain of the U.S. Debtors and the Mexican Affiliates (the "Surviving Contracts"), all contracts between one or more of the Mexican Affiliates and one or more of the Parties (other than contracts solely among two or more Mexican Affiliates) will be terminated (the "Terminated Contracts").

13.     The Surviving Contracts consist of:  (a) that certain *Bill of Sale and Assignment*, between Polymers, Resins and Sales, dated February 1, 2018; and (b) that certain *License Agreement*, between M&G USA, Polymers, Resins, Polimeros and M&G Polimeros Brasil S.A., dated April 2, 2018.  A non-exhaustive list of the Terminated Contracts includes:[17]

(a)     the Polymers Product Supply Agreement;

(b)     the Resins Product Supply Agreement;

(c)     that certain *Cost Sharing Agreement*, between M&G Finanziaria Industriala S.p.A. and Polimeros, *et al*, dated December 29, 2003;

(d)     that certain *Trademark License Contract*, between M&G Finanziaria Srl and M&G Polymeros Mexico S.A., dated April 1, 2006;

---

the releases between the Italian Affiliates and the Mexican Entities may be subject to the approval of the Italian Court.

[16]     The Settlement Agreement provides that, in the event the Brazilian Affiliates and/or Magnate decline to execute such agreement, the Settlement Agreement shall nonetheless be binding among the Parties that have executed it.

[17]     A non-exhaustive list of the Terminated Contracts to which a Debtor is a counterparty (the "Rejected Contracts") is attached to the Proposed Order as Exhibit 4.

(e)  that certain *Agency Agreement*, between M&G Polímeros Mexico SA de CV and Mossi & Ghisolfi International S.A., dated July 15, 2007;

(f)  that certain *Global Agency and Mercantile Commission Agreement* (Contrato Global de Mandata Y Comision Mercantil) between Polímeros and Mossi & Ghisolfi International S.A., dated January 2, 2009;

(g)  that certain *PTA Supply Agreement* between M&G International S.A. and Mexico Holding, executed on May 31, 2010; and

(h)  that certain *Contrato de Prestacion de Servicios Especializados*, between MGI and Servicios, executed on December 30, 2015.

**3.  Other Key Terms of the Settlement Agreement**

14.  The other key terms of the Settlement Agreement are as follows:[18]

(a)  ***Effective Date***.  The Settlement Agreement shall be fully effective and enforceable against the Parties and the "<u>Settlement Effective Date</u>" shall occur on the first date on which all of the following conditions have been satisfied:

    (i)  the Court shall have entered the Proposed Order (or any Order approving the Settlement Agreement ("<u>Court Approval</u>")); and

    (ii)  Polimeros shall have received an irrevocable release of the MGI Guarantee.

Settlement Agreement, § 7(b).

(b)  ***Court Approval***.  The Settlement Agreement shall be automatically deemed null and void, and the Parties returned to their original standing, as if the Settlement Agreement had never been entered into, if (i) the Court enters an order denying approval of the Settlement Agreement; (ii) the Court Approval does not occur before December 12, 2018; or (iii) the Parties unanimously agree in writing to terminate the Settlement Agreement.  *Id.* at § 7(f).

(c)  ***Retained Claims***.  With effect on and from the Settlement Effective Date:

    (i)  The U.S. Debtors shall allow the Retained Claims, which shall remain and be included in these Cases as general unsecured claims, not subject to challenge, subordination, setoff, recharacterization, counterclaim or other reduction with respect to their validity, allowed amount, or distributions under any plan in these Cases; *provided that* in the event of a Substantive Consolidation (as defined in the Settlement Agreement), consistent with

---

[18]  The following summary is qualified in its entirety by reference to the provisions of the Settlement Agreement.  In the event of any inconsistencies between the provisions of the Settlement Agreement and the terms set forth herein, the terms of the Settlement Agreement shall govern.

the terms thereof, each of the Retained Claims shall receive any distributions from the applicable substantively consolidated estates rather than from the applicable U.S. Debtors against which such claims were asserted. *Id.* at § 3(a)(i).

(ii)    Each of the Parties agrees not to challenge the allowance of the Retained Claims pursuant to the Settlement Agreement. *Id.* at § 3(a)(ii).

(iii)    The U.S. Debtors shall promptly arrange for the official claims register in the Cases to be revised to reflect the allowance of the Retained Claims in the proposed amounts identified above and any other relevant terms of the Settlement Agreement. *Id.* at § 3(a)(iii).

(d)    ***Contribution of the Mexico Equity to the Mexico Creditor Trust***.

(i)    U.S. Holding and M&G USA agree to abandon and contribute the Mexico Equity to the Mexico Creditor Trust. *Id.* at § 4(a).

(ii)    Each non-Mexican Affiliate Party to the Settlement Agreement (each such party, a "<u>Non-Mexico Party</u>"), other than USA Holding and M&G USA, (1) represents and warrants that it holds no equity (or other) interest in any Mexican Affiliate, and (2) consents to the abandonment and contribution set forth in Section 4(a) of the Settlement Agreement (reflected in ¶ (d)(i) above). *Id.* at § 4(b).

(iii)    Promptly after the Settlement Effective Date, USA Holding and M&G USA shall (1) enter into an agreement with the Mexico Creditor Trust, to the extent necessary to render the transfer valid under Mexican law, whereby USA Holding and M&G USA irrevocably transfer title to the Mexico Equity to the Mexico Creditor Trust, and (2) endorse the certificates evidencing the Mexico Equity over to the Mexico Creditor Trust. For the avoidance of doubt, U.S. Holding, M&G USA and the Mexico Creditor Trust shall each bear their own costs in connection with the drafting, negotiation and execution of any such agreement and such endorsement. USA Holding and M&G USA agree to take such further steps as the Mexican Affiliates or the Mexico Creditor Trust may reasonably request to effect such transfer; *provided*, *that* in the event USA Holding or M&G USA or its successor asserts in good faith that its costs to take such further steps are unreasonable, it shall nonetheless take such further steps to the extent practicable if one or more of the Mexican Affiliates or the Mexico Creditor Trust, in their sole discretion, agree to reimburse such costs. *Id.* at § 4(c).

(e)    ***Terminated and Surviving Contracts***.

(i)    Each of the Debtors that is a counterparty to the Terminated Contracts agrees to reject, to the extent not previously rejected by order of the Court, pursuant to section 365 of the Bankruptcy Code, the Terminated

Contracts, all of which shall be terminated and of no further effect as of the Settlement Effective Date, with no rejection damages accruing in favor of the relevant Mexican Affiliates. *Id.* at § 5(a).

(ii)    Each of the Debtors that is a counterparty to the Surviving Contracts agrees to ratify the Surviving Contracts, all of which shall remain valid as among the Parties thereto as of the Settlement Effective Date, subject to termination as provided therein; *provided*, *however,* that the U.S. Debtors shall have no obligation to keep the Cases open or maintain their corporate existence solely for the purposes of continuing to perform under such Surviving Contracts. *Id.* at § 5(b).

(f)    ***Releases****.*

(i)    With effect on and from the Settlement Effective Date, each of the Mexican Affiliates unconditionally and irrevocably waives and releases all Released Claims that it had, has or may have against each Non-Mexico Party and its Party Representatives;[19] *provided, that,* the Mexican Affiliates shall setoff their claims against the Luxembourg Debtors against the Luxembourg Debtors' claims against the Mexican Affiliates pursuant to a multilateral setoff with no net claim remaining outstanding, and it is agreed that any net claim that otherwise would remain outstanding is hereby released; *provided, further,* that the Mexican Affiliates shall setoff their claims against the Italian Affiliates against the Italian Affiliates' claims against the Mexican Affiliates pursuant to a multilateral setoff with no net claim remaining outstanding, and it is agreed that any net claim that otherwise would remain outstanding is hereby released. *Id.* at § 6(a).

(ii)    With effect on and from the Settlement Effective Date, each Non-Mexico Party unconditionally and irrevocably waives and releases all Released Claims that it had, has or may have against each Mexican Affiliate and its Party Representatives; *provided*, *that*, the Luxembourg Debtors shall setoff their claims against the Mexican Affiliates against the Mexican Affiliates' claims against the Luxembourg Debtors pursuant to a multilateral setoff with no net claim remaining outstanding, and it is agreed that any net claim that otherwise would remain outstanding is hereby released; *provided*, *further*, that the Italian Affiliates shall setoff their claims against the Mexican Affiliates against the Mexican Affiliates' claims against the Italian Affiliates pursuant to a multilateral setoff with no net claim remaining outstanding, and it is agreed that any net claim that otherwise would remain outstanding is hereby released; *provided*, *however*, that no Debtor hereby releases any of its officers or directors or

---

[19]    "Party Representative" means "each Party's respective shareholders, members, owners, officers, directors, employees, advisors, attorneys, other professionals, agents, and any other persons acting or purporting to act on behalf of such Party in connection with the Liquidated Claims and the other matters resolved by this Agreement."

the officers or directors of any other Debtor from any claims whatsoever. *Id.* at § 6(b).

## RELIEF REQUESTED

15.     The Debtors request entry of an order, pursuant to Bankruptcy Rules 6006 and 9019 and sections 105, 363 and of the Bankruptcy Code, in substantially the form of the Proposed Order, approving the Settlement Agreement.

## BASIS FOR RELIEF

**A.     The Settlement Agreement Falls Well Above the Lowest Point in the Range of Reasonableness and Should Be Approved**

16.     Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the bankruptcy court may approve a compromise or settlement."  Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1). Courts have held that a transaction involving property of the estate should generally be approved so long as the trustee can demonstrate "some articulated business justification for using, selling, or leasing property outside of the ordinary course of business."  *In re Continental Airlines, Inc.*, 780 F. 2d 1223, 1226 (5th Cir. 1986); *accord In re Lionel Corp.*, 722 F. 2d 1063, 1071 (2nd Cir. 1983).  Moreover, section 105(a) provides that a bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

17.     Compromises are favored in the bankruptcy context "[t]o minimize litigation and expedite the administration of a bankruptcy estate."  *Martin v. Myers (In re Martin)*, 91 F. 3d 389, 393 (3d Cir. 1996).  "The authority to approve a compromise [or] settlement is within the sound discretion of the bankruptcy court."  *In re Northwestern Corp.*, 2008 WL 2704341, at *6 (Bankr. D. Del. Jul. 10, 2008) (quoting *Key3media Group, Inc. v. Pulver.Com, Inc. (In re*

*Key3media Group, Inc.)*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) ("In exercising this discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate.")).

18. When determining whether a settlement is fair and reasonable under Bankruptcy Rule 9019(a), courts in the Third Circuit consider the following factors (collectively, the "Martin Factors"):

   (a)   the probability of success in litigation;

   (b)   the likely difficulties of collection;

   (c)   the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and

   (d)   the paramount interest of the creditors.

*Martin*, 91 F. 3d at 393; *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006); *see also In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (in applying Bankruptcy Rule 9019(a), whether a court should approve a settlement depends on several factors, including the probability of success in the litigation, the complexity of the litigation, the attendant expense and delay, and the interests of the creditors); *In re Geller*, 74 B.R. 685, 688 (Bankr. E.D. Pa. 1987) (generally, a settlement will be approved as long as it clears a threshold of reasonableness); *Official Unsecured Creditors' Committee v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines, Inc.)*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd* 8 F. 3d 812 (3d Cir. 1993) (settlement must not fall below the lowest level in the range of reasonableness).

19. Although bankruptcy courts are directed to determine whether settlements are in the "best interests of the estate," *In the Matter of Energy Cooperative, Inc.*, 886 F. 2d 921, 927 (7th Cir. 1989), the bankruptcy court should not substitute its judgment for that of a trustee or

debtor in possession.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985); *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Indeed, the bankruptcy court is not to decide the numerous questions of law or fact raised in the litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.  *See In re Penn Trans. Co.*, 596 F. 2d 1102, 1114 (3d Cir. 1979); *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F. 2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983); *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("[I]n approving a settlement, the court does not have to be convinced that the settlement is the best possible compromise . . . [it] must only conclude that the compromise or settlement . . . be above the lowest point in the range of reasonableness.") (internal quotation and citations omitted).

20.     As set forth in greater detail below, the Debtors believe that the weight of the Martin Factors favors approval of the Settlement Agreement.  The Settlement Agreement results in the mutual release of claims between the Debtors and the Mexican Affiliates (subject to the Retained Claims and the Preserved Rights), including in excess of $700 million in scheduled claims (plus the release of the MGI Guarantee) that the Mexican Affiliates have against the Debtors in exchange for the release of approximately $160 million in claims that the Debtors have against the Mexican Affiliates, plus the contribution of the Mexican Equity to the Mexico Creditor Trust and the allowance of $200 million in general unsecured claims (*i.e.*, the Retained Claims) against the U.S. Debtors estates.  Further, the Settlement Agreement, if approved, will result in the Dismissal of the Luxembourg Cases, consistent with the Dismissal Stipulation, which the Court previously approved as in the best interests of the Debtors' estates.  Finally, the Settlement Agreement is the result of arms'-length negotiations between the Parties.  As such, the

Debtors respectfully submit that the Settlement Agreement falls well above the lowest point in the range of reasonableness and should be approved by this Court.

21.    *Probability of Success*.  The Mexico – U.S. Debtor Claims and the Mexico – Lux Debtor Claims were each evidenced in the respective Debtors' *Schedules of Assets and Liabilities* as liquidated, non-contingent and undisputed.[20]  As such, notwithstanding that the Debtors have certain counterclaims (including the U.S. Debtor – Mexico Claims and Lux Debtor – Mexico Claims) to the claims asserted by the Mexican Entities, the claims asserted by the Mexican Affiliates far outweigh the claims asserted by the Debtors such that the Mexican Affiliates would likely be entitled to a recovery (consistent with the Plan) on account of such claims.[21]  Rather than risk an adverse ruling, the Mexican Affiliates and the Debtors have agreed (subject to Court approval) to a mutual release of claims between the parties, subject to the Retained Claims and the Preserved Rights.  Therefore, this factor weighs in favor of approval of the Settlement Agreement.

22.    *Difficulties of Collection*.  The Debtors believe that it would be difficult, if not impossible, to collect the full amount of the U.S. Debtor – Mexico Claims and the Lux Debtor – Mexico Claims.  As discussed above, the Mexican Affiliates are presently in the process of restructuring their indebtedness pursuant to Mexican insolvency law.  As such, given the Mexican Affiliates' financial condition, it appears unlikely that the Debtors could make a recovery meaningful enough to warrant a collection action in Mexico, the likely situs of any such collection effort.  Moreover, the Mexican Affiliates have informed the Debtors that they would

---

[20]    *See*, *e.g.*, Docket Nos. 745 (MGC), 747 (Finance), 755 (USA Holding), 760 (USA), 778 (Chemtex), 780 (Polymers), 782 (Resins) & 784 (MGI).

[21]    Further, as set forth above, Polimeros Claim 832 has already been allowed pursuant to the Bancomext Order.

resist any effort by the Debtors to collect on account of their claims against the Mexican Affiliates and potentially would seek to setoff any recovery to which the Debtors are entitled. Accordingly, this factor weighs in favor of approval of the Settlement Agreement.

23.     *Complexity of Litigation.*  Litigating the claims between the Mexican Affiliates and the Debtors is potentially complex.  Among other things, Polimeros Claim 823 is based, in part, on amounts that Resins owes Polimeros for products supplied under the Resins Product Supply Agreement, which is governed by, and to be interpreted in accordance with, Mexican law.  Litigating this claim would thus require interpretation of Mexican law, a process that the Settlement Agreement avoids.

24.     Further, a majority of the Mexico – U.S. Debtor Claims and Mexico – Lux Debtor Claims arise in connection with the winding up of the Cash Pooling Account.  As discussed above, upon the termination of such account, the Debtors evidenced the obligations between the parties thereunder through execution of a number of intercompany credit agreements.  Although the agreement governing the Cash Pooling Account is governed by Italian law, each of the intercompany credit agreements is governed by either New York law (in the case of agreements with the U.S. Debtors) or Luxembourg law (in the case of agreements with the Luxembourg Debtors).  This factor thus favors approval of the Settlement Agreement.

25.     *Paramount Interests of Creditors.*  Finally, the Settlement Agreement is in the paramount interests of all creditors.  The Settlement Agreement releases the Debtors from in excess of $700 million in claims scheduled as undisputed, non-contingent and liquidated without the need for litigation, thereby saving the estates the administrative cost of litigating such claims. More to the point, the Settlement Agreement substantially reduces the amount of general unsecured claims asserted against the U.S. Debtors, thereby potentially increasing the recovery

to the holders of such claims.  Further, the Settlement Agreement results in the consensual

rejection of all agreements between the Mexican Affiliates and the Debtors, with the exception

of the Surviving Contracts, without the need for litigation.

26.     For these reasons, entry into the Settlement Agreement is a sound exercise of the

Debtors business judgment, is in best interests of their creditors and their estates and falls well

above the lowest point in the range of reasonableness.  Accordingly, the Debtors respectfully

request that the Court approve and authorize their entry into the Settlement Agreement.

**B.     Rejection of the Rejected Contracts Is an Appropriate Exercise of the Debtors' Business Judgment and Should Be Approved**

27.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a); *see also L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home

Centers, Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000) (section 365 of the Bankruptcy Code "allows a

trustee to relieve the bankruptcy estate of burdensome agreements which have not been

completely performed").  Courts routinely approve motions to reject executory contracts and

unexpired leases upon a showing that a debtor's decision to take such action will benefit the

debtor's estate and is an exercise of sound business judgment.  *See Krebs Chrysler-Plymouth,

Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 492 (3d Cir. 1998); *In re Taylor*, 913 F.2d 102, 107 (3d

Cir. 1990); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006)

("Courts have uniformly deferred to the business judgment of the debtor to determine whether

the rejection of an executory contract or unexpired lease by the debtor is appropriate under

section 365(a) of the Bankruptcy Code.").

28.     Courts generally will not second-guess a debtor's reasonable and good faith

business judgment concerning the rejection of an executory contract or unexpired lease, unless

the decision is the product of bad faith, whim or caprice. *See In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (applying a business judgment standard, absent a showing of bad faith, whim, or caprice); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (same); *see also Summit Land Co. v. Allen (In re Summit Land. Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstance, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course"). The standard merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Cor. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989).

29.     The rejection of the Rejected Contracts is a sound exercise of the Debtors' business judgment and in the best interests of their estates. Given that they no longer have a use for the Rejected Contracts, the Debtors determined that rejection of the Rejected Contracts is necessary, reasonable and appropriate. Moreover, under the Settlement Agreement, the Mexican Affiliates have agreed to waive and release any rejection damages resulting from the rejection of the Rejected Contracts. Accordingly, the Debtors respectfully request that, in connection with approval of the Settlement Agreement, they be authorized to reject the Rejected Contracts.

## COMPLIANCE WITH BANKRUPTCY RULE 6006(f)

30.     Bankruptcy Rule 6006(f) establishes requirements for a motion to reject multiple executory contracts or unexpired leases that are not between the same parties. Bankruptcy Rule 6006(f) states, in part, that such a motion shall:

(a)     state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;

(b)     list parties alphabetically and identify the corresponding contract or lease;

(c)     specify the terms, including the curing of defaults, for each requested assumption or assignment;

(d)     specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;

(e)     be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases; and

(f)     be limited to no more than 100 executory contracts or unexpired leases.

The Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6006(f).

## NOTICE

31.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) the Internal Revenue Service, the Securities and Exchange Commission and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or order of the Court; (c) DAK and its counsel, Weil, Gotshal & Manges LLP and Morris, Nichols, Arsht & Tunnell LLP; (d) Banco Inbursa S.A., Institución De Banca Multiple, Grupo Financiero Inbursa,Control Empresarial de Capitales, S.A. de C.V. and their counsel, Cleary Gottlieb Steen & Hamilton LLP and Young Conaway Stargatt & Taylor, LLP; (e) Macquarie Investments US Inc. and its counsel, Sidley Austin LLP and Ashby & Geddes, P.A.; (f) the Committee and its counsel Milbank, Tweed, Hadley & McCoy LLP and Cole Schotz P.C.; (g) Corpus Christi Polymers, LLC and its counsel, Weil, Gotshal & Manges LLP, Lowenstein Sandler LLP and Duane Morris; (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 at the time of noticing; (i) the Mexican Affiliates and their counsel Morgan, Lewis & Bockius; (j) the Brazilian Affiliates and Magnate

S.a r.l. and their counsel Kirkland & Ellis LLP; and (k) the Italian Affiliates.  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

32.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order and grant such other and further relief as may be appropriate.

Dated: October 19, 2018

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Joseph M. Mulvihill
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              joneill@pszjlaw.com
              jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:    (212) 326-3939
Facsimile:    (212) 755-7306
Email:        sgreenberg@jonesday.com
              scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, OH 44114
Telephone:    (216) 586-7035
Facsimile:    (216) 579-0212
Email:        ceblack@jonesday.com

Co-Counsel for the Debtors and Debtors in Possession