## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| M & G USA CORPORATION, *et al.*,[1] | : | Case No. 17-12307 (BLS) |
| Debtors. | : | (Jointly Administered) |

---

## AMENDED JOINT PLAN OF LIQUIDATION OF
## THE U.S. DEBTORS AND DEBTORS IN POSSESSION

---

JONES DAY
Scott J. Greenberg (admitted *pro hac vice*)
Stacey Corr-Irvine (admitted *pro hac vice*)
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Email:     sgreenberg@jonesday.com
           scorrirvine@jonesday.com

Carl E. Black (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-7035
Facsimile: (216) 579-0212
Email:     ceblack@jonesday.com

Daniel J. Merrett (admitted *pro hac vice*)
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
Email:     dmerrett@jonesday.com

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:     ljones@pszjlaw.com
           joneill@pszjlaw.com
           jmulvihill@pszjlaw.com

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

Dated: October 31, 2018

---

[1]     The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449); M & G Resins USA, LLC (3236); M & G Polymers USA, LLC (7593); M & G Finance Corporation (4230); M&G Waters USA, LLC (2195); Mossi & Ghisolfi International S.à r.l. (1270); M&G Chemicals S.A. (N/A); M&G Capital S.à r.l. (7812); M & G USA Holding, LLC (3451); Chemtex International Inc. (7695); Chemtex Far East, Ltd. (2062); and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

# TABLE OF CONTENTS

I.     DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ...................... 1

     A.     Defined Terms ................................................................................................................ 1

     B.     Rules of Interpretation and Computation of Time ....................................................... 18

II.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................... 19

     A.     Unclassified Claims ..................................................................................................... 19

     B.     Classification of Claims and Interests .......................................................................... 21

     C.     Treatment of Claims ..................................................................................................... 22

     D.     Reservation of Rights Regarding Claims ..................................................................... 25

     E.     Postpetition Interest on Claims ..................................................................................... 25

     F.     Insurance ...................................................................................................................... 26

III.     MEANS OF IMPLEMENTATION .......................................................................................... 26

     A.     Corporate Existence ..................................................................................................... 26

     B.     Dissolution Transactions .............................................................................................. 26

     C.     Litigation Trust ............................................................................................................ 26

     D.     Corporate Governance, Directors and Officers ........................................................... 30

     E.     No Revesting of Assets ................................................................................................ 30

     F.     Creation and Maintenance of Trust Accounts .............................................................. 30

     G.     Substantive Consolidation of the U.S. Debtors ........................................................... 31

     H.     Preservation of Causes of Action; Compromise and Settlement of Disputes .............. 31

     I.     Cancellation and Surrender of Instruments, Securities and Other Documentation ...... 32

     J.     Release of Liens ........................................................................................................... 32

     K.     Effectuating Documents; Further Transactions ........................................................... 33

     L.     Substitution in Pending Legal Actions ......................................................................... 33

IV.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................... 33

     A.     Assumption and Rejection of Executory Contracts and Unexpired Leases ................. 33

     B.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................ 34

     C.     Claims Based on Rejection of Executory Contracts and Unexpired Leases ................ 34

     D.     Contracts and Leases Entered Into After the Petition Date .......................................... 34

     E.     Insurance Policies ........................................................................................................ 35

     F.     Reservation of Rights ................................................................................................... 35

     G.     Pre-Existing Obligations to the U.S. Debtors Under Executory Contracts and Unexpired Leases ........................................................................................................ 35

V.     PROVISIONS GOVERNING DISTRIBUTIONS ................................................................... 35

     A.     Distributions for Allowed Claims as of the Effective Date .......................................... 35

     B.     Method of Distributions to Holders of Claims ............................................................. 35

     C.     Disbursing Agent; No Liability .................................................................................... 36

     D.     Disputed Claims Reserves and Fee Reserves .............................................................. 36

| | | | |
|---|---|---|---|
| E. | Investment of Trust Accounts | | 37 |
| F. | Delivery of Distributions and Undeliverable Distributions to Holders of Claims | | 37 |
| G. | Distribution Record Date | | 37 |
| H. | Minimum Distributions | | 38 |
| I. | Compliance with Tax Requirements | | 38 |
| J. | Manner of Payment Under the Plan. | | 38 |
| K. | Time Bar to Cash Payments. | | 38 |
| L. | Setoffs | | 39 |
| M. | Allocation Between Principal and Accrued Interest | | 39 |
| N. | Distributions to Holders of Disputed Claims | | 39 |
| O. | Claims Paid or Payable by Third Parties | | 39 |
| VI. | DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS | | 40 |
| A. | Allowance of Claims | | 40 |
| B. | Prosecution of Objections to Claims | | 40 |
| C. | Estimation of Claims | | 41 |
| D. | Claims Subject to Pending Actions | | 41 |
| E. | Offer of Judgment | | 41 |
| VII. | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | 41 |
| A. | Conditions to Confirmation | | 41 |
| B. | Conditions to the Effective Date | | 41 |
| C. | Waiver of Conditions to the Effective Date | | 42 |
| D. | Effect of Nonoccurrence of Conditions to the Effective Date | | 42 |
| VIII. | NON-CONSENSUAL CONFIRMATION | | 42 |
| IX. | EFFECT OF CONFIRMATION | | 43 |
| A. | Dissolution of Official Committees | | 43 |
| B. | Exculpation | | 43 |
| C. | Releases | | 43 |
| D. | Injunction Related to Releases | | 44 |
| E. | Votes Solicited in Good Faith | | 45 |
| F. | Term of Injunctions or Stays | | 45 |
| G. | Approval of the Bancomext Settlement | | 45 |
| X. | RETENTION OF JURISDICTION | | 46 |
| XI. | MISCELLANEOUS PROVISIONS | | 48 |
| A. | Modification of the Plan | | 48 |
| B. | Revocation of the Plan or Non-Occurrence of the Confirmation Date or Effective Date | | 48 |
| C. | Conversion or Dismissal of Certain of the Chapter 11 Cases | | 48 |
| D. | Inconsistency | | 48 |

|  | E. | Exhibits / Schedules ............................................................................................................ | 48 |
|  | F. | Severability .......................................................................................................................... | 49 |
|  | G. | Governing Law ..................................................................................................................... | 49 |
|  | H. | Successors and Assigns ........................................................................................................ | 49 |
|  | I. | Service of Documents .......................................................................................................... | 49 |
| XII. |  | CONFIRMATION REQUEST ............................................................................................. | 51 |

**TABLE OF EXHIBITS**[2]

Exhibit A – Initial Members of the Litigation Trust Oversight Committee

Exhibit B – Initial Litigation Trustee

Exhibit C – Litigation Trust Agreement

Exhibit D – Nonexclusive Schedule of Pending Litigation Trust Causes of Action

Exhibit E – Schedule of Executory Contracts and Unexpired Leases to Be Assumed and Assigned to the Litigation Trust

Exhibit F – Dissolution Transactions Exhibit

---

[2] Any Exhibits not initially annexed to the Plan will be Filed as part of the Plan Supplement. All Exhibits will be made available, free of charge, on the Document Website once they are filed. Copies of all Exhibits may be obtained from the Claims and Noticing Agent by calling (855) 388-4578 (toll-free). The Debtors reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make any such Exhibits available on the Document Website.

**INTRODUCTION**

M & G USA Corporation; M & G Resins USA, LLC; M & G Polymers USA, LLC; M & G Finance Corporation; M&G Waters USA, LLC; M & G USA Holding, LLC; Chemtex International Inc.; Chemtex Far East, Ltd.; and Indo American Investments, Inc., as debtors and debtors in possession, propose this amended joint plan of liquidation for the resolution of Claims against and Interests in each of the U.S. Debtors pursuant to chapter 11 of the Bankruptcy Code. The U.S. Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Creditors' Committee supports confirmation of the Plan.

This Plan provides for, among other things, (i) the substantive consolidation of the U.S. Debtors' assets and liabilities for the purposes of implementing, voting on and calculating and making Distributions under this Plan, assessing whether the Confirmation standards have been met and filing certain post-Confirmation reports and paying certain fees, (ii) the liquidation and conversion of all of the U.S. Debtors' Remaining Assets to Cash and Litigation Trust Assets and (iii) the Distribution of the net proceeds realized therefrom to creditors holding Allowed Claims in accordance with the relative priorities established in the Bankruptcy Code. This Plan contemplates the formation of a Litigation Trust and the appointment of a Litigation Trustee to, among other things, resolve Disputed Claims, make potential recoveries in prosecuting the Causes of Action, implement the terms of this Plan, make Distributions in accordance with this Plan and dissolve the U.S. Debtors under applicable law.

Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the U.S. Debtors' assets, liabilities, history, businesses, results of operations, historical financial information and properties, and for a summary of the Plan and the Distributions to be made thereunder.

Other agreements and documents supplementing the Plan are appended as Exhibits hereto and have been or will be Filed with the Bankruptcy Court. These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and will be available for review on the Document Website.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, IN BANKRUPTCY RULE 3019 AND IN THE PLAN, THE U.S. DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

**I.      DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME**

**A.      Defined Terms**

Capitalized terms used in the Plan and not otherwise defined herein shall have the meanings set forth below. Any term that is not defined in this Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**1.      "Administrative Claim"** means a Claim against a U.S. Debtor or its Estate for costs or expenses of administration of the Estates pursuant to sections 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the U.S. Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

**2.      "Administrative Claim Interim Bar Date"** means June 11, 2018 at 5:00 p.m. (prevailing Eastern Time).

**3.      "Administrative Claims Final Bar Date"** means the date that is 30 days after the Effective Date.

4. **"Administrative Claims Objection Deadline"** means the date that is 60 days after the Administrative Claims Final Bar Date or such other date as designated in a Final Order.

5. **"Affiliate"** means, with respect to any Entity, an "affiliate," as such term is defined in section 101(2) of the Bankruptcy Code, as if such Entity were a debtor.

6. **"Allowed"** means with respect to Claims: (a) any Claim (i) for which a Proof of Claim has been timely Filed on or before the applicable Bar Date (or for which a Proof of Claim is not required to be Filed pursuant to the Bankruptcy Code or a Final Order) or (ii) that is identified in the Schedules as of the Effective Date as not disputed, not contingent and not unliquidated, and for which no Proof of Claim has been timely Filed; provided that, in each case, any such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed by the Claims Objection Bar Date or such an objection has been interposed and the Claim thereafter has been Allowed by a Final Order; or (b) any Claim Allowed pursuant to the Plan, a Final Order of the Bankruptcy Court (including pursuant to any stipulation or settlement agreement approved by the Bankruptcy Court); provided, further, that the Claims described in clauses (a) and (b) above shall not include any Claim on account of a right, option, warrant, right to convert or other right to purchase an Interest. Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.

7. **"Apple Grove Assets"** means the Apple Grove Plant, the Sharon Center Facility, and related Intellectual Property that was sold pursuant to the Apple Grove Sale.

8. **"Apple Grove Plant"** means manufacturing property, equipment and plant formerly owned by the Debtors located in Apple Grove, West Virginia.

9. **"Apple Grove Sale"** means the sale of the Apple Grove Assets to Far Eastern Investment (Holding) Limited pursuant to that certain *Asset Purchase Agreement* among M&G Polymers and M&G USA and Far Eastern Investment (Holding) Limited, dated as of January 30, 2018, and approved by the Bankruptcy Court on February 1, 2018 (Docket No. 864).

10. **"Avoidance Actions"** means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the U.S. Debtors or the Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code and other similar state law claims and causes of action other than any such claims or causes of action against any of the Released Parties or the Exculpated Parties.

11. **"Ballot"** means the applicable form or forms of ballot(s) distributed to Holders of Claims entitled to vote on the Plan and on which the acceptance or rejection of the Plan is to be indicated.

12. **"Bancomext"** means Banco Nacional de Comercio Exterior, S.N.C. Institución de Banca de Desarrollo.

13. **"Bancomext Acquired Claim"** means any Claim, other than the Mexico Polimeros Allowed Claim, of any Entity other than Bancomext, including from Mexico Holding and Mexico Polimeros, in which Bancomext acquires rights, whether by assignment, novation, participation or other form of agreement.

14. **"Bancomext Allowed Claim"** means Bancomext's Allowed General Unsecured Claim in the amount of $70,000,000 against the U.S. Debtors' substantively consolidated Estates, Allowed pursuant to the Bancomext Settlement Order.

15. **"Bancomext Settlement"** means the settlement among the Debtors, Bancomext and the Creditors' Committee, as set forth in the Bancomext Term Sheet, the Bancomext Stipulation and Section IX.G of this Plan.

16. **"Bancomext Stipulation"** means the *Stipulation Regarding Mediation Term Sheet and Related Matters*, a copy of which is attached as Exhibit A to the Bancomext Settlement Order.

17. **"Bancomext Settlement Order"** means the *Order Approving Stipulation Regarding Mediation Term Sheet and Related Matters* (Docket No. 1798), entered by the Bankruptcy Court on August 28, 2018.

18. **"Bancomext Term Sheet"** means the *Mediation Term Sheet*, a copy of which is attached as Exhibit 1 to the Bancomext Stipulation.

19. **"Banibu"** means Banibu II Holdings, Inc.

20. **"Bankruptcy Code"** means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to these Chapter 11 Cases.

21. **"Bankruptcy Court"** means the United States District Court having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to 28 U.S.C. § 157, the bankruptcy unit of such District Court.

22. **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

23. **"Bar Date"** means the applicable deadline by which a Proof of Claim or request for payment of administrative expenses must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

24. **"Bar Date Order"** means (a) the Lien Identification Order; (b) the General Bar Date Order; and (c) the Interim Administrative Claims Bar Date Order.

25. **"Bidders"** means (a) Far Eastern Investment (Holding) Ltd.; (b) DAK Americas LLC; (c) Indorama Ventures Public Company Limited; and (d) the Purchaser.

26. **"Bid Support Term Sheet"** means the bid support term sheet annexed to the *Stipulation Regarding Settlement and Agreement with Respect to Sale of Corpus Christi Assets and Related Matters* (Docket No. 1299-1), approved by the Bankruptcy Court on March 29, 2018, as amended on October 18, 2018 and approved by the Bankruptcy Court on October 19, 2018 (Docket No. 1991).

27. **"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

28. **"Cash"** means the lawful currency of the United States of America and equivalents thereof.

29. **"Causes of Action"** means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, arising on, prior to or after the Petition Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, including Avoidance Actions, asserted, or which may be asserted, by or on behalf of any of the U.S. Debtors and/or the Estates, which are or may be pending on the Effective Date or prosecuted thereafter against any Entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Confirmation Date.

30. **"CCP Budget"** means the Budget (as defined in the CCP DIP), as amended or modified with the consent of the Purchaser, the Pre-Petition First Lien Lender and CEC.

31. **"CCP DIP"** means that certain Debtor-In-Possession Credit and Security Agreement dated as of May 18, 2018 by and between, inter alia, the Purchaser, as lender, and M&G Resins, as borrower and approved on a final basis pursuant to the CCP Final DIP Order (as amended, modified, or supplemented).

NAI-1504730427v10

**32.** **"CCP DIP Claims"** means the Claims of the Purchaser, in its capacity as postpetition lender to certain of the Debtors, against any of the U.S. Debtors under or evidenced by the CCP Final DIP Order.

**33.** **"CCP Final DIP Order"** means the *Final Order (I) Authorizing Certain Debtors to Incur Postpetition Secured Superpriority Indebtedness Pursuant to Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d); (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1366), entered by the Bankruptcy Court on April 12, 2018 (as it has been or may be amended, modified or supplemented from time to time, including by the order of the Bankruptcy Court dated October 19, 2018 (Docket No. 1991)).

**34.** **"CEC"** means Control Empresarial de Capitales, S.A. de C.V., in its capacity as postpetition lender to certain of the Debtors.

**35.** **"CEC DIP Claims"** means the Claims of CEC against any of the U.S. Debtors under, evidenced or authorized by the CEC Final DIP Order (including DIP Obligations (as defined therein) as they have been or may be amended, modified or supplemented from time to time).

**36.** **"CEC Final DIP Order"** means the *Final Order Granting Debtors' Motion to (1) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (2) Grant Liens and Superpriority Administrative Expense Claims to DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507; (3) Provide Adequate Protection to the Pre-Petition First Lien Lender and the Pre-Petition Second Lien Secured Party; (4) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (5) Granting Related Relief* (Docket No. 479), entered by the Bankruptcy Court on December 13, 2017 (as it has been or may be amended, modified or supplemented from time to time, including by the orders of the Bankruptcy Court dated March 28, 2018 (Docket No. 1292), October 2, 2018 (Docket No. 1908) and October 19, 2018 (Docket No. 1991)).

**37.** **"Chapter 11 Cases"** means the cases commenced under chapter 11 of the Bankruptcy Code by the U.S. Debtors in the Bankruptcy Court.

**38.** **"Chemtex"** means Chemtex International Inc.

**39.** **"Chemtex Assets"** means the Debtors' equity interests in non-Debtors Chemtex Engineering Co. Ltd., Chemtex Trading, Chemtex Shanghai Chemical Engineering Co. Ltd. and Chemtex Consulting of India (Pvt.) Ltd.

**40.** **"Chemtex Sale"** means the sale of the Chemtex Assets pursuant to that certain *Stock Purchase Agreement* by, between and among Chemtex Global Corporation; Shiner Management & Consulting Co. Ltd.; MGI; Chemtex; Chemtex Far East, Ltd.; Chemtex Consulting of India (PVT.) Ltd.; Chemtex Engineering Co. Ltd.; Chemtex (Shanghai) International Trading Co. Ltd.; and Chemtex (Shanghai) Chemical Engineering Co. Ltd., dated February 22, 2018, and approved by the Bankruptcy Court on March 12, 2018 (Docket No. 1137).

**41.** **"Claim"** means a claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a U.S. Debtor.

**42.** **"Claims and Noticing Agent"** means Prime Clerk LLC, in its capacity as claims and noticing agent appointed in the Chapter 11 Cases.

**43.** **"Claims Objection Bar Date"** means, for all Claims, the later of: (a) 180 days after the Effective Date and (b) such other period of limitation for objecting to Claims as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a further order of the Bankruptcy Court.

**44.** **"Class"** means a class of Claims or Interests, as described in Section II of this Plan.

**45.** **"Closing Date"** has the meaning given to that term in section 4.1 of the Corpus Christi Asset Purchase Agreement and refers to the date on which the sale of the Corpus Christi Assets and the assumption of liabilities contemplated under the Corpus Christi Asset Purchase Agreement closes.

NAI-1504730427v10

46. **"Comerica"** means Comerica Bank.

47. **"Comerica Adequate Protection Liens"** means the adequate protection liens granted to Comerica under the Final Cash Collateral Order and the Final Order of the Bankruptcy Court approving the Apple Grove Sale (Docket No. 864), including on $10,600,000 of the proceeds of the Apple Grove Sale.

48. **"Comerica Adequate Protection Superpriority Claim"** means the Allowed Administrative Claim with superpriority pursuant to section 507(b) of the Bankruptcy Code granted Comerica pursuant to paragraph 6 of the Final Cash Collateral Order, which shall not receive the treatment provided for Allowed Administrative Claims under Section II.A.1 hereof but will instead receive the treatment provided for in Section II.C.5 hereof.

49. **"Comerica Claims"** means the Claims of Comerica, or any successor or assign thereof, against any of the U.S. Debtors under or evidenced by the Comerica Credit Documents and the Final Cash Collateral Order.

50. **"Comerica Collateral Accounts"** means the segregated cash collateral accounts maintained by, and under the exclusive control of, Comerica, including (a) the account ending in *452 and (b) the account ending in *306.

51. **"Comerica Credit Documents"** means that certain Credit Agreement, dated as of December 21, 2015 between Comerica and M&G Polymers, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, security agreement, financing statement, pledge, assignment, forbearance agreement and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time.

52. **"Comerica Obligations"** means the "Prepetition Obligations," as such term is defined in the Final Cash Collateral Order.

53. **"Completion Fee"** means those fees payable to (a) Alvarez & Marsal North America, LLC in the amount of $2,500,000, (b) Rothschild Inc., Rothschild S.p.A. and Greenhill & Co., LLC in the amount of $9,000,000 and (c) Jefferies LLC in the amount of $2,500,000, each in their capacity as Professionals, in respect of and subject to the occurrence of the Closing Date in connection with the Corpus Christi Sale.

54. **"Completion Fee Reserve"** means an escrow account to be established and funded by the Purchaser on the Closing Date (and subject in all respects to the occurrence of the Closing Date) with Cash in the amount of $14,000,000.00, pursuant to Section 3.3(h) of the Corpus Christi Asset Purchase Agreement.

55. **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

56. **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

57. **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan, as such hearing may be continued from time to time.

58. **"Confirmation Order"** means the order of the Bankruptcy Court, which shall be in form and substance acceptable to the U.S. Debtors, the Creditors' Committee, Pre-Petition First Lien Lender, CEC and the Purchaser confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

59. **"Corpus Christi Assets"** means the Corpus Christi Plant and related real property, Intellectual Property and other assets, including the desalination equipment and boilers owned by M&G Waters being sold pursuant to the Corpus Christi Asset Purchase Agreement.

NAI-1504730427v10

60.     "**Corpus Christi Asset Purchase Agreement**" means the Asset Purchase Agreement executed among M&G Resins, M&G Polymers, M&G Waters, M&G USA, Chemtex, MGI and the Purchaser, dated as of March 28, 2018 (a copy of which is attached as Exhibit 1 to the Corpus Christi Sale Order), as amended by that certain First Amendment to Asset Purchase Agreement, dated as of October 18, 2018 and approved by the Bankruptcy Court on October 19, 2018 (Docket No. 1991).

61.     "**Corpus Christi Claims**" means:  (a) all Claims arising from mechanic and materialmen's liens relating to the Corpus Christi Assets, including, without limitation, Corpus Christi Mechanics' Lien Claims; (b) all Cure Claims relating to the Corpus Christi Assets; (c) all Purchaser Priority Claims; and (d) all Purchaser Administrative Claims.

62.     "**Corpus Christi Causes of Action**" means all claims, counterclaims, Causes of Action and any defenses thereto with respect to (a) mechanic and materialmen's liens relating to the Corpus Christi Assets (including claims and Causes of Action against Sinopec and Chemtex) and (b) counterparties to any agreements relating to the Corpus Christi Assets.

63.     "**Corpus Christi Mechanics' Lien Assumed Claim**" means the Corpus Christi Mechanics' Lien Claims of (a) WFS Construction Company, LLC and (b) Blanchard Contractors, Inc., which are not subject to treatment under this Plan because such liabilities (subject to any and all defenses, counterclaims and offsets available to the U.S. Debtors' estates), constitute "Closing Date Permitted Exceptions" (as defined in the Corpus Christi Asset Purchase Agreement), which shall be assumed by the Purchaser as of the Closing Date pursuant to and in accordance with the Corpus Christi Asset Purchase Agreement and Corpus Christi Sale Order.

64.     "**Corpus Christi Mechanics' Lien Claim**" means any Claim (other than an Intercompany Claim) (a) asserted as secured by a mechanic's or materialmen's lien over some or all of the Corpus Christi Assets pursuant to Chapter 53 of the Texas Property Code and/or Article XVI, Section 37 of the Constitution of the State of Texas and (b) asserted by a Holder identified in the Corpus Christi Mechanics' Lien Schedule as having (i) recorded one or more affidavits claiming mechanics' and materialman's liens in the official real property records or deeds records of Nueces County, Texas, (ii) filed in the Chapter 11 Cases one or more notices of perfection of lien pursuant to section 546(b)(2) of the Bankruptcy Code and/or (iii) submitted in the Chapter 11 Cases one or more statement of lien forms in accordance with the *Order (I) Establishing Lien Identification Procedures and (II) Granting Related Relief* (Docket No. 457).

65.     "**Corpus Christi Mechanics' Lien Reserve Claim**" means any Corpus Christi Mechanics' Lien Claim other than a Corpus Christi Mechanics' Lien Assumed Claim.

66.     "**Corpus Christi Mechanics' Lien Schedule**" means the Revised Lienholder Schedule attached as <u>Exhibit A</u> to the *Debtors' Omnibus Reply in Support of Their Motion for Entry of an Order Establishing a Lienholder Claims Reserve and Granting Related Relief* (Docket No. 1227).

67.     "**Corpus Christi Mechanics' Lien Reserve**" means the escrow account to be established pursuant to Section 3.3(j) of the Corpus Christi Asset Purchase Agreement (and subject in all respects to the occurrence of the Closing Date).

68.     "**Corpus Christi Mechanics' Lien Reserve Procedures**" means any procedures established by any Final Order of the Bankruptcy Court for the administration of the Corpus Christi Mechanics' Lien Reserve.

69.     "**Corpus Christi Plant**" means the Debtors' manufacturing facility located in Corpus Christi, Texas.

70.     "**Corpus Christi Sale**" means the sale of the Corpus Christi Assets to the Purchaser pursuant to the Corpus Christi Asset Purchase Agreement.

71.     "**Corpus Christi Sale Order**" means the *Order (I) Approving the Sale of Certain Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Executory*

*Contracts and Unexpired Leases in Connection Therewith; and (III) Granting Related Relief* (Docket No. 1300), entered by the Bankruptcy Court on March 29, 2018.

72.     **"Creditors' Committee"** means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

73.     **"Creditors' Committee Professionals"** means Milbank, Tweed, Hadley & McCloy LLP; Cole Schotz P.C.; Jefferies LLC; Berkeley Research Group, LLC; Gattai, Minoli, Agostinelli, Partners; and Loyens & Loeff.

74.     **"Cure Claim"** means the Claim of any counterparty to any Executory Contract or Unexpired Lease assumed pursuant to section 365 of the Bankruptcy Code and the Plan for monetary defaults under such Executory Contract and Unexpired Lease.

75.     **"Debtors"** means, collectively, M&G USA; M&G Resins; M&G Polymers; M&G Waters; MGI; M&G Chemicals S.A.; M&G Capital S.à r.l.; M&G Finance; M&G Holding; Chemtex; Chemtex Far East, Ltd.; and Indo American Investments, Inc.

76.     **"Debtor Professionals"** means Jones Day; Pachulski Stang Ziehl & Jones; Alvarez & Marsal North America, LLC; Rothschild, Inc.; Greenhill & Co., LLC; Crain Caton & James LLP; and Prime Clerk LLC.

77.     **"Deficiency Claim"** means the unsecured portion of any Corpus Christi Mechanics' Lien Reserve Claim or Comerica Claim, if any.  For the avoidance of doubt, there shall be no unsecured portion of any Pre-Petition Second Lien Claim or Macquarie Claim because such Claims are deemed fully secured under this Plan.

78.     **"Diminution in Value"** has the meaning given to such term in the Final Cash Collateral Order.

79.     **"DIP Claims"** means the CEC DIP Claims and the CCP DIP Claims.

80.     **"DIP Payment"** has the meaning given to such term in the Corpus Christi Asset Purchase Agreement.

81.     **"Disbursing Agent"** means (a) the Litigation Trustee or the Entity or Entities selected by the Litigation Trustee, to make or facilitate Distributions contemplated under this Plan and (b) the U.S. Debtors solely with respect to Distributions that are required to be made on the Effective Date by the U.S. Debtors under this Plan.

82.     **"Disclosure Statement"** means the *Disclosure Statement for Amended Joint Plan of Liquidation of U.S. Debtors and Debtors in Possession*, dated September 5, 2018 (including all exhibits and schedules thereto or referenced therein), that has been prepared and distributed by the U.S. Debtors, pursuant to section 1125(b) of the Bankruptcy Code, as the same may be amended, modified or supplemented.

83.     **"Disclosure Statement Order"** means an order entered by the Bankruptcy Court, approving, among other things, the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, authorizing solicitation of this Plan and approving related materials.

84.     **"Dismissal Motion"** means the *Motion of Debtors M&G Capital S.A.R.L., M&G Chemicals S.A. and Mossi & Ghisolfi International S.A.R.L. for an Order Dismissing Their Chapter 11 Cases and Granting Related Relief* (Docket No. 1537).

85.     **"Dismissal Stipulation"** means the *Stipulation Between Debtors and Creditors' Committee Regarding Settlement and Agreement With Respect to Motion to Dismiss*, a copy of which is attached as Exhibit A to, and was approved by, the Dismissal Order.

86.     **"Dismissal Order"** means the *Order (I) Approving (A) Dismissal of Chapter 11 Cases of M&G Capital S.A R.L., M&G Chemicals S.A. and Mossi & Ghisolfi International S.A R.L. and (B) Related Stipulation*

*Among Debtors and Creditors' Committee and (II) Granting Related Relief* (Docket No. 1859), entered by the Bankruptcy Court on September 13, 2018.

87. **"Disputed Claim"** means any portion of a Claim: (a) that is neither an Allowed Claim nor a disallowed Claim; (b) that is listed as disputed, contingent or unliquidated in the Schedules or that is otherwise subject to an objection; or (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent (i) the U.S. Debtors have, or any party in interest entitled to do so has, interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order or (ii) that such Proof of Claim has been asserted in an amount that is greater than the undisputed, non-contingent or liquidated amount of such Claim in the Schedules, if any.

88. **"Disputed Claims Reserves"** means the reserve fund(s) created pursuant to Section V.D.1 of this Plan.

89. **"Dissolution Transactions"** means the transactions that the Plan Administrator determines to be necessary or appropriate to implement the terms of this Plan, and that ultimately result in the dissolution or other termination of the corporate entities that comprise the U.S. Debtors, including, without limitation those transactions identified in Exhibit F to this Plan.

90. **"Distribution"** means any distribution of property to a Holder of a Claim on account of such Claim in accordance with Sections II and V of this Plan.

91. **"Distribution Date"** means the Initial Distribution Date, the applicable Periodic Distribution Date or the Final Distribution Date, as determined in accordance with the Litigation Trust Agreement and this Plan.

92. **"Distribution Record Date"** means the date for determining which Holders of Allowed Claims are eligible to receive distributions hereunder, which, unless otherwise specified, shall be the Confirmation Date or such other date as designated in a Final Order.

93. **"Document Website"** means the internet site at https://cases.primeclerk.com/MGUSA at which all of the Exhibits and schedules to this Plan and the Disclosure Statement will be available to any party in interest and the public, free of charge.

94. **"Effective Date"** means a day, as determined by the U.S. Debtors, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date in Section VII.B have been met or waived in accordance with the provisions of that section.

95. **"Entity"** means an individual, firm, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization or government or any political subdivision thereof, or other person or entity.

96. **"ERISA"** means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461, *as amended*, (2012 & Supp. IV 2016), and the regulations promulgated thereunder.

97. **"Estate"** means, as to each U.S. Debtor, the estate created for such U.S. Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

98. **"Excluded Causes of Action"** means: (a) any claims, counterclaims, Causes of Action, and defenses thereto with respect to the Released Parties and (b) the Corpus Christi Causes of Action.

99. **"Exculpated Parties"** means, collectively and individually, (a) the U.S. Debtors; (b) the Creditors' Committee; (c) the members of the Creditors' Committee; and (d) the Representatives of each of the parties enumerated in the preceding clauses (a)-(c) (solely in their respective capacities as such).

100. **"Executory Contract"** or **"Unexpired Lease"** means a contract or lease to which a U.S. Debtor is a party or with respect to which a U.S. Debtor may be liable that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code, including any modifications, amendments, addenda or supplements thereto or restatements thereof.

101. **"Exhibit"** means an exhibit attached to this Plan or included in the Plan Supplement.

102. **"Fee Claim"** means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or another Entity for services rendered or expenses incurred in the Chapter 11 Cases, provided that a Fee Claim shall not include any Substantial Contribution Claim.

103. **"Fee Order"** means any order establishing procedures for compensation and reimbursement of expenses of Professionals entered by the Bankruptcy Court.

104. **"File," "Filed"** or **"Filing"** means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

105. **"Final Cash Collateral Order"** means the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507 (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay and (4) Granting Related Relief* (Docket No. 487), entered by the Bankruptcy Court on December 14, 2017.

106. **"Final Distribution Date"** means, for a particular Class of Claims, the Distribution Date upon which final Distributions to Holders thereof are to be made as provided under the Litigation Trust Agreement.

107. **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a vacatur, new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a vacatur, new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the vacatur, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule or other analogous rule or procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

108. **"First Lien Payment"** means Cash proceeds of the sale of the Pre-Petition First Lien Collateral sufficient to satisfy in full all unpaid Pre-Petition First Lien Obligations as of the Closing Date except the First Lien Payment Waived Amount.

109. **"First Lien Payment Waived Amount"** means (a) $1,000,000 of the exit fee due to the Pre-Petition First Lien Lender, (b) the un-utilized line fee due to the Pre-Petition First Lien Lender and (c) any structuring fees otherwise due to the Pre-Petition First Lien Lender pursuant to the Pre-Petition First Lien Loan Agreement and any amendments thereto (subject to the right of the Pre-Petition First Lien Lender to receive the Additional Inbursa Payment and Post Closing Additional Inbursa Payment (both as defined in the Corpus Christi Asset Purchase Agreement) in an amount no greater than the Waived Fee Amount (as defined in the Corpus Christi Asset Purchase Agreement) in accordance with and subject to the terms of the Corpus Christi Asset Purchase Agreement), which amounts shall be deemed to have been waived by the Pre-Petition First Lien Lender pursuant to the Corpus Christi Sale Order on the Closing Date.

110. **"General Bar Date Order"** means the *Order (I) Establishing Bar Dates for Filing Claims and (II) Approving the Form and Manner of Notice Thereof* (Docket No. 1053), entered by the Bankruptcy Court on February 27, 2018

111. **"General Unsecured Claim"** means any Claim that is not (a) an Administrative Claim, (b) a DIP Claim, (c) a Secured Pre-Petition First Lien Claim, (d) a Pre-Petition Second Lien Claim, (e) a Corpus Christi Mechanics' Lien Reserve Claim, (f) a Secured Comerica Claim, (g) a Macquarie Claim, (h) an Other Secured Claim, (i) a Priority Claim or (j) a U.S. Debtor Intercompany Claim, underlined provided, that, for the avoidance of doubt, all Deficiency Claims and Intercompany Claims other than U.S. Debtor Intercompany Claims shall be General Unsecured Claims.

112. **"Holder"** means an Entity holding a Claim or an Interest, as the context requires.

113. **"Impaired"** means "impaired," as such term is defined in section 1124 of the Bankruptcy Code.

114. **"Inbursa"** means Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa.

115. **"Inbursa Professionals"** means professionals retained by the Pre-Petition First Lien Lender, the DIP Agent (as defined in the CEC Final DIP Order) or CEC.

116. **"Initial Distribution Date"** means the Effective Date or the date occurring as soon as reasonably practicable after the Effective Date when Distributions under the Plan shall commence.

117. **"Insurance Security"** means all collateral posted by the U.S. Debtors or a third party to secure the U.S. Debtors' liabilities under insurance policies, including but not limited to the Workers' Compensation Program.

118. **"Intellectual Property"** means (a) any rights in intellectual property, whether arising under the United States, multinational or foreign laws, including copyrights, patents, trademarks and know-how; and (b) all rights to sue at law or in equity for past, present and future infringement, impairment or misappropriation thereof, including the right to receive all proceeds and damages therefrom.

119. **"Intercompany Claim"** means (a) any account reflecting intercompany book entries by any Debtor or Affiliate of any Debtor against any U.S. Debtor; or (b) any Claim that is not reflected in such book entries but is held by any Debtor or Affiliate of any Debtor against any U.S. Debtor, in each case accruing before or after the Petition Date, including, but not limited to, any Claim for reimbursement, payment as guarantor or surety, any Claim for contribution and expenses allocable between multiple Debtors or Affiliates of Debtors or any Claim asserted by one Debtor against another Debtor as secured by a mechanic's or materialmen's lien over some or all of the Corpus Christi Assets pursuant to Chapter 53 of the Texas Property Code and/or Article XVI, Section 37 of the Constitution of the State of Texas.

120. **"Interest"** means the rights of the Holders of the common stock, membership interests, partnership interests or other equity interests in a Debtor and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto, or any other instruments evidencing an ownership interest in a Debtor and the rights of any Entity to purchase or demand the issuance of any of the foregoing, including: (a) redemption, conversion, exchange, voting, participation and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidation preferences; and (c) stock options and warrants.

121. **"Interim Administrative Bar Date Order"** means the *Order (I) Establishing an Administrative Bar Date and (II) Approving the Form and Manner of Notice Thereof* (Docket No. 1410), entered by the Bankruptcy Court on April 26, 2018.

122. **"Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

123. **"Lien Identification Order"** means the *Order (I) Establishing Lien Identification Procedures and (II) Granting Related Relief* (Docket No. 457), entered by the Bankruptcy Court on December 11, 2017.

124. **"Litigation Trust"** means the trust established pursuant to Section III.C to, among other things, hold the Litigation Trust Assets and make distributions pursuant to the Plan.

125. **"Litigation Trust Agreement"** shall be the trust agreement governing the Litigation Trust, substantially in the form of <u>Exhibit C</u> setting forth, among other things, the duties and powers set forth in Section III.C.5.

126. **"Litigation Trust Assets"** means (a) the Unsecured Claims Pool; (b) the Remaining Assets; (c) the Litigation Trust Causes of Action (including any Privilege Rights); (d) the New Equity Interests; and (e) any Corpus Christi Causes of Action transferred to the Litigation Trust pursuant to Section III.H.2 of the Plan.

127. **"Litigation Trust Beneficiaries"** shall have the meaning ascribed to the term "Beneficiaries" in the Litigation Trust Agreement.

128. **"Litigation Trust Causes of Action"** means all Causes of Action of the U.S. Debtors and their Estates other than the Excluded Causes of Action, and including, without limitation: (a) Avoidance Actions; (b) any claims and proceeds of claims against Magnate S.à r.l., its managers and/or affiliates; (c) any claim against auditors and any professionals utilized by the U.S. Debtors and/or the Estates at any time (other than the Professionals retained by the Debtors in the Chapter 11 Cases); (d) the Litigation Trust's entitlements with respect to any recovery against Sinopec, as provided for in Section III.H.2 of this Plan; and (e) all Privilege Rights.

129. **"Litigation Trust Oversight Committee"** means the committee appointed pursuant to Section III.C.3 of this Plan to oversee the activities of the Litigation Trust and the Litigation Trustee.

130. **"Litigation Trustee"** means the trustee appointed by the Creditors' Committee pursuant to Section III.C.4 (or any successor trustee), in his, her or its capacity as trustee of the Litigation Trust.

131. **"M&G Finance"** means Debtor M & G Finance Corporation.

132. **"M&G Holding"** means Debtor M & G Holding USA, LLC.

133. **"M&G Polymers"** means Debtor M & G Polymers USA, LLC.

134. **"M&G Resins"** means Debtor M & G Resins USA, LLC.

135. **"M&G USA"** means Debtor M & G USA Corporation.

136. **"M&G Waters"** means Debtor M&G Waters USA, LLC.

137. **"Macquarie"** means Macquarie Investments US Inc.

138. **"Macquarie Credit Documents"** means that certain Credit Agreement, dated as of November 9, 2016, among Macquarie, as administrative and collateral agent, the lenders that are party thereto from time to time and M&G Waters, as borrower, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, security agreement, financing statement, pledge, assignment, forbearance agreement and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time.

139. **"Macquarie Claim"** means any Claim of Macquarie or any successor or assign thereof against any of the U.S. Debtors under or evidenced by the Macquarie Credit Documents.

140. **"Macquarie Payment"** has the meaning given to such term in the Corpus Christi Asset Purchase Agreement.

141. **"Mexico Holding"** means M&G Mexico Holding, S.A. de C.V.

142. **"Mexico Holding Revolver"** means that certain revolving credit agreement titled "Contrato de Apertura de Credito en Cuenta Corriente", between Bancomext, as lender, and M&G Holding Mexico, S.A. de C.V., as borrower, dated March 31, 2010, as amended on April 27, 2012 and October 10, 2013, and including any subsequent amendments and/or modifications thereto.

143. **"Mexico Polimeros"** means M&G Polimeros Mexico, S.A. de C.V.

144. **"Mexico Polimeros Allowed Claim"** means Proof of Claim number 832 filed by Mexico Polimeros against M&G Polymers in the amount of $55,515,900.90, Allowed pursuant to the Bancomext Settlement Order.

145. **"Mexico Polimeros Revolver"** means that certain revolving credit agreement titled "Contrato de Apertura de Credito en Cuenta Corriente" between Bancomext, as lender, and Mexico Polimeros, as borrower, dated August 3, 2015, including any subsequent amendments and/or modifications thereto.

146. **"MGI"** means Mossi & Ghisolfi International S.à r.l.

147. **"MGI Payments Transfer Date"** means the Effective Date or as soon thereafter as the Dismissal Order is in full force and effect and is unstayed.

148. **"New Equity Interests"** means the Interests in the Senior U.S. Debtors to be issued to the Litigation Trust by the Senior U.S. Debtors on the Effective Date pursuant to Section III.A of this Plan, following the cancellation of all existing Interests in the Senior U.S. Debtors pursuant to Section II.C.10 of this Plan.

149. **"Notice Parties"** means the parties set forth in Section XI.I.

150. **"Objection Deadline"** means the deadline to File objections to Confirmation of the Plan, on December 7, 2018, at 5:00 p.m. (prevailing Eastern Time) or any other deadline to File objections to Confirmation of the Plan established by the Disclosure Statement Order.

151. **"Ordinary Course Professionals Order"** means the *Order (I) Authorizing the Retention and Payment, Nunc Pro Tunc as of the Petition Date, of Professionals Utilized by the Debtors in the Ordinary Course of Business and (II) Granting Related Relief* (Docket No. 299), entered by the Bankruptcy Court on November 30, 2017.

152. **"Other Secured Claim"** means a Secured Claim, including a Secured Tax Claim, but excluding any Pre-Petition First Lien Claim, Pre-Petition Second Lien Claim, Corpus Christi Mechanics' Lien Claim, Comerica Claim or Macquarie Claim.

153. **"PBGC"** means Pension Benefit Guaranty Corporation, a wholly owned United States government corporation, and an agency of the United States created under Title IV of ERISA.

154. **"Pension Plans"** means the M&G Polymers USA LLC Hourly Pension Plan and the M&G Polymers USA Salaried Employees' Retirement Plan & Trust.

155. **"Periodic Distribution Date"** means, unless otherwise ordered by the Bankruptcy Court, (a) the first Business Day that is 180 days after the Initial Distribution Date; or (b) the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date, as applicable.

156. **"Petition Date"** means: (a) with respect to M&G Polymers, October 24, 2017; and (b) with respect to the other Debtors, October 30, 2017.

157. **"Plan"** means this *Amended Joint Plan of Liquidation of the U.S. Debtors and Debtors in Possession*, and all Exhibits attached hereto or referenced herein, supplements, appendices, schedules, and the Plan Supplement, as the same may be amended, modified or supplemented.

158.     **"Plan Administrator"** means an individual, who may be the Litigation Trustee, appointed by the Litigation Trust Oversight Committee to effectuate any Dissolution Transactions after the Effective Date.

159.     **"Plan Supplement"** means the compilation of documents and forms of documents as amended from time to time that constitute Exhibits to the Plan Filed with the Bankruptcy Court no later than ten days before the earlier of (a) the Voting Deadline and (b) the Objection Deadline (or such later date as may be approved by the Bankruptcy Court), including, without limitation, the following:  (i) the initial members of the Litigation Trust Oversight Committee; (ii) the initial Litigation Trustee; (iii) the Litigation Trust Agreement; (iv) the non-exclusive schedule of pending Litigation Trust Causes of Action; (v) schedule of Executory Contracts and Unexpired Leases to be assumed and assigned to the Litigation Trust; and (vi) the Dissolution Transactions.

160.     **"Pre-Petition First Lien Claim"** means any Claim of the Pre-Petition First Lien Lender or its successors or assigns against any of the U.S. Debtors under or evidenced by the Pre-Petition First Lien Loan Documents.

161.     **"Pre-Petition First Lien Collateral"** means, collectively, the "Collateral" (as defined in the Pre-Petition First Lien Loan Agreement) in existence on the Petition Date, and all products and proceeds thereof securing the Pre-Petition First Lien Loan Obligations of the Pre-Petition First Lien Loan Obligors under (a) the Pre-Petition First Lien Loan Agreement, including the collateral described in the Pre-Petition First Lien Mortgage and (b) the Pre-Petition First Lien Guaranty, including, but not limited to, the collateral described in the Pre-Petition First Lien Guaranty Mortgage.

162.     **"Pre-Petition First Lien Guaranty"** means that certain Guaranty dated as of March 21, 2013, granted by M&G Polymers for the benefit of the Pre-Petition First Lien Lender in connection with the Pre-Petition First Lien Loan Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

163.     **"Pre-Petition First Lien Guaranty Mortgage"** means that certain Credit Line Deed of Trust, Assignment of Rents and Leases, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing (as at any time modified, amended or restated), executed as of March 15, 2013 and effective as of March 21, 2013, and recorded in the Office of the Clerk of the County Commission of Mason County, West Virginia in Trust Deed Book 394, at Page 556, by M&G Polymers, as grantor, for the benefit of the Pre-Petition First Lien Lender.

164.     **"Pre-Petition First Lien Lender"** means Inbursa, in its capacity as lender under the Pre-Petition First Lien Loan Agreement, together with its successors and assigns.

165.     **"Pre-Petition First Lien Loan Agreement"** means that certain Loan Agreement dated as of March 21, 2013, as at any time amended, restated, amended and restated, supplemented or otherwise modified, between the Pre-Petition First Lien Lender, as lender, and M&G Resins, as borrower.

166.     **"Pre-Petition First Lien Loan Documents"** means the Pre-Petition First Lien Loan Agreement, the Pre-Petition First Lien Guaranty, the Pre-Petition First Lien Mortgage and the Pre-Petition First Lien Guaranty Mortgage, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, security agreement, financing statement, pledge, assignment, forbearance agreement, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time.

167.     **"Pre-Petition First Lien Loan Obligors"** means M&G Resins, as borrower under the Pre-Petition First Lien Loan Agreement, and M&G Polymers, as guarantor, pursuant to the Pre-Petition First Lien Guaranty.

168.     **"Pre-Petition First Lien Mortgage"** means that certain Deed of Trust, Assignment of Rents and Leases, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing, dated as of March 21, 2013, and recorded as document number 2013010972 in the Official Public Records, Nueces County, Texas executed by M&G Resins, as grantor, and the Pre-Petition First Lien Lender, as beneficiary, for the benefit of

the Pre-Petition First Lien Lender, as at any time amended, restated, amended and restated, supplemented, or otherwise modified.

169. **"Pre-Petition First Lien Obligations"** means (a) an approximate principal amount of $423,800,000.00 and (b) interest (to the extent unpaid) determined and calculated at the non-default rate, fees, expenses, and other amounts due under the Pre-Petition First Lien Loan Documents, together with all other obligations of each Pre-Petition First Lien Loan Obligor in respect of indemnities, guaranties and other payment assurances made to or by each Pre-Petition First Lien Loan Obligor for the benefit of the Pre-Petition First Lien Lender, and all fees, costs, legal expenses and all other amounts theretofore or thereafter accruing thereon or at any time chargeable to either Pre-Petition First Lien Loan Obligor in connection therewith, but excluding the First Lien Payment Waived Amount.

170. **"Pre-Petition Second Lien Claim"** means any Claim of the Pre-Petition Second Lien Secured Party or its successors or assigns against any of the U.S. Debtors under or evidenced by the Pre-Petition Second Lien Documents.

171. **"Pre-Petition Second Lien CRA"** means the Corpus Christi Capacity Reservation Agreement, dated as of May 20, 2015, by and among the Pre-Petition Second Lien Obligors and the Prepetition Second Lien Secured Party, as at any time amended, restated, amended and restated, supplemented, or otherwise modified.

172. **"Pre-Petition Second Lien Documents"** means the Pre-Petition Second Lien CRA and the Pre-Petition Second Lien Mortgage, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, security agreement, financing statement, pledge, assignment, forbearance agreement, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time.

173. **"Pre-Petition Second Lien Mortgage"** means that certain Subordinated Deed of Trust, Assignment of Rents and Leases, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing, dated as of December 23, 2016, and executed by M&G Resins and the Pre-Petition Second Lien Secured Party.

174. **"Pre-Petition Second Lien Obligors"** means M&G USA and M&G Resins, as obligors under the Pre-Petition Second Lien CRA.

175. **"Pre-Petition Second Lien Secured Party"** means DAK Americas, LLC and its affiliates.

176. **"Priority Claim"** means a Claim that is entitled to priority in payment pursuant to sections 507(a)(1), (3), (4), (5), (6), (7), (9) or (10) of the Bankruptcy Code.

177. **"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

178. **"Privilege Rights"** mean any attorney-client privilege, attorney work-product protection or any other similar privileges or protections from disclosure associated with the Litigation Trust Assets belonging to or operating in favor of the U.S. Debtors and their counsel.

179. **"Pro Rata"** means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or any other specified group of Claims pursuant to Section II, proportionately, so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of the amount of property to be distributed on account of such Claim to the amount of such Claim is the same as the ratio of the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to the amount of all Allowed Claims in such Class or group of Claims. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their face amount for purposes of calculating Pro Rata distribution of property to Holders of Allowed Claims in such Class.

-14-

180.    **"Professional"** means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code or any professional or other Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

181.    **"Professionals Reserve"** means an escrow account to be established and funded by the Purchaser on the Closing Date (and subject in all respects to the occurrence of the Closing Date) in an amount equal to:  (a) the amounts sufficient to pay all accrued and unpaid Fee Claims (other than Completion Fees) of the Debtor Professionals from and after April 1, 2018 through the Closing Date, as such amounts shall be estimated in good faith by each of the Debtor Professionals, in an amount not to exceed the budgeted amounts for each Debtor Professional plus applicable carryforwards in accordance with the CCP DIP and the Corpus Christi Asset Purchase Agreement (which carryforwards arising from the period from April 1, 2018 through September 30, 2018 shall be capped at no more than $1.5 million in the aggregate with respect to Jones Day and Alvarez & Marsal North America, LLC); (b) the amounts sufficient to pay all accrued and unpaid Fee Claims (other than Completion Fees) of the Creditors' Committee Professionals from and after April 1, 2018 through the Closing Date, up to the amounts set forth in the CCP Budget plus applicable carryforwards and carrybacks, as set forth on pages 9 and 10 of the Bid Support Term Sheet (which carryforwards and carrybacks arising from the period from April 1, 2018 through September 30, 2018 shall be capped at no more than $560,000 in the aggregate), as such amounts shall be estimated in good faith by each of the Creditors' Committee Professionals; plus (c) the amounts sufficient to pay all accrued and unpaid fees and expenses of the Inbursa Professionals through the Closing Date, as such amounts shall be estimated in good faith by each of the Inbursa Professionals.  For the avoidance of doubt, and in accordance with the Corpus Christi Asset Purchase Agreement (as amended on October 18, 2018), the U.S. Debtors shall be required to use any amounts previously funded by the Purchaser under the CCP DIP to the U.S. Debtors pursuant to one or more Advances (as defined in the CCP DIP) for the purpose of paying Professional Payment Amounts (as defined in the Corpus Christi Asset Purchase Agreement) or other Fee Claims in accordance with the CCP Budget by professional but still unpaid as of the Closing Date (the "Previously Funded Unpaid Professional Amounts") for the budgeted purposes so intended, and the Previously Funded Unpaid Professional Amounts shall be funded by the Debtors into the Professionals Reserve on the Closing Date and reduce on a dollar-for-dollar basis the amount Purchaser shall be required to fund into the Professional Reserve.

182.    **"Proof of Claim"** means a proof of Claim Filed with the Bankruptcy Court and/or the Claims and Noticing Agent in connection with the Chapter 11 Cases, including a Lien Identification Statement submitted pursuant to paragraph 9 of the Lien Identification Order.

183.    **"Purchaser"** means Corpus Christi Polymers, LLC.

184.    **"Purchaser Administrative Claim"** means:  (a) any Administrative Claim payable by the U.S. Debtors in accordance with the CCP Budget, including any permitted variances relating thereto, in an aggregate amount (together with the amounts identified in Section I.A.178(a) hereof) of up to, and in no event exceeding, the total available funding under the CCP DIP (as such total available funding has been and may further be increased with the consent of the Purchaser); (b) any Administrative Claim that is incurred by the U.S. Debtors (i) upon the written direction of the Purchaser or its designated representative or (ii) following no written objection to written notice of an Administrative Claim provided by the U.S. Debtors to a designated representative of the Purchaser. Purchaser Administrative Claims include, without limitation, Claims for fees and expenses incurred by the Purchaser and the Bidders and each of their Affiliates and professionals (which claims shall be deemed waived as of the Effective Date and shall not be paid by the Purchaser). For the avoidance of doubt, Fee Claims (other than Completion Fees) of the Debtor Professionals, the Creditors' Committee Professionals that, in each case, are Allowed by a Final Order, and the fees and expenses of Inbursa Professionals shall be satisfied from the Professionals Reserve and shall not be deemed to be Purchaser Administrative Claims; and (b) the Completion Fees (subject in all respects to the occurrence of the Closing Date in connection with the Corpus Christi Sale) shall be satisfied from the Completion Fee Reserve and shall not be deemed to be Purchaser Administrative Claims.  For the further avoidance of doubt, Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code shall not be deemed to be Purchaser Administrative Claims.

185.    **"Purchaser Priority Claim"** means:  (a) any Priority Claim or Priority Tax Claim payable by the U.S. Debtors in accordance with the CCP Budget, including any permitted variances relating thereto, in an aggregate

amount (together with the amounts identified in Section I.A.177(a) hereof) of up to, and in no event exceeding, the total available funding under the CCP DIP (as such total available funding has been and may further be increased with the consent of the Purchaser); (b) any Priority Claim or Priority Tax Claim that is incurred by the U.S. Debtors (i) upon the written direction of the Purchaser or its designated representative or (ii) following no written objection to written notice of a Priority Claim or Priority Tax Claim provided by the U.S. Debtors to a designated representative of the Purchaser. Purchaser Priority Claims include, without limitation, Claims for fees and expenses incurred by the Purchaser and the Bidders and each of their Affiliates and professionals (which claims shall be deemed waived as of the Effective Date and shall not be paid by the Purchaser). For the avoidance of doubt, Fee Claims (other than Completion Fees) of the Debtor Professionals, the Creditors' Committee Professionals that, in each case, are Allowed by a Final Order, and the fees and expenses of Inbursa Professionals shall be satisfied from the Professionals Reserve and shall not be deemed to be Purchaser Priority Claims; and (b) the Completion Fees (subject in all respects to the occurrence of the Closing Date in connection with the Corpus Christi Sale) shall be satisfied from the Completion Fee Reserve and shall not be deemed to be Purchaser Priority Claims.

186. **"Released Parties"** means, collectively and individually, and, in each case, solely in their capacity as such: (a) the U.S. Debtors; (b) the Estates; (c) the Creditors' Committee and its members; (d) the Purchaser; (e) the Pre-Petition Second Lien Secured Party; (f) the Bidders; (g) the Pre-Petition First Lien Lender, CEC and Banibu; (h) Comerica and (i) with respect to (a) through (h), each such Entity's respective Representatives; provided that any Entity that objects to Confirmation of, or votes to reject, the Plan and any of their respective Representatives shall not be a Released Party.

187. **"Remaining Assets"** means all uncollected accounts receivable, any cash proceeds resulting from the release of any Insurance Security, and all of the remaining assets of the U.S. Debtors on the Effective Date, other than, in each case, those otherwise reserved or set aside pursuant to this Plan, the Final Cash Collateral Order or other orders of the Bankruptcy Court. For the avoidance of doubt, the proceeds of the Comerica Collateral Accounts shall constitute Remaining Assets solely to the extent of the Estates' residual interest in such proceeds after the irrevocable payment and satisfaction of the Secured Comerica Claims in full in Cash.

188. **"Representatives"** means, with respect to: (a) any Entity other than a Debtor, any successor, predecessor, officer, director, partner, limited partner, general partner, shareholder, manager, management company, investment manager, Affiliate, employee, agent, attorney, advisor, investment banker, financial advisor, accountant or other professional of such Entity or any of the foregoing and any committee of which such Entity is a member, in each case, in such capacity, serving on or after the Petition Date; and (b) any Debtor, any successor, attorney, advisor, investment banker, financial advisor, accountant or other professional of such Debtor, in each case, in such capacity, retained in the Chapter 11 Cases and serving on or after the Petition Date.

189. **"Sales"** means, collectively, the Apple Grove Sale, the Chemtex Sale and the Corpus Christi Sale.

190. **"Schedules"** means, collectively, the (a) schedules of assets and liabilities and (b) statements of financial affairs, as each may be amended and supplemented from time to time, Filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

191. **"Second Installment Payment"** means $2,000,000 deposited into the MGI Payments Escrow Account within 21 days following entry of the Dismissal Order.

192. **"Secured"** means, with respect to any Claim, a Claim that is secured by a lien on property in which an Estate has an interest or that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to such valid right of setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

193. **"Secured Tax Claim"** means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

194. **"Securities Act"** means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

195. **"Senior U.S. Debtors"** means Debtors M&G USA and M&G Holding.

196. **"Sharon Center Facility"** means the research and development center located in Sharon Center, Ohio.

197. **"Sinopec"** means, collectively, Sinopec Engineering Group America, LLC and Sinopec Engineering (Group) Co., Ltd.

198. **"Subsidiary U.S. Debtors"** means the U.S. Debtors other than the Senior U.S. Debtors.

199. **"Substantial Contribution Claim"** means, collectively, (a) any claim under section 503(b)(3)(D) of the Bankruptcy Code, (b) any related claim under section 503(b)(4) of the Bankruptcy Code and (c) any claim under section 503(b)(5) of the Bankruptcy Code.

200. **"Tax"** means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental, employment or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

201. **"Trust Accounts"** means the bank accounts to be held in the name of the Litigation Trustee that are created pursuant to Section III.C.

202. **"Third Party Disbursing Agent"** means an Entity engaged by the U.S. Debtors in their capacity as Disbursing Agent or engaged by the Litigation Trustee to act as a Disbursing Agent pursuant to Section III.C.

203. **"Third Party Payment"** means a payment made to the Holder of a Claim on account of such Claim by an Entity that is not a U.S. Debtor or the Litigation Trust.

204. **"Unimpaired"** means, when used in reference to a Claim, a Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

205. **"Unsecured Claims Pool"** means (a) Cash in the amount of up to $50,000,000 (as the same may be reduced by up to $8,700,000 on account of certain Monthly Inbursa Obligations (as defined in the Corpus Christi Asset Purchase Agreement) and other amounts, in each case solely pursuant to and in accordance with the Bid Support Term Sheet) to be funded by the Purchaser on the Closing Date (and subject in all respects to the occurrence of the Closing Date) into an escrow account and transferred to the Litigation Trust on the Effective Date; and (b) Cash in the amount of $6,000,000 (as the same may be refunded pursuant to the Dismissal Stipulation) funded by MGI into an escrow account established in accordance with and pursuant to the Dismissal Stipulation and transferred to the Litigation Trust on the MGI Payments Transfer Date. For so long as MGI may become entitled to any refund under the Dismissal Stipulation, the U.S. Debtors and the Litigation Trustee, as applicable, shall maintain sufficient reserves in the Unsecured Claims Pool to provide MGI with any such refund, within five business days of such entitlement arising.

206. **"Unsecured Claims Pool Administrative Claim"** means (a) any Allowed Fee Claims of the Creditors' Committee's Professionals that have not otherwise been paid and are not payable from the Professional Fee Reserve or the Completion Fee Reserve; and (b) any other Allowed Administrative Claims that are not Purchaser Administrative Claims and that have not otherwise been paid (including pursuant to Section II.C.1.b hereof); provided, however, that no Claims by Inbursa, CEC, Banibu or their respective affiliates for professional fees and expenses shall be Unsecured Claims Pool Administrative Claims.

207. **"Unsecured Claims Pool Priority Claim"** means any Allowed Priority Claims or Priority Tax Claims required to be paid under the Plan that are not Purchaser Priority Claims and that have not otherwise been paid (including pursuant to Section II.C.1.b hereof).

208. **"U.S. Debtors"** means, collectively, M&G USA; M&G Resins; M&G Polymers; M&G Waters; M&G Finance; M&G Holding; Chemtex; Chemtex Far East, Ltd.; and Indo American Investments, Inc.

209. **"U.S. Debtor Intercompany Claim"** means any Intercompany Claim held by a U.S. Debtor.

210. **"U.S. Trustee"** means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the District of Delaware.

211. **"Voting Deadline"** means 5:00 p.m. (prevailing Eastern time) on December 6, 2018, which is the deadline for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

212. **"Workers' Compensation Program"** means the workers' compensation insurance maintained by the U.S. Debtors to insure against injuries to their employees that were incurred while certain employees were performing in their respective employment positions with the U.S. Debtors.

### B. Rules of Interpretation and Computation of Time

#### 1. Rules of Interpretation

For purposes of this Plan, unless otherwise provided herein: (a) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan, Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Plan; (f) the words "herein," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code (other than subsection (5) thereof) shall apply to the extent not inconsistent with any other provision of this Section I.B.1.

#### 2. Computation of Time

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

#### 3. Reference to Monetary Figures

All references in this Plan to monetary figures refer to the lawful currency of the United States of America, unless otherwise expressly provided.

## II. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Claims and Interests, except for those Claims set forth in sub-section A below, are classified for voting and distribution pursuant to this Plan as set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in sub-section A below, are not classified herein. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes.

A Holder of a Claim that may be asserted against more than one of the U.S. Debtors shall be entitled to a single Distribution as if such Holder had a single Claim against the U.S. Debtors.

### A. Unclassified Claims

#### 1. Administrative Claims

##### a. Administrative Claims in General

Except as specified in this Section II.A.1.a, and subject to the bar date provisions herein and set forth in any applicable Bar Date Order, unless otherwise agreed by the Holder of an Administrative Claim and the applicable Debtor, the Litigation Trustee or the Purchaser, as applicable, or unless a Final Order provides otherwise, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim on either (i) the Effective Date (or as soon thereafter as practicable) or (ii) if the Administrative Claim is not allowed as of the Effective Date, within 60 days after the date on which such Administrative Claim becomes an Allowed Administrative Claim. Holders of Administrative Claims against more than one of the U.S. Debtors for the same Liability shall be entitled to Distributions as if such Holder had a single Administrative Claim against the U.S. Debtors. Allowed Purchaser Administrative Claims shall be paid by the Purchaser, provided, however, that any Purchaser Administrative Claims to the extent previously included in the CCP Budget and funded by the Purchaser pursuant to an Advance (as defined in the CCP DIP) shall be paid by the Estates and not the Purchaser. All other Allowed Administrative Claims shall be paid by the Estates; provided that, to the extent the funds in the Estates are not sufficient to pay all Allowed Administrative Claims in full, such Claims shall be paid from the Unsecured Claims Pool.

##### b. Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the applicable U.S. Debtors in Cash equal to the amount of such Administrative Claims. Fees payable pursuant to 28 U.S.C. § 1930 for each Estate after the Effective Date will be paid from the Litigation Trust by the Litigation Trustee until the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

##### c. Professional Compensation

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Notice Parties, the Litigation Trustee and such other Entities as are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or another order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; provided, however, that any Professional whose compensation or reimbursement of expenses is authorized pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval. Objections to any Fee Claim must be Filed and served on the Notice Parties, the Litigation Trustee and the requesting party no later than 90 days after the Effective Date or such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claim. Allowed Fee Claims that were reserved for in the Professional Fee Reserve or the Completion Fee Reserve shall be satisfied from such

reserve, to the extent applicable. Allowed Fee Claims in excess of any applicable reserves with respect to Creditors' Committee Professionals shall be satisfied from the Litigation Trust.

### d.     Post-Effective Date Professional Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Effective Date, subject only to the terms of the Litigation Trust Agreement, the Litigation Trustee may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court. Any such funding for Litigation Trustee professionals and/or expenses shall be paid from the Litigation Trust Assets.

### e.     Bar Date for Administrative Claims

Unless previously Filed or as otherwise governed by any Bar Date Order or another order of the Bankruptcy Court, requests for payment of Administrative Claims (other than Fee Claims) arising after May 1, 2018 must be Filed and served on the Notice Parties, pursuant to the procedures specified in the Confirmation Order no later than the Administrative Claims Final Bar Date. Holders of Administrative Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code that have asserted such Claims as part of a Proof of Claim Filed in accordance with the General Bar Date Order and/or the Administrative Claims Interim Bar Date Order shall not be required to File additional requests for payment of Administrative Claims with the Bankruptcy Court to maintain their assertion of such Administrative Claims, and the General Bar Date shall continue to apply to such Claims. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the U.S. Debtors, the Litigation Trust or their respective property, and such Administrative Claims shall be discharged as of the Effective Date. Objections to requests for payment of postpetition Administrative Claims (other than Fee Claims) must be Filed and served on the Notice Parties and the requesting party no later than the Administrative Claims Objection Deadline. Nothing in this Section II.A.1.e shall waive, extend or lengthen any applicable Bar Date for the Holder of any such Claim, even if such Claim is an Administrative Claim.

### f.     Bar Date for Ordinary Course Administrative Liabilities

Holders of Administrative Claims arising from Liabilities incurred by a U.S. Debtor in the ordinary course of its business on or after the Petition Date but prior to the Effective Date must, if not paid by 20 days after the Effective Date, File with the Bankruptcy Court an Administrative Claim by no later than the Administrative Claims Final Bar Date, unless previously Filed or as otherwise governed by any applicable Bar Date Order, or in another order of the Bankruptcy Court, or Holders of such Administrative Claims shall be forever barred from asserting such Claims against the Estates.

### 2.     Payment of Priority Tax Claims

### a.     Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the U.S. Debtors or Litigation Trustee, as applicable, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the U.S. Debtors or Litigation Trustee, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement, satisfaction and release of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Litigation Trustee as they become due; provided, further, that, in the event an Allowed Priority Tax Claim that is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

### b. Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding anything to the contrary in Section II.A, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the U.S. Debtors or their respective property.

### 3. DIP Claims

#### a. CEC DIP Claims

To the extent not previously satisfied in full, on the Closing Date, in accordance with section 1129(a)(9) of the Bankruptcy Code, the Holder of the CEC DIP Claims shall receive Cash from the DIP Payment in an amount required to satisfy in full all Allowed CEC DIP Claims; provided, that consistent with paragraph 17 of the CEC Final DIP Order, any additional fees and expenses incurred following the Closing Date by CEC and the DIP Agent (as defined in the CEC Final DIP Order) constitute Administrative Claims of the Estates and therefore must be satisfied in full in cash on the Effective Date.

In exchange for the foregoing treatment of Allowed CEC DIP Claims, on the Closing Date, any and all outstanding notes issued in connection with the CEC DIP Claims shall be canceled and shall be deemed terminated and of no further force and effect.

#### b. CCP DIP Claims

On the Closing Date, the CCP DIP Claims (a) shall be deemed indefeasibly satisfied in full, and (b) any and all outstanding notes issued in connection with the CCP DIP Claims shall be canceled and shall be deemed terminated and of no further force and effect.

### B. Classification of Claims and Interests

#### 1. General

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for voting and distribution pursuant to this Plan, as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class. Except as otherwise specifically provided for herein, the Confirmation Order or any other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the Disclosure Statement Order indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan. The U.S. Debtors may seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

Claims against and Interests in the U.S. Debtors are classified in 11 Classes as follows:

| Class | Designation |
|-------|-------------|
| 1 | Priority Claims |
| 2 | Secured Pre-Petition First Lien Claims |
| 3 | Pre-Petition Second Lien Claims |

-21-

| Class | Designation |
|---|---|
| 4 | Corpus Christi Mechanics' Lien Reserve Claims |
| 5 | Comerica Claims |
| 6 | Secured Macquarie Claims |
| 7 | Other Secured Claims |
| 8 | General Unsecured Claims |
| 9 | U.S. Debtor Intercompany Claims |
| 10 | Interests in Senior U.S. Debtors |
| 11 | Interests in Subsidiary U.S. Debtors |

## 2. Identification of Classes of Claims Against and Interests in the U.S. Debtors

The following table designates the Classes of Claims against and Interests in the U.S. Debtors and specifies which Classes are (a) Impaired or Unimpaired by this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code or (c) deemed to accept or reject this Plan.

| Class | Designation | Treatment | Voting Status |
|---|---|---|---|
| 1 | Priority Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 2 | Secured Pre-Petition First Lien Claims | Impaired | Entitled to Vote |
| 3 | Pre-Petition Second Lien Claims | Impaired | Entitled to Vote |
| 4 | Corpus Christi Mechanics' Lien Reserve Claims | Impaired | Entitled to Vote |
| 5 | Comerica Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 6 | Secured Macquarie Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 7 | Other Secured Claims | Unimpaired | Deemed to Accept/ Not Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | U.S. Debtor Intercompany Claims | Impaired | Deemed to Reject/ Not Entitled to Vote |
| 10 | Interests in Senior U.S. Debtors | Impaired | Deemed to Reject/ Not Entitled to Vote |
| 11 | Interests in Subsidiary U.S. Debtors | Unimpaired | Deemed to Accept/ Not Entitled to Vote |

## C. Treatment of Claims

### 1. Priority Claims (Class 1)

**a.** *Classification*. Class 1 consists of all Priority Claims.

**b.** *Treatment.* On the later of (i) the Effective Date, or as soon as practical thereafter, and (ii) the date on which such Priority Claim becomes an Allowed Priority Claim, unless otherwise agreed to by the U.S. Debtors, the Litigation Trustee or the Purchaser (as applicable) and the Holder of an Allowed Priority Claim (in which event such other agreement will govern), each Holder of an Allowed Priority Claim shall receive on account of and in full and complete settlement and release of such Claim, Cash in the amount of such Allowed Priority Claim in accordance with section 1129(a)(9) of the Bankruptcy Code. All Allowed Priority Claims that are not due and payable on or before the Effective Date shall be paid (i) by the Litigation Trustee (A) first, from the Estates' assets and (B) solely with respect to the Unsecured Claims Pool Priority Claims, to the extent the Estates' assets are insufficient to pay such Claims in full, from the Unsecured Claims Pool, in each case, when such

Claims become due and payable in the ordinary course of business, or on an expedited basis pursuant to section 505(b) of the Bankruptcy Code upon request of the U.S. Debtors or the Litigation Trustee, in accordance with the terms thereof, or (ii) by the Purchaser to the extent such Claims are Purchaser Priority Claims, provided, however, that any Purchaser Priority Claims to the extent previously included in the CCP Budget and funded by the Purchaser pursuant to an Advance (as defined in the CCP DIP) shall be paid by the Estates and not the Purchaser.

        **c.** *Voting.* Claims in Class 1 are Unimpaired. Each Holder of an Allowed Claim in Class 1 is conclusively presumed to have accepted this Plan and is, therefore, not entitled to vote on this Plan.

### 2. Secured Pre-Petition First Lien Claims (Class 2)

        **a.** *Classification.* Class 2 consists of all Secured Pre-Petition First Lien Claims.

        **b.** *Treatment.* The Secured Pre-Petition First Lien Claims shall be Allowed in the amount of the Pre-Petition First Lien Obligations. Unless otherwise agreed by the Holder of a Secured Pre-Petition First Lien Claim and the U.S. Debtors, on the Closing Date each Holder of an Allowed Secured Pre-Petition First Lien Claim, subject to the terms of this Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall receive such Holder's Pro Rata share of the First Lien Payment.

        **c.** *Voting.* Claims in Class 2 are Impaired. Each Holder of an Allowed Claim in Class 2 is thus entitled to vote on this Plan.

### 3. Pre-Petition Second Lien Claims (Class 3)

        **a.** *Classification.* Class 3 consists of all Pre-Petition Second Lien Claims.

        **b.** *Treatment.* Unless otherwise agreed by the Holder of a Pre-Petition Second Lien Claim and the U.S. Debtors, on the Closing Date, the Pre-Petition Second Lien Obligations shall be deemed indefeasibly satisfied in full.

        **c.** *Voting.* Claims in Class 3 are Impaired. Each Holder of an Allowed Claim in Class 3 is thus entitled to vote on this Plan.

### 4. Corpus Christi Mechanics' Lien Reserve Claims (Class 4)

        **a.** *Classification.* Class 4 consists of all Corpus Christi Mechanics' Lien Reserve Claims.

        **b.** *Treatment.* Unless otherwise agreed by any Holder of a Corpus Christi Mechanics' Lien Reserve Claim and the U.S. Debtors or the Purchaser (as applicable), each Holder of an Allowed Corpus Christi Mechanics' Lien Reserve Claim, subject to the terms of this Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall be paid in Cash, solely from the funds available in the Corpus Christi Mechanics' Lien Reserve, and in accordance with the Corpus Christi Mechanics' Lien Reserve Procedures.

        **c.** *Voting.* Claims in Class 4 are Impaired. Each Holder of an Allowed Claim in Class 4 is thus entitled to vote on this Plan.

### 5. Comerica Claims (Class 5)

        **a.** *Classification.* Class 5 consists of all Comerica Claims.

        **b.** *Treatment.* The Comerica Claims shall be Allowed in the aggregate amount of the Comerica Obligations, to the extent not previously paid in Cash. Unless otherwise agreed by the Holder of a Comerica Claim and the U.S. Debtors or the Litigation Trustee (as applicable), on the Effective Date or as soon as

reasonably practicable thereafter, each Holder of an Allowed Comerica Claim, subject to the terms of this Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall, until such Claims are irrevocably paid and satisfied in full in Cash, be entitled to: (i) such Holder's Pro Rata share of the proceeds of the Comerica Collateral Accounts; (ii) to the extent that such Claims remain unsatisfied, such Holder's Pro Rata share of the proceeds of the Comerica Adequate Protection Liens, up to the amount of Diminution in Value suffered by such Holder, as determined by the Bankruptcy Court; and (iii) to the extent that such Claims still remain unsatisfied, Cash paid by the Estates in the amount of such Holder's Comerica Adequate Protection Superpriority Claim, up to the amount of Diminution in Value suffered by such Holder, as determined by the Bankruptcy Court; <u>provided</u> that, to the extent the funds in the Estates are not sufficient to pay the Comerica Adequate Protection Superpriority Claim in full, the Comerica Adequate Protection Superpriority Claim shall be paid from the Unsecured Claims Pool or, after the Effective Date, the Litigation Trust Assets. Comerica shall retain all Liens, including the Comerica Adequate Protection Liens, and Administrative Claims, including the Comerica Adequate Protection Superpriority Claim, granted to it under the Comerica Credit Documents and the Cash Collateral Final Order until the Comerica Claims have been irrevocably paid and satisfied in full in Cash. Until the Comerica Claims have been irrevocably paid and satisfied in full in Cash, the provisions of, and the rights granted to Comerica in, the Final Cash Collateral Order shall remain in full force and effect, and the Comerica Collateral Accounts shall remain under the exclusive custody and control of Comerica, in each case, notwithstanding anything else in the Plan, Confirmation Order, Litigation Trust Agreement or otherwise.

     **c.** *Voting.* Claims in Class 5 are Unimpaired. Each Holder of an Allowed Claim in Class 5 is conclusively presumed to have accepted this Plan and is, therefore, not entitled to vote on this Plan.

    **6.**  **Macquarie Claims (Class 6)**

     **a.** *Classification.* Class 6 consists of all Macquarie Claims.

     **b.** *Treatment.* The Macquarie Claims shall be deemed to be fully Secured and shall be Allowed in the aggregate amount of $57,300,000, plus, to the extent not previously paid, monthly 9% interest thereon commencing August 1, 2018. Unless otherwise agreed by any Holder of a Macquarie Claim and the U.S. Debtors, on the Closing Date, each Holder of a Macquarie Claim, subject to the terms of this Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall receive such Holder's Pro Rata share of such Allowed amount in Cash from the Macquarie Payment.

     **c.** *Voting.* Claims in Class 6 are Unimpaired. Each Holder of an Allowed Claim in Class 6 is conclusively presumed to have accepted this Plan and is, therefore, not entitled to vote on this Plan.

    **7.**  **Other Secured Claims (Class 7)**

     **a.** *Classification.* Class 7 consists of all Other Secured Claims.

     **b.** *Treatment.* Unless otherwise agreed by any Holder of an Other Secured Claim and the U.S. Debtors or the Litigation Trustee (as applicable), on the later of (i) the Effective Date or as soon as reasonably practicable thereafter and (ii) the date on which such Other Secured Claim becomes an Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the U.S. Debtors or the Litigation Trustee (as applicable): (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest thereon required to be paid under section 506(b) of the Bankruptcy Code; or (iii) such other recovery as is necessary to render such Claim Unimpaired.

     **c.** *Voting.* Claims in Class 7 are Unimpaired. Each Holder of an Allowed Claim in Class 7 is conclusively presumed to have accepted this Plan and is, therefore, not entitled to vote on this Plan.

    **8.**  **General Unsecured Claims (Class 8)**

     **a.** *Classification.* Class 8 consists of all General Unsecured Claims.

**b.** *Treatment.* Unless otherwise agreed by any Holder of a General Unsecured Claim and the U.S. Debtors or the Litigation Trustee (as applicable), on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim, subject to the terms of this Plan, in full and final satisfaction, settlement and release of, and in exchange for, such Claim, shall receive its Pro Rata share of the beneficial interests in the Litigation Trust Assets.

**c.** *Voting.* Claims in Class 8 are Impaired. Each Holder of an Allowed Claim in Class 8 is thus entitled to vote on this Plan.

### 9. U.S. Debtor Intercompany Claims (Class 9)

**a.** *Classification.* Class 9 consists of all U.S. Debtor Intercompany Claims.

**b.** *Treatment.* On the Effective Date, all U.S. Debtor Intercompany Claims shall be released, canceled or waived (including, potentially, by way of contribution to capital). No Distribution shall be made on account of the U.S. Debtor Intercompany Claims.

**c.** *Voting.* Class 9 is Impaired. Each Holder of an Allowed Claim in Class 9 is conclusively presumed to have rejected this Plan and is, therefore, not entitled to vote on this Plan.

### 10. Interests in Senior U.S. Debtors (Class 10)

**a.** *Classification.* Class 10 consists of all Interests in the Senior U.S. Debtors.

**b.** *Treatment.* On the Effective Date, all Interests in the Senior U.S. Debtors held by any Entity will be cancelled.

**c.** *Voting.* Class 10 is Impaired. Each Holder of an Interest in Class 10 is conclusively presumed to have rejected this Plan and is, therefore, not entitled to vote on this Plan.

### 11. Interests in Subsidiary U.S. Debtors (Class 11)

**a.** *Classification.* Class 11 consists of all Interests in the Subsidiary U.S. Debtors.

**b.** *Treatment.* On the Effective Date, all Interests in each of the Subsidiary U.S. Debtors will be reinstated, subject to the Dissolution Transactions.

**c.** *Voting.* Class 11 is Unimpaired. Each Holder of an Interest in Class 11 is conclusively presumed to have accepted this Plan and is, therefore, not entitled to vote on this Plan.

### D. Reservation of Rights Regarding Claims

Except as otherwise provided in this Plan or in other Final Orders of the Bankruptcy Court, including the Final Cash Collateral Order, nothing shall affect the U.S. Debtors' or the Litigation Trustee's rights and defenses, whether legal or equitable, with respect to any Claim, including, without limitation, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### E. Postpetition Interest on Claims

Except as required by applicable bankruptcy law, postpetition interest shall not accrue or be payable on account of any General Unsecured Claim.

-25-

F. **Insurance**

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an insurance policy, such Claim shall first be paid from proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of this Plan governing the Class applicable to such Claim.

## III. MEANS OF IMPLEMENTATION

A. **Corporate Existence**

On the Effective Date, the Senior U.S. Debtors will issue the New Equity Interests to the Litigation Trust. Consistent with Section IIIB of this Plan, each of the U.S. Debtors will be subject to one or more Dissolution Transactions on or after the Effective Date, at the discretion of the Plan Administrator and in accordance with the Litigation Trust Agreement. Each U.S. Debtor shall continue to exist after the transfer of the property of their Estates to the Litigation Trust until dissolved by the Plan Administrator, pursuant to a Dissolution Transaction.

B. **Dissolution Transactions**

1. **Dissolution Transactions Generally**

At any time on or after the Effective Date, the Plan Administrator will enter into such Dissolution Transactions (including any transactions set forth on Exhibit F) and will take such actions as may be necessary or appropriate on the U.S. Debtors' behalf to merge, dissolve or otherwise terminate the corporate existence of each of the U.S. Debtors in accordance with the Litigation Trust Agreement. The actions to effect the Dissolution Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation or dissolution containing terms that, among other things, are consistent with the terms of this Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of this Plan and that satisfy the requirements of applicable law; (iii) the filing of appropriate certificates or articles of merger, consolidation, continuance or dissolution or similar instruments with the applicable governmental authorities; and (iv) the taking of all other actions that these entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions.

2. **Recourse Solely to Litigation Trust Assets**

All Claims against the U.S. Debtors are deemed satisfied, waived and released as to the U.S. Debtors in exchange for the treatment of such Claims under the Plan, and, except as otherwise set forth in the Plan or other Final Orders of the Bankruptcy Court, Holders of Allowed Claims against any U.S. Debtor will have recourse solely to the assets of the Litigation Trust for the payment of their Allowed Claims in accordance with the terms of the Plan and the Litigation Trust Agreement.

C. **Litigation Trust**

1. **Litigation Trust Generally**

On or prior to the Effective Date, the Litigation Trust shall be established in accordance with the Litigation Trust Agreement for the purpose of liquidating the Litigation Trust Assets, resolving all Disputed Claims, making all distributions to Holders of Allowed Claims in accordance with the terms of this Plan and otherwise implementing this Plan. Subject to and to the extent set forth in this Plan, the Confirmation Order, the Litigation Trust Agreement or any other order of the Bankruptcy Court entered in connection therewith, the Litigation Trust shall be empowered to: (i) perform all actions and execute all agreements, instruments and other documents necessary to implement the Plan; (ii) establish, maintain and administer the Trust Accounts, which shall be segregated to the extent appropriate in accordance with this Plan; (iii) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle and protect, as applicable, the Litigation Trust Assets (directly or through its

-26-

professionals or a Third Party Disbursing Agent), in accordance with this Plan; (iv) review, reconcile, settle or object to all Claims that are Disputed Claims as of the Effective Date pursuant to the procedures for allowing Claims prescribed in this Plan; (v) calculate and make Distributions of the proceeds of the Litigation Trust Assets to the Holders of Allowed Claims; (vi) pursue the Litigation Trust Causes of Action transferred to the Litigation Trust in accordance with the Litigation Trust Agreement and the Bid Support Term Sheet; (vii) retain, compensate and employ professionals to represent the Litigation Trust; (viii) file appropriate Tax returns and other reports on behalf of the Litigation Trust and the U.S. Debtors and pay Taxes or other obligations owed by the Litigation Trust and the U.S. Debtors; (ix) exercise such other powers as may be vested in the Litigation Trust under the Litigation Trust Agreement and this Plan, or as are deemed by the Litigation Trustee to be necessary and proper to implement the provisions of this Plan and the Litigation Trust Agreement; (x) take such actions as are necessary or appropriate to close or dismiss all of the Chapter 11 Cases; and (xi) dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

Notwithstanding anything to the contrary in this Section III.C.1, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

### 2. Funding of and Transfer of Assets Into the Litigation Trust

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the U.S. Debtors shall transfer the Litigation Trust Assets to the Litigation Trust, and all such assets shall vest in the Litigation Trust on such date, to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement. Except as set forth in Section III.J below, the Litigation Trust Assets shall be transferred to the Litigation Trust free and clear of all Liens.

The Litigation Trustee shall have the authority to create additional sub-accounts in the Trust Accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust.

The act of transferring the Litigation Trust Assets, as authorized by this Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Litigation Trust as if the asset or right was still held by the applicable Debtor.

### 3. Litigation Trust Oversight Committee

The Litigation Trust Oversight Committee shall be established to review and monitor the actions of the Litigation Trustee in administering the Litigation Trust. The Litigation Trust Oversight Committee shall have standing to be heard on all matters brought before the Bankruptcy Court after the Effective Date with respect to the U.S. Debtors or the Litigation Trust. The initial members of the Litigation Trust Oversight Committee are identified on Exhibit A to this Plan. The Litigation Trust Oversight Committee shall not be entitled to reimbursement from the U.S. Debtors or the Litigation Trust for any fees or expenses incurred in conducting its duties hereunder.

### 4. Litigation Trustee

The initial Litigation Trustee selected by the Creditors' Committee is identified on Exhibit B of this Plan.

The Litigation Trustee shall be the successor to and representative of the Estate of each of the U.S. Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code. The powers, rights and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in Section IIIC.1 above, subject to the oversight of the Litigation Trust Oversight Committee. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement

5. **Litigation Trust Agreement**

Prior to the Effective Date, the U.S. Debtors and the Litigation Trustee shall execute and deliver the Litigation Trust Agreement.

6. **Reports to be filed by the Litigation Trustee**

Following the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Litigation Trust Agreement), no later than 31 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to this Plan, distributions made by it and other matters relating to the implementation of this Plan.

7. **Fees and Expenses of the Litigation Trust**

The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the U.S. Debtors or the Creditors' Committee) to assist in carrying out its duties under the Litigation Trust Agreement and may compensate and reimburse the expenses of these professionals from the appropriate Trust Account, based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Litigation Trust Agreement.

8. **Indemnification**

The Litigation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Litigation Trustee, the members of the Litigation Trust Oversight Committee and/or other parties. Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.

9. **Tax Treatment; No Successor in Interest**

The Litigation Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) and in part as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section 1.468B-9. For U.S. federal income tax purposes, the transfer of assets by the U.S. Debtors to the Litigation Trust will be treated (i) in part as the transfer of assets by the U.S. Debtors to the Holders of Allowed General Unsecured Claims, subject to any liabilities of the U.S. Debtors or the Litigation Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such Holders to the Litigation Trust in exchange for the beneficial interests in the Litigation Trust, and (ii) in part as the transfer of assets by the U.S. Debtors to one more Disputed Claims Reserves.

a. **Litigation Trust as a Liquidating Trust**

The Litigation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries and not unduly prolong its duration. The Litigation Trust shall not be deemed a successor-in-interest of the U.S. Debtors for any purpose other than as specifically set forth in this Plan or in the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose.

The Litigation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Litigation Trust Beneficiaries treated as grantors and owners of the Litigation Trust. For all U.S. federal income tax purposes, all parties (including the U.S. Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall

treat the transfer of the Litigation Trust Assets by the U.S. Debtors to the Litigation Trust, as set forth in the Litigation Trust Agreement, as a transfer of such assets by the U.S. Debtors to the Holders of Allowed Claims entitled to distributions from the Litigation Trust Assets, followed by a transfer by such Holders to the Litigation Trust. Thus, the Litigation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

As soon as practicable after the Effective Date, the Litigation Trustee shall make a good faith determination of the fair market value of the Litigation Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties (including the U.S. Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) for all U.S. federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Litigation Trust Assets.

The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Litigation Trust during liquidation, (ii) to pay the respective reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with this Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

### b. Disputed Claims Reserves

Litigation Trust Assets reserved for Holders of Disputed Claims shall be treated as one or more Disputed Claims Reserves. The Litigation Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment). The Litigation Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all Tax reporting and withholding required by the Disputed Claims Reserves. No Holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such Holder receives or is allocated an interest in such asset. The Litigation Trustee will file all Tax returns on a basis consistent with the treatment of the Litigation Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation section 1.671-1(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds, and will pay all Taxes owed from Litigation Trust assets.

### 10. Settlement of Claims

Except as otherwise provided in this Plan or the Litigation Trust Agreement, on and after the Effective Date, the Litigation Trustee may compromise or settle any Claims (other than Corpus Christi Claims, which may be compromised and settled by the Purchaser) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Litigation Trust expenses, professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of applications for payment of Fee Claims) without application to the Bankruptcy Court.

### 11. Sales of Assets by Litigation Trust

The Litigation Trustee may conduct any sales or liquidations of non-Cash Litigation Trust Assets on any terms it deems reasonable, without further order of the Bankruptcy Court. Upon the sale, liquidation, transfer or other disposition of the Litigation Trust Assets by the Litigation Trustee, the Litigation Trustee shall deposit the proceeds of all such sales, liquidations, transfers or dispositions into one or more of the Trust Accounts.

D. **Corporate Governance, Directors and Officers**

1. **Certificates of Incorporation and Bylaws**

Consistent with Sections III.A and III.B above, in the discretion of the Plan Administrator, each of the U.S. Debtors will cease to exist at a point in time after the Effective Date, and all existing certificates of incorporation and by-laws will be canceled at that time. Accordingly, except to the extent necessary to effect the issuance of the New Equity Interests to the Litigation Trust on the Effective Date in accordance with Section II.C.10 of this Plan, no new certificates of incorporation and by-laws will be necessary.

2. **Directors and Officers**

Effective as of the Effective Date, all directors, officers and voting trustees of the U.S. Debtors shall be discharged, and all such appointments rescinded for all purposes, without any necessity of taking any further action in connection therewith.

3. **Corporate Action**

The Dissolution Transactions and the following corporate actions and transactions will occur and be effective as of the date specified in the documents effectuating the applicable Dissolution Transactions (or other transactions), or the Effective Date if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the U.S. Debtors, the Plan Administrator, the Litigation Trustee or any other Person: (a) the establishment of the Litigation Trust; (b) the appointment of the Litigation Trustee to act on behalf of the Litigation Trust; (c) the transfer of the Litigation Trust Assets (including the issuance of the New Equity Interests) into the Litigation Trust, as set forth in this Plan; (d) the distribution of Cash pursuant to the Plan; (e) the adoption, execution, delivery and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; (f) the adoption, execution and implementation of the Litigation Trust Agreement; and (g) the other matters provided for under this Plan involving the corporate structure of any U.S. Debtor or corporate action to be taken by or required of any U.S. Debtor, the Plan Administrator or the Litigation Trustee.

E. **No Revesting of Assets**

To the extent not otherwise Distributed in accordance with this Plan, the property of the U.S. Debtors' Estates shall not revest in the U.S. Debtors on or after the Effective Date but shall instead vest in the Litigation Trust to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement.

F. **Creation and Maintenance of Trust Accounts**

1. **Creation of Trust Accounts**

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Litigation Trust or, if applicable and appropriate, the Third Party Disbursing Agent. Cash deposited in the Trust Accounts will be invested, held and used solely as provided in the Litigation Trust Agreement. The Litigation Trustee is authorized to establish additional Trust Accounts after the Effective Date, consistent with the terms of the Litigation Trust Agreement.

2. **Additional Funding of Trust Accounts**

After the funding of the Trust Accounts on the Effective Date, each Trust Account will be funded by the Cash proceeds obtained through litigation or the disposition of the Litigation Trust Assets.

### 3. Closure of Trust Accounts

Upon obtaining an order of the Bankruptcy Court authorizing final Distribution and/or closure of the Chapter 11 Cases, any funds remaining in the Trust Accounts shall be distributed in accordance with the Plan and the Litigation Trust Agreement, and the Trust Accounts may be closed.

### G. Substantive Consolidation of the U.S. Debtors

#### 1. Substantive Consolidation of the U.S. Debtors

On the Effective Date, the Estates of the U.S. Debtors shall be deemed consolidated for all purposes related to the Plan, including for purposes of implementing the Plan, for purposes of voting, for assessing whether the standards for Confirmation have been met, for calculating and making Distributions under the Plan and for filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee. As of the Effective Date: (a) all assets and liabilities of the U.S. Debtors shall be deemed merged; (b) all guarantees by one U.S. Debtor of the obligations of any other U.S. Debtor shall be deemed eliminated so that any Claim against any U.S. Debtor and any guarantee thereof executed by any other U.S. Debtor and any joint or several liability of any of the U.S. Debtors shall be deemed to be one obligation of the U.S. Debtors; (c) each and every Claim Filed or to be Filed in the Chapter 11 Cases of any U.S. Debtor shall be deemed Filed against all U.S. Debtors and shall be deemed one Claim against and a single obligation of the U.S. Debtors; and (d) Intercompany Claims between U.S. Debtors shall be eliminated and extinguished. This substantive consolidation shall not affect (a) the legal and corporate structures of the U.S. Debtors; (b) the vesting of their assets in the Litigation Trust; (c) the right to Distributions from any insurance policies or proceeds of such policies; (d) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; or (e) the rights of the U.S. Debtors or the Litigation Trustee to contest setoff or recoupment rights alleged by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law.

#### 2. Plan as Motion Seeking Order Granting Substantive Consolidation of the U.S. Debtors

This Plan will serve as a motion seeking entry of an order substantively consolidating the U.S. Debtors, as described and to the extent set forth in Section IIIG.1 above. Unless a written objection to such substantive consolidation by any creditor affected by the same is Filed with the Bankruptcy Court and served on the Notice Parties on or before the Objection Deadline, or such other date as may be fixed by the Bankruptcy Court, the order approving the substantive consolidation of the U.S. Debtors (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

### H. Preservation of Causes of Action; Compromise and Settlement of Disputes

#### 1. Preservation of All Causes of Action Not Expressly Settled or Released

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Litigation Trustee will retain and may enforce any Litigation Trust Causes of Action (including Privilege Rights) that any Estate may hold against any Entity to the extent not released under Section IX.C hereof or otherwise, including the Avoidance Actions. The Litigation Trustee may pursue the Litigation Trust Causes of Action, as appropriate, in accordance with the best interests of the Litigation Trust Beneficiaries. A nonexclusive schedule of currently pending actions and claims brought by one or more U.S. Debtors that constitute Litigation Trust Causes of Action is attached hereto as Exhibit D. In accordance with and subject to any applicable law, the U.S. Debtors' inclusion or failure to include any Litigation Trust Cause of Action on Exhibit D shall not be deemed an admission, denial or waiver of any claims, demands, rights or causes of action that any U.S. Debtor or Estate may hold against any entity. The U.S. Debtors intend to preserve all such Litigation Trust Causes of Action except to the extent any such claim is specifically released herein or otherwise during the Chapter 11 Cases.

2. **Litigation Trust's Interest in Certain Corpus Christi Causes of Action**

The Corpus Christi Causes of Action shall be transferred to the Purchaser as of the Closing Date in accordance with the Bid Support Term Sheet. If the Purchaser has not commenced litigation with respect to any Corpus Christi Cause of Action or otherwise settled such Corpus Christi Cause of Action in the Purchaser's sole discretion within 270 days after the Closing Date, all of the Purchaser's rights and interests in such Corpus Christi Cause of Action with respect to such party shall thereafter be automatically and irrevocably transferred to the Litigation Trust. For the avoidance of doubt, the resolution of any Corpus Christi Cause of Action, whether by settlement or litigation commenced during the 270 days after the Closing Date, by the Purchaser in accordance with this Section III.H.2 shall be binding upon the Litigation Trust.

The Purchaser shall (in consultation with the Litigation Trustee) prosecute any Corpus Christi Causes of Action against Sinopec and fund such prosecution; provided, however, that any net recovery (in excess of professional fees incurred in connection with such prosecution) on Corpus Christi Causes of Action against Sinopec in excess of any final, unwaived, Allowed Corpus Christi Mechanics' Lien Claims held by Sinopec shall be allocated 50% to the Litigation Trust and 50% to the Purchaser; provided further that, if the Purchaser does not commence litigation with respect to, or otherwise resolve, any Corpus Christi Cause of Action against Sinopec within 270 days of the Closing Date, such Corpus Christi Cause of Action shall be automatically and irrevocably transferred to the Litigation Trust in accordance with this Section III.H.2. Thereafter, the Litigation Trust shall fund any prosecution of such Corpus Christi Cause of Action against Sinopec and shall be entitled to 100% of any net recovery thereon.

3. **Comprehensive Settlement of Claims and Controversies**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, this Plan incorporates an integrated compromise and settlement designed to achieve a beneficial and efficient resolution of these Chapter 11 Cases for all parties in interest. Accordingly, in consideration of the Distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section IX.C hereof, shall constitute a good-faith compromise and settlement of all Claims, disputes and controversies relating to the rights that a Holder of a Claim may have against any U.S. Debtor or with respect to any Distribution to be made pursuant to the Plan on account of any such Claim.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, disputes, or controversies provided for herein, and the Bankruptcy Court's determination that such compromises and settlements are in the best interests of the U.S. Debtors, their Estates, creditors and all other parties in interest, and are fair, equitable and within the range of reasonableness. If the Effective Date does not occur, the settlements set forth herein shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

I. **Cancellation and Surrender of Instruments, Securities and Other Documentation**

Except as provided in (1) any contract, instrument or other agreement or document entered into or delivered in connection with this Plan, including the Litigation Trust Agreement, (2) any of the asset sales effectuated during the pendency of the Chapter 11 Cases or (3) Section II.C.11 hereof with respect to the reinstatement of the Interests in the Subsidiary U.S. Debtors, on the Effective Date and concurrently with the applicable Distributions made pursuant to Section II hereof, all notes, instruments, certificates and other documents evidencing Claims or Interests shall be deemed canceled and surrendered and of no further force and effect against the U.S. Debtors or the Litigation Trust, without any further action on the part of any U.S. Debtor or the Litigation Trust.

J. **Release of Liens**

Except as otherwise provided in this Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all liens on the property of any U.S. Debtors' Estate shall be fully released and discharged, and all of the right, title and interest of any Holder of such liens, including any rights to any collateral securing such liens (including any net proceeds of any disposition of such collateral), shall attach to and be

enforceable solely against the asset(s) to which the Holder's lien previously attached, as now owned by the Litigation Trust. All liens against the Litigation Trust Assets shall be released and discharged upon the Holders thereof receiving its Distribution in accordance with the terms of this Plan.

### K. Effectuating Documents; Further Transactions

On and after the Effective Date, the U.S. Debtors, the Plan Administrator, the Litigation Trust and the Litigation Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of this Plan and the Dissolution Transactions, in each case, in the name of and on behalf of the U.S. Debtors or the Litigation Trust, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to this Plan.

### L. Substitution in Pending Legal Actions

On the Effective Date, the Litigation Trustee shall be deemed to be substituted as a party to any litigation in which any U.S. Debtor is a party, including (but not limited to): (a) pending contested matters or adversary proceedings in the Bankruptcy Court; (b) any appeals of orders of the Bankruptcy Court; and (c) any state court or federal or state administrative proceedings pending as of the Petition Date. The Litigation Trustee and its professionals are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

## IV. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each of the U.S. Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for any Executory Contract or Unexpired Lease (1) identified on Exhibit E to this Plan (which shall be Filed as a Plan Supplement) as an Executory Contract or Unexpired Lease designated for assumption and assignment to the Litigation Trust, (2) that is the subject of a separate motion or notice to assume or reject Filed by a U.S. Debtor and pending as of the Confirmation Hearing or (3) that previously expired or terminated pursuant to its own terms.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the assumptions and assignments and the rejections of such Executory Contracts and Unexpired Leases as set forth in the preceding paragraph. Unless otherwise indicated herein, assumptions and assignments and rejections of Executory Contracts and Unexpired Leases pursuant to this Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall vest in and be fully enforceable by the Litigation Trust in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to section 365 of the Bankruptcy Code; provided that if an assignment is pending as of the Effective Date, the Litigation Trustee shall be authorized to take any and all actions necessary to implement such assignment.

To the maximum extent permitted by law, to the extent any provision (including, without limitation, any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the assumption and assignment contemplated by this Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, except for asserting and pursuing a Cure Claim. Notwithstanding anything to the contrary in this Plan, the U.S. Debtors reserve the right, with the consent of the Creditors' Committee, to alter, amend, modify or supplement Exhibit E to this Plan in their discretion prior to the Effective Date on no less than three days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

NAI-1504730427v10

### B. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Claim shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Allowed amount of such Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to any particular Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the Allowed amount of any Cure Claim; (b) the ability of the Litigation Trust or another assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, no payments on account of the Cure Claim shall be made until such dispute is resolved by a Final Order. At least ten days before the Confirmation Hearing, the U.S. Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or the related amount of the Cure Claim must be Filed, served and actually received by the U.S. Debtors on the later of: (a) three days before the date of the Confirmation Hearing; and (b) seven days after receiving notice of any amendment, modification or supplement to Exhibit E. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and assignment or Cure Claim will be deemed to have assented to such assumption and assignment or Cure Claim.

Payment of the Allowed Cure Claim upon the assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under such Executory Contract or Unexpired Lease occurring at any time prior to the effective date of the assumption and assignment. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned and with respect to which the Allowed Cure Claim has been paid shall be deemed disallowed and expunged without further notice, action, order or approval of the Bankruptcy Court.

### C. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of any Executory Contracts and Unexpired Leases pursuant to this Plan must be filed with the Claims and Noticing Agent within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Proofs of Claim arising from the rejection of any Executory Contracts and Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any U.S. Debtor or the Litigation Trust without the need for any objection by the U.S. Debtors or the Litigation Trust or further notice to or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of any Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Section II hereof.

The Litigation Trust reserves the right to object to, settle, compromise or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

**Holders of Claims arising from the rejection of Executory Contracts and Unexpired Leases with respect to which no Proof of Claim is timely Filed will be forever barred from asserting a Claim against the U.S. Debtors, the Estates, the Litigation Trust or the property of any of the foregoing, unless otherwise expressly allowed by the Bankruptcy Court.**

### D. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into or assumed by a U.S. Debtor after the Petition Date that are not assigned to the Purchaser or the Litigation Trust shall be considered repudiated by the applicable U.S. Debtor as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must file a Claim within 30 days of the Effective Date in accordance with this Plan or have their rights forever waived and released.

### E. Insurance Policies

All rights of the U.S. Debtors under any insurance policies under which they are the insured parties and all related insurance agreements shall automatically become vested in the Litigation Trust as of the Effective Date without necessity for further approvals or orders. To the extent that any such insurance policies or related insurance agreements are deemed executory contracts, then, unless such policies have been rejected pursuant to an order of the Bankruptcy Court (including the Confirmation Order), notwithstanding anything to the contrary in this Plan, this Plan shall constitute a motion to assume and assign to the Litigation Trust, permit to "ride through" or ratify such insurance policies or insurance agreements. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute both approval of such assumption and assignment pursuant to section 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interests of the Estates. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed upon by the parties prior to the Effective Date, no payments shall be required to cure any defaults existing as of the Confirmation Date with respect to any insurance policy or insurance agreement assumed and assigned to the Litigation Trust pursuant to this Section IV.E. Each applicable insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to these Chapter 11 Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for any insured Claims or Causes of Action. Nothing in this Plan shall impair the rights of the Litigation Trust with respect to (or affect the coverage under) any insurance policy that provides liability coverage for officers, directors, and other fiduciaries of the Debtors and their affiliates.

### F. Reservation of Rights

Neither the identification of any contract or lease as assumed, assumed and assigned or rejected in connection with the Sales nor anything contained in the Plan or Plan Supplement, nor the U.S. Debtors' delivery of a notice of proposed assumption and proposed Cure Claim to an applicable counterparty shall constitute an admission by the U.S. Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any U.S. Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired on the Effective Date, the Litigation Trustee shall have 30 days following entry of a Final Order resolving such dispute to determine whether to alter the treatment of such contract or lease hereunder.

### G. Pre-Existing Obligations to the U.S. Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of the obligations owed by the counterparty to the applicable U.S. Debtor(s) under such Executory Contracts or Unexpired Leases. Notwithstanding any applicable non-bankruptcy law to the contrary, the U.S. Debtors and the Litigation Trustee expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations from the counterparties to rejected Executory Contracts or Unexpired Leases.

## V. PROVISIONS GOVERNING DISTRIBUTIONS

### A. Distributions for Allowed Claims as of the Effective Date

Except as otherwise provided in this Section V, Distributions to be made on the Effective Date to Holders of Allowed Claims as provided by Section II or this Section V shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the U.S. Debtors or the Litigation Trustee.

### B. Method of Distributions to Holders of Claims

All Distributions to be made under this Plan (including with respect to DIP Claims, Secured Pre-Petition First Lien Claims, Corpus Christi Mechanics' Lien Reserve Claims and Macquarie Claims) shall be made by the Disbursing Agent or such Third Party Disbursing Agents as the Litigation Trustee may employ in its sole discretion.

Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan, if approved by the Litigation Trustee.

### C. Disbursing Agent; No Liability

#### 1. Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (i) make all Distributions contemplated hereby; (ii) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

#### 2. Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation to the Disbursing Agent for services rendered shall be paid in Cash by the Litigation Trustee from the Litigation Trust Assets pursuant to the terms of the Litigation Trust Agreement.

#### 3. No Liability

Except on account of gross negligence or willful misconduct, the Disbursing Agent shall have no (i) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability to any party who does not hold a Claim against the U.S. Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

### D. Disputed Claims Reserves and Fee Reserves

#### 1. Establishment of Disputed Claims Reserves

On the Effective Date or as soon thereafter as is reasonably practicable, the Litigation Trustee shall establish Disputed Claims Reserves for Disputed Administrative, Priority, Priority Tax and General Unsecured Claims, which reserves shall be administered by the Litigation Trustee. The Litigation Trustee shall reserve, in Cash or other property, on account of the full asserted amount (or such lesser amount as may be determined or estimated by the Court after notice and a hearing in accordance with Section VI hereof) with respect to each such Disputed Claim.

#### 2. Maintenance of Disputed Claims Reserves

To the extent that the property placed in a Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The property in the Disputed Reserves shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class. Each Disputed Claims Reserve shall be closed by the Litigation Trust when all Distributions required to be made under this Plan to the Holders of Claims in the applicable Class will have been made in accordance with the terms of this Plan. Upon closure of a Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in that Disputed Claims Reserve shall be distributed in accordance with this Plan or the Litigation Trust Agreement, as applicable.

#### 3. Professionals Reserve

Upon the Closing Date, the Purchaser (or the U.S. Debtors, with respect to the Previously Funded Unpaid Professional Amounts) shall establish the Professionals Reserve and the Completion Fee Reserve, which shall be used for the sole purpose of paying the accrued and unpaid Allowed Fee Claims (and, in the case of fees and

expenses of Inbursa Professionals, following satisfaction of the notice procedures under the CEC Final DIP Order) specified in the definitions of such reserves. The Purchaser shall hold the residual interest in the Professionals Reserve and the Completion Fee Reserve, and, upon the satisfaction of all claims associated therewith, any funds remaining in the applicable reserve shall revert to the Purchaser.

### E. Investment of Trust Accounts

To assist in making Distributions under the Plan, Trust Accounts may be held in the name of the Litigation Trust or in the name of one or more Third Party Disbursing Agents, in each case, for the benefit of Holders of Allowed Claims in the applicable Class. The Litigation Trustee shall invest, or shall direct the Third Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to the limitations established by the Litigation Trust Agreement; provided, however, that should the Litigation Trustee determine, in its sole discretion, that the administrative costs associated with such investment exceeds the return on such investment, it may determine not to, and may direct the Third Party Disbursing Agent not to, invest such Cash. Any interest or other proceeds, if any, from such investment of Cash, net of any Taxes payable with respect thereto, shall be deposited into the applicable Trust Accounts and shall be available for Distribution to Holders of applicable Allowed Claims.

### F. Delivery of Distributions and Undeliverable Distributions to Holders of Claims

#### 1. Address for Delivery of Distributions

Except as otherwise provided in this Plan, Distributions under this Plan shall be made to the Holders of record of Allowed Claims as of the Distribution Record Date by the applicable Disbursing Agent at the latest known address, as identified in: (i) the most recently Filed Proof of Claim; (ii) at the addresses set forth in any written notices of address change delivered to the U.S. Debtors after the date of the most recently Filed Proof of Claim or where no Proof of Claim was Filed; (iii) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the U.S. Debtors have not received a written notice of a change of address; (iv) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf; or (v) if clauses (v) through (iv) are not applicable, at the last address directed by such Holder after such Claim becomes an Allowed Claim. As set forth in Section VCC.3 hereof, the Disbursing Agent shall not incur any liability whatsoever on account of any Distributions made under this Plan.

#### 2. Undeliverable Distributions

The Disbursing Agent shall make one attempt to make Distributions in accordance with the procedures set forth herein. The Disbursing Agent in its sole discretion may, but shall have no obligation to, attempt to locate the Holders entitled to receive such undeliverable Distributions. Any Distributions returned to the Disbursing Agent as undeliverable shall remain in the possession of the Litigation Trust until such time as a Distribution becomes deliverable, and the Litigation Trustee shall invest such Distribution in a manner consistent with the Litigation Trust Agreement. No further Distributions shall be made to the applicable Holder unless such Holder notifies the Disbursing Agent of its then current address.

Any Holder of an Allowed Claim entitled to a Distribution under this Plan that does not notify the Disbursing Agent of such Holder's then current address within 90 days of the Final Distribution Date shall have its Claim on account of which an undeliverable Distribution was being made discharged and shall be forever barred from asserting any such Claim against the U.S. Debtors, the Estates, the Litigation Trust or each of their respective property, and such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Litigation Trust for distribution to Holders of other Allowed Claims in the applicable Class in accordance with this Plan notwithstanding any federal or state escheat laws to the contrary.

### G. Distribution Record Date

As of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Disbursing Agent shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and

make Distributions only to those Holders who are Holders of Claims as of 5:00 p.m. on the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### H. Minimum Distributions

No Distribution of less than twenty-five dollars ($25.00) shall be made by the Disbursing Agent. Each such Distribution shall revest in the Litigation Trust for distribution to Holders of other Allowed Claims in the applicable Class in accordance with this Plan.

### I. Compliance with Tax Requirements

In connection with this Plan, to the extent applicable, the U.S. Debtors or the Litigation Trustee, as applicable, shall comply with all Tax withholding and reporting requirements imposed on them by any governmental unit (as defined in the Bankruptcy Code), and all Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding Taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate. The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

The Disbursing Agent shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution. The applicable Disbursing Agent shall provide advance written notice of such requirement to each Holder of a Claim affected thereby. The notice shall provide each Holder of a Claim with a specified time period after the date of mailing of such notice to provide an executed Form W-9, Form W-8 or other tax form or documentation to the Disbursing Agent. If a Holder of an Allowed Claim does not provide the Disbursing Agent with an executed Form W-9, Form W-8 or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the U.S. Debtors or the Litigation Trust, as applicable, for Distribution on account of other Allowed Claims and the Claim of the Holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.

### J. Manner of Payment Under the Plan.

Unless a Holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### K. Time Bar to Cash Payments.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the Entity to whom such check was originally issued. Any claim in respect of such a voided check shall be made within 30 days after the date upon which such check was deemed void. If no request is made as provided in

the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed distribution shall be re-allocated as set forth in Section V.F.2 of the Plan, notwithstanding any federal or state escheat laws to the contrary.

## L. Setoffs

Except with respect to Claims released pursuant to this Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim (and the Distributions to be made on account of such Claim), counterclaims, rights and causes of action of any nature that such U.S. Debtor may hold against the Holder of such Claim; provided, however, that the failure to effectuate such a setoff shall not constitute a waiver or release by the applicable U.S. Debtor, the Disbursing Agent or the Litigation Trust of any Causes of Action that the U.S. Debtors or the Litigation Trust may possess against the Holder of a Claim.

## M. Allocation Between Principal and Accrued Interest

Except as otherwise provided in this Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to this Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

## N. Distributions to Holders of Disputed Claims

Notwithstanding any other provision of this Plan: (1) no Distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever; and (2) except as otherwise agreed to by the relevant parties, no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, any Distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. On the Distribution Date that is at least 30 days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the Holder of such Claim shall receive any Distribution to which such Holder would have been entitled under the Plan as of the Effective Date (including any Distribution such Holder would have been entitled to on the Distribution Date on which such Holder is receiving its initial Distribution) if such claim had been Allowed as of the Effective Date, without any interest to be paid on account of such Claim.

## O. Claims Paid or Payable by Third Parties

### 1. Claims Paid by Third Parties

To the extent that the Holder of an Allowed Claim receives a Third Party Payment, the Litigation Trustee shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the Third Party Payment, and such Claim shall be disallowed or deemed satisfied, as applicable, to the extent of the Third Party Payment without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 2. Claims Payable by Insurance

No Distributions shall be made on account of any Allowed Claim that is payable pursuant to one of the U.S. Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that any of the U.S. Debtors' insurers agrees to satisfy in full or in part an Allowed Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

NAI-1504730427v10

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the U.S. Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## VI. DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

### A. Allowance of Claims

After the Effective Date, the Litigation Trustee (or, with respect to Corpus Christi Claims, the Purchaser) shall have any and all rights and defenses that the U.S. Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or released under this Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

### B. Prosecution of Objections to Claims

#### 1. Authority to Prosecute and Settle Claims

Except as otherwise specifically provided in this Plan, the U.S. Debtors, prior to the Effective Date, and the Litigation Trustee (or, with respect to Corpus Christi Claims, the Purchaser), after the Effective Date, shall have the sole authority: (i) to File, withdraw or litigate to judgment, objections to Claims; (ii) to settle or compromise any Disputed Claim (other than a Fee Claim) without any further notice to or action, order or approval by the Bankruptcy Court; and (iii) to direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order or approval by the Bankruptcy Court.

#### 2. Pending Objections

To the extent that the U.S. Debtors have filed objections to Claims that remain pending as of the Effective Date, the Litigation Trustee shall be substituted as the objecting party without further action of the parties or order of the Court.

#### 3. Application of Bankruptcy Rules

To facilitate the efficient resolution of Disputed Claims, the Litigation Trustee shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to file omnibus objections to Claims.

#### 4. Authority to Amend Schedules

The U.S. Debtors and the Litigation Trustee, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make distributions based on such amended Schedules (if no Proof of Claim is timely filed in response thereto) without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the U.S. Debtors or the Litigation Trustee, in accordance with the Bar Date Orders, will provide the Holder of such Claim with notice of such amendment and such parties will have 30 days to File an objection to such amendment in the Bankruptcy Court.

NAI-1504730427v10

5.    **Request for Extension of Claims Objection Bar Date**

Upon motion to the Bankruptcy Court, the Litigation Trustee may request one or more extensions to the Claims Objection Bar Date generally or with respect to a specific list of Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

C.    **Estimation of Claims**

The U.S. Debtors, prior to the Effective Date, and the Litigation Trustee after the Effective Date, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of Distributions), and the relevant U.S. Debtor, or the Litigation Trustee (as the case may be) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

D.    **Claims Subject to Pending Actions**

Except as otherwise provided herein, any Claims held by Entities against which a Debtor, the Litigation Trustee or another party in interest Files a complaint seeking to recover property under sections 542, 543, 550 or 553 of the Bankruptcy Code to avoid a transfer under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed a Disputed Claim pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due as a result, if any, have been turned over by that Entity to the Litigation Trust.

E.    **Offer of Judgment**

The U.S. Debtors (with the consent of the Creditors' Committee), before the Effective Date, and the Litigation Trustee, after the Effective Date, are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Disputed Claim must pay the costs incurred by the U.S. Debtors after the making of such offer, the U.S. Debtors are entitled to set off such amounts against the amount of any Distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

## VII.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.    **Conditions to Confirmation**

The Bankruptcy Court shall not be requested to enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section C:

1.    The Bankruptcy Court shall have entered the Disclosure Statement Order.

2.    The Plan and the Confirmation Order shall be in form and substance acceptable to the U.S. Debtors, the Creditors' Committee, the Pre-Petition First Lien Lender, CEC and the Purchaser.

B.    **Conditions to the Effective Date**

The Effective Date shall not occur, and the Plan shall not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section C:

1.     The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

2.     All other documents and agreements necessary to implement the Plan on the Effective Date, including without limitation the Litigation Trust Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable government unit in accordance with applicable laws, and all other actions required to be taken in connection with the Effective Date shall have occurred;

3.     The Litigation Trustee shall have been appointed and have accepted his or her appointment and the Litigation Trust Agreement shall have been executed;

4.     The Trust Accounts shall be created and funded as set forth herein;

5.     The Closing Date shall have occurred;

6.     The Dismissal Order shall have been entered by the Bankruptcy Court;

7.     The Bancomext Settlement shall have been approved by the Bankruptcy Court; and

8.     All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid in full.

## C.     Waiver of Conditions to the Effective Date

The conditions to consummation of this Plan set forth in this Section VII may be waived by the U.S. Debtors, with the consent of the Creditors' Committee, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; provided that the condition that the Closing Date shall have occurred shall only be waived with the consent of the Purchaser, Inbursa and CEC and in no event shall the obligations of the Purchaser set forth herein (including any payment or funding obligations) be effective until the Closing Date occurs; provided further, that in no event shall the Purchaser's obligation to fund the Corpus Christi Mechanics' Lien Reserve upon the occurrence of the Closing Date in accordance with Section 3.3(j) of the Corpus Christi Asset Purchase Agreement be waived.

## D.     Effect of Nonoccurrence of Conditions to the Effective Date

The U.S. Debtors reserve the right to seek to withdraw this Plan at any time prior to the Effective Date. If the Bankruptcy Court denies approval of the Bancomext Settlement or denies entry of the Dismissal Order, this Plan shall be deemed immediately withdrawn.  If this Plan is withdrawn pursuant to this Section:  (1) each of this Plan and the Confirmation Order shall be null and void in all respects, including with respect to (i) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases and (ii) the releases described in Section IX.C; and (2) nothing contained in this Plan or the Confirmation Order shall (i) constitute a waiver or release of any claims by or against, or any Interest in, any Debtor or (ii) prejudice in any manner the rights of the U.S. Debtors or any other party in interest.

## VIII.   NON-CONSENSUAL CONFIRMATION

In the event that any Impaired Class of Claims or Interests rejects this Plan, the U.S. Debtors reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (a) request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case this Plan shall constitute a motion for such relief and/or (b) amend this Plan in accordance with Section XI.A.

## IX.    EFFECT OF CONFIRMATION

### A.    Dissolution of Official Committees

Except to the extent provided herein, upon the Effective Date:  (i) the Creditors' Committee shall be dissolved; (ii) the current and former members of the Creditors' Committee and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases; and (iii) the Professionals retained by the Creditors' Committee will not be entitled to assert any Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Creditors' Committee, except to the extent necessary to:  (i) prepare, File and, if necessary, litigate final applications for compensation; and (ii) object to final fee applications Filed by other Professionals.

### B.    Exculpation

**From and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability from any Entity, and no Holder of a Claim against or Interest in, a U.S. Debtor, no other party in interest and none of their respective Representatives shall have any right of action against any Exculpated Party for any act taken or omitted to be taken before the Effective Date in connection with, related to or arising out of the Chapter 11 Cases, any of the U.S. Debtors or the Estates, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, the Sales, or any other transactions proposed or consummated in connection with the Chapter 11 Cases, any Distributions made under or in connection with this Plan or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or with this Plan or the obligations assumed hereunder; <u>provided</u>, <u>however</u>, that the foregoing provisions of this Section IX.B shall have no effect on:  (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under this Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with this Plan; (b) the liability of any Exculpated Party that is the result of any act or omission of such Exculpated Party that is determined in a Final Order to have constituted gross negligence, fraud or willful misconduct; and (c) the Litigation Trust Causes of Action and any right of the Litigation Trust to assert any Corpus Christi Cause of Action pursuant to Section III.H.2 hereof.**

### C.    Releases

#### 1.    Releases by U.S. Debtors

**Without limiting any other applicable provisions of, or releases contained in, this Plan, as of the Effective Date, to the fullest extent permitted by law, the U.S. Debtors, on behalf of themselves, their Estates, their respective Representatives any and all Entities who may purport to claim by, through, for or because of them, shall forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party with respect to any of the U.S. Debtors, the Estates, the Chapter 11 Cases or the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Exhibits, the Disclosure Statement, the Sales, the Dissolution Transactions or any other transactions proposed or consummated in connection with the Chapter 11 Cases, any Distributions, any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with this Plan or the obligations assumed hereunder; <u>provided</u>, <u>however</u>, that the foregoing provisions of this Section IX.C.1 shall not affect:  (a) the liability of any Released Party that is the result of any act or omission determined in a Final Order to have constituted gross negligence, fraud or willful misconduct; (b) any rights to enforce the Plan or any contracts, instruments, releases, agreements or documents to be, or previously, entered into or delivered in connection with the Plan; (c) except as otherwise expressly set forth in this Plan, any objections by the U.S. Debtors or the Litigation Trust to Claims filed by any Entity against any U.S. Debtor and/or the Estates, including rights of setoff, refund or other adjustments; (d) the rights of the U.S. Debtors or the Litigation Trust to assert any applicable defenses in litigation or other proceedings (including the rights to seek sanctions, fees and other costs); (e) any claim of the U.S. Debtors or the Litigation Trust, including (but not limited to) cross-claims or**

counterclaims or other Causes of Action against any parties, arising out of or relating to any litigation, judicial process, administrative proceeding or related proceeding, whether in law or in equity, to which the U.S. Debtors or the Litigation Trust are a party; or (f) the Litigation Trust Causes of Action (including without limitation, the U.S. Debtors' and their Estates' Causes of Action against any current or former director or officer of any U.S. Debtor) and any right of the Litigation Trust to assert any Corpus Christi Cause of Action pursuant to Section III.H.2 of the Plan.

2.      Releases by Holders of Claims

Without limiting any other applicable provisions of, or releases contained in, this Plan, as of the Effective Date, in consideration for the obligations of the U.S. Debtors under this Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with this Plan, unless otherwise provided in the Confirmation Order, each Holder of a Claim or Interest that (a) votes in favor of this Plan or is Unimpaired by and conclusively presumed to accept this Plan or (b) either (i) abstains from voting, (ii) votes to reject this Plan or (iii) is deemed to reject this Plan and does not opt out of the voluntary release contained in this Section IX.C.2 (by, in the case of either (i) or (ii), checking the opt-out box on the Ballot and returning it in accordance with the instructions set forth thereon, indicating that such Holder opts not to grant the releases provided in this Plan or, in the case of (iii), timely objecting to the Plan's third-party release provisions), shall be deemed to forever release and waive and discharge all Liabilities in any way that such Entity has, had or may have against any Released Party (which release shall be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code), in each case, relating to any of the U.S. Debtors, the Estates, the Chapter 11 Cases, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of this Plan, the Exhibits, the Disclosure Statement, the Sales, the Dissolution Transactions or any other transactions proposed or consummated in connection with the Chapter 11 Cases, any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with this Plan or the obligations assumed hereunder; <u>provided</u>, <u>however</u>, that the foregoing provisions of this Section IX.C.2 shall have no effect on:  (a) any liability of (i) the Purchaser, solely with respect to any Corpus Christi Mechanics' Lien Assumed Claim, (ii) any Released Party that is the result of any act or omission of such Released Party determined in a Final Order to have constituted gross negligence, fraud or willful misconduct and (iii) any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with this Plan; (b) the Litigation Trust Causes of Action (including without limitation, the U.S. Debtors' and their Estates' Causes of Action against any current or former director or officer of any U.S. Debtor) and any right of the Litigation Trust to assert any Corpus Christi Cause of Action pursuant to Section III.H.2 of this Plan; or (c) the enforcement against the Purchaser of any arbitration clause under a contract giving rise to a Corpus Christi Mechanics' Lien Claim.

D.      **Injunction Related to Releases**

The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution or rights of indemnification released pursuant to the Plan, including pursuant to the releases in this Section IX.

Notwithstanding any provision of this Plan, the Disclosure Statement or the Confirmation Order to the contrary, including but not limited to the exculpations, releases and injunctions set forth in this Section IX, neither the Plan, the Disclosure Statement nor the Confirmation Order will:  (a) release, discharge or exculpate the Debtors, the Released Parties, the Exculpated Parties, the Representatives of any of the foregoing or any other party with respect to "controlled group liability" owed to the Pension Plans or PBGC under ERISA or the Internal Revenue Code; (b) release, discharge or exculpate the Debtors, the Released Parties, the Exculpated Parties, the Representatives of any of the foregoing or any other party for fiduciary breach related to the Pension Plans; or (c) enjoin or prevent the Pension Plans or PBGC from collecting any such liability from a liable party.

### E. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the U.S. Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and pursuant to section 1125(e) of the Bankruptcy Code.

### F. Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### G. Approval of the Bancomext Settlement

To the extent not previously approved pursuant to the Bancomext Settlement Order, as part of Confirmation, and pursuant to Bankruptcy Rule 9019 and sections 105 and 363 of the Bankruptcy Code, this Plan shall constitute a motion seeking approval of the Bancomext Settlement, as set forth in the Bancomext Term Sheet and the Bancomext Stipulation, whether or not restated herein, and this Section IX.G of the Plan. To the extent of any conflict between the terms of the Bancomext Term Sheet, the Bancomext Stipulation and this Plan, this Plan shall govern.

    **1.** **Allowance of Bancomext Allowed Claim**. To the extent not previously Allowed pursuant to the Bancomext Settlement Order, the Bancomext Allowed Claim shall be Allowed as a General Unsecured Claim in the amount of $70,000,000 against the U.S. Debtors' substantively consolidated Estates; provided that in the event that the U.S. Debtors are not substantively consolidated pursuant this Plan as part of Confirmation, Bancomext shall be permitted to allocate the Bancomext Allowed Claim in its reasonable discretion among the U.S. Debtors, without duplication, subject to the Creditors' Committee and the U.S. Debtors' right to (i) object to such allocation of the Bancomext Allowed Claim and (ii) seek a determination from the Bankruptcy Court with respect to any such allocation. The Bancomext Allowed Claim shall not be subject to reconsideration, setoff, counterclaim, subordination or reduction in any manner or for any reason, including pursuant to section 502(j) of the Bankruptcy Code. Subject to the releases set forth in Section 4, the allowance of the Bancomext Allowed Claim shall not be deemed to prejudice or waive any defenses, arguments, claims, or causes of action, rights of setoff, or otherwise affect any other claims against Bancomext or any other claims asserted by Bancomext.

    **2.** **Allowance of Mexico Polimeros Allowed Claim**. To the extent not previously Allowed pursuant to the Bancomext Settlement Order, the Mexico Polimeros Allowed Claim shall be Allowed as a General Unsecured Claim in the amount of $55,515,900.90 against M&G Polymers, as the same shall be substantively consolidated pursuant to this Plan. The Mexico Polimeros Allowed Claim shall not be subject to reconsideration, setoff, counterclaim, subordination or reduction in any manner or for any reason, including pursuant to section 502(j) of the Bankruptcy Code. Subject to the releases set forth in Section 4, the allowance of the Mexico Polimeros Allowed Claim shall not be deemed to prejudice or waive any defenses, arguments, claims, or causes of action, rights of setoff, or otherwise against Mexico Polimeros or any other Claims asserted by Mexico Polimeros (unless otherwise provided in this Plan) or any other non-Debtor affiliate. In accordance with Bancomext's rights of assignment and collection set forth in section 10 of the Mexico Polimeros Revolver, any recovery on account of the Mexico Polimeros Allowed Claim shall be distributed to Bancomext pursuant to this Plan, and to the extent not previously updated, the Claims and Noticing Agent is directed to update the U.S. Debtors' claim register to this effect.

    **3.** **Bancomext Reservation of Rights**. Bancomext shall retain the right to recover against Mexico Holding and Mexico Polimeros, or any non-Debtor, including with respect to its rights to consent to any restructuring of Mexico Holding and Mexico Polimeros, affecting their assets and liabilities in any process or proceeding, other than in the Chapter 11 Cases; provided that Bancomext shall not be entitled to any further distributions from the Debtors on account of the Bancomext Allowed Claim and the Mexico Polimeros Allowed Claim if Bancomext recovers in excess of $190,000,000 of principal in Cash (in the aggregate and accounting for recoveries from all sources) on account of claims relating to the Mexico Polimeros Revolver or the Mexico Holding Revolver, or the use of funds advanced thereunder. To the extent that Bancomext receives distributions in respect of

the Bancomext Allowed Claim and the Mexico Polimeros Allowed Claim after it has received recoveries in excess of $190,000,000, Bancomext shall turn over such distributions, up to and to the extent of any such excess, to the Litigation Trust. Except as otherwise provided in the Bancomext Settlement (including as set forth in this Section IX.G.2), (i) Bancomext's rights against the Debtors with respect to any Bancomext Acquired Claims shall be limited to the right to receive distributions on such Claims, to the extent that such Claims are Allowed, and (ii) Bancomext shall not participate or give any direction in respect of any vote, litigation, settlement, or similar action in the Chapter 11 Cases, whether before or after the effective date of Bancomext's acquisition of any such Bancomext Acquired Claim, with respect to any Bancomext Acquired Claim, including with respect to the liquidation of such Bancomext Acquired Claim pursuant to this Plan.

    **4.**  **Mutual Release**. Effective as of the Effective Date, in consideration for the obligations under the Bancomext Settlement, to the fullest extent permitted by law: (i) each of the Debtors, on behalf of itself, its Estate and its successors, assigns and any and all entities who may purport to claim by, through, for or because of it, shall forever release, waive and discharge all claims, counterclaims, actions, Causes of Action, defenses or setoff rights that such Debtor may have against Bancomext and its successors and assigns, whether disputed or undisputed, at law or in equity or known or unknown, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provision of applicable state, federal or other law; (ii) the Creditors' Committee, on behalf of itself and its successors, assigns and any and all entities who may purport to claim by, though, for or because of it, including the Litigation Trust, shall forever release, waive and discharge all claims, counterclaims, actions, Causes of Action, defenses or setoff rights that the Creditors' Committee may have against Bancomext and its successors and assigns, whether disputed or undisputed, at law or in equity or known or unknown, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provision of applicable state, federal or other law; and (iii) Bancomext, on behalf of itself and its successors, assigns and any and all entities who may purport to claim by, though, for or because of it, shall forever release, waive and discharge all claims, counterclaims, actions, Causes of Action, defenses or setoff rights that Bancomext may have against (a) the Debtors, their Estates and their successors and assigns and (b) the Creditors' Committee and its successors and assigns, including the Litigation Trust, whether disputed or undisputed, at law or in equity or known or unknown, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provision of applicable state, federal or other law; provided that the releases set forth in this Section 4 shall not affect any of the rights of the Debtors, Bancomext or the Creditors' Committee under the Bancomext Settlement, including the allowance of the Bancomext Allowed Claim and the Mexico Polimeros Allowed Claim; provided further that the Mutual Releases set forth herein shall apply only to civil liability and shall not encompass any criminal liability in any jurisdiction.

## X.  RETENTION OF JURISDICTION

    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date to the fullest legally permissible extent, including jurisdiction to:

    **1.**  Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, and establish the priority or secured or unsecured status of any Claim, including any Administrative Claim;

    **2.**  Grant or deny any applications for allowance of any Fee Claims for periods ending on or before the Effective Date;

    **3.**  Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

    **4.**  Ensure that Distributions are accomplished pursuant to the provisions of this Plan;

5.    Decide or resolve any motions, adversary proceedings, contested matters and any other matters Filed in the Bankruptcy Court involving any U.S. Debtor or the Litigation Trust that may be pending on the Effective Date or brought thereafter;

6.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Chapter 11 Cases, this Plan, the Confirmation Order, the Sales, the Bid Support Term Sheet, the Dismissal Stipulation or the Bancomext Settlement;

7.    Resolve any controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is entered into or delivered in connection with this Plan and any Entity's rights arising from or obligations incurred in connection with this Plan or such documents, the Sales, the Bid Support Term Sheet, the Dismissal Stipulation or the Bancomext Settlement;

8.    Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Sales, the Bid Support Term Sheet, the Dismissal Stipulation or the Bancomext Settlement; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Sales, the Bid Support Term Sheet, the Dismissal Stipulation or the Bancomext Settlement, in such manner as may be necessary or appropriate to consummate this Plan and the transactions contemplated hereby;

9.    Hear and determine any matter, case, controversy, suit, dispute, or Cause of Action regarding the existence, nature and scope of the releases, injunctions, and exculpation provided under the Plan, and issue injunctions, enforce the injunctions contained in this Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the consummation, implementation or enforcement of this Plan or the Confirmation Order, including the releases, injunctions, and exculpation provided under this Plan;

10.   Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

11.   Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement, the Confirmation Order, the Sales, the Bid Support Term Sheet, the Dismissal Stipulation or the Bancomext Settlement;

12.   Grant, under section 505(b) of the Bankruptcy Code, an expedited determination with respect to Tax returns filed, or to be filed, on behalf of the U.S. Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date;

13.   Enforce, clarify or modify any orders previously entered in the Chapter 11 Cases;

14.   Enter a final decree closing the Chapter 11 Cases;

15.   Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

16.   Assist in recovery of all assets of the U.S. Debtors and their Estates, wherever located; and

17.   Hear any other matter over which the Bankruptcy Court has jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in this Section X, the provisions of this Section X shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## XI.   MISCELLANEOUS PROVISIONS

### A.   Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the U.S. Debtors reserve the right, with the consent of the Creditors' Committee, to alter, amend or modify the Plan before the Effective Date, provided that no such alteration, amendment or modification shall be materially adverse to the Pre-Petition First Lien Lender, CEC, the Purchaser, the Bidders or Comerica without such party's consent.  Prior to the Effective Date, the U.S. Debtors, with the consent of the Creditors' Committee, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.  Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as amended, modified, or supplemented, if the proposed amendment, modification, or supplement does not materially and adversely change the treatment of such Claim; provided, however, that any Holders of Claims who were deemed to accept the Plan because such Claims were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment, modification or supplement, such Claims continue to be Unimpaired.

### B.   Revocation of the Plan or Non-Occurrence of the Confirmation Date or Effective Date

The U.S. Debtors reserve the right to revoke or withdraw this Plan, and the Creditors' Committee reserves its right to withdraw its support for this Plan, as to any (or all) of the U.S. Debtors prior to the Confirmation Date or at the Confirmation Hearing.  If this Plan is revoked or withdrawn as to any (or all) of the U.S. Debtors, or if the Confirmation Date or the Effective Date as to any (or all) of the U.S. Debtors does not occur, then this Plan shall be null and void in all respects solely with respect to such U.S. Debtors, and nothing contained in this Plan shall: (1) prejudice in any manner the rights of any U.S. Debtor or any other party in interest; (2) constitute a waiver or release of any claims by or against, or any interests in, any of the U.S. Debtors or any other Entity; or (3) constitute an admission of any sort by any U.S. Debtor or any other Entity.  The revocation or withdrawal of this Plan with respect to one or more U.S. Debtors shall not require the re-solicitation of this Plan with respect to the remaining U.S. Debtors.

### C.   Conversion or Dismissal of Certain of the Chapter 11 Cases

If the requisite Classes do not vote to accept this Plan with respect to any U.S. Debtor or the Bankruptcy Court does not confirm this Plan with respect to any U.S. Debtor, such U.S. Debtor shall have the right to seek to have its Chapter 11 Case dismissed or converted, or to liquidate or dissolve itself under applicable non-bankruptcy law or chapter 7 of the Bankruptcy Code.

### D.   Inconsistency

In the event of any inconsistency among this Plan, the Disclosure Statement or any exhibit or schedule to the Disclosure Statement, the provisions of this Plan shall govern.  In the event of any inconsistency among this Plan and any document or agreement filed in the Plan Supplement, such document or agreement shall control.  In the event of any inconsistency among this Plan or any document or agreement filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

### E.   Exhibits / Schedules

All exhibits and schedules to this Plan, including the Plan Supplement, are incorporated into and constitute a part of this Plan as if set forth herein.

### F. Severability

If prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, at the request of the U.S. Debtors, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### G. Governing Law

Except to the extent that (1) the Bankruptcy Code or other federal law is applicable or (2) an exhibit or schedule to this Plan or the Disclosure Statement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit, schedule or agreement), the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

### H. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### I. Service of Documents

To be effective, any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the Creditors' Committee and the U.S. Trustee must be sent by overnight delivery service, facsimile transmission, courier service, first class mail or messenger to:

#### 1. The Debtors

JONES DAY
250 Vesey Street
New York, New York  10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Scott J. Greenberg, Esq.
Stacey L. Corr-Irvine, Esq.

901 Lakeside Avenue
Cleveland, OH 44114
Telephone:  (216) 586-7035
Facsimile:  (216) 579-0212
Carl E. Black, Esq.

1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Daniel J. Merrett, Esq.

-49-

– and –

PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801-8705
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Laura Davis Jones, Esq.
James E. O'Neill, Esq.
Joseph M. Mulvihill, Esq.

2.      **Creditors' Committee**

MILBANK, TWEED, HADLEY & MCCLOY
28 Liberty St.
New York, NY 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Dennis F. Dunne, Esq.
Abhilash M. Raval, Esq.
Lauren C. Doyle, Esq.

– and –

COLE SCHOTZ P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117
J. Kate Stickles, Esq.
David R. Hurst, Esq.

3.      **Office of the U.S. Trustee**

OFFICE OF THE UNITED STATES TRUSTEE
844 King Street, Suite 2207
Wilmington, Delaware  19801
Telephone:   (302) 573-6491
Facsimile:  (302) 573-6497
Hannah McCollum, Esq.

## XII.    CONFIRMATION REQUEST

The U.S. Debtors request Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

Dated: _____, 2018

Respectfully submitted,

On behalf of each of the U.S. Debtors other than Chemtex International Inc.

By: _____
    Name:
    Title:

Chemtex International Inc.

By: _____
    Name:
    Title:

JONES DAY
Scott J. Greenberg (admitted *pro hac vice*)
Stacey Corr-Irvine (admitted *pro hac vice*)
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-3939
Facsimile:  (212) 755-7306
Email:        sgreenberg@jonesday.com
                  scorrirvine@jonesday.com

Carl E. Black (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-7035
Facsimile:  (216) 579-0212
Email:        ceblack@jonesday.com

Daniel J. Merrett (admitted *pro hac vice*)
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Email:        dmerrett@jonesday.com

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:        (302) 652-4100
Facsimile:        (302) 652-4400
Email:              ljones@pszjlaw.com
                        joneill@pszjlaw.com
                        jmulvihill@pszjlaw.com

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION