**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| M&G USA CORPORATION, *et al.*,[1] | : | Case No. 17-12307 (BLS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**THE DEBTORS' MEMORANDUM OF LAW IN
SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT
PLAN OF LIQUIDATION OF THE DEBTORS AND DEBTORS IN POSSESSION**

---

[1]    The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M&G Finance Corporation (4230), M&G Waters USA, LLC (2195), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208).  The Debtors' noticing address in these Cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ................................................................................... 4

ARGUMENT ......................................................................................................... 4

I.    THE PLAN MEETS EACH OF THE REQUIREMENTS FOR
CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE ........... 4

    A.    Section 1129(a)(1) — The Plan Complies with the Applicable Provisions
of the Bankruptcy Code ................................................................... 4

        1.    The Plan Satisfies the Classification  Requirements of Section
1122 of the Bankruptcy Code ................................................... 5

        2.    The Plan Satisfies the Mandatory Requirements of Section 1123(a) ........ 6

            a.    Section 1123(a)(1) —  The Plan Designates Classes of
Claims and Interests. .................................................... 7

            b.    Section 1123(a)(2) —  The Plan Identifies Unimpaired
Classes of Claims and Interests. ..................................... 7

            c.    Section 1123(a)(3) —  The Plan Specifies the Treatment of
Impaired Classes. ........................................................ 7

            d.    Section 1123(a)(4) —  The Plan Provides for the Same
Treatment of Claims and Interests within Each Class. ................. 7

            e.    Section 1123(a)(5) — The Plan  Provides for Adequate
Means of Implementation. ............................................. 8

            f.    Section 1123(a)(6) —  Provisions Regarding the  Debtors'
Charter are Inapplicable. ............................................... 9

            g.    Section 1123(a)(7) — Director and Officer  Selection
Provisions are Consistent with Public Policy. ............................. 9

        3.    Section 1123(b) – The Plan  Includes Appropriate Discretionary
Provisions. ................................................................... 9

    B.    Section 1129(a)(2) — The Debtors Have Complied with All Applicable
Provisions of the Bankruptcy Code Regarding Disclosure and Solicitation
of the Plan. ............................................................................. 11

        1.    The Debtors Have Complied with Section 1125 of the Bankruptcy
Code. ........................................................................ 11

        2.    The Debtors have Satisfied the Plan Acceptance  Requirements of
Section 1126 of the Bankruptcy Code. ................................... 13

        3.    Modifications to the Plan Comply with Section 1127 ............................ 13

    C.    Section 1129(a)(3) — The Plan Has Been Proposed in Good Faith. ................... 15

D.    Section 1129(a)(4) — The Plan Provides for Court Approval of All Payments for Services in Connection with these Cases......................................17

E.    Section 1129(a)(5) — The Plan Discloses All Required Information Regarding Post-Confirmation Management and Insiders...................................17

F.    Section 1129(a)(6) — The Plan Does Not Require Governmental Approval of Rate Changes. ..................................................................................18

G.    Section 1129(a)(7) — The Plan Is in the Best Interests of Creditors. .................18

H.    Section 1129(a)(8) — The Plan Has Been Accepted By the Requisite Classes of Creditors and Interest Holders. ...........................................................20

I.    Section 1129(a)(9) — The Plan Complies with the Required Treatment of Administrative Claims and Priority Claims. .......................................................21

J.    Section 1129(a)(10) — The Plan Has Been Accepted By at Least One Impaired, Non-Insider Class of Claims. ...............................................................21

K.    Section 1129(a)(11) — The Plan Is Feasible......................................................22

L.    Section 1129(a)(12) — The Plan Provides for the Payment of Statutory Fees .....................................................................................................................23

M.    Sections 1129(a)(13) – (16) of the Bankruptcy Code Are Inapplicable. .............23

N.    Section 1129(b) — The Plan Satisfies the "Cramdown" Requirements for Confirmation ......................................................................................................24

    1.    The Plan Does Not Discriminate Unfairly................................................25

    2.    The Plan is Fair and Equitable. ...............................................................25

O.    Section 1129(c) — The Plan is the Only Plan Filed in These Chapter 11 Cases ...................................................................................................................27

P.    Section 1129(d) — The Principal Purpose of the Plan is Not the Avoidance of Taxes or the Application of Section 5 of the Securities Act .........28

II.    THE PLAN'S RELEASE, EXCULPATION AND INJUNCTION PROVISIONS ARE APPROPRIATE AND SHOULD BE APPROVED............................................28

A.    The Plan's Releases Should be Approved...........................................................28

    1.    The Debtor Release Is a Valid Exercise of the Debtors' Business Judgment. ................................................................................................28

    2.    The Debtor Releases Satisfy the *Zenith* Factors. ....................................30

        a.    Identity of Interest .......................................................................31

        b.    Substantial Contribution to the Restructuring.............................31

        c.    Essential Nature of the Debtor Releases .....................................33

# TABLE OF CONTENTS
(continued)

|  |  | d. | Support for the Debtor Release | 33 |
|  |  | e. | Payment of Claims in the Affected Classes | 33 |
|  |  | 3. | Releases by Holders of Claims Should be Approved. | 34 |
|  | B. | | The Exculpation Provisions are Appropriate | 35 |
|  | C. | | The Injunction Is Necessary and Customary | 36 |
| III. | | | SUBSTANTIVE CONSOLIDATION IS APPROPRIATE | 37 |
| IV. | | | THE SETTLEMENTS INCORPORATED INTO THE PLAN SHOULD BE APPROVED | 41 |
| V. | | | THE ASSUMPTION OR REJECTION OF THE EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED | 43 |
| VI. | | | RESERVATION OF RIGHTS WITH RESPECT TO POTENTIAL CONFIRMATION OBJECTIONS | 45 |
| VII. | | | WAIVER OF STAY | 45 |
| | | | CONCLUSION | 46 |

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Bank of Am. Nat'l Trust and Savs. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)................................................................................................19

*Corestates Bank, N.A. v. United Chemical Technologies, Inc.*,
202 B.R. 33 (E.D. Pa. 1996) ..................................................................................19

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
699 F. 2d 599 (2d Cir. 1983)...................................................................................42

*Fin. Sec. Assur. Inc. v. T H New Orleans Ltd. P'ship*
*(In re T H New Orleans Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997) .....................16

*Grp. of Inst'l Investors v. Chi., M., St. P., & P.R.R. Co.*,
318 U.S. 523 (1943)................................................................................................45

*In re 500 Fifth Ave. Assocs.*,
148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ...................................................................5

*In re Aleris Int'l, Inc.*,
2010 WL 3492664 (Bankr. D. Del. May 13, 2010)....................................... passim

*In re Armstrong World Indus.*,
348 B.R. 136 (D. Del. 2006).....................................................................................5

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006)...................................................................................25

*In re Buttonwood Partners, Ltd.*,
111 B.R. 57 (Bankr. S.D.N.Y. 1990)......................................................................25

*In re Century Glove, Inc.*,
1993 WL 239489 (D. Del. Feb. 10, 1993).........................................................16, 19

*In re Chateaugay*,
10 F.3d 944 (2d Cir. 1993)........................................................................................5

*In re Chateaugay Corp.*,
  89 F.3d 942 (2d Cir. 1996).............................................................................5

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) ...........................................................42

*In re Curlew Valley Assocs.*,
  14 B.R. 506 (Bankr. D. Utah 1981) .............................................................42

*In re DACCO Transmission Parts (NY), Inc.*,
  No. 16-13245 (MKV) (Bankr. S.D.N.Y. Mar. 21, 2017) .............................27

*In re Dex Media, Inc.*,
  No. 16-11200 (KG) (Bankr. D. Del. July 15, 2016) ....................................46

*In re Dex One Corp.*,
  No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013).....................................46

*In re Drexel Burnham Lambert Grp. Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) .......................................................5, 6

*In re Eagle-Picher Indus., Inc.*,
  203 B.R. 256 (S.D. Ohio 1996) ................................................................5, 16

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) .........................................................31, 35

*In re Finlay Enterprises, Inc.*,
  2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010).................................22

*In re First Interregional Equity Corp.*,
  218 B.R. 731 (Bankr. D.N.J. 1997) ..............................................................5

*In re G-1 Holdings Inc.*,
  420 B.R. 216 (Bankr. D.N.J. 2009) .........................................................4, 19

*In re Gatehouse Media, Inc.*,
  No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) .................................46

*In re Geller*,
  74 B.R. 685 (Bankr. E.D. Pa. 1987) ...........................................................42

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) .................................................................34

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007) ..................................................................5

*In re HQ Global Holdings, Inc.*,
290 B.R. 507 (Bankr. D. Del. 2003) ....................................................................45

*In re Indianapolis Downs*,
LLC, 486 B.R. 286 (Bankr. D. Del. 2013) .....................................................31, 34

*In re Ion Media Networks, Inc.*,
419 B.R. 585 (Bankr. S.D.N.Y. 2009) ..................................................................27

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987) ................................................................................5

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) .................................................................4, 25

*In re Koelbl*,
751 F.2d 137 (2d Cir. 1984) ................................................................................16

*In re Leslie Fay Cos.*,
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..................................................................16

*In re Lisanti Foods, Inc.*,
241 Fed. Appx. 1 (3d Cir. 2007) ..........................................................................39

*In re Lisanti Foods, Inc.*,
329 B.R. 491 (Bankr. D.N.J. 2005) ......................................................................38

*In re Magnum Hunter Res. Corp.*,
No. 15-12533 (KG) (Bankr. D. Del. Apr. 18, 2016) .............................................46

*In re Marvel Entertainment Group, Inc.*,
222 B.R. 243 (D. Del. 1998) ...............................................................................42

*In re Mcorp Fin., Inc.*,
137 B.R. 219 (Bankr. S.D. Tex. 1992) .................................................................25

*In re MPM Silicones, LLC*,
531 B.R. 321 (S.D.N.Y. 2015) ................................................................. 27

*In re New Century TRS Holdings, Inc.*,
390 B.R. 140 (Bankr. D. Del. 2008) .......................................................... 37

*In re Northwestern Corp.*,
2008 WL 2704341 (Bankr. D. Del. Jul. 10, 2008) ................................... 41

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ............................................................ 4

*In re Owens Corning*,
419 F.3d (3d Cir. 2005) ............................................................................. 38

*In re P.J. Keating Co.*,
168 B.R. 464 (Bankr. D. Mass. 1994) ...................................................... 26

*In re Pac. Ethanol Holding Co. LLC*,
No. 09-11713 (KG) (Bankr. D. Del. June 8, 2010) ................................... 27

*In re Penn Trans. Co.*,
596 F. 2d 1102 (3d Cir. 1979) ................................................................... 42

*In re Physiotherapy Holdings, Inc.*,
No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) ................................. 45

*In re Pinnacle Brands, Inc.*,
259 B.R. 46 (Bankr. D. Del. 2001) ............................................................ 43

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) ........................................................... 11, 15, 29

*In re Resorts Int'l, Inc.*,
145 B.R. 412 (Bankr. D.N.J. 1990) ........................................................... 17

*In re Stone & Webster, Inc.*,
286 B.R. 532 (Bankr. D. Del. 2002) .......................................................... 38

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010) ....................................................... 4, 25

*In re Texaco Inc.*,
   84 B.R. 893 (Bankr. S.D.N.Y.) ...................................................................................17

*In re Trans World Airlines, Inc.*,
   261 B.R. 103 (Bankr. D. Del. 2001) ...........................................................................44

*In re Tribune Co.*,
   464 B.R 126 (Bankr. D. Del. 2011). ......................................................................31, 33

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) .........................................................................................15

*In re W.R. Grace & Co.*,
   729 F.3d 332 (3d Cir. 2013)....................................................................................16, 32

*In re Washington Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ...........................................................................30

*In re West Coast Video Enters., Inc.*,
   174 B.R. 906 (Bankr. E.D. Pa. 1994) ..........................................................................35

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ...................................................................25, 31, 33

*In the Matter of Energy Cooperative, Inc.*,
   886 F. 2d 921 (7th Cir. 1989) ......................................................................................42

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993).........................................................................................5

*Martin v. Myers (In re Martin)*,
   91 F. 3d 389 (3d Cir. 1996).........................................................................................42

*N.L.R.B. v. Bildisco & Bildisco*,
   465 U.S. 513 (1984).....................................................................................................45

*Official Unsecured Creditors' Committee v. Pennsylvania Truck Lines, Inc. (In re
   Pennsylvania Truck Lines, Inc.)*, 150 B.R. 595 (E.D. Pa. 1992) ..............................42

*Richmond Leasing Co. v. Capital Bank, N.A.*,
   762 F. 2d 1303 (5th Cir. 1985) ...................................................................................42

*U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*,
  426 B.R. 114 (Bankr. D. Del. 2010) ................................................................28, 30

*Upstream Energy Servs. v. Enron Corp (In re Enron Corp.)*,
  326 B.R. 497 (S.D.N.Y. 2005).........................................................................36

*Will v. Northwestern Univ. (In re Nutraquest, Inc.)*,
  434 F.3d 639 (3d Cir. 2006)..........................................................................42

**FEDERAL STATUTES**

11 U.S.C. § 105.................................................................................................16, 37

11 U.S.C. § 350.......................................................................................................23

11 U.S.C. § 365.................................................................................................. passim

11 U.S.C. § 1114.................................................................................................23, 24

11 U.S.C. § 1122.................................................................................................. passim

11 U.S.C. § 1123.................................................................................................. passim

11 U.S.C. § 1125.................................................................................................. passim

11 U.S.C. § 1126.................................................................................................. passim

11 U.S.C. § 1127.......................................................................................................14

11 U.S.C. § 1129.................................................................................................. passim

11 U.S.C. § 1142.......................................................................................................16

28 U.S.C. § 1930.......................................................................................................23

**RULES**

Fed. R. Bankr. P. 3019.............................................................................................14

Fed. R. Bankr. P. 3020.............................................................................................45

Fed. R. Bankr. P. 6004.............................................................................................45

Page

Fed. R. Bankr. P.6006 ................................................................................................45

Fed. R. Bankr. P. 9019 ..........................................................................................41, 42

**OTHER AUTHORITIES**

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 412 (1977), *reprinted in* 1978
    U.S.C.C.A.N. 5963 ............................................................................................4

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .........................11

S. Rep. No. 95-989, 95th Cong. 2nd Sess. 126 (1978), *reprinted in* 1978
    U.S.C.C.A.N. 5787 ............................................................................................4

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 ...............................11

NAI-1505451088v10
DOCS_DE:222295.1 54032/001

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Confirmation Memorandum") in support of confirmation of the *Third Amended Joint Plan of Liquidation of the Debtors and Debtors in Possession*, dated December 11, 2018 (Docket No. 2115) (the "Third Amended Plan" and, as modified, supplemented and amended, the "Plan"),[2] pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code"). In support of this memorandum of law and confirmation of the Plan, the Debtors rely upon and incorporate herein by reference: (i) the *Declaration of Brian Corio in Support of Confirmation of Third Amended Plan of Liquidation of the Debtors and Debtors in Possession* (the "Corio Declaration"), filed contemporaneously herewith; (ii) the *Declaration of Craig E. Johnson of Prime Clerk, LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Plan of Liquidation of the U.S. Debtors and Debtors in Possession* (Docket No. 2114) (the "Voting Declaration"); and (iii) the *Declaration of Dennis Stogsdill in Support of First Day Pleadings* (Docket No. 3) (the "First Day Declaration"), and respectfully represent as follows:

## PRELIMINARY STATEMENT

1. The Debtors commenced these Chapter 11 Cases facing numerous challenges to a successful outcome, including, among other things, a liquidity crisis that rendered them virtually non-operational and a key asset – their PTA/PET manufacturing facility in Corpus Christi, Texas – that remained only partially constructed and heavily encumbered. Recognizing that the sale of their assets would be the best possible outcome for their creditors, the Debtors'

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Plan. On September 5, 2018 the Debtors filed the *Joint Plan of Liquidation of the U.S. Debtors and Debtors in Possession* (Docket No. 1813) (the "Original Plan"). On October 31, 2018, the Debtors amended the Original Plan by filing the *First Amended Joint Plan of Liquidation of the U.S. Debtors and Debtors in Possession* (Docket No. 2019). On November 6, 2018, the Debtors filed the *Second Amended Joint Plan of Liquidation of the U.S. Debtors and Debtors in Possession* (Docket No. 2049) (the "Second Amended Plan").

stated goal at the outset of these Chapter 11 Cases was to "pursue an organized and orderly sale of the Corpus Christi Plant and certain other assets."[3]

2.     By all accounts, the sale processes conducted by the Debtors have been a resounding success.  In addition to the sales of certain assets related to the Debtors' facility in Apple Grove, West Virginia and the stock of certain non-debtor subsidiaries, on March 29, 2018, the Debtors obtained this Court's approval to enter into a value-maximizing sale of the Corpus Christi Assets to the Purchaser, as Successful Bidder, with a deal value in excess of $1 billion. Nearly nine months after obtaining Court approval of the Corpus Christi Sale, the Purchaser is on the cusp of obtaining regulatory approval for the transaction, the only remaining significant obstacle to closing.

3.     The closing of the Corpus Christi Sale and confirmation of the Plan go hand in hand.  The distributions that the Debtors propose to make to creditors under the Plan are predicated upon the closing of the Corpus Christi Sale to the Purchaser, the proceeds of which are the principal source of recoveries for creditors under the Plan.  With the Corpus Christi Sale nearing closing, and the Debtors' postpetition financing facilities on the verge of maturity, the Debtors must move forward with the prompt confirmation of their Plan.

4.     On November 6, 2018, the Court entered an order (Docket No. 2047) approving the *Disclosure Statement for Second Amended Joint Plan of Liquidation of the U.S. Debtors and Debtors in Possession* (Docket No. 2050) (the "<u>Disclosure Statement</u>") and authorizing the Debtors to solicit votes on the Second Amended Plan.

5.     The Court approved the Disclosure Statement over the objections of various holders of construction liens against certain of the Corpus Christi Assets, including the

---

[3]     *See* First Day Decl., ¶ 48.

members of the Construction Lienholder Group (collectively, the "Objecting Lienholders"). The Objecting Lienholders raised objections to approval of the Disclosure Statement and confirmation of the Plan on numerous grounds. Following intensive negotiations over an extended period with the Construction Lienholder Group and the other Objecting Lienholders, the Debtors and the Creditors' Committee agreed to a resolution of their confirmation objections (together with a number of informal comments or objections raised by certain other parties), which resolutions are incorporated into the Third Amended Plan.

6. The Third Amended Plan thus reflects the Debtors' hard-fought resolution of the confirmation objections of the Objecting Lienholders and all other parties. As such, the modifications to the Plan incorporated in the Third Amended Plan do not adversely impact the treatment of any creditor in any material respect and pave the way to a fully consensual resolution of these Chapter 11 Cases. This widespread support for the Plan, as revised, is evidenced by the fact that, to date, no party has filed a substantive objection to confirmation of the Plan and, the Debtors anticipate, the majority of Holders of Claims in the only Class that affirmatively voted initially to reject the Plan (*i.e.*, Class 4 – Corpus Christi Mechanics' Lien Reserve Claims) will submit superseding ballots accepting the Plan.

7. The Debtors' request for confirmation of the Plan is thus unopposed and supported by the Creditors' Committee and the Objecting Lienholders, among other parties. The burden rests with the Debtors, however, to demonstrate compliance with the statutory predicates for confirmation of the Plan under section 1129 of the Bankruptcy Code. As demonstrated below, the Plan satisfies each of the requirements of section 1129. Accordingly, the Debtors respectfully request that the Court enter an order substantially in the form filed contemporaneously herewith confirming the Plan.

## STATEMENT OF FACTS

8.    The facts relevant to Confirmation of the Plan are set forth in the

Disclosure Statement, the Plan, the Corio Declaration, the Voting Declaration, the First Day

Declaration, the record of these Chapter 11 Cases and any evidence presented or testimony that

may be adduced at the Confirmation Hearing, all of which are incorporated herein by reference.

## ARGUMENT

## I.    THE PLAN MEETS EACH OF THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE

### A.    Section 1129(a)(1) — The Plan Complies with the Applicable Provisions of the Bankruptcy Code

9.    Section 1129(a)(1) of the Bankruptcy Code provides that a plan of

liquidation may be confirmed only if the plan "complies with the applicable provisions of this

title."[4]  The legislative history of section 1129(a)(1) of the Bankruptcy Code indicates that the

primary focus of this requirement is to ensure that the form of the plan complies with the

provisions of sections 1122 (classification of claims and interests) and section 1123 (contents of

a plan) of the Bankruptcy Code.[5]  As discussed in greater detail below, the Plan complies fully

with the applicable provisions of the Bankruptcy Code (as required by section 1129(a)(1) of the

Bankruptcy Code), including, without limitation, sections 1122 and 1123 of the Bankruptcy

Code.

---

[4]     11 U.S.C. § 1129(a)(1).

[5]     *See* S. Rep. No. 95-989, 95th Cong. 2nd Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5913; H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) ("As confirmed by legislative history, 11 U.S.C. § 1129(a)(1), which provides that the plan must 'compl[y] with the applicable provisions of this title,' requires that a plan comply with 11 U.S.C. §§ 1122 and 1123."); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 132 (Bankr. D.N.J. 2010) ("The legislative history reflects that 'the applicable provisions of chapter 11 [refers to] . . . section 1122 and 1123, governing classification and contents of plan.'"); *In re G-1 Holdings Inc.*, 420 B.R. 216, 258 (Bankr. D.N.J. 2009) (reviewing a plan to determine whether it "complies with other applicable provisions of § 1129(a)(1), including §§ 1122 and 1123"); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986) (stating that "[o]bjections to confirmation raised under § 1129(a)(1) generally involve the failure of a plan to conform to the requirements of § 1122(a) or § 1123."), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

## 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

10.     Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class."[6] By its plain language, section 1122(a) prohibits only the classification of dissimilar claims in the same class.[7] As such, section 1122(a) does not require the placement of all similar claims in one class, and therefore, courts have broad discretion to determine the propriety of classification schemes in light of the facts of each case.[8] Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[9]

---

[6]     11 U.S.C. § 1122(a); *see In re Armstrong World Indus.*, 348 B.R. 136, 160 (D. Del. 2006) (holding that section 1122(a) of the Bankruptcy Code was satisfied where similar claims were classified together); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *12 (Bankr. D. Del. May 13, 2010) (same and further noting that section 1122(a) is satisfied where a plan "does not propose a classification scheme to create an impaired consenting class" or manipulate class voting); s*ee also In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 270 (S.D. Ohio 1996) (same).

[7]     *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993); *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules: dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason.").

[8]     *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the general view which permits the grouping of similar claims in different classes."); *In re First Interregional Equity Corp.*, 218 B.R. 731, 738-39 (Bankr. D.N.J. 1997) (same); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together . . .").

[9]     Separate classification may be justified (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification. *John Hancock*, 987 F.2d at 158-59 (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d at 1061 (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also In re Chateaugay*, 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification of certain claims appropriate where plan classified certain claims in different classes based on a bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan . . . has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted); *In re Drexel Barrnham Lambert Grp. Inc.*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together . . .").

11.     The Plan designates Claims against and Interests in the Debtors into 11 different classes.[10]  The classification of Claims and Interests into each respective class reflects the differences in the legal nature and/or priority of such Claims and Interests in accordance with applicable law.  Further, each Class consists of substantially similar Claims or Interests.  To the extent that the Plan classifies similar Claims and Interests into different classes, valid business, legal and factual reasons justify such separate classification, and no unfair discrimination exists between or among the Holders of Claims and Interests under the Plan.  Accordingly, the classification of Claims and Interests set forth in the Plan complies with, and satisfies the requirements of, section 1122 of the Bankruptcy Code.

**2.      <u>The Plan Satisfies the Mandatory Requirements of Section 1123(a)</u>**

12.     Section 1123(a) of the Bankruptcy Code provides that a chapter 11 plan filed by a corporate debtor must:[11]

(a)     designate classes of claims and equity interests;

(b)     specify which classes are unimpaired;

(c)     specify the treatment of impaired classes of claims and interests;

(d)     provide for equal treatment within each class;

(e)     provide adequate means for the plan's implementation;

(f)     prohibit the issuance of nonvoting equity securities and provide an appropriate distribution of voting power among classes of securities; and

(g)     contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of the debtors officers and directors.[12]

13.     As further detailed below, the Plan fully complies with the requirements of section 1123(a) of the Bankruptcy Code.

---

[10]     *See* Plan, § II.B.

[11]     Section 1123(a)(8) of the Bankruptcy Code applies only in cases "in which the debtor is an individual" and is thus inapplicable here.  11 U.S.C. § 1123(a)(8).

[12]     *See* 11 U.S.C. § 1123(a)(7).

### a. Section 1123(a)(1) — The Plan Designates Classes of Claims and Interests.

14. As previously noted with respect to the Plan's compliance with section 1122, Section II.B of the Plan designates Classes of Claims and Interests (other than Administrative Claims, Priority Tax Claims and DIP Claims), as required by section 1123(a)(1) of the Bankruptcy Code.

### b. Section 1123(a)(2) — The Plan Identifies Unimpaired Classes of Claims and Interests.

15. Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." Section II.B of the Plan satisfies this requirement by specifying that Classes 1, 5, 6, 7 and 11 are Unimpaired under the Plan.

### c. Section 1123(a)(3) — The Plan Specifies the Treatment of Impaired Classes.

16. Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." Section II.B of the Plan satisfies this requirement by identifying that Classes 2, 3, 4, 8, 9 and 10 are Impaired under the Plan.

### d. Section 1123(a)(4) — The Plan Provides for the Same Treatment of Claims and Interests within Each Class.

17. Consistent with section 1123(a)(4) of the Bankruptcy Code, the Plan provides for the same treatment for each Claim or Interest within a particular Class, unless the Holder of a Claim or Interest agrees to different treatment on account of its Claim or Interest. In the case of every Class that is receiving or retaining property under the Plan, the Debtors have

proposed to distribute such property equally to every Holder of an Allowed Claim in such Class.[13]

### e. Section 1123(a)(5) — The Plan Provides for Adequate Means of Implementation.

18.    In accordance with the requirements of section 1123(a)(5) of the Bankruptcy Code, Section III of the Plan and the documents in the Plan Supplement provide adequate means for the Plan's implementation.  Specifically, the Plan provides for, on the Effective Date:  (a) the substantive consolidation of the Debtors' Estates for all purposes related to the Plan, including for (i) purposes of implementing the Plan, (ii) purposes of voting, (iii) assessing whether the Confirmation standards have been met, (iv) calculating and making distributions under the Plan and (v) filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee;[14] (b) the establishment of the Litigation Trust and the appointment of the Litigation Trustee and Plan Administrator to, with the oversight of the Litigation Trust Oversight Committee, (i) liquidate the Litigation Trust Assets, (ii) resolve certain Disputed Claims, (iii) make Distributions to certain Holders of Allowed Claims in accordance with terms of the Plan and (iv) dissolve the Debtors;[15] (c) the discharge of the Debtors' existing boards of directors and managers;[16] (d) the preservation of certain Causes of Action and provisions governing the comprehensive settlement of claims and controversies;[17] (e) the cancellation and surrender of securities, instruments and other related documentation, except as otherwise provided in the Plan, including with respect to the transfer of Subsidiary

---

[13]    *See* Plan, § II.C.

[14]    *See id.* at § III.G.

[15]    *See id.* at § III.B-C.

[16]    *See id.* at § III.D.

[17]    *See id.* at § III.H.

Debtor Interests to the Litigation Trust;[18] and (i) the release of liens.[19]  The Plan thus satisfies section 1123(a)(5) of the Bankruptcy Code.

### f. Section 1123(a)(6) — Provisions Regarding the Debtors' Charter are Inapplicable.

19.     Section 1123(a)(6) prohibits the issuance of nonvoting equity securities. The Plan does not provide for the issuance of nonvoting equity securities by the Debtors. Accordingly, the requirements of section 1123(a)(6) do not apply to the Plan.

### g. Section 1123(a)(7) — Director and Officer Selection Provisions are Consistent with Public Policy.

20.     Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director or trustee."  On the Effective Date, all directors, officers and voting trustees of the Debtors will be discharged,[20] and, in accordance with Sections III.C.3-4 of the Plan, the Litigation Trust Oversight Committee, Litigation Trustee and Plan Administrator will be appointed.  The Plan thus satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### 3. Section 1123(b) – The Plan Includes Appropriate Discretionary Provisions.

21.     Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a chapter 11 plan, provided they are "not inconsistent with" applicable provisions of the Bankruptcy Code.[21]

---

[18]     *See id.* at § III.I.

[19]     *See id.* at § III.J.

[20]     *See* Plan, § III.D.2.

[21]     11 U.S.C. § 1123(b)(6).

22.     As permitted by section 1123(b) of the Bankruptcy Code, the Plan provides for (a) the impairment or unimpairment of Classes of Claims and Interests;[22] (b) the rejection of Executory Contracts or Unexpired Leases under section 365 of the Bankruptcy Code (as described more fully below), in addition to the assumption of Executory Contracts or Unexpired Leases by the Litigation Trust;[23] (c) the settlement or compromise of any claim or interest belonging to the Debtors or their Estates;[24] and (d) the creation of the Litigation Trust to make distributions to Holders of Allowed Claims.[25]

23.     Consistent with section 1123(b)(6) of the Bankruptcy Code, the Plan contains other discretionary provisions not otherwise inconsistent with the Bankruptcy Code. As discussed in greater detail below, the Plan contains certain release, exculpation and injunction provisions that are consistent with the applicable provisions of the Bankruptcy Code.[26]  Further, the Plan provides that the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases following the Effective Date to the extent permitted by applicable law.[27]  These provisions are consistent with the applicable provisions of the Bankruptcy Code and should be approved as integral parts of the Plan.

24.     Accordingly, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code (as well as with the other applicable provisions of the Bankruptcy Code) and thus satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

---

[22]     *See* Plan, § II.B.

[23]     *See* Plan, § IV.A.

[24]     *See* Plan, § III.C.10.

[25]     *See* Plan, § III.C.1.

[26]     *See* Plan, § IX.B-D.

[27]     *See* Plan, § X.

**B.** **Section 1129(a)(2) — The Debtors Have Complied with All Applicable Provisions of the Bankruptcy Code Regarding Disclosure and Solicitation of the Plan.**

25.    The legislative history of section 1129(a)(2) of the Bankruptcy Code indicates that its principal purpose is to ensure that the proponent complies with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[28] The Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126 of the Bankruptcy Code, regarding disclosure and solicitation of the Plan.

**1.     The Debtors Have Complied with Section 1125 of the Bankruptcy Code.**

26.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information."[29]

27.    The Debtors have satisfied the requirements of section 1125. On November 6, 2018, the Bankruptcy Court entered an order (Docket No. 2047) (the "Disclosure Statement Order") approving, among other things, the Disclosure Statement and

---

[28]     *See* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("[Section] 1129(a)(2) [of the Bankruptcy Code] requires that the plan proponent comply with the adequate disclosure requirements of § 1125"); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *20 ("The legislative history of Section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under Sections 1125 and 1126 of the Bankruptcy Code.").

[29]     11 U.S.C. § 1125(b).

finding that it contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code.[30]

28.     In addition, the Court considered, and, in the Disclosure Statement Order, approved:  (a) all materials to be transmitted to creditors entitled to vote on the Plan (collectively, the "Solicitation Packages"), including (i) the Plan, the Disclosure Statement and certain related documents, (ii) a notice of the Confirmation Hearing (the "Confirmation Hearing Notice") which disclosed the deadline to vote on the Plan (December 6, 2018) and the deadline to object to Confirmation of the Plan (December 7, 2018), (iii) an appropriate form of Ballot for creditors in Classes 2, 3, 4 and 8 (collectively, the "Voting Classes") and instructions on how to cast such Ballot and (iv) the procedures for the solicitation and tabulation of votes to accept or reject the Plan; and (b) certain materials to be transmitted to creditors not entitled to vote on the Plan, including a Confirmation Hearing Notice and the appropriate notice of non-voting status for Holders of Claims and Interests either deemed to accept, or reject, the Plan.[31]  Thereafter, the Debtors (through the Claims and Noticing Agent) transmitted the approved Solicitation Packages and notices in accordance with the Disclosure Statement Order.[32]  The Service Affidavits demonstrate that (a) the Solicitation Packages and related notices were served in accordance with the Disclosure Statement Order and (b) the Debtors solicited votes on the Plan only following approval and transmittal of the Disclosure Statement.

---

[30]     *See* Disclosure Statement Order, § A.

[31]     *See generally id.* at § D.

[32]     The "Service Affidavits" are:  (i) the *Affidavits of Service of Solicitation Materials*, filed on November 14, 2018 (Docket No. 2065), November 20, 2018 (Docket No. 2075), November 27, 2018 (Docket No. 2080) and December 5, 2018 (Docket No. 2096) (collectively, the "Solicitation Affidavits"); and (ii) the *Certificate of Publication of Stanislav Kesler*, (Docket No. 2071) (the "Publication Affidavit").

29. Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

### 2. The Debtors have Satisfied the Plan Acceptance Requirements of Section 1126 of the Bankruptcy Code.

30. Pursuant to section 1126 of the Bankruptcy Code, only holders of allowed claims in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan.[33] As noted above, the Debtors did not solicit votes on the Plan from Classes 1, 5, 6, 7, 9, 10 and 11, because Holders of Claims and Interests in such classes are deemed to have accepted (in the case of Classes 1, 5, 6, 7 and 11) or reject (in the case of Classes 9 and 10) the Plan. Instead, the Debtors only solicited votes from the Voting Classes because such Classes are Impaired and may be entitled to receive or retain property under the Plan.

31. Based upon the foregoing, the Debtors' solicitation of votes with respect to the Plan was undertaken in conformity with sections 1125 and 1126 of the Bankruptcy Code and the Disclosure Statement Order, and the Debtors acted in good faith at all times with respect to the solicitation of votes on the Plan. The Debtors, therefore, have complied with applicable provisions of the Bankruptcy Code and have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

### 3. Modifications to the Plan Comply with Section 1127

32. Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify a plan at any time prior to confirmation, so long as the plan, as modified, complies

---

[33] 11 U.S.C. § 1126.

with sections 1122 and 1123 of the Bankruptcy Code.[34]  Section 1127(d), in turn, provides that

"any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted

or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court,

such holder changes such holder's previous acceptance or rejection."[35]  Consistent with

section 1127(d), Bankruptcy Rule 3019 provides that, so long as the court finds that the proposed

modification "does not adversely change the treatment of the claim of any creditor or the interest

of any equity security holder who has not accepted in writing the modification, it shall be

deemed accepted by all creditors and equity security holders who have previously accepted the

plan."[36]

        33.     Subsequent to the filing of the Second Amended Plan, the Debtors made

certain modifications thereto (the "Modifications"), which are incorporated into the Third

Amended Plan.  The Modifications reflect the consensual resolution of informal confirmation

objections and otherwise constitute immaterial modifications and/or improve, and do not

adversely affect, the treatment of any Claims or Interests.  In particular, the Modifications affect

Holders of Corpus Christi Mechanics' Lien Reserve Claims and were agreed-upon following

extended and hard-fought negotiations among the Objecting Lienholders, the Debtors,

the Purchaser and the Creditors' Committee (among other parties).  In connection with this

resolution, the applicable Holders of Corpus Christi Mechanics' Lien Reserve Claims have

agreed to support, and to submit superseding votes in favor of, confirmation of the Third

Amended Plan.  Accordingly, the Modifications do not require (i) additional disclosure under

---

[34]      11 U.S.C. § 1127(a).

[35]      11 U.S.C. § 1127(d).

[36]      Fed. R. Bankr. P. 3019.

section 1125 of the Bankruptcy Code, (ii) the resolicitation of acceptances or rejections of the Plan under section 1126 of the Bankruptcy Code.

### C. Section 1129(a)(3) — The Plan Has Been Proposed in Good Faith.

34. The Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[37] Although the Bankruptcy Code does not define "good faith" as that term is used in this section, the Third Circuit has held that "for purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[38]

35. Courts generally view the good faith requirement in light of the totality of the circumstances surrounding the establishment of the chapter 11 plan.[39] In assessing good faith, the court may look to whether a plan has been proposed with a legitimate purpose and is consistent with the Bankruptcy Code's objectives.[40] Accordingly, the Debtors must show that the Plan was proposed with honesty and good intentions and that the Plan has a reasonable likelihood of success.[41]

---

[37] 11 U.S.C. § 1129(a)(3).

[38] *PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *see also In re W.R. Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013) (under section 1129(a)(3), "courts may only confirm reorganization plans proposed in good faith").

[39] *In re Century Glove, Inc.*, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ("The requirement of good faith must be viewed in light of the totality of circumstances.") (quoting *In re Sun Country Development, Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)).

[40] *See, e.g., id.*, at 107-08 (citing *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988) and (holding that the plan was proposed in good faith where such plan was "proposed with the legitimate purpose of restructuring [debtor's] finances to permit [debtor] to reorganize successfully . . . exactly what chapter 11 of the Bankruptcy Code was designed to accomplish")); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 87-88 (D. Del. 2012) (evaluating whether the plan "(1) fosters a result consistent with the [Bankruptcy] Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) [exhibits] a fundamental fairness in dealing with the creditors") (internal quotation marks omitted), *aff'd sub nom. W.R. Grace & Co. v. Garlock Sealing Techs., LLC*, 532 Fed. Appx. 264 (3d Cir. 2013).

[41] *See In re Century Glove, Inc.*, 1993 WL 239489, at *4 ("A court may only confirm a plan . . . if . . . 'the plan has been proposed in good faith and not by any means forbidden by law. . . .' Moreover, '[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good

36.     The Debtors respectfully submit that the record in these Chapter 11 Cases and the Corio Declaration establish that they have proposed the Plan in good faith, with the legitimate purposes of maximizing distributions to Holders of Claims entitled to a distribution under the Plan, winding down the estate of the Debtors and distributing the Debtors' remaining assets in accordance with the priority scheme set forth in the Bankruptcy Code and not by any means forbidden by law.  Further, the Plan's classification, settlement, exculpation, release and injunction provisions are consistent with sections 105, 1122, 1123(b)(6), 1129 and 1142 of the Bankruptcy Code and are each necessary for the Debtors to consummate the Plan and the transactions contemplated therein.

37.     Good faith for purposes of section 1129(a)(3) of the Bankruptcy Code also may be found where the plan is supported by key creditor constituencies, or was the result of extensive arm's-length negotiations with creditors.[42]  Here, the Plan is supported by the Debtors' key creditor constituencies and is the result of good faith, arm's-length negotiations with, among other parties, the Creditors' Committee, the Pre-Petition First Lien Lender and CEC, the Purchaser, the Bidders, Comerica, Macquarie and certain Holders of Corpus Christi Mechanics' Lien Reserve Claims.  Therefore, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

---

faith requirement of Section 1129(a)(3) is satisfied.'") (citations omitted); *see also Fin. Sec. Assur. Inc. v. T H New Orleans Ltd. P'ship (In re T H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (same); *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984) (noting that plan provisions may not contravene any law, including state law, and a plan must have been proposed with "a basis for expecting that a reorganization can be effected'") (citations omitted).

[42]     *See In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith.") (citation omitted); *In re Eagle-Picher Indus.*, 203 B.R. 256, 274 (S.D. Ohio 1996) (finding that plan of reorganization was proposed in good faith when, among other things, it was based on extensive arm's length negotiations among plan proponents and other parties in interest).

**D.      Section 1129(a)(4) — The Plan Provides for Court Approval of All Payments for Services in Connection with these Cases.**

38.      Section 1129(a)(4) of the Bankruptcy Code requires that a payment "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  Courts have construed this section as requiring a bankruptcy court's review and approval of the reasonableness of all professional fee payments made from estate assets.[43]

39.      Pursuant to the Court's *Order Authorizing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (Docket No. 308), the Court has authorized and approved, on an interim basis, the payment of certain fees and expenses of the Professionals retained in these Chapter 11 Cases.  All such fees and expenses, as well as all other accrued fees and expenses of the Professionals through the Effective Date, remain subject to final review of the Court.  In addition, Section X.2 of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation of any Fee Claims for periods ending on or before the Effective Date pursuant to the Bankruptcy Code and the Plan.

40.      Accordingly, the Debtors believe that the Plan satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

**E.      Section 1129(a)(5) — The Plan Discloses All Required Information Regarding Post-Confirmation Management and Insiders.**

41.      Section 1129(a)(5) of the Bankruptcy Code requires that (i) the proponent of a chapter 11 plan disclose the identity of any individual proposed to serve after the confirmation as a director, officer or voting trustee of the debtor, (ii) the appointment of such

---

[43]      *In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990); *In re Texaco Inc.*, 84 B.R. 893, 908 (Bankr. S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988).

individuals comply with the interests of the creditors and shareholders and with public policy and (iii) the proponent disclose the identity of any insider that the debtor will employ and the nature of the compensation provided to that insider.

42.     Section III of the Plan provides that, on the Effective Date, the Debtors' directors and officers will be discharged and the Litigation Trustee and Plan Administrator will be appointed to, among other things, administer the Litigation Trust following the Effective Date, subject to the oversight of the Litigation Trust Oversight Committee.  The responsibilities of the Litigation Trustee are governed by the Litigation Trust Agreement, the form of which was provided in the Plan Supplement, together with the identity of the Litigation Trustee.  Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

**F.     Section 1129(a)(6) — The Plan Does Not
Require Governmental Approval of Rate Changes.**

43.     Section 1129(a)(6) of the Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  Section 1129(a)(6) is inapplicable here because the Debtors' businesses do not involve the establishment of rates over which any regulatory commission has jurisdiction or will have jurisdiction after Confirmation.

**G.     Section 1129(a)(7) — The Plan Is in the Best Interests of Creditors.**

44.     Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests under a chapter 11 plan, each holder of a claim or interest (i) has accepted the plan or (ii) will receive or retain property of a value, as of the effective date of the plan, not less than what such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on that date.  Section 1129(a)(7) of the

Bankruptcy Code is often referred to as the "best interests of creditors test" or the "liquidation test."

45.     The best interests of creditors test applies if a class of claims or interests entitled to vote does not vote unanimously to accept a plan, even if the class as a whole votes to accept the plan.[44]  The best interests test is generally satisfied by a liquidation analysis demonstrating that an impaired class will receive no less under the plan than in a chapter 7 liquidation.[45]

46.     As set forth in the Corio Declaration and the *Liquidation Analysis* attached as Exhibit D to the Disclosure Statement (the "Liquidation Analysis"), the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.  The best interests of creditors test is satisfied with respect to Classes 1 (Priority Claims), 5 (Comerica Claims), 6 (Secured Macquarie Claims), 7 (Other Secured Claims) and 11 (Interests in Subsidiary Debtors) because those Claims are Unimpaired and, therefore, those Holders are deemed to have accepted the Plan.  The best interests of creditors test is satisfied with respect to Classes 9 (Debtor Intercompany Claims) and 10 (Interests in Senior Debtors) because such Classes are Impaired and are not entitled to receive or retain any property under the Plan, the same treatment that such Claims and Interests would receive in a liquidation under chapter 7 of the Bankruptcy Code.

47.     With respect to creditors in the Voting Classes, the Liquidation Analysis demonstrates that such Holders of Claims will receive value under the Plan on the Effective Date

---

[44]     *See Bank of Am. Nat'l Trust and Savs. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441, n. 13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

[45]     *See Corestates Bank, N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33, 56 (E.D. Pa. 1996) (holding that the best interests test was satisfied when the debtor's liquidation analysis showed that creditor would receive at least as much in chapter 7 liquidation as chapter 11 reorganization); *see also In re G-I Holdings, Inc.*, 420 B.R. 216, 265 (D.N.J. 2009) (affirming bankruptcy court's finding that the best interests test was satisfied based on the liquidation analysis provided by the debtor.); *In re Century Glove, Inc.*, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993) (same).

that is equal to or more than the value that they would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code.[46] Further, the Liquidation Analysis demonstrates that the value of the Debtors' assets under chapter 7 of the Bankruptcy Code would be reduced substantially by chapter 7 wind-down expenses and the increased costs and expenses arising from fees payable to a chapter 7 trustee and its retained professional advisors.[47]

48.     Based on the foregoing analysis, no dissenting Holder of a Claim or Interest in an Impaired Class will receive less under the Plan than it would receive in a chapter 7 liquidation of the Debtors' assets. As a result, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

H.     **Section 1129(a)(8) — The Plan Has Been Accepted By the Requisite Classes of Creditors and Interest Holders.**

49.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a chapter 11 plan either accept the plan or not be impaired under the plan. Pursuant to section 1126(c) of the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in amount and more than one-half in number of the allowed claims in that class vote to accept the plan. Section 1126(f) of the Bankruptcy Code conclusively presumes that an unimpaired class of claims or interests accepts the plan. Conversely, section 1126(g) of the Bankruptcy Code deems classes of claims or interests that do not receive or retain any property under a plan to reject that plan.

50.     As set forth in the Voting Declaration, Voting Classes 2 (Secured Pre-Petition First Lien Claims) and 8 (General Unsecured Claims) are impaired by, and overwhelming voted to accept, the Plan. To date, Voting Classes 3 (Pre-Petition Second Lien

---

[46] *See* Liquidation Analysis.

[47] *Id.*

Claims) and 4 (Corpus Christi Mechanics' Lien Reserve Claims) have not voted to accept the

Plan, and nonvoting Classes 9 (Debtor Intercompany Claims) and 10 (Interests in Senior

Debtors) (together, the "Deemed Rejecting Classes") are fully impaired under, and deemed to

reject, the Plan. Nevertheless, confirmation of the Plan is justified because, as described in

greater detail below, the Plan does not discriminate unfairly against any Class and treats the

Rejecting Classes fairly and equitably, thus satisfying section 1129(b) of the Bankruptcy Code.

I.    **Section 1129(a)(9) — The Plan Complies with the Required Treatment of Administrative Claims and Priority Claims.**

51.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority

claims be paid in full on the effective date of a plan and that the holders of certain other priority

claims receive deferred cash payments, except to the extent that the holder of such a priority

claim agrees to different treatment.

52.    Section II.A of the Plan provides that Holders of Allowed Administrative

Claims, Allowed Priority Tax Claims and DIP Claims will receive a cash distribution in full

satisfaction of their Claims. In addition, to the extent that an Allowed Fee Claim is in excess of

any applicable reserves with respect to Creditors' Committee Professionals, the Allowed Fee

Claim will be satisfied from the proceeds of the Litigation Trust Assets. Accordingly, in light of

the foregoing, the Plan satisfies the requirements set forth in section 1129(a)(9) of the

Bankruptcy Code.

J.    **Section 1129(a)(10) — The Plan Has Been Accepted By at Least One Impaired, Non-Insider Class of Claims.**

53.    Section 1129(a)(10) of the Bankruptcy Code requires that the Plan be

accepted by at least one class of claims that is impaired under the Plan, determined without

including the acceptance of the plan by any insider. As evidence by the Voting Declaration,

Classes 2 and 8, which are both impaired under the Plan, have voted to accept the Plan. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### K. Section 1129(a)(11) — The Plan Is Feasible.

54. Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Section 1129(a)(11) does not require the Debtors to guarantee the Plan's complete success. Instead, in order to satisfy the feasibility requirement, the Debtors must show that the Plan has a reasonable chance of success.[48]

55. In the context of a liquidating plan, feasibility is established by demonstrating that the debtor is able to satisfy the conditions precedent to the Effective Date and otherwise has sufficient funds to meet its post-Confirmation obligations to pay for the costs of administering and fully consummating the Plan and closing the chapter 11 cases.[49] As set forth in the Corio Declaration, (a) the conditions precedent to the Effective Date are reasonably likely to be satisfied[50] and (b) the various reserves proposed to be established under the Plan, including the Professional Fee Reserve, Completion Fee Reserve, Corpus Christi Mechanics' Lien Reserve, Disputed Claims Reserve and proceeds of the Litigation Trust Assets provide sufficient funds to administer and consummate the Plan and to close the Chapter 11 Cases.[51]

---

[48] *See In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *27-29; *accord Kane*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.").

[49] *See In re Finlay Enterprises, Inc.*, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010).

[50] *See* Corio Decl., ¶ 13.

[51] *See id.*

Accordingly, the Plan has a reasonable likelihood of success and satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**L. Section 1129(a)(12) — The Plan Provides for the Payment of Statutory Fees**

56. Section 1129(a)(12) of the Bankruptcy Code requires that, as a condition precedent to the confirmation of a chapter 11 plan, "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."[52] Section II.A.1.b of the Plan provides that on or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the applicable Debtors in Cash equal to the amount of such Administrative Claims. After the Effective Date, fees payable pursuant to 28 U.S.C. § 1930 for each Estate will be paid from the Litigation Trust by the Litigation Trustee until the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**M. Sections 1129(a)(13) – (16) of the Bankruptcy Code Are Inapplicable.**

57. Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all retiree benefits (as defined in section 1114 of the Bankruptcy Code) at the level established pursuant to section 1114(e)(1)(B) or (g) of the Bankruptcy Code. Section 1129(a)(13) of the Bankruptcy Code is not applicable to the Plan because the Court has not established the level of any retiree benefits pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code at any time prior to entry of the Confirmation Order other than, to the extent applicable, those retiree benefits that were terminated as of June 1, 2018 pursuant to the *Order Approving Stipulation By and Between M&G Polymers USA, LLC and*

---

[52] 11 U.S.C. § 1129(a)(12).

*United Steelworkers* (Docket No. 1602). The Debtors reserve all their rights under applicable law with respect to such retiree benefits.

58.     Sections 1129(a)(14) and (15) of the Bankruptcy Code apply only to individual debtors and thus are inapplicable here. Additionally, section 1129(a)(16) of the Bankruptcy Code applies only to debtors that are nonprofit entities or trusts and thus is inapplicable.

### N.     Section 1129(b) — The Plan Satisfies the "Cramdown" Requirements for Confirmation

59.     Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where not all impaired classes of claims and interests accept a plan, as required by section 1129(a)(8). This mechanism, colloquially referred to as "cram down," is set forth in Section 1129(b), which provides that:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.[53]

60.     Thus, under section 1129(b), a bankruptcy court may "cram down" a plan over the rejection or a deemed rejection of a plan by an impaired class of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such class.[54]

---

[53]     11 U.S.C. § 1129(b)(1).

[54]     *See Johns-Manville Corp.*, 843 F.2d at 650.

1. **The Plan Does Not Discriminate Unfairly.**

61.     The "unfair discrimination" standard of section 1129(b)(1) of the Bankruptcy Code requires that a dissenting class receive "treatment which allocates value to the [dissenting] class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor,"[55] so that "a dissenting class will receive relative value equal to the value given to all other similarly situated classes."[56]  Generally speaking, section 1129(b)(1) of the Bankruptcy Code is intended to prevent a plan proponent from "segregat[ing] two similar claims or groups of claims into separate classes and provide disparate treatment for those classes."[57]

62.     Under the foregoing standards, the Plan does not "discriminate unfairly" against any Holder of a Claim or Interest in Classes that are deemed to reject (*i.e.*, the Deemed Rejecting Classes), or voted to reject, the Plan (together, the "Rejecting Classes").  The treatment of Holders of Claims and Interests in the Rejecting Classes is proper because all similarly situated Holders of Claims and Interests will receive the same treatment under the Plan.

2. **The Plan is Fair and Equitable.**

63.     Section 1129(b)(2)(B) and Section 1129(b)(2)(C) set forth the requirements of the "fair and equitable" test with respect to unsecured creditors and equity

---

[55]     *In re Mcorp Fin., Inc.*, 137 B.R. 219, 234 (Bankr. S.D. Tex. 1992), *dismissed on other grounds*, 139 B.R. 820 (S.D. Tex. 1992).

[56]     *Johns-Manville*, 68 B.R. at 636.

[57]     *Id.*; *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) ("hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination"); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ("for discriminatory treatment of claims to be fair, four tests must be satisfied: (i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale"); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of creditors or shareholders has not accepted a plan. . . , the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'"); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 157 (Bankr. D.N.J. 2010) (citing *Armstrong World Indus.*, 348 B.R. at 121).

holders, with each subsection specifying an alternative requirement. A chapter 11 plan must satisfy the applicable requirement to be found to be fair and equitable with respect to a dissenting class of unsecured creditors or equity interests.[58]

64. The Bankruptcy Code states that a plan is "fair and equitable" with respect to a class of unsecured claims if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."[59] Further, a plan is fair and equitable with respect to a class of interests if the plan provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."[60] Although the Plan provides that the Holders of Interests in Subsidiary Debtors in Class 11—a class junior to the Debtor Intercompany Claims in Class 9—will technically receive property through the reinstatement of their equity, the Plan nonetheless satisfies the "fair and equitable" requirement because (a) courts recognize that the reinstatement of intercompany interests "constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure;"[61] and (b) the reinstatement of Interests in Subsidiary Debtors is a purely administrative act because all assets of such Subsidiary Debtors will be transferred to the Litigation Trust as of the Effective Date pursuant to the Plan.[62]

---

[58] *See In re P.J. Keating Co.*, 168 B.R. 464, 468 (Bankr. D. Mass. 1994) (noting that the "test under Section 1129(b)(2)(C) is an alternative one").

[59] 11 U.S.C. § 1129(b)(2)(B).

[60] 11 U.S.C. § 1129(b)(2)(C).

[61] *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan."); *In re MPM Silicones, LLC*, 531 B.R. 321, 331, n.8 (S.D.N.Y. 2015) (citing *Ion Media Networks*); *see also In re DACCO Transmission Parts (NY), Inc.*, No. 16-13245 (Docket No. 415) (MKV) (Bankr. S.D.N.Y. Mar. 21, 2017); *In re Pac. Ethanol Holding Co. LLC*, No. 09-11713 (Docket No. 604) (KG) (Bankr. D. Del. June 8, 2010) (finding plan that preserved the corporate structure for purposes of distributing equity interests in the debtors to be fair and equitable).

[62] *See* Plan, at § III.C.2.

65.     The reinstatement of the Subsidiary Debtor Interests is an integral part of the Plan and necessary to effect the transactions contemplated therein.  In relevant part, the Plan provides that, on the Effective Date, the Senior Debtor Interests will be cancelled and reissued to the Litigation Trust in accordance with the Litigation Trust Agreement.[63]  Although the Debtors do not believe that the Subsidiary Debtor Interests have any economic value, the Debtors have determined to reinstate such interests to the Litigation Trust to preserve the Debtors' prepetition corporate structure for the benefit of the Litigation Trust beneficiaries and in furtherance of the liquidation of their remaining assets.

66.     The "fair and equitable" requirement also incorporates a rule that a class of senior creditors may not be paid more than the full amount of their claims.[64]  Here, this rule has been satisfied because no senior Class will receive more than payment in full on their account of their respective Claims.  Accordingly, the Plan is "fair and equitable" with respect to all Rejecting Classes and satisfies section 1129(b) of the Bankruptcy Code.

**O.     Section 1129(c) — The Plan is the
        Only Plan Filed in These Chapter 11 Cases**

67.     Section 1129(c) of the Bankruptcy Code provides that a bankruptcy court may confirm only one plan.  The Plan is the only plan that has been filed in these Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

---

[63]     The Senior Debtors wholly own each of the Subsidiary Debtors.

[64]     *See*, *e.g.*, 11 U.S.C. § 1129(b)(2)(A).

P. **Section 1129(d) — The Principal Purpose of the Plan is Not the Avoidance of Taxes or the Application of Section 5 of the Securities Act**

68.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, thereby satisfying section 1129(d) of the Bankruptcy Code.

II.     **THE PLAN'S RELEASE, EXCULPATION AND INJUNCTION PROVISIONS ARE APPROPRIATE AND SHOULD BE APPROVED**

A.     **The Plan's Releases Should be Approved.**

1.     **The Debtor Release Is a Valid Exercise of the Debtors' Business Judgment.**

69.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Section IX.C.1 of the Plan provides for releases by the Debtors of certain claims (the "Debtor Releases") against the Released Parties.[65]

70.     In the Third Circuit, the overarching question for determining the permissibility of releasing claims held by a debtor is whether the release is fair, equitable, in the best interest of the estate and reflects a sound exercise of the debtor's business judgment.[66] Courts in the Third Circuit have held that, "[w]here such releases are an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary

---

[65]     The "Released Parties" means, "collectively and individually, and, in each case, solely in their capacity as such: (a) the Debtors; (b) the Estates; (c) the Creditors' Committee and its members; (d) the Purchaser; (e) the Pre-Petition Second Lien Secured Party; (f) the Bidders; (g) the Pre-Petition First Lien Lender, CEC and Banibu; (h) Comerica and (i) with respect to (a) through (h), each such Entity's respective Representatives; *provided* that any Entity that objects to Confirmation of, or votes to reject, the Plan and any of their respective Representatives shall not be a Released Party." *See* Plan, § I.A.187.

[66]     *See U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).

provision of a plan."[67]  Here, the Debtor Releases are an integral part of the Plan, in the best interest of the Estates and consistent with and complementary to the settlements and releases previously approved by the Court.

71.     As demonstrated by the record in these Chapter 11 Cases, each of the Released Parties has been an active participant and has provided a substantial contribution warranting the release of claims embodied in the Debtor Releases.  For example, the Pre-Petition First Lien Lender and CEC extended financing to the Debtors at the onset of these Chapter 11 Cases in the form of the CEC DIP Facility.  The Final CEC DIP Order, the order authorizing the Debtors to obtain such financing, approved certain releases in favor of the Pre-Petition First Lien Lender and CEC.[68]  Further, Comerica, in consenting to the use of its cash collateral pursuant to the Final Cash Collateral Order, obtained certain waivers of prepetition claims.[69]  Moreover, the Bidders and the Purchaser obtained certain releases under the Bid Support Term Sheet (as amended in October 2018) and in connection with the extension of financing to the Debtors following the sale of the Corpus Christi Assets under the Final CCP DIP Order.[70]  As such, pursuit of any claims against the Released Parties is not in the best interest of the estates because

---

[67]     *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *20; *see also In re PWS Holding Corp.*, 228 F.3d at 242 (affirming debtor's release of claims against equity sponsor in connection with leverage privatization transaction where the claims had "negative value" to the estate because they were not likely to produce recoveries and were costly to the estate).

[68]     *See* Final CEC DIP Order, ¶ 24 (approving waiver of certain of the Debtors' rights with respect to, among other things, seeking relief from the Bankruptcy Court for the purpose of restricting or impairing certain rights of the Pre-Petition First Lien Lender and CEC); *id.* at ¶ 26(c) (approving Debtors' release of claims against the Pre-Petition First Lien Lender and CEC (and its affiliates) relating to, among other things, the CEC DIP Facility, the Pre-Petition First Lien Loan Documents and the transactions embodied therein).

[69]     *See* Final Cash Collateral Order, ¶ F and ¶ 19 (approving certain Debtor stipulations, including with respect to the validity, amount and allowability of the Prepetition Obligations and validity and perfection of the Prepetition Liens (each as defined therein) and providing for a waiver of all of the Debtors' claims relating to the Prepetition Credit Documents (as defined therein)).

[70]     *See* Bid Support Term Sheet, at 7 (providing for the mutual release of certain claims between the Bidders and the Purchaser, on the one hand, and the Debtors and the Creditors' Committee, on the other).

doing so could violate the terms of previous financing agreements and stipulations approved by the Bankruptcy Court.

72.     Finally, the Debtor Releases, like all elements of the Plan, were negotiated by sophisticated parties represented by able counsel and are the result of arm's-length negotiations.  Viewed in this light, the Debtor Releases are crucial to the success of the Plan, which embodies the settlement and resolution of certain claims and reflects contributions, concessions and compromises made by the Released Parties throughout these Chapter 11 Cases. Accordingly, the Debtor Releases are fair, equitable, in the best interest of the Debtors and their Estates and justified under Third Circuit law and precedent, and should be approved by the Court.

## 2.     The Debtor Releases Satisfy the *Zenith* Factors.

73.     Courts in the Third Circuit consider five factors when determining whether a debtor's release of any non-debtor is appropriate:

> (1)   an identity of interest between the debtor and the third party, such that a suit against the third party is, in essence, a suit against the debtor or will deplete assets of the estate;
>
> (2)   substantial contribution by the third party to the plan;
>
> (3)   the essential nature of the release to the debtor's plan;
>
> (4)   an agreement by a substantial majority of creditors to support the plan and the release; and
>
> (5)   provision in the plan for payment of all or substantially all of the claims of the creditors and interest holders under the plan.[71]

No factor is dispositive, nor is a proponent required to establish each factor required for the release to be approved; rather the factors are intended to provide guidance to the court in

---

[71]     *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)); *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143, n. 47 (Bankr. D. Del. 2010) (citing the *Zenith* factors); *In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (same).

determining the fairness of the releases.[72]  As demonstrated below, a weighing of the *Zenith* factors tips heavily in favor of approving the Debtor Releases.

### a.      Identity of Interest

74.      An identity of interest exists between the Debtors and the Released Parties.  Each of the Released Parties, as a stakeholder and critical participant in the Plan and Confirmation process, shares the common goal with the Debtors of ensuring the Plan's success and consummation.[73]  In relevant part, each of the Released Parties is entitled to a substantial recovery under the Plan on account of their claims if the Effective Date occurs.  In the event that the Plan is not approved, however, there is no guarantee that such parties would receive as meaningful a recovery (if any) on account of their claims.

### b.      Substantial Contribution to the Restructuring

75.      The second *Zenith* factor — a substantial contribution to the restructuring of the Debtors and the Estates — supports the release of claims against the Released Parties because each of the Released Parties has in some manner either (a) affirmatively contributed value, monetary or otherwise, necessary to consummation of the Plan or (b) agreed to compromise or forgo rights in furtherance of the liquidation of the Debtors' estates.[74]

76.      The Released Parties have provided direct benefits to the Debtors and their creditors in these Chapter 11 Cases.  As discussed above, CEC, an affiliate of the Pre-Petition

---

[72]      *See In re Wash. Mut., Inc.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *see also In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that the *Zenith* factors are not exclusive or conjunctive requirements); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (approving the debtors' releases despite not meeting the third and fifth Zenith factors).

[73]      *See, e.g., Tribune*, 464 B.R. at 187, *modified*, 464 B.R. 208 (Bankr. D. Del. 2011) (noting an identity of interest between the debtors and the settling parties where such parties "share[d] the common goal of confirming the [plan] and the [plan] settlement"); *Zenith*, 241 B.R. at 110 (Bankr. D. Del. 1999) (holding that the released parties shared an identity of interest with the debtor "in seeing that the Plan succeed.").

[74]      *See W.R. Grace*, 446 B.R. 96, 138 (Bankr. D. Del. 2011) (finding that parties involved in settlement with the debtor made substantial contribution where, absent the release, settling parties would not have contributed a significant sum necessary to the restructuring).

First Lien Lender, provided financing to the Debtors in the form of a $100 million

debtor-in-possession financing facility. The CEC DIP Facility enabled the Debtors to conduct a

value maximizing sale process for the sale of substantially all of their assets, administer these

Chapter 11 Cases and maintain limited ongoing operations. Further, in October 2018, CEC

agreed to reopen the CEC DIP Facility to provide the Debtors with $2 million in emergency

bridge financing, which enabled the Debtors to negotiate the extension of additional financing

from CCP under the CCP DIP Facility.[75]

        77.    The Purchaser extended financing to the Debtors in the form of the CCP

DIP Facility following approval of the Corpus Christi Sale. In addition, the Purchaser agreed to

fund various recoveries under the Plan. In relevant part, in exchange for the purchase of the

Corpus Christi Assets, the Purchaser agreed to: (a) contribute up to $50 million into an escrow

(subject to certain reductions) to provide a source of recovery for unsecured creditors; (b) satisfy

various Claims in accordance with the terms of the Plan, including, among others, CEC DIP

Claims, Purchaser Administrative Claims, Purchaser Priority Claims, Pre-Petition First Lien

Lender Claims and Macquarie Claims; and (c) fund a reserve for the benefit of the Holders of

Corpus Christi Mechanics' Lien Reserve Claims which is intended to satisfy their Claims in full.

Moreover, at the outset of these Chapter 11 Cases, the Pre-Petition Second Lien Secured Party,

which is a member of the consortium that constitutes the Purchaser, agreed to the priming of its

liens by the CEC DIP Facility, without which the marketing process and these Chapter 11 Cases

could not have continued. For all of the foregoing reasons, the Released Parties have provided

"substantial contributions" contemplated by the second *Zenith* factor.

---

[75]    *See Order (I) Authorizing Debtors to Amend the CEC DIP Loan Agreement to Permit Additional Draw Thereunder Solely in Accordance with Revised Budget and (II) Granting Related Relief* (Docket No. 1918).

### c.     *Essential Nature of the Debtor Releases*

78.     The Debtor Releases are essential to the Plan and consistent with and complementary to the releases already approved by the Court.  The Debtors and the Released Parties have made unique and substantial commitments of time and effort in negotiating the releases.  In entering into these negotiations, the Released Parties relied heavily on the inclusion of such releases in the Plan in order to maximize the value of the Debtors' Estates through the Plan and the liquidating transactions contemplated therein.  Thus, the Debtor Releases are integral to the Plan.

### d.     *Support for the Debtor Release*

79.     As evidenced by the Voting Declaration, the Debtors' myriad unsecured creditors overwhelming support the Plan.  This level of support weighs heavily in favor of approving the Debtor Releases.

### e.     *Payment of Claims in the Affected Classes*

80.     The fifth *Zenith* factor, which looks to whether the plan provides for the payment of affected claims, is also satisfied here.  The standard for determining whether this factor is present is "whether the non-consenting creditors receive . . . reasonable compensation in exchange for the release."[76]  This factor is not relevant because the Debtors are not proposing any non-consensual releases under the Plan.  For all these reasons, the Debtor Releases are an appropriate exercise of the Debtors' business judgment and should be approved by the Bankruptcy Court.

---

[76]     *In re Tribune Co.*, 464 B.R. 126, 178 (Bankr. D. Del. 2011) (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001)).

### 3. **Releases by Holders of Claims Should be Approved.**

81.     Section IX.C.2 of the Plan provides narrow and appropriately tailored third party releases (the "Third Party Releases") that apply only to consenting parties and, therefore, should be approved.

82.     Generally, a chapter 11 plan may provide for a consensual release of claims by third parties.  The determination as to whether a third party release is consensual ultimately depends on the particular circumstances at issue in a particular case.[77]  Further, affirmative consent to a third party release (as opposed to opting out of the release) is not required for such release to be consensual.[78]  Thus, unimpaired creditors receiving a full recovery under a plan may be deemed to have consented to a third party release.[79]  Similarly, a third party release is consensual against non-debtor parties where the releasing parties have the opportunity to opt out of the release but fail to do so.[80]  Thus, by declining to return a ballot, or by not opting out of a release, the creditor may be deemed to consent to the release.

83.     The Third Party Releases are fully consensual in nature and may therefore be approved on the basis that they are premised upon the releasing creditor's consent.  Here, each Holder of a Claim or Interest that (a) votes in favor of the Plan or is Unimpaired by and conclusively presumed to accept the Plan or (b) either (i) abstains from voting, (ii) votes to reject the Plan or (iii) is deemed to reject this Plan and does not opt-out of the voluntary release

---

[77]     *See Indianapolis Downs*, 486 B.R. at 306.

[78]     *See id.*; *Spansion*, 426 B.R. at 144.

[79]     *See id.*

[80]     *See Indianapolis Downs*, 486 B.R. at 306 (granting consensual third party releases of "impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases"); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (finding third party release consensual with respect to parties that had the "ability to 'check the box' on the Plan ballots" which includes "those parties who voted in favor of the Plan and those who voted to reject the Plan but failed to opt out from granting the release provisions").

contained in Section IX.C.2 of the Plan, shall be deemed to have granted the Third Party Releases.

84.     Moreover, the Third Party Releases were extensively disclosed in the Disclosure Statement and the Ballots and therefore, creditors entitled to vote on the Plan who submitted their ballot in favor of the Plan did so inclusive of such releases.[81]  Therefore, any party that failed to affirmatively opt-out of such releases have consented thereto.

85.     Finally, the Third Party Releases are fair, reasonable, appropriate and narrowly tailored.  As noted above, each of the Released Parties made significant contributions to these Chapter 11 Cases, and their inclusion in the Third Party Releases was also a material inducement for their participation, negotiation and ultimate resolution of claims through the Plan. Most importantly, the Plan excludes from the Third Party Release provision any conduct "that is the result of any act or omission of such Released Party determined in a Final Order to have constituted gross negligence, fraud or willful misconduct."[82]  Therefore, the Third Party Releases are appropriately and narrowly tailored to the circumstances of these Chapter 11 Cases because they (a) are consistent with the Bankruptcy Code and applicable in light of the substantial contribution of the Released Parties; and (b) promote finality and prevent parties from attempting to circumvent the Plan's terms.

**B.      The Exculpation Provisions are Appropriate**

86.     Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan has been proposed in good faith, whether the exculpation provision is narrowly tailored and whether it was necessary in connection with plan

---

[81]     *See In re Exide Techs.*, 303 B.R. at 74 (holding that creditors are bound by third party release upon voting for the plan); *In re West Coast Video Enters., Inc.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) (same).

[82]     *See* Plan, Section IX.C.2.

negotiations.[83]  Section IX.B, which contains an exculpation provision (the "Exculpation Provision"), satisfies this standard.

87.     In response to informal communications with the U.S. Trustee, the Debtors have agreed to modify the definition of "Exculpated Parties" under the Plan and proposed Confirmation Order to mean "collectively and individually, (a) the Debtors; (b) the Creditors' Committee; (c) the members of the Creditors' Committee; and (d) all Professionals (solely in their respective capacities as such, including, for the avoidance of doubt and without limitation, the Chief Restructuring Officer)."  Exculpation of the Exculpated Parties, as revised, is particularly appropriate here, where participation in these Chapter 11 Cases and negotiations related to the Sales and the Plan would have been nearly impossible absent the protections embodied in the Exculpation Provision.  Through the efforts of the Exculpated Parties, the Plan will provide meaningful recoveries to creditors, and the Debtors submit that these contributions support the fairness of the Exculpation Provision.

88.     Further, the scope of the exculpation is narrowly tailored to the Exculpated Parties' acts or omissions in connection with the transactions contemplated by the Plan, and the Exculpation Provision does not protect the Exculpated Parties from liability resulting from gross negligence or willful misconduct.[84]  The Debtors therefore respectfully submit that the Exculpation Provision should be approved.

## C.     The Injunction Is Necessary and Customary

89.     The injunction provision set forth in Section IX.D of the Plan implements the Plan's release provisions set forth in Section IX.C of the Plan, the exculpation provisions set

---

[83]     *See, e.g., Upstream Energy Servs. v. Enron Corp (In re Enron Corp.)*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (noting that exculpation provisions are typically evaluated based on the manner in which the provision was made a part of the plan, the necessity of the limited liability to the plan negotiations, and whether those who participating in proposing the plan did so in good faith).

[84]     *See* Plan, § IX.B.

forth in Section IX.B of the Plan and the compromises and settlements implemented under the Plan and throughout the Chapter 11 Cases.  Moreover, the injunction is a key provision because it permanently enjoins all entities from commencing or maintaining any action against the Debtors or any other entity that is a Released Party or Exculpated Party.  As such, to the extent the Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision must also be appropriate.

## III.    SUBSTANTIVE CONSOLIDATION IS APPROPRIATE

90.    Pursuant to Section III.G.1, on the Effective Date, the Estates of the Debtors shall be deemed consolidated for all purposes related to the Plan, including (a) for purposes of implementing the Plan, (b) for purposes of voting, (c) for assessing whether the standards for Confirmation have been met, (d) for calculating and making Distributions under the Plan and (e) for filing post-Confirmation reports and paying quarterly fees to the Office of the U.S. Trustee.  The Debtors believe that such substantive consolidation is fair, equitable and in the best interest of the Estates.

91.    It is well established that bankruptcy courts may use their equitable powers under section 105 of the Bankruptcy Code to consolidate cases involving related debtors.[85]  Moreover, section 1123(a)(5)(C) of the Bankruptcy Code expressly contemplates plan provisions that provide for a merger or consolidation of the debtor with one or more persons as a means for the implementation of the chapter 11 plan.[86]

---

[85]    *See, e.g., In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 159 (Bankr. D. Del. 2008) ("[s]ubstantive consolidation is a construct of federal common law that emanates from equity.") (citing *In re Owens Corning*, 419 F.3d, 195, 205 (3d Cir. 2005); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 497 (Bankr. D.N.J. 2005) ("[t]he power to order substantive consolidation of bankruptcy estates is within the Bankruptcy Court's equitable powers under § 105 of the Code.") (citing *Fed. Deposit Ins. Corp. v. Colonial Realty Co.*, 966 F.2d 57,59 (2d Cir. 1992);  *In re Stone & Webster, Inc.*, 286 B.R. 532, 539 (Bankr. D. Del. 2002).

[86]    *See* 11 U.S.C. § 1123(a)(5)(C); *Stone & Webster*, 286 B.R. at 542 ("substantive consolidation such as that proposed by the Plan is, by reason of § 1123(a)(5)(C), clearly an allowable provision in a Chapter 11 plan.").

92.     The Third Circuit has held that substantive consolidation is warranted where there was a pre-petition disregard of corporate separateness or postpetition scrambling of assets and liabilities.[87]  In doing so, the Third Circuit explained that, unlike the substantive consolidation tests in other circuits, the Third Circuit has no set list of factors that it uses in determining if substantive consolidation is appropriate; rather, "what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (a) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (b) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."[88]

93.     With respect to the first element, Courts have concluded that substantive consolidation is appropriate where the factual record shows that all debtors (a) have the same officers, same directors and shareholders; (b) conduct the same general business operations under very similar names; (c) conduct intercompany dealings without the usual corporate formalities; (d) do not charge each other for all services which they rendered to one another; and (e) move profits between and among other debtors.[89]  These courts have also noted that substantive consolidation may be appropriate where debtors are viewed as a single entity for the purposes of secured lending, and unsecured creditors view the debtors as a single entity when extending credit terms.[90]

94.     In many respects, the Debtors behaved, and their creditors treated them, as a single legal entity prior to the Petition Date.  Prior to the Petition Date, the Debtors operated as

---

[87]     *Owens Corning*, 419 F.3d at 205 ("Substantive consolidation . . . emanates from equity [and] 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities'") (quoting *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d Cir. 2005)).

[88]     *Id.* at 210-11.

[89]     *In re Lisanti Foods, Inc.*, 241 Fed. Appx. 1, 2-3 (3d Cir. 2007).

[90]     *Id.* at 3.

a consolidated enterprise, principally focused on the manufacture and sale of PET resin in the United States.[91] The Debtors share many of the same directors and officers, with management and administration of the Debtors centered in Luxembourg and Houston, Texas. In addition, as of the Petition Date, most of the Debtors were members of a financial arrangement through which the Debtors pooled their cash assets for purposes of funding working capital and operational needs.[92] Due in part to the use of such cash pooling account, the Debtors accrued significant intercompany claims among each other, which remained unpaid as of the Petition Date.[93] As a result of these facts, the Debtors believe that third parties with whom they transacted prior to the Petition Date treated them as a single entity. This is evident from, among other things, the various credit facilities entered into by the Debtors prior to the Petition Date pursuant to which substantially all of the operational Debtors were generally co-borrowers and/or guarantors.

95. Postpetition, the Debtors' assets are so scrambled that separating them (or attempting to do so) would be highly detrimental to the interests of all creditors. Specifically, the Plan funds distributions to Holders of Allowed Claims from the proceeds of the Corpus Christi Sale and, in the case of General Unsecured Creditors, from the Litigation Trust Assets. Attempting to allocate these assets among each of the Debtors would be unduly costly and burdensome, if at all possible. In particular, the Debtors anticipate that the principal source of recovery for the Holders of General Unsecured Claims under the Plan will come from the proceeds of the Unsecured Claims Pool (a Litigation Trust Asset). The Unsecured Claims Pool comprises (a) cash in an amount equal to $50 million, subject to certain reductions described in

---

[91] *See* First Day Decl., ¶¶ 8; 35; Corio Decl., ¶ 17

[92] *See* Corio Decl. ¶ 17.

[93] *See* First Day Decl., ¶ 35; Corio Decl., ¶ 17.

more detail in the Plan, to be funded by the Purchaser on the Closing Date and (b) cash in the amount of $3 million funded by the Debtors' affiliate MGI.[94]

96.     The portion of the Unsecured Claims Pool funded by the Purchaser on the Closing Date is the result of a settlement embodied in the Bid Support Term Sheet, which resolved the Creditors' Committee's objection to the sale of the Corpus Christi Assets to the Purchaser and a related challenge litigation brought against DAK.  The ownership of the Corpus Christi Assets are spread amongst a number of the Debtors, and the Debtors do not believe that it would be feasible to allocate the value of the Unsecured Claims Pool amongst the Debtors given the nature of the Corpus Christi Assets.[95]

97.     Similarly, no attempt has been made to allocate among the Debtors the value of the $3 million payment already made by MGI, which will be transferred to the Unsecured Claims Pool on the Effective Date.  The Debtors do not believe that it would be feasible to allocate such payment because it results from a settlement reached on the dismissal of, among other affiliates, the chapter 11 cases of the Debtors' Luxembourg affiliates and is not specifically allocable to any Debtor entity.[96]

98.     Accordingly, for the reasons set forth above, the Debtors submit that substantive consolidation should be approved as in the best interests of the Debtors, their estates and their creditors, and as it is necessary to effectuate the terms of the Plan and fair and reasonable under the circumstances.

---

[94]     *See* Corio Decl., ¶ 18.

[95]     *See Id.* at ¶ 19.

[96]     *Id.* at ¶ 20.

## IV. THE SETTLEMENTS INCORPORATED INTO THE PLAN SHOULD BE APPROVED

99.     Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates an integrated compromise and settlement designed to achieve a beneficial and efficient resolution of these Chapter 11 Cases for all parties in interest.[97]  As more fully described above, the Modifications to the Plan reflected in the Third Amended Plan reflect the resolution of informal objections to confirmation asserted by various parties, including, most significantly, the Objecting Lienholders (the "Lienholder Settlement").  Pursuant to the Lienholder Settlement, the Debtors and the Creditors' Committee agreed to, among other things, the clarification and resolution of the respective rights of the Holders of Corpus Christi Mechanics' Lien Claims, the Purchaser and the Litigation Trust with respect to the claims of, and potential causes of action against, such Holders, including the estimation at $0.00 for purposes of receiving Distributions under the Plan of certain duplicative and unasserted liabilities.[98]

100.     Compromises are favored in the bankruptcy context "[t]o minimize litigation and expedite the administration of a bankruptcy estate."[99]  "The authority to approve a compromise [or] settlement is within the sound discretion of the bankruptcy court."[100]  When determining whether a settlement is fair and reasonable under Bankruptcy Rule 9019(a), courts in the Third Circuit consider the following factors:  (a) the probability of success in litigation; (b) the likely difficulties of collection; (c) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the

---

[97]     Plan, § III.H.3.

[98]     *See, e.g.,* Plan, §§ II.C.4, III.B.2, III.H.2.

[99]     *Martin v. Myers (In re Martin)*, 91 F. 3d 389, 393 (3d Cir. 1996).

[100]     *In re Northwestern Corp.*, 2008 WL 2704341, at *6 (Bankr. D. Del. Jul. 10, 2008) (quoting *Key3media Group, Inc. v. Pulver.Com, Inc. (In re Key3media Group, Inc.)*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) ("In exercising this discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate.")).

creditors.[101]  Although bankruptcy courts are directed to determine whether settlements are in the "best interests of the estate,"[102] the bankruptcy court should not substitute its judgment for that of a trustee or debtor in possession.[103]  Indeed, the bankruptcy court is not to decide the numerous questions of law or fact raised in the litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.[104]

101.    The Debtors submit that ample justification exists for approval of the Lienholder Settlement and the other settlements incorporated into the Plan.  These settlements resolve informal confirmation objections asserted by the Objecting Lienholders and other parties and pave the way for a consensual confirmation process.  Absent these settlements, the confirmation of the Plan would have been contested by various parties asserting complex legal and factual issues and represented by sophisticated counsel, draining the limited resources of the Debtors' estates with no guarantee of success.  Accordingly, approval of the settlements incorporated into the Plan is a sound exercise of the Debtors' business judgment and in the paramount interest of their creditors.

---

[101]    *Martin*, 91 F. 3d at 393; *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006); *see also In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (in applying Bankruptcy Rule 9019(a), whether a court should approve a settlement depends on several factors, including the probability of success in the litigation, the complexity of the litigation, the attendant expense and delay, and the interests of the creditors); *In re Geller*, 74 B.R. 685, 688 (Bankr. E.D. Pa. 1987) (generally, a settlement will be approved as long as it clears a threshold of reasonableness); *Official Unsecured Creditors' Committee v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines, Inc.)*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd* 8 F. 3d 812 (3d Cir. 1993) (settlement must not fall below the lowest level in the range of reasonableness).

[102]    *In the Matter of Energy Cooperative, Inc.*, 886 F. 2d 921, 927 (7th Cir. 1989).

[103]    *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985); *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).

[104]    *See In re Penn Trans. Co.*, 596 F. 2d 1102, 1114 (3d Cir. 1979); *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F. 2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983); *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("[I]n approving a settlement, the court does not have to be convinced that the settlement is the best possible compromise . . . [it] must only conclude that the compromise or settlement . . . be above the lowest point in the range of reasonableness.") (internal quotation and citations omitted).

# V. THE ASSUMPTION OR REJECTION OF THE EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED

102. Section IV of the Plan provides that on the Effective Date each of the Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court will be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for any Executory Contract or Unexpired Lease (a) identified on Exhibit D to the Plan as an Executory Contract or Unexpired Lease designated for assumption and assignment to the Litigation Trust; (b) that is the subject of a separate motion or notice to assume or reject filed by a Debtor and pending as of the Confirmation Hearing; or (c) that previously expired or terminated pursuant to its own terms.[105] Additionally, unless otherwise assumed by the Debtors and assigned to the Litigation Trust, any Executory Contract or Unexpired Lease that remains, as of the Effective Date, the subject of a pending notice of proposed or potential assumption and assignment issued in connection with any Sale, shall be deemed rejected as of such date to the extent not assumed and assigned to the applicable purchaser in connection with such Sale.[106]

103. Finally, the Plan provides that to the extent any Executory Contract or Unexpired Lease remains, as of the Effective Date, the subject of a disputed Cure Claim and such Executory Contract or Unexpired Lease with a disputed Cure Claim is listed as a Purchased Contract (as defined in the Corpus Christi Asset Purchase Agreement) as set forth on Schedule 2.1(b)(vii) to the Corpus Christi Asset Purchase Agreement (as such schedule may be modified by Purchaser pursuant to the Corpus Christi Asset Purchase Agreement), such Executory Contract or Unexpired Lease will not be deemed assumed or rejected unless and until

---

[105] *See* Plan, Section IV.A.

[106] *Id.*

the disputed Cure Claim is resolved or determined by Final Order, at which point Purchaser shall have the right to either (1) pay the Cure Claim (or, to the extent such holder of the Cure Claim is also the holder of a Corpus Christi Mechanics' Lien Reserve Claim, have such Cure Claim paid from the Corpus Christi Mechanics' Lien Reserve in accordance with the Corpus Christi Mechanics' Lien Reserve Procedures) and have the contract thereby deemed assumed and assigned to Purchaser, or (2) delete such Executory Contract or Unexpired Lease from the list of Purchased Contracts set forth on Schedule 2.1(b)(vii) to the Corpus Christi Asset Purchase Agreement pursuant to the terms of the Corpus Christi Asset Purchase Agreement and have such contract thereby deemed an Excluded Asset (as defined in the Corpus Christi Asset Purchase Agreement) and deemed rejected.[107]

104. Courts routinely approve motions to assume and assign or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.[108] Courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease.[109]

105. The Debtors, in consultation with the Creditors' Committee, determined, in their business judgment, that the Executory Contracts or Unexpired Leases identified on

---

[107]    *Id.*

[108]    *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts to authorize the rejection of an executory contract is that of "business judgment"); *Grp. of Inst'l Investors v. Chi., M., St. P., & P.R.R. Co.*, 318 U.S. 523, 550 (1943) ("[T]he question whether a lease should be rejected and, if not, on what terms it should be assumed is one of business judgment"); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 53 (Bankr. D. Del. 2001) ("The Debtors' decision to assume or reject an executory contract is based upon its business judgment."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) ("A debtor's decision to reject an executory contract under section 365 is governed by the business judgment standard.").

[109]    *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim or caprice.") (internal quotation marks omitted).

Exhibit D to the Plan are necessary to implement the terms of the Plan.[110]  Accordingly, it is a sound exercise of the Debtors' business judgment to assume these Executory Contracts and Unexpired Leases, and reject any other Executory Contracts and Unexpired Leases not assumed and assigned to any purchaser of the Debtors' assets or other third party.  Therefore, the proposed treatment of Executory Contracts and Unexpired Leases set forth in the Plan should be approved in connection with the Confirmation of the Plan.

## VI.  RESERVATION OF RIGHTS WITH RESPECT TO POTENTIAL CONFIRMATION OBJECTIONS

106.    As of the filing of this Confirmation Memorandum, no substantive objections have been filed to confirmation of the Plan.[111]  In the event that any party attempts to assert an objection to confirmation notwithstanding this resolution, the Debtors reserve all of their rights to respond to any such objection.

## VII.  WAIVER OF STAY

107.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

108.    The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004 and 6006

---

[110]     *See, e.g.,* Plan, Ex. D.

[111]     The Port of Corpus Christi Authority filed a document styled as a response to the Second Amended Plan (Docket No. 2100) (the "Corpus Christi Response").  The Corpus Christi Response states expressly that it is not an objection to confirmation of the Plan but rather is an objection to the cure amounts associated with the potential assumption and assignment to the Purchaser in connection with the Corpus Christi Sale of certain leases and agreements among the parties.  Corpus Christi Response, at ¶ 7.  As such, the Corpus Christi Response presents no substantive objection to confirmation.

so that the proposed Confirmation Order will be effective immediately upon its entry and the closing of the Corpus Christi Sale.[112]  These Chapter 11 Cases and the transactions contemplated under the Plan have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.  For these reasons, the Debtors, their advisors and other key constituents are working towards closing of the Corpus Christi Sale and, relatedly, the confirmation of the Plan so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## CONCLUSION

For all of the foregoing reasons, the Debtors submit that the Court should confirm the Plan, because it fully satisfies all applicable requirements of the Bankruptcy Code, and provide such other relief as the Court deems is just and appropriate.

---

[112]     *See, e.g., In re Dex Media, Inc.*, No. 16-11200 (KG) (Bankr. D. Del. July 15, 2016) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Apr. 18, 2016) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same); *In re Gatehouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same).

NAI-1505451088v10
DOCS_DE:222295.1 54032/001

Dated: December 12, 2018                    PACHULSKI STANG ZIEHL & JONES LLP

/s/ Joseph M. Mulvihill
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Joseph M. Mulvihill (DE Bar No. 6061)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                joneill@pszjlaw.com
                jmulvihill@pszjlaw.com

and

JONES DAY
Scott J. Greenberg
Stacey L. Corr-Irvine
250 Vesey Street
New York, NY 10281
Telephone:      (212) 326-3939
Facsimile:      (212) 755-7306
Email:          sgreenberg@jonesday.com
                scorrirvine@jonesday.com

and

Carl E. Black
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:      (216) 586-7035
Facsimile:      (216) 579-0212
Email:          ceblack@jonesday.com

and

Daniel J. Merrett
1420 Peachtree Street, N.E., Suite 800
Atlanta, GA 30309-3053
Telephone:      (404) 581-8476
Facsimile:      (404) 581-9330
Email:          dmerrett@jonesday.com

*Co-Counsel for the Debtors and Debtors in Possession*