# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| M & G USA CORPORATION, *et al.*,[1] | Case No. 17- 12307 (BLS) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF BRIAN CORIO
## IN SUPPORT OF CONFIRMATION OF THIRD AMENDED
## PLAN OF LIQUIDATION OF THE DEBTORS AND DEBTORS IN POSSESSION

I, Brian Corio, declare and state as follows:

1. I am a Senior Director at Alvarez & Marsal North America, LLC ("A&M"). A&M acts as financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I submit this declaration (this "Declaration") in support of: (a) *The Debtors Memorandum of Law in Support of Confirmation of Third Amended Joint Plan of Liquidation of the Debtor and Debtors in Possession* (the "Confirmation Memorandum"), filed contemporaneously herewith; and (b) confirmation of the *Third Amended Joint Plan of Liquidation of the Debtors and Debtors in Possession* (Docket No 2115) (the "Third Amended Plan" and, as modified, supplemented and amended, the "Plan").[2]

2. Effective as of September 7, 2017, A&M began providing the Debtors with the services of Dennis Stogsdill, a Managing Director at A&M as Chief Restructuring Officer

---

[1] The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan or the Confirmation Memorandum, as applicable.

(the "CRO") of each of the Debtors, with the exception of Chemtex International, Inc. At the direction of the CRO, I lead the team of A&M employees (the "A&M Team") that supports the CRO in carrying out his duties. In this capacity and over the course of these chapter 11 cases (the "Cases"), I have become familiar with the Debtors' businesses, operations and financial affairs. Together with the CRO, I oversee the Debtors in their day-to-day operations, budgets, cash flows and financial analysis, and at the direction of the CRO, I lead the A&M Team in, among other things, assisting the Debtors with forecasting their liquidity position, identifying and implementing cost-saving strategies, negotiating with key constituents and analyzing potential claims. In addition, I have been engaged in the negotiation and formulation of the Plan and certain related documents, including the Liquidation Analysis. Accordingly, I have knowledge of the Plan and the transactions contemplated therein.

3. I have over ten years of financial restructuring and management consulting experience across a broad spectrum of industries, including retail, chemicals, coal and consumable fuels, renewable energy, casinos and gaming, telecommunication services, transportation and shipping and homebuilding. I specialize in developing financial, operational and strategic solutions for troubled companies, lenders, and equity sponsors in distressed and non-distressed situations, including developing strategic business and turnaround plans, implementing cash flow forecasting and cash preservation programs, evaluating operational performance and improvement opportunities and assessing debt capacity and recapitalization alternatives. I am recognized as a Certified Insolvency and Restructuring Advisor by the Association of Insolvency & Restructuring Advisors. I earned my B.S. in finance and leadership from Boston College.

4. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management, the A&M Team or the Debtors' other professionals that I believe in good faith to be reliable; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. The Debtors have authorized me to submit this Declaration.

## **SECTION 1129(A)(3) – THE GOOD FAITH REQUIREMENT**

5. I understand that section 1129(a)(3) of the Bankruptcy Code requires the Debtors to have proposed the Plan in good faith and not by any means forbidden by law.

6. As an active participant in the negotiations concerning the formulation and development of the Plan, I believe that the Debtors have proposed the Plan in good faith and with the legitimate purposes of maximizing distributions to Holders of Claims entitled to a distribution under the Plan, winding down the Estates of the Debtors and distributing the Debtors' remaining assets in accordance with the priority scheme set forth in the Bankruptcy Code, and not by any means forbidden by law.

7. Further, I believe that the Plan has been proposed by the Debtors in good faith because it is supported by the Debtors' key creditor constituencies and is the result of good faith, arm's-length negotiations with, among other parties, the Creditors' Committee, the Pre-Petition First Lien Lender and CEC, the Purchaser, the Bidders, Comerica, Macquarie and certain Holders of Corpus Christi Mechanics' Lien Reserve Claims. Moreover, the Plan, as amended by the Third Amended Plan, reflects and incorporates a good faith, arm's length resolution of the objections of certain Holders of Corpus Christi Mechanics' Lien Claims to confirmation of the Second Amended Plan.

## SECTION 1127(A)(7) – THE BEST INTERESTS OF CREDITORS TEST

8. I understand that, pursuant to section 1127(a)(7) of the Bankruptcy Code, the Plan must satisfy the "best interests of creditors" test with respect to each impaired class of claims or interests under the Plan. I understand that, in order to satisfy this test, each Holder of a Claim or Interest in an impaired class must either: (a) accepted the Plan or (b) receive or retain property of a value, as of the Effective Date of the Plan, not less than what such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7") on that date.

9. I believe that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code. To demonstrate that the Plan satisfies the best interests test, the A&M Team assisted the Debtors in preparing the Liquidation Analysis, which was attached as Exhibit D to the *Disclosure Statement for Second Amended Joint Plan of Liquidation of the U.S. Debtors and Debtors in Possession* (Docket No. 2049) (the "Disclosure Statement"). Based upon my review of, and my participation in formulating, the Liquidation Analysis, I believe that the Liquidation Analysis: (a) is reasonable as of the date such analysis or evidence was prepared, presented or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions in light of the purpose for which it was prepared; (c) has not been controverted by other evidence; and (d) establishes that distributions to Holders in every Impaired Class under the Plan on account of Allowed Claims or Interests will receive a value equal to or greater than the amount such Holder would be entitled to receive if the Debtors were liquidated on December 31, 2018 (the "Conversion Date") under Chapter 7. I have no reason to believe that the Liquidation Analysis or the assumptions underlying the Liquidation Analysis should be revised based on information I have learned since the filing of the Disclosure Statement.

10. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs that would likely be available to the Debtors' creditors if the Debtors were to be liquidated under Chapter 7 as an alternative to the liquidation proposed under the Plan. The Liquidation Analysis was based on a variety of assumptions, which are detailed in the Liquidation Analysis and the notes thereto. I believe the Liquidation Analysis and the assumptions and conclusions set forth therein are fair and accurate, are reasonable under the circumstances, and represent the best judgement of the A&M Team and the Debtors' management with regard to the results of a hypothetical liquidation of the Debtors under Chapter 7 on the Conversion Date.

11. In conclusion, it is my professional opinion based on the Liquidation Analysis that no dissenting Holder of a Claim or Interest in an Impaired Class will receive less under the Plan than it would receive in a Chapter 7 liquidation of the Debtors' assets on the Conversion Date.

## SECTION 1127(A)(11) – THE FEASIBILITY REQUIREMENT

12. I understand that, pursuant to section 1127(a)(11) of the Bankruptcy Code, the Plan must be feasible. In addition, it is my understanding that the feasibility standard under section 1129(a)(11) is greatly simplified when tested against plans of liquidation. Specifically, I understand that in the context of a liquidating chapter 11 plan, feasibility is established by demonstrating that the debtor is able to satisfy the conditions precedent to the Effective Date and otherwise has sufficient funds to meet its post-Confirmation obligations to pay for the costs of administering and fully consummating the Plan and closing the chapter 11 cases. Notably, there is no requirement that such payments will be guaranteed.

13. Based on my understanding of the requirements of section 1129(a)(11) of the Bankruptcy Code, I believe that the Plan is feasible. In particular, I believe that (a) the

-5-

conditions precedent to the Effective Date are reasonably likely to be satisfied and (b) the various reserves proposed to be established under the Plan, including the Professional Fee Reserve, Completion Fee Reserve, Corpus Christi Mechanics' Lien Reserve, Disputed Claims Reserve and proceeds of the Litigation Trust Assets provide sufficient funds to administer and consummate the Plan and to close the Chapter 11 Cases.  Accordingly, I believe that the Plan has a reasonable likelihood of success and satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

## **SECTION 1129(B) – THE FAIR AND EQUITABLE REQUIREMENT**

14. I understand that section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where not all impaired classes of claims and interests accept a plan.  I further understand that a bankruptcy court may "cram down" a plan over the rejection or the deemed rejection of a plan by an impaired class of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such class.

15. Based on my understanding of this standard, I believe that the Plan is fair and equitable.  I understand that a plan is fair and equitable with respect to a class of unsecured claims if no junior class will receive or retain property under the Plan.  Although the Plan provides that the Holders of Interests in Subsidiary Debtors in Class 11—a class junior to the Debtor Intercompany Claims in Class 9—will technically receive property through the reinstatement of their equity, I believe that the Plan nonetheless satisfies the "fair and equitable" requirement because the reinstatement of the Subsidiary Debtor Interests is an integral part of the Plan and necessary to effect the transactions contemplated therein.  Further, although I do not believe that the Subsidiary Debtor Interests have any economic value, I believe that the reinstatement of such interests to the Litigation Trust is necessary to preserve the Debtors'

prepetition corporate structure for the benefit of the Litigation Trust Beneficiaries and in furtherance of the liquidation of the Debtors' remaining assets.

## THE SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

16. The Plan provides for the substantive consolidation of the Debtors' Estates. I have been informed by counsel that substantive consolidation of two or more debtors is warranted where there was a pre-petition disregard of corporate separateness or postpetition intertwining of assets and liabilities with respect to such debtors. In that regard, I believe that there is sufficient evidence regarding the pre-petition disregard of corporate separateness and postpetition intertwining of assets and liabilities of the Debtors and their Estates.

17. Based on my prepetition and postpetition engagement with the Debtors, I believe that in many respects, the Debtors behaved, and their creditors treated them, as a single legal entity prior to the Petition Date. More to the point, prior to the Petition Date, the Debtors operated as a consolidated enterprise, principally focused on the manufacture and sale of PET resin in the United States. The Debtors share many of the same directors and officers, with management and administration of the Debtors centered in Luxembourg and Houston, Texas. In addition, as of the Petition Date, most of the Debtors were members of a financial arrangement through which the Debtors pooled their cash assets for purposes of funding working capital and operational needs. Due in part to the use of such cash pooling account, the Debtors accrued significant intercompany claims among each other, which remained unpaid as of the Petition Date. As a result of these facts, I believe that third parties with whom the Debtors transacted prior to the Petition Date treated them as a single entity. I believe that this is evident from, among other things, the various credit facilities entered into by the Debtors prior to the Petition Date pursuant to which substantially all of the operational Debtors were generally co-borrowers and/or guarantors.

18.     Postpetition, I believe that the Debtors' assets are so intertwined that separating them (or attempting to do so) would be highly detrimental to the interests of all creditors. Specifically, the Plan funds distributions to Holders of Allowed Claims from the proceeds of the Corpus Christi Sale and, in the case of General Unsecured Creditors, from the Litigation Trust Assets. It is my opinion that attempting to allocate these assets among each of the Debtors would be unduly costly and burdensome, if at all possible. In particular, I anticipate that the principal source of recovery for the Holders of General Unsecured Claims under the Plan will come from the proceeds of the Unsecured Claims Pool (a Litigation Trust Asset). The Unsecured Claims Pool comprises (a) cash in an amount equal to $50 million, subject to certain reductions described in more detail in the Plan to be funded by the Purchaser on the Closing Date and (b) cash in the amount of $3 million funded by the Debtors' affiliate MGI.

19.     The portion of the Unsecured Claims Pool funded by the Purchaser on the Closing Date is the result of a settlement embodied in the Bid Support Term Sheet, which resolved the Creditors' Committee's objection to the sale of the Corpus Christi Assets to the Purchaser and a related challenge litigation brought against DAK seeking to recharacterize DAK's liens. The ownership of the Corpus Christi Assets are spread amongst a number of the Debtors, and for that reason, I do not believe that it would be feasible to allocate the value of the Unsecured Claims Pool amongst the Debtors given the nature of the Corpus Christi Assets.

20.     Similarly, no attempt has been made to allocate among the Debtors the value of the $3 million payment made by MGI, which will be transferred to the Unsecured Claims Pool on the Effective Date. I do not believe that it would be feasible to allocate such payment because it results from a settlement reached on the dismissal of, among other affiliates, the chapter 11 cases of the Debtors' Luxembourg affiliates and is not specifically allocable to any Debtor entity.

21.     For these reasons, I believe that the substantive consolidation of the Debtors' Estates proposed under the Plan is in the best interests of the Debtors, their estates and their creditors, and is necessary to effectuate the terms of the Plan and fair and equitable under the circumstances.

## THE RELEASE PROVISIONS

22.     Section IX of the Plan includes certain release, exculpation, injunction and related provision.  I believe that these provisions are essential components of the Plan, were negotiated by sophisticated parties represented by able counsel and are the result of arm's-length negotiations and should be approved in connection with confirmation of the Plan.

23.     <u>Debtor Releases</u>.  I believe that the Debtor Releases included in the Plan are an appropriate exercise of the Debtors' business judgment, are fair, reasonable, in the best interests of the Debtors and their Estates, and are consistent with and complementary to the settlements and releases previously approved by the Court.  Further, I believe that each of the Released Parties has been an active participant in these Chapter 11 Cases and has provided a substantial contribution warranting the release of claims embodied in the Debtor Releases.

24.     For example, CEC, an affiliate of the Pre-Petition First Lien Lender, provided financing to the Debtors in the form of a $100 million debtor in possession financing facility.  It is my opinion that the CEC DIP Facility enabled the Debtors to conduct a value maximizing sale process for the sale of substantially all of their assets, administer these Chapter 11 Cases and maintain limited ongoing operations.  Further, in October 2018, CEC agreed to reopen the CEC DIP Facility to provide the Debtors with $2 million in emergency bridge financing, which, I believe, enabled the Debtors to negotiate the extension of additional financing from CCP under the CCP DIP Facility.

25. Moreover, the Purchaser extended financing to the Debtors in the form of the CCP DIP Facility following approval of the Corpus Christi Sale. In addition, the Purchaser agreed to fund various recoveries under the Plan. In relevant part, in exchange for the purchase of the Corpus Christi Assets, the Purchaser agreed to: (a) contribute up to $50 million into an escrow (subject to certain reductions) to provide a source of recovery for unsecured creditors; (b) satisfy various Claims in accordance with the terms of the Plan, including, among others, CEC DIP Claims, Purchaser Administrative Claims, Purchaser Priority Claims, Pre-Petition First Lien Lender Claims and Macquarie Claims; and (c) fund a reserve for the benefit of the Holders of Corpus Christi Mechanics' Lien Reserve Claims. Moreover, at the outset of these Chapter 11 Cases, the Pre-Petition Second Lien Secured Party, which is a member of the consortium that constitutes the Purchaser, agreed to the priming of its liens by the CEC DIP Facility. Without such priming, I do not believe that the marketing process and these Chapter 11 Cases could not have continued.

26. Finally, I believe that the Debtors and the Released Parties have made unique and substantial commitments of time and effort in negotiating the releases and relied heavily on the inclusion of the Debtor Releases in the Plan when agreeing to the terms and transactions contemplated thereunder.

27. <u>Third Party Releases</u>. I believe that the Third Party Releases are fair to Holders of Claims and Interests. I further believe, for all the reasons discussed above regarding the appropriateness of the Debtor Releases, that the Third Party Releases are fair, reasonable, appropriate and narrowly tailored. As noted above, I believe that each of the Released Parties made significant contributions to these Chapter 11 Cases, and their inclusion in the Third Party Releases was also a material inducement for their participation, negotiation and ultimate

-10-

resolution of claims through the Plan.  Moreover, the Plan excludes from the Third Party Release provision any conduct "that is the result of any act or omission of such Released Party determined in a Final Order to have constituted gross negligence, fraud or willful misconduct."[3] Therefore, I believe that the Third Party Releases are appropriately and narrowly tailored to the circumstances of these Chapter 11 Cases because they promote finality and prevent parties from attempting to circumvent the Plan's terms.

## THE SETTLEMENTS INCORPORATED INTO THE PLAN

28.     The Plan incorporates, among other settlements, a resolution of informal objections to confirmation asserted by various parties, including, most significantly, the Objecting Lienholders (the "Lienholder Settlement").  As more fully described in the Confirmation Memorandum, under the Lienholder Settlement, the Debtors and the Creditors' Committee agreed to, among other things, the clarification and resolution of the respective rights of the Holders of Corpus Christi Mechanics' Lien Claims, the Purchaser and the Litigation Trust with respect to the claims of, and potential causes of action against, such Holders, including the estimation at $0.00 for purposes of receiving Distributions under the Plan of certain duplicative and unasserted liabilities.

29.     I understand that the Lienholder Settlement resolves informal objections asserted by the Objecting Lienholders and other parties and paves the way for a consensual confirmation process.  For these reasons, I believe that the Lienholder Settlement and each of the settlements incorporated into the Plan are fair, reasonable, and a sound exercise of the Debtors' business judgment and in the paramount interest of creditors.

---

[3]     *See* Plan, Section IX.C.2.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  December 12, 2018       */s/ Brian Corio*
     New York, New York       Brian Corio
                                       Senior Director
                                       Alvarez & Marsal North America, LLC

-12-
DOCS_DE:222296.1 54032/001