# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 17-12307 (BLS) |
| M & G USA CORPORATION, *et al.*, |  |
| Debtors. | Re: Docket Nos. 1555; 2274; 2286; 2246; 2279; 2280; 2281; 2282; 2283; 2284; 2285; 2291; 2349 |

Jeffrey R. Waxman, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

*Counsel for the Construction Lienholder Group*

Hannah Mufson McCollum, Esquire
U.S. Department of Justice
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801

*Office of the United States Trustee*

J. Kate Stickles, Esquire
David R. Hurst, Esquire
Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801

-and-

Daniel J. Merrett, Esquire
Jones Day
1420 Peachtree Street, N.E.,
Suite 800
Atlanta, GA 30309

*Counsel for the M&G Corporation Litigation Trust*

## OPINION[1]

Before the Court is the Motion of the Construction Lienholder Group for Allowance and Payment of Administrative Expense for Substantial Contribution [Docket No. 1555]. By this

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

Motion, the Construction Lienholder Group[2] seeks allowance and payment of professional fees and expenses in the aggregate amount of $1,591,036.86.[3] The Construction Lienholder Group contends that it provided a "substantial contribution" in this case within the meaning of 11 U.S.C. § 503(b)(3)(D) in representing the interests of hundreds of creditors asserting mechanic's lien claims against the Debtors' Corpus Christi Plant. The Substantial Contribution Motion is supported by a number of mechanic's lien claimants, *see* Docket Nos. 2279; 2280; 2281; 2282; 2283; 2284; 2285; and 2291; and is opposed by the post-confirmation Litigation Trust and the United States Trustee. For the reasons that follow, the Court will grant the Substantial Contribution Motion.

## BACKGROUND

M & G USA Corporation and its affiliates (hereinafter "the Debtors") were producers of polyethylene terephthalate resin ("PET") and one of its precursors, purified terephthalic acid ("PTA"). First Day Declaration of Dennis Stogsdill [Docket No. 3 at ¶ 8]. PET is a product used in the manufacture of plastic bottles and other plastic packaging. *Id*. In April of 2013, the Debtors began construction on a manufacturing plant in Corpus Christi, Texas, which was intended to be the largest production facility of its kind in the world (the "Corpus Christi Plant" or the "Plant"). *Id*. at ¶ 9. The Corpus Christi Plant was designed to be a vertically integrated plant, capable of manufacturing both PET and PTA on a single line. When construction began on the Corpus Christi Plant in 2013, the expected completion date was December of 2015. *Id*.

---

[2] Capitalized terms are defined *infra*.
[3] This figure represents the final aggregate amount requested in a supplement [Docket No. 2246] to the Motion.

Unfortunately, the record reflects that construction of the Plant was greatly delayed and far over budget, with catastrophic consequences for the Debtors.

On October 30, 2017, the Debtors filed for Chapter 11 protection. [Docket No. 1]. The Corpus Christi Plant remained substantially incomplete as of the Petition Date. First Day Declaration at ¶ 10. The Debtors claimed to be facing substantial liquidity concerns brought on, in large part, by delays in the Plant's completion. *Id*. at ¶¶ 10-11. The projected costs of the Plant's completion had more than doubled in the four years since the Plant began construction, increasing from $1.1 billion to nearly $2.4 billion. *Id*. at ¶ 39. In addition to the debt incurred for ballooning construction costs, the Debtors were not obtaining any revenue from the Plant to service existing debt, since the Plant remained uncompleted and inoperable. *Id*. at ¶ 11.

In their First Day Declaration, the Debtors pointed to multiple factors contributing to the years-long construction delay: labor costs had been underestimated; design and technical problems necessitated changes; and damage and disruption from Hurricane Harvey had further impacted the project. *Id*. at ¶¶ 10; 39. Most significant for this proceeding, though, the Debtors reported that they were engaged in "disputes with [Debtors'] prior engineering, procurement and construction firms" which ultimately led to hundreds of millions of dollars in mechanic's liens being filed against the Corpus Christi Plant. *Id*.

Some, but not all, of those mechanic's lienholders formed an *ad hoc* committee soon after the Petition Date in order to participate in the bankruptcy proceedings (the "Construction Lienholder Group" or the "CLG"). The membership of the CLG has varied throughout the proceedings, and has not at any point comprised the universe of all mechanic's lienholders. [Docket No. 2274 at ¶ 1]. Instead, it has consisted of a number of lienholders and claimed to represent the interests of all lienholders who were similarly situated. *Id*. To assist it with its

3

work, the CLG retained counsel, Morris James LLP, as well as Province, Inc., a financial advisory firm.

The CLG filed a motion seeking to be appointed as an official committee pursuant to 11 U.S.C. § 1102(a) approximately a month after the Debtors filed their petitions. [Docket No. 246]. That motion was opposed by the Debtor, the Unsecured Creditor's Committee, and the Debtors' senior lenders. After an extensive hearing, the Court denied the motion, declining to allow the CLG to operate as an official committee. Transcript of December 11, 2017 Hearing [Docket No. 461 at 118-21]. Ruling from the bench, the Court found that the appointment of an official committee to represent the interests of the mechanic's lienholders was not warranted given the relevant facts. In so ruling, the Court noted the heavy burden imposed by 11 U.S.C. § 1102(a) and applicable case law for the appointment of additional official committees. *Id.* Additionally, the Court expressed reservations about the propriety or wisdom of appointing an official committee to represent the interests of a group of putatively secured creditors. *Id.* After that decision, the CLG remained active throughout the duration of the Debtors' Chapter 11 proceedings as an *ad hoc* committee.[4]

The Debtors' cases were contentious from the outset. The record reflects that the Debtors entered bankruptcy short on cash and saddled with a partially-built (and non-revenue-producing) plant. First Day Declaration at ¶¶ 10-11. Secured and unsecured creditors, including the CLG, vigorously engaged with the Debtors to protect their interests in hopes of obtaining a recovery that seemed far from assured.

The Debtors pursued a sale and marketing process for the Corpus Christi Plant that yielded expressions of interest from several potential buyers. Each of those buyers, of course,

---

[4] *See, e.g.*, Docket Nos. 257; 341; 380; 684; 685; 686; 824; 825; 995; 1113; 1199; 1238; 1920; 2127.

demanded the "free and clear" protections available under Bankruptcy Code § 363(f) and sought to acquire the Plant without the massive liens (mechanic's and otherwise) that had been filed against it. The record reflects that the sale process led to a successful auction and ultimately to Court approval and closing of a sale of the Corpus Christi Plant for consideration of approximately $950 million. [Docket No. 1251 at ¶ 7]. The sale also provided for an escrow of certain proceeds in the amount of approximately $230 million that would be available to pay allowed claims of mechanic's lien claimants. *Id*. at ¶ 15. The record further reflects that the mechanic's lien claimants and the Debtors' senior lenders released their liens on the Corpus Christi Plant as part of the closing of the sale to Corpus Christi Polymers LLC. *See* Sale Order [Docket No. 1300 at 9-11].

Following the closing of the sale, the Debtors drafted and proposed a plan and a disclosure statement. In broadest terms, the plan contemplated creation and funding of the litigation trust on a post-confirmation basis, and also provided for administration of the approximately $230 million escrow fund for mechanic's lien claimants. The record reflects that the CLG objected to both the disclosure statement and later to the confirmation of the plan on the ground that the Debtors had not provided for or articulated specific procedures for dealing with the mechanic's lien claimants. The CLG noted that the settlement agreement reached in the context of the sale of the Corpus Christi Plant required the establishment of claims administration procedures, and the Debtors essentially stated little more in the Plan than that these procedures would be determined at a later point. The Court overruled the CLG's objections to the disclosure statement, noting that the escrowed funds were safe from dissipation and that the interests of all stakeholders, including the mechanic's lien claimants, would not be served by delaying plan confirmation. November 5, 2018 Hearing Transcript [Docket No. 2046 at 80-83].

In the initial balloting on the plan, holders of claims in Class 4 (which included mechanic's lien claimants) voted overwhelmingly to reject the plan. [Docket No. 2144-1 at 2]. Separately, the CLG and numerous individual mechanic's lien claimants filed objections to plan confirmation. *Id*. The Court did not address the CLG's objection to the confirmation of the Plan, however, because it was settled consensually shortly before the Plan confirmation hearing. The record reflects that a number of a mechanic's lienholders entered into a consensual settlement regarding the contents of the plan [Docket No. 2144] which was filed with the Court on the day of, but prior to, the Court's order confirming the plan. [Docket No. 2146]. That settlement, which the record indicates was brokered largely between the Debtors and the CLG, resulted in the withdrawal of confirmation objections and the switch of rejecting ballots to accepting ballots in Class 4, providing for that class's acceptance of the plan. [Docket No. 2144-1 at 2].

The CLG has filed the Motion of the Construction Lienholder Group for Allowance and Payment of Administrative Expense for Substantial Contribution [Docket No. 1555] (the "Substantial Contribution Motion"). By the Substantial Contribution Motion, the Construction Lienholder Group requests that this Court enter an order allowing it an administrative claim in the amount of $1,166,297.08 pursuant to 11 U.S.C. §§ 503(b)(3) and (4). As discussed more fully below, this sum represents the fees and costs of Morris James LLP and Province, Inc. in representing the CLG. Objections to the Substantial Contribution Motion were filed by the M & G Corporation Litigation Trust (a successor to the Debtor) [Docket No. 2274] and by the United States Trustee [Docket No. 2286]. A hearing was held on April 11, 2019, following which the Court took the matter under advisement. This matter is ripe for disposition.

**JURISDICTION AND VENUE**

Venue in this District and Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Jurisdiction over this matter is proper pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (B).

**DISCUSSION**

**A. Legal Standard**

An *ad hoc* committee may be awarded an administrative claim for the "actual, necessary" expenses incurred in making a "substantial contribution" to a case under Chapter 11. 11 U.S.C. §§ 503(b)(3)-(4). An *ad hoc* or unofficial committee that is found to have an administrative claim for substantial contribution may also be awarded an administrative claim for "reasonable compensation" for its professionals, as well as for any "actual, necessary expenses" that they incur. 11 U.S.C. §§ 503(b)(3)-(4). Allowance of professional fees under section 503(b)(4) is therefore contingent upon establishing a claim under section 503(b)(3)(D).

A party seeking an award of administrative expenses has the burden of proving its claim by a preponderance of the evidence. *In re FF Holdings Corp.*, 343 B.R. 84, 86-87 (D. Del. 2006). Creditors seeking an award of administrative expenses are, in particular, "presumed to be self-interested unless they establish that their actions are designed to benefit others who would foreseeably be interested in the estate." *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937 at 946 (3d Cir. 1994). To overcome this presumption, the movant must offer "something more than self-serving statements regarding its involvement in the case." *In re Worldwide Direct, Inc.*, 334 B.R. 112, 123 (Bankr. D. Del. 2005). "Corroborating testimony by a disinterested party… has proven to be a decisive factor in awarding compensation." *In re KiOR, Inc.*, 567 B.R. 451, 459 (D. Del. 2017). However, disinterested testimony is not an exclusive predicate for a finding of substantial

contribution. *In re Deval Corp.*, 592 B.R. 587, 599 (Bankr. E.D. Pa. 2018). "[A] court may take into account its first-hand observance of the services provided throughout the entire chapter 11 case in determining whether an applicant has demonstrated that it made a substantial contribution to the case." *Id.*; *see also In re Ocean Blue Leasehold Prop., LLC*, 414 B.R. 798, 809 (Bankr. S.D. Fla. 2009).

The Bankruptcy Code does not define "substantial contribution," but nearly all courts and the leading bankruptcy treatise agree that the contribution must provide "tangible, clearly demonstrable benefits to the estate." 5 *Collier on Bankruptcy,* ¶ 503.10[a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2015) (collecting cases). As with all of the Bankruptcy Code's priority statutes, section 503(b)(3) is strictly construed to keep administrative expenses to a minimum. *In re Columbia Gas Sys., Inc.,* 224 B.R. 540, 548 (Bankr. D.Del. 1998). A bankruptcy court may find that an *ad hoc* committee has made a substantial contribution to a chapter 11 case "if and only if the [committee's] services directly and materially contributed to the reorganization." *Lebron v. Mechem Fin. Inc.*, 27 F.3d at 944. Such actions must have "been undertaken absent an expectation of reimbursement from the estate." *Id*.

While the phrase "substantial contribution" does not lend itself to a set of exacting criteria, a well-developed body of case law teaches that the sort of contribution that reaches the substantial threshold is exceedingly narrow: extensive and active participation alone does not qualify, *In re Bayou Grp., LLC*, 431 B.R. 549, 556 (Bankr. S.D.N.Y. 2010), services that are duplicative of other estate professionals are insufficient, *In re Worldwide Direct, Inc.*, 334 B.R. at 134; and activities that primarily further the movant's self-interest do not suffice, *Lebron,* 27 F.3d at 944.

As this Court has noted, "expected or routine activities in a chapter 11 case—such as encouraging negotiation among parties, commenting and participating in successful plan negotiations, and reviewing documents—generally do not constitute a substantial contribution." *In re RS Legacy Corp.*, No. 15-10197 (BLS), 2016 WL 1084400, at *4 (Bankr. D. Del. Mar. 17, 2016) (slip copy). However, some arguably "expected or routine" activities may, depending on the circumstances, "confer a significant and demonstrable benefit upon the reorganization *process*." *In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989) (emphasis added). Reorganizations that proceed with a minimum of litigation keep costs low and hasten reorganizations. *See In re FF Holdings Corp.*, 343 B.R. at 87; *In re 1250 Oceanside Partners*, 519 B.R. 802, 808 (Bankr. D. Haw. 2014). For example, a creditor may ensure the consensual confirmation of plan by persuading a key creditor to withdraw its objection to confirmation. *In re FF Holdings Corp.*, 343 B.R. at 87. Similarly, ensuring that key parties to a reorganization are content with their treatment during a sale or under a plan may "obviate[] further litigation and, perhaps, [avoid] a denial of plan confirmation," *In re 1250 Oceanside Partners*, 519 B.R. at 808, allowing the estate to "avoid the potential losses that could have resulted from a delay" in the issuance of a sale order or a plan's confirmation. *In re FF Holdings Corp.*, 343 B.R. at 87. Therefore, in some limited circumstances, creditor activities which result in meaningful settlements and a consensual process may constitute a substantial contribution to reorganization.

### B. The Parties' Positions

The CLG contends that it has carried its evidentiary burden under 11 U.S.C. § 503(b)(3)(D) to warrant allowance of its request on the threshold ground that it materially aided in both the sale and the plan process. The CLG stresses that the prospects for a sale would have been dim at best if scores or hundreds of mechanic lien claims remained to be litigated, and

its direct engagement with the Debtors as well as with potential buyers facilitated a consensual resolution by offering counterparties a single point of contact for dialogue. Additionally, the CLG notes that it satisfies the *Lebron* standard in that it continued to provide valuable services in the case even after denial of its motion to be appointed as an official committee, thus demonstrating that it was not acting in expectation of payment from the estate.

The M & G Litigation Trust opposes the Substantial Contribution Motion on several grounds. First, the Trust notes that the mechanic's lien creditors are slated to receive a full recovery. Given that, the Trust contends that payment of an additional $1.6 million to these claimants (which presumably cuts into unsecured creditor recoveries) constitutes a windfall. Additionally, the Trust contends that the CLG actually cost the estate significantly given the amount of litigation and motion practice pursued by the CLG. The Trust further asserts that no substantial contribution was conferred here because the Debtors were always prepared to protect the interests of mechanic's lienholders. Rather than acting to resolve existing issues, then, the Trust asserts that the CLG "stood [mechanic's lienholders] up in order to create" opposition to Plan confirmation and then "[cut] a deal" to resolve issues that the CLG created. April 11, 2019 Hearing Transcript [Docket No. 2381 at 59]. Finally, and relatedly, the Trust argues that the CLG's role in the confirmation of a consensual plan was unimportant, because the cooperation of the mechanic's lienholders with plan confirmation was unimportant. In a nutshell, the Trust contends that the CLG engaged in expensive motion practice and litigation in exchange for benefits that were either trivial or effectively already on the table.[5]

---

[5] The U.S. Trustee's objection [Docket No. 2286] centered on the CLG's failure to provide sufficient evidentiary support for the Substantial Contribution Motion, such as detailed billing reports or invoices. The Court finds the CLG's supplemental filings [Docket Nos. 2246; 2349] adequately address the U.S. Trustee's objection.

**C. Analysis**

It is not meaningfully in dispute that the multitude of entities holding mechanic's liens against the Debtors' Corpus Christi Plant were important players in this restructuring. As noted in the Debtors' first day filings, the construction liens encumbering the Corpus Christi Plant were identified by the Debtors as a significant factor in the liquidity crisis which motivated the Debtors' filing. [Docket No. 3 at ¶¶ 10-11]. Mechanic's liens are creatures of state law and may often be senior to other security interests. In this case, the parties holding mechanic's liens against the Corpus Christi Plant alleged they were senior to all other creditors. Given their position as putative senior secured creditors, it is beyond cavil that the mechanic's lienholders were a significant constituency to this reorganization. The question is, thus, whether the *ad hoc* committee formed by some of those key players "foster[ed] and enhance[d] … the process of reorganization" to the extent necessary to constitute a "substantial contribution." *Lebron*, 27 F.3d at 944.

The Court finds that the CLG provided a substantial contribution to this case by demonstrably and materially facilitating the process of reorganization. The CLG played a particularly significant role in at least two points in these proceedings. First, it negotiated for an additional $32 million cushion in the DIP Facility's lienholder reserve. *Id*. at ¶ 5. The negotiations that led to that reserve ultimately allowed for the sale of substantially all of the Debtors' assets free and clear from the claims of mechanic's lienholders. Mechanic's liens, like all liens, may pass through bankruptcy unaffected in certain circumstances. Without the cooperation of the lienholders, the existence of pre-bankruptcy liens may have served to discourage potential purchasers who were interested in reaping the benefits of a bankruptcy sale. In this case, the M & G Litigation Trust has acknowledged at several points that the number and

complexity of these liens would make it challenging for a potential purchaser to determine the actual effect or liability outstanding, should that buyer not have the protections of a broad sale order. [Docket No. 1075-3 at ¶¶ 8-12].

The second significant role played by the CLG was in facilitating the consensual confirmation of the Plan. The Court finds that this is a significant consideration weighing in favor of a finding that the CLG made a "substantial contribution" to these cases. The CLG facilitated and encouraged the negotiations that led to a settlement between mechanic's lienholders and other economic stakeholders, and, ultimately, to the consensual confirmation of a plan. [Docket No. 2274 at ¶ 19]. The CLG's representation and the settlement it reached with other interested parties—described by the M & G Litigation Trust in its objection—smoothed the reorganization process at a key moment. [Docket No. 2274 at ¶ 5]. On the eve of the confirmation hearing, the class of mechanic's lienholders were almost unanimously opposed to the plan's confirmation, but ultimately, that class voted in favor of the plan. [Docket No. 2285 at 3]. Because they had negotiated for a sufficient reserve for mechanic's lienholders, and by settling avoidance actions against those same lienholders, the CLG provided those parties with little reason to oppose a consensual settlement and plan confirmation—a major boon to the estate, and by no means "largely beside the point," as alleged by the Trust. [Docket No. 2274 at ¶ 22].

The Court also finds that the CLG generally eased the burden upon the estate by providing a valuable coordinating function for the mechanic's lienholders, who were represented by various counsel and primarily based in Texas. As described by the Debtors, simply identifying and contacting all of the mechanic's lienholders was an arduous task. [Docket No. 1075 at ¶ 12]. The Debtors' successor-in-interest, the M & G Litigation Trust, asserts in its

12

objection that at the commencement of this case, the members of the CLG were facing a chaotic and challenging alternative to restructuring. [Docket No. 2274 at ¶ 2]. The Litigation Trust points out that the members of the CLG would have faced "inevitable litigation…among each other" had the Debtors not commenced these cases. *Id*. The Court largely agrees, but finds that this fact increases the value of the coordination that the CLG provided, given that inter-lienholder disputes did not play a meaningful role in the reorganization proceedings, at least in open Court.

Furthermore, the record supports a finding that the CLG committee undertook its actions without expectation of compensation, a factor that weighs in favor of a finding of "substantial contribution." *See Lebron*, 27 F3d. at 944. As described above, before undertaking the bulk of its work in these cases, the CLG sought—but was denied—status as an official committee. Transcript of December 11, 2017 Hearing [Docket No. 461 at 118-21]. While the standard for an official committee is obviously different from the standard for substantial contribution under the Code, *see* 11. U.S.C. §§ 503 and 1102, the Court finds the fact that CLG's actions were taken after the Court's denial of official committee status to be evidence that CLG had no expectation of compensation. Taken together, the facts support a finding that CLG provided a "substantial contribution" to these cases.

Having determined that the CLG has provided a "substantial contribution" under section 503(b)(3)(D) the Court turns now to the standard for professional compensation found in section 503(b)(4). That statute permits the Court to allow administrative expense claims for attorneys and accountants who have provided services to a committee making a "substantial contribution" under section 503(b)(3)(D). The Court may allow a claim for an amount that reflects "reasonable compensation for professional services rendered by an attorney or an accountant…based on the time, the nature, the extent, and the value of such services, and the cost

of comparable services other than in a case under this title" as well as for "reimbursement for actual, necessary expenses incurred by such attorney or accountant." 11 U.S.C. § 503(b)(4).

When considering whether the requirements of section 503(b)(4) have been met, the Court considers the fee and expense information that has been provided by the Movants. [Docket Nos. 2246; 2349]. The Court also takes notice of CLG's participation in the bankruptcy case, both by its numerous filings and its participation in various hearings before the Court.[6] The record before the Court today provides a sufficient factual basis for the Court to find that the compensation and expenses requested by the CLG in the Substantial Contribution Motion meet the section 503(b)(4) standard, and therefore an administrative claim in favor of CLG in the amount requested by the Substantial Contribution Motion is justified and will be approved.

## CONCLUSION

For the reasons above, the Court hereby GRANTS the CLG's Motion for Allowance and Payment of Administrative Expense for Substantial Contribution [Docket No. 1555] as supplemented [Docket Nos. 2246; 2349]. The parties are requested to confer and provide the Court with a form of order consistent with this opinion within seven (7) days.

By the Court:

Dated: May 6, 2019

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

---

[6] *See, e.g.*, Docket Nos. 257; 341; 380; 684; 685; 686; 824; 825; 995; 1113; 1199; 1238; 1920; 2127.